# BOIES,  SCHILLER  &  FLEXNER  LLP

575 LEXINGTON AVENUE • 7th FLOOR • NEW YORK, NY 10022 • PH. 212-446-2300 • FAX 212-446-2350

MATTHEW L. SCHWARTZ
Tel.: (212) 303-3646
E-mail: mlschwartz@bsfllp.com

February 1, 2017

**BY ECF**

Hon. Ronnie Abrams
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

   Re: *United States v. Jason Galanis, et al.*, S1 16 Cr. 371 (RA)

Dear Judge Abrams:

  We represent Devon Archer, one of the defendants in the above-referenced case. Yesterday afternoon, the Court denied on the record Mr. Archer's motion to (a) prevent Google from producing records responsive to a search warrant issued under the Stored Communications Act, and (b) stop the Government from reviewing responsive records already produced by Apptix, another service provider, in response to the same warrant.[1]  At the conclusion of the hearing, the Court ordered Mr. Archer to file any application for a stay pending appeal by noon today.  Accordingly, Mr. Archer respectfully asks that the Court stay its order pending what we hope will be an expedited appeal to the United States Court of Appeals for the Second Circuit.

**BACKGROUND**

  Last Thursday, at approximately 7:30 PM, we learned that the government had served a search warrant upon Google that called for e-mail account records and other data from several

---

[1] Mr. Archer's original motion also sought to compel the government to produce the warrant and supporting application in unredacted form.  By letter dated January 30, 2017, the government indicated that it was prepared to do so, and so that aspect of Mr. Archer's motion was denied as moot.  The government finally produced the warrants and application this morning at approximately 9:20 AM.  Because the warrant seeks the production of e-mails and other data from accounts apparently belonging to unindicted individuals, Mr. Archer is not filing them on the open record unless directed to do so by the Court.  Mr. Archer respectfully requests that the warrant and application be made part of the record on appeal, however.

accounts, one of which appears to be associated with Mr. Archer. The warrant was signed on December 28, 2016.

On January 27, 2017, Mr. Archer filed a letter motion seeking to compel production of the unredacted warrant (which was not filed under seal) and supporting affidavit, which the government had refused to produce. He also sought to challenge the warrant. By letter dated January 30, 2017, co-defendant Bevan Cooney – who was associated with another of the accounts that was the subject of the warrant – joined in Mr. Archer's motion.

On January 30, 2017, the government responded, indicating that the warrant actually applied to two accounts associated with Mr. Archer, and that it had already received certain responsive records from Apptix. The government also indicated that it had advised Your Honor of the existence of the warrant *ex parte* on or about January 13, 2017.[2] It argued that any motion to quash the warrant was "premature" and "unprecedented," and that the sole remedy was suppression of evidence.

At a conference on January 31, 2017, the Court denied Mr. Archer and Mr. Cooney's motion from the bench.

## ARGUMENT

As the Court acknowledged at yesterday's hearing, Mr. Archer's argument may be "novel" (but more on that below), but it is far from meritless. A stay is therefore appropriate so that the Second Circuit can consider whether the government's execution of a facially over-broad warrant that threatens to invade the attorney-client privilege of not only Mr. Archer, but other individuals and entities, with absolutely no protocol for protecting that privilege, is appropriate.

**A.**     **Legal Standard**

Courts in the Second Circuit consider four criteria when deciding whether to issue a stay pending appeal: "the likelihood of success on the merits, irreparable injury if a stay is denied, substantial injury to the party opposing a stay if one is issued, and the public interest." *Mohammed v. Reno*, 309 F.3d 95, 100-01 (2d Cir. 2002). "The necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other [stay] factors," *id.* (citing *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.,* 559 F.2d 841, 843 (D.C. Cir. 1977)), and "the probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiff will suffer absent the stay. Simply stated, more of one excuses less of the other." *Reno*, 309 F.3d at 101 (2d Cir. 2002) (citing *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog,* 945 F.2d 150, 153 (6th Cir. 1991)). "Applying this test, [courts have] granted a stay pending appeal where the

---

[2]     It is far from clear how this *ex parte* communication could have been appropriate, given that the warrant was not filed under seal. According to the government's submission, they discussed the existence of the warrant in the context of the not-yet-set motion schedule in this case, in some senses preempting Mr. Archer's motion.

likelihood of success is not high but the balance of hardships favors the applicant, and has stated that a stay may be granted where the probability of success is 'high' and 'some injury' has been shown." *Reno*, 309 F.3d at 101 (internal citations omitted). Courts considering a stay pending appeal in criminal matters apply the same test. *See, e.g., United States v. Ghailani*, No. S10 98 Crim. 1023 (LAK), 2010 WL 1816010, at *4 (S.D.N.Y. May 5, 2010).

