H2FVGALS

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        15 CR 643 (PKC)

 5   JASON GALANIS,

 6              Defendant.                SENTENCE

 7   ------------------------------x

 8                                        New York, N.Y.
                                          February 15, 2017
 9                                        11:30 a.m.

10
     Before:
11
                    HON. P. KEVIN CASTEL,
12
                                          District Judge
13

14                        APPEARANCES

15
     PREET BHARARA,
16        United States Attorney for the
          Southern District of New York
17   BRIAN BLAIS
     REBECCA MERMELSTEIN
18   AIMEE HECTOR
          Assistant United States Attorneys
19
     THOMAS P. MAZZUCCO
20   AARON K. McCLELLAN
          Attorneys for Defendant
21

22   ALSO PRESENT:  SHANNON BIENIEK, FBI

23

24

25
```

Case 1:16-cr-00371-RA    Document 215-1    Filed 08/09/17    Page 2 of 53
Case 1:16-cr-00643-RA    Document 590    Filed 03/15/17    Page 2 of 53        2
H2FVGALS

1          (Case called)

2          MR. BLAIS:  Good morning, your Honor.

3          Brian Blais, Amy Hector, and Rebecca Mermelstein for

4     the government.  Also with us at counsel table is Special Agent

5     Shannon Bieniek from the FBI.

6          THE COURT:  Good afternoon.  Good to see you.

7          For the defendant?

8          MR. MAZZUCCO:  Good afternoon, your Honor.

9          Thomas Mazzucco and Aaron McClellan here with the

10    defendant, Jason Galanis.

11         THE COURT:  Good to see you all.

12         Now, Mr. Mazzucco, the first thing I'm going to do is

13    I'm going to go through the materials I have.  The question

14    will be do I have everything I should have.

15         So I have a presentence report, recommendation, and

16    addendum that were transmitted to me by probation on January

17    30, 2017, which is also the date that the report was revised.

18    I have redacted and unredacted sentencing memoranda from the

19    government which was submitted on February 8, 2017.  I also

20    have a redacted and unredacted sentencing -- well, I have a

21    sentencing memorandum filed February 1, 2017, and then I have

22    an *ex parte* under seal submission dated February 1, 2017, which

23    includes a letter written by Mr. Galanis.

24         Now, have you filed an unredacted version of these

25    materials, sir?

Case 1:16-cr-00371-RA   Document 215-1   Filed 08/09/17   Page 3 of 53
Case 1:16-cr-00643-PAC   Document 590   Filed 08/15/17   Page 3 of 53          3

H2FVGALS

1          MR. MAZZUCCO:  We have not, your Honor.

2          THE COURT:  All right.  I'm going to direct you to do

3     that by Tuesday of next week.

4          MR. MAZZUCCO:  We will, your Honor.

5          THE COURT:  There's a letter from the defendant which

6     is 11 pages in length, as well as a letter from his wife, Monet

7     Berger, and others.

8          Do I have everything I should have on the subject of

9     sentencing?

10          MR. MAZZUCCO:  On behalf of the defendant, yes, you

11     do, your Honor.

12          THE COURT:  All right.

13          Has the defendant read, reviewed, and discussed with

14     you the presentence report, recommendation, and addendum?

15          MR. MAZZUCCO:  He has, your Honor.

16          THE COURT:  Does the defendant have any objections to

17     the facts set forth in the presentence report?

18          MR. MAZZUCCO:  Other than the objections we set forth

19     in our memorandum, and we have one issue I'd like to raise with

20     the Court about the starting point with reference to the change

21     of the guidelines with reference to his most recent plea

22     elevating his criminal history, that's one issue I'd like to

23     address with the Court.

24          THE COURT:  We're going to discuss that.  First I'm

25     talking about the facts, not the guideline calculation.  I will

Case 1:16-cr-00371-RA   Document 215-1   Filed 08/09/17   Page 4 of 53
Case 1:16-cr-00643-PAC   Document 390   Filed 03/13/17   Page 4 of 53          4
H2FVGALS

1    ask you about the guideline calculation.

2              Do you have any objections to the facts set forth in

3    the presentence report?

4              MR. MAZZUCCO:  We do not, your Honor.

5              THE COURT:  All right.

6              Does the government have any objections to the facts

7    set forth in the presentence report?

8              MR. BLAIS:  We do not.

9              But just back to the Court's original question about

10   whether there are other materials in connection with sentence,

11   I think there are actually two additional things beyond the

12   list that your Honor provided.

13             There was, I think, one additional filing by the

14   defense on February 9th.  It was a very short letter attaching

15   another letter in support of the defendant.

16             THE COURT:  I have it right here.

17             MR. BLAIS:  It's dated February 9th.

18             THE COURT:  Yes.  And the letter relates to operation

19   gratitude.  Is that what you're referring to?

20             MR. BLAIS:  That is what I'm referring to.

21             THE COURT:  I've seen it.  Thank you for pointing that

22   out.

23             MR. BLAIS:  And then there was one additional filing

24   by the government.  We filed a one-page letter yesterday

25   evening on the issue of restitution, which essentially said --

1                THE COURT:  You're going to need time.

2                MR. BLAIS:  -- we're going to need time; and that we

3        would request the Court set a briefing schedule on the issue of

4        restitution.

5                THE COURT:  Okay.

6                MR. BLAIS:  So there was that one additional filing by

7        the government.

8                THE COURT:  Thank you for pointing that out.

9                All right.  In the absence of any objection to the

10       facts set forth in the presentence report -- am I understanding

11       you correctly, Mr. Mazzucco, there are no objections to the

12       facts?

13               MR. MAZZUCCO:  There are no objections, your Honor.

14       Mr. Galanis has fully accepted responsibility for the facts.

15       They are annunciated in the plea agreement and in the

16       presentence report.

17               THE COURT:  All right.

18               I adopt as my findings of fact the facts set forth in

19       the presentence report.

20               Now, let me hear you with regard to the guideline

21       calculation.  You pointed out that you had an objection with

22       regard to the inclusion in the criminal history of the

23       defendant the guilty plea before Judge Abrams, I take it

24       because he has not been sentenced on that case.

25               MR. MAZZUCCO:  That is correct, your Honor.

H2FVGALS

1          A few additional facts I'd like to share with

2     reference to that.

3          THE COURT:  Sure.

4          MR. MAZZUCCO:  So, your Honor, as the Court is well

5     aware, we entered into a plea agreement with a guideline range

6     of 121 to 151 months.  We entered into that disposition back in

7     July of last year.

8          Now, sentencing moves forward.  The government is now

9     asking for a guideline range, a starting point of 135 to 168

10    months.

11         THE COURT:  Let's back up on that.

12         That's the guideline range that probation has

13    determined in this case.  The government is asking for a

14    guideline sentence, as I understand it.

15         MR. MAZZUCCO:  That is correct, your Honor.

16         THE COURT:  All right.  I don't understand the

17    government to have changed its position with regard to the plea

18    agreement in this case.

19         MR. MAZZUCCO:  No, they have not changed their mind to

20    the plea agreement.  But the starting point with the

21    guidelines -- a little bit of chronology.  When we entered into

22    this agreement, sentencing was set for December.  Mr. Galanis

23    has pled to the new case with his other counsel, Ms. Scolari

24    and Mr. Madiou, who are present, in January.  That plea

25    elevated his Criminal History Category.  And it's clear as day

H2FVGALS

1    in the guidelines that that can be done.  But my concern is --

2            THE COURT:  Help me with that.  Help me with that,

3    because I look at 4A1.1, sentence C, and it refers to one point

4    for each prior sentence not counted in A or B, up to a total of

5    four points.  How do you get to a sentence which has not been

6    imposed?

7            4A1.2(a)(1) says:  "The term 'prior sentence' means

8    any sentence previously imposed upon adjudication of guilt,

9    whether by guilty plea, trial, or plea of *nolo contendere*, for

10   conduct not part of the instant offense."

11           Unless I've missed something, your client hasn't been

12   sentenced.

13           MR. MAZZUCCO:  That is correct, your Honor.  Exactly

14   what we were going to put forth to the Court; he has not been

15   sentenced.

16           THE COURT:  I thought I just understood you to say

17   that that's proper to include --

18           MR. MAZZUCCO:  Well, if he was sentenced on that

19   matter, that's why I want to give the Court a chronology.  But

20   I don't think that's necessary at this point.  The matter is he

21   had not been sentenced on that matter.  It would be unfair to

22   use that to elevate his criminal history at this point.

23           THE COURT:  It's not a question of whether it's fair

24   or not; it doesn't look like it's permissible.

25           MR. MAZZUCCO:  And I agree with you, your Honor.  It's

H2FVGALS

1      not permissible.

