H8b6gals

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

         v.                       16 CR 371(RA)

JASON GALANIS,

         Defendant.

------------------------------x

                            New York, N.Y.
                            August 11, 2017
                            2:30 p.m.

Before:

                HON. RONNIE ABRAMS,

                          District Judge

                     APPEARANCES
JOON H. KIM
     Acting United States Attorney for the
     Southern District of New York
BRIAN R. BLAIS
REBECCA G. MERMELSTEIN
     Assistant United States Attorney

CHRISTOPHER P. MADIOU, ESQ.
LISA SCOLARI, ESQ.
     Attorneys for Defendant

BOIES SCHILLER FLEXNER, LLP
     Attorneys for Defendant
BY:  MATTHEW L. SCHWARTZ

H8b6gals

1              (In open court; case called)

2              THE LAW CLERK:  Counsel, please state your name for

3    the record.

4              MS. MERMELSTEIN:  Good afternoon, your Honor.  Rebecca

5    Mermelstein and Brian Blais for the government.  With us at

6    counsel table is Special Agent James Ecker of the FBI.

7              THE COURT:  Good afternoon.

8              MS. SCOLARI:  Good afternoon.  Lisa Scolari for Jason

9    Galanis.  I am here with Christopher Madiou.

10             THE COURT:  Good afternoon.

11             Good afternoon to you, Mr. Galanis.

12             This matter is on for sentencing in the *United States*

13   *v. Jason Galanis*.  Mr. Galanis pled guilty in January to

14   conspiracy to commit securities fraud, securities fraud, and

15   conspiracy to commit investment advisor fraud.

16             In connection with today's proceedings, I reviewed the

17   following submissions:  The presentence investigation report

18   dated April 12th, Mr. Galanis's sentencing memorandum dated

19   July 28th, the government's sentencing memorandum dated

20   August 4th, the supplement to Mr. Galanis's sentencing

21   memorandum dated August 10th, and various victim impact

22   statements.

23             Have the parties received each of these submissions?

24             MS. MERMELSTEIN:  Yes, your Honor.

25             MS. SCOLARI:  The last thing, the victim impact

H8b6gals

1   statements, came too late for us to get it in a printed form;

2   but we were able to read it on the phone.  That was the best

3   the government could do in that period of time.

4               THE COURT:  Do you want a minute now to review it?

5               MS. SCOLARI:  No.  Thank you.

6               THE COURT:  Let's begin by discussing the presentence

7   report prepared by the Probation Department.

8               Ms. Scolari, have you reviewed the presentence report

9   and discussed it with your client?

10              MS. SCOLARI:  Yes, we have, your Honor.

11              THE COURT:  Do you have any objections to it?

12              MS. SCOLARI:  No.

13              THE COURT:  Mr. Galanis, have you had enough time and

14   opportunity to review the presentence report and discuss it

15   with your attorney?

16              THE DEFENDANT:  Yes, I have, your Honor.

17              THE COURT:  Does the government have any objections?

18              MS. MERMELSTEIN:  No, your Honor.

19              THE COURT:  The Court adopts the factual findings in

20   the report.  The presentence will be made part of the record in

21   this matter and placed under seal.  If an appeal is taken,

22   counsel on appeal may have access to the sealed report without

23   further application to the Court.

24              Mr. Galanis, when you pled guilty in January, we

25   discussed the Federal Sentencing Guidelines, which is as you

H8b6gals

1    know a set of rules published by the United States Sentencing

2    Commission designed to guide judges in imposing sentence.

3    Although at one time they were mandatory, meaning that judges

4    were required to follow them, they are no longer mandatory.

5    They are no longer binding, but judges must nonetheless

6    consider them in determining an appropriate sentence and must

7    thus ensure that they have properly computed the guidelines.

8            I understand that consistent with the plea agreement

9    the parties agree with the guidelines calculation in the

10   presentence report pursuant to which Mr. Galanis is facing a

11   guidelines range of 188 to 235 months in prison; is that

12   correct?

13           MS. MERMELSTEIN:  Yes, your Honor.

14           MS. SCOLARI:  Yes, your Honor.

15           THE COURT:  Ms. Scolari, I understand from your

16   submission that in your view a more appropriate starting point

17   is 168 to 210 months, but I want to confirm with you that you

18   are not seeking a hearing or a departure or claiming that

19   another range is the applicable range; is that right?

20           MS. SCOLARI:  That is right.  It is a 3553(a)

21   argument, your Honor.

22           THE COURT:  Understood.

23           Based on the parties' agreement and my own independent

24   evaluation of the sentencing guidelines, I accept the

25   guidelines calculation if the presentence report.  I find

H8b6gals

1   Mr. Galanis's offense level is 34, his criminal history

2   category is three, and his recommended guideline sentence is

3   188 to 235 months in prison.

4          As I said a moment ago that range is only advisory.

5   Courts may impose a sentence outside of that range base on one

6   of two legal concepts, a departure or a variance.  A departure

7   allows for a sentence outside of the advisory range based on

8   some provision of the guidelines themselves.  In the plea

9   agreement both parties agreed that no departure from the

10  guidelines range was warranted.  Nevertheless, I have

11  considered whether there is an appropriate basis for departure

12  from the advisory range within the guidelines system and while

13  recognizing that I have the authority to depart, I don't find

14  any grounds warranting a departure under the guidelines.  I

15  also have the power to impose a nonguideline sentence based on

16  what we call a variance pursuant to 18, United States Code,

17  Section 3553(a) that I know the defendant is seeking.

18         With that I will hear from the parties.  Does the

19  government or any victims wish to be heard?

20         MS. MERMELSTEIN:  Your Honor, other than the victim

21  impact statements that have already been submitted, the victims

22  do not wish to be heard in person at this proceedings.  The

23  government, however, would like to be heard.

24         THE COURT:  Bring the microphone a little closer,

25  please.

H8b6gals

1           MS. MERMELSTEIN:  I don't want to belabor the points

2      that are made in our submission, but the government thinks that

3      a sentence at the top of the applicable guidelines is

4      appropriate here for a number of reasons.  This defendant as

5      your Honor knows has a significant prior criminal history,

6      regulatory history, from which he has never before learned to

7      be dissuaded from engaging in criminal conduct.  Not only has

8      he gone on to engage in crime after crime, but he has done so

9      while at the same time attempting to deceive prosecutors and

10     victims and courts about his intentions and about his claims to

11     have changed his ways.  I will not belabor all the ways in

12     which he has done that or the number of times he sat with the

13     prosecutor and lied about what he was doing in his business

14     endeavors or lied about the facts of historical business

15     endeavors; but I think there is a tremendous need here for

16     personal deterrence.  While the government recognizes that the

17     defendant is already serving a significant sentence, in the

18     government' view this is a person who after 135 months might

19     well go on to commit additional crimes.

