

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 4, 2018

**BY ECF**

The Honorable Ronnie Abrams
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

      Re:    <u>United States v. Jason Galanis, et al.,</u>
              **S1 16 Cr. 371 (RA)**

Dear Judge Abrams:

      The Government writes in opposition to the motions filed by defendants Gary Hirst, Bevan Cooney, John Galanis, and Michelle Morton, seeking to compel the Government to review the SEC's entire investigative file for hypothetical *Brady* material and to obtain and produce the SEC's entire investigative file as Rule 16 material solely because the Government and the SEC purportedly conducted a joint investigation.[1] In support of these arguments, the defendants urge the Court to improperly extend the law of this Circuit, which would result in perverse and undesirable incentives and undermine the efficient enforcement of the criminal and civil laws. Additionally, the Government has already agreed to review for *Brady* material any interview notes or testimony taken in connection with this investigation that is in the possession of the SEC. Accordingly, the defendants' requests should be denied.

---

[1] Michelle Morton seeks only to compel the Government to review the SEC's investigative file for *Brady* material but does not seek to compel the Government to obtain and produce the SEC's entire file. Morton Ltr. at 3. The Government notes that the defendants have all been on notice since June 2016 that the SEC was in possession of voluminous materials not in the possession of the Government and not included in the Government's Rule 16 productions. Archer Ltr. Ex. A. Indeed, Morton herself demanded such materials from the Government approximately a full year ago, Morton Ltr. Ex. A, but took no further action when the Government rejected her request. In light of the Government's disclosure of the existence of these materials more than 18 months ago, the defendants' requests are – in addition to being meritless – completely untimely.

Devon Archer – the only defendant with whom civil discovery has not been stayed – also moved to compel the Government to identify which materials being made available to him by the SEC had not been produced to him by the Government. Although the Government does not believe it has any obligation to provide such information, in an effort to expedite the resolution of the discovery disputes, the Government has provided the requested information to Archer. Accordingly, Archer's motion is moot.

### A.  The Wakpamni Fraud

As set forth in far greater detail in the Government's complaint and superseding indictment, between approximately March 2014 and April 2015, the defendants engaged in a complex scheme to defraud both the Wakpamni Lake Community Corporation (the "WLCC") and the pension fund clients of Hughes Capital Management ("Hughes") and Atlantic Asset Management ("Atlantic" and together with Hughes "AAM") by (i) inducing the WLCC to issue more than $60 million in bonds based on false and misleading representations; (ii) causing AAM pension-fund clients to purchase the bonds without disclosing various conflicts of interest and notwithstanding that such purchases were outside of the pension funds' set investment parameters; (iii) failing to invest the bond proceeds on the WLCC's behalf in the manner agreed upon; and (iv) misappropriating the proceeds of the bonds for their own purposes.

More specifically, Jason and John Galanis induced the WLCC, through false and misleading representations and omissions, to issue a total of more than $60 million of bonds over the course of four bond issuances (respectively, the "First Bond Issuance," the "Second Bond Issuance," the "Third Bond Issuance," the "Fourth Bond Issuance" and together, the "Bond Issuances").  According to the trust indentures and other documents relating to the Bond Issuances (collectively, the "Bond Agreements"), proceeds of the Bond Issuances were to be provided to an annuity provider, Wealth Assurance, to be invested in an annuity for the benefit of the WLCC and which would generate sufficient income to pay interest and eventually the principal to bond holders.  Hugh Dunkerley ("Dunkerley") established Wealth Assurance in the British Virgin Islands, while Gary Hirst ("Hirst") opened, and together with Dunkerley, was a signatory on, Wealth Assurance's Florida bank account (the "Wealth Assurance Account").

In connection with each of the Bond Issuances, the WLCC also entered into a placement agency agreement with Burnham Securities ("Burnham"), where Dunkerley was employed and in which Devon Archer ("Archer") and Bevan Cooney ("Cooney") each had an ownership interest.

