UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

JASON GALANIS, *et al*.

                 Defendants.

Case No. 16-cr-371 (RA)

# MEMORANDUM OF LAW IN SUPPORT OF
# DEFENDANT GARY HIRST'S MOTION FOR SEVERANCE

Michael Tremonte
Noam Biale
Emily Burgess
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004
Tel: (212) 202-2600
Email: mtremonte@shertremonte.com

*Attorneys for Defendant Gary Hirst*

**PRELIMINARY STATEMENT**

Defendant Gary Hirst, by and through his undersigned attorneys, respectfully submits the following memorandum of law in support of his motion for severance. Counts One and Two of the Superseding Indictment in this action (the "Superseding Indictment") charge Mr. Hirst and six co-defendants with, respectively, securities fraud and conspiracy to commit the same, and Counts Three and Four charge Mr. Hirst, Jason Galanis ("Jason"), and Michelle Morton with, respectively, investment adviser fraud and conspiracy to commit the same. Jason has pled guilty and has been sentenced. Mr. Hirst and Ms. Morton – as well as three of their co-defendants – are proceeding to trial.

Pursuant to Rule 14(a) of the Federal Rules of Criminal Procedure, Mr. Hirst's trial should be severed from Ms. Morton's because joinder will severely prejudice Mr. Hirst and deprive him of a fair trial. Severance is required because Mr. Hirst's and Ms. Morton's defenses will be mutually antagonistic, such that each will attempt to convince the jury to convict the other. Each will argue that the other was responsible for providing truthful, accurate information concerning the investment guidelines of certain investors of Hughes Capital Management ("Hughes"), and each will likely argue that the other made misrepresentations and omissions with regard to placement of bonds in the investors' portfolios. Each will argue that the other bore ultimate decision-making authority and took on fiduciary duties such that the failure of that person to disclose relevant information regarding the bonds, as well as alleged conflicts of interest, to Hughes' clients breached the duties owed by an investment adviser. And each will argue that the evidence shows the other conspired with Jason to commit fraud without his or her knowledge. In other words, each will argue that the other is guilty of the charged crimes and that the jury should so conclude as part of its finding that he or she is not guilty. These defenses are

mutually antagonistic or, at minimum, their essences are likely to be in such conflict that each defendant will be forced to contend with *two* prosecutors at trial: the attorney for the government and counsel for the other defendant. Severance is warranted to prevent such a prejudicial outcome that would compromise Mr. Hirst's right to a fair trial.

In addition, Mr. Hirst's trial should be severed from that of his other co-defendants because a joint trial will result in severe prejudice to him and substantial jury confusion, without providing any benefit to trial management or judicial economy. The Superseding Indictment alleges that other co-defendants were involved in fraudulent acts about which Mr. Hirst is not alleged to have any knowledge. It is wholly unnecessary for the government to present evidence as to such conduct to meet its burden as to Mr. Hirst. Evidence of these alleged extrinsic acts will overwhelm the scant evidence the government will muster against Mr. Hirst, will confuse the jury, and will create substantial risk that Mr. Hirst will be convicted based on evidence that would not be admissible against him alone. Moreover, the likelihood of constant, overlapping objections and evidentiary battles between five sets of defense counsel will erase any gains in judicial economy that ordinarily arise from a joint trial. For these reasons, explained more fully below, the Court should grant Mr. Hirst's severance motion.

## FACTUAL BACKGROUND

### I. The Securities Fraud Conspiracy

The Superseding Indictment alleges the existence of a securities fraud conspiracy that began when John Galanis ("John") met with representatives of the Wakpamni Lake Community Corporation ("WLCC") at a Native American economic development conference in Las Vegas, Nevada in March 2014. *See* Superseding Indictment ¶¶ 26, 28(a), *United States v. Galanis*, No. 16-cr-371 (RA) (S.D.N.Y. Nov. 2, 2016), ECF No. 90 (the "Superseding Indictment").

Subsequently, both John and Jason are alleged to have met with WLCC representatives on other occasions and, through "false and misleading representations and omissions," persuaded the WLCC to issue $60 million worth of tribal bonds over the course of four bond issuances. *Id.* ¶ 6. The Superseding Indictment does not allege that Mr. Hirst ever met with the WLCC, or that Mr. Hirst was aware of John and Jason's meetings with the WLCC, or that Mr. Hirst was aware of any misrepresentations by John and Jason to the WLCC.

