**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

       v.

JASON GALANIS,
GARY HIRST,
JOHN GALANIS, a/k/a "Yanni,"
HUGH DUNKERLEY,
MICHELLE MORTON,
DEVON ARCHER, and
BEVAN COONEY,

             Defendants.

No. 16 Cr. 371 (RA)

## MEMORANDUM OF LAW IN SUPPORT OF
## DEVON ARCHER AND BEVAN COONEY'S MOTION FOR SEVERANCE

Paula Notari
THE LAW OFFICE OF PAULA J. NOTARI
152 West 57th Street, 8th Floor
New York, New York 10019
Tel.: (646) 943-2172
Fax: (212) 980-2968
paulanotari@aol.com

Abraham J. Hassen
O'NEILL / HASSEN
25 Eighth Ave, Suite C
Brooklyn, New York 11217
Tel./Fax.: (212) 203-1858
hassen@oandh.net

*Attorneys for Bevan Cooney*

Matthew L. Schwartz
BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, New York 10022
Tel.: (212) 446-2300
Fax: (212) 446-2350
mlschwartz@bsfllp.com

*Attorneys for Devon Archer*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. ii

PRELIMINARY STATEMENT ........................................................................... 1

THE INDICTMENT ............................................................................................ 2

LEGAL STANDARD ........................................................................................... 5

ARGUMENT ........................................................................................................ 7

    THE COURT SHOULD SEVER THE TRIAL OF DEVON ARCHER AND
    BEVAN COONEY FROM THE TRIAL OF THE OTHER DEFENDANTS......................... 7

      I.     Mr. Archer And Mr. Cooney's Defenses Are Inherently Antagonistic  To The
             Defenses Of Their Remaining Co-Defendants, And Vice Versa .............................. 9

      II.    The Evidence Against Mr. Archer And Mr. Cooney Is Different In Kind  And
             Degree From The Evidence Against Their Co-Defendants .................................... 16

             A.      Neither Mr. Archer Nor Mr. Cooney Was Involved In AAM,
                    Had Any Contact With The Alleged Victims, Or Participated  Actively
                    In The Alleged Fraud ......................................................................... 16

             B.      Mr. Archer And Mr. Cooney Are Not Charged In The Investment
                    Adviser Fraud Counts, Which Will Create Massive Evidentiary
                    Problems ........................................................................................ 19

      III.   Incredibly Prejudicial Evidence Against Their Co-Defendants  Will Not Be
             Admissible Against Messrs. Archer And Cooney .................................................. 23

             A.      The Gerova Fraud ................................................................................ 25

             B.      The Alleged Code Rebel Fraud .......................................................... 27

             C.      John Galanis's Extensive Criminal And Regulatory History .............. 28

      IV.   A Limiting Instruction Cannot Cure The Potential Prejudice ................................. 30

      V.    If The Court Deems Severance Premature, It Should Allow Mr. Archer  And Mr.
             Cooney To Renew Their Severance Motion After The Government Provides Rule
             404(b) Notice ..................................................................................................... 32

CONCLUSION ..................................................................................................... 33

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Bourjaily v. U.S.,*
    483 U.S. 171 (1987)..................................................................................................20

*Greer v. Miller,*
    483 U.S. 756 (1987)..................................................................................................32

*Kotteakos v. U.S.,*
    328 U.S. 750 (1946)..................................................................................................22

*Krulewitch v. U.S.,*
    336 U.S. 440 (1949)............................................................................................18, 30

*Richardson v. Marsh,*
    481 U.S. 200 (1987)..............................................................................................5, 32

*U.S. v. Aparo,*
    221 F. Supp. 2d 359 (E.D.N.Y. 2002) .....................................................................17

*U.S. v. Baker,*
    10 F.3d 1374 (9th Cir. 1993) ...................................................................................32

*U.S. v. Barret,*
    824 F. Supp. 2d 419 (E.D.N.Y. 2011) .......................................................................6

*U.S. v. Basciano,*
    No. 05-cr-60 (NGG), 2007 WL 3124622 (E.D.N.Y. Oct. 23, 2007)...................24, 31

*U.S. v. Bellomo,*
    954 F. Supp. 630 (S.D.N.Y. 1997)...........................................................................19

*U.S. v. Bertolotti,*
    529 F.2d 149 (2d Cir. 1975).....................................................................................20

*U.S. v. Boscia,*
    573 F.2d 827 (3d Cir. 1978).......................................................................................5

*U.S. v. Cardascia,*
    951 F.2d 474 (2d Cir. 1991).....................................................................................13

*U.S. v. Carrasco,*
    968 F. Supp. 948 (S.D.N.Y. 1997).............................................................................7

*U.S. v. Casamento,*
    887 F.2d 1141 (2d Cir. 1989).....................................................................................9

*U.S. v. Coppola*,
   671 F.3d 220 (2d Cir. 2012).........................................................................20

*U.S. v. DiNome*,
   954 F.2d 839 (2d Cir. 1992).........................................................................19

*U.S. v. Figueroa*,
   618 F.2d 934 (2d Cir. 1980).........................................................................24

*U.S. v. Gigante*,
   166 F.3d 75 (2d Cir. 1999)...........................................................................20

*U.S. v. Gonzalez*,
   No. 09-cr-481 (CM), 2010 WL 339698 (S.D.N.Y. Jan. 28, 2010)..........................21

*U.S. v. Jones*,
   16 F.3d 487 (2d Cir. 1994)...........................................................................31

*U.S. v. Kercado*,
   No. 91-cr-685 (SWK), 1992 WL 196778 (S.D.N.Y. Aug. 3, 1992)........................32

*U.S. v. Lino*,
   No. 00-cr-632 (WHP), 2001 WL 8356 (S.D.N.Y. Jan. 2, 2001) ............6, 16, 17, 21

*U.S. v. Lujan*,
   529 F. Supp. 2d 1315 (D.N.M. 2007) ............................................................24

*U.S. v. McDermott*,
   245 F.3d 133 (2d. Cir. 2001)........................................................................31

*U.S. v. Nordby*,
   225 F.3d 1053 (9th Cir. 2000) ......................................................................32

*U.S. v. Ozsusamlar*,
   428 F. Supp. 2d 161 (S.D.N.Y. 2006).............................................................23

*U.S. v. Rittweger*,
   524 F.3d 171 (2d Cir. 2008).........................................................................22

*U.S. v. Rodriguez*,
   734 F. Supp. 116 (S.D.N.Y. 1990).................................................................32

*U.S. v. Rodriguez*,
   No. 08-cr-1311 (RPP), 2009 WL 2569116 (S.D.N.Y. Aug. 20, 2009) ...................33

*U.S. v. Russo*,
   305 F.3d 37 (2d Cir. 2002)...........................................................................20

*U.S. v. Salameh*,
    152 F.3d 88 (2d Cir. 1998)................................................................9, 10, 13, 21

*U.S. v. Serpoosh*,
    919 F.2d 835 (2d Cir. 1990)........................................................................22

*U.S. v. Shkreli*,
    260 F. Supp. 3d 247 (E.D.N.Y. 2017) .................................15, 22, 23, 31

*U.S. v. Spinelli*,
    352 F.3d 48 (2d Cir. 2003).........................................................................21

*U.S. v. Upton*,
    856 F. Supp. 727 (E.D.N.Y. 1994) ..........................................................7, 21

*U.S. v. Villegas*,
    899 F.2d 1324 (2d Cir. 1990)......................................................................9

*Zafiro v. U.S.*,
    506 U.S. 534 (1993)...........................................................................passim

**Rules**

Fed. R. Crim. P. 14 ...............................................................................5, 6

Fed. R. Crim. P. 8(b) ...............................................................................5

Fed. R. Evid. 404(b) .......................................................................passim

## PRELIMINARY STATEMENT

This is a textbook case for severance.  Devon Archer and Bevan Cooney are the last two defendants charged in an Indictment that otherwise alleges sweeping criminality by five other people.  In the most important ways, Messrs. Archer and Cooney stand apart from all of their co-defendants.  Neither of them had any contact whatsoever with the alleged victims of the investment adviser fraud counts, and indeed neither is charged in those counts.  Neither Mr. Archer nor Mr. Cooney had any contact whatsoever with the alleged victims of the securities fraud counts, either.  Neither of them had any control over or visibility into any of the accounts through which funds were allegedly misappropriated, and neither of them had any operational responsibility for the alleged fraud.  Rather, Messrs. Archer and Cooney are alleged to have been generally kept "apprised" of developments, to have had passive ownership interests in some of the allegedly relevant entities, and to have received certain of the misappropriated funds.

