**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

    - v. -

MICHELLE MORTON,

          Defendant.

No. 16-cr-00371 (RA)

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>MICHELLE MORTON'S PRETRIAL MOTIONS</u>**

ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, New York 10019
(212) 506-5000

*Attorneys for Defendant Michelle Morton*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND AND PROCEDURAL HISTORY.............................................................. 3

I.   MS. MORTON'S BACKGROUND AND THE PERPETRATION OF THE
     GALANIS FRAUD ............................................................................................... 3

     A.   Formation of GMT Duncan, LLC.............................................................. 3

     B.   The Acquisition of Hughes Capital Management................................... 3

     C.   The Placement of the Bonds at Hughes .................................................. 5

     D.   Acquisition of Atlantic Asset Management .......................................... 10

     E.   Galanis Provides Additional Capital for Atlantic ............................... 11

     F.   The Placement of the Bonds at Atlantic ............................................... 11

II.  MS. MORTON REPORTS SUSPICIOUS ACTIVITY AND ASSISTS THE SEC,
     FBI, AND USAO ................................................................................................ 13

     A.   Ms. Morton Suspects Corrupt Activity and Reports It to FINRA ....... 13

     B.   Ms. Morton Assists the Government Prior to Being Charged and Arrested ....... 14

     C.   The Government Charged and Arrested Ms. Morton .......................... 17

ARGUMENT ...................................................................................................................... 17

I.   THE COURT SHOULD DISMISS THE INDICTMENT AGAINST MS.
     MORTON BECAUSE THE GOVERNMENT VIOLATED HER DUE
     PROCESS RIGHTS, OR, IN THE ALTERNATIVE, THE COURT SHOULD
     SUPPRESS THE FRUITS OF MS. MORTON'S COOPERATION ............................ 17

     A.   The Dismissal Standard Is High, But the Court Should Evaluate the
          Standard and the Facts in Light of Ms. Morton's Personal Circumstances......... 18

     B.   The Government Acted Unfairly When It Met With and Proactively
          Cooperated Ms. Morton Without an Attorney.................................... 20

          1.   The Government Misled Ms. Morton About Her Criminal
               Exposure ................................................................................ 21

          2.   Ms. Morton Wore a Wire...................................................... 22

          3.   The Government Persuaded Ms. Morton to Grant It Access to Her
               Cell Phone.............................................................................. 23

          4.   The Government Never Explained to Ms. Morton That
               "Cooperation" Is a Term of Art ............................................ 23

          5.   The Government Further Indicated that Ms. Morton was Safe
               During a Call to Provide Her with Guidance......................... 24

## TABLE OF CONTENTS
(continued)

Page

6. Ms. Morton Did Not Understand the Benefit of Having an Attorney ............................................................................................. 25

7. The Government Used Ms. Morton's Wired Conversations as the Basis for the Overt Acts Described in Its Complaint............................... 25

8. The Government's Conduct Prejudiced the Effectiveness of Her Legal Representation and Resulted in the Government Having a Stronger Case Against Her Than It Would Absent Her Cooperation...... 26

C. The Court Should Hold the Government Accountable for Its Conduct by Dismissing the Indictment or Suppressing the Evidence From her "Cooperation" ........................................................................................... 27

II. THE COURT SHOULD ORDER THE GOVERNMENT TO PROVIDE A BILL OF PARTICULARS ............................................................................................. 29

A. Applicable Legal Standard.................................................................................. 29

B. The Court Should Order the Government to Provide the Requested Particulars ............................................................................................................ 30

1. All Coconspirators and the Time Periods of Their Individual Involvement in Each of the Two Charged Conspiracies ........................ 30

2. The Date on Which Ms. Morton Is Alleged to Have Joined the Conspiracy .............................................................................................. 31

3. Identities of Any Cooperating Witnesses and the Dates They Began Cooperating.................................................................................. 31

4. The Basis for Ms. Morton's Knowledge of the Three Means Through Which the WLCC Was Defrauded............................................ 32

5. The Basis for the Allegations That the WLCC Bonds Did Not Fit Within the Investment Parameters ......................................................... 32

6. Particulars Concerning Ms. Morton's Knowledge of the Dunkerley Account Referenced in Paragraph 7 ....................................................... 33

7. Support for the Assertion That Ms. Morton "Installed" Gary Hirst as CIO .................................................................................................... 33

8. Ms. Morton's Knowledge of the Specific Conflicts Sets Forth in Paragraph 15(a)-(c) of the Indictment.................................................... 33

9. When the Government Believes Ms. Morton Became Aware of the Galanis Bond Fraud ............................................................................... 34

III. THE COURT SHOULD SEVER THE TRIALS OF MS. MORTON AND DEFENDANTS GARY HIRST, JOHN GALANIS, DEVON ARCHER, AND BEVAN COONEY ............................................................................................. 34

## TABLE OF CONTENTS
(continued)

**Page**

A.   The Indictment Fails to Allege Common Conspiracies ........................................ 36

B.   Ms. Morton and Hirst Will Present Inconsistent and Hostile Defenses .............. 37

C.   The Risk for Spillover Prejudice Against Ms. Morton Is Substantial ................. 38

D.   Severance Would Not Impose an Unwarranted Burden on Judicial Economy .................................................................................................................. 39

IV.   MS. MORTON REQUESTS THE ABILITY TO FILE ADDITIONAL APPROPRIATE MOTIONS AND JOIN IN ANY CODEFENDANT'S MOTIONS AS APPROPRIATE AND APPLICABLE .................................................... 40

CONCLUSION .................................................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bruton v. United States,*
    391 U.S. 123 (1968)..................................................................................................35

*Kinsella v. United States ex rel. Singleton,*
    361 U.S. 234 (1960)..................................................................................................17

*Krulewitch v. United States,*
    336 U.S. 440 (1949)..................................................................................................35

*Rochin v. California,*
    342 U.S. 165 (1952)..................................................................................................18

*United States v. Bortnovsky,*
    820 F.2d 572 (2d Cir. 1987)......................................................................................29

*United States v. Branker,*
    395 F.2d 881 (2d Cir. 1968)......................................................................................38

*United States v. Chen,*
    378 F.3d 151 (2d Cir. 2004)......................................................................................29

*United States v. Chin,*
    934 F.2d 393 (2d Cir. 1991)......................................................................................17

*United States v. Cuervelo,*
    949 F.2d 559 (2d Cir. 1991)......................................................................................18

*United States v. DeVillio,*
    983 F.2d 1185 (2d Cir. 1993)....................................................................................35

*United States v. DiGregorio,*
    795 F.Supp. 630 (S.D.N.Y 1992) .................................................. 18, 19, 20, 27-28

*United States v. Fruchter,*
    104 F. Supp. 2d 289 (S.D.N.Y. 2000)......................................................................38

*United States v. Gore,*
    154 F.3d 34 (2d Cir. 1998)........................................................................................36

*United States v. Guillen-Rivas,*
    950 F. Supp. 2d 446 (E.D.N.Y. 2013) ......................................................................37

*United States v. Lech*,
    161 F.R.D. 255 (S.D.N.Y. 1995) (Sotomayor, J.) ................................................34

*United States v. Lino*,
    2001 WL 8356 (S.D.N.Y. 2001) ..........................................................................29

*United States v. McDermott*,
    245 F.3d 133 (2d Cir. 2001) .................................................................................36

*United States v. McVeigh*,
    169 F.R.D. 362 (D. Colo. 1996) ...........................................................................40

*United States v. Moazzam*,
    1993 WL 36175 (S.D.N.Y. 1993) ........................................................................30

*United States v. Morrison*,
    449 U.S. 361 (1981) ..............................................................................................18

*United States v. O'Connor*,
    237 F.2d 466 (2d Cir. 1956) .................................................................................29

*United States v. Rajaratnam*,
    753 F. Supp. 2d 299 (S.D.N.Y. 2010) .................................................................38

*United States v. Rubio*,
    709 F.2d 146 (2d Cir. 1983) .................................................................................20

*United States v. Russell*,
    411 U.S. 423 (1973) ..............................................................................................17

*United States v. Sattar*,
    314 F. Supp. 2d 279 (S.D.N.Y. 2004) .............................................................34-35

*United States v. Snype*,
    441 F.3d 119 (2d Cir. 2006) .................................................................................28

*United States v. Taylor*,
    707 F. Supp. 696 (S.D.N.Y. 1989) ......................................................................30

*Upjohn Co. v. United States*,
    449 U.S. 383 (1981) ..............................................................................................21

*Watts v. State of Indiana*,
    338 U.S. 49 (1949) ................................................................................................18

*Zafiro v. United States*,
    506 U.S. 534 (1993) ..............................................................................................35

Defendant Michelle Morton submits this memorandum of law in support of her pretrial motions.  Ms. Morton respectfully moves the Court for an order dismissing, in the interest of justice, the superseding indictment filed November 2, 2016, (the "Indictment") because the U.S. Attorney's Office for the Southern District of New York ("USAO" or "government") treated Ms. Morton in an unconscionable manner.  In the alternative, Ms. Morton requests that the Court suppress the fruits of her cooperation with the government's investigation.  Should the Court decline to dismiss the Indictment, Ms. Morton respectfully requests that the Court order the government to provide a bill of particulars as specified herein, and sever Ms. Morton's trial from that of her codefendants.

## PRELIMINARY STATEMENT

In June 2015, Michelle Morton became concerned that one of her business partners had engaged in conduct that could harm the clients of her investment advisory firm.  As a result, she reached out to regulatory and enforcement authorities for assistance.  She reported the suspicious conduct to a contact at FINRA.  She subsequently provided documents to the SEC.  She voluntarily spoke to the FBI.  She even spoke—without a lawyer present—to an Assistant United States Attorney for the Southern District of New York.  She wore a wire to surreptitiously record two different meetings to further the government's investigation; she made consensually recorded calls at the government's behest; and she allowed the government to image the contents of her cellphone.  All the while, the government never explained, and Ms. Morton never understood, that the government was investigating her conduct and that she was at risk of prosecution.

