UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| - v. - | **16-CR-00371 (RA)** |
| MICHELLE MORTON, et al., | **AFFIDAVIT OF** |
| Defendants. | **MICHELLE MORTON** |

STATE OF NEW JERSEY        )
                               ) ss:
COUNTY OF MIDDLESEX        )

MICHELLE MORTON, being duly sworn, deposes and says:

1.    I am a defendant in the above-captioned matter.  I submit this Affidavit in support of my pretrial motion to dismiss the indictment or, in the alternative, for an order suppressing the fruits of my cooperation with the government, directing the government to provide a bill of particulars, and severing my trial from that of my codefendants.  Unless otherwise stated, this Affidavit is based upon my own personal knowledge, experience, and belief.

2.    In early 2013, Richard Deary and I formed GMT Duncan as a corporate vehicle to facilitate raising capital for building an investment advisory firm.  We hoped to implement a socially responsible investing initiative through our new firm, which would provide investment advisory services to underserved and ill-served communities, including Native Americans.

3.    In August 2014, Jason Galanis and his affiliated firm provided financing for GMT Duncan to acquire Hughes Capital Management ("Hughes").

4.    Prior to acquiring Hughes, and after Mr. Deary's and my representation that we wanted to pursue socially responsible investing, Mr. Galanis informed Mr. Deary and me that Mr. Galanis had access to a Wakpamni Lake Community Corporation's ("WLCC" or "Wakpamni") bond issuance (the "Bonds").  Mr. Galanis gave us the impression her was

interested in socially responsible investing.  Neither Mr. Deary nor I agreed to place the Bonds at this time.  Once we completed the Hughes acquisition, the Hughes investment and compliance teams began to analyze the Bonds as a potential investment in certain client portfolios.

5.     Around the same time, Mr. Galanis introduced me to Gary Hirst and suggested him as a possible CIO for Hughes.  Mr. Hirst appeared intelligent and qualified, and he expressed interest in working with Hughes.  He ultimately agreed to take the position.  At the time, I understood that Mr. Hirst was joining Hughes as the full-time CIO as a long-term position.  I did not know Mr. Hirst prior to this time.

6.     On or about August 20, 2014, Hughes purchased a tranche of the Bonds and worked to place them in certain client portfolios.  Leading up to and on the day that Hughes purchased the Bonds, I relied on the expertise of investment and compliance professionals with regard to the analysis of this investment and the appropriateness of placing the Bonds in certain client portfolios.

7.     In April 2015, Mr. Galanis and his affiliated firm provided capital for Hughes to purchase Atlantic Asset Management ("Atlantic" or together, "Hughes-Atlantic" or the "Company").

8.     Around April 16, 2015, Atlantic purchased a tranche of Bonds and worked to place them in one investment account.  Leading up to and on the day that Atlantic purchased the Bonds, I relied on the expertise of investment and compliance professionals with regard to the analysis of the investment and the appropriateness of placing the Bonds in the investment account.

9.     Based on requests from Hughes-Atlantic clients, the Company worked to liquidate the Bonds.  Mr. Galanis had informed Mr. Deary and me that Mr. Galanis would assist, either

directly or indirectly, in purchasing the Bonds from Hughes-Atlantic clients.  In May 2015, Mr. Galanis introduced Mr. Deary and me to an individual who owned a broker-dealer called Bonwick Capital, and whom Mr. Galanis said had interest in purchasing the Bonds.

10.     Based on communications Mr. Deary and I had with the individual at Bonwick, we began to suspect that Mr. Galanis was being deceitful about the Bonds.  Mr. Deary and I discussed our suspicions, and we agreed that I would report Mr. Galanis to the authorities.

11.     Through my work at a prior firm, I became acquainted with David Greene, a FINRA Regional Director who had oversight of my prior firm.  On June 11, 2015, I reached out to Mr. Greene to discuss Mr. Deary's and my suspicions about Mr. Galanis.  I believed that FINRA was an arm of the United States government and that Mr. Greene, who worked for FINRA, routinely worked with other government agencies, including but not limited to the SEC. I therefore believed that reporting something to him was a direct route of reporting to the SEC or other authorities.

