# EXHIBIT 4

# 16 MAG   8347

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In the Matter of Warrants for All Content
and Other Information Associated with the
Email Accounts: btcooney@gmail.com,
darcher@rosemontseneca.com and
smomtazi@rosemontseneca.com
Maintained at Premises Controlled by
Google; and darcher@rosemontcapital.com
and smomtazi@rosemontcapital.com
Maintained at Premises Controlled by
Apptix, USAO Reference No. 2015R01447

**TO BE FILED UNDER SEAL**

**AGENT AFFIDAVIT**

### Agent Affidavit in Support of Application for Search Warrants
### for Stored Electronic Communications

STATE OF NEW YORK   )
                     ) ss.
COUNTY OF NEW YORK   )

SHANNON BIENIEK, Special Agent with the Federal Bureau of Investigation ("FBI"),

being duly sworn, deposes and states:

## I.   Introduction

### A. Affiant

1. I have been a Special Agent with the FBI for approximately five years.  I am currently

assigned to a squad that investigates white collar crimes, including securities fraud.  I have received

training regarding computer technology and have participated in the execution of search warrants

involving electronic documents.

### B. The Providers, the Subject Accounts, and the Subject Offenses

2. I make this affidavit in support of an application for search warrants pursuant to 18

U.S.C. § 2703 for all content, including emails and draft emails, created, sent or received between

January 1, 2014 and May 11, 2016, inclusive, and other information associated with the email

12.28.2016

USAO-SDNY_012217

accounts: btcooney gmail.com (the "COONEY ACCOUNT"), darcher@rosemontseneca.com (the "ARCHER SENECA ACCOUNT") and smomtazi@rosemontseneca.com (the "MOMTAZI SENECA ACCOUNT") maintained and controlled by Google, headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043; and darcher@rosemontcapital.com (the "ARCHER ACCOUNT") and smomtazi@rosemontcapital.com (the "MOMTAZI ACCOUNT"), maintained and controlled by Apptix (together, the "Providers"), headquartered at 13461 Sunrise Valley Drive, Ste 300, Herndon, VA 20171 (together the "Subject Accounts"). The information to be searched is described in the following paragraphs and in Attachment A to the proposed warrants.

3. As detailed below, there is probable cause to believe that the Subject Accounts contain evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 1348, and Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Sections 240.10b-5; conspiracy to commit securities fraud, in violation of Title 18, United States Code, Section 371; investment advisor fraud, in violation of Title 15, United States Code, Sections 80b-6 and 80b-17; and conspiracy to commit investment adviser fraud, in violation of Title 18, United States Code, Section 371 (the "Subject Offenses"). This affidavit is based upon my personal knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers, as well as my training and experience concerning the use of email in criminal activity. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts I have learned during my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**C. Services and Records of the Providers**

4. I have learned the following about the Providers:

12.28.2016

USAO-SDNY_012218

a.  The Providers offer email services to the public.  In particular, the Providers allow subscribers to maintain email accounts which can be accessed from any computer connected to the Internet.

b.  The Providers maintain certain of the following records and information with respect to subscriber accounts:[1]

i.  *Email contents.*  In general, any email (which can include attachments such as documents, images, and videos) sent to or from a subscriber's account, or stored in draft form in the account, is maintained on the Providers' servers unless and until the subscriber deletes the email.  If the subscriber does not delete the email, it can remain on the Providers' computers indefinitely.  Even if the subscriber deletes the email, it may continue to be available on the Providers' servers for a certain period of time.

ii.  *Google Docs, Sheets, and Slides.*  Google provides users with the ability to write, edit, and collaborate on various documents with other Google users through a service called "Google Docs," "Google Sheets," and "Google Slides."  Users can use Google Docs, Sheets, and Slides to create online documents that can be stored on or saved to the user's Google Drive.

iii.  *Google Drive content.*  Google provides users with a certain amount of free "cloud" storage, currently 15 gigabytes, through a service called "Google Drive" (users can purchase a storage plan through Google to store additional content).  Users can use their Google Drive to store email, attachments, videos, photographs, documents, and other content "in the cloud," that is online. A user can access content stored on Google Drive by logging into his or her Google account through any computer or other electronic device that is connected to the

---

[1] Certain of the listed records and information are only applicable to Google, as indicated.

12.28.2016

USAO-SDNY_012219

Internet. Users can also share files stored on Google Drive with others, allowing them to view, comment, and/or edit the files.

      iv.   *Google Chats and Hangouts content.*  Google allows subscribers to engage in "chat" sessions in an instant messaging format with other Google users, the transcripts of which are generally stored in a user's email content. Similarly, Google allows users to engage in enhanced chat sessions, called Hangouts, which permit the sharing of additional content such as videos, sounds, and images. In general, Hangouts content is stored separately from a user's email and chat content.

      v.   *Address book.*  The Providers also allow subscribers to maintain the equivalent of an address book, comprising email addresses and other contact information of other email users.

      vi.   *Subscriber and billing information.*  The Providers collect and maintain (typically unverified) identifying information about each subscriber, including, for example, name, username, address, telephone number, and other email addresses associated with the account. Specifically, with  regard to other email addresses associated with the account, Google maintains records regarding (1) recovery and (2) alternate email accounts, which can be used to sign in to the account and recover a password; (3) fetching and (4) forwarding addresses, which are email accounts from which the primary account receives emails and forwards emails, respectively; (5) domain aliases or (6) separate domains associated with the account, which are means by which accounts with other domain names can be associated with a primary account; (7) other Google accounts that have access to the primary account, which access can be granted by the user of the primary account; and (8) other email accounts that are associated with the primary account. Google also maintains records concerning the date on which the account was created, the Internet

protocol ("IP") address of the user at the time of account creation, the current status of the account (*e.g.*, active or closed), the length of service, and the types of services utilized by the subscriber. Additionally, for paying subscribers, Google maintains records of the subscriber's means and source of payment, including any credit card or bank account number.

vii.    *Transactional information.*    The Providers also typically retain certain transactional information about the use of each account on its system. This information can include records of login (*i.e.*, session) times and durations and the methods used to connect to the account (such as logging into the account through the Providers' website).

viii.    *Customer correspondence.*    The Providers also typically maintain records of any customer service contacts with or about the subscriber, including any inquiries or complaints concerning the subscriber's account.

ix.    *Location data.*    Google maintains recent location data, collected periodically, from mobile devices that are logged into or have used applications (or "apps") or services provided by Google. For example, Google collects information collected from GPS, Wi-Fi networks, cell site locations, and mobile networks to estimate a user's location. Google apps and services also allow for location reporting, which allows Google to periodically store and use a device's most recent location data in connection with a Google account.

x.    *Picasa Web Albums.*    Google provides users with a certain amount of free storage, currently 1 gigabyte, through a service called "Picasa Web Albums" that allow for users to store and share digital photographs. Google also retains the metadata—or data that provides information about the data in question, such as the time and date of creation, the author or creator, the means of its creation, the purpose of the data, among other data—for photos and videos that are uploaded to Google, including to Picasa Web Albums. This metadata includes what is known

