**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> v. <br><br> JASON GALANIS, <br> GARY HIRST, <br> JOHN GALANIS, a/k/a "Yanni," <br> HUGH DUNKERLEY, <br> MICHELLE MORTON, <br> DEVON ARCHER, and <br> BEVAN COONEY, <br><br> Defendants. | No. 16 Cr. 371 (RA) |

**DEVON ARCHER'S MEMORANDUM OF LAW IN**
**<u>OPPOSITION TO THE GOVERNMENT'S PRE-TRIAL MOTIONS</u>**

Matthew L. Schwartz
BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, New York 10022
Tel.: (212) 446-2300
Fax: (212) 446-2350
mlschwartz@bsfllp.com

*Attorneys for Devon Archer*

## ARGUMENT

**I.   THE GOVERNMENT HAS ENTIRELY FAILED TO MEET ITS BURDEN TO INVOKE THE CRIME-FRAUD DOCTRINE**

The government's approach to the crime-fraud doctrine in its motion is emblematic of the disrespect that it has shown towards Mr. Archer's attorney-client privilege throughout this litigation and is, frankly, irresponsible.

The attorney-client privilege is one of the oldest and most important privileges available at law, and it exists so that lawyers and their clients can freely share information necessary to obtain and provide legal advice without the fear that some third party will gain access to those private conversations. While communications with a lawyer in furtherance of a crime or fraud are not privileged, the so-called crime-fraud exception is "narrow and precise," and applies only where the government can demonstrate probable cause to believe that *specific* communications with a lawyer were *in furtherance* of a crime or fraud.

The government's motion gives lip service to this standard, but fails entirely to engage with it. Instead, the government moves to vitiate Mr. Archer's privilege with respect to an entirely undefined universe of communications that may well be "related to" various aspects of the alleged crimes. Gov. Mem. at 12. But it is not enough that communications with a lawyer "relate to" the subject matter of the indictment – if that were so, the privilege would be meaningless, particularly in corporate cases involving transactions that inevitably involve lawyers. "While the Government may have deeply held convictions as to the strength of its claims, the blanket assertion that every communication was 'in furtherance of' a crime or fraud does not make it so. Rather, for the crime-fraud exception to apply, the Government must provide particularized evidence that *each* challenged communication was made *in furtherance* of

the crime or fraud." *In re 650 Fifth Ave.*, No. 08-cv-10934 (KBF), 2013 WL 3863866 (S.D.N.Y. July 25, 2013) (emphasis in original).  The government has not even tried to do that here.

As a fallback, the government asks the Court to review unspecified material *in camera* to determine whether the crime-fraud exception applies.  The Court should decline this invitation to do the government's job for it.  In order to justify *in camera* review – a review that necessarily will expose Mr. Archer's privileged communications – the government must make some showing that the crime-fraud exception is likely to apply.  Here, the government has made no showing at all.  At best, it has asserted that, within some unknown universe of documents involving Mr. Archer and a lawyer, some of the same general subjects as are relevant to the indictment were discussed.  Worse, the government has also failed to provide the information necessary to even begin to assess that assertion – information that it promised, in writing, to provide.

A.    **Relevant Background**[1]

On December 28, 2016, the government obtained two warrants pursuant to the Stored Communications Act to search for and seize records from certain internet service provider accounts associated with Mr. Archer.  *See* Declaration of Matthew L. Schwartz, dated February 5, 2018 ("Schwartz Decl.") ¶ 3.  Pursuant to those warrants, the government seized, among many other things, thousands of Mr. Archer's privileged communications.  *Id.*

---

[1]     Mr. Archer has previously provided the Court, in his severance and suppression motions, ECF Nos. 290 & 302, with an extensive recitation of the facts related to his unique and tangential role in the crimes alleged in the indictment, as well as the circumstances surrounding the government's obtaining and executing two Stored Communications Act warrants, which resulted in its obtaining thousands of his privileged communications.  In order to avoid burdening the Court with unnecessarily duplicative briefing, Mr. Archer respectfully incorporates the discussion of the relevant facts and allegations in those motions into this memorandum.

On November 2, 2017, an Assistant United States Attorney, speaking on behalf of a government "filter team," wrote to counsel for Mr. Archer to identify certain documents that the government had purportedly "designated as either Not Privileged or subject to the crime-fraud exception [to] the attorney-client privilege." *Id.* Ex. A at 1.  The government's letter identified more than 1,200 pages of material as "potentially falling within the crime-fraud exception." *Id.* at 2-3 & n.1.  The filter team AUSA explained that after non-privileged documents were released to the trial team, the trial team would "assess whether to seek a crime-fraud ruling," and confirmed that "the crime-fraud exception [was] not being asserted at [that] stage." *Id.* Ex. B at 1.

Counsel for Mr. Archer responded by confirming that he understood that the government was not yet seeking a crime-fraud ruling, but explained that "[g]iven the impending motions deadline and trial date in this case  . . .  Mr. Archer must be in a position to respond quickly once the government determines to seek [such] a ruling from the Court." *Id.* Ex. C at 2.  Counsel therefore requested that the government "please identify for each 'crime fraud' document (a) which crime the government believes the communication is in furtherance of, and (b) all alleged co-conspirators with respect to that crime." *Id.*  Counsel observed that the government had presumably "compiled this information already, as it would have been necessary in order to characterize any documents as potentially subject to the crime fraud exception." *Id.*

On December 28, 2017, the government identified an additional approximately 130 pages of material as being "potentially subject to the crime-fraud exception to the attorney-client privilege." *Id.* Ex. D at 1 & n.1.  Altogether, therefore, the government has asserted in pre-motion correspondence with Mr. Archer that approximately 1,400 pages of material that he sent

or received might be subject to the crime-fraud exception.  These, presumably, are the "Crime-Fraud Emails" that are the subject of the government's motion.  *See* Gov. Mem. at 10.[2]

      Counsel for Mr. Archer responded to the government's December 28 letter via e-mail that same day.  Among other things, counsel stated that he "still request[ed] a response to the questions set out in" his November 20 letter – *i.e.*, the identification of the crimes that the "crime-fraud documents" were allegedly in furtherance of, and of who was alleged to have participated in those crimes.  *Id.* Ex. E at 3.  Counsel also flagged that he "had asked for responses to those questions by December 1, but received no response," and requested a response by January 8, 2018.  *Id.*

      Later that same day, the government responded, stating that "[i]f, after reviewing the non-privileged evidence, the Investigative Team decides to assert the crime-fraud exception, the Investigative Team *will provide* the information that you are requesting and the Filter Team *will create* a log of the communications that fall within the scope of the Investigative Team's crime-fraud argument.  I cannot answer your questions because I do not yet know if the Investigative Team will be asserting the crime-fraud argument or its scope."  *Id.* at 2 (emphasis supplied).

      On January 8, 2018, counsel for Mr. Archer wrote to the government and again pressed his November 20, 2017 requests that the government "please identify for each 'crime fraud' document (a) which crime the government believes the communication is in furtherance of, and (b) all alleged co-conspirators with respect to that crime," as he had still not received any substantive response.  *Id.* Ex. F at 2 (internal quotation marks omitted).  Counsel reiterated that the government had presumably "compiled this information already, as it would have been

---

[2]     The government's motion is not clear on whether it is limited to the approximately 1,400 pages of documents identified by the "filter team," or whether it extends to all communications that fall within the four broad categories discussed in the motion.  This ambiguity only highlights the impermissibly generalized approach taken in the motion.

necessary in order to characterize any documents as potentially subject to the crime fraud exception," and that this information was necessary for Mr. Archer "to understand the basis for [the filter team's] curation of those documents as potentially being subject to the crime fraud exception." *Id.* (internal quotation marks omitted).

*     *     *

To date, more than 75 days after his initial request on November 20, 2017, Mr. Archer *still* has not received any information from the government – which clearly must have had some documented basis, legitimate or not, for asserting that nearly 1,400 pages of material were potentially subject to the crime-fraud exception – as to why or how it made such a determination.

Instead of providing Mr. Archer with the vital information that it *promised to provide* or following the procedure *suggested by the filter team AUSA* that would have allowed the Court and Mr. Archer to assess the government's argument on a communication-by-communication basis, as the law requires (*i.e.*, creating a log of communications allegedly subject to the crime-fraud doctrine), the government filed its motion to invoke the crime-fraud exception over an indeterminate universe of documents.

## B.     Applicable Law

The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law," and "recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client."  *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).  "The attorney-client privilege is designed to promote unfettered communication between attorneys and their clients so that the attorney may give fully informed legal advice."  *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995) ("*Roe I*") (citations omitted); *see also Upjohn*, 449 U.S. at 389 (the rationale for the attorney-client privilege is "to encourage full and frank communication between

5

attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice").

