

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 12, 2018

**BY EMAIL AND ECF**

The Honorable Ronnie Abrams
United States District Judge
40 Foley Square
New York, NY 10007

Dear Judge Abrams:

      The Government writes in response to the Court's order at the March 6, 2018 conference that it set forth its arguments regarding the admissibility of the evidence included in its 404(b) notice to the defendants.  For the reasons set forth below, although the Government disclosed such evidence in an abundance of caution, the admissibility of such evidence does not principally rely on the provisions of Rule 404(b) because it is admissible as direct evidence of the charged crimes. Any evidence not admissible as direct evidence is, in the alternative, admissible pursuant to Fed. R. Evid. 404(b).

**I.  Background**

      As set forth in the Government's 404(b) notice and as expanded upon at the pretrial conference on March 6, 2018, the Government seeks to offer the following evidence as either direct evidence of the charged crime and/or as 404(b) evidence.

- <u>Archer's False Statements to Morgan Stanley and Deutsche Bank</u>: Evidence that during the conspiracy in this case Archer made false statements to Morgan Stanley and Deutsche Bank regarding the source of the funds he used to purchase the tranche of Wakpamni bonds issued on October 1, 2014.  More specifically, in an effort to deposit approximately $15 million of the Wakpamni bonds at either Morgan Stanley or Deutsche Bank, Archer sent emails and/or other documentation to both banks which falsely stated that the source of the funds used to purchase the bonds was real estate sales through his business, Rosemont Seneca Bohai, LLC.

- <u>Code Rebel</u>: Evidence relating to the buying and selling of shares of Code Rebel (defined as the "Technology Company" in the criminal complaint in this case), during the conspiracy in this case, and following Code Rebel's May 2015 initial public offering ("IPO").  More specifically, and as discussed in detail at the conference, the Government intends to prove that Jason Galanis, Bevan Cooney, Gary Hirst, Devon Archer and other of their confederates took control of the entirety of Code Rebel's shares prior to the IPO, and purchased virtually the entirety of the IPO shares.  As a result, Galanis, Hirst, Cooney, Archer and others controlled virtually the entirety of Code Rebel's stock.  This control enabled them to move Code Rebel's stock price from

approximately $5 to a high of more than $40, making the shares owned by the various defendants (many of whom had received them for no consideration) worth millions (and in some cases tens of millions) of dollars.

- Archer's False Statements to the BIT Board: Evidence that during the period of the conspiracy in this case, defendant Archer made false and misleading statements and omitted material facts in oral and written statements to the board of the Burnham Investment Trust, concerning, among other things, the involvement of Jason Galanis and John Moran in the potential acquisition of Burnham Securities.

- Jason Galanis and John Moran's SEC Bars: Evidence that the SEC had previously barred both Jason Galanis and John Moran from holding certain positions in the securities industry.

- Efforts to Issue Additional Tribal Bonds Whose Revenue Could be Used to Cover Up the Wakpamni Fraud: Evidence that during the conspiracy in this case, the defendants were engaged in efforts to induce an additional Native American Tribal Entity to issue bonds (referred to as the "Wisconsin," "Rosebud" or "propane" bonds), the proceeds of which were, among other purposes, to be used by Bonwick to repurchase Wakpamni bonds from complaining pension fund investors.

- False Statements in the Hughes and Atlantic ADV's: Evidence that the SEC Form ADV for both Hughes Capital Management and Atlantic Asset Management (the "Investment Advisers"), filed after defendant Morton acquired those entities and during the conspiracy in this case, omitted material facts about the actual owners and/or control persons of the Investment Advisers. In particular, the Form ADV did not disclose the control exercised by BFG Socially Responsible Investments (which had provided Morton with the capital to acquire Atlantic and Hughes) or the control exercised by Jason Galanis, Devon Archer and Bevan Cooney, among others.

- The Gerova Arrests/Convictions: Evidence that defendants Gary Hirst, Jason Galanis, and John Galanis were arrested in a separate case (the "Gerova Case") on or about September 24 and 25, 2015, i.e., during the period of the charged conduct here, and were subsequently convicted of securities fraud, wire fraud, and/or investment adviser fraud in the Gerova Case. The Government does not intend to prove the underlying facts of the Gerova case. Rather, the Government intends to prove to the jury merely (i) that Hirst, Jason Galanis, and John Galanis were arrested in the same case; and (ii) that all three were variously convicted of securities fraud, conspiracy to commit securities fraud, investment adviser fraud, and conspiracy to commit investment adviser fraud. The Government intends to do so by eliciting the fact of their arrest from witnesses and by offering their judgments of conviction into evidence.

