**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

v.

JASON GALANIS,
GARY HIRST,
JOHN GALANIS, a/k/a "Yanni,"
HUGH DUNKERLEY,
MICHELLE MORTON,
DEVON ARCHER, and
BEVAN COONEY,

Defendants.

No. 16 Cr. 371 (RA)

**DEVON ARCHER'S SUR-REPLY MEMORANDUM OF LAW**
**IN FURTHER OPPOSITION TO THE GOVERNMENT'S**
**MOTION TO INVOKE THE CRIME-FRAUD EXCEPTION**

Matthew L. Schwartz
BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, New York 10022
Tel.: (212) 446-2300
Fax: (212) 446-2350
mlschwartz@bsfllp.com

*Attorneys for Devon Archer*

## <u>TABLE OF CONTENTS</u>

RELEVANT BACKGROUND ........................................................................................... 1

THE GOVERNMENT HAS STILL FAILED TO MEET ITS BURDEN TO INVOKE
    THE CRIME-FRAUD EXCEPTION ................................................................... 5

A.    The Government Was Required To, But Failed To, Demonstrate Why Each
    Individual Communication Is Subject To The Crime-Fraud Exception ........................... 5

B.    Even If The Government Were Permitted To Meet Its Burden Categorically,
    It Has Failed To Do So .............................................................................................. 12

C.    The Government's Log And Appendix Do Not Show That Mr. Archer's
    Privileged Communications Were "In Furtherance Of" Any Charged Crime ................ 18

D.    *In Camera* Review Of The Communications Will Demonstrate That
    The Crime-Fraud Exception Has No Application Here ................................................. 27

CONCLUSION ........................................................................................................... 27

# TABLE OF AUTHORITIES

## Cases

*Chevron Corp. v. Salazar*,
  274 F.R.D. 437 (S.D.N.Y. 2011)........................................................................ 8, 10-11

*Glidden Co. v. Jandernoa*,
  173 F.R.D. 459 (W.D. Mich. 1997) ...................................................................... 11

*In re 650 Fifth Ave.*,
  2013 WL 3863866 (S.D.N.Y. July 25, 2013) ........................................6-8, 19-20, 26

*In re Cty. of Erie*,
  546 F.3d 222 (2d Cir. 2008)................................................................................ 26

*In re Donald Sheldon & Co., Inc.*,
  191 B.R. 39 (Bankr. S.D.N.Y. 1996) .................................................................... 25

*In re Grand Jury Subpoena Duces Tecum*,
  798 F.2d 32 (2d Cir. 1986)................................................................................. 15

*In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*,
  731 F.2d 1032 (2d Cir. 1984)........................................................................... 7, 9

*In re Grand Jury Subpoenas Dated Mar. 2, 2015*,
  628 Fed. Appx. 13 (2d Cir. 2015) ..................................................................6-7, 13

*In re Richard Roe, Inc.*,
  168 F.3d 69 (2d Cir. 1999).......................................................... 6-7, 12-15, 17-18, 26

*In re Richard Roe, Inc.*,
  68 F.3d 38 (2d Cir. 1995)............................................................................ 6, 13, 15

*In re Sealed Case*,
  107 F.3d 46 (D.C. Cir. 1997) .......................................................................... 14-16

*Linde v. Arab Bank, PLC*,
  608 F. Supp. 2d 351 (E.D.N.Y. 2009)................................................................... 13

*Loughrin v. United States*,
  134 S. Ct. 2384 (2014) ........................................................................................ 1

*Macnamara v. City of New York*,
  2007 WL 3196295 (S.D.N.Y. Oct 20, 2007) ............................................................ 6

*Macnamara v. City of New York*,
  2008 WL 186181 (S.D.N.Y. Jan. 18, 2008)............................................................ 6-7

*Secs. Inv. Protection Corp. v. Bernard L. Madoff Inv. Secs. LLC*,
  319 F.R.D. 100 (S.D.N.Y. 2017)........................................................................ 8, 10

*Specialty Minerals, Inc. v. Pleuss-Stauffer AG*,
  2004 WL 42280 (S.D.N.Y. Jan. 7, 2004)........................................................ 8, 10

*United States v. Chervin*,
  2011 WL 4424297 (S.D.N.Y. Sept. 21, 2011) ................................................13-14

*United States v. Daccarett*,
  6 F.3d 37 (2d Cir. 1993)........................................................................................ 7

*United States v. Diaz*,
  176 F.3d 52 (2d Cir. 1999).................................................................................... 3

*United States v. Jacobs*,
  117 F.3d 82 (2d Cir. 1997)................................................................ 1, 7, 13, 26

*United States v. Neal*,
  743 F.2d 1441 (10th Cir. 1984)........................................................................ 25

*United States v. Stephenson*,
  183 F.3d 110 (2d Cir. 1999).............................................................................. 17

*United States v. Tucker*,
  254 F. Supp. 3d 620 (S.D.N.Y. 2017) ..............................................................9-10

*United States v. Wood*,
  259 Fed. App'x 48 (9th Cir. 2007) .................................................................... 16

*United States v. Zolin*,
  491 U.S. 554 (1989) .......................................................................................... 13

*Wuxi City Runyuan Keji Ziaoe Daikuan Co. Ltd. v. Xuewei Xu*,
  2013 WL 3946549 (C.D. Cal. July 30, 2013) ................................................16-17

## Other Authorities

Manhattan United States Attorney Announces Superseding Indictment Charging
  Members Of Newburgh Street Gang With Additional Racketeering And Firearms
  Offenses," Feb. 1, 2018, *available at* http://bit.ly/2ppsIgH ...................................... 8

Seven Defendants Charged in Manhattan Federal Court With Defrauding a Native
  American Tribe and Investors of Over $60 Million," May 11, 2016, *available at*
  http://bit.ly/24SJqpA ............................................................................................. 8

**<u>Rules</u>**

Federal Rules of Civil Procedure, Supp. R. G(2) ........................................................................... 7

Defendant Devon Archer respectfully submits this sur-reply memorandum of law in further opposition to the government's pre-trial motion to invoke the crime-fraud exception with respect to certain privileged communications, as permitted by the Court on the record at the March 6, 2018 motions hearing.[1]

## RELEVANT BACKGROUND

On January 16, 2018, the government moved to invoke the so-called "crime-fraud" exception to the attorney-client privilege over communications "regarding" or "relating to" four broad topics: (1) "the issuance of the WLCC Bonds"; (2) "the purchase of the WLCC bonds by Archer, Cooney, [and] clients of Hughes and Atlantic, and attempts by the Hughes and Atlantic clients to liquidate those bonds"; (3) "the misappropriation of bond proceeds"; and (4) "defendants' establishment of and/or efforts to gain control of" various legal entities.  [ECF No. 300 at 14-16].  In disregard of the "narrow and precise application" of the crime-fraud exception, *United States v. Jacobs*, 117 F.3d 82, 88 (2d Cir. 1997), *abrogated in part on other grounds by Loughrin v. United States*, 134 S. Ct. 2384 (2014), the government asked the Court to give its "filter team" the unilateral, unchecked power to determine which communications fall within these four categories, and would thus be stripped of the privilege.  [*See* ECF No. 300 at 17].

