**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

v.

JASON GALANIS,
GARY HIRST,
JOHN GALANIS, a/k/a "Yanni,"
HUGH DUNKERLEY,
MICHELLE MORTON,
DEVON ARCHER, and
BEVAN COONEY,

Defendants.

No. 16 Cr. 371 (RA)

---

## BEVAN COONEY'S OPPOSITION TO THE GOVERNMENT'S MOTION TO ADMIT EXTRINSIC ACTS EVIDENCE UNDER RULE 404(b)

Paula Notari
THE LAW OFFICE OF PAULA J. NOTARI
152 West 57th Street, 8th Floor New York
New York 10019 Tel.: (646) 943-2172
Fax: (212) 980-2968
paulanotari@aol.com

Abraham J. Hassen
O'NEILL / HASSEN
25 Eighth Ave, Suite C
Brooklyn, New York 11217
Tel./Fax.: (212) 203-1858
hassen@oandh.net

*Attorneys for Bevan Cooney*

## **Preliminary Statement**

The defendant Bevan Cooney respectfully objects to the admission of evidence described in the government's letter of March 12, 2018 [ECF No. 339] pursuant to Fed. R. Evid. 404(b). The Government seeks to introduce statements made by Mr. Cooney to City National Bank (hereinafter "CNB Bank") in the spring of 2015, which allegedly contain misstatements of fact.  The government also seeks to admit evidence of Mr. Cooney's involvement in proposed financial transactions relating to Jason Galanis' residence at 1920 Bel Air, Los Angeles, California, even though Mr. Cooney never executed the proposed transactions and they did not result in any change of ownership regarding the property or any financial gain to Mr. Cooney.  Instead of providing a reasoned argument for the introduction of this evidence, the government merely recites a list of statutory factors for admissibility; namely, that the proffered evidence is "inextricably intertwined" with the charges in the Indictment, and that the proffered evidence demonstrates "motive, intent, knowledge, absence of mistake, and modus operandi."  However, the government never provided any of the proverbial meat on these statutory bones.

The Court should preclude this evidence on several grounds:  (1) the government cannot produce competent, admissible non-hearsay evidence that could prove the conduct alleged with regard to both of their offers of "other act" evidence; (2) the allegations are not relevant to the intent findings that the jury must make; (3) even if the Court were to find some slight relevance to this evidence, its limited probative value is substantially outweighed by the danger of unfair prejudice and confusion that the jury could convict based on its belief that Mr. Cooney committed a fraudulent "other act" in a separate, entirely unrelated incident after he purchased the bonds; and (4) the government's proffer would create a burdensome and time-

consuming trial-within-a-trial, which would require Mr. Cooney to call numerous additional witnesses at trial unrelated to the actual charges.

Mr. Cooney joins the arguments of co-defendant Devon Archer's opposition to the government's motion to admit extrinsic evidence pursuant to Fed. R. Evid. 404(b) filed on March 23, 2018 including but not limited to evidence concerning certain of their co-defendants involving: (1) the alleged Code Rebel fraud (2) the "Wisconsin" Bonds (3) evidence about purported false statements in Atlantic and Hughes' SEC filings  (4) Jason Galanis and John Moran's SEC Bars and (5) the Gerova Arrests and Convictions.

With regard to defendant Archer's motion to exclude evidence of the alleged Code Rebel fraud, we join Mr. Archer's arguments and we highlight for the Court that just as in the case of Mr. Archer, any shares of Code Rebel acquired by Mr. Cooney were *not* paid for using proceeds from the WLCC, but were paid for out of his own pocket.  Mr. Cooney was not involved in any "pump" of the shares – as explained in Mr. Archer's opposition motion, and the government hasn't even explained how the pump worked.  And perhaps most importantly, Mr. Cooney like Mr. Archer didn't "dump" any shares either.  Code Rebel's price may have jumped from $5 to $40, but Mr. Cooney never sold any shares and in fact took a complete loss when trading in Code Rebel was ultimately suspended.  To the extent Code Rebel reveals anything about the "relationship" between Mr. Cooney and Galanis, it represents yet another situation in which Mr. Cooney was tricked and used.  If the government is permitted to introduce evidence of the Code Rebel fraud, Mr. Cooney here just like Mr. Archer will have no choice but to introduce extensive evidence of their interactions around the Code Rebel issuance, which are entirely exculpatory.

