

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 26, 2018

**BY ECF**
The Honorable Ronnie Abrams
United States District Judge, Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

      Re:    <u>United States v. Jason Galanis, et al.</u>, S1 16 Cr. 371 (RA)

Dear Judge Abrams:

      The Government writes, pursuant to the Court's invitation at the March 6, 2018 conference, in response to defendant Archer's March 19 sur-reply brief regarding the Government's crime-fraud motion. (*See* Tr. 3/6/18 Conf at 34 ("After Mr. Schwartz serves the sur-reply, if you want to be heard either by letter or in a conference, let me know that.")).

      *First*, in a further effort to prevent the Government from obtaining relevant, non-privileged evidence, Archer claims confusion about the documents for which the Government is seeking to invoke the crime-fraud exception. There is no mystery here. The Government is seeking to invoke the crime-fraud exception over the documents listed on Appendix A to its crime-fraud reply brief, plus five additional documents that the Filter Team subsequently identified as potentially falling within the crime-fraud exception.[1]

      *Second*, Archer repeatedly argues the Government has failed to meet the second requirement to the crime-fraud exception: "probable cause to believe . . . that the communications were in furtherance of" the crime or fraud. *In re Richard Roe*, 68 F.3d 38, 40 (2d Cir. 1995). Archer's sur-reply repeatedly incants the applicable legal standards, but in application it ignores them and instead seeks to apply a standard that would essentially eliminate the crime-fraud doctrine.

      The "in furtherance of" requirement, for example, is essentially a question of intent. Intent, of course, is "often established by circumstantial evidence" and "rarely susceptible to direct proof." *See United States* v. *Singh*, 390 F.3d 168, 188 (2d Cir. 2004) (discussing fraudulent intent) (quotation omitted).

---

[1] The Filter Team's supplemental crime-fraud log consists of (i) the documents that are both on Archer's privilege log and listed in Appendix A to the Government's reply brief and (ii) the five subsequently identified documents.

Case 1:16-cr-00371-RA   Document 357   Filed 03/26/18   Page 2 of 5

Page 2

Thus even assuming *arguendo* that the "mere presence of Mr. Archer's alleged co-conspirators on certain communications"[2] or "'temporal proximity between the communication and a crime'"[3] may not be sufficient, standing alone, to justify invoking the crime-fraud exception, taken together these elements can and should be deemed sufficient to invoke the exception.

To hold otherwise would essential render the crime-fraud exception a nullity. The movant on a crime-fraud motion typically has available only, at most, (i) the date of the particular communication,[4] (ii) the sender and recipients of the communication, and (iii) a description of the subject matter of the communication. If these elements, taken together, cannot establish that a communication was "in furtherance" of a fraud, then the crime-fraud exception is a dead letter. That is not the law.

Thus, it is not surprising that Archer's sur-reply (at least the non-*ex parte* portion) fails to address communications (i) in and around key dates in the charged scheme; (ii) involving multiple conspirators; (iii) that, on their face, concern the fraudulent WLCC bond deals, including:

- A May 30, 2014 e-mail from Jason Galanis to Archer, forwarding an email from attorney, forwarding an email from Michelle Morton to Jason Galanis and others "regarding transaction involving Burnham native American municipal bonds" (Entry 2 on Government Crime-Fraud Log);

- A May 30, 2014 email between Cooney and Galanis "discussing forwarded email from Michelle Morton" regarding, *inter alia*, "Burnham native american bonds" (Entry 73 on Government Crime-Fraud Log);[5]

- A September 24, 2014[6] email from Archer's assistant to an attorney, Galanis, and Archer "attaching investor letter, re WLCC 2014 Town Center" (Entry 56 on Government Crime Fraud Log);

- A September 24, 2014 email from Galanis to Archer, Archer's assistant, and an attorney "forwarding email . . . attaching investor letter, re WLCC 2014 Town Center" (Entries 57 and 58 on Government Crime Fraud Log);

---

[2] (Sur-reply at 14).

[3] (*Id.* (quoting *In re Sealed Case*, 107 F.3d 46, 50 (D.C. Cir. 1997)).

[4] Archer's privilege log, however, inexplicably does not include the date of any of the communications listed. (*See* Gov't Reply Br., Ex. A).

[5] Obviously, neither Galanis nor Cooney are attorneys, so it seems doubtful this email is privileged in the first instance.

[6] Archer purchased the second tranche of WLCC bonds just eight days later, on October 1, 2014, using recycled proceeds from the first bond issuance.

- September 24, 2014 email from an attorney to Archer, Galanis, and Archer's assistant regarding the WLCC investor letter (Entry 59 on Government Crime-Fraud Log);

- A September 24, 2014 email form Archer's assistant to an attorney, Galanis, and Archer re "WLCC 2014 Town Center" and attaching "Investor Letter Executed by Archer" (Entries 69 and 70 on Government Crime-Fraud Log);

- A September 24, 2014 email from Galanis to Archer, Cooney, and an attorney re "CUSIP Confirmation: Wakpamni Lake Community Corp . . . ." (Entry 74 on Government Crime-Fraud Log);

- A December 2, 2014 email from Jason Galanis to Archer and Cooney attaching "Letter from Tim Anderson to Hugh Dunkerley, Burnham Securities, re WLCC bonds" (Entries 77 and 78 on Government Crime-Fraud Log); and

- A December 3, 2014 email from Galanis to Archer and Cooney, attaching a letter from Tim Anderson to Hugh Dunkerley re Wakpamni Lake Community Corp bonds (Entries 4 and 5 on Government Crime-Fraud Log).[7]

And Archer's privilege log contains numerous similar e-mails, albeit (inexplicably) without any dates, but which are cited on Appendix A of the Government's reply brief.[8]

Similarly, "probable cause is not a high bar" and "does not require officers to rule out a suspect's innocent explanation for suspicious facts." *Dist. of Columbia* v. *Wesby*, 138 S. Ct. 577, 589 (2018).

