# EXHIBIT 2

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA

 4              v.                         10 Cr. 228 (LTS)

 5   DANIEL BONVENTRE,
     JEROME O'HARA,
 6   GEORGE PEREZ,
     ANNETTE BONGIORNO,
 7   JOANN CRUPI,
                                           Jury Trial
 8                 Defendants.

 9   ------------------------------x
                                           New York, N.Y.
10                                         March 13, 2014
                                           9:50 a.m.
11
     Before:
12
                HON. LAURA TAYLOR SWAIN
13
                                           District Judge
14


15
                APPEARANCES
16

17   PREET BHARARA
          United States Attorney for the
18        Southern District of New York
     MATTHEW L. SCHWARTZ
19   RANDALL W. JACKSON
     JOHN T. ZACH
20        Assistant United States Attorneys

21

     GORDON MEHLER
22   SARAH LUM
          Attorneys for Defendant O'Hara
23


24   LARRY H. KRANTZ
     KIMBERLY A. YUHAS
25        Attorneys for Defendant Perez
```

1  sheets, right?

2  We looked at thousands of -- you saw that there were

3  thousands and thousands of pages of information that

4  Miss Bongiorno created during the course of the time that she

5  was at Madoff Securities. Did we know if she balled up every

6  random sheet? I don't know. You saw one because that's an

7  example of what she did. You also saw all of the fake account

8  information, all of the fake client statements that went out

9  time after time, and there's no dispute it was fake.

10  The randomization was part of her job. It was part of

11  Mr. O'Hara and Mr. Perez's job that they were doing on behalf

12  of Miss Crupi. It was a part of Madoff Securities. It was a

13  critical part, and it's one thing that all by itself exposes

14  that these defendants knew that the trading was entirely fake.

15  What's a fifth reason that you should reject this

16  argument that they didn't know that the trading was fake?

17  Well, what about the fact that the accounts that they managed

18  always managed to get this very consistent, reasonable rate of

19  return? Very consistent rate of return, I think some people

20  talked about, was around 18 percent most years. Some of the

21  articles talked about the fact that Bernie was beloved because

22  he had a consistent rate of return.

23  These people have suggested to you that they believed

24  plausibly that Bernard Madoff could pull any security in the

25  market, going back as far as 12 years, just pick any time that

1  it was bought and any sell date and just add that in and it
2  would be totally legit because he had so much market volume.
3  Well, if he could do that, if they really believed that you
4  could do that at any time, why are the rates of return so
5  consistent?
6           THE COURT:  Mr. Jackson, please be careful about
7  "they" and "these people" in relation to particular issues and
8  accusations.
9           MR. JACKSON:  Absolutely, your Honor.  I'm just trying
10 to be efficient, but I will use names.
11          THE COURT:  Well, justice demands precision.
12          MR. JACKSON:  And all of these demands are reasonable.
13          So just to go back to what we were talking about, why
14 are the rates of return so consistent?  Why don't you see some
15 people just popping off of the charts?  I mean, wouldn't it
16 have been easy for them to just grab Apple stock right before
17 the iPod was invented on any particular day and, you know, put
18 the sell date of now and have a gabillion dollars in any given
19 day, under their understanding of what Mr. Madoff was capable
20 of doing?
21          And they didn't do that, though.  They kept the rates
22 of return for the customers consistent and reasonable.  Why?
23 They wanted it to look realistic.  They didn't want eye-popping
24 numbers that wouldn't look realistic.  That's the only reason.
25          THE COURT:  Is the "they," Madoff Securities?  Is the

1    "they" particular defendants?  Please be precise.

2              MR. JACKSON:  Absolutely, your Honor.

3              THE COURT:  Thank you.

4              MR. JACKSON:  Ms. Crupi and Ms. Bongiorno wanted to

5    keep it looking realistic.

6              Let me move on.  What's another reason that you know

7    that they knew that the trading was fake, that you should

8    reject this argument that they didn't know that the trading was

9    fake?  Well, their own words tell you that.  There was a note

10   that Mr. Riopelle used during the course of the trial.  There

11   was a lot of talk about it, where he referenced Miss Bongiorno

12   writing on something, Don't do anything until you hear from

13   Bernie.

14             Don't do anything until you hear from Bernie, what

15   does that note mean?  Who has to write a note like that to

16   themselves?  A person who will often do things without hearing

17   from Bernie.  I mean, you don't have to write that note if

18   Bernie Madoff is the person who gives you detailed instructions

19   on every single thing that you should be doing.  You do have to

20   write that note if you are an autonomous individual who manages

21   the fake investment advisory business and often makes your own

22   decisions about how things are supposed to go down.  Their own

23   words tell you that they knew that the trading was fake.

24             Let's also look at Government Exhibit 105-B504.  This

25   is the other note.  If you could blow up the top half,

1     I can't emphasize more what the Judge just said.  What
