**EXHIBIT A**




MATTHEW L. SCHWARTZ
Tel.: (212) 303-3646
E-mail: mlschwartz@bsfllp.com

March 30, 2018

**BY ELECTRONIC MAIL**

Rebecca Mermelstein
Brendan Quigley
Negar Tekeei
Assistant United States Attorneys
U.S. Attorney's Office for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

**Re: *United States v. Galanis*, No. 16 Cr. 371 (RA)**

Dear AUSAs Mermelstein, Quigley, and Tekeei:

Pursuant to Federal Rule of Criminal Procedure 16(b)(1)(C), and in accordance with the parties' agreement regarding the timing of pre-trial disclosures, Devon Archer hereby provides the following notice regarding anticipated expert witness testimony.

John D. Finnerty

Mr. Archer anticipates calling John D. Finnerty, Professor of Finance at Fordham University's Gabelli School of Business. An overview of his qualifications is available at https://www.fiasi.org/fixed-income-hall-of-fame/69/224-dr-john-d-finnerty. We expect to elicit testimony from Dr. Finnerty regarding the following:

- Municipalities often need to raise money for maintenance and improvement projects such as public buildings, infrastructure, new roads, bridges and schools. These projects often cost many millions of dollars.

- A typical way for municipalities to raise these funds are through the sale of bonds to investors.

- These bonds are often sold through private transactions rather than in public offerings, generally to qualified investors who have substantial assets and income.

- These financial instruments are called "bonds," which is really another way of saying a "loan." The municipality borrows the money for a certain amount of time and during the time it has use of the money it pays the bondholder (*i.e.*, the lender) an interest rate, much the same way that a customer of a bank receives interest while the customer's money is on deposit.

- In order to pay bondholders the interest, the municipality has to also generate a return. One way that municipalities generate enough money to pay the interest is





to find an investment that will pay the municipality even more interest. One instrument that does this is called an annuity and many municipalities invest at least some of the money they collect from a sale of bonds into different types of annuities so they can pay the interest to the bondholders *and* have money left over to pay for the projects.

- The amount of time the money is borrowed is referred to as the term of the bond offering or the maturity date. At the time of the maturity date, the principal of the bond has to be returned to the bondholder.

- Native American tribes in the United States, just like municipalities, from time to time need money for projects, and engage in transactions known as tribal bond offerings.

- Like other municipalities, tribal groups typically do not sell their bonds on large markets like the New York Stock Exchange but in smaller more controlled sales called private offerings.

- Tribal bonds also often are not settled through the Depository Trust & Clearing Corporation ("DTCC," formerly known as the DTC). There is nothing unusual or suspect about that.

- Bonds that are sold in this manner are subject to SEC rules that restrict their resale under Rule 144.

- There are certain exceptions to this rule that include resales to qualified purchasers.

- In addition, while the rule imposes restrictions on resales, the bonds may be transferred to another entity in a transaction that is not a sale. That is perfectly lawful under the rules regarding restricted stock.

- Tribal bond offerings are also just a way of borrowing, and they have a term, or maturity date, as well as a promised amount of interest to be paid.

- Collectively, these and other aspects of the bonds are often referred to the "terms" of the bonds.

- The "terms" of the bonds are contained in a set of legal documents generally referred to as the "offering materials," which often include a Private Placement Memorandum.

- Bond offerings also include a document known as a Trust Indenture. The Trust Indenture generally contains the key terms about the bond offering such as how much money will be raised, how long until it is returned, and how much interest will be paid over the life of the offering. These terms are usually important to people considering whether or not to buy the bonds.





- Because municipal or tribal bonds may not be easy to resell (because they do not trade on a stock exchange) most bond purchasers do so for the steady interest. These types of investment are sometimes called "fixed income investments" because they provide a steady stream of interest income over a set period of time.

- The bonds in this case allegedly purchased by Mr. Archer through Rosemont Seneca Bohai LLC were described in the Trust Indenture as being for an amount of $15 million, for a period seven years, with an interest rate of approximately 6% per year. The Trust Indenture also provides that most of the funds were to be invested in an annuity and the surplus of the annuity payments over the interest were to fund the construction of a community center for the Wakpamni Lake Community Corporation ("WLCC"), a tribal entity affiliated with the Sioux Oglala Nation, and other projects to benefit the tribe.

- A second issuance of the bonds in the amount of $5 million was purchased by Mr. Cooney. They were subject to the same terms and intended use.

- Nothing about the terms of any of the WLCC bond issuances or the intended use of proceeds was unusual or would have raised any concerns about the legitimacy of the offering.

