UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

MICHELLE MORTON,

           Defendant.

No. 16-cr-00371 (RA)

**DEFENDANT MICHELLE MORTON'S MEMORANDUM OF LAW IN OPPOSITION TO DEVON ARCHER'S AND GARY HIRST'S MOTIONS *IN LIMINE***

ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, New York 10019
(212) 506-5000

*Attorneys for Defendant Michelle Morton*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................... ii

ARGUMENT .......................................................................................................................... 1

I. THE COURT SHOULD ALLOW EVIDENCE OF MS. MORTON'S 2015 STATEMENTS REGARDING THE ALLEGED ONGOING CONSPIRACIES ............ 1

II. THE COURT SHOULD ALLOW REFERENCES TO THE "MINORITY BUSINESS ENTERPRISE" STATUS OF HUGHES CAPITAL MANAGEMENT AND ATLANTIC ASSET MANAGEMENT .................................... 6

    A. Hughes and AAM's MBE Status Is Directly Relevant to Ms. Morton's State of Mind and Critical to Her Defense ............................................................ 7

    B. The Fact That Hughes and AAM Were Minority Owned Carries No Risk of Unfair Prejudice and thus Should Not Be Excluded Under Rule 403 ............... 9

CONCLUSION ..................................................................................................................... 13

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Mena v. Heath*,
  No. 11-cv-3681, 2016 WL 7767005 (S.D.N.Y. May 31, 2016) ..............................................11

*Smith v. Farley*
  59 F.3d 659 (7th Cir. 1995) ..................................................................................................10

*United States v. Biaggi*,
  909 F.2d 662 (2d Cir. 1990) ...................................................................................................5

*United States v. Bowman*
  302 F.3d 1228 (11th Cir. 2002) ............................................................................................10

*United States v. Bueno-Risquet*,
  799 F.2d 804 (2d Cir. 1986) .................................................................................................10

*United States v. DiMaria*,
  727 F.2d 265 (2d Cir. 1984) ...................................................................................................5

*United States v. Doe*
  903 F.2d 16 (D.C. Cir. 1990) ................................................................................................11

*United States v. Harris*,
  733 F.2d 994 (2d Cir. 1984) ...................................................................................................4

*United States v. Kadir*,
  718 F.3d 115 (2d Cir. 2013) .................................................................................................12

*United States v. Pierre*,
  781 F.2d 329 (2d Cir. 1986) ...................................................................................................3

*United States v. Saccoccia*
  58 F.3d 754 (1st Cir. 1995) ..................................................................................................11

*United States v. White*,
  692 F.3d 235 (2d Cir. 2012) ..............................................................................................7, 9

**Other Authorities**

Fed. R. Evid. 403 ................................................................................................................ *passim*

Fed. R. Evid. 801(c) ........................................................................................................................2

Fed. R. Evid. 801(d)(1)(B) ..............................................................................................................3

Fed. R. Evid. 803(3)......................................................................................................2, 3, 4, 6

Defendant Michelle Morton respectfully submits this memorandum of law in opposition to Defendants Devon Archer's and Gary Hirst's motions *in limine* ("Archer Motion" and "Hirst Motion," respectively).[1]

## ARGUMENT

Ms. Morton opposes two of the motions *in limine* submitted by Archer and one submitted by Hirst.[2]  First, Ms. Morton opposes both Archer's and Hirst's motions to preclude her 2015 statements related to the alleged ongoing conspiracies.  *See* Archer Mot. at 19; Hirst Mot. at 3.  Second, she opposes Archer's motion to preclude certain references to the Minority Business Enterprise status of Hughes Capital Management ("Hughes") and Atlantic Asset Management ("AAM").  *See* Archer Mot. at 7.  For the reasons stated below, the Court should deny these three Motions.

### I.    THE COURT SHOULD ALLOW EVIDENCE OF MS. MORTON'S 2015 STATEMENTS REGARDING THE ALLEGED ONGOING CONSPIRACIES

On April 2, 2018, the government moved *in limine* to preclude Ms. Morton from introducing evidence of her 2015 efforts to assist federal authorities.  The government's motion sought to whitewash the past.  Defendants Archer and Hirst now seek to piggyback on the government's efforts to scrub the past of facts that demonstrate that Ms. Morton was not a participant in any alleged conspiracy.  Hirst and Archer ask the Court to preclude (1) any evidence of Ms. Morton's participation in the government's investigation, whether or not offered

---

[1] Ms. Morton also opposes Mr. Cooney's motion to join the arguments set forth by Archer and Hirst. (ECF No. 401)

[2] Archer and Hirst submitted additional motions *in limine*, which Ms. Morton does not oppose.  Ms. Morton joins Archer's motions *in limine* requesting that the government not be permitted to refer to "the defendants" unless it really means all the defendants (at I) and that the Court should require the parties to be precise when referring to various similarly named entities in the case (at II).

