

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 19, 2018

**BY ECF**

The Honorable Ronnie Abrams
United States District Judge
40 Foley Square
New York, NY 10007

      Re:    **United States v. Gary Hirst, et al.,**
                     **16 Cr. 371 (RA)**

Dear Judge Abrams:

The Government writes to further address the admissibility of (i) evidence of Jason Galanis, Gary Hirst and John Galanis's Gerova convictions; and (ii) Cooney's misstatements to City National bank concerning his ownership of the Wakpamni bonds. For the reasons set forth below, such evidence is admissible as direct evidence, or in the alternative, as 404(b) evidence and should be admitted at trial.

<b>The Gerova Convictions</b>

The Government respectfully submits that Gerova-related evidence is relevant against John Galanis and Gary Hirst.

**I.  Applicable Law**

The Second Circuit has long held that prior criminal conduct between or among co-conspirators is relevant to show the nature of the relationship between those co-conspirators. A quarter of a century ago, the Court of Appeals noted that "we have held repeatedly that it is within the court's discretion to admit evidence of prior acts . . . to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators." *United States* v. *Rosa*, 11 F.3d 315, 334 (2d Cir. 1993) (collecting cases). These principles remain in effect to the present day. *See, e.g.*, *United States* v. *Gracesqui*, No. 17-0363-CR, 2018 WL 1633696, at *3 (2d Cir. Apr. 5, 2018) (affirming admission of prior bad acts involving defendant and co-conspirators, noting "[w]e have previously permitted similar background evidence to show the evolution of the relationship between participants in the crime,

and demonstrate how discussions of extreme criminal activity—that might otherwise seem farfetched—were not atypical for the defendant").[1]

It also well-settled that evidence of prior criminal conduct between or among co-conspirators can be relevant to issues of knowledge and intent, and relatedly, absence of mistake. *See, e.g.*, *United States* v. *Paulino*, 445 F.3d 211, 223 (2d Cir. 2006)

## II.   Discussion

### A.   Gerova-Related Evidence is Relevant and Admissible

Here, the level of the defendants' knowledge and their intent, and the nature of their relationships, will likely be the central issues at this trial.  This is so because there is no dispute that each of the defendants was involved in various aspects of the Wakpamni bond transactions. John Galanis, for example, made representations to the Wakpamni tribe to induce them to issue the bonds.  Gary Hirst executed the purchases of the first tranche of bonds on behalf of clients of Hughes Capital.  Their defenses appear to largely be premised on the idea that, despite their actions, they did not know they were participating in a fraudulent scheme.[2]

#### 1.   Gerova-Related Evidence is Relevant to Show the Nature of the Relationship Between the Co-conspirators

First, Gerova-related evidence is relevant, because even if there is other evidence that Jason Galanis had a prior relationship with John Galanis or with Hirst, the Gerova-related evidence is

---

[1] There is an inconsistency in the case law as to whether evidence offered to establish the nature of the relationship among co-conspirators should be treated as direct evidence or admissible other act evidence under Rule 404(b).  *Compare United States* v. *Diaz*, 176 F.3d 52, 79 (2d Cir. 1999) (treating such evidence as direct evidence) *with United States* v. *Rosa*, 11 F.3d at 333 (2d Cir. 1993) (treating such evidence as admissible pursuant to Rule 404(b)). Practically speaking, the basis upon which any Gerova-related is admitted here should have little bearing here, because the Government does not object to the Court instructing the jury (as it would be required to do upon defense request under Rule 404(b)) about the limited purposes for which the evidence is being offered.

