H2GSJOHS

```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x

 3  UNITED STATES OF AMERICA,

 4              v.                        15 CR 643 (PKC)

 5  JOHN GALANIS,

 6              Defendant.

 7  ------------------------------x

 8                                   New York, N.Y.
                                     February 16, 2017
 9                                   3:00 p.m.

10
    Before:
11
                      HON. P. KEVIN CASTEL,
12
                                     District Judge
13

14                          APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    AIMEE HECTOR
17  REBECCA G. MERMELSTEIN
    BRIAN R. BLAIS
18       Assistant United States Attorneys

19  PELUSO & TOUGER
         Attorneys for Defendant
20  BY:  DAVID TOUGER

21  ALSO PRESENT:
    Shannon Bieniek, FBI Agent
22

23

24

25
```

H2GSJOHS

1        (Case called)

2        MR. HECTOR:  Good afternoon, your Honor.  Rebecca

3   Mermelstein, Aimee Hector, and Brian Blais for the government.

4   With us is Special Agent Shannon Bieniek of the FBI.

5        THE COURT:  Good afternoon, Ms. Mermelstein.

6        For the defendant.

7        MR. TOUGER:  Good afternoon, your Honor.  David Touger

8   for Mr. John Galanis.

9        THE COURT:  Good afternoon, Mr. Touger.  Good

10  afternoon, Mr. Galanis.

11       Let me first go through the materials I have and the

12  question will be do I have everything I should have.  I have a

13  presentence report, recommendation, and addendum revised by

14  probation on January 23, 2017, I have a sentencing memorandum

15  from the government, which is dated February 9, 2017, and,

16  Mr. Touger, I have your sentencing memorandum dated February 2,

17  2017, which has several letters and an opinion by Judge Bryant

18  annexed.

19       Do I have everything I should have on the subject of

20  sentencing, Mr. Touger?

21       MR. TOUGER:  I believe so, your Honor.

22       THE COURT:  There was also a letter, I should mention,

23  from the government urging that the restitution obligation be

24  resolved in a subsequent order.

25       MR. TOUGER:  That's correct, your Honor.

H2GSJOHS

|     |                                                                       |
|-----|-----------------------------------------------------------------------|
| 1   | THE COURT:  Ms. Mermelstein, do I have everything I                   |
| 2   | should have?                                                          |
| 3   | MS. MERMELSTEIN:  Yes, your Honor.                                    |
| 4   | THE COURT:  Mr. Touger, has Mr. Galanis read,                         |
| 5   | reviewed, and discussed with you the presentence report,             |
| 6   | recommendation, and addendum?                                         |
| 7   | MR. TOUGER:  Yes, in great detail, your Honor.                       |
| 8   | THE COURT:  Are there any objections to the facts set                |
| 9   | forth in the presentence report?                                     |
| 10  | MR. TOUGER:  Facts?  No, your Honor.                                  |
| 11  | THE COURT:  Any objection to the guideline calculation              |
| 12  | set forth in the presentence report?                                 |
| 13  | MR. TOUGER:  The only objection would be the two                     |
| 14  | additional points for sophisticated meanings that was put in,        |
| 15  | that the government did not find that in the plea agreement.          |
| 16  | While it might be a close call, I don't think this case really       |
| 17  | comes down to a sophisticated means situation.  I know the            |
| 18  | court ruled yesterday relative to Jason Galanis that it would        |
| 19  | not find those two points applicable.                                 |
| 20  | THE COURT:  That's right.                                            |
| 21  | Ms. Mermelstein, any objection to eliminating those                  |
| 22  | two points?                                                          |
| 23  | MS. MERMELSTEIN:  No, your Honor, for the reasons set               |
| 24  | forth yesterday for Jason Galanis.                                   |
| 25  | THE COURT:  I'll reiterate, it looks like a very close               |

1    question to me.  This case was resolved by a plea.  While I

2    presided at the trial of Gary Hirst, I don't have a full

3    picture from that trial and I don't know all of what transpired

4    with regard to John Galanis.  I will sustain the objection, and

5    that would put the defendant at total offense level 28,

6    criminal history III, which puts the guideline range at 97 to

7    121 months.  Correct, Mr. Touger?

8             MR. TOUGER:  That's correct, your Honor.

9             THE COURT:  Ms. Mermelstein, any objection to the

10   facts set forth in the presentence report?

11            MS. MERMELSTEIN:  No, your Honor.

12            THE COURT:  Any objection to the guideline

13   calculation?

14            MS. MERMELSTEIN:  Other than as we just addressed, no.

15            THE COURT:  I adopt as my findings of fact the facts

16   set forth in the presentence report.  Further, I find the

17   guideline range of total offense 28, criminal history

18   category III is the correct one.

19            I'll now give Mr. Touger an opportunity to speak on

20   behalf of John Galanis.

21            MR. TOUGER:  Thank you, your Honor.

22            Before I get to the meat of the discussion here today,

23   I want to echo something I just heard the court say relevant to

24   the sentence of Derek Galanis, that sentencing is an imperfect

25   art.  It has always been one of the difficult moments for me as

H2GSJOHS

 1    a defense lawyer, because as a defense lawyer we are trained to

 2    constantly fight in a black-and-white nonguilt-or-guilt

 3    situation, whereas sentencings always come down to gray areas.

 4         You have a client who has admitted his guilt to a

 5    crime, no matter what that crime might be, and the difficult

 6    arguments now are what should the sentence be relative to that

 7    crime and your client's life history.  As the court mentioned

 8    earlier today, it is not an exact science.  Two plus two does

 9    not always equal four in this equation.

10         This sentence for me personally has been a very

11    difficult one.  I would say in my 32 years of practicing law,

12    one of the most difficult ones because of the life history that

13    Mr. Galanis has.  But before I get into this actual case, your

14    Honor, I know the court is well aware of what I wrote in my

15    letter.  I am sure the court has read the letter many times.  I

16    want to deal just briefly with the criminal history category of

17    Mr. Galanis, which technically is a III.  There is no doubt

18    about it that that was a correct calculation.

19         THE COURT:  You're relying on the statements that

20    Judge Bryant made in his opinion regarding the state court

21    case?

22         MR. TOUGER:  That's correct, your Honor.

23         THE COURT:  I have tremendous admiration and respect

24    for Judge Bryant and I read his opinion.  It was apparent to me

25    that he personally had a large role in the crafting of the

1    words that appear on the page.  This is not a draft submitted

2    by eager law clerks.  This is something that he wrote.  I heard

3    and read what he said.  He said, This court has previously

4    expressed its opinion and continues to believe that the crimes

5    for which Mr. Galanis pleaded guilty in New York State probably

6    should not have been prosecuted separately, among other things.

7    He also expressed -- I don't know if the right word is display

8    or surprise -- at how long it appeared that Mr. Galanis'

9    sentence was.

10          I have to tell you, Mr. Touger, your point about

11    criminal history is one that I will take account of, but I've

12    had in front of me a situation where a person was convicted of

13    a crime and I had to pass sentence on him even though that

14    individual had spent something on the order of 20 years in

15    prison for a crime that was later proven he didn't commit.

16    Judges, when called upon to sentence, are not here to try and

17    smooth out all the injustices that a person may suffer in their

18    life.  It is a valid guideline point to argue or urge that the

19    criminal history category overstates the actual criminal

20    history.

