UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                  :

UNITED STATES OF AMERICA

                                  :

            - v. -

                                  :      S3 16 Cr. 371 (RA)

GARY HIRST, et al.,

                                  :

           Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF ITS MOTIONS TO PRECLUDE
CERTAIN CROSS-EXAMINATION AND DEFENSE EXHIBITS**

ROBERT KHUZAMI
Attorney for the United States,
Acting Under Authority Conferred by 28
U.S.C. § 515

Rebecca Mermelstein
Brendan F. Quigley
Negar Tekeei
Assistant United States Attorneys
       - Of Counsel -

The Government respectfully submits this memorandum of law in support of its motions to preclude (i) cross-examination of Government witnesses on certain topics and (ii) certain defense exhibits.

## The Court Should Preclude Cross-Examination of Government Witnesses on Certain Topics

### I.  The Court Should Preclude Cross-Examination of a Government Witness Regarding Drug-Related Conduct

At trial, the Government intends to offer, among other evidence, testimony from a witness ("Witness-1") who was a credit analyst and junior portfolio manager at Hughes Capital Management at the time when Michelle Morton became its Chief Executive Officer and Gary Hirst became its Chief Investment Officer.   Witness-1 is expected to testify about communications with Michelle Morton and Gary Hirst regarding, among other topics, the WLCC bonds, and Hughes' investment policies and practices.   Witness-1 opposed Morton's and Hirst's efforts to purchase the WLCC bonds into Hughes client portfolios, refused to execute the trades, and resigned when the trades were executed.

The Government requests a pretrial ruling precluding any cross-examination of Witness-1 on the subjects described below.

- Witness-1's personal illegal drug use for several years, including Witness-1's personal use of methamphetamine, cocaine, marijuana, and Xanax.

- Witness-1's sale of drugs on two occasions in approximately 2013 or 2014, specifically the sale of approximately one to two grams of methamphetamine to a friend, and the sale of one to two grams of cocaine to a family member.

- Witness-1's July 15, 2017 arrest in Key West, Florida for (a) battery, a misdemeanor, (b) possession of a controlled substance (Xanax) without a prescription, a misdemeanor, and (c) smuggling contraband into a detention facility, a felony.   Witness-1 was arrested for battery in connection with a domestic dispute.   Witness-1 had Xanax pills in Witness-1's wallet upon arrest.   When officers processed the arrest, they discovered the pills inside of Witness-1's wallet, leading to the charge for possession of a controlled substance without a prescription.   At the time, Witness-1 was inside of a police station, which led to the charge for smuggling contraband into a detention facility.   Since the arrest, the battery

and drug possession charges have been dismissed.  Witness-1 intends to enter into a pretrial diversion program that would result in dismissal of the remaining charge, for smuggling contraband into a detention facility.

- Witness-1's possession of marijuana and tabs of LSD during a car stop for speeding in approximately February 2018.  Witness-1 was given a citation or ticket for speeding and possession of marijuana, and the officer who stopped Witness-1 threw the LSD tabs onto the road.

### A.  Applicable Law

The Federal Rules of Evidence limit the circumstances under which evidence of specific acts of a witness may be introduced.   Rule 608(b) provides that "[e]xcept for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness."   The Court "may, on cross-examination, allow [those prior acts] to be inquired into," but only if such acts "are probative of the character for truthfulness or untruthfulness of . . . the witness."   Fed. R. Evid. 608(b)(1).   Any such cross-examination also must satisfy Rule 403—that is, specific instances of a witness's prior conduct may be inquired into on cross-examination only if the probative value of such evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.   *See* Fed. R. Evid. 403; *United States v. Sasso*, 59 F.3d 341, 347-48 (2d Cir. 1995).

Furthermore, Rule 611 provides that "[c]ross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility," and that the Court should "avoid wasting time" and "protect witnesses from harassment or undue embarrassment."   It is well-settled that "[t]he scope and extent of cross-examination lies within the discretion of the trial judge."   *United States v. Scarpa*, 913 F.2d 993, 1018 (2d Cir. 1990) (internal quotation marks omitted).   As the Supreme Court has explained:

2

> [T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination [of a prosecution witness] based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. And as we observed earlier this Term, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.

*Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (internal quotation marks omitted). "As long as a defendant's right to confront the witnesses against him is not violated, limitations on cross-examination are not grounds for reversal," *United States v. Roldan-Zapata*, 916 F.2d 795, 806 (2d Cir. 1990), and "[t]he decision of the trial court to restrict cross-examination will not be reversed on appeal unless its broad discretion has been abused," *United States v. Maldonado-Rivera*, 922 F.2d 934, 956 (2d Cir. 1990). "A trial judge does not abuse his discretion by curtailing cross-examination as long as the jury has 'sufficient information to make a discriminating appraisal of the particular witness's possible motives for testifying falsely in favor of the government.'" *Scarpa*, 913 F.2d at 1018 (quoting *United States v. Singh*, 628 F.2d 758, 763 (2d Cir. 1980)).

The Second Circuit has held that courts should preclude cross-examination concerning a witness's past drug or alcohol use as irrelevant to the witness's veracity because "'a general habit of intemperance tells us nothing of the witness's testimonial incapacity unless it involves actual intoxication at the time of the event observed or at the time of testifying.'" *See United States v. DiPaolo*, 804 F.2d 225, 230 (2d Cir. 1986) (quoting 3A J. Wigmore, Evidence §§ 933–934 (brackets omitted) (collecting cases). Indeed, courts routinely preclude cross-examination concerning a witness's past drug use as irrelevant to the witness's veracity. *See United States v. Turner*, 104 F.3d 217, 223 (8th Cir. 1997) ("Misconduct involving violations of narcotics laws is

not an act involving dishonesty or untruthfulness and therefore may not be inquired into under Federal Rule of Evidence 608(b)."); *United States v. Sellers*, 906 F.2d 597, 602 (11th Cir. 1990) ("[P]rior instances of drug use are not relevant to truthfulness for purposes of Fed. R. Evid. 608(b)."); *United States v. McDonald*, 905 F.2d 871, 874 (5th Cir. 1990) (drug use not probative of truthfulness); *accord United States v. Puco*, 453 F.2d 539, 543 (2d Cir. 1971) ("[W]e believe that a narcotics conviction has little necessary bearing on the veracity of the accused as a witness.").

