

MATTHEW L. SCHWARTZ
Tel.:  (212) 303-3646
E-mail:  mlschwartz@bsfllp.com

May 14, 2018

**BY ECF**

Hon. Ronnie Abrams
United States District Judge
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

   **Re:** *United States v. Jason Galanis, et al.*, S1 16 Cr. 371 **(RA)**

Dear Judge Abrams:

   I represent Devon Archer.  I write in further support of Mr. Archer's request for a limiting instruction, and to preclude the government from arguing that Mr. Archer or Bevan Cooney purchased any of the WLCC bonds "to falsely suggest that there were legitimate purchasers of the bonds," [ECF No. 417, at 7] – a theory of the crime that is not embraced in the Indictment.[1]

**A.**  **The Government's New Theory Of Securities Fraud Should Be Precluded**

   By letter dated April 17, 2018 – just a month before the start of trial – and in the course of seeking to reargue the exclusion of certain Rule 404(b) evidence, the government for the first time articulated a new theory of securities fraud against Mr. Cooney, which would seem to have equal application against Mr. Archer:[2]

> Cooney was given money to purchase the [WLCC] bonds for at least two purposes: (i) to falsely suggest that there were legitimate purchasers of the bonds; and (ii) to permit the defendants to obtain control of additional Wakpamni bonds without locating any additional investor money, so that the bonds could be used as a currency in other transactions – as they were, for example, in funding the purchase of Bonwick.

[ECF No. 417, at 7].  As set forth in Mr. Archer's April 24th letter, there is no objection to the

---

[1]  Mr. Archer originally raised these issues by letter on April 24, 2018, in the context of briefing related to the government's Rule 404(b) motions, [ECF No. 424], and the government responded by formal memorandum on Friday, [ECF No. 449].

[2]  The government's response does not confirm whether it intends to make this argument with respect to Mr. Archer, or only Mr. Cooney.  If its argument is aimed only at Mr. Cooney, then at a minimum a limiting instruction would be required.



government arguing the second alleged purpose, of which the defendants have been given proper notice.  But the first alleged purpose, "to falsely suggest that there were legitimate purchasers of the bonds," was brand new, and should be prohibited.

The primary reason this allegation constitutes a constructive amendment is that it brings a whole new category of victims into the equation.  *See United States v. Zingaro*, 858 F.2d 94, 99-103 (2d Cir. 1988) (overturning RICO conviction where the government offered proof of predicate loansharking acts committed against victims not named in the indictment); *United States v. Yeo*, 739 F.2d 385 (8th Cir. 1984) (where indictment named a certain victim, jury instructions allowing conviction for extortion of either that victim "or *another*, amounted to a constructive amendment of the indictment" (emphasis in original)).[3]

Previously, the government has represented and put the defendants on notice that this case involves two categories of victims:  the WLCC that was allegedly fraudulently induced to issue the bonds, and the clients of the investment advisers that were allegedly stuck with the bonds.  The argument that Mr. Cooney or Mr. Archer bought some of the WLCC bonds to "falsely suggest that there were legitimate purchasers of the bonds" brings a new category of victims into play:  participants in the market for sovereign and municipal bonds.  Plainly, misrepresentations aimed at a new and previously undisclosed category of victim constitute a dramatic change to the charges, and constitute a constructive amendment of the Indictment.  *See United States v. Milstein*, 401 F.3d 53, 65-66 (2d Cir. 2005) (vacating conviction where indictment charged a different manner of rebranding drugs than was proposed at trial); *United States v. Bastian*, 770 F.3d 212, 220 (2d Cir. 2014) ("Even if an indictment might have been drawn in more general terms to encompass the ultimate conviction, where 'only one particular kind of [criminal conduct] is charged . . . a conviction must rest on that charge and not another.'" (quoting *Zingaro*, 858 F.2d at 99 (alterations in original)); *United States v. Mollica*, 849 F.2d 723, 729 (2d Cir. 1988) (finding constructive amendment where jury was allowed to consider purported money laundering activity as part of charged tax fraud conspiracy although "it was not established that [the money laundering scheme] was included in the original indictment"); *United*

---

[3]     In arguing that the government's new theory of the crime constitutes a constructive amendment, Mr. Archer also intends to assert the closely-related concept of variance.

