

MATTHEW L. SCHWARTZ
Tel.: (212) 303-3646
E-mail: mlschwartz@bsfllp.com

May 18, 2018

**BY ECF AND E-MAIL**

Hon. Ronnie Abrams
United States District Judge
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

**TO BE FILED UNDER SEAL**

Re:     *United States v. Jason Galanis, et al.*, 16 Cr. 371 (RA)

Dear Judge Abrams:

       I represent Devon Archer. I write to follow up on various items from yesterday's final pretrial conference, to respond to the government's letter that was e-mailed to Your Honor earlier this evening, and to raise one new issue that is relevant to opening statements next week.

**A.**      **Proposed Questions For Jurors**

       Attached as Exhibit A is a proposed mark-up of the voir dire, consistent with the discussion on the record yesterday. *See* 5/16/2018 Tr. at 115-118. I am also e-mailing a Word version to chambers for the Court's convenience.

       In addition, the Court requested a list of people and names that may come up during the course of the trial for use during jury selection. The list provided by the government did not include any names provided by the defendants. I have therefore attached as Exhibit B a consolidated list that includes all of the names on the government's list as well as names provided by the defendants.

**B.**      **Objections to Certain Exhibits**

     **1.**      **Previously Objected-To Defense Exhibits Likely To Be Used During The Government's Case**

       Yesterday, the Court asked for information about which of the objected-to defense exhibits would be relevant during the government's case, or would otherwise benefit from early resolution by the Court. On behalf of Mr. Archer, a list of exhibits for which a relatively early



decision would be helpful follows.[1]  Now that the government has provided the identities of its first few witnesses, we have also indicated whether the exhibits are likely to be a "next week issue":

- DX 4908 and 4909 (*i.e.*, the Cooney-Crafton recordings) – *see* ECF No. 441, at 15-16 (government objection); ECF No. 454, at 1-9 (defense response) – this may be an issue for opening statements.  (We discuss the government's new arguments about the recordings below).

- DX 4900-4906 (*i.e.*, certain Instagram posts) – *see* ECF No. 441, at 17-18 (government objection); ECF No. 454, at 11-12 (defense response) – this is not a "next week issue."

- DX 4308, 4321 (*i.e.*, certain BIT Board e-mails) – *see* ECF No. 441, at 18-19 (government objection); ECF No. 454, at 12-13 (defense response) – this is not a "next week issue."

- DX 4503, 4504, 4506, 4512, 4514, 4519-4522 (*i.e.*, certain Morgan Stanley PLA records) – *see* ECF No. 441, at 20 (government objection); ECF No. 454, at 14 (defense response) – this is not a "next week issue."

- DX 4910 and 4916 (*i.e.*, photographs of Bevan Cooney and Sebastian Momtazi) – this is probably not a "next week issue."

With respect to DX 4910 and 4916, the government objected to these exhibits yesterday [ECF No. 465], on the grounds that, in the government's view, the photographs make Mr. Cooney and Mr. Momtazi appear to be "gamblers, drinkers, and generally less upstanding" than Mr. Archer.  *Id.* at 3.  As an initial matter, I have conferred with counsel for Mr. Cooney, who does not share the government's view and does not object to DX 4910.  Next, and to be clear, Mr. Archer does not intend to argue or insinuate that Mr. Cooney and Mr. Momtazi are "gamblers" or "drinkers."   If the Court believes it necessary (it isn't), Mr. Archer would have no objection to cropping the exhibits such that no one would be drinking or gambling in them.  More fundamentally, though, these exhibits are admissible as is.  They are accurate depictions of Mr. Cooney and Mr. Momtazi, and there is no prejudice to *the government* – as opposed to Mr. Cooney, who perceives no prejudice, and Mr. Momtazi, who is irrelevant for prejudice purposes because he is not a trial participant – from the exhibits as they are marked.  *See generally United States v. Quattrone*, 441 F.3d 153, 186 (2d Cir. 2006) (finding, for the purposes of Rule 403, "[e]vidence is prejudicial only when it tends to have some adverse effect *upon a defendant. . . .*" (emphasis supplied)).

