

MATTHEW L. SCHWARTZ
Tel.: (212) 303-3646
E-mail: mlschwartz@bsfllp.com

June 14, 2018

**BY ECF**

Hon. Ronnie Abrams
United States District Judge
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

    Re:    *United States v. Galanis*, S3 16 Cr. 371 (RA)

Dear Judge Abrams:

    I represent Devon Archer.  In advance of the defense case beginning next week, I write to provide the Court with an updated summary of outstanding evidentiary motions, as well as to present certain new evidentiary issues to the Court.

**A.**    **Objections to Certain Exhibits and Testimony**

    A list of outstanding motions and/or objections follows, along with citations to the applicable briefing and an estimate of when the evidence is likely to be relevant, based on the government's disclosures to date.

- **DX 4308, 4321** (Certain BIT Board e-mails).  *See* ECF No. 441 at 18-19 (government objection); ECF No. 454 at 11-12 (defense response).  These documents may be relevant to the testimony of government witness Molly Moynihan, who is scheduled to testify on Monday.

- **Defense Experts:**  Although the Court has provided an indicative ruling, Your Honor indicated that some tailoring of the experts' opinions may be necessary.  *See* ECF No. 410 (government objection); ECF No 452 (defense opposition).

- **DX 4908, DX 4909** (the Cooney-Crafton Recordings).  *See* ECF No. 441 at 15-16 (government objection); ECF No. 454 at 1-9 (defense response); ECF No. 468 at 3 (defense letter); ECF No. 472 at 1 (government response).  The Court has ruled that the recordings are admissible and will not open the door to additional parts of the recordings, but Your Honor's ruling indicated that not all of the proffered sections would be admitted.  A copy of the draft transcript for the portions proffered by the defense is attached for the Court's convenience as Exhibit A, so that Your Honor can indicate which portions are permitted.

- **DX 4900-4906** (Certain Instagram posts).  *See* ECF No. 441 at 17-18 (government objection); ECF No. 454 at 11-12 (defense response).



- **DX 5000-5203** (Calendar entries). *See* ECF No. 441 at 16-17 (government objection); ECF No. 454 at 10-11 (defense response). We neglected to include this as an open issue in our previous letter, but after discussing the issue with the government, it appears a ruling will be necessary.

We would be happy to provide the Court with any additional briefing or information that might be helpful.

**B.     Objections to GX 1401**

Mr. Archer orally objected to GX 1401 in Court on Wednesday, but the government agreed to hold the exhibit until Monday, so I did not have an opportunity to present Mr. Archer's objection.

GX 1401 should be excluded for two independent reasons. First, it is privileged and should never have been in the government's possession in the first place. Second, it should be excluded under Rule 403 because it is has no probative value and will mislead the jury.

First and foremost, GX 1401 is a privileged e-mail solely between Mr. Archer and attorney Stephen Weiss. The e-mail appears to have been produced by Weiss in hard copy, within a single 552-page PDF representing a seemingly random compilation of Weiss's documents (SEC-SDNY_EPROD-000045835). These documents were originally produced by Weiss to the SEC on or around January 27, 2016. The SEC subsequently produced the document ultimately marked as GX 1401 to the U.S. Attorney's Office as part of its dump of more than three million documents, which the Office in turn produced to the defendants. As Mr. Archer noted frequently prior to trial,[1] the size of the production (over three million *documents*, not pages) and the manner of production (almost entirely in PDF form, not as a formal production with searchable text, image, and metadata files), made it impossible for Mr. Archer to effectively search or review all of the files. Consequently, Mr. Archer was unaware that this particular version of this privileged e-mail was in the government's possession until the government indicated its intention to read GX 1401 into evidence this week.

Although Mr. Archer was unaware that this particular hard copy version of the document was in the government's possession, a literally identical copy of this document was logged as privileged in an October 13, 2017 privilege log produced to the SEC. A copy of that document and the corresponding log entry are attached as *ex parte* Exhibit B for the Court's reference.

---

[1]     *See, e.g.*, ECF No. 296 at 6 (January 17, 2018 Archer pre-trial motion listing reasons that the government's "discovery has not only been mammoth in volume, but it has also been particularly challenging to review"); ECF No. 301-28 (December 29, 2017 Letter from M. Schwartz to AUSAs, stating that "the government failed to provide any useful description of its production of over three million documents it received from the Securities and Exchange Commission"); ECF No. 249 at 2 (October 18, 2017 Motion for Adjournment noting that "[T]he government has been producing voluminous discovery on a rolling basis . . . in a fashion that has made it particularly difficult to review"); ECF No. 240 at 2 (9/26/2017 Letter to Court from M. Schwartz noting that the government "has been producing voluminous discovery on a rolling basis . . . and in a fashion that has made it particularly laborious to review").



