

MATTHEW L. SCHWARTZ
Tel.:  (212) 303-3646
E-mail:  mlschwartz@bsfllp.com

June 15, 2018

**BY ECF**

Hon. Ronnie Abrams
United States District Judge
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

   Re: *United States v. Galanis*, S3 16 Cr. 371 (RA)

Dear Judge Abrams:

   I represent Devon Archer.  I write in response to the government's letter of yesterday [ECF No. 312], objecting to Mr. Archer's offer of certain exhibits comprising text message exchanges between Michelle Morton, Jason Galanis, and others.

   As discussed in Court on Wednesday, Mr. Archer has designated and has offered, subject to the Court's ruling, certain text messages and other material extracted from Michelle Morton's cell phone.[1]  This material was all contained in two exhibits the government originally marked as GX 3004 and 3004B, and which Mr. Archer has re-marked as DX 3004 and 3004B (relevant excerpts only).  In addition, Mr. Archer offers DX 4817, a text exchange between Morton and Jerry Thunelius (an Atlantic Asset Management employee), also extracted from Morton's phone. (Copies of the exhibits Mr. Archer seeks to admit are attached for the Court's convenience.)

   This evidence is relevant and admissible for primarily three reasons.  *First*, certain of this evidence establishes Morton's whereabouts on March 25, 2015 – when the government will incorrectly argue she was meeting with Mr. Archer to discuss the WLCC bonds – and is thus admissible as impeachment and under the rule of completeness.  *Second*, the evidence is admissible to show the way in which Jason Galanis traded off of Mr. Archer's connections, money, and reputation – a core component of the defense.  *Third*, it is admissible to demonstrate the relationship and course of dealings between Morton and Jason Galanis, and Morton's state of mind as a result of those course of dealings.

**I.  DX 3004, 3004B, and 4817: Michelle Morton's Text Messages on March 25, 2015**

   DX 3004 and DX 4817 are admissible under Rule 106 to correct the inaccurate narrative presented by the government's selective and misleading designations of Morton's texts in GX 3004A.  *See* Fed. R. Evid. 106 (rule intended to combat "the misleading impression created by

---

[1]  On Wednesday, the Court admitted pages 3060 through 3092 of DX 3004, which is the Activity Analytics section of the cell phone analysis.



taking matters out of context").  In addition, because the government has sought to rely on Michelle Morton's out-of-court statements (*e.g.*, GX 955) to argue that a meeting occurred between Morton and Mr. Archer on March 25, 2015, at which the WLCC bonds were discussed, the evidence is also admissible under Rule 806 to impeach Morton.[2]

Searching for some link between Mr. Archer and Morton's and Jason Galanis's placement of the WLCC bonds with Hughes and AAM clients, the government has pointed to an alleged March 25, 2015 meeting between Morton and "the chairman of board of wealth assurance and two board members."  (GX 955.)  The government contends that that e-mail supports the inference that Morton "met with . . . Mr. Archer on that day, . . . a week later the transaction closes, and two weeks after that she buys $16 million of bonds that nobody wants, and then gets $300,000 in operating capital."  (Tr. at 1995).

Putting aside the fact that that timeline alone would hardly support a permissible inference of fraudulent intent on Mr. Archer's part, the government misunderstands the evidence. To support its story, the government has marked a series of text messages between Morton and Galanis apparently intended to suggest – inaccurately – that Mr. Archer and Morton not only met on March 25, 2015, but also discussed the WLCC bonds.  In particular, the government has admitted the following texts:

| | |
|---|---|
| Morton (6:57 PM):[3] | Just finished up.  Going to be tough to put up a trade before hand but he has other ideas where to place it (he came prepared) but I am super confident because he mike and Cliff are on top of it. . . . |
| | *     *     * |
| Morton (7:28 PM): | I'm really really feeling good about it.  Not because I was a bitch, but because he was ready [and] discussed the multiple clients in which the bond would fit.  He was prepared with information. . . . |
| Morton (7:29 PM): | Love Devon Devin |
| Galanis (7:29 PM): | great human |

---

[2]    The parties are awaiting a ruling with respect to GX 955.  If the government withdraws that exhibit and represents that it does not intend to argue that Morton and Mr. Archer met on March 25, 2015 and discussed the WLCC bonds, then Mr. Archer would likely not need to introduce the evidence discussed in section I of this letter.

[3]    Although certain exhibits use Universal Coordinated Time, because the precise time-line is critical on this point, all times presented in this section have been adjusted to Eastern Standard Time (UTC-4) for clarity.

| | | |
|---|---|---|
| Galanis (7:29 PM): | | I'm glad you got time with him |
| Galanis (7:29 PM): | | and you met andrew! |

GX 3004A at 8.

