

MATTHEW L. SCHWARTZ
Tel.:  (212) 303-3646
E-mail:  mlschwartz@bsfllp.com

June 16, 2018

**BY ECF**

Hon. Ronnie Abrams
United States District Judge
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

> **Re:**   *United States v. Galanis*, S3 16 Cr. 371 (RA)

Dear Judge Abrams:

I represent Devon Archer.  I write in response to the government's letter of yesterday afternoon [ECF No. 516], and to raise one new issue with respect to certain summary charts the government intends to introduce on Monday.

## I.     The BIT Board Minutes Should Be Excluded Or, At A Minimum, Heavily Redacted

The government's argument about the BIT Board minutes misses the point.  There is no dispute – presuming that the government's witness on Monday can lay an appropriate foundation – that at least certain of the BIT Board meeting minutes may be business records.[1]  Thus, for example, if the government wishes to introduce the minutes to reflect attendance at the meetings or to show what the BIT Board's resolutions were, Mr. Archer would likely have no objection to admitting just those portions of the minutes.  The cases cited by the government support admitting the minutes for those narrow purposes.  *See N.L.R.B. v. Local 40, Intern. Ass'n of Heat and Frost Insulators and Asbestos Workers, AFL-CIO*, 451 F.2d 119, 121 (2d Cir. 1971) (in employment dispute, admitting meeting minutes as business records because they reflected the decision of the Joint Trade Board: "The minutes of that meeting reveal an undertaking to expand union membership by taking in former permit men, not to include Morehouse, who was spoken of unfavorably"); *United States v. Pirk*, No. 15 Cr. 142 (EAW), 2018 WL 1521781, at *1 (W.D.N.Y. Mar. 28, 2018) (admitting meeting minutes to show official action taken at motorcycle club meetings, including that for "party planning and events," "'Old Ladies'—girlfriends and wives of KMC members—are responsible for bringing side dishes to pass," as well as official actions concerning club rules, changes in leadership, and the like).

But that is not what the government wants to do; it wants to introduce the minutes because they contain alleged statements by Mr. Archer, as reflected in someone else's notes.  Those statements are hearsay.  *See Hamad v. Michael Euguence Cook & Concrete Reflections, Inc.*, No. 13 Civ. 3222 (MHD), 2014 WL 3507340, at *7 (S.D.N.Y. June 30, 2014)

---

[1]     As discussed below, this is not so clear for meeting minutes that post-date Galanis's September 2015 arrest and the initiation of the SEC investigation.



("Inadmissible hearsay does not become admissible solely by virtue of its inclusion in an admissible report." (internal quotation marks omitted)); *see also Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991) (finding that a recorded statement "is plainly not admissible merely because contained in a[n admissible] police report").

This distinction between the (admissible) ordinary business reflected in meeting minutes and (hearsay) embedded testimonial statements is precisely the one drawn by the Eleventh Circuit in *United States v. Borrasi*, 639 F. 3d 774 (11th Cir. 2011), in which the Court of Appeals affirmed the introduction of meeting minutes to prove who was in attendance – an issue relevant in that case to demonstrate that the defendant only rarely attended meetings – but excluded the substance of the meeting minutes because they "constituted inadmissible hearsay." *Id.* at 777, 780.

The government mischaracterizes the holding in *Borrasi* by trying to draw a distinction between "reports" and "minutes." But as the opinion makes clear, everything that was excluded was contained in the meeting minutes themselves ("Borrasi sought to introduce the minutes as exhibits"), which *discussed* the reports: "Some of the minutes contained comments about committee reports submitted to Rock Creek's board of directors." 639 F.3d at 779. *See also id.* ("the district court ruled the minutes' substantive *descriptions* of the reports inadmissible because the statements would constitute hearsay" (emphasis supplied)). The minutes in *Borrasi* are therefore no different than the BIT Board minutes, insofar as they reflected "what actually occurred at the meeting." (Gov. Ltr. at 2).

This distinction between embedded hearsay and admissible information from business records is one also drawn in the business records rule itself. Rule 803(6) does not permit all evidence in a business record to be admitted, it is expressly limited to evidence of "[a] record of an act, event, condition, opinion, or diagnosis." Mr. Archer's supposed statements to the BIT Board do not fit into any of those categories, and cannot be admitted as a business record.

The government nonetheless contends that introducing notes of Mr. Archer's alleged out-of-court statements presents no hearsay problem because "the minutes report on Archer's actual statements." (*Id.*). But that was precisely the case with GX 2117, which the Court properly excluded; the minutes may purport to "report on" Mr. Archer's statements, but they are not *his* statements.

Statements by party opponents are admissible only if they were made by the party him- or herself, authorized or adopted by the party, or made by the party's agent. *See* Fed. R. Evid. 801(d)(2). Here, the statements were made by Molly Moynihan, counsel to the BIT Board. To be sure, her statements were *about* things that Mr. Archer supposedly said. But they are no more Mr. Archer's own statements than Mark Waddington's summary of Mr. Archer's statements in GX 2117. *See* Tr. at 1984-85 (excluding GX 2117 even though they contained what Waddington "believe[d] to be accurate summaries of the conversations he and Mr. Archer had on the telephone," because "there is no indication Mr. Archer adopted these statements in the emails as being accurate."). So too here: Mr. Archer did not write the BIT Board minutes, he did not



adopt or even review them, and they were not created by his agent because he was never part of the BIT Board.[2]  They are hearsay, and hearsay-within-hearsay.

