

MATTHEW L. SCHWARTZ
Tel.: (212) 303-3646
E-mail: mlschwartz@bsfllp.com

June 23, 2018

**BY ECF**

Hon. Ronnie Abrams
United States District Judge
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:    *United States v. Galanis*, S3 16 Cr. 371 (RA)

Dear Judge Abrams:

      I represent Devon Archer. I write to respond briefly to the government's letter of this afternoon, objecting to certain of Mr. Archer's proposed exhibits [ECF No. 525]. As set forth below, the government objects to these exhibits principally on hearsay grounds, but none is being offered for the truth of the matter asserted.

      **DX 4705 and 4846.** These are both e-mails from Jason Galanis to Mr. Archer and Mr. Cooney. In one (DX 4705), Jason Galanis sends information about a potential real estate investment in a Ritz Carlton hotel in Maui. In the other (DX 4846), Galanis forwards information about a real estate investment from Aloyse Steichen and remarks "im all over the real estate stuff." None of this evidence is being offered for its truth. Rather, it is relevant to Mr. Archer's state of mind. Specifically, the government will contend that Mr. Archer was lying when he told Morgan Stanley and Deutsche Bank that he understood the source of the $15,000,000 used by Rosemont Seneca Bohai to be real estate. Evidence that Jason Galanis was heavily involved in real estate investing is therefore centrally relevant to Mr. Archer's belief that this was an accurate statement, and critically important to Mr. Archer's defense.[1]

      **DX 2000**. This exhibit is a January 11, 2014 e-mail from Mr. Archer to Chase Coleman, a prominent hedge fund manager, in which Mr. Archer discusses his various business interests. Of particular note, Mr. Archer says about the entities involved in this case "I am also a principal investor and Director of Wealth Assurance holding company, which owns 90% of a medium sized European based Insurance carrier *in which I am participating in a roll up of similar providers*, WA being the first acquisition." This exhibit is therefore directly relevant to Mr.

---

[1]     The government raises questions about when DX 4705 was produced, but that exhibit was produced as a marked trial exhibit – along with the vast majority of Mr. Archer's trial exhibits – on or about April 23rd, as part of Mr. Archer's first batch of trial exhibits, which were produced on the agreed-upon date by the parties. The government has therefore known that DX 4705 would be a trial exhibit for at least two months. It may be correct (we haven't had time to check) that it was not produced to the SEC, as the cover e-mail is dated December 19, 2013, which was outside of the date range of the SEC's subpoenas.



Archer's state of mind and is admissible for that non-hearsay purpose (as well as under Rule 803(3)), insofar as it demonstrates his expression that he had invested in Wealth Assurance Holdings in furtherance of the "roll-up strategy." It is particularly critical that this e-mail was sent in January 2014, which was months before even the very first conversations about the WLCC bonds. This evidence thus demonstrates that Mr. Archer's participation in the various entities at issue in this case was as an investor, and not to further Jason Galanis's scheme to steal the proceeds of the WLCC bonds. His discussion of this investment alongside all of his other business interests further demonstrates innocent his state of mind.

**DX 4023B**. The government objects to this valuation report on hearsay grounds, but Mr. Archer does not offer it for the truth of the matter asserted. Mr. Archer has never disputed that Calvert was a sham entity used by Jason Galanis and Hugh Dunkerley to deceive the SEC, which was first created by Francisco Martin in or about October 2015. To be clear, contrary to the government's prediction, Mr. Archer will not argue that Calvert existed in September 2014, and we would be happy to stipulate to that fact. Indeed, I elicited from Hugh Dunkerley extensive evidence about the fundamentally illegitimate nature of Calvert. *See, e.g.,* Tr. at 1454 ("Q: Anything with Calvert you knew to be false, correct? A: Correct."); 1456 ("Q: Now, again, this is a Calvert Capital document, and so we know it is fake, right? A: Correct.").

The valuation report, however, has an important non-hearsay purpose. The government elicited from Francisco Martin that Jason Galanis commissioned, through a lawyer, a valuation report on shares of Wealth Assurance Holdings, Ltd. purportedly held by Calvert. DX 4023B is that valuation report. Mr. Archer's purpose in offering it is simply to demonstrate that many people touched Calvert, and that simply uttering the word "Calvert" does not make one a co-conspirator. This purpose for the exhibit is directly responsive to an argument that we expect the government to make in closing, which is that because Mr. Archer – in a single e-mail (GX 2119) – made a reference to Calvert, he must have known its purpose and been in on Jason Galanis's plot to re-write history and fool the SEC. Mr. Archer would have no objection to this exhibit being received pursuant to a limiting instruction, or indeed for all substantive information about



the purported valuation to be redacted. Alternatively, if the government is willing to refrain from arguing that Mr. Archer knew Calvert to be a sham entity, he would withdraw this exhibit.[2]

**DX 4839.** As the government observes, this e-mail is from Mr. Archer's account but is signed "Seb," and therefore supports the inference that Sebastian Momtazi had access to and sent e-mails from Mr. Archer's account – a non-hearsay, relevant use of the document. This is fundamentally legally different than DX4111,[3] which was an e-mail on which Mr. Archer was not copied, which contained the factual assertion by Mr. Momtazi in an e-mail that "He has been speaking to 'Devon' throughout this process."

