UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    - v. -

MICHELLE MORTON,

            Defendant.

16-cr-00371 (RA)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT**
**<u>MICHELLE MORTON'S MOTION TO WITHDRAW GUILTY PLEA</u>**

ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, New York 10019
(212) 506-5000

*Attorneys for Defendant Michelle Morton*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................ 1

STATEMENT OF RELEVANT FACTS .......................................................... 3

    A.    Ms. Morton Entered a Guilty Plea One Week Before Trial .................................. 3

    B.    ███████████████████████████████ ............................ 3

    C.    ██████████████████████████████████ ......... 4

ARGUMENT .................................................................................................. 6

    A.    Ms. Morton Asserts Her Innocence ......................................................... 7

        1.    Evidence Exists to Support Ms. Morton's Claim of Innocence ................. 7

        2.    Ms. Morton's Allocution Does Not Contradict Evidence of Her Innocence .......................................................................... 144

    B.    Ms. Morton Took Timely Steps to Withdraw Her Plea ..................................... 166

    C.    The Government Cannot Reasonably Claim Prejudice ...................................... 188

CONCLUSION ............................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Nunez Cordero v. United States*,
    533 F.2d 723 (1st Cir.1976)................................................................16

*United States v. Barker*,
    514 F.2d 208 (D.C. Cir.), *cert. denied*, 421 U.S. 1013 (1975) ...............15

*United States v Benedict*,
    62 Fed.Appx. 14 (S.D.N.Y. 2003) .......................................................6

*United States v. Carr*,
    740 F.2d 339 (5th Cir.1984)................................................................16

*United States v. Carreto*,
    583 F.3d 152 (2d Cir. 2009)...................................................7, 17, 18

*United States v. Dean*,
    591 Fed. Appx. 11 (2d Cir. 2014).......................................................15

*United States v. Doe*,
    537 F.3d 204 (2d Cir. 2008)...............................................................16

*United States v. Fernandez*,
    734 F. Supp. 599 (S.D.N.Y. 1990) ...............................................15, 16

*United States v. Gonzalez*,
    970 F.2d 1095 (2d Cir. 1992)........................................................6, 16

*United States v. Hirsch*,
    239 F.3d 221 (2d Cir. 2001)................................................................7

*United States v. Karro*,
    257 F.3d 112 (2d Cir. 2001)................................................................6

*United States v. Lasky*,
    23 F.Supp.2d 236 (E.D.N.Y. 1998) ...............................................16, 17

*United States v. Maher*,
    108 F.3d 1513 (2d Cir. 1997).......................................................6, 17

*United States v. Schmidt*,
    373 F.3d 100 (2d Cir. 2004)..........................................................6, 7

*United States v. Smith*,
   160 F.3d 117 (2d Cir. 1998)...................................................................................7

*United States v. Torres*,
   129 F.3d 710 (2d Cir. 1997)...................................................................................7

*Woodward v. United States*,
   426 F.2d 959 (3d. Cir. 1970)..................................................................................7

**Other Authorities**

Federal Rule of Criminal Procedure 11(d)........................................................1, 6, 7, 18

Defendant Michelle Morton respectfully submits this memorandum of law in support of her motion to withdraw her guilty plea pursuant to Rule 11(d)(2)(B) of the Federal Rules of Criminal Procedure.

## PRELIMINARY STATEMENT

By entering a guilty plea, Michelle Morton unwittingly deceived herself and unintentionally misled this Court.  By moving the Court to withdraw her plea, she seeks to remedy the mistake she made because she does not in fact believe that she is guilty of any crime.

In the months preceding what was to be Ms. Morton's criminal trial, she grappled with unbearable pressures.  ███████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███

The combination of these factors left Ms. Morton vulnerable and shaken.  It was through this prism that Ms. Morton began to view the fact that numerous of her former colleagues sided with the government against her, and others who claimed to know she did nothing wrong refused to assist in her defense.  In this weakened state, Ms. Morton began to question whether all the people who rejected her—family, friends, and colleagues alike—could be right about her and her conduct.  For the first time, she allowed doubt to creep into her conscience.  She became more

defeated and deflated each day until she convinced herself that she must be guilty of something. She thus accepted a plea offer and told this Court that she had engaged in improper conduct.