### B.  The Execution of the Warrant Should Be Stayed Pending Appeal

#### 1.  Mr. Archer Will Be Irreparably Injured in the Absence of a Stay

Mr. Archer will be gravely prejudiced if his request for a stay pending appeal of the order is not granted. As counsel for Mr. Archer explained to the Court at the January 31, 2017 conference, high-level searches through the email accounts targeted by the warrant returned approximately 9,000 potentially privileged documents. As Mr. Archer explained in his original motion, he "would be horribly prejudiced if the government had the opportunity to search through tremendous amounts of data that it may not be entitled to see – but which it cannot, of course, un-see." Mot. at 3.

Further, the government's insistence that its use of a so-called "taint team" will obviate any prejudice is incorrect. Even if approached by the government with the best intentions, "taint teams" are inherently problematic, as they are premised on trusting the government to screen itself off from information which it will naturally desire to see. Without questioning the integrity of the government, courts have nevertheless called into question the use of taint teams, both because of their failure to prevent the inadvertent disclosure of privileged information, *see*, *e.g.*, *In re Grand Jury Subpoenas*, 454 F.3d 511 (6th Cir. 2006) (citing *United States v. Noriega,* 764 F. Supp. 1480 (S.D. Fla. 1991), wherein a taint team overlooked a document clearly protected by the attorney-client privilege), and because their very appearance is problematic, *see, e.g.*, *In re Search Warrant for Law Offices Executed on Mar. 19, 1992*, 153 F.R.D. 55, 59 (S.D.N.Y. 1994) ("[T]his Court notes that reliance on the implementation of a Chinese Wall, especially in the context of a criminal prosecution, is highly questionable, and should be discouraged. The appearance of Justice must be served, as well as the interests of Justice. It is a great leap of faith to expect that members of the general public would believe any such Chinese wall would be impenetrable; this notwithstanding our own trust in the honor of an AUSA."). Indeed, the volume of material produced to the government will likely make it necessary for the government to utilize significant resources and non-lawyers to analyze the information, including perhaps FBI or other law enforcement agents, as well as outside contractors. *See id.* ("[I]n a case such as this the Chinese Wall attorney to perform the search required the physical assistance of agents, laborers, truckmen, and others not bound by the ethical considerations which affect a lawyer."); *see also United States v. Kaplan*, No. 02 cr. 882 (DAB), 2003 WL 22880914, at *12 (S.D.N.Y. Dec. 5, 2003) ("Certainly this Opinion should be counted among those *disapproving* the Government's use of an ethical wall team to 'protect' the attorney-client and work-product privileges.") (emphasis in original).

The inevitable problems that so-called "taint teams" present have led at least one circuit court to determine that a district court made reversible error in allowing the government to utilize a taint team to safeguard privilege. In *In re Grand Jury Subpoenas*, 454 F.3d 511 (6th Cir. 2006), the Sixth Circuit considered the sole question of "whether the district court erred in

3

preferring the government's proposed taint team to the appellants' own attorneys to make initial privilege determinations with respect to documents in the third party subpoena in recipient's possession." 454 F.3d 511, 516 (6th Cir. 2006). The court determined that taint teams presented "inevitable, and reasonably foreseeable risks" *id*. at 523; that historically they have "been implicated . . . in leaks of confidential information to prosecutors" *id*.; and that "human nature being what it is, occasionally some taint-team attorneys will make mistakes or violate their ethical obligations." *Id*.

Even those cases the Government cites in support of the efficacy of a taint team appear wary of their use. In its January 30 letter, the Government cited *United States v. Hunter,* 13 F. Supp. 2d 574, 583 & n. 2 (D. Vt. 1998) for the proposition that the "screening procedure designed by the government was an adequate safeguard against the seizure of [privileged] papers." In addition to its failure to note that the warrant application in *Hunter* included a detailed set of instructions to searching agents and computer analysts designed to limit the invasion of confidential, privileged, or irrelevant material – none of which appear present in the warrant at issue here – the Government also ignores the content of the very footnote it cited. *See id.* Indeed, the *Hunter* court was critical of the notion of a so-called "Chinese Wall," and described other, better alternatives:

> It may be preferable for the screening of potentially privileged records to be left not to a prosecutor behind a "Chinese Wall," but to a special master or the magistrate judge.