2                  THE COURT:  Let me hear from the government.

3                  Do you agree?

4                  MR. BLAIS:  I disagree, your Honor.

5                  THE COURT:  Walk me through it.

6                  MR. BLAIS:  It is specifically provided for in the

7      guidelines under this particular circumstance.  Again, we're

8      focusing on the issue of what the guidelines require, not

9      whether this overstates his criminal history or some other

10     factor like that.

11                 THE COURT:  I understand.

12                 MR. BLAIS:  And I'm focusing specifically on

13     4A1.24(a)(4) of the guidelines.

14                 THE COURT:  One second.

15                 MR. BLAIS:  I'll give your Honor a moment to get

16     there.

17                 That provision specifically says:  "Where a defendant

18     has been convicted of an offense -- " which is true here; he's

19     pled guilty -- "but not yet sentenced -- " which is, again,

20     true here; he has not yet been sentenced -- "such conviction

21     shall be counted as if it constituted a prior sentence under

22     4A1.1C," which provides for there being one criminal history

23     point, "if a sentence resulting from that conviction otherwise

24     would be counted."

25                 So we think that provision covers exactly the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:16-cr-00643-PAC Document 215-1 Filed 08/09/17 Page 9 of 53
Case 1:16-cr-00643-PAC Document 190 Filed 03/13/17 Page 9 of 53          9
H2FVGALS

 1    circumstance that we're in here, where there has been a guilty

 2    plea entered, but a sentence not yet imposed.

 3              THE COURT:  Yes, but help me out here.  An application

 4    note can explain or clarify the meaning of a guideline

 5    provision.

 6              MR. BLAIS:  That's correct.

 7              THE COURT:  Can an application note modify the express

 8    language of a guideline?

 9              MR. BLAIS:  Are you referring to a specific

10    application?  Because 4A1.2(a)(4) is not an application note,

11    it is a specific --

12              THE COURT:  All right.  So I may not have caught up

13    with you.  I have it.  I have it.

14              All right.  You're right.  It's part of the guideline.

15              MR. BLAIS:  It is a specific guideline; it is not an

16    application note that we're referring to.  I think this is the

17    provision that was cited to by probation in the presentence

18    report.  And again, we do think it applies.

19              THE COURT:  All right.  What's your response?

20              MR. MAZZUCCO:  Your Honor, we've looked through what

21    the government submitted, and we disagree.  And, again, the

22    other argument, in case the Court is leaning in the other

23    direction, is the whole chronology of the events, that this was

24    unilaterally created by the government giving drop-dead dates,

25    waiting with certain cases that caused the elevation.

H2FVGALS

```
 1              THE COURT:  Listen.  There's a difference between
 2    arguing, if you will, that the guidelines overstate something
 3    or that the Court should depart from the guidelines or give a
 4    sentence outside the advisory guidelines.
 5              I raised with you and we had a discussion of whether
 6    or not the inclusion of the conviction in the criminal history
 7    was permitted -- indeed required -- by the guidelines.  And you
 8    said it was not.  My preliminary reading focusing, I confess,
 9    on 4A1.2(a)(1), was that you were right.  It has now been
10    called to my attention that 4A1.2(a)(4) says otherwise.
11              Now, I'm inviting you to tell me why I'm not reading
12    4A1.2(a)(4) correctly, when it says "Where a defendant has been
13    convicted of an offense, but not yet sentenced, such conviction
14    shall be counted as if it constituted a prior sentence under
15    4A1.1(c), if a sentence resulting from that conviction
16    otherwise would be counted."
17              Now, what's your argument?
18              MR. MAZZUCCO:  Your Honor, the plain reading of the
19    statute, I would have to be in agreement with the government.
20              I'm here to be candid with the Court.  That's why I
21    would like to make the chronological argument about the
22    unfairness of the government unilaterally running up the base
23    guideline calculation.  I think that's what we need and we are
24    prepared to argue today, because we do look at that note.
25    After what Mr. Blais said, I can see where there's an
```

H2FVGALS

1    applicability.  But the reality is --

2            THE COURT:  It sounds to me like your argument is that

3    I should depart or vary from the guideline, not that the

4    guideline is not properly stated on its face.

5            MR. MAZZUCCO:  Yes, your Honor, that's exactly what

6    I'm arguing.

7            THE COURT:  Okay.  That's a whole different situation.

8            Go ahead.  And so, again, as we move into it, we'll

9    talk about the guidelines a little more, if I may, your Honor.

10           Defense counsel was given this drop-dead date to

11   plead, and that elevated the guidelines.  The problem is the

12   government unilaterally created this, and it put Mr. Galanis in

13   a spot where he had no choice.

14           For example, when he pled to this case in July, there

15   was an offer from the government to plead to both cases:  This

16   matter and the matter before Judge Abrams, before this Court.

17   And he was given a guideline range in that matter to plead to

18   both cases of, I'll take a look at my notes here, that was 168

19   to 210 months.

20           We could not enter into a disposition into that matter

21   because, one, Mr. Galanis at the time was pro se; we were not

22   appointed to represent him, nor were we retained; I had not

23   seen a single lick of discovery.  I had just read a complaint

24   and an indictment.  I did forward some information --

25   Mr. Galanis asked me to forward early on to Mr. Blais and the

H2FVGALS

1    prosecution team some documents as to why he shouldn't be

2    indicted in the case.  But I was not professionally prepared --

3    nor could I have been -- to enter into that joint disposition.

4    So we chose this disposition with the guideline range of 121 to

5    151 months.

6            Ironically, there's also shifting of the guidelines

7    with reference to we had a sentencing date in December.  And

8    that was continued so that the government can continue to look

9    at this issue of restitution.  Again, Mr. Galanis is willing to

10   make the restitution, if this Court orders; Mr. Galanis is

11   accepting, as you will hear later, when he has an opportunity

12   to speak to the Court, full responsibility for his actions.

13   There is no dispute about the facts.  But if he had been

14   sentenced in December, we wouldn't be here.  So it's more of a

15   chronological fundamental fairness as we move our way down on

16   that front.

17           So those are my concerns.

18           I noticed that in the government's pleadings they

19   advised the Court that the guideline range that Mr. Galanis

20   pled to in Judge Abrams' court is 188 to 235 months.  So they

21   put that out there for the Court to see.

22           My concern is that we should stop and focus on the

23   deal that we have here.

24           Now, when I contacted Mr. Blais about the change after

25   I spoke to Mr. Kapitansky, the probation officer, he told me

H2FVGALS

 1    that, We'll honor the deal.  Then he comes back to me and said,

 2    Unfortunately, others in the office had made the decision not

 3    to honor that initial deal.  So that's a fact that he could

 4    bring to the Court.  I don't point towards the prosecution

 5    team, but it sounds like it was an office-wide decision.

 6              So that's my argument on that fact.

 7              The second prong that I'd like to talk about, if I

 8    may, at this point, is why the Court -- other reasons this

 9    Court should vary into a sentence, and then lastly --

10              THE COURT:  I'm going to give you a full opportunity

11    to do that.  I'm not up to that yet.

12              MR. MAZZUCCO:  Okay.

13              THE COURT:  I'm going to invite your client to speak.

14    I'm going to give you an opportunity to speak.

15              First I have to determine what the correct guideline

16    range is in this case.  After I do that, I'll give you an

17    opportunity to speak.

18              MR. MAZZUCCO:  Thank you, your Honor.  It's submitted.

19              THE COURT:  Anything further from either side on the

20    guideline calculation?

21              MR. BLAIS:  No, your Honor.  We believe the 135 to 168

22    that's reflected in our submission is the appropriate

23    calculation of the guidelines.

24              THE COURT:  How does the guideline range in your

25    submission vary from the guidelines recommended by probation?

H2FVGALS

 1    For example, probation has a sophisticated means increase.  Is

 2    that included in your calculation?

 3             MR. BLAIS:  Your Honor, the 135 to 168 that's included

 4    in our submission -- and that's derived largely from our plea

 5    agreement, with the exception of the additional criminal

 6    history point that we've just been discussing -- that

 7    calculation differs from probation's calculations in two ways:

 8    One is that probation has assessed a two-level enhancement for

 9    the use of sophisticated means.

10             THE COURT:  And the other is because the offense was

11    committed while on pretrial release in the Central District of

12    California matter?

13             MR. BLAIS:  Correct.

14             There's a three-level enhancement under, I believe,

15    3C1.2.

16             THE COURT:  This is the question I'm asking you and

17    you're required to respond:  Are you urging that the office of

18    probation has erroneously included those two enhancements?

19             MR. BLAIS:  Yes, we are, your Honor.  We believe those

20    enhancements do not apply.