20          The notion that somehow any of this is mitigated by

21     the defendant's personal circumstances should be given no

22     weight whatsoever.  There is no doubt that the defendant's

23     father was himself a longstanding criminal and that has

24     affected the defendant; but he is 47 years old and that is not

25     the first time he has had the opportunity to say to a court, to

H8b6gals

1    a prosecutor, to the SEC, Look, I grew up in this family and I

2    learned the wrong lessons.  He has lots of opportunities to

3    learn the right lessons since then and he has not done so.

4         The last two things I will say are this:  One, the

5    defendant has asked somewhat astoundingly for no additional

6    time.  He asked for a free pass on this fraud.  That would just

7    be a wildly inadequate sentence.  That would suggest that a

8    white-collared defendant having engaged in a large

9    white-collared fraud should quickly engage as many more as

10   possible before getting caught since there will be no

11   additional punishment for any additional crimes after the first

12   one and that would just not be an adequate sentence.

13        I think the other thing to say which concerns both the

14   nature of this crime itself and also some of the defendant's

15   arguments, are that the notion that the defendant never

16   intended to inflict loss on anyone in this case is facially

17   completely inconsistent with what he did in this case.  The

18   defendant targeted the Oglala Sioux Tribe of the Wakpamni Lake

19   Community Corporation.  That is a subdivision of that tribe.

20   It is their economic development arm.  They are, as the victim

21   impact statement said, one of the poorest tribes in the

22   country.  They have unemployment exceeding 80 percent.

23        They were induced to issue these bonds on the promises

24   that these bonds would be invested in safe annuities that would

25   provide money to pay back investors and to allow for some

H8b6gals

development by the tribe.  None of that happened as your Honor
knows.  It is not a question, as the defendant, suggests in his
submission of making a slightly different investment that was
promised but technically not allowed.  Money was used in wildly
different ways.  It is not fair to characterize the defendant's
conduct as his submission does as being a fraudulent business
practice.

        This is not a fraudulent business practice.  It was an
outright fraud from the beginning.  The money was spent --
roughly 25 percent of it, more than $8 million -- on the
defendant.  It was spent on his mansion in Bel-Air.  As your
Honor remembers from the Tagliaferri trial, on personal
expenses and on luxurious living.  The notion that that was, as
he calls it, prematurely compensating himself for his role in
this business endeavor is laughable on its face.  The notion
that you could prematurely steal 25 percent of the bond
proceeds and then successfully, safely invest the proceeds in
order to make everyone whole was never a realistic possibility
and it was never anyone's intent.  There are a lot of facts
about the way the fraud works that let's you know that that can
never have been the intent.

        First of all, no one ever told the tribe that things
were going to be done a little bit differently.
Notwithstanding, that there was round after round after round
of bonds.  If these insurance company aspects, if these private

H8b6gals

1    equity investments were a reasonable way to investment bond

2    proceeds, there was no reason not to tell people.  There was no

3    reason not to tell people about all the inherent conflicts of

4    interests of all of the various players, which I will not walk

5    through in detail.  But you could tell people, "I am on both

6    sides of this, but I think it is a good investment" and no one

7    ever did.

8           The two biggest ones are, first, you don't need to

9    take over Atlantic and Hughes, the investment advisors and

10   force clients into these bonds if you think it is a good

11   investment.  Pitch them to the public.  Secondly, as your Honor

12   knows in the second and third rounds of these bonds, the bonds

13   weren't purchased by anyone.  The proceeds of the first bond

14   issuance was recycled to purchase the second and third bond

15   issuances apparently so that the facial amount of the bonds

16   would be increased and could be used for all of these other in

17   many cases illegitimate purposes, like claiming you had net

18   capital for a broker dealer.  The only reason to do that kind

19   of recycling is because it is a fraud.  The notion that after

20   all of that things could work out, notwithstanding that you now

21   issued $20 million of bonds that no one has even purchased, is

22   simply untrue.

23          I think that in light of all of those facts, in light

24   of the defendant's longstanding criminal conduct, in light of

25   his involvement in these prior crimes but in this one over a

H8b6gals

1    long period of time, a very significant sentence is warranted.

2    While I don't doubt that the inmates at MCC enjoys his business

3    classes, it strains an understanding of the history here to

4    conveniently think that this is the moment when he has truly

5    changed as a person given all of the times that that claim has

6    been made to the government and to courts on prior occasions

7    and all of the other opportunities for a lesson to be learned

8    when it simply has not happened.  So I think that that claim

9    should be given little weight here.

10        In light of all those factors, not just the need to

11   deter this defendant but to justly punish hip for his crimes

12   and to deter other defendants, a sentence to the high end of

13   the guidelines to be served concurrently to the current

14   sentence, so roughly 100 months, is the appropriate sentence.

15            THE COURT:  Thank you.

16            MR. MADIOU:  Thank you, your Honor.  With your Honor's

17   permission, Ms. Scolari and I would like to bifurcate our

18   arguments here.

19            THE COURT:  That's fine.  Go ahead.

20            MR. MADIOU:  Good afternoon again, your Honor.

21            Your Honor, 3553(a) requires a sentence that is

22   sufficient but not greater than necessary.  The Court knows

23   this.  We know this.  The government knows this.  It is

24   something we talk about all the time in our field.  That phrase

25   is the most important phrase in all of federal criminal

H8b6gals

1    sentencing.  It is the most important because it embodies our

2    system's view of the role of punishment and of incarceration.

3    It recognizes in one succinct phrase that there may be indeed

4    many reasonable sentences, but this Court's role is to select

5    the lowest of those reasonable sentences.

6         THE COURT:  How would it be sufficient if he didn't

7    get any additional time for this conduct?

8         MR. MADIOU:  Your Honor, we're not saying that he

9    should not get any additional time.  We're saying that a below

10   guidelines concurrent sentence is the sufficient but not

11   greater than necessary sentence.  We're saying that the next 11

12   years and more is the sufficient but not greater than necessary

13   sentence.  Hopefully I can convince your Honor with our remarks

14   today why that is.

15        Again, the purpose of that phrase is to highlight that

16   there is a heartland of reasonable sentences but that the

17   difficult work in federal sentencing, the difficult work of

18   judges is to select the lowest of those reasonable sentences

19   and not a day more.  Our disagreement with the government is

20   not over the facts, it is not over the loss amount, and it is

21   not over the catastrophic loss and harm that Mr. Galanis'

22   conduct caused.  It is over what the lowest reasonable sentence

23   for this flawed imperfect but redeemable human being is.  We

24   respectfully argue that the government's request is far greater

25   than what is necessary.  A top of the guideline sentence for

H8b6gals

1    this man is far greater than what is necessary.