In furtherance of the scheme, the defendants also took control of two investment advisers, whose clients funds were used to purchase the First and Fourth Bond Issuances.  More specifically, Burnham Financial Group ("BFG"), an entity controlled by Jason Galanis, Dunkerley, Archer and Cooney, provided financing to Morton to purchase first Hughes and later Atlantic (after which the two entities merged and were collectively known as AAM).  Hirst served as the Chief Investment Officer, and later as the Chairman of the Investment Committee, of Hughes.  In August 2014, Morton and Hirst directed the use of Hughes client funds to purchase approximately $27 million of bonds, representing the entirety of the First Bond Issuance.  In April 2015, Morton directed the use of AAM client funds to purchase $16.2 million of bonds, representing the entirety of the Fourth Bond Issuance.

Morton, and with respect to Hughes, Hirst, failed to make any disclosure to AAM's clients prior to causing the purchase of the bonds, notwithstanding that the bond purchases were outside the investment parameters of many of the clients.  Morton and Hirst also failed to disclose – as they were legally required to do – the numerous conflicts of interest that existed with respect to the purchase of the bonds.  For example, Morton and Hirst failed to disclose that (i) Dunkerley

was a managing director at Burnham, a managing member of BFG, an officer of Wealth Assurance, and a signatory on the Wealth Assurance Account; (ii) Hirst was the CIO and later the Chairman of the Investment Committee of Hughes and signed the trade tickets authorizing the purchase of the First Bond Issuance, the Assistant Secretary of Wealth Assurance, and a signatory on the Wealth Assurance Account; and (iii) Jason Galanis held himself out as affiliated with Burnham and was the notice party for certain placement agent agreements, orchestrated the purchase of Hughes and AAM by BFG, directed Morton and Hirst to purchase the First and Fourth Bond Issuances using client funds, and exercised control over Wealth Assurance.

The entirety of the proceeds from the First and Fourth Bond Issuances were deposited into the Wealth Assurance Account. Rather than invest the proceeds as specified in the Bond Agreements, the proceeds were transferred – often through intermediaries – to accounts controlled by Jason Galanis, John Galanis, Hirst, Archer and Cooney, among others. Among other transfers, in September 2014, $15 million from the proceeds of the First Bond Issuance was transferred from the Wealth Assurance Account to Archer, who then used the money to purchase the entirety of the Second Bond Issuance. Similarly, in October 2014, $5 million of the proceeds of the First Bond Issuance was transferred to Cooney, who then used the money to purchase the Third Bond Issuance. Jason Galanis, Archer and Cooney then used the bonds purchased with the recycled proceeds of the First Bond Issuance to, among other things, support their other business endeavors, including for example, using the bonds to meet broker-dealer net capital requirements.

B. Background of the Parallel Investigations

As the Court knows, the United States Attorney's Office is an arm of the United States Department of Justice, which is an executive agency responsible for enforcing the criminal laws in this country. The SEC is an independent regulatory agency charged with enforcing civil securities laws. In this case, in or around August 2015 the SEC commenced an investigation into the fraudulent use of client funds by AAM to purchase bonds issued by the WLCC (the "SEC Investigation").[2] On December 15, 2015, the SEC filed an action against AAM itself, alleging that AAM had committed securities fraud by, among other things, investing client funds in the WLCC bonds without the necessary disclosure of existing conflicts of interest. The SEC sought, among other remedies, to permanently enjoin AAM from engaging in the alleged fraudulent practices, a temporary restraining order and preliminary injunction against AAM, the appointment of an independent monitor, the disgorgement of ill-gotten gains, and civil monetary penalties. *See SEC* v. *Atlantic Asset Management, LLC*, 15 CV 9764 (WHP) (Dkt. No. 1). On December 21, 2015, having granted the SEC's motion, Judge Pauley appointed a temporary monitor over AAM. *Id.* (Dkt. No. 16). On January 8, 2016, in reliance in large part on reports written by the temporary

---

[2] 

monitor, Judge Pauley appointed a permanent receiver (the "Receiver") to oversee the dissolution of AAM. *Id.* (Dkt. No. 26). As a result of the receivership, the Receiver – and through the Receiver, the SEC – came into possession of the entirety of AAM's records, including, but not limited to (i) servers; (ii) computers, thumb drives and other electronic devices; (iii) emails; and (iv) hard copy documents.