The Superseding Indictment further alleges that Jason "apprised Devon Archer and Bevan Cooney . . . about the progress of the Bond Issuances and the likely proceeds to be obtained therefrom, and further discussed with them potential uses that could be made of the proceeds." *Id.*; *see also id.* ¶ 11. It is not alleged, however, that Jason (or anyone else) apprised Mr. Hirst of these developments, or discussed with Mr. Hirst the use of proceeds of the Bond Issuances; nor is it alleged that Mr. Hirst was aware of any of this, either contemporaneously or subsequently.

The Superseding Indictment alleges that, in connection with each of the bond issuances, the WLCC entered into a placement agency agreement with a broker-dealer (the "Placement Agent") to solicit investors in exchange for a fee. *Id.* ¶ 9. Archer and Cooney are alleged to have been owners of the Placement Agent, and Hugh Dunkerley was employed by the Placement Agent and signed the placement agency agreements. Mr. Hirst is not alleged to have had any stake in, or involvement with, the Placement Agent or the placement agency agreements.

John is alleged to have falsely represented to the WLCC that Jason was affiliated with the Placement Agent. *Id.* ¶¶ 9-10. At the same time, Archer is alleged to have falsely represented to the Placement Agent that Jason would not be involved with the Placement Agent (or any of its affiliates), and that Jason would not source deals to the Placement Agent. *Id.* ¶ 10. The

4

Superseding Indictment does not allege that Mr. Hirst was aware of these matters, or was in any involved in any representations made to the Placement Agent or to the WLCC concerning the Placement Agent.

The Superseding Indictment alleges that the trust indentures entered into in connection with the bond issuances stated that the bond proceeds would initially be placed in a bank account held by an annuity provider, and that Mr. Hirst opened a bank account in Florida (the "Dunkerley Account") in the name of the annuity provider, with Mr. Hirst and Dunkerley as signatories on the account. *Id.* ¶¶ 7-8. The Superseding Indictment alleges the proceeds of the bond issuances were placed in the Dunkerley Account and that Mr. Hirst was the "Assistant Secretary" of the annuity provider, *id.* ¶ 7, 15(b), but it does not allege Mr. Hirst actually possessed or exercised any authority over the Dunkerley Account. Rather, all transfers of the bond proceeds from the Dunkerley Account were initiated by Dunkerley at Jason's direction, without any involvement by Mr. Hirst. *Id.* ¶ 17. The Superseding Indictment alleges that Jason transferred a portion of the proceeds from the first bond issuance to "an entity controlled by" Dunkerley and Mr. Hirst, but again, does not allege that Mr. Hirst actually exercised any control over those funds. *Id.* ¶ 20.

The Superseding Indictment further alleges that Jason, Dunkerley, Archer, and Cooney misappropriated $20 million from the proceeds of the First Bond Issuances and used the money to purchase the Second and Third Bond Issuances." *Id.* ¶ 21. The Superseding Indictment does not allege, however, that Mr. Hirst played any role in that alleged misappropriation, nor does it allege that he had any involvement in the second and third bond issuances; nor does the Superseding Indictment allege that Mr. Hirst played any role in a subsequent, fourth bond issuance.

## II.     The Alleged Investment Adviser Fraud Conspiracy

The Superseding Indictment alleges that the investment adviser fraud conspiracy began in May 2014, and that Jason "arranged for an entity he, Devon Archer, Hugh Dunkerley, and Bevan Cooney . . . controlled to provide financing for Michelle Morton . . . to purchase" Hughes and, later, another investment adviser, Atlantic Asset Management ("Atlantic"), both of which had clients whose funds could be used to purchase tribal bonds. *Id.* ¶ 12. The Superseding Indictment does not allege that Mr. Hirst was associated with or in any way controlled the entity providing the financing, or that he played any role in securing that financing or was otherwise involved in any way with Atlantic.