A joint trial in these circumstances would be profoundly unfair to both Messrs. Archer and Cooney – who would be harmed by a raft of otherwise inadmissible, irrelevant, and prejudicial evidence – as well as to the other defendants, who would suffer from Messrs. Archer and Cooney acting as a "second prosecutor" against them.  In particular, Rule 404(b) evidence that the government may seek to introduce includes evidence relating to at least two other frauds involving a subset of the same defendants – but not Messrs. Archer or Cooney – as well as at least one co-defendant's prodigious criminal history.  Complicated evidentiary issues will also make a joint trial unmanageable, and will require repeated limiting instructions that no juror could plausibly follow.  In these circumstances, a severance is the only way to ensure a constitutionally fair trial.

**THE INDICTMENT**[1]

The Indictment in this case alleges at least two fundamentally separate schemes. In the first, Jason Galanis, Gary Hirst, and Michelle Morton took over two investment advisers (collectively, "Atlantic Asset Management" or "AAM"). Ind. ¶¶ 5, 12, 13. Jason Galanis and his father John Galanis then "induced the WLCC [*i.e.*, Wakpamni Lake Community Corporation], through false and misleading representations and omissions, to issue a total of approximately $60 million of bonds." *Id.* ¶ 6.

Although the bonds were allegedly supposed to be sold through a placement agent at which Hugh Dunkerley was employed, *see id.* ¶ 9, more than $43 million of the bonds were instead allegedly moved into customer accounts of AAM by Jason Galanis, Morton, and Hirst, *see id.* ¶ 13. In doing so, the Indictment alleges, Morton and Hirst purchased the bonds in AAM client accounts without the knowledge of those clients and in violation of the "investment parameters of many of the clients." *Id.* ¶ 14. In addition, Morton and Hirst allegedly failed to disclose numerous conflicts to their AAM clients, including that Dunkerley, Hirst, and Jason Galanis were each involved in numerous entities that had different and allegedly inconsistent obligations with respect to the bonds. *Id.* ¶ 15(a)-(c).

In the second scheme, the proceeds of the WLCC bonds were allegedly misappropriated, principally by Jason Galanis, Hugh Dunkerley, and Gary Hirst. The Indictment alleges that rather than invest the bond proceeds as promised, the money was instead routed to an account controlled by Hirst and Dunkerley, where it was misappropriated. *Id.* ¶ 7. According to the

---

[1]     In this memorandum, references and citations to the "Indictment" are to the first superseding indictment, returned on or about November 2, 2016 [ECF No. 90]. References and citations to the "SEC Complaint" are to the Amended Complaint and Jury Demand filed by the U.S. Securities and Exchange Commission on November 14, 2016 in *SEC v. Archer, et al.*, No. 16 Civ. 3505 (WHP) [ECF No. 88].

Indictment, more than $43 million of the bond proceeds were transferred to accounts controlled

by Jason and John Galanis, and Jason Galanis then transferred some of that money on, "often

through layers of intermediaries," to pay his own expenses (including his legal fees in connection

with defending himself against allegations of a prior fraud) and advance his own business

interests, as well as to accounts associated with Hirst, John Galanis, and Messrs. Archer and

Cooney.  *Id.* ¶ 17.

Thus, according to the Indictment itself, Messrs. Archer and Cooney were merely

downstream recipients of some of the allegedly misappropriated money, which was transferred

to them via "layers of intermediaries," in the second scheme.  *Id.*  They are not alleged to have

had any involvement in the first scheme at all, and neither of them is charged in Counts Three or

Four of the Indictment, which allege conspiracy to commit investment adviser fraud and

substantive investment adviser fraud.  *See id.* ¶¶ 31-36.  Indeed, there is no allegation that

Messrs. Archer and Cooney had *anything at all* to do with the fraud at AAM.  They are not

alleged to have had any contact with the WLCC, or to have been aware of any representations

allegedly made to the WLCC by Jason or John Galanis, or by anyone else.  Messrs. Archer and

Cooney are also not alleged to have had any contact with AAM's clients, or to have been aware

of any representations allegedly made to those customers by Hirst, Morton, Jason Galanis, or

anyone else.  And Messrs. Archer and Cooney are not alleged to have been aware of the

existence of any alleged conflicts at AAM, let alone the fact that they were undisclosed to

AAM's clients.

Rather, the Indictment's allegations against Messrs. Archer and Cooney are of an entirely

different character than those against the other defendants, because they had absolutely no

operational involvement with either the alleged fraud or the underlying businesses, even

according to the Indictment's allegations.  The Indictment's factual allegations against Messrs.

Archer and Cooney are limited to the following:

- Jason Galanis "apprised" Messrs. Archer and Cooney "of the status of the Bond Issuances and the likely proceeds to be obtained therefrom." *Id.* ¶ 6; *see also id.* ¶ 11 (containing examples of communications from Jason Galanis).

- Messrs. Archer and Cooney "had an ownership interest" in the placement agent.  *Id.* ¶ 9.

- Jason Galanis arranged for an entity that Messrs. Archer and Cooney, among others, "controlled" to provide financing for Morton's acquisition of AAM. According to the Indictment, Messrs. Archer and Cooney "were well aware of JASON GALANIS's efforts to locate and gain control of [AAM], and that client funds were to be used for the purchase of the Bond Issuances."  *Id.* ¶ 12.

- As noted above, the Indictment alleges that Messrs. Archer and Cooney received, "through layers of intermediaries," funds that had allegedly been misappropriated by Jason Galanis and others.  *Id.* ¶ 17; *see also id.* ¶ 19 (alleging that Jason Galanis e-mailed Messrs. Archer and Cooney about the potential acquisition of another business).

The single instance of active conduct alleged on the part of Messrs. Archer and Cooney was that

each of them, separately, purchased some of the WLCC bonds using funds transferred to them by

Jason Galanis.  *Id.* ¶ 21.[2]  The Indictment alleges that the funds that Jason Galanis transferred to

Messrs. Archer and Cooney, and which they in turn used to purchase the bonds, had been

misappropriated from earlier WLCC bond issuances.  *Id.*  The Indictment *does not allege*,

however, that Mr. Archer or Mr. Cooney had any knowledge of the source of the funds that they

---

[2]    With respect to Mr. Archer alone, the Indictment contains one further allegation: that Mr. Archer, "who was affiliated with the Placement Agent, falsely represented to affiliates of the Placement Agent that, among other things, JASON GALANIS would not be involved with any entities affiliated with the Placement Agent or source deals to the Placement Agent, despite ARCHER's knowledge of JASON GALANIS's role in procuring the Bond Issuances."  *Id.* ¶ 10. It is utterly unclear from the Indictment what role this alleged misrepresentation had, or how it could have advanced any allegedly fraudulent scheme.  This is particularly so since, as a matter of fact, the bond issuances were already well underway at the time of this alleged misrepresentation, and Jason Galanis's role in the bond issuances was no secret.  Mr. Archer understands, however, that the factual falsity of the government's allegation is a matter for trial.

allegedly used to purchase the bonds.  To the contrary, the Indictment alleges that Jason Galanis directed interest payments to be made on the bonds – including those bond issuances that had allegedly been purchased in whole by Messrs. Archer and Cooney – presumably to lull the bondholders (including Messrs. Archer and Cooney) into believing that the bonds were being handled appropriately.  *Id.* ¶ 25.

## LEGAL STANDARD

Under Federal Rule of Criminal Procedure 8(b), multiple defendants who allegedly "participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses" may be charged in a single indictment.  Rule 8(b) is counterbalanced by Rule 14(a), which allows a court to "order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires" if "the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government."

"There is a preference in the federal system for joint trials of defendants who are indicted together," as joint trials can "promote efficiency and 'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'"  *Zafiro v. U.S.*, 506 U.S. 534, 537 (1993) (quoting *Richardson v. Marsh*, 481 U.S. 200, 210 (1987)).  Nevertheless, "no defendant should ever be deprived of a fair trial because it is easier or more economical for the government to try several defendants in one trial" rather than in multiple trials.  *U.S. v. Boscia*, 573 F.2d 827, 833 (3d Cir. 1978).  Accordingly, the Supreme Court has stated that a district court should grant severance under Rule 14 where "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  *Zafiro*, 506 U.S. at 539.  "The risk of prejudice will vary with the facts in each case," and "[w]hen the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary."  *Id.*; *see also U.S. v. Barret*, 824 F. Supp. 2d 419,

433 (E.D.N.Y. 2011) ("The determination of whether [prejudice warranting severance] exists is highly fact-specific and must be evaluated on a case-by-case basis.").