Despite her efforts to assist the government, it charged Ms. Morton with multiple crimes. The Indictment alleges a conspiracy to commit securities fraud and conspiracy to commit investment adviser fraud, and one substantive count in connection with each conspiracy.  Each of

1

the four counts relates to a single scheme that was conceived, born, and executed by Jason Galanis—an undisputed first-rate con man who defrauded a Native American tribe by causing it to issue approximately $60 million in bonds so that he could steal the proceeds to use for his and his cohorts' benefit.  Ms. Morton knew *nothing* about Galanis's underlying fraud on the Native American tribe.

Ms. Morton was simply one of the marks of Galanis's Native American con.  Over the course of their brief relationship, Galanis deceived and took advantage of Ms. Morton by using her as a vehicle to place these bonds so he could steal the money.  When she finally caught on, she reported him to FINRA, which she believed to be an arm of the United States government. In the wake of her discovery, she met with and assisted the government, and it took advantage of Ms. Morton as surely as Galanis did.  Once the government extracted all the value it could from Ms. Morton, the government shocked her by charging her with securities and investment adviser fraud.

The Indictment's allegations against Ms. Morton are as wrong as the government's conduct.  The thrust of this motion therefore focuses on dismissing the Indictment in the interests of justice or, in the alternative, suppressing the fruits of Ms. Morton's cooperation.  Short of dismissal, Ms. Morton seeks a bill of particulars aimed at understanding the government's position concerning which aspects of the multidimensional Galanis fraud that Ms. Morton understood.  Finally, because of her lack of involvement with the overarching Galanis scheme to defraud the Native American tribe, Ms. Morton requests that the Court sever her from her codefendants because they will present inconsistent defenses and indelibly taint her at trial.

## BACKGROUND AND PROCEDURAL HISTORY

I.   **MS. MORTON'S BACKGROUND AND THE PERPETRATION OF THE GALANIS FRAUD**

A.   **Formation of GMT Duncan, LLC**

In 2013, Ms. Morton partnered with her long-time friend, Richard Deary, to form GMT Duncan, LLC.  *See* Affidavit of Michelle Morton ("Morton Aff."), ¶ 2.  Ms. Morton and Mr. Deary sought capital to launch a firm that promoted socially responsible investing, meaning that the firm would work toward investing its clients' assets in products that promoted diversity, socioeconomic equality, and other socially just purposes.  *Id.*  They met with several individuals and organizations as potential financiers.  In May 2014, one of their contacts introduced Ms. Morton and Mr. Deary to Jason Galanis as a potential financial backer.  Criminal Complaint, ¶ 39(a) (ECF Dkt. No. 1) (the "Complaint").

B.   **The Acquisition of Hughes Capital Management**

Just prior to meeting Galanis, Ms. Morton and Mr. Deary determined to launch their socially responsible investment platform by acquiring an existing firm rather than building a new firm from scratch.  Such an acquisition would have the benefit of preexisting infrastructure such as information systems, investment professionals, and compliance personnel.  Mr. Deary identified as an acquisition target a certified Minority and Woman-Owned Business Enterprise ("MWBE") called Hughes Capital Management ("Hughes"): a Virginia-based, fixed-income asset manager for primarily institutional investors with discretionary accounts.  Mr. Deary had long known the owner, Frankie Hughes, and knew that she hoped to sell her firm.

Ms. Morton and Mr. Deary discussed the possible Hughes acquisition in their first meeting with Galanis in May 2014.  Specifically, they told Galanis that they sought financing to acquire Hughes and reconstitute it to advance a socially responsible investment platform serving

the Native American community,[1] African-American athletes, and other groups that are frequently subject to predatory practices with respect to wealth management.

Galanis feigned the same interest in socially responsible investing.  *See* Morton Aff., ¶ 4. He told Ms. Morton that he was working to gain access to certain kinds of financing deals within the Native American community.[2]  However, he did not explain that he already had access to a specific offering at that time.  Following further discussions, Galanis, Ms. Morton, and Mr. Deary decided to work together to purchase Hughes and implement the socially responsible investment initiative.

During the summer months, Ms. Morton and Mr. Deary negotiated with both Hughes and Galanis to work out an acquisition plan.  Toward the end of July 2014, but before the Hughes purchase, Galanis first presented Ms. Morton with a specific bond issuance (the "Bonds") for the Wakpamni Lake Community Corporation ("WLCC" or "Wakpamni"), a tribally chartered economic development corporation under the umbrella of the Oglala Sioux Tribe in Pine Ridge, South Dakota.  *Id*. at ¶ 4.  Galanis told Ms. Morton that he had direct access to the Bond issuance.  Ms. Morton did not commit to purchase the Bonds at that time; however, she viewed the Bonds as a potentially timely vehicle for implementing the socially responsible investment initiative at Hughes.  *Id*.

---

[1]  Ms. Morton previously owned a broker-dealer called Pacific American Securities ("PAS"). PAS employed a Native American woman who specialized in assisting Native American communities with financing opportunities and advice.  Consequently, Ms. Morton became interested in and committed to helping Native American communities grow and protect their wealth.  Morton Aff., ¶ 2.  To be sure, Ms. Morton's interest in Native American issues began nearly two decades before she ever caught whiff of Jason Galanis.

[2]  According to the Complaint, and unbeknownst to Ms. Morton, Galanis and his father, codefendant John Galanis, had already procured a bond issuance from the Wakpamni Lake Community Corporation—the Bonds at issue in this case.  *See* Complaint, ¶ 31(a)-(d).

In August 2014, Galanis formed Burnham Financial Group Socially Responsible Investing ("BFGSRI") to provide the necessary financing for GMT Duncan to acquire Hughes. *See* Complaint, ¶ 39(k).  Under the Hughes deal terms, Mr. Deary became the Hughes president, a minority owner at 49%, and earned $350,000 annually.  Mr. Deary commanded a high salary because he had years of experience at a MWBE fixed-income asset management firm similar to Hughes.  Ms. Morton, by comparison, became Chief Executive Officer ("CEO") and majority owner at 51%; but she only earned $35,000 annually.[3]  Ms. Morton's salary was one-tenth of Mr. Deary's salary and reflected her lack of experience in fixed income investment management.[4]

Because neither Ms. Morton nor Mr. Deary were investment professionals, Hughes needed a Chief Investment Officer ("CIO").  Neither Ms. Morton nor Mr. Deary knew of a qualified candidate, so Ms. Morton asked Galanis for a recommendation.  Galanis introduced her to Gary Hirst, an experienced lawyer and investment professional who, on paper and in person, appeared eminently qualified.  Morton Aff., ¶ 5.  Ms. Morton understood from Galanis that Hirst agreed to join Hughes as its permanent CIO.  *Id.*  Ms. Morton had no knowledge whether, as the Complaint alleges, Galanis placed Hirst at Hughes to help Galanis execute his broader fraudulent scheme to defraud the WLCC and the Oglala Sioux.  Complaint, ¶ 39(i).

C.    **The Placement of the Bonds at Hughes**

On August 12, 2014, GMT Duncan closed the Hughes acquisition.  Morton Aff., ¶ 3. Ms. Morton and Mr. Deary met with the Hughes staff and disclosed the initiative to transform Hughes into a socially responsible investment firm.  Complaint, ¶ 39(k-l).  Hirst joined them as

---

[3]  Applicable rules required that Ms. Morton own 51% of the company for it to qualify as a MWBE.

[4]  Ms. Morton and Mr. Deary each had years of experience managing the administrative and client-relations aspects of financial firms, but neither had any experience in determining the quality or appropriateness of specific investment products like stocks or bonds.

the Hughes CIO that same day.  *Id.*, ¶ 39(n).  They acknowledged to Hughes' employees the new and unfamiliar direction for the firm, but contended that it would be a rewarding direction for both clients and employees.

On the same day, Ms. Morton asked Hughes' Chief Compliance Officer ("CCO"), Carolyn Lisa, whether any of Hughes' clients permitted investments like the Bonds.  Morton Aff., ¶ 4.  Despite the government's allegations, Ms. Morton had not yet agreed to purchase any Bonds for Hughes' client portfolios; she only agreed to explore the possibility.  *Id.*  Therefore, the investment and compliance teams—Hirst, Ms. Lisa, Mr. Deary and others—began to explore the suitability of the Bonds for any Hughes clients.  *Id.*

Ms. Lisa initially believed that Hughes' clients likely could not purchase the Bonds. However, over the next eight days, Ms. Lisa, Hirst, and other Hughes investment professionals analyzed the Bonds to better understand the nature of the issuance and the Hughes clients' investment parameters to learn whether any clients could take advantage of this unique, socially responsible investment opportunity.  Contrary to the allegations in this matter, the Hughes investment team concluded that numerous Hughes clients had investment parameters that permitted their portfolios to invest in the Bonds.  *Id.*, ¶ 6.  As part of the same analysis, Ms. Morton came to understand that Hughes' client accounts were discretionary.[5]

Ms. Morton did not participate substantively in the bond or portfolio analysis because she lacked the experience and expertise to perform such functions.  However, based on her previous

---

[5]  A discretionary account is, by nature, an investment account that allows an investment adviser to buy and sell securities without the client's consent.  Typically, the client must sign a discretionary disclosure as documentation of the client's consent.  Often, the client may set parameters regarding trading in the account.

history of working on Native American issues, she attempted to conduct some of her own due diligence concerning the Oglala Sioux tribe.