12.     Over the next several weeks, I spoke with Mr. Greene on multiple occasions about my suspicions relating to Mr. Galanis.  I asked that he alert the SEC so that it could open an investigation into the matter without my name being associated.

13.     A little more than two weeks after my last substantive conversation with Mr. Greene about this issue, the SEC issued a document request to Hughes-Atlantic seeking documents relating to the Bonds.  I believed that these document requests came as a result of my conversations with Mr. Greene.  I worked with employees at Hughes-Atlantic to respond to the SEC's request.

14.     On or about August 25, 2015, agents from the Federal Bureau of Investigation ("FBI") physically approached me about Mr. Galanis.  I spoke with the agents without hesitation.

They primarily asked me questions about Mr. Galanis and his activities and contacts. I did not have a lawyer present for this meeting, nor was I advised that I could or should have one. I believed that the FBI sought me out because of the information I provided to Mr. Greene.

15.     On or about September 3, 2015, I met with FBI agents and an Assistant United States Attorney ("AUSA") for the Southern District of New York (the "government"). At this meeting, I was told that I could have an attorney if I wanted one. I perceived this offer to be a mere formality and not because those present believed I needed one. I questioned out loud why I would need an attorney when I had done nothing wrong. No one countered that it would be in my best interest to consult an attorney prior to speaking with the government. When the AUSA and FBI proceeded with the interview, I concluded that they also believed that I had done nothing wrong, and that caused me to trust the government and its representatives, and want to assist as much as I could.

16.     At the September 3, 2015 meeting, I was told that I was a "subject" in the investigation. I was told that the "subject" category contains the majority of people who are contacted in an investigation. The person who explained this to me used a pie analogy and informed me that most people they spoke with were included in this largest slice of the pie. He then informed me that I was closer to the "witness" slice of the pie. I was told that I fell into the subject category because I knew Mr. Galanis and I had some contact with the Bonds. The manner in which this was described to me caused me to feel even more comfortable in speaking with the government because there was no outward indication that the government suspected me of wrongdoing. I did not understand that, as a subject, I faced the possibility of criminal prosecution. No one from the FBI or government told me that subjects are often charged with crimes at the end of investigations. No one informed me that my status as a subject could

4

change. In hindsight, I felt misled by the explanations made and the information omitted. Had I understood that subjects of investigations have criminal exposure, I would have spoken with an attorney prior to speaking with the government.

17.    At the September 3, 2015 meeting, I was not offered a proffer agreement. Indeed, I had never heard of a proffer agreement as of that date. I did not know to ask for one. I did not understand from my conversation with the FBI and AUSA that most voluntary interviews with the government are protected by a proffer agreement. Had the government offered me a document or an agreement that stated it would not use my statements against me, I would have accepted this protection or sought to speak with an attorney, or both.

18.    At the September 3, 2015 meeting, the AUSA and the FBI agents focused primarily on questions about Mr. Galanis and his conduct and contacts. At no time was I told or did I get the impression that those present were scrutinizing my conduct. Now that I know what a subject of an investigation really is, I understand that I was wrong to have this impression. After I answered many questions about Galanis, I was asked to step outside while the FBI and government assessed my credibility. When I returned to the interview room, I was told that they believed me, that they thought that I was trustworthy, and that they thought I was an honest person. I believe that the substance of the meeting contributed to my belief that the government did not view me as having done anything wrong.

19.    Because I believed that I had alerted the government—through Mr. Greene— to this conduct and that I was now assisting in its investigation for that reason, I volunteered to wear a wire to record meetings with Mr. Galanis, even though I was afraid of him and his associates. The government accepted my offer. No one told me that those same conversations could and would be used against me at a future date. The government sent me to two meetings wearing a

wire: one on September 16, 2015, and one on September 17, 2015.  I did not know, because no one explained, that the content and fact of these recorded meetings could and would be used against me.  When I read the initial charging document I realized that the government used these recorded meetings as part of its criminal complaint and did not note that it was the government who sent me to these meetings wearing a wire.  When I read the complaint, I felt as if the government had betrayed me.

20.    During the month of September 2015, the government also asked me to, and I in fact did, place numerous phone calls so that it could record the substance of those calls.  Again, no one explained that these calls could be used against me.