USAO-SDNY_012221

as exchangeable image file format (or "Exif") data, and can include GPS location information for where a photo or video was taken.

xi.   *Android Services.*  Google also maintains information relating to Android, as it relates to an account.  Android is a mobile operating system that is developed by Google, and is used on a variety of touchscreen mobile devices, such as smartphones and tablet computers. Google retains information related to the Android device associated with an account, including the IMEI (the International Mobile Station Equipment Identifier), MEID (the Mobile equipment Identifier), device ID, and/or serial number of the devices.  Each of those identifiers uniquely identifies the device used.  One device may be associated with multiple different Google and Android accounts, and one Google or Android account may be associated with multiple devices.

xii.   *Web History.*  Google maintains searches and account browsing activity, from Chrome, Google's proprietary web browser, as well as other Google applications.

xiii.   *Google Alerts.*  Google provides a service that allows for email notifications any time Google finds new results on a topic of interest to a particular user.  Users can create an alert by entering keywords for which they would like to receive email notifications.  Once an alert is set up, Google will send emails to the designated email account every time Google finds new search results for the keywords entered by the user.

xiv.   *Google Webmaster Tools and Google Search Console.*  Google provides a service (previously called Webmaster Tools but renamed Google Search Console as of May 20, 2015) that allows users to monitor and maintain their site's presence in Google Search results.  The tool allows a user to ensure that Google can access the content of a website; submit new content for purposes of crawling (i.e., to ensure that Google captures data from the website for purposes of its search engine) and remove content that the user does not want shown in each result; create

12.28.2016

USAO-SDNY_012222

and monitor content; see what queries caused a site to appear in search results, and the amount of traffic generated by such searches, and what websites are linked to that site; and other activity.

xv.     *Google Analytics.*  Google Analytics is a subscription service offered by Google, which caters to online businesses.  A business subscribed to Google Analytics can use the serve to monitor traffic to and within the business's website.  Google Analytics collects information about a website's users by installing a "cookie"—or a small piece of data—on the computer of each user of the business's website, which then collects information about the user's interactions with the website by, for example, tracking what pages of the business's website the user visits.  Among the user data collected by Google Analytics is "referral traffic," which lets the business see what websites are referring traffic to the business's website—that is, the websites that users are visiting immediately before visiting the subscriber's website.  Such data can help the subscriber to understand the sources of its online business.  Google Analytics provides a platform through which subscriber can run various queries and generate various reports based on the website traffic data collected through the service.  Google Analytics retains records of the queries run and reports generated by the subscriber.

xvi.    *Google Payments.*  Google allows for the storage of payment information associated with a Google Account, including credit cards and bank accounts, and contains information about all transactions made with a Google account, allowing for the payment for goods (such as those purchased through Google Shopping) and bills, among other features.

xvii.   *Google Apps and Google Apps Administrator Control Panel.*  Google Apps is a package of cloud-based services that allow for an organization to communicate in ways beyond emailing and chatting—such as through video conferences, social media, real-time document collaboration, and other things.  A user can sign up for Google Apps by providing a domain name

USAO-SDNY_012223

that s/he wishes to use with Google services. Google then allows for a group of people to use Gmail, Calendar, Drive, and other services together. The Google Apps Administrator Panel allows a designated user to serve as the administrator of an organization's Google Apps account, allowing the administrator to control access to mail, data, and security for others in the organization. Google Apps Administrator Control Panel lets an administrator monitor how individual services are being used, as well as managing individual domains.

xviii.   *Google URL Shortener.*  Google provides a service that allows a user to shorten URLs to make them easier to share, and tracks the clicks that a shortened URL receives.

xix.   *Preserved and backup records.*  The Providers also maintain preserved copies of the foregoing categories of records with respect to an account, for at least 90 days, upon receiving a preservation request from the Government pursuant to 18 U.S.C. § 2703(f). The Providers may also maintain backup copies of the foregoing categories of records pursuant to its own data retention policy.

### D. Jurisdiction and Authority to Issue Warrant

5.   Pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A), the Government may require a provider of an electronic communications service or a remote computing service, such as the Providers, to disclose all stored content and all non-content records or other information pertaining to a subscriber, by obtaining a warrant issued using the procedures described in the Federal Rules of Criminal Procedure.

6.   A search warrant under § 2703 may be issued by "any district court of the United States (including a magistrate judge of such a court)" that "has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

7.   When the Government obtains records under § 2703 pursuant to a search warrant, the Government is not required to notify the subscriber of the existence of the warrant. 18 U.S.C.

12.28.2016

USAO-SDNY_012224

§ 2703(a), (b)(1)(A), (c)(2) & (3). Additionally, the Government may obtain an order precluding the Provider from notifying the subscriber or any other person of the warrant, for such period as the Court deems appropriate, where there is reason to believe that such notification will seriously jeopardize an investigation. 18 U.S.C. § 2705(b).

## II.    Probable Cause

### A. Probable Cause Regarding the Subject Offenses

8.  As part of my investigation in this case, I have reviewed, among other things, business records, bank records, telephone records, public records, email correspondence, court filings, and spoken to SEC staff attorneys about their review of such records. Based on my review of those documents and materials, and my participation in those conversations and interviews, I have concluded that there is probable cause to believe that Devon Archer and Bevan Cooney have engaged in the Subject Offenses. This affidavit does not contain all of the information that I have learned in connection with this investigation, but is limited to only those facts necessary to support probable cause to search the Subject Accounts.

### The Investigation and Prosecution

9.  Since at least 2015, the FBI and the United States Postal Inspection Service ("USPIS") have been investigating individuals involved in a fraudulent scheme to (i) to misappropriate the proceeds of bonds (the "Tribal Bonds") issued by the Wakpamni Lake Community Corporation (the "WLCC"), a subordinate unit of the Oglala Sioux Native American Tribe; and (ii) to use funds in the accounts of clients of captive asset management firms to purchase the Tribal Bonds, which the clients were then unable to redeem or sell because of the illiquidity of the Tribal Bonds and the lack of a ready secondary market for the same.

10. On or about November 2, 2016, a Grand Jury sitting in the Southern District of New York returned a Superseding Indictment, S1 16 Cr. 371 (RA) (the "Indictment"), charging Jason

12.28 2016

USAO-SDNY_012225

Galanis, Gary Hirst ("Hirst"), John Galanis ("Galanis"), Hugh Dunkerley ("Dunkerley"), Michelle

Morton ("Morton"), Devon Archer ("Archer") and Bevan Cooney ("Cooney") (together "the

Defendants") with conspiracy to commit securities fraud (Count One) and securities fraud (Count

Two). Jason Galanis, Hirst, and Morton were also charged with conspiracy to commit investment

advisor fraud (Count Three) and investment advisor fraud (Count Four).   The Defendants had all

previously been arrested on May 11, 2016 pursuant to a criminal complaint.