Nevertheless, "communications that otherwise would be protected by the attorney-client privilege" are not protected if they are "*in furtherance of* contemplated or ongoing criminal or fraudulent conduct." *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1038 (2d Cir. 1984) ("*In re Grand Jury 1983*") (citations omitted, emphasis supplied). "Although there is a societal interest in enabling clients to get sound legal advice, there is no such interest when the communications or advice *are intended to further* the commission of a crime or fraud.  The crime-fraud exception thus insures that the secrecy protecting the attorney-client relationship does not extend to communications . . . 'made *for the purpose* of getting advice for the commission of a fraud or crime.'" *Roe I*, 68 F.3d at 40 (emphasis supplied; quoting *United States v. Zolin*, 491 U.S. 554, 563 (1989)); *see also Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 319 F.R.D. 100, 110 (S.D.N.Y. 2017) ("[T]he crime-fraud exception arises out of the judiciary's recognition that the attorney-client privilege exists so that clients may confidentially seek 'sound legal advice.'  As the Second Circuit has observed, 'advice in furtherance of a fraudulent or unlawful goal cannot be considered "sound."'  Rather, such advice is 'socially perverse.'  It follows that courts should not extend the protections of the attorney-client privilege to such advice." (quoting *In re Grand Jury 1983*, 731 F.2d at 1038)).

"A party wishing to invoke the [crime-fraud] exception must prove (1) 'that the client communication . . . in question was *itself* in furtherance of the crime or fraud' and (2) 'probable cause to believe that the particular communication with counsel . . . was intended in some way to facilitate or to conceal the criminal activity.'" *In re Grand Jury Subpoenas Dated Mar. 2, 2015*, 628 F. App'x 13, 14 (2d Cir. 2015) (quoting *In re Richard Roe, Inc.*, 168 F.3d 69, 71 (2d Cir. 1999) ("*Roe II*")) (emphasis in original); *see also Roe I*, 68 F.3d at 40 ("[A] party seeking to

invoke the crime-fraud exception must at least demonstrate that there is probable cause to believe that a crime or fraud has been attempted or committed and that the communications were in furtherance thereof." (citation omitted)).

Importantly, the crime-fraud exception has "a narrow and precise application." *United States v. Jacobs*, 117 F.3d 82, 88 (2d Cir. 1997), *abrogated in part on other grounds by Loughrin v. United States*, 134 S. Ct. 2384 (2014). The Second Circuit has cautioned that "[g]iven that the attorney-client privilege . . . play[s] a critical role in our judicial system, the limited exceptions to [it] should not be framed so broadly as to vitiate much of the protection [it] afford[s]." *Roe II*, 168 F.3d at 71 (citations omitted); *see also In re Cty. of Erie*, 546 F.3d 222, 228 (2d Cir. 2008) ("rules which result in the waiver of this privilege and thus possess the potential to weaken attorney-client trust, should be formulated with caution").

"With strong emphasis on intent, the crime-fraud exception applies 'only when there is probable cause to believe that the communications with counsel were *intended* in some way to facilitate or to conceal the criminal activity.'" *Id.* (quoting *In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d 32, 34 (2d Cir. 1986)) (emphasis added). This emphasis on intent reflects the fact that the purpose of the exception is "to assure that the seal of secrecy between lawyer and client does not extend to communications *made for the purpose* of getting advice for the commission of a fraud or crime." *Zolin*, 491 U.S. at 563 (internal quotations omitted; emphasis added).

As these cases make clear, the crime-fraud exception cannot apply unless there is a clear showing that the purpose and intent of the communication at issue was to further a crime; it is not remotely sufficient that the communication be simply *about* the subject matter of a criminal investigation or charge. *See*, *e.g.*, *In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d at 34 (reversing compulsion order for failure "to show the requisite purposeful nexus"); *In re Grand*

7

*Jury 1983*, 731 F.2d at 1039 (the crime or fraud must "have been *the objective* of the client's communication" (emphasis added)); *United States v. White*, 887 F.2d 267, 271 (D.C. Cir. 1989) ("[t]o subject the attorney-client communications to disclosure, they must actually have been made with *an intent* to further an unlawful act" (emphasis added)); *Aiossa v. Bank of Am., N.A.*, No. 10-cv-01275, 2011 WL 4026902, at *9 (E.D.N.Y. Sept. 12, 2011) (declining to apply crime-fraud exception where there was no showing "that *the objective* of these communications was the perpetration of a fraud" (emphasis added)); *Linde v. Arab Bank, PLC*, 608 F. Supp. 2d 351, 361 (E.D.N.Y. 2009) (declining to apply crime-fraud exception because "there is no indication here that [defendant] *solicited counsel's assistance in order to* disguise criminal, fraudulent, or tortious conduct," and collecting cases where the exception applied because "an attorney's assistance *was sought* to perpetrate a crime or fraud" (emphases added)); *In re: Gen. Motors LLC*, No. 14-mc-2543 (JMF), 2015 WL 7574460, at *6-7 (S.D.N.Y. Nov. 25, 2015) (noting "important distinction between effect and intent" in determining applicability of the crime-fraud exception, and refusing to apply exception because, although privileged communications "may well have contributed to the delay in public disclosure of the ignition switch defect," there was no evidence that the "intent" of the communications was to facilitate criminality or fraud); *In re MarketXT Holdings Corp.*, No. 04-12078, 2009 WL 7216076, at *3 (Bankr. S.D.N.Y. Mar. 4, 2009) ("The question before the Court is whether the client consulted the attorney for the purpose of furthering a crime or fraud, and *the issue is the client's state of mind*." (citations omitted; emphasis added)).

Given the centrality of the question of intent, the crime-fraud exception "cannot be successfully invoked merely upon a showing that the client communicated with counsel while the client was engaged in criminal activity." *In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d at 34; *see also In re Sealed Case*, 107 F.3d 46, 50 (D.C. Cir. 1997) ("[T]he government had

to demonstrate that the Company sought the legal advice with the intent to further its illegal conduct.  Showing temporal proximity between the communication and a crime is not enough."). Likewise, the government cannot simply sweep all communications between an accused and an attorney within the ambit of the exception.  *See*, *e.g.*, *In re Grand Jury Subpoena*, 419 F.3d 329, 344 (5th Cir. 2005) ("We conclude that the proper reach of the crime-fraud exception when applicable does not extend to all communications made in the course of the attorney-client relationship, but rather is limited to those communications and documents in furtherance of the contemplated or ongoing criminal or fraudulent conduct").

Nor can the government take a broad-brush approach by seeking to apply the exception to expansive, ill-defined categories of communications with counsel where doing so would not permit the required individualized intent determinations.  Instead, to establish that a given communication was made with the intent of furthering a fraudulent or criminal scheme, the government must demonstrate that "there is probable cause to believe that *the particular communication* with counsel . . . was intended in some way to facilitate or to conceal the criminal activity." *Roe I*, 68 F.3d 69 at 40 (emphasis added); *see also Macnamara v. City of New York*, No. 04-cv-9216, 2007 WL 3196295, at *2 (S.D.N.Y. Oct. 20, 2007) ("*Macnamara I*") ("[T]he crime-fraud exception does not create a general waiver of the attorney-client privilege. The [requesting parties] must . . . demonstrate that *specific communications* were made in furtherance of a fraud." (emphasis added)); *Macnamara v. City of New York*, No. 04-cv-9216, 2008 WL 186181 (S.D.N.Y. Jan. 18, 2008) ("*Macnamara II*") ("[A]pplication of the crime-fraud exception requires a showing of probable cause to believe that *each of the particular attorney-client communications at issue* was used in furtherance of a crime or fraud." (quotation and alteration omitted; emphasis added)).

Similarly, "communications that merely *relate to* the fraudulent scheme will not trigger the crime-fraud exception to the attorney-client privilege." *United States v. Chervin*, No. 10-cr-918, 2011 WL 4424297, at *3 (S.D.N.Y. Sept. 21, 2011) (citing *Jacobs*, 117 F.3d at 88) (emphasis added); *see also Roe I*, 68 F.3d at 40-41 ("Because a simple finding of relevance does not demonstrate a criminal or fraudulent purpose, it does not trigger the exception.").  This is because "the crime-fraud exception does not apply simply because privileged communications would provide an adversary with evidence of a crime or fraud.  If it did, the privilege would be virtually worthless because a client could not freely give, or an attorney request, evidence that might support a finding of culpability."  *Roe I*, 68 F.3d at 40; *see also In re Omnicom Grp. Inc. Secs. Litig.*, 233 F.R.D. 400, 404 (S.D.N.Y. 2006) (movant's "burden is not satisfied by a showing that the material in question 'might provide evidence of a crime or fraud'") (quoting *Roe II*, 168 F.3d at 71).