- Cooney's Involvement in 1920 Bel Air: Defendant Cooney's involvement in financial transactions relating to Jason Galanis's residence at 1920 Bel Air, Los Angeles, California. More specifically, the Government intends to prove that in 2014, again, during the period of the charged conduct here, Dunkerley, Cooney, and Jason Galanis engaged in a sham transaction with respect to 1920 Bel Air, through which 1920 Bel

Air Road Real Estate Holding Co, LLC, an entity of which Hugh Dunkerley was managing director, "sold" 1920 Bel Air Road to Bevan Cooney.  Millions of dollars purportedly being paid by Cooney in connection with the sale, were in fact provided to Cooney by Galanis from the Wealth Assurance Private Client Corp bank account (the same bank account used to misappropriate the bond proceeds in this case) just prior to the sale.

- <u>Cooney's False Statements to City National Bank</u>: Evidence that Cooney made false statements relating to the Wakpamni bonds to City National Bank in the spring of 2015, once again during the period of the charged conduct.  More specifically, the Government intends to prove that in or about June of 2015 Cooney obtained a $1.2 million loan from City National Bank.  In a personal financial statement relied on by the bank in issuing the loan, Cooney stated that his assets included, among others, $5 million of bonds and approximately $2 million of stock, largely comprised of Cooney's Code Rebel shares.  Cooney defaulted on the loan and City National attempted to recoup its losses through the sale of the Wakpamni bonds and/or the Code Rebel stock.  In conversations with the bank following the default, Cooney admitted that he had never owned the bonds and thus could not sell them.  He also stated that he had removed the bond from a brokerage and provided it to a friend.

## II.  Applicable Law

Evidence of an uncharged act is admissible as direct evidence, without regard to Rule 404(b), if the uncharged act "arose out of the same transaction or series of transactions as the charged offense"; (2) "is inextricably intertwined with the evidence regarding the charged offense"; or (3) "is necessary to complete the story of the crime on trial." *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997); *see also United States v. Kaiser*, 609 F.3d 556, 570 (2d Cir. 2010) (explaining that some kinds of evidence offered "to show the background of a conspiracy" is not "other crimes" evidence subject to Rule 404(b), but rather "'direct proof of the charged conspiracy'"); *accord United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988) ("[T]he trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment.  Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed.").

The Second Circuit has repeatedly affirmed the admissibility of evidence fitting one or more of these descriptions, whether it relates to conduct during the period of the charged crime or before it.  *See, e.g.*, *United States v. Hsu*, 669 F.3d 112, 118-19 (2d Cir. 2012) (following conviction after trial on campaign finance related charges, affirming district court's admission, as direct evidence, of testimony that defendant had engaged in a Ponzi scheme contemporaneously with, and arguably related to, the campaign finance violations); *United States v. Robinson*, 702 F.3d 22, 37-38 (2d Cir. 2012) (in child sex trafficking case, affirming admission as direct evidence and necessary to complete the story of the crimes on trial proof of defendant's calls, contemporaneous with the charged conduct, in which he discussed uncharged crimes related to prostitution and trafficking); *United States v. Greer*, 631 F.3d 608, 614 (2d Cir. 2011) (where defendant was charged with being a felon in possession of a firearm, affirming admissibility as direct evidence necessary to complete the story of the crime charged testimony regarding

defendant's uncharged plan to commit a robbery, which immediately preceded the charged conduct); *United States v. Kaiser*, 609 F.3d at 571 (in securities fraud case, holding that bad acts predating the conspiracy were admissible as direct evidence, without regard to Rule 404(b), because they had carry-over effects during the conspiracy); *United States v. Rigas*, 490 F.3d 208, 238-39 (2d Cir. 2007) (affirming district court's decision to permit Government to adduce evidence of uncharged fraudulent acts predating the charged conspiracy as direct proof of charged accounting fraud conspiracy because the evidence was "'inextricably intertwined with'" the proof of the charged conspiracy and "'necessary to complete the story of the crime on trial'"); *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (in case charging false statements to maintain a line of credit, affirming admissibility of uncharged acts of falsification of business inventory, which occurred at or around the same time as the charged crimes, as direct proof inextricably intertwined with charged conduct); *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990) (evidence of pre-existing drug trafficking relationship between defendant and co-conspirator admissible to aid jury's understanding of how transaction for which defendant was charged came about and his role in it).