On reply – seemingly conceding that Mr. Archer correctly criticized the government's blunderbuss and inappropriate approach – the government for the first time provided an itemization of the communications supposedly subject to the exception, in the form of a log of

---

[1]       Unless otherwise noted, capitalized terms in this memorandum have the same meaning as in Mr. Archer's opposition brief.  [*See generally* ECF No. 310].  References to "Gov. Reply" are to the unredacted copy of the government's reply memorandum in further support of its pre-trial motions, dated February 12, 2018.  (The redacted copy of the government's reply was filed at ECF No. 313.)

179 communications[2] obtained from the execution of two Stored Communications Act warrants

on accounts associated with Mr. Archer and his co-defendant, Bevan Cooney.  [*See* ECF No. 313

Ex. B (the "crime-fraud log")].[3]

Despite itemizing the relevant communications, the government's reply still failed to

provide any reason to believe that the communications listed on its log were "in furtherance of"

the alleged fraud – as opposed to merely "relating to" or "concerning" the subject matter of this

case, if that.  The government also failed to provide other information that it had explicitly

promised, in writing, to furnish if it sought to invoke the exception.[4]  Instead, the government's

reply argued that the logged communications were "in furtherance of" some crime because many

of them "involve not only Archer and an attorney, but also either Jason Galanis or Cooney, two

---

[2]     The government's crime-fraud log contains a total of 181 entries, two of which
(Entries 67 and 68) have been blacked out.  The government has informed Mr. Archer that
whatever communications are reflected in those two lines are "not within our crime-fraud
argument, and we're not seeking to invoke the crime-fraud exception to them."

[3]     Because all of the communications subject to the government's crime-fraud motion
derive from the warrants, this motion would be mooted if the Court were to grant Mr. Archer's
motion to suppress the fruits of those warrants, as it should.  The Court reserved decision on that
motion at the March 6 hearing.

[4]     As set forth in Mr. Archer's opposition brief, counsel had repeatedly asked the
government's filter team to "identify for each 'crime fraud' document (a) which crime the
government believes the communication is in furtherance of, and (b) all alleged co-conspirators
with respect to that crime."  [ECF No. 310 at 3-5; ECF No. 309 Exs. C, E-F].  On December 28,
2017, one of the AUSAs explicitly represented that "[i]f, after reviewing the non-privileged
evidence, the Investigative Team decides to assert the crime-fraud exception, the Investigative
Team will provide the information that you are requesting and the Filter Team will create a log
of the communications that fall within the scope of the Investigative Team's crime-fraud
argument."  [*Id.* Ex. E at 2].  The government, however, neither answered counsel's questions
nor provided Mr. Archer with any log or list of the communications to which it would seek to
apply the crime-fraud exception prior to filing its motion.  Indeed, the government failed to
provide such a log or list even when it actually filed its motion, which should be dispositive.  It
was not until the government's reply that it ever provided such a list, which as discussed below
even now remains a moving target.  [*See, e.g.*, ECF No. 338 (identifying new documents
potentially to be added to the crime-fraud motion)].

of Archer's charged co-conspirators," which supposedly "provides additional evidence [that]

these communications were not merely retrospective or incidental communications about the

scheme but instead were intended to 'promote or facilitate achievement' of its goals."  *Id.*

(quoting *United States v. Diaz*, 176 F.3d 52, 85 (2d Cir. 1999)).  In other words, in complete

disregard of the applicable case law, the government contended that merely because these

communications related to the facts underlying the charged bond scheme and involved

Mr. Archer's alleged co-conspirators, they were therefore necessarily "in furtherance" of that

scheme, and thus subject to the crime-fraud exception.  But in fact, the government's reply did

little more than to try to group the e-mails on its log into one of the four broad categories to

which it claims the crime-fraud exception applies.

The government embraced this approach at the March 6 motions hearing.  For example,

in response to the Court's question about "the basis for finding that" certain communications

"fall within the crime-fraud exception," Transcript of March 6, 2018 Hearing ("Tr.") at 24-25,

the government explained:

> [AUSA]:  As to why the crime fraud exception, we believe there is a basis for
> thinking that applies it here.
>
> This email [Entry 154 on the government's crime-fraud log] is from September 5,
> 2014.  So, just to situate ourselves, that's right after the first tranche of WLCC
> bonds were issued and just about a month before Mr. Cooney and Mr. Archer
> purchased the second and third tranches.
>
> So we're right within the kind of the heartland of the early part of the conspiracy.
> Again, between two of the coconspirators, it appears to relate to a residence in
> New York that Mr. Galanis was attempting to purchase.
>
> We believe, based on that, based on when it happened, after the misappropriation
> of WLCC bonds from the first tranche had begun by Mr. Galanis, that there is
> a basis to believe that it could involve either the misappropriation of funds or the
> preparation for the second and third bond issuances which Mr. Cooney became
> involved in just a month later. Preparations were ongoing during the month of
> September 2015.

THE COURT:  What about 155, the photo of the Galanis T-shirt?

[AUSA]:  Again, your Honor, same argument. Again, right in the heartland of when –

THE COURT:  Is your argument just that it's [a] communication between these two people during the relevant time period?

[AUSA]:  I think it's more than during the relevant time period, your Honor. The relevant time period would be the time period of the conspiracy charged in the indictment and perhaps sometime on either end of that.

This is during the exact time when funds were being moved around to both misappropriate the first tranche and to recycle those funds into the second and third tranches, and Mr. Cooney received some of those funds from the first tranche to buy the third tranche.

There are emails that we've seen that are responsive to the warrant that are not privileged between these defendants where the subject or the [content] of the email has some type of sarcastic joke or picture that are clearly relevant to the scheme.

So just the fact that it refers to a T-shirt I think does not undercut the basis for believing that it's potentially in furtherance of the scheme.

THE COURT:  With respect to Mr. Cooney's individual tax returns, why would those be in furtherance of the conspiracy?

[AUSA]:  Again, your Honor, this is a few weeks – it would have been over a month before Mr. Cooney bought the third tranche of bonds. . . . Mr. Wolf[] is an attorney with the Florida law firm that's referenced in the complaint. That was one of the entities in which the proceeds of the first bond issuance, which were issued just days before this email, were passed through to finance the second and third bond issuance.

So you have an email involving, again, Mr. Cooney a month before he bought the third bond issuance with an individual whose firm was used as a pass-through for those proceeds discussing Mr. Cooney's tax returns.

It also goes to – why would that individual need tax returns.  Perhaps it was some sort of loan or information like that, information that was relevant to the movement of the bond proceeds.

THE COURT:  It sounds like you're really just speculating as to why someone would send their tax returns.  Right?

*Id.* at 25-28.

The Court was exactly right:  the government's motion is nothing more than an exercise in speculation that any communication around the time of the charged conduct, involving some of the same people, must necessarily be "in furtherance of" the charged conduct.  That is simply not the law, as Mr. Archer's counsel explained at the hearing.  *Id.* at 28 ("The government has read away the 'in furtherance' requirement and instead wants to pierce the privilege for any communication that appears to be on the subject matter of transactions that are mentioned in the indictment.").

**THE GOVERNMENT HAS STILL FAILED TO MEET ITS BURDEN
TO INVOKE THE CRIME-FRAUD EXCEPTION**

Even having now provided a log identifying which communications are supposedly subject to the crime-fraud exception, the government has still not met its burden.  The government has entirely failed to address these communications on an individual basis or to otherwise demonstrate probable cause to believe that any of them were "in furtherance of" the charged crimes.  Moreover, the government has failed to demonstrate probable cause to believe that many of the listed communication are even *about* or relevant to the conduct underlying the charged crimes, as the Court observed at the March 6 hearing.  And – though unwarranted and unnecessary – an *in camera* review of the communications will confirm that none of them were, in fact, in furtherance of any criminal activity.