Finally, in view of the enormous volume of other act evidence and 404(b) material offered against defendants Gary Hirst, John Galanis and Michele Morton, Mr. Cooney

joins Mr. Archer and renews their previous motion for severance filed on January 16, 2018

[ECF No. 290].  Here, the evidence proffered by the government is not admissible against Mr.

Cooney, even if some of it might be admissible against his co-defendants.  For the original

reasons stated in Messrs. Archer and Cooney's severance motion and now in light of the

prejudicial spillover from this evidence-- articulated in Mr. Archer's, March 23, 2018

opposition motion, which will compromise their right to a fair trial.

We additionally join the arguments of Mr. Cooney's co-defendants to the extent

they relate to Mr. Cooney.

## POINT I

**THE PROFFERED "FALSE STATEMENT" EVIDENCE TO CNB IS NOT FALSE, NOR IS IT INEXTRICABLY INTERTWINED WITH THE CHARGES IN THE INDICTMENT. FURTHER, THIS EVIDENCE DOES NOT PROVE A PERMISSIBLE USE UNDER RULE 404(b) AND SHOULD  BE PRECLUDED AS: (1) NOT RELEVANT TO THE ISSUE OF INTENT (2) CONFUSING TO THE JURY, (3) CREATING A DISTRACTING TRIAL-WITHIN-TRIAL, AND (4) IS UNDULY PREJUDICIAL**

### A.    The Statement to CNB  Was Not False and Is Not Inextricably Intertwined with the Charges in the Indictment

The government alleges that in or about June 2015 Cooney obtained a $1.2 million

dollar loan from CNB based on an alleged false financial statement that listed the Wakpamni

Bonds ("the Bonds").   Specifically, the government alleges that Mr. Cooney falsely stated that his

assets included, *inter alia*, $5 million of Bonds and approximately $2 million in stock.  The

government alleges that after Cooney defaulted on his bank loan, he admitted in conversations

with the bank that he had never owned the bonds, and thus could not sell them, and that he had

removed the Bonds from a brokerage account and provided them to a friend. Id. at p. 8.

The government does not explain how this evidence relates to the charged scheme of

inducing the tribe to issue the Bonds.  Rather, in moving for its introduction at trial, the

government resorts to the talismanic claim that it is (i) "inextricably intertwined" with the charges

in the Indictment, and (ii) that it demonstrates "intent, plan, modus operandi and absence of mistake." *Id*. at p. 8.  "Cooney's admission that he had never truly owned the bonds and his admission that he had transferred them to a 'friend' is thus direct evidence of Cooney's participation in the scheme."  *Id*. at p. 8.

      As an initial matter, the government does not identify any witnesses who might be called to testify on the issue of Cooney's alleged false financial statement disclosures and failed to present any documentary exhibits that might be introduced to prove them.  Mr. Cooney denies that the disclosures were false, and if the government were allowed to introduce its claim here, Cooney would be forced to call his own witnesses and introduce extrinsic evidence to counter the government's false claim.

      At the time Mr. Cooney completed the financial statement in question, he did, in fact, own $5 million of Wakpamni Bonds and he additionally owned, *inter alia*, approximately $2 million worth of stock.  See Def. Exhibit B.  More critically, the government has not even identified a Cooney financial statement completed in the Spring of 2015.[1]  The only document the government referred to in its motion is a CNB financial statement dated in January 2015 for a $100,000 line of credit – completely unrelated to the $1.2 million loan Cooney later received in June 2015.  See Defense Ex. B.