Archer, however, repeatedly asks the Court to credit his own "innocent explanation for suspicious facts." For example, he asserts that "the fact that [Hughes and Atlantic, whose clients purchased the first and fourth bond issuances] are alleged to have been involved in the charged conduct does not mean that every single communication about them was *necessarily* 'in furtherance of' that scheme." (Archer Sur-reply at 24 (emphasis added)). But there are sufficient "suspicious facts" regarding Archer's involvement with those entities believe that Archer's communications about them, particularly when they involve a co-conspirator, were in furtherance of the scheme.

---

[7] This email and the previous email do not appear to be privileged at all. The only communication between an attorney and another individual appears to be a communication between Timothy Anderson, Esq. and Jason Galanis. In the parallel SEC civil action, Judge Pauley ruled there was no privilege between Mssrs. Anderson and Galanis. *See* Order, *SEC* v. *Archer*, No. 16 Civ. 3505 (WHP) (Aug. 22, 2016), ECF No. 76. *See Generally* Letter from Jennifer Platzkere Snyder, counsel for Timothy Anderson, to Hon. William H. Pauley III, *SEC* v. *Archer*, No. 16 Civ. 3505 (WHP) (June 20, 2016), ECF No. 17 (disclaiming any attorney-client relationship with either Jason or John Galanis).

[8] To be clear, the Government is not limiting its crime-fraud argument to the emails cited herein.

As to Hughes, in the summer of 2014, defendants Jason Galanis, Archer, and Cooney directed, supported, and financed Michelle Morton's acquisition of Hughes. (See, e.g., Complaint ¶ 39(a)-(n)). Days after acquiring the company, Morton purchased the first tranche of WLCC bonds on behalf of Hughes clients. (Complaint ¶¶ 20, 39(v)).

Morton's acquisition of Atlantic in April 2015, which was also backed by her co-defendants, followed the same pattern. Just days after acquiring the company, she purchased the entirety of the fourth WLCC bond issuance on behalf of one of Atlantic's clients. (Complaint ¶¶ 22, 56(d)). In short, there is strong circumstantial evidence that the defendants acquired both Hughes and Atlantic for the purpose of placing the WLCC bonds and thus communications regarding the acquisition of Hughes or Atlantic were in furtherance of the scheme.

Similarly, Archer also ignores the probable cause standard when arguing that (i) there is nothing remotely illegal about . . . the issuance of bonds, . . . the sale of bonds, or . . . obtaining a shareholding in companies"[9] and (ii) "merely spending money—even criminally-derived money— cannot generally be considered to be 'in furtherance of' the underlying criminal or fraudulent misappropriation,'" Sur-reply at 16. Again, Archer essentially asks the Court to accept his own innocent explanations for, and characterizations of, the facts. But again the Court should not do so under the circumstances here.

Here, a key motive for issuing the bonds was to provide the defendants with a "source of discretionary liquidity" for their other endeavors, including the formation of a financial services conglomerate. (*See* Complaint ¶ 31(d) (citing 7/6/14 email from Jason Galanis to Archer and Cooney stating that counsel for the WLCC had "met and approved the [First Tribal Bond Issuance]. . . [M]y primary objective is to get us a source of discretionary liquidity. sick of begging.")).

In short, the defendants intended to misappropriate the bond issuances from the start. As such, "issuance of the bonds"; "the sale of the bonds" to clients of investment advisers that had been taken over by the defendants; and the acquisition of entities on essentially all sides of the transaction, including the placement agent, the purported annuity provider, and the investment advisers, were all critical parts of the scheme. They allowed the defendants to control the transaction and ensure that the bonds were issued without a hitch and that the money went where the defendants wanted.

Further, Archer and Cooney purchased the second and third bond issuances using recycled proceeds from the first bond issuance. Clearly, that is not "merely spending money"; it is a step in the defendants' scheme. And Archer and Cooney then both attempted to use the bonds to help Burnham Securities and Bonwick Capital meet regulatory net capital requirements. (*See* Complaint ¶ 47(i) ("Burnham began using the $2,600,000 of Tribal Bonds transferred to it by Rosemont via VL Assurance (Bermuda) Ltd. as part of the net capital Burnham, as a registered broker-dealer, was required to maintain under applicable SEC regulations."); ¶ 49(d)). Again, this was not "merely spending money"; it was part of the objective of the defendants' scheme—to use the WLCC bonds to finance and support their other business endeavors.

---

[9] (Sur-reply at 11).

*Finally*, the undersigned are available and happy to answer any additional questions the Court has as it conducts its *in camera* review of emails provided by the Filter Team.

                Respectfully submitted,

                ROBERT KHUZAMI
                Attorney for the United States, Acting Under
                Authority Conferred by 28 U.S.C. § 515

By:  /s/ Brendan F. Quigley
      Rebecca Mermelstein
      Brendan F. Quigley
      Negar Tekeei
      Assistant United States Attorneys
      (212) 637-2360/2190/2442

cc:    All counsel of record (by ECF)