2  I'm saying is argument.  What all the defense attorneys have
3  said is argument.  But what I'm asking you to do is look at the
4  facts, look at the reality of the situation, and probably after
5  we take a break, I want to focus specifically on the subject of
6  what is argument versus reality.

7     And we'll get to that in a moment, but just to tie up
8  the last thing I was saying about the Wall Street Journal
9  articles and the Bloomberg research.  If you think that the
10 trading is actually happening somewhere, why do you need to go
11 to periodicals to research trades?  Wouldn't you, at some point
12 in the decades that you were working there, said, well, let's
13 just get the information from the actual trades?  Whether it's
14 upstairs or in Europe, why don't we just get the information of
15 the actual trades?  Of course you would.

16    You only need to go to the Wall Street Journal to look
17 up historical prices.  You only need to go to Bloomberg to do
18 that if you know that what you're doing is a fantasy, it's all
19 made up, and you can do whatever you want.  The notion that
20 these defendants didn't know that the trading was fake is an
21 absurdity.  It's completely inconsistent with the evidence,
22 with common sense and with logic.  You should reject it.

23    And, your Honor, I could continue, or I don't know if
24 this is --

25            THE COURT:  Yes, we can take our morning break now.

1      MR. JACKSON: Thank you very much, your Honor.

2      THE COURT: Members of the jury, we'll take our
3  ten-minute morning break now. Thank you for your attentive
4  work. Continue to keep your minds open and your thoughts to
5  yourselves. All rise. Ms. Courtney, would you please escort
6  the jury out.

7      (Jury exits)

8      Please be seated for a moment. So, Mr. Jackson, in
9  the rebuttal in a five-defendant case, where there are hundreds
10 of thousands, if not millions, of page of documents, one has to
11 be -- the government has a responsibility to be accurate when
12 it is purporting to describe evidence. To the extent the
13 government is arguing inferences to be drawn from evidence that
14 may or may not literally say what the government is claiming
15 should be inferred from it, that distinction must be made.

16     And so the theys, the things that sound like
17 quotations that may not be, must be very, very careful, and I'm
18 not saying that I know the record well enough to know whether,
19 you know, every single one of the characterizations of the
20 record was spot on or not, but I do know enough to be
21 concerned. And I know that the prudent way to approach this is
22 to say, you know, you should draw from the evidence as to such
23 conclusion.

24     MR. JACKSON: Your Honor, I will definitely endeavor
25 to be as precise as possible. The only thing I would say with

1    regard to the "they," I'm going to definitely add names and may
2    get more precise.  I thought some of the theys I was referring
3    to arguments that I believe all defendants had made, but I'm
4    going to undertake to follow your Honor's good suggestion to
5    add more -- good, good instruction to add more precision.  It
6    may lengthen me out just a little bit, but I'm going to do
7    that.
8            THE COURT:  Very good.  And to the extent you're
9    arguing there was a situation at Madoff Securities and the
10   "they," which it seemed to me sometimes, you can certainly
11   accuse Madoff Securities of whatever you want, but when you say
12   "they" in this courtroom with five individuals here, people who
13   did different functions, that's problematic.
14           MR. JACKSON:  Absolutely, Judge.
15           THE COURT:  Mr. Frisch?
16           MR. FRISCH:  Your Honor, there have been a number of
17   occasions where Mr. Jackson has simply either misstated the
18   records or just made things up.  I'm going to address one of
19   them.  I think Mr. Breslin, possibly Mr. Krantz has another.  I
20   didn't want to object when it happened.  I don't like objecting
21   during an adversary's closing statement.  I may have to change
22   that preference as we go forward.
23           In talking about what was overheard by Ms. Squillari,
24   Mr. Madoff saying to his brother "Mind your own business, Dan
25   knows how everything works," it was plain that was something

1  she heard.  There's no context whatever for it.  I believe, I
2  may have, I don't remember, objected to its admission at the
3  time, certainly questioned it.  And Mr. Jackson now says it was
4  in response to Peter questioning authority over his realm.
5  That's just made up.
6       And I think it might be prudent for the Court to hear
7  what each of us has to say with regards to that.  I request an
8  instruction that that simply isn't in the evidence because it
9  simply isn't in the evidence, and it's a very explosive piece
10 of evidence.  "Dan knows how everything works," we don't know
11 the context, but Mr. Jackson just made up his own context and
12 it's inappropriate.
13          THE COURT:  Mr. Breslin?
14          MR. BRESLIN:  The issue I rose on, your Honor, and I
15 concede that Mr. Jackson, as a matter of fairness, is entitled
16 to a certain.degree of latitude --
17          THE COURT:  You need to talk a little louder because I
18 told Ms. Prater she could stay there.
19          MR. BRESLIN:  Mr. Jackson is entitled to a certain
20 degree of latitude, your Honor, but to say that these
21 defendants controlled the trading, which he said, it not only
22 lumps them all together, but it lumps them all together in