- In order to encourage municipalities and tribal entities to engage in such transactions (and make improvements to their communities) there are laws that provide the tribal entities with some form of limited immunity from lawsuits.

- In this case the Sioux tribe was subject to such immunity and thus not subject to any liability in connection with the offering of the bonds, including whatever happened to them in the future.

<u>William Jannace</u>

Mr. Archer anticipates calling William Jannace, Adjunct Professor at the Fordham School of Law and Wharton Business School and former Director and Counsel, Sales Practice Policy at FINRA. An overview of his qualifications is available at https://www.batesgroup.com/experts/william-jannace. We expect to elicit testimony from Mr. Jannace regarding the following:

- Broker-dealers such as JP Morgan, Morgan Stanley and other brokerage firms, are highly regulated entities, and are subject to many rules and regulations, including those that are intended to protect the financial well-being of their customers. The regulations include state regulations and federal regulations.

- The main federal regulations of broker-dealers are written and overseen by the Securities and Exchange Commission. These rules are also enforced by an organization known as the Financial Industry Regulatory Authority, or FINRA.





- One such rule is known as the "net capital rule" or the "minimum net capital rule." The purpose of the net capital rule is to insure, should anything ever go wrong at the broker-dealer, that the broker-dealer would always have enough money to refund all the customers their money.

- Broker-dealers operate in different ways. Some broker-dealers maintain possession of customers' money and the securities they buy. The net capital rules are generally stricter for these types of brokers because if something should go wrong, the customers' money and securities would be directly at risk. These brokers are referred to as "clearing brokers" or "self-clearing brokers."

- Other broker-dealers take orders to buy and sell securities but they do not maintain the customers' money or securities; they pass the orders on to larger broker-dealers to carry out the trades and keep custody of the customers' securities and money. The broker-dealers that do not maintain customers' money or securities are sometimes called "introducing brokers." The regulations for introducing brokers are less strict.

- Clearing brokers have to file reports every month called Financial and Operational Combined Uniform Single, or FOCUS, reports. These reports, among other things, contain a calculation of the broker's "net capital," to show that the broker has enough cash and other liquid assets to be able pay back all its customers if needed.

- "Liquid assets" are investments that could quickly and easily be sold and converted into cash. These include investments with the U.S. government, such as Treasury bills, because there is always a ready market available for Treasury bills.

- Introducing brokers are not required to file FOCUS report as frequently as clearing brokers. Their reports also contain a calculation of net capital, however.

- In calculating net capital, different securities are given different values. Cash is valued at 100% because cash is 100% available to pay someone back if need be. Most other securities are considered less valuable under the net capital rules because they cannot immediately be converted into cash. For net capital calculation purposes, their values are discounted from their fair market value. In the securities industry this reduction is called a "haircut."

- Most securities get a "haircut" of 100% for purposes of calculating net capital. That is, for net capital purposes, most securities' value is exactly zero. While the fair market value of those securities is non-zero, and may be substantial, they are valued at zero for purposes of calculating a broker's net capital position.

- Burnham Securities ("BSI") was an introducing broker, and was subject to less stringent reporting requirements than clearing brokers. BSI only had to file an annual FOCUS report.





- BSI's annual report had to contain a net capital calculation.

- BSI's annual report for the year ended December 31, 2014 showed that it was in compliance, and that it had more net capital than was required.

- BSI was also in compliance with the net capital requirement as of April 2015, when it filed its annual report.

- The WLCC bonds are a type of highly illiquid municipal bonds, which means that, while they have value to some investors, for purposes of calculating net capital, they would have received a 100% haircut and their value would have been discounted to zero. They would have no positive effect on the calculation of BSI's net capital.

- Bonds such as tribal bonds and other municipal securities are subject to restrictions by the SEC limiting their re-sale to qualified purchasers under certain circumstances. The bonds have a warning label on them indicating that they are restricted. However, those rules do not prohibit transferring the bonds to another person or entity. The other person or entity would be subject to the same restrictions on re-sale and the bonds in their possession would carry the warning label.

- Specifically, the WLCC bonds allegedly purchased by Mr. Archer, through Rosemont Seneca Bohai LLC, and by Mr. Cooney carried a restricted legend, and could only be sold or transferred under Rule 144 if the transferee was subject to the same restrictions.

- Rosemont Seneca Bohai's transfer of WLCC bonds to VL Assurance and/or BSI was entirely permissible, and consistent with Rosemont Seneca Bohai's representation letter.

- Mr. Cooney's transfer of WLCC bonds to Bonwick Capital was entirety permissible, and consistent with Mr. Cooney's representation letter.