1

by Ms. Morton (including a December 2015 letter Ms. Morton wrote to AAM's clients) (Archer Mot. at 19); and (2) GX 1403, a November 2015 letter from Ms. Morton to David Chamowitz, an attorney, in which she expressed her views as to events that the government charges were part of multiple ongoing conspiracies (Hirst Mot. at 3).

       That Archer and Hirst jumped at the opportunity to preclude evidence of Ms. Morton's assistance to the government in an investigation into their own alleged wrongdoing is unsurprising. But Hirst's and Archer's obvious preference that the evidence contain only facts that are not detrimental to their defenses does not make Ms. Morton's statements to authorities, an attorney, and AAM clients inadmissible at trial. To the contrary, as Ms. Morton explained in detail in her Memorandum of Law in Opposition to the Government's Motions *In Limine* (ECF No. 391), her statements in 2015 regarding the allegedly ongoing conspiracies are admissible as non-hearsay or under Federal Rule of Evidence 803(3)'s hearsay exception.[3]

       First, Ms. Morton's statements are admissible as non-hearsay to the extent Ms. Morton does not offer them to prove the truth of the matter asserted in the statements. *See* Fed. R. Evid. 801(c). There are a number of reasons why Ms. Morton's statements are relevant to the charges against her without Ms. Morton using them to prove the truth of the matters asserted. These statements will (1) show what she knew or thought she knew (regardless of whether it was true); (2) demonstrate that she assisted law enforcement; (3) show what she communicated to her investment advisory clients during the course of an alleged conspiracy to commit investment adviser fraud; and (4) serve as circumstantial evidence of her state of mind at various times

---

[3] Because Ms. Morton set forth these arguments in detail in her opposition to the government's motions *in limine*, they will only be briefly restated here.

2

during the course of the alleged misconduct.  Used for these evidentiary purposes, Ms. Morton's statements are not hearsay and thus are admissible at trial.[4]

Second, Ms. Morton's statements are admissible under Rule 803(3) as statements of her then-existing state of mind.  In particular, the statements will show Ms. Morton's mindset, intent, and motive at the time she approached and began assisting law enforcement, when she communicated with Mr. Chamowitz regarding her concerns, and when she sought to assure her clients as to the propriety of AAM's business.  Hirst argues, as the government did with respect to her statements to law enforcement, that the letter to Mr. Chamowitz is inadmissible under Rule 803(3) because it "look[s] backwards" and thus cannot speak to her contemporaneous state of mind.  Hirst Mot. at 4.[5]  Unlike the government, however, Hirst reasons that "Ms. Morton was clearly looking backwards *to a conspiracy from which she had already withdrawn* . . . ."  Hirst Mot. at 4 (emphasis added).  Although Hirst evidently intends to argue that Ms. Morton had withdrawn from the conspiracy by November 2015, the government charges Ms. Morton with conspiring to commit fraud through April 2016.  Hirst, try as he might, does not get to determine the scope of the conduct with which Ms. Morton is charged.  The government has already done

---

[4] Should Ms. Morton testify at trial, her statements could also be admissible non-hearsay as prior consistent statements.  Fed. R. Evid. 801(d)(1)(B).  Ms. Morton has consistently professed her innocence dating back years, and the statements at issue here will support her continued assertion that she lacked the requisite awareness and intent to commit the crimes charged.  First, these statements will be admissible as substantive evidence to rebut challenges to her credibility because she made the statements under the belief that she had done nothing wrong and thus had no motive to testify falsely at trial.  *See, e.g.*, *United States v. Pierre*, 781 F.2d 329, 330-31 (2d Cir. 1986).  In fact, as Ms. Morton has informed the Court, when she began assisting law enforcement she learned that the authorities viewed her more akin to a witness than to a target of the investigation.  Morton Affidavit, ECF No. 299.  Second, these statements may be used to rehabilitate Ms. Morton if necessary.  *See, e.g.*, *Pierre*, 781 F.2d at 333.  Until Ms. Morton testifies, if she elects to do so, there is no basis for determining whether the statements at issue may be used as prior consistent statements.