[2] *See, e.g.,* John Galanis Opp'n to Gov't Rule 404(b), ECF No. 352 at 3 ("Galanis is not denying knowledge of the Native American bond deal or his participation it it."); Hirst Mem. of Law in Support of Motion for Severance, ECNF No. 287 at 4 ("The Superseding Indictment does not allege that Mr. Hirst ever met with the WLCC, or that Mr. Hirst *was aware* of John and Jason's meetings with the WLCC, or that Mr. Hirst *was aware* of any misrepresentations by John and Jason to the WLCC . . . .  It is not alleged, however, that Jason (or anyone else) *apprised* Mr. Hirst of these developments, or discussed with Mr. Hirst the use of proceeds of the Bond Issuances; nor is it alleged that Mr. Hirst *was aware* of any of this, either contemporaneously or subsequently" (emphases added)).

probative of the "*nature* of th[ose] relationship[s]." *United Sates* v. *Araujo*, 79 F.3d 7, 9 (2d Cir. 1996) (emphasis added)).

John Galanis's April 6 sur-reply argues primarily that Gerova-related evidence is inadmissible because the "relationship of mutual trust" between Jason and John Galanis is "self-evident" because "the men are father and son."  (4/6/18 Sur-reply at 1).[3]

If anything, however, the father-son relationship makes evidence of John Galanis's involvement in Gerova more probative in this case.  While John Galanis has asserted that the Government "cannot cite one case where prior criminal conduct was allowed in under Rule 404(b) to establish a relationship between parties that already have an obvious and well-established relationship, 4/6/18 Sur-reply at 2, that is not so.

Just last year, in *United States* v. *Dupree*, 870 F.3d 62 (2d Cir. 2017), a murder and drug-trafficking case against three brothers, the Second Circuit affirmed the admission of evidence that, before the murder, which occurred on Staten Island, two of the brothers had engaged in a separate drug trafficking conspiracy in Maryland.  870 F.3d at 67-68.  The Second Circuit noted the evidence showed "they knew and worked with each other as coconspirators rather than merely as . . . brothers."  *Id.* at 76.  Therefore, the court explained, the evidence was "probative . . . of defendants' knowledge, intent, and relationships as to the charged conduct."  *Id.*  at 76-77.

Relatedly, in *United States* v. *Mercado*, 573 F.3d 138 (2d Cir. 2009), the Second Circuit affirmed the admission of prior firearms sales involving the co-conspirators, in a drug-trafficking prosecution.  Judge Calabresi noted that such prior acts evidence can be probative as to knowledge and intent, and to show "the development of the relationship" and that the evidence was particularly probative in that case, precisely because the defendant asserted he and his co-conspirators were "friends":

> [These principles are] especially applicable in this case where, as Defendant strenuously argues, some of the observed conduct might be nothing more than innocent acts of a friend, and not a knowing participation in a conspiracy.  Driving two friends around town might, for example, seem innocuous.  Prior gun sales, however, at least suggest that Defendant was not an innocent pawn taken by surprise by the drug transaction.

573 F.3d at 141.

Finally, in *United States* v. *Russo*, 302 F.3d 37 (2d Cir 2002), the Second Circuit affirmed a father's conviction for witness tampering and obstruction of justice, in connection with an investigation into efforts to threaten a juror in his son's criminal trial.   In affirming, the court found proper the admission of other acts evidence showing both the father and the son were members of the Colombo crime family, describing the evidence as "highly relevant."  302 F.3d at

---

[3] In addition to being legally wrong, see below, this argument also rests on a faulty factual premise. The mere fact of paternity does not create "an obvious and well-established relationship."

43. It noted, among other things, that "[w]hile the father's motivation to seek to contact a juror in the [son's] trial . . . might be attributed to his parental relationship . . ., his Colombo family relationship to [his son and the other trial] defendants explains his motivation in a manner less sympathetic than as father seeking to protect his child." *Id.*

In short, as in *Dupree, Mercado*, and *Russo*, the existence of an otherwise innocent, pre-existing relationship between co-conspirators makes evidence of their prior joint criminal activity even more probative as to the nature of that relationship, and as, as discussed below, to knowledge and intent.[4]  Here, evidence that John Galanis and Jason Galanis previously engaged in a securities fraud scheme together shows that "they knew and worked with each other as conspirators rather than merely as" father and son, *Dupree*, 870 F.3d at 76; that John Galanis and Gary Hirst were "not . . . innocent pawn[s]" of Jason Galanis, *Mercado*, 573 F.3d at 141; and that John Galanis was not motivated to assist in the Wakpamni fraud simply because of "his parental relationship." *Russo*, 302 F.3d at 43.