21          MR. TOUGER:  It is in that vein only that I make that

22    argument, your Honor, that in my humble opinion, that there is

23    no doubt -- I just want to correct something that the

24    government put forth in their sentencing memoranda.  They seem

25    to argue in that sentencing memoranda that the federal case was

Case 1:16-cr-00371-RA Document 394 Filed 03/19/18 Page 7 of 46

H2GSJOHS

1    indicted and then sometime later, that the state case came in.

2    That is not at all what the actual facts were.

3        Mr. Galanis was arrested in California on both

4    charges.  He was actually brought to state court first and

5    remanded by Judge Rothwax.  When that bail decision was

6    overturned by the appellate decision and he made bail in the

7    state case, he was then brought to federal court, where he was

8    given bail by the federal court, and he was out on bail pending

9    the case from that point on.

10       But there is no doubt that these cases were brought at

11   the same time, investigated by the same individuals.  And in

12   talking to people who were around at that time, not just

13   Mr. Galanis, but others, that Robert Morgenthau decided that he

14   wanted a part of that case, since part of his team was

15   investigating that case.  So he was given one part and the

16   federal jurisdiction was given another part.  These were never

17   two separate and distinct investigations.

18       That is the only point I am trying to make, your

19   Honor.  I am not trying to say you should make up for that

20   error.  I am saying when you consider everything involved in

21   this case and what sentence fulfills the goal of sentencing,

22   that this should be one of the considerations that you have,

23   that he is receiving three extra criminal history points

24   because of the state case.  That is merely the argument that

25   I am making, your Honor.

1          As far as the case itself, now I have sat through

2    Jason Galanis' sentencing and Derek Galanis' sentencing and I

3    have read the paper that all the Galanis children had put in

4    and I read the government's responses and heard their

5    arguments, your Honor.  I want the court to certainly realize

6    that any arguments I make from this point on are not made to

7    throw anybody under the bus or blame anybody else for Mr. John

8    Galanis' conduct, because it is not.

9          THE COURT:  Well, I am tempted to say why should you

10    be any different.  Everybody else has a theory of who else is

11    to blame.

12          MR. TOUGER:  I am not making that argument, your

13    Honor.

14          THE COURT:  In the Galanis family, there's been a lot

15    of cross-finger pointing.

16          MR. TOUGER:  I am not making that argument at all.  I

17    am going by the facts.  I have read the Hirst trial.  I have

18    read the good percentage of the discovery in this case, which

19    as the court is well aware, it was seen that this case was

20    going to go to trial.  I read all the discovery and I read the

21    PSI and all the government response.  The best I can coordinate

22    all this information together, there is no doubt, I don't think

23    the government would argue with me, that Jason Galanis began

24    this train sort of going down the tracks when he started with

25    the ASSAC company and then turning it into Gerova.

H2GSJOHS

1          To me also a good sign or a good indicator of who was

2     in charge of the conspiracy and who are the lower officers, so

3     to speak, in a conspiracy is by who got the most money and who

4     got less money.  And here there is no argument, I think, by

5     anybody that Jason Galanis profited the most, followed by Gary

6     Hirst and others, and then John Galanis comes in somewhere in

7     the middle of that pyramid.  The fact is also undeniable that

8     while Jason was not the CEO of Gerova, he was the CEO of

9     Gerova's N.A., which he could be, he could not be the CEO of

10    Gerova.

11         There is also no arguing the facts of discovery that

12    Jason played a major hand in the running of Gerova.  He

13    attended all the board of director meetings, he manipulated the

14    firing of numerous CEOs of Gerova and putting Gary Hirst in

15    power.  John Galanis is never around for any of that conduct.

16         There is also no argument, I think, from anybody that

17    as far as bringing Shahini into the conspiracy, that that was

18    between Jason and Derek Galanis and that John Galanis had no

19    part in that situation.  I would also venture that that was all

20    of Derek's involvement in this case was the Shahini aspect of

21    the case.

22         Then the Gary Hirst situation occurs with the shares

23    of Shahini, and the court is well aware of that manipulation,

24    and I won't go into detail of those facts.  What is clear is

25    that John Galanis is not involved in that situation either.

H2GSJOHS

1          What happens when John Galanis starts to get involved

2     is when Jason Galanis comes to him and asks him to ask an

3     attorney -- whose name I don't believe is necessary to mention

4     at this point, but the court is well aware of who I am speaking

5     about -- to write an opinion letter as to whether the conduct

6     surrounding Shahini was legal.  Mr. Galanis -- when I say

7     Mr. Galanis, I am talking about Mr. John Galanis.

8          THE COURT:  You can call him John if it might be

9     easier.

10          MR. TOUGER:  It might be easier to keep all the

11     parties straight.

12          John then talks to Barry Finer.  What is interesting

13     for the court to know, though, Barry Finer gets his facts from

14     the incident from Jason Galanis, not John Galanis.  And Barry

15     Finer writes his opinion letter saying that all is kosher, so

16     to speak.  That is when John Galanis starts to get involved in

17     this case.

18          I will leave to John Galanis to discuss with the court

19     why he does get involved and why he goes along with what

20     Jason's demands are, but what happens, what is also going on at

21     this point is Jason Galanis has gone to C.K. Cooper, an

22     investment firm, and convinced them to take the Gerova shares

23     and also he convinces -- this comes from the Hirst trial --

24     Mr. Montano to give him a 14 million margin loan on those

25     shares.

H2GSJOHS

```
 1          What occurs is C.K. Cooper's clearinghouse does their
 2     due diligence and decides, wait a minute, these shares aren't
 3     worth this 14 million, and they do a call on that 14 million.
 4     This is where the Gerova train track almost goes off the cliff.
 5     That is when Jason Galanis turns to John Galanis with --
 6          THE COURT:  Well, let's call it the Gerova criminal
 7     conspiracy, which is different than Gerova the entity.
 8          MR. TOUGER:  That's true.  But at this point, Jason is
 9     between a rock in a hard place.  He needs to come up with
10     $14 million, which he does not have.  If he doesn't come up
11     with it, not only would the Gerova criminal conspiracy go off
12     its tracks, but Jason Galanis' life will go off its tracks.
13     There is where John Galanis really gets involved in the
14     criminal aspect of this case.  Again, I will leave it to him to
15     describe to you why that occurs.
16          What is important to know here is that Jason Galanis
17     is the one that has the contacts with C.K. Cooper, not John
18     Galanis.  Also, the other brokerage firms that are convinced,
19     Hamels and the other brokerage firms that are convinced to
20     trade the shares, do not come from contacts of John Galanis.
21     They all come from the contacts of either Jason Galanis or
22     Derek Galanis.
23          THE COURT:  He uses Jared Galanis' law firm e-mails.
24          MR. TOUGER:  Right.  I am getting to that.
25          THE COURT:  And cell phone.
```

H2GSJOHS

1        MR. TOUGER:  There is no doubt at that point --

2        THE COURT:  And poses as Jared Galanis.

3        MR. TOUGER:  Right.  That is where I am going to, your

4    Honor.

5            There is no doubt at that point in time that John

6    Galanis then, as he will talk to you later, does what he

7    considers his worst act in this case and starts acting as Jared

8    Galanis.  This is a plan that comes from him and Jason,

9    deciding that the plan would be a lot better effectuated if an

10   attorney is issuing these requests to sell and buy shares as

11   opposed to John Galanis, who is a known fraudster.  There is no

12   doubt that he does that.