Courts may allow cross-examination to "determine whether a witness was under the influence of drugs or narcotics or alcohol at the time of observation of events in dispute or at the time the witness is testifying." *DiPaolo*, 804 F.2d at 229-30 (citations omitted). However, a witness's use of drugs and alcohol at *other* times is irrelevant, and such cross-examination should be precluded. *See Jarrett* v. *United States*, 822 F.2d 1438, 1446 (7th Cir. 1987) ("A witness's use of drugs may *not* be used to attack his or her general credibility, but only his or her ability to perceive the underlying events and testify lucidly at the trial.") (emphasis added). It is therefore not surprising that courts have precluded testimony concerning a "'general habit of intemperance'" because its "'bearing on moral character 'does not involve the veracity trait.'" *DiPaolo*, 804 F.2d at 229-30. (quoting 3A J. Wigmore, Evidence §§ 933). Thus, evidence of drug use generally or its effects on the witness' memory or ability to recollect in general would be "grossly prejudicial and of indeterminate relevance without scientific evidence or expert testimony." *Nibbs v. Goulart*, 822 F. Supp. 2d 339, 345-46 (S.D.N.Y. 2011).

Similarly, the Second Circuit has routinely affirmed rulings by trial courts to preclude cross-examination regarding past arrests or convictions for violence, drug possession, or other

crimes that are irrelevant to a witness's truthfulness, and unrelated to the subject matter of the

trial.  *See United States v. Flaharty*, 295 F.3d 182, 191 (2d Cir. 2002) (witness's involvement in

a murder properly precluded because "[m]urder generally is not a crime of dishonesty, and

nothing about the [ ] murder suggested it would in any way reflect on the [witness']

truthfulness."); *United States v. Rosa*, 11 F.3d 315, 336 (2d Cir. 1993) (cross-examination

regarding witness's rape and burglary properly precluded); *Salameh*, 152 F.3d 88, 131-32 (2d

Cir. 1998) (affirming court's refusal, after *in camera* review, to disclose information regarding

government witness's prior arrests and convictions for robbery, assault, sodomy, and disorderly

conduct on the ground the crimes were not probative of truthfulness under Fed. R. Evid. 608(b));

*United States v. Lenese*, 890 F.2d 1284, 1289 (2d Cir. 1989) (cross-examination on past extortion

arrest was properly precluded).

### B.  Discussion

The Government does not dispute that the defendants may cross-examine Witness-1

concerning whether the influence of drugs impaired his perception of events related to Morton's

and Hirst's purchase of WLCC Bonds in August 2014.   *See DiPaolo*, 804 F.2d 225 at 229-30.

However, evidence that Witness-1 used illegal drugs prior to and after the course of events

related to the crimes charged against Morton and Hirst is irrelevant to this case, as it does not go

to Witness-1's veracity.   *See Nibbs v. Goulart*, 822 F. Supp. 2d 339, 346 (S.D.N.Y. 2011)

(permitting introduction of evidence of drug use for "limited purpose or impeaching [witness's]

perception" of relevant events and precluding evidence as to "long-term marijuana use" as

"grossly prejudicial.").   The introduction of evidence relating to his drug use is particularly

likely to serve only to harass or embarrass—and thus, pose an undue risk of prejudice—as

opposed to illuminate any issue of credibility, veracity, or a material fact.   *See* Fed. R. Evid. 403.

Similarly, the Court should preclude cross-examination regarding Witness-1's (a) prior drug sales in 2013 or 2014, (b) arrest in July 2017 and pending charges, and (c) citation for possession of marijuana in approximately February 2018 during a car stop.   None of these prior acts is probative of Witness-1's credibility, and are entirely unrelated to the subject matter of this trial.   In addition, they are far less serious than conduct that the courts have precluded cross-examination about, as noted above.   Cross-examination as to these acts would not only be irrelevant, but it could inflame and distract the jury and subject the witness to harassment or undue embarrassment.

## II. The Court Should Preclude Cross-Examination of Witnesses Affiliated With the WLCC Concerning the WLCC's Involvement in "Pay Day Lending."

### A.  Background

At trial, the Government intends to call members of the Wakpamni Lake Community Corporation (the "Community"), a subdivision of the Oglala Sioux Tribe, and one of the victims of the charged crimes.   The Government expects that these witnesses will testify about the circumstances that led the Community to issue bonds, including the Community's lack of access to many types of more traditional financing.   These witnesses will also testify about the various false statements made to the Community by defendant John Galanis in order to induce the Community to issue bonds and to the consequences suffered by the community as a result of the fraud.

As the Court may be aware, Native American communities generally suffer from a lack of access to traditional financing options.   The poverty of many Native American communities

has left them without access to a tax base.   Mortgages are unavailable on tribal lands because

the land itself is not personally owned and thus cannot be pledged as collateral.   Tribal

sovereign immunity similarly dissuades typical lenders from doing business with Native

American communities.   As a result, Native American communities have frequently sought to

capitalize on their sovereign status in order to generate revenues for the community.   For

example, in regions where gambling is prohibited by state law, many Native American tribes

have utilized their sovereign status to build casinos on tribal lands.   Similarly, Tribal

communities may sell cigarettes at a steep discount because they are exempt from charging state

mandated taxes.

In more recent years, many tribal communities have expanded into unsecured, short term,

high interest loans often known as "payday lending."   In doing so, Native American

communities have contended that they are not bound by the laws passed in many jurisdictions

limiting the annual percentage rate that any lender may charge.[1]   The WLCC, like many of its

peer communities, has been involved in payday lending for several years and has been advised

by counsel throughout.   The Government's trial witnesses, each of whom held leadership or

other roles within the WLCC thus were (and are) themselves involved in payday lending.