> The theory of "variance" is related to constructive amendment and "occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *United States v. Salmonese*, 353 F.3d at 621 (quoting *United States v. Frank*, 156 F.3d at 337 n.5). Unlike constructive amendment, a variance 'does not broaden the possible basis for conviction beyond that contained in the indictment.'" *LaSpina*, 299 F.3d at 183 (quoting *United States v. Patino*, 962 F.2d 263, 266 (2d Cir. 1992)).

*Davis*, 2017 WL 3328240, at *29.  Thus, if the Court agrees with the government that its new theory is not technically a constructive amendment because it is embraced by the broad language of the indictment, it should nonetheless be precluded as a prejudicial variance.



*States v. Davis*, No. 13 Cr. 923 (LAP), 2017 WL 3328240, at *28-35 (S.D.N.Y. Aug. 3, 2017) (reversing conviction and finding constructive amendment in case arising from fraud in construction of new World Trade Center project where government introduced "a new theory of economic harm").

The government avoids this issue, pretending not to understand the phrase "fraud-on-the-market" outside of the *Basic v. Levinson* reliance presumption for civil securities fraud. [ECF No. 449, at 2]. Of course Mr. Archer is not arguing that reliance is an element of criminal securities fraud. Rather, as was clear from our April 24 letter, the point is that the government's new theory is that, by buying the WLCC bonds, Mr. Cooney and Mr. Archer committed a fraud upon the bond market. [*See* ECF No. 424, at 3 ("In a single clause of a single sentence hidden in a letter re-litigating unrelated Rule 404(b) evidence, the government appears to announce an entirely new theory of securities fraud: that Mr. Cooney defrauded the bond market by falsely suggesting that there were legitimate purchasers of the bonds, when he was somehow an illegitimate purchaser.")]. This constitutes an entirely new theory of securities fraud, with a brand new victim, that is simply not appropriate at this point in the case, and which has absolutely no support in the evidence. *See, e.g., Stirone v. United States*, 361 U.S. 212, 217 (1960) (proof of interference with interstate shipment of steel from Pennsylvania to Michigan and Kentucky was constructive amendment of indictment that alleged interference with shipment of sand into Pennsylvania); *United States v. Salinas*, 654 F.2d 319 (5th Cir. 1981) (indictment alleging aiding and abetting theft by named bank official was constructively amended by proof showing that defendant aided and abetted another official), *overruled on other grounds by United States v. Adamson*, 700 F.2d 953 (5th Cir. 1983).

The government also argues that this theory is within the "core criminality charged in the Indictment" because there will be evidence that "after the first Wakpamni bond issuance, John Galanis told representatives of the Wakpamni Lake Community that the first issuance had been a success and falsely stated that investors were demanding even more Wakpamni bonds. This led to the second and third issuances, in which Archer and Cooney purchased the bonds. . . ." [ECF No. 449, at 3]. First of all, any such evidence does not support the government's new theory, which has to do with Mr. Cooney's "purpose" in buying the bonds. John Galanis's alleged lies about the success of the *first* issuance may have led to the second and third issuances, but Mr. Cooney and Mr. Archer did not buy bonds from the first issuance. Plainly, the "success" of the second and third issuances (the ones that Messrs. Archer and Cooney allegedly bought) could not have been used to induce the WLCC to engage in the second and third issuances themselves.

Assuming, however, that the government will put on evidence that John Galanis also induced the *fourth* bond issuance based upon the claimed success of the second and third issuances, that would still not support its market-as-victims theory. As alleged by the government, the fourth bond issuance was not sold to the market; it was put to a single client of Atlantic, without that client's knowledge. The "success" of the second and third bond issuances therefore was not part of the calculus in "selling" the fourth issuance to that client.