---

[1]      A decision on the government's outstanding motion to preclude Mr. Archer's experts would also be appreciated, as any ruling may affect our cross-examination of the government's experts, two of whom are set to testify next week.  In addition, in the unlikely event that the Court determines that some or all of the experts' proffered testimony is inadmissible, it will affect our preparation of those witnesses – which may result in a substantial cost savings.  And in the event that the Court orders additional disclosure, earlier is better, too.

**BSF**

### 2.    The Defendants' Mug Shots Should Be Excluded

On the other hand, the government yesterday indicated that it intends to use "booking photos" of the defendants in its opening statement. [ECF No. 465 at 2].  Mr. Archer certainly has no objection to the government using photographs of the defendants, but there is no reason why it should be permitted to use the unmistakable "mug shot," which is inherently prejudicial and can itself constitute reversible error.  The Second Circuit has

> established a tripartite test for determining whether the introduction of a "mug-shot" type photograph may have such a prejudicial effect as to render its admission reversible error:
>
> 1. The Government must have a demonstrable need to introduce the photographs; and
>
> 2. The photographs themselves, if shown to the jury, must not imply that the defendant has a prior criminal record; and
>
> 3. The manner of introduction at trial must be such that it does not draw particular attention to the source or implications of the photographs.

*United States v. Oliver*, 626 F.2d 254, 263 (2d Cir. 1980) (quoting *United States v. Harrington*, 490 F.2d 487, 496 (2d Cir. 1973)); *see also United States v. Mohammed*, 27 F.3d 815, 822 (2d Cir. 1994) (holding that introduction of mug shot constituted reversible error because it suggested to the jury that defendant had prior conviction); *Barnes v. United States*, 365 F.2d 509, 510 (1966) (same).

The mug shots here fail at the first step.  The government can easily use one of the many truly neutral and non-prejudicial photographs of Mr. Archer that are available to it, such as the one that was included in another document that the government has already marked as an exhibit. *See* GX 375.  There is no possible "demonstrable need" for the government to use Mr. Archer's mug shot in particular.  *Oliver*, 626 F.2d at 263.  Moreover, the use of mug shots is inherently prejudicial, and evokes the image of the defendants being arrested and handcuffed – and not necessarily in connection with this case.  The government's sole reason to want to use a mug shot of Mr. Archer is to depict him as a criminal, a purpose which – unlike with the pictures that Mr. Archer seeks to introduce – would be unfairly prejudicial to an actual party to this case.  Those mug shots should be excluded.

### 3.    A Photo Of Mr. Archer And His Wife Is Admissible

The government also objected yesterday to a number of photographs of Mr. Archer himself.  With one exception, those are not time sensitive.  However, DX 4924 is an exhibit that



Mr. Archer intends to use in opening statements.  The government describes this exhibit as a "photograph of two children, which appears to be of Archer as a child with a sibling."  [ECF No. 465, at 2].  The government's objection is simply that this exhibit and the other photographs of Mr. Archer are "intended to create juror sympathy for Archer."  *Id.*

In fact, DX 4924 is a photograph of Mr. Archer and his wife, Krista, from when they were three years old.  We anticipate that Dr. Archer will be a witness during trial, and the length of their relationship is a relevant fact as well as fair background.  *See, e.g., Michaelson v. United States*, 335 U.S. 469, 478 (1948); *United States v. Rea*, 958 F.2d 1206, 1215 (2d Cir. 1992).  The government's sympathy argument, on the other hand, doesn't make sense.  The jury will see Mr. Archer in front of them throughout the trial.  The fact that he was once upon a time a baby is both obvious, and not likely to evoke any particular sympathy.  Moreover, Rule 403 only prohibits the introduction of evidence whose probative value is "substantially outweighed" by the danger of "unfair prejudice."  Surely the government's case is not so flimsy that a single family photo will cause it such extreme and unfair prejudice.

### 4.    The Cooney Recordings

Although the briefing on this motion has been closed for some time, the government in its letter of earlier this evening further objects to the introduction of the Cooney-Crafton recordings.  The government's objections are meritless.