Accordingly, there has been no waiver of the privilege, and the government should not be permitted to introduce – and indeed should return or destroy – GX 1401.

Independently, GX 1401 should be excluded under Rule 403.  The e-mail consists of two parts.  The underlying e-mail is from a lawyer, Weiss, to an unstated list of recipients and attaches an unknown document called "00017827.docx."  There is no record evidence of what this attachment is.  The top e-mail, from Mr. Archer to Mr. Weiss, appears to contain some sort of inscrutable inside joke, the relevance of which is nil.  In sum, this e-mail proves nothing, and will create a high degree of juror confusion by raising questions about what the underlying attachment was, and/or what Mr. Archer's joke meant.  But the e-mail has no probative value, and has the potential to mislead the juror into believing that Mr. Archer reviewed some (unidentified) document.

**C.    Motion to Admit DX 4801, 4802, 4803, 4804, 4813, and 4821.**

Finally, Mr. Archer respectfully seeks to admit DX 4801-04, 4813, and 4821.  On Wednesday, the Court declined to admit DX 4801 on cross-examination of Francisco Martin.  As set forth below, however, DX 4801 and the other identified exhibits are independently admissible as direct evidence on the defense case.  In addition, or alternatively, Mr. Archer respectfully requests that the Court reconsider its decision not to admit DX 4801 for impeachment, and to admit DX 4802 and 4804 for impeachment as well.[2]  Each of the proffered exhibits is attached for the Court's convenience.

DX 4801 concerns the proposed acquisition of La Compagnie Financiere Rodolphe Hottinger SA ("Hottinger Bank") by a group of investors including Jason Galanis, Jason Sugarman, Francisco Martin, Lucas Mann, and Dr. Rory Knight in January 2013.  As Martin testified, he understood that Jason Galanis and Jason Sugarman were looking to purchase a bank, *see* Tr. at 2320 – this was, in essence, the first step that Galanis and Sugarman took in furtherance of the "roll-up plan" that became the model for the re-branded Burnham & Co., and which underlies all of the corporate transactions at issue in this case.  This e-mail and the ones that follow therefore have independent relevance because they show the long-standing course of dealings between the parties, including the fact that Galanis and Sugarman were pursuing the roll-up plan more than a year before John Galanis, Tim Anderson, and Raycen Raines had their very first conversations about the WLCC bonds.

The e-mails are also relevant because they illustrate Jason Galanis's modus operandi, including his strict control over information and his appeals to celebrity.  For example, in one e-mail Martin writes that "Jason [Galanis] is VERY sensitive on how communication flows."  (DX 4801, at 1).  In the same chain, Martin also reacts to Peter Hottinger forwarding a letter from the Swiss Financial Market Supervisory Authority (FINMA) to Galanis, Sugarman, Mann, Knight, and Martin:

---

[2]    On cross-examination of Martin, I confronted the witness with DX 4802 and 4804, but did not offer those exhibits in light of the Court's ruling with respect to DX 4801.

> Peter, sending this to the entire team was not a good idea. Jason Galanis, is not pleased. You should have sent this to me and I would have delegated it. We must go through one source of communication (me) and I make sure all correspondence gets disseminated to the proper parties at the proper time.

DX 4801, at 2.

Similarly, DX 4802, 4803, 4804, 4813, and 4821 concern the contemplated acquisition of Chelsea Management Company, a Los Angeles based investment advisor with more than $1 billion in assets under management, also as part of the roll-up plan. Those discussions began in or about March 2013 and lasted until early 2014 – again, before any discussion of the WLCC bonds – and show important aspects of the course of dealings between the alleged conspirators as well as Jason Galanis's way of doing business. For example, in DX 4802, Martin contacted the son of Chelsea's CEO, Fred Ruopp (who was himself a Chelsea executive), on behalf of "a local very large investment group" to see if he could "interest [his] dad in doing a deal." (DX 4802, at 4). The two agreed to have lunch, at which point Martin forwarded the e-mail chain to Jason Galanis and asked, "What can I disclose?" (*Id.*, at 3). Galanis then provided information about COR Capital – Jason and Steven Sugarman's company, at which Hugh Dunkerley worked at the time, *see* Tr. at 902, 1068 (Q. . . . What company did you [Dunkerley] work at after the FDIC [in 2011]? A. COR Capital . . . Q. And how long had you worked for COR Capital? A. For roughly three years.") – as well as Burnham Financial Group. (DX 4802, at 2-3). Martin responded to Galanis, "I will bcc you on the response."