This theory makes sense only if one ignores Morton's other text messages from March 25, 2015, which make absolutely clear that her meeting that day about the bonds was not with Mr. Archer, but was with Jerry Thunelius, Atlantic's managing director and a member of its investment committee.[4]  To correct the record, Mr. Archer has marked DX 3004 and DX 4817: portions of Morton's cell phone extraction report prepared by the government and certain of Morton's text messages with Thunelius.  Those exhibits establish beyond doubt that the meeting Morton had "[j]ust finished up" prior to her text message to Jason Galanis was with Thunelius, not Mr. Archer:

| | |
|---|---|
| Thunelius (10:13 AM): | I would love to get some face time with you.  I will be done with this board meeting by 1130.  I wrap the day at 3 pm. |
| | *     *     * |
| Morton (12:01 PM): | . . . Hyatt grand central? I probably won't be there until 315 or so if that's ok |
| Morton (2:58 PM): | On my way to Hyatt at grand central station . . . |
| Morton (3:20 PM): | Going to grab a table |
| Thunelius (3:26 PM): | Ok on way in 10 . . . |
| Morton (3:26 PM): | OK . . . I am in and grabbed a table. |
| Morton (6:51 PM): | Thanks for spending time with me.  Getting the investment team strategy laid out was GREAT! It's one major thing off my plate and in such a positive way! You're the best and you and mike are going to be a wonderful team.  I am a very very very lucky woman. |

(DX 4817 at 1-3).[5]

---

[4]    Indeed, Thunelius is in some documents described as Atlantic's Chief Investment Officer.

[5]    The government objects to certain texts in DX 4817 as irrelevant.  *See* ECF 512 at 1-2. Mr. Archer has redacted DX 4817 to include only the text messages relevant to establish the fact and timing of their meeting.  A revised version is attached.



Morton sent her 6:51 PM text message to Thunelius ("Thanks for spending time with me. Getting the investment team strategy laid out was GREAT!") *immediately* prior to sending her 6:57 PM ("just finished up") text message to Jason Galanis; Morton had no communications with anyone between those two texts. (DX 3004 at 12.) Underscoring the impossibility of the inference the government wishes to invite the jury to draw, Morton also texted her business partner, Richard Deary, at 7:34 PM to tell him that she "[j]ust finished up a meeting with jerry so I have bond info. Things are starting to go our way." (DX 3004 at 13.)

In addition, DX 3004B includes a series of text messages establishing the timing of Morton's totally separate meeting with Jason Galanis earlier in the day on March 25. *See* DX 3004B at 31 (Morton (12:22 PM): "Hello I'm on the 35th floor in the lobby area where are you? Want to make sure I'm in the right place."); *see also* DX 3004 at 12 (Morton (3:19 PM): ". . . [G]reat meeting with Jason Rory the chair.")

The government's version of the events that took place on March 25, 2015, is belied by evidence that not only is in the government's possession, but also was among the material the government originally marked for trial. Its decision to ignore those documents in favor of a more selective – and misleading – narrative requires, in fairness, the contemporaneous admission of DXs 3004, 3004B, and 4817 to correct the record. To the extent that the government persists in arguing that Morton's communications establish that she spoke to Mr. Archer about the bonds, these exhibits are also independently admissible to her impeach her on that central question, under Rule 806.

## II.    DX 3004B: Morton's Text Messages with Jason Galanis

Mr. Archer also seeks the admission of DX 3004B, which contains a selection of text messages between Morton and Jason Galanis that are directly relevant to Mr. Archer's defense that he was never a part of any conspiracy to steal the bond proceeds or place the bonds with Morton's clients, and was instead used by Jason Galanis, who traded on his reputation and connections.

As Morton's text messages make clear, her relationship with Jason Galanis was utterly unique. The two were in nearly constant communication. Mr. Archer does not seek to admit any of the exchanges designated in DX 3004B for the truth of the matters they assert. Instead, these messages establish Morton's course of conduct and state of mind, which – as the government repeatedly has argued – are directly relevant to this case. *See, e.g.*, Tr. at 1966 (AUSA: GX 955 "goes to [Morton's] state of mind and course of dealing"). Their intimacy – and undisputed status as co-conspirators – along with similar evidence about the relationship between Jason Galanis and other conspirators like Hugh Dunkerley and Francisco Martin, stands in stark contrast to the relationship that Mr. Archer had with the alleged conspirators, and supports the inference that he was not a part of their scheme.