The government's attempt to defend the content of the minutes is also revealing.  For example, with respect to GX 784, the minutes effectively falsely accuse Mr. Archer of being one of the unnamed individuals in the *SEC v. AAM* complaint – something the government now agrees was not the case.  But the government insists that Mr. Archer's supposed statement that he had "no involvement whatsoever" with the events in that complaint is somehow a "false exculpatory statement."  (Gov. Ltr. at 2).  With respect to the government, that is ridiculous.

Mr. Archer is not a person identified in the *SEC v. AAM* complaint, and that complaint notably does not mention the second bond issuance that allegedly was acquired by Rosemont Seneca Bohai LLC.  *See* Gov. Ltr. at 2 (admitting that the *SEC v. AAM* complaint only "discusses the first and final issuances of WLCC bonds," but not the second).  The evidence throughout this trial has shown that, taken in the light most favorable to the government, while Mr. Archer may have been in some sense on notice of the occurrence of the first bond issuance, he was not "involved" in it:  he never communicated with anyone from Atlantic or Hughes about the bonds, never communicated with the WLCC, and was not involved in BSI's underwriting of the bonds.

If Mr. Archer indeed said that he had "no involvement whatsoever" in the *SEC v. AAM* events – a dubious prospect to begin with, given that there is no evidence that Mr. Archer had read the complaint, and it is far more likely that if he denied anything it was some summary description of the misconduct by Moynihan – that amounts to no more than a generalized denial of the conflict-of-interest charges contained in that complaint.  But it is black letter law that generalized denials of wrongdoing are not admissible as false exculpatory statements.  *See United States v. Bear Killer*, 534 F.2d 1253, 1260 (8th Cir. 1976) (in case involving manslaughter on the Pine Ridge Indian Reservation, holding: "A denial of guilt can never be evidence of guilt."); *United States v. McDougald*, 650 F.2d 532 (4th Cir. 1981) (noting that "general denials of guilt later contradicted are not considered [false] exculpatory statements . . . ."); *see also United States v. Colcol*, 16 M.J. 479 (C.M.A. 1983) ("unlike a false explanation or alibi given by a suspect when he is first confronted with a crime, his general denial of guilt does not demonstrate any consciousness of guilt.  Moreover, in order to decide that an accused's general denial of illegal activity is false, the factfinder must decide the very issue of guilt or innocence; and so the instruction would only tend to produce confusion because

---

[2]     This is an important point.  Meeting minutes are arguably admissions as to the members of the relevant committee or board, because the minutes are taken by a corporate secretary, attorney, or some other person who constitutes an agent of the meeting participants for purposes of Rule 801(d)(2)(D).  In the case of the BIT Board, however, Mr. Archer was always an invited guest and was in some senses adverse to the BIT Board, insofar as he was on the other side of a business deal.  This fact severely undermines the reliability of the minutes as to Mr. Archer's statements.



of its circularity.").[3]  And of course Mr. Archer's purported *specific* statement – that he was not one of the unidentified people referenced in the complaint – was entirely true.

This is not the only prejudicial hearsay in the minutes.  For example, the minutes of a January 19, 2016 meeting contain the following allegation:

> The Independent Trustees questioned Mr. Archer's candor and the candor of others on the events leading up to the net capital issues. In particular they noted that they had only learned in the prior weeks, after Ms. Moynihan was asked to join a call with the SEC, that the Indian bonds had been contributed to the capital of BSI.

(GX 783).  No witness would be allowed to testify that he or she "questioned Mr. Archer's candor" – it would be an irrelevant opinion.  The government should not be able to introduce this sort of inflammatory statement in the guise of a business record.  Indeed, it is no mistake that of the six sets of BIT Board meeting minutes the government seeks to admit, fully half of them post-date Jason Galanis's September 2015 arrest and the start of the SEC investigation here, and therefore include all forms of backwards-looking speculation and recriminations that are both incredibly prejudicial and not reliable.  (*See* GX 782, 783, 784).  Indeed, there is a compelling argument that these later meeting minutes could not possibly be business records, but were instead created in anticipation of litigation.  *See Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*, 38 F.3d 627, 632 (2d Cir. 1994) ("Data prepared or compiled for use in litigation are not admissible as business records"); *United States v. Freidin*, 849 F.2d 716, 719 (2d Cir.1988) (explaining that the purpose of the business records rule is to ensure that documents were not created for "personal purpose[s] . . . or in anticipation of any litigation" so that the creator of the document "had no motive to falsify the record in question.").  In any event, their lack of reliability renders them inadmissible even as a business record.  *See* Fed. R. Evid. 803(6)(E) (record that otherwise qualifies as a business record is inadmissible if "the source of information or the method or circumstances of preparation indicate a lack of trustworthiness").