---

[2] The government also informed us this afternoon that it objects to DX 4023B on authenticity grounds. The principle of Avenue M. Advisors, Inc. (the consulting company that prepared the report) resides in California, and it is not clear that she could be in Court Monday morning to testify. We have reached out to her to see if that is possible. The government has stipulated, however, that DX 4023B was produced by Hugh Dunkerley.

We believe that, along with the other existing evidence, is more than sufficient to lay a foundation for its authenticity under the prevailing caselaw, which sets a "low bar" for authenticity. *Busby v. United States*, No. 13 Civ. 4899 (ALC), 2016 WL 47450, at *8 (S.D.N.Y. Jan. 4, 2016). "Rule 901(a) requires the proponent of any evidence to submit 'evidence sufficient to support a finding that the matter in question is what its proponent claims.' This requirement is satisfied 'if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification.'" *United States v. Ruggiero*, 928 F.2d 1289, 1303 (2d Cir. 1991) (citation omitted). "Once the court determines that the proponent of the evidence meets the threshold, the evidence may be admitted and any outstanding issues regarding its authenticity are to be resolved by the fact-finder." *Bazak Int'l Corp. v. Tarrant Apparel Grp.*, 378 F. Supp. 2d 377, 392 (S.D.N.Y. 2005) (citing *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997)).

Here, the parties have stipulated that DX 4023B is a true and accurate copy of the valuation report that was provided by Hugh Dunkerley to the government. *See* DX 4742, ¶ 18. There is also evidence that the whole purpose of creating Calvert was to provide documents to the government and obstruct its investigation, and that Jason Galanis specifically commissioned a valuation report of its assets through the same lawyer who dealt with Avenue M. *See* Tr. at 1457 (Dunkerley testifying about purpose of Calvert); 2185-85 (Martin testifying about valuation report); GX 1612 (e-mail to attorney commissioning valuation report). This evidence is more than sufficient to meet the "low bar" of authenticity under Rule 901. If the Court disagrees, and if the principle of Avenue M. Advisors is not available in Court on Monday, we have asked the government to produce Mr. Dunkerley, who can certainly authenticate the report, although we respectfully submit that it would be a waste of the jury's time and the taxpayers' money to fly witnesses across the country to authenticate this single document, whose authenticity is not seriously in question.

[3] The government's letter mistakenly references DX 4011.



Page 4

**DX 4825, 4826, and 4128**.  These e-mails concern the purported purchase by Valor Life of approximately $3.2 million in WLCC bonds.  It appears that Valor Life was fooled into believing it was purchasing WLCC bonds, and that the funds were instead misappropriated by Jason Galanis to fund the purchase of his apartment on West Broadway.  As explained at length in Court on Thursday (Tr. 3310-3319), the relevance of these e-mails is to demonstrate that Valor Life was tricked into transacting in the bonds, just as Mr. Archer was.  This is relevant for two reasons.  First, it further impeaches Hugh Dunkerley and Jason Galanis, who were responsible for the misappropriation.  Second, it rebuts the government's anticipated argument that the only people who bought WLCC bonds – or believed they were buying them – were victims or co-conspirators.  Here, among the members of the board who participated in discussions and approved the purchase of WLCC bonds were Dr. Rory Knight and Aloyse Steichen, whom the government does not contend are co-conspirators.  Yet they authorized a board resolution "put[ting] its trust in the proven expertise of Jason Sugarman and Hugh Dunkerley on investment matters," and investing in the WLCC bonds.  Mr. Archer notes further that numerous Valor Life and Valor Group board materials, including other board resolutions, have been admitted (*e.g.*, DX 4016D, 4038B), and/or stipulated as business record (*e.g.*, 4038D).

**DX 4325 and 4384**:  As the government observes, these are e-mails between Mr. Archer and Jon Burnham concerning the course of negotiations with the BIT Board.  As such, they fall squarely into the Court's prior ruling, and are relevant to Mr. Archer's state of mind.  In addition, these exhibits contain non-cumulative evidence.  For example, DX 4325 contains Mr. Burnham's report that he "had an excellent meeting with Bill Connell," one of the independent trustees of the BIT Board, that he wished to discuss with Mr. Archer.  This tends to prove that Mr. Burnham was keeping Mr. Archer aware of the BIT Board's internal deliberations.  Other comments in the e-mails constitute admissible hearsay under Rule 803(1) and/or 803(3).  For example, Mr. Archer's comment on July 7, 2014 – three days after his son's birth – that "[w]e just got home from the hospital and setting up nursery camp" is a classic present sense impression under Rule 801(1).

**DX 4606**.  Upon further review of the transcript, Mr. Archer withdraws this exhibit.

**DX 4772.**  This e-mail chain is amongst the board of directors of Wealth Assurance Holdings, Ltd. / Valor Group Ltd, and demonstrate the significant independence of the board of directors.  Much of this e-mail chain consists of Dr. Rory Knight and David Ezekiel – two individuals the government does not contend to be co-conspirators – jockeying for various positions in the Valor Group.  The non-hearsay purpose of this e-mail is that it is relevant to Mr. Archer's state of mind, insofar as he understood and observed the independence of the board of Valor Group from Jason Galanis.  If there are any objectionable factual assertions in the underlying e-mails, we would have no objection to their redaction.

Thank you for your consideration.

Respectfully,

 /s/  Matthew L. Schwartz          
Matthew L. Schwartz