Two days after her plea, a conversation with her Pretrial Services Officer ("PSO") snapped Ms. Morton out of her deluded state. When she spoke with her PSO—a woman with whom she had developed a trusted and open relationship since her arrest in 2016—she realized her error and the gravity of it. For the first time in weeks, she saw clearly that she had deluded herself and that entering a guilty plea was a reaction to the stresses in her life—not an honest acknowledgment of wrongdoing. She reaffirmed her long-maintained belief that she was not a guilty party to Jason Galanis's fraudulent schemes but was, in fact, a victim. As soon as Ms. Morton realized that she made a grievous error, she informed the Court that she would seek to withdraw her plea.

Ms. Morton pursues this relief in a timely manner and in full recognition that her claim of innocence appears inconsistent with her allocution. Other than her crisis-driven and momentary lapse into self-delusion about her guilt, Ms. Morton has maintained her innocence from the moment she contacted FINRA and met with the FBI and United States Attorney's Office in the investigatory stage of this matter. Ms. Morton acknowledges that the perceived prejudice to the government may be the largest hurdle in her petition. However, there is little to no actual prejudice to the government in proceeding to trial against one defendant considering it has successfully conducted a test run against others. Ms. Morton knows that a trial would be inconvenient for the Court and the government; nevertheless, she urges this Court not to substitute the notion of prejudice for the notion of inconvenience.

Accordingly, and in keeping with the mandate to liberally grant such relief, Ms. Morton respectfully requests that the Court permit her to withdraw her plea and proceed to trial.

## STATEMENT OF RELEVANT FACTS

### A.  Ms. Morton Entered a Guilty Plea One Week Before Trial

Trial in this matter began on May 23, 2018.  One week earlier, Ms. Morton entered a guilty plea to counts 1 and 4 of the superseding indictment (the "S3 Indictment").  (ECF Dkt. No. 504).  These counts respectively charged Ms. Morton with conspiracy to commit securities fraud and substantive investment adviser fraud.  Ms. Morton allocuted to the elements of these crimes by stating that, in connection with one of the bond transactions at issue (the Atlantic purchase), she was aware of a conflict of interest that she did not disclose to her investors prior to the transaction.  Morton Plea Hearing Tr. at 20:18-21 ("I knew there was a material conflict of interest in connection with the bonds and did not disclose it to the client before making the purchase.").  Neither Ms. Morton's allocution nor the plea colloquy address the reasons that she engaged in this conduct—reasons that Ms. Morton believes explain her innocent state of mind. Indeed, Ms. Morton now understands that she pled guilty to this conduct *not* because of actual guilt but because of self-delusion, fear, and unbearable stress.

### B.  ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

3

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

　████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████

████████████████████

**C.**　███████████████████████████████████

　████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████

████████████████

　████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████[1]

 In December 2015, Ms. Morton lost her job at Atlantic as a result of the investigation in this case.  *Id*.  With the loss of her job, ██████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████

 To make matters worse, ████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████

  ████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████

---

[1] ████████████████████████████████████████

██ █████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████

█████████████   Again, Ms. Morton convinced herself that she must have done something wrong.

In reaction to the mounting stresses in her life, Ms. Morton lost control of her unwavering sense of self.  As a result, she convinced herself that she could plead guilty and accept responsibility for the conduct at issue in this case.  *Id.*, 14.  Almost immediately after the plea, she recognized that she acted in error and moved expeditiously to inform the Court of her intention to seek withdrawal.  *Id.*, ¶ 15.

## ARGUMENT

A defendant who moves to withdraw her guilty plea after the court's acceptance, but before sentencing, must show that there is a "fair and just reason" for requesting withdrawal. Fed. R. Crim. P. 11(d)(2)(B).  The standard "implies that motions to withdraw prior to sentence should be liberally granted," however, it is the defendant's burden to convince the court of valid grounds for relief.[2]  *United States v. Benedict,* 62 Fed. App'x 14, 15-16 (S.D.N.Y. 2003), citing *United States v. Gonzalez*, 970 F.2d 1095, 1100 (2d Cir. 1992); *see also United States v. Maher*, 108 F.3d 1513, 1529 (2d Cir. 1997).