> [R]eliance on the implementation of a Chinese Wall, especially in the context of a criminal prosecution, is highly questionable, and should be discouraged. The appearance of Justice must be served, as well as the interests of Justice. It is a great leap of faith to expect that members of the general public would believe any such Chinese wall would be impenetrable; this notwithstanding our own trust in the honor of an AUSA.

> *In Re Search Warrant for Law Offices Executed on March 19, 1992,* 153 F.R.D. 55, 59 (S.D.N.Y.1994). *See also United States v. Neill,* 952 F. Supp. 834, 841 (D.D.C. 1997) (expressing preference for "more traditional alternatives of submitting disputed documents under seal for in camera review by a neutral and detached magistrate or by court-appointed special masters").

*Id*. Accordingly, the prejudice that the Government's proposed screening method presents to Mr. Archer is self-evident: "the government's fox is left in charge of the appellants' henhouse, and may err by neglect or malice, as well as by honest differences of opinion." 454 F.3d at 523 (6th Cir. 2006).

4

### 2. The Government Will Suffer No Prejudice From a Stay

The Government, on the other hand, will not be prejudiced at all by the requested stay pending Mr. Archer's expedited appeal. As an initial matter, no trial date has been set in this case, and there is therefore no exigent need for the government to immediately review documents responsive to the warrant. There is certainly no risk that evidence will be lost or destroyed: the Government is already in possession of responsive documents from Apptix and, according to Google's published policies, the company created a copy of all materials responsive to the warrant before it even notified Mr. Archer of the Warrant's existence, so there is no risk that these materials will be lost while the appeal is adjudicated. *See* Google Transparency Report, available at https://goo.gl/LS5Saq ("If the request appears to be legally valid, we will endeavor to make a copy of the requested information before we notify the user.").

At the January 31, 2017 conference, the government made two prejudice arguments. First, they argued that they intended to take additional investigative steps based upon their review of the search warrant materials. But of course this is precisely the problem – any further investigative steps will be hopelessly tainted by the government's exposure to materials it should not have, create *Kastigar* and fruit-of-the-poisonous tree problems. The government has no legitimate interest in taking investigative steps premised on an unconstitutional search.

The government's second prejudice arguments was that a ruling in Mr. Archer's favor would create bad precedent for other cases. This, of course, is far from a compelling argument. *See*, *e.g.*, *United States v. $22,050.00 U.S. Currency*, 595 F.3d 318, 325 (6th Cir. 2010) ("The government also argues that setting aside default here would create bad precedent that would 'undermine' the entire civil forfeiture system, leading to all potential claimants and their attorneys ignoring properly served forfeiture claims. Chicken Little would be proud of this logic."). Moreover, as explained below, the government itself has urged this precedent. In sum, there is no cognizable injury to the government from a stay.

### 3. The Public Interest Favors a Stay

In general, the "harm to the opposing party" and the "weighing the public interest . . . factors merge when the Government is the opposing party" in a stay application. *Nken v. Holder*, 556 U.S. 418, 435 (2009). For the reasons just given, the government will suffer no prejudice from a stay, and therefore the public interest favors granting the stay. Indeed, the public – and the government – has an interest in ensuring the protection of the Fourth Amendment and the attorney-client privilege. *See, e.g., Verizon New York Inc. v. Village of Westhampton Beach*, Nos. CV 11-252 (AKT), CV 11-213 (AKT), 2013 WL 5762926, at *9 (E.D.N.Y. Oct. 18, 2013) (public interest favors speedy adjudication of constitutional claims). Putting a stay in place while the Second Circuit hears Mr. Archer's appeal therefore affirmatively advances the public interest.

### 4. Mr. Archer Has A Strong Likelihood of Success on the Merits

Finally, Mr. Archer can demonstrate a strong likelihood of success on the merits of this appeal – more than strong enough, especially when combined with the one-sided balance of the hardships in this case, to justify a stay.

### a. The Second Circuit Has Jurisdiction Over the Appeal

As an initial matter, an interlocutory appeal from the Court's January 31, 2017 order is entirely appropriate, for at least two reasons.