21             THE COURT:  Why does the statutory enhancement not

22    apply?  As I see this, the defendant was arrested on the

23    Central District of California case on or about May 24th, 2010,

24    and the conspiracy continued, including the recruiting of

25    Tagliaferri, through to September of 2010.  Why wouldn't that

H2FVGALS

1      mean that a part of the conspiracy continued while he was on

2      pretrial release?

3              MR. BLAIS:  Your Honor, I don't dispute the factual

4      recitation that you just gave.  We actually quibble with the

5      application of 3C1.3 here from a legal standpoint.

6              THE COURT:  All right.  Let me hear you.

7              MR. BLAIS:  3C1.3 provides:  If a statutory sentencing

8      enhancement, under 18, United States Code, Section 3147,

9      applies, increase the offense level by three levels.

10             We obviously did not charge Mr. Galanis with a

11     violation of Section 3147.  I think it's uncertain from the

12     case law whether this particular guidelines enhancement can

13     apply in the absence of an actual charge under 3147.  In fact,

14     if the Court were to review the application note for this

15     particular enhancement, what it requires is that the Court

16     allocate the sentence, if you will --

17             THE COURT:  I know.

18             MR. BLAIS:  -- attribute it partially to the

19     underlying conduct and partially to a sentence for the 3147

20     violation.

21             THE COURT:  I've read the history going back to the

22     *Stevens* case on forward.  It seemed to me that the Second

23     Circuit was backing away from some of its earlier juris

24     prudence based on amendments to the commentary.

25             MR. BLAIS:  Right.  So given the structure of the

H2FVGALS

1    commentary for 3C1.3, which suggests that this allocation,

2    which, again, suggests that there needs to be a charge under

3    3147 in order for 3C1.3 to actually apply, here, because there

4    was no such charge, it is our position that it was legally not

5    appropriate under these facts for that enhancement to apply.

6    So we don't dispute the facts that your Honor recited, but we

7    do dispute the legal applicability of 3C1.3 in a circumstance

8    where 3147 hasn't been specifically charged.

9             THE COURT:  But the grand jury need not charge 3147

10   for it to apply, I thought.

11            MR. BLAIS:  I think that is accurate.  I think it has

12   to be specified somewhere for notice purposes, again, which has

13   not happened here.

14            THE COURT:  All right.  Okay.

15            It seems to me that that's fundamental to due process,

16   that you have to have notice that 3147 is at issue.  And on

17   that basis, I will not include that enhancement.

18            Now, talk to me about sophisticated means, because it

19   sure looked to me like sophisticated means.

20            MR. BLAIS:  Your Honor, sophisticated means, I think,

21   is ultimately, in some respects, a bit of a judgment call.

22   There is guidance in the guidelines about the applicability to

23   talk, for example, about locating in a telecommunications

24   fraud, a phone banking fraud, essentially, if you locate the

25   phone banks offshore, that that may qualify.  That doesn't

H2FVGALS

1    provide, I think, a whole lot of guidance as to the

2    applicability.

3           I think at the end of the day, our view was that at

4    the end of the day this was a relatively straightforward fraud.

5    There was an issuance of shares to somebody who didn't deserve

6    them, who was not entitled to them, and then those shares were

7    sold for the benefit of Mr. Galanis and his defendants.  So it

8    was ultimately a judgment call and it was, in our view, the

9    best reading of the guidelines, was that that particular

10   enhancement did not apply here.

11          THE COURT:  All right.

12          Let me hear from defense counsel.

13          MR. MAZZUCCO:  Your Honor, I would agree with the

14   arguments the government has made with reference to both.

15          Would you like me to move forward into some additional

16   arguments about comparative sentences and the others that --

17          THE COURT:  No.  We're talking about whether the

18   sophisticated means enhancement applies.  That's what we're

19   talking about.

20          MR. MAZZUCCO:  It does not.  I agree with the argument

21   made by the government.

22          THE COURT:  Okay.  Thank you, counsel.

23          I think it's a very close question whether the

24   sophisticated means enhancement applies.  This case did not go

25   to trial and I'm going to defer to the government's judgment on

Case 1:16-cr-00371-RA   Document 215-1   Filed 08/09/17   Page 18 of 53
Case 1:16-cr-00643-PKC   Document 159   Filed 03/13/17   Page 18 of 53          18
H2FVGALS

 1    this.

 2              I will delete the enhancement under 3147 and the

 3    sophisticated means enhancement, which results in a total

 4    offense level of 31.

 5              Let me hear with regard to the Criminal History

 6    Category.  Is there any dispute that the defendant is in

 7    Criminal History Category III?

 8              MR. BLAIS:  Not from the government.

 9              THE COURT:  From the defendant?

10              MR. MAZZUCCO:  Your Honor, again, reiterating the

11    argument we made earlier about how he got to Criminal History

12    Category III, we dispute that; we think he should be in

13    Criminal History Category II, because the raise was generated,

14    if the Court accepts their argument, by the fact that there was

15    a plea that happened.  Mr. Galanis's plea happened before

16    Mr. --

17              THE COURT:  Well --

18              MR. BLAIS:  With reference to the other matter, your

19    Honor, we submit it.

20              THE COURT:  All right.  It appears to me that the

21    defendant correctly is in Criminal History Category III at a

22    level 31.  So the guideline range is 135 to 168 months'

23    imprisonment.

24              I'll now give defense counsel an opportunity to speak.

25              MR. MAZZUCCO:  Thank you very much, your Honor.

H2FVGALS

1          Mr. Galanis, as I said earlier, fully accepts

2     responsibility for what he has done.  He will explain to the

3     Court later, when he has an opportunity to speak, as I do ask

4     the Court's permission for Ms. Monet Berger, Mr. Galanis's wife

5     of ten years, also wants an opportunity to speak to the Court.

6          THE COURT:  I'm happy to receive and I have, in fact,

7     received a letter from Ms. Berger, but that is not my practice.

8     So Ms. Berger's thoughts on the subject have been received and

9     reviewed.  I will give the defendant an opportunity to speak,

10    but not other family members.

11         MR. MAZZUCCO:  Thank you, your Honor.

12         So why is Mr. Galanis entitled to a variance in this

13    case?  In addition to the documents and pleadings that we've

14    submitted, it was a very vigorously-litigated case, we'd like

15    to just turn to one of the mirror image cases, that is the case

16    of Mr. Jim Tagliaferri, who went to trial for many of the same

17    transactions that are in this indictment.  It's almost a mirror

18    image indictment, although Mr. Tagliaferri had some additional

19    charges that were brought with reference to IEAH and the

20    racehorses.

21         Now, Mr. Tagliaferri was given a sentence of 72

22    months.  I do agree with the government that he's much older

23    than Mr. Galanis, but he did get a 72-month sentence after

24    going to trial.

25         THE COURT:  He was a leader.  He got a leader and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:16-cr-00371-RA   Document 215-1   Filed 08/09/17   Page 20 of 53
Case 1:16-cr-00643-PAC   Document 150   Filed 03/13/17   Page 20 of 53          20
H2FVGALS

1    organizer enhancement.

2                   MR. MAZZUCCO:  That is correct.

3                   THE COURT:  All right.

4                   For which conduct?  Because as I read the facts here,

5    this scheme goes back 2009 to 2011.  Mr. Jason Galanis was in

6    it from the beginning.  However, Tagliaferri does not come on

7    board until September 2010.  He was a leader and organizer of

8    the Gerova conspiracy, is that -- Tagliaferri was a leader and

9    organizer of the Gerova conspiracy?

10                  MR. MAZZUCCO:  Mr. Tagliaferri came on board in 2006,

11   when that all started with fund.com and made its way to Gerova.

12   So he was a leader; he was an organizer; he's a registered

13   investment advisor.

14                  THE COURT:  Well, the grand jury did not charge that

15   there was a conspiracy in existence in 2006; is that correct?

16                  MR. MAZZUCCO:  That's correct.

17                  I can't say what the government provided to the grand

18   jury; I don't know what information -- there may have been some

19   statute of limitations issues with what they presented to the

20   government.

21                  THE COURT:  But you're asking me to consider that

22   Mr. Tagliaferri was a member of a criminal conspiracy in 2006.

23                  Was he charged with being a member of a criminal

24   conspiracy in 2006?

25                  MR. MAZZUCCO:  He was not.

H2FVGALS

1          THE COURT:  Okay.  All right.  Go ahead.

2          MR. MAZZUCCO:  So he had a 72-month sentence.

3          The total value involved with Mr. Tagliaferri was $51

4    million with reference to the embezzlement IEAH.  It's

5    separate.  But he did participate with Mr. Galanis.  If you

6    look at the Tagliaferri indictment, Mr. Galanis is referred to

7    as associate, Associate 1's brother, who's an attorney.  He's

8    essentially an unindicted co-conspirator and what facts the

9    government chose to indict upon.