2            Now, the government is asking for a sentence that is

3    routinely imposed on violent recidivists in this courthouse,

4    dangerous defendants who have engaged in reckless conduct and a

5    blatant disregard for human life.  Ms. Scolari and I have

6    represented many of those defendants in this courthouse.  If

7    you permit me, I would like to bring two of those cases that I

8    have done in this past year, which are admittedly completely

9    different than Mr. Galanis' but which I think highlight some

10   very relevant points today.

11           February 2017 Rory Poole was sentenced for his role in

12   a robbery conspiracy in this courthouse.  He robbed commercial

13   locations with a group of people, guns were brandished,

14   customers were tied up.  He was also held responsible for a

15   separate drug conspiracy and a related shooting charge to that

16   drug conspiracy.  He shot multiple times into a crowd of people

17   and he hit someone in the head.  That person didn't die.  Judge

18   Kaplan, not an easy sentencer, sentenced him to a bottom of a

19   guidelines sentence of 13 years, five years less than what the

20   government was asking for for Mr. Galanis.

21           In January of 2017, Wallie Burgos was sentenced in

22   this courthouse for the murder of a 16-year-old boy in a

23   separate attempted murder in connection with a racketeering

24   conspiracy.  Judge Engelmayer sentenced Mr. Burgos to 22 years,

25   four years more than what Ms. Mermelstein is asking you to do

H8b6gals

1    to Mr. Galanis.  Four of the deceased's family members spoke to

2    Judge Engelmayer on the day of his sentence and spoke about

3    their brutal loss and the catastrophic effects that my client

4    had on their family.  When Judge Engelmayer described his

5    decision to both the family and on the record, he started by

6    saying that a life sentence was absolutely reasonable for that

7    conduct, but again he highlighted that one phrase from 3553(a),

8    the phrase that ties our whole system together and he told the

9    family -- the mother, the father, the sisters and brothers of

10   this person -- that 22 years was the lowest of the reasonable

11   sentences while recognizing that life was indeed a reasonable

12   sentence for this human being.

13           Again, both cases were recidivists, both engaged in

14   violence and again they're fundamentally different than

15   Mr. Galanis.  The point is that they are not apples to apples.

16   That is why their sentences should not be fundamentally similar

17   to that of Mr. Galanis'.  Mr. Galanis' conduct was egregious

18   and it caused harm, but in a qualitatively different way.

19   Shooting into a crowd of people, tying up store patrons,

20   robbing people and ending a 16-year-old's life, this is

21   fundamentally different than the offense conduct at issue here

22   and requires a different kind of punishment.

23           There are similar cases in this courthouse that are

24   instructive as well and I would like again bring two to the

25   Court's attention today.  In 2009 Eric Skys was sentenced in

H8b6gals

1    this courthouse by Judge Pauley for his role in an $83 million

2    fraud scheme.  Mr. Skys was in criminal history category two,

3    the same category Mr. Galanis would have been in if he accepted

4    the joint plea offer.  He was in an offense level of 37, one

5    point higher than Mr. Galanis would have been even if he had

6    added on the two obstruction points that Ms. Mermelstein argues

7    for in her memo.

8              THE COURT:  Walk me through that.  My understanding

9    was if you added the two acceptance points, he was facing a

10   guidelines range of 210.  Is that what the government said in

11   its letter, or were you assuming that he was in criminal

12   history category three as opposed to two?

13             MS. MERMELSTEIN:  No, your Honor.  The point is that

14   had he accepted the joint plea offer and we rejected the notion

15   and now is being sentenced by your Honor on both the two cases,

16   the plea agreement guidelines would be wrong because the

17   government since the time it made that plea offer learned that

18   he obstructed justice in the way we described and so the

19   guidelines range would go two points and your Honor is right

20   that that range is 210 to 235 range.

21             THE COURT:  Please proceed.

22             MR. MADIOU:  My point is that is still one point lower

23   than the defendant I am describing to your Honor here.  He had

24   a level of 37.  From the U.S. Attorney's press release

25   statement, Eric Skys, former chairman and president and CEO

H8b6gals

Kaiser Himmel Corporation was sentenced by Judge Pauley to 130

months.  Skys previously pleaded guilty in the middle of a jury

trial in August of 2009 to securities fraud, wire fraud, bank

fraud, charges of arising from his scheme to defraud Citibank

of more than $83 million.  Skies attempted to obtain a loan in

that amount from Citibank by posting nonexistent stock as

collateral and forged various financial documents as part of

the scheme.  The evidence also showed that after Citibank

detected the fraud refused to grant the loan, Skies attempted

to defraud several other financial institutions.

Again, Judge Pauley sentenced Mr. Skys to 130 months.

The difference between Mr. Galanis and him is that unlike

Mr. Galanis, he did not accept responsibility and pled guilty

in the middle of trial.  Again, he got five years less than

Mr. Galanis already has now -- five months less than what

Mr. Galanis already has now.

In 2008 Philip Bennett was sentenced in this

courthouse by Judge Buchwald to 16 years for a fraud of

$2.4 billion.  The Southern district's press release statement

in July of 2008 states that Mr. Bennett, the former chief

executive officer and 50 percent owner of Refco, one of the

largest commodities brokerage firms in the world at the time,

was sentenced to 16 years in prison for his role in executing a

for $.4 billion fraud.  Bennett pleaded guilty one month before

his scheduled trial to all 20 counts in the indictment.  The

H8b6gals

losses that the government described in the press release

statement include a $71 million loss sustained by a customer in

trading on the Chicago Mercantile Exchange in 1997, $160

million in losses sustained by a group of customers trading in

the Asian markets in 1997, $40 million in losses from Refco's

own trading in Russian bonds in 1998.

In addition, Bennett caused the following expense

shifting and revenue padding transactions:  Approximately $43

million of computer expenses moved out of Refco into Bennett's

holding company, $492 million in interest income charged on the

debt owed to Bennett, $68 million in litigation settlements,

$40 million in profit from a fake U.S. treasury note, and

approximately $109 million in wage and salary expenses moved

out Refco into Bennett's own holding company.

The point is is that Bennett, this person's fraud, was

on an expedientially larger scale than Mr. Galanis'.  Judge

Buchwald did the same analysis that your Honor is called to do

today.  She was called on to determine what the lowest of the

reasonable sentences were for that human being and it easily

could have been 40, 50 or 60 years, but the lowest reasonable

sentence for him was 16 years for a loss of $2.4 billion in

untold harm.  Again, our point is simply that the government's

request here for a top of the range sentence for Mr. Galanis is

just greater than necessary.