Subsequently, in connection with its parallel, criminal investigation into that conduct (the "Criminal Investigation"), the Government submitted an access request letter to the SEC on or about January 20, 2016. Once granted, this access request allowed the SEC to provide to the Government documents and materials that the SEC obtained as part of its investigation (and which were otherwise not subject to any privilege or limitation). Pursuant to that access request letter, the Government obtained millions of documents from the SEC. All of the SEC materials in the possession, custody and control of the Government have been produced to the defendants pursuant to the Government's disclosure obligations under Rule 16 of the Federal Rules of Criminal Procedure. The Government understands that there are documents in the possession, custody and control of the SEC – principally, but not exclusively, consisting of documents obtained by the SEC as the result of the AAM receivership – that the Government does not have. Likewise, the Government obtained evidence pursuant to court orders, grand jury subpoenas, and grand jury immunity orders, which it did not share with the SEC.

During the investigation, to maximize efficiency and reduce the financial and other burdens on third-party witnesses, the Government and the SEC have generally conducted witness interviews together. Before each interview, the respective, independent agencies informed the witness that the criminal and civil investigations were separate investigations designed to enforce separate laws, and that the interviews were conducted at the same time primarily for the convenience of the parties. For the most part (but with some exceptions), representatives from both the Government and the SEC asked questions, but in all cases, either an FBI agent or an agent from the United States Postal Inspection Service ("USPIS") took the only notes and drafted reports memorializing the interviews. On some occasions, attorneys for the SEC went to the U.S. Attorney's Office to review and create notes and/or memoranda from some, but not all, of those reports. In a number of cases, the Government and/or FBI or USPIS agents have conducted interviews without the SEC present.

On May 11, 2016, the Government's complaint against Jason Galanis, John Galanis, Hirst, Dunkerley, Morton, Archer and Cooney was unsealed. The Government's complaint alleged that the defendants had engaged in securities fraud and (solely with respect to Jason Galanis, Hirst, and Morton) investment adviser fraud, in connection with the defendants' participation in a scheme to fraudulently cause the WLCC to issue more than $60 million worth of bonds and to fraudulently use more than $40 million of AAM clients' assets to purchase the majority of those bonds. The same day, the SEC filed a civil complaint against those defendants, alleging violations of the securities laws related to the same scheme to defraud both AAM investors and the WLCC (the "SEC Action"). On or about November 14, 2016, the SEC amended its complaint in the SEC Action to add charges against Francisco Martin ("Martin"). Although the charges were based on the same underlying conduct, and the Government and the SEC discussed broad theories of liability based on the underlying facts, the Government and the SEC each evaluated its own evidence and made independent charging decisions based on each agency's own mandate to

enforce its respective laws. The Government did not direct the SEC to take any action or make any particular decision, nor did the SEC direct the Government to do the same. Indeed, the SEC brought charges against both AAM and Martin, where the Government did not.

By motion dated July 11, 2016, the Government intervened in the SEC Action and sought a stay of (a) all depositions, interrogatories, requests for admission, and any other form of discovery that would create statements of any person who the Government asserts may be called as a witness in the criminal prosecution; (b) production of transcripts of testimony and notes of or memoranda describing interviews with, written statements made or adopted in the course of an interview by, or correspondence concerning interviews of any person whom the Government asserts may be called as a witness in the criminal action; and (c) disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1)(A)(i) in the SEC Action until the conclusion of the parallel criminal case. The Government did not seek to otherwise stay document discovery. *See* Government Memorandum of Law in Support of Motion to Intervene and For a Stay, *SEC* v. *Archer, et al.*, No. 16 Civ. 3505 (WHP) (July 11, 2017) (Dkt. No. 34). As represented in the Government's motion, defendants Jason Galanis, John Galanis, Dunkerley, and Morton consented to the stay. On July 25, 2016, defendants Archer, Cooney and Hirst opposed the Government's motion. *See* Memorandum of Law in Opposition to the Motion of the U.S. Attorney's Office to Intervene and For a Stay of Discovery, *Archer*, 16 Civ. 3505 (WHP) (July 25, 2016) (Dkt. No. 47) ("Stay Opp."); Notice of Joinder and Joinder to Co-defendant Devon Archer's Opposition to Government's Motion to Intervene and for a Limited Stay of Discovery, *Archer*, 16 Civ. 3505 (WHP) (July 25, 2016) (Dkt. No. 49) ("Cooney Joinder"); Defendant Gary Hirst's Notice of Joinder With Certain Defendants' Memorandum of Law in Opposition to the Motion of the U.S. Attorney's Office to Intervene and for a Stay of Discovery, *Archer*, 16 Civ. 3505 (WHP) (July 25, 2016) (Dkt. No. 50) ("Hirst Joinder").