The Superseding Indictment further alleges that Ms. "Morton installed Gary Hirst . . . with Jason Galanis's knowledge and approval" as Chief Investment Officer ("CIO") and, later, Chairman of the Investment Committee, of Hughes. *Id.* ¶ 12. It alleges that "Morton and Hirst, at the direction of Jason Galanis, directed the use of Hughes client funds to purchase . . . the entirety of the First Bond Issuance." *Id.* ¶ 13(a). It further alleges that "Hirst . . . sent an email containing trade tickets signed by him authorizing the purchase of certain bonds issued by the WLCC on behalf of certain clients of Hughes." *Id.* ¶ 28(d). And it alleges that Ms. Morton and Mr. Hirst failed to consult with Hughes' clients prior to purchasing the tribal bonds, even though the purchases "were outside the investment parameters of many of the clients," *id.* ¶ 14, and that Ms. Morton and Mr. Hirst failed to disclose conflicts of interest regarding the bond purchases. *Id.* ¶ 15.

Finally, the Superseding Indictment alleges misconduct by Jason, Dunkerley, Archer, and Cooney with respect to a second and third bond issuance, but does not allege any involvement of Mr. Hirst in these bond issuances. *Id.* ¶ 21. The Superseding Indictment also alleges that Ms.

"Morton, at the direction of Jason Galanis, directed the use of Atlantic client funds to purchase . . . the entirety of the Fourth Bond Issuance," *id.* ¶ 13(b), and that "Morton . . . failed to make any disclosures to any Atlantic client, prior to causing the clients' purchases of the bonds," and failed to disclose conflicts of interest regarding the bond purchases to Atlantic clients. *Id.* ¶¶ 14-15.  Mr. Hirst is not alleged to have played any role in the management of Atlantic, and he is not alleged to have been involved in any decisions regarding the use of Atlantic's clients' funds to purchase tribal bonds.

## ARGUMENT

I. **THE COURT SHOULD SEVER MR. HIRST'S TRIAL FROM THE TRIALS OF HIS CO-DEFENDANTS**

"Even if joinder is proper under Rule 8, a court may still sever pursuant to Rule 14(a) if it appears joinder would prejudice a defendant or the government." *United States v. Bowen*, 689 F. Supp. 2d 675, 685 (S.D.N.Y. 2010), *aff'd sub nom. United States v. Ingram*, 490 F. App'x 363 (2d Cir. 2012).  Under Rule 14(a) of the Federal Rules of Criminal Procedure, "a district court should grant a severance . . . if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993).  Where a joint trial creates such prejudice or compromises the jury's ability to make a reliable determination, an essential element of the defendant's constitutional right to a fair trial is undermined.  *See Bruton v. United States*, 391 U.S. 123, 131 n.6 (1968).

A court's determination of whether such prejudice rises to the level of warranting severance is "clearly fact-driven" and "must necessarily be determined on a case-by-case basis, considering the totality of the circumstances." *United States v. Heatley*, No. S2 96-cr-515 (SS), 1997 WL 12961, at *2 (S.D.N.Y. Jan. 14, 1997); *see also Zafiro*, 506 U.S. at 539 ("The risk of

7

prejudice will vary with the facts in each case. . . ."). The Second Circuit has recognized several types of situations in which severance may be appropriate, including cases involving mutually antagonistic defenses. Indeed, "'[m]utually antagonistic' or 'irreconcilable' defenses may be so prejudicial in some circumstances as to mandate severance." *United States v. Salameh*, 152 F.3d 88, 116 (2d Cir. 1998) (quoting *id.* at 538).

"In order to make a showing of 'mutually antagonistic' or 'irreconcilable defenses,' the defendant must make a factual demonstration that 'acceptance of one party's defense would tend to preclude the acquittal of [the] other.'" *Id.* at 116 (quoting *United States v. Smith*, 788 F.2d 663, 668 (10th Cir. 1986)) (alteration in original). This requirement is met where a co-defendant "will act as a second prosecutor," such that "[t]he jury may convict [one defendant] based upon either the government's theory or [the co-defendant's] theory." *United States v. Copeland*, 336 F. Supp. 2d 223, 224 (E.D.N.Y. 2004); *see also United States v. Volpe*, 42 F. Supp. 2d 204, 210 (E.D.N.Y. 1999) ("[T]he facts establish the existence of mutually antagonistic defenses . . . . where, in effect, a defendant's counsel becomes a 'second prosecutor,' who, 'in order to zealously represent his client . . . . [does] everything possible to convict the other defendant,'" which "may inhibit the jury from evaluating the evidence against each defendant based on that defendant's own acts and statements") (quoting *United States v. Tootick*, 952 F.2d 1078, 1082 (9th Cir. 1991)).