The Supreme Court has identified several circumstances that, if any one of which is present, may justify severance under Rule 14:

- "when the defendants present mutually antagonistic defenses in the sense that the acceptance of one party's defense precludes the acquittal of" another defendant;

- when "evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant";

- when "evidence of a codefendant's wrongdoing . . . could lead a jury to conclude that a defendant was guilty";

- when "many defendants are tried together in a complex case and they have markedly different degrees of culpability";

- when "essential exculpatory evidence that would be available to a defendant tried alone [is] unavailable in a joint trial"; and

- when "[e]vidence that is probative of a defendant's guilt but technically admissible only against a codefendant" is introduced at trial.

*Zafiro*, 506 U.S. at 537, 539 (quotations and citations omitted); *see also U.S. v. Lino*, No. 00-cr-632 (WHP), 2001 WL 8356, at *23 (S.D.N.Y. Jan. 2, 2001) ("Factors that a district court should consider in deciding a motion for severance include: (i) the complexity of the indictment; (ii) the estimated length of trial; (iii) disparities in the amount or type of proof offered against the defendants; (iv) disparities in the degrees of involvement by defendants in the overall scheme; (v) possible conflict between various defense theories or trial strategies; and (vi) prejudice from evidence admitted only against co-defendants but which is inadmissible or excluded as to a particular defendant.").  Severance is warranted when any one of these factors, or some combination of them, creates a risk that a defendant's rights will be compromised in a joint trial.

*See U.S. v. Carrasco*, 968 F. Supp. 948, 952 (S.D.N.Y. 1997); *U.S. v. Upton*, 856 F. Supp. 727, 736 (E.D.N.Y. 1994).

## ARGUMENT

### THE COURT SHOULD SEVER THE TRIAL OF DEVON ARCHER AND BEVAN COONEY FROM THE TRIAL OF THE OTHER DEFENDANTS

At base, Mr. Archer and Mr. Cooney's most fundamental defense is that, unlike the other defendants who were in the midst of the alleged frauds, they were on the outside looking in. According to the Indictment, each of the other defendants had operational responsibility for some essential part of the fraud:  John Galanis procured the WLCC as victims and induced them to issue the bonds in question; Michelle Morton, and to a lesser extent Gary Hirst, took over AAM and then foisted the bonds on their clients without their knowledge, in violation of certain of those clients' investment parameters, and without disclosing material conflicts of interest; Hugh Dunkerley and Gary Hirst controlled the account into which all of the proceeds of the bonds were deposited and caused them to be misappropriated; and, of course, Jason Galanis was pulling the strings on it all.[3]  Messrs. Archer and Cooney, in stark contrast, are alleged merely to have been "apprised" of certain aspects of Jason Galanis's plan; to have had passive ownership interests in some of the relevant entities; and to have received, "through layers of intermediaries," some of the misappropriated bond proceeds.  In short, Messrs. Archer and Cooney are simply in a fundamentally different position – in terms of the charges, their alleged conduct, and the evidence – than any of their co-defendants.

As a result, Messrs. Archer and Cooney should be tried separately from their remaining co-defendants, for a variety of reasons.  *First*, their core defense – that Jason Galanis and the

---

[3]      As the Court is well aware, Jason Galanis pled guilty to conspiracy to commit securities fraud, securities fraud, and conspiracy to commit investment adviser fraud in January 2017, and was sentenced in August 2017 to a term of 173 months' imprisonment.

7

other defendants orchestrated a large-scale fraud in which they were unwitting dupes –
is mutually antagonistic to the defenses of their remaining co-defendants.

*Second*, the evidence against Messrs. Archer and Cooney is different in kind and degree
from the evidence against their remaining co-defendants, and a massive amount of evidence
relevant to the investment adviser counts and the operations of AAM – all of which has nothing
to do with Messrs. Archer and Cooney – will inevitably be introduced at a joint trial.  For
example, Messrs. Archer and Cooney are not alleged to have had any contact with either the
WLCC or any AAM clients, or to have been involved in any way with the failure of certain
defendants to disclose conflicts at AAM.  Moreover, the fact that Messrs. Archer and Cooney are
not charged in the investment adviser counts will create dizzying evidentiary issues for the jury,
as every alleged co-conspirator statement will have to be parsed, with statements in support of
the investment adviser fraud conspiracy totally inadmissible against Messrs. Archer and Cooney.

*Third*, other evidence that may be admissible against the remaining defendants will be
deeply prejudicial as to Messrs. Archer and Cooney if presented by the government.  For
example, Jason Galanis, John Galanis, and Gary Hirst were all convicted for their role in an
entirely separate securities fraud scheme.  *See United States v. Galanis, et al.*, No. 15 Cr. 643
(PKC); *see also SEC v. Galanis, et al.*, No. 15 Civ. 7547 (VSB).  Jason Galanis, Gary Hirst, and
Hugh Dunkerley were also allegedly involved in another securities fraud scheme that involved,
in part, some of the same entities involved in this case.  And Jason Galanis and his father John
have also been found guilty or liable, as the case may be, in numerous prior criminal and SEC
enforcement matters.  All of this evidence will dramatically change the complexion of the trial if
introduced by the government, and risks confusion of the issues for the jury, spillover prejudice
to Messrs. Archer and Cooney, and further adversity and antagonism between them and their co-

defendants.  Moreover, as we explain below, no limiting instruction could possibly cure the prejudice to Messrs. Archer and Cooney from a joint trial.

I.    **Mr. Archer And Mr. Cooney's Defenses Are Inherently Antagonistic**
      **To The Defenses Of Their Remaining Co-Defendants, And Vice Versa**

If tried together with their remaining co-defendants, Messrs. Archer and Cooney will have no choice but to underline the fundamental differences between the evidence against them and the evidence against their co-defendants.  This sort of antagonism between defendants is well-recognized as a proper basis for severance.

Although "[t]he mere fact that codefendants seek to place the blame on each other is not the sort of antagonism that requires a severance," *U.S. v. Villegas,* 899 F.2d 1324, 1346 (2d Cir. 1990) (citing *U.S. v. Casamento*, 887 F.2d 1141, 1154 (2d Cir. 1989)), "'mutually antagonistic' or 'irreconcilable' defenses may be so prejudicial in some circumstances as to mandate severance." *Zafiro*, 506 U.S. at 538 (citations omitted).  "In order to make a showing of mutually antagonistic or irreconcilable defenses, the defendant must make a factual demonstration that acceptance of one party's defense would tend to preclude the acquittal of the other." *U.S. v. Salameh*, 152 F.3d 88, 116 (2d Cir. 1998) (quotation, citation, and alteration omitted).

That is the case here.  The core defense that both Messrs. Archer and Cooney will advance at trial is that they were unwitting tools of Jason Galanis, and were used by him in furtherance of his crimes and the crimes of his co-conspirators.  Likewise, Messrs. Archer and Cooney reasonably believe that their co-defendants will attempt to shift blame away from themselves by parroting the Indictment's allegations that Jason Galanis kept them "apprised" of developments and used entities owned or controlled by them in order to paint them in some sort of command-and-control role, when nothing could be further from the truth.  Under these

9

circumstances, if the Court were to order a joint trial, the acceptance by the jury of Messrs. Archer and Cooney's defenses "would tend to preclude the acquittal of" the other remaining defendants, just as the acceptance of the other defendants' anticipated defenses "would tend to preclude" Messrs. Archer and Cooney's acquittals. *Salameh*, 152 F.3d at 116.

Messrs. Archer and Cooney will argue at trial that they were duped by Jason Galanis and used by him to further his criminal conspiracy with the other defendants. Knowing that Messrs. Archer and Cooney were content to be passive participants in Jason Galanis's ambitious and convoluted – but seemingly legitimate – business plans, Jason Galanis and his conspirators kept Messrs. Archer and Cooney in the dark about their illegal intentions and used them to attract potential investors into the financial services firm that Jason Galanis was claiming to be in the process of creating, to lend credibility and respectability to the myriad ventures comprising their conspiracy (all of which Messrs. Archer and Cooney believed to be legitimate), and, in Mr. Archer's case, to tap into his personal wealth for infusions of capital when necessary, including via several six-figure investments and loans that were never repaid. Indeed, Mr. Archer will demonstrate at trial that, far from being a beneficiary of the frauds alleged in the Indictment (like many of the other defendants, who received misappropriated funds for their personal benefit), he suffered significant financial losses as a result of placing his trust in Jason Galanis.

In mounting their defense, Messrs. Archer and Cooney will argue that the most essential components of Jason Galanis's overall scheme – all of which simply would not have worked without the knowing and willful participation of others – involved one or several of the other defendants, but did not involve them. This includes: (1) John Galanis's recruitment of the WLCC, which was necessary to issue the bonds in the first place; (2) Hirst's and Morton's allegedly improper use of funds belonging to AAM's clients to purchase the bonds, without which there would not have been any bond proceeds to misappropriate; and (3) Hirst's

10

and Dunkerley's alleged control over the bank account through which the bond proceeds were misappropriated, which enabled the bond proceeds to be unlawfully plundered. *See* Ind. ¶ 4 (alleging, under the heading "Overview of the Conspiracy," that the conspiracy charged in Count One involved "(i) causing the WLCC to issue more than $60 million in bonds based on false and misleading representations; (ii) failing to invest the bond proceeds on the WLCC's behalf in the manner agreed upon; and (iii) instead misappropriating the proceeds of the bonds for their own purposes").