As part of this due diligence, Ms. Morton spoke about the Bond issuance and the Oglala Sioux tribe with a friend at the Native American Finance Officers Association. Ms. Morton's friend expressed surprise that the WLCC planned to issue bonds for the Oglala Sioux because the tribe was extremely poor and its purported revenue streams were controversial and uncertain. Ms. Morton became concerned that the tribe had positioned itself to mislead potential investors, and in so doing, to mislead Galanis as well.

Although Galanis wanted Hughes to purchase the Bonds, Ms. Morton knew she could not remain silent about her concerns because she believed that she owed her best efforts to everyone involved. On August 17, 2014, Ms. Morton submitted a memorandum to Galanis that detailed her findings about the tribe. *See*, *generally*, Complaint ¶ 39(s)-(t). She suggested that the WLCC may have misled Galanis concerning the Sioux tribe's ability to repay the Bond purchasers. Further, Ms. Morton gently wrote that she did not think that the Bonds were a wise investment because of questions about the tribe's revenue streams. Ms. Morton's memorandum demonstrates that, as late as mid-August, she had not yet agreed to purchase the Bonds and that she took seriously her obligations to Hughes' clients. Her concerns about the Bonds' long-term viability in turn demonstrate her complete ignorance of Galanis's scheme.

Galanis reacted to Ms. Morton's memorandum with venom. He bombarded her with information about the Bonds aimed at demonstrating the legitimacy of the issuance. *Id.* He emailed her Greenberg Traurig's legal opinion (which concluded that the Bonds were sound), the tribal finances, and the U.S. Bank Trust Indenture. Galanis augmented his email barrage with personal attacks on Ms. Morton via text message. *Id.* He berated her as a financially

unsophisticated person who lacked the experience to draw any conclusions whatsoever. He sneered that she fancied herself a legal expert but had no such expertise. He barked that *real* experts had vetted the offering and that she was out of her depth. Worst of all, he called her a racist. He accused her of allowing her prejudice against Native Americans to color her views of a legitimate business opportunity.[6] Ms. Morton had come to trust and admire Galanis, who, like any successful con man, could expertly charm and manipulate his target.

In the wake of Galanis's communications and his continued wish to place the Bonds, Ms. Morton expressed her intention to resign from Hughes. Ms. Morton's resignation would have jeopardized Hughes' status as a WMBE. However, on August 18, 2014, she spoke with her investment and compliance team about the Bonds. She learned that the Sioux tribe had previously issued bonds that had performed well, and that the WLCC Bonds could have a positive impact on Hughes clients' long-neglected portfolios.[7] The investment team knew, based on the offering documents, that the Bonds were unrated, illiquid, and intended as long-term investments. Before purchasing the Bonds, and while Ms. Morton was still conflicted about the purchase, Galanis instructed her that Hirst should make the decision because he was the CIO. Complaint, ¶ 39(s).

---

[6] Ms. Morton has survived rape and the violent suicide of her former husband—a white man. As a result, she is particularly vulnerable to being attacked in any form, and particularly by domineering white men. For these reasons, Galanis's powerful personal attacks deeply disturbed her. Further, Ms. Morton has experienced racial and gender bias during her life; she is therefore hypervigilant about prejudice of any form, and Galanis's accusation of racial and socioeconomic bias cut deeply.

[7] Leading up to the Hughes acquisition, Frankie Hughes had not permitted Ms. Morton or Mr. Deary to view the Hughes client portfolios or to meet any of the Hughes staff. When Ms. Morton and Mr. Deary finally gained access, they discovered that the Hughes staff was unhappy and that Frankie Hughes, who also acted as the CIO, had not truly managed the client portfolios for a long time. The portfolios therefore contained many nonperforming investments ill-suited to the account parameters.

As a result of the investment and compliance teams' analysis, Hughes purchased approximately $27 million of the Bonds on or around August 22, 2014.  *Id.*, ¶ 39(v).  Hughes purchased the Bonds for only the client portfolios that could permissibly invest in such Bonds under the operative investment parameters.  At the end of that day, Ms. Lisa told Ms. Morton that she had never seen Hughes' employees work in such focused concert and that the purchase felt like a positive team effort.

Before Hughes purchased the Bonds, Ms. Lisa and Ms. Morton discussed with Hirst and Mr. Deary whether Hughes first needed to speak with its clients about the Bond purchase.  Ms. Morton learned that, because Hughes' client accounts were discretionary, Hughes' staff had no obligation to seek permission before any purchase.  Not one of these seasoned professionals identified any conflict in purchasing the WLCC Bonds, and neither Mr. Deary nor Hirst recommended disclosing the Bond purchase to Hughes' clients.  Ms. Morton, as CEO, relied on her team's expertise.

After purchasing the Bonds, Ms. Morton learned that Frankie Hughes never informed Hughes' clients that she sold the firm and that new management had assumed responsibility for the client portfolios.[8]  Therefore, Ms. Morton and Mr. Deary sent letters to Hughes' clients informing them that Hughes was under new management, that it would pursue a socially responsible investment strategy, and that, for applicable clients, it had already implemented this strategy by purchasing the Bonds.

Some clients complained after receiving the letter.  Some complained because Frankie Hughes had not initially informed them about the Hughes sale, and they expressed a desire to

---

[8]   Frankie Hughes had a contractual obligation to inform Hughes' clients in the event that she sold the firm or placed their accounts under new management.

leave Hughes for this reason.  Some clients expressed discomfort with the Bonds.  Some simply requested more information.  For any number of these reasons, certain clients asked Hughes to liquidate the Bonds.  While the Hughes investment team understood the difficulty in selling illiquid investments like the Bonds, they agreed to try.  Morton Aff., ¶ 9.

### D.  Acquisition of Atlantic Asset Management

In the month after Hughes purchased the Bonds, Michael Allen, a portfolio manager at Hughes, informed Ms. Morton that Hughes might have an opportunity to acquire Atlantic Asset Management ("Atlantic").  He suggested Ms. Morton speak with a senior Atlantic portfolio manager named Jerry Thunelius.  By October 2014, Ms. Morton and Mr. Deary were engaged in discussions with the Atlantic partners about a potential acquisition.  Once again, Galanis and his business partners were prepared to provide the acquisition capital.

Around the same time, Galanis informed Ms. Morton that the WLCC planned to issue a $5 million tranche of Bonds.  He asked her if Hughes would purchase this second tranche for its clients.  Ms. Morton declined because Hughes' clients already owned sufficient amounts of the Bonds.  Nonetheless, Ms. Morton continued to believe—based in part on the initial analysis by Hughes investment professionals, the positive bond rating by Bloomberg,[9] and her commitment to socially responsible investing—that the Bonds provided excellent investment opportunities. For those reasons, Ms. Morton asked Mr. Thunelius whether, in the event of a successful Atlantic acquisition and the further availability of the Bonds, Atlantic would be interested in purchasing WLCC Bonds for its clients.  Mr. Thunelius responded enthusiastically that Atlantic would be interested and that he personally managed money for clients that would embrace such

---

[9]  The Bonds had been rated by Bloomberg.

an investment.  Mr. Thunelius repeated this to Ms. Morton on multiple occasions, instilling even more confidence in Ms. Morton that the Bonds were sound investments.

### E.   Galanis Provides Additional Capital for Atlantic

After several months of negotiations, Hughes and Atlantic agreed to a deal.  On April 2, 2015, Hughes purchased Atlantic with financing from Galanis and BFGSRI (together "Hughes-Atlantic" or the "Company").  Complaint, ¶ 56(a).

Within two weeks after the Atlantic deal closed, Ms. Morton discovered that Atlantic management had materially misrepresented its financial position during acquisition negotiations. *Id.*, ¶ 56(b).  Atlantic had nearly $1 million more in debt than it originally disclosed, and it did not have sufficient funds to make the next payroll cycle.  Ms. Morton asked Galanis for additional financing to bridge the gap.  He obliged, providing Atlantic with a loan of approximately $500,000.

### F.   The Placement of the Bonds at Atlantic

Similar to Hughes, Ms. Morton wanted to implement the socially responsible investment platform at Atlantic as soon as the deal closed.  In addition, Ms. Morton continued to believe that the Bonds presented a strong, socially responsible investment opportunity for appropriate client portfolios.  Mr. Thunelius had repeatedly indicated his and Atlantic's interest in the Bonds. Because Galanis had access to additional WLCC issuances, Ms. Morton explored the possibility of Atlantic clients purchasing the Bonds.

Ms. Morton instructed the Atlantic investment team, including now-Chief Strategist Jerry Thunelius[10] and Chief Compliance Officer Dina Clements, to determine which Atlantic clients

---

[10]   Hirst left his position as Hughes' CIO within one month of his greenlighting the purchase of the Bonds.

could permissibly purchase the Bonds.  As Ms. Morton learned, Mr. Thunelius was at best incorrect, if not intentionally misleading, when he previously claimed that he had client accounts that could invest in the Bonds.  In fact, Ms. Clements determined that only one Atlantic client account could permissibly invest in the Bonds: the Global Yield Opportunity Fund ("GYOF"), an offshore hedge-fund investment vehicle established to provide different kinds of investment exposure to participating Atlantic clients.  Ms. Morton relied on the CCO and investment team's determination that GYOF could permissibly invest in the Bonds.  Morton Aff., ¶ 8.

Prior to purchasing the Bonds, Ms. Morton held a conference call with the Atlantic investment team, including Mr. Deary, Mr. Thunelius, Ron Sellers, Ms. Clements, and others. They discussed the nature and viability of the Bonds.  No investment or compliance professional objected to purchasing the Bonds, and no one indicated that Atlantic needed to make client disclosures regarding the purchase.[11]  After this call, Atlantic purchased approximately $15 million of the Bonds for the GYOF account.