21.    Also in the month of September, I participated in a telephone call with the AUSA and FBI, and I asked for guidance concerning what I could reveal to Company clients about my assistance to the government, and whether I should still seek to sell the Bonds.  During this call, I suggested having the Company send information directly to the government, but the government told me that it would be better if the information went through the SEC, and indicated that it would have the SEC send another request.  The AUSA also told me not to sell the Bonds because I could be perpetuating a fraud.  This was the first time I had reason to suspect that something was wrong with the Bonds themselves.  This phone call caused me to continue to believe that the government and I were on the same side, and that it did not view me as having done anything wrong.  Soon after this call, the SEC sent a supplemental document request to the Company issued October 5, 2015.

22.    The government never explained to me that cooperation was a term of art that could have negative legal implications for me.  I believed that cooperating with the authorities meant being of assistance during its investigation.  I did not understand, because no one explained it to

me, that cooperation has a specific meaning in the criminal justice system, far different from the definition commonly used. I was not told that most cooperating witnesses plead guilty to crimes as a condition of cooperating with the authorities. I did not know that I could be unknowingly placing myself at risk of possibly serving time in prison by cooperating with the government. At no time did anyone indicate that cooperation is generally consideration for leniency at sentencing. I affirmatively thought that cooperating with the government meant that the government and I had the same goal: to make sure the Hughes-Atlantic clients were not harmed further and to understand whether Mr. Galanis and his cohorts had committed crimes. Had the meaning of cooperation in the criminal context been explained to me, I would have sought the advice of an attorney.

23.    Also at the September 3, 2015 meeting, I signed a consent form to allow the government to obtain information from my cellular phone. I signed this form because the FBI and AUSA asked me to do so. I did not volunteer my phone to the authorities. I was under the impression at the time that the request for my phone was aimed at getting information about Mr. Galanis, not about me or my conduct. I believed that the government sought this information from me as *de facto* member of its investigatory team. I did not understand that the government could and, in fact, would use this information against me because I thought I was assisting in the investigation. I did not know that I had a Fifth Amendment right not to provide them the password to my iPhone. Had I understood the risks, or had I spoken with an attorney who would have informed me about the risks, I never would have allowed the government to access my phone.

24.    I engaged in all of the above-described cooperative efforts without an attorney. Aside from the September 3, 2015 meeting, the government never again informed me that I

7

could or should retain counsel.  I did not understand that individuals routinely seek advice from counsel when speaking with the government, or that retaining an attorney does not indicate a guilty conscience.  I was unaware that the government did not have my interests in mind, but only its own.  I thought the government and I were on the same side sharing the same goal.

25.    My interactions with the government did not give me any indication that they were investigating me.  In fact, I believe that the government's conduct drew me into a false sense of security that essentially deprived me of the knowledge that I needed counsel to protect me from the very people I thought I was assisting.  Had I known they were uncertain whether I committed a crime or not, I would have sought the assistance of a lawyer.  I now realize that the delusion under which I operated, as a result of the government's deception, had lasting implications for my case: the government now has in its possession evidence that it would not have but for my ill-informed agreement, including the contents of my cell phone.

26.     Based on the foregoing, I respectfully request that the Court grant my motion to dismiss the indictment against me because of the government's unfair and misleading treatment that induced me to forgo legal advice at a crucial moment in my life, and caused me to unwittingly engage in conduct that ultimately has profoundly harmed me, like allowing the government to search my phone.  Alternatively, I request that the Court suppress the materials that the government gathered through my cooperation, including the contents of my phone, any statements I made to the government, and the recordings I made while wearing a wire and placing consensual calls.  I also respectfully request that, if the Court is not going to dismiss my case, that the Court to grant my motions for a bill of particulars and to sever my trial from that of my codefendants.

Dated:      Colonia, New Jersey
            January 16, 2018

                                                    _Michelle_
                                                    Michelle Morton


Subscribed and sworn to before me
this 16th day of January 2018.

_Caitlin Sikes_
Notary Public


CAITLIN CAREY SIKES
NOTARY PUBLIC-STATE OF NEW YORK
No. 02SI6319410
Qualified in Kings County
My Commission Expires February 17, 2019