     11. The Indictment is attached hereto as Exhibit A, and the facts contained therein are

incorporated by reference herein.  Nonetheless, the following provides a summary of the charged

fraudulent scheme, based on my knowledge and participation in this investigation:

        a.  Beginning in or about March 2014, John Galanis and Jason Galanis pitched the

           concept of special limited taxable revenue bonds (the "Tribal Bonds") to employees

           and advisors to the WLCC. The WLCC ultimately agreed to a series of four bond

           issuances, totaling approximately \$60 million. (Ex. A ¶ 6).

        b.  According to trust indentures and other documents underlying the bond issuances,

           the WLCC understood that the proceeds of the bond issuances were going to be

           provided to an annuity provider to be invested for the benefit of the WLCC, which

           would generate enough income to pay interest to the bondholders and an annual

           sum to the WLCC for use in development projects. (Ex. A ¶ 7). Instead, significant

           portions of the bond proceeds were misappropriated and diverted for the personal

           benefit and use of the Defendants. (Ex. A ¶ 17).

        c.  In order for the scheme to succeed, Jason Galanis and his co-conspirators needed

           to generate buyers for the Tribal Bonds, which was particularly challenging given

           that there was no ready secondary market.  To that end, Jason Galanis gained

USAO-SDNY_012226

control of two related investment advisers, Hughes Capital Management, Inc. ("Hughes") and Atlantic Asset Management, LLC ("Atlantic") (together "the Investment Advisers"), with financing provided, at least in part, by an entity controlled by Jason Galanis, Archer, Cooney and Dunkerley.

d.  Morton and Hirst, acting at the direction of Jason Galanis, used funds belonging to clients of the Investment Advisers to purchase the Tribal Bonds, even though Jason Galanis, Hirst and Morton were well aware that material facts about the Tribal Bonds had been withheld from clients in whose accounts they were placed, including the fact that the Tribal Bond purchases fell outside of the investment parameters set forth in the investment advisory contracts of certain of those clients. When the Investment Adviser clients learned about the purchase of the Tribal Bonds in their accounts, several of them demanded that the Tribal Bonds be sold. However, because there was no ready secondary market, the Tribal Bonds could not be sold.

e.  In addition, a portion of the misappropriated proceeds were recycled and provided by Jason Galanis to entities affiliated with Archer and Cooney in order to enable Archer and Cooney to purchase subsequent Tribal Bonds issued by the WLCC. As a result of the use of recycled proceeds to purchase additional issuances of Tribal Bonds, the face amount of Tribal Bonds outstanding increased and the amount of interest payable by the WLCC increased, but the actual bond proceeds available for investment on behalf of the WLCC did not increase.

12.28.2016

11

USAO-SDNY_012227

**B. Probable Cause Regarding the Subject Accounts**

12. Based on my participation in this investigation, I believe there is probable cause to search the Subject Accounts for all content, including emails and drafts, and other information associated with the Subject Accounts from January 1, 2014 to May 11, 2016.

13. In particular, as part of this investigation, I have reviewed email correspondence involving Jason Galanis, Cooney at the COONEY ACCOUNT, Archer at the ARCHER ACCOUNT and/or the ARCHER SENECA ACCOUNT and Momtazi,[2] at the MOMTAZI ACCOUNT and/or the MOMTAZI SENECA ACCOUNT concerning, inter alia, the initiation of the scheme to orchestrate the issuance of the Tribal Bonds; the placement of the Tribal Bonds with clients of the captive Investment Advisors; and the use of Tribal Bond proceeds. Some examples of such emails are described herein, in substance and in part. For example:

14. Soon after John Galanis first pitched the concept of the Tribal Bonds to the WLCC, Jason Galanis engaged in email correspondence with Archer at the ARCHER ACCOUNT and Cooney at the COONEY ACCOUNT to apprise them of the progress of the bond issuance. These emails further demonstrate that Jason Galanis and his co-conspirators intended to fraudulently control and use the proceeds of the bond issuances for their own purposes. Specifically:

    a. On or about April 4, 2014, Jason Galanis sent an email to the ARCHER ACCOUNT and the COONEY ACCOUNT with subject line "Oglala Native Spirits Memo.docx." The body of the email stated, "$20mm bond approved. Proceeds are

---

[2] At times relevant to the events described in the Indictment, Sebastian Momtazi served as Chief Operating Officer of Rosemont Capital, LLC and Rosemont Seneca Partners. Archer is a co-founder of Rosemont Capital LLC, an investment platform that manages private equity, fixed income and real estate investments, and Rosemont Seneca Partners, a private equity firm specializing in technology companies.

12.28.2016

USAO-SDNY_012228

$15mm *to us* and 5mm to them for a winery investment they want to make." (emphasis added).

b. On or about July 5, 2014, Jason Galanis sent an email to the ARCHER ACCOUNT and the COONEY ACCOUNT in which Jason Galanis apprised Cooney and Archer that, in sum and substance and in part, counsel for the WLCC had "met and approved the [bond issuance]." Jason Galanis further stated, "[S]hooting for end of month. lots to accomplish to finesse this over the line. im [sic] not counting the money yet, but I'm encouraged by the quality fo [sic] the work and the professionalism from everyone im [sic] coordinating." Jason Galanis further wrote, "[M]y primary objective is *to get us a source of discretionary liquidity.* sick of begging." (emphasis added).

c. On or about August 15, 2014, Jason Galanis sent an email to the ARCHER ACCOUNT and the COONEY ACCOUNT indicating that representatives of the WLCC had executed the legal documentation necessary for the first Tribal Bond issuance to occur. Cooney responded from the COONEY ACCOUNT, "This is pure genius alla [sic] mikey Milken!! The Native American Bonds!!...Great work here Greek!!" Based on my review of documents, I know that "Greek" is a nickname sometimes used by Jason Galanis, Archer and Cooney to refer to Jason Galanis. Also, based on my training and experience, and involvement in this investigation, I believe the statement "alla mikey Milken" refers to Michael Milken, who is a former financier notorious for his involvement in the development of the "junk bond" market and his conviction on securities fraud charges.