"Instead, confidential communications must be *in furtherance of the criminal or fraudulent conduct* for the crime-fraud exception to apply."  *United States v. Stewart*, No. 03-cr-717 (MGC), 2003 WL 23024461, at *2 (S.D.N.Y. Dec. 29, 2003) (citing *Roe I*, 68 F.3d at 40) (emphasis added).  "If the law were otherwise, every defendant accused of a crime . . . would lose the protection of the attorney-client privilege with respect to prior statements to his lawyer concerning the same subject matter."  *Id.*  Accordingly, "[a]lthough an indictment may provide probable cause to believe that the crime charged was committed, an indictment, standing alone, does not provide probable cause to believe that [communications between the charged individual and his or her] lawyers were in furtherance of the conduct charged in the [i]ndictment."  *Id.*

## C.    The Crime-Fraud Exception Does Not Apply

Applying these standards, it is clear that the government has not carried its burden of demonstrating that any specific privileged communications were made with the intent to further

a crime or fraud.  To the contrary, the government's motion eschews any discussion of particular

communications and instead asserts that broad and ill-defined categories of communications are

subject to the crime-fraud exception.  Worse, the government asks this Court to bless an invasion

of Mr. Archer's legal privilege over an amorphous group of communications, and to then

delegate to the "filter team" the ability to identify specific communications subject to the

exception.  *See* Gov. Mem. at 17.  This approach is simply inconsistent with the attorney-client

privilege, the proper application of the crime-fraud exception, and due process.

> ### 1.   The Government Has Established Probable Cause Only To The Extent Set Out In The Indictment

The crime-fraud exception is limited to communications with an attorney in furtherance

of a crime that there is probable cause to believe the defendant was specifically involved in; it

does not extend to conduct by others.  Thus, the first prong of the crime-fraud test requires a

demonstration "that there is probable cause to believe that a crime or fraud has been attempted or

committed" by the privilege-holder.  *Roe I*, 68 F.3d at 40.  Courts in this district have found that

the return of an indictment charging a defendant with a given crime satisfies this first prong with

regard to the crimes charged.  *See, e.g.*, *United States v. Levin*, No. 15-cr-101, 2015 WL

5838579, at *4 (S.D.N.Y. Oct. 5, 2015) ("The Grand Jury has returned an Indictment, finding

probable cause to charge the defendants with mail and wire fraud.  The Government has thus

satisfied the first prong of the crime-fraud exception").[3]

---

[3]      Mr. Archer has moved to dismiss the indictment as against him.  *See* ECF Nos. 295, 303.
Obviously, if the Court grants that motion, it will moot this one as well.  But for the same
reasons given in Mr. Archer's motion to dismiss, the indictment fails to provide sufficient
information to understand the crimes with which he is charged.  That lack of clarity undermines
the government's crime-fraud argument, because although the indictment may supply probable
cause to believe that Mr. Archer was involved in the charged crimes, it does very little to explain
what those crimes are beyond statutory labels.

The government's motion, however, concerns broad swaths of conduct with which Mr. Archer was never charged.  For example, the government seeks to pierce the privilege over attorney-client privileged communications concerning the issuance of the WLCC bonds or the sale of those bonds to the customers of Atlantic and Hughes, the two investment advisers involved in this case.  But as explained in Mr. Archer's severance motion, Mr. Archer is not alleged to have had any involvement in the issuance of the WLCC bonds, or to have had any interactions with the WLCC or any customers of the investment advisers.

The government's motion provides no reason to think otherwise.  While it contains a lengthy recitation of the alleged facts, it does so mostly by referring generically to the conduct of "the defendants," without making any attempt to isolate Mr. Archer's alleged role.  Indeed, the government spends the first eight pages of its brief laying out its "overview of the criminal scheme," but it mentions Mr. Archer's name only a handful of times, and never at all in connection with the issuance of the bonds or the bonds' placement with clients of the investment advisers.  *See* Gov. Mem. at 1-8.  Without providing specific information about Mr. Archer's alleged role in the charged crimes, it is impossible to assess the government's crime-fraud argument.

> **2.    The Government Has Made No Effort To Demonstrate That Any Communication Was Made For The Purpose Of Furthering A Crime Or Fraud**

More fundamentally, the government does not even try to meet its burden of demonstrating that particular communications were made in furtherance of the charged crimes.  *See Macnamara I*, 2007 WL 3196295, at *2 ("[T]he crime-fraud exception does not create a general waiver of the attorney-client privilege.  The [moving party] must . . . demonstrate that *specific communications* were made in furtherance of a fraud." (emphasis added)); *Macnamara II*, 2008 WL 186181 ("[A]pplication of the crime-fraud exception requires a showing of probable

cause to believe that *each of the particular attorney-client communications at issue* was used in furtherance of a crime or fraud." (quotation and alteration omitted; emphasis added)).

The government's motion fails to grapple with this requirement at all.  Amazingly, it does not even identify any particular lawyer or law firm, or discuss how Mr. Archer's communications with a lawyer or law firm might have been used to facilitate or further the charged crimes.[4]  Instead, the government asserts that the exception applies to "at least four categories" of privileged communications, namely communications "regarding" or "relating to" (1) "the issuance of the WLCC Bonds," (2) "the purchase of the WLCC bonds by Archer, Cooney, clients of Hughes and Atlantic, and attempts by the Hughes and Atlantic clients to liquidate those bonds," (3) "the misappropriation of bond proceeds," and (4) "defendants' establishment of and/or efforts to gain control of" various legal entities.  Gov. Mem. at 14-16.

Communications that simply "regard" or "relate to" the general subject matter of the Indictment do not fall within the scope of the crime-fraud exception.  *See, e.g., Roe I*, 68 F.3d at 40-41 ("Because a simple finding of relevance does not demonstrate a criminal or fraudulent purpose, it does not trigger the exception.").  Rather, the government must make an evidentiary showing "that *the objective*" of each communication to which it seeks to apply the exception "was the perpetration of a fraud," *Aiossa*, 2011 WL 4026902, at *9 (emphasis added), and that Mr. Archer, with regard to each such communication, "*solicited counsel's assistance in order to disguise criminal [or] fraudulent*" conduct, *Linde*, 608 F. Supp. 2d at 361 (emphasis added).  *See also MarketXT*, 2009 WL 7216076, at *3 ("The question before the Court is whether the client

---

[4]      The only lawyer or law firm mentioned in the government's motion is an unnamed "Florida Law Firm."  *See* Gov. Mem. at 15-16.  But Mr. Archer is not alleged to have had any relevant communications with that law firm, beyond the fact that the Florida Law Firm allegedly acted "as registered agent" for an entity allegedly controlled by Mr. Archer and filed a form with the Florida Secretary of State.  There is nothing allegedly improper about that form.  *Id.*

consulted the attorney for the purpose of furthering a crime or fraud, and *the issue is the client's state of mind*." (citations omitted; emphasis added)).

The government's motion utterly fails on this score.  For example, the government seeks to invade Mr. Archer's privilege over communications concerning "the issuance of the WLCC Bonds," including "emails relating to the drafting, editing, or execution of documents needed to issue the WLCC bonds, including indentures, the private placement memoranda and agreements, and the annuity agreements."  Gov Mem. at 14 (citations to Complaint omitted).  Nowhere in the motion, the Indictment, or the Complaint, however, is Mr. Archer alleged to have had any involvement in the drafting, editing, or execution of any of these documents, and the paragraphs of the Complaint to which this portion of the government's motion cites do not mention Mr. Archer at all.  *See* Complaint ¶¶ 11, 32(a), 46(a)-(d), 55(c)-(d).  Given the total absence of any allegations connecting Mr. Archer to this aspect of the alleged fraud, the government cannot establish that there even *exist* any communications between Mr. Archer and attorneys relating to the subjects encompassed by this category, let alone that any such communications, if they did exist, were purposefully intended to further the crimes of which Mr. Archer stands accused.

Instead of addressing particular communications or providing evidence that Mr. Archer's communications were in furtherance of the alleged crimes, the government effectively argues that all communications about the subject matter of the indictment should be stripped of their privilege.  But this is demonstrably not the law.  "[C]ommunications that merely *relate to* the fraudulent scheme will not trigger the crime-fraud exception to the attorney-client privilege." *Chervin*, 2011 WL 4424297, at *3 (citing *Jacobs*, 117 F.3d at 88) (emphasis added); *see also Roe I*, 68 F.3d at 40-41.