In addition, Rule 404(b), while prohibiting the introduction of other act evidence to prove that the defendant has a propensity to commit the offenses charged, nonetheless explicitly allows admission of such evidence "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). The Second Circuit has adopted an "'inclusionary' approach" to Rule 404(b), under which "all 'other act' evidence is generally admissible unless it serves the *sole* purpose of showing a defendant's bad character." *United States v. Siddiqui*, 699 F.3d 690, 702 (2d Cir. 2012); *see also United States v. Curley*, 639 F.3d 50, 57 (2d Cir. 2011) ("'Other act' evidence serves a proper purpose so long as it is not offered to show the defendant's propensity to commit the offense."). To determine admissibility under Rule 404(b), the Court should consider whether (1) the evidence is offered for a proper purpose; (2) the evidence is relevant to a disputed issue; and (3) the probative value of the evidence is substantially outweighed by its prejudicial effect. *Curley*, 639 F.3d at 56-57. In addition, the Court should give an appropriate limiting instruction to accompany any such evidence, if the defense so requests. *Id.*

## III.  The Evidence Is Admissible As Direct Evidence of the Charged Offenses or, in the Alternative, Under Rule 404(b)

Virtually all of the above-described evidence is admissible as direct evidence of the charged crimes and is both inextricably intertwined with, and necessary to complete the story of the conduct charged in the Indictment. Indeed, five of the categories of evidence described above are so inherently intertwined with the charged conduct that they were expressly articulated in the charging instruments in this case. (*See, e.g.*, Complaint ¶47(e) [Lies to Morgan Stanley], ¶¶58-59 [Code Rebel]; ¶34 [Lies to Bit Board]; ¶¶ 39(g), 56(a) [omissions on Hughes and Atlantic Form ADV]; ¶¶ 49(h)-(g)-50 [citing an email from Cooney regarding the "3.9mm that came into my account and went out . .  for the down payment for the 1920 bel air purchase"]).

### A.  Archer's False Statements to Morgan Stanley and Deutsche Bank

Taking them each in turn, Devon Archer's choice to lie to Morgan Stanley (lies he also told to Deutsche Bank) by claiming that the $15 million used to purchase the second bond

issuance had come from "real estate sales," when it had actually come from Jason Galanis is direct evidence of Archer's fraudulent intent and consciousness of guilt.  As a preliminary matter, it was essential to the fraudulent scheme that Archer successfully deposit the shares and later transfer the shares to other of the defendants' endeavors.  The steps Archer took to do so are thus direct evidence of the charged scheme.  In addition, Archer's decision to withhold the true source of the funds demonstrates that he understood that the funds were derived from an illicit endeavor and that he was engaged in efforts to ward off scrutiny of the same.  This evidence thus directly bears on Archer's fraudulent intent, and renders the evidence admissible as both direct evidence and pursuant to Rule 404(b).

### B.   Archer's False Statements to the BIT Board

Archer's lies to the BIT Board are similarly illustrative of his criminal conduct and fraudulent intent.  The BIT Board's consent was necessary in order for Archer to acquire Burnham.  The Board became aware of Jason Galanis and John Moran's prior regulatory history[1] and told Archer that they would not approve the transaction if either Galanis or Moran was to be involved.  On multiple occasions, Archer lied to and misled the BIT Board about Galanis and Moran's involvement.  After Jason Galanis was arrested in the Gerova matter,[2] the BIT Board again confronted Archer about Jason Galanis, during which conversation Archer admitted that he had allowed Galanis to remain involved in Burnham notwithstanding Archer's representations to the contrary.  Again, Archer's efforts to conceal Galanis's involvement in Burnham from the BIT Board is direct evidence of Archer's understanding that Galanis's involvement was fraudulent.  Archer's interactions with the BIT Board further establish that Archer was aware of Galanis's fraudulent past, was aware that Galanis's past gave legitimate financial professionals qualms about doing business with Galanis, and that Archer nonetheless intertwined himself with Galanis and covered up that relationship.   Thus, contrary to what Archer's counsel has argued, Archer was not an unwitting dupe of Galanis.  Archer's knowledge is also a basis to admit this evidence pursuant to Rule 404(b).  Such evidence strongly undercuts Archer's argument that he believed and relied on Jason Galanis and believed Galanis to be involved in legitimate business transactions.