**A.     The Government Was Required To, But Failed To, Demonstrate Why Each
        Individual Communication Is Subject To The Crime-Fraud Exception**

The government continues to misunderstand its burden in invoking the crime-fraud exception.  In its reply, and at oral argument, the government persisted in its mistaken view that it can succeed in abrogating Mr. Archer's privilege without demonstrating probable cause to demonstrate that each *specific* communication was in furtherance of a crime, and therefore subject to the crime-fraud exception.  *See*, *e.g.*, Gov. Reply at 4.

5

This is not a point on which there can be disagreement.  The Second Circuit has repeatedly held that, to invoke the exception, the government "must prove (1) 'that the client communication . . . in question was *itself* in furtherance of the crime or fraud' and (2) 'probable cause to believe that the *particular communication* with counsel . . . was *intended* in some way to facilitate or to conceal the criminal activity.'"  *In re Grand Jury Subpoenas Dated Mar. 2, 2015*, 628 Fed. Appx. 13, 14 (2d Cir. 2015) (table) (quoting *In re Richard Roe, Inc.*, 168 F.3d 69, 71 (2d Cir. 1999) ("*Roe II*")) (first and third emphases in original); *see also In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995) ("*Roe I*") ("the crime-fraud exception applies only where there is probable cause to believe that *the particular communication* with counsel . . . was intended in some way to facilitate or to conceal the criminal activity" (emphasis added)); *In re 650 Fifth Ave.*, No. 08 Civ. 10934 (KBF), 2013 WL 3863866, at *2 (S.D.N.Y. July 25, 2013) ("While the Government may have deeply held convictions as to the strength of its claims, the blanket assertion that every communication was 'in furtherance of' a crime or fraud does not make it so. Rather, for the crime-fraud exception to apply, the Government must provide particularized evidence that *each* challenged communication was made *in furtherance* of the crime or fraud; the fact that the communication may contain *evidence* that would help to prove the Government's case that a fraud or crime was committed is insufficient." (emphases in original)); *Macnamara v. City of New York*, No. 04 Civ. 9216 (RJS) (JCF), 2007 WL 3196295, at *2 (S.D.N.Y. Oct. 20, 2007) (Francis, *M.J.*) ("[T]he crime-fraud exception does not create a general waiver of the attorney-client privilege.  The [requesting parties] must . . . demonstrate that *specific communications* were made in furtherance of a fraud." (emphasis added)); *Macnamara v. City of New York*, No. 04 Civ. 9216 (RJS) (JCF), 2008 WL 186181, at *4 (S.D.N.Y. Jan. 18, 2008) (Sullivan, *J.*) ("[A]pplication of the crime-fraud exception requires a showing of 'probable cause to believe' that *each of the particular attorney-client communications at issue* was used 'in

furtherance of a crime or fraud.'" (alteration omitted; emphasis added; quoting *Jacobs*, 117 F.3d at 87).

The government's reply entirely ignores this binding Second Circuit authority, failing to cite either *Grand Jury Subpoenas Dated Mar. 2, 2015* or *Roe II* at all, or to otherwise address the long line of authority requiring the government to make a particularized showing.  Having blinkered itself to the law, the government claims that *650 Fifth Avenue* is an outlier whose "standard appears in no prior decisions of the Court of Appeals or the district courts in this circuit."  Gov. Reply. at 4.  But as the just-quoted language makes clear, it has long been the clear and straightforward requirement in the Second Circuit that, to invoke the crime-fraud exception, the government must provide proof with respect to each "particular communication."

The government's attempt, in a footnote, to distinguish *650 Fifth Avenue* is also unconvincing.  *See* Gov. Reply at 4 n.2.  It claims that the case is distinguishable because it was a civil forfeiture action, whereas the Indictment in this case supplies probable cause.  *Id.*  But civil forfeiture complaints, like criminal complaints, must be sworn by a law enforcement officer and provide sufficient evidentiary detail "to support a reasonable belief that the government will be able to meet its burden of proof at trial," Fed. R. Civ. P., Supp. R. G(2) – a standard that the Court of Appeals has held is "more stringent" than the typical civil pleading standard, *United States v. Daccarett*, 6 F.3d 37, 47 (2d Cir. 1993), and akin to probable cause, *see In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1039 (2d Cir. 1984) (for purposes of crime-fraud analysis, equating probable cause to "reasonable basis").

It is true, as the government observes, that the court in *650 Fifth Avenue* "noted the 'unproven allegation[s] from the' civil complaint." Gov. Reply. at 4 n.2.  But that is no different than the unproven allegations in the government's Indictment.  Even though indictments and criminal complaints are based upon a finding of probable cause, they are still merely unproven

allegations – as the Court will surely instruct the jury, and as the government itself notes every day in its public statements, including when it announced the charges in this case. *See* "Seven Defendants Charged in Manhattan Federal Court With Defrauding a Native American Tribe and Investors of Over $60 Million," May 11, 2016, *available at* http://bit.ly/24SJqpA ("The allegations contained in the Complaint are merely accusations"; "the entirety of the text of the Complaint and the description of the Complaint set forth below constitute only allegations, and every fact described should be treated as an allegation").[5]  Three of the cases cited by the government in support of its approach are true civil actions, revealing that the basis on which the government attempts to distinguish *650 Fifth Avenue* is entirely illusory.  *See* Gov. Reply. at 4-5 (citing *Secs. Inv. Protection Corp. v. Bernard L. Madoff Inv. Secs. LLC*, 319 F.R.D. 100 (S.D.N.Y. 2017); *Chevron Corp. v. Salazar*, 274 F.R.D. 437 (S.D.N.Y. 2011), and *Specialty Minerals, Inc. v. Pleuss-Stauffer AG*, No. 98 Civ. 7775 (VM), 2004 WL 42280 (S.D.N.Y. Jan. 7, 2004)).

The string citation the government offers in support of its categorical approach, on the other hand, is readily distinguishable.  Each and every one of the cited cases involves the application of the crime-fraud exception to communications with an attorney concerning a

---

[5]      The government's press release involving this case came after the filing of a criminal complaint, rather than an indictment.  But, of course, the same disclaimers are included every day in the government's announcements of indictments.  *See, e.g.,* "Manhattan United States Attorney Announces Superseding Indictment Charging Members Of Newburgh Street Gang With Additional Racketeering And Firearms Offenses," Feb. 1, 2018, *available at* http://bit.ly/2ppsIgH ("The charges contained in the Indictment are merely accusations"; "the entirety of the text of the Superseding Indictment and the descriptions of the Superseding Indictment set forth below constitute only allegations, and every fact described should be treated as an allegation").

The government also tries to distinguish *650 Fifth Avenue* based on what it claims is its "surgical . . . request," Gov. Reply at 4 n.2, but as the Court's questions at oral argument revealed, and as further discussed below, there is nothing "surgical" about the government's motion.

transaction that was inherently and wholly fraudulent because it was designed to conceal a prior fraud.  Moreover, even in those circumstances, most of the cases cited by the government do not take a categorical approach.