      The government ignored that Mr. Cooney had a longstanding relationship with CNB. See Defense Ex. A (letter of reference prepared by Ana Y. Perez, Vice President of CNB on September 12, 2014 stating that Bevan Cooney has been a client in good standing of City National Bank since 2002).  He was on a friendly basis with bankers there, who had previously granted him loans which he repaid.  In January 2015, Mr. Cooney sought a new line of credit.  In support of

---

[1] The government has not offered as proof any of the financial documents which Mr. Cooney filed with CNB bank in connection with the $1.2 million loan.  Accordingly, Mr. Cooney presumes the government is relying upon the financial statement Mr. Cooney filed in connection with a separate loan with CNB in February 2015 for a $100,000 line of credit.  See Defense Exhibit B.

that application Mr. Cooney submitted a financial statement and corroborating records verifying that he owned $1.95 million of Flikmedia (FLKM) stock, in addition to $5 million of Wakpanmi bonds. See Def. Ex. B. At that time, CNB was only able to grant Mr. Cooney a $100,000 line of credit. Certainly, CNB had a full grasp of every aspect of Mr. Cooney's financial portfolio and his assets. CNB handled the majority of Mr. Cooney's assets and they certainly handled significant aspects of Mr. Cooney's transactions concerning the instant charges. For example, Mr. Cooney obtained a loan to purchase the Wakpamni bonds and the money for the Bonds was wired into a CNB account. The Bonds were then physically delivered to the securities division of CNB. Mr. Cooney's Code Rebel Stock was also deposited in an account with CNB Securities Bank. See Def. Ex E. Mr. Cooney also had additional business accounts with CNB for other entities that he managed.

The government's allegation that CNB was somehow misled or told false facts is entirely absurd and not supported by the evidence. In January 2015, CNB having reviewed Mr. Cooney's financial situation (including the Bonds), decided it only could give Mr. Cooney a $100,000 line of credit. However, by June 2015, Mr. Cooney's financial situation changed: the value of his Code Rebel Stock had increased to $11,976,900 million. See Def. Ex. E. In early June 2015, Mr. Cooney spoke with a CNB banker who advised him that based on his changed "stock position" CNB would now be willing to grant him a $1.2 million loan. (email by Bevan Cooney on June 2, 2015 to his money managers at Fulton Money Management: "I spoke with our banker Shapiro at CNB and he thinks he will be able to get me a 1.2 mm bridge loan based on my stock position.") See Def. Ex. D Based on the value of Cooney's Code Rebel stock, which had increased to almost $12 million, and despite CNB also being told that Cooney could not immediately sell this stock until a later date, CNB extended Mr. Cooney a $1.2 million promissory note in June 2015, for a period of six months becoming due on January 1, 2016.

Even assuming arguendo, that the alleged false financial disclosures to CNB were indeed misstatements (which they were not), evidence must be relevant to be admissible and more probative than prejudicial.  United States v. Huddleston, 485 U.S. 681, 689 (1988). Relevant evidence must "add[] context and dimension to the government's proof of the charges," and is admissible "to provide background for the events alleged in the indictment or to enable the jury to understand the complete story of the crimes charged." United States v. Williams, 585 F.3d 703, 707 (2d Cir. 2009) (internal quotations and citation omitted); see also United States v. Huddleston, 485 U.S. 681, 689 (1988) (holding that 404(b) evidence must be relevant to be admissible and more probative than prejudicial).  Mr. Cooney is charged in only one of the two conspiracies alleged in the Indictment, and his role in that single conspiracy is narrower and far less clearly defined than other co-defendants.  Mr. Cooney is not alleged to have had any role in the operations of the investment advisers or underwriters for the Bonds.  Indeed, the primary allegation against Mr. Cooney is that he **bought** certain Bonds in October 2014, which later became worthless.   The government's allegation now that Cooney never, in fact, purchased these Bonds runs counter to its own allegations in the Indictment, and its new claim that Cooney somehow never actually owned these Bonds would act to further confuse the jury and not relate back to the actual charges in the Indictment.  The allegation in the Indictment is that Mr. Cooney allegedly knew that the money he used to purchase the Bonds was "recycled" from the original issuance – not that he never purchased the Bonds in the first place.