23 something that's utterly fictional, and, really, almost
24 nonsensical after five-and-a-half months.  The idea that any of
25 these -- that there's been any testimony that any of these five

1    the statement means, and it is an argument, but it is one that,
2    on this record and in the context of this case, has to be made
3    as one tied to inference from context, not a supposed
4    description of a scenario that was testified to by the witness.
5             This witness didn't say that she had heard what the
6    argument between Bernie and Peter was about.  She didn't say
7    what Bernie was reacting to there, and your inference and your
8    contextual extrapolation puts in there, as a fact of the
9    testimony about the conversation, that there was some
10   understanding or knowledge or discussion that Mr. Bonventre had
11   dominion over everything and that, of course is a highly
12   contested fact.
13            MR. JACKSON:  I agree, your Honor, it's highly
14   contested.  I think it's a fair extrapolation.  I will endeavor
15   to make a clear delineation between what is argument and what
16   is what a witness said.  I will say, your Honor, I think that
17   each one of the defense counsel during their summations
18   referenced testimony.  They made arguments about what the
19   implications were, what that meant.  There was interpretation
20   of things that were said by Frank DiPascali, what this really
21   meant.
22            THE COURT:  There was a lot of that, and a lot of that
23   was tied to specifically showing the evidence and showing the
24   testimony.  And in both the government's opening and in this
25   argument so far, there is an awful lot of absurd, broad brush,

1  unbelievable, they did everything that's not tied particularly
2  to evidence.  Mr. Riopelle?
3           MR. RIOPELLE:  Indeed, your Honor.  I didn't get a
4  chance to make my objection to Mr. Jackson's statement to the
5  jury that Ms. Bongiorno ran the investment advisory business,
6  which I think way overstates her role.  And, by gosh, right
7  there on Page 2631 of Eleanor Squillari's testimony, we have
8  the following:  Annette worked for Bernie down in what I
9  originally thought was accounting, but it was the investment
10 advisory business.  She worked on the accounts downstairs."
11 That's a fair characterization of what went on.  She worked for
12 Bernie.  She didn't run it.  The evidence is completely
13 contrary to that.
14          THE COURT:  Your broad conclusions, to the extent
15 they're within the ambit of fair argument, and of course I'm
16 not even going to try to parse statement by statement, should
17 be presented as, you the jury can find from the whole body of
18 evidence here X, but don't try to put something in somebody's
19 mouth that wasn't in that person's mouth.
20          And be very careful whom you accuse of what on what
21 basis.  And don't brand each of these people with your
22 institutional thesis.  You have to prove your case with respect
23 to each individual and, obviously, it isn't seriously in
24 dispute that the institution was corrupt.  The question here is
25 whether these individuals knowingly participated in the

1    corruption.  And it is, as you've embraced, the government's
2    burden to prove that, and this is not a situation in which, as
3    with the prior closing arguments any defendants are going to be
4    able to come back and say, well, that had to have been
5    hyperbole because this is what the statement was.  So you have
6    an extra responsibility both of persuasion but of accuracy and
7    precision.
8             MR. FRISCH:  And, your Honor, the reason I request
9    instruction on that particular point, I don't want to be in a
10   position of objecting during Mr. Jackson's summation going
11   forward on something like this, on this statement,
12   Mr. Bonventre knows how everything works, when it's clear
13   Miss Squillari heard nothing else.  That's such a major
14   statement on which the government is relying on, and I objected
15   to it at the time.
16            And I simply ask for an instruction that that
17   statement that Miss Squillari heard was just one thing that she
18   heard, without any other part of the conversation, something of
19   that effect.  Take the sting out of what Mr. Jackson did in
20   that regard.
21            THE COURT:  Let me ask it to you another way.  Are you
22   asking that the particular section of Ms. Squillari's testimony
23   be read?
24            MR. FRISCH:  I hadn't thought of that, but I think
25   that would be another way of doing it.

1　　　　　　MR. RIOPELLE:  Why don't we read 2,631, it's all on

2　　the page for both of us.

3　　　　　　MR. JACKSON:  Your Honor, I'd be happy, when we come

4　　back from the break, to start off by just reading exactly what

5　　Ms. Squillari wrote -- said in the testimony.

6　　　　　　MR. FRISCH:  I guess my only problem with that is now

7　　they're going to hear it twice, and now we're going to hear

8　　another argument about what he said.  This is a problem

9　　Mr. Jackson has created.  I don't know why he had to do it.

10　　　　　　I guess if you're asking me what relief I'm seeking,

11　　the relief I'm seeking is an instruction that Mr. Jackson, in

12　　substance, work on the language, put more in this conversation

13　　than the witness had heard.  All the witness heard was

14　　Mr. Madoff's response, not what the question was or not what

15　　the conversation was about.  That's the request for relief that

16　　I seek.

17　　　　　　(Continued on next page)