<u>Paul Atkins</u>

Mr. Archer anticipates calling Paul Atkins, CEO of Patomak Global Partners, LLC and former Commissioner of the U.S. Securities and Exchange Commission (2002-2008). An overview of his qualification is available at https://www.patomak.com/paulatkins. We expect to elicit testimony from Mr. Atkins regarding the following:

- Companies are led by two types of leaders: executive managers and directors. Executives, such as the Chief Executive Officer, President, Vice President, Chief Financial Officer, Chief Investment Officer, and General Counsel are responsible for the day-to-day operation of the company.





- The Board of Directors of the company has a different role. They oversee the executives to make sure that they are performing up to expectation, including meeting the company's projections and targets.

- Directors are also involved in larger decisions involving the company, such as the decision to acquire another company.

- Directors are generally not involved in daily decisions about the company, nor are they aware of them, nor should they be.

- In the financial services industry, entities such as broker-dealers and investment advisers also have executives and directors. The executives are responsible for the day-to-day operation of the companies, including assuring that the company complied with all SEC and other rules.

- The directors would generally not receive information about the daily activities of the firm. For financial services firms, directors would not be expected to be aware of particular transactions, investments, financial products, or customers. It would be highly unusual for directors to be aware of such matters unless, for some specific reason, a member of the executive team elevated it to the board level.

- Directors are instead involved in broad, top level decisions about the business, and receive information of a more general nature that broadly impacts the business. They would not receive information about the day-to-day operations such as individual transactions that were made unless they had a significant impact on the business.

- As a director, Devon Archer would not be expected to be aware of the specifics of any of the particular businesses of the Burnham Financial Group, including the details of the WLCC bonds or the nature of the annuity investment.

- Investment advisers are a type of entity regulated by the SEC. Under SEC rules, investment advisers who control assets over a certain threshold have to register with the SEC and make certain disclosures on a Form ADV. That form contains information about the investment adviser including who the principals are, who the owners are, and who the control persons are. The identification of owners and control persons is defined in the SEC rules, and other people with interests in the investment adviser do not need to be disclosed unless they meet those definitions.

- Hughes Capital Management and Atlantic Asset Management were both registered investment advisers, and each filed a Form ADV. At no point was either Hughes or Atlantic required to disclose Mr. Archer or Mr. Cooney as a direct or indirect owner on Schedule A or Schedule B of the Form ADV.

- SEC cases are often resolved by settlement. In a settlement, absent specific admissions by the defendant, there is no finding of wrongdoing, and the defendant





does not admit to any violations of the law. The significance of the case is often measured by the amount of the fine or penalty that the defendant agrees to pay.

- The significance of SEC cases is sometimes also measured by other remedies that the SEC obtains. In some matters the SEC can seek “lifetime bars” that prohibit individuals from working in the financial services industry ever again. The SEC can also settle for suspensions of a fixed period of time.

- A settled case that has a fixed suspension allows for the individual involved to lawfully re-enter the securities or financial services industry after the suspension has been served. Moreover, other participants in the industry are absolutely permitted to do business with the individual.

- The SEC in general brings a relatively small percentage of cases against recidivists, also known as ‘repeat offenders.’ The fact that an individual settled one case with the SEC in the past does not suggest that he is any more or less likely than anyone else to violate the law in the future.

- In particular, there is nothing about Jason Galanis or John Moran’s historical SEC settlements that would have made it inappropriate to do business with them. To the contrary, their settlements were remote in time and involved relatively modest fines and other terms.

- The Burnham Financial Group “roll up” plan was perfectly lawful and appropriate.

- Companies pursue many different business models to expand in size. Some companies put their efforts into “organic growth” by, for example, trying to increase the number of customers for their existing business lines. For example, Whole Foods might try to increase revenues by persuading customers at other stores to come to Whole Foods.

- Other companies try to expand by acquiring other companies. This is a common and recognized business model. For example, Amazon recently bought Whole Foods in order to increase both the business of Amazon and the business of Whole Foods.

- The growth-by-acquisition model is common in the financial services industry as well. Companies often conclude that people who have an interest in buying insurance might also want to buy stocks and bonds, and vice versa. A bank that provides savings and checking accounts might enter into the credit card business and offer credit cards to its customers. Trying to build a company that had insurance, brokerage, and investment advisory services would not be unusual at all and would be perfectly lawful.






Mr. Archer reserves the right to supplement or amend this notice as he continues to prepare for trial, especially in light of the production of additional government exhibits and 3500 material.

Sincerely,

/s/ Matthew L. Schwartz
Matthew L. Schwartz