[5] Archer makes the same argument in a single conclusory sentence.  *See* Archer Mot. at 21.

3

this, and Hirst must now follow the indictment as written, not as he would like it to be. As Ms. Morton explained in her opposition to the government's motion, Ms. Morton's statements demonstrate her *present* state of mind with respect to allegedly continuing misconduct *at the time she made the statements,* which is during the alleged conspiracies. The cases to which Hirst cites to support his self-serving and yet unsupportable assessment of Ms. Morton's supposed post-conspiratorial statements demonstrate a profound lack of understanding of the timeline of the alleged conspiracies and the government's view of the defendants' participation in it. Ms. Morton is alleged to have participated in the conspiracy for the same length of time as Hirst participated, and therefore any statements she made during that time period reflect her then state of mind and are not backward looking. Thus, Ms. Morton's letter to Mr. Chamowitz and other statements relating to her assistance to law enforcement (including her letter to AAM's clients) are admissible under Rule 803(3).[6] *See, e.g., United States v. Harris*, 733 F.2d 994, 1004 (2d Cir. 1984).

Third, like the government, Archer and Hirst call into question Ms. Morton's credibility and truthfulness. They deride her efforts to assist the government and, naturally, her honesty regarding Hirst's and Archer's alleged misconduct, including her comments to Mr. Chamowitz

---

[6] Ms. Morton intends to show that she never joined any conspiracy. Hirst contends that Ms. Morton joined a conspiracy but withdrew as of June 2015 when she contacted FINRA. And the government alleges that despite the fact that she reached out to the government, voluntarily met with its agents multiple times, recorded certain defendants for the government, permitted the USAO to copy the contents of her cell phone, and generally assisted the government's investigation for several months, she continued to conspire with her codefendants for many months yet. That none of the parties can agree on the timing of Ms. Morton's alleged participation in the charged conspiracies is exactly why this evidence is so important to this case—Ms. Morton's state of mind at various points from 2014 through 2016 is essential to establishing whether or not she participated in a conspiracy and, if the government proves that she did, when she participated in that conspiracy. The government established the scope of the alleged conspiracy and neither it nor Hirst can wish away the actual facts that undermine their respective false narratives.

4

and AAM's clients. But Hirst and Archer are not entitled to judge Ms. Morton's credibility; it is the province of the jury to determine the interpretation and credibility of a defendant's exculpatory statements. *See, e.g.*, *United States v. DiMaria*, 727 F.2d 265, 272 (2d Cir. 1984). The mere fact that the government has alleged wrongdoing in this case is not indicative of any falsehood with respect to Ms. Morton's statements. Until the jury renders a verdict in this case, the government's allegations are merely legal and factual theories that remain unproven. Neither Hirst nor Archer can defend against these allegations for themselves while promoting the truth of these allegations to discredit Ms. Morton's positions and preclude them from admission at trial. Ms. Morton, contemporaneously with the alleged conspiracy, viewed Hirst and Archer as participants in a scheme to defraud AAM's clients; Hirst and Archer decry this evidence as self-serving. Were it not so disingenuous, it would be comical that Hirst and Archer call Ms. Morton's statements self-serving in what can only be described as their own transparently self-serving effort to exclude damaging evidence from coming before the jury. Regardless of Hirst's and Archer's fear of Ms. Morton's statements, it is only the jury's opinion that matters here.

Lastly, Ms. Morton's statements are directly relevant to whether or not she formed the necessary criminal intent with respect to any charge against her. Such consciousness of innocence evidence is relevant and admissible. *See, e.g.*, *United States v. Biaggi*, 909 F.2d 662, 691-92 (2d Cir. 1990). Moreover, as noted above, the statements speak directly to Ms. Morton's participation in the alleged conspiracies. Like the government, Archer makes an unsupported argument that this evidence will "hopelessly confuse the jury and unduly prejudice Mr. Archer." Archer Mot. at 21. Because Archer makes a conclusory statement regarding jury confusion, but fails to articulate what that confusion would stem from, the Court should pay little heed to this argument. Moreover, the unquestionable relevance of Ms. Morton's statements outweighs any

5

risk of hypothetical jury confusion or prejudice with which Archer is concerned, and her statements thus should not be excluded under Rule 403.

Because Ms. Morton's assistance to the authorities and statements she made around that time to the authorities, AAM's clients, and Mr. Chamowitz are admissible either as non-hearsay or under Rule 803(3), and because they are relevant both to Ms. Morton's intent and to her involvement in the alleged conspiracies, Ms. Morton respectfully submits that the Court should deny Archer's and Hirst's motions to exclude this evidence.