### B.  Gerova-Related Evidence is Also Admissible to Show Knowledge and Intent

For similar reasons, Gerova-related evidence is probative of John Galanis and Hirst's knowledge that their actions in the Wakpamni scheme were in furtherance of a fraud and their intent to further that fraud.

 John Galanis argues in his sur-reply brief that Gerova-related evidence is not probative on knowledge and intent because the Gerova fraud and the Wakpamni fraud are not sufficiently similar.  (4/6/18 Sur-reply at 2).  To begin with, Galanis incorrectly states that the Gerova and Wakpamni cases are distinguishable because Gerova "was criminal from its inception" while, in Wakpamni, "the alleged criminality occurs after the bonds are sold when Jason Galanis allegedly steals some of the proceeds of the sale."  (*Id.*)  That is wrong.  Indeed, the Indictment alleges that John Galanis made false representations to the WLCC to get them to issue the bonds.  (*See, e.g.*, Indictment ¶¶ 6, 10).

In any event, both schemes involved securities fraud and both schemes involved an overlapping set of actors, including Jason Galanis, John Galanis, and Gary Hirst.  To be probative of knowledge and intent, the prior act and the charged conduct need only be similar, not identical.

---

[4] In addressing the admissibility of the Gerova evidence at the April 13 conference, the Court stated that "in the context of discussing discovery, the government repeatedly represented to me that the Gerova matter was wholly unrelated and irrelevant to the current case."  (4/13/18 Tr. at 25-26).  Respectfully, the Government's assertions on that issue came in the context of a motion by defendant Archer seeking access to Gerova discovery materials on a theory that they constituted *Brady* material or were material to his defense under Rule 16. (*See* Gov't Opp'n to Defs.' Pre-Trial Motions at 108 ("Jason Galanis's prior criminal case was a wholly separate investigation that did not involve Archer at all.")).

The Government is not now asserting that the Gerova evidence is relevant against Archer.  It is relevant, and always has been relevant, against Gary Hirst and John Galanis, who received the Gerova discovery in that case and who are in fact represented by the same attorneys that represented them in that case.

In *United States* v. *Inserra*, 34 F.3d 83 (2d Cir. 1994), for example, a prosecution for making written false statements to the Probation Department, the Second Circuit affirmed the introduction of the defendant's conviction from four years earlier for making oral false statements to the Department of Labor.   The Second Circuit explained that the prior conviction "provided a reasonable basis for inferring knowledge or intent in contradiction of [the defendant's] innocent explanation for his conduct" and was for "the same offense" as the charged offense.  34 F.3d at 89 ("Although the prior conviction involved an oral misrepresentation to a labor investigator instead of a written misrepresentation to the Probation Department, these convictions for the same offense were similar enough "to permit the jury reasonably to draw from that act the knowledge inference advocated by the proponent of the evidence" (quotation omitted)); *accord Dupree*, 870 F.3d at 77 (noting that prior conspiracy in Maryland was sufficiently similar to charged conduct to be probative of knowledge and intent, even though "the Maryland acts and the charged conduct did not involve exactly the same co-conspirators, cocaine amounts, sales locations, [and] temporal timelines").

In short, although not identical frauds, Wakpamni and Gerova are sufficiently similar to make Gerova probative of John Galanis's and Hirst's knowledge and intent.

## C.   Introducing Evidence of the Gerova Convictions Would Not Run Afoul of Rule 403

Further, introducing the Gerova convictions would not run afoul of Rule 403.  Again, nothing about the Gerova conduct itself is any more sensationalistic than the crimes charged. Moreover, in seeking to introduce evidence of Hirst and John Galanis's conviction, the Government was and is seeking to present the Gerova-related evidence in a streamlined, efficient fashion.