13       THE COURT:  Maybe it would be tougher for the

14   government to detect because it would all be shielded by an

15   attorney-client privilege.

16       MR. TOUGER:  I don't think that was the idea there.  I

17   think the idea was more to convince others to go along with it,

18   that it was coming from an attorney.  I don't think they were

19   really thinking about protecting themselves from government

20   involvement at that point, or at least I don't think John

21   Galanis was.  During the Hirst trial, you know there are many

22   e-mails that go back and forth between Jason and John Galanis

23   about when to sell.  There is no doubt John Galanis is fully

24   involved at this point.

25           Skipping ahead, your Honor, the government maintains

H2GSJOHS

in its sentencing memorandum that it is sort of ridiculous for
John Galanis to even claim that he could think that Jason
Galanis was involved in anything legal when he first approached
him to get the Finer letter.  I find that argument almost as
ridiculous as they find my argument.  The reason I do, your
Honor, is that as the court noted yesterday --

            THE COURT:  Well, everybody seems to want to urge that
when the first toe was dipped into the water, they didn't know
it was a criminal conspiracy.  But then the story always is, I
sure as heck found out really early on.  So what do we get from
that really?  We don't get a whole lot from that.

            MR. TOUGER:  Well, I think what we get from that, your
Honor --

            THE COURT:  That's Jared, Derek, and now John all with
the same story.

            MR. TOUGER:  Well, because what we get from that, your
Honor, is that if you take all the Galanis stories and put them
together, what we get from that, your Honor, is that there is
no doubt that Jason Galanis started this, as I say, this train
rolling down the tracks.  I believe maybe in the beginning that
Jason Galanis thought he was going to try to do this in a legal
fashion.  I don't know that for a fact at all.  That is maybe
my personal belief from talking to Jason.  Obviously it didn't
go that way.

            I am not arguing that on his behalf.  Jason, as the

Case 1:16-cr-00371-RA   Document 417-2   Filed 04/19/18   Page 14 of 46
Case 1:16-cr-00643-PKC   Document 394   Filed 03/19/17   Page 14 of 46          14
H2GSJOHS

1    court noted yesterday, had done many successful financial deals

2    that had made a lot of money in his life that weren't criminal

3    in nature.  John Galanis obviously knew that.  What is also

4    interesting is that when the government brings forth James

5    Tagliaferri, they say, well, James Tagliaferri had done

6    numerous non-criminal deals with Jason Galanis, why would he

7    have thought this was criminal to begin with?  If they can make

8    that argument for Mr. Tagliaferri, I don't see why we can make

9    that argument for John Galanis.

10           THE COURT:  It only takes you a portion down the path.

11           MR. TOUGER:  No doubt about that, your Honor.

12           Now, there is also the fact, as is documented in the

13    letters, the point of Jason's conversations that are going on

14    in California where nothing is happening to stop the Gerova

15    train from marching on, even though those conversations were

16    happening in California.

17           Now, the other issue I would like to bring up is this

18    idea that John Galanis was living in the lap of luxury during

19    this criminal conspiracy.  The government states in their

20    papers that he was being put up in a luxury hotel by his son

21    during the time before his son was incarcerated.  Well, that

22    luxury hotel that he was living in was a one room at a Hilton

23    Garden Hotel for $100 a day.

24           THE COURT:  Well, they can be pretty nice.

25           MR. TOUGER:  They're nice.  I wasn't saying he was

H2GSJOHS

1    living in a roach-infested hotel.  No doubt about it.

2              THE COURT:  There are a lot of Americans who wouldn't

3    mind it.

4              MR. TOUGER:  I understand that, your Honor.  I don't

5    want the court to think that Mr. Galanis was living in, I don't

6    know, whatever luxury hotel the court wants to think of and

7    having servants come in and serve for him.  He was living in a

8    Hilton Garden Hotel in one room with his wife.

9              THE COURT:  I think the breakfast, it is self-served.

10             MR. TOUGER:  I think the breakfast is self-served,

11   your Honor, but it is a good breakfast.

12             Then once Jason Galanis goes to jail, the money soon

13   runs out, and he goes to live with his son Jessie, who is not

14   involved with this at all, and he and his wife Chandra, they've

15   been married 49 years, go to live with the son Jessie.  Both

16   Jessie and his wife work, and they take care of their

17   granddaughter while they're off at work.

18             I have to say that when I see John Galanis -- and I've

19   had many video conferences with John, I see him with his

20   grandchild -- there is no happier individual than Mr. Galanis

21   with his grandchild bouncing on his knee.  There is definitely

22   a relationship there that is amazing.

23             So having said all that, your Honor, now the question

24   becomes what is the rightful sentence.  Is the guideline

25   sentence the rightful sentence or is a below-guideline

H2GSJOHS

1    sentence, as we requested in this case, called for.  This is

2    the difficult question.  It is my humble opinion that, while

3    there is no doubt, I am sure, the government is going to stand

4    up here when I'm done and when Mr. Galanis is done and say that

5    Mr. Galanis is nothing but a lifetime criminal, and that's what

6    he is and he's nothing else, and he spent 17 years in custody

7    and that didn't teach him a lesson.  And he gets out, and no

8    sooner does he get out, then a few years later he is back

9    involved doing the same thing, and the court should not

10   entertain any idea of giving him a below-guideline sentence.

11        You know what, that argument is true.  That is what

12   happened.  That is the facts that we have before us.  There is

13   no way of hiding that, glossing over that, or getting around

14   that.  What I've tried to do, your Honor, in my sentencing

15   letter and the letters we've given the court and here today is

16   sort of give the court an explanation of why that occurred.  I

17   think Mr. Galanis is the best person to explain to the court

18   the real details of why that occurred and why he stands and

19   sits here today awaiting the sentence that, in all likelihood,

20   no matter what the court gives it, he is spending the rest of

21   his probably natural life in jail, if not most of his natural

22   life in jail.

23        I think that this is where the nuance comes in, your

24   Honor.  This is why it is important for the court to understand

25   that John Galanis did not begin this conspiracy and begin the

H2GSJOHS

idea of the conspiracy.  Because if he did, I would think the
court would have every right to give him a guideline sentence.
If he had just done this out of greed and wanting to make more
money, then yes, the court would have every right to give him a
guideline sentence.

        I don't think those are the reasons why he did this.
Matter of fact, I know those are not the reasons why he did
this.  I've gotten to know John Galanis very well over the time
that I've represented him.  Almost too well, because I have
always said that a lawyer should not cross the line of becoming
a friend of his client, that they should always be a
lawyer-client relation.  There is no reason why you can't be
friendly, but the idea that a lawyer should not cross the line
and become a personal friend of his client.  And I've always
tried to do that in my 30 years.  I think I get along very well
with my clients.  I have only been fired from a client once in
32 years.  I think I have done a good job getting along with my
clients.

        I think in this case I have come perilously close to
crossing that line, because I find him a very interesting and
friendly character.  I have gotten to know him very well
because of that.  I truly believe in what he said.  I want to
just go back to Judge Bryant for one moment.  Mr. Galanis
testified for weeks in front of Judge Bryant.  When he was
sentencing Mr. Galanis, he said he had no doubt that when John

H2GSJOHS

1    Galanis began all the different financial transactions that

2    went on in that case, that he believed that he started out in a

3    very legal fashion.  And yes, he believed he was bouncing along

4    the line of going over that line, and ultimately he did.  I

5    think that is also what happened here, your Honor.