### B.  Applicable Law

As described in further detail in section I.A. supra, the Court may permit cross-

examination concerning prior acts only if such acts "are probative of the character for

---

[1]  The Government and courts in this Circuit have taken a different view., s*ee, e.g., Otoe-
Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 768 F.3f 105 (2d Cir. 2014)
(holding that a tribe-run lender doing business over the internet is not *necessarily* exempt from
state usury laws), although the issue has not been firmly decided.

truthfulness or untruthfulness of . . . the witness." Fed. R. Evid. 608(b)(1). Any such cross-examination also must satisfy Rule 403—that is, specific instances of a witness's prior conduct may be inquired into on cross-examination only if the probative value of such evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See* Fed. R. Evid. 403; *United States v. Sasso*, 59 F.3d 341, 347-48 (2d Cir. 1995). Furthermore, Rule 611 provides that "[c]ross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility," and that the Court should "avoid wasting time" and "protect witnesses from harassment or undue embarrassment." It is well-settled that "[t]he scope and extent of cross-examination lies within the discretion of the trial judge." *United States v. Scarpa*, 913 F.2d at 1018 (internal quotation marks omitted).

### C. Discussion

The involvement of certain WLCC witnesses in payday lending has no bearing on the witnesses' truthfulness and should thus be precluded under Federal Rule of Evidence 608(b)(1). Efforts to associate these witnesses with a practice that many find unseemly or exploitive would operate only to unfairly tarnish these witnesses while saying nothing about their credibility. The defendants may suggest that cross-examination is proper because the witnesses involvement in an allegedly illegal business bears on their credibility. But this is not so. The WLCC witnesses are adamant that their involvement in high interest lending is legal by virtue of their sovereign immunity. They are bolstered in this belief by the advice of their counsel. And while the Government believes the WLCC is wrong, the issue is not firmly decided. Thus, whether the WLCC is right or wrong is irrelevant and their involvement in such lending in no way weighs on their credibility.

8

Moreover, any arguable relevance to such cross-examination – and there is none – is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury.   If defense counsel insinuates through questioning that the witnesses have engaged in illegal activity the Government expects the witnesses to flatly deny the allegations and to point to principals of sovereign immunity and the advice of counsel.   This would necessitate a mini-trial on usury laws, sovereign immunity, and the advice of counsel, which would undoubtedly confuse the jury and unfairly prejudice the witnesses.   This is not a trial about Native American sovereignty or the enforcement of state usury laws.   Efforts to cross examine members of the WLCC about their involvement in this industry risks unfairly tarnishing these witnesses and confusing or misleading the jury about the matters at issue in this trial. Accordingly, cross examination on this basis should be precluded.

### The Court Should Preclude the Defendants' From Introducing Self-Serving Statements, Other Hearsay, or Irrelevant Evidence

From reviewing the defense exhibits, it is clear that the defendants intend to introduce numerous simply irrelevant documents, including for example, emails from yelp, Instagram posts by Jason Galanis's then-wife, and emails and documents relating to completely separate business transactions.   It is also apparent that the defendants intend to offer certain of their own statements, and other out-of-court statements, for the truth of the matter asserted.   For example, Morton has marked dozens of her own emails and emails sent by other employees of Hughes or Atlantic.   Similarly, Archer has marked a recording of statements by Bevan Cooney, numerous emails sent by him or his assistants, as well as dozens of entries purportedly from his email calendar.   For the reasons set forth below, all such evidence should be precluded.

9

## I.       Applicable Law

It is axiomatic that in order to be admissible evidence must first be relevant, that is,

having any tendency to make the existence of any fact that is of consequence to the

determination of the action more or less probable."   Fed. R. Evid. 401.   Relevant evidence may

nonetheless be precluded where its probative value is substantially outweighed by the danger of

unfair prejudice, confusion of the issues, or misleading the jury."   Fed. R. Evid. 403.

It is similarly axiomatic that, absent an applicable exception, no party may offer hearsay,

that is, a statement by a non-testifying declarant offered for the truth of the matter asserted.   Fed.

R. Evid. 801(c).   A significant portion of the Government's proof at trial will consist of each of

the defendants' own statements, particularly in email and other correspondence   These

statements of the defendants are admissible when offered by the Government as both statements

of a party opponent, under Federal Rule of Evidence 801(d)(2)(A), and, often, in addition, as co-

conspirator statements pursuant to Federal Rule of Evidence 801(d)(2)(E).   Federal Rule of

Evidence 801(d)(2) in its entirety, provides:

> **(2) An Opposing Party's Statement**. The statement is offered against an
> opposing party and:
>
> (A) was made by the party in an individual or representative capacity;
>
> (B) is one the party manifested that it adopted or believed to be true;
>
> (C) was made by a person whom the party authorized to make a statement on
> the subject;
>
> (D) was made by the party's agent or employee on a matter within the scope of
> that relationship and while it existed; or
>
> (E) was made by the party's coconspirator during and in furtherance of the
> conspiracy.
>
> The statement must be considered but does not by itself establish the declarant's
> authority under (C); the existence or scope of the relationship under (D); or the

10

existence of the conspiracy or participation in it under (E).

As the name of the rule ("An Opposing Party's Statement") suggests, the rule does not allow defendants to introduce their own statements or the statements of their co-conspirators. *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982) ("'[w]hen the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible."); *see also United States v. Kadir*, 718 F.3d 115, 124 (2d Cir. 2013) ("A defendant may not introduce his own prior out-of-court statements because they are hearsay, and . . . not admissible." (internal quotation marks omitted)); *Marin*, 669 F.2d at 84; *see also United* States *v. Yousef*, 327 F.3d 56, 153 (2d Cir. 2003) (holding that defendant "could have testified to everything asserted in his statement, [but] he could not offer the document itself for the truth of the matter asserted"); *United States v. Rea,* 958 F.2d 1206, 1225 (2d Cir. 1992) (same); *United States v. Fernandez*, 839 F.2d 639, 640 (9th Cir. 1987) ("defense counsel wished to place [the defendants] statement before the jury without subjecting [the defendant] to cross-examination, precisely what the hearsay rule forbids.").