Mr. Archer addressed this directly in his April 24 letter, in which he explained that the government has alleged that John Galanis falsely told the WLCC that the First, Second, and Third Bond Issuances had been successful and that investors were demanding even more WLCC



Bonds.  [ECF No. 424, at 3 n.3].  But as he also explained, it is undisputed that Mr. Archer and Mr. Cooney were not aware of these representations, and had no interactions with the WLCC. Thus, while these misstatements may constitute state of mind evidence as to John Galanis, they are not admissible as against Mr. Archer and Mr. Cooney, and are yet one more reason why Messrs. Archer and Cooney should be severed.  *See generally Zafiro v. United States*, 506 U.S. 534, 539 (1993).

If the Court is nonetheless inclined to allow the government to introduce this evidence of false statements to the WLCC (as opposed to a fraud-on-the-market), it should give the following limiting instruction before and after the jury hears the evidence, as Mr. Archer previously requested:

> [You are about to hear/You have heard] evidence that John Galanis made certain statements to the WLCC concerning the success of the WLCC bonds and the demand for them in the market.  It is for you alone to decide whether John Galanis actually made those statements and, if so, whether there was anything wrongful about them, and you may consider that evidence only for its bearing, if any, on the question of John Galanis's knowledge and intent, and for no other purpose.  You may not consider that evidence as evidence of guilt of any crime for which Devon Archer or Bevan Cooney is now on trial; that evidence has absolutely nothing to do with them.

The government has failed to respond meaningfully to either aspect of Mr. Archer's argument.  First, the government should not be permitted to argue that Mr. Archer and Mr. Cooney somehow acted with the intent to defraud the bond market when they allegedly purchased bonds.  And second, while Mr. Archer has no objection to arguments that John Galanis made misrepresentations based upon the fact that Mr. Archer and Mr. Cooney purchased bonds, that evidence should be subject to a limiting instruction because it was neither known nor foreseeable to Messrs. Archer and Cooney.

## B.        The Government Continues To Confuse Conduct With Liability

Relatedly, the government in a footnote disputes Mr. Archer's contention that he is "not alleged to have been involved in the second sort of misconduct" charged in the Indictment, *i.e.*, the failure to disclose conflicts of interest and other violations of fiduciary duty at the investment advisers.  [ECF No. 449, at 4 n.1].  The sole basis for this argument is that Mr. Archer is charged with the substantive securities fraud scheme, which encompasses both aspects of criminality.  *Id.*

This is another example of the government conflating conduct with legal theories.  *See* May 10, 2018 Archer Reply Mem. in Supp. of Mot. *in Limine* [ECF No. 448], at 5-7 (discussing *Pinkerton* liability).  There is no *evidence* whatsoever connecting Mr. Archer to the alleged failure to disclose material information to the clients of the investment advisers, which was allegedly perpetrated by Jason Galanis, Hugh Dunkerley, Gary Hirst, Michelle Morton, and perhaps others.  The government has once again made clear that it intends to blur the lines and



tar Mr. Archer with the misconduct of others, which emphasizes the absolute importance of disciplining the government when it talks about "the defendants."

It is of course true that the defendants were charged in a single fraud count that includes different kinds of conduct. The government apparently believes that it will be able to prove that this was a single scheme, rather than multiple conspiracies. But framing the charges in this way does not mean it is proper for the government to argue that Mr. Archer was involved in conduct that he had no knowledge of, was not reasonably foreseeable to him, and in which he certainly did not participate. Even under *Pinkerton*, a defendant is only liable for the acts of co-conspirators that are reasonably foreseeable to him or her. There is no reason to believe that Galanis, Dunkerley, Morton, and Hirst's alleged failures to disclose conflicts and other violations of their fiduciary duty were foreseeable to Mr. Archer. To the contrary, Mr. Archer was not aware of the investment parameters of the investment adviser clients, nor was he aware of the alleged conflicts of interest, let alone that they were undisclosed.