First of all, the portions of the recording that matter most to the defendants – that Mr. Cooney referred to Mr. Archer as a "whale" and a "show pony" and boasted about his business and political connections and general legitimacy – is plainly offered for a non-hearsay purpose, which is to prove that this is the way that Mr. Cooney spoke about Mr. Archer.  The government does not argue otherwise.  Instead, it contends that these statements "suggest that the coconspirators used Archer's purported legitimate reputation to further their crimes."  That would be the inference the government argues from this evidence; Mr. Cooney and Mr. Archer would argue a different inference.  The fact that the evidence may be subject to dueling interpretations is no reason to exclude it – and notably the government's argument on this point is bereft of citation.

In fact, the entirety of the recordings offered by Mr. Cooney and Mr. Archer are admissible as non-hearsay.  Contrary to the government's argument, no one is seeking to argue that Mr. Cooney actually was involved in a potash company in Arizona, or that a particular bit of information actually was in the Wall Street Journal.  The primary purpose of the evidence is to demonstrate to the jury how Mr. Cooney conducted business, and how he spoke about Mr. Archer, which also demonstrates Mr. Cooney's state of mind.  These are permissible non-hearsay uses, and the government's straw-man argument about "verbal acts" doesn't change that fact.  Non-hearsay evidence is routinely admitted to show a course of dealings, and it should be here.  *See, e.g., United States v. Arifi*, Case No. 92 Cr. 274, 1993 WL 147558, at *1 (S.D.N.Y. Apr. 29, 1993) (noting weight of "recorded conversations" as "a basis upon which a reasonable juror could conclude that a course of dealing" existed between defendant and co-conspirator).  The defendants have no objection to an appropriate limiting instruction accompanying this evidence, to the extent it is offered as non-hearsay.



Finally, the recordings are admissible hearsay under the state-of-mind exception.  The government's argument that "the statement must face forward, rather than backward" miscomprehends the way that Rule 803(3) works.  Under Rule 803(3), an out-of-court statement offered to prove state of mind must be forward-facing in the sense that it must reflect the declarant's "then-existing state of mind," rather than "a statement of memory or belief to prove the fact remembered or believed." Fed. R. Evid. 803(3).  For example, in the case cited by the government, the Court found a recording that contained the following statement to be hearsay:

> [Klein]: I went to your president, the president of your union and asked him to put you on your job, on, on my job.  And he says, "Look Jack, I'm not a real big fan of this guy; he's got issues." I don't know what that means, right?  He said, "but he's got issues with the union."  And I don't know what that means, but I went to the president of your union and I'm tellin' ya, under normal circumstances Frankie [Noviello] would have done whatever I asked him to do.

*Bell v. Constr. & Gen. Bldg. Laborers' Local 79*, No. 04 Civ. 6520 (RJH), 2011 WL 3796355, at *2 (S.D.N.Y. Aug. 24, 2011) (alterations in original), *aff'd*, 510 Fed. Appx. 39 (2d Cir. 2013).  Judge Holwell explained that this recording was barred as "a statement of memory or belief to prove the fact remembered or believed" under Rule 803(3) because "Klein's recorded statement is a statement of his memory of a meeting with Noviello, and the statement is introduced to prove that memory." *Id.*, at *3.  In other words, the challenged statement was nothing more than an out-of-court story about something that had happened in the past, to prove that that's what actually happened.  There is no dispute that this sort of evidence is explicitly barred by Rule 803(3).

Here, in contrast, the Cooney-Crafton recordings are neither "statement[s] of memory" nor, even if they were, are they being introduced to "prove the memory" – notwithstanding that some of the verbs used by Mr. Cooney are in the past tense.  For example, Mr. Cooney's reference to "the guy I brought to the table" is not being introduced to prove that Mr. Cooney ever brought any guy to any table, and the reference to a potash company that "was" in Arizona is not being introduced to prove that any potash company existed, let alone that Arizona is where the company actually was located.  All of these statements are being offered to prove the way that Mr. Cooney sold himself and Mr. Archer to potential business partners, and to his state of mind when doing so – contemporaneously.

## C.    Evidence And Argument About Michael Milken

Next, we write in follow-up to the discussion on the record yesterday regarding GX 2217, which is the "mikey Milken!!" e-mail from Mr. Cooney to Mr. Archer and Jason Galanis.  Mr. Archer respects the Court's decision that this e-mail is admissible.  Nonetheless, the government's plans for how it intends to use this e-mail are at odds with the Rules of Evidence.