DX 4803 is Martin's response to Ruopp of the same day, which is little more than a cut-and-paste of the language that Jason Galanis had given him in DX 4802.[3]

DX 4821 is a January 2014 e-mail in which Galanis instructs Martin that he can share certain information with Ruopp, and that Martin "could also mention steve and jason sugarman, as well as Peter Guber, Jason's father in law." The attachment that Galanis instructed Martin to share includes a description of COR Capital, *but also a lengthy description of Mr. Archer*. DX 4813 is then Martin's e-mail to Ruopp of the same day, in which he dutifully relays the following, referring to Mr. Archer as "one of the principals":

> In order to further assess whether there is a basis to proceed, below is a summary of COR investments, as well as a summary of one of the principals' bios. Part of this deal would also be Steven and Jason Sugarman. Jason Sugarman is married to Peter Guber's daughter. Peter Guber is part owner of the Los Angeles Dodgers.

In the same e-mail, Martin also includes Galanis's language about Mr. Archer, boasting about Mr. Archer's political and business connections:

---

[3] It appears that Martin produced these documents to the SEC in hard copy. It is therefore impossible to tell whether he did, in fact, bcc Jason Galanis on his e-mail to Ruopp.



Page 5

**Devon Archer:**

Managing Partner and Director of COR Fund Advisors. Co-founder of Rosemont Group, a $2.4 billion private equity firm co-owned by Devon Archer, Hunter Biden and Chris Heinz. Founding shareholder of COR Fund Advisors, the lead investor in Burnham Financial Group. Currently serves as a director of Burnham Financial Group, Burnham Asset Management and Burnham Securities. Mr. Archer started his career at Citibank's foreign direct investment group, Citicorp Asia Ltd., before serving at New England Financial and subsequently MetLife where he worked as a special analyst to the Strategic Management Group of both groups' Executive Committees; and was closely involved in MetLife's historic IPO and demutualization in 2000. Mr. Archer served as an advisor to John Kerry during his 2004 Presidential Campaign and co-chaired the National Finance Committee. Along with Rosemont Realty, Mr. Archer serves on the Board of Viet Thai Joint Stock Company, Cataphora Inc. and the Howard J. Heinz Trust. Mr. Archer earned his Bachelor of Arts in History from Yale University. Rosemont has a track record in alternative asset classes, with an emphasis on private equity and real estate. The firm acquired an established commercial real estate investment business and has grown that business to in excess of $2.4 billion in assets.

Rosemont is an equity partner and Investment Committee member of BOHAI HARVEST RST (SHEN ZHEN) EQUITY INVESTMENT FUND MANAGEMENT CO., LTD., a joint venture of BOHAI Capital, Rosemont and Ample Harvest. BOHAI investors include BOC International Holdings Limited, Teda Investment Holding Co., Ltd., China's National Council for Social Security Fund, Bank of China Group Investment Limited, Postal Savings Bank of China Co., Ltd., Tianjin Jinneng Investment Company, China Development Bank Capital Corporation Ltd., China Life Insurance (Group) Company, China Life Insurance Company Limited, and Tianjin Urban Infrastructure Construction & Investment (Group) Co., Ltd.

Devon Archer is a principal investor and director of Wealth-Assurance AG, a $1.5 billion life insurance company exclusively focused on the high net worth wealth management business.

(DX 4813, at 2). Notably, this description of COR Capital and Mr. Archer is virtually identical to the one that Jason Galanis gave to Michelle Morton to show to Frankie Hughes, "to demonstrate who your financial sponsors are" in connection with the acquisition of Hughes Capital Management. (GX 800).[4]

Communications with Ruopp about the Chelsea acquisition stretched into at least April 2014 – that is, into the period of the charged offenses. (*See* DX 4808).[5] This evidence is therefore directly probative of Jason Galanis's practice of trading upon the names and reputations of his various investors, including Mr. Archer himself. This has been one of Mr. Archer's core defenses, and it is something that Martin flatly denied. *See* Tr. at 2318 ("Q. One of the things that [Jason Galanis] often instructed you to do was to name-drop, correct? A. No.").