### A.  Jason Galanis Peddled Mr. Archer's Connections

In his literally thousands of text exchanges with Morton, Jason Galanis went to great lengths to underscore his proximity to Mr. Archer and emphasize Mr. Archer's connections and



influence.  Mr. Archer seeks to introduce just a small sample of those communications.  For example:

> From: From: +13104259575 Jason Galanis Timestamp: 10/29/2014
> 9:30:20 PM(UTC+0)
> Source App: iMessage: +17325985189 Body:
> get your head back in the game
> -----------------------------
> From: From: +13104259575 Jason Galanis Timestamp: 10/29/2014
> 9:30:40 PM(UTC+0)
> Source App: iMessage: +17325985189 Body:
> Hunter and Devon
> -----------------------------
> From: From: +13104259575 Jason Galanis Timestamp: 10/29/2014
> 9:42:56 PM(UTC+0)
> Source App: iMessage: +17325985189 Body:
> will change your access forever
>
> -----------------------------

(DX 3004B at 23; *see also id.* at 17, 21-22, 28.)  Like Jason Galanis's references to Rory Knight (the former Oxford Business School dean whom Jason Galanis "installed . . . as our chairman at the insurance group") and Jason Sugarman's billionaire father-in-law – neither of whom is alleged to be a co-conspirator – the references to Mr. Archer were meant to illustrate Jason Galanis's value to Morton and his access to legitimate and credible investors.  S*ee* DX 3004B 29-30.

None of these communications is offered for its truth.  Instead, Mr. Archer offers the text messages to establish Jason Galanis's course of dealings with Morton, Jason Galanis's and Morton's state of mind with respect to Mr. Archer, and the fashion in which Galanis traded off Mr. Archer's name and relationships.  Indeed, in its opening statement the government argued repeatedly that each of the defendants "had their own role."  (Tr. at 52; *see also id.* at 62, 65).  Mr. Archer's role was that he was exploited by Jason Galanis for his money, his connections, and his reputation.  These texts are direct evidence of that fact.

### B. Michelle Morton Did Not Know Who Devon Archer Was Well into the Alleged "Conspiracy"

DX 3004B also includes notable examples of Morton's confusion regarding Mr. Archer's identity, which underscores their lack of relationship.  For example:

> From: From: +13104259575 Jason Galanis
> Timestamp: 2/13/2015 3:56:04 AM(UTC+0)
> Source App: iMessage: +17325985189
> Body:
> Just finished a booze-a-thon with andrew and Bevan
> ----------------------------- From: From:
> +17325985189
> Timestamp: 2/13/2015 4:43:25 AM(UTC+0)
> Source App: iMessage: +17325985189
> Body:
> A...is that Devon maybe?

**BSF**

           *       *       *

From: From: +13104259575 Jason Galanis
Timestamp: 2/13/2015 4:49:45 AM(UTC+0)
Source App: iMessage: +17325985189 Body:
Bevan is Bevan. Devon is Devon. And there is a Kevin.
-----------------------------
From: From: +13104259575 Jason Galanis
Timestamp: 2/13/2015 4:49:59 AM(UTC+0)
Source App: iMessage: +17325985189 Body:
And a Devin.

           *       *       *

-----------------------------
From: From: +17325985189
Timestamp: 3/5/2015 10:38:23 PM(UTC+0)
Source App: iMessage: +17325985189 Body:
Texting you and Devin at the same time. He's given me a new name "the Greek Whisperer" I love it!
-----------------------------
From: From: +13104259575 Jason Galanis
Timestamp: 3/5/2015 10:38:39 PM(UTC+0)
Source App: iMessage: +17325985189 Body:
Bevan
-----------------------------
From: From: +13104259575 Jason Galanis
Timestamp: 3/5/2015 10:38:43 PM(UTC+0)
Source App: iMessage: +17325985189 Body:
Devon is someone else
-----------------------------
From: From: +13104259575 Jason Galanis
Timestamp: 3/5/2015 10:38:51 PM(UTC+0)
Source App: iMessage: +17325985189 Body:
and Devin is some else too
-----------------------------
From: From: +13104259575 Jason Galanis
Timestamp: 3/5/2015 10:38:56 PM(UTC+0)
Source App: iMessage: +17325985189
Body:
Bonwick Devin

           *       *       *

-----------------------------
From: From: +17325985189
Timestamp: 3/5/2015 10:43:15 PM(UTC+0)
Source App: iMessage:
+17325985189 Body:
You're confusing ME
-----------------------------

(DX 3004B at 24-27.)



In these texts and others, Morton plainly – and repeatedly – confused the identities of those with whom she was purportedly "conspiring."  The above exchanges demonstrate that Morton's connection with Mr. Archer was so remote that, well into the alleged conspiracy – and after tens of millions of dollars of WLCC bonds were allegedly placed improperly with Morton's clients – Morton could not distinguish Mr. Archer from "Bonwick Devin" and Bevan Cooney.  Again, Mr. Archer does not offer these exchanges for their truth.  They are offered to establish merely that they were said, which reflects Ms. Morton's state of mind and her course of dealings with Jason Galanis – and the obvious effects of the absence of any such dealings with Mr. Archer.  The jury is permitted to infer from this confusion that Mr. Archer was never a part of any such conspiracy, and that – given his apparent interchangeability with at least two others – reasonable doubt exists regarding Mr. Archer's knowledge of any alleged misconduct related to the placement of the WLCC bonds with Hughes's and AAM's clients.