Given that the government has a percipient witness who will be testifying to all of these interactions – the best evidence – the Court should exclude the meeting minutes.  They are hearsay, unreliable, and far more misleading and prejudicial than any incremental probative value.

## II.   GX 1401 Should Be Excluded

As set out in Mr. Archer's original objections, GX 1401 should be excluded because it is privileged, and also because it is misleading.  Indeed, the government's response confirms that it wishes to use the exhibit precisely *because* it will be misleading.  To set the record straight,

---

[3]      *Cf.* U.S. Sentencing Guidelines § 3C1.1, application n.2) (for purposes of obstruction of justice enhancement, "[a] defendant's denial of guilt (other than a denial of guilt under oath that constitutes perjury), [or] refusal to admit guilt . . . is not a basis for application of this provision.").



however, Mr. Archer would be forced to introduce privileged communications himself – which only underscores that the communication was privileged in the first place.

### A.    GX 1401 is a Privileged Attorney-Client Communication

GX 1401 is a communication between attorney and client concerning legal advice; it is plainly privileged.  The fact that the SEC obtained the document, unbeknownst to Mr. Archer, and produced it to the government does not strip the communication of its privileged character.

"The attorney-client privilege is designed to promote unfettered communication between attorneys and their clients so that the attorney may give fully informed legal advice." *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995) (citations omitted).  "A party invoking the attorney-client privilege must show (1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice."  *In re Cty. of Erie*, 473 F.3d 413, 419 (2d Cir. 2007) (citing *Const. Prod. Research, Inc.*, 73 F.3d 464, 473 (2d Cir. 1996).

The government effectively concedes the first element, and attacks the second and third. With respect to the second element – that the communication was made and kept in confidence – there is no dispute that the original communication was solely between lawyer and client and was maintained in confidence.  The government contends, however, that Mr. Archer – the privilege holder – somehow waived the privilege when *Weiss* produced the document to the SEC. This argument, however, is foreclosed by the Rules of Evidence:

> **Inadvertent Disclosure**. When made in a federal proceeding or to a federal office or agency, the disclosure [of a communication or information covered by the attorney-client privilege or work-product protection] does not operate as a waiver in a federal or state proceeding if:
>
> (1)    the disclosure is inadvertent;
>
> (2)    the holder of the privilege or protection took reasonable steps to prevent disclosure; and
>
> (3)    the holder promptly took reasonable steps to rectify the error, including (if applicable) following Federal Rule of Civil Procedure 26(b)(5)(B).

Fed. R. Evid. 502(b).[4]  Mr. Archer has more than satisfied the requirements of the Rule.  Indeed, Mr. Archer did not produce the document at all, and he previously logged a different copy of the

---

[4]      Federal Civil Rule 26(b)(5)(B) is obviously not applicable in a criminal case like this one. If it were, however, Mr. Archer has complied with it.  "That rule . . . provides that if the producing party has a privilege claim affecting a produced document, that party may notify the recipient, who is then obliged to 'promptly return, sequester or destroy the specified information



identical document. Mr. Archer therefore took reasonable steps to prevent disclosure. He also asserted the privilege and sought relief from the Court immediately upon learning that the government had this e-mail. The government contends that Mr. Archer waited too long, because it had produced its exhibits prior to trial, but that is not the relevant test. Indeed, Rule 502(b) protects from waiver privileged communications produced by the privilege-holder itself. Here, Mr. Archer's counsel represents that *immediately* upon realizing that the government intended to introduce this privileged communication – which realization took place during the break in testimony on Wednesday when counsel first reviewed the e-mails that the government indicated it intended to read into evidence – Mr. Archer raised his objection.

Rule 502(b) was designed to protect situations precisely like this one, where a party realizes that its privileged communications have inadvertently been turned over to an adversary. As explained in Mr. Archer's initial letter, GX 1401 appears to be a document from within a 552-page PDF scan of a hard copy collection of miscellaneous documents maintained by Weiss, which Weiss produced to the SEC, which the SEC then produced to the U.S. Attorney's Office in a production of more than 3 million documents, which the Office subsequently produced to Mr. Archer – all in a disorganized fashion without load files, searchable text, image, or metadata files. *See* ECF No. 513 at 2. Revealing his clear intent to keep GX 1401 in confidence, Mr. Archer identified an identical copy of this document in a privilege log. *See id.*, Ex. B. And when Mr. Archer became aware that the government possessed this document, he immediately objected to its admission. He never waived the privilege.

With respect to the third element of privilege – whether the communication was made for the purpose of obtaining legal advice – the government responds with a single conclusory assertion: "The email contains no actual legal advice from Weiss to Archer[.]" ECF No. 516 at 3. This argument again misses the point. The third element requires that a privileged communication be "made for the *purpose* of obtaining or providing legal advice," *In re Cty. of Erie*, 473 F.3d at 419 (emphasis supplied), but does not require that the communication itself contain a legal conclusion from counsel.