Whether to grant such a motion is within the sound discretion of the trial court.  Courts determine whether a "fair and just" reason for withdrawal exists by evaluating three factors: (1) whether the defendant asserts that she is innocent; (2) the time lapse between the plea and the

---

[2]   When evaluating a motion to withdraw, courts may consider whether the defendant has simply had a "change of heart" akin to buyer's remorse.  *See United States v. Schmidt*, 373 F.3d 100, 102–03 (2d Cir. 2004).  Ms. Morton's motive in seeking withdrawal is, in fact, the antithesis of buyer's remorse because she understands full well that she will be positioned less favorably regardless of the outcome of this motion.  On one hand, the Court denies Ms. Morton's motion and she faces sentencing without credit for acceptance of responsibility; on the other hand, the Court grants Ms. Morton's motion and she faces a long and arduous trial similar to the trial at which three defendants were swiftly convicted.  Neither outcome is a proverbial walk in the park.

motion to withdraw; and (3) whether the government would be prejudiced by withdrawal of the plea. *United States v. Schmidt*, 373 F.3d 100, 102–03 (2d Cir. 2004); *see also United States v. Karro,* 257 F.3d 112, 117 (2d Cir. 2001). Taken together, these three factors weigh in favor of permitting Ms. Morton to withdraw her guilty plea: Ms. Morton asserts her innocence; she timely expressed her intention to withdraw her plea; and withdrawal will not significantly prejudice the government because of the procedural posture of the broader case. For these reasons, the Court should grant Ms. Morton's motion.

### A.  Ms. Morton Asserts Her Innocence

The Second Circuit has repeatedly instructed district courts to evaluate whether the defendant claims her factual or legal innocence in moving to withdraw a guilty plea. *See United States v. Carreto*, 583 F.3d 152, 157 (2d Cir. 2009) (directing district courts to consider "whether the defendant has asserted his or her legal innocence in the motion to withdraw the guilty plea."); *Schmidt*, 373 F.3d at 102-03 (denying motion to withdraw where *not* based on innocence); *Woodward v. United States*, 426 F.2d 959, 964 (3d Cir. 1970) ("a defendant's claim of innocence may provide a basis for a finding that the guilty plea was not entered intelligently or that withdrawal of the plea is necessary to correct manifest injustice.").

### 1.  Evidence Exists to Support Ms. Morton's Claim of Innocence

A defendant who moves to withdraw her plea on the basis of innocence must support that claim with evidence. *See United States v. Hirsch*, 239 F.3d 221, 225 (2d Cir. 2001). Bald statements contradicting a defendant's plea allocution are insufficient. *See United States v. Torres*, 129 F.3d 710, 715 (2d Cir. 1997). If the Court determines that the factual basis for any guilty plea is insufficient, it should grant a defendant's motion to withdraw. *See United States v. Smith*, 160 F.3d 117, 121 (2d Cir. 1998) ("The district court's obligations under Rule 11[(b)(3)]

continue until it has entered judgment.  If it decides there was no factual basis for a guilty plea after accepting it, the court should vacate the plea and enter a plea of not guilty on behalf of the defendant.").

As the government is well aware, Ms. Morton's defenses have always focused on three aspects of this case: (1) Jason Galanis's methodical manipulation of Ms. Morton; (2) Ms. Morton's reliance on individuals with more specific knowledge about fixed income, including her business partner Richard Deary, her portfolio managers, and her compliance personnel; and (3) Ms. Morton's efforts to report her suspicions about Galanis and assist the SEC and the government in their joint investigation.  *See*, *generally*, Morton Pretrial Motions, Dkt. No. 288.  Ms. Morton's defenses are supported by the following evidence.

### a.  *Jason Galanis Manipulated Ms. Morton*

Even the government concedes that Jason Galanis is a master con man.  He used his significant skill to manipulate Ms. Morton by flirting with her, flattering her, and regaling her with tales of his intelligence, success, and lavish lifestyle.  Ms. Morton's text messages with Jason Galanis exemplify this gross manipulation:

- Only days after their very first meeting, in a July 18, 2014, text message, Jason Galanis repeatedly refers to Ms. Morton as "my dear" and "cute" (July 28th) and "adorable" (July 29th).  GX-3004A.
- In a July 22, 2014, text message, Jason Galanis facetiously refers to Ms. Morton as "my girlfriend."  *Id*.
- Jason Galanis refers to his parents in July 22, 2014 text messages stating, "I can't stand them" "either one of them."  *Id*.[3]
- On July 26, 2014, Jason Galanis texted Ms. Morton "very confident in your abilities," and again refers to her as "my dear," twice.  *Id*.

---

[3]  This is significant because the government apparently proved, and the jury agreed, that his father and co-defendant John Galanis is a pivotal part of this fraud, yet the statements to Ms. Morton show Jason Galanis to be estranged from his father and demonstrates that Galanis manipulated Ms. Morton, in part, by causing her to sympathize with his life circumstances.