*First*, Mr. Archer has an appeal as of right under 28 U.S.C. § 1291. In general, section 1291 provides for a single, end-of-case appeal. However it also permits appeals from orders that are not final in the traditional sense. Under the collateral order doctrine, a party may take an appeal as of right in a "narrow class of decisions that do not terminate the litigation, but must, in the interest of achieving a healthy legal system, nonetheless be treated as final." *Digital Equip. Corp. v. Desktop Direct*, 511 U.S. 863, 867 (1994).

In the case of criminal investigative steps directed at third parties, the Supreme Court has recognized that interlocutory appeals that are necessary to preserve the attorney-client privilege and other legal privileges may fall within the collateral order doctrine. "To obtain appellate review, the subpoenaed person ordinarily must defy the district court's enforcement order, be held in contempt, and then appeal the contempt order, which is regarded as final under § 1291." *In re Air Crash at Belle Harbor*, 490 F.3d 99, 104 (2d Cir. 2007) (internal quotation marks omitted). "In some instances, however, the obligation to submit to contempt is excused because 'the purposes underlying the finality rule require a different result.'" *United States v. Punn*, 737 F.3d 1, 5 (2d Cir. 2013) (quoting *In re Air Crash at Belle Harbor*, 490 F.3d at 105). As the Second Circuit has stated:

> One such instance, the "*Perlman Exception*," takes its name from the Supreme Court decision describing it, *Perlman v. United States,* 247 U.S. 7 (1918). *See also In re Air Crash at Belle Harbor,* 490 F.3d at 105 (describing the "*Perlman Exception*" to the contempt requirement). . . . **The *Perlman* decision has "come to stand for the principle that the holder of an asserted privilege may immediately appeal the enforcement of a subpoena when the subpoena is directed at another person who does not object to providing the testimony or documents at issue."** *In re Air Crash at Belle Harbor,* 490 F.3d at 106; *see also In re Grand Jury Subpoena Dated Jan. 30, 1986 to Bronx Democratic Party,* 784 F.2d 116, 118 (2nd Cir. 1986) ("There is an exception to [the contempt] rule, first enunciated in *Perlman v. United States,* 247 U.S. 7 (1918), that allows an immediate appeal from the denial of a motion to quash—without the prerequisite of an adjudication in contempt—when a person seeks to quash a subpoena directed to another, enforcement of which could violate one or more of the constitutional rights of the person not served."). The rule is justified by the fact that a subpoenaed party is unlikely to risk contempt in order to protect a privilege that is not his own. *In re Air Crash at Belle Harbor,* 490 F.3d at 105-06; *In re Subpoenas to Local 478,* 708 F.2d 65, 69 (2d Cir. 1983).

*Punn*, 737 F.3d at 5-6 (emphasis added); *see also In re Grand Jury Subpoenas*, 123 F.3d 695, 696-97 (1st Cir. 1997) ("An exception to the rule requiring a contempt citation prior to appeal exists when subpoenaed documents are in the hands of a third party. In that case, the owner of the documents may seek immediate appeal of a district court's order requiring production of those documents. This exception, known as the '*Perlman* doctrine,' exists because it is unlikely

6

that a third party will risk contempt simply to create an appealable order for the benefit of the owner of the documents. In other words, the district court order is effectively final with respect to a party that is powerless to prevent compliance with the order." (citing *Perlman*, 247 U.S. at 12-13)).[3]

Here, as counsel for Mr. Archer explained to the Court at the January 31 conference, rough searches of the two accounts associated with Mr. Archer reveal that, combined, there are at least approximately 9,000 documents in the possession of Google or Apptix potentially implicating the attorney-client privilege during the relevant date range. Under *Perlman*, therefore, Mr. Archer may immediately appeal the Court's order.

In other words, the Court's order "conclusively determine[d] the disputed question," as Mr. Archer has no means other than immediate appeal by which to prevent Google from producing documents to the Government, or to prevent the Government from reviewing the documents already produced by Apptix. *See Van Cauwenberghe*, 486 U.S. at 522. The order also "resolve[d] an important issue completely separate from the merits of the action," as the questions presented by the motion are completely separate from the question of whether Mr. Archer is guilty of any of the crimes charged in this action, but are dispositive of whether the attorney-client privilege will be pierced by the government's standardless review. *Id.*