10          So I just give that to the Court as a point of

11   reference.  He was given a 72-month sentence.

12          Also with reference to Mr. Galanis's father, John

13   Galanis, who will be before this Court tomorrow for sentencing,

14   Mr. Galanis was given a guideline range -- despite an extremely

15   high criminal history -- of 97 to 121 months for his

16   disposition, his sentence.  That's something the Court sort of

17   needs to take into consideration.

18          Other factors that need to be taken into consideration

19   is that this was a conspiracy -- as this Court is well aware,

20   you tried the *Gary Hirst* case.  There were many people involved

21   in these transactions.

22          THE COURT:  And who is the prime mover?

23          MR. MAZZUCCO:  John Galanis.

24          THE COURT:  Do you have any evidence to back that up?

25          MR. MAZZUCCO:  Well, your Honor, I think the Court is

Case 1:16-cr-00371-RA  Document 215-1  Filed 08/09/17  Page 22 of 53
Case 1:16-cr-00643-PAC  Document 159-1  Filed 08/25/17  Page 22 of 53
22
H2FVGALS

1    well aware in the sentencing of Jared Galanis, who pled to a

2    misprision of felony, Mr. Galanis's younger brother, who's an

3    attorney, that it was discovered after the government's

4    indictment that the phone calls to Mr. Tagliaferri, the phone

5    calls to Mr. Hamels were done by John Galanis --

6            THE COURT:  Absolutely correct.  And that was done

7    late in the game after the principal fraud was accomplished.

8    That was getting rid of the shares in the three Shahini

9    accounts.  That was late in the game, sir.  That was not the

10   origins of this conspiracy.

11           MR. MAZZUCCO:  Your Honor, Mr. Galanis has been

12   involved in the origins of this conspiracy for a long time from

13   the very beginning, back to the days when he was in custody and

14   he was having his son run The Money Store out of his dorm room

15   at the University of California.

16           THE COURT:  Anything before me of an evidentiary

17   nature that supports the statements you're making now?

18           MR. MAZZUCCO:  Your Honor, may my partner,

19   Mr. McClellan, please stand up; he'll explain a little bit of

20   that to you.  He's worked on that side.

21           THE COURT:  Anything of an evidentiary nature before

22   me is the question, sir.

23           MR. McCLELLAN:  Your Honor, I believe it is within the

24   scope of the indictment and the materials before you that the

25   damages that are now the subject of the restitution were

Case 1:16-cr-00371-RAC Document 215-1 Filed 08/09/17 Page 23 of 53
Case 1:16-cr-00643-PKC Document 350 Filed 08/29/17 Page 23 of 53     23
H2FVGALS

generated by the stock transactions performed pursuant to John
Galanis's direction.

THE COURT:  That's late in the game.  The assertion
that was just made related to the origins of the conspiracy to
which Mr. Jason Galanis pled guilty occurred while John Galanis
was in prison and Jason Galanis was running -- was called The
Credit Store, The Money Store or one of them, from prison.

MR. McCLELLAN:  I don't want to speak for
Mr. Mazzucco, but I believe he's alluding to the fact that
Mr. John Galanis has been intruding on Jason Galanis's attempts
at business ventures since he was a very young man; he has
never left him to his own affairs and has continually distorted
those efforts.

In this case --

THE COURT:  How did his father intrude on the
*Penthouse* matter in which Judge Sweet of this Court entered a
five-year SEC ban in 2007 from serving as an officer or
director of Penthouse and imposed a $60,000 penalty?  My
recollection is that Mr. Galanis got involved with the
Penthouse transaction considerably earlier in time.  I think it
goes back to 2002.

MR. McCLELLAN:  Mr. Galanis, through associations,
introduced Jason Galanis to those principals.

THE COURT:  And told them to commit securities fraud?

MR. McCLELLAN:  Your Honor, I don't want to divert too

Case 1:16-cr-00371-RA-C Document 215-1 Filed 08/09/17 Page 24 of 53
Case 1:16-cr-00643-PAC Document 151 Filed 03/13/17 Page 24 of 53      24
H2FVGALS

1    far from the scope of what we're talking about here, which is a

2    sentence for this case and this conspiracy.

3              This conspiracy, we will submit, began when the

4    formation of Gerova occurred.  Mr. Tagliaferri was on the

5    advisory board at the formation of Gerova.  John Galanis was

6    present and intervened to take control of the warrants at

7    issue.  Those warrants have been issued.

8              THE COURT:  Where's the evidence of that, that John

9    Galanis intervened to take control of the warrants at issue?  I

10   think that's what you just said.  Where's the evidence of that?

11             MR. McCLELLAN:  The presentence report, that once the

12   warrants were obtained and they were in the Shahini account --

13             THE COURT:  Oh, once they were in the Shahini account.

14   But the backdating of the documents in the spring of 2010 had

15   nothing to do with John Galanis or James Tagliaferri, as far as

16   the information before me indicates.

17             MR. McCLELLAN:  I agree.

18             THE COURT:  Okay.  Go ahead.

19             MR. McCLELLAN:  The sales and the transactions which

20   occurred with regard to the financial advisors, the damages,

21   that people injured, the victims, all that conduct occurred as

22   a result of the transactions that were supervised solely by

23   John Galanis and conducted at John Galanis's direction, without

24   the prior knowledge of Jason Galanis.

25             Jason Galanis acknowledges that he became aware of

H2FVGALS

1     them and that he was complicit in the scheme as alleged.

2     That's why he pled guilty.  But he did not direct the sales; he

3     did not make the arrangements and the matched trading that's

4     been alleged here.  For that reason -- that's all I want to

5     say.  Thank you.

6             THE COURT:  Thank you.

7             MR. MAZZUCCO:  Thank you, your Honor.

8             Another conversation I'd like to have with the Court

9     is Mr. Galanis, since he's been remanded into custody, has had

10    an incredible record next-door in the MCC.  He's teaching a

11    class.  You saw that he received a work performance inmate

12    evaluation and it's incredible.  Eight out of the nine

13    categories are outstanding.  He'll explain to you why he has

14    taken to teaching that class and what a different person he is.

15            THE COURT:  He's an extremely bright and talented

16    individual.  I don't think there's any dispute from any quarter

17    on that subject.

18            MR. MAZZUCCO:  His work with Operation Gratitude,

19    serving the troops of our country, Mr. Galanis is a good

20    person.  These are the characteristics of the defendant I would

21    like the Court to consider at sentencing, even though he does

22    accept full responsibility for what he did wrong.  But he's

23    gone in there; he's contrite; he's changed.  The question is

24    how long do we put Mr. Galanis in prison and what interest does

25    that serve to have him serve an extremely long sentence, like

H2FVGALS

1    the sentence he followed his father through for many years,

2    visited his father behind barbed wires in many different

3    federal prisons, being introduced to people by his father who

4    are of a different character in the business world.

5            We need to stop this cycle.

6            Mr. Galanis is not the person that he's portrayed in

7    this indictment.  He made these mistakes.  But there's another

8    side of him worth saving, another side of him worth giving

9    another opportunity to.

10           So without anything further, I'd like to have this

11   opportunity for Mr. Galanis to address the Court.

12           THE COURT:  All right.

13           Mr. Galanis, this is your opportunity to speak, to

14   bring to the Court's attention any facts or circumstances that

15   you believe I should take account of.  If there's anything you

16   wish to say, Mr. Galanis, this is the time to say it.

17           THE DEFENDANT:  Your Honor, is it appropriate -- may I

18   sit or shall I stand?

19           THE COURT:  You may sit.

20           THE DEFENDANT:  All right.

21           Your Honor, given how tense I am, I have written some

22   notes and I hope you'll permit me to read from them.

23           THE COURT:  That's perfectly fine.

24           THE DEFENDANT:  Thank you for the opportunity to

25   address the Court.

Case 1:16-cr-00371-RA Document 215-1 Filed 08/09/17 Page 27 of 53
Case 1:16-cr-00643-PAC Document 159 Filed 08/15/17 Page 27 of 53          27
H2FVGALS

1          I stand humbly before the Court in judgment.  My hope

2     is to relay in my own words how profoundly sorry I am for my

3     conduct, and even more sorry for the adversity that has been

4     imposed on others as a consequence of my conduct.

5          I'm both self-aware and smart enough to appreciate the

6     damage that I've done, your Honor.  Despite my awareness, there

7     is something in my decision-making process that's deeply

8     flawed, I acknowledge that.  It's something I must use in the

9     next years of incarceration to address, to identify, to try to

10    correct.

11         After gaining my sea legs at MCC, which took me

12    several months, your Honor -- if you remember that was last May

13    2016 -- I asked myself a number of questions.  The two that are

14    most pertinent, I think, for your Honor, in being reflective

15    and thinking about my behavior, my aberrant behavior, was am I

16    a bad person and do I just not recognize that.