Mr. Galanis' conduct caused real harm to real people

H8b6gals

1    and it is inexcusable but he did not intend to inflict harm on

2    anyone.  He did not take the bond proceeds and flee to Brazil.

3    He invested in real companies with real value.

4              THE COURT:  He took almost $9 million to pay off

5    expenses on his Bel-Air home and his Tribeca home and jet and

6    jewelry --

7              MR. MADIOU:  He absolutely did.

8              THE COURT:  -- very lavish expenditures.

9              MR. MADIOU:  And it is inexcusable.  That is his

10   offense conduct and that is why he will spend north of 11 years

11   in prison because of it.  My comments are not meant to excuse

12   at all.  They are meant to contextualize.  They are meant to

13   try to place him in the heartland of these reasonable

14   sentences.  Again, he will be punished for the rest of his life

15   for his actions here today.

16             He has absolutely no assets that the government hasn't

17   seized.  Any money that he will ever earn in his life will be

18   the government's money.  Of course the impact of this fraud

19   scheme unraveling is a tragedy.  Of course the Wakpamni

20   community should get the $500,000 they seek in restitution,

21   which the government can provide and of course the pension fund

22   holders should be made whole.

23             Again, he has repeatedly accepted his own

24   responsibility in this fraud.  These things while very easy to

25   dismiss in the face of the painful losses that were inflicted,

H8b6gals

1    they really do matter when making this difficult decision about

2    what the lowest reasonable sentence should be.

3              Finally, your Honor, I want to bring to the Court's

4    attention some of the points from our filing yesterday.  In our

5    experience, BOP staff is rarely, if ever, allowed to write on

6    behalf of an inmate.  Whenever an inmate works in the prison or

7    helps out or shows him or herself to be a model inmate, we as

8    lawyers try to get their counselors to write the letters and it

9    has been my experiences that hardly ever happens.  I feel the

10   need to bring this to your Honor's attention because frankly

11   the documents that we filed yesterday, Ms. Scolari and I, have

12   never seen before.

13             Right now I am reading from his Work Performance

14   Rating.  "Mr. Galanis appears to have acknowledged the lessons

15   learned so far and are very motivated.  He has quickly taken

16   his negative experience and turned it into a positive one and

17   all of his efforts are being acknowledged."  I am now reading

18   from what is called a Positive Decision Report.  I have never

19   seen this document in my years of practice and neither has Ms.

20   Scolari.  It is written by the MCC earlier this month on

21   August 3rd.  It says that Mr. Galanis had a positive impact on

22   his fellow inmates by volunteering his time to provide

23   education programs on Unit 5 North.  Mr. Galanis has showed

24   himself to be a responsible inmate by contributing to the

25   environment of his unit in a positive way and that impact is

H8b6gals

1    evidenced by the number of fellow inmates that continue to

2    benefit from his efforts.

3         Your Honor, I am going to turn rest of the argument

4    over to Ms. Scolari.  Thank you for your attention.

5         THE COURT:  Thank you.

6         MS. SCOLARI:  Your Honor, I will stay here if that is

7    okay.

8         THE COURT:  That's fine.  Speak into the microphone.

9         MS. SCOLARI:  Your Honor, one of the things I haven't

10   seen in 25 years of practice in this court is entering into a

11   plea agreement with the government with the expectation,

12   because it was not warned otherwise, there have been a request

13   for a guideline sentence.  The government certainly has the

14   right to ask under the plea agreement for the top of the

15   guideline, but that was never even hinted at when we reached a

16   plea agreement in this case.  I suspect that part of the reason

17   that the government is doing that now is because we had the

18   temerity to bring up the plea agreement that was offered to

19   Mr. Galanis when he was unrepresented on this case.

20        He was arrested on May 11th, 2016.  He was remanded on

21   May 19th of the same year.  At that time he was represented on

22   the Gerova case by a law firm from California.  This Court held

23   a conference on this case on July 11th at which I first

24   appeared for Mr. Galanis as a possible assigned counsel and

25   there was a great deal of discussion about how Mr. Galanis

H8b6gals

1    didn't have the money to pay for counsel, how he couldn't file

2    a financial affidavit because he didn't know the value of his

3    assets, but the government was fully aware that Mr. Galanis was

4    unrepresented because the government notified the Court that

5    Mr. Galanis was unrepresented.  Eight days later fully aware

6    that Mr. Galanis was not represented on this case, the

7    government produced a 14-year or 168-month bottom of the

8    guideline range offer for both cases.  They made that offer to

9    him if he would plead guilty on both cases.

10          What happened is what the government refers to as he

11    rejected the plea offer; but what actually happened, Judge, is

12    what Mr. Galanis' lawyer in the Gerova case said at sentencing.

13    We, meaning the law firm, that represented about Mr. Galanis on

14    Gerova, could not enter into a disposition in that matter,

15    meaning this case, because Mr. Galanis at the time was pro se.

16    We were not appointed to represent him nor were we retained.  I

17    was not professionally prepared nor could I have been to enter

18    a joint disposition.

19          So Mr. Galanis was absolutely failed by the system.

20    Failed.  And the government says he rejected the joint plea

21    offer.  Once we were appointed in August and got up to speed as

22    quickly as we could, we reached out to the government and said,

23    Mr. Galanis wants to plead on this other case.  He should have

24    taken the joint plea and he wants to take the plea and the

25    government said no.  They didn't say we discovered more bad

H8b6gals

1    conduct or we discovered obstruction or we found out other

2    things.  They simply said no.  Now, we suggest to the Court

3    that a starting point is that low end of that guideline because

4    the system failed Mr. Galanis.  He was unrepresented.

5           However, the government argues that if he were to have

6    gotten that 14-month or that 168-month bottom of the guideline

7    joint plea agreement, he would have been facing more time

8    because the obstruction would have come up.  But this Court

9    sees what happens every day when a defendant has pled guilty in

10   good faith and something comes up in the plea agreement.  I am

11   sorry.  Something comes up apart from the plea agreement.

12   Something comes up in the PSR.  One of the things that happens

13   when a defendant pleas guilty, they do it to cut off any

14   further exposure.  They take a plea and the government

15   ordinarily stops investigating because the idea is both parties

16   agree they want to end the case.  Sometimes something comes up

17   that causes the defendant to be facing a higher guideline than

18   what is in the plea agreement.