On August 10, 2016, Judge Pauley granted the Government's motion to intervene and its motion for a partial stay of discovery. Opinion and Order re: Motion to Intervene filed by United States Attorney, *Archer*, 16 Civ. 3505 (Dkt. No. 54). Following requests by defendants Morton and Dunkerley for a full stay, on August 24, 2016, Judge Pauley fully stayed discovery with respect to those defendants – John Galanis, Jason Galanis, Morton and Dunkerley – who were not formally represented in the SEC Action. *See* Order Terminating Motion to Stay, *Archer*, 16 Civ. 3505 (WHP) (August 24, 2016) (Dkt. No. 77). With respect to defendants Archer, Cooney and Hirst, Judge Pauley ordered that discovery would proceed as limited by the August 10, 2016 Order, but that discovery would be fully stayed with respect to any defendant who invoked his Fifth Amendment rights in response to a discovery request. *Id.* On October 14, 2016, in response to invocations of Fifth Amendment rights by both Hirst and Cooney, Judge Pauley stayed discovery with respect to those defendants. *Id.* (Dkt. No. 82). Archer has not invoked his Fifth Amendment rights with respect to the production of documents, and the Government understands he is engaged in civil discovery with the SEC.

On December 26, 2017, the Government informed the defendants that it would voluntarily review for *Brady* any interview notes or testimony taken in connection with the SEC Investigation. No defendant has responded to the Government's disclosure.

**C. Applicable Law**

"An individual prosecutor is presumed . . . to have knowledge of all information gathered in connection with his office's investigation of the case and indeed 'has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police.'" *United States* v. *Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (quoting *Kyles* v. *Whitley*, 514 U.S. 419, 437 (1995)). "Nonetheless, knowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor, for the imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office would inappropriately require us to adopt 'a monolithic view of government' that would 'condemn the prosecution of criminal cases to a state of paralysis.'" *Id.* at 255 (internal citations omitted); *see also United States* v. *Locascio*, 6 F.3d 924, 949 (2d Cir. 1993) (rejecting imputation of knowledge of FBI reports by agents who were not involved in the investigation or trial); *United States* v. *Quinn*, 445 F.2d 940, 944 (2d Cir. 1971) (rejecting imputation of knowledge of a Florida prosecutor to an AUSA in New York). Instead, a prosecutor's constructive knowledge, and hence her *Brady* obligations, extend only to members of the "prosecution team," i.e., "those whose actions can be fairly imputed to" her. *United States* v. *Bin Laden*, 397 F. Supp. 2d 465, 481 (S.D.N.Y. 2005).