Severance is also required "when antagonism at the *essence* of the defenses prevails to such a degree – even without being mutually exclusive – that the jury unjustifiably infers that the conflict alone indicated that both defendants were guilty." *United States v. Cardascia*, 951 F.2d 474, 484 (2d Cir. 1991). Applying this principle, the Second Circuit reversed the denial of a motion for severance in *United States v. Serpoosh*, 919 F.2d 835 (2d Cir. 1990), where "[e]ach

8

[defendant] described himself as the unwitting dupe of the other," and "each defense counsel attacked the credibility of the other defendant as well as his version of events." *Id.* at 836-37. The government in *Serpoosh* made use of the conflict between the defendants' stories to "contrast[ ] the 'theoretical[ ]' possibility that neither of the defendants knew of the [criminal conduct of others] (*i.e.*, both stories were true) with the 'realistic world' in which neither story could be true." *Id.* at 838. The Second Circuit noted that because "both defendants gave detailed and mutually exclusive explanations of their conduct" and "[t]he damage done was greatly enhanced by the sparring between counsel for the two defendants in which each characterized the other defendant as a liar who concocted his story to escape blame," severance was required to prevent the "'substantial prejudice'" that would otherwise result from a joint trial. *Id.* at 839 (quoting *United States v. Potamitis*, 739 F.2d 784, 790 (2d Cir. 1984)).

### A. Mr. Hirst's Trial Should Be Severed from Ms. Morton's

Mr. Hirst's trial should be severed from Ms. Morton's because their respective defenses are mutually antagonistic.[1]  Each will argue that the other exercised ultimate decision-making authority over Hughes' investments and owed a fiduciary duty to its clients. These defenses cannot be squared and are likely to result in the conviction of both, based not on the evidence, but rather on the jury's inability to reconcile the two competing narratives.

Mr. Hirst will likely argue that, though Ms. Morton offered him a position as CIO of Hughes, he never actually assumed the fiduciary responsibilities associated with that or any other position at the company. Mr. Hirst will also likely argue that, although he reviewed the

---

[1]  We provide here a preview of what we anticipate the evidence at trial will show. To the extent the Court wishes to inquire further into the factual basis for our argument, we respectfully request an opportunity to make an *in camera* submission consistent with our obligation not to reveal trial strategy to the government. *See United States v. McKeon*, 738 F.2d 26, 33 (2d Cir. 1984).

9

investment guidelines for some of Hughes' clients and offered his perspective on the potential applicability of those guidelines to Ms. Morton, he did so at Ms. Morton's direction, relying on her and her team of professionals, including Hughes' Chief Compliance Officer, to make the ultimate determination concerning whether the investment of Hughes' clients' funds fit within the applicable investment guidelines.  For example, Mr. Hirst will point to evidence indicating that the Hughes clients whose funds were used to purchase tribal bonds and the quantities of bonds purchased by each were based on an allocation spreadsheet created in the first instance by Ms. Morton and vetted by her team; and he will likely argue that he relied on them to ensure that the allocations reflected in the spreadsheet were correct and consistent with the clients' investment guidelines.  Mr. Hirst will also likely argue that he played no role in evaluating which disclosures, if any, were required to be made to Hughes's clients, that he played no role in the decision whether or not to make any such disclosures, and that Hughes' Chief Compliance Officer did not communicate with Mr. Hirst on the issue of prior disclosures to its clients.