For example, Messrs. Archer and Cooney's defense will focus on the essential role played by John Galanis in locating the WLCC, allegedly inducing it through false and misleading representations to issue each tranche of the bonds, and remaining the WLCC's primary point of contact regarding the bonds throughout the life of the conspiracy. Messrs. Archer and Cooney will contrast John Galanis's indispensable role in the conspiracy with the fact that they had no contact whatsoever with the WLCC. Messrs. Archer and Cooney will also contrast the fact that John Galanis allegedly used millions of dollars of bond proceeds to pay for personal expenses, *see* Ind. ¶ 17, with the fact that they are not alleged to have received any bond proceeds for their personal use and, in Mr. Archer's case, actually lost money over the course of the events giving rise to the charges in the Indictment. The fact that John Galanis, Jason Galanis, and Gary Hirst were allegedly rewarded with the proceeds of the bond offerings while Mr. Archer lost money as a result of his unfortunate association with Jason Galanis further illustrates that he was an unwitting dupe rather than a knowing conspirator.

Likewise, Gary Hirst – a recidivist enabler of Jason Galanis's criminal schemes – was allegedly installed, at Jason Galanis's behest, as the Chief Investment Officer at one of the investment advisory firms at issue in this case, where he personally directed that over $27 million in client funds be invested in the bonds, signing the trade tickets himself. Ind.

¶¶ 12-15, 28(d).[4]  As part of his alleged role in the investment adviser conspiracy, Hirst

personally analyzed AAM client accounts and investments to determine what could be liquidated

to generate the funds needed to improperly purchase the bonds.  *See* SEC Complaint ¶ 56.

In contrast, Messrs. Archer and Cooney were not employed by AAM, had no hand in the

investment of any client funds in the bonds, had no interactions with AAM's clients or

knowledge of what representations were or were not being made to them, and indeed had no

direct interactions with, and did not know or have any direct dealings with, Gary Hirst.

Likewise, with respect to the misappropriation of bond proceeds, Hirst was one of only two

signatories on the bank account through which the bond proceeds were misappropriated, with

Dunkerley being the other.  Messrs. Archer and Cooney will argue that this role gave Hirst front-

row-seat visibility into the misappropriation of tens of millions of dollars of bond proceeds –

visibility that they lacked entirely.

     Messrs. Archer and Cooney also anticipate putting on defenses that are antagonistic to

Michelle Morton.  She allegedly authorized the investment of over $43 million in AAM client

funds to purchase the bonds, in violation of the clients' investment guidelines and without

disclosing material conflicts of interest of which she was allegedly aware.  Messrs. Archer and

Cooney will be able to point to written communications in which Morton makes clear that she

was aware both that the bonds were outside of certain AAM clients' investment guidelines and

---

[4]     Messrs. Archer and Cooney will also focus on evidence indicating that Hirst took steps
to obscure his role by resigning as Chief Investment Officer of the investment advisory firm and
taking a position as an independent investment consultant in order to avoid disclosing his name
on the firm's Form ADV (a public SEC filing).  In contrast, Messrs. Archer and Cooney are not
alleged to have taken any measures to obscure their various roles in several of the entities that
have become ensnared in this case, as they believed at all relevant times that those businesses
were completely legitimate.  Indeed, Messrs. Archer and Cooney will argue that Jason Galanis
fooled them into allegedly acquiring two of the bond issuances precisely because, as credible
innocents, Jason Galanis believed they were appropriate "faces" for the business.

that Hirst was attempting to avoid reporting his name in AAM's securities filings.  *See*, *e.g.*, SEC

Complaint ¶ 74 (describing e-mail from Morton to Jason Galanis regarding AAM clients'

"restrictive investment policies"); *id.* ¶ 55 (recounting communications between Hirst and

Morton concerning Hirst's desire not to be identified in SEC filings).  In stark contrast, Messrs.

Archer and Cooney were deceived into believing that AAM's clients would voluntarily purchase

the bonds.  For example, as alleged by the SEC in its parallel case, Jason Galanis sent Messrs.

Archer and Cooney an e-mail containing a term sheet for the acquisition of one of the investment

advisers, along with the note, "I believe they will take $28 million of the [WLCC bond] issue."

*Id.* ¶ 48.

*    *    *

In sum, Messrs. Archer and Cooney anticipate putting on trial defenses that will be

antagonistic to each of their three remaining co-defendants.[5]  In putting on their respective

defenses in a joint trial, Messrs. Archer and Cooney's counsel would, in effect, be required to act

as additional *de facto* prosecutors of each of their remaining defendants.  Accordingly, "the

acceptance of" Messrs. Archer and Cooney's defenses by the jury at a joint trial "would tend to

preclude the acquittal of" the other defendants.  *Salameh*, 152 F.3d at 116; *see also U.S. v.*

*Cardascia*, 951 F.2d 474, 484 (2d Cir. 1991) ("Defenses are mutually exclusive or irreconcilable

---

[5]    Based upon his non-appearance at recent conferences and his voluntary production
of documents to the government, Hugh Dunkerley does not appear to be a "remaining
co-defendant," notwithstanding the fact that the docket does not reflect a disposition of his case.
If he were, Messrs. Archer and Cooney would certainly be antagonistic to him as well.  Among
other things, Dunkerley incorporated and was the sole shareholder of the entity that was
supposed to act as the annuity provider for the bonds, but which allegedly misappropriated the
bond proceeds, and was a signatory on the bank account that received and allegedly
misappropriated those proceeds.  As with Hirst, this gave Dunkerley visibility into the
misappropriation of bond proceeds that Messrs. Archer and Cooney simply did not have.
Indeed, assuming that Dunkerley will appear as a government witness, Messrs. Archer and
Cooney will be even more antagonistic with respect to Hirst given the similarities between
Dunkerley and Hirst's alleged conduct.

13

if, in order to accept the defense of one defendant, the jury must of necessity convict a second

defendant.  The trial judge should order a trial severance when the jury, in order to believe the

core of the testimony offered on behalf of one defendant, must necessarily disbelieve the

testimony offered on behalf of his codefendant." (quotation, citation, and alteration omitted)).

Put differently, if the Court orders a joint trial, Messrs. Archer and Cooney's respective

defenses will overwhelmingly reinforce the government's case-in-chief against the other

defendants, and it is quite possible that the defenses of the remaining defendants will attempt to

reinforce the government's case-in-chief against Messrs. Archer and Cooney, running a grave

risk of depriving all five remaining defendants of their right to a fair trial.  Judge Matsumoto

evoked precisely this logic in recently severing the trial of Martin Shkreli from the trial of his

former lawyer, Evan Greebel:

> A joint trial would place on Shkreli an unfair and heavy burden in
> defending himself against both the government and Greebel.
> Severance is granted because of the stated intention of Greebel's
> counsel . . . that Greebel's defense team will act as a second
> prosecutor against Shkreli, by arguing that Shkreli is guilty and
> that Greebel is, himself, just another victim of Shkreli's fraud.
> Greebel's counsel intends to assert a defense that will be an "echo
> chamber" for the prosecution[.] . . . The court recognizes that
> counsel's arguments are not evidence, and the jury will be so
> instructed, however, the underlying theme of Greebel's defense,
> that Shkreli lied, committed fraud, and is guilty, will permeate a
> joint trial to the substantial prejudice of Shkreli.  Through such
> double prosecution of Shkreli by the government and Greebel,
> there is a serious risk that the jury would be prevented from
> making a reliable judgment about guilt or innocence even with
> limiting instructions by the court.
>
> \*       \*       \*
>
> These defenses amount to more than simple finger pointing by two
> defendants.  Rather, the defense strategy of Shkreli's co-defendant
> presents a realistic scenario that Shkreli will be prosecuted, not
> only by the government, but also by Greebel, his co-defendant.
> Shkreli will be substantially prejudiced by having to wage a
> defense on two fronts, in a single trial, before the jury. The jury's
> ability to make a reliable judgment maybe [sic] affected by the
> compounded effect of hearing the government's case in chief

> twice, once from the government and then again from Greebel.
> Such a burden on Shkreli causes the court great concern and rises
> to the level of legally cognizable prejudice that likely meets the
> level of denying Shkreli a constitutionally fair trial.