The sole Atlantic client that was invested in the GYOF vehicle learned about the Bonds shortly after Atlantic made the purchase.  The client asked Atlantic to liquidate the position.  *Id.*, ¶ 9.  Atlantic attempted to oblige, even though the Atlantic team knew beforehand that the Bonds were, by their nature, an illiquid, long-term investment with no readily available secondary market.

---

[11]   Similar to Hughes, Atlantic clients had discretionary accounts.

## II.   MS. MORTON REPORTS SUSPICIOUS ACTIVITY AND ASSISTS THE SEC, FBI, AND USAO

### A.   Ms. Morton Suspects Corrupt Activity and Reports It to FINRA

In or about May 2015, Ms. Morton, Mr. Deary, and their colleagues continued to try to find buyers to purchase the Bonds from the Hughes-Atlantic client portfolios.  Galanis had previously told Ms. Morton that Burnham would repurchase the Bonds if necessary.  Morton Aff., ¶ 9.  Ms. Morton asked Galanis to make good on that promise.  *Id*.  Instead, Galanis introduced Ms. Morton to Devin Wicker of Bonwick Capital, a minority-owned broker-dealer run by a former Goldman Sachs employee.  *Id*.  Galanis represented to Ms. Morton that Bonwick had an interest in minority-focused investments and would purchase the Bonds from those clients that requested liquidity.  *Id*.

Ms. Morton and Mr. Deary spoke and corresponded with Wicker frequently about the Bonds during May and June 2015.  Eventually, Wicker told Ms. Morton and Mr. Deary that he had concerns about the Bonds because he questioned the validity of the underlying annuity investment.  *Id*., ¶ 10.  Indeed, Wicker informed Ms. Morton that he suspected the annuity investment was never made and that the funds were possibly invested in undisclosed private equity deals.

Wicker's disclosure shocked Ms. Morton and Mr. Deary.  They immediately became concerned about the investment they had believed in so fervently before.  *Id*.  Ms. Morton and Mr. Deary discussed their concerns, and they agreed that Ms. Morton would report their suspicions to regulatory authorities.  *Id*.

13

On June 11, 2015, Ms. Morton reached out to David Greene, a Regional Director at FINRA, who had become a friendly acquaintance through past dealings.[12]  Morton Aff., ¶ 11. Because of their previous interactions, Ms. Morton trusted Mr. Greene and, because FINRA was a regulatory body, she viewed Mr. Greene as a member of the government.  *Id*.  Over the next few weeks, Ms. Morton spoke with Mr. Greene on numerous occasions.  *Id*., ¶ 12.  She informed him about her suspicions concerning Galanis and the Bonds, and she asked that he alert the SEC so that it could investigate the matter.  *Id*.

Approximately two weeks after Ms. Morton's final conversation with Mr. Greene, the SEC submitted a document request to Hughes seeking documents related to the Bonds.  *Id*., ¶ 13. Ms. Morton and the Hughes-Atlantic team worked cooperatively and diligently to respond to the SEC's document request.  *Id*.  During this time, Ms. Morton produced documents and worked with the SEC without retaining counsel.

The SEC spoke with several Hughes-Atlantic employees during its investigation.  Ms. Morton understands that Hughes' Chief Compliance Officer, Ms. Lisa, informed the SEC that she saw no red flags about the Bonds and that Ms. Morton had not done anything wrong.  Ms. Morton also understands that the SEC never interviewed nor spoke with Mr. Deary, the President and 49% owner of Hughes-Atlantic.

### B.  Ms. Morton Assists the Government Prior to Being Charged and Arrested

On or about August 25, 2015, the FBI sought out Ms. Morton to inquire about Galanis. Morton Aff., ¶ 14.  Ms. Morton spoke with the FBI and informed the agents that she would

---

[12]  Ms. Morton had become acquainted with Mr. Greene when he acted as the FINRA supervisor of her former broker-dealer, Pacific American Securities ("PAS").  Morton Aff., ¶ 11.  Mr. Greene and Ms. Morton became friendly during a dispute between PAS and a client.  During this dispute, Ms. Morton reported to Mr. Greene potentially violative conduct on the part of the client, and she asked that he alert the SEC.  *Id*.  The SEC opened an investigation into the client after she reported this information to Mr. Greene.

provide whatever help they needed.  *Id.*  Ms. Morton did not request a lawyer, nor was she offered one.  Ms. Morton answered all questions the FBI posed to her.  *Id.*

On September 3, Ms. Morton again met with FBI agents, but this time in the presence of an Assistant United States Attorney ("AUSA").  *Id.*, ¶ 15.  Though someone present casually told Ms. Morton that she could have a lawyer, she questioned aloud why she needed a lawyer because she had been the one to report Galanis and she had done nothing wrong.  *Id.*

Once again, Ms. Morton answered all questions posed to her.  No one at this meeting conveyed that Ms. Morton's personal conduct was under scrutiny.  *Id.*, ¶¶ 15-16.  Moreover, the overwhelming majority of the questions that the FBI and AUSA asked related to Galanis and his conduct, not to Ms. Morton's conduct.  *Id.*, ¶ 18.  While the government told Ms. Morton that she was a subject in the investigation, she was also told that this was a necessary label because subject status encompassed virtually anyone who had contact with the participants in the events under suspicion.  *Id.*, ¶ 16.  Indeed, the individual who informed Ms. Morton that she was a subject used a pie analogy: he said that, of the three slices in the pie (a slice each for subject, witness, and target), the subject slice was by far the largest and encompassed the most people, and, in any event, Ms. Morton was closer to the witness end of the spectrum.  *Id.*  Without the benefit of counsel, Ms. Morton had no manner of understanding that being categorized as a subject meant that she faced criminal exposure.  *Id.*

After the AUSA and FBI proceeded to question Ms. Morton at length, they asked her to step out of the room to discuss her credibility.  When she returned, the AUSA and FBI thanked Ms. Morton for speaking with them and told her that they thought she was trustworthy, that they believed her, and that she was an honest person.  *Id.*, ¶ 18.

Ms. Morton was so convinced that she had done nothing wrong and that she and the government were on the same team that she *volunteered* to proactively cooperate in its investigation.  Morton Aff., ¶ 19.  She offered to wear a wire to gather information to assist the government.  And so, capitalizing on her vulnerabilities and lack of legal acumen, the government dispatched Ms. Morton to do its bidding.  On September 16, 2015, Ms. Morton wore a wire to a meeting with Galanis.  *Id*.  The next day she wore a wire to a meeting with Galanis and another participant in Galanis's scheme.  *Id*.  Even more, she placed numerous consensually recorded phone calls at the government's request.  *Id*., ¶ 20.

Toward the end of September, Ms. Morton participated in a phone call with the FBI and AUSA to ask how to handle certain client inquiries.  *Id*. ¶ 21.  She sought guidance on whether she should disclose to her clients the fact that she was assisting the government, and about what she should do with the Bonds.  *Id*.  The AUSA advised her not to disclose her involvement and not to sell the Bonds because she could be perpetuating a fraud.  *Id*.  This was the first time Ms. Morton had reason to suspect that there was something wrong with the Bonds themselves in addition to Galanis's conduct.  *Id*.  The AUSA who dispensed this advice did not indicate that the government believed Ms. Morton had previously participated in the fraud.  In response to the AUSA's advice, Ms. Morton asked to send certain information directly to the government.  The AUSA further advised that she should work through the SEC, and that it would ask the SEC to issue another document request.  *Id*.  Shortly thereafter, the SEC issued a second document request to the Company on October 5, 2015.  *Id*.

During this time, the government never explained to Ms. Morton that "cooperation" is a legal term of art.  *Id,* ¶ 22.  Nor did it explain the attendant consequences or benefits of cooperation.  The government allowed Ms. Morton to provide all of this assistance without ever

16

understanding that she needed a lawyer.  Indeed, after one casual reference during an initial

meeting, there is no record of or suggestion that the government ever again asked whether she

wanted to speak with counsel.  *Id.*, ¶ 24.

     **C.**     **The Government Charged and Arrested Ms. Morton**

On May 9, 2016, FBI agents arrested Ms. Morton at her elderly parents' home at 6 a.m.

In part, the Complaint pursuant to which Ms. Morton was arrested relies on the two meetings

Ms. Morton attended with Galanis.  Complaint ¶¶ 3(f)-(g), 7(b)-(c).  The descriptions of these

meetings appear as overt acts in furtherance of the conspiracies.  The Complaint does not

mention that Ms. Morton attended these meetings *at the direction of the USAO while wearing an*

*FBI-installed wire as part of her active cooperation.  Id.*

**ARGUMENT**

**I.**    **THE COURT SHOULD DISMISS THE INDICTMENT AGAINST MS. MORTON
BECAUSE THE GOVERNMENT'S MISCONDUCT VIOLATED HER DUE
PROCESS RIGHTS, OR, IN THE ALTERNATIVE, THE COURT SHOULD
SUPPRESS THE FRUITS OF MS. MORTON'S COOPERATION**

The Court can dismiss an indictment in cases in which the government's conduct is "so

outrageous that due process principles would absolutely bar the government from invoking

judicial processes to obtain a conviction."  *United States v. Russell*, 411 U.S. 423 (1973).

Government conduct is outrageous when it violates "that 'fundamental fairness, shocking to the

universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment."  *Id.* at

432 (*quoting Kinsella v. United States ex rel. Singleton*, 361 U.S. 234 (1960)); *see also United*

*States v. Chin*, 934 F.2d 393, 398 (2d Cir. 1991) (right to due process violated where "the

governmental conduct, standing alone, is so offensive that it shocks the conscience") (*quoting Rochin v. California*, 342 U.S. 165 (1952).[13]

Even under this admittedly high standard, the Court has the authority to dismiss the Indictment for the reasons set forth in detail below.  However, if the Court determines that dismissal is not warranted, the appropriate remedy is suppression of the evidence obtained as a result of the government's egregious treatment of Ms. Morton. *See, e.g.*, *United States v. DiGregorio*, 795 F. Supp. 630, 635 (S.D.N.Y 1992); *United States v. Morrison*, 449 U.S. 361 (1981).