USAO-SDNY_012229

15. In furtherance of the scheme, as described above, Jason Galanis obtained control over the Investment Advisers in order to use client funds for his own purposes, such as the purchase of the Tribal Bonds. Jason Galanis did so by arranging for an entity he, Archer, Cooney and Dunkerley, among others, controlled, to provide financing for Morton to purchase the investment advisors. Jason Galanis kept Archer and Cooney apprised, via email communication, of his efforts to gain control of an investment advisor for purposes of selling the Tribal Bonds. For example:

  a. On or about May 9, 2014, Jason Galanis sent an email to the ARCHER ACCOUNT and the COONEY ACCOUNT, among others. The subject of the email was "Hughes Asset Management." In the email, Jason Galanis wrote that a particular individual had "brought us an RIA [registered investment adviser] to acquire. possibly useful." Later in the email, Jason Galanis wrote, "can buy for 1.7x fee ($3.4 million) with 70% down. The deal referral comes from two competent sounding marketing people (resumes attached)." The email attached biographical information regarding Morton and her business partner.

  b. On or about July 16, 2014, Jason Galanis sent an email to the ARCHER ACCOUNT and the COONEY ACCOUNT. In the email, Jason Galanis said, "greek is forging ahead for us. see attached executed term sheet for the acquisition of 100% of Hughes Capital management. Firm manages $900 million on a discretionary basis for 28 institutional clients (pensions and endowments)." Later in the email, Jason Galanis said, "We have agreed to give the firm an opportunity to participate in native american bond new issues. I believe they will take $28 million of the Wakpamni/Ogala [sic] Sioux issue that Greenberg Traurig is working on." Archer responded via the ARCHER ACCOUNT, "This is very encouraging!"

USAO-SDNY_012230

Cooney responded via the COONEY ACCOUNT, "West Coast offense charging down the field!"

16. Also as described above, a portion of the misappropriated proceeds from the first tribal bond issuance were recycled and provided by Jason Galanis to entities affiliated with Archer and Cooney in order to enable Archer and Cooney to purchase subsequent Tribal Bonds issued by the WLCC. Specifically, in or about September 2014, Jason Galanis transferred approximately $15 million from the proceeds of the first Tribal Bond issuance via an intermediary to an entity controlled by Archer, who then used the funds to purchase a subsequent Tribal Bond issuance. (Ex. A ¶ 21(a)). In October 2014, in connection with Archer's attempt to deposit the bonds into a brokerage firm account under his control, Archer falsely represented that the funds he had used to purchase the bonds came from real estate sales. (Ex. A. ¶ 21(a)).

17. On several occasions between September 29, 2014 and October 24, 2014, Archer and Archer's assistant, Sebastian Momtazi ("Momtazi"), engaged in email correspondence with representatives of a brokerage firm regarding the purchase of the Tribal Bonds using the ARCHER ACCOUNT and the MOMTAZI ACCOUNT. For example:

a. On or about September 29, 2014, the MOMTAZI ACCOUNT emailed a representative of the brokerage firm, cc'ing the ARCHER ACCOUNT, stating, in sum and substance and in part, that "we would like to make the following bond purchase...A purchase in the amount of $15,000,000.00 of: ISSUER: WAKPAMNI LAKE COMNT CORP S D SPL LTD REV".

b. On or about October 1, 2014, the MOMTAZI ACCOUNT emailed a representative of the brokerage firm, cc'ing the ARCHER ACCOUNT, providing wire instructions for the purchase of the Tribal Bonds.

15

USAO-SDNY_012231

       c.  On or about October 24, 2014, the MOMTAZI ACCOUNT emailed a representative of the brokerage firm, cc'ing the ARCHER ACCOUNT, attaching a client representation letter stating, in sum and substance and in part, "The funds used to purchase the bonds were from real estate sales through my business..."

18. Also in furtherance of the scheme, by letter dated October 1, 2014, Archer provided false and misleading information to the Independent Trustees of an asset manager affiliated with the placement agent for the Tribal Bonds, which had sought assurances from Archer that Jason Galanis would not be involved with either the placement agent or related entities. On or about September 26, 2014, Momtazi sent a copy of the letter from the MOMTAZI SENECA ACCOUNT to an employee of the placement agent, cc'ing the ARCHER SENECA ACCOUNT.

19. I also know, based on my review of bank records and documents provided by various entities, that a portion of the proceeds of the last Tribal Bond issuance, which were supposed to be invested on the WLCC's behalf in accordance with the documentation underlying the issuance, were instead used to purchase a significant percentage of the shares of the initial public offering of a technology company in which Jason Galanis, Hirst, Archer, Cooney and Dunkerley all held shares. Proceeds generated by a later sale of these shares were used, in part, to fund the interest payment on the first Tribal Bond Issuance when it became due. Jason Galanis communicated with Archer and Cooney by email regarding his plans for the initial public offering. Specifically:

       a.  On or about February 25, 2014, Jason Galanis, the defendant, emailed the ARCHER ACCOUNT and the COONEY ACCOUNT attaching a draft Form S-1 registration statement for Technology Company-1's initial public stock offering. In the email, Jason Galanis stated, in substance and in part, "arch  we put the attached together in about a week. Lots of work, but just a week. . . .  will use

16

USAO-SDNY_012232

Burnham west coast for the IPO. will be in NASDAQ by summer. should be doing more of these using the machinery. jason."

20. I also know that that during the relevant time period, Archer and Cooney resided, at least in part, in different locations throughout the United States from Jason Galanis and the other co-conspirators in the charged scheme, and therefore were likely to frequently communicate with each other via electronic, rather than in-person, communications.

### C. Evidence, Fruits and Instrumentalities

21. Based upon the foregoing, I respectfully submit there is probable cause to believe that information stored on the Providers' servers associated with the Subject Accounts will contain evidence, fruits, and instrumentalities of the Subject Offenses, as more fully described in Section II of Attachment A to the proposed warrant.

22. In particular, I believe the Subject Accounts are likely to contain the following information:

- evidence of the agreement to engage in a fraudulent scheme involving the issuance of bonds on behalf of the Wakpamni Lake Community Corporation ("WLCC") and the misappropriation of the proceeds of those bonds, from January 1, 2014 to May 11, 2016;

- evidence of communications and/or meetings involving or related to the bonds issued on behalf of the WLCC, including but not limited to:
    - all emails with or pertaining to Jason Galanis, John Galanis, Gary Hirst, Hugh Dunkerley, Michelle Morton, Devon Archer, and Bevan Cooney;
    - all emails with or pertaining to entities involved in the issuance, placement, purchase or sale of the bonds;

17

USAO-SDNY_012233

- o   all emails with or pertaining to entities involved in the receipt and/or use of the bond proceeds;

- evidence of crime (*e.g.*, agreement to engage in unlawful conduct, references to or discussion of unlawful conduct), communications constituting crime (*e.g.*, emails containing fraudulent representations); and identities and locations of co-conspirators or victims (communications with co-conspirators or victims, photos or other attachments, address book information).

- e-mail communications with co-conspirators;

- e-mails that can be helpful to establish user identity;

- email header information which can assist in placing the targets or confederates at a certain time and place;

- geographic location of user, computer, or device (*e.g.*, the content and header information can both indicate that the email was communicated through a particular physical location; metadata from photo attachments can reflect geographic location);

- identities and locations of co-conspirators or victims (communications with co-conspirators, photos or other attachments, address book information);

- location of other evidence (*e.g.*, emails reflecting registration of other online accounts potentially containing relevant evidence);

- passwords or other information needed to access the user's computer or other online accounts.