If the government's argument were correct, then the privilege would be meaningless in virtually every white collar case or case involving even remotely complicated financial

transactions.  For example, the subject matter of every "offering fraud" case is a securities

offering that has invariably been heavily lawyered.  By the government's reasoning, it could

pierce the privilege over any communications "regarding" the offering.  So too with

communications regarding finances or financial disclosures in any accounting fraud case.

Indeed, very little in corporate America happens without the advice of a lawyer.  If it were

sufficient that attorney-client communications simply "regard" or "relate to" the subject matter

of a criminal case, the privilege would be meaningless.  But "the crime-fraud exception does not

apply simply because privileged communications would provide an adversary with evidence of a

crime or fraud.  If it did, the privilege would be virtually worthless because a client could not

freely give, or an attorney request, evidence that might support a finding of culpability." *Roe

I*, 68 F.3d at 40; *see also In re Omnicom Grp. Inc. Secs. Litig.*, 233 F.R.D. 400, 404 (S.D.N.Y.

2006) (movant's "burden is not satisfied by a showing that the material in question 'might

provide evidence of a crime or fraud'") (quoting *Roe II*, 168 F.3d at 71).

Along the same lines, the mere "existence of the Indictment in this case" does not

"eliminate[] attorney-client privilege . . . protection with regard to evidence relating to [the

crimes] charged in the Indictment," as "confidential communications must be in furtherance of

the criminal or fraudulent conduct for the crime-fraud exception to apply."  *Stewart*, 2003 WL

23024461, at *2 (citing *Roe I*, 68 F.3d at 40).  "If the law were otherwise, every defendant

accused of a crime . . . would lose the protection of the attorney-client privilege with respect to

prior statements to his lawyer concerning the same subject matter."  *Id.*  Accordingly,

"[a]lthough an indictment may provide probable cause to believe that the crime charged was

committed, an indictment, standing alone, does not provide probable cause to believe that

[communications between the charged individual and his or her] lawyers were in furtherance of

the conduct charged in the [i]ndictment."  *Id.*; *see also In re 650 Fifth Ave.*, 2013 WL 3863866,

at *1-2 ("disagree[ing]" with the government's position that, since all of defendant's actions were allegedly in furtherance of a criminal purpose, then "all advice by counsel . . . constitute, *ipso facto*, communications made 'in furtherance of' those schemes," and finding that, "[w]hile the Government may have deeply held convictions as to the strength of its claims, the blanket assertion that every communication was 'in furtherance of' a crime or fraud does not make it so. Rather, for the crime-fraud exception to apply, the Government must provide *particularized evidence* that *each* challenged communication was made *in furtherance* of the crime or fraud." (first emphasis added)); *McDonald*, No. 2002 WL 31056622, at *2 (declining to apply the crime-fraud exception because the government failed to satisfy "its burden to identify a factual basis for the exception and . . . to offer legal or evidentiary support").

The application of the crime-fraud exception to the attorney-client privilege in the wholesale, broad-brush, categorical manner proposed by the government simply cannot be squared with the Second Circuit's admonition that the "crime-fraud exception has a narrow and precise application." *Jacobs*, 117 F.3d at 88; *see also Roe II*, 168 F.3d at 71 ("[g]iven that the attorney-client privilege . . . play[s] a critical role in our judicial system, the limited exceptions to [it] should not be framed so broadly as to vitiate much of the protection [it] afford[s].") (citations omitted); *In re Cty. of Erie*, 546 F.3d at 228 ("rules which result in the waiver of this privilege and thus possess the potential to weaken attorney-client trust, should be formulated with caution"); *cf. Zolin*, 491 U.S. at 571 ("There is no reason to permit opponents of the privilege to engage in groundless fishing expeditions, with the district courts as their unwitting (and perhaps unwilling) agents.").

Far from demonstrating that any specific privileged communications were made for the purpose of furthering a crime or fraud, the government has not even provided any reason to believe that such communications exist at all.

16

### 3. The Government Has Failed To Provide The Necessary Information That It Promised

Knowing that the government would likely try to avoid taking the required communication-by-communication approach to asserting the crime-fraud exception, Mr. Archer repeatedly asked the government to identify certain information for each communication purportedly subject to the exception.  Specifically, Mr. Archer asked the government to identify (a) which crime each communication was supposedly in furtherance of, and (b) who the participants in that crime are alleged to have been.

This information is absolutely essential to assessing the government's crime-fraud argument.  Knowing which crime a communication allegedly furthers is obviously part of the required showing.  And because the government's "filter team" identified as being potentially subject to the crime-fraud exception communications involving not only Mr. Archer and his lawyers, but also many other individuals (none of whom broke the privilege), it is essential to understand who the government believes participated in the alleged crime.  Indeed, for the overwhelming majority of the crime-fraud documents identified by the filter team, Mr. Archer is not the author of the communication nor is a lawyer responding to his request for advice; most of the communications involve Mr. Archer being cc'd on communications between lawyers and others, including numerous uncharged individuals.

Seemingly agreeing that this information is critical to assess the crime-fraud argument, the government *explicitly agreed to provide it*.  *See* Ex. E ("If, after reviewing the non-privileged evidence, the Investigative Team decides to assert the crime-fraud exception, the Investigative Team will provide the information that you are requesting.").  Moreover, in apparent recognition of the fact that the crime-fraud doctrine must be assessed separately for *each* communication to which it is sought to be applied, the filter team AUSA promised to provide a log of documents

purportedly subject to the crime-fraud exception.  *See id.* ("If, after reviewing the non-privileged evidence, the Investigative Team decides to assert the crime-fraud exception, . . . the Filter Team will create a log of the communications that fall within the scope of the Investigative Team's crime-fraud argument.").

This sort of fact-intensive showing is necessary to vitiate the attorney-client privilege using the crime-fraud exception.  In *Roe I*, for example, the Second Circuit remanded the case with instructions that the district court "determine which, if any, of the documents or communications were in furtherance of a crime or fraud":

> If production is ordered, the court shall specify the factual basis for the crime or fraud that the documents or communications are deemed to have furthered, which of the parties asserting claims of privilege possessed a criminal or fraudulent purpose with respect to those documents or communications, and, if appropriate, whether the crime-fraud exception applies to an innocent joint privilege-holder.

*Roe I*, 68 F.3d at 40-41.

But the government entirely failed to live up to its promise or its burden, instead making a blunderbuss argument.  The government attempts to excuse these failures as the result of its "cautious approach," Gov. Mem. at 14 n.5, but there is nothing cautious about what the government is attempting to do here.  Nor should the Court allow the government to correct its error on reply, when Mr. Archer has no opportunity to respond, and with trial looming only weeks away.

**4.      The Government's Categorical Approach Inappropriately Seeks To Outsource The Court's Responsibilities To The Filter Team**

The government's request "that the Court order" that communications falling within one or more of the four categories outlined in its motion be "released by the Filter Team to the Trial Team" is also entirely inappropriate because of the amount of autonomy that it would give the

government.  Gov. Mem. at 17.  This request, if granted, would effectively outsource the Court's role in determining whether "there is probable cause to believe that [any] particular communication with counsel . . . was intended in some way to facilitate or to conceal the criminal activity" to the government's "filter team."  *Roe I*, 68 F.3d 69 at 40.  But clearly, the government should not have unilateral, unchecked power to determine whether any "particular communication" falls within one of the four categories in its motion, and is thus subject to the crime-fraud exception.  *Id.*

Safeguarding the attorney-client privilege is within the purview of the Court, and only the Court may permit that privilege to be overridden – and even then, only after it has been satisfied that the requisite showings required under *both* prongs of the crime-fraud test have been met. *See*, *e.g.*, *Jacobs*, 117 F.3d at 88 (the "crime-fraud exception has a narrow and precise application"); *Roe II*, 168 F.3d at 71 ("[g]iven that the attorney-client privilege . . . play[s] a critical role in our judicial system, the limited exceptions to [it] should not be framed so broadly as to vitiate much of the protection [it] afford[s]." (citations omitted)); *In re Cty. of Erie*, 546 F.3d at 228 ("rules which result in the waiver of this privilege and thus possess the potential to weaken attorney-client trust, should be formulated with caution").

Allowing the government's filter team to exercise its self-interested judgment on the crime-fraud exception will create an unacceptable risk, if not a near certainty, that documents which do not, in fact, qualify for the exception will lose the protection afforded by the attorney-client privilege.

This is not a merely an academic concern, as numerous of the approximately 1,400 pages of communications that the "filter team" previously identified to Mr. Archer as potentially being subject to the crime-fraud exception are clearly not, for one reason or another.  For example, at least one of the alleged crime-fraud communications involve Mr. Archer's current counsel, and

post-date by a significant period of time the conduct with which Mr. Archer has been charged.