### C.   Code Rebel

The facts concerning Code Rebel are similarly intertwined with the criminal conduct here because they relate directly to the defendants' use of the bond proceeds and show the nature of the relationships between the defendants.  Many of the defendants and their confederates – either directly or through entities they controlled – received significant grants of Code Rebel shares,

---

[1] Galanis's and Moran's SEC bars – also included in the Government's 404(b) notice – are inexorably intertwined with Archer's lies to the BIT Board.  Indeed, absent evidence of those bars it would be impossible for the jury to understand why the BIT Board demanded representations about their lack of involvement or why Archer lied to hide their involvement.  Nor would the jury understand the significance of Archer's decision to do business with Galanis.

[2] Evidence of Jason Galanis's arrest is also inexorably tied to the BIT Board evidence because the BIT Board's confrontation with Archer can be explained only in the context of Galanis's arrest, which confirmed the BIT Board's worst fears about Galanis and demonstrates the materiality of Archer's deception.

often for no consideration.  This includes Hugh Dunkerley, Gary Hirst, Bevan Cooney and his spouse, Devon Archer, Jason Galanis, and Jason Sugarman and his spouse.  After Galanis and his confederates purchased virtually all of the IPO shares with proceeds of the Wakpamni bond fraud, they pumped Code Rebel's share price from $5 to more than $40, which resulted in the various defendants owning Code Rebel shares worth millions or tens of millions of dollars.  The circumstances of the Code Rebel IPO thus demonstrate how the defendants profited from the Wakpamni scheme.  *See, e.g., United States v. Green*, 175 F.3d 822, 831 (10th Cir. 1999) (defendant's efforts to collect profits from the scheme was "intrinsic to the conspiracy charged and consequently does not implicate Rule 404(b)").

Further, the Code Rebel events, which occurred in May 2015, are directly relevant against Hirst, in light of Hirst's argument that he had a "limited role in this case -- and the allegations make clear that he's really only around for a period of a few weeks in August of 2014." (3/8/18 Tr. at 39 (argument of Mr. Biale)).  As the Code Rebel and other evidence establishes, Hirst was far more involved (and for a longer period) than he now claims.

### D.   False Statements in the Hughes and Atlantic Form ADV's

So too are the false statements and omissions in the Hughes and Atlantic Form ADV's direct evidence of the charged crime.  A significant piece of Morton's participation in the charged crimes involved her failure to disclose various conflicts of interest to her clients.  Form ADV's, which are both filed with the SEC and provided to clients, demand the disclosure of a firm's owners and control persons.  By failing to disclose the control of Atlantic and Hughes exercised by Jason Galanis, Hugh Dunkerley, Devon Archer and Bevan Cooney, Morton hid from her clients that various individuals and entities exercising control over the investment adviser were also connected to both the placement agent for the bonds and the purported annuity provider guaranteeing payment on the bonds.  Morton's failure to cause accurate ADV's to be filed is thus direct evidence of the charged crimes.  In the alternative, Morton's failure to disclose their control also demonstrates her knowledge that their involvement was improper under Rule 404(b).

### E.   Cooney's Involvement in 1920 Bel Air

Throughout the course of the present fraud, Jason Galanis lived in a Bel Air mansion at 1920 Bel Air Road.  As described above, despite the fact that Galanis lived and functionally owned 1920 Bel Air, in approximately November 2014 an entity managed by Dunkerley "sold" the property to Bevan Cooney.  On November 12, 2014, approximately $3.9 million was transferred from the Wealth Assurance Private Client Corporation ("WAPCC") bank account to Cooney's account.  WAPCC was the purported annuity provider for the Wakpamni bonds, and the $3.9 million represented a portion of the proceeds of the Wakpamni bond issuances.  (*See* Complaint ¶ 49(g)-(h)).  On November 13, 2014 – one day after receiving the money from WAPCC – Cooney transferred that same amount to another entity for the purchase of 1920 Bel Air Road.