For example, contrary to the government's argument, the court in *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983* did not apply a categorical approach.  Rather, it looked at the government's showing with respect to each communication and determined that most did *not* fall within the crime-fraud exception.  731 F.2d at 1038-39 (rejecting argument that approximately 130 specific documents concerning "employee compensation" and the "reorganization" of various companies were subject to the crime-fraud exception).  Only with respect to certain communications that dealt with an inherently fraudulent transaction designed to cover up a prior fraud upon the United States did the Court agree that the exception applied.  *Id.* That is not a categorical approach, however; it is merely the recognition that, in certain cases, the same explanation may apply to multiple documents.

In *Subpoena Duces Tecum Dated Sept. 15, 1983*, the target of the government's investigation had refused to comply with a subpoena without cause, and was subsequently held in contempt.  After the target had been held in contempt, but before the District Court had fixed the amount of the monetary penalty against it, the target engaged in a fraudulent transaction of all of its American assets in an attempt to avoid having to pay any judgment.  On these facts, the Court held that communications concerning the transaction – the only purpose of which was to defraud the United States – were subject to the crime-fraud exception.  *Id.* at 1039.

The other cases cited by the government likewise involve transactions that were inherently unlawful in their entirety because they were designed to cover up a prior crime.  *See United States v. Tucker*, 254 F. Supp. 3d 620 (S.D.N.Y. 2017) (where defendant was indicted for engaging in "sham" lawsuit designed to invoke sovereign immunity to conceal and protect prior

usurious payday lending scheme, and where government's motion included additional particularized evidentiary support demonstrating probable cause that lawsuit was entirely fraudulent, communications with counsel regarding that lawsuit fell within the exception); *Specialty Minerals, Inc. v. Pleuss-Stauffer AG*, No. 98 Civ. 7775 (VM), 2004 WL 42280 (S.D.N.Y. Jan. 7, 2004)) (defendant fraudulently sought reexamination of patent that had previously been procured by fraud, in order to strengthen the patent claim under false pretenses).

The approach taken by the Court in *Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC*, 319 F.R.D. 100 (S.D.N.Y. 2017), is illustrative. In that case, the trustee administering the estate of Bernard Madoff's defunct securities firm sued one of Madoff's former associates who had already been convicted of participating in his Ponzi scheme. In the weeks before Madoff was arrested – when the collapse of his scheme was inevitable – that defendant transferred title in an expensive beach house to her partner, and took efforts "to ensure that 'her name' did not appear on the title to the [beach] property." *Id.* at 108. The Court found, based on a variety of evidence, that this transaction was fraudulent and intended to defraud the victims of the Madoff Ponzi scheme, and that the defendant had sought advice from attorney in accomplishing her unlawful goal. *Id.* at 109-10. Even in that case, however, the Court scrutinized the individual communications and found that only the specific ones that pertained to "the Defendants' efforts to take title to the house in the name of someone other than" the convicted fraudster fell within the exception; other communications concerning the house were not subject to the exception. *Id.* at 109.[6]

---

[6]     The government also cites *Chevron Corp. v. Salazar*, 275 F.R.D. 437 (S.D.N.Y. 2017), but the Court in *Chevron* also did not take a categorical approach. Rather, after finding "ample evidence" that a foreign judgment had been procured by fraud, Magistrate Judge Francis reviewed a log of privileged communications and found that the crime-fraud exception applied only to those specific communications that were in furtherance of the foreign plaintiffs' efforts to

In this case, however, none of the transactions the government identifies as being subject to the crime-fraud exception are inherently fraudulent such that all related communications should lose their privileged character.  There is nothing remotely illegal about (i) the issuance of bonds, (ii) the sale of bonds, or (iii) obtaining a shareholding in companies.  The thing that makes that conduct allegedly unlawful in this case is that Jason Galanis and his co-conspirators (whomever they may be) allegedly stole the proceeds of those bond sales.  *See*, *e.g.*, *Glidden Co. v. Jandernoa*, 173 F.R.D. 459, 481-82 (W.D. Mich. 1997) ("Grow is . . . treating the entire stock purchase transaction as if it were one massive fraud or beach of duty.  The law does not sanction so sweeping an application of the crime/fraud exception.  A management buyout is not a fraud or crime.  Rather, the wrongdoing (if any there was) would consist in the alleged nondisclosures and misstatements upon which Grow claims to have relied.").  And while the fourth category advanced by the government – "the misappropriation of the WLCC Bond proceeds" – certainly *is* inherently unlawful as framed, there is no reason to believe that any such communications exist.  Rather, and as its answers at oral argument proved, the government regards any communications about spending money at or about the same time as the charged conduct to fit into this category.  That proves far too much.  As Mr. Archer's counsel stated at oral argument:

> [The government's categorical approach] is tremendously problematic here. One, because most of the subject matter of the indictment is perfectly lawful. The acquisition of another company is perfectly lawful. The issuance of securities is perfectly lawful.
>
> The thing that makes this entire thing allegedly illegal is, one, the undisclosed conflicts in investment advisor conduct, which has nothing to do with Mr. Cooney and Mr. Archer; and two, this alleged scheme to misappropriate the proceeds of the bonds.

---

procure fraudulent expert reports.  *Id.* at 454-55.  Notably, the Court refused to conduct even an *in camera* review of other privileged communications concerning the judgment, though it was the result of fraud.  *Id.*

> If [the government] had any reason to believe that any single one of these communications was in furtherance of that scheme, I think we would have heard it, and I invite you. Do an *in camera* review. Look at all these communications. Any of them that are about misappropriating the proceeds of the bonds, by all means. That should not be protected by the attorney-client privilege.

> But that's not what any of these things are about. I do have the benefit, at least with respect to Mr. Archer's communications, of having seen them. That's not what these are. Instead, what the government gave us in their motion is anything about the issuance of the bonds should be not privileged.

Tr. at 28-29.[7]

In short, the clear law in this Circuit is that the government must demonstrate that individual communications fall within the crime-fraud exception. The government has made no attempt to do that here. Rather, it has identified broad topics that it says are part of the charged conduct, and claims that any communications that it says (often without any basis) are in any way related to those topics should be stripped of their privilege. That is simply not the law. Because the government has failed to meet its burden of demonstrating the application of the exception with respect to each relevant communication, its motion should be denied.

**B.      Even If The Government Were Permitted To Meet Its Burden Categorically, It Has Failed To Do So**

Even if the government's categorical approach were permissible, its motion should be denied because it still fails to demonstrate how Mr. Archer's privileged communications were "*intended* in some way to facilitate or to conceal [any] criminal activity," *Roe II*, 168 F.3d at 71 (emphasis in original), or "made for the purpose of getting advice for the commission of a fraud or crime," *United States v. Zolin*, 491 U.S. 554, 563 (1989) (quotation omitted), or how

---

[7]      Although Mr. Archer continues to believe that the government has failed to make the showing necessary for *in camera* review, such a review will confirm that none of the communications identified by the government were "in furtherance of" any criminal scheme, and that all such communications relate to lawful business activities. Additional detail is set out in the *ex parte* appendices to this memorandum, which address each of the communications on the government's log.

Mr. Archer or anyone else sending, receiving, or copied on these communications "solicited counsel's assistance in order to disguise criminal, fraudulent, or tortious conduct . . . [or] perpetrate a crime or fraud," *Linde v. Arab Bank, PLC*, 608 F. Supp. 2d 351, 361 (E.D.N.Y. 2009).