The government is also wrong that the alleged misstatements are "inextricably intertwined" with the Indictment's charges.  There is nothing about Cooney's request for a CNB credit line that is necessary to complete the government's story about an alleged fraudulent Bond issuance. See *U.S. v. Ferguson*, 246 F.R.D. 107, 115 (D.Conn.2007); *United States v. Hatfield*, 685 F. Supp.2d 320 (E.D.N.Y. 2010) (district court concluded defendants' alleged

misrepresentations to stock exchange were not admissible because they were not inextricably intertwined with the indictment).

Mr. Cooney's June 2, 2015 email, along with other related emails leading up to the $1.2 million loan, revealed that CNB changed its position and agreed to lend him a more significant amount because of the value of his Code Rebel Stock and not the value of tribal Bonds.  Certainly, these emails confirmed this position of the bank.  The Bonds were identified in earlier (January and February 2015) disclosures by Cooney to CNB and did not give reason for the bank to lend more money to Cooney at that time.  The only asset that comforted the bank to extend more loans to Cooney was the appreciated Code Rebel Stock.

In a case where there is simply no evidence of Mr. Cooney's fraudulent intent— the government is latching onto a theory, which simply put, is refuted by the evidence and must be precluded because it is not only false but highly prejudicial.

**B.** **The Proffered Statement to CNB Bank is Not Admissible Pursuant to Rule 404(b)**

The government does not support its Rule 404(b) motion with any credible explanation of how this evidence helps to prove the permissible uses of knowledge and intent. To the contrary, the government's own proffered reason for the introduction of this evidence – to show how Mr. Cooney lied to the bank about his ownership of the bonds – demonstrates that the government intends to use this evidence for the impermissible purpose of arguing that he has a "propensity" to engage in criminal conduct. Fed. R. Evid. 404; Huddleston, 485 U.S. at 689 (holding that 404(b) evidence must be relevant to be admissible and more probative than prejudicial); United States v. Gordon, 987 F.2d 902, 909 (2d Cir. 1993).[3]

1.  The Legal Standard Under Rule 404(b)

While the Second Circuit has adopted an "inclusionary" approach to "other act" evidence under Rule 404(b), it has emphasized that this rule is "not a carte blanche to admit

prejudicial extrinsic evidence when . . . it is offered to prove propensity." *United States v. Scott*, -- F.3d --, (2d Cir. 2012) (citing *United States v. McCallum*, 584 F.3d 471, 477 (2d Cir. 2009)).

The proper Rule 404(b) inquiry was provided by the Supreme Court in *Huddleston v. United States*, 485 U.S. at 691-92. *See also United States v. Gilan*, 967 F.2d 776, 780 (2d Cir. 1992) (discussing adoption of *Huddleston* test).  Under *Huddleston,* the court must consider whether "other act" evidence:  (1) is being admitted for a proper purpose under the rule; (2) relevant to a material issue in dispute; (3) its probative value is substantially outweighed by its prejudicial effect; and (4) if a limiting instruction can remove any risk of undue prejudice. *Id.*  The statements Mr. Cooney made to CNB do not survive this threshold finding.

On this point, *U.S. v. Cushing*, 2002 WL 1339101, *1–2 (S.D.N.Y.2002) is instructive.  In *Cushing*, the Court rejected the government's efforts to admit evidence concerning a lie told "to a separate investigatory authority on a different subject at a different point in time." Id. The Court held that "[w]hether [the defendant] lied previously makes it no more likely that he knew he made an untruthful statement to the SEC," and would, instead "only tend to demonstrate [the defendant's] willingness to lie to an investigatory authority." Id.  Here the government is essentially trying to mischaracterize the facts to show that because Mr. Cooney allegedly misrepresented his ownership of the Bonds to the bank, it shows his fraudulent intent with regard to his purchase of the Wakpanmi Bonds.  For the reasons stated above, this is simply not true.  CNB was never interested in the Wakpanmi Bonds as an asset.  Here, the government's argument seeks to characterize Mr. Cooney's alleged misstatement to CNB as lies to show knowledge and fraudulent intent while it is nothing more than forbidden propensity evidence.  But, as Cushing found, "[s]uch a result is exactly the type of consequence that Rule 404(b) seeks to preclude." Id.