## II. THE COURT SHOULD ALLOW REFERENCES TO THE "MINORITY BUSINESS ENTERPRISE" STATUS OF HUGHES CAPITAL MANAGEMENT AND ATLANTIC ASSET MANAGEMENT

Archer seeks to preclude certain references to the "Minority Business Enterprise" ("MBE")[7] status of Hughes and AAM.  Archer Mot. at 7.  Hughes and AAM were majority-owned by GMT Duncan (later called Atlantic Capital Holdings), which qualified as an MBE as a result of Ms. Morton's ownership of the company.  Archer reasons that certain references to this undisputed fact should be withheld from the jury because it is either irrelevant or would cause him undue prejudice.  Specifically, Archer contends that the jury will infer from the fact that these entities were minority-owned that he and other alleged coconspirators "took advantage of the rules surrounding minority owned business, or more generally took advantage of minorities." *Id.* at 8.  Archer, however, cannot rewrite history.  Hughes and AAM were minority-owned businesses, and Archer discussed this fact with Jason Galanis, which is evidenced by the specific references Archer seeks to preclude.  In turn, Jason Galanis discussed the MBE aspect of the venture with Ms. Morton.  Moreover, it is simple truth that Ms. Morton owned 51% of both

---

[7] An MBE is also, in certain cases, referred to as an "MWBE," or Minority and Woman-Owned Business Entity. Though Ms. Morton qualifies for both as a minority woman, for purpose of this Opposition, we refer to the MBE certification consistent with Archer's Motion.

6

entities after their purchase, and evidence of this fact cannot and should not be kept from the jury. This uncontroverted business fact is highly relevant to the charges in this case and critical to Ms. Morton's defense because it evidences that Jason Galanis targeted Ms. Morton precisely for this purpose. It is farfetched, at best, to suggest that Ms. Morton's race and gender as a business owner will have any impact on Archer at all, let alone that it will severely prejudice him. The Court should therefore deny Archer's Motion and allow all evidence that Ms. Morton's businesses were minority-owned and accordingly certified.

### A. Hughes and AAM's MBE Status Is Directly Relevant to Ms. Morton's State of Mind and Critical to Her Defense

Archer claims that the fact that Hughes and AAM were MBEs "is irrelevant to the charged conduct here and will be of no probative value at trial." Archer Mot. at 8-9. In particular, he claims this evidence is irrelevant "because there is no allegation that anyone broke any laws relating to MBEs." *Id.* at 10. He bases his conclusion upon his reading of the Complaint and Indictment, the government's trial exhibits, and the 3500 material. *Id.* at 8.

Archer misses the point. Even if Hughes and AAM's MBE status is not facially central to the government's case based on the material listed above—or to Archer's defense of the case—that does not mean it is irrelevant. There are five defendants in this case and each will have independent arguments and evidence to present in his or her defense. Evidence carries probative value if relevant to a defense argument just as it does if relevant to the government's case. *See, e.g.*, *United States v. White*, 692 F.3d 235, 247 (2d Cir. 2012) ("We find, therefore, that evidence of the Government's charging decisions was relevant to the issue of possession at trial; the decisions were probative of [the defendant's] innocence and were central to his defense.").

7

For Ms. Morton, a primary element of her defense will be that she lacked the requisite state of mind to have committed the crimes alleged. Central to that defense is her motivation for acquiring Hughes and AAM, her goals with respect to those companies and the placement of the bonds, and her relationship with Jason Galanis and other alleged conspirators. In particular, Ms. Morton expects the evidence to show that she acquired Hughes and AAM with the immediate purpose of leading minority-owned business ventures; that she sought to use her MBE businesses to aid underserved minority populations; that she began a business relationship with Jason Galanis in order to further those efforts; that she trusted Jason Galanis precisely because he expressed a desire to help her further those efforts and evidently shared Ms. Morton's same values; and that they discussed the new business ventures that would be available to Hughes and Atlantic because they qualified as MBEs. As Archer himself concedes, the fact that Hughes and AAM were MBEs "was apparently something that Jason Galanis found desirable." Archer Mot. at 8.

Archer seeks to exclude or redact the exact portions of GX 2029, 2030, and 2213 which demonstrate this point and are crucial to Ms. Morton's defense at trial:

> [Hughes Capital Management] is a minority owned firm now, and will continue to be so with our partner, Michelle Morton. There are a great number of minority opportunities for affirmative action type of allocations to a fixed income shop like this. the group we are sponsoring are amazing marketers with a track record in the institutional world. Richard raised $6bn for his last firm, which was hispanic owned. this is black woman which i am told there are more mandates for.