At the April 13 conference, the Court indicated concern about the jury in this case "hearing that a jury in a previous matter had convicted two of the defendants for engaging in a scheme to defraud. . . . They were convicted by a jury in another case."  (4/13/18 Tr. at 26-27).[5]  But there is nothing inherently unfairly prejudicial about introducing evidence of a prior conviction to prove up conduct admissible under Rule 404(b).   The Second Circuit has repeatedly affirmed the introduction of prior convictions for these purposes.  *See Inserra*, 34 F.3d at 86 (noting "the indictment and judgment from the 1989 case also were introduced by the Government"); *accord, e.g.*, *United States* v. *Alcantara*, 674 F. Appx. 27, 30 (2d Cir. 2016) (affirming admission of "Alcantara's prior conviction for conspiracy to commit tax fraud"); *United States* v. *Pickett*, 387 F. App'x 32 (2d Cir. 2010) (affirming admission of prior conviction under Rule 404(b), as being probative on the issue of intent); *United States* v. *Barris*, 377 F. App'x 93, 95-96 (2d Cir 2010) (affirming admission of defendant's "prior arrest and conviction for firearms possession" as relevant to charged crime and to defendant's relationship with an alleged co-conspirator);  *United States* v. *Vargas*, 297 F. App'x 56, 59-60 (2d Cir. 2008) (affirming admission of defendant's "prior heroin conviction" to "rebut[] defense claims" that a witness "was the true leader of the conspiracy" and that defendant "played only a minor role"); *United States* v. *Tsekhanovich*, 251

---

[5]  In fact, only Gary Hirst was convicted after trial in Gerova.  As discussed below, John Galanis pled guilty, and there is no reason the Wakpamni jury would need to know that Hirst was convicted by a jury.

Fed. App'x 706, 707 (2d Cir. 2007) (affirming admission of defendant's prior conviction for health-care fraud as relevant to "the defendant's knowledge and the absence of mistake, [which] are highly relevant to the defendant's intent, which is an element of any fraud"); *United States* v. *Clement-Shenandoah*, 183 Fed. App'x 87, 89 (2d Cir. 2006) ("Nguyen had denied knowing anything about the drugs, making her knowledge and intent crucially important issues. Nguyen's prior conviction was highly probative evidence tending to rebut her claim of ignorance.").  The Government should thus be permitted to put before the jury the fact of John Galanis, Jason Galanis and Gary Hirst's convictions in the Gerova matter.  Such evidence is the most straightforward evidence of these defendants' prior criminal conduct with each other and is far more straightforward than any other available evidence.

Recognizing the Court's concerns, however, the Government has attempted to identify alternatives to introducing the prior convictions and is continuing to do so for Gary Hirst.  With respect to John Galanis, as an alternative to introducing his prior Gerova conviction, the Government seeks to introduce two portions of Galanis's plea and sentencing allocutions in the Gerova case.  These statements are admissible as a statements by a party opponent under Federal Rule of Evidence 801(d)(2)(A).  *United States* v. *Gotti*, 641 F. Supp. 283, 289 (E.D.N.Y. 1986) ("When offered against a defendant a plea by him to a felony and his allocution on that plea are admissions under Rule 801(d)(2)(A)."); *S.E.C.* v. *Berger*, 244 F. Supp. 2d 180, 189 (S.D.N.Y. 2001) (holding, in civil case, that a party's "statements at his plea allocution, including his explicit and unambiguous agreement with the description of evidence given by the Government, are admissions under Rule 801(d)(2)(A).").  To further alleviate any potential for unfair prejudice, the Government would be amenable to a stipulation that John Galanis made the statements "in a prior proceeding," without referring that the proceedings were a change of plea and a sentencing.