6              THE COURT:  Well, let me ask you, was that a comment

7    that was made in connection with his first criminal prosecution

8    before Judge Bryant or his second criminal prosecution several

9    years later?

10             MR. TOUGER:  His second one.  The one he testified

11   before.

12             THE COURT:  OK.

13             MR. TOUGER:  The first one, I believe he got

14   probation.

15             THE COURT:  He got, I think it was, something like

16   60 months with 54 months suspended.

17             MR. TOUGER:  Exactly.

18             THE COURT:  Practically speaking, a six-month

19   sentence.

20             MR. TOUGER:  Six-month sentence, right.

21             With that, your Honor --

22             THE COURT:  That was a totally unrelated criminal act

23   on his part.

24             MR. TOUGER:  Yes.

25             With that, your Honor, I'll leave it for Mr. Galanis

Case 1:16-cr-00371-RA Document 417-2 Filed 04/10/18 Page 19 of 46
Case 1:16-cr-00643-PKC Document 894 Filed 03/19/18 Page 19 of 46    19
H2GSJOHS

```
1    to speak to the court.

2              THE COURT:  Thank you, Mr. Touger.

3              MR. TOUGER:  Your Honor, would you mind if he sat?

4              THE COURT:  That's fine.  Everybody can do that.

5              Mr. Galanis, this is your opportunity to speak, to

6    bring to my attention any facts or circumstances that you

7    believe I should consider.  If there is anything you wish to

8    say, this is the time.

9              THE DEFENDANT:  Thank you, your Honor.

10             I wish, actually, my sentencing -- and I understand

11   the court's order had been first, so I could explain more of

12   the events and maybe modified my children.

13             THE COURT:  Why don't you bring your microphone a

14   little bit closer, please.  Thank you.

15             THE DEFENDANT:  Because I am before this court again,

16   it must view me with great suspicion, and that's where I decel.

17   Please know that as an older man whose fire for success and a

18   vibrant life has been dimmed by more than a decade and a half

19   in prison, there wasn't -- and there wasn't anything that I was

20   more fearful of than going to prison again.

21             The court should know that none of us intended, I

22   think, to do wrong, but for me.  I felt the push of both

23   obligation and events caused me to be where I am.  I am here

24   and I am guilty.  I know that my term will likely be the

25   balance of my life.  Of course that frightens me, but it is not
```

H2GSJOHS

 1    as painful as having been a failed parent, which has finally

 2    and irreparably shattered my family.

 3         It is important for me to tell the court how sorry I

 4    am that I did not employ tough love and save my family and all

 5    the others who suffered through this chaos.  I pled guilty to

 6    two serious charges, but the most serious crime which I'm

 7    guilty is not in the charges.  Rather, it was in an attempt to

 8    win back the respect of my two oldest boys by false means.

 9         The disappointment, Derek and Jason's disappointment

10    at my not being released after my federal parole caused my

11    relationship with them to deteriorate.  During my time away, I

12    always tried to explain that my hubris led to my conviction,

13    that my riding close to the legal edge was of short reward, and

14    perhaps exciting for the moment, but always led to the place I

15    was in.

16         The breach in our relationship caused them to take a

17    diversion and risky path.  Derek unfortunately turned from drug

18    user to a drug dealer.  Jason became involved in the securities

19    business, which I had warned him was a poor choice for someone

20    with our last name.  However, he seemed determined to prove he

21    could succeed in the business where I had caused so much shame

22    for myself.  I now realize both came to view me as a man broken

23    by the system.

24         Worse than their disrespect for me was the rival that

25    came between them.  Each convinced themselves that it was my

H2GSJOHS

1    unique weaknesses that caused my being in prison.  While not

2    getting along with each other, they both manifested contempt

3    for me in a situation where Jason became dismissive and Derek

4    verbally and physically abusive.  The methods in distancing

5    themselves from me was different, but the reasons were the

6    same, because both had to deal with the horrible legacy I had

7    left.  It is another reason why I never wanted to go back to

8    prison.

9         I am fortunate in that my wife and two younger

10   children and I have maintained a strong bond.  My younger son

11   survived incarceration much better than Jason and Derek

12   primarily because of the remarkable woman I married 40 years

13   ago.  She loves all of our sons and has been devastated by what

14   happened to them.  In trying to recapture the love of two of my

15   sons, I let myself and my family down.  Most of my involvement

16   in the Gerova matter started when Jason came to me and asked me

17   to sell the shares on an arrangement he had made with an

18   investment advisor.  Jason explained that this relationship

19   would save him from financial ruin and the shares at

20   C.K. Cooper that he had arranged for Shahini to borrow, almost

21   $14 million, was being called.  The firm could no longer

22   maintain the loan and they were going to sell the shares, which

23   severely depressed the price.

24        Jason explained that the deal would be the investment

25   advisor would buy shares which would save him and Gerova.  I

H2GSJOHS

1    wanted to tell him he was riding to close to the edge, but his

2    fear and agitation were real, which made me want to help him.

3    Maybe Jason would not have stopped with his plan if I said no,

4    but I did not and could not say no to Jason.  Not only was he

5    convincing of the bright future for his company, but more

6    importantly, there was a debt of gratitude that I owed to him.

7    He had taken care of the family all the years I was away, and

8    that exceeded any repayment I could ever make for him.  He

9    financially supported the family, even sending each of his

10   younger brothers to law school.  He fulfilled it even better

11   than perhaps I could have.  I just couldn't say no.  I should

12   have.

13        As your Honor knows, not only did I act as Jason's

14   intermediary in his prearranged selling of the shares, but I

15   did it by impersonating my son Jared.  That my son Jared has

16   forgiven me for putting him in this terrible position is the

17   only bright spot in this horrible mess I've created.  My wife

18   and I want to thank the court for recognizing Jared's limited

19   involvement in this matter.

20        Having seen the effects of prison on older men, I have

21   attempted to ready myself.  The operations I have had were to

22   allow me to have as few impediments as possible in returning to

23   prison.  I want to thank your Honor for the consideration you

24   have given me in that regard.

25        Finally, your Honor, I want to again apologize to this

H2GSJOHS

1    court for my actions.  There is no logical explanation for why

2    I find myself in this predicament.  It is only, as I said, due

3    to my failed parenting and my insatiable desire to repay my

4    children for my past.  When I appeared for sentencing in this

5    court, I told Judge Bryant that I was done with criminal

6    conduct, and I truly believed that.  I never intended to get

7    involved with criminal activity again.  I wish that I had kept

8    that thought in my head when Jason approached me.

9            I will live with breaking that trust forever, and I

10   thank this court for the courtesy it has always shown me.

11   Thank you, your Honor.

12           THE COURT:  Thank you, Mr. Galanis.

13           This is the government's opportunity to speak.

14           MS. MERMELSTEIN:  Thank you, your Honor.

15           THE COURT:  One of the things I would like you to

16   address is the assertion that has been made that the first

17   involvement of John Galanis in this scheme is at or about the

18   time of the margin call.  I would like you to address whether

19   that's an accurate portrayal or is there some evidence that is

20   being overlooked.

21           MS. MERMELSTEIN:  Your Honor, that's a hard question

22   to answer.  The government doesn't have evidence that it is

23   prepared to present that would prove that that is not true,

24   although it may well be the case that John participated in

25   crafting the plan itself, a plan that bears a not insignificant

H2GSJOHS

1    resemblance to prior frauds in which he engaged.