Further, as a general matter, the rule of completeness, Federal Rule of Evidence 106 "does not render admissible evidence that is otherwise inadmissible." *United States v. Terry*, 702 F.2d 299, 314 (2d Cir. 1983). Instead, the rule of completeness requires admission of a hearsay statement only when the statement is "*necessary* to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion." *United States v. Johnson*, 507 F.3d 793, 796 (2d Cir. 2007) (emphasis added) (quoting *United States v. Castro*, 813 F.2d 571, 575-76 (2d Cir. 1987)).[2]

---

[2] Moreover, the defendant bears the burden of showing that the portions of the statement he

Accordingly, courts have routinely precluded defendants from offering their own self-serving statements, including attempting to offer their own statements through cross-examination of the Government's witnesses.  *United States v. Jackson*, 180 F.3d 55, 73 (2d Cir. 1999) (no abuse of discretion to preclude portion of tape that included defendant's "own self-serving statements"); *United States v. Bumagin*, 136 F. Supp. 3d 361, 375 (E.D.N.Y. 2015) ("Defendant is precluded from cross-examining the Government's witnesses in an effort to elicit exculpatory statements made by Defendant because such statements are inadmissible hearsay"); *United States v. Black*, No. 13 Cr.316, 2014 WL 5783067, at *1 (E.D.N.Y. Nov. 5, 2014) (granting government's motion *in limine* to preclude defendant from eliciting self-serving statements from law enforcement on grounds that "[w]hen the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible"); *United States v. Wilkerson*, 84 F.3d 692, 695 (4th Cir. 1996) (noting that during direct examination, the government "could have introduced inculpatory statements made by [the defendant]" but also recognizing that the Federal Rules of Evidence "do not provide an exception for self-serving, exculpatory statements made by a party which are being sought for admission by that same party").

Under this well-settled law, the defendants should be precluded from eliciting any self-serving exculpatory statements made during recorded conversations, in emails and other

---

seeks to offer are necessary to clarify or explain the portions offered by the Government.  *See United States v. Glover*, 101 F.3d 1183, 1190 (7th Cir. 1996) ("[T]he proponent of the additional evidence sought to be admitted must demonstrate its relevance to the issues in the case, and must show that it clarifies or explains the portion offered by the opponent.").

correspondence, or during their post-arrest interviews with law enforcement to the extent they would not otherwise be admissible pursuant to a hearsay exception.

Further, the business records exception, Rule 803(b)(6), does not provide a basis for the defendants to introduce emails simply because they were created by a business.   As Judge Kaplan has noted, "[a]n email created within a business entity does not, for that reason alone, satisfy the business records exception of the hearsay rule."   *Morisseau v. DLA Piper*, 532 F.Supp.2d 595, 621 n.163 (S.D.N.Y. 2008).

In addition, while a defendant is, of course, permitted to offer evidence of opinion or reputation for a pertinent character trait, that a defendant would not commit fraud is not a pertinent character trait.    Instead, any such testimony is limited to reputation or opinion testimony concerning actual pertinent traits such as truthfulness.    In addition, while the accused may introduce evidence of a pertinent character trait through generalized opinion or reputation testimony, *see* Fed. R. Evid. 405(a); *United States v. Nektalov*, No. S2 03 Cr. 828 (PKL), 2004 WL 1637010, at *1-3 (S.D.N.Y. July 21, 2004) (summarizing principles governing application of Rule 405(a)); *United States v. Chan*, No. S11 97 Cr. 1053 (PKL), 2002 WL 109528, at *1-2 (S.D.N.Y. Jan. 25, 2002) (same), Federal Rule of Evidence 405(b) expressly precludes proof of the defendant's good character by specific acts where, as here, the defendant's character or trait of character is not an essential element of the crime charged.    *See, e.g.*, *United States v. Benedetto*, 571 F.2d 1246, 1249-1250 (2d Cir. 1978) (explaining that defense-proffered character evidence of defendant's specific acts in the past was improperly admitted because "character evidence has long been admissible only in the form of reputation and not in the form of a recitation of good or bad acts"); *United States v. Nektalov*, 2004 WL 1637010, at *2 (explaining

that defendant "may offer direct testimony about his good character, but must do so by testimony about his reputation and by opinion testimony, and not by testimony about specific instances of conduct").[3]

## II. Discussion

The Government has reviewed the exhibits produced by defendants Hirst, Morton, Cooney and Archer to date.    The Government's review of the defense exhibits reveals that a significant percentage of the exhibits are inadmissible, principally because the exhibits are irrelevant, constitute inadmissible hearsay, or both.    Given the volume of the exhibits and that the Government cannot yet fully anticipate the defendants' use of these exhibits, it is impossible for the Government to move to preclude each and every seemingly inadmissible exhibit.[4] Instead, mindful of the Court's directive that the parties should avoid requesting side bars, the Government sets forth below (i) its specific objections to certain exhibits; and (ii) its more generalized objections to certain categories of exhibits (for which it has not identified each and every example).    The Government reserves the right to make further objections to the admissibility of the defense exhibits.

---

[3]As the Advisory Committee Notes and applicable case law make plain, cases in which character is an essential element of the crime charged are rare: "Illustrations are: the chastity of the victim under a statute specifying her chastity as an element of the crime of seduction, or the competency of the driver in an action for negligently entrusting a motor vehicle to an incompetent driver." Advisory Committee Note to Fed. R. Evid. 404(a); *see, e.g.*, *United States v. Doyle*, 130 F.3d 523, 542 (2d Cir. 1997) (explaining that "the exception of Rule 405(b)" cannot be read to "swallow the general rule of 405(a) that proof of specific acts is not allowed"); *Shakur v. United States*, 32 F. Supp. 2d 651, 668-69 (S.D.N.Y. 1999) (discussing this rule).