## C.      The Court Should Give A Limiting Instruction On The Form ADV Evidence

The government resists a limiting instruction on the Form ADV evidence for two reasons, neither of which is persuasive.

First, as a legal matter, the government argues that in a conspiracy case, "all the evidence admitted to prove that conspiracy, even evidence relating to acts committed by co-defendants, is admissible against the defendant." [ECF No. 449, at 4 (quotation marks and citation omitted)]. But this argument is too broad, and yet again is an attempt to prejudicially lump all of the defendants together based on the government's charging decision rather than the actual facts. Notably, the case cited by the government for the just-quoted proposition involved prejudicial spillover in the context of a severance motion, not the propriety of limiting instructions. *See United States v. Al Fawwaz*, 67 F. Supp. 3d 581, 585 (S.D.N.Y. 2014). Indeed, Judge Kaplan in *Al Fawwaz* explicitly held that "[t]o the extent that certain evidence relevant to the crimes with which one defendant has been charged proves inadmissible against the other . . . an appropriate limiting instruction would suffice. . . ." *Id.* at 586.

Of course evidence against one co-conspirator may not be admissible against others. The textbook example of this is an admission by one co-conspirator, which courts have repeatedly held needs to be redacted precisely so it isn't admissible against the others. *See Bruton v. United States*, 391 U.S. 123 (1968); *United States v. Jass*, 569 F.3d 47, 60 (2d Cir. 2009) ("[W]hat *Bruton* and its progeny demand is a redaction and substitution adequate to remove the 'overwhelming probability' that a jury will not follow a limiting instruction that precludes its consideration of a redacted confession against a defendant other than the declarant.").

Similarly, courts give limiting instructions in a variety of contexts in multi-defendant trials in recognition of the fact that evidence may be admissible against one defendant, but not all. *See, e.g*., *United States v. Monfort*, 603 Fed. Appx 40, 44 (2d Cir. 2015) (approving use of limiting instructions where certain prior-acts evidence was admissible only against certain co-defendants); *United States v. DeVillio*, 983 F.2d 1185, 1192 (2d Cir. 1993) (approving use of limiting instructions where testimony was only admissible against certain co-defendants); *United*



*States v. Tuzman*, 2017 WL 4785459, at *8 (S.D.N.Y. Oct. 19, 2017) (finding that limiting instructions could be used to cure prejudice where certain evidence was admissible only against certain co-defendants); *see also, e.g., United States v. Diplan*, 22 F. Appx. 19 (D.C. Cir. 2001) (per curiam) (approving limiting instruction regarding evidence obtained in search of co-defendant's residence); *United States v. Ashby*, 864 F.2d 690, 694 (10th Cir. 1988) (in prosecution for possession and aiding and abetting possession of marijuana with intent to distribute, approving use of limiting instruction cautioning jury that testimony regarding money found on co-defendant could only be considered as evidence against that co-defendant); *United States v. White*, 788 F.2d 390, 394 (6th Cir. 1986) (in case involving criminal housing rights violations, district court "should have given a limiting instruction" with respect to acts of arson that only one defendant engaged in); *United States v. Hoang Ai Le*, No. CR. S-99-433 WBS, 2002 WL 32103064, at *1 (E.D. Cal. Nov. 7, 2002) (approving limiting instruction in Hobbs Act robbery conspiracy case where one defendant was not alleged to have engaged in certain robberies that were allegedly committed by co-defendants); *United States v. Simpson*, No. 07-20168-JWL, 2008 WL 4758588, at *2 (D. Kan. Oct. 30, 2008) (in narcotics trial, defendant who was involved in only "one isolated incident" would be protected from prejudice from evidence against co-defendants through limiting instruction).