The government can obviously not offer a witness to testify about Mr. Milken's crimes,



nor can Mr. Archer offer a witness to testify about Milken's financial innovation or philanthropy, or the fact that Milken was part of what made Drexel Burnham Lambert – Burnham Financial Group's progenitor – so successful; that would be hearsay. *See, e.g., Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 135-36 (2d Cir. 2013) (affirming trial court's exclusion of witness "who purported to offer historical perspective concerning the relationship between Marvel" and famous comic book artist because "[t]he appropriate way to adduce factual details of specific past events is, where possible, through persons who witnessed those events").[2] Nor can the parties, without any factual basis in the record, argue that the reference to Milken is a reference to his criminal past or to his creation of novel bond products. This amounts to the lawyers testifying, and the dangers of lawyers testifying in closing arguments is particularly acute where a prosecutor effectively testifies about an individual's prior criminal conviction, because a jury will attach particular significance to the specialized and perhaps personal knowledge that prosecutors have on the subject. *See United States v. Wright*, 625 F.3d 583, 610 (9th Cir. 2010) ("Improper vouching also occurs where the prosecutor suggests that the testimony of government witnesses is supported by information outside that presented to the jury.").

Whatever leeway a lawyer should have to argue "common knowledge," the facts underlying a nearly 30 year-old criminal conviction or the creation of the high yield bond do not qualify as common knowledge. *Cf.* Fed. R. Evid. 609(b) (convictions more than 10 years old presumptively irrelevant). Indeed, as the Court correctly observed, the identity and history of Michael Milken is *not* common knowledge. *See* 5/16/018 Tr. at 84; *cf.* "A shocking percentage of Americans can't name the vice presidential nominees," *The Week* (Oct. 3, 2016), available at https://bit.ly/2rSBSmT (poll finding that fewer than 60 percent of Americans knew who the vice presidential nominees were, just one month before the last election).

Mr. Archer respectfully submits that in light of the above, the better course would be to redact the reference entirely. Although it is possible that the exhibit could simply be admitted without any argument about what the "mikey Milken!!" reference means, that is a recipe for havoc. Yesterday, the government gave the perfect example: Kobe Bryant. *See* 5/16/2018 Tr. at 87 (AUSA: "I don't think it would be in any fashion improper to ask any witness: Do you know who Kobe Bryant is?").

Imagine an e-mail in which Mr. Cooney had written, in response to the same Jason Galanis e-mail about the WLCC bonds, "You nailed this like Kobe Bryant!!" instead of "This is pure Genius alla mikey Milken!!" Was that a reference to Kobe Bryant's well-known reputation as a sharpshooter? *See Kobe Bryant Career Statistics*, Basketball-Reference.com, *available at*

---

[2]      At argument yesterday, the government suggested that Milken's criminal conviction could be introduced as a self-authenticating record or that the Court could even take judicial notice of that fact. *See* 5/16/2018 Tr. at 91. There are at least two things wrong with that approach. First, it would be inadmissible extrinsic evidence introduced to attempt to prove up the government's interpretation of an ambiguous e-mail. *See* Fed. R. Evid. 608(b). And even if it weren't, the admission of Milken's conviction would be totally inappropriate, both because it would be unduly prejudicial and because it would be one-sided. Plainly, the government should not be able to prove up the extrinsic facts supporting its interpretation of the "mikey Milken!!" e-mail without the defendants having the same opportunity.



https://bit.ly/2KvCCpW.  Or to the well-known allegations of sexual misconduct against him, which resurfaced this year after Bryant's Academy Award?  *See* Maura Judkis, "Oscar winner Kobe Bryant's sexual assault allegations resurface in the #MeToo era," *The Washington Post* (Mar. 4, 2018), *available at* https://wapo.st/2GtGfKq.

Absent some record evidence about Kobe Bryant – which, as set out above, is inadmissible – each juror would bring their own memories and biases to deliberations, which would be inappropriate.  *See United States v. Torres*, 128 F.3d 38, 42 (2d Cir. 1997) ("One touchstone of a fair trial is an impartial trier of fact—a jury capable and willing to decide the case solely on the evidence before it.").  Worse, especially when a disagreement breaks out amongst the jurors, there is a substantial danger that one of them may simply go home and resort to the internet.  *See United States v. Lawson*, 677 F.3d 629, 651 (4th Cir. 2012) (vacating conviction and awarding new trial where juror consulted Wikipedia and shared research with other jurors during deliberations).