In addition, GX 4801, 4802, and 4804 are also relevant and admissible to impeach Martin. During his cross-examination on Wednesday, Martin either flatly denied or denied recalling statements he made in those exhibits. The exhibits are therefore relevant – aside from their facial relevance to Mr. Archer's defense – to impeach Martin's overall credibility, specific testimony, and/or his memory. In those instances in which Martin's testimony was simply inconsistent with the e-mails, the e-mails are admissible as his prior inconsistent statements under Rule 613.

---

[4] The government never actually offered GX 800. Instead, it offered GX 2212, which is slightly later in the same e-mail chain, in which Jason Galanis forwards his e-mail to Bevan Cooney with the comment that he (Galanis) is "whoring it out shamelessly." GX 2212, however, does not contain the underlying attachment that Galanis sent to Morton.

[5] Mr. Archer does not believe it is necessary to offer DX 4808. I provide it for the Court's reference, however, to demonstrate that the communications between Martin and Ruopp about the Chelsea acquisition stretched into the time of the charged conspiracy.



In Court, Your Honor declined to admit DX 4801 on the grounds that "This is extrinsic evidence." The Court explained: "It has other information in it and it is something unrelated. You can ask about a particular phrase that you are using to impeach him. That is what I think is relevant." (Tr. at 2312). This was, with respect, error. Rule 613(b), titled "extrinsic evidence of a prior inconsistent statement," expressly permits impeachment through extrinsic evidence so long as "the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it" – which is precisely what happened here. Importantly, in order to be "inconsistent" under Rule 613, it is not necessary that the witness's testimony be the diametric opposite of his or her prior statement. Rather, "[t]he test is whether there is any variance between the statement and the testimony that has a reasonable bearing on credibility." *United States v. Ghailani*, 761 F. Supp. 2d 114, 117–18 (S.D.N.Y. 2011) (internal quotation marks, citations, and alteration omitted). DX 4801, along with DX 4802 and 4804 (which I did not seek to offer at the time, but for which an appropriate foundation was laid under Rule 613), are therefore admissible as Martin's prior inconsistent statements.[6]

In the instances in which Martin testified that he did not recall making the prior statement, the exhibits are further relevant to impeach his memory of critical facts, such as the way he interacted with and was instructed by Jason Galanis in connection with the roll-up plan. *See Rhodes v. Artus*, Case No. 9-cv-4251 (ER), 2013 U.S. Dist. LEXIS 194602 at *14 (S.D.N.Y 2013) (approving use of various prior inconsistent statements to impeach testimony that witness "could not remember what Petitioner was wearing" at specific time); *Johnson v. Bryco Arms*, Case No. 3-cv-2582, 2005 WL 469612 at *6 (E.D.N.Y. Mar. 1, 2005) (Weinstein, *J*.) ("A prior statement by a witness—in this case, a central witness to the case—will provide plaintiffs with a critical piece of impeachment material, particularly if . . . the witness's subsequent depositions have suggested inconsistencies or gaps in memory.").

Thank you for your consideration.

Respectfully,

 /s/ Matthew L. Schwartz
Matthew L. Schwartz

---

[6] The Court is of course correct in treating FBI 302s differently. Because the witness did not create the 302, it cannot be read or moved into evidence as a prior inconsistent statement. Instead, the admissible extrinsic evidence of a witness confronted with his or her prior inconsistent statement to the FBI would be the testimony of the FBI agent who was present for the interview.

# EXHIBIT A

*DRAFT 5/1/2018*
*CONFIDENTIAL*

**USAO_SDNY_013645 at 2:42:06**

Crafton: Where did the…what was the potash company? Where was it based? Was it based in…?

Cooney: That was all Arizona.

Crafton: Ok.

Cooney: And Brownie now taking the last two deals public—NASDAQ and had, you know, big, high-flying opportunities to make a ton of money—

Crafton: Yeah.

Cooney: The…but the bottom line is, you have to…I'm fucking convinced—and there's Jim [U/I] and these fuckers are no smarter than us. You have to get lucky.

Crafton. Mm hmm.

Cooney: You have to time your mine with the commodity pricing around it. You know? That's just a fact. And then if—and ride the wave, right? So…

Crafton: I just didn't know if you guys set up in different states or…

Cooney: For me, because all I am, Billy, is a deal catalyst.