Moreover, this evidence is absolutely central to undermining the government's theory that Mr. Archer somehow was a "control person" at Hughes and Atlantic through his investments that should have been, for instance, disclosed on Atlantic's Form ADV.  The CEO of Hughes and Atlantic who was making, the government argues, all investment decisions about the WLCC bonds apparently had no clue who Mr. Archer was.  The notion that Mr. Archer controlled her, therefore, is far-fetched, and this evidence is necessary to meet the government's argument to the contrary.

### C.  Michelle Morton's Relationship with Jason Galanis

Mr. Archer's obvious distance from AAM stands in direct contrast to the intimacy of Morton's and Jason Galanis's relationship.  While Jason Galanis references a formal "presentation to Archer's partners," on the one hand, Morton explains to Jason Galanis that they (Morton and Galanis) "are kindred spirits and share virtually the same goal" and have "a non romantic passion that we share."  DX 3004B at 9.  Morton addresses Jason Galanis as "Mr. Luscious" (*id.* at 24), the "emerald eyed Greek at the end of the rainbow" (*id.* at 2), and texts the lyrics to The Pointer Sisters' song, "I'm So Excited" (*id.* at 9-10).  Just as Hugh Dunkerley was the "wide receiver" to Jason Galanis's "quarterback" and his "brother in [love and war]" (Tr. at 1428 – 1429), these communications illustrate the way in which Galanis dealt with his true co-conspirators, and should be admissible for that purpose.

### D.  Jason Galanis's and Morton's State of Mind Concerning Jason Sugarman

While the text messages related to Mr. Archer speak in terms of the *potential* significance of his Rolodex, the text messages concerning Jason Sugarman allude to Morton's understanding of his *actual* involvement in the management of AAM, consistent with Sugarman's role as an Atlantic Capital Holdings board member.  (*See, e.g.*, GX 700 at 2.)  The government has repeatedly asserted the relevance of the alleged co-conspirators' control over Hughes and AAM.  The evidence that Mr. Archer held any such coercive power, however, is non-existent.  If the government intends to assert that Mr. Archer controlled Hughes and AAM, Morton's relative familiarity with Sugarman and her perception of his role in the business (as a result of Jason Galanis's representations) are relevant, as are Mr. Archer's contrasting anonymity and complete lack of involvement with Hughes and AAM.



The frequency and quality of Jason Galanis's references to Sugarman paint Sugarman as a powerful man with whom Jason Galanis had deep personal connections.  With that picture in mind, he communicated to Morton that Sugarman reviewed the company's operating agreement (DX 3004B at 3, 5), monitored the business (*id.* at 16, 42, 43), and met with Jason Galanis regularly both professionally (*id.* at 18, 19, 20, 36-37), and socially (*id.* at 12, 14, 38).  Morton also references her business dealings with Sugarman (*id.* at 19, 37, 42-43), and jokes about him in familiar terms (*id.* at 2, 6-7, 30).  Jason Galanis – as he did with Mr. Archer – emphasizes Sugarman's connections and wealth to underscore the significance of Jason Galanis's relationship with him.  *Id.* at 35 ("He was at his family's teams game.  The Dodgers.  Sorry.")

Again, these texts are not offered for their truth.  The point is not whether Jason Sugarman actually reviewed an operating agreement, met with Jason Galanis, or was at a Dodgers game.  The point is that Jason Galanis said all of these things to Michelle Morton.

Mr. Archer offers this evidence to highlight the radical difference between the nature of Jason Galanis's and Morton's references to Sugarman, on the one hand, and those to Mr. Archer, on the other, to establish both the course of dealings between Jason Galanis and Morton, and their states of mind.  Ms. Morton's understanding of who was "behind the curtain" with respect to her business – by this evidence, Jason Sugarman – as well as her understanding of Jason Galanis's relationship with Sugarman, are directly relevant to rebut the government's apparent contention that Mr. Archer was a silent, absentee control person.  The jury should be permitted to review the evidence, draw its own conclusions regarding the control of Hughes and AAM, and weigh the likelihood that Mr. Archer was part of any alleged conspiracy to acquire and assert such control in order to place the WLCC bonds.  Given the government's seeming pivot to making this case about undisclosed conflicts of interest rather than stolen bond money, Mr. Archer should be permitted to introduce this evidence illustrating his distance from the investment advisers.

Thank you for your consideration.

Respectfully,

 /s/  Matthew L. Schwartz
Matthew L. Schwartz