GX 1401 plainly reflects an exchange between Mr. Archer and attorney Weiss for the purpose of obtaining and providing legal advice. The e-mail reflects that Weiss sent Mr. Archer an (unidentified) document that he drafted, and asks Mr. Archer to review and comment. Mr. Archer then responds with what appears to be an inside joke acknowledging Weiss's request. This exchange about drafting a legal document falls squarely within the privilege. Indeed, the government effectively concedes as much when it argues that GX 1401 is relevant to rebut the argument "that Archer had no role in drafting the letter . . . ." The government thus agrees that

---

and any copies' and is prohibited from using or disclosing the information until a court resolution, which would be triggered by the discovering party applying to the court for a determination of the privilege claim." *Briese Lichttechnik Vertriebs GmbH v. Langton*, 272 F.R.D. 369, 372 (S.D.N.Y. 2011). Here, upon learning that the government had this privileged document, Mr. Archer promptly notified the government and asked that it return or destroy the privileged e-mail, and presented the issue to the Court for a determination. In addition, although Mr. Archer is not the producing party for this communication, he has preserved a copy of the document as required by the Rule.



this e-mail shows how Mr. Archer contributed to some (unidentified) legal document drafted by Weiss.  If the government is correct, then GX 1401 is assuredly privileged.

**B.      GX 1401 Should Be Excluded Under Rule 403**

The exhibit should also be excluded under Rule 403.  Indeed, the government admits that its purpose in marking the exhibit is to prove that Mr. Archer "was given th[e] opportunity to review and comment on" a letter sent to the BIT Board.  But the exhibit does not prove that.  Instead, GX 1401 refers to an unidentified attachment; there is no reason to believe that it is identical to any letter actually delivered to the BIT Board.

The bottom e-mail in GX 1401 – the one that the government apparently believes is relevant – is from Weiss to unnamed recipients attaching a document labeled "00017827.docx."  There is no record evidence of what this document is.  Yet the government states in its letter that it intends to argue that this e-mail shows that Mr. Archer reviewed a specific version of a letter that was sent to the BIT Board.  *See* ECF No. 516 at 3.  But there is no evidence of what the attachment is – it might be a letter to the BIT Board, or it might be something else entirely.  Moreover, even if it is a letter to the BIT Board, it is undisputedly a draft, and there is no evidence of what changes might have been made between that draft and the letter ultimately submitted to the BIT Board.  The e-mail is simply not probative at all on the question of whether Mr. Archer reviewed any specific letter that was ultimately given to the BIT Board.  Its admission will therefore serve only to mislead the jury and to prejudice Mr. Archer.[5]

Worse, if GX 1401 is admitted, Mr. Archer cannot rebut the government's false inference without introducing the privileged underlying e-mail and attachment.  Thus, the jury will be forced to speculate about why they are seeing GX 1401 without the full version of the bottom e-mail.  And Mr. Archer cannot fully argue his side of the story without waiving privilege as to that e-mail.  The end result of allowing in this document will be to prejudice Mr. Archer, confuse the jury, and waste the Court's time.[6]

---

[5]      The government states that "[o]n September 26, 2014, Archer sent the Board a letter. . . ." (Gov. Ltr. at 3).  But that is simply not so.  If it were true that Mr. Archer himself sent the letter, then the government would have no need to introduce GX 1401 to try to mislead the jury into believing that Mr. Archer had reviewed and adopted it – it could simply introduce the evidence that Mr. Archer "sent the Board a letter."  But he did not.  The exhibit cited by the government, GX 762, has no transmission e-mail, and discovery does not reveal any communication in which Mr. Archer himself sent this or any other letter to the BIT Board.

[6]      The government does not appear to disagree, but the top e-mail in GX 1401 is plainly irrelevant.  It is included in GX 1401 presumably because that's the only version of the document in the government's possession – further underscoring that it is privileged.  In any event, the top e-mail has no probative value and increases the potential for prejudice and confusion.  It is an e-mail from Mr. Archer to Weiss in reference to their dealings relaying some type of inside joke that only they likely understand.



Finally, the government's alternative argument is misplaced.  The government argues that if GX 1401 is excluded on privilege grounds, Mr. Archer should be precluded from arguing that he relied on the advice of counsel.  To be clear, Mr. Archer does not intend to argue and will not argue that he relied on the advice of counsel.  Mr. Archer understands that a true advice of counsel defense entails waiver of the privilege, among other things.  *See generally United States v. Wells Fargo Bank N.A.*, No. 12 Civ. 7527 (JMF), 2015 WL 3999074, at *1 (S.D.N.Y. June 30, 2015).  But Mr. Archer is entitled to argue, and will argue, that the presence of attorneys in the negotiations with the BIT Board – as with their presence in connection with the WLCC bond offerings, and the acquisition of various companies, and other transactions in this case – is relevant to his lack of fraudulent intent.  *See, e.g., United States v. Schussel*, 291 Fed. Appx. 336, 344-45 (1st Cir. 2011) (declining to find waiver of attorney-client privilege even where defendant "made selective use of [privileged] documents as part" of a reliance on counsel defense to negate element of the offense); *Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Amer.*, Case No. 04 Civ. 10014 (PKL), 2009 WL 3111766 at *16 (S.D.N.Y. Sept. 28, 2009) (finding that party could "inform the jury of the fact that counsel was consulted on the subject matter of this litigation" without waiving privilege since "that in and of itself is not privileged").  That argument, which does not turn on the *content* of attorney-client communications, does not require waiver of the privilege, and therefore in making it Mr. Archer will not be using the privilege "as both a sword and a shield."