- On August 2, Galanis texted Ms. Morton to brag about a wedding he attended in Aspen where "Stevie Wonder" and "Usher performed . . . At the welcome party the night before. Supposedly a bigger deal tonight at the wedding . . . And fireworks." *Id*.

- On August 11, 2014, Galanis texted Ms. Morton: "I really feel close to you in a very short period of time . . . you've shared a lot of life experiences with me very openly . . . which is rare." *Id*.

Galanis also promised Ms. Morton a glorious second act to her career, and she believed

that he was supportive of her success:

- On July 12, 2014, just prior to their first in-person meeting, Ms. Morton texted Galanis "What if What if you were about to meet the person that is going to change your WHOLE life? What if you were about to meet the person that was able to make all your dreams (since you are married to your career) come true? Trust me, you'd be throwing up all over the place." GX-3004A.

- On July 26, 2014, Ms. Morton texted Galanis that "Your happiness and confidence in me are the most important things to me right now . . . I don't want to let you down so I've simply decided not to." *Id*.

- On August 21, 2014, Galanis texted Ms. Morton: "I am so incredibly proud of what we're doing together and of your leadership of the troops . . . You gave them hope that there is a future." *Id*.

When it suited him, Galanis became abusive toward Ms. Morton. He manipulated her by

berating her, belittling her, and intending to make her feel insignificant and stupid:

- On August 17, 2014, Galanis e-mailed Ms. Morton and called her discriminatory: "I'm afraid your bias against the tribe is precisely why they are where they are today. They are discriminated against by people who form conclusions like that expressed in your memo . . . that is, that they are poor, thus not worthy of credit. You've made yourself part of the problem and I'm disappointed in your preliminary conclusion." DX 1048 (previously marked by Ms. Morton).

- On the same day, when Ms. Morton expressed reservations about the Bonds, Galanis threatened her: "[You] totally sandbagged me . . . the worst I can do is go nuclear on you . . . and rip the firm apart." GX 3004A.

- On June 9, 2015, Galanis texted Ms. Morton: "God damn it michelle . . .moronic judgment . . . Worst sales technique I've ever heard of." *Id*.

- On February 24, 2015, Galanis texted Ms. Morton: "don't mess with me by text . . . michelle don't get like that with me." *Id*.

- On April 10, 2015, Galanis texted Ms. Morton: "Upset isn't the word . . . deeply disappointed in you . . . And angry at the position you've put me in . . . Disgusting

9

. . . I don't care how f'ing busy you think you are and I'm tired of hearing about how busy you are and that you're too busy to take a god damned phone call from the most important fucking person in your life." *Id.*

But more than that, Galanis convinced her that he was genuinely interested in a socially responsible approach to investing, particularly with Native American tribes. As the best con men do, Galanis latched on to an issue about which Ms. Morton deeply cared. In short, he tricked her into believing that they were of one mind:

- On July 31, 2014, Ms. Morton and Galanis exchanged text messages wherein Ms. Morton stated her desire to "help the Native Americans because they are still getting screwed," to which Galanis replied "They are getting so hosed . . . and few care." Ms. Morton stated that Galanis was "a man of honor." GX-3004A.

- On August 1, 2014, Ms. Morton sent a text to Galanis stating "When this is done I want to give you inside info on how the US really treats Natives . . . You will then understand why supporting your efforts is so important to me . . . Part of it is gratitude and part of it is my hatred of some of the players in the space . . . Your success is good for all trust me on that!" *Id.*

- On August 2, 2014, Ms. Morton and Galanis exchanged texts in which Ms. Morton asked "do you realize yet how important the work you are planning to do in Indian country is?" and Galanis responded "Very much so . . . Career defining for me and life changing for them." *Id.*

- On August 5, 2014, Ms. Morton texted Galanis to tell him that she was "presenting the native initiative to Methodist Church next week" and Galanis responded "i love it . . . we are going to make a difference." *Id.*

\*        \*        \*

The above-referenced exchanges represent a fraction of the communications between Galanis and Ms. Morton that evidence his intent and ability to manipulate her and convince her that their joint mission with respect to the Bonds was honorable. These tactics worked. Ms. Morton fell victim to Jason Galanis's fraud.