Additionally, the Order is "effectively unreviewable on appeal from a final judgment," *id.*, because it "involves an asserted right the legal and practical value of which would be destroyed if it were not vindicated before trial." *Lauro Lines s.r.l.*, 490 U.S. at 498-99 (internal quotation marks omitted). For example, in *United States v. Lavender*, 583 F.2d 630, 632 (2d Cir. 1978), this Court held, with respect to the appellant's Fifth Amendment claim of self-incrimination, that there is "a conceivable danger that appellate review following a subsequent conviction will not adequately preserve his rights":

> Where a claim of privilege is involved appellate courts cannot always repair the error once the "cat is out of the bag." *Maness v. Meyers*, 419 U.S. 449, 463 (1975). If forced to rely on motions at trial or on post-trial review for vindication of his rights under the Fifth Amendment, the individual who unsuccessfully challenges a subpoena directed to a third party may be "compelled to surrender the very protection which the privilege is designed to guarantee." *United States v. Hoffman*, 341 U.S. 479, 486 (1951). Thus, in *Perlman v. United States*, 247 U.S. 7 (1918), immediate review was allowed of an order directing a third party to produce documents in which Perlman asserted a Fifth Amendment privilege. The

---

[3] In *Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100 (2009), the Court held that, generally speaking, disclosure orders adverse to attorney-client privilege are not immediately appealable. *Mohawk* did not purport to overrule *Perlman*, however, and the Second Circuit has explicitly declined to address the impact of *Mohawk* on *Perlman. See, e.g., In re Grand Jury Subpoenas Dated Mar. 2, 2015*, 628 F. App'x 13, 14 (2d Cir. 2015); *Punn*, 737 F.3d at 12 n.8. Meanwhile, numerous other courts have continued to apply the *Perlman* doctrine. *See, e.g., In re Grand Jury Subpoena*, 642 F. App'x 223, 225 (4th Cir. 2016); *United States v. Tucker*, 745 F.3d 1054, 1067 (10th Cir. 2014); *In re Sealed Case*, 716 F.3d 603, 610 (D.C. Cir. 2013).

>Court explained that if Perlman were forced to "seek a remedy at some other time and in some other way" he would be left "powerless to avert the mischief of the order." *Id.* at 13.

*Id.* at 632-33.

Accordingly, for the reasons set forth above, the Second Circuit will have appellate jurisdiction over Mr. Archer's anticipated appeal of the Order pursuant to 28 U.S.C. § 1291.

*Second*, even if the *Perlman* doctrine did not clearly apply, the Second Circuit would have jurisdiction under 28 U.S.C. § 1292(a)(1), which permits an immediate interlocutory appeal from any order "granting, continuing, modifying, refusing, or dissolving injunctions, or refusing to dissolve or modify injunctions." *Id.; see, e.g., Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 893 F.2d 26, 28 (2d Cir. 1990).

Because Mr. Archer's motion sought to prevent Google and the government from taking certain actions, it was in the nature of a request for injunctive relief.  Namely, it sought to prevent Google from producing e-mails and other documents to the government in response to the warrant and to prevent the government from reviewing documents that it had already received from Apptix in response to the warrant.  Accordingly, had the motion been granted, it would have functioned as an injunction.  Interlocutory appeals from orders granting or – as the order here does – refusing to grant injunctions are not subject to the collateral order bar.  *See United States v. Allen*, 155 F.3d 35, 39 (2d Cir. 1998) ("[T]his Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1), which generally confers jurisdiction on Courts of Appeals over '[i]nterlocutory orders of the district courts . . . granting, continuing, modifying, refusing or dissolving injunctions.") (omission and second alteration in original); *Nat'l Equipment Rental, Limited v. Fowler*, 287 F.2d 43, 45 (2d Cir. 1961) ("28 U.S.C. § 1292(a)(1) grants us jurisdiction to hear the appeal from the granting of the injunction even though it be an interlocutory order.").

Because interlocutory appeals of orders granting or denying injunctive relief are not subject to the collateral order bar, it does not matter for purposes of § 1292(a)(1) whether Mr. Archer would have an opportunity to challenge the Order in an end-of-the-case appeal or at some other later date over the course of these proceedings.  Instead, because the Order completely resolves Mr. Archer's request for injunctive relief, it is appealable under 28 U.S.C. § 1292(a)(1).  *See HBE Leasing Corp. v. Frank*, 48 F.3d 623, 632-33 (2d Cir. 1995).

Furthermore, even if Mr. Archer's appeal did not fall within the plain language of the statue, it still would fall under 28 U.S.C. § 1292(a)(1)'s grant of appellate jurisdiction as an appeal of an order that had the "practical effect" of refusing an injunction.  *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 839 F.2d 69 (2d Cir. 1988).