17         I've asked myself also am I such a selfish person that

18    I put my own needs before other people?  And I've asked myself

19    that time and again, looking at what are clearly criminal

20    actions.  And I ask them in the context -- those questions I

21    ask myself in the context of hundreds of compliant

22    transactions, thousands or hundreds of thousands of moral

23    interactions with people over my both career and my personal

24    life.  And I have to say, I have a long history of

25    self-sacrifice for my family and for my friends.  I don't think

Case 1:16-cr-00371-RA Document 215-1 Filed 08/09/17 Page 28 of 53
Case 1:16-cr-00643-PAC Document 591 Filed 08/15/17 Page 28 of 53        28
H2FVGALS

1    I'm a selfish person.  I've had a long history of business

2    opportunities where I've behaved morally, your Honor.  I've had

3    opportunities where a criminal mindset would have compelled the

4    theft of tens of millions of dollars; specific businesses, your

5    Honor, where there was an opportunity; many opportunities to

6    conduct criminal conduct and snatch money, and I did not.  I

7    resisted, your Honor.  So I've tried to be reflective, your

8    Honor, and tried to determine what it is that caused me to err

9    in judgment and err so badly I breached into criminality and

10   criminal conduct.

11           I guess the question that I've asked myself, your

12   Honor -- and thank you for giving me this time -- am I a bad

13   person or am I a good person that went bad.  And it's possible.

14   Maybe I was good and I went bad.  Clearly, bad acts suggest a

15   bad person.  And there is some element, given my bad acts, that

16   I must have a bad element of me.

17           My own feeling though, your Honor, I'm a good person.

18   And I want you to know I believe I have a moral compass; I

19   believe I'm aware of my behavior; I believe that my moral

20   compass is not broken though, your Honor.  I believe I have

21   ignored it, and I've ignored it willfully at times.  And I have

22   to spend a number of years in prison rehabilitating myself in

23   trying to understand why it is I ignore, when I know full well

24   what's proper and improper, I know full well what's risky or

25   safe, your Honor, I know what's prudent or ill-advised.  And,

H2FVGALS

your Honor, most of all, I know it was within the law and what
was criminal.  I am aware of it.  You've pointed out I'm a
smart man, I was aware of it, and there's no sugarcoating that,
your Honor.

          Over thousands of financings and 27 years of business,
I was able to obey my moral compass, and I know right from
wrong.  And the certain occasions I just ignored it and I
transgressed.

          I have to say, your Honor, it wasn't until being
thrown into MCC -- and I think the word is right, thrown into
an environment I had never seen before.  But I think your Honor
was correct to -- and I think I wrote this to your Honor.  You
were correct to remand me, your Honor, to snap the behavior,
snap me back into reality, to stop this cycle of justification
and rationalization that people like me sometimes fall into,
trying to defend my actions and using my intellect to continue
to defend my past actions.  I had to be forced into it.

          And I will tell you that MCC is a sobering experience,
your Honor.  Your Honor knows the conditions, but I want to
tell you my experience.  Virtually all 95 of my fellow inmates
in Five North, where I live and have lived for the last nine
months, are street dealers in crack cocaine and heroin.  And
without any exaggeration, your Honor, they are universally
accustomed to violence.  It's evidenced by bullet wounds, knife
scars on the vast majority of the people I live with.

H2FVGALS

1          I've witnessed firsthand now, your Honor, in the last

2     nine months vicious fights, half of them with weapons, some

3     were just jump-ins, they call them, where it's three-on-one

4     gang beatings.  Every week, your Honor, there's a rapid

5     response team that storms my unit and forces us on the ground

6     on our face for one violent act or another, one outburst or

7     another.

8          But I have to say, your Honor, even in the middle of

9     all of that, I'm not sure there was another way to scare me

10    back into some sort of reflection, instead of the cycle of

11    justification, which I had been in and I'm capable of.  And

12    without being shocked like that, I don't know that I wouldn't

13    have continued, your Honor.  And I think that also applies to

14    my incarceration.  Whatever time your Honor sees fit to impose

15    on me, I think it's time that was required to snap my behavior.

16         Your Honor, I want you to also know a couple of

17    things.  I'll try not to impose too much on the Court's time,

18    but I want you to know that I understand my old life is over;

19    that I have no delusions that personally or professionally of

20    going back to any business life.  That's in the rearview mirror

21    in every respect.  I think I wrote your Honor, I said if -- I

22    talked about a scarlet letter; I felt that way my whole life.

23    But what I have to say to your Honor is if a scarlet letter is

24    what I inherited in my family name, it's me alone that allowed

25    that scarlet letter to metastasize into something much worse,

Case 1:16-cr-00371-RA Document 215-1 Filed 08/09/17 Page 31 of 53
Case 1:16-cr-00643-PAC Document 150 Filed 03/13/17 Page 31 of 53     31
H2FVGALS

1   and that much worse was criminal conduct.  It's one thing to

2   have a bad reputation, it's a whole another thing to break the

3   law, and especially knowingly breaking law.  And then breaking

4   law having the skills I have and still breaking the law, it's

5   not excusable, your Honor, and I can't blame anybody except for

6   myself.

7          To say though, your Honor, just to emphasize that I

8   understand that my business life is over, however long I'm

9   incarcerated, a phrase that myself and my colleagues used to

10  use in the banking business was "that guy is radioactive."  And

11  what that meant was, Don't touch that guy.

12         I'm now that guy, your Honor.  I'm that guy that

13  nobody will ever touch again.  So my life has forever changed,

14  the course of my life.  In a certain way, I'm thankful for it.

15  I think I can apply myself, and my skills are translatable into

16  other areas, your Honor.  I think I've shown myself willing to

17  do other things other than business.  I don't view myself only

18  as a businessman; my self-worth is not only as a businessman.

19         But, your Honor, whatever my future is, the

20  inescapable torment will be the pain I've caused to others.

21  There's no remedy for this other than my own suffering in being

22  incarcerated.  My wife has lost her husband, her home, any

23  sense of normalcy.  My little brother has lost his ability to

24  practice law and make a living from his educational sacrifices.

25  And other than short sellers, investors within Gerova lost all

H2FVGALS

 1     their hard-earned money.  My decisions contributed directly to

 2     an outcome that's unforgivable.

 3             Your Honor, sometimes businesses fail and America

 4     gives us -- the law gives us a second chance to rebuild to try

 5     again and again.  And I believe that's fundamentally American.

 6     However, the same rule of law that fosters a special

 7     environment, commands obedience to a set of rules and fair

 8     play.

 9             My conduct in 2010 betrayed the opportunity afforded

10     me by our special American system.  I breached that ability to

11     try again, to overcome sins of my father.  I breached that and

12     I alone breached that, your Honor.  I had my proverbial chance

13     at bat and I struck out.

14             I won't strike out in life, your Honor.  As I said, I

15     have translatable skills.  I'll use them in prison and I'll use

16     them after I'm imprisoned.  There will be a day when I'm out,

17     your Honor; hopefully, sooner rather than later, but there will

18     be a day, however long it is.  I'm willing to face it.  And I

19     have skills that can be used and put to work.  My life will be

20     simpler, it will be smaller, your Honor; I hope it will be more

21     rich, your Honor.

22             Your Honor, it's been seven years since the Gerova

23     crimes.  And the SEC and S.D.N.Y. doggedly pursued me the

24     entire time, so I've lived with this for a long time now.  I've

25     lived nine months in the torments of prison, the trivial

Case 1:16-cr-00371-RA Document 215-1 Filed 08/09/17 Page 33 of 53
Case 1:16-cr-00643-PAC Document 159-1 Filed 08/13/17 Page 33 of 53          33
H2FVGALS

1     torments and terrible torments.  They've shaped me.

2              I want you to know, your Honor, that it's had an

3     effect on me.  Coming business sense will have an effect on me

4     and I'll embrace it, your Honor.  I want to earn the right to

5     go home, your Honor.  Through the passage of time, I'll earn

6     it; through repentance, I'll earn it; and through my

7     contributions to the world, I'll earn it.

8              Your Honor, business doesn't define me, you need to

9     know that.  Even though I spent my entire career trying to

10    achieve in business, and "in business" means in pursuit of

11    money, accumulation of money, that part of me is over; it's not

12    necessary for me to be defined by it.  And I want my good acts

13    to define me, your Honor.