19          Time and again the government stands before the Court

20   and says, Your Honor we stand by our plea agreement.  That is

21   exactly what Mr. Blais said in the Gerova case because in the

22   Gerova case Mr. Galanis' original guideline agreement was lower

23   than what came out in the presentence report.  Mr. Blais stood

24   up and said, Your Honor, we stand by our plea agreement.

25          THE COURT:  He is not claiming ineffectiveness in that

H8b6gals

1   case; right?  He has the same lawyer on appeal; right?

2              MS. SCOLARI:  No, he does not.  He absolutely does

3   not.

4              THE COURT:  He is claiming ineffectiveness?

5              MS. SCOLARI:  Yes, your Honor, and he is for very good

6   reason, which I can't really go into.  At some point we're

7   going to be asked to be relieved because we're witnesses.  We

8   are going to be asked to be relieved after we finish the

9   sentencing here.

10             So, your Honor, the point is that the government

11  cannot have it both ways.  They cannot offer him a plea

12  agreement that he doesn't get counseled on and he fuses to

13  accept.  They will not give it to him.  They say, If he had

14  given it to him anyway, he would be facing more time because of

15  the obstruction.  That is not how it works.  People take a plea

16  to be finished.

17             Now, the conduct in this case is terrible.  The letter

18  that the Wakpamni Lake Community lawyers wrote about the victim

19  impact in this case is horrendous and there is nothing I can

20  say to detract from how serious it is.  If that were the only

21  thing that the Court were to consider in this case, I should

22  sit down because there would be nothing I can say.

23             Your Honor, well knows that there are factors to

24  consider.  One of them is the character and history of the

25  defendant, which we have presented to the Court in somewhat

H8b6gals

colorful fashion because that is who John Galanis was.  We are
not trying to say that Jason Galanis is not responsible as an
adult for his conduct, but the Court is under 3553(a) asked to
consider the background.  If his father was a drug dealer, we
would tell you about that.  If his father was a child molester,
we would tell you about that.  We are not saying he is not
responsible and we're not trying to have it both ways.  We're
saying that background is relevant.

        I didn't grow up with that man as a father.  I cannot
imagine how it might affect me, but people who have responsible
ethical parents tend to be responsible and ethical.  My point
is that it is a perfectly valid point for make for the Court.
We're not trying to shift responsibility nor are we trying to
have it both ways, but it is a factor for the Court to consider
and it is an important factor.  Your Honor knows John Galanis a
defendant in this case.  Who knows where Mr. Galanis would be
if John Galanis were out of his life long before he got
involved in this case, but we're not blaming his father, but
those are factors for the Court to consider.

        I would suggest that the Court consider not only the
parsimony clause, which obviously says that the lowest sentence
is appropriate, the least strict sentence; but what Judge
Rakoff said about deterrence and white-collared criminals.  In
U.S. v. Adelson, which is later repeated in the Gupta case,
which we cited for the Court, Judge Rakoff noted there is

H8b6gals

considerable evidence that even relatively short sentences can

have a strong deterrent effect on perspective white-collared

offenders.  He cited a law review article and he cited some of

the language that was in the Sentencing Commission's 15-year

report.

By the way, the government makes light of or is

sarcastic or mocking about the idea that Mr. Galanis has

transformed.  They repeat what we said "complete

transformation" several times.  Your Honor, a person can be

transformed in one day.  They can be transformed by one

traumatic experience.  Mr. Galanis has been in jail for 15

months.  I am not suggesting it was overnight, but Mr. Galanis

has been in some of the worst conditions that I have seen in 25

years of practice.

MCC has turned into what in effect is a maximum

security facility.  There are assaults and attacks constantly.

They are constantly locking down.  Lawyers cannot even get in

to visit.  People are smoking K2.  They are there are weapons.

The guards cannot keep up.  It probably is because of the

volume.  It is because of the nature and the different groups

that they are bringing in.  There are street kids and gang kids

that are just not stopping.  You don't have to take my word

about Jason Galanis being incredibly impacted by his time in

jail.  What he wrote, I am deterred, and his description of

what he has seen on his unit in the time that he has been

H8b6gals

there.  He has seen seven on one beatings.  He has seen weapons

made out of locks in socks swung and used to smack people's

heads in, smash their teeth in.  He saw one person have their

face cut from cheek to ear by razor all of this because these

people were thought to be snitches.  All of this because there

is a code there that is something he cannot imagine.

     Mr. Galanis is from California.  He has no neighbors,

friends, gang members, associates in that jail.  So what he has

been through just by being surrounded by this is enough to

change anyone.  What he is saying is not, I am now a perfect

person.  I now know I will always be a good person.  What he

said was, I will never be back in a situation like this again.

Courts say, I am going to send a message relating to general

deterrence.  What Mr. Galanis is saying is this:  I have a

message for anybody thinking about doing what I did:  Don't do.

Don't be foolish.  Do not end up where I am because it is not

worth it.  That is what he is telling you in his letter.  That

is what he is telling you about what he has been through.

     You also don't have to take Mr. Galanis's word.  There

was a letter that was written by another inmate who is a GED

tutor.  What he says is, The transformative properties of

incarceration falls on deaf ears most of the time.  Recidivism

rates show that.  I can safely say that Jason Galanis is not

deaf.  Quite the opposite.  During conversations and teaching

sessions, the one thought that Jason pounds into the listener

H8b6gals

1    is, We have an ethical responsibility beyond our own agenda.

2    Failure to live up to this standard will only land you back in

3    here.  These are not the words of a man who has not responded

4    positively to a thoughtful analysis of where he went wrong.

5    This is not somebody that would ever expect to have his voice

6    heard but seems to genuinely believe what he has seen and what

7    he has seen Jason Galanis teaching to the kids that he has been

8    working with that Jason Galanis truly has changed in the sense

9    that he believes that he is responsible for where he is, he is

10   responsible to be sure he never comes back.  So he has changed

11   in the sense that he will never do something that will land him

12   in prison again and prison clearly can be transformative.

13        You also don't have to take that inmate's word.  Take

14   the word of the staff and what has been written about

15   Mr. Galanis.  Madiou read some of it so I will not repeat it,

16   but one of the things that struck me is this:  When someone is

17   dealing with the worst situation they have ever been in in

18   their life, their true colors show, whether they are

19   courageous, whether they are blaming, whether they are hiding

20   or stepping up.  What one staff member wrote about Jason is

21   that he handles his situation with grace.  He faces challenges

22   gracefully and is being recognized for his dedication and the

23   efforts that he has made to teach.