Courts in this Circuit have repeatedly rejected arguments that cooperation between the Government and another state or federal agency resulted in a "joint investigation" between the USAO and that agency, such that the other agency became part of the prosecution team. *United States* v. *Rigas*, 583 F.3d 108 (2d Cir. 2009) (affirming district court opinion holding that there was "no joint investigation with the SEC" and therefore the Government did not need to produce documents in the custody of the SEC); *SEC* v. *Stanard*, No. 06 Civ. 7736 (GEL), 2007 WL 1834709, at *3 (S.D.N.Y. June 26, 2007) (finding that facts similar to those here "make clear that the investigations, while they may have overlapped, were not conducted jointly" in denying the defendant's request for the Court to require the SEC to access and review FBI interview notes that were not in the SEC's possession, custody or control); *United States* v. *Finnerty*, 411 F. Supp. 2d 428, 433 (S.D.N.Y. 2006) (Chin, *J.*) (holding that the Government and the NYSE, even if it were a state actor, did not conduct a joint investigation related to the policies of the NYSE); *Ferreira* v. *United States*, 350 F. Supp. 2d 550, 556-57 (S.D.N.Y. 2004) (holding that cooperation between the Government and NYPD was "not sufficient to make the Government and the state prosecutor members of the same 'prosecutorial team'"); *United States* v. *Upton,* 856 F. Supp. 727, 749-50 (E.D.N.Y. 1994) (holding that USAO and FAA did not conduct a "joint investigation" even though the FAA provided two inspectors to assist the criminal investigation); *United States* v. *Guerrerio*, 670 F. Supp. 1215, 1219 (S.D.N.Y. 1987) (denying Rule 16 discovery request for grand jury minutes at the Bronx District Attorney's Office where there was no joint investigation with the USAO and USAO had no control over the material).

The defendants rely principally on a single opinion in this District that attempted to determine whether parallel investigations became joint through an analysis of the ways in which the agencies gathered relevant facts. In *United States* v. *Gupta,* 848 F. Supp. 2d 491 (S.D.N.Y. 2012), the Government and the SEC interviewed 44 witnesses together, attorneys for both agencies asked questions, and the SEC attorney prepared memoranda that summarized the relevant information shortly after the interviews occurred while also consulting with the Government in

doing so. *Id.* at 494. While recognizing the inconsistency of the case law in this area, and without citing to any authority, Judge Rakoff determined that, in the context of *Brady* disclosures, the proper inquiry to determine whether parallel investigations are also joint investigations "is one of fact-gathering, not charging determinations or otherwise." *Id.* Judge Rakoff thus determined that "joint fact-gathering" triggers *Brady* obligations for the Government related to the interviews conducted together by the Government and the SEC, even if there is no "joint prosecution." *Id.* at 494-95. Judge Rakoff clarified that "[t]his does not mean that all of the documents the SEC prepared and accumulated in its investigation are part of the joint investigation," but rather held that the Government need only review for *Brady* documents related to the witness interviews conducted by both agencies. *Id.* at 495. Similarly, in *United States* v. *Walters*, No. 16 Cr. 338 (PKC) Judge Castel held that the Government need only review the same materials – the materials the Government has also committed to reviewing here. (Dkt. 51, Tr. 11-14).

### D.  Discussion

As described above, the Government has already agreed to conduct the review that *Gupta* would require (and is consistent with the review ordered by Judge Castel in *Walters)*. The defendants nonetheless urge the Court to require the Government to scour the SEC's entire "investigative files" for *Brady*. But even if this Court were to adopt the reasoning of *Gupta*—and it should not—the materials the defendants want the Government to review for *Brady* are neither in the possession of the Government nor were they obtained as part of any joint investigation. Accordingly, the defendants' demands should be rejected.

#### 1.  The Criminal and Civil Investigations Were Parallel, Not Joint[3]

First, the Government and the SEC were not engaged in a "joint investigation," such that the SEC is part of the "prosecution team."

Courts in this District have emphasized that whether a person or agency is a member of the prosecution team depends on the totality of the circumstances. *United States* v. *Meregildo*, 920 F. Supp. 2d 434, 442 (S.D.N.Y. 2013). These circumstances include not just joint fact gathering, but also whether the individual or agency "acts under the direction of the prosecutor . . . or aids the prosecution in crafting trial strategy." *Id.* "At bottom," as Judge Pauley noted in *Meregildo*, "imputation [of knowledge for *Brady* purposes] involves a question of agency law: should a prosecutor be held responsible for someone else's actions?" *Id.* at 443. "An agency relationship is limited in scope and defined by control." *Id.* Thus, instead of focusing the "joint investigation"