We anticipate that Ms. Morton will argue, by contrast, that Mr. Hirst accepted the positions both of CIO and Chairman of Hughes' Investment Committee, that he alone owed a fiduciary duty to make disclosures to Hughes' clients in connection with the tribal bond purchases, and that Mr. Hirst exercised ultimate decision-making authority concerning these purchases.  We expect Ms. Morton will argue that, to the extent she made determinations as to which clients' funds could be used to purchase the bonds and the quantities of bonds to be purchased, her decisions were based on information that she received from Mr. Hirst.  And we expect Ms. Morton to argue that, even though she received information and analysis from others, including the aforementioned Chief Compliance Officer, ultimately, she relied on Mr. Hirst's

determinations concerning which clients' funds could be used to purchase the bonds and to ensure that those purchases were consistent with the clients' investment guidelines.

Ms. Morton will also likely argue that, although she created the allocation spreadsheet, she believed that Mr. Hirst had independently reviewed it and approved the bond allocations reflected therein and reflected on the "trade tickets" referenced in the Superseding Indictment. Ms. Morton will likely further argue that, to the extent she failed to disclose certain information to Hughes' clients, she relied on Mr. Hirst to determine what information to disclose and, like Hughes' clients, she was not aware of all of the relevant information that Jason and Mr. Hirst conspired to conceal.

Thus, Mr. Hirst's and Ms. Morton's defenses will meet the Second Circuit's definition of "detailed, mutually exclusive explanations" of events, in which "each characterizes the other . . . as a liar who concocted his [or her] story to escape blame." *Serpoosh*, 919 F.3d at 839. The jury will be faced with a conundrum: Mr. Hirst and Ms. Morton cannot both have had final authority over how Hughes' clients' funds were invested, and cannot both have been ultimately responsible for determining what information must be disclosed to those clients. Accordingly, the jury will believe it must choose between mutually exclusive options: either Mr. Hirst is guilty or Ms. Morton is. When such irreconcilable narratives are presented by antagonistic defendants at a joint trial, there is a substantial risk that the jury will "unjustifiably infer[ ] that the conflict alone indicate[s] that *both* defendants [a]re guilty." *Cardascia*, 951 F.2d at 484 (emphasis added). That is particularly true in this case because, even though it is theoretically possible that Mr. Hirst and Ms. Morton each believed that the other was responsible for ensuring the investments were proper, and that appropriate disclosures were made, the government will undoubtedly take advantage of the conflict between their defenses to "contrast that 'theoretical[ ]

possibility'" – *i.e.*, that neither Mr. Hirst nor Ms. Morton knew the purchases were inconsistent with the clients' guidelines – against the "'realistic world'" in which both defendants knew and deliberately made representations and omissions to Hughes' clients in connection with the purchases.  *Serpoosh*, 919 F.3d at 839.

Even if these defenses were not mutually exclusive – which they are – in presenting these contrasting theories, Ms. Morton's attorneys will do "everything possible to convict the other defendant," namely, Mr. Hirst, *Volpe*, 42 F. Supp. 2d at 210, and acquit their client as the "unwitting dupe" of Mr. Hirst and Jason.  *Serpoosh*, 919 F.3d at 839.  Thus, Ms. Morton's attorneys will be acting as a "second prosecutor" of Mr. Hirst, such that "[t]he jury may convict [Mr. Hirst] based upon either the government's theory" (*i.e.*, that both Mr. Hirst and Ms. Morton knew that the purchases of the tribal bonds were inconsistent with Hughes' clients' investment guidelines) or "[Ms. Morton's] theory" (*i.e.*, that only Mr. Hirst knew, or bore the ultimate responsibility for communicating about the purchase to Hughes' investors).  *Copeland*, 336 F. Supp. 2d at 224.  Similarly, Mr. Hirst's defense team will be acting as a "second prosecutor" of Ms. Morton, arguing that she bore ultimate responsibility to Hughes' clients and any deficiencies in disclosures were based on her own intentional concealment of the relevant information from Mr. Hirst and others.  This degree of antagonism, even if it were not the consequence of mutually exclusive defenses, nevertheless will result in "substantial prejudice" to both defendants' fair trial rights, thereby necessitating severance.  *Serpoosh*, 919 F.3d at 839.