*U.S. v. Shkreli*, 260 F. Supp. 3d 247, 256-57 (E.D.N.Y. 2017) (quotations, citations, and
alteration omitted).[6]

      Forcing Messrs. Archer and Cooney to stand trial alongside the other three remaining
defendants therefore runs a serious risk of "prevent[ing] the jury from making a reliable
judgment about [the] guilt or innocence" of all five defendants.  *Zafiro*, 506 U.S. at 539 (citations
omitted).  Accordingly, for the reasons set forth above, the mutual antagonism between
Messrs. Archer and Cooney's trial defenses and the anticipated trial defenses of the other
defendants is "so prejudicial . . . as to mandate severance."  *Id.* at 538.

---

[6]     In *Shkreli*, Judge Masumoto analyzed the prejudice resulting from one defendant acting
as a "second prosecutor" against the other as analytically separate from whether their defenses
were "mutually antagonistic."  Regardless of the label, the court found that these circumstances
required severance in order to ensure a fair trial.  *Shkreli*, 260 F. Supp. 3d at 256.

II.     **The Evidence Against Mr. Archer And Mr. Cooney Is Different In Kind
       And Degree From The Evidence Against Their Co-Defendants**

Even if their defenses were not fundamentally inconsistent and antagonistic, the different

positioning of Messrs. Archer and Cooney – both factually and from an evidentiary standpoint –

would suffice to justify severance. *See Lino*, 2001 WL 8356, at *23 ("Factors that a district court

should consider in deciding a motion for severance include: (i) the complexity of the indictment;

(ii) the estimated length of trial; (iii) disparities in the amount or type of proof offered against the

defendants; [and] (iv) disparities in the degrees of involvement by defendants in the overall

scheme," among other things).

A.     **Neither Mr. Archer Nor Mr. Cooney Was Involved In AAM,
       Had Any Contact With The Alleged Victims, Or Participated
       Actively In The Alleged Fraud**

The Indictment alleges a complex, multi-faceted pair of schemes involving numerous

individuals and legal entities. The government's discovery in this case has spanned millions of

documents, and the trial evidence is likely to be similarly vast and complicated. The

government's prediction notwithstanding, *see* March 3, 2017 Transcript at 5:7, 10 (THE

COURT: "[H]ow long do you think the trial will last?" / AUSA: "My best guess would be three

weeks."), the simultaneous trial of all five remaining defendants would easily last longer than

a month, and would likely run for several months.[7]

As complex as this case is, however, the allegations of the Indictment, even if they are

credited, clearly demonstrate that Messrs. Archer and Cooney had a markedly lower degree of

involvement in the events at issue here than did any of the other defendants. *See Zafiro*, 506

U.S. at 539 (listing "many defendants [being] tried together in a complex case and [having]

---

[7]     The government has recently estimated that a joint trial will involve 20-25 prosecution
witnesses, not including document custodians, summary witnesses, and the like. *See* Decl.,
Ex. 1.

markedly different degrees of culpability" as a potential ground for severance under Rule 14); *Lino*, 2001 WL 8356, at *23 (citing "disparities in the degrees of involvement by defendants in the overall scheme" as one of the "[f]actors that a district court should consider in deciding a motion for severance"); *U.S. v. Aparo*, 221 F. Supp. 2d 359, 363 (E.D.N.Y. 2002) ("The obvious complexity of the case and the widely disparate degrees of culpability with which they are charged dictates the necessity for severing the defendants in relation to the crimes with which they are charged in a coherent manner which would minimize the risk of prejudice to them.").

As was discussed extensively above, the government's case against Messrs. Archer and Cooney differs in both degree and kind from its cases against the other defendants.  The Indictment alleges no contact between either Mr. Archer or Mr. Cooney and the WLCC; no contact between either Mr. Archer or Mr. Cooney and AAM's clients; no awareness by either Mr. Archer or Mr. Cooney of the misrepresentations allegedly made to the WLCC or to AAM's clients; no involvement by Mr. Archer or Mr. Cooney in the annuity provider that was allegedly supposed to invest the bond proceeds for the benefit of the WLCC; and no control over or visibility on the part of either Mr. Archer or Mr. Cooney into the bank account through which the bond proceeds were allegedly misappropriated.  The Indictment also does not allege that either Mr. Archer or Mr. Cooney received bond proceeds for his own personal use; to the contrary, the Indictment alleges that Jason Galanis caused lulling interest payments to be made on the bonds that Messrs. Archer and Cooney allegedly purchased, in order to give the bonds the veneer of legitimacy.

Put differently, the Indictment does not allege any involvement by Mr. Archer or Mr. Cooney in the functional aspects of the conspiracies charged in the Indictment, and indeed, they are charged in only one of the two conspiracies alleged.  *See* Ind. ¶ 4 (alleging, under the heading "Overview of the Conspiracy," that the conspiracy charged in Count One involved

17

"(i) causing the WLCC to issue more than $60 million in bonds based on false and misleading representations; (ii) failing to invest the bond proceeds on the WLCC's behalf in the manner agreed upon; and (iii) instead misappropriating the proceeds of the bonds for their own purposes").

Instead, all that the government has alleged with regard to Messrs. Archer and Cooney is that they (1) received a handful of vague and entirely innocent e-mails from Jason Galanis; (2) were kept "apprised" of perfectly lawful developments, such as the acquisition of a business; (3) had ownership or "control" interests in certain of the entities that Jason Galanis used to further his crimes; (4) received, "through layers of intermediaries," certain of the bond proceeds; and (5) allowed themselves to be unwittingly used by Jason Galanis by purchasing some of the bonds with money provided by Galanis.

Messrs. Archer and Cooney understand that the Court is not currently in a position to know whether the Indictment fairly reflects the facts concerning criminal activities in which they may have been involved at the periphery, or whether it represents prosecutorial overreach in response to recidivist fraudster Jason Galanis. But even crediting the government's allegations, Messrs. Archer and Cooney were only at the outskirts of the charged offenses, whereas their co-defendants were allegedly front-and-center.

Particularly in a joint trial involving a conspiracy charge, "[t]here generally will be evidence of wrongdoing by somebody. It is difficult for the individual to make his own case stand on its merits in the minds of jurors who are ready to believe that birds of a feather are flocked together." *Krulewitch v. U.S.*, 336 U.S. 440, 454 (1949) (Jackson, *J.*, concurring). A joint trial in this case would make that degree of difficulty even higher, as the government will spend days or even weeks putting on evidence of conflicts of interest at AAM, the investment parameters of its clients, lies allegedly told to the WLCC to get them to agree to issue the bonds

in the first place, and interactions between the other defendants to advance these aspects of the alleged fraud – all of which have nothing to do with either Mr. Archer or Mr. Cooney.

Forcing Messrs. Archer and Cooney to participate in a joint trial that will showcase an abundance of evidence implicating the other defendants in numerous instances of egregiously fraudulent conduct in which Messrs. Archer and Cooney were entirely uninvolved presents precisely the type of spillover prejudice that courts in this Circuit have found to warrant severance.  *See*, *e.g.*, *U.S. v. DiNome*, 954 F.2d 839, 844-45 (2d Cir. 1992) (reversing trial court's denial of severance as to certain defendants because they had, as a result of said denial, been "swamped" by a "mass of irrelevant evidence"); *U.S. v. Bellomo*, 954 F. Supp. 630, 650 (S.D.N.Y. 1997) ("Absent severance, these defendants would face a lengthy trial that would include evidence of a RICO enterprise in which none of them is charged with participating . . . which would not be presented at a separate trial and which is not alleged to have been a part of their criminal activity.  Thus, there is clear potential for spillover prejudice in this case."). Moreover, given the complexity of this case, the markedly different degrees of involvement in the underlying events as between Messrs. Archer and Cooney and the group of defendants from whom they seek severance, and the disparities in the amount, quality, and type of proof that will be offered against them, the risk of spillover prejudice is even greater.  *See Zafiro*, 506 U.S. at 539 ("When many defendants are tried together in a complex case and they have markedly different degrees of culpability, th[e] risk of prejudice [from the jury considering evidence admitted against a co-defendant] is heightened.").

### B.    Mr. Archer And Mr. Cooney Are Not Charged In The Investment Adviser Fraud Counts, Which Will Create Massive Evidentiary Problems

In addition to the sheer weight of the evidence that the government will need to introduce in a joint trial that simply has nothing to do with Messrs. Archer and Cooney, a joint trial would

be besieged by profoundly complicated and prejudicial evidentiary issues.  In particular, the fact

that Messrs. Archer and Cooney are not charged in the investment adviser counts means that for

every alleged co-conspirator statement, the government will need to specify – and the Court will

need to find – *which* conspiracy that statement was in furtherance of.  *See generally Bourjaily v.