 **A.** **The Dismissal Standard Is High, But the Court Should Evaluate the Standard and the Facts in Light of Ms. Morton's Personal Circumstances**

To be clear, the majority of cases dealing with dismissal in the face of government misconduct are extreme cases dealing with physical coercion of the sort that is not present here. However, when evaluating conduct that may be found to violate due process, "there is no meaningful distinction between physical and psychological harm inflicted upon the defendant." *DiGregorio*, 795 F.Supp. at 635 (citing *United States v. Cuervelo*, 949 F.2d 559, 565 (2d Cir. 1991) (granting a hearing as to defendant's claims of government misconduct in connection with coerced cooperation); *Watts v. State of Indiana*, 338 U.S. 49, 52 (1949) (noting that an individual's will is affected by fear as much as by force, and admonishing that courts "should not be ignorant as judges of what we know as men" with respect to the psychological effect of government conduct).

In *United States v. DiGregorio*, FBI agents detained the defendants and coerced them into waiving certain rights and proactively cooperating by repeatedly telling them that nothing

---

[13] Ms. Morton does not suggest that the cases cited above are on all fours with the facts in the instant case.  She references these cases to demonstrate that courts have extraordinary powers to resolve extraordinary problems.

would happen to them if they cooperated in the investigation and refrained from retaining counsel. 795 F. Supp. at 635.  Notwithstanding their substantial assistance, an AUSA entered the picture several months later and presented the defendants with plea agreements.  *Id*. at 633.  The *DiGregorio* court found these facts to warrant a hearing to evaluate the government's conduct in the context of defendants' motion to dismiss.  *Id*. at 638.

      *DiGregorio* demonstrates that a defendant's subjective belief matters.  Here, the government tacitly convinced Ms. Morton that she was safe and secure just as surely as the *DiGregorio* agents did.  Through the government's silent embrace and active use of Ms. Morton, it caused her to believe that she was not in any danger.  The government *knew* Ms. Morton felt that way because she stated that she had done nothing wrong and that she wanted to help.  The government's handling of Ms. Morton here had exactly the same effect as the agents' handling of the *DiGregorio* defendants: in both instances, government misrepresentations caused the defendants to believe they were safe.

      Moreover, like *DiGregorio*, the Court should evaluate the government's misconduct relative to Ms. Morton's personal circumstances.  Specifically, the government conduct that is detailed below must be viewed in light of Ms. Morton's vulnerabilities: her lack of legal sophistication; her personal illness and trauma triggers that cause her to be susceptible to stress and pressure both physically and mentally; her view of herself as someone who could help the government bring about justice.

      The conduct described below prejudiced Ms. Morton and must be remedied.  Ms. Morton therefore respectfully urges the Court to use its substantial discretion and its "supervisory function" for the purposes identified by the *DiGregorio* court:  "(1) to eliminate prejudice to a defendant in a criminal prosecution or (2) to help translate the assurances of United States

Attorneys into consistent performances by their assistants." *DiGregorio* at 638 (citing *United States v. Rubio*, 709 F.2d 146, 152 (2d Cir. 1983)). The Court can help provide the public with assurances against government abuse by dismissing the Indictment and sending a strong signal to the government that it must take more care to observe the rights of individuals that it seeks to use for its own purposes. Short of dismissal, the Court should suppress the fruits of Ms. Morton's cooperation, including the contents of her cell phone, her statements to FBI agents and AUSAs, and the recordings of meetings and phone calls she attended or made at the government's behest.

### B.    The Government Acted Unfairly When It Met With and Proactively Cooperated Ms. Morton Without an Attorney

As described above in detail, Ms. Morton informed what she believed to be the United States government about possible fraud in June 2015. She contacted David Greene, a FINRA Regional Director, to report her growing suspicions about Galanis and to ask that Mr. Greene alert the SEC. Ms. Morton then assisted the SEC in its investigation that immediately followed her contact with FINRA. This started a process whereby she thought she could trust the authorities. Her faith in the system proved ill-placed when the U.S. Attorney's Office ("USAO") became involved and took advantage of her vulnerabilities and lack of legal sophistication.

The government ran roughshod over Ms. Morton in an effort to fast-track its investigation. It downplayed her status so that she did not understand that she, too, was a part of the criminal investigation. The government lulled her into a false sense of security and elicited answers to questions posed by an AUSA without an attorney present and without proffer protection. The government then persuaded her to grant it access to her cell phone, without explaining the attendant risks to her. It accepted her offer to wear a wire to multiple meetings with potential defendants and asked her to make consensually recorded phone calls. It never explained the meaning of cooperation and the significant downside that comes with it. But it did

dispense legal advice to her concerning the disposition of the Bonds.  In short, the USAO took advantage of Ms. Morton in an egregious and harmful way.  The government should be held accountable for its conduct.

### 1.      The Government Misled Ms. Morton About Her Criminal Exposure

At the first meeting between Ms. Morton and the USAO, she was told that she could retain an attorney.  Morton Aff., ¶ 15.  In response, Ms. Morton openly questioned why she needed an attorney because she had done nothing wrong.  *Id.*  The government simply proceeded without informing Ms. Morton—a civilian with no knowledge of the federal criminal system— that individuals routinely seek advice from attorneys when they encounter the criminal justice system because such a complicated system requires expert guidance.  *Id.*, ¶ 15, 24.  The government did not explain that retaining an attorney does not indicate consciousness of guilt. *Id.*  Nor did it explain that no one in the room had Ms. Morton's interests in mind.[14]  *Id.*

Instead, the government continued with its interview as if Ms. Morton understood the serious legal implications and terms of art used in the federal criminal system.  In fairness to the government, it told Ms. Morton she was a "subject" in the investigation.  *Id.*, ¶ 16.  However, it immediately tempered the meaning of that term until it lost the import of criminal exposure by using a pie analogy: Ms. Morton's status as a subject was likened to the largest slice in a three-slice pie, and she was told that the majority of people fall into that category.  *Id.*  This gave her a sense of comfort.  *Id.*  She was also told that, within the subject slice of the pie, she was closer to

---

[14]   Ironically, civil law requires more in the form of *Upjohn* warnings given by corporate counsel to individual employees that it does not personally represent.  Why should the government be held to a lesser standard in the criminal context?  *See Upjohn Co. v. United States*, 449 U.S. 383 (1981).  Particularly in light of the fact that the AUSA may have provided legal advice to Ms. Morton concerning the disposition of the Bonds, the *Upjohn* analogy applies with greater force.  *See* Morton Aff., ¶ 21.

the witness slice than the target slice.  This also comforted her.  She did not know that it meant the government viewed her as a potential participant in the criminal conduct at issue.

Ms. Morton had no reason to question her understanding because she had no indication that the government was investigating her conduct.  During her interviews, very few of the questions inquired into Ms. Morton's actions or state of mind.  Morton Aff., ¶ 18.  The interviews instead focused on her eventual codefendants, specifically Galanis.  *Id.*  Indeed, after the AUSA and FBI questioned Ms. Morton on September 3, they asked her to step out of the meeting so that they could discuss her *credibility*—not her conduct.  *Id.*  When Ms. Morton returned from the meeting, the AUSA and FBI agents further comforted her by telling her that she was trustworthy, they believed her, and they thought she was an honest person.  *Id.*

The government's omissions during its interactions with Ms. Morton make its conduct unconscionable.[15]  Ms. Morton did not come to understand that subjects often are charged with crimes.  *Id.*, ¶ 16.  The government did not reveal that most voluntary interviews with the USAO come with proffer protection.  *Id.*, ¶ 17.  The government did not disclose that it might someday seek to use Ms. Morton's statements against her.  *Id.*  In sum, the government failed to inform Ms. Morton that, by speaking to the AUSA and the FBI agents, she stood starkly unprotected, risking her reputation, her freedom, and her future.

### 2.   Ms. Morton Wore a Wire

Ms. Morton volunteered to wear a wire to record meetings with Galanis.  Morton Aff., ¶ 19.  She made this extraordinary offer because she thought she was assisting the government in pursuit of wrongdoers and that she and the government were on the same side.  The government

---

[15]   It is ironic that in a case where the government charged fraud, claiming Ms. Morton omitted material information, that it has so many omissions in its interactions with her.

accepted her offer without suggesting to her that she would best be served by speaking with counsel about the potential risks.  *Id*.  Nor did the government identify those risks.

Ms. Morton wore a wire during two meetings; first, on September 16, 2015, with Jason Galanis, and then the following day, September 17, 2015, with Jason Galanis and another person. *Id*.  She also placed numerous consensually recorded calls at the direction of the FBI.  *Id*., ¶ 20.

### 3. The Government Persuaded Ms. Morton to Grant It Access to Her Cell Phone

At the September 3, 2015 meeting, the government convinced Ms. Morton to allow the FBI to image the contents of her cell phone.  Morton Aff., ¶ 23.  She did not hesitate in turning over her cell phone password and data.  She believed that the government wanted access to her cell phone to retrieve evidence against Galanis.  *Id*.  No one disabused her of this notion.  Once again, an attorney would have helped her understand the risks associated with assisting the government in this unprotected fashion.  Had she understood the risks, Ms. Morton would have sought the advice of counsel.  *Id*.

As a consequence of the government's omissions, the government accessed text messages between Ms. Morton and Galanis that it subsequently used to charge her and will doubtless seek to introduce as evidence against her at trial.  *Id*., ¶ 25.  The

### 4. The Government Never Explained to Ms. Morton That "Cooperation" Is a Term of Art

Finally, the government failed to explain "cooperation."  Morton Aff., ¶ 22.  Cooperation, as the Court well knows, is a multifaceted legal term of art.  No one explained to Ms. Morton that cooperating with the government almost always includes a guilty plea from the cooperator. *Id*.  No one disclosed that incarceration was among the possible end results.  *Id*.  No one indicated that cooperators often must testify at trials.  No one informed her that cooperators must

do any and everything the government asks.  No one explained that cooperators most often must publicly accept responsibility for legally cognizable crimes.