## III.   Review of the Information Obtained Pursuant to the Warrant

23. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for service of a search warrant issued under § 2703, or for the collection or production of

18

USAO-SDNY_012234

responsive records. Accordingly, the warrant requested herein will be transmitted to the Provider, which shall be directed to produce a digital copy of any responsive records to law enforcement personnel within 30 days from the date of service. Law enforcement personnel (including, in addition to law enforcement officers and agents, and depending on the nature of the ESI and the status of the investigation and related proceedings, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will retain the records and review them for evidence, fruits, and instrumentalities of the Subject Offenses as specified in Section III of Attachment A to the proposed warrant.

24. In conducting this review, law enforcement personnel may use various methods to locate evidence, fruits, and instrumentalities of the Subject Offenses, including but not limited to undertaking a cursory inspection of all emails within the Subject Accounts. This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with emails, including attachments such as scanned documents, pictures, and videos, do not store data as searchable text. Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications in an account, as it is impossible to know in advance all of the unique words or phrases that investigative subjects will use in their communications, and consequently there are often many communications in an account that are relevant to an investigation but that do not contain any keywords that an agent is likely to search for.

12.28.2016

USAO-SDNY_012235

## IV.  Conclusion

25. Based on the foregoing, I respectfully request that the Court issue the warrants sought herein pursuant to the applicable provisions of the Stored Communications Act, 18 U.S.C. § 2703(b)(1)(A) (for contents) and § 2703(c)(1)(A) (for records and other information), and the relevant provisions of Federal Rule of Criminal Procedure 41.


Special Agent Shannon Bieniek
Federal Bureau of Investigation


Sworn to before me this
_____ day of December, 2016
                 S/Barbara Moses

DEC 2 8 2016

HONORABLE BARBARA MOSES
United States Magistrate Judge
Southern District of New York

20

12.28.2016

USAO-SDNY_012236

# EXHIBIT A

USAO-SDNY_012237

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - x
                                     :
UNITED STATES OF AMERICA             :
                                     :
            - v. -                   :
                                     :
JASON GALANIS,                       :      **SUPERSEDING**
GARY HIRST,                          :      **INDICTMENT**
JOHN GALANIS,                        :      S1 16 Cr. 371 (RA)
    a/k/a "Yanni,"                   :
HUGH DUNKERLEY,                      :
MICHELLE MORTON,                     :
DEVON ARCHER, and                    :
BEVAN COONEY,                        :
                                     :
            Defendants.              :
                                     :
- - - - - - - - - - - - - - - - - - x

## COUNT ONE
### (Conspiracy to Commit Securities Fraud)

The Grand Jury Charges:

### Relevant Persons and Entities

1.    At all times relevant to this Indictment, the Wakpamni
Lake Community Corporation (the "WLCC") was a tribally-chartered
economic development corporation, wholly-owned by the Wakpamni
Lake Community, a subdivision of the Wakpamni Lake District,
which are each subordinate units of the Oglala Sioux Tribe of
the Pine Ridge Reservation, South Dakota.

2.    At certain times relevant to this Indictment, Hughes
Capital Management, Inc. ("Hughes") was an investment adviser
registered with the U.S. Securities and Exchange Commission
("SEC") with its principal place of business in Alexandria,

1

USAO-SDNY_012238

Virginia.  On August 4, 2014, a limited liability corporation of which MICHELLE MORTON, the defendant, was a fifty percent owner (the "Morton Corporation") acquired Hughes.  Following the acquisition, MORTON became the Chief Executive Officer of Hughes.  At certain times relevant to the Indictment, GARY HIRST, the defendant, was the Chief Investment Officer of Hughes.

3.    At all times relevant to this Indictment, Atlantic Asset Management, LLC ("Atlantic" and together with Hughes, the "Investment Advisers") was an investment adviser registered with the SEC with its principal place of business in Stamford, Connecticut.  In or about April 2015, the Morton Corporation purchased Atlantic and Hughes was merged into Atlantic. Following the acquisition of Atlantic, MICHELLE MORTON, the defendant, became the Chief Executive Officer of Atlantic. MORTON and GARY HIRST, the defendant, were legally obligated to the clients of the Investment Advisers to act in their best interests.

<u>Overview of the Conspiracy</u>

4.    From at least in or about March 2014 through in or about April 2016, JASON GALANIS, GARY HIRST, JOHN GALANIS, a/k/a "Yanni," HUGH DUNKERLEY, MICHELLE MORTON, DEVON ARCHER, and BEVAN COONEY, the defendants, and others known and unknown, conspired to defraud the WLCC by (i) causing the WLCC to issue

2

USAO-SDNY_012239

more than $60 million in bonds based on false and misleading representations; (ii) failing to invest the bond proceeds on the WLCC's behalf in the manner agreed upon; and (iii) instead misappropriating the proceeds of the bonds for their own purposes.

5.   From at least in or about May 2014 through in or about April 2016, JASON GALANIS, GARY HIRST, and MICHELLE MORTON, the defendants, and others known and unknown, conspired to defraud certain of the clients of the Investment Advisers by gaining ownership and control of the Investment Advisers and causing client funds to be invested in the WLCC's bonds, without disclosing material facts to these clients, including that the bonds did not fit within the investment parameters of certain clients' investment advisory contracts and that certain substantial conflicts of interest existed.

JASON AND JOHN GALANIS INDUCE THE WLCC TO ISSUE MORE THAN $60 MILLION OF BONDS THROUGH FALSE AND MISLEADING REPRESENTATIONS

6.   As a part of the scheme to defraud, JASON GALANIS and JOHN GALANIS, a/k/a "Yanni," the defendants, induced the WLCC, through false and misleading representations and omissions, to issue a total of approximately $60 million of bonds, over the course of four bond issuances (respectively, the "First Bond Issuance," the "Second Bond Issuance," the "Third Bond Issuance," and the "Fourth Bond Issuance" and, together, the

USAO-SDNY_012240

"Bond Issuances"). In furtherance of the scheme, JASON GALANIS apprised DEVON ARCHER and BEVAN COONEY, the defendants, of the status of the Bond Issuances and the likely proceeds to be obtained therefrom, and further discussed with them potential uses that could be made of the proceeds that were for the benefit of JASON GALANIS, ARCHER, COONEY and their co-conspirators.

7.    According to the trust indentures and other documents relating to the Bond Issuances (collectively, the "Bond Agreements") entered into by the WLCC, proceeds of the Bond Issuances were to be provided to an annuity provider (the "Annuity Provider") established in the British Virgin Islands by HUGH DUNKERLEY, the defendant, to be invested in an annuity for the benefit of the WLCC which would generate sufficient income to pay interest and eventually the principal to bond holders. On or about August 6, 2014, GARY HIRST, the defendant, opened a bank account in Florida in the name of the Annuity Provider and provided himself and DUNKERLEY with signatory authority on the account (the "Dunkerley Account").