Moreover, many of the e-mails identified by the "filter team" concern transactions or entities that

have nothing to do with the charges in the indictment.  For instance, several concern an entity

called BAK USA LLC.  BAK USA LLC is not mentioned anywhere in the government's

motion, the Indictment, or the Complaint, and the relevant communication do not discuss any

topic that is.  There is therefore no colorable basis for believing that these communications were

"intended in some way to facilitate or conceal the criminal activity," *In re Grand Jury Subpoenas*

*Dated Mar. 2, 2015*, 628 Fed. Appx. at 14, but if the "filter team" were left to its own devices, it

has already demonstrated that it would produce these communications to the trial team.

    In short, if the Court were to entrust the government's "filter team" with the task of

determining which of Mr. Archer's privileged communications fall within the crime-fraud

exception based on the extraordinarily broad generalizations set out in the government's motion,

it is certain that Mr. Archer's privilege would be needlessly and repeatedly violated.

    **5.**    **There Is No Basis For The Court To Conduct An *In Camera* Review**

    The Court should also reject the government's invitation to conduct an *in camera* review,

because the government has failed to provide any reason to believe that any of Mr. Archer's

privileged communications were in furtherance of a crime or fraud.  *In camera* review would

therefore needlessly pierce Mr. Archer's privilege, and reward the government for its slipshod

motion by foisting the hard work of evaluating individual communications upon the Court.

    "*[I]n camera* proceedings may be used to determine whether the [crime-fraud] exception

applies to particular communications. . . . *Zolin* held, however, that prior to an *in camera*

disclosure of the communications, 'the judge should require a showing of a factual basis

adequate to support a good faith belief by a reasonable person . . . that *in camera* review of the

materials may reveal evidence to establish the claim that the crime-fraud exception applies.'" *In re John Doe, Inc.*, 13 F.3d 633, 636 (2d Cir. 1994) (quoting *Zolin*, 491 U.S. at 572).

And even if the government makes this threshold showing, the Court still need not conduct an *in camera* review.  Instead, once the threshold "'showing of a factual basis adequate to support a good faith belief by a reasonable person' that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies . . . is made, the decision whether to engage in *in camera* review rests in the sound discretion of the district court." *Zolin*, 491 U.S. at 572 (quoting *Caldwell v. District Court*, 644 P.2d 26, 33 (Colo. 1982)).  In exercising that discretion, the Court should consider the volume of the material it is being asked to review, the "relative importance to the cause of the alleged privileged information," and the likelihood that the crime-fraud exception will actually apply. *Id.*; *see also In re John Doe Corp.*, 675 F.2d 482, 490 (2d Cir. 1982) (*in camera* submission "deprive[s] one party to a proceeding of a full opportunity to be heard on an issue," and its use is justified only by a compelling interest).

In this case, the government has failed at the outset to meet its burden of showing reason for a good faith belief that any of Mr. Archer's privileged communications will be subject to the crime-fraud exception.  Far from it.  The government's motion not only fails to provide any reason to believe that Mr. Archer communicated with an attorney for the purpose of furthering a crime, it also fails to provide any reason to believe that Mr. Archer communicated with a lawyer about the subject matter of the indictment at all.  For example, the motion argues that the crime-fraud exception "applies documents [*sic*] and communications between the defendants and attorneys regarding the purchase of the WLCC bonds by Archer, Cooney, clients of Hughes and Atlantic, and attempts by the Hughes and Atlantic client to liquidate those bonds." Gov. Mem. at 15.  But the motion fails to provide any reason to believe that Mr. Archer communicated with a

lawyer on that general subject matter, let alone that he communicated with one to further that aspect of the alleged crimes. Instead, all of the communications cited by the government in its motion on this topic are ones between the defendants; none of them involve lawyers. *Id.*

Since, among other things, the government's motion fails to identify any specific communications and to provide the requisite showings, the government has failed to provide "a factual basis adequate to support a good faith belief by a reasonable person . . . that *in camera* review . . . may reveal evidence to establish the claim that the crime-fraud exception applies." *Zolin*, 491 U.S. at 572. The Court should therefore refuse to conduct an *in camera* review. *See, e.g., In re 650 Fifth Avenue*, 2013 WL 3863866, at *2 (finding that government failed to satisfy "the lesser burden necessary for the Court to order *in camera* review" because the government's "annotations and highlights to the . . . privilege logs merely assume the ultimate question and do not independently establish a good faith belief that the documents were created 'in furtherance of' a crime or fraud"; in this case, of course, the government has not even attempted to address Mr. Archer's privileged communications on a communication-by-communication basis).

Even if the Court were to determine that the government had met the threshold showing, this is a case in which, given the government's failure to address and satisfy the elements it well knew it had to address and satisfy in order to establish the applicability of the crime-fraud exception, the Court should exercise its discretion in denying *in camera* review.

The considerations set out by the Supreme Court in *Zolin* argue against such a review. The first of these is "the volume of materials the district court has been asked to review" 491 U.S. at 572, which is inexplicably not quantified by the government and thus presumed to be very large, but comprises at least the approximately 1,400 pages of material previously identified to Mr. Archer by the filter team. The second and third *Zolin* considerations are "the relative importance to the case of the alleged privileged information" and "the likelihood that the

22

evidence produced through *in camera* review, together with other available evidence then before the court, will establish that the crime-fraud exception does apply." *Id.* Here, for all the reasons explained above, the government has not given the Court sufficient information to determine what "importance," if any, the communications it seeks to subject to the exception have to this case, or that it is at all likely that *in camera* review "will establish that the crime-fraud exception does apply." *Id.* The Court should therefore decline to undertake an *in camera* review of Mr. Archer's privileged communications.[5]

## II. THE GOVERNMENT'S MOTION TO COMPEL MR. ARCHER TO COMPLY WITH ITS TWO-AND-A-HALF YEAR OLD GRAND JURY SUBPOENA, TWO MONTHS BEFORE TRIAL, IS PROCEDURALLY AND SUBSTANTIVELY FLAWED

Two and a half years ago, the government served Mr. Archer with a grand jury subpoena. Now, on the eve of trial and after failing to take any steps to ensure complete compliance, the government moves to compel in an obvious effort to assist its trial preparation. But the government's motion is both procedurally and substantively wrong, and is utterly without precedent. Indeed, the government's motion cites not a single case in which a court has required an indicted criminal defendant to comply with an underlying grand jury subpoena.

To begin with, consistent with the principle that grand jury subpoenas have nothing to do with trial preparation, any motion to compel must be brought as a stand-alone application in a miscellaneous case, rather than as a discovery motion in a charged case. This is not a small difference, for a final order quashing or compelling compliance with a subpoena would be immediately appealable in a stand-alone case, whereas the government has tried to immunize its entirely novel motion as an interlocutory discovery issue that would not be subject to appeal.

---

[5] In the event that the Court determines to undertake an *in camera* review, Mr. Archer reserves the right to address the application of the crime-fraud doctrine on a document-by-document basis – once those documents are actually identified.

Even if this Court were to determine that it could hear the government's motion, it should be denied.  To begin with, the government has failed to demonstrate that the underlying subpoena remains valid.  The subpoena was issued well over two years ago, and the issuing grand jury has necessarily expired.  It is black-letter law that once a grand jury expires, its subpoenas lose all force because no one can be compelled to produce evidence to a grand jury that does not exist.  It is likewise black-letter law that grand jury subpoenas cannot be used for the purposes of trial preparation, but that is exactly what the government is doing here.  Indeed, its motion does not even pretend to claim that there is an on-going investigation.

Finally, although not legally relevant, the government's insinuation that Mr. Archer deliberately withheld "perhaps one of the most incriminating emails" is factually false.  To the contrary, that e-mail was not in Mr. Archer's files, but was instead obtained from the files of someone else.  The government's reliance on it as an excuse for its belated motion to compel therefore falls flat.

A.    **Relevant Background**

During the course of the investigation of this case, Mr. Archer was served with a grand jury subpoena dated October 2, 2015, and returnable at 1:00 PM on Friday, October 16, 2015. *See* Schwartz Decl. ¶ 10; *see also id.* Ex. G.[6]  One day earlier, on October 1, 2015, the U.S. Securities and Exchange Commission had issued its own administrative subpoena to Mr. Archer seeking essentially the same records.  *Id.* ¶ 11; *see also id.* Ex. H.