This evidence is admissible as direct evidence for multiple reasons.  First, it demonstrates the relationship of trust between Jason Galanis and Cooney.  *United States* v. *Alston*, 15-Cr-435, 2016 WL 5806780, at * (S.D.N.Y. Sept. 27, 2016)(CM) (citing *United States* v. *Pascarella,* 84

F.3d 61, 73 (2d Cir. 1996).  Second, it is direct evidence of Cooney's involvement in the misappropriation of the bond proceeds for the indisputably fraudulent purpose of buying Jason Galanis's house.  Third, and relatedly, it is relevant to show the scope of Cooney's involvement in the scheme and that he was not "simply, at best," a person who "purchased a bond at fair market value."  (*See* 3/6/18 Tr. at 6 (argument of Ms. Notari)).

For similar reasons, this evidence is also admissible under Rule 404(b) as evidence of Cooney's knowledge of the fraudulent nature of the scheme.  Cooney has suggested that his purchase of the Wakpamni bonds was a legitimate purchase which simply happened to be funded by a "loan" from Jason Galanis.  But Cooney's role as a straw purchaser in a transaction using misappropriated proceeds is certainly relevant to his knowledge regarding the fraudulent nature of the scheme.

*** 

The other evidence included in the Government's 404(b) notice (and not explicitly referenced in the charging instruments) is no less inextricably intertwined with the charged offense.

### F.   Efforts to Issue Additional Tribal Bonds

For example, evidence that following the four Wakpamni bond issuances, the defendants were engaged in efforts to induce a different Native American Tribe to issue bonds is direct evidence of the present fraud because the defendants intended to use proceeds of the new tribal bond issuances to repurchase the Wakpamni bonds from disgruntled pension fund investors in order to keep the investors from reporting the matter to authorities.  The defendants efforts to keep the Wakpamni fraud from coming to light is thus direct evidence of their participation in the scheme.  This evidence is separately admissible pursuant to Rule 404(b) because it demonstrates the defendants' modus operandi – inducing unwitting tribal entities to issue bonds in order to provide the defendants with "discretionary" capital.

### G.   Gerova Arrests/Convictions

As referenced above, the fact of Jason Galanis's arrest in the Gerova matter is direct evidence of the crime because it is inexorably linked to Archer's lies to the BIT Board.  Jason Galanis's arrest will also necessarily be admitted at trial because the evidence demonstrates that various of the defendants, including Archer and Cooney, discussed how to manage the Wakpamni bond situation following Jason Galanis's arrest.  These emails constitute direct evidence because they demonstrate that the defendants knew Galanis had orchestrated the bonds and that with his arrest it was their responsibility to manage the fraud.

Beyond Jason Galanis's own arrest, the fact that Jason Galanis, John Galanis and Gary Hirst also participated in a previous securities fraud together – as evidenced by their arrests and convictions in the same case – is direct evidence of the present crime because it demonstrates the pre-existing relationships between the defendants and will aid the jury's understanding of how the present transaction came about.  *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990) (evidence of pre-existing drug trafficking relationship between defendant and co-

conspirator admissible to aid jury's understanding of how transaction for which defendant was charged came about and his role in it).  Such evidence is also admissible pursuant Rule 404(b). It is clear that both Hirst and John Galanis intend to argue that they were each duped by Jason Galanis, who they believed was engaged in legitimate business transactions.  But the fact that Hirst and John Galanis had previously engaged in securities fraud with Jason Galanis severely undercuts any such argument by demonstrating his knowledge and intent.  The fact of the Gerova arrest and conviction is thus admissible to prove both Hirst and John Galanis's knowledge and lack of mistake.

### H.  Cooney's False Statements to City National Bank

Cooney's statements to City National – first claiming ownership of $5 million of the Wakpamni bonds, and later admitting he had never owned the bonds – is direct evidence of the charged crimes.  The Government alleges that Cooney purchased the bonds using recycled bond proceeds both to hide the fact that there were no legitimate interested purchasers and to increase the facial value of outstanding bonds, with the defendants could then use for other business purposes (for example, as net capital at Bonwick).  Cooney's admission that he had never truly owned the bonds and his admission that he had transferred them to a "friend" is thus direct evidence of Cooney's participation in the scheme.  Further, this evidence is also admissible under Rule 404(b) as evidence of Cooney's knowledge that the bond transactions were fraudulent and that he was not an unwitting dupe who "at best" "purchased a bond a fair market value." (3/6/18 Tr. at 6 (arguments of Cooney's counsel)).