Rather – and as the government conceded in its moving papers – it seeks to invoke the exception to communications that merely "regard" or "relate to" transactions mentioned in the Indictment.  [ECF No. 300 at 16-17].  But that, too, is not the law; the government must show that the communications were "in furtherance of" the charged crimes, and demonstrate "probable cause to believe that the *particular communication* with counsel . . . was *intended* in some way to facilitate or to conceal the criminal activity.'"  *Grand Jury Subpoenas Dated Mar. 2, 2015*, 628 Fed. Appx. at 14 (quoting *Roe II*, 168 F.3d at 71 (first emphasis added)); *see also*, *e.g.*, *United States v. Chervin*, No. 10-cr-918 (RPP), 2011 WL 4424297, at *3 (S.D.N.Y. Sept. 21, 2011) ("communications that merely *relate* to the fraudulent scheme will not trigger the crime-fraud exception to the attorney-client privilege" (citing *Jacobs*, 117 F.3d at 88; emphasis in original)); *see also Roe I.*, 68 F.3d at 40-41 ("Because a simple finding of relevance does not demonstrate a criminal or fraudulent purpose, it does not trigger the exception.").  While the government claims that it "is not seeking to apply the [crime-fraud] exception to communications that merely 'relate to' the crime-fraud," Gov. Reply at 8, its arguments both in its reply brief and at the hearing prove otherwise.

The government's reply brief makes essentially one and only one substantive argument as to why "there is probable cause to believe that the communications on [its Appendix] both relate to, *and are in furtherance of*, the WLCC scheme":

> [T]he vast majority of the communications listed on [the Appendix] involve not only Archer and an attorney, but also either Jason Galanis or Cooney, two of Archer's charged co-conspirators. The presence of Archer's co-conspirators on

> these communications provides additional evidence these communications were not merely retrospective or incidental communications about the scheme but instead were intended to "promote or facilitate achievement" of its goals.

Gov. Reply at 8 (emphasis in original); *see also id.* at 7-8 (arguing that communications were "in furtherance of" the charged crimes because "many of them involve one or more of Archer's [alleged] co-conspirators"); *id.* at 7 ("the Crime-Fraud Log reflects multiple communications involving Archer and his [alleged] co-conspirators regarding the WLCC bonds, during the time period of the charged conspiracy" and "contains numerous communications between Archer and his co-conspirators *relating to* the" entities at issue in this case) (emphasis added).

But whether the communications "concern issues directly relevant to the charged scheme" is not the proper inquiry, *id.*, and the fact that a communication "merely *relate[s]* to the fraudulent scheme will not trigger the crime-fraud exception." *Chervin*, 2011 WL 4424297, at *3 (emphasis in original). The mere presence of Mr. Archer's alleged co-conspirators on certain of the communications does not relieve the government of its obligation to demonstrate "probable cause to believe that [those] particular communication[s] . . . [were] *intended* in some way to facilitate or to conceal [any] criminal activity." *Roe II*, 168 F.3d at 71 (emphasis in original). If the government's argument were correct, then every e-mail between a criminal defendant, one of his alleged co-conspirators, and an attorney during the period of the charged conspiracy would automatically be subject to the crime-fraud exception. This, of course, is not the law. Similarly, merely "[s]howing temporal proximity between the communication and a crime is not enough" to demonstrate that legal advice was sought "with the intent to further . . . illegal conduct." *In re Sealed Case*, 107 F.3d 46, 50 (D.C. Cir. 1997).

Nonetheless, the government doubled-down on this theory at the March 6 motions hearing, arguing that certain privileged e-mails were subject to the crime-fraud exception simply because they were sent at roughly the same time as the charged conduct. *See* Tr. at 25-28. But

14

the crime-fraud exception "cannot be successfully invoked merely upon a showing that the client communicated with counsel while the client was [allegedly] engaged in criminal activity." *In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d 32, 34 (2d Cir. 1986); *see also In re Sealed Case*, 107 F.3d at 50 ("[T]he government had to demonstrate that the Company sought the legal advice with the intent to further its illegal conduct.  Showing temporal proximity between the communication and a crime is not enough.").

The government's arguments at the hearing illustrated just how threadbare its evidence in support of the motion is.  For example, when the Court questioned the government about one e-mail that – like many on the government's log – appeared to concern a totally unrelated real estate transaction, the government replied that because the e-mail was dated at some point after the first bond issuance, "there is a basis to believe that it could involve either the misappropriation of funds or the preparation for the second and third bond issuances which Mr. Cooney became involved in just a month later."  Tr. at 25-26.

This argument is emblematic of the government's overall approach to the crime-fraud doctrine, as it is absolutely riddled with errors.  First of all, the applicable standard is not "a basis to believe" that a communication "could" fall within the exception – it is probable cause.  *See*, *e.g.*, *In re Grand Jury Subpoenas*, 628 F. App'x at 14; *Roe I*, 68 F.3d at 40, *Roe II*, 168 F.3d at 71.  Second, as the Court rightly observed, the government's arguments are nothing more than speculation.  *See* Tr. at 28.  For example, there is absolutely no evidentiary basis offered by the government to believe that a communication seemingly about a New York real estate purchase relates to, let alone is in furtherance of, any "preparation[s] for the second and third bond issuances," aside from mere temporal proximity.  Tr. at 25:24-25, 26:5-6; *see In re Sealed Case*, 107 F.3d at 50 ("Showing temporal proximity between the communication and a crime is not enough.") (citations omitted).

Third, both common sense and the clear meaning of the words "in furtherance of" dictate that merely spending money – even criminally-derived money – cannot generally be considered to be "in furtherance of" the underlying criminal or fraudulent misappropriation.  For example, if a bank robber uses stolen funds to buy a house, that purchase cannot reasonably be said to be "in furtherance of" the bank robbery such that all attorney-client communications about the purchase of the house should be pierced.  *See United States v. Wood*, 259 Fed. Appx. 48, 49-50 (9th Cir. 2007) (overturning jury verdict in wire fraud prosecution because "a rational trier of fact could not have concluded beyond a reasonable doubt that the transfer [in question] was in furtherance of the indicted scheme," and holding that defendant who embezzled money from his employer by check and then used a wire to send the embezzled funds to a third party for an unrelated business venture was not acting "in furtherance of" the embezzlement scheme because (1) the wire transfer "was in furtherance of [an] investment opportunity unrelated to" the victim of that scheme, and (2) "the scheme to defraud . . . was complete before [defendant] made the wire transfer"; in other words, "[b]ecause the wire transfer . . . was not a 'step in the plot' to defraud[,] it was not in furtherance of the scheme to defraud" (citations omitted)); *Wuxi City Runyuan Keji Ziaoe Daikuan Co. Ltd. v. Xuewei Xu*, No. 13-cv-00944 (DDP), 2013 WL 3946549, at *4 (C.D. Cal. July 30, 2013) (describing *Wood* as holding that, "[w]hile the second transfer may have furthered the eventual spending of the theft proceeds by moving it to a different country, it did not further the scheme to obtain Plaintiff's money in the first place"); *Id*. at *5 (noting, in wire fraud case involving "fraudulent loan applications" to Chinese banks, that "[w]hile the Defendants allegedly used wires to transfer money out of China, the issue is whether the fraud would have been completed without their use," and holding that because (1) "the alleged wire transfers occurred after the loan proceeds had been issued [and] did not play any role in inducing the lenders to make the loans to the Defendants," (2) "the fraud took place because of forged