Finally, even if the Court finds evidence of Mr. Cooney's statements to CNB might, arguably, have some probative value in regards to Mr. Cooney's "intent" other concerns tip against its

admissibility. See Fed.R.Evid. 403, 404(b). Under Fed.R.Evid. 403, the Court may exclude evidence if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Here, the admissibility of the proffered evidence for the reasons argued by the Government is prejudicial, as it suggests Mr. Cooney's propensity to lie and /or commit fraud. See *Cushing*, 2002 WL 1339101 at *1–2. And, in a trial that will already likely last for  4 to 6 weeks and include tens of thousands of pages of witness testimony and exhibits, the CNB evidence will undoubtedly  confuse the jury as to the actual crimes charged, which a curative instruction may not alleviate. Finally, conducting a "mini-trial" as to whether Mr. Cooney lied to CNB will necessarily result in "undue delay," while adducing no evidence concerning whether the he committed the charged crimes.  This evidence is prejudicial and distracting and will consume the court and the jury with wasted time during which Mr. Cooney will be forced to bring in witnesses and evidence to prove that he never lied to CNB bank.   In a case where there is virtually no evidence against Mr. Cooney, the risk that he could be convicted based on the prejudice of this evidence alone weighs in favor of its exclusion by this Court.

### POINT II

**THE PROFFERED EVIDENCE REGARDING MR. COONEY'S INVOLVEMENT IN FINANCIAL TRANSACTIONS  RELATING  TO  BEL  AIR  PROPERTY  IS  NEITHER  INEXTRICABLY INTERTWINED WITH THE CHARGES IN THE INDICTMENT, NOR ADMISSIBLE PURSUANT TO RULE 404(b)**

> **A.** **Mr. Cooney's Involvement in Financial Transactions Relating to Jason Galanis's Residence at 1920 Bel Air, Los Angeles, California is Not Inextricably Intertwined with the Charges in the Indictment**

Here again, the government misrepresents an unexecuted, legitimate, real estate deal—in which  Mr. Cooney made no money—as a "sham transaction." The government uses scare quotes and disparaging language to hide the fact that not only was no crime committed with the Bel Air deal, but no real estate was in fact "sold," nor was any transaction ever completed.

The government contends that throughout the course of the period charged in the Indictment, Jason Galanis lived in a Bel Air mansion in California.  The government seeks to introduce evidence showing that, in approximately November 2014, an entity managed by Dunkerley "sold" this property to Bevan Cooney.  The government alleges that this was a "sham" transaction.

The government contends this evidence is admissible as direct evidence of the charged fraud for multiple reasons: (1) it demonstrates the relationship of trust between Jason Galanis and Cooney; (2) it is direct evidence of Cooney's involvement in the misappropriation of the Bond proceeds for the indisputably fraudulent purpose of buying Jason Galanis's house; and (3) relatedly, it is relevant to show the scope of Cooney's involvement in the scheme and that he was not "simply, at best," a person who "purchased a bond at fair market value."

The government further contends this evidence is also admissible under Rule 404(b) as evidence of Cooney's knowledge of the fraudulent nature of the scheme.

As an initial matter, to be relevant, evidence must "add[] context and dimension to the government's proof of the charges," and is admissible "to provide background for the events alleged in the indictment or to enable the jury to understand the complete story of the crimes charged." United States v. Williams, 585 F.3d at 707 (internal quotations and citation omitted); see also United States v. Huddleston, 485 U.S. at 689 (holding that 404(b) evidence must be relevant to be admissible and more probative than prejudicial).

The government's arguments fail to meet either threshold.  It asserts that Mr. Cooney was involved in a "sham" real estate transaction without adequate proof.  It submits no documentation and cites no legal authority as to the why Mr. Cooney's involvement in the alleged real estate transaction was illegal or fraudulent.