Archer argues that this paragraph should be redacted because it "shows Galanis pushing an investment in Hughes Capital Management primarily because of the benefits inherent in its MBE status…" Archer Mot. at 10.[8] But this is exactly the reason Ms. Morton seeks to have it

---

[8] Archer makes the same argument for GXs 2018, 2019, and 2207. *Id.* at 11.

8

admitted. This evidence helps establish that Jason Galanis viewed Ms. Morton as a means to an end and tends to show that she was on the outside of the conspiratorial group looking in, rather than being among Galanis's inner circle.

That Hughes and AAM were minority-owned is directly relevant to Ms. Morton's state of mind, her conduct with respect to the bonds, and her motivations with respect to relationships with the other alleged conspirators. Further, it shows Jason Galanis's motivation in targeting Ms. Morton as a victim of his intended fraudulent scheme. That fact is thus not only relevant to Ms. Morton's case but critical to her defense and, therefore, must be presented to the jury. *See White*, 692 F.3d at 247-48.

### B. The Fact That Hughes and AAM Were Minority-Owned Carries No Risk of Unfair Prejudice and thus Should Not Be Excluded Under Rule 403

In light of the high degree of relevance this evidence carries, there is no basis for its exclusion under Rule 403. To warrant exclusion under Rule 403, Archer must not only demonstrate an actual risk of unfair prejudice, but that risk must *substantially* outweigh the probative value of the evidence. Fed. R. Evid. 403. Here, Archer contends, without support, that providing the jury with a complete and accurate explanation of Ms. Morton's business ventures and goals will be "incredibly inflammatory." Archer Mot. at 7. In truth, the facts Archer seeks to exclude concern business matters and, at most, touch upon race only tangentially. For example, GX 2069 contains an email in which Jason Galanis states that "proprietary things" include "1) municipals for tribal governments, 2) latin American credit desk, 3) *minority asset maageemnt* [sic] and sales and trading, 4) archer cross border advisory (china, KZ), 5) permanent capital vehicles like BDC, 6) 22 year track record inheritance from Fondinvest." Archer Mot. Ex. 9 (emphasis added). To the extent the term "minority asset management and sales and trading" touches upon the issue of race, it certainly could not introduce the "highly

9

inflammatory racial dynamics" of which Archer warns. *Cf. United States v. Bueno-Risquet*, 799 F.2d 804, 814 (2d Cir. 1986) ("The probative value of the testimony that Bueno-Risquet obtained weapons from Zarate's house in order to chase away a rival group of black drug dealers outweighs any prejudicial impact. As the government suggests, 'the evidence did not concern racial rivalries; it concerned business.' The district court acted within its discretion under Fed. R. Evid. 403 in admitting the evidence.").

Tellingly, the cases Archer relies upon—all from outside the Second Circuit—address (1) the exclusion of blatantly racist or offensive evidence; (2) evidence the court deemed admissible under Rule 403; or (3) both. In *United States v. Bowman*, the court excluded "gratuitous references to race" in a case not involving any racially motivated crimes—specifically, the defendant's "allegiance to a racist organization not relevant to his guilt or innocence" and a "whites-only policy" written into that organization's constitution. 302 F.3d 1228, 1239-40 (11th Cir. 2002).

*Smith v. Farley* addressed a prosecutor's closing argument—in a murder case in which the defendants were black while the murder victim, the judge, the prosecutor, and the entire jury were white—stating that a black witness was "shucking and jiving" on the stand and that a black defendant was acting like "super-fly." 59 F.3d 659, 663-64 (7th Cir. 1995). The court engaged in a lengthy discussion of the racial origins of the terms, in particular noting that "[t]he racial character of 'super-fly' (more properly "Superfly") is unmistakable. The reference is to the eponymous hero of a 1972 movie . . ., a black dealer in cocaine who seeks to neutralize the police by hiring the Mafia to kill the police commissioner's [children] should the need arise, and who succeeds in getting away with his crimes." *Id.* at 664. The court still determined that the

10

statements did not create an "atmosphere of intimidation" so as to conclude that the defendants were denied a fair trial.