Specifically, from Galanis's guilty plea, the Government seeks to introduce the following:

> I, John Galanis, along with others conspired to commit securities fraud in or about 2009 to in or about 2011 in that I and others openly managed brokerage accounts of an individual and effected the sale of Gerova stock and received and concealed proceeds derived therefrom knowing that this activity was designed to conceal from the investing public the true ownership and control of that Gerova stock.

Transcript, *United States* v. *Galanis*, 15 Cr. 643 (PKC), (S.D.N.Y. July 20, 2016), at 21, attached as Exhibit A.

From Galanis's sentencing allocution, the Government seeks to introduce the following:

> Most of my involvement in the Gerova matter started when Jason came to me and asked me to sell the shares on an arrangement he had made with an investment advisor . . . .  Jason explained that the deal would be the investment advisor would buy shares which would save him and Gerova.

Transcript, *United States* v. *Galanis*, 15 Cr. 643 (PKC), (S.D.N.Y. Feb. 16, 2017), at 21-22, attached as Exhibit B.

***

In short, Gerova-related evidence is relevant to show the nature of the  conspiratorial relationship between (i) Jason Galanis and John Galanis and (ii) Jason Galanis and Gary Hirst, and because it is probative of John Galanis's and Hirst's knowledge and intent with respect to the Wakpamni fraud.  Further, given that the Gerova fraud is no more sensational than the crimes on trial and that Government seeks to introduce Hirst and Galanis's convictions in a streamlined, efficient way, there is no Rule 403 issue.  The Government therefore respectfully requests that the Court re-consider its prior ruling regarding the Gerova convictions.  In the alternative to introducing the convictions, the Court should allow the Government to introduce excerpts from John Galanis's plea and sentencing transcripts, cited above.

### Cooney Misstatements to City National Bank

As the Court is well aware, in October 2014, Cooney purchased $5 million of the Wakpamni bonds, representing the entirety of the Third Bond Issuance.  He did not, however, do so with his own money.  Rather, on October 6, 2014, at Jason Galanis's direction, Hugh Dunkerley transferred more than $5 million of proceeds from the First Bond Issuance from the Wealth Assurance bank account (the purported annuity provider) to Thorsdale, an account controlled by Jason Galanis.  That same day, Jason Galanis transferred just over $5 million from Thorsdale to Bevan Cooney.  And three days later, on October 9, 2014, Cooney used that money to purchase the entirety of the Third Bond Issuance.  On May 29, 2015, in connection with the acquisition of Bonwick, Cooney transferred the entirety of his Wakpamni holdings to Bonwick for net capital purposes.

At trial, the Government intends to prove that Cooney's purchase was fraudulent and that he was not a bona fide purchaser of the bonds.  Rather, Cooney was given money to purchase the bonds for at least two purposes: (i) to falsely suggest that there were legitimate purchasers of the bonds; and (ii) to permit the defendants to obtain control of additional Wakpamni bonds without locating any additional investor money, so that the bonds could be used as a currency in other transactions— as they were, for example, in funding the purchase of Bonwick.  A key issue at trial will thus be Cooney's understanding and intent with respect to his purchase of the bonds.  Did he believe that Jason Galanis had simply loaned him $5 million to purchase the bonds and that he was in fact obligated to repay that money? Or did Cooney understand that the bond purchase was a sham and that his involvement was designed to hide both Jason Galanis's role and the true nature of the transaction?

Evidence of Cooney's interactions with City National Bank, and in particular, of his statements concerning his ownership of the bonds, is thus essential and direct evidence of Cooney's participation in the fraud.  Those facts are, in summary, as follows:

In January 2015, Cooney sought a $100,000 loan from City National Bank.  In connection with that loan, Cooney submitted a personal financial statement which described, among other things, his ownership of a significant quantity of Code Rebel stock and his ownership of the $5 million of bonds.  The personal financial statement did not, however, describe a corresponding liability.  That is, Cooney did not disclose that he owed repayment of a purported $5 million loan from Jason Galanis/Thorsdale.  Following the submission of the personal financial statement, City

National requested additional information about the bonds. Thus, for example, on February 9, 2015, Cooney emailed Fulton & Meyer (his accountants, who were assisting Cooney in obtaining the loan) that his account "now shows my bonds with a value of $5.5mm. [T]his should be helpful for the loan." Fulton & Meyer forwarded the email to City National Bank. In February 2015, City National agreed to make the $100,000 loan.