2         I don't think for purposes of this proceeding that we

3    are in a position to prove that that assertion is untrue,

4    except to say that, at a minimum, I think there is documentary

5    evidence that his participation began earlier than what he

6    seems to be saying is that he got involved only when the

7    C.K. Cooper margin loans became a problem.

8         In June of 2010, which is prior to that date, John

9    Galanis sent an e-mail to Ymer Shahini -- I think we mentioned

10   it in some of the papers and it was described at trial -- in

11   which he sends Mr. Shahini a description of Weston, and the

12   clear purpose of that e-mail is a description of this entity

13   that Mr. Shahini ought to know something about, but doesn't,

14   since there is, in fact, no such business relationship.

15        At what point he exactly became involved may be

16   unclear, but it was not only in disposing of the shares,

17   because he had some participation in setting up the Shahini

18   relationship prior to even the existence of the C.K. Cooper

19   account, and the whole point of the Shahini relationship of

20   course is exactly for the purpose of the fraud.  I think, at

21   best, for Mr. John Galanis then, he knew and understood the

22   plan and participated in that plan prior to the actual deposit

23   of shares into the C.K. Cooper account.

24             THE COURT:  All right.

25             MS. MERMELSTEIN:  I would say that if sentencing is

Case 1:16-cr-00371-RA Document 417-2 Filed 04/10/18 Page 25 of 46
Case 1:16-cr-00643-PAC Document 894 Filed 03/19/18 Page 25 of 46        25
H2GSJOHS

1    often gray and difficult, this is about as clear as it gets.

2    This is a defendant who has a shocking and longstanding history

3    of securities fraud that dates back, as your Honor has noted,

4    to the early 1970s, when he got a tremendous break from Judge

5    Bryant in the first instance, having received only six months.

6    That did nothing at all to deter him from entering into a

7    number of different securities fraud schemes, however they were

8    ultimately charged.

9         The PSR demonstrates that his arrests in the state

10   case and federal case were separate, but that is really not the

11   point.  There is no debate, I think, that he was the person

12   running a variety of different complicated security fraud

13   schemes that were, in fact, tangentially related.  They were

14   really separate things, many ultimately charged in one massive

15   case before Judge Bryant.  He served an incredibly long

16   sentence and it did not deter him.  Indeed, I think this is

17   something he mentioned, but he briefly, for about a year, was a

18   fugitive living in Mexico after he walked away from a work

19   program in prison.  If he can be deterred, he has not been so

20   to date.

21        The notion that he joined this conspiracy out of some

22   kind of paternal obligation to Jason Galanis is, in fact,

23   preposterous.  He did not do it for no compensation.  Indeed,

24   he received significantly more money than Derek Galanis, than

25   Jared Galanis did and --

H2GSJOHS

```
 1              THE COURT:  What did he receive?

 2              MS. MERMELSTEIN:  Well, he received $575,000 went to

 3     the Galanis family trust, which he controlled, some of which

 4     went to, for example, Derek Galanis, and $330,000 went to

 5     Little Giggles LLC, also a John Galanis entity.  We're jumping

 6     ahead slightly, but he then, after this fraud, he then went on

 7     to participate in a completely unrelated fraud with Jason

 8     Galanis, where he got $2.3 million of money that was supposed

 9     to be invested in bonds issued by a Native American tribal

10     entity.

11              Now, I understand that he has not pled guilty in that

12     case.  I expect that he will claim he didn't know that was a

13     crime either.  But even if that were true, and it clearly is

14     not, he went into business with Jason Galanis in yet another

15     endeavor and accepted millions of dollars from that endeavor

16     after, as he now admits, he had participated in this fraud, and

17     it didn't stop him from continuing down that road with his son.

18     He has just an unchangeable, he has done nothing but commit

19     these securities frauds over and over and over again, leaving

20     devastation not only on the victims of the crimes themselves in

21     his wake, but frankly devastation to his family.

22              Now, the fact that Jason and Derek and Jared

23     committed, participated in this criminal conduct, they are

24     adult men who made that choice.  They bear that responsibility.

25     But it is also fair to say that if they had had a different
```

H2GSJOHS

father, they probably would not be here.  That he now wants to

suggest that it was somehow his own sense of obligation to his

family that left him with no choice but to do this, when what

he did, among other things, as your Honor has noted, is misuse

his lawyer son's identity in order to cover his tracks, and as

a result put his son in further criminal exposure than he

already had, since it would appear on the face of all of the

evidence that, in fact, it was Jared Galanis orchestrating

that, is barely decent.  It certainly bears no resemblance

whatsoever to any kind of familial loyalty.

          The criminal history --

          THE COURT:  Well, he says -- and make of it what you

will -- gee, I had to do something because if the margin call

went through, the scheme would have gone crashing down on my

beloved son Jason and he would have certainly have been caught

and prosecuted, etc.  So I only committed this crime to protect

my son from detection of the larger crime.

          MS. MERMELSTEIN:  Perhaps I misunderstood what he

said.  As I understood what he was saying, he was saying not

that he understood that there was a Gerova fraud, but that he

understood Jason would simply be in financial straits if this

wasn't fixed.

          First of all, the notion that saving your own child

from financial straits justifies in any fashion the

victimization of all of the Martin Kelly and Tagliaferri

H2GSJOHS

1    clients who lost tens and millions of dollars is no

2    justification at all.  The notion that even to save one son

3    from jail, one would frame another son for a crime, I think,

4    leaves something to be desired in the notion of family loyalty.

5    The notion that he came forward and owned up to that, only

6    after Jared Galanis had been arrested, it's not something that

7    one gets extra credit for.

8             This is a defendant, notwithstanding his claims that

9    he has learned his lesson somehow now, it is not clear that he

10   can be deterred.  If he is released from prison, I don't think

11   there is an age at which there are investors and victims who

12   are safe from the next securities fraud that is coming.  The

13   notion that after this Gerova scheme, he joined an endeavor,

14   leaving aside whether or not he knew it was criminal, obviously

15   there is plenty of evidence that he knew that it did, but that

16   he went into that scheme with Jason Galanis suggests that he

17   cannot be deterred.

18            I think that given this defendant's unusually lengthy

19   criminal history, his history category, if anything,

20   understates it, and given his role in this offense and criminal

21   history, I think a guideline sentence is absolutely necessary

22   here.  I will note, in addition, given the sentence imposed an

23   hour ago on Derek Galanis of 72 months, I think there can be no

24   question that a more significant sentence is warranted for a

25   defendant with this level of prior involvement in securities

Case 1:16-cr-00371-RA Document 417-2 Filed 04/19/18 Page 29 of 46
Case 1:16-cr-00643-PAC Document 894 Filed 05/15/17 Page 29 of 46          29
H2GSJOHS

1    frauds and his role in this offense.  But on all of those

2    facts, I think there is simply no sentence that would be

3    adequate that is less than the guidelines range in this case.

4             THE COURT:  Thank you.

5             I'll give Mr. Touger a brief opportunity to respond to

6    points that were new.

7             MR. TOUGER:  Just very briefly.

8             I don't want the court to misunderstand me.  The

9    manipulation of the share-selling happened after Mr. Galanis

10   was already involved.  There is no doubt that he got involved

11   when Shahini was being brought in with the letter with the

12   attorney and that situation, so that does predate that selling

13   of those shares.