[4]  To date Hirst has produced approximately 24 exhibits, Morton has produced approximately 321 exhibits, Cooney has produced approximately 254 exhibits, and Archer has produced approximately 480 exhibits.

### A.  Defendant Archer

#### 1.  The Cooney Recording

Defendant Archer, joined by Defendant Cooney, seeks to offer portions of a 2014 recorded conversation (a transcript of which is attached hereto as Exhibit A) between Cooney and another individual ("CC-1") who was then cooperating with the USAO in a different district. The three excerpts of the recording the defendants seek to offer, however, constitute classic inadmissible hearsay and should be precluded.

In the first portion of the recording, Cooney and CC-1 discuss Cooney's prior involvement in a potash company and the involvement of an individual named "Brownie" in taking two prior deals public.   Cooney goes on to state that his typical role in any deal is to buy up a shell, orchestrate a reverse merger, and then "up-list" on the NASDAQ, but that he does not generally have any role in managing the business.   As a preliminary matter, leaving aside hearsay problems, Cooney cannot offer evidence of his prior involvement in purportedly legitimate deals as evidence that his involvement in the present fraud was legitimate.   *Benedetto*, 571 F.2d 1246, 1249-1250 (2d Cir. 1978) (specific acts not admissible as character evidence); *accord United States v. Scarpa,* 913 F.2d 993, 1011 (2d Cir. 1990) ("A defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on specific occasions."); *United States v. Gambino*, 838 F. Supp. 744, 748 (S.D.N.Y. 1993) ("A defendant cannot introduce evidence of innocent behavior on other occasions to prove his innocence."). Nor can Cooney offer evidence, if true, that he did not generally involve himself in managing another business, as evidence that he did not involve himself in this one.   But even if such evidence was generally proper – and it is not – Cooney's own statements to that effect constitute inadmissible hearsay.

Similarly, in the second and third portions of the recording, Cooney tells CC-1 about his relationship with Devon Archer, about Archer's connections with Hunter Biden, John Kerry, and Chris Heinz, and about Archer's role as the "show pony," for his deals.   Cooney also states that "these guys don't do [] skuzzy deals" although Archer is "not afraid . . . to work with people who have a little hair on them."   Again, Archer's involvement with the sons of well-known political figures is wholly irrelevant to the present matter.   As above, neither Archer nor Cooney may argue that Archer's prior involvement with purported legitimate business figures says anything about the legitimacy of the present fraud.   But again, even if it did, Archer and Cooney cannot offer Cooney's prior statements to this effect because they are classic hearsay-statements of an out of court declarant being offered for their truth, i.e., that Archer was connected to Biden, Kerry, and Heinz, guys who "don't do skuzzy deals."

The Government further notes that if the Court were to permit the admission of these plainly inadmissible portions of the recording, the Government would seek to introduce additional portions of the recording, which undercut Cooney's seeming claim to be involved in legitimate businesses with Archer.   For example, the Government would seek to offer portions of the recording in which Cooney discussed his pump-and-dump methodology, discussed the need to control all of the freely trading shares of such stock, acknowledged his efforts to engage in such tactics with respect to shares of Flikdate (which was run by one of the same individuals who ran Code Rebel), and considered CC-1's offer to assist in such schemes by parking shares with CC-1's investment advisory clients in return for a kickback.

## 2.   Calendar invites, calendar entries, itineraries, travel emails etc.

Defendant Archer has marked several hundred exhibits consisting of calendar invites, calendar entries, boarding passes, itineraries, and emails concerning his travel.   The Government

surmises that Archer intends to offer this evidence to show generally that he was very busy.   But this evidence is inadmissible because it consists almost exclusively of hearsay.   That is, Archer cannot offer statements by himself and others about his travel and schedule as proof that he was in fact travelling or otherwise at the specified events.   Because these exhibits are too numerous to discuss on a case by case basis, the Government describes a representative sample below. The Government moves to preclude all such exhibits, including but not limited to DX 5000-5203.

- DX 5136 is a July 14, 2015 email from an individual who appears to be Archer's assistant at Rosemont Capital to Jason Sugarman and Jason Galanis, copied to Archer, stating that "Devon has asked that I forward you his travel schedule to Beijing, Dubai and Riga for next week," and including flight and itinerary information.

- DX 5155 is a travel itinerary for flights to/from JFK to Tahoe.

- DX 5167 is a December 5-6, 2015 calendar entry reflecting a flight to Dubai.

- DX 5170 is Archer's calendar for the month of February 2014, including for example, an outlook calendar invite from his assistant to a lunch with Alex Kerry.

- DX 5168 is a December 15, 2014 email from Archer to another individual at Rosemont Capital stating, "I am in Astana until tomorrow."

- GX 5203 is an invitation to the May 7, 2015 East Harlem school poetry slam.

### 3.   Instagram Posts

Archer has marked as exhibits DX 4900-4906 various posts from the Instagram account of Jason Galanis's then-wife.   Such posts are of no relevance, and the statements contained within them are – if offered for the truth – inadmissible hearsay.   The posts include, for example, DX 4906, an April 5, 2015 photo of Jason Galanis and a woman, accompanied by the statement "Best Passover ever [emoji] thank you [individual] for making us family."   Another

17

post from March 11, 2015, consists of a photograph of Galanis's then-wife and several other women and is accompanied by the statement "Thank you #Chanel for such a French Day!"   And a third post from December 7, 2014, is a photo of a coastline, seemingly taken from an airplane, which has been captioned "Somewhere over the rainbow!"   In short these posts are wholly irrelevant and should be precluded.