Here, the government intends to introduce evidence that has nothing whatsoever to do with Mr. Archer, involving conduct that Mr. Archer did not know about and which was not reasonably foreseeable to him, and which would not be admissible in a trial of Mr. Archer alone. A limiting instruction (or severance) is therefore appropriate. Indeed, the analogy to *Bruton* is a good one. In *Bruton* cases, one defendant's admissions (*e.g.,* "I committed a robbery with my co-defendant, Mr. X") must be redacted to remove references to Mr. X, precisely because the evidence is admissible only against the defendant who gave the confession. Here, the government argues that Michelle Morton effectively lied about Mr. Archer by failing to disclose him as a control person on the investment advisers' Forms ADV. This evidence may be admissible against Morton, but it should say nothing about Mr. Archer – who had no knowledge of this statement, let alone that it was allegedly false.

The government also argues that a limiting instruction is not factually appropriate because "the Government anticipates introducing evidence that, around the time of the Hughes ADV filing, Archer, Cooney, and Galanis discussed aspects of one of Atlantic's recently filed Form ADVs." [ECF No. 449, at 5]. This is the first time that the government has ever suggested any responsibility on Mr. Archer's part in connection with the Form ADV, and it is – to our knowledge – totally unsupported by the evidence. In particular, there is no exhibit, document produced in discovery, or piece of 3500 material of which we are aware that supports this statement by the government. We have asked the government to identify what evidence it is referring to, but it has so far declined to respond. Moreover, the suggestion by the government that it will introduce evidence of a "discussion" among Mr. Archer, Mr. Cooney, and Jason Galanis is hard to understand, since none of those individuals will be witnesses in the government's case-in-chief.

Of course if there is actually evidence that Mr. Archer was involved in the decision about how to fill out the Form ADV and in particular the decision of who to disclose as owners or control persons for the investment advisers, then a limiting instruction might not be appropriate.

But that is not the evidence, and the Court should accept the proposed limiting instruction absent a proffer from the government.

**D.      Mr. Archer Does Not Intend To Introduce Evidence About The Gerova Fraud**

Finally, for the reasons set forth in Mr. Archer's pending motion for severance, in his Rule 404(b) briefing, and in his April 24, 2018 letter, evidence about the Gerova arrests and convictions would be substantially and unduly prejudicial to Mr. Archer – who had nothing to do with that conduct and did not even know Jason Galanis at the time.  Mr. Archer is prepared to rest on his prior submissions (and the Court's prior ruling) on this point, but we write to address one mischaracterization in the government's response.

In its brief, the government states:

> it bears noting that Archer has previously indicated he believes the Gerova case is relevant to his defense, and he has not disavowed that idea. (*See, e.g.*, Archer Mem. of Law in Support of Severance Motion, Dkt. 290 at 25 n.8 ("expressly reserv[ing] the right to seek to introduce [Gerova] evidence if sound trial strategy suggests that it is appropriate")).  Indeed, Archer's defense exhibits include at least three Gerova-related emails.

[ECF No. 449, at 6].  It is true that Mr. Archer has marked as defense exhibits certain evidence that was *produced in discovery* in the Gerova action, but none of that evidence concerns the Gerova fraud, arrest, or convictions.  [*See* DX 4701, 4702, 4703].  Rather, the exhibits were marked to show aspects of the relationships between various relevant individuals, but none of the exhibits mentions any criminal or fraudulent conduct, and none is being offered for the truth of the matter asserted.

To be perfectly clear, Mr. Archer has no present intention to introduce any evidence about the Gerova fraud, arrests, or convictions, assuming the Court adheres to its prior Rule 404(b) order.  That evidence has no place in a trial involving Mr. Archer, and if the Court orders it admissible against Gary Hirst and John Galanis, then Mr. Archer's trial should be severed.

Thank you for your consideration.

Respectfully,

 /s/  Matthew L. Schwartz
Matthew L. Schwartz