Accordingly, Mr. Archer respectfully requests that references to Michael Milken in the challenged exhibits (*e.g.,* GX 375, 2204, 2217. 2292, 3004, and 3226) be redacted.  Assuming that the Court adheres to its ruling yesterday, however, there should be no evidence or argument concerning who Michael Milken is.  *See* 5/16/2018 Tr. at 87 (THE COURT: "to the extent that the jurors have no idea who Michael Milken is, there is no prejudice. But to the extent you were going to ask someone who is Michael Milken, who wasn't a party to these particular e-mails – if someone was a party to the e-mail, you can say: What was your understanding of what was meant? But assuming that you're not going to have anyone who wasn't [*sic*] a party to the e-mail, and you're going to ask a witness about Michael Milken, I don't want to have a mini-trial about Michael Milken.").  In addition, and regardless, Milken's name should be included in the list of names read to the jury at the beginning of the case so that the participants can understand what, if any, preconceived notions the jurors bring about him to the case.





**BSF**

**E.       Galanis, Hirst, and Morton Pleas**

There is also one new, and related, issue.  As the Court is aware, Jason Galanis, Michelle Morton, and Gary Hirst have now pleaded guilty in this case.  The defendants – all defendants – would like to introduce evidence of those guilty pleas.  As the government intends to introduce co-conspirator statements by each of these individuals, evidence of their pleas is plainly admissible to impeach them under Rules 806 (impeachment of out-of-court declarant) and 609 (impeachment through prior conviction).  Indeed, this follows directly from the government's concession yesterday with respect to Jason Galanis's tax fraud conviction.  *See* 5/16/2018 Tr. at 27 (AUSA:  "I think we're prepared to say that that [*i.e.*, Jason Galanis's conviction for tax fraud] could come in under Rule 609 as impeachment of a hearsay declarant.").  Nonetheless, the government has advised us that it objects to evidence of Galanis's, Hirst's, and Morton's convictions in this case.

Evidence of these convictions "must" be admitted to impeach under Rule 609(a)(1)(A), and the government has provided no explanation for its position other than that "we do not believe the pleas are admissible on that basis."  We therefore respectfully request a ruling that this evidence is admissible.  (We have informed the government that we are amenable to a simple stipulation concerning the pleas.)

**F.       Limiting Instructions**

Finally, the government seeks to re-litigate the Court's ruling regarding certain limiting instructions.  *Compare* Gov. Ltr. at 3 ("strenuously object[ing]") *with* A Few Good Men (1992).[4]

At yesterday's conference, after lengthy discussion, the Court ruled that it will give a limiting instruction at the time that the government introduces evidence about John Galanis's

---

[4]       Per IMDB:

> Lt. Weinberg: [*sarcastically to Joanne with Danny present, in an empty courtroom after the trial has been adjourned for the day*] "I strenuously object?" Is that how it works? Hm? "Objection." "Overruled." "Oh, no, no, no. No, I STRENUOUSLY object." "Oh. Well, if you strenuously object then I should take some time to reconsider."

Available at https://www.imdb.com/title/tt0104257/quotes; *see also* https://bit.ly/2KzEw8K (YouTube clip).



alleged misrepresentations to the WLCC *about* Mr. Archer and Mr. Cooney's conduct and, if the evidence is admissible at all, at the time the government introduces evidence about Michelle Morton's alleged misrepresentations on a Form ADV *about* Mr. Archer and Mr. Cooney. *See* 5/15/2018 Tr. at 14-25.[5]

     As the Court recognized yesterday, the issue is not whether each defendant knew every alleged co-conspirator and each of their alleged activities – it is what was "reasonably foreseeable to *these defendants*." 5/16/2018 Tr. at 24 (emphasis supplied). There is no evidence whatsoever that John Galanis's alleged misrepresentations to the WLCC or that Michelle Morton's alleged misrepresentations on a Form ADV were reasonably foreseeable to Mr. Archer or Mr. Cooney. Certainly Messrs. Archer and Cooney had no actual knowledge of this conduct. Nor was this conduct an essential or even logical part of the charged scheme. The defendants here are charged with misappropriating tens of millions of dollar in bond proceeds. Even assuming they were part of that conspiracy, there is nothing about the John Galanis statements to the WLCC or the Form ADV evidence that is an integral part of that conspiracy. It is therefore important to highlight for the jury, at the time the evidence comes in, that it is admissible against Mr. Archer only if the jurors find it to be reasonably foreseeable to him.