Crafton: Yeah.

Cooney: So all I'm doing is packing this deal up front—usually buying a fucking [U/I] shell, merging the fucking existing company into the shell, taking the company public that way. And then we up-list up on the NASDAQ and that's one of my specialties. But, I don't have any fucking expertise from business management or any of that kind of stuff. All I'm doing is helping put the money together, and put the actual deal together. [U/I] Once the deal is cooked, you know, I can be wherever the fuck I want—there's no...it's not like I'm sitting managing a fucking…no one wants me managing a business.

1

*DRAFT 5/1/2018*
*CONFIDENTIAL*

**USAO_SDNY_013645 at 3:09:40**

Cooney: The guy that I brought to the table, Devon Archer, is the biggest whale of anyone—he's running—the guy was on the fucking front page of the Wall Street Journal. He's on the board of Burisma. Hunter Biden works for him. So we've got the top level people with us. All of my guys, is as top tier as it gets. And so—

Crafton: Because I can get the advisors, the other guys with me with a shit load of money where they just need to be broken off or it can be anything.

Cooney: So tell me how you break them off.

Crafton: Yeah it's obviously…I just haven't seen it in years so it's still early but…I uh…

Cooney: Because we have six—right now my deal flow is so large and the guys that—I have the biggest show-pony of all time, Devon Archer. The guy is I'll show you the…

Crafton: That's the thing is like I wanna know if we are gonna go balls to the walls and like, cover our ass—

Cooney: [Showing picture] Here's my business partner….

Crafton: Can I see those girls in the back?

Cooney: [U/I]

Crafton: [Laughs]

Cooney: Here's my best buddy from [U/I]—

Crafton: This is Devon Archer?

Cooney: —yeah that I brought into the fucking pool. And he's our show-pony here.

Crafton: And he's like, what? Brain power Sugy or better?

Cooney: He's just a total fucking whale. And these are the kind of articles that [U/I].

Crafton: But so you think Sugy is gun shy because of the shit he's been through?

Cooney: I don't think Sugarman—I don't think Sugarman understands how to articulate to you how to umm…

Crafton: Well I felt like the reach out of you coming with me to Liechtenstein was the

2

*DRAFT 5/1/2018*
*CONFIDENTIAL*

Cooney: [U/I] Biden's son and Kerry's family friend that's—we're talking about Devon. This was in the Wall Street Journal. Just—you know, just read this article.

Crafton: Wow.

Cooney: This was in the Journal—

Crafton: [Reading] Obama, Biden and his son…

Cooney: Not that I'm an Obama fan but…

Crafton: Hey, if he can help us, then...

Cooney: Well, you know—but you see that this is who we're doing business with? You don't get more politically connected and make people more comfortable than that. [Pause] And there's a lot of shit I do without Sugarman, just so you know.

Crafton: No, that's good.

3

*DRAFT 5/1/2018*
*CONFIDENTIAL*

**USAO_SDNY_013646 at 24:40**

Cooney: The key to these deals and the thing I'm doing now is layering myself with people a lot smarter than I am and out of George Alvarez's league to be honest with you.

Crafton: His what?

Cooney: the guys I'm doing business with are—

Crafton: Out of George Alvarez's league.

Cooney: Yeah, way fucking…ten times smarter. And Devon Archer in particular who I have a ten year, twelve year relationship with—you know, ex lacrosse player he's a great dude.

Crafton: You know him from Montana or where?

Cooney: Met him out in LA working on John Kerry's presidential campaign twelve years ago through Dan Merell.

Crafton: I've heard that name before. And Archer is boys with Joe Biden's son?

Cooney: Best... Biden works for him.

Crafton: Wait, so Joe Biden's son works for Archer—like if we're involved in this stuff, he'd be involved?

Cooney: Yeah, yeah.

Crafton: Ok, well that would help a lot.

Cooney: That's what my whole point is. You don't get any better.

Crafton: I'm just saying…

Cooney: Chris Heinz is his best friend from college, you know from the Heinz family? So you have these layers of legitimacy with all the deals we're doing now. And these guys don't do fucking skuzzy deals. But he's also not afraid, Billy, to work with people who have a little hair on them. So he's not a pussy either. You know what I'm saying? So if we went to him—he's not afraid to fucking… like all of us, if you believe in the people on the deal, you'll do the deal.

4