## III.   DX 4801-04, 4813, And 4821 Should Be Admitted

These exhibits – communications involving Francisco Martin and Jason Galanis – should be admitted for the reasons set forth in Mr. Archer's prior letter, namely that they evidence the way in which Galanis traded on Mr. Archer's name and reputation, controlled access to information, and interacted with his real co-conspirators.  In addition, the e-mails are direct evidence of the fact that the "roll-up plan" long predated any talk of the WLCC bonds, which is directly responsive to the government's contention that the *purpose* of the acquisition of all of the financial services companies was to facilitate the WLCC bond fraud.  Finally, certain of the exhibits are also admissible to impeach Martin.

The government argues that these e-mails are hearsay, but none are admitted for the truth of the matter asserted.  For example, Martin's statement that "Jason is VERY sensitive how communications flows" is not being offered to prove that Jason Galanis is in fact VERY sensitive to how communications flow.  Rather, it is being offered to show that Martin *said* that to a party in a potential financial services acquisition that was the first part of the roll-up plan, and that he (Martin) *believed* it.  Likewise, Jason Galanis's various statements about Jason Sugarman, COR Advisors, or Mr. Archer are not meant to prove the truth of those statements – they are being offered to demonstrate that Jason Galanis was boasting and name-dropping, and instructed Martin to do the same.  These exhibits should be admitted – with a limiting instruction, if the government so desires – as direct evidence on the defense case.

The government is also incorrect about the value of DX 4801, 4802, and 4804 as impeachment evidence.  The government correctly notes that Martin said "I must have written" those e-mails and/or did not deny writing those e-mails – but because the e-mails were not admitted and Mr. Archer's counsel was precluded from phrasing questions in terms of the



content of the e-mails, there is no record evidence of what Martin agreed he must have written. The e-mails therefore impeach Martin's testimony. *United States v. Ghailani*, 761 F. Supp. 2d 114, 117–18 (S.D.N.Y. 2011) (test is not whether prior statement is the polar opposite of a witness's trial testimony; "[t]he test is whether there is any variance between the statement and the testimony that has a reasonable bearing on credibility" (internal quotation marks, citations, and alteration omitted)).

And in at least one case – totally unaddressed in the government's letter – Martin squarely denied being instructed by Jason Galanis to name-drop, *see* Tr. at 2318 ("Q. One of the things that [Jason Galanis] often instructed you to do was to name-drop, correct?  A. No."), which plainly renders e-mails in which Martin was instructed to do just that admissible under Rule 613(b).  Likewise, the government fails to address the fact that because Martin testified that he could not recall these e-mails (though he did not deny writing them) they are admissible to impeach his memory.  *See Rhodes v. Artus*, Case No. 9-cv-4251 (ER), 2013 U.S. Dist. LEXIS 194602 at *14 (S.D.N.Y 2013) (approving use of various prior inconsistent statements to impeach testimony that witness "could not remember what Petitioner was wearing" at specific time); *Johnson v. Bryco Arms*, Case No. 3-cv-2582, 2005 WL 469612 at *6 (E.D.N.Y. Mar. 1, 2005) (Weinstein, *J.*) ("A prior statement by a witness—in this case, a central witness to the case—will provide plaintiffs with a critical piece of impeachment material, particularly if . . . the witness's subsequent depositions have suggested inconsistencies or gaps in memory.").

## IV.   The Government's Summary Charts Are Misleading And Must Be Corrected

Finally, Mr. Archer writes to object to two very limited aspects of summary charts that the government intends to introduce on Monday.  Courtesy copies of the relevant summary charts are attached as Exhibit A for the Court's reference.[7]

### A.   The Government's Summary Charts Intentionally Conflate Wealth Assurance Private Client Corporation With The Legitimate Wealth Assurance Entities

First, numerous of the summary charts concern the movement of money through various accounts, including the alleged misappropriation of bond money from the Wealth Assurance Private Client Corporation bank account.  On all but one exhibit, however, the government's summary chart labels that account "Wealth Assurance," rather than "Wealth Assurance Private Client Corporation" or "WAPCC."  (*See* GX 4004-10, 4012-14).  This is both misleading and flatly inconsistent with the Court's ruling on Mr. Archer's motion *in limine* that the government should avoid intentionally conflating the various Wealth Assurance entities.  *See* 5/16/2018 Final Pretrial Tr. at 62-65 (granting motion *in limine* to preclude the government from non-specific references to "the defendants" and from conflating various similarly-named entities, explaining

---

[7]      In addition to the two issues raised in the body of this letter, Mr. Archer's counsel also asked the government to remove gratuitous references to Code Rebel in GX 4008.  While that chart is generally consistent with the Court's ruling regarding Code Rebel and the WLCC bond proceeds, the government's chart has at least one totally unnecessary reference to "proceeds from Code Rebel sale."  The government declined to change its summary chart.