### b.  *Ms. Morton Relied on Others with More Experience*

Ms. Morton held the CEO title at Hughes and Atlantic. However, she never held herself out as an investment expert. Even before she and Mr. Deary acquired Hughes, she

10

acknowledged her lack of experience in this area: she thus requested a Chief Investment Officer. She also relied on her business partner and many of her other employees when making the decision to purchase the Bonds.[4]  Indeed, texts and e-mails demonstrate that other individuals with experience analyzed and advised on the Bond purchase:

- In a July 21, 2014, text message from Ms. Morton to Jason Galanis, she indicated that she relied on Gary Hirst's expertise: "I know we discussed having Gary act as CIO, but I think it having him serve as an LLC Board Member as well ...will give long term comfort to the clients, will let the investment staff know that he will continue to provide oversight, and will give the staff in general comfort that we have strong investment acumen as a component of leadership..."  GX-3004A.
- In a July 25, 2014, text message from Ms. Morton to Jason Galanis, she stated, "just got great intelligence and Richard is going to [do] a surgical analysis this evening to identify the accounts for bonds."  *Id.*
- On August 12, 2014, Ms. Morton texted Galanis: "FYI compliance officer is reviewing each investment policy statement to isolate/indicate which clients can hold native bonds . . . She is working on it now so that we have it in the morning . . . She is supportive and told me that Hughes has held non rated bonds before."  *Id.*
- On August 14, 2014, the Hughes compliance officer e-mailed Ms. Morton: "I reviewed the guidelines for the accounts below and have written my comments on what I found" and continues work on the analysis as they learn more about the Bonds.  GX 805.
- On August 17, 2014, Galanis texted Ms. Morton: "[Gary Hirt]'s CIO.  He bears 100% of the resoibsility [sic] . . . make him make the decision [as to whether or not to buy the Bonds]."  GX 3004A.
- On February 9, 2015 (months before the Atlantic acquisition), a portfolio manager at Atlantic texted Ms. Morton:  "I won't do anything with the bonds but simply see if there is place I can find – a home – for them … yes, I will speak to you about [the Bonds] whenever you want."  *Id.*

The handful of text messages and e-mails referenced above are representative of the substantial evidence demonstrating that Ms. Morton relied on more experienced investment and

---

[4]  This is not to say that Ms. Morton was opposed to purchasing the Bonds.  She was not.  She favored the broader strategy of socially responsible investing and believed that the Bonds supported this mission.  She was not, however, able to evaluate whether the Bonds were good or bad investments and thus relied on others to make that determination.

compliance personnel when purchasing the Bonds.  At no time during the Bond transactions at

Hughes or Atlantic did any of the employees who examined the Bonds tell Ms. Morton that they

were improper investments.

### c. Ms. Morton Assisted the Government's Investigation

Ms. Morton acted as a whistleblower in this case.  When she became suspicious of Jason

Galanis, she notified FINRA.  At Ms. Morton's request, FINRA notified the SEC.  The SEC then

referred the matter to the U.S. Attorney's Office, and they jointly investigated the purchase of the

Bonds.  Ms. Morton's personal phone records corroborate these events:

- On June 11, 2015, Ms. Morton called David Greene (FINRA Regional Director) to discuss her suspicions about Jason Galanis.[5] *See* Dkt. No. 299 (Morton Aff. to Pretrial Motions) at 3.

- Over the next several weeks, Ms. Morton spoke with Mr. Greene on multiple occasions about Galanis and asked Mr. Greene to contact the SEC regarding her suspicions.  *Id.*

- On June 12, 2015, Mr. Greene called Ms. Morton on his cell phone and left a voice message.  GX-3004 at 2622.  The voice mail states, "Hi Michelle, it's David.  I have left the building… so we can pick this up on Sunday with respect uh to the individuals involved and go through the whole story then, okay?  I hope you have a great weekend until then.  Buh-bye."  DX-1308 (Marked as Morton Defense Exhibit).

- On June 20, 2015, Ms. Morton called Mr. Greene.  GX-3004 at 108.

- On June 22, 2015, Ms. Morton texted Mr. Greene "Can we please speak tomorrow?"  and he responded "Absolutely."  GX-3004 at 964.

- June 24, 2015, Ms. Morton and Mr. Greene spoke for over half an hour.  *Id.*

- On July 9, 2015, the SEC delivered a document request to Atlantic asking for documents related to the Bonds.  Dkt. No. 299 (Morton Aff. to Pretrial Motions) at 3.