Accordingly, for the reasons set forth above, the Second Circuit will have appellate jurisdiction over Mr. Archer's anticipated appeal of the Order under both 28 U.S.C. § 1291 and § 1292(a)(1).

### b. The Government Has Conceded that a Motion to Quash a Stored Communications Act Warrant is Procedurally Appropriate

In response to Mr. Archer's motion, the government principally argued that the motion was "premature." Specifically, the government effectively argued that there is no such thing as a motion to quash a search warrant, and that Mr. Archer's exclusive remedy was to seek to suppress evidence at trial. The government argued that Mr. Archer's attempt to challenge a search warrant prior to its execution is "unprecedented," and that he "cites no case law – and the Government is aware of none – supporting the notion that a defendant has a right to move to quash a lawfully obtained search warrant before its execution."

But contrary to the government's assertions, there is not only precedent for a party moving to quash a search warrant, but the government has recently argued to the Second Circuit that that is the *appropriate* way to proceed in the case of an e-mail search warrant. *See*, *e.g.*, *In re Warrant to Search a Certain E-Mail Account Controlled & Maintained by Microsoft Corp.*, No. 13-MJ-2814, 2014 WL 4629624, at *1 (S.D.N.Y. Aug. 29, 2014) ("Microsoft immediately moved to stay execution of the Warrant pending review by the Court of Appeals. . . . [B]ased on the Government's consent to stay enforcement of the July 31 Order pending appeal, the Court extended the stay only for such period as will permit Microsoft to file its notice of appeal, request for a stay and request for an expedited appeal."); *see also In re Solomon*, 465 F.3d 114, 117 (3d Cir. 2006) ("Before the warrant was executed, Solomon filed a motion to quash. The motion asserted that there was not sufficient probable cause for the issuance of the search warrant and that its execution would violate his Fourth Amendment right against unreasonable searches and seizures."); *United States v. Kama*, 394 F.3d 1236, 1237 (9th Cir. 2005) ("Unhappy with the state court's order to return the marijuana to Kama, the DEA applied for a seizure warrant in the United States District Court for the District of Oregon. The district court issued the warrant, and Portland moved to quash it."); *see also In re Search Warrant*, 810 F.2d 67 (3d Cir. 1987) (motion to enjoin execution of search warrant filed mid-search; government agreed to return all original documents and to give the only copies to the court, to be held under seal pending a decision on the adequacy of the search).

Pre-execution stays of warrants have been routinely considered in other contexts, as well. *See*, *e.g.*, *In re Search Warrant (Sealed)*, 810 F.2d 67, 69 (3d Cir. 1987) ("Later in the day that the warrant was executed, the physician filed a 'Motion to Enjoin or, in the Alternative, for Relief From, Execution of Search Warrant' in the District Court for the Middle District of Pennsylvania. The physician alleged that the warrant violated the constitutional right to privacy in that it breached his patients' privilege against disclosure of confidential medical records. Within two days after this motion was filed, the government agreed to photocopy the medical records, place the copies under seal with the Clerk of Court, and return the originals."); *In re Inspection of Norfolk Dredging Co.*, 783 F.2d 1526, 1529 (11th Cir. 1986) ("if a federal court is asked to consider the validity of a warrant prior to its execution . . . exhaustion of remedies will not be appropriate, since the irreparable harm of the threatened unconstitutional search can be prevented prior to the warrant's execution."); *Empire Steel Mfg. Co. v. Marshall*, 437 F. Supp. 873, 875 (D. Mont. 1977) (prior to service of warrant on OSHA defendant, Empire Steel successfully moved for temporary restraining order prohibiting warrant's execution; the warrant was then found to be defective on its face and quashed); *Brock v. Gretna Mach. & Ironworks, Inc.*, 769 F.2d 1110, 1111 (5th Cir. 1985) (in case involving defendant's outright refusal to allow

OSHA onto his premises, the court noted that the employer "had the option of seeking to quash the warrant before execution or, as it did, refuse entry and challenge the warrant in resulting civil contempt proceedings.); *Matter of BIN-00029 (Field S-1)*, No. 16-mj-09608 (EJL/CWD), 2016 WL 6836933, at *1 (D. Idaho Nov. 18, 2016*), report and recommendation adopted sub nom. Matter of: BIN-00029 (Field S-1)*, No. 16-mj-009608 (EJL/CWD), 2016 WL 7013455 (D. Idaho Nov. 29, 2016) ("On November 10, 2016, the Farmers filed a motion for the Court to quash the warrants, or alternatively, to stay execution of the warrants, to issue a protective order, and to suppress evidence. On November 10, 2016, the Court granted the motion to stay until briefing and a hearing on the motion could occur on an expedited basis.").