14             I do want to leave one quote that I've thought about

15    every day, your Honor, and I hope it's appropriate.  But while

16    incarcerated, your Honor, I'll always be reminded about what

17    Mohammad Ali had said.  He said, "Don't count the days; make

18    the days count."  And I intend to make my days count, your

19    Honor.  All of this won't be for naught and I will make amends.

20             THE COURT:  Thank you, Mr. Galanis.

21             This is the government's opportunity to speak.

22             MR. BLAIS:  Thank you, your Honor.

23             I first just wanted to clarify a couple of factual

24    issues.  There was some, I think, effort to compare the case

25    here to Mr. Tagliaferri, and I think there was some reference

H2FVGALS

 1    to Mr. Tagliaferri being a leader or organizer.  Just for

 2    clarity of the record, Mr. Tagliaferri did not have any

 3    leadership points assessed at his sentencing; he was not a

 4    leader or organizer, at least for sentencing purposes under the

 5    guidelines.  So I wanted to make sure that that was clear.

 6         Also I wanted to, for your Honor's benefit,

 7    Mr. Tagliaferri was certainly charged with various flavors of

 8    criminal conduct.  The Gerova conduct was not part of what

 9    Mr. Tagliaferri was charged with.  So he was not charged with

10    the matched trading activity that formed part of the case and

11    part of the trial here.  So that was not part of his

12    indictment.  There were certainly other crimes that he was

13    charged with, but that was not one of them.  So I wanted to

14    just make that clear.

15         As we point out in our papers, sentencing is an

16    individualized exercise.  There obviously are various

17    attributes that differentiate Mr. Tagliaferri on a personal

18    level, but also from underlying conduct.  I think, as we say in

19    our papers, while it is true that Mr. Galanis was not the

20    person directly interacting with Tagliaferri's clients, it was

21    deals that Mr. Galanis organized, structured, and founded that

22    were ultimately the garbage that Tagliaferri was placing with

23    his clients.  So absent Mr. Galanis, those transactions that

24    defrauded and caused Tagliaferri's clients to lose millions of

25    dollars, they don't happen without Mr. Galanis.

Case 1:16-cr-00371-RA Document 215-1 Filed 08/09/17 Page 35 of 53
Case 1:16-cr-00643-PAC Document 190 Filed 03/13/17 Page 35 of 53      35
H2FVGALS

1          Now, there's also been some effort to highlight the

2     role of John Galanis.  And as I think we say in our papers, we

3     don't dispute that John Galanis had an important role in this

4     offense.  He was the person who largely managed the placement

5     of the Shahini shares in the various accounts; and there

6     certainly was evidence at trial from Mr. Hamels and others that

7     it was John, posing as his son, who coordinated some of that

8     matched trading activity.

9          But John's involvement in those offenses doesn't in

10    any way minimize Jason's role in this offense.  There are

11    obviously a number of areas where Jason was involved, one in

12    the original issuance of the five million shares to Shahini in

13    the first place.  That wasn't Gary Hirst's idea on his own to

14    issue these shares to Shahini.  It wouldn't have made sense for

15    Hirst to do it.  He didn't get very much money from those

16    shares; it was the Galanis family that got the money that was

17    generated from the sale of the Shahini shares.

18         So, one, Jason was involved in that early stage in

19    actually getting those shares issued in the first place.

20         Now, two, with respect to the matched trading,

21    although, yes, it is true that it appears to have been John

22    that was largely coordinating the actual day-to-day selling, it

23    was Jason who reached the original deal with the Martin Kelly

24    principals of Gavin Hamels, who testified at the trial, there

25    was a meeting at the W Hotel in Los Angeles on June 23rd, 2010,

H2FVGALS

1    where the deal was structured.  John Galanis wasn't at that

2    meeting, it was Jason Galanis meeting with Gavin Hamels,

3    meeting with Gavin Hamels' partner, Billy Crafton.  Matt

4    Jennings was the one who brought them all together, because the

5    original problem for Martin Kelly was because they had invested

6    in some of Mr. Jennings' entities that ultimately turned out to

7    be a Ponzi scheme.  So the solution was you, Martin Kelly, buy

8    Gerova shares; and I, Jason Galanis, will give you free shares

9    in the two entities I control, Rineon and WLMG Holding.

10            THE COURT:  Buy one, get one free.

11            MR. BLAIS:  Basically.

12            THE COURT:  I think that was said.

13            MR. BLAIS:  Yes.

14            So that matched trading activity that John Galanis

15    then coordinated, never happens unless the deal is reached in

16    the first place with Jason Galanis.  And so it was Jason that

17    set the deal in place that caused that to happen.  And in

18    support of that, we included as part of our sentencing

19    submission an email that corroborates exactly what it was that

20    Mr. Hamels said on the stand, which is an email from Galanis

21    saying, Send the wire to Gavin; I reached a deal with him

22    today, or something to that -- in sum and substance, that's

23    what that email says.  It was Jason that reached that deal.

24            The third thing I would point to regarding Jason's

25    role is follow the money; look at where the money ended up.

H2FVGALS

1          The single largest recipient of the proceeds of the

2     Shahini sales was an entity called Basileus Holdings.  We have

3     the tax returns for that entity.  It's 100 percent owned by

4     Jason Galanis.  Other entities, and we detail them in our

5     submission as well, 1920 Bell Air LLC, a limited liability

6     company that existed for the purpose of paying expenses

7     associated with Jason Galanis's mansion in Bell Air.

8          The Galanis family trust, an entity that, from what we

9     can tell from following the proceeds, largely existed to pay

10    the credit card bills of various members of the Galanis family.

11    That's where the money from the Shahini shares went to; it went

12    to members of the Galanis family and largely to Jason Galanis

13    and entities associated with Jason Galanis.  So even if he

14    wasn't actually the one generating all of the proceeds by

15    calling Gavin Hamels and saying, Buy 20,000 shares of Gerova at

16    $6, he got a bunch of money, in fact, a significant portion,

17    the most significant portion of the money that was generated

18    from the Shahini sales.  So, yes, John Galanis had an important

19    role, but Jason Galanis did as well.  And I certainly don't

20    want his involvement, his role, in this scheme to be minimized.

21         Now, I listened to Jason Galanis's words, and I have

22    no reason to doubt that they are sincere.  But as your Honor

23    knows, human beings are complex people.  It is the rare

24    defendant who comes before this Court or that we encounter who

25    is entirely bad, completely irredeemable.  Human beings have

Case 1:16-cr-00371-RA Document 215-1 Filed 08/09/17 Page 38 of 53
Case 1:16-cr-00643-PAC Document 159 Filed 03/13/17 Page 38 of 53                 38
H2FVGALS

1    good attributes and bad attributes and can participate in bad

2    conduct even though they have good sides to them.

3           Let's not lose sight, let's be clear, the bad here was

4    pretty bad.  There were real people who lost a lot of money.

5    Your Honor heard from some of them during the *Hirst* trial.

6    You've heard from the children of Eleanor Kram and Rita Cole,

7    who were clients of James Tagliaferri, who lost millions of

8    dollars in Gerova; lost millions of dollars in fund.com.

9           Why?  So that money could go to 1920 Bell Air LLC to

10   pay for the landscaping at Jason Galanis's mansion in Bell Air.

11   That's serious conduct that has serious consequences to real

12   victims, to real people who lost money.  This wasn't insider

13   trading where there is a generalized market loss; this was real

14   people who lost real money.  And I think we've outlined some of

15   the numbers in our submission.  Tagliaferri's clients alone

16   lost $18 million on Gerova.  They lost another 18 million or so

17   on fund.com.  I think together the losses, as we detail in the

18   papers, $44 million between fund.com, which, again, was part of

19   the Count Eight plea here, and the Gerova conduct.  So these

20   are substantial losses suffered by real people.  That's serious

21   conduct that requires just punishment.

22          I think Mr. Galanis asked during his statement to you,

23   in examining his conduct and in examining his conscience, was I

24   a selfish person.  And I think it's hard to look at these facts

25   and not conclude that he was.

H2FVGALS

1          As I said, we've talked about the real people who've

2     lost money.  And, again, where did that money go?  It went to

3     Mr. Galanis's mansion in Bell Air; his apartment here, his $10

4     million apartment here in New York; his Bentley that he drove

5     around LA.  I mean this was greed, pure and simple, money that

6     was used to line his pocket so that he could live the high

7     life.  And that's, I think, what the evidence in this case

8     shows.  And again, I think that warrants a substantial

9     sentence.

10          Let me just talk for one minute about the plea in the

11     other cases.

12          There's been some argument about the criminal history

13     score being manufactured by the government.  Let's be clear.

14     As in any plea offer, there was a plea offer made in the other

15     matter, there were benefits to the defendant for that plea

16     offer, there were benefits to the government in resolving that

17     case.  And it was Mr. Galanis's choice to either accept that

18     plea offer or reject it with whatever consequences came from

19     it.