24        What Mr. Galanis has also learned beside the fact that

25   he doesn't want to be in jail because it is horrible is that

H8b6gals

there is really value.  He has learned that those of us who do

public service, who have been chosen to do public service have

learned, which is doing good work that affects people can have

a far greater value than the money or the possessions that you

can obtain by doing something else.  He has learned by

teaching.  He has learned somewhat when he was working at

Operation Gratitude that volunteering and helping someone else

helps you.  It raises you.  It lifts you.  It makes you a

better person.

       Jason Galanis cannot change what he did.  It was

terrible.  He cannot change it.  All he can do is what he is

trying to do, Judge, which is change who he is.

       Thank you.

       THE COURT:  Thank you.

       Mr. Galanis, I read your letter, but I am happy to

hear anything you would like to say today.

       THE DEFENDANT:  Thank you, your Honor.  I will stand.

       THE COURT:  Bring the microphone a little closer so we

can hear, please.

       THE WITNESS:  Can you hear me now, your Honor?

       THE COURT:  Yes.

       THE WITNESS:  If you don't mind, your Honor, I am

nervous and if I could read from this that will be helpful.

       THE COURT:  That's fine.  Go ahead.

       THE DEFENDANT:  First of all good afternoon.

H8b6gals

1          Your Honor, the wish there were words in precious

2     moments granted that I thought were enough, enough to provide

3     you with additional insight or inform you of my mindset.  There

4     simply are not enough words to fully express how profoundly

5     sorry and remorseful that I am.

6          I wrote you a letter and I shouldn't -- and I hope it

7     communicated some facts and you would consider that.  I wanted

8     to tell you also not just facts but the way I feel and how I

9     feel about my conduct and the implications on others around me.

10    Your Honor, I stand before you humiliated.  Utterly humiliated.

11    Although it is insufficient I want to apologize for my actions

12    and how they have affected numerous victims in this case.  I

13    will never live down the shame.  It will be with me forever.  I

14    brought ruin upon my loving and devoted wife who I have been

15    with for 20 years.  I almost cannot bear the shame and

16    imposition on her and all the innocent parties affected.

17         Humiliation and shape are powerful emotions and they

18    are deserved and I must be made to suffer under their weight.

19    I understand this.  However, from out of humiliation I am

20    gaining humility that I didn't always practice in my former

21    life.  Humiliation is the pain.  Being humble is the

22    redemption.  I am learning to walk a smaller path and act more

23    thoughtfully.

24         Your Honor, a Buddhist monk visits us once a month at

25    MCC.  Three or four of the men in my unit, Unit 96, do sit with

H8b6gals

1  him.  There are a bunch of words that I have taken away and

2  have meant something to me.  One phrase meant a lot to me and I

3  wanted to read it for your Honor.  That is:  Think good

4  thoughts, speak kind words, do good deeds.  I believe I can

5  learn to live true to these words and teachings, your Honor.  I

6  believe I am capable of redemption.

7          In closing I owe your Honor a thank you.  You

8  appointed two of the most capable and dedicated lawyers I could

9  have hoped for and I am grateful.  With humility I stand in

10  judgment, your Honor.  Thank you.

11          THE COURT:  Thank you.

12          Is there any reason why sentence cannot be imposed at

13  this time?

14          MS. MERMELSTEIN:  No, your Honor.

15          MS. SCOLARI:  No, your Honor.

16          I just have one request once the Court imposes

17  sentence, which is what has to be addressed is the fact that

18  Mr. Galanis will not get credit for the time he has been in.

19  So I will explain that to you, but I don't want to interrupt.

20          THE COURT:  We'll talk about that at the end.

21          Mr. Galanis, you speak and you write very eloquently

22  and while recognizing that you have spent a good deal of your

23  life charming, manipulating and flat out lying to people, I

24  like Judge Castel did before me choose to believe that your

25  time at the Metropolitan Correctional Center has changed you in

H8b6gals

1    some way.  I've considered the reports from the MCC praising

2    the work that you have done teaching your fellow inmates.  I

3    have also read the letters from the fellow inmates, who have

4    taken your classes.

5          I will add that I had a defendant in a totally

6    unrelated case mention in a letter to me that he took one of

7    your classes.  I never have had defendants submit letters for

8    fellow inmates before.

9          So I am pleased to see that you have found some

10   salvation in teaching and in giving back; but even assuming the

11   truth of this so-called transformation, that is not the only

12   thing I have to consider at sentencing today.  I am required to

13   consider the advisory guidelines range of 188 to 235 months in

14   prison as well as the various other factors of the provision of

15   the law that I mentioned, 18, U.S. Code, Section 3553(a), and I

16   have done that.

17         There is no real dispute about the seriousness of the

18   crime and the harm done to one of the poorest Native American

19   tribes in the country as well as the clients of Hughes and

20   Atlantic, pension funds held for the benefit of transit

21   workers, longshoreman, housing working authorities, housing

22   authorities workers and city employees, hard-working people,

23   everyday people, among others.  So I do believe that a very

24   substantial sentence needs to be imposed to reflect the

25   seriousness of the offense, promote respect for the law,

H8b6gals

 1    provide just punishment for the offense, and afford adequate

 2    deterrence to others who may seek to engage in such conduct.

 3            I also agree with the government that while loss

 4    amount -- this is an argument your attorney made in your

 5    sentencing submission -- is sometimes in imperfect proxy for

 6    wrongdoing, here you have someone who over the course of two

 7    years stole more than $40 million from numerous pension fund

 8    clients and left the Wakpamni Lake Community Corporation

 9    without the money for economic development and owning more than

10    $60 million on the outstanding bond.  And you benefited

11    personally as I alluded to earlier using over $8 million,

12    almost $9 million for lavish personal expenditures, including

13    home expenses, automobiles, travel, clothing, jewelry expenses

14    and meanwhile the WLCC and Atlantic and Hughes investors were

15    left with nothing.

16            In a victim impact statement the Wakpamni Lake

17    Community described how the fraud has affected the community

18    reputationally, economically and emotionally.  The Chicago

19    Transit Authority Retiree Healthcare Trust, a client of Hughes

20    has also written to the Court noting that the money lost would

21    have gone to pay for healthcare costs, for retired employees

22    and their spouses.  The Water Works Board for the City of

23    Birmingham described how you and your co-conspirators defrauded

24    nearly 900 retirement plan participants for most of whom the

25    planned income is their primarily source of income.  Out of

H8b6gals

$4.3 million.  And the MDAL, which provides health and medical
benefits to over 65,000 participants suffered a loss of $2.8
million, which could have been used to pay for healthcare for
tens of thousands of working people and families in the United
States.