---

[3] Defendant Morton requests – to the extent the Government denies the existence of joint fact gathering – that the Court seek, among other items, documents and emails between the USAO and the SEC in order to determine "the extent to which the [two] worked together on this investigation." Morton Ltr. at 3. Such an invasive and unprecedented request is unwarranted. The Government has readily proffered the extent to which its investigation has run parallel to the SEC Investigation and has openly disclosed the relevant facts. The Government's disagreement with the defendants does not arise from a dispute about the facts. Accordingly, there is no justification for any request for production of the Government's communications.

inquiry solely on joint fact-gathering, which simply is a result of efforts to promote efficiency and which would lead to perverse results if abandoned, the Government asks the Court to consider whether the parallel investigations made joint decisions about which charges to bring or which defendants to charge, or if the SEC otherwise acted at the direction of the USAO, for example, obtaining evidence solely for use in the criminal case. Here, the two agencies did not strategize about what charges they intended to bring, or even agree on which entities and defendants each would charge and the USAO exercised no control over the SEC. Instead, each agency independently evaluated their separate evidence to make independent investigatory and charging decisions consistent with their separate mandates.

The defendants' overly broad and burdensome requests demonstrate why the proper inquiry into whether parallel civil and criminal investigations are "joint investigations" should focus on decision-making, not fact-finding as suggested in *Gupta*. *See SEC* v. *Stanard*, No. 06 Civ. 7736 (GEL) 2007 WL 1834709, at *3 (S.D.N.Y. June 26, 2007) (noting that the SEC is an independent agency from the Government in holding that, although the parallel investigations "may have overlapped," they were not conducted jointly); *see also United States* v. *Rigas*, 2008 WL 144824, at *2 (S.D.N.Y. Jan. 15, 2008) (finding similarly parallel civil and criminal investigations were not "joint"). Any long-term parallel investigation will inevitably result in some overlap in fact gathering, and courts in this District, prior to *Gupta*, repeatedly rejected the suggestion that coordination between the USAO and SEC resulted in a joint investigation. To do otherwise would require witnesses to travel, sit and be asked questions about the same subject matter by two (or more) agencies serially, and would require subpoena recipients to respond and produce documents to two (or more) agencies on multiple occasions. Asking the Government to review the entire SEC investigative file — including accessing servers, electronic files, and hard copy documents in multiple locations, reviewing terabytes of documents, and parsing through attorney work product — simply because the Government and the SEC sought to maximize the efficiencies of investigation would "inappropriately require [the court] to adopt 'a monolithic view of government' that would 'condemn the prosecution of criminal cases to a state of paralysis.'" *Avellino*, 136 F.3d at 255. Reviewing the entire investigative file of another independent agency would be inordinately time consuming and burdensome for attorneys for the Government, which does not have custody of the files, is not familiar with the files, and knows of no effective way to search the files. Indeed, the Government routinely does not ask the SEC for its entire investigative file for this precise reason, as it cannot afford to take on obligations it cannot realistically be expected to meet.

It is entirely unsurprising that the law of parallel proceedings has developed in this fashion, given that parallel investigations between the SEC and the Government have been repeatedly endorsed in support of the "[e]ffective enforcement of the securities laws." *SEC* v. *Dresser Industries, Inc.*, 628 F.2d 1368, 1377 (D.C. Cir. 1980) (en banc) ("If the SEC suspects that a company has violated the securities laws, it must be able to respond quickly: it must be able to obtain relevant information concerning the alleged violation and to seek prompt judicial redress if necessary. Similarly, Justice must act quickly if it suspects that the laws have been broken. Grand jury investigations take time, as do criminal prosecutions."). To that end, the typical overlap between investigations that existed here to promote efficiency and reduce costs has been affirmed by several judges in this District as indicative of parallel, not joint, investigations. *See, e.g.*, *United States* v. *Goffer*, No. 10 Cr. 56 (RJS) (S.D.N.Y. July 29, 2010) (Dkt. No. 90) (denying motion for