Here, it is not simply a matter of "co-defendants seek[ing] to place the blame on each other."  *United States v. Villegas*, 899 F.2d 1324, 1346 (2d Cir. 1990).  To accept Ms. Morton's anticipated defense, a jury must find (a) that Mr. Hirst is guilty as charged, having conspired with, at minimum, Jason, to commit securities fraud, and (b) that Mr. Hirst, by virtue of his role

12

at Hughes, committed investment adviser fraud in failing to cause Hughes to make required disclosures to its investor clients. Even absent mutually exclusive defenses, this situation will lead to substantial prejudice if Ms. Morton and Mr. Hirst are tried together. A recent decision in this circuit, *United States v. Shkreli*, 260 F. Supp. 3d 247 (E.D.N.Y. 2017), is instructive. In *Shkreli*, Judge Matsumoto granted severance upon her finding that, although the defenses of co-defendants Martin Shkreli and Evan Greebel were not mutually exclusive *per se*, severance was nevertheless warranted because Greebel "intend[ed] to present evidence and argue that Shkreli is guilty as charged, and that Greebel is but another victim of Shkreli's lies and deceitfulness—a pawn in 'fraudulent schemes unbeknownst to [him].' . . . [T]he defense strategy of Shkreli's co-defendant present[ed] a realistic scenario that Shkreli will be prosecuted, not only by the government, but also by Greebel, his co-defendant." *Id.* at 257 (citation omitted). The court's decision to sever the defendants' trials was premised on its finding that the "underlying theme of Greebel's defense, that Shkreli lied, committed fraud, and is guilty" would "permeate a joint trial" and raise a "serious risk that the jury would be prevented from making a reliable judgment about guilt or innocence even with limiting instructions by the court." *Id.* As in *Shkreli*, absent severance, Mr. Hirst will be forced to defend himself against not only the government's accusations, but also against those of Ms. Morton's counsel, who, in order zealously to represent their client, will do "everything possible to convict" Mr. Hirst and acquit Ms. Morton. *Volpe*, 42 F. Supp. 2d at 210.[2] Requiring Mr. Hirst to defend against a second prosecutor in this manner

---

[2] This problem will be especially acute in this case because it is likely that, irrespective of what the government elects to introduce in its case-in-chief, Ms. Morton's attorneys will likely attempt to present evidence pursuant to Federal Rule of Evidence 404(b) to bolster its argument that Mr. Hirst and Jason conspired to deceive Ms. Morton. While Mr. Hirst will strongly contest the admissibility of any such evidence, a joint trial risks the likelihood that Ms. Morton's right to present her defense will run headlong into Mr. Hirst's right to a trial free of improper and prejudicial propensity evidence.

cannot be squared with due process; a fair trial is only possible if Mr. Hirst's trial is severed from Ms. Morton's.

### B. The Court Should Sever Mr. Hirst's Trial from That of His Other Co-Defendants

The Second Circuit has also held severance to be warranted where "the sheer volume and magnitude of the evidence against one defendant so dwarfs the proof presented against his co-defendant that a severance is required to prevent unacceptable spillover prejudice." *United States v. Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003). In *United States v. Kelly*, 349 F.2d 720 (2d Cir. 1965), the Second Circuit held that the defendant was unacceptably prejudiced by "the slow but inexorable accumulation of evidence of fraudulent practices by [his] co-defendants," where the "ingenious schemes and designs they formulated to cover their tracks as well as the shameless way in which they manipulated the market, thumbed their noses at the SEC and feathered their nests at [others'] expense, concealing their ill-gained payoffs . . . , must have stamped them in the eyes of the jurors as unscrupulous swindlers of the first rank," and "some of this rubbed off on [the defendant]." *Id.* at 759; *see also United States v. Branker*, 395 F.2d 881, 888 (2d Cir. 1968) (holding severance is warranted when a joint trial will cause the jury to hear evidence of "incidents of criminal misconduct which do not involve these defendants in any way," such that there is a "huge volume of testimony relating not to [the defendants] but to the manifold criminal activities of [their co-defendants]"). Similarly, in *United States v. Gilbert*, 504 F. Supp. 565 (S.D.N.Y. 1980), a court in this district granted severance based in part on the "substantial risk that [defendant] would be prejudiced by the gradually accumulating effect of evidence of [his codefendant's] wrongdoing, . . . in connection with transactions where [defendant] played no part, or where his involvement was directed by others without full

disclosure to [defendant]," and where there was a risk that the jury would be unable to distinguish between the respective roles of the various alleged co-conspirators. *Id.* at 571.