U.S.*, 483 U.S. 171, 175 (1987) (finding that facts concerning whether an asserted co-conspirator

statement is admissible are "preliminary questions of fact that . . . must be resolved by the

[district] court"); *U.S. v. Coppola*, 671 F.3d 220, 246 (2d Cir. 2012) (for co-conspirator

statements to be admissible, district court must find by a preponderance of the evidence "(a) that

there was a conspiracy, (b) that its members included the declarant and the party against whom

the statement is offered, and (c) that the statement was made during the course of and in

furtherance of the conspiracy").  Statements by co-conspirators in furtherance of the investment

adviser fraud conspiracy will not be admissible against Messrs. Archer and Cooney, who are not

charged in that count or involved in the underlying conduct.  *U.S. v. Russo*, 305 F.3d 37, 44 (2d

Cir. 2002) (("[A] declarant's statement made in furtherance of a criminal act . . . is not

admissible against the defendant under the co-conspirator exception unless the defendant was

associated with the declarant in a conspiracy or joint venture having that criminal act as its

objective.  An association between the defendant and the declarant in some other venture . . . will

not suffice."); *U.S. v. Gigante*, 166 F.3d 75, 83 (2d Cir. 1999) ("The discussions between [third

party co-conspirators] should have been excluded, because there was no evidence that

[Defendant] ever joined in a conspiracy with those figures to [commit the crime he is charged

with]. . . . [T]he fact that [Defendant] might have conspired with [the third parties] to commit

other crimes on other occasions is irrelevant."); *cf. U.S. v. Bertolotti*, 529 F.2d 149, 157 (2d Cir.

1975) (finding in reversing appellants' convictions that they have a "right not to be tried en

masse for the conglomeration of distinct and separate offenses committed by others. . . . The

20

possibilities of spill-over effect from testimony on these transactions are patent when the number

of conspiracies, the number of defendants and the volume of evidence are weighed against the

ability of the jury to give each defendant the individual consideration our system requires"

(internal citations and quotations omitted)).  Given that the government is likely to seek to

introduce numerous statements by Jason Galanis, who has pleaded guilty, and Hugh Dunkerley,

who is presumably cooperating, this is a particularly grave concern.

Undue prejudice justifying severance may occur "when proof inadmissible against a

defendant becomes a part of his trial solely due to the presence of co-defendants as to whom its

admission is proper."  *U.S. v. Gonzalez*, No. 09-cr-481 (CM), 2010 WL 339698, at *3 (S.D.N.Y.

Jan. 28, 2010) (quoting *Salameh*, 152 F.3d at 115); *see also Lino*, 2001 WL 8356, at *23 (citing

"prejudice from evidence admitted only against co-defendants but which is inadmissible or

excluded as to a particular defendant" as one of the "[f]actors that a district court should consider

in deciding a motion for severance").  Similarly, a defendant may be entitled to severance where

failure to sever would force him "to endure a trial involving many incidents of misconduct which

do not involve [him]," and which could ultimately confuse or prejudice the jury against him.

*Upton*, 856 F. Supp. at 736; *accord U.S. v. Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003) (noting the

existence of "cases in which the sheer volume and magnitude of the evidence against one

defendant so dwarfs the proof presented against his co-defendant that a severance is required to

prevent unacceptable spillover prejudice").  Indeed, the Supreme Court has explicitly stated that

prejudice warranting severance

> might occur when evidence that the jury should not consider
> against a defendant and that would not be admissible if a defendant
> were tried alone is admitted against a codefendant.  For example,
> evidence of a codefendant's wrongdoing in some circumstances
> erroneously could lead a jury to conclude that a defendant was
> guilty.  When many defendants are tried together in a complex case

> and they have markedly different degrees of culpability, this risk of
> prejudice is heightened.

*Zafiro*, 506 U.S. at 539 (citing *Kotteakos v. U.S.*, 328 U.S. 750, 774-75 (1946)); *cf. U.S. v. Rittweger*, 524 F.3d 171, 180 (2d Cir. 2008) (noting "the danger of joining relatively minor participants, who have discrete roles in a larger conspiracy, with the more prominent and active members of overlapping conspiracies," and that "Rule 8(b) does not provide the government with limitless discretion to join defendants and does not absolve the government from an independent obligation to consider the unfairness that may result from joinder").

Evidentiary issues alone may justify severance, and also tend to underscore any adversity between the defendants.  For example, as Judge Matsumoto explained in *Shkreli*:

> [B]oth defense counsel have indicated that they expect to raise frequent objections during the trial, both to the government's and each co-defendant's evidence, leading to a litany of side bar debates about various legal issues[.] . . . Constant objections during opening statements, witness examinations and cross-examination, followed by side bars, will disrupt the flow of the trial and increase the length of the trial, will likely confuse the jury in what is already a complex case, and may risk prompting the jury to find both defendants guilty based on each defendant's arguments that he was deceived by the other, instead of deciding the case based on the evidence presented.  Thus, the court finds that from a trial management perspective and to prevent substantial prejudice and jury confusion, severance is warranted.

260 F. Supp. 3d at 256-57; *see also U.S. v. Serpoosh*, 919 F.2d 835, 837-38 (2d Cir. 1990) (holding that the "conflict between the defenses of" two defendants tried together had led "the jury [to] infer that both defendants [we]re guilty solely due to the conflict" because of, among other things, "the sparring between counsel for the two defendants in which each characterized the other defendant as a liar who concocted his story to escape blame," and that "each defense counsel attacked the credibility of the other defendant as well as his version of events" during summations).

In a joint trial of this case, the two separate schemes and conspiracies charged in the Indictment will invariably lead to numerous evidentiary disputes as the government will surely argue that its evidence is admissible against all of the defendants, whereas Messrs. Archer and Cooney intend to hold the government to its burden of demonstrating which conspiracy a specific statement was allegedly made in furtherance of.  Statements in furtherance of the investment adviser conspiracy are simply inadmissible against Messrs. Archer and Cooney, and the Court will be forced to give repeated limiting instructions that allegedly incriminating statements are not admissible against them.  This will be both unwieldy and, as discussed below, ineffective and deeply prejudicial.  Because Messrs. Archer and Cooney not only are not charged in the investment adviser counts, but factually had nothing whatsoever to do with AAM (other than a passive, indirect ownership interest), its clients, or the WLCC, the far better approach is to simply sever the trial of Messrs. Archer and Cooney from the trial of the remaining defendants. *See*, *e.g.*, *Shkreli*, 260 F. Supp. 3d at 256-57 ("the court finds that *from a trial management perspective* and to prevent substantial prejudice and jury confusion, severance is warranted." (emphasis added)).

III.    **Incredibly Prejudicial Evidence Against Their Co-Defendants Will Not Be Admissible Against Messrs. Archer And Cooney**

The Supreme Court's concern regarding "evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone [being] admitted against a codefendant" is especially applicable to Rule 404(b) evidence, which possesses a unique ability to "erroneously . . . lead a jury to conclude that a defendant [is] guilty."  *Zafiro*, 506 U.S. at 539.  Thus, "[t]he Second Circuit recognizes the potential 'spillover' prejudice that a co-defendant may incur in a joint trial where prior-act evidence is admitted against another co-defendant."  *U.S. v. Ozsusamlar*, 428 F. Supp. 2d 161, 173 (S.D.N.Y. 2006)

(citing *U.S. v. Gelzer*, 50 F.3d 1133, 1140 (2d Cir. 1995)).  Accordingly, severance is an appropriate remedy to prevent the introduction of overly prejudicial Rule 404(b) evidence against co-defendants to whom it does not relate.

Messrs. Archer and Cooney anticipate that, as part of its proof at trial, the government will seek to introduce Rule 404(b) evidence concerning certain of their co-defendants.  The introduction of such evidence by the government presents a serious risk of spillover prejudice that would compromise the integrity of a joint trial.  *See*, *e.g.*, *U.S. v. Basciano*, No. 05-cr-60 (NGG), 2007 WL 3124622, at *5 (E.D.N.Y. Oct. 23, 2007) (severance granted based on prejudicial effect of proffered Rule 404(b) evidence that a co-defendant had previously been convicted for the same conduct for which the defendant was currently on trial); *U.S. v. Lujan*, 529 F. Supp. 2d 1315, 1326 (D.N.M. 2007) (finding that the introduction of additional murders perpetrated by co-defendant, which would not be admissible against the moving defendants in a separate trial, would create the possibility "that a jury might infer [the defendants'] guilt because of the enhanced likelihood of [the co-defendant's] guilt," and was a "factor weighing in favor of severance"); *cf. U.S. v. Figueroa*, 618 F.2d 934, 944 (2d Cir. 1980) (remanding for new trial where Rule 404(b) evidence erroneously admitted against one defendant caused sufficient likelihood of prejudice to co-defendants).