Ms. Morton, like most individuals unfamiliar with the criminal justice system, did not realize that the legal connotation of "cooperation" differs from the common understanding—to work together in concert.  Neither the USAO nor the FBI bothered to explain the distinction. Had the government explained the meaning of cooperation in the legal context, Ms. Morton would have sought an attorney.  *Id.*

### 5.   The Government Further Indicated that Ms. Morton was Safe During a Call to Provide Her with Guidance

Sometime during the month of September while Ms. Morton was unwittingly cooperating with the government, Ms. Morton participated in a call with the AUSA and FBI agents.  Morton Aff., ¶ 21.  During this call, Ms. Morton asked for guidance concerning what she should disclose to Company clients about her contact with the government, and what she should do about liquidating the Bonds.  The AUSA advised her not to disclose her involvement, and not to sell the Bonds because she could be perpetuating a fraud.  *Id.*  This is the first time Ms. Morton had reason to believe that there may be a problem with the Bonds themselves.  What is more, she believed that the AUSA was advising her *not* to perpetuate a fraud because she had not been involved in the fraud in the first instance.  In this manner, the AUSA and FBI continued to take advantage of Ms. Morton's helpfulness while keeping her in the dark concerning her criminal exposure.

In this same conversation, Ms. Morton asked whether she should send certain Company information directly to the government.  *Id.*  The AUSA and FBI advised her that she was best served going through the SEC, and that it could have the SEC send the Company another document request.  *Id.*  Sure enough, on October 5, 2015, the SEC issued a second document

request to the Company.[16]  For this reason, Ms. Morton continued to believe that she was an active participant in the government's investigation and that her interests were aligned with the government's interests and the interests of justice.

### 6.  Ms. Morton Did Not Understand the Benefit of Having an Attorney

Any marginally competent defense attorney would have explained the foreign concepts of "subject" and "cooperation" to Ms. Morton.  An attorney would have asked for and received proffer protection.  An attorney would have advised Ms. Morton about the risks associated with granting the government access to her cell phone, as well as proactively cooperating.  An attorney would have had only Ms. Morton's interests at heart.  In another instance of irony in a case veritably dripping with it, the government alleges that Ms. Morton failed to disclose a conflict of interest, all the while the government is itself guilty of failing to disclose its own conflict of interest in its dealings with Ms. Morton.  Morton Aff., ¶¶ 24-25.

### 7.  The Government Used Ms. Morton's Wired Conversations as the Basis for the Overt Acts Described in Its Complaint

The government filed the Complaint against Ms. Morton on May 9, 2015.  In paragraphs 3(f)-(g), the Complaint lists as overt acts the wired meetings in which Ms. Morton took part.  It then repeats these same overt acts as support for counts two and three.  Complaint at 7(b)-(c).  However, nowhere does the Complaint mention that the government sent her to these meetings

---

[16]   On December 21, 2017, Ms. Morton raised with the Court the issue of a joint investigation between the USAO and the SEC.  See Dkt No. 267.  She raises it again here based on the new knowledge that a former AUSA in this case directed—or at least told Ms. Morton that he would direct—the SEC to issue a new document request, which the SEC ultimately issued.  The AUSA's direction demonstrates the requisite control over the SEC's actions to qualify as a joint investigation under *United States v. Gupta*, 848 F. Supp. 2d 491 (S.D.N.Y. 2012).  Ms. Morton therefore renews her request that the Court order the government to review the entire SEC file for *Brady* material.  *Brady v. Maryland*, 373 U.S. 83 (1963).  In addition, Ms. Morton requests discovery regarding the communications between the government and the SEC to determine whether the communications are relevant to a number of issues here, most importantly Ms. Morton's status as a cooperator.

wearing FBI electronic surveillance devices.  The Complaint simply made it appear as if the USAO caught Ms. Morton and Galanis conspiring in September 2015.  This distinction would not have been evident to the court that issued the arrest warrant.

> ### 8.     The Government's Conduct Prejudiced the Effectiveness of Her Legal Representation and Resulted in the Government Having a Stronger Case Against Her Than It Would Absent Her Cooperation

By lulling Ms. Morton into a false sense of security and thereby "cooperating" her without her understanding, the government both prejudiced Ms. Morton's future legal representation and built a stronger case against her than it would have been able to absent its conduct.

Ms. Morton gave the government access to her cell phone because the AUSA or FBI agent asked for it.  In doing so, Ms. Morton unwittingly gave the government the text messages that became part of the government's case against her.  Morton Aff., ¶¶ 23-25.  Indeed, the government quoted liberally from these text messages in the Complaint and Indictment.  It is undeniable that, had the government not caused Ms. Morton to believe that its interests were aligned with hers, she would not have granted the government access to her phone.  And there is no doubt that the government will seek to introduce scads of this information at trial in an effort to convict her as well.  This is similarly true about the meetings to which Ms. Morton wore wires:  the government cited these meetings as overt acts in the Complaint.  Thus, the government's violative conduct allowed it to build a stronger case against Ms. Morton than it would otherwise have had without her cooperation.

The harm to Ms. Morton is not theoretical.  The evidence the government gathered in duping Ms. Morton is indeed very real and would have been otherwise unattainable.  The government should not profit from its egregious conduct.

### C.   The Court Should Hold the Government Accountable for Its Conduct by Dismissing the Indictment or Suppressing the Evidence From her "Cooperation"

The government did not act with sufficient due care for a person unfamiliar with the intricacies of the criminal justice system.  While the law does not require the USAO to force an individual to retain an attorney, nor to assign an attorney to an individual who does not know she needs one, the government's interactions with Ms. Morton lacked any transparency and were devoid of requisite care for a vulnerable person.  The criminal justice system has devices in place to ensure the protection of Constitutional rights and to safeguard the uninitiated.  Access to an attorney is one of the most important of these safeguards because society has an interest in not subjecting its citizens to the mercy of those with superior power.  And it certainly has no interest in allowing the government, which has been tasked with promoting justice, to advance its own agenda at the expense of an unwitting and vulnerable individual.

Conduct like this broadly erodes faith in the justice system.  But more personally, the government's conduct has destroyed Ms. Morton's life by permitting her to believe that she was working harmoniously with the justice system to do right while, surreptitiously, the government was working to charge her with a crime.  For all of the reasons discussed here, the government's mistreatment of Ms. Morton should be viewed as a violation of her due process rights under the Fifth Amendment and her right to counsel under the Sixth Amendment, for which dismissal is an available remedy.  Ms. Morton therefore respectfully requests that the Court dismiss the Indictment against her.

However, should the Court determine that dismissal is not the appropriate remedy here, Ms. Morton alternatively requests that the Court suppress the fruits of Ms. Morton's cooperation because of the government's misconduct.  Indeed, if the "prosecution has improperly obtained incriminating information from the defendant in the absence of his counsel, the remedy

characteristically imposed is not to dismiss the indictment but to suppress the evidence or to order a new trial if the evidence has been wrongfully admitted and the defendant convicted." *DiGregorio* at 636 (quoting *United States v. Morrison*, 449 U.S. 361 (1981)).  Ms. Morton did not have counsel during her interactions with the government strictly because the government encouraged her sense of security in its hands.

Specifically concerning the contents of Ms. Morton's phone, the government's conduct violated her Fourth Amendment rights by searching her phone without her knowing consent.  In circumstances like Ms. Morton's, "voluntariness is determined by . . . a 'totality of the circumstances'" and consent is *involuntary* if it is extracted from explicit or implicit coercion. *United States v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006) (internal citations omitted).  As outlined above, Ms. Morton's consent to image her phone cannot be said to be knowing or voluntary because the government tacitly coerced her into signing the consent by drawing her into a false sense of safety and alignment of interest.[17]

Accordingly, Ms. Morton requests that the Court suppress all evidence from her "cooperation" with the government, including, but not limited to, her statements to law enforcement, statements to the government, FBI memoranda and notes regarding such statements, Ms. Morton's cell phone data, and any recorded meetings or telephone calls made at the government's behest.

---

[17]   There is a timely analogy emerging from the #MeToo movement:  chiefly, that coercion is not always explicit, and consent is often extracted through quietly manipulative means.  Female defendants are a minority in the criminal justice system, and Ms. Morton does not and cannot believe that the investigatory tactics are gender-blind.

## II.   THE COURT SHOULD ORDER THE GOVERNMENT TO PROVIDE A BILL OF PARTICULARS

### A.   Applicable Legal Standard

Pursuant to Federal Rule of Criminal Procedure 7(f), the Court may direct the government to file a bill of particulars when it appears that an indictment does not inform the defendant with sufficient particularity of the conduct underlying the charges she will have to defend at trial.  *See United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) ("Rule 7(f) . . . permits a defendant to seek a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling [the] defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense.").  Although the government can avoid issuing a bill of particulars where it has made sufficient disclosures by other means, *United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004), it does "not fulfill its obligation merely by providing mountains of documents to defense counsel who [a]re left unguided."  *Bortnovsky*, 820 F.2d at 575.

Financial crimes like securities fraud or tax-related cases especially warrant particulars because of the factual complexity, variant theories, and quantity of evidence.  *See*, *e.g.*, *United States v. Lino*, 2001 WL 8356, at *7 (S.D.N.Y. 2001) (Courts "consistently order the filing of particulars directed to the details of misrepresentations or fraudulent acts" in securities-related cases.).  Because of the complexity of such matters, "it is no answer to say that [the defendant] should have kept better records, or that his memory should have been better. . . [W]here he genuinely lacks knowledge, he should not be denied information relevant to his defense by a restrictive interpretation" of Rule 7(f).  *United States v. O'Connor*, 237 F.2d 466, 476 (2d Cir. 1956) (intimating that the denial of a bill of particulars was errant, but ordering a new trial on other grounds).