8.    According to the Bond Agreements, a separate investment manager (the "Investment Manager") was to receive the bond proceeds from the Annuity Provider so that they could be invested on the WLCC's behalf.

4

9.    In connection with each of the Bond Issuances, the WLCC also entered into a placement agency agreement with a broker-dealer (the "Placement Agent") at which HUGH DUNKERLEY, the defendant, was employed, and in which DEVON ARCHER and BEVAN COONEY, the defendants, had an ownership interest.  Pursuant to the placement agency agreements – which in most cases were signed by DUNKERLEY – the Placement Agent would solicit investors for the WLCC bonds in exchange for a fee.  None of the eventual purchasers of the WLCC bonds, however, were solicited by the Placement Agent.

10.    At various times in furtherance of the scheme, JOHN GALANIS, a/k/a "Yanni," the defendant, falsely represented to the WLCC that JASON GALANIS, the defendant, was affiliated with the Placement Agent in order to create the false impression that JASON GALANIS'S role in the transaction was legitimate or authorized.  In addition, the placement agency agreements signed by HUGH DUNKERLEY, the defendant, stated that any notice that was to be provided to the Placement Agent should be sent to the attention of JASON GALANIS, thus ensuring that the conspirators were apprised of any developments concerning the Bond Issuances. Notwithstanding these representations, DEVON ARCHER, the defendant, who was affiliated with the Placement Agent, falsely represented to affiliates of the Placement Agent that, among other things, JASON GALANIS would not be involved with any

5

entities affiliated with the Placement Agent or source deals to the Placement Agent, despite ARCHER's knowledge of JASON GALANIS's role in procuring the Bond Issuances.

11.  JASON GALANIS, the defendant, apprised DEVON ARCHER and BEVAN COONEY, the defendants, among others, about the progress of the Bond Issuances via email, among other means. For example:

a.  On or about April 4, 2014, JASON GALANIS emailed ARCHER and COONEY, stating, "$20mm bond approved. Proceeds are $15mm to us and 5 mm to them."

b.  On or about July 6, 2014, JASON GALANIS emailed ARCHER and COONEY, noting that the WLCC had approved the first bond issuance and stating, "[M]y primary objective is to get us a source of discretionary liquidity. Sick of begging."

c.  On or about August 15, 2014, JASON GALANIS emailed ARCHER and COONEY, stating that the legal documents for the First Bond Issuance had been executed.  COONEY replied, "This is pure genius alla [sic] mikey Milken!! The Native American Bonds!!! . . . Great work here Greek!!"

### CONTROL OF ATLANTIC AND HUGHES

12.  In furtherance of the scheme to defraud, JASON GALANIS, the defendant, obtained control of the Investment Advisers, in order to use client funds for his own purposes. JASON GALANIS did so by arranging for an entity he, DEVON

6

USAO-SDNY_012243

ARCHER, HUGH DUNKERLEY, and BEVAN COONEY, the defendants, among others, controlled to provide financing for MICHELLE MORTON, the defendant, to purchase the Investment Advisers.  ARCHER and COONEY were well aware of JASON GALANIS's efforts to locate and gain control of the Investment Advisers, and that client funds were to be used for the purchase of the Bond Issuances.  To further facilitate the fraudulent scheme, MORTON installed GARY HIRST, the defendant, with JASON GALANIS's knowledge and approval, as the Chief Investment Officer and later as the Chairman of the Investment Committee of Hughes.

13.  Having obtained control of the Investment Advisers, JASON GALANIS, MICHELLE MORTON, and GARY HIRST, the defendants, purchased a total of approximately $43.2 million of the Bond Issuances with client funds.  In particular:

a.  In or about August 2014, MORTON and HIRST, at the direction of JASON GALANIS, directed the use of Hughes client funds to purchase approximately $27 million of bonds, representing the entirety of the First Bond Issuance.

b.  In or about April 2016, MORTON, at the direction of JASON GALANIS, directed the use of Atlantic client funds to purchase $16.2 million of bonds, representing the entirety of the Fourth Bond Issuance.

14.  MICHELLE MORTON and GARY HIRST, the defendants, failed to disclose the contemplated bond purchases to, or to consult

7

with, any Hughes clients, and MORTON likewise failed to make any disclosures to any Atlantic client, prior to causing the clients' purchases of the bonds, notwithstanding that the bond purchases were outside the investment parameters of many of the clients.

15.  MICHELLE MORTON and GARY HIRST, the defendants, also failed to disclose to the Investment Advisers' clients the numerous conflicts of interest that existed with regard to the Investment Advisers' role in the purchase of the bonds, despite their legal obligations to make such disclosures.  For example:

a.  HUGH DUNKERLEY, the defendant, was (i) a Managing Director at the Placement Agent; (ii) a managing member of an entity that invested in both Investment Advisers; (iii) an officer of the Annuity Provider; and (iv) a signatory on the Dunkerley Account.  DUNKERLEY was thus affiliated with the entity purportedly soliciting investors for the WLCC bonds; the entities whose clients actually purchased the bonds; and the entity receiving the proceeds of the bond issuances and purportedly investing those proceeds on the WLCC's behalf.

b.  HIRST was (i) the Chief Investment Officer, and later the Chairman of the Investment Committee, of Hughes and signed the trade tickets authorizing the purchase of the First Tribal Bond Issuance on behalf of Hughes clients; (ii) the Assistant Secretary of the Annuity Provider; and (iii) a

8

signatory on the Dunkerley Account.  HIRST was thus affiliated both with the entities whose clients purchased the bonds and the entity receiving the proceeds of the bond issuances and purportedly investing those proceeds on the WLCC's behalf.

c.   JASON GALANIS, the defendant, (i) held himself out as affiliated with the Placement Agent and was the notice party for certain of the agreements between the Placement Agent and the WLCC; (ii) orchestrated the purchase of Hughes and Atlantic; (iii) directed the purchase of the Bond Issuances using Atlantic and Hughes client funds; and (iv) exercised control over the Annuity Provider.  JASON GALANIS was thus affiliated with the entity purportedly soliciting investors for the WLCC bonds; the entities whose clients actually purchased the bonds; and the entity receiving the proceeds of the bond issuances and purportedly investing those proceeds on the WLCC's behalf.

16.   When clients of the Investment Advisers learned that certain of the Bond Issuances had been purchased in their accounts, several demanded that the bonds be liquidated. However, because there was no ready secondary market for the bonds, none were ever able to be sold or redeemed from the client accounts.