In subsequent conversations with the U.S. Attorney's Office, Mr. Archer was directed to discuss the scope of any production with the SEC, and to produce documents to the SEC in the first instance.  *Id.* ¶ 12.  This is common practice in coordinated USAO/SEC investigations in

---

[6]    The government's motion refers to a subpoena issued "on or about October 5, 2015."  The subpoena was actually dated October 2.

this District, because it allows the SEC and USAO to freely share documents and information with one another without the constraints of grand jury secrecy, which would attach to any documents produced to the USAO in response to a grand jury subpoena. *Id.* Subsequently, Mr. Archer and the SEC lawyers negotiated the temporal scope of the productions and a list of search terms, and Mr. Archer made a series of productions to the SEC on January 27, 2016. *Id.* ¶ 13. Each of these productions was shared with the USAO. *See* Gov. Mem. at 19 ("the SEC has provided the Government with the entirety of the Archer SEC Productions").

Approximately six months after the subpoenas were issued, on Friday, May 6, 2016, counsel for Mr. Archer met with representatives of the USAO and the SEC, as well as an FBI Special Agent. Schwartz Decl. ¶ 14. During the course of that meeting, Mr. Archer's counsel discussed certain documents with which the AUSAs were unfamiliar, and the government referenced certain other documents with which Mr. Archer's counsel was unfamiliar. *Id.*[7] On that same afternoon, one of the AUSAs called Mr. Archer's counsel and informed them that Mr. Archer needed to produce any documents responsive to the grand jury subpoena by the following Monday, May 9, 2016, if he wished the government to consider his arguments. *Id.* ¶ 15.

As a result, Mr. Archer's defense team worked through the Mother's Day weekend to review documents, and on Monday the 9th – the next business day after the government demanded the documents – produced 3,792 responsive documents, totaling 30,092 pages, to the USAO. *Id.*[8] As it turns out, the government's promise to consider those documents before

---

[7]     As it turned out, the documents referenced by the government had never been signed by Mr. Archer and were not in any of his custodial files. This is consistent with the way in which certain alleged co-conspirators, principally Jason Galanis, unknowingly used Mr. Archer's name to perpetrate their crimes.

[8]     The government's motion feigns confusion over why Mr. Archer referred to this production as "urgent." Gov. Mem. at 18. But as the timeline above makes clear, the

making a charging decision was not genuine.  Earlier in the day on Monday the 9th, the

government had obtained a sealed complaint charging Mr. Archer with securities fraud and

conspiracy to commit securities fraud.  *See* ECF No. 1.

It was not until more than two years after issuing the subpoena, and more than a year

after Mr. Archer was charged, that on November 13, 2017 the government next raised the issue,

asking whether Mr. Archer's production "is complete or if we should expect an additional

production." *See* ECF No. 285, Ex. D at 3 (Nov. 13, 2017 email from R. Mermelstein to M.

Schwartz).  In reply, counsel for Mr. Archer stated that he was unaware of any authority

requiring further compliance with the subpoena, and requested the government cite any authority

for its request. *See id.* at 1 (Nov. 21, 2017 email from M. Schwartz to R. Mermelstein).  The

government did not respond.  Schwartz Decl. ¶ 16.  Instead, on January 16, 2018, it filed its

motion to compel.

### B.    A Motion To Compel Compliance With A Grand Jury Subpoena Must Be Brought As A Stand Alone Action

At the outset, the government's motion is procedurally improper.  Motions to compel

compliance with grand jury subpoenas are properly brought as stand-alone miscellaneous

actions, not as discovery motions in pending criminal cases.  *See United States v. Punn*, 737 F.3d

1, 6–7 (2d Cir. 2013) ("His letter motion bore the docket number of his pending indictment and

was addressed to the judge presiding over his criminal case; it was not styled as a miscellaneous

matter addressed to the judge supervising the grand jury proceedings or to the motions part.").

The government's motion should be rejected out of hand for this procedural impropriety.

Requiring motions to compel or to quash to be brought as stand-alone actions is not mere

form over substance.  Among other things, a contempt order following a decision on a motion to

---

government on a Friday afternoon required Mr. Archer to produce responsive documents by the
following Monday.

compel (or denying a motion to quash), when brought in a miscellaneous action, is an appealable final order rather than an interlocutory discovery order.  *See United States v. Ryan*, 402 U.S. 530, 532 (1971) (noting on witness's motion to quash grand jury subpoena, "If, as he claims, the subpoena is unduly burdensome or otherwise unlawful, he may refuse to comply and litigate those questions in the event that contempt or similar proceedings are brought against him.").  By filing its motion to compel as a pretrial motion in this case, the government has attempted to strip Mr. Archer of important procedural protections that attach to grand jury process.  It should not be permitted to do so, and for this reason alone the motion to compel should be denied.

### C.   The Subpoena Is Invalid Because The Issuing Grand Jury Is No Longer Empaneled

Even if this Court were to determine that it could hear the government's motion, it would be a dead letter.  The government's motion to compel must be denied for the simple reason that the grand jury that issued the subpoena is no longer empaneled.

The Court cannot compel a witness to produce documents to a grand jury that does not exist. To do otherwise would order a person to do that which is impossible.  As the First Circuit recently explained, relying on the long-settled law of this Circuit, the recipient of a grand jury subpoena can "only comply with the subpoena so long as the issuing grand jury was in existence."

> In this case, the subpoenaing grand jury was dead to begin with.  It had expired even before the government moved to compel compliance with its subpoena. The district court's order granting the motion to compel therefore ran afoul of the maxim "*lex non cogit ad impossibilia*"—literally, "[t]he law does not compel to impossible ends," 6 Black's Law Dictionary 1844 (9th ed. 2009). [The recipient] could not produce documents before a grand jury that no longer existed, and therefore "could, of course, be no longer compelled to discharge a duty which had ended." [*Loubriel v. United States*, 9 F.2d 807, 809 (2d Cir. 1926) (L. Hand, *J.*)]; *see also In re Grand Jury Proceedings, Thursday Special Grand Jury Sept. Term, 1991*, 33 F.3d 342, 347 (4th Cir. 1994) ("The

subpoenas issued by the September Term 1991 grand jury . . . clearly do not have force as a result of the expiration of that grand jury."); *accord In re Special Investigation No. 195*, 295 Md. 276, 454 A.2d 843, 846 (1983) ("The grand jury was dead. There was no one to whom the subpoena was returnable. . . . It thus was impossible to enforce the subpoena.").

*In re Grand Jury Proceedings*, 744 F.3d 211, 217-18 (1st Cir. 2014) (some citations and footnotes omitted); *cf. United States v. Fein*, 504 F.2d 1170, 1180-81 (2d Cir. 1974) (upholding the dismissal of an indictment returned nine days after the expiration of the 18–month period but during an attempted extension).

Here, the government has failed to meet its burden of demonstrating that the subpoena remains valid. Although the government's motion neither attaches a copy of the subpoena nor proffers which grand jury issued it, it is plain that the issuing grand jury must have expired. The subpoena was issued on Friday, October 2, 2015, and was returnable to the grand jury on Friday, October 16, 2015. Assuming for the sake of argument that the grand jury was empaneled on October 2, 2015, there is no way that the jury could still exist today. *See* Fed. R. Crim. P. 6(g) ("A grand jury must serve until the court discharges it, but it may serve more than 18 months only if the court, having determined that an extension is in the public interest, extends the grand jury's service. An extension may be granted for no more than 6 months, except as otherwise provided by statute."); *see also* 18 U.S.C. § 3331.

Moreover, it is well known in this District that "special" grand juries sit only two days a week, on either Mondays and Wednesdays or Tuesdays and Thursdays, whereas "regular" grand juries sit five days a week for one month. *See* Schwartz Decl. ¶ 17. The grand jury that issued the subpoena to Mr. Archer, however, sat on a Friday – meaning that it was not a special grand jury at all, but a regular (*i.e.*, monthly) grand jury. That grand jury would have been dissolved at or about the end of October 2015 – long long ago. Moreover, it appears that the grand juries that

returned the original and superseding indictments in this case were different from one another

(one sat on a Tuesday in May, the other on a Wednesday in November), suggesting that the

government may have used regular grand juries for all of its work here, or at least that the grand

jury that issued the original indictment expired prior to the issuance of the superseding

indictment.  *See* ECF No. 22 (original indictment, returned Tuesday, May 31, 2016); ECF No. 90

(superseding indictment, returned Wednesday, November 2, 2016).[9]

In any case, it was the government's burden to demonstrate that the subpoena it wishes to

enforce is actually valid.  It has utterly failed to do so, and for that simple reason, its motion to

compel must be denied.