## IV.  The Evidence Is Admissible Under Rule 403

Rule 403 does not counsel against admissibility.  Again, all of the evidence above is admissible as direct evidence of the charged offenses.  All of the evidence above concerns events that occurred during the time of the charged conduct in this case.  Moreover, none of the evidence—which consists almost entirely of false statements and omissions, in addition to Hirst's and Galanis's convictions for securities fraud—is "any more sensational or disturbing than the crime with which [the defendants are] charged.'" *See United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992) (quoting *United States* v. *Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990)).  To the contrary, false statements and securities fraud are the central facets of this matter.  In addition, the proffered evidence will not confuse the issues, mislead the jury, cause undue delay, waste of time, or needless presentation of cumulative evidence. See Fed. R. Evid. 403.

## V.  The Proffered Evidence Is Not a Basis for Severance

The proffered evidence also does not provide a basis for severance.  None of this evidence overcomes the strong preference for joint trials by creating "a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993).  To the contrary, much of the evidence cited above shows the interconnectedness between the defendants and demonstrates that there will be virtually no benefit to judicial economy by trying this case multiple times.  No defendant will be subject to any "spillover prejudice" from a joint trial because the evidence to be introduced at separate trials would overlap considerably given the

intertwined nature of each defendant's conduct underlying the charges in this case.[3]  In any event, the Government would not object to an appropriately crafted limiting instruction to the extent necessary.

For one, evidence concerning Code Rebel, Cooney's straw purchase of 1920 Bel Air, and the issuance of additional Indian bonds are all direct evidence of either the misappropriation of the Wakpamni bonds or efforts to buy those bonds from the clients of the investment advisers, into whose accounts Morton and Hirst had placed the bonds.  Put simply, this evidence is direct evidence of the fraud related to the Wakpamni bonds, regardless of who is sitting at the trial table.

Similarly, the arrests in the Gerova case, while certainly relevant to show the relationship between Hirst and the Galanises, is also relevant to provide context for Archer's conversations with the BIT Board and steps Archer and Cooney took regarding the bonds in the aftermath of Jason Galanis's arrest.  Among other things, and in addition to facilitating the making of interest payments on the bonds, Archer dealt directly with Morton concerning an Atlantic Asset Management capital request in the days following Jason Galanis's arrest.

Furthermore, evidence regarding the false statements on Hughes and Atlantic ADV Forms is relevant against Morton precisely because the forms failed to disclose the nature of her relationship with her financial backers including Galanis, Archer, and Cooney.  In addition, the Government expects the evidence will show that Hirst told Morton he did not want to be a Hughes employee, as opposed to a consultant, because he did not want to be listed on Hughes' Form ADV.

---

[3] Hirst's argument that his "limited role in this case" would result in a one week long trial if he were to be severed, *see* 3/6/18 Tr. at 38-39 (arguments from Hirst's counsel), is inconsistent with the facts of the case, as illustrated by the foregoing evidence.  Instead, Hirst was intricately involved in multiple aspects of the conspiracy, including, *inter alia*, (i) his control over the purported annuity provider for the bonds, Wealth Assurance Private Client Corporation, (ii) his actions to defraud Hughes clients by using Hughes clients' portfolios to purchase the WLCC bonds when the bonds were outside the investment parameters of many clients and without the required disclosures, and (ii) his actions to take control of the entirety of Code Rebel's shares prior to the IPO and, along with certain of his co-defendants, to purchase virtually the entirety of the IPO shares.  To say that a trial against Hirst, or, for that matter, any single defendant, would last no longer than a week simply ignores the quantum of proof in this case about the extent of the fraudulent scheme and each defendant's involvement.

        In short, most of the categories of evidence cited above are relevant against multiple defendants.  Far from providing an additional basis to overcome the strong preference for joint trials, the evidence discussed above further shows the interconnectedness of the defendants in this case and why they should be tried together.


                            Respectfully submitted,


                            ROBERT KHUZAMI
                            Attorney for the United States, Acting Under
                            Authority Conferred by 28 U.S.C. § 515



                    by: _____/s_____
                            Rebecca Mermelstein
                            Brendan F. Quigley
                            Negar Tekeei
                            Assistant United States Attorneys
                            (212) 637-2360 / 2190 /2444