[loan] documents, not because of wire use," (3) "the use of wires was not essential to the fraud," and (4) "the fraud would have been completed as soon as the Defendants received the money while in China," the wire transfer was merely "an after-the-fact transaction that, although foreseeable, was not in furtherance of the defendant's fraudulent scheme" (citations omitted)). But under the government's argument, every transaction involving criminally-derived funds is subject to the exception. *But see, e.g., United States v. Stephenson*, 183 F.3d 110, 121 (2d Cir. 1999) ("an ordinary purchase made with ill-gotten gains does not violate the money laundering statute"). Indeed, by the government's boundless logic, if a fraudster consults a lawyer to draw up a will so that she can leave her estate to her children, that consultation would not be privileged.[8]

With regard to another e-mail, which the Court described as "the photo of the Galanis T-shirt," the government again relied on nothing more than timing, plus the following contention:

> There are emails that we've seen that are responsive to the warrant that are not privileged between these defendants where the subject or the [content] of the email has some type of sarcastic joke or picture *that are clearly relevant to the scheme*.

Tr. at 26-27 (emphasis added). But it does not remotely follow that because the defendants may have once joked or traded pictures in e-mails "clearly relevant to the scheme" that there is probable cause to believe that all photographs are not only "relevant" to, but "in furtherance of," the charged crimes. *Id.*

---

[8] Where a subsequent transaction in criminally-derived funds is designed to cover up the underlying crime, that is of course a different matter. *See Roe II*, 168 F.3d at 71. But the government makes no such argument here, nor is there probable cause to believe that any defendant engaged in such concealment, let alone with respect to any of the specific communications or transactions that are the subject of this motion.

The only other communications that were discussed at any length at the hearing related to tax returns. Again, the government pointed to nothing but the timing of the email, and then began to wildly speculate as to why Mr. Cooney may have sent a copy of his tax return: "Perhaps it was some sort of loan or information like that, information that was relevant to the movement of the bond proceeds." *Id.* at 27-28.

Unfortunately, these responses encapsulate the way the government has approached this motion, and the defendants' privilege: it has failed to offer probable cause to believe that any of the defendants' privileged communications, either individually or even by category, were "in furtherance of," or designed to "facilitate or to conceal," the charged crimes. *Roe II*, 168 F.3d at 71.

## C.     The Government's Log And Appendix Do Not Show That Mr. Archer's Privileged Communications Were "In Furtherance Of" Any Charged Crime

In an attempt to meet its burden, the government's reply not only includes the crime-fraud log (Exhibit B to its Reply), but it also includes an Appendix that it claims is designed to explain how certain communications relate to and are in furtherance of the charged crimes.

As an initial matter, **it is still utterly unclear what documents the government says the crime-fraud exception applies to**. The government's reply brief asserts that "approximately half" of the documents on Mr. Archer's privilege log are subject to the exception, Gov. Reply at 6, but it fails to identify which ones. Moreover, while the government's Appendix contains citations to "Relevant Crime Fraud Log Entries," it also references some communications that do not appear on the crime-fraud log at all.[9]

---

[9]     Along the same lines, on March 9, 2018, a representative of the government's "filter team" wrote to the Court enclosing what it referred to as a "Supplemental Crime Fraud log" listing 63 additional privileged communications that the government apparently believes may be subject to the exception. [ECF No. 338]. The government explicitly explained that it was not

This approach is simply not acceptable:  the Court and Mr. Archer are both entitled to and *must* know the exact communications to which the exception supposedly applies.  For purposes of this sur-reply, Mr. Archer assumes that the government's motion applies solely to the documents identified on its "crime-fraud log" (*i.e.*, Exhibit B to its reply brief), which we understand are the same documents that the government's filter team has provided to the Court for *in camera* review (along with the documents on its supplemental log, which are explicitly not the subject of its motion, *see supra* n.9) in response to the Court's request at the March 6 hearing.  Mr. Archer respectfully submits that the government should not be permitted to further supplement the record now, when the deficiencies in its approach have been pointed out time and time again, when trial is looming, and when the motions deadline has long since passed.

With respect to its Appendix, the government still fails to provide any meaningful information,[10] doing nothing more than sorting the e-mails into one of the four categories to which it claims the exception applies.  This is not enough to satisfy its burden.  *See*, *e.g.*, *In re 650 Fifth Ave.*, 2013 WL 3863866, at *2 (S.D.N.Y. July 25, 2013) (finding that government failed to satisfy even "the lesser burden necessary for the Court to order in camera review" because the government's "annotations and highlights to the . . . privilege logs merely assume

---

yet moving to invoke the crime-fraud exception with respect to those documents, but that it might do so in the future.  *Id.* at 2.  Many of the documents cited in the Appendix to the government's reply appear on this Supplemental Log.  Consistent with the government's explicit direction in its March 9 submission to the Court, Mr. Archer understands that notwithstanding the confusion created by the government's Appendix, the government is not currently moving with respect to those documents.  Although Mr. Archer believes it is far too late – and far too close to trial – for the government to be adding documents to its motion, Mr. Archer respectfully requests the opportunity to be heard if and when the government attempts to include additional communications as part of its motion.

[10]     In some cases, the government's Appendix provides explanatory footnotes, but many of those footnotes only list the applicable Bates range for the document.  *See*, *e.g.*, Gov. Reply, Appendix at 1 & n.19; *id.* at 2 & nn.21-22; *id.* at 3 & nn.25-28; *id.* at 4 & n.29.

the ultimate question and do not independently establish a good faith belief that the documents were created 'in furtherance of' a crime or fraud").

In actuality, the e-mails on the government's crime-fraud log fall into roughly three categories:  (1) communications about which the government provides absolutely no information to guide the Court's decision-making; (2) communications that concern matters other than the four general categories subject to the crime-fraud motion; and (3) e-mails that, at best, may be "about" the transactions described in the Indictment, but certainly are not "in furtherance of" them.  (Moreover, *in camera* review will demonstrate that many of the e-mails in this last group aren't even "about" those transactions at all).  For example:

> Communications about which the government provides no meaningful
> information linking the e-mail to the charged conduct:

- An e-mail dated December 31, 2014, with no description beyond "forwarding attachment w/o comment." (Entry 4 on the government's "crime-fraud log," Ex. B to its reply brief).

- E-mails from a lawyer to Mr. Archer and another individual concerning "Camden/Thorsdale Loan; Valor." The government provides no information about what or who "Camden" is, and there is no allegation anywhere in the Indictment or complaint that "Camden" played any role in the charged conduct.  (Entries 18, 19).

- E-mails from the same lawyer to Mr. Archer and the same third-party concerning a different loan in the amount of $3.1 million, attaching various seemingly real estate-related documents.  (Entries 20-28).

- E-mails between solely Mr. Archer, his personal assistant, and his lawyer concerning a "[w]ire received."  (Entries 110, 111).

- An e-mail between solely Mr. Archer, his personal assistant, his lawyer, and an individual not alleged to be a co-conspirator on the subject of "LOC sign off." There is no allegation anywhere in the Indictment or complaint about the use of any letter of credit in connection with the charged offenses.  (Entry 114).