The government's claim that Mr. Cooney must have known that he was accepting misappropriated funds from the Bond issuance merely from the fact that money was wired from the

Wealth Assurance Private Client Corporation ("WAPCC") bank account is left unconnected.  Mr. Cooney like the other victims in this case believed that the WAPCC was an entirely legitimate entity. In fact, the extensive email correspondence that was sent to Mr. Cooney by Jason Galanis regarding the success of WAPCC corroborates Mr. Cooney's reasonable and sincere belief that the money which was wired into his account was not misappropriated money.  The government failed to provide evidence that Mr. Cooney knew or should have known that the money wired into his account relating to the Bel Air property was misappropriated funds.  Consistent with Mr. Cooney's belief, the evidence is overwhelming that Jason Galanis was involved in numerous successful entities like WAPCC that generated profits for successful financial investors.  The government's proffer does not alter this belief.  It failed to provide evidence that would have led Mr. Cooney to know that these profits were anything but the result of legitimate and valuable investment decisions.  Certainly, it was Jason Galanis' *modus operandi* to hold himself out as a legitimate businessman in order to obtain the assistance of innocent parties.

Here again, the emails and documents surrounding Mr. Cooney's involvement with 1920 Bel Air shows that at every turn, Mr. Cooney relied upon the advice of lawyers and real estate professionals.  More importantly, the proposed Bel Air transaction never was executed.   The documentary evidence shows that whatever money was wired into Mr. Cooney's CNB account was wired out the following day to a lawyer's escrow account and eventually the escrow was canceled because the real estate transaction never happened.  Mr. Cooney retrieved the necessary documentation to later show his accountant that the escrow was cancelled and that he was never the recipient of any funds relating to this transaction.  See Def. Ex. F.

The proffered evidence adds nothing to prove that Mr. Cooney engaged in the scheme alleged in the Indictment.  Additionally, Mr. Cooney's limited conduct of holding funds in his account for one day does not provide "background" for the allegations in the Indictment; nor is this evidence

necessary to enable the jury to "understand the complete story" of the crimes charged.  Williams, 585 F.3d at 707.  The government wholly fails to establish a "close parallel" between the crimes charged and these "other acts," dispelling any probative value of such evidence. United States v. Corey, 566 F.2d 429, 431 (2d Cir. 1977). Moreover, if such evidence is precluded, it will not create "gaps" in the government's trial narrative. Williams, 585 F.3d at 708.

We urge the Court to reject the government's contention that this evidence should be singled out to "demonstrates the relationship of trust between Jason Galanis and Cooney."  There are thousands of documents the government can rely upon to show that Mr. Cooney and Galanis were involved in business dealings and that their relationship involved both friendship and trust.

**B.**     **The Proffered Evidence of Mr. Cooney's Involvement With 1920 Bel Air is Not Admissible Pursuant to Rule 404(b)**

The government also does not support its claim for admission of this evidence to prove the permissible uses of knowledge and intent under Rule 404(b).  The government's proffered reason for the introduction of this evidence is that Cooney played the role of "straw purchaser" in a transaction using misappropriated funds.

However, as stated above, the government failed to connect its claim with a showing that Cooney was aware that the funds wired to his account were misappropriated in the first place.  Also, the fact that the transaction was never completed, fails to show that Cooney somehow agreed to play the role of the alleged "straw purchaser."  The ambiguity in the government's proof creates the larger danger that what the government is actually trying to do with this evidence is show the jury that Cooney has a "propensity" to engage in criminal conduct, which is an impermissible use of "other act" evidence. Fed. R. Evid. 404(b); Huddleston, 485 U.S. at 689 (holding that 404(b) evidence must be relevant to be admissible and more probative than prejudicial); United States v. Gordon, 987 F.2d 902, 909 (2d Cir. 1993).

The government seeks permission to introduce evidence of an entirely separate fraud without providing basic disclosure of how the fraud supposedly worked.  The failure to make full disclosure, by itself, is grounds to deny the government's motion, *see* Fed. R. Evid. 404(b), advisory committee's note (1991) ("The court in its discretion may, under the facts, decide that the particular request or notice was not reasonable, either because of the lack of timeliness or completeness. Because the notice requirement serves as condition precedent to admissibility of 404(b) evidence, the offered evidence is inadmissible if the court decides that the notice requirement has not been met."), and could even constitute reversible error, *see United States v. Carrasco*, 381 F.3d 1237, 1241–43 (11th Cir. 2004) (per curiam) (failure to provide notice of Rule 404(b) incidents required reversal of conviction).