In *United States v. Saccoccia*, the defendant sought to exclude "impermissibly suggestive innuendo and stereotypes about Colombians." 58 F.3d 754, 774 (1st Cir. 1995). In allowing the evidence, the court explained that Rule 403 "does not mean, however, that *all* evidence touching upon race or national origin automatically must be excluded. A trial involves a search for the truth, and, as such, it cannot be entirely antiseptic. The trick is to separate impermissible uses of highly charged evidence from those uses that are proper and permissible." *Id.* (emphasis in original).

Lastly, in *United States v. Doe*, defendants sought to exclude the prosecutor's lengthy discussion of the drug-related activities of Jamaicans during closing argument. 903 F.2d 16, 23 (D.C. Cir. 1990). In small part, the prosecutor stated: "And what is happening in Washington, D.C. is that Jamaicans are coming in, they're taking over the retail sale of crack in Washington, D.C. It's a lucrative trade. The money, the crack, the cocaine that is coming into the city is being taken over by people just like this-just like this." *Id.* at 24. In quoting the *Doe* court for the proposition that "appeals to racial passion" can affect a juror's impartiality, Archer's Motion omits the crucial next sentence of the opinion: "We speak, of course, only of racial comments beyond the pale of legally acceptable modes of proof." *Id.* at 25.

Archer trumps up a racially charged atmosphere where none exists. Unlike the evidence from the cases upon which Archer relies, the business-related evidence Archer seeks to exclude here simply cannot create the type of severely undue prejudice that warrants exclusion under Rule 403. *See Mena v. Heath*, No. 11-cv-3681, 2016 WL 7767005, at *11 (S.D.N.Y. May 31, 2016), *report and recommendation adopted*, 2017 WL 167915 (S.D.N.Y. Jan. 13, 2017) ("Mena

11

is correct that he was not charged with any hate crimes that would have directly put at issue his racial views. Moreover, the statements that he made obviously painted him in a bad light. Nevertheless, New York law does not require the suppression of prejudicial evidence unless its prejudice "substantially outweighs" its probative value. The federal rule is, of course, the same.") (internal citations omitted). The mere fact that Ms. Morton is a black woman and owned the businesses in question is not at all inflammatory. There is thus no legitimate basis to claim it is so highly inflammatory as to substantially outweigh the relevance to Ms. Morton's defense and other key issues in this case.

In reality, Archer seeks exclusion of undisputed facts because they will tend to support Ms. Morton's defense that she unknowingly and involuntarily may have been linked to a fraud, and that Jason Galanis may have had several motives in entangling Ms. Morton within his web of deceit. This, in turn, may work to establish that Jason Galanis's cohorts knew of her lawful and altruistic business goals and sought to exploit them. Archer Mot. at 8 (speculating that Ms. Morton "apparently intends to point the finger at her codefendants").[9] That an undisputed fact may tend to prove the very charges levied by the government does not make it unduly prejudicial so as to trigger the protections of Rule 403. *United States v. Kadir*, 718 F.3d 115, 122 (2d Cir. 2013) ("The defendants wanted to exclude this testimony because it was detrimental to their case, but evidence is unduly prejudicial only when it tends to have some adverse effect upon a

---

[9] While it is not unreasonable for Archer to assume that Ms. Morton intends to demonstrate the distinctions between herself and those who worked with Jason Galanis prior to Ms. Morton ever knowing Galanis, this will not be tied to race or gender. Ms. Morton has no intention of arguing that she is not guilty because she is a black woman; she will argue she is not guilty because she never knowingly participated in the crimes of the other defendants.

defendant beyond tending to prove the fact or issue that justified its admission into evidence.").[10] Ms. Morton fails to see how her status as a black, female business owner is at all prejudicial to Archer or anyone else.

\* \* \*

## CONCLUSION

For the foregoing reasons, Michelle Morton respectfully requests that the Court grant the relief requested herein.

Dated: New York, New York
       April 18, 2018

Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP

By: _____
Gregory Morvillo
Savannah Stevenson
Caitlin Sikes
51 West 52nd Street
New York, New York 10019
(212) 506-5000

*Attorneys for Defendant Michelle Morton*

---

[10] In a footnote, Archer expresses concern as to evidence of false statements in the Forms ADV for Hughes and AAM. Ms. Morton does not intend to use evidence that Hughes and AAM were MBEs in order to show that Jason Galanis, Bevan Cooney, and/or Archer controlled those companies. Indeed, Ms. Morton's defense is that Galanis and others did not control her businesses. Thus, Ms. Morton does not object to the Court issuing limiting instructions to preclude this evidence from being used to establish that Galanis, Cooney, and/or Archer controlled the companies.

13