In the spring of 2015, Cooney sought a larger loan of $1.2 million from City National Bank. In obtaining that loan, Cooney signed a promissory note in which he provided that:

> Borrower represents and promises to Lender that (a) the most recent financial statements Borrower has given to Lender are true and correct in all respects, (b) they fairly represent Borrower's financial condition as of the date shown on the statements, and (c) no material adverse change has occurred in Borrower's financial condition since that date.

In addition, directly above Cooney's signature on the promissory note in bold the promissory note also indicated as follows:

> Financial Condition: By signing this authorization, I represent and warrant to Lender that the information provided above is true and correct and that there has been no material adverse change in my financial condition as disclosed in my most recent financial statement to Lender. This authorization is dated June 24, 2015.

These statements were, of course, false. By the time of the June promissory note, Cooney had transferred his $5 million of bonds to Bonwick and thus no longer even possessed them.

When the $1.2 million loan came due, Cooney was unable to repay it. His principal method of repayment—the sale of his Code Rebel shares—was unavailable because the shares' value had plummeted. Faced with default, Cooney was asked to consider selling the Wakpamni bonds to repay the loan. It was at that point that Cooney first disclosed that he no longer possessed the bonds and could not sell them, and that in any event, having used a loan to purchase the bonds, he would not be able to use the proceeds to repay the City National loan. Cooney then submitted a new personal financial statement in which he disclosed a liability in the form of a more than $5 million loan from Thorsdale.

Cooney's statements to City National—first claiming ownership of the bond, then disavowing ownership and claiming to have purchased the bonds with loan proceeds are central evidence of Cooney's fraudulent intent. *See, e.g.*, *United States* v. *Palacios*, 835 F.2d 230, 232 (9th Cir. 1987) ("The most probative evidence of Palacios' guilty knowledge was three contradictory statements that Palacios made to explain where and when he obtained the bills.").

Cooney's initial claim that he owned the bonds outright suggests either (i) that he did not believe he had any obligation to repay the loan to Thorsdale since this was not a bona fide transaction; and/or (ii) that he hid the loan from City National because he knew that the "loan" itself was suspect. Cooney's later admission that he no longer possessed the bonds and had used

borrowed Thorsdale money to purchase the bonds is similarly relevant.  Cooney's casual treatment of his transfer of the bonds demonstrates that he did not truly believe they belonged to him.  His admission that the money used to buy the bonds had come from Thorsdale also demonstrates his knowledge that the source of the funds was Jason Galanis.  Thus, the entirety of Cooney's interactions with City National is central evidence of his guilt.

The City National interactions are also relevant for a second reason. Cooney has made clear that he intends to argue at trial that his failure to obtain any money from the offense is evidence of his innocence.  Leaving aside that a defendant who does not profit may certainly be guilty, the City National evidence establishes that Cooney did benefit from this fraud.  In addition to the money received directly from Thorsdale and Galanis, Cooney used his fraudulent bonds (and Code Rebel shares) to obtain a $1.2 million loan, *which he never repaid*.  The City National evidence is thus also admissible as evidence of the manner in which Cooney profited from the scheme.

Respectfully submitted,

ROBERT KHUZAMI
Attorney for the United States, Acting Under
Authority Conferred by 28 U.S.C. § 515

By:  _/s/ Rebecca Mermelstein
Rebecca Mermelstein/Brendan F. Quigley/
Negar Tekeei
Assistant United States Attorneys
(212) 637-2360/2190/2482