14            THE COURT:  That goes back to June 2010.

15            MR. TOUGER:  Right.  There is no doubt of that.  But

16   those are the two sort of flash points of Mr. Galanis' conduct.

17            THE COURT:  But in June of 2010, at least at that

18   point in time he knew the general outlines of the scheme, the

19   whole reason why Shahini was so important and why he had to be

20   briefed on Weston.

21            MR. TOUGER:  Right.  What he knew, your Honor, was

22   what the lawyer knew, because that is the facts Jason Galanis

23   gave the facts to the lawyer, and he knew the facts that the

24   lawyer knew and that lawyer wrote the letter saying everything

25   was kosher and that lawyer is now indicted.

H2GSJOHS

1      THE COURT:  We are talking about June 2010 and he is

2   briefing Shahini on Weston.  An inference from that is, hey, if

3   this guy made the transaction happen, he better know what the

4   transaction was and who he was dealing with and how he brought

5   them together and what he brought together.  No?

6      MR. TOUGER:  I'm sorry.  You lost me a little bit with

7   the question, your Honor.

8      THE COURT:  Well, he transmitted what type of

9   information to Shahini in June 2010?  Tell me the type of

10  information he submitted.

11     MR. TOUGER:  Between the two of you, now I understand

12  where we are.

13     Your Honor, at that point in time, Shahini contacts

14  Mr. Galanis -- Mr. Galanis was involved with the attorney --

15  and asks him about this contract.  Mr. Galanis then contacts --

16     THE COURT:  Meaning the backdated contract where he is

17  supposed to have brought two parties together.

18     MR. TOUGER:  Then Mr. Galanis doesn't know any of the

19  facts of that.  He goes to Jason, gets the facts from Jason,

20  and that is when the bulb goes off in everybody's head.

21     THE COURT:  Basically what he is doing is helping to

22  supply Shahini with the cover story.

23     MR. TOUGER:  I believe Shahini knew the cover story at

24  this point.

25     THE COURT:  Maybe he was a little bit soft with the

Case 1:16-cr-00371-RA Document 417-2 Filed 04/18/18 Page 31 of 46    31
Case 1:16-cr-00643-PAC Document 334 Filed 09/19/17 Page 31 of 46
H2GSJOHS

1    details and he wanted some richness of details.

2              MR. TOUGER:  I never met Mr. Shahini.  From my reading

3    of the discovery and everything, I don't believe Mr. Shahini

4    went into this with his eyes wide open.

5              THE COURT:  No, I am not suggesting that.  But I am

6    just saying, you know, in case somebody should knock on my door

7    and ask me about Wimbledon and Weston and Gerova, I better know

8    what it is I did to earn $2.2 million.

9              MR. TOUGER:  I agree with you.  That is when the light

10   starts to go off in Mr. Galanis' head, there is no doubt about

11   that.  I agree with that.

12             As far as the funds received, I think the PSR and the

13   proof at the Hirst trial and all the other matters in this

14   case, Mr. Galanis got about $300,000, give or take, from this

15   process.  Jason Galanis got millions.  Mr. Hirst got about two

16   and a half million I think was the number.  Other people,

17   individuals, got more than Mr. Galanis, and then Mr. Galanis

18   comes in.

19             Basically Mr. Galanis made some money.  There is no

20   doubt about it.  Again, I am not here saying that Mr. Galanis

21   was innocent, your Honor, but --

22             THE COURT:  It sounds like, and maybe I'm getting this

23   wrong, but about $800,000, minus the 130 or whatever it turns

24   out to be that was paid to Derek.

25             MR. TOUGER:  No, your Honor.  Some of the money was --

H2GSJOHS

```
 1              THE COURT:  The 156 that was paid to Derek.

 2              MR. TOUGER:  Some of the money in Little Giggles went

 3    to Jason.  While John Galanis wrote the checks to that, Jason

 4    was in control of that.  Some of the Little Giggles money went

 5    to John Galanis, as well as some of the money from the other

 6    account went to support and pay bills for Jason Galanis also.

 7              I am not saying Mr. Galanis made no money on this, but

 8    to compare the amount of money he made to the major actors in

 9    this case, Mr. Jason Galanis and Mr. Hirst and Mr. Tagliaferri,

10    there is no doubt that there is a difference in the money they

11    made and the money Mr. Galanis made.

12              THE COURT:  All right.  Mr. Touger, I have received

13    correspondence, extensive correspondence from you with regard

14    to Mr. Galanis' health situation.

15              MR. TOUGER:  Yes.

16              THE COURT:  Tell me what the situation is and should I

17    take this into account in sentencing or not.

18              MR. TOUGER:  Your Honor, I think as far as sentencing

19    is concerned, what the court should take into account is more

20    just the fact that Mr. Galanis is a man in his 70s and not in

21    the best of health.  I don't think --

22              THE COURT:  Well, what do you mean by "not in the best

23    of health?"

24              MR. TOUGER:  The court is well aware of the operations

25    he has had.  He has high blood pressure, he has diabetes, and
```

H2GSJOHS

 1   other ailments, and a possible diagnosis of cancer.  At this

 2   point, there is none.  There are growths in his colon that are

 3   possibly cancerous that he has to get checked for again.  Right

 4   now, thank God, that is not a diagnosis.

 5          What I think the court really has to take in

 6   consideration with his health is whether the court will allow

 7   Mr. Galanis seven weeks, which is the usual period to

 8   self-report, so that the operations he's had to make his prison

 9   life more bearable can fully heal, and he can then begin his

10   prison date like anybody else who is allowed to self-report.

11          One of the reasons we asked for this sentence date,

12   if the court remembers, is that he was going to have his

13   operations, as he did in January, and that would give him

14   enough time to be able to be travel across the country and be

15   here for sentence, and then my hope and request would be to

16   this court to allow him to self-report and then have the last

17   seven weeks -- I've talked to his doctors and I believe the

18   doctors have written letters to the court that the court has

19   seen -- saying that seven weeks from now, he should be fully

20   able to enter prison life and with medical care that should be

21   available to him in prison and be able to cope with prison

22   life.

23          THE COURT:  The problem with this, with a person of

24   Mr. Galanis' age and condition, based on my experience on the

25   bench, is that there is a shocking and unanticipated surprise

H2GSJOHS

1    that occurs in the six- or seven-week period, who possibly knew

2    that now there is some complication, which means the person

3    couldn't possibly surrender --

4             MR. TOUGER:  Your Honor --

5             THE COURT:  -- let me finish -- on the date directed.

6    If you would be so kind as to put it off another four weeks.

7    And then shockingly in the next four weeks, it only gets worse,

8    all leading up to don't ever put the person in prison.  I've

9    been to that rodeo.

10            MR. TOUGER:  I know you have, and I know the court, if

11   I could respond, I will tell you here today you will not get

12   that application from me.  I told you that in the letter that

13   I sent you in December and January, that you would not get

14   another letter to adjourn this sentence, and you have not, and

15   I will tell you, you will not get another letter in several

16   weeks or six weeks from now.  If you do, you can reject it.

17            THE COURT:  Well, no.  Mr. Touger, you're a man of

18   integrity and I trust you completely.  You're a respected

19   member of the bar of this court.  I have no doubt that you

20   speak the truth as you know it.  That is not my concern.  I

21   still have the concerns though.