### 4.   BIT Board Emails

Archer has marked numerous emails between himself and Jon Burnham;[5]  John Burnham and representatives of the Board of Trustees of the Burnham Investors Trust (the "BIT Board"),[6] and himself and the BIT Board as exhibits at trial.   Because, as the Court is aware, Archer made repeated misrepresentations to the BIT Board about Galanis, the Government intends to offer evidence of Archer's communications to the BIT Board.   And there may well be certain BIT Board communications that Archer may himself properly offer.   But the Government's ability to use Archer's statements against him does not render all communications concerning the BIT Board admissible if offered by him.

For example, Archer has marked DX 4308, an email in which Archer receives an invitation to a BIT Board meeting and responds that he will be on a flight and unable to dial in. The seeming purpose of DX 4308 is to establish that Archer did not participate in the referenced meeting.   But Archer cannot offer his own statement that he would be unable to participate in the meeting and proof that he did not in fact do so.

---

[5]  Mr. Burnham was the Chairman of the Burnham Financial Group ("BFG"), an entity that Archer, backed by defendants Jason Galanis and Bevan Cooney, sought to acquire.

[6]  As discussed in prior briefing in this case, the BIT Board oversaw three mutual funds managed by Burnham Asset Management, a subsidiary of BFG.

Similarly, DX 4321 is a series of emails between Archer and Jon Burnham in which Burnham recounts at length the legal bills from counsel for the BIT Board, characterizes the bills as utterly outrageous, and describes various fees Burnham is expecting.   But all of Burnham's statements similarly constitute impermissible hearsay.

Given the volume of Jon Burnham/BIT Board emails and the Government's uncertainty with respect to Archer's trial strategy, the Government cannot assess the precise purpose for which Archer seeks to offer such emails.   For now, the Government moves to preclude 4308 and 4321 and reserves the right to revisit these emails after Archer's theory of the case has solidified.



### 6.   Evidence of PLA

Archer has marked numerous exhibits, *see, e.g.,* DX 4503, 4504, 4506, 4512, 4514, 4519-4522, relating to Rosemont Seneca Bohai's revolving loan agreement with Morgan Stanley, including monthly statements showing the balance and credit available.   The Government is awaiting confirmation that such documents are business records of Morgan Stanley.   Even assuming a business records foundation could be laid, however, the existence of the agreement or its uses appears of no relevance and accordingly, should be excluded.

### 7.   Additional Facially Irrelevant Evidence and Impermissible Hearsay

Recognizing that the Government may not understand all arguments Archer may wish to advance at trial, Archer has marked certain exhibits so facially irrelevant, that the Government can conceive of no possible basis for admissibility.   Similarly, Archer has marked a large number of emails, including numerous emails with his personal assistant, that appear to contain inadmissible hearsay and for which no obvious exception applies.   And in some cases Archer has marked exhibits that both contain hearsay and are irrelevant.   As Archer is the proponent of this evidence, absent a sufficient showing from Archer that such emails are admissible for non-hearsay purpose, such emails must be excluded.   The Government cannot summarize every such email from the hundreds of emails Archer has marked, but includes the below as a sample.   The

Government moves to preclude the admission of the exhibits referenced below and reserves the

right to object to any additional similar emails.

- DX 4704 and 4724, are, respectively automated emails from Yelp, the food-review site, pertaining to cronuts and cookies.

- DX 4728 is an email from Jason Galanis to Devon Archer attaching what appears to be a photos of a koi pond and is accompanied by the statement, "bbq'ing the koi.   Filet o' fish sandies."

- DX 4120 is an April 2015 email chain in which a Rosemont Seneca employee emails Andrew Godfrey saying that Devon [Archer] suggested the employee reach out because "[a] friend of Hunter's [Biden's] contacted us and wanted to introduce us to a Native American, Thomas Seneca, who runs his own wealth management business," and that Burnham, which had just acquired a minority owned broker dealer might be able to advise.

- DX 4500 to 4502 are a series of emails relating to a purported loan from Archer to Godfrey, including confirmation that the wire for the loan has been sent.   The substance of the emails consists of statements by Archer and/or Momtazi about the size of the loan and the fact that the wire transfer is a loan.

- DX 4701 is a April 2009 email in which Jason Galanis introduced another individual to Galanis's "friend" Bevan Cooney and indicates that Cooney will host them in the Governor's mansion.

- DX 4702 is a January 2010 email in which Bevan Cooney emails Galanis that he believes a third party "has forgotten about the 100k for now!!!!"

- DX 4703 is a 2010 email in which Jason Galanis says that Bevan Cooney should receive a "tombstone" for a transaction involving fund.com.

**B.  Defendant Cooney**

Cooney too has marked a number of exhibits which on their face appear irrelevant to the

present trial and which should be precluded.   These include:

- DX 3186 is an email from Cooney to a new Fulton and Meyer employee handling his account in which he says "Here's a photo of the Cooney family you will be assisting." Attached is a photo of Cooney with his wife and children.

- DX 3321, 3420, 3421, 3624, 3625, 3627, 3628, 3629 are various communications concerning Cooney's participation in acquiring the Viper Room, a Los Angeles night club.

- DX 3303 is an email from Fulton and Meyer asking Cooney if he wishes to renew his children's subscription to Highlights.

    a.  Exhibits for Which No Hearsay Exception Applies

Cooney has also marked a number of exhibits inadmissible hearsay and for which no obvious exception applies.   Again, as Cooney is the proponent of this evidence, absent a sufficient showing from Archer that such emails are admissible for non-hearsay purpose, such emails must be excluded.   The Government cannot summarize every such email from the hundreds of emails Cooney has marked, but includes the below as a sample:

    b.  Cooney's Statements to Fulton and Meyer

- DX 3141/3142 is an email in which Cooney tells Fulton and Mayer that a particular wire transfer is for an investment in Burnham that is a convertible loan.

- DX 3152 is an email in which Cooney responds to an inquiry from Fulton and about how he learned of the Wakpamni bonds and says that Burnham Securities turned him on to the investment.