     Notably, Mr. Archer has repeatedly challenged the government to make any kind of proffer that this conduct was reasonably foreseeable. The best the government has been able to muster, on the form ADV evidence, is that there is an e-mail that Mr. Archer received that attached a Form ADV that the government does not contend is false, that is dated from before the defendants acquired control of the investment adviser, and in which there is no discussion of the Form ADV itself let alone any falsification of it. At best – at very best – this is evidence that Mr. Archer knew that there is such thing as a Form ADV.

     The only other thing the government cites is the communications between COR Fund Advisors and the BIT Board, "about who exactly was going to be taking over that company." 5/16/2018 Tr. at 21. Putting aside that this is not a correct recitation of the facts – the discussions were about who was going to be taking over Burnham Asset Management, not the BIT Board – Forms ADV were never part of the discussions between CORFA and the BIT

---

[5]     As we explained yesterday, the Form ADV evidence should be excluded as unduly prejudicial and confusing in light of Michelle Morton's plea. Whereas the evidence was previously relevant, as the Court held, to Morton's state of mind, her state of mind is no longer an issue in this trial. That being so, all that is left is highly prejudicial and confusing evidence about alleged misrepresentations Morton made about Mr. Archer and Mr. Cooney, which they had no idea was occurring and which was not in any way reasonably foreseeable to them. At yesterday's conference, Your Honor indicated that this evidence was still *sub judice*. *See* 5/16/2018 Tr. at 24.

**BSF**

Board.[6]   That a customer (the BIT Board) of one investment advisor (BAM) asked questions about an investor group did not remotely put Mr. Archer on notice of the fact that Michelle Morton may have lied on an SEC filing about the control group for a different investment adviser.  Indeed – although there is no evidence that Mr. Archer knew this, either – BAM's Form ADV fully disclosed Mr. Archer's ownership interest.  *See* Ex. C, attached.

There is simply no evidence to support the conclusion that any misstatements on Atlantic or Hughes' Forms ADV were reasonably foreseeable to Mr. Archer, and in light of Michelle Morton's guilty plea, this evidence should be excluded altogether.  At a minimum, the Court should adhere to its ruling that a limiting instruction is appropriate.[7]   There is no harm whatsoever to the government from a very small and targeted number of such instructions – if the government is right that this conduct was reasonably foreseeable to Mr. Archer, it will be admitted against him – and potentially tremendous prejudice to Mr. Archer from this evidence coming in without the jury being attuned to the specific factual questions surrounding it at the time it comes in.

In rejecting severance, courts routinely comment (as Your Honor did yesterday) that limiting instructions will mitigate the prejudice from joint trials.  *See* 5/16/2018 Tr. at 96, 98.  That is precisely what Mr. Archer is asking for here, and what the Court has already held is appropriate, *see id.* at 19-21.  There is nothing in the government's letter, strenuous objection aside, that should cause the Court to reconsider its ruling.

Thank you for your consideration.

Respectfully,

/s/  Matthew L. Schwartz
Matthew L. Schwartz

---

[6]   Yesterday, the government speculated generally that the discussions with the BIT Board included "very few requirements under the Investment Advisers Act." 5/16/2018 Tr. at 25.  It is unclear what this was a reference to, but we have looked back at the BIT Board correspondence and been unable to find any reference to a Form ADV.  Even if there is one in there somewhere, it is buried in hundreds of pages of documents, and was certainly not an active topic of conversation.

[7]   The government has never made any sort of proffer as to how John Galanis's alleged misstatements to the WLCC could have been reasonably foreseeable to Mr. Archer or Mr. Cooney, and they were not.  Mr. Archer had no idea John Galanis was talking to the WLCC, and the alleged misrepresentations were not in any way a logical or essential part of the alleged fraud.  Nonetheless, in light of the obvious relevance of this evidence to John Galanis, Mr. Archer does not object to it so long as an appropriate limiting instruction is provided.