"it's essential that all the parties be as precise as possible throughout the course of the trial. . . . We just want the evidence to be clear").  Indeed, numerous witnesses have testified that Wealth Assurance Private Client Corporation had absolutely nothing to do with Wealth Assurance Holdings, Ltd. or Wealth Assurance AG, and no one has testified to the contrary.  *See, e.g.*, Tr. at 1520 (Hugh Dunkerley, agreeing that Wealth Assurance Private Client "had nothing to do with the real Wealth Assurance [H]oldings and Wealth Assurance AG.").  One of the government's allegations against John Galanis, in fact, is that he falsely conflated the two.  It is beyond ironic that the government is doing exactly the same thing.

In an attempt to avoid bringing this issue to the Court, I contacted the government to ask it to correct its charts.  In response, the government yesterday stated as follows:  "We intend to elicit that all references to Wealth Assurance are references to Wealth Assurance Private Client Corp.," but not to change the exhibits.

This is simply not acceptable.  The visual image – an image that will surely be used by the government in its closing argument, and that will go back into the jury room – of allegedly stolen funds flowing into and out of "Wealth Assurance" will have the effect of tainting the real Wealth Assurance entities in a way that cannot be cured with a single line of testimony.  The correction to the government's charts is trivially easy to make, and its insistence on keeping the name "Wealth Assurance" on *thirty-one* separate images (over ten separate exhibits) serves literally no purpose other than to mislead.  The government should be required to conform its charts to the Court's pre-trial ruling.

### B.    The Government's Summary Charts Intentionally Conflate Rosemont Seneca Bohai With Mr. Archer Himself

In a similar vein, the government's charts list Rosemont Seneca Bohai, LLC as "RSB (Archer)."  (*See* GX 4004, 4006, 4011, 4012).  That may be the government's thesis, but it is not appropriate on a summary chart that the government presumably intends to move into evidence as an admitted trial exhibit.  The government has introduced evidence (albeit not in any of the exhibits cited in its summary chart) that RSB was "associated" with Mr. Archer, *e.g.*, Tr. at 158, 221, 539 (Tim Anderson), 809 (Catherine Driever), 1464 (Hugh Dunkerley), and that he opened its bank account at Morgan Stanley, *e.g.,* Tr. at 791 (Driever), but the government's attempt to create exact equivalence between RSB and Mr. Archer is pure argument.  The charts should be corrected to read simply "RSB" or "Rosemont Seneca Bohai."  Again, Mr. Archer's counsel asked the government to make this correction, but the government has declined to do so.

Thank you for your consideration.

Respectfully,

 /s/  Matthew L. Schwartz
Matthew L. Schwartz

# Exhibit A

# Second Bond Series: Part I (September 23, 2014 – May 29, 2015)





(GX 215; 301; 306; 322; 327; 512; 522; 640; 653; 1078; Tr. 2082)

# Second Bond Series: Part I (September 23, 2014 – May 29, 2015)



(GX 215; 301; 306; 322; 327; 512; 522; 640; 653; 1078; Tr. 2082)

# Second Bond Series: Part I (September 23, 2014 – May 29, 2015)



(GX 215; 301; 306; 322; 327; 512; 522; 640; 653; 1078; Tr. 2082)

# Second Bond Series: Part I (September 23, 2014 – May 29, 2015)



(GX 215; 301; 306; 322; 327; 512; 522; 640; 653; 1078; Tr. 2082)

# Second Bond Series: Part I (September 23, 2014 – May 29, 2015)



(GX 215; 301; 306; 322; 327; 512; 522; 640; 653; 1078; Tr. 2082)



(GX 215; 301; 306; 322; 327; 512; 522; 640; 653; 1078; Tr. 2082)

# Second Bond Series: Part I (September 23, 2014 – May 29, 2015)



(GX 215; 301; 306; 322; 327; 512; 522; 640; 653; 1078; Tr. 2082)

# Second Bond Series: Part II (October 6, 2014 – May 29, 2015)



Thorsdale

$5,970,000
10/6/2014

Wealth
Assurance



GOVERNMENT
EXHIBIT
4005
16 Cr. 371 (RA)

(GX 432; 512; 522; 641; 641A; 216; 330; 412; 1074; 1075; 3274; 2093; Tr. 2091)

# Second Bond Series: Part II (October 6, 2014 – May 29, 2015)



(GX 432; 512; 522; 641; 641A; 216; 330; 412; 1074; 1075; 3274; 2093; Tr. 2091)

# Second Bond Series: Part II (October 6, 2014 – May 29, 2015)



(GX 432; 512; 522; 641; 641A; 216; 330; 412; 1074; 1075; 3274; 2093; Tr. 2091)

# Second Bond Series: Part II (October 6, 2014 – May 29, 2015)



Wealth Assurance → $5,970,000 10/6/2014 → Thorsdale

Thorsdale → $5,050,000 10/6/2014 → Cooney

Cooney → $5,000,000 10/9/2014 → US Bank WLCC

US Bank WLCC → $10,000 10/9/2014 → Burnham

(GX 432; 512; 522; 641; 641A; 216; 330; 412; 1074; 1075; 3274; 2093; Tr. 2091)