---

[5]  Ms. Morton contacted David Greene at FINRA to report Jason Galanis for two reasons: *first*, Ms. Morton had a trusted history of working with Mr. Greene on investigations involving whistleblowing when he regulated her California-based broker-dealer; and *second*, Ms. Morton had reached out to Mr. Greene in mid-2014 to conduct due diligence on Jason Galanis and Jason Sugarman when she initially engaged in talks with those men about acquiring Hughes Capital Management.

- On or about August 25, 2015, the FBI visited Ms. Morton about Jason Galanis. *Id*.  She spoke to the FBI without hesitation and without an attorney.  *Id*.

- On August 26 and 27, 2015, Ms. Morton forwarded e-mails from Jason Galanis to an FBI agent.  DX-1293, 1294, 1295.

- On September 3, 2015, Ms. Morton participated in a joint interview with the U.S. Attorney's Office, FBI, and SEC without an attorney and without a proffer agreement.  *Id*. at 4, 5.

- At this meeting, Ms. Morton asked the government why she might need an attorney when she had done nothing wrong.  *Id*.  No one explained to her the risks of meeting with the government without counsel or that she, herself, was under investigation.

- Ms. Morton volunteered to wear a wire to meetings with Jason Galanis.  *Id*.  The government accepted her offer.  *Id*.

- On September 16 and 17, 2015, Ms. Morton attended meetings with Jason Galanis wearing an FBI recording device.  *Id*. at 5-6.

- During September 2015, Ms. Morton placed consensually recorded phone calls at the direction of the FBI.  *Id*. at 6.

- In September 2015, Ms. Morton asked an Assistant U.S. Attorney for guidance on what information to reveal to Atlantic's clients.  *Id*.  The Assistant U.S. Attorney advised her not to sell the Bonds so that she could avoid perpetuating a fraud.  *Id*.

- Soon after this September phone call, in October 2015, Atlantic received another document request from the SEC.  *Id*.

- Ms. Morton signed a consent form giving the government unfettered access to copy the contents of her cell phone.  *Id*. at 7.[6]

The above recitation of facts summarizes the open nature with which Ms. Morton initiated and assisted the SEC's and the government's investigations.  While the government sought to exclude this evidence from trial, the Court never ruled on the motion.  (ECF Dkt. No. 370 at 8-9).  Ms. Morton maintains that this evidence is admissible, crucial, and strongly evidences her consciousness of innocence.  (ECF Dkt. No. 391 at 1-11).

---

[6]  As the Court knows, Ms. Morton submitted an affidavit setting forth these facts in support of her motion for dismissal based on egregious government conduct.  The government failed to offer any facts in opposition.  Ms. Morton's affidavit is thus the extent of the record on this issue and the Court should rely on it for the purpose of this motion.

### 2.  Ms. Morton's Allocution Does Not Contradict Evidence of Her Innocence

On May 16, 2018, Ms. Morton allocuted to conduct sufficient to satisfy the basic

elements of the two counts to which she pled guilty.  She stated:

> [O]n or about April 2015 while I was chief executive officer of a registered investment
> adviser known as Atlantic Asset Management I agreed with others to purchase certain
> bonds for a client account at Atlantic.  I knew there was a material conflict of interest in
> connection with the bonds and did not disclose it to the client before making the
> purchase.  This was wrong for me to do.  This enabled Jason Galanis to steal the bond
> proceeds through a broader fraud that I did not know anything about and, therefore, my
> investors lost money.  And for that I am truly sorry.

Morton Tr. at 20:15-25.

Though Ms. Morton allocuted to this conduct, her allocution is consistent with the

evidence supporting her defenses.  Ms. Morton allocuted to her knowledge of a conflict of

interest; however, her allocution did not address the reasons that she proceeded in the face of

such a conflict.  Indeed, evidence presented at trial would not seek to deny the conflict, but to

explain it by demonstrating that Ms. Morton acted reasonably and in good faith.

Rather than confessing her guilt, Ms. Morton's allocution is illustrative of a classic

problem in the criminal justice system: innocent defendants plead guilty every day for reasons

having nothing to do with genuine guilt.  In his essay entitled "Why Innocent People Plead

Guilty," Judge Rakoff recognized that innocent people make the often "rational, if cynical, cost-

benefit analysis of his situation" and plead guilty, ignoring innocence as a factor when making

their decision. *See* The New York Review of Books, November 20, 2014, *available at*

http://www.nybooks.com/articles/2014/11/20/why-innocent-people-plead-guilty/.  An estimated

20,000 Americans are in prison for crimes they did not commit, and groups like the Innocence

Project have begun campaigns to raise awareness specifically about this issue in the plea

bargaining process. *See*, Innocence Project, January 23, 2017, *available at*

https://www.innocenceproject.org/guilty-plea-campaign-announcement/;
http://guiltypleaproblem.org/.  Ms. Morton is not unlike these defendants even though she
recognized her error after entering her plea—she maintains her innocence and understands that
similar uncontrollable forces led her to plead guilty.