Mr. Archer seeks only the exact same procedure that the government *agreed to* in the Microsoft case. Indeed, before the Second Circuit, the government – the same office that is prosecuting this case – argued that the District Court had correctly held that a Stored Communications Act warrant (*i.e.*, a warrant for e-mails or other electronic data held by a third party service provider) is "not a conventional warrant" but instead "a hybrid: part search warrant and part subpoena." The government continued:

> As the District Court correctly observed, an SCA warrant "is obtained like a search warrant when an application is made to a neutral magistrate who issues the order only upon a showing of probable cause" but then "is executed like a subpoena in that it is served on the [provider] in possession of the information and does not involve government agents entering the premises of the [provider] to search its servers and seize the e-mail account in question."

Brief for the United States of America, *In the Matter of a Warrant to Search a Certain E-mail Account Controlled and Maintained by Microsoft Corporation*, No. 14-2985 (2d Cir.) (ECF No. 212, at 23-24). The government therefore argued that the same checks that exist for subpoenas are appropriately employed to challenge SCA warrants:

> The act of gathering records by an entity with custody and control over those records does not amount to a government search or seizure at the time the records are gathered.
>
> This is not to say that there are no constitutional limits on the government's power to compel the disclosure of information. The Supreme Court has recognized that "subpoenas which suffer from too much indefiniteness or breadth" may be appropriately quashed."

*Id.* at 34-35 (quoting *Fisher v. United States*, 425 U.S. 391, 401 (1976)). Thus, the government in the *Microsoft* case not only declined to challenge the motion to quash on procedural grounds, but affirmatively recognized that was the correct way to proceed.

In response at yesterday's hearing, the government offered two responses, neither of which holds up. First, they attempted to distinguish *Microsoft* because the challenge was

10

brought by the service provider, rather than the account holder. But that is a distinction without a difference: either a warrant can be quashed, or – as the government tried to argue – it cannot. There is no basis for holding that only certain parties, despite having standing to do so, can procedurally bring a motion to quash. Second, the government tried to argue that allowing a motion to quash a search warrant would create a dangerous precedent, interfering with the orderly administration of justice. But no such precedent would need to be created, for the reasons explained on the record yesterday. And in any event, every single subpoena – a far more common investigative tool[4] – is potentially subject to a motion to quash, but that has not stopped the government from doing its job.

The government has simply cited no authority for the proposition that a search warrant cannot be challenged prior to execution. The Federal Rules do not prohibit it; the case law does not prohibit it; and the government itself has recently affirmed that a motion to quash is appropriate in the case of an SCA warrant.

      **c.**     **The Warrant Here is Facially Defective**

Finally, Mr. Archer is likely to succeed on the merits of his challenge to the warrant, because it is facially defective.

First, the Warrant does not appear to satisfy the basic elements of particularity. The warrant sought not only the entire contents of multiple email accounts, it also sought the entire contents of Mr. Archer's Google Drive, all photographs Mr. Archer had stored on Picasa Web Albums, all of Mr. Archer's internet browsing activity, all of his location data, as well as other broad categories of information, with much of it having nothing to do with the crimes charged in this action. The facial overbreadth of the warrant – especially because the government made no attempt to demonstrate probable cause for these broad categories of information – demonstrates that it is nothing more than an unconstitutional general search. *See generally United States v. Otero*, 563 F.3d 1127, 1132 (10th Cir. 2009) ("The modern development of the personal computer and its ability to store and intermingle a huge array of one's personal papers in a single place increases law enforcement's ability to conduct a wide-ranging search into a person's private affairs, and accordingly makes the particularity requirement that much more important."); *United States v. Galpin*, 720 F.3d 436, 447 (2d Cir. 2013) ("There is . . . a serious risk that every warrant for electronic information will become, in effect, a general warrant, rendering the Fourth Amendment irrelevant. This threat demands a heightened sensitivity to the particularity requirement in the context of digital searches."); *United States v. Payton,* 573 F.3d 859, 861-62 (9th Cir. 2009) ("There is no question that computers are capable of storing immense amounts of information and often contain a great deal of private information. Searches of computers therefore often involve a degree of intrusiveness much greater in quantity, if not different in kind, from searches of other containers."); Orin Kerr, *Searches and Seizures in a Digital World,*

---

[4]     According to statistics published by Google, for example, for the period ending June 30, 2016, it received approximately 8,200 subpoenas for information about approximately 16,800 user accounts, but about 4,250 search warrants. *See* https://docs.google.com/spreadsheets/d/1YJpG4U_ms-zrSqVu-U4gjmf-0MO_VXFpk3-DsBsc34E/edit#gid=424587837.