20          And one of those consequences was ultimately bumping

21     up the criminal history score in this case.  That offer had an

22     expiration date, as we said, and the parameters of that plea

23     agreement, I think, as we indicated in our negotiations, would

24     change if it wasn't accepted by that date.  So there certainly

25     were consequences, but there were benefits to Mr. Galanis from

H2FVGALS

1   that plea offer, as well, as in any plea offer.  So I think the

2   idea that that somehow was manufactured by the government,

3   without there being any benefit to Mr. Galanis or that he was

4   somehow forced to accept it, is just completely false and not

5   borne out by the record.

6          And although it is true he is not being sentenced here

7   for the conduct in that case, it's certainly relevant on the

8   issue of individual and specific deterrence whether that's

9   necessary.  We are not looking at Mr. Galanis's crimes here in

10  Gerova in isolation.  He's a recidivist.  He's admitted that

11  he's a recidivist.  He's engaged in multiple frauds, not just

12  the Gerova fraud and the Tagliaferri fraud, but now a new

13  fraud, a $60 million fraud involving a Native American tribal

14  entity that issued $60 million of bonds that were placed in the

15  accounts of unsuspecting investment advisory clients, including

16  pension funds.

17         The Michelin pension fund, for example, is a victim of

18  that offense and is now holding millions of dollars of tribal

19  bonds for which there's no ready secondary market for which

20  they can't monetize in the market.  Again, an offense with real

21  victims where the bonds were placed with real entities, with

22  real pension beneficiaries who are now holding what are

23  essentially worthless bonds.

24         This is a case that calls out for specific deterrence.

25  There is a need to incapacitate Mr. Galanis from committing

H2FVGALS

1   further offenses, and that is yet another reason why I think a

2   substantial sentence and one within the guidelines range is

3   called for in this case.

4           So unless the Court has any further questions, we'll

5   rest on our fairly detailed submission in this matter.

6           Thank you, your Honor.

7           THE COURT:  This is the Court's statement of reasons

8   for the sentence to be imposed on Jason Galanis:

9           In sentencing Mr. Galanis, I've considered all the

10  materials that I've referenced at the outset.  I've considered

11  the statements of counsel, Mr. Mazzucco and Mr. McClellan, as

12  well as what I consider to be the very sincere and thoughtful

13  statement of Jason Galanis.  I've also considered the very

14  thoughtful statements of Mr. Blais.  I've considered each of

15  the factors set forth in Section 3553(a).  I need not recount

16  all that I've considered, but I've considered all of it.

17          The oath I took as a judge was to administer justice

18  without respect to persons, and do equal right to the rich and

19  to the poor.  And that is the obligation I face.

20          Jason Galanis is something of an enigma.  If you saw

21  him shortly before his arrest in this case, you would have seen

22  someone who was the owner of a Bentley, which was later sold

23  for $115,000, had $75,000 worth of watches, a beautiful $7

24  million home in Bell Air, California, $12 million co-op in

25  lower Manhattan, and was riding high on top of the world.  You

H2FVGALS

1    would have seen that in the 45 years leading up to his arrest,

2    he had what -- to use an understatement -- was a most unusual

3    background.

4           He was born into the world, grew up in Greenwich,

5    Connecticut, a family of privilege.  Though it doesn't factor

6    into any of his arguments here, at the age of three his father

7    was sentenced on a conspiracy to make false statements to the

8    SEC and mail fraud and served about six months.  That was a

9    sentence by Judge Brieant of this Court, my friend and late

10   colleague.

11          He lived in Greenwich until 1986, and then moved to

12   the San Diego area.  He reports that on the day he was to take

13   his SAT exam, his father was arrested for conspiracy to defraud

14   the IRS, tax fraud, securities fraud, bank fraud, and bribery.

15   He says he went ahead and took the SAT.  His father was

16   sentenced to 324 months in prison by Judge Brieant on that

17   second case.

18          As a college freshman, he started a company called

19   Gulf Stream Financial, which acquired loans in default.  And by

20   1996, the company had morphed into something called The Credit

21   Store, which he seems to have been a 50 percent owner of.  That

22   was sold for 154 million.  I have no idea how much Mr. Galanis

23   truly netted from that, but I have no reason at this point to

24   think that it was anything other than honest efforts on his

25   part.

H2FVGALS

1          He left college in 1992 and remained in the San Diego

2     area.  By everything I can see, he had concern for his family

3     and his brothers and was a great support to the family while

4     his father was incarcerated.

5          In 1997/'98, he moved to London for 18 months.  He

6     started a company called Incubator Capital, which, in the .com

7     era, opened and closed by 2000.  He started a company called

8     Extran, but as a result of legislation following the September

9     11 attacks, that business did not succeed.

10         In 2002, at the age of 32, he invested in General

11    Media, the parent of Westinghouse, and ultimately, as a result

12    of his involvement with the Penthouse investment, he was

13    charged in an SEC enforcement action with preparing and filing

14    a false 10-Q and received a five-year SEC ban from serving as a

15    director and officer of a public company, and a $60,000 civil

16    penalty was imposed.

17         In '06, he married Monet Berger, and there were other

18    ups and downs.

19         In 2001, his brother Derek was sentenced to federal

20    imprisonment on an ecstasy conspiracy charge, unlawful

21    distribution.  It was with this backdrop that he began his

22    involvement with something called Asia Special Situation

23    Acquisition Corp., which was the subject of an IPO in 2008.

24    Jason Galanis was paid $600,000 for his work in connection with

25    that.

H2FVGALS

1    July 2008, his father is released from prison.  By

2    January 2010, Asia Special Situation Acquisition Corp. faced a

3    deadline to make an acquisition.  Among other things, it

4    acquired something called Wimbledon from Weston, and changed

5    its name to Gerova.  Mr. Galanis could not become an officer of

6    Gerova; he became CEO of Gerova Advisors, LLC, a subsidiary.

7    He saw an opportunity and he launched a criminal scheme.

8    His brother Derek, who had lived in eastern Europe,

9    recruited a Bosnian citizen, Shahini, to become the strawman

10   who would acquire shares of Gerova.  The reason the foreign

11   national was important was the foreign national could hold

12   unregistered shares or restricted shares without a restricted

13   legend.  I guess it would be unregistered shares on the theory

14   that they are not going to be traded within U.S. markets.

15   Now, how is Shahini going to get any shares?  Well,

16   this was a two-step process:  First, there was a January 22nd,

17   2010 agreement signed with Shahini.  It was backdated.  It was

18   actually signed in May of 2010, but it was backdated to January

19   22nd.  It provided for Shahini to receive a two percent

20   commission for having brought about the acquisition of

21   Wimbledon.  That would be about $2.2 million.  Well, to state

22   the obvious, Shahini had no involvement whatsoever with regard

23   to Gerova's acquisition of Wimbledon.  None.  This was a total

24   fraud.

25   The second step of this was to backdate from May of

Case 1:16-cr-00371-RA Document 215-1 Filed 08/09/17 Page 45 of 53
Case 1:16-cr-00643-PAC Document 590 Filed 08/29/17 Page 45 of 53                45
H2FVGALS

2010 to March 29th of 2010 an agreement signed by Gary Hirst

giving Shahini 11 million worth of warrants that purportedly

was equal to the 2.2 million. And it was a right to purchase

the 11 million shares at $7.50, and it had a cashless exercise

provision. The whole idea was, by May, they knew what the

value of the shares were worth; they were worth $13.56. So if

you backdated it to January -- not January, March 29, when it

appeared they were only worth $7.50, then it equated out to the

$2.28 million finder's fee, which itself was a fraud.

So in May of 2010, Shahini exercises 10 million worth

of warrants and receives 5,333,333 shares of Gerova. That

number is significant, because that happened to be the exact

number of restricted shares that were returned by a CEO who

separated from the company in April. And at $13.56, the

5,333,333 shares were worth $72 million. It was necessary to

work with a lawyer and with Gary Hirst to get a representation

that the shares could be -- from a lawyer that the shares could

be transferred, because Shahini was a foreign national who

represented that the shares would not be sold in U.S. markets.

They were, in fact, sold in U.S. markets.

While all this was going on, also in May of 2010,

Jason Galanis was arrested in the Central District of

California for an attempt to evade or defeat income tax,

failure to report income relating to the sale of Penthouse

shares, failure to file income tax returns from 2003 to 2007, a

Case 1:16-cr-00371-RA Document 215-1 Filed 08/09/17 Page 46 of 53
Case 1:16-cr-00643-PAC Document 39-1 Filed 03/13/17 Page 46 of 53    46
H2FVGALS

1    period in which he had six million in income, and, as a result

2    of all this, he owed back taxes of $1.9 million.  Thereafter,

3    the price of the Gerova shares started to decline and this

4    presented a problem, because in order to realize dollars from

5    the Gerova shares that were given to Shahini, they had to be

6    sold.  So Jason orchestrated a scheme in which others would get

7    their clients to purchase the soon-to-be-worthless Gerova

8    shares and then have coordinated sales of the Shahini sales to

9    ultimately these individuals who were buying the stock that

10   were soon going to decline in value.