          I have considered your leadership role, the number of
victims, and your attempt to obstruct justice, and then you
have this history of fraud and dishonesty.  Not only were you
barred by the SEC in 2007, convicted of tax evasion in 2011,
but as we discussed sentenced to 135 months in prison earlier
this year by Judge Castel in connection with the Gerova and
Tagliaferri scheme.  Indeed you committed the instant offense
in part while you were on probation and following your arrest
in the Gerova matter.  So here there is not only a need for
general deterrence to deter others from committing these crimes
but a need to deter you in the future when you get out from
future crimes.

          I have considered all of the arguments that you have
made.  I have considered the need to avoid unwarranted
sentencing disparities.  I have read all the letters on your
behalf and I have read the very positive work performance
ratings and certificates in completions from the MCC.

          Just a word about your father.  I don't doubt how his
life trajectory affected yours, but you are 47 years old.  You
are almost 50 years old.  This is far from your first offense.

H8b6gals

1   You have had a lot of time to decide who you want to be and you

2   and only you as you recognize made the conscious adult decision

3   to follow in his footsteps.  Frankly, you have had many more

4   opportunities in life than most of the defendants that I see

5   before me.

6          So for all of those reasons I do believe that a

7   sentence within the guidelines is appropriate.  It is the

8   judgment of this Court that you be committed to custody of the

9   Bureau of Prisons for a term of 188 months, 60 months on Count

10  One and Count Three and 188 months on Count Two all to run

11  concurrent to each other and 128 months to run concurrent to

12  the sentence imposed by Judge Castel.  That term of

13  imprisonment is to be followed by term of three years of

14  supervised release on each count also to run fully concurrent.

15  I believe that this sentence is sufficient but not greater than

16  necessary to comply with the purposes of sentencing set forth

17  in the law.

18         You can be seated if you would like while we discuss

19  the conditions of supervised release.  I am happy to talk about

20  the credit issue.  I do believe that he should get credit for

21  time that he has served.  So I am happy to hear you out on

22  that.

23         MS. SCOLARI:  Your Honor, the issue with that is this:

24  Even if your Honor were to say that your intention is that his

25  sentence now were to run fully concurrent with the Judge Castel

H8b6gals

1    sentence, Mr. Galanis will not get credit for the 15 months he

2    has been in because the sentence that he will be serving that

3    you are about to impose begins today the day of imposition.  So

4    what we ask the Court to do to give him credit is to reduce the

5    sentence you are imposing of 188 months by 15 months because

6    that has already been credited to the Gerova case and he will

7    not get that credit because it has been credited.  There is a

8    statute that prohibits the Bureau of Prisons from double

9    counting and this would be double counting.  So the way to do

10   it and the only way to give him that credit is to say, I intend

11   to give you 188 months concurrent, but I am reducing it by 15

12   months to give him the credit.

13            THE COURT:  What is the government's position on that?

14   He should get some credit I think we would agree for the time

15   he has spent incarcerated; right?

16            MS. MERMELSTEIN:  Your Honor, the government doesn't

17   have any objection to structuring the sentence so that it is as

18   though he surrendered on those cases on the same day.

19            THE COURT:  How would you propose that I do that?

20            MS. MERMELSTEIN:  Just one moment, your Honor.

21            THE COURT:  Sure.

22            I think the way to structure the sentence is as

23   follows:  Your Honor, imposed a sentence of 188 months, 128 of

24   which was to be concurrent.  Functionally I understand your

25   Honor to have indicated that you think 60 months of additional

H8b6gals

1   time on top of Judge Castel's sentence is what is warranted.

2   So if you structure it that way and you say the total sentence

3   of 195 months would have been from the starting date and you

4   then substract the 15 months that Mr. Galanis has been served

5   the resulting appropriate sentence if my math -- oh, Mr. Blais

6   is saying my math is wrong.

7        MS. SCOLARI:  Your Honor, I can tell you we're puzzled

8   back here.  When your Honor said 128 months concurrent, I

9   didn't understand that.  I thought you meant 188 months

10  concurrent, which would mean the difference between 135 and

11  188.

12       THE COURT:  No.  I said 128 months current.  By that I

13  mean that he should serve five additional years for the conduct

14  in this case.  That was my intention.  I gave him a guideline

15  sentence of 188 months and the idea is 128 months is to be

16  served concurrently to the Judge Castel sentence so he does an

17  additional five on this case.  That is my intention.  Again, I

18  think people should get credit for time they serve in prison

19  and I am open to talking about how to accomplish that.

20       MS. SCOLARI:  Okay.

21       MR. MADIOU:  16 total.  The Gerova sentence and this

22  sentence, your intention is to have Mr. Galanis serve a total

23  of 16 years, five plus 11?

24       THE COURT:  It's 15 years, eight months.

25       MR. MADIOU:  Or 15 years, eight months.

H8b6gals

1          THE COURT:  It is 188 months.  That is the intention.

2     That is the sentence.  The idea is that 60 months are not

3     concurrent.  I am trying to explain it a different way.  As I

4     said, 128 months are concurrent so that he is sentenced to a

5     five-year additional term.

6          Is that unclear?

7          MS. MERMELSTEIN:  I think I understand what your Honor

8     is saying.  What I suggest then is to structure the sentence to

9     effectuate credit for the time that he has already been in,

10    which the government agrees with your Honor is appropriate, is

11    I think is as follows:  If you think about the sentence that

12    would have been imposed on the day he first started serving his

13    sentence if we were effectuating Judge Castel's sentence and an

14    additional 60 months functionally, then the Judge Castel

15    sentence of 135 months would have had 60 months added to it and

16    the total sentence from --

17         THE COURT:  195.

18         MS. MERMELSTEIN:  195.  He has been in 15 months.  In

19    order to credit that, your Honor should impose a sentence of

20    180 months.

21         THE COURT:  All to be served concurrently to the

22    sentence.

23         MS. SCOLARI:  We need to work this out.

24         THE COURT:  Sure.

25         MS. SCOLARI:  Your Honor, I think the confusion is

H8b6gals

1    this:  The only way to give Mr. Galanis credit for the time he

2    has been in, is to reduce the sentence you intend to impose by

3    15 months.  So if what you intend to do is impose 188 with only

4    128 months of it being concurrent, then what I would recommend

5    the Court do, and I think this is the way to do it, is to say

6    is what you said, which is instead of saying 188, impose 188

7    minus 15 and say that out of that amount that you are imposing

8    only 128 is to be concurrent.

9            THE COURT:  Well, I think if we started at 173 then we

10   would substract 135 from that; right?

11           MS. SCOLARI:  Because he doesn't have 135 left to do.

12   That is because they give him the 15 months credit.  It is not

13   15 months.  The other case he has got jail credit that he had

14   up until that sentence.