production of material in possession of the SEC based, in part, on representations by the Government that similar cooperation as here occurred between the Government and the SEC); *Rigas*, 2008 WL 144824, at *2; *Stanard*, 2007 WL 1834709, at *2. In *Stanard*, for example, then-District Judge Lynch addressed a defendant's discovery request to the SEC to obtain and produce notes and memoranda that were in the possession, custody and control of the U.S. Attorney's Office but which the SEC had reviewed. *Stanard*, 2007 WL 1834709, *2. Acknowledging that the SEC could be considered to have "effective control" over the documents if it conducted a joint investigation with the Government, Judge Lynch instead determined that the facts of the case "ma[d]e clear that the investigations, while they may have overlapped, were not conducted jointly," and rejected the defendant's argument. *Id.*; *see also Finnerty*, 411 F. Supp. 2d at 433 (finding NYSE investigation into own policies that were relevant to criminal charges was not joint investigation). Thus, there was no "joint investigation" and the defendants' request should be denied.

### 2. The Defendants' Request is Distinguishable from *Gupta*

Even if the Court were inclined to focus solely on joint fact-gathering in determining whether there was a "joint investigation," the defendants' requested relief is unsupported by any authority and excessively broad. Unlike here, where the defendants seek to compel the Government to review the entire SEC investigative file for *Brady*, Gupta simply requested that the Government review for *Brady* the SEC's notes and memoranda of interviews that the two agencies conducted together. Indeed, in holding that the Government's *Brady* obligations extended to the SEC's notes and memoranda of jointly conducted interviews, *Gupta* relied on the fact that the Government could easily access the requested materials. *See Gupta*, 848 F. Supp. 2d at 495 (citing *United States* v. *Brooks*, 966 F. 2d 1500, 1503 (D.C. Cir. 1992) (holding that prosecutor must search files "particularly when files can be searched 'without any difficulty'")). That is not true with respect to the SEC's entire investigative file, which is cumbersome, located in multiple places, and difficult, if not impossible, to search. Moreover, *Gupta* makes clear that not "all of the documents the SEC prepared and accumulated in its investigation of Gupta are part of the joint investigation." *Id.* Rather, *Gupta* held that the Government's obligation to review for *Brady* extends only to "documents arising from those joint efforts" to "investigate the facts of a case together. *Id.* Accordingly, the defendants' overbroad request runs afoul of *Gupta*.

In the present case, the materials the defendants now seek as "highly relevant" and not in the possession of the Government consist of:

- Approximately 40 boxes of documents stored by AAM in its Alexandria, Virginia and Stamford, Connecticut Offices
- Servers, back up tapes collected from AAM by the Receiver from AAM offices in Alexandria and Stamford
- Assorted materials collected by the Receiver from AAM Alexandria and Stamford offices. Includes selected documents obtained by the Receiver; additional hard drives from Alexandria and Kansas City (old); back up external harddrive of the Stamford server; Daniel Turney's back up external harddrive from Alexandria' keys, id cards and employee phones (excluding Morton's); Hughes 2013 tax return; Service providers contracts; quick books data

- Emails from Intel (the Internet Service Provider for AAM Stamford) and
- 55 Desktop harddrives; 7 laptops and 10 other devices.

(Hirst Ltr. at 3). These are all AAM materials that came to be in the possession of the SEC solely as a result of the SEC's suit against AAM and the resulting appointment of a Receiver. Even under *Gupta*, the joint nature of any investigation is not binary, but "must be evaluated in light of the disclosures being requested." *Gupta*, 848 F.Supp. 2d at 494; *see also*, *United States* v. *Wilmington Trust Corp.*, 2016 WL 3749860, at *3 (D. Del. July 12, 2016) (applying *Gupta* and noting that "parallel investigations in cases [of large] size and complexity may converge and be considered 'joint' with regard to certain disclosures, but can also be entirely independent with regard to other fact-finding efforts"). Thus, documents gathered in the ordinary course of an SEC investigation are not a part of the joint investigation nor deemed in the possession of the Government for *Brady* purposes. *Gupta*, 848 F.Supp. 2d at 495 ("[t]his does not mean that all of the documents the SEC prepared and accumulated in its investigation are part of the joint investigation," only documents related to the witness interviews conducted by both agencies are part of the joint investigation and subject to review for *Brady*). Documents like the ones here, gathered largely as the result of the appointment of a Receiver and thus outside of the SEC's normal investigative efforts, are thus even less a part of any purported joint investigation. Indeed, these materials were obtained by the SEC without an iota of input or communication with the Government and as the result of the appointment of a Receiver *prior* to the Government's submission of an access request letter to the SEC. *United States* v. *Connolly*, No. 16-cr-370, 2017 WL 945934, at * 7 (S.D.N.Y. March 2, 2017) ("The fact that the Government obtained documents that had already been produced to [a regulator] does not convert its fact-finding into joint fact-finding.") Accordingly, the documents were not part of any joint fact finding effort and are not constructively in the Government's possession.