Similarly, "[t]he risk of prejudice against a defendant due to a joint trial may be heightened where, for example, 'many defendants are tried together in a complex case and they have markedly different degrees of culpability.'" *Shkreli*, 260 F. Supp. 3d at 253 (quoting *Zafiro*, 506 U.S. at 539). Here, no less than five defendants are currently scheduled to go trial jointly, a situation that will necessarily lead to a chaotic courtroom atmosphere with multiple overlapping objections and extended sidebars, resulting juror confusion, and an unacceptably high risk of substantial prejudice to Mr. Hirst because the "sheer volume and magnitude" of evidence against his co-defendants simply "dwarfs the proof presented against" him. *Spinelli*, 352 F.3d at 55.

The Superseding Indictment describes multiple "incidents of criminal misconduct which do not involve [Hirst] in any way." *Branker*, 395 F.2d at 888. For example, the government alleges that Jason and John "induced the WLCC, through false and misleading representations and omissions, to issue a total of approximately $60 million of bonds." Superseding Indictment ¶ 6. Yet, as noted above, Mr. Hirst is not alleged to have made any misrepresentations or omissions to the WLCC. Indeed, Mr. Hirst is not alleged to have had any contact with the WLCC at all.[3]

The misrepresentations and omissions made to the WLCC by individuals other than Mr. Hirst included, among others, a representation that "Jason Galanis . . . was affiliated with the

---

[3] The prospect of a joint trial with John Galanis, a serial fraudster who has been convicted of numerous notorious schemes, in and of itself presents a risk of substantial prejudice for Mr. Hirst and the other co-defendants in this case, who will be unfairly equated in the minds of the jurors with this "unscrupulous swindlers of the first rank." *Kelly*, 349 F.2d at 759.

15

Placement Agent" for the bonds. *Id.* ¶ 10. At the same time, "Devon Archer . . . represented to affiliates of the Placement Agent that . . . Jason Galanis would not be involved with any entities affiliated with the Placement Agent." *Id.* The Superseding Indictment further alleges that "Hugh Dunkerley was employed" by the Placement Agent and signed the placement agency agreement, and that "Devon Archer and Bevan Cooney . . . had an ownership interest" in the Placement Agent. *Id.* ¶ 9. Mr. Hirst is not alleged to have had any ownership interest in the Placement Agent or its affiliates, to have had any contact with the placement agent, or to have played any role in drafting or signing the placement agency agreement signed by the WLCC. The Superseding Indictment also alleges that "Jason Galanis . . . apprised Devon Archer and Bevan Cooney . . . about the progress of the Bond Issuances and the likely proceeds to be obtained therefrom, and further discussed with them potential uses that could be made of the proceeds." *Id.* ¶ 6. The Superseding Indictment does not allege that Mr. Hirst was kept apprised of the status of the issuances or that Mr. Hirst participated in the discussions about the uses of the bond proceeds.

The evidence concerning alleged fraudulent inducement of and misrepresentations to the WLCC will be especially prejudicial to Mr. Hirst, because it will include victim impact testimony that will undoubtedly provoke the sympathy of the jury, while having no relevance as to Mr. Hirst's guilt or innocence of the charged crimes.[4] Although Mr. Hirst is not currently aware of the witnesses the government intends to call, to the extent a substantial portion of the

---

[4] This is of a piece with the government's trial strategy in *United States v. Galanis*, 15-CR-643 (PKC), in which the government, over Mr. Hirst's objection, presented extensive testimony of victims of a wholly separate fraud perpetrated by Jason and James Tagliaferri, as to which the government conceded Mr. Hirst had no knowledge. The erroneous admission of such testimony and its undue prejudicial impact on the jury's verdict are among the grounds for appeal of Mr. Hirst's conviction in that case.

government's case against John, Archer, and Cooney involves such evidence of fraud committed against the WLCC, the prejudicial impact on Mr. Hirst will be sharply increased.