In particular, Messrs. Archer and Cooney anticipate that the government may attempt to introduce at least three different types of Rule 404(b) evidence.[8]

### A.        The Gerova Fraud

First, the government is likely to introduce evidence that Jason Galanis, John Galanis, and Gary Hirst committed a previous securities fraud together (the "Gerova" fraud). They were all arrested by the government and charged civilly by the SEC in September 2015 in connection with this prior fraud, and each of them was eventually convicted for their role in it. *See United States v. Galanis, et al.*, No. 15 Cr. 643 (PKC); *SEC v. Galanis, et al.*, 15 Civ. 7547 (VSB).

As alleged in the Gerova case, Jason Galanis, John Galanis, Gary Hirst, and their co-conspirators secretly took control over millions of shares of a publicly-traded company (Gerova), and orchestrated what was, in effect, a pump-and-dump scheme. They did so by bribing investment advisers to purchase Gerova stock in their client accounts. In addition, as part of the scheme, Jason Galanis and Gary Hirst were alleged to have secretly taken control over Gerova itself and caused it to, among other things, issue stock. *See generally*, "Manhattan U.S.

---

[8]     It is possible that the government may take the position that some or all of this evidence is not Rule 404(b) evidence at all, but instead direct evidence of the charged crimes. As explained in the previous section, however, because Messrs. Archer and Cooney are not involved in any of these incidents of actual or alleged misconduct, severance would still be appropriate to avoid undue prejudice to them. (We have asked the government explicitly whether they intend to introduce certain of this evidence, such as the Gerova fraud, but it has declined to answer at this time.)

That said, evidence that might be inadmissible *against* Messrs. Archer and Cooney may well be admissible *by* them. For example, in the event of a joint trial in which Messrs. Archer and Cooney are forced to be directly antagonistic to the other remaining co-defendants, Messrs. Archer and Cooney may determine that it is in their interest to affirmatively introduce evidence that would otherwise be inadmissible as against them. In seeking severance on the basis of such evidence in this memorandum, Messrs. Archer and Cooney expressly reserve the right to seek to introduce such evidence if sound trial strategy suggests that it is appropriate.

Attorney Announces Charges Against Seven Individuals For Multimillion-Dollar Investment Scheme," Sept. 24, 2015, available at http://bit.ly/2D87ZUO.

In both the Gerova case and this one, Jason Galanis obtained effective control over existing entities in order to cause them to enter into transactions designed to further his fraudulent scheme. *See*, *e.g.*, *id.* ("Jason Galanis obtained such control over Gerova so as to be able to cause Gerova to enter into transactions of his design, and for his benefit, including the issuance of Gerova stock.").  Both involved the use of investment advisory firms to cash out on the fraud using client funds.  In the Gerova case, the conspirators "fraudulently induced investment advisers . . . to purchase shares of Gerova stock in the investment advisers' client accounts . . . thereby enabling the[m] to cash out from the scheme and make millions in illegal profits."  *Id.*  Here, the Indictment alleges that Jason Galanis, Hirst, and Morton "gain[ed] ownership and control" over two investment advisers and then "caus[ed] client funds to be invested in the WLCC's bonds, without disclosing material facts to these clients."  Ind.  ¶ 5.

The government is likely to argue, therefore, that the Gerova fraud is relevant to show the prior criminal association between Jason Galanis, John Galanis, and Gary Hirst, as well as to show their modus operandi of taking control over companies, hiding their identities, and causing securities to be wrongfully foisted upon the clients of investment advisers.  None of this has anything to do with Messrs. Archer and Cooney, but the introduction of this evidence will be deeply prejudicial, as well as confusing to the jury.  That is all the more true because it will be impossible to try this case without any reference to the Gerova case at all.  Indeed, Jason Galanis's arrest in September 2015 in the Gerova case caused shockwaves to go through the entities at issue in this case, many of which were entirely legitimate and untouched by any alleged fraud.  For example, Mr. Archer had an ownership interest in an incredibly successful asset manager that was managing billions of dollars at the time of Jason Galanis's arrest, and had

to scramble to attempt to keep that business afloat in the wake of it.  His contemporaneous reaction to Jason Galanis's arrest in the Gerova case, and the subsequent interactions between certain of the other defendants, may well be relevant and admissible at the trial in this case.  But the *facts* of the Gerova fraud, on the other hand, are inadmissible against Messrs. Archer and Cooney.

> **B.** **The Alleged Code Rebel Fraud**

The government may also attempt to introduce evidence of another pump-and-dump scheme orchestrated by Jason Galanis, this one involving a company called Code Rebel.

Although the government's Indictment makes no reference to Code Rebel, the SEC Complaint alleges that a "significant portion" of the misappropriated bond proceeds were used to support an initial public offering of stock of Code Rebel, to which Jason Galanis served as an advisor.  SEC Complaint ¶ 104.[9]  The SEC alleges that Jason Galanis, Hirst, and a third person "coordinated the success" of the IPO, which was underwritten by the same broker-dealer that underwrote the WLCC bonds, "with Dunkerley taking a lead on the [Code Rebel] deal."  *Id.* ¶ 106.  The SEC alleges that more than $4.3 million in misappropriated WLCC bond proceeds were used to purchase IPO shares, representing 87% of the Code Rebel issuance. "The remaining 13% was also sold to friendly accounts, including accounts controlled by Hirst."  *Id.* ¶ 108.  The conspirators then allegedly sold the shares for a profit, and "sent millions of dollars . . . to a variety of Galanis-related transferees, including Jason Galanis's criminal defense attorneys" in the Gerova case.  *Id.* ¶ 110.

Again, Messrs. Archer and Cooney are not alleged to have had any knowledge of or involvement in the Code Rebel fraud.  Their only alleged connection to Code Rebel is that they

---

[9]    The SEC Complaint refers to the "Technology Company," which Mr. Archer believes to be a reference to Code Rebel.

held shares, *id.* ¶ 104 – yet another consequence of believing Jason Galanis.  But unlike the people allegedly knowledgeable about the Code Rebel fraud, Mr. Archer never sold his shares. To the contrary, he continued to hold them at the time that the SEC filed its case, including after trading in Code Rebel was suspended and the stock became worthless.  Thus, while the government may attempt to introduce evidence of the Code Rebel fraud for one reason or another, that evidence would not be admissible against Messrs. Archer and Cooney, and its admission in a joint trial – even with a limiting instruction – would be deeply prejudicial to both of them.

### C.    John Galanis's Extensive Criminal And Regulatory History

The government may also try to admit aspects of John Galanis's lengthy criminal and regulatory history.  Whatever relevance John Galanis's prior crimes and bad acts may have to his own guilt or innocence, it plainly has none with respect to Messrs. Archer and Cooney – neither of whom even knew that John Galanis was involved with the WLCC bonds.[10]

John Galanis has a long, checkered history of financial crime, encompassing mail fraud, tax fraud, racketeering, bank fraud, and bribery.  The SEC, for example, describes John Galanis as having been "the subject of numerous prior criminal proceedings, as well as enforcement actions by the [SEC], dating back to the late 1960s."  SEC Complaint ¶ 17.  The government's sentencing memorandum in the Gerova case recounts the following criminal history for John Galanis, much of which resembles the alleged facts of this case:

---

[10]    Likewise, at least one other remaining defendant, Michelle Morton, has potential Rule 404(b) material related to her role as CEO of another investment firm, which was expelled from the industry by FINRA in 2012.  And although he will not be a trial defendant, Jason Galanis also has a criminal and/or regulatory history prior to the Gerova case.  To the extent the government may attempt to introduce this evidence about either Morton or Jason Galanis, the same arguments made here as to John Galanis would apply.

- Charges of investor and bank fraud in Quebec, Canada in 1973 that do not appear to have resulted in a conviction;

- Charges of mail fraud and conspiracy to make false statements to the SEC in connection with his participation in a scheme to hide investment losses through a fraudulently back-dated reverse merger in 1973, resulting in a sentence of 60 months' imprisonment;

- Engaging "in a number of tangentially interconnected criminal schemes relating to the oil and gas industry and to savings and loan institutions" in the mid-to-late 1970s in which he and his co-conspirators "hid their control of various entities, backdated documents, . . . defrauded investors through false representations, . . . obtain[ed] fraudulent tax deductions, bribed bank employees to do their bidding, and used various entities to engage in fraudulent securities transactions" over the course of several years;

- Defrauding various investors in funds managed by the ISI Corporation and misappropriating the funds for his and his co-conspirators' own purposes between November 1985 and September 1987;

- Charges in this District of conspiracy to defraud the IRS, tax fraud, racketeering, securities fraud, bank fraud, and bribery in 1987 in connection with the criminal conduct described in the two bullet-points above, resulting in his conviction on 44 counts of conspiracy to defraud the IRS, tax fraud, racketeering, securities fraud, bank fraud, and bribery; a sentence of 27 years' imprisonment; and "a judicially-imposed lifetime bar on executing securities trades in brokerage accounts other than accounts in his name or the names of his family members";

- Charges in New York County Supreme Court "with Grand Larceny in the Second Degree arising out of a wholly separate criminal scheme focused on the real estate industry" wherein he and his co-conspirators misappropriated money from investors in 1987, resulting in a sentence of seven to 20 years' imprisonment imposed concurrently to the 27-year sentence described above; and

- Absconding from a state work release program in 2000, less than two years after he was paroled from federal custody to the custody of the New York State Department of Corrections, and remaining a fugitive for over a year, resulting in his remand to state custody, where he remained for over five years.