Here, Ms. Morton faces an Indictment that does not clearly set forth the government's theory regarding her role in the overarching Galanis fraud.  The government has not alleged that Ms. Morton knew that Galanis stole the proceeds of the bond offering, and as such, the government's view of the complete nature of Ms. Morton's role in the alleged securities fraud is unknown.  Accordingly, a bill of particulars as specified below is necessary so that Ms. Morton can understand what conduct she needs to defend, and to avoid surprise at trial and efficiently use her resources.

**B.    The Court Should Order the Government to Provide the Requested Particulars**

Ms. Morton has previously requested particulars from the government with respect to each category below, and the government has declined to provide or not responded to requests for the information in the following categories.

**1.    All Coconspirators and the Time Periods of Their Individual Involvement in Each of the Two Charged Conspiracies**

Defendants are generally entitled to know the names and other relevant information concerning coconspirators in order to properly defend criminal charges.  *See, e.g.*, *United States v. Moazzam*, 1993 WL 36175 (S.D.N.Y. 1993) *aff'd*, 29 F.3d 621 (2d Cir. 1994) (government conceding the defendant is entitled to the names of coconspirators); *United States v. Taylor*, 707 F. Supp. 696, 700 (S.D.N.Y. 1989) (granting bill of particulars as to the names of known coconspirators, the dates each joined conspiracy, and the dates and locations of conspiratorial meetings).

Throughout the Indictment, the government alleges that Ms. Morton and her codefendants conducted unlawful business activities with "others known and unknown."  *See, e.g.*, Indictment, ¶¶ 4, 5, 26-27, 30, 32-33.  Because Ms. Morton does not know what the government alleges is her precise role in the Galanis fraud and whom, if anyone, she knew was

30

also participating, the identities of unindicted coconspirators are critical to preparing her defense.
Ms. Morton respectfully requests that the Court order the government to provide a bill of
particulars disclosing the names of any unidentified coconspirators and their connections to Ms.
Morton, as well as the timing of their involvement in the two alleged conspiracies.

**2.      <u>The Date on Which Ms. Morton Is Alleged to Have Joined the
Conspiracy</u>**

The entire period covering the two conspiracies charged in the Indictment runs from
March 2014 through April 2016.  *See* Indictment, ¶ 4.  As noted above, Ms. Morton incorporated
GMT Duncan with Mr. Deary to focus on socially responsible investing, including with Native
American communities, in late 2013.  Ms. Morton never spoke with Galanis until May 2014 and
only learned about the Bonds in July 2014.  Moreover, as late as mid-August after the Hughes
purchase, Ms. Morton still had not agreed to have Hughes purchase the Bonds and only did so
after investment professionals reviewed the investment.  Moreover, Ms. Morton did not suspect
that Galanis was engaged in any nefarious conduct until June 2015.  Because Ms. Morton first
met Galanis in May 2014 and was unaware of his unlawful aims until after the time she reported
his suspicious conduct, Ms. Morton is entitled to learn when the government believes she
knowingly joined the alleged conspiracies and when she withdrew from the charged
conspiracies.

**3.      <u>Identities of Any Cooperating Witnesses and the Dates They Began
Cooperating</u>**

Because any cooperating witnesses will likely provide some nexus between Ms. Morton
and the broader Galanis fraud at issue in this case, Ms. Morton is entitled to know any
cooperating witnesses' identities and the dates on which they began cooperating.

31

### 4. The Basis for Ms. Morton's Knowledge of the Three Means Through Which the WLCC Was Defrauded

The Indictment alleges that all of the defendants collectively conspired to defraud the WLCC by "(i) causing the WLCC to issue more than $60 million in Bonds based on false and misleading representations; (ii) failing to invest the bond proceeds on the WLCC's behalf in the manner agreed upon; and (iii) instead misappropriating the proceeds of the Bonds for their own purposes." Indictment, ¶ 4. However, the Indictment continues to flesh out the three afore-listed means of defrauding the WLCC in connection with each of the other defendants *except* Ms. Morton. Indeed, not a single allegation against Ms. Morton pertains to "causing" the WLCC to issue Bonds, or to "failing to invest" the bond proceeds as agreed or to "misappropriating" the proceeds. Accordingly, Ms. Morton is entitled to know the government's theory and support for her alleged involvement in these activities.

### 5. The Basis for the Allegations That the WLCC Bonds Did Not Fit Within the Investment Parameters

The Indictment alleges that Ms. Morton, along with defendants Hirst and Galanis, defrauded certain clients of the Investment Advisers by, *inter alia*, investing in the Bonds when they "did not fit within the investment parameters of certain clients' investment advisory contracts." Indictment, ¶ 5. Yet the government has produced ample evidence that demonstrates that the CCOs of Hughes and Atlantic, among other employees, reviewed the investment mandates for Hughes and Atlantic clients and informed Ms. Morton that the Bonds *could* be placed in the specific accounts in which the Bonds were, in fact, placed. Surely, the government knows of this same evidence since it produced it to Ms. Morton. For this reason, Ms. Morton is entitled to understand the government's theory and support for its allegation that the Bonds did not fit within the applicable clients' investment parameters.

6.   **Particulars Concerning Ms. Morton's Knowledge of the Dunkerley Account Referenced in Paragraph 7**

The Indictment alleges that defendant Hirst opened a bank account in Florida on August 6, 2014, in the name of the Annuity Provider that was to invest the Bond proceeds into an annuity, and that Hirst and Dunkerley had signatory authority on the account.  Indictment, ¶ 7. Ms. Morton had no knowledge of the alleged Dunkerley Account or that her then-CIO allegedly opened such account.  Yet the Indictment charges her with conspiracy to commit securities fraud. Accordingly, Ms. Morton requests particulars concerning the government's position regarding Ms. Morton's knowledge of the Dunkerley Account and its creation.

7.   **Support for the Assertion That Ms. Morton "Installed" Gary Hirst as CIO**

The Indictment alleges that Ms. Morton herself "installed Gary Hirst" as the CIO of Hughes to *facilitate* the placement of the Bonds in Hughes clients' accounts.  Indictment, ¶ 12. Evidence that the government produced contradicts this assertion.  Therefore, Ms. Morton seeks particulars regarding the government's theory and support for the allegation that she specifically "installed" Hirst as CIO to facilitate the placement of the Bonds.

8.   **Ms. Morton's Knowledge of the Specific Conflicts Sets Forth in Paragraph 15(a)-(c) of the Indictment**

The Indictment asserts that Ms. Morton and Hirst knew of and failed to disclose to clients three specific conflicts of interest in connection with the Bonds.  *See* Indictment ¶ 15(a)-(c).  Ms. Morton seeks particulars regarding the government's position concerning her knowledge of Dunkerley's status as a managing director, member, or officer of the Annuity Provider and the Dunkerley Account (Indictment, ¶ 15(a)); Hirst's alleged status as the Assistant Secretary of the Annuity Provider and a signatory on the Dunkerley Account (Indictment, ¶ 15(b)); and Galanis's status in exercising control over the Annuity Provider (Indictment, ¶ 15(c)).

**9.      When the Government Believes Ms. Morton Became Aware of the Galanis Bond Fraud**

In charging Ms. Morton with conspiracy to commit securities fraud, the government alleges one overt act involving Ms. Morton: a July 21, 2014, text message obtained from Ms. Morton's cell phone in which she says to Galanis, "Should know how$ [sic] we can proceed with Bonds soon getting information."  Indictment, ¶ 28(b).  Nothing about this text message indicates whether Ms. Morton believed that Galanis was perpetrating a fraud on a Native American tribe, or whether she simply believed these Bonds may be good investments for her clients and in keeping with the socially responsible investment platform that she implemented through the Hughes acquisition.  Nor does any evidence exist that demonstrates that Ms. Morton knew of the underlying fraud when Atlantic purchased the Bonds.  Therefore, Ms. Morton seeks particulars disclosing the government's position regarding when and how it alleges she knew about the Galanis fraud.

**III.      THE COURT SHOULD SEVER THE TRIALS OF MS. MORTON AND DEFENDANTS GARY HIRST, JOHN GALANIS, DEVON ARCHER, AND BEVAN COONEY[18]**

Rule 8(b) of the Federal Rules of Criminal Procedure permits joinder of defendants in a single indictment if they are alleged to have participated "in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  However, "[i]t is well settled . . . that . . . separate transactions do not constitute a 'series' within the meaning of Rule 8(b) 'merely because they . . . involve one or more common participants."  *United States v. Lech*, 161 F.R.D. 255, 256 (S.D.N.Y. 1995) (Sotomayor, J.) (internal citation omitted); *see also United States v. Sattar*, 314 F. Supp. 2d 279, 316 (S.D.N.Y. 2004) *aff'd sub nom United States v.*

---

[18]   Jason Galanis pled guilty to the offenses in the Indictment on January 19, 2017, and was sentenced to 173 months of imprisonment on August 11, 2017.  ECF Dkt. No. 229.

*Stewart*, 590 F.3d 93 (2d Cir. 2009) ("separate transactions do not constitute a 'series' within the meaning of Rule 8(b) 'merely because they are of a similar character or involve one or more common participants.'") (citations omitted).

Even when defendants are properly joined, this Court has "discretion to grant a defendant's request for severance under Rule 14 if it appears that the joinder with other defendants will result in undue prejudice." *United States v. DeVillio*, 983 F.2d 1185, 1192 (2d Cir. 1993). To that end, though joint trials may help "promote economy and efficiency," courts must take great care that "these objectives can be achieved without substantial prejudice to the right of the defendants to a fair trial." *Bruton v. United States*, 391 U.S. 123, 132 (1968) (citations omitted).