9

MISSAPROPRIATION OF THE BOND PROCEEDS

17.   As a further part of the scheme to defraud, JASON
GALANIS, the defendant, aided by HUGH DUNKERLEY, the defendant,
misappropriated the bond proceeds for his own benefit and for
the benefit of various co-defendants.   In particular, the
entirety of the bond proceeds were deposited into the Dunkerley
Account.   At no time were the funds deposited in the Dunkerley
Account transferred to the Investment Manager as specified in
the Bond Agreements.   Instead, at JASON GALANIS's direction,
DUNKERLEY transferred more than $43 million of bond proceeds
from the Dunkerley Account to accounts controlled by both JASON
GALANIS (the "Jason Galanis Account") and JOHN GALANIS, a/k/a
"Yanni," the defendant.   JASON GALANIS then transferred those
proceeds, often through layers of intermediaries, (i) to
accounts controlled by GARY HIRST, DEVON ARCHER, JOHN GALANIS,
and BEVAN COONEY, the defendants, among others; (ii) to other
business interests of JASON GALANIS and his co-defendants; and
(iii) for use in connection with his own personal expenses.

18.   For example, HUGH DUNKERLEY, the defendant, acting at
the direction of JASON GALANIS, the defendant, transferred
approximately $2.3 million to a bank account associated with
JOHN GALANIS, a/k/a "Yanni," the defendant, which JOHN GALANIS
used for personal expenses.   In addition, between on or about
August 27, 2014 and on or about October 30, 2015, JASON GALANIS

10

USAO-SDNY_012247

used approximately $8,750,000 transferred by DUNKERLEY to the Jason Galanis Account for his own personal expenses, including: at least $5,000,000 for expenses associated with JASON GALANIS's home; at least $1,250,000 to pay various law firms; at least $875,000 in payments to various members of the JASON GALANIS's family; at least $500,000 in payments to the IRS; at least $200,000 on automobile-related expenses; at least $75,000 for restaurants and other food-related expenses; at least $75,000 for travel expenses; at least $40,000 in payments to JASON GALANIS directly; at least $350,000 in clothing and jewelry purchases; at least $55,000 in ATM withdrawals; and at least $100,000 in miscellaneous personal expenses.

19.   JASON GALANIS, the defendant, and others, communicated by email, among other means, about the use of the misappropriated funds.  For example, on or about August 13, 2014, JASON GALANIS emailed DEVON ARCHER, the defendant, about a business entity that HUGH DUNKERLEY, the defendant, was trying to acquire, noting: "[first name] and Hugh [Dunkerley] have locked it up and came to me for the money, which I have agreed to arrange/provide (probably Indians)."

20.   During the same period, JASON GALANIS, the defendant, transferred significant amounts from the Jason Galanis Account to various co-defendants, including at least $1.3 million to an

11

entity controlled by GARY HIRST and HUGH DUNKERLEY, the
defendants.

### PROCEEDS OF THE FIRST BOND ISSUANCE ARE RECYCLED TO PURCHASE THE SECOND AND THIRD BOND ISSUANCES

21.  As a further part of the scheme to defraud, JASON
GALANIS, HUGH DUNKERLEY, DEVON ARCHER, and BEVAN COONEY, the
defendants, misappropriated $20 million from the proceeds of the
First Bond Issuance and used the money to purchase the Second
and Third Bond Issuances.  Specifically:

a.  In or about September 2014, JASON GALANIS, the
defendant, transferred approximately $15 million from the
proceeds of the First Bond Issuance via an intermediary to an
entity controlled by DEVON ARCHER, the defendant.  ARCHER then
used the funds to purchase the entirety of the Second Bond
Issuance.  In or about October 2014, in connection with ARCHER's
attempt to deposit the bonds into a brokerage firm account under
his control, ARCHER falsely represented to the brokerage firm
that the funds he had used to purchase the Second Bond Issuance
came from real estate sales.

b.  In or about October 2014, JASON GALANIS, the
defendant, transferred $5 million from the proceeds of the First
Bond Issuance to BEVAN COONEY, the defendant.  COONEY then used
the funds to purchase the entirety of the Third Bond Issuance.

USAO-SDNY_012249

22.  As a result of this recycling, although the face amount of WLCC bonds outstanding increased and the amount of interest payable by the WLCC increased, the actual bond proceeds available for investment on behalf of the WLCC did not increase.

23.  JASON GALANIS, BEVAN COONEY, and DEVON ARCHER, the defendants, then used the bonds purchased with the recycled proceeds of the First Bond Issuance to, among other things, support other business endeavors.  For example, ARCHER provided $2.6 million of bonds to the Placement Agent to meet its net capital requirements as a registered broker-dealer under applicable SEC regulations and COONEY transferred $5 million of bonds to another registered broker-dealer for the same purpose.

### The Defendants Make Interest Payments to the WLCC

24.  Pursuant to the Bond Agreements, regular interest payments were due on each of the Bond Issuances and were to be derived from annuity distributions.  For example:

a.  The first interest payment of $1,546,417.13 was due on the First Bond Issuance on or before September 1, 2015.

b.  The first interest payment of $903,000 was due on the Second Bond Issuance on or about September 30, 2015.

c.  The first interest payment of $294,311.11 was due on the Third Bond Issuance on or about September 30, 2015.

d.  The first interest payment of $1,013,166 was due on the Fourth Bond Issuance on or about May 1, 2016.

13

25.  Interest payments on the Bond Issuances, however, did not derive from annuity distributions because the bond proceeds had not been invested as provided in the Bond Agreements. Instead, at the direction of JASON GALANIS, the defendant, the first interest payments on the First, Second and Third Bond Issuances were made using funds provided directly or through entities or accounts controlled by JASON GALANIS, HUGH DUNKERLEY, GARY HIRST, and DEVON ARCHER, the defendants.  No interest payment on the Fourth Bond Issuance was ever made.

### Statutory Allegations

26.  From at least in or about March 2014 through in or about April 2016, in the Southern District of New York and elsewhere, JASON GALANIS, GARY HIRST, JOHN GALANIS, a/k/a "Yanni," HUGH DUNKERLEY, MICHELLE MORTON, DEVON ARCHER, and BEVAN COONEY, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

27.  It was a part and object of the conspiracy that JASON GALANIS, GARY HIRST, JOHN GALANIS, a/k/a "Yanni," HUGH DUNKERLEY, MICHELLE MORTON, DEVON ARCHER, and BEVAN COONEY, the defendants, and others known and unknown, willfully and

14

USAO-SDNY_012251

knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, and of the facilities of national securities exchanges, would and did use and employ manipulative and deceptive devices and contrivances, in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

### Overt Acts

28.  In furtherance of the conspiracy and to effect its illegal object, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.  In approximately March 2014, JOHN GALANIS, a/k/a "Yanni," the defendant, met with employees of and advisers to the WLCC at a Native American economic development conference in Las Vegas, Nevada.