### D.  The Government Cannot Compel Compliance With A Grand Jury Subpoena For The Purpose Of Trial Preparation

The government's motion to compel should also be denied because the issuance of the

indictment mooted the subpoena as it pertains to the offenses charged in this case.  And because

the government's motion supplies absolutely no reason to believe that there is any ongoing

investigation to which the subpoena would otherwise be relevant, it is moot altogether.  Simply

put, the rules governing the discovery due to the government from a criminal defendant are

supplied by the Federal Rules of Criminal Procedure, and the government may not use the

technical pendency of a grand jury subpoena to circumvent those rules.

At "the time the indictment is returned, the grand jury's investigative role is ended, and

the rules of pretrial discovery take effect to govern the extent to which the parties may use the

legal process to obtain information about the case."  Sara Sun Beale et al., *Grand Jury Law and*

---

[9]    To confirm this fact, the Court may inspect the minutes of the November 2016 grand jury *in camera*.  *See, e.g.*, *United States v. Gilbert*, No. 94 CR. 1003 (LMM), 1996 WL 345782, at *1 (S.D.N.Y. June 24, 1996) (requesting and reviewing minutes *in camera* prior to deciding motion).

*Practice* § 9:16 (2d ed. 2017); *see also Resolution Tr. Corp. v. Thornton*, 41 F.3d 1539, 1546 (D.C. Cir. 1994) ("While a grand jury wields broad investigatory powers prior to returning an indictment, courts uniformly have held that, once a targeted individual has been indicted, the government must cease its use of the grand jury in preparing its case for trial." (internal quotation marks and alteration omitted)).[10]  It is, in fact, expressly impermissible for the government to use the grand jury to prepare for trial: "The law is settled in this circuit and elsewhere that it is improper to utilize a Grand Jury for the sole or dominating purpose of preparing an already pending indictment for trial."  *In re Grand Jury Subpoena Duces Tecum Dated Jan. 2, 1985 (Simels)*, 767 F.2d 26, 29 (2d Cir. 1985) (internal quotation marks and alteration omitted).

Here, the government plainly wishes to force Mr. Archer to comply with the subpoena to aid in its trial preparation, just as it has caused other post-indictment grand jury subpoenas to be issued for the purposes of trial preparation.  *See* Schwartz Decl. ¶ 18.  But there is absolutely no support for these tactics.  Indeed, the government's motion is entirely bereft of relevant legal authority.  Aside from general and uncontroversial propositions like "courts can compel compliance with grand jury subpoenas," Gov. Mem. at 20, the government's motion relies on precisely one case for its unprecedented request.[11]

---

[10]     Even if the government were to assert that there is still some ongoing investigation, the Court should still deny the motion. *See* Sara Sun Beale et al., *Grand Jury Law and Practice* § 9:16 n.4 (2d ed. 2017) ("Where one grand jury has already handed down an indictment for a particular offense, a subsequent grand jury is only precluded from examining those subjects which led to the particular presentment before the prior grand jury.").

[11]     The cases cited by the government for these generic principles, *see* Gov. Mem. at 20, did not arise in remotely analogous circumstances.  *See In re Grand Jury Subpoena Dated February 2, 2012*, 741 F.3d 339 (2d Cir. 2013) (granting motion to compel compliance with subpoena by an unindicted witness based upon the "required records" exception to the Fifth Amendment); *United States v. Punn*, 737 F.3d 1 (2d Cir. 2013) (dismissing motion to quash grand jury subpoenas issued to unindicted witnesses because movant lacked standing); *United States v. Salameh*, 152 F.3d 88 (2d Cir. 1998) (refusing to overturn conviction based upon evidence

The differences between that case and this one demonstrate just how lawless the government's motion is.  Citing *In re Various Grand Jury Subpoenas*, 235 F. Supp. 3d 472 (S.D.N.Y. 2017), the government argues that its attempt to enforce a grand jury subpoena against Mr. Archer for the first time two and a half years after it was issued, and one and a half years after Mr. Archer was charged, is proper.  That case does not remotely support the government's position.

In *Various Grand Jury Subpoenas*, the government filed a miscellaneous proceeding to compel "Subject E" to comply with a grand jury subpoena calling for certain financial account records.  Subject E refused to do so, and the Court entered an order compelling her to comply with a portion of the subpoena that called for certain records required by the Bank Secrecy Act. The Court also entered a civil contempt order, sanctioning Subject E $1,000 per day until she complied.  In response, Subject E produced three pages of documents, and represented that her production was complete.  The government's investigation, however, revealed that Subject E was the beneficial owner of additional foreign bank accounts that she had not produced responsive records for, though they were within the scope of both the subpoena and the Court's compulsion and sanctions orders.  In response, in June 2016, the government returned to the Court to seek additional contempt sanctions.  At the same time, the government served a new grand jury subpoena upon Subject E.

This all happened before any charges were filed.  In July 2016 – a month after the government filed its renewed motion to compel and for sanctions – Subject E was indicted on tax

---

derived from subpoena issued in terrorism investigation of individual in Southern District, where subpoena was issued as part of a "wholly independent investigation" after defendant's indictment in a different judicial district for unrelated passport fraud); *United States v. Vanwort*, 887 F.2d 375 (2d Cir. 1989) (declining to overturn conviction on the basis of improper grand jury subpoena where subpoena was issued prior to indictment, was never served upon the witness, and where witness subsequently voluntarily decided to cooperate with the government).

charges.  Judge Pauley – presiding over the miscellaneous matter, not the criminal case – held that Subject E had failed to comply with his original (pre-indictment) compulsion and sanctions orders.  To be sure, in doing so, he decided that the tax charges did not strip his ability to enforce his prior order, but he also limited his holding to those original compulsion and contempt orders. *See id.* at 484 ("Because Subject E has not produced all records within her 'care, custody, or control'—defined as the legal authority or practical ability to obtain such records—she is in violation of the Compulsion Order.  Nevertheless, this Court declines to issue additional contempt sanctions because a valid sanctions order—the Contempt Order—is already in place.").

*Various Grand Jury Subpoenas* differs from this case on a multitude of levels.  To begin with, the government there took action to enforce its subpoenas long before Subject E was indicted, such that Judge Pauley was not ordering compliance with the subpoena so much as he was enforcing his own prior order.  The government also made a detailed showing that it was seeking compliance for a proper purpose, rather than trial preparation:  the government demonstrated that it was investigating other individuals, and investigating Subject E for uncharged crimes.  And of course the government's motion in *Various Grand Jury Subpoenas* was procedurally proper, brought in a miscellaneous action rather than as part of the indicted case. *See id.* at 477 ("That criminal action is now pending before another judge in this District.").

In sum, the only case cited by the government for attempting to enforce the subpoena against Mr. Archer does not remotely support its position. Consider the facts of each:

| *In re Various Grand Jury Subpoenas* | *United States v. Archer* |
|---|---|
| Motion to compel filed <u>before</u> indictment | Motion to compel filed <u>after</u> indictment |
| Compulsion order obtained <u>before</u> indictment | No compulsion order |
| Subpoena litigated for <u>years</u> before indictment | Motion filed <u>three months before trial</u> |
| Defendant produced two documents, totaling three pages | Mr. Archer produced 3,792 documents, or more than 30,000 pages |
| Subpoena called for required records that did not implicate Fifth Amendment concerns | Subpoena calls for numerous broad categories of documents[12] |
| Defendant subject to ongoing sanctions | Mr. Archer has not been sanctioned |
| Grand Jury investigation ongoing | No continuing investigation |
| Responsive information to be used to investigate additional subjects and offenses | Responsive information wanted for trial preparation |
| Miscellaneous proceeding | Criminal proceeding |

The two cases simply bear no similarity to one another, and the fact that *Various Grand Jury Subpoenas* is the best and only case the government could locate speaks volumes about its position here.

### E.    The Government Has Sat On Its Hands For Far Too Long

The government's utter failure to enforce the subpoena provides an independent ground on which to deny its motion. A party may not sit on its hands for more than two years, only to attempt to assert its rights at a time when the prejudice to the non-moving party is at its zenith. *See*, *e.g.*, *Eppendorf-Netheler-Hinz GMBH v. Nat'l Sci. Supply Co.*, 14 F. App'x 102, 105-06 (2d

---

[12]    As the government notes, Mr. Archer has not invoked his Fifth Amendment rights in either this case, the SEC's civil action, or the underlying investigations in response to document requests and subpoenas. The grand jury subpoena, however, plainly calls for information that implicates that right, and nothing in the government's motion suggests that it would be inapplicable. In the event that the Court grants the government's motion, therefore, Mr. Archer certainly reserves his rights under the Fifth Amendment.