- E-mails between solely Mr. Archer, his lawyer, and his personal assistant concerning "Estonian LOI (Burnham, Burnham US)." There is no allegation

anywhere in the Indictment or complaint about any Estonian transaction or any letter of intent in connection with the charged offenses.  (Entry 148).

- An e-mail about the "Melville office" with an attachment of a "Picture of wolf in a suit."  Wolff is the name of the lawyer on the e-mail.  (Entries 177-179).

- An e-mail from a lawyer, copying individuals not alleged to be co-conspirators, concerning "Burnham / Sal / Johnny – Question About Prospective Agreement" with an attached document entitled "JM ADVISORY AGREEMENT," suggesting that it concerns some sort of consulting or employment agreement.  (Entry 181, 181).

> Communications that, on their face, do not fall within the scope of the government's motion:

- A series of e-mails that concern what the government calls the "Wisconsin bonds."  These bonds are *not* the subject of the charges in the Indictment, and indeed are the subject of the government's Rule 404(b) notice.[11]  As such, these communications are outside of the government's crime-fraud motion in the first place.  Moreover, the government has made no evidentiary showing related to the "Wisconsin bonds" – which are not part of the charged conduct, and are not mentioned in the Indictment or criminal complaint – and so the government may not rely on the Indictment to supply probable cause to believe that any crime was committed with respect to these bonds.  (Entries 12-15, 50, 53, 99, 150).

---

[11]     As the government explains in its motion to admit Rule 404(b) evidence, its allegation is that certain defendants "were engaged in efforts to induce an additional Native American Tribal Entity to issue bonds (referred to as the 'Wisconsin,' 'Rosebud,' or 'propane' bonds), the proceeds of which were, among other purposes, to be used by Bonwick to repurchase [WLCC] bonds from complaining pension fund investors."  [ECF No. 339 at 2].  As such, communications about the Wisconsin bonds do not fall into any of the topics within the government's crime-fraud motion:  they do not concern (1) "the issuance of the *WLCC Bonds*"; (2) "the purchase of *the WLCC bonds* by Archer, Cooney, clients of Hughes and Atlantic, and attempts by the Hughes and Atlantic clients to liquidate those bonds"; (3) "the misappropriation of bond proceeds"; and (4) "defendants' establishment of and/or efforts to gain control of" various legal entities.  [ECF No. 300 at 14-16 (emphases added)].  As the government concedes in its Rule 404(b) motion, evidence about the Wisconsin bonds cannot be said to be part of the charged scheme and were not referenced in any of the government's charging instruments.  [ECF No. 339 at 7].

- E-mails concerning a "Sublease at West 57th," which include non-lawyers that the government does not contend are co-conspirators.  (Entries 86-90, 130, 134).[12]

- E-mails from July 10, 2014 – three weeks *before* the first bond issuance, and so not conceivably involving the "proceeds" of Jason Galanis's theft – concerning "Galanis purchase of condo using Archer Diversified TRG LLC." (Entry 104).

- E-mails concerning "260 W. Broadway," one of which apparently had an attached "Photo of Galanis t-shirt."  (Entries 154-55, 170-176).

- E-mails between Mr. Cooney, a lawyer, and in some cases an outside accountant concerning Mr. Cooney's bank statements, trust statements, and tax returns.  (Entries 156-169).

  <u>Communications that, at best, are "about" certain entities
  and events mentioned in the Indictment</u>

- A series of e-mails from either outside counsel or an individual not alleged to be a co-conspirator to numerous individuals including other outside counsel and several individuals not alleged to be co-conspirators, seemingly about routine corporate matters such as "Update on Atlantic, Valor Asset Management, Hughes."  (Entries 31-43).

- E-mails from individuals not alleged to be co-conspirators to several individuals and Mr. Archer, *none* of whom are alleged co-conspirators, on generic topics such as "FW: Burnham (Burnham Securities)."  (Entries 118, 119).

- E-mails solely between counsel, Mr. Archer's assistant, and an accounting firm – *with no alleged conspirator on the e-mail at all* – concerning routine matters such as "Update, Burnham, Bonwick, Thorsdale, CORFA funds." (Entries 62-66).

- An e-mail solely between Mr. Archer and his wife, with the subject "Burnham & Co Pitch Deck."  (Entry 135).

The government's attempt in its Appendix to provide some *de minimus* context for some

(but far from all) of these e-mails does not withstand scrutiny, and in some cases is either

---

[12]  Entry 130 does not explicitly reference a sublease, but does mention AlixPartners, the sublessor.  If the Court has any questions about whether this e-mail concerns the sublease, *in camera* review will confirm it.

misleading or literally nonsensical.  For example, on the second page of the government's

Appendix, it describes under the heading "Description from Privilege Log": "[a]n email from

Archer to any attorney [*sic*], cc-ing Archer's assistant, subject 'Wire Received,' 'regarding loan

proceeds.'"  Gov. Reply, Appendix at 2.  In a footnote, the government identifies the relevant

document as Bates-stamped pr.review.archer_00020517, and states, "[t]o finance Archer's

purchase of the second tranche of WLCC bonds, Galanis send Archer $15,000, [*sic*] which was

documented as a loan."  *Id.* at 2 n.23.

      But the document identified by the government is not on its crime-fraud log.[13]  Instead,

the crime-fraud log contains two e-mails solely between Mr. Archer, his personal assistant, and a

lawyer with the subject line "wire received" (Entries 110, 111), which are entirely left off of the

---

[13]     The document Bates-stamped pr.review.archer_00020517 is, in fact, on the
"Supplemental Log" attached to the government's March 9 letter, and is therefore one of the
communications with respect to which the government is explicitly not seeking a ruling at this
time.  [ECF No. 338].  As with many of the items on the government's Appendix, the Court
should therefore ignore this entry.  If and when the government moves with respect to this
communication, and if the Court conducts an *in camera* review, it will see that this e-mail has
nothing whatsoever to do with a transfer from Jason Galanis, $15 million, or the WLCC bonds.
In actuality, this document is dated March 2014, more than six months before Mr. Archer
allegedly purchased WLCC bonds with money that Galanis allegedly recycled from the first
(July 2014) bond issuance.

     To take another example, the first page of the government's Appendix describes a
document, Bates-stamped pr.review.archer_00004884, with the subject line "$20 million."  The
government speculates that this communication relates to the WLCC bonds because "$20 million
was, at one point, the anticipated amount of the second WLCC offering," although there in fact
never was a $20 million offering.  Gov. Reply, Appendix at 1 n.20.  The document Bates-
stamped pr.review.archer_00004884 is again not on the government's crime-fraud log (Exhibit B
to its reply brief), and is instead on the Supplemental Log of communications that the
government has informed the Court it is *not* moving on at this time.  [ECF No. 338].  If and
when the government moves, and the Court conducts an *in camera* review, it will see that this
was an e-mail from someone not alleged to be a co-conspirator about a transaction not involving
any of the entities relevant to the charged conduct.  But this is representative of the government's
deeply flawed approach:  it sees something that could *conceivably* be *relevant* to the charged
conduct, and claims, in conclusory fashion, that is has supplied the requisite "probable cause" to
believe the communication was "in furtherance of" the charged conduct.