Even if this evidence were being offered for a legitimate purpose (which it is not) and was relevant to proving Mr. Cooney's intent with regard to his purchase of the Wakpamni Bonds, it is unquestionably barred by Rule 403.  The high risk of unfair prejudice to Bevan Cooney is obvious: the government seeks to condemn Cooney for his association with Galanis in unrelated transactions rather than produce actual proof of Cooney's participation in the charged conspiracy.  In a case where there is simply no evidence of Mr. Cooney's fraudulent participation in the charged conspiracy, the government seeks to smear Cooney with other transactions that will prejudice him with the jury. [2]

Finally, under Fed. R. Evid. 403, the Court may also exclude evidence if "its probative value is substantially outweighed by . . .  considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  The government asks this Court to conduct a "mini-trial" as to whether Mr. Cooney attempted to participate in a "sham" real estate transaction that involved multiple different corporate entities and the advice and guidance of other professionals, including

---

[2]      Because the government's proffered testimony lacks necessary detail, we respectfully ask the Court to hold a hearing under Rule 104 of the Federal Rules of Evidence outside the presence of the jury before allowing the government to inquire on either of the proffered topics.

broker agents and lawyers.  The litigation of this separate venture will necessarily result in "undue delay," while adducing no evidence concerning whether Cooney committed the charged crimes. Mr. Cooney will be forced to call multiple witnesses at trial about the Bel Air proposal, and issues of advice of counsel will have to be litigated before the Court related to matters that are wholly separate from the charged crimes.

We reiterate that in a case where there is virtually no evidence against Mr. Cooney on the charges in the Indictment, the risk that he could be convicted based on the prejudice of "other act" evidence alone weighs in favor of its exclusion by this Court.  As the Advisory Committee's Note to Rule 404(b) explains, the prejudice associated with character-type evidence is quite real:

> Character evidence is of slight probative value and may be very prejudicial.  It tends to distract the trier of fact from the main question of what actually happened on the particular occasion.  It subtly permits the trier of fact to reward the good man and to punish the bad man because of their respective characters despite what the evidence in the case shows actually happened.

Fed. R. Evid. 404(a), Advisory Committee's Note; see also Michelson v. United States, 335 U.S. 469, 476 (1948) (explaining that character evidence "is said to weigh too much with the jury and to so overpersuade them as to prejudice one with a bad general record and deny him a fair opportunity to defend against a particular charge").   The government is fully aware of the inference it seeks to draw from this evidence.  "Although the government will hardly admit it," its motive for introducing other bad act evidence is "often mixed between an urge to show some other consequential fact as well as to impugn the defendant's character."  United States v. Sampson, 980 F.2d 883, 886 (3d Cir. 1992).

## <u>CONCLUSION</u>

The government's motion should be denied.  To the extent that the Court permits the government to introduce any of its proffered evidence, the Court should sever Mr. Cooney's trial and/or give the jury an appropriate limiting instruction, as the case may be.  In addition, if the Court permits the government to introduce any of the categories of evidence that are the subject of this Motion, Mr. Cooney reserves the right to object to or move to exclude particular exhibits or testimony, as appropriate.

                                        Respectfully,

Dated:      March 23, 2018
            New York, New York              /s/ Paula J. Notari
                                        THE LAW OFFICE OF PAULA J. NOTARI
                                        152 West 57th Street, 8th Floor New York
                                        New York 10019 Tel.: (646) 943-2172
                                        Fax: (212) 980-2968
                                        paulanotari@aol.com

                                        Abraham J. Hassen
                                        O'NEILL / HASSEN
                                        25 Eighth Ave, Suite C
                                        Brooklyn, New York 11217
                                        Tel./Fax.: (212) 203-1858
                                        hassen@oandh.net

                                        *Attorneys for Bevan Cooney*