22            MR. TOUGER:  I understand that, your Honor, but let's

23   look at the opposite side of the coin.  If he goes into jail

24   today, all the last six weeks of the surgery and the

25   rehabilitation he's done is for naught.  That operation, the

H2GSJOHS

effects of that operation will deteriorate.

        He has had his spine cut off, he has had his ankles
screwed together, he has had the fusion of vertebrae, and they
all need special care for seven more weeks.  He has progressed
perfectly for the last six weeks.  Everything has gone
according to plan.  There has been no setbacks whatsoever.

        Again, your Honor, Mr. Galanis told me that way back
in December and January that he won't make another application.
He told me that last week.  The last thing I asked him today
was, What do we want to ask for?  And he said, I need seven
weeks.  That was the reason we asked for this court date to
begin with, was that I knew from the doctors talking that this
would be the progression of the care that he needed.

        The government will bring up the fact that he
absconded decades ago from New York State.  First of all, the
facts are not what they said.  He was not living in Mexico.
What happened was, he got out of jail in federal custody, was
put on a work release program in the state court system, went
to the hospital for certain care, had a nervous breakdown, went
to Greece, and was in medical care in Greece.  He came back to
Mexico, because his attorneys at that time were negotiating his
return to New York, and this I learned directly from talking to
that attorney, and New York State found out where he was and
picked him up in Mexico.

        Since that point, your Honor, up until that point,

H2GSJOHS

1    Judge, he had been out on bail pending appeal, your Honor, in

2    federal court.  Judge Bryant let him out after conviction,

3    after sentencing, and left him out pending appeal, and he

4    voluntarily surrendered on the exact date he was supposed to

5    to the MCC to start, serving his 17-year sentence with no

6    problems at all.

7            THE COURT:  It may be my concerns and the government's

8    concerns are somewhat different.

9            MR. TOUGER:  Well, if you're concerned --

10           THE COURT:  My concern really was not focused on

11   Mr. Galanis taking off for Guadalajara or Kosovo or some place.

12   Maybe I should be concerned about that.

13           MR. TOUGER:  I will tell you, your Honor, that if I

14   come back here in a month, five weeks, six weeks, whatever it

15   is, reject my letter.

16           THE COURT:  No, I understand that.  I understand that,

17   Mr. Touger.

18           MR. TOUGER:  Reject it.  I am not asking anything more

19   than these seven weeks.  When I'm talking to the doctors, these

20   seven weeks are critical.  It's a difference of him being able

21   to walk or not be able to walk and being in a wheelchair the

22   rest of his life.

23           He's going to be in jail, from the court's questions,

24   I would think he is going to be in jail for many years because

25   of this case.  The only mercy we are asking from the court is

H2GSJOHS

1    that it allow him to be able to do that prison time not in a

2    wheelchair and being able to walk and be ambulatory and

3    therefore have an easier time in jail, because he won't be

4    going to a camp.  He'll be going to either a low or medium

5    facility.  He is not going to be going to a camp where it is

6    wide open space.

7            THE COURT:  Why is that?

8            MR. TOUGER:  Because of his prior criminal record,

9    I've been told that his chances of getting a camp -- and I

10   talked to both former employers of BOP and the BOP -- more than

11   likely he will end up not going to a camp because of the prior

12   record.  Anticipating what your sentence might be, the amount

13   of time, I didn't think you were going to be giving him less

14   than five years, the amount of time that he'll be serving.  The

15   jail we were asking the court to give him is a low facility,

16   Terminal Island in California.  He might get that, he might

17   not.

18           The reason we would be asking for that is, obviously,

19   that it is close to his home and his wife and his children who

20   he has a relationship, who are out and can visit him.  Again, I

21   can't stress to you enough the importance that his doctors and

22   his surgeons have told me these seven weeks are.

23           THE COURT:  Let me hear from the government.

24           MS. MERMELSTEIN:  Your Honor, I think that the

25   defendant should be remanded.  I think your Honor's point was

H2GSJOHS

well taken about the realities of finding a point in time at

which Mr. Galanis' health will be sort of perfect such that

there are no issues.  But separately and apart from that, I

also think there is a flight risk here.  It is a defendant, I

don't know if it is better to have gone to Greece or directly

to Mexico.  There is no dispute that he fled from custody and

was gone for a year.

I think there is no dispute here that while I think it

is very likely he is going to receive a sentence that is, at

least, at the risk of functionally a life sentence, and the

difference between the incentive of a middle-aged man with four

young children, while he received a sentence of 27 years,

expected apparently at that time to serve something like five,

the difference in incentive of flight for that person and a

person, who by his own admission has destroyed his relationship

with half of his children and who is likely to die in prison,

is simply different.  I think there is a legitimate flight risk

here, and I think he should be remanded today.

I have spoken to counsel at MDC.  They are aware that

he has certain limitations of mobility.  I understand that

those can be accommodated.

MR. TOUGER:  Your Honor, if he was going to flee, as

the government is suggesting, why is he here?  He's been out

for many, many months, if not over a year in this case.  This

court let him out after he was re-arrested.

H2GSJOHS

```
 1              The court in California left him out after he was
 2    arrested to come across this country to a bail hearing where
 3    you, just the day before, put his son in jail.  He had no idea
 4    that you were going to be releasing him at that point and he
 5    did not fail to appear.  He appeared, the court let him out,
 6    and he has made every request that pretrial has asked of him
 7    and he is here today.  If he wanted to flee, your Honor, he
 8    knew he was going to jail.  It wasn't like he was asking this
 9    court, even his request that the court gave him, he is going to
10    jail.  If he wanted to flee because of his fear of going to
11    jail, he wouldn't be here.
12              THE COURT:  Thank you, Mr. Touger.
13              This is the court's statement of reasons for the
14    sentence to be imposed on John Galanis.  In sentencing
15    Mr. Galanis, I have considered all the materials that were
16    referenced at the outset, I have considered the very thoughtful
17    comments of Mr. Touger and Ms. Mermelstein, and the sincere
18    statement of John Galanis.  I have considered all the factors
19    under Section 3553(a).  I need not recount all that I have
20    considered, but I have considered it all.
21              I have to say, in the white-collar arena, not only
22    have I not encountered a family situation as unusual as this
23    and an individual as unusual as John Galanis, but I'm not quite
24    sure that I've really read or heard of someone with quite this
25    circumstance.  Through, I think, talent of his own and no
```

H2GSJOHS

1   reason to believe criminal activity, he seemed to have quite

2   the life in Greenwich, Connecticut, in San Diego, and great

3   wealth and the stature that goes with it.

4           The child of parents who, I read, ran a diner or a

5   restaurant, and he made something of himself.  He had something

6   of a life that others might admire.  And then he engaged in

7   false statements to the SEC and mail fraud resulting in a 1973

8   conviction.  You would think in a story like that, that that

9   would be the end of it, and the person went off and went in a

10  different direction in their life.

11          I don't know how it came to pass how cases were

12  assigned at the time.  The first conviction was before I was a

13  young law clerk in this court.  It was in 1973.  The second

14  conviction was in 1988.  Both cases were before Judge Bryant.

15  This time it was conspiracy to fraud the IRS, tax fraud, RICO

16  securities fraud, bank fraud, bribery, and he received a

17  324-month sentence.  From what I've read, he did 17 years in

18  prison on that.