- DX 3161c is an email from Fulton and Meyer telling Cooney that a wire was sent. Cooney responds that a $100,000 wire is coming the next day

- DX 3167 is an email in which Cooney tells Fulton and Meyer that he working on trading out of his bonds and has another trade that will bring him liquidity.

- DX 3177 is an email in which Cooney tells Fulton and Meyer that the Code Rebel IPO was a major success and he will receive 500,000 shares.   He also states that he spoke to Steve Shapiro of City National Bank who believes that City National will make a $1.3 million loan based on the stock position.

- DX 3184 is an email in which Cooney tells Fulton and Meyer that they made late payments on his credit cards which has caused his interest rate to rise.

- DX 3246 is an email in which Cooney tells Fulton and Meyer that a particular wire was a loan repayment.

22

- DX 3609-3612, 3615-3622 are emails in which Cooney provides Fulton and Meyer with promotional and other materials concerning various deals including MBloom, Palihouse, Flikdate.

      c.   Emails For Which Cooney is Neither the Sender nor a Recipient

- 3159b and 3160 are emails between Fulton and Meyer and City National concerning efforts to have Coney's medallion stamped.

- 3623 is an email between Fulton and another financial professional who tells Fulton that Cooney may need to sell his bonds and that Cooney's "partner" was able to secure a margin loan against the partner's bond position and that the financial professional is looking into a similar option for Cooney.

      d.   Other hearsay

- DX 3179 is a law firm opinion letter sent to Continental Stock Transfer opining that the restrictive legend may be removed from Cooney's Code Rebel shares.

### C. Defendant Morton

a. Facially Irrelevant and Impermissible Hearsay

Morton has marked certain exhibits that are facially irrelevant and which contain inadmissible hearsay for which no obvious exception applies.   As Morton is the proponent of this evidence, absent a sufficient showing from Morton that such emails are admissible for non-hearsay purpose, such emails must be excluded.   Morton has marked more than 300 exhibits, and, therefore, the Government cannot summarize every such email from the exhibits Morton has marked, but includes the below as a sample:

      i.     Emails that are Irrelevant, Contain Impermissible Hearsay, and For Which Morton is Neither the Sender Nor a Recipient

- DX 1001 is January 26, 2012 email from Frankie Hughes, the former owner of Hughes Capital Management, to a former Hughes pension fund client regarding a request to raise $30 million through withdrawals.

- DX 1002 is a February 3, 2013 email from Richard Deary, Morton's former business partner, regarding a business plan for acquiring different investment management firms and opportunities for minority, women-owned, and disabled veteran firms.

- DX 1054 is an August 17, 2014 email exchange between Sylvan Schefler, a Burnham employee, and Hugh Dunkerley regarding various documents related to the bond issuance.

- DX 1062 is an August 18, 2014 email exchange between Richard Deary and Daniel Turney, a Hughes employee, regarding Hughes logistical and operational issues.

- DX 1076 is an August 20, 2014 email exchange between Carolyn Lisa, Justin Malkin and Mike Allen, Hughes employees, regarding Malkin and Allen's concerns regarding the Wakpamni bonds.

- DX 1078 is an August 20, 2014 email exchange between Gary Hirst and Richard Deary regarding the bond interest accrual start date.

- DX 1133 is an October 7, 2014 email from Jason Galanis to Cooney forwarding an email chain with others regarding Cooney's purchase of $5 million in bonds.

- DX 1152 is a November 11, 2014 email from Richard Deary to a Hughes client regarding the Wakpamni bonds.

- DX 1198 is a March 11, 2015 email exchange between Atlantic employees and a pension fund client, including various internal Atlantic employee emails, regarding the investment guidelines for a particular portfolio (and not the portfolio into which the Wakpamni bonds were later purchased).

- DX 1280 is a June 29, 2015 email from an Atlantic employee to Andrew Godfrey, a Burnham employee, regarding calls from an Atlantic client demanding liquidation of the Wakpamni bonds from the Atlantic portfolio into which the client invested.

- DX 1287 is an August 11, 2015 email from an Atlantic employee to the former owner of Atlantic describing the employee's speculation regarding issues with the Wakpamni bonds, and requesting help in resolving the situation with Burnham.

ii.   Emails for which Morton is a Sender or Recipient and Which Contain Impermissible Hearsay

Morton has marked dozens of her own emails, all containing impermissible hearsay for which there is no obvious exception.

24

- DX 1005 is a June 5, 2018 email from Morton to Jason Galanis regarding Native American initiatives in which she purports to be interested in working on and meeting with Jason Galanis to discuss working with Burnham, among other topics.

- DX 1010 is a July 6, 2014 email from Morton to Jason Galanis regarding a plan for Burnham, COR, and GMT Duncan to collaborate on tribal finance initiatives.

- DX 1012 is a July 12, 2014 email from Morton to Jason Galanis regarding pushing back a meeting because she was nervous.

- DX 1019 is a July 21, 2014 email from Morton to Jason Galanis regarding Hirst being appointed to act as a board member and consulting Chief Investment Officer to give comfort to clients.

- DX 1050 is an August 17, 2014 email from Morton forwarding an email chain that includes Jason Galanis, Hugh Dunkerley and Gary Hirst regarding a memorandum from Greenberg Traurig, counsel for the WLCC, about the WLCC's authority to issue bonds.

- DX 1058 contains multiple August 18, 2014 email exchanges with different individuals, including Carolyn Lisa, a former Hughes and Atlantic employee, Morton, Galanis and Hirst regarding a spreadsheet of Hughes client portfolios and investment policies.

- DX 1087 is an August 22, 2014 email from Morton to Hirst and several Hughes employees in which Morton complains about the adequacy of Hughes systems to meet portfolio management an operational needs.

- DX 1088-1090 and 1099-1111 are purportedly August 25, 2014 and September 2, 2014 letters from Morton and Deary to Hughes clients regarding the new ownership of Hughes and investment in the Wakpamni bonds.