# Second Bond Series: Part II (October 6, 2014 – May 29, 2015)



(GX 432; 512; 522; 641; 641A; 216; 330; 412; 1074; 1075; 3274; 2093; Tr. 2091)

# Second Bond Series: Part II (October 6, 2014 – May 29, 2015)



(GX 432; 512; 522; 641; 641A; 216; 330; 412; 1074; 1075; 3274; 2093; Tr. 2091)

# Proceeds of the Second Bond Series Sent Back to Thorsdale



Thorsdale

$11,070,000
(10/2-11/14/2014)

US Bank WLCC — $14,780,000 10/1/2014 → Wealth Assurance

$15 million 10/1/2014

RSB (Archer)

$15 million 9/24/2014

Wolff Law Firm

9/24/2014 $15 million

Thorsdale

$15 million 9/23/2014

Wealth Assurance

Thorsdale — $5,970,000 10/6/2014

$5,050,000 10/6/2014

Cooney

10/9/2014 $5,000,000

US Bank WLCC

$4,966,500 10/9/2014

GOVERNMENT
EXHIBIT
4006
16 Cr. 371 (RA)

(GX 215; 301; 432; 512; 522; 640; 641; 641A; 653)

## Bond Proceeds to Vaudoise



GOVERNMENT
EXHIBIT
4007
16 Cr. 371 (RA)

(GX 435; 512; 522; 653; 654; 3224; 3225)

# Bond Proceeds to Vaudoise



(GX 435; 512; 522; 653; 654; 3224; 3225)

# Bond Proceeds to Vaudoise



(GX 435; 512; 522; 653; 654; 3224; 3225)

# Bond Proceeds to Vaudoise



(GX 435; 512; 522; 653; 654; 3224; 3225)

# Third Bond Series



OSERS/
GYOF

$16,200,000
4/16/2015

US Bank
WLCC

**GOVERNMENT
EXHIBIT
4008**
16 Cr. 371 (RA)

(GX 217; 512; 522; 644; 644A; 787; 790; 1212; 2442; Tr. 639-640)

# Third Bond Series



(GX 217; 512; 522; 644; 644A; 787; 790; 1212; 2442; Tr. 639-640)

# Third Bond Series



(GX 217; 512; 522; 644; 644A; 787; 790; 1212; 2442; Tr. 639-640)

# Third Bond Series



OSERS/ GYOF → $16,200,000 4/16/2015 → US Bank WLCC

US Bank WLCC → Burnham Securities: $80,000 4/16/2015

US Bank WLCC → $15,850,000 4/16/2015 → Wealth Assurance

Wealth Assurance → $1,250,000 4/23/2015 → US Bank WLCC

US Bank WLCC → Wakpamni Lake Distribution Project/ Economic Development

Wealth Assurance (starting balance: ~$5,000)

Wealth Assurance → $1,100,000 4/17 – 5/21/2015 → Thorsdale

Wealth Assurance → Numerous Individuals and Entities (See Next Chart)

Wealth Assurance → $4,336,000 4/29 – 5/18, 2015 → Seymour Capital/ Thunder Valley

(GX 217; 512; 522; 644; 644A; 787; 790; 1212; 2442; Tr. 639-640)

# Third Bond Series



Thorsdale

Burnham
Securities

OSERS/
GYOF

$16,200,000
4/16/2015

US Bank
WLCC

$80,000
4/16/2015

$15,850,000
4/16/2015

$1,250,000
4/23/2015

Wealth
Assurance
(starting balance:
~$5,000)

$1,100,000
4/17 – 5/21/2015

Numerous
Individuals
and Entities
(See Next
Chart)

$4,336,000
4/29 – 5/18, 2015

Seymour Capital/
Thunder Valley

$4,335,000
5/18/2015

Code
Rebel

Code Rebel Shares

Wakpamni Lake
Distribution
Project/
Economic
Development

(GX 217; 512; 522; 644; 644A; 787; 790; 1212; 2442; Tr. 639-640)

# Third Bond Series

Thorsdale

Burnham Securities

$80,000
4/16/2015

$1,100,000
4/17 – 5/21/2015

OSERS/ GYOF

$16,200,000
4/16/2015

US Bank WLCC

$15,850,000
4/16/2015

Wealth Assurance
(starting balance: ~$5,000)

Numerous Individuals and Entities (See Next Chart)

$1,250,000
4/23/2015

$4,336,000
4/29 – 5/18, 2015

$1,312,000 (proceeds from Code Rebel sales)
9/2/2015

Wakpamni Lake Distribution Project/ Economic Development

Seymour Capital/ Thunder Valley

$4,335,000
5/18/2015

Code Rebel

Code Rebel Shares

(GX 217; 512; 522; 644; 644A; 787; 790; 1212; 2442; Tr. 639-640)

# Third Bond Series



Thorsdale

Burnham Securities

$80,000
4/16/2015

OSERS/ GYOF

$16,200,000
4/16/2015

US Bank WLCC

$15,850,000
4/16/2015

$1,250,000
4/23/2015

Wealth Assurance
(starting balance: ~$5,000)

$1,100,000
4/17 – 5/21/2015

Numerous Individuals and Entities (See Next Chart)