National attention has been recently focused on this significant flaw in the criminal
justice system.  *See* "Innocence is Irrelevant," The Atlantic, September 15, 2017, *available at*
https://www.theatlantic.com/magazine/archive/2017/09/innocence-is-irrelevant/534171/; "How
to make an innocent client plead guilty," *The Washington Post*, January 12, 2018, *available at*
https://www.washingtonpost.com/opinions/why-innocent-people-plead-
guilty/2018/01/12/e05d262c-b805-11e7-a908-
a3470754bbb9_story.html?noredirect=on&utm_term=.d6f47cc5e899; "Plea Bargaining and the
Innocent," The Marshall Project, December 26, 2014, *available at*
https://www.themarshallproject.org/2014/12/26/plea-bargaining-and-the-innocent.

In the broad view, Ms. Morton is no differently situated from many of the defendants
discussed in these distasteful articles. ███████████████████████████
█████████████████████████████████████████
██████████████████████   If she is unable to withdraw her plea now, Ms. Morton will become
just another statistic.  *See* "Innocents Who Plead Guilty," 24 November 23015, *available at*
http://www.law.umich.edu/special/exoneration/Documents/NRE.Guilty.Plea.Article1.pdf.
Moreover, the Court will be in the unenviable position of having to pronounce sentence over a
woman who is staunchly maintaining her innocence.  This does nothing to inspire confidence in
the criminal justice system.

**B.  Ms. Morton Took Timely Steps to Withdraw Her Plea**

"A motion to withdraw a guilty plea made shortly after the plea was entered may indicate

that the plea was entered impulsively, justifying withdrawal." *See United States v. Fernandez*,

734 F. Supp. 599 (S.D.N.Y. 1990) (*citing United States v. Barker*, 514 F.2d 208 (D.C. Cir.), *cert.*

*denied*, 421 U.S. 1013 (1975) (swift change of heart indicates plea made in haste or confusion.)).

The Second Circuit has found that delays of four, five, and seven months are too excessive to

warrant plea withdrawal.  *United States v. Dean*, 591 Fed. Appx. 11 (2d Cir. 2014)

("[defendant's] motion to withdraw his plea was further undercut by the fact that he did not make

the motion until four months after the plea."); *United States v. Doe*, 537 F.3d 204, 213 (2d Cir.

2008) (finding a five-month delay undercut the defendant's claim that his plea was not

voluntary); *United States v. Gonzalez*, 970 F.2d 1095, 100 (2d Cir. 1992) ("Gonzalez's assertion

of his innocence is undercut by its timing, coming nearly seven months after the plea."). [7]

Moreover, the period of time between plea entry and withdrawal may be suspect if new

information or changed circumstances call into question the defendant's motive for seeking

withdrawal.  *See United States v. Lasky*, 23 F.Supp.2d 236, 241 (E.D.N.Y. 1998); *United States*

*v. Fernandez*, 734 F. Supp. at 603 (the defendant moved to withdraw after he learned that

Probation's Guidelines calculation was higher than he expected); *United States v. Gonzalez*, 970

F. 2d 1095, 1100 (2d Cir. 1992) (the defendant moved for a withdrawal after discovering that the

---

[7]   Other circuits have found shorter time periods of a delay to be too long to justify a plea
withdrawal.  *See also United States v. Carr*, 740 F.2d 339, 345 (5th Cir.1984) (twenty-two days
not swift enough); *Nunez Cordero v. United States*, 533 F.2d 723, 726 (1st Cir.1976) (two weeks
not quick enough).  Both cases are distinguishable.  In *Carr*, the defendant made advice of
counsel and conflict of interest claims which are not relevant here.  In *Nunez Cordero*, the
defendant learned new information after he took his plea—that he would be deported—which
makes this case wholly inapposite.

government would not agree to a downward departure in his sentencing guidelines).  Neither of these factors are implicated by Ms. Morton's timely decision to seek withdrawal.