11

119 Harv. L. Rev. 531, 569 (2005) (Computers "are postal services, playgrounds, jukeboxes, dating services, movie theaters, daily planners, shopping malls, personal secretaries, virtual diaries, and more.").

Second, the warrant is facially defective because – despite the fact that the government was well aware that the relevant accounts were likely to contain privileged information – it (a) has no prohibition on the government's review and collection of attorney-client materials, and (b) has no protocol to safeguard the privilege. Indeed, even the cases cited by the government recognized that such procedures need to be part of the warrant itself, and not merely something the government adopts *ad hoc* after the fact. *See, e.g., United States v. Hunter*, 13 F. Supp. 2d 574, 583 (D. Vt. 1998). For the reasons explained above, moreover, the government's use of a "taint team" would be insufficient to protect Mr. Archer's privilege – and the privilege of other individuals and entities – and renders the government's search constitutionally defective.

In sum, Mr. Archer has demonstrated a likelihood of success on the merits of his appeal. At the very least, he has presented sufficiently serious questions going to the merits of an appeal such that, when combined with the fact that the balance of the hardships tips decidedly in his favor, this factor of the stay analysis favors granting the requested stay pending appeal.[5]

## C. If the Court Denies a Stay, It Should at Least Afford Mr. Archer 72 Hours to File an Emergency Motion for Stay Pending Appeal in the Second Circuit

If the Court does not grant a stay pending appeal, Mr. Archer respectfully requests that the Court delay enforcement of the warrant for 72 hours, so that he may file an emergency motion for stay pending appeal before the Second Circuit. Courts in this district routinely afford movants that opportunity, so that the Second Circuit can consider the application before it is potentially mooted by further action. *See, e.g., Haimdas v. Haimdas*, 720 F. Supp. 2d 183, 212 (E.D.N.Y.) ("[T]he Court finds that a brief stay is in order, so that respondent may make a request to the Second Circuit Court of Appeals for an emergency stay and expedited treatment of his appeal." (citing *Diorinou v. Mezitis*, 237 F.3d 133, 138 (2d Cir. 2001) (noting that district court which granted Hague Convention petition had "helpfully stayed its order" of return for a period of two days to permit respondent to seek a stay pending appeal from the Court of Appeals))), *aff'd*, 401 F. App'x 567 (2d Cir. 2010).

---

[5] There appear to be other grounds to challenge the warrant, as well. For example, the fact that the Warrant does not ask for documents through the present suggested that probable cause for it was based on old evidence, raising staleness concerns. *See generally Rivera v. United States*, 928 F.2d 592 (2d Cir. 1991); *Walczyk v. Rio*, 496 F.3d 139, 162 (2d Cir. 2007) ("In evaluating probable cause, a magistrate is always required to consider whether the facts adduced in the warrant application appear to be current, *i.e.*, true at the time of the application, or whether they have become stale. The law sensibly draws no bright-line rule for staleness. Rather, a magistrate is expected to consider the age of the facts in light of the conduct at issue with a view toward ensuring that probable cause exists at the time the warrant is to be executed, not simply at some past time.") (internal quotation marks omitted). Now that Mr. Archer has had an opportunity to review the warrant application, it is plain that it was not supported by any fresh probable cause.

## **CONCLUSION**

For the foregoing reasons, the Court should enter a stay pending the resolution of Mr. Archer's anticipated expedited appeal to the United States Court of Appeals for the Second Circuit of the Order denying the Motion or, in the alternative, the Court should issue a brief 48-hour stay in order to permit Mr. Archer to file a notice of appeal and an emergency motion for a stay pending appeal in the United States Court of Appeals for the Second Circuit.

Thank you for your consideration.

Respectfully,

 /s/  Matthew L. Schwartz
Matthew L. Schwartz