11       By February 2011, the price had declined from a high

12   of $28.75, to $5.28.  They ultimately were worth zero.  There's

13   a stipulation here that the amount of loss was between 25 and

14   $65 million.  It appears that there were approximately 60

15   victims of the scheme.  Parenthetically, in March of 2011,

16   Jason Galanis was sentenced to five years' probation on the

17   Central District of California case.

18       Jason Galanis used his very considerable intellect and

19   talents as a weapon.  The reality here is he had the ability

20   with those talents to live a good and successful life, enjoying

21   many of the pleasures of life that are far beyond the reach of

22   others.  In other words, he didn't have to do it.  When you

23   take into account his own statement today, which I tend to

24   credit -- that his moral compass was not broken, it was

25   ignored -- that is something to be contemplated here.  Because

H2FVGALS

1    what it means is there's a choice that's made to proceed.  It's

2    not someone who, as a result of tragedies in their life

3    experiences, maybe addiction, maybe mental illness, has to use

4    Mr. Galanis's very appropriate term, has a moral compass that

5    is skewed or not functioning right.

6         This is a man who knew the consequences of his acts,

7    and either for the thrill of the game, for being on top of the

8    world in terms of the trappings of wealth, or for his own

9    self-esteem as feelings of accomplishment, proceeded with this

10   course of action.  In that sense, Jason Galanis stands apart

11   from many of the defendants who I see in this Court, including

12   white-collar criminals.

13        I think that there is a need for just punishment in

14   this case and there's a need for general deterrence.

15        As to specific deterrence, there is something to be

16   said for Mr. Galanis's point that he is radioactive, though I

17   have to quickly add that others who have been radioactive have

18   found ways to continue a life of criminal behavior.

19        I'm mindful that Jason Galanis has another day of

20   court ahead of him on other charges for which he has not yet

21   been sentenced.  I also accept at face value that Mr. Galanis

22   has, in recent months, made a commitment to turn his life

23   around.  I choose to believe it.  But it truly does not wipe

24   away what has occurred here.

25        I've considered the sentencing guidelines, policy

H2FVGALS

 1    statements, and official commentary of the United States

 2    Sentencing Commission.  I've considered them in an advisory

 3    manner and recognize I'm not obligated to sentence within the

 4    guidelines.  I've considered all of the matters that were set

 5    forth in the submissions under seal by the defendant and by the

 6    government, and taken full account of them as well.  I

 7    acknowledge I have variance discretion.

 8             Based upon all the surrounding circumstances, I intend

 9    to sentence Jason Galanis to a term of 135 months'

10    imprisonment, three years' supervised release, and impose

11    forfeiture of $37,591,681.10, a special assessment of $400, and

12    restitution to be determined in further proceedings.

13             In view of the forfeiture and restitution obligations

14    that Mr. Galanis has, I do not intend to impose a fine in this

15    case.

16             Does the defendant or his counsel have any objection

17    to the Court's proposed sentence or the statement of reasons

18    for that sentence?

19             MR. MAZZUCCO:  No objection, your Honor.

20             THE COURT:  Same question for the government.

21             MR. BLAIS:  Just one request for an addition.  I know

22    that your Honor orally imposed the forfeiture order, but --

23             THE COURT:  I will be doing it.  I haven't done it

24    yet.

25             MR. BLAIS:  Oh, okay.

H2FVGALS

1          We just request when you impose the order at a future

2     point, if you can also specifically order the forfeiture of

3     Mr. Galanis's interests in the two properties that are

4     specified on page 26 of our submission.

5          THE COURT:  All right.  And there is no written order

6     on that.

7          MR. BLAIS:  I believe there is.  I think your Honor

8     has already entered it.

9          THE COURT:  Okay.  All right.

10          MR. BLAIS:  But, nonetheless, I think there needs to

11     be an oral pronouncement of that forfeiture.

12          THE COURT:  All right.

13          The defendant will please stand and I will impose

14     sentence.

15          Jason Galanis, it is the judgment of this Court that

16     you are hereby remanded to the custody of the United States

17     Bureau of Prisons, to be imprisoned for 135 months on Count

18     Two.  You are also sentenced to a term of imprisonment of 60

19     months on Counts One, Five, and Eight, the sentence on Counts

20     One, Five, and Eight to run concurrently with the sentence on

21     Count Two, meaning a total sentence of 135 months'

22     imprisonment.

23          Following your release, you shall be placed on

24     supervised release with the following terms and conditions:

25     You shall not commit another federal, state, or local crime or

H2FVGALS

illegally possess a controlled substance nor possess a firearm

or destructive device.  The mandatory drug testing condition is

suspended based on the Court's determination that you pose a

low risk of future substance abuse.  You shall cooperate in the

collection of DNA as directed by probation.

The standard conditions of supervision 1 through 13

are imposed, with the following special conditions:  You shall

report to the nearest probation office within 72 hours of

release from custody.  You may be supervised in the district of

your residence.  You shall provide the probation officer with

access to any requested financial information.  You shall not

incur new credit card charges or open additional lines of

credit without the approval of the probation officer, unless

you're in compliance with the installment payment schedule.

You shall submit your person, residence, place of

business, vehicle, and any other property, computer, electronic

communications, data storage devices, and/or other media under

your control to a search on the basis that the probation

officer has reasonable suspicion that contraband or evidence of

a violation of the conditions of release may be found.  The

search must be conducted at a reasonable time and in a

reasonable manner.  Failure to submit to a search may be

grounds for revocation.  You shall inform any other residents

that the premises may be subject to search pursuant to this

condition.

H2FVGALS

1          It is further ordered that you shall pay to the United

2     States a special assessment of $400, which shall be due

3     immediately.

4          Within 90 days, an order will be entered by this Court

5     on restitution.  And that order should contain a proposed

6     payment schedule which takes account of the statutory factors

7     in that regard.

8          The defendant shall forfeit his interest in the

9     following property to the United States:  A sum of money equal

10     to $37,591,681.10, including in that all right, title, and

11     interest to a parcel of real property and the proceeds from the

12     sale of same at 1920 Bell Air Road in Los Angeles, California.

13     And further, all right, title, and interest in a cooperative

14     apartment at 260 West Broadway, New York, New York, Unit 1, or

15     the proceeds of any sale thereof.

16          Mr. Galanis, you have the right to appeal the sentence

17     I have imposed on you.  If you cannot afford the cost of an

18     appeal, you may apply for leave to appeal as a poor person.

19     The time limits for filing a notice of appeal are brief and

20     they are strictly enforced.  If you request, the Clerk of Court

21     will prepare and file a notice of appeal on your behalf

22     immediately.

23          Do you understand all that?

24          THE DEFENDANT:  I do, your Honor.

25          THE COURT:  All right.

H2FVGALS

1              Is there anything further from the government?

2              MR. BLAIS:  Yes.

3              At this time, your Honor, the government would move to

4    dismiss any open counts.

5              THE COURT:  Without objection, that is granted.

6              Anything further from the defendant?

7              MR. MAZZUCCO:  Yes, your Honor.

8              With reference to --

9              THE COURT:  You may be seated, Mr. Galanis.

10             MR. MAZZUCCO:  -- where Mr. Galanis is eventually

11   housed, we'd ask that the Court ask the Department of

12   Corrections for Mr. Galanis to be housed somewhere near his

13   family in California.

14             THE COURT:  The Court will recommend that the Bureau

15   of Prisons house Mr. Galanis as close as feasible to Los

16   Angeles to facilitate family visits.

17             MR. MAZZUCCO:  Thank you very much, your Honor.

18             THE COURT:  All right.

19             With regard to the schedule on restitution, what are

20   you proposing?

21             MR. BLAIS:  Your Honor, we propose we can submit

22   something within 30 days.

23             THE COURT:  All right.  So let's pick a date for that.

24             MR. BLAIS:  Or just, for simplicity's sake, if we want

25   to do four weeks from today.

H2FVGALS

1          THE COURT:  Let me pick an actual date so we know

2     where we are.

3          Your submission will be due on Wednesday, March 15th;

4     and any response from the defendant will be due March 31st; and

5     any reply from the government, April 7th.

6          There is a hope that you will meet and confer in an

7     effort to resolve the restitution issues.

8          MR. BLAIS:  Understood, your Honor.

9          THE COURT:  All right.

10          Mr. Galanis, I take you at your word that you want to

11     do something meaningful with your time.  I suspect that you

12     have the ability to figure something out that will be

13     meaningful.  I wish you the best in those efforts.

14          We are adjourned.

15                              *     *     *

16

17

18

19

20

21

22

23

24

25