15           THE COURT:  Okay.

16           MS. SCOLARI:  So that is why I am saying the only way

17   to get him the time that he has been in to give that back to

18   him is to take the total sentence you intend to impose,

19   substract the 15 and make that top amount lower and then

20   indicate what you would like to be concurrent as a

21   clarification.

22           THE COURT:  Does the government have any objection to

23   my imposing a 173-month sentence and indicating that all but 60

24   months should be concurrent?

25           MS. MERMELSTEIN:  I think that reaches the same

H8b6gals

1    result.

2              THE COURT:  That what?

3              MS. MERMELSTEIN:  It reaches the same result as what

4    the government proposed.  To the extent the point here is 60

5    months on top of Judge Castel's sentence --

6              MS. SCOLARI:  I can't hear.

7              MS. MERMELSTEIN:  I think that the proposal that the

8    Court has just suggested functions in the same way ultimately

9    as what the government suggested.  The government doesn't have

10   a view about what structure is better.

11             THE COURT:  I am going to impose a sentence of 173

12   months and all but 60 months of that is to be served

13   concurrently.  My intention was to give a sentence within the

14   guidelines.  I am making this variance for the sole purpose of

15   allowing him credit for time that he has served, which I think

16   is fair.

17             MS. SCOLARI:  Your Honor, I understand that.  I would

18   just ask the Court this:  I am not asking you not to impose

19   sentence.  I am asking you to give me leave to come back to

20   request a correction if I check with BOP and they say that

21   saying you intend all but 60 months to be concurrent needs to

22   be clarified.

23             THE COURT:  That's fine.  Let me know that.  If need

24   be, you can let me know and we'll meet good.  If not, I will

25   hold off on signing the judgment for a few days until early

H8b6gals

1   next week.  I think my intention is clear.

2          MS. SCOLARI:  I do, too.  We have one other request in

3   terms of recommendation as to designation.

4          THE COURT:  Okay.

5          MS. SCOLARI:  Mr. Galanis's wife lives in southern

6   California and we are requesting a recommendation of Terminal

7   Island, which is a facility in California.

8          THE COURT:  I will make a recommendation for a

9   facility in California as close to his home in California as

10  possible.

11         MS. SCOLARI:  Your Honor, if you could specifically

12  say Terminal Island.  The Bureau of Prisons doesn't have to

13  follow it, but it does pinpoint the closest facility to his

14  home.

15         THE COURT:  That's fine.

16         MS. SCOLARI:  I will make that recommendation.

17         THE COURT:  So with respect to the supervised release,

18  the mandatory conditions of supervised release shall apply.

19         Mr. Galanis, you must not commit any other federal,

20  state or local crime.  You must not unlawfully possess a

21  controlled substance.  You must refrain from any unlawful use

22  of a controlled substance.  You must submit to one drug test

23  within 15 days of release from prisonment and at least two

24  periodic drug tests thereafter as determined by the Court.  You

25  must cooperate in the collection of DNA as directed by the

H8b6gals

1    Probation officer and you must make restitution in accordance

2    with the provisions of the law cited herein.

3            The standard conditions of supervised release shall

4    apply.  In addition, in light of the nature of the crime, I am

5    going to follow the Probation Department's recommendation and

6    make the following special conditions part of your supervised

7    release:  You must provide the Probation officer with access to

8    requested financial information.  You must not incur new credit

9    card charges or open additional lines of credit without the

10   approval of the Probation officer unless you are in compliance

11   with the installment payment schedule.  If you are sentenced to

12   any period of supervision, which you are, you'll be supervised

13   by the district of your residence.

14           I am not going to impose a fine in light of the

15   restitution order and the forfeiture order given the amounts in

16   question.  I am imposing the mandatory special assessment of

17   $300, which shall be paid immediately.  Pursuant to the consent

18   preliminary order of forfeiture money judgment, you are ordered

19   to forfeit $43,277,000 -- is it 43 cents?

20           MS. MERMELSTEIN:  $43,277,436.

21           THE COURT:  $436.

22           Is the government prepared to submit a proposed

23   restitution order at this time?

24           MS. MERMELSTEIN:  We are, your Honor.  The one

25   outstanding issue was the restitution to the Wakpamni Lake

H8b6gals

1    Community Corporation.  The rest of the proposed restitution

2    order is the money invested by the Atlantic and Houghs clients

3    which is that same $43 million.  So the government will submit

4    a restitution order for that $43 million and the approximate

5    $500,000 that the Wakpamni Lake Community Corporation seeks and

6    which I understand the defendant does not object to.  If my

7    math is right the total restitution is therefore $43,785,176,

8    but we'll submit a restitution order next week, your Honor.

9            THE COURT:  So I will get the restitution order next

10   week.  I understand that there is no objection to that amount

11   of restitution.

12           Does either counsel know of any legal reason why this

13   sentence cannot be imposed?

14           MS. MERMELSTEIN:  No, your Honor.

15           THE COURT:  Does counsel know of any legal reason why

16   this sentence cannot be imposed?

17           MS. SCOLARI:  Can we have another moment, your Honor.

18           THE COURT:  Go ahead.

19           That's the sentence of this Court.

20           Mr. Galanis, you have the right to appeal your

21   conviction and sentence except to whatever extent you may have

22   validly waived that right as part of your plea agreement.  If

23   you do choose to appeal, the notice of appeal must be filed

24   within 14 days of the judgment of conviction.  If you are not

25   able to pay for the cost of an appeal, you may apply for leave

H8b6gals

1    to appeal in forma pauperis, which simply means the court costs

2    and filing fees will be waived.  If you request, the Clerk of

3    Court will prepare and file a notice of appeal on your behalf.

4            Are there any open counts to dismiss?

5            MS. MERMELSTEIN:  There is an underlying indictment

6    which the government moves to dismiss.

7            THE COURT:  That will be dismissed.

8            Mr. Galanis, you talked in your letter about having

9    squandered a life of promise.  I think to some extent that

10   definitely is true.  With your intelligence and talents, you

11   could have been leading a very different life right now.  You

12   knowingly made the decisions that brought you here and you hurt

13   a lot of people.  I think you are right as you said in your

14   letter to focus on what your friend said, which is that you can

15   make a choice to leave prison a better person than the person

16   that went in.  I do hope you will make that choice and will

17   keep teaching and keep being a positive influence on other

18   people.  I wish you luck with that.

19           Are there any other applications?

20           MS. MERMELSTEIN:  No, your Honor.

21           THE COURT:  Are there any other applications from

22   defendant?

23           MS. SCOLARI:  No, your Honor.  Thank you.

24           THE COURT:  Thank you, we're adjourned.

25                              o0o