### 3. The Defendant's Demand For Production of the Entire SEC File is Without Merit

Not content to demand merely that the Government search the SEC's entire investigative file for *Brady* material, defendants Hirst, Cooney and John Galanis also demand that the Government obtain the entirety of the SEC's investigative file and produce it to the defendants. Because, for the reasons set forth above, there was no joint investigation and any "joint fact gathering" did not encompass the documents at issue here, the defendants' request should be denied. *See United States* v. *Chalmers*, 410 F.Supp.2d 278, 289 (S.D.N.Y. 2006) ("[A]lthough the 'material to the defense' category is arguably a broader scope of documents than exculpatory materials required by *Brady,* the Court is not persuaded that the 'government' for purposes of Rule 16 should be any broader than the 'prosecution team' standard that has been adopted in the *Brady* line of cases.").

Although the lack of a joint investigation or joint fact gathering ends the inquiry, the Government further notes that the defendants' characterization of the entirety of AAM's documents, including entire servers, backup tapes, emails, and electronic devices as both "highly relevant," Morton Ltr. at 2, and as constituting Rule 16 materials, Hirst Ltr. at 1, is preposterous. It is apparent on the face of the SEC's description of these documents that the documents the defendants now seek will include, to name only a few examples: (i) documents dated years or even decades before the events at issue; (ii) communications between individuals wholly uninvolved in

the Wakpamni bonds, or indeed in any investment decisions; and (iii) contracts with third parties, such as service providers and landlords. The defendants' attempt to paint with a broad brush the entirety of AAM's documents as both relevant and material to the defense reveals that their demand for the production of these materials is no more than a fishing expedition designed to waste Government resources and to provoke the delay of trial. The defendants' meritless request should be denied.

### E. Conclusion

The United States Attorney's Office and the SEC are separate agencies with separate mandates. One is located within the Department of Justice, the other is an independent administrative agency. One is a law enforcement agency, the other a regulator. They have separate offices, budgets, personnel, and files, not to mention procedures for organizing and maintaining evidence and other materials. Government attorneys seek indictments from the grand jury. SEC attorneys seek approval to file charges from the members of their Commission. Although, as here, they occasionally investigate the same conduct, they make their own, independent determinations about whether the evidence gathered satisfies their respective criminal and civil standards and burdens of proof. They make independent decisions about whom to charge and with what offenses—as is evidenced here by the SEC's decision to charge both AAM and Francisco Martin. While they occasionally gather evidence together to promote efficiencies and ease the burden on witnesses and subjects of their investigations, they are not the same party. To require the Government to search the SEC's entire voluminous files for material that is not, and never was, in its possession nor was ever reviewed based simply on their efforts to conduct parallel investigations would seriously undermine the separate but complementary criminal and regulatory structure set up by Congress. Accordingly, where, as here, the only meaningful collaboration between the Government and SEC investigations was to conduct interviews together to promote efficiency and reduce costs, and for the SEC to provide documents to the Government that the Government could have otherwise obtained through grand jury subpoena, the Government respectfully submits that the Court should determine that the investigations were parallel, not joint, and deny the defendants' motions.

Respectfully submitted,

JOON H. KIM
Acting United States Attorney

By: _/s/ Rebecca Mermelstein_____
Rebecca Mermelstein/ Brendan F. Quigley/
Negar Tekeei
Assistant United States Attorneys
(212) 637-2360/2190/2482

cc: All defense counsel (by ECF)