The Superseding Indictment also alleges "Jason Galanis, Hugh Dunkerley, Devon Archer, and Bevan Cooney . . . misappropriated $20 million from the proceeds of the First Bond Issuance and used the money to purchase the Second and Third Bond Issuances." *Id.* ¶ 21. Mr. Hirst is not alleged to have played any role in that misappropriation. Indeed, Mr. Hirst is not alleged to have been involved in the second, third, or fourth bond issuances at all, or to have received any proceeds from those issuances. Thus, to the extent the government seeks to introduce evidence regarding the second, third, and fourth bond issuances, such evidence will have undue prejudicial spillover effect, compromising Mr. Hirst's right to a fair trial.

Finally, the Superseding Indictment alleges that Ms. "Morton, at the direction of Jason Galanis, directed the use of Atlantic's clients' funds to purchase $16.2 million of bonds, representing the entirety of the Fourth Bond Issuance." *Id.* ¶ 13(b). Mr. Hirst is not alleged to have had any knowledge of or role in the fourth bond issuance; nor is it alleged that he received any proceeds from that issuance. The Superseding Indictment alleges that Ms. "Morton . . . failed to make any disclosures to any Atlantic client, prior to causing the clients' purchases of the bonds." *Id.* ¶ 14. Mr. Hirst is not alleged to have had any involvement in Atlantic. Nor is Mr. Hirst alleged to have had any control over how Atlantic's clients' funds were invested or to have had any communications with Atlantic's clients. The introduction of evidence of Mr. Hirst's co-defendants' involvement in misrepresentations and omissions made to Atlantic's clients, misrepresentations to the Placement Agent, the second, third, and fourth bond issuances, and misrepresentations and omissions made to the WLCC to will undoubtedly "stamp[ ] them in the eyes of the jurors as unscrupulous swindlers of the first rank," and there

can be "no doubt" that some of this will "rub off on [Mr. Hirst]," *Kelly*, 349 F.3d at 759, even though he played no role in the conduct alleged. Thus, severance is warranted in light of the "substantial risk that [Mr. Hirst] would be prejudiced by the gradually accumulating effect of evidence" of wrongdoing in which Hirst "played no part." *Gilbert*, 504 F. Supp. at 571.

      Moreover, the very number of co-defendants going to trial, the volume of evidence against Mr. Hirst's co-defendants, and the complexity of the case overall will serve both to confuse the jury and to undercut any gains in judicial economy that would derive from trying the cases jointly. In *Shkreli*, which, as noted above, involved only two defendants, the court expressed concern about the efficiency of the trial because "both defense counsel have indicated they expect to raise frequent objections during trial, both to the government's and each co-defendant's evidence, leading to a litany of side bar debates about various legal issues including limiting instructions." *Shkreli*, 260 F. Supp. 3d at 256. Such a situation, the court held, would "disrupt the flow of the trial and increase the length of the trial, will likely confuse the jury in what is already a complex case, and may risk prompting the jury to find both defendants guilty based on each defendant's arguments that he was deceived by the other, instead of deciding the case based on the evidence presented." *Id.* Here, similarly, multiple overlapping objections, extensive sidebars, and juror confusion are likely to result from a joint trial, with a high risk of prejudice to the defendants and little in the way of efficiency gained by the government and the Court. Thus, even if trying Mr. Hirst and his co-defendants together would be efficient – which is a highly dubious proposition, given the complexity and chaos of trying the case against five co-defendants with substantially different roles in distinct fraudulent schemes and all raising substantially different issues to be decided by the Court and the jury – any marginal increase in judicial economy must "give way to fairness." *Id.* at 257. Accordingly, "from a trial

management perspective and to prevent substantial prejudice and jury confusion, severance is warranted." *Id.*

## CONCLUSION

For the foregoing reasons, Mr. Hirst respectfully requests that the Court issue an order severing his trial from that of his co-defendants.

Dated: New York, New York
January 16, 2018

                            SHER TREMONTE LLP

                            By: /s/ Michael Tremonte
                                Michael Tremonte
                                Noam Biale
                                Emily Burgess
                        90 Broad Street, 23rd Floor
                        New York, New York 10004
                        Tel: 212.202.2600
                        E-mail: mtremonte@shertremonte.com

                        *Attorneys for Defendant Gary Hirst*