Decl. Ex. 1 (Gov't Sentencing Mem. as to John Galanis in the Gerova case) at 2-5.

If the government is permitted to introduce this evidence against John Galanis, it will plainly be inadmissible against Messrs. Archer and Cooney, but it will prejudice them tremendously by suggesting to the jurors that "birds of a feather are flocked together." *Krulewitch*, 336 U.S. at 454 (Jackson, *J.*, concurring).[11]

*       *       *

In short, the introduction of Rule 404(b) evidence against Messrs. Archer and Cooney's co-defendants will present a serious risk of spillover prejudice to them, and counsels strongly in favor of severance.

## IV.   A Limiting Instruction Cannot Cure The Potential Prejudice

The prejudice to Messrs. Archer and Cooney of a joint trial with the other defendants could not be cured by a simple limiting instruction to the jury.  As discussed above, this is a complex case alleging multiple long-running conspiracies, four different bond issuances, numerous legitimate and allegedly illegitimate legal entities, and several defendants who are in no sense similarly situated to one another.  The distinct positioning of Messrs. Archer and Cooney as compared to the other defendants; the fact that this juxtaposition will create a situation in which Messrs. Archer and Cooney stand to benefit by helping to prove the government's case against the other defendants, and vice versa; the marked disparities in the involvement and culpability of, and the amount, quality, and type of proof that will be offered against, Messrs. Archer and Cooney, on the one hand, and the other defendants, on the other

---

[11]   At the same time, as with the Gerova fraud, the existence of John Galanis's criminal history may be relevant to a limited extent if offered by Messrs. Archer and Cooney.  For example, not only did Messrs. Archer and Cooney have absolutely no interactions with John Galanis, they will argue that Jason Galanis took pains to ensure that they did not learn about John Galanis's involvement.

hand; and the serious potential that Messrs. Archer and Cooney will be prejudiced by spillover

from the other defendants' conduct in this case – not to mention their conduct in the Gerova case

and the Code Rebel fraud, and John and Jason Galanis's prior history of fraud – all represent a

confluence of circumstances that, when considered collectively, will run such a severe risk of

prejudicing Messrs. Archer's and Cooney's respective trial defenses that it cannot be overcome

by any limiting instruction. *See U.S. v. McDermott*, 245 F.3d 133, 139-40 (2d. Cir. 2001)

(holding that the presumption that jurors will adhere to limiting instructions "fades when there is

an overwhelming probability that the jury will be called upon to perform humanly impossible

feats of mental dexterity," and noting that in a case where prejudicial spillover is

"overwhelming," jury instructions cannot be presumed to be effective); *see also Shkreli*, 260 F.

Supp. 3d at 256 ("Through such double prosecution of Shkreli by the government and Greebel,

there is a serious risk that the jury would be prevented from making a reliable judgment about

guilt or innocence even with limiting instructions by the court."); *Basciano*, 2007 WL 3124622,

at *5 ("[I]t is hard to imagine a situation in which a jury would be called upon to perform greater

feats of 'mental dexterity' than being asked to ignore the fact of [one defendant's] prior

conviction in assessing [the] guilt [of his co-defendants].  Thus, I believe this to be exactly the

type of situation in which the presumption that a jury will adhere to jury instructions fades, and

find that a limiting instruction would not suffice to cure the potential for prejudice." (internal

citations omitted)).

        The use of limiting instructions is of particularly dubious value here, where in light of the

serious evidentiary issues, the Court will be called upon to issue limiting instructions with such

frequency that it will be impossible for any juror to keep proper account of what evidence is

properly admissible against whom.  *See*, *e.g.*, *U.S. v. Jones*, 16 F.3d 487, 493 (2d Cir. 1994) ("Of

course, jurors are presumed to follow instructions from the court.  But it would be quixotic to

expect the jurors to perform such mental acrobatics called for by the district judge. . . . The

presumption that a jury will adhere to a limiting instruction evaporates where there is an

overwhelming probability that the jury will be unable to follow the court's instructions and the

evidence is devastating to the defense." (citing *Greer v. Miller*, 483 U.S. 756, 766 n.8, (1987));

*U.S. v. Baker*, 10 F.3d 1374, 1391 (9th Cir. 1993) ("Most importantly, the human limitations of

the jury system and the consequent risk of spillover prejudice cannot be ignored. This risk is

particularly acute for comparatively peripheral defendants . . . whose separate trial could have

been concluded in a matter of days or weeks, but who was required to sit in the courtroom during

months of proof involving entirely unrelated conspiracies and substantive offenses. . . . Our

presumption that a jury is able to follow the trial court's instructions is 'rooted less in the

absolute certitude that the presumption is true than in the belief that it represents a reasonable

practical accommodation of the interests of the state and the defendant in the criminal justice

process.' . . . The presumption is not irrebuttable." (quoting *Richardson*, 481 U.S. at 211)),

*overruled on unrelated grounds by U.S. v. Nordby*, 225 F.3d 1053 (9th Cir. 2000).

## V.     If The Court Deems Severance Premature, It Should Allow Mr. Archer And Mr. Cooney To Renew Their Severance Motion After The Government Provides Rule 404(b) Notice

The parties in this case have agreed that the government will provide notice of any Rule

404(b) evidence it intends to introduce no later than 60 days prior to the start of trial  *See* Decl.

¶ 4; Ex. 1.  In the event that the Court finds severance to be premature at this stage, it should, at a

minimum, hold the instant motion for severance in abeyance pending development of the factual

record – including but not limited to Messrs. Archer and Cooney's receipt of the government's

notice of its intended Rule 404(b) evidence.  *See, e.g.*, *U.S. v. Kercado*, No. 91-cr-685 (SWK),

1992 WL 196778, at *2 (S.D.N.Y. Aug. 3, 1992); *U.S. v. Rodriguez*, 734 F. Supp. 116, 118, n.1

(S.D.N.Y. 1990); *cf. U.S. v. Rodriguez*, No. 08-cr-1311 (RPP), 2009 WL 2569116, at *11

(S.D.N.Y. Aug. 20, 2009) (dismissing motion to sever without prejudice, with leave to amend at a later date).

## <u>CONCLUSION</u>

For the reasons just given, the Court should sever the trials of Devon Archer and Bevan Cooney from the trial of their remaining co-defendants.  Moreover, Messrs. Archer and Cooney ask that the Court order the other defendants to be tried first.  Although Messrs. Archer and Cooney are eager for their day in court, the government continues to produce evidence to them collected pursuant to its post-Indictment  search warrants, which evidence will need to be reviewed, and the parties are likely to have to litigate additional evidentiary issues related to the warrants.  Scheduling Messrs. Archer and Cooney's trial after that of the other defendants will ensure that Messrs. Archer and Cooney, and the Court, have sufficient time to deal with this evidence, which relates solely to them and not to any of the other three remaining defendants.

Dated:      January 16, 2018
            New York, New York

                                        Respectfully submitted,

                                         /s/ Matthew L. Schwartz
                                        Matthew L. Schwartz
                                        BOIES SCHILLER FLEXNER LLP
                                        575 Lexington Avenue, 7th Floor
                                        New York, New York 10022
                                        Tel.: (212) 446-2300
                                        Fax: (212) 446-2350
                                        mlschwartz@bsfllp.com

                                        *Attorneys for Devon Archer*

                                         /s/ Paula Notari
                                        Paula Notari
                                        THE LAW OFFICE OF
                                                PAULA J. NOTARI
                                        152 West 57th Street, 8th Floor
                                        New York, New York 10019
                                        Tel.: (646) 943-2172
                                        Fax: (212) 980-2968
                                        paulanotari@aol.com

                                        Abraham J. Hassen
                                        O'NEILL / HASSEN
                                        25 Eighth Ave, Suite C
                                        Brooklyn, New York 11217
                                        Tel./Fax.: (212) 203-1858
                                        hassen@oandh.net

                                        *Attorneys for Bevan Cooney*