A district court should sever defendants' trials where "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). A central concern for courts is "spillover evidence," where a defendant's rights are compromised when "evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant." *Id.* That is, a jury may erroneously consider evidence of a codefendant's wrongdoing in concluding that a defendant is likewise guilty. *Id.* Particularly in a joint conspiracy trial, "[t]here generally will be evidence of wrongdoing by somebody. It is difficult for the individual to make his own case stand on its own merits in the minds of the jurors who are ready to believe that birds of a feather are flocked together." *Krulewitch v. United States*, 336 U.S. 440, 454 (1949) (Jackson, J., concurring).

Ms. Morton seeks severance from codefendants Hirst, John Galanis, Devon Archer, and Bevan Cooney for four reasons:  (1) the Indictment fails to allege a common securities fraud conspiracy between Ms. Morton and defendants Archer and Cooney; (2) Ms. Morton and several of her codefendants, namely Hirst, will present inconsistent and hostile defenses; (3) the severe risk of spillover prejudice to Ms. Morton is substantial and unfair; and (4) severance will not impose an undue burden on judicial resources.

### A.      The Indictment Fails to Allege Common Conspiracies

Severance is required because the government has improperly joined Ms. Morton with Archer and Cooney.  While the Indictment charges Ms. Morton, Archer, and Cooney in the same counts for conspiracy to commit securities fraud (Count I) and substantive securities fraud (Count II), the Indictment does not allege facts to establish that they agreed to become part of the same conspiracy or that they were part of the same fraudulent securities scheme.

"The essence of conspiracy is the agreement and not the commission of the substantive offense." *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001) (quoting *United States v. Gore*, 154 F.3d 34, 40 (2d Cir. 1998).  Commonality of purpose, without agreement, is not sufficient to maintain a conspiracy charge.  *See id*.  Here, the Indictment merely alleges that Ms. Morton, with others, caused Hughes and Atlantic clients to purchase issuances of the Bonds. The government does not allege that Ms. Morton participated in the scheme to cause the issuance of the Bonds, nor that she participated in the misappropriation of the proceeds.  Count I itself— conspiracy to commit securities fraud—fails to allege any overt acts that involve both Ms. Morton and Archer and Cooney.  *See* Complaint, ¶ 3(a)-(g).  The Complaint and Indictment allege that Archer and Cooney were central to Galanis's scheme to recycle the Bond proceeds and use them for personal desires.  Ms. Morton knew nothing of this underlying scheme. Because she cannot have agreed to any sort of common purpose or carried out the same

36

fraudulent securities scheme as Galanis, Archer, and Cooney, she cannot be properly joined for purposes of the securities fraud conspiracy.

    **B.**    **<u>Ms. Morton and Hirst Will Present Inconsistent and Hostile Defenses</u>**

The Court may sever the trials of codefendants when inconsistent or conflicting defenses exist. *See United States v. Guillen-Rivas*, 950 F. Supp. 2d 446, 457 (E.D.N.Y. 2013) (listing eight factors courts consider when weighing severance). The Court should sever Ms. Morton and Hirst because they will present inconsistent and hostile defenses at trial. These inconsistent defenses are likely to confuse the jury and result in prejudice against both Ms. Morton and Hirst.

As previously explained, Ms. Morton and Hirst first crossed paths when Galanis recommended Hirst to become the CIO of Hughes. Ms. Morton believed that Hirst was a legitimate CIO who came to Hughes for long-term employ. She did not know, as the Indictment alleges, that Galanis placed Hirst at Hughes for the sole purpose of ensuring the placement of the Bonds. Indeed, Ms. Morton intends to establish at trial that she relied on numerous investment and compliance professionals, including Hirst, in determining which client portfolios could permissibly accept the Bonds. Further, Ms. Morton intends to establish that other investment and compliance professionals at Hughes viewed the Bonds as a product that Hirst recommended and supported.

Likewise, Ms. Morton expects Hirst to distance himself entirely from the Bonds and from Hughes more broadly. Ms. Morton believes that Hirst will deny accepting the position of CIO at Hughes and claim that he never worked full-time at Hughes. Ms. Morton expects Hirst to attempt to place the responsibility for the Bonds entirely on Ms. Morton's shoulders. In essence, Ms. Morton and Hirst will point fingers at each other.

These inconsistent defenses will confuse the jury, and no limiting or other set of instructions will prevent such confusion. Simply stated, if the jury believes Ms. Morton, it must

convict Hirst; but if the jury credits Hirst, it must convict Ms. Morton.  Thus, the defenses are

wholly inconsistent.  The only remedy to avoid jury confusion and an unfair result for either Ms.

Morton or Hirst is to sever the trials of Ms. Morton and Hirst.

### C.      The Risk for Spillover Prejudice Against Ms. Morton Is Substantial

Rule 14 requires severance from all of Ms. Morton's codefendants because of the

substantial risk of spillover prejudice.  *See United States v. Fruchter*, 104 F. Supp. 2d 289, 309

(S.D.N.Y. 2000) (of concern is "spillover evidence," meaning "evidence that the jury should not

consider against a defendant and that would not be admissible if a defendant were tried alone.").

Ms. Morton will be indelibly tainted by the evidence against Hirst, John Galanis, Archer,

and Cooney, each of whom were allegedly members of Galanis's inner circle.  This evidence

relates to the other four defendants:  (1) causing the WLCC to issue approximately $60 million in

Bonds; (2) misappropriating the proceeds of the Bonds for personal and other purposes; and (3)

recycling the proceeds of the Bonds to purchase additional tranches of Bonds, to the tribe's

detriment.  By contrast, Ms. Morton is alleged only to have caused Hughes and Atlantic clients

to invest in the Bonds, which she believed were good investments, without disclosing a conflict

of interest and without regard for the applicable investment parameters.

Especially in financial crimes cases, a trial dealing with charges involving many issues

that do not concern a single defendant creates the risk that the "'jury is subjected to weeks of trial

dealing with dozens of incidents of criminal misconduct which do not involve [the co-defendant]

in any way' such 'that mounting proof of the guilt of one is likely to affect another.'"  *United

States v. Rajaratnam*, 753 F. Supp. 2d 299, 316 (S.D.N.Y. 2010) (granting severance) (quoting

*United States v. Branker*, 395 F.2d 881, 888 (2d Cir. 1968).

This concern applies with force in this case.  Ms. Morton had no knowledge of the above-

listed integral aspects of the government's case against Galanis and his alleged cohorts Hirst,

John Galanis, Dunkerley, Archer, and Cooney.  If Ms. Morton is tried together with the remainder of her codefendants, she will be forced to contend with the prejudicial spillover from evidence pertaining to numerous other fraudulent transactions aimed at defrauding a Native American tribe—conduct of which Ms. Morton had no knowledge.  Moreover, the government has alleged that the other defendants in this case profited from this scheme to the tune of millions of dollars that they each, to varying degrees, misappropriated for personal use.  Ms. Morton did not engage in such conduct, nor has the government alleged it.  Ms. Morton made $35,000 per year as the CEO of Hughes-Atlantic and did not receive any funds from the misappropriation of the Bond proceeds.  To comingle these defendants who allegedly engaged in such vastly different conduct would significantly prejudice Ms. Morton.

Moreover, Ms. Morton understands that the government intends to offer substantial 404(b) evidence of other defendants' prior wrongdoings.  No limiting instruction will prevent this evidence from casting a shadow over Ms. Morton, who has no criminal history, and no jury is likely to distinguish that carefully.  Severance is accordingly necessary to ensure each defendant is afforded a fair and untainted trial.

### D.    Severance Would Not Impose an Unwarranted Burden on Judicial Economy

The government's case appears to center on activities that are distinguishable between Ms. Morton and the other defendants.  For Ms. Morton, the government appears focused on her conduct as it relates to the clients of Hughes-Atlantic and the placement of the Bonds into their accounts.  The government's case against the remaining defendants, however, involves a large-scale fraud that occurs almost entirely away from Hughes, Atlantic, and Ms. Morton.  Ms. Morton will be required to sit through vast quantities of evidence unrelated to her conduct.

The evidentiary and proof lines for Ms. Morton versus the other defendants will vary substantially among relevant and admissible events, witnesses, transactions, and documents,

which will be difficult, if not impossible, to distinguish in what promises to be a complex, lengthy, and document-intensive trial.  *See United States v. McVeigh*, 169 F.R.D. 362, 370 (D. Colo. 1996) (discussing "efficiencies and advantages in single focused trials. . . .  It is easier to apply the rules of evidence when there is a trial of one defendant, particularly with regard to . . . proof of motive, opportunity, intent, preparation, plan, knowledge and identity under Rule 404(b).").  Indeed, separate trials may enhance judicial economy through streamlining these defendants' respective cases.  For these reasons, the Court should grant severance.

## IV.  MS. MORTON REQUESTS THE ABILITY TO FILE ADDITIONAL APPROPRIATE MOTIONS AND JOIN IN ANY CODEFENDANT'S MOTIONS AS APPROPRIATE AND APPLICABLE

Ms. Morton reserves the right to make additional motions as appropriate and applicable. Further, Ms. Morton joins in her codefendants' pretrial motions to the extent applicable.

## CONCLUSION

For the foregoing reasons, Michelle Morton respectfully requests that the Court grant the relief requested herein.

Dated:  New York, New York
             January 16, 2018

Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP

By: _____
Gregory Morvillo
Savannah Stevenson
Caitlin Sikes
51 West 52nd Street
New York, New York 10019
(212) 506-5000

*Attorneys for Defendant Michelle Morton*

40