USAO-SDNY_012252

b.    On or about July 21, 2014, MICHELLE MORTON, the defendant, sent a text message to JASON GALANIS, the defendant, stating, "Should know how$ [sic] we can proceed with bonds soon getting information."  JASON GALANIS responded, "i'm confident you will figure it out."

c.    On or about August 8, 2014, HUGH DUNKERLEY, the defendant, signed an agreement pursuant to which he bound the broker-dealer at which he was employed to serve as the placement agent for an issuance of bonds by the WLCC.

d.    On or about August 22, 2014, GARY HIRST, the defendant, sent an email containing trade tickets signed by him authorizing the purchase of certain bonds issued by the WLCC on behalf of certain clients of Hughes.

e.    On or about October 1, 2014, DEVON ARCHER, the defendant, caused the transfer of $15,000,000 from a brokerage account located in New York, New York for the purchase of $15,000,000 of bonds issued by the WLCC, which bonds were also held, for a period of time, in the brokerage account located in New York, New York.

f.    On or about October 9, 2014, BEVAN COONEY, the defendant, caused the transfer of $5,000,000 from an account in his name for the purchase of $5,000,000 of bonds issued by the WLCC.

(Title 18, United States Code, Section 371.)

16

## COUNT TWO
(Securities Fraud)

The Grand Jury further charges:

29.    The allegations contained in Paragraphs 1 through 25 and 28 are repeated, realleged, and incorporated by reference as though fully set forth herein.

30.    From at least in or about March 2014 through in or about April 2016, in the Southern District of New York and elsewhere, JASON GALANIS, GARY HIRST, JOHN GALANIS, a/k/a "Yanni," HUGH DUNKERLEY, MICHELLE MORTON, DEVON ARCHER, and BEVAN COONEY, the defendants, and others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, and of the facilities of national securities exchanges, used and employed manipulative and deceptive devices and contrivances, in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons,

17

USAO-SDNY_012254

to wit, the defendants engaged in a scheme to misappropriate the proceeds of several bond issuances by the WLCC and also caused investor funds to be used to purchase the bonds, for which there was no secondary market through which such bonds could be redeemed, without disclosure to those investors of material facts, including the existence of multiple conflicts of interest, and which investments, in some cases, were outside the investment parameters of the accounts in which they were placed.

(Title 15, United States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5; and
Title 18, United States Code, Section 2.)

## COUNT THREE
### (Conspiracy to Commit Investment Adviser Fraud)

The Grand Jury further charges:

31.   The allegations contained in Paragraphs 1 through 25 and 28 are repeated, realleged, and incorporated by reference as though fully set forth herein.

32.   From at least in or about May 2014 through in or about April 2016, in the Southern District of New York and elsewhere, JASON GALANIS, GARY HIRST, and MICHELLE MORTON, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, investment adviser fraud, in violation of Title 15, United States Code, Sections 80b-6 and 80b-17.

USAO-SDNY_012255

33. It was a part and object of the conspiracy that JASON GALANIS, GARY HIRST, and MICHELLE MORTON, the defendants, and others known and unknown, willfully and knowingly would and did use the mails and other means and instrumentalities of interstate commerce, directly and indirectly, (a) to employ a device, scheme, and artifice to defraud clients and prospective clients; (b) to engage in a transaction, practice, and course of business which operated as a fraud and deceit upon clients and prospective clients; and (c) to engage in an act, practice, and course of business which was fraudulent, deceptive, and manipulative, in violation of Title 15, United States Code, Sections 80b-6 and 80b-17.

### Overt Acts

34. In furtherance of the conspiracy and to effect its illegal object, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a. On or about July 21, 2014, MICHELLE MORTON, the defendant, sent a text message to JASON GALANIS, the defendant, stating, "Should know how$ [sic] we can proceed with bonds soon getting information." JASON GALANIS responded, "i'm confident you will figure it out."

b. On or about August 22, 2014, GARY HIRST, the defendant, sent an email containing trade tickets signed by him

19

authorizing the purchase of certain bonds issued by the WLCC on behalf of certain clients of Hughes.

(Title 18, United States Code, Section 371.)

### COUNT FOUR
### (Investment Adviser Fraud)

The Grand Jury further charges:

35.   The allegations contained in Paragraphs 1 through 25, 28 and 34 are repeated, realleged, and incorporated by reference as though fully set forth herein.

36.   From at least in or about May 2014 through in or about April 2016, in the Southern District of New York and elsewhere, JASON GALANIS, GARY HIRST, and MICHELLE MORTON, the defendants, willfully and knowingly used the mails and other means and instrumentalities of interstate commerce, directly and indirectly, (a) to employ a device, scheme, and artifice to defraud clients and prospective clients; (b) to engage in a transaction, practice, and course of business which operated as a fraud and deceit upon clients and prospective clients; and (c) to engage in an act, practice, and course of business which was fraudulent, deceptive, and manipulative, to wit, HIRST and MORTON, who were employees of a registered investment adviser and thus had fiduciary duties to their investment advisory clients, with the knowledge and approval of JASON GALANIS, intentionally withheld material information from their clients

20

regarding purchases of bonds issued by the WLCC, including the existence of multiple conflicts of interest and the fact that the purchases were outside the investment parameters set forth in the investment advisory agreements of certain clients, for the purpose of profiting from the placement of such bonds.

(Title 15, United States Code, Sections 80b-6 and 80b-17; and Title 18, United States Code, Section 2.)

### FORFEITURE ALLEGATION AS TO COUNTS ONE THROUGH FOUR

37.   As a result of committing one or more of the offenses alleged in Counts One through Four of this Indictment, JASON GALANIS, GARY HIRST, JOHN GALANIS, a/k/a "Yanni," HUGH DUNKERLEY, MICHELLE MORTON, DEVON ARCHER, and BEVAN COONEY, the defendants, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code Section 2461, any property, real or personal, that constitutes or is derived from proceeds traceable to the commission of the offenses alleged in Counts One through Four of this Indictment.

### Substitute Assets Provision

38.   If any of the above-described forfeitable property, as a result of any act or omission by any of the defendants:

a.   cannot be located upon the exercise of due diligence;

21

b.    has been transferred or sold to, or deposited with, a third party;

c.    has been placed beyond the jurisdiction of the court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code Section 2461, to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described above.

> (Title 18, United States Code, Section 981(a)(1)(C);
> Title 21, United States Code, Section 853(p);
> Title 28, United States Code, Section 2461.)

_____          _____
GRAND JURY FOREPERSON                     PREET BHARARA
                                          United States Attorney

USAO-SDNY_012259

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

JASON GALANIS,
GARY HIRST,
JOHN GALANIS, a/k/a "Yanni,"
HUGH DUNKERLEY,
MICHELLE MORTON,
DEVON ARCHER,
and BEVAN COONEY,

Defendants.

SUPERSEDING INDICTMENT

S1 16 Cr. 371 (RA)

(Title 15, United States Code, Sections
78j(b), 78ff, 80b-6 and 80b-17; Title
17, Code of Federal Regulations, Section
240.10b-5;
Title 18, United States Code, Sections
371 and 2.)

_____    PREET BHARARA
Foreperson                          U.S. Attorney.

23