Cir. 2001) (finding that "the requirements for affirmatively pleading laches" were met where appellees showed that appellant "had knowledge of the . . . alleged infringement of its marks [and] inexcusably delayed in taking action with respect thereto," and where appellees would "be prejudiced if [appellant] is permitted to inequitably assert its rights at this time") (citing *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1040 (2d Cir. 1980)).[13]

The government implicitly recognizes its own inequitable conduct, trying to justify its belated motion by claiming that it has recently "developed concerns" that Mr. Archer's production was incomplete in light of materials received from the SEC and in response to its e-mail search warrant, insinuating that Mr. Archer deliberately withheld "perhaps one of the most incriminating emails." Gov. Mem. at 19. But this claim does not withstand scrutiny.

After reviewing the government's motion, counsel for Mr. Archer immediately contacted the AUSAs to request that they identify this "most incriminating email," as well as any other document that they claim Mr. Archer failed to produce. *See* Schwartz Decl. ¶ 19; *see id.* Ex. I. In response, the government identified the single document referenced in its motion, *id.* Ex. I at 2, "an email from Archer to Morgan Stanley in which," according to the government, Mr. Archer "provides false information to Morgan Stanley concerning the source of the funds used to purchase the [WLCC] bonds." Gov. Mem. at 19.[14] By its Bates numbering

---

[13]     By the government's own admission, Mr. Archer's "May 9, 2016 production letter explicitly represented that Archer would produce other responsive documents as they were identified." Gov. Mem. at 20 n.8. While this argument substantially overstates the facts, it demonstrates that the government could have moved to compel prior to indictment instead of first following up with Mr. Archer 18 months later, on November 13, 2017. *See* Schwartz Decl. ¶ 16. The very next day, Mr. Archer requested authority for the proposition that a charged criminal defendant has a continuing obligation to respond to a grand jury subpoena issued in connection with the same investigation in which he was charged, but the government neither responded nor moved to compel until another two months had passed, at the motions deadline in this case. *Id.*

[14]     The government's motion cites this e-mail as "just one example" of responsive material supposedly withheld by Mr. Archer. Gov. Mem. at 19. The government, however, refused to

(SearchWarrant_v2_00021900), it was clear that the government had obtained this e-mail in response to its search warrant.

According to the metadata associated with the document identified by the government, however, the government obtained it from the search warrant on Mr. Archer's *assistant's* e-mail – the assistant was cc'd on the e-mail.  Schwartz Decl. ¶ 20.  That is, the e-mail that Mr. Archer supposedly withheld was not in his files at all, but rather was maintained in the e-mail of one of the other individuals on the e-mail.  The government's claim that Mr. Archer deliberately withheld documents is unsupported.

*       *       *

At base, the government's motion to compel is both unprecedented and remarkable, because it seeks to require an indicted criminal defendant to produce documents just a few weeks before trial.

The government is plain wrong on the incentives that are at stake. *See* Gov Mem. at 22. The government argues that by denying its motion, the Court will "incentivize other subjects of grand jury investigations to attempt to avoid compliance simply by waiting out the Government's investigation." *Id.*  But the government ignores its own responsibilities and the substantial sanctions that a non-compliant witness faces, as well as the fact that granting the motion would instead encourage (and reward) indicting suspects before investigations are complete.

---

provide any other examples to Mr. Archer, *see* Schwartz Decl. Ex. I at 1, and should not be allowed to do so on reply, when Mr. Archer will have no opportunity to respond, *see id.* (e-mail on behalf of Mr. Archer to the government, putting them on notice that "it would not be appropriate for the government in reply to point to additional specific examples that we were not provided notice of").  *See generally In re Various Grand Jury Subpoenas*, 235 F. Supp. 3d at 485 ("The law in the Second Circuit is clear that arguments or requests for relief raised for the first time in reply briefs need not be considered.") (citing *ABN Amro Verzekeringen BV v. Geologistics Americas, Inc.*, 485 F.3d 85, 100 n.16 (2d Cir. 2007) ("[W]e decline to consider an argument raised for the first time in a reply brief.")).

The targets of grand jury subpoenas already face considerable risks should they decide not to comply. In *Various Grand Jury Subpoenas*, the defendant was sanctioned for non-compliance and fined $1,000 per day, 235 F. Supp. 3d at 486.  In other cases, courts have jailed the recipient of a grand jury subpoena to coerce compliance.  *See, e.g.*, *In re Grand Jury Proceedings*, 280 F.3d 1103, 1107 (7th Cir. 2002) (fine and imprisonment ordered for failure to obey grand jury subpoena), *cert denied*, 536 U.S. 925 (2002).   The contempt powers of the Court are very broad, and courts have discretion to fashion appropriate means of ensuring compliance. Had the government been diligent here and moved to compel prior to indictment, it could easily have avoided the numerous flaws in its motion.  Instead, it waited for no good reasons, until well after it had begun trial preparation in earnest.

Allowing the government to move to compel compliance with grand jury subpoenas on the eve of trial creates a far worse set of incentives.  It creates an incentive for the government to indict first and investigate later, as it has done here.  And it creates an incentive to prejudice criminal defendants by doing an end-run around the discovery rules of the Federal Rules of Criminal Procedure.  Indeed, the government may obtain by grand jury subpoena what the Rules expressly forbid, such as witness statements and other "reverse 3500" type material.  *See* Fed. R. Crim. P. 16(b)(2) (describing "information not subject to disclosure" from a defendant).  And at the extreme end of the spectrum, a grand jury subpoena may call for the testimony of the defendant him- or herself.  Imagine for a moment the government seeking to require a criminal defendant to testify in the grand jury three months before his criminal trial.  That is ridiculous, but it is neither analytically nor legally different from what the government is asking for here.  Its motion to compel should be denied.

### III.    THE DEFENDANTS HAVE NO OBJECTION TO A DEADLINE FOR RECIPROCAL DISCOVERY[15]

Finally, the government asks that the Court set a deadline of March 30, 2018, for defense disclosures pursuant to Rule 16(b).  Gov. Mem. at 23-24.  The remaining defendants have no objection to such a deadline, but wish to be clear about two things.

*First*, Rule 16(b) applies solely to evidence "within the defendant's possession, custody, or control."  Fed. R. Crim. P. 16(b)(1)(A)(i).  Thus, to the extent that a defendant comes into possession, custody, or control of evidence after the deadline – including after the start of trial – that defendant will promptly produce it, but should not in any way be precluded from relying upon it.  *See* Fed. R. Crim. P. 16(c) ("A party who discovers additional evidence or material before or during trial must promptly disclose its existence to the other party or the court if" it is otherwise discoverable).[16]

*Second*, Rule 16(b) requires a defendant to produce evidence that he or she "intends to use . . . in the defendant's case-in-chief at trial."  Fed. R. Crim. P. 16(b)(1)(A)(ii).  Unlike the government, which bears the burden of proof beyond a reasonable doubt and is able to prepare its case-in-chief substantially in advance of trial, the defense case is necessarily reactive.  Thus, while the defendants agree to produce one month before trial any evidence that they reasonably anticipate using in their case-in-chief at that time, the defense trial strategy is likely to be significantly influenced by the government's production of its exhibit list and 3500 material, and by the development of its evidence at trial.  The defendants certainly agree to make a good faith

---

[15]    The text of this section of this memorandum has been circulated to counsel for all remaining defendants – Gary Hirst, John Galanis, Michelle Morton, Devon Archer, and Bevan Cooney – who are in agreement.

[16]    The government asserts that it has, to date, received "exactly one item of reciprocal discovery."  Gov. Mem. at 23.  But this is extremely misleading, as many of the defendants made extensive productions to the government previously.  For example, as described above, Mr. Archer produced in excess of 30,000 pages of evidence to the government.

disclosure of Rule 16(b) material one month prior to trial, as the government requests.  But to the extent that, after that deadline or during the course of trial, a defendant concludes that he or she is reasonably likely to seek to introduce another piece of evidence during the defense case-in-chief, it will be disclosed promptly to the government, and that defendant should in no way be precluded from relying upon it.

## CONCLUSION

For the reasons just given, the government's motions should be denied, except that the Court should impose a deadline of March 30, 2018 for the defendants to produce to the government all evidence then in their possession, custody, or control that they reasonable anticipate introducing during the defense case-in-chief at that time, without prejudice to subsequent production of evidence that comes into their possession or that they determine they are reasonably likely to seek to introduce.

Dated:    February 5, 2018
          New York, New York

                                        Respectfully submitted,

                                        /s/ *Matthew L. Schwartz*
                                        Matthew L. Schwartz
                                        BOIES SCHILLER FLEXNER LLP
                                        575 Lexington Avenue, 7th Floor
                                        New York, New York 10022
                                        Tel.: (212) 446-2300
                                        Fax: (212) 446-2350
                                        mlschwartz@bsfllp.com

                                        *Attorneys for Devon Archer*