Appendix.  The "wire received" e-mails on the government's crime-fraud log are dated March

28, 2014 – more than four months before the issuance of the first tranche of WLCC bonds, and

more than six months before the issuance that Mr. Archer allegedly purchased using funds

provided by Jason Galanis, which the government claims came from money recycled from the

first bond offering.  *See* Gov. Reply, Appendix at 1 n.20 (alleging that Mr. Archer purchased the

second tranche on or about October 1, 2014).  Accordingly, there is simply no way that these

communications could possibly be about any alleged $15 million transfer on their face, since (on

the government's theory) the $15 million was not raised until at least late August 2014, after the

first issuance.

Likewise, the government justifies including e-mails – many of which are from and

include numerous non-lawyers who are not alleged to be co-conspirators – generically

concerning some of the entities involved in the charged conduct by asserting things like:

"Atlantic and Hughes were the investment advisers that purchased [the] first and fourth WLCC

issuances on behalf of their clients."  Gov. Reply, Appendix at 4 & n.41 (referring to crime-fraud

log entries 29-45, 73, 79-81, and 105-108).  Obviously, however, the fact that these two entities

are alleged to have been involved in the charged conduct does not mean that every single

communication about them was necessarily "in furtherance of" that scheme.  Moreover, many of

the e-mails relied upon by the government not only are from and include numerous individuals

not alleged to be part of the conspiracy, but are also dated long after the final WLCC bond

issuance in April 2015, and after Jason Galanis's arrest on unrelated charges in the Gerova case

on or about September 25, 2015.  (*See* Entries 31-43, all dated mid-October 2015).  The

government provides no basis for believing that these seemingly generic e-mails involving

numerous non-lawyers not alleged to be conspirators, and which were sent well after the last

bond issuance, have anything to do with the charged conduct, let alone that they are "in furtherance of" it.

Indeed, a staggering number of the e-mails listed on the government's crime-fraud log long post-date the bond issuances around which this case revolves. But despite the fact that the last WLCC bond offering took place, by the government's own account, on or about April 16, 2015, *see* ECF No. 1 at ¶ 56(d), *more than half* of the entries on the government's crime-fraud log – 92 of 179 entries – pertain to communications sent *after* that date, and often several months after that date. *See* Entries 12-46, 49-55, 60-66, 71, 97-99, 105-109, 115-128, 135-148, 150-151, 171, 177-179. It simply cannot be said, then, that these communications were sent "in furtherance of" allegedly fraudulent bond offerings that had already taken place.

In other circumstances, documents on the government's crime-fraud log are entirely omitted from its Appendix. For example, the government's Appendix fails to include an e-mail solely between Mr. Archer and his wife, which is Entry 135 on the crime-fraud log. For good reason, too: although the subject of the e-mail is "Burnham & Co Pitch Deck," there is absolutely no cause to believe that such a marital communication could have been "in furtherance of" the charged conduct. It is not even clear that the crime-fraud exception could apply to communications covered by the marital privilege except in situations where spouses "form a 'partnership in crime'" – something that the government certainly does not claim to be the case here. *United States v. Neal*, 743 F.2d 1441, 1446 (10th Cir. 1984); *see also In re Donald Sheldon & Co., Inc.*, 191 B.R. 39, 49 (Bankr. S.D.N.Y. 1996) ("The purpose of the marital privilege is to encourage domestic peace, and the sanctity of the marital relation. Even under an application of the crime-fraud exception, there is no reason, in this case, to utilize the same standards for its application that is employed in the attorney-client privilege realm. The

25

requirement that the communication be in furtherance of the crime – while relevant in the attorney-client privilege context – is not relevant in that of the marital privilege.").

Simply put, the government cannot be so cavalier about Mr. Archer's privilege.  Its Appendix and log are a mess – the government includes numerous communications that explicitly *are not* the subject of its motion, fails to include numerous communications that *are* part of its motion, and somehow even got the footnotes out of order – and utterly fail to meet its burden of demonstrating that any of the listed communications are "in furtherance of" the charged crimes.  Many of the documents aren't even *about* conduct within the scope of the Indictment.  Indeed, even at this extraordinarily late stage, it remains unclear which documents the government claims the exception applies to.  *See*, *e.g.*, *Jacobs*, 117 F.3d at 88 ("[T]he crime-fraud exception has a narrow and precise application."); *Roe II*, 168 F.3d at 71 ("Given that the attorney-client privilege . . . play[s] a critical role in our judicial system, the limited exceptions to [it] should not be framed so broadly as to vitiate much of the protection [it] afford[s].") (citations omitted); *In re Cty. of Erie*, 546 F.3d 222, 228 (2d Cir. 2008) ("[R]ules which result in the waiver of this privilege and thus possess the potential to weaken attorney-client trust, should be formulated with caution.").

The government's strategy here is clear:  it wants the Court to conduct an *in camera* review and do its job for it.  But as the Court acknowledged at the March 6 hearing, it is not well-equipped to do so; the Court's knowledge of the facts of the case are constrained to the charging instruments and the parties' arguments.  It is for precisely that reason why the government must make a threshold showing in order to be entitled to *in camera* review.  The government has failed to meet that standard here, and its motion should be rejected outright.  *See In re 650 Fifth Ave.*, 2013 WL 3863866, at *2 (finding that government failed to satisfy even "the lesser burden necessary for the Court to order in camera review" because the government's

"annotations and highlights to the . . . privilege logs merely assume the ultimate question and do not independently establish a good faith belief that the documents were created 'in furtherance of' a crime or fraud").

**D.**   *In Camera* **Review Of The Communications Will Demonstrate That The Crime-Fraud Exception Has No Application Here**

For the reasons explained above and in Mr. Archer's prior written and oral submissions, (1) the government has not demonstrated a factual basis to support a good faith belief by a reasonable person that *in camera* review would reveal evidence establishing that the crime-fraud exception applies, and (2) even if the government has demonstrated the requisite factual basis for *in camera* review, the Court should nevertheless exercise its discretion to refuse to undertake such a review, particularly in light of the state of the record that the government has created. But if the Court undertakes such a review of the documents on the government's crime-fraud log, it will be obvious that none of them fall within the crime-fraud exception. Attached as *ex parte* Appendix 1 is a chart discussing the substance of the documents on the government's crime-fraud log, which Mr. Archer respectfully requests that the Court review concurrently with any *in camera* review.[14]

<u>**CONCLUSION**</u>

The Court should deny the government's motion.[15]

---

[14]   Attached as *ex parte* Appendix 2 is a chart discussing the documents on the government's "Supplemental Crime Fraud log." [ECF No. 338]. However, because the government has explicitly not moved with respect to those documents, *see id.*, there is no need for the Court to review the underlying documents (which the Court has received from the government's filter team) at this time.

[15]   At the March 6 hearing, the Court instructed the government, "if you want to be heard either by letter or in a conference" after reviewing this sur-reply, "let me know that." Tr. at 34. With respect, Mr. Archer believes that allowing the government a sur-sur-reply would be

Dated:     March 19, 2018
           New York, New York

                                        Respectfully,


                                         /s/ Matthew L. Schwartz
                                        Matthew L. Schwartz
                                        BOIES SCHILLER FLEXNER LLP
                                        575 Lexington Avenue, 7th Floor
                                        New York, New York 10022
                                        Tel.: (212) 446-2300
                                        Fax: (212) 446-2350
                                        mlschwartz@bsfllp.com

                                        *Attorneys for Devon Archer*

---

inappropriate.  Of course, Mr. Archer has no objection to the Court holding further argument on the motion or addressing any questions to counsel for the parties.