19          Now, I read Judge Bryant's memorandum and order, and

20  by way of digression, I do remember the days before the

21  sentencing guidelines and before truth in sentencing, and I

22  just shutter at what it was all about.  I remember as a law

23  clerk being explained that a nine-year sentence wasn't a

24  nine-year sentence, maybe it was a three-year sentence.  If you

25  wanted to give somebody three years, you gave them nine years.

H2GSJOHS

1    It was an insane system.  I read Judge Bryant was not thinking

2    it was going to be more than nine years, and it turned out to

3    be 17 and it could have been 27.

4         Be that as it may, one would think after an experience

5    like that, that you would be obsessed with conveying the right

6    message to your family, in making amends, and communicating the

7    lessons that have been learned through the life that was lived,

8    be the greatest spokesman you could give of the message, don't

9    cross the line, it's not worth it.

10        Mr. Galanis was an educated man, had a bachelor of

11   arts in international relations from Syracuse in 1965.  He was

12   in law school but left to support his wife and son at the time,

13   and then took graduate courses.  To hear Mr. Touger say that it

14   was tough not crossing the line to friendship, it's because

15   Mr. John Galanis is a talented person, and again, it seems that

16   this talent has been used as weaponry in commission of crimes.

17   If you want to persuade someone to engage in an enterprise,

18   John Galanis is your man.  He is going to get it done, and that

19   was used in this particular case in a criminal way.

20        I am at least happy to see that it was acknowledged, I

21   think, by Mr. Touger and I think by the defendant himself that

22   one of the most horrific aspects of this was bringing Jared

23   Galanis in the midst of this.  This was extending this circle

24   of criminality.  Instead of coming out of prison and being the

25   person to communicate the message, Don't even think of coming

H2GSJOHS

1    close to these things, he became the agent of other people's

2    involvement in this scheme.

3            Look, there is no evidence before me, no credible

4    evidence before me, that he cooked this scheme up, but I can't

5    really give him the benefit of a story that only when Jason was

6    in a jam and you have this margin call, that he involved

7    himself.  He got involved at least as of June 2010.  He knew

8    the parameters.  He could have thought twice.  He could have

9    disassociated himself from Jason and said, I love you too much

10   to stand by and let this happen.  I'm not going to be the one

11   to stand here and let this happen.  I'm going elsewhere.  But

12   it was kind of a distorted and perverted sense of how to make

13   amends for not being there for his family that led him into

14   what he did.  He was not the principal beneficiary of the

15   scheme, but he certainly got what was deemed to be his fair

16   share.

17           I have taken into account his age and the likelihood

18   of recidivism.  He's 74 and he has earned punishment based on a

19   consideration of the sentencing guidelines, policy statements,

20   and official commentary of the United States Sentencing

21   Commission, the need to avoid unwarranted sentencing

22   disparities, the view that there is some merit to the argument

23   that his criminal history category is overstated to some

24   extent, and the fact that he's not likely to engage in this

25   conduct when he is released given his age and his health, I

H2GSJOHS

1    conclude that a sentence of 72 months' imprisonment, three

2    years' supervised release, waiver of the fine because of the

3    restitution and forfeiture obligations, and a special

4    assessment of $200 is sufficient but not greater than necessary

5    to achieve the purposes of Section 3553(a).

6          Does the defendant or his counsel have any objection

7    to the court's proposed sentence or to the statement of reasons

8    for that sentence?

9          MR. TOUGER:  No, your Honor.

10         THE COURT:  Same question for the government.

11         MS. MERMELSTEIN:  No, your Honor.

12         THE COURT:  If the defendant will please stand and the

13   court will pronounce sentence.

14         John Galanis, it is the sentence of this court that

15   you are hereby remanded to the custody of the United States

16   Bureau of Prisons to be imprisoned for 72 months.

17         Following release from imprisonment, you shall be

18   placed on supervised release for three years with the following

19   terms and conditions:  You shall not commit another federal,

20   state or local crime, nor illegally possess a controlled

21   substance, nor possess a firearm or destructive device.  The

22   mandatory drug-testing condition is suspended based on the

23   court's determination that you pose a low risk of future

24   substance abuse.  You shall cooperate in the collection of DNA

25   as directed.

H2GSJOHS

1          The standard conditions of supervision 1 through 13

2     are imposed.  You shall submit your person, residence, place of

3     business, vehicle, and any property, computer, electronic

4     communications, data storage devices, and/or other media under

5     your control to a search on the basis that the probation

6     officer has reasonable suspicion that contraband or evidence of

7     a violation may be found.  The search must be conducted at a

8     reasonable time and in a reasonable manner.  Failure to submit

9     shall be grounds for revocation.  You shall inform other

10    residents of the condition.  You shall refrain from engaging in

11    any legal or financial transactions, be it directly or in an

12    advisory capacity, involving family members, including

13    children, spouses, and grandchildren.  You shall provide

14    probation with access to any requested financial information

15    owned or controlled by you or your spouse or for which you

16    enjoy the benefits of, and notify the probation officer of any

17    new credit charges or additional lines of credit.

18         You shall report to the nearest probation office

19    within 72 hours.  You may be supervised in the district of your

20    residence.  It is further ordered that you pay to the United

21    States a special assessment of $200.

22         The restitution will be determined with a submission

23    from the government in 30 days.  The dates for response and

24    replies, please.

25         MS. MERMELSTEIN:  Your Honor, the government's brief

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H2GSJOHS

1    is due on March 15, the reply is due on March 31, and the

2    government's reply is April 17.

3            THE COURT:  Do you have that, Mr. Touger?

4            MR. TOUGER:  Yes, your Honor.

5            THE COURT:  The defendant shall forfeit his right,

6    title, and interest to a sum of money equal to $19,038,650.53,

7    representing any property, real and personal, that constitutes

8    or is derived from the proceeds traceable to the commission of

9    the offenses in Counts One and Two.  You have the right to

10   appeal this sentence in this case.  If you cannot afford the

11   cost of an appeal, you may apply for leave to appeal as a poor

12   person.  The time limits for filing a notice of appeal are

13   brief and they're strictly enforced.  If you request, the Clerk

14   of Court will prepare and file a notice of appeal on your

15   behalf immediately.  Do you understand all that?

16           THE DEFENDANT:  I do, your Honor.

17           THE COURT:  Surrender is set in this case for April 25

18   at 2:00 p.m.  I will recommend that you be housed at FCI

19   Terminal Island to facilitate family visits.  I also recommend

20   that you get appropriate healthcare treatment for your

21   condition.

22           Anything further from the government?

23           MS. MERMELSTEIN:  One thing, as a technical matter,

24   your Honor.  I assume that the sentence is 72 months on Count

25   Two?

H2GSJOHS

1          THE COURT:  I'm sorry.  Thank you very much.  Yes.

2          The sentence is 72 months on Count Two and 60 months

3     on Count One to run concurrently.

4          MR. TOUGER:  Thank you, your Honor.

5          MS. MERMELSTEIN:  Your Honor, the government moves to

6     dismiss the open counts.

7          THE COURT:  Without objection, that is granted.

8          Anything further?

9          MR. TOUGER:  No, your Honor.

10         MS. MERMELSTEIN:  No, your Honor.

11         THE COURT:  Thank you all very much.

12         Mr. Galanis, I wish you good health, and I think you

13    have a lot to reflect upon in your life, and I hope you gain

14    the appropriate insight.

15         THE DEFENDANT:  Thank you, your Honor.

16                              o0o

17

18

19

20

21

22

23

24

25