- DX 1132 is an October 5, 2014 email from Morton to various Atlantic employees regarding a term sheet for the proposed acquisition of Atlantic.

- DX 1160 is a December 17, 2014 email from Morton to various Atlantic employees regarding the Atlantic Christmas party, and in which Morton expresses being upset about Atlantic performing due diligence on her and describes how a company owned by her investors makes loans and supports Native American business development efforts.

- DX 1165 and 1168 are text messages throughout 2014 and 2015 between Morton and an Atlantic employee regarding various topics, including Morton's acquisition of Atlantic.

25

- DX 1195 contains email exchanges on March 5 and 6, 2015 containing emails between Morton and Jason Galanis regarding the bonds that Morton forwards to an Atlantic employee, stating that, among other things, she is seeking clarity on the annuity and cash flow regarding the bonds.

- DX 1210 is an April 10, 2015 email from Morton to Atlantic employees providing information regarding the Wakpamni bonds, including allocations of the bonds in the Hughes portfolios and letters to Hughes clients regarding the bonds.

- DX 1216 is an April 12, 2015 email from Morton to an Atlantic employee regarding her conversation with another Atlantic employee regarding the bonds.

- DX 1239 is an April 30, 2015 email from Morton to two employees about problems between the two employees.

- DX 1241 is a May 3, 2015 email exchange between Morton and Atlantic employees in which Morton lodges allegations of misconduct against Atlantic and the Atlantic pension fund client who invested in the Atlantic portfolio into which Morton purchased the Wakpamni bonds.

- DX 1263 and 1264 are June 15, 2015 email exchanges between Morton, Devin Wicker and others regarding liquidation of the Wakpamni bonds.

- DX 1284 is an August 3, 2015 email exchange between an Atlantic employee and the Atlantic client who invested in the portfolio into which the Wakpamni bonds were purchased regarding Atlantic's failure to sell the bonds to Bonwick Capital.

- DX 1290 contains August 13, 2015 emails from Richard Deary and an Atlantic employee (who previously worked at Hughes) to Morton and others containing speculation and allegations of misconduct lodged against the Atlantic pension fund client who complained about and requested liquidation of the Wakpamni bonds from the Atlantic portfolio into which the client invested.

iii.   Folders Containing Compilations of Unidentified Notes, Memos, and Other Information

Morton has also marked as exhibits what appear to be several folders found at Hughes and/or Atlantic and contain unidentified handwritten notes, including of calls and meetings, memorandum, emails, and other documents, which, as offered by Morton, contain hearsay.   For example:

- DX 1000 is a file of "Wakpamni research" containing miscellaneous and unidentified handwritten notes regarding phone calls about the bonds, letters, memoranda, and background materials.

- DX 1254 is a folder of documents marked "found in Carolyn's Desk" (an apparent reference to former Hughes and Atlantic employee Carolyn Lisa), and which contains miscellaneous documents, emails, and other materials relating to the Wakpamni bonds.

b. Emails Regarding Morton's Purported Attempt to Cooperate with Law Enforcement

Morton has also marked several emails relating to her purported attempt to cooperate with law enforcement.   The Government's motion to preclude all such evidence is currently pending.   In addition to the reasons set forth in the Government's prior motion, Morton's exhibits regarding her communications with the FBI, the U.S. Attorney's Office, the SEC, and FINRA should be precluded. Some of those exhibits constitute impermissible hearsay (see, DX 1296 and 1308 below). The remainder, even if some non-hearsay basis exists, are so rife with various substantive hearsay statements that a limiting instruction would likely be necessary. Those include the following:

- DX 1293, 1294, and 1295 are August 26 and 27, 2015 emails from Morton to Special Agent Bieniek forwarding emails from Jason Galanis and providing Jason Galanis's contact information.

- DX 1296 is an August 31, 2015 email from Postal Inspector Adam Fascio to two Assistant United States Attorneys regarding scheduling a meeting with Morton.

- DX 1304 is a November 2, 2015 email from Morton to an SEC employee forwarding various emails regarding selling the Wakpamni bonds out of an Atlantic portfolio and referencing Morton's and the SEC employee's conversation.

- DX 1308 is a voicemail from a FINRA employee regarding having missed Morton's call.

### D.  Defendant Hirst

Defendant Hirst has marked several exhibits (DX 1-4) pertaining to a purported agreement by Rosemary & Rue (a Hirst entity) to purchase a $1.3 million real estate parcel from Bonair, LLC (a Jason Sugarman Entity).   Hirst has also marked exhibits which purport to show that after making payment for the parcel, Hirst elected to cancel the transaction and demanded the return of the $1.3 million.   With respect to this transaction, Hirst has marked DX 4, a February 23, 2014 letter from the president of the Insurance Company of the Americas (another Hirst entity) explaining the need for the repayment of the $1.3 million.   But such statements, offered for their truth, constitute inadmissible hearsay and should be precluded.

Hirst also marked DX 18, an email from Morton to Hughes personnel stating that Carolyn Lisa has been made a full time employee and chief compliance officer of Hughes Capital Management.   Offered to show that Carolyn Lisa was a full time employee or the chief compliance officer, this email constitute impermissible hearsay.

With respect to the remainder of Hirst's exhibits, the Government presently believes that although they contain hearsay, a permissible non-hearsay basis exists for their admission. Accordingly, the Government does not presently object to the remainder of Hirst's exhibits but reserves its right to do so as Hirst's theory of relevance becomes clearer.

28

## **CONCLUSION**

The Court should preclude cross-examination on topics listed above and preclude the

defense exhibits, as set forth above.

Dated: New York, New York
        May 8, 2018

                              Respectfully submitted,


                              ROBERT KHUZAMI
                              Attorney for the United States, Acting Under
                              Authority Conferred by 28 U.S.C. § 515


                      by: _____/s/_____
                              Rebecca Mermelstein
                              Brendan F. Quigley
                              Negar Tekeei
                              Assistant United States Attorneys
                              (212) 637-2360 / 2190 /2444

29