$4,336,000
4/29 – 5/18, 2015

$1,312,000 (proceeds from Code Rebel sales)
9/2/2015

Wakpamni Lake Distribution Project/ Economic Development

Seymour Capital/ Thunder Valley

$4,335,000
5/18/2015

Code Rebel

Code Rebel Shares

$1,776,000
5/21/2015

(GX 217; 512; 522; 644; 644A; 787; 790; 1212; 2442; Tr. 639-640)



(GX 217; 512; 522; 644; 644A; 787; 790; 1212; 2442; Tr. 639-640; Tr. 1042)

**OSERS/ GYOF** → $16,200,000 (4/16/2015) → **US Bank WLCC**

**US Bank WLCC** → $80,000 (4/16/2015) → **Burnham Securities**

**US Bank WLCC** → Wakpamni Lake Distribution Project/ Economic Development

**US Bank WLCC** → $15,850,000 (4/16/2015) → **Wealth Assurance** (starting balance: ~$54)

**Wealth Assurance** → $1,250,000 (4/21/2015) → **US Bank WLCC**

**Wealth Assurance** → **Thorsdale**

**Wealth Assurance** → $75,837 Amex

**Wealth Assurance** → $5,439,622 New Line/Fondinvest

**Wealth Assurance** → $650,000 Burnham Financial Group

**Wealth Assurance** → $305,000 Hughes Capital Mgmt

**Wealth Assurance** → $75,000 Bevan Cooney

**Wealth Assurance** → $236,000 Jason Sugarman

**Wealth Assurance** → $4,635,000 VL Assurance

**Wealth Assurance** → Seymour Capital/ Thunder Valley

GOVERNMENT EXHIBIT 4009
16 Cr. 371 (RA)



Devon Archer

$250,000 (9/1/2015)

Seymour Capital

$1,060,000 (9/2/2015)

$122,000 (9/2/2015)

Daniel White (Jason Sugarman)

$250,000 (9/2/2015)

Thunder Valley

$71,000 9/2/2015

$59,000 9/2/2015

$1,812,000

Wealth Assurance

(starting balance: ~$2,000)

GOVERNMENT EXHIBIT
4010
16 Cr. 371 (RA)

(GX 512; 523; 642; 648; 649B; 649C; 649E; 649F)



# Interest Payment on the First Bond Series

Devon Archer — $250,000 (9/1/2015)
Seymour Capital — $1,060,000 (9/2/2015)
— $122,000 (9/2/2015)
Daniel White (Jason Sugarman) — $250,000 (9/2/2015)
Thunder Valley — $71,000 9/2/2015
— $59,000 9/2/2015

$1,812,000 → Wealth Assurance (starting balance: ~$2,000)

Wealth Assurance → US Bank WLCC $1,546,417 9/2 - 9/3/2015

Wealth Assurance → Thorsdale $240,000 (9/4/2015)

(GX 512; 523; 642; 648; 649B; 649C; 649E; 649F)



# Interest Payment on the First Bond Series

# Interest Payment on the Second Bond Series



VL Assurance → $1,000,000 9/30/2015 → Burnham Financial Group

(GX 301; 306; 308; 327; 330; 380; 605; 645)

GOVERNMENT
EXHIBIT
4011
16 Cr. 371 (RA)

# Interest Payment on the Second Bond Series



(GX 301; 306; 308; 327; 330; 380; 605; 645)



# Interest Payment on the Second Bond Series



# Interest Payment on the Second Bond Series

# Thorsdale Proceeds (August 2014 – October 30, 2015 )



**Wealth Assurance** → ~38 million → **Thorsdale**

**Other** → ~ $5 million → **Thorsdale**

Thorsdale branches:
- $24,128 ATM
- $930,500 Family Members
  - $237,000 Chandra Galanis
  - $41,500 Jason Galanis
  - $291,000 Monet Berger/Hilltop
  - $235,000 John Galanis
- $5,431,732 Home/Cars
- $545,046 Restaurants/ Travel/Clothing/Jewelry
- $16,600,168 Accountants/ Lawyers
  - $15,287,334 Wolff Law Firm
- $220,600 Code Rebel/Bump Network
- $523,500 IRS
- Individuals
  - $20,485 Hugh Dunkerley
  - $175,000 Francisco Martin
  - $5,557,000 Bevan Cooney
  - $69,681 Lucas Mann
  - $47,500 Jason Sugarman
- $8,384,500 Wealth Assurance Holdings
- $117,370 Vaudoise
- $1,300,000 Rosemary and Rue (Hirst/Dunkerley)
- $700,513 RSB (Devon Archer)

GOVERNMENT EXHIBIT 4012
16 Cr. 371 (RA)

(GX 512; 522; 523; 1104; 1107; 2255; Tr. 2173)



# Bond Proceeds Used to Purchase 260 West Broadway



**Wealth Assurance** → $1,000,000 / 8/28/2014 → **Katsky Korins (Seller's Counsel for 260 West Broadway)** → $1,000,000 / (at closing) → **260 West Broadway Seller**

GOVERNMENT EXHIBIT
4014
16 Cr. 371 (RA)

(GX 225; 226; 512)