Ms. Morton entered her guilty plea on May 16, 2018.  On June 14, 2018, she informed the Court about her intention to move to withdraw her plea.  *See* Exhibit A to the annexed Declaration of Gregory Morvillo ("Morvillo Decl.").  On June 20, the Court informed the government and the trial defendants about Ms. Morton's decision prior to the close of the government's case in chief.  Morvillo Decl. ¶ 3.  In contrast to the periods of four, five, and seven months that courts have found excessive, Ms. Morton waited less than four weeks to inform all interested parties about her intent to seek withdrawal.  This timing demonstrates that she quickly realized the error of her plea and made a swift determination to reverse it.

Ms. Morton's motive for seeking withdrawal is her desire to remedy her error.  She clearly is not motivated by any favorable change in her case.  Consider *United States v. Lasky*, wherein the defendant expressed his intention to file a motion to withdraw after he received a favorable decision in a parallel civil case which involved the very same issues as the criminal matter.  23 F.Supp.2d 236, 241 (E.D.N.Y. 1998).  The court found the timing of the defendant's motion suspicious in that it evidenced that the defendant believed his chances of an acquittal to be higher after the favorable ruling, which undermined his argument that he sought to withdraw based on his innocence.  *Id*.  Here, Ms. Morton's decision cannot be attributed to any favorable ruling or recent information.  Indeed, the fact that the government secured four convictions in this case—three of them at trial—would logically deter most any defendant from moving to withdraw a guilty plea.  Yet, Ms. Morton seeks to proceed to trial, and she notified all interested persons of her intent to do so in a timely manner.

### C. The Government Cannot Reasonably Claim Prejudice

Once the defendant has shown a fair and just reason for withdrawal of her plea, the government bears the burden of showing prejudice. *United States v. Maher*, 108 F.3d 1513, 1529 (2d Cir. 1997). Courts in this district have found prejudice to the government in certain cases, none of which apply here. *Id.*; *United States v. Carreto,* 583 F.3d 152 (2d Cir. 2009).

*United States v. Carreto* is informative. In *Carreto*, the Court found prejudice to the government when the defendant filed his motion to withdraw one year after the plea, requiring the government to "re-assemble its evidence after more than a year's delay." 583 F.3d 152 (2d Cir. 2009). Because Ms. Morton only waited a few weeks before indicating her intent to withdraw—to which the Court alerted the government during the trial of Ms. Morton's codefendants—the same prejudice does not exist here. Unlike *Carreto*, the government will not have to reassemble its case because it believed it was going to trial against Ms. Morton up until one week before trial. At that point, the government's investigation was (in its view) complete, its witnesses were prepared, and its exhibits set. Any reshuffling of witnesses or exhibits in which the government engages for Ms. Morton's trial would be in response to the events from the trial of her codefendants. In this regard, the government may have a tactical advantage from what was essentially a successful "dress rehearsal" for Ms. Morton's trial. Although the focus and details of the government's case centered on Ms. Morton's codefendants at trial, the government has the advantage of having lived and breathed the Court's evidentiary decisions, certain witnesses' testimony, and the defendants' cases (primarily expert testimony), and it will use this invaluable insight during a trial against Ms. Morton. The government's evidence will not change if it was in fact truthful. And the Court should not be swayed by any testimony given

18

about Ms. Morton because none of the witnesses at trial were cross-examined by counsel with Ms. Morton's interests in mind.

The government's inconvenience is not equivalent to prejudice.  Any inconvenience to the government or its witnesses is significantly outweighed by the prejudice Ms. Morton would experience by proceeding to sentencing while maintaining her innocence.  This should tip the balance in Ms. Morton's favor and the government's inconvenience thus should not dissuade the Court from granting Ms. Morton's motion to withdraw.

## **CONCLUSION**

For all the reasons set forth above, Ms. Morton respectfully requests that the Court grant her motion to withdraw her plea pursuant to Federal Rule of Criminal Procedure 11(d), and that the Court permit Ms. Morton to move to dismiss the case in its entirety or, alternatively, to proceed to trial.

Dated: New York, New York
       July 20, 2018

ORRICK, HERRINGTON & SUTCLIFFE LLP

By:  /s/ Gregory Morvillo
     Gregory Morvillo
     Savannah Stevenson
     51 West 52nd Street
     New York, New York 10019
     (212) 506-5000

     *Attorneys for Defendant Michelle Morton*