UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
UNITED STATES OF AMERICA
                                                    :
            - v. -                                          S3 16 Cr. 371 (RA)
                                                    :
MICHELLE MORTON,
                                                    :
                    Defendant.
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## THE GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANT MICHELLE MORTON'S MOTION TO WITHDRAW HER GUILTY PLEA


ROBERT KHUZAMI
Attorney for the United States, Acting Under
Authority Conferred by 28 U.S.C. § 515

Rebecca Mermelstein
Brendan F. Quigley
Negar Tekeei
Assistant United States Attorneys
    - Of Counsel -

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND ................................................................................................................... 2

I.  The Charged Conduct ................................................................................................ 2

II.  Pretrial Litigation ...................................................................................................... 3

III.  The Plea Agreement and the Defendant's Guilty Plea ............................................. 4

IV.  Morton Waits Until the Middle of Trial to Notify the Court of Her Intention to Withdraw Her Guilty Plea ......................................................................................................... 8

DISCUSSION ...................................................................................................................... 8

I.  Generally Applicable Law ........................................................................................ 8

II.  The Record Establishes that Morton Pled Guilty Knowingly, Voluntarily, and with a Clear Mind ................................................................................................................ 11

III.  Morton Is Guilty ...................................................................................................... 15

   A.  Morton's Allocution Contradicts Her Claim of Innocence ................................ 16

   B.  Morton's Argument that Jason Galanis Manipulated Her Does Not Establish Her Innocence ......................................................................................................... 16

   C.  Morton's Purported Reliance on Others Does Not Establish Innocence ........... 22

   D.  Morton's Attempted Cooperation was Part of Her Attempt to Cover Up Her Crimes and Only Further Establishes her Culpability ...................................................... 23

IV.  The Court Should Also Deny the Motion Because of the Passage of Time and the Prejudice to the Government ......................................................................................... 25

CONCLUSION .................................................................................................................... 28

# TABLE OF AUTHORITIES

*Adames* v. *United States*, 171 F.3d 728 (2d Cir. 1999) .................................................................. 10

*Blackledge* v. *Allison*, 431 U.S. 63 (1977)........................................................................... 10, 11

*United States* v. *Rose*, 891 F.3d 82 (2d Cir. 2018) ....................................................... 27

*Nunez Cordero* v. *United States*, 533 F.2d 723 (1st Cir. 1976)................................... 26

*United States* v. *Arteca*, 411 F.3d 315 (2d Cir. 2005) .................................................. 11

*United States* v. *Carr*, 740 F.2d 339 (5th Cir. 1984) ................................................... 26

*United States* v. *Carr, cert. denied*, 471 U.S. 1004 (1985)........................................... 26

*United States* v. *Doe*, 537 F.3d 204 (2d Cir. 2008) ................................................ 10, 11

*United States* v. *Gonzalez*, 970 F.2d 1095 (2d Cir. 1992) ................................... 9, 10, 11

*United States* v. *Hirsch*, 239 F.3d 221 (2d Cir. 2001) ....................................... 10, 15, 16

*United States* v. *Hyde*, 520 U.S. 670 (1997) ........................................................... 9

*United States* v. *Karro*, 257 F.3d 112 (2d Cir. 2001) ................................................. 9

*United States* v. *Kolaczynski*, No. 16-CR-0834 (NSR), 2018 WL 377342 (S.D.N.Y. Jan. 10, 2018) .............................................................................................................. 13, 14

*United States* v. *Maher*, 108 F.3d 1513 (2d Cir. 1997) ............................................... 9

*United States* v. *March*, 382 F. App'x 76 (2d Cir. 2010).............................................. 11

*United States* v. *Quinones*, 906 F.2d 924 (2d Cir. 1990)............................................. 9

*United States* v. *Schmidt*, 373 F.3d 100 (2d Cir. 2004) ......................................... 9, 27

*United States* v. *Spencer*, 836 F.2d 236 (6th Cir. 1987) ............................................. 26

*United States* v. *Spencer, cert. denied*, 486 U.S. 1009 (1988)...................................... 26

*United States* v. *Torres*, 129 F.3d 710 (2d Cir. 1997) .......................................... 10, 13

*United States* v. *Torres*, 129 F.3d 710, 715 (2d Cir.1997) ........................................ 16

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to defendant Michelle Morton's ("Morton" or "the defendant") motion to withdraw her guilty plea. In the motion, Morton proclaims her innocence more than two months after her guilty plea proceeding in which she and her counsel repeatedly acknowledged her guilt, her competence to enter a plea of guilty, and the voluntary and knowing nature of her guilty plea. Morton is guilty. She is guilty of knowingly participating with others in a massive scheme to defraud the Wakpamni Lake Community Corporation (the "WLCC") into issuing more than $60 million in bonds and to force victim investors – her clients – into buying those bonds without their knowledge, without their permission, and while hiding material conflicts of interest from those investors. Morton, before this Court and under oath, has already admitted that she is guilty of conspiring to commit securities fraud and committing investment advisor fraud. Now, faced with the reality that she is about to be sentenced for her illegal conduct, and citing no new evidence, facts or circumstances that were unknown to her prior to her guilty plea proceeding, Morton uses the same tactics she used to perpetrate the bond scheme in the context of this case – lies, excuses, ████████████████████████████████████████, and efforts to cast blame on others. Morton's rehashed arguments are not defenses, and they certainly do not support legitimate claims of innocence that should allow her to withdraw her sworn-to admission of guilt before this Court.

As set forth in more detail below, the Court should deny Morton's motion. First, Morton's new claim that ███████████████████████ caused her to dupe herself into pleading guilty is nonsensical and fatally undermined by the clear and undisputed record of the May 16, 2018 plea proceeding. There was an adequate factual basis for Morton's guilty plea, and Morton's motion to withdraw is not based on any intervening change in the facts or the law.

Second, Morton pled guilty because she is, in fact, guilty, and the purported defenses she raises in the instant motion – all arguments she has made before, and based on evidence she has had for several years – do not provide sufficient grounds to withdraw the guilty plea.  Finally, the length of time since Morton's plea and the related prejudice to the Government from allowing Morton to withdraw her plea now, after the completion of a six-week trial against her co-defendants that she would have been present for absent her plea, provide additional bases to deny the motion.

## BACKGROUND

### I.    The Charged Conduct

On May 16, 2018, Morton pled guilty to Counts One and Four of the third superseding Indictment (the "Indictment").  Count One of the Indictment charges Morton with conspiring to commit securities fraud in connection with a scheme to defraud the WLCC by causing it to issue bonds based on false and misleading representations, and to fraudulently cause clients of two investment advisory firms controlled by Morton – first, Hughes Capital Management ("Hughes"), and, second, Atlantic Asset Management ("Atlantic") to buy certain of those bonds, thereby defrauding those clients as well.  Count Four of the Indictment charges Morton with committing investment adviser fraud in connection with the scheme and, in particular, defrauding certain clients of Hughes and Atlantic by causing client funds to be invested in the Wakpamni Bonds without disclosing material facts to the clients, including that the bonds did not fit within the investment parameters of certain clients' investment advisory contracts and that certain substantial conflicts of interest existed.  Morton and her co-conspirators caused Hughes clients to unwittingly purchase more than $27 million in WLCC bonds in August 2014.  When Hughes clients learned that WLCC bonds had been purchased in their accounts, several demanded that the bonds be liquidated.  However, because there was no ready secondary market for the bonds, none were ever able to be sold or redeemed from the Hughes client accounts.

Notwithstanding the fallout from forcing Hughes clients to purchase the WLCC bonds, Morton

then, in April 2015, used money from a single Atlantic investor – a pension fund – to purchase

more than $16 million in additional WLCC bonds.  Upon learning about the purchase, the

multiple conflicts of interest inherent in the purchase, and how the WLCC bonds violated the

guidelines of the investment fund, the Atlantic client immediately demanded that the bonds be

liquidated.  But, again, because there was no ready secondary market for the bonds, the more

than $16 million in WLCC bonds were never sold.

## II.    Pretrial Litigation

In advance of trial, the parties filed numerous pretrial and *in limine* motions.  Of

particular relevance here are Morton's and her co-defendants' motions for severance (Dkt. Nos.

286, 290, 297), Morton's motion to dismiss the indictment or to suppress certain evidence (Dkt.

No. 288), and the Government's motion to preclude evidence of Morton's purported attempted

cooperation. (Dkt. No. 370).  In connection with those motions Morton argued that (i) she had in

fact been a whistleblower who reported her suspicions about wrongdoing by Jason Galanis to a

contact at FINRA; (ii) she had cooperated with the FBI and the Government; and (iii) that she

had been duped by Jason Galanis both because she "is particularly vulnerable to being attacked

in any form," particularly by "domineering white men," and because, as a victim of racial and

gender bias "Galanis's accusations of racial and socioeconomic bias cut [her] deeply."  (Dkt. 288

at n. 6).

On March 6, 2018, the Court denied Morton's motions for dismissal or suppression.

(March 6, 2018 Tr. 78, 123-24).  At a subsequent conference on April 26, 2018, the Court denied

the defendants' severance motions.  (April 26, 2018 Tr. at 11).[1]

### III.    The Plea Agreement and the Defendant's Guilty Plea

Morton pled guilty on Wednesday, May 16, 2018 pursuant to a plea agreement (the "Plea Agreement").  (*See* May 14, 2018 Plea Agreement (Court Ex. 1)).  Morton and her counsel both signed the Plea Agreement on Monday, May 14, 2018, and Morton signed it again on May 16, 2018, prior to her plea proceeding.  *Id.*  In the plea agreement, Morton agreed, among other

---

[1] The Court had not yet ruled on the Government's motion to preclude evidence of Morton's purported "cooperation" at the time of Morton's plea, which rendered the motion moot.

things, as follows:  "The defendant hereby acknowledges that she has accepted this [Plea]

Agreement and decided to plead guilty because she is in fact guilty."  *Id.*

At the beginning of the plea proceeding on May 16, 2018 (the "Plea Proceeding"), the

Court placed Morton under oath.  (May 16, 2018 Plea Transcript ("Plea Tr.") 4).  The Court then

asked Morton questions about her personal and educational background, and engaged in the

following colloquy during which Morton stated that her mind was clear and that her heath issues

did not affect her understanding of the plea proceeding:

| | |
|---|---|
| THE COURT: | Is there anything about your health condition that affects your ability here and now to understand what's happening in these proceedings? |
| THE DEFENDANT: | No, nothing that affects my understanding. |
| THE COURT: | In the past 24 hours have you taken any drugs, medicine, or pills, or drunk any alcoholic beverages? |
| THE DEFENDANT: | Just prescribed medicine for blood pressure and for lupus. |
| THE COURT: | Do those medications, again, affect your ability to understand what's happening here today? |
| THE DEFENDANT: | Not at all. |
| THE COURT: | And is your mind clear today? |
| THE DEFENDANT: | Yes, it is. |

(Plea Tr. 4-5).  Defense counsel stated that he had no doubt as to Morton's competence to plead

guilty.  (Plea Tr. 5).  Based on Morton's responses to the questions, and the Court's

"observations of her demeanor here in court and representations of counsel," the Court found

that Morton was "fully competent to enter an informed plea of guilty at this time."  (Plea Tr. 5).

Morton stated she had enough time and opportunity to discuss her case with her

attorneys, discussed with them the nature of the charges, any possible defenses she might have,

and the rights that she would be giving up if she pled guilty. (Plea Tr. 5-6). She stated that her attorneys' representation of her "has been excellent," and that she was "very satisfied" with their representation. (Plea Tr. 6). The Court explained the trial and other rights that Morton would be giving up by pleading guilty, and Morton acknowledged that she understood she was giving up these rights. (Plea Tr. 6-9). The Government then stated the elements of Counts One and Four of the Indictment, and Morton acknowledged that she understood the elements. (Plea Tr. 9-11). The Court also explained to Morton the maximum penalties she faced (Plea Tr. 11-14), the possible loss of certain civil rights as a result of her conviction (Plea Tr. 15), and the method by which the Court would impose sentence and the impact of the Sentencing Guidelines. (Plea Tr. 15-16).

In a colloquy with the Court, Morton stated she had read the Plea Agreement and discussed the Plea Agreement with counsel before she signed it. (Plea Tr. 16). The Court asked Morton whether she understood "all the terms of" the Plea Agreement, and the defendant stated that she did. (Plea Tr. 16). The Court and the Government then summarized and reviewed particular aspects of the Plea Agreement, including Morton's appellate waiver, which Morton said she understood. (Plea Tr. 18). The Court asked Morton if she willingly signed the Plea Agreement, and Morton responded, "Yes, I did." (Plea Tr. 19). Morton stated that no one had threatened, bribed, or forced her to sign the Plea Agreement, and that, other than what was in the Plea Agreement, no one had offered her any inducement to plead guilty. (Plea Tr. 19). The Court then engaged in the following colloquy during which Morton admitted her guilt to Counts One and Four of the Indictment:

THE COURT:        Now that you've been advised of the charges against you and the possible penalties you face and the right that you're giving up, is it still your intention to plead guilty.

THE DEFENDANT: Yes, it is.

THE COURT:        So now I'm going to ask you the official question with respect to each of the two counts.  So how do you plead with respect to Count One of the superseding indictment, guilty or not guilty?

THE DEFENDANT: Guilty.

THE COURT:        And with respect to Count Four of the superseding indictment, how do you plead?

THE DEFENDANT: Guilty.

(Plea Tr. 20).

The Court then asked Morton to "tell me what you did in your words that makes you believe you're guilty of these crimes."  (Plea Tr. 20).  Morton stated:

> On or about April 2015 while I was chief executive officer of a registered investment adviser known as Atlantic Asset Management I agreed with others to purchase certain bonds for a client account at Atlantic.  I knew there was a material conflict of interest in connection with the bonds and did not disclose it to the client before making the purchase.  This was wrong for me to do.  This enabled Jason Galanis to steal the bond proceeds through a broader fraud that I did not know anything about and, therefore, my investors lost money.  And for that I am truly sorry.

(Plea Tr. 20-21).  Defense counsel agreed that there was a sufficient factual predicate for the guilty plea as to Counts One and Four of the Indictment.  (Plea Tr. 21).  The Government then summarized what its evidence would be at trial, and proffered the facts that would establish venue.  (Plea Tr. 21-22).

The Court accepted Morton's guilty plea, finding that she had acknowledged that she was "in fact, guilty as charged in these two counts in the superseding indictment."  (Plea Tr. 23).  The Court also found that Morton understood her rights, including her right to go to trial and the consequences of her plea, and that the defendant had "knowingly and voluntarily" pled guilty.  (Plea Tr. 23).

The Court scheduled sentencing for November 30, 2018.  (Plea Tr. 25).

IV.   **Morton Waits Until the Middle of Trial to Notify the Court of Her Intention to Withdraw Her Guilty Plea**

As described in detail above, Morton signed the Plea Agreement on Monday, May 14, 2018, and entered a guilty plea on Wednesday, May 16, 2018.  According to Morton, she decided that she had made a mistake in entering her guilty plea on May 18, 2018 (two days after her plea).  Notably, however, Morton took no steps to withdraw her guilty plea at that time, which would have permitted her to proceed to trial with her co-defendants.  Instead, Morton made the strategic decision to wait until June 14, 2018 – after trial against her co-defendants had already commenced and it was too late for her to proceed to trial with them – to inform the Court of her intention to withdraw her guilty plea in an *ex parte* letter.  Morton never informed the Government of her intention to withdraw her plea.  Rather, on June 20, the Court informed the Government that Morton had filed the June 14 letter indicating her intention to seek to withdraw her guilty plea.[2]  Trial ended on June 28, 2018, and Morton still had not filed any motion to withdraw her guilty plea.  On July 9, 2018, with still no motion filed, the Court entered an order setting a motions schedule, "[t]o the extent Ms. Morton still intends to submit a motion to withdraw her plea[.]"  (Dkt. No. 540).  On July 10, 2018, the Court ordered Morton to file any such motion by July 20, 2018, which Morton did.

## DISCUSSION

I.   **Generally Applicable Law**

A defendant who has pled guilty "has no automatic entitlement" to withdraw his guilty plea.  *United States* v. *Maher*, 108 F.3d 1513, 1529 (2d Cir. 1997); *see also United States* v.

---

[2] The Government had learned of Morton's intent to seek to withdraw her guilty plea a day or two earlier, following an inadvertent public filing in a related civil case.

*Karro*, 257 F.3d 112, 117 (2d Cir. 2001).  The Supreme Court has recognized that allowing a

defendant to "withdraw his guilty plea simply on a lark" serves to "debase[] the judicial

proceeding at which a defendant pleads and the court accepts his plea" and "degrade the

otherwise serious act of pleading guilty into something akin to a move in a game of chess."

*United States* v. *Hyde*, 520 U.S. 670, 676-77 (1997). "[S]ociety has a strong interest in the

finality of guilty pleas, and allowing withdrawal of pleas not only undermines confidence in the

integrity of our judicial procedures, but also increases the volume of judicial work, and delays

and impairs the orderly administration of justice."  *Maher*, 108 F.3d at 1529.

Accordingly, once a guilty plea has been accepted, a defendant may not withdraw a guilty

plea unless she shows "a fair and just reason for requesting the withdrawal."  Fed. R. Crim. P.

11(d)(2)(B).  While the "fair and just reason" standard "implies that the motions to withdraw

prior to sentence should be liberally granted," a defendant who seeks to withdraw her plea "bears

'the burden of satisfying the trial judge that there are valid grounds for withdrawal, taking into

account any prejudice to the government.'"  *United States* v. *Gonzalez*, 970 F.2d 1095, 1100 (2d

Cir. 1992) (quoting *United States* v. *Quinones*, 906 F.2d 924, 928 (2d Cir. 1990) (internal

citation omitted)).  The standard is thus a "stringent" one.  *United States* v. *Schmidt*, 373 F.3d

100, 103 (2d Cir. 2004).

In determining whether the defendant has shown a "fair and just reason" to justify

withdrawal, a district court "should consider, *inter alia*: (1) the amount of time that has elapsed

between the plea and the motion; (2) whether the defendant has asserted a claim of legal

innocence; and (3) whether the government would be prejudiced by a withdrawal of the plea."

*United States* v. *Doe*, 537 F.3d 204, 210 (2d Cir. 2008)) (internal citation omitted).  Because the

burden is on the defendant, "[t]he Government is not required to show prejudice when opposing

a defendant's motion to withdraw a guilty plea where the defendant has shown no sufficient grounds for permitting withdrawal; however, the presence or absence of such prejudice may be considered by the district court in exercising its discretion." *Gonzalez*, 970 F.2d at 1100; *see also United States* v. *Torres*, 129 F.3d 710, 715 (2d Cir. 1997) ("[T]he government need not demonstrate prejudice where the defendant fails to show sufficient grounds to justify withdrawal of the plea.").

"A claim of innocence can be a basis for withdrawing a guilty plea, but the claim must be supported by evidence." *United States* v. *Hirsch*, 239 F.3d 221, 225 (2d Cir. 2001). "A defendant's bald statements that simply contradict what [s]he said at h[er] plea allocution are not sufficient grounds to withdraw the guilty plea." *Id.* (quotation and internal citation omitted); *see also Blackledge* v. *Allison*, 431 U.S. 63, 73-74 (1977) ("[T]he representations of the defendant, h[er] lawyer, and the prosecutor at [a plea] hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity."); *Adames* v. *United States*, 171 F.3d 728, 732 (2d Cir. 1999) ("A criminal defendant's self-inculpatory statements made under oath at h[er] plea allocution carry a strong presumption of verity, and are generally treated as conclusive in the face of the defendant's later attempt to contradict them." (citations and internal quotation marks omitted)).

A motion to withdraw a guilty plea may be denied without a hearing where the defendant's allegations "merely contradict the record," are "inherently incredible," or are "simply conclusory." *Gonzalez*, 970 F.2d at 1100. A district court's denial of a motion to withdraw a plea is reviewed for abuse of discretion, meaning that the decision will be overturned only if the district court misapplies the law or makes a clearly erroneous factual finding. *United*

*States* v. *March*, 382 F. App'x 76, 77 (2d Cir. 2010) (citing *United States* v. *Doe*, 537 F.3d at 211; *United States* v. *Arteca*, 411 F.3d 315, 320 (2d Cir. 2005)).

## II.     The Record Establishes that Morton Pled Guilty Knowingly, Voluntarily, and with a Clear Mind

Morton's primary argument is that ███████████████████████ made it such that she "unwittingly deceived herself" into pleading guilty even though she believes that she did not commit a crime.  (Morton Mem. at 1).  This argument is nonsensical in light of the undisputed record and the Court should reject it.

First, based on the Plea Proceeding alone, there is no serious question that Morton knowingly and voluntarily signed the Plea Agreement (twice) and knowingly and voluntarily entered her guilty plea.  Morton's and her counsel's representations to the Court at the plea proceeding, and the Court's findings made in connection with the plea, "constitute a formidable barrier in any subsequent collateral proceedings" because "[s]olemn declarations in open court carry a strong presumption of verity." *Blackledge*, 431 U.S. at 73-74.  At the beginning of the plea proceeding, after taking an oath to answer the Court's questions truthfully, Morton expressly told the Court that there was *"nothing"* about her health conditions that affected her understanding of the plea proceedings, that the medications she was taking for blood pressure and lupus – ████████████████████████ – did not affect her ability to understand the proceedings, and that her mind was clear the day of the proceeding.  (Plea Tr. 4-5).  Defense counsel stated that he had no doubt as to the defendant's competence to plead guilty.  (Plea Tr. 5).  Moreover, the Court observed Morton's demeanor in court and found that she was fully competent to enter an informed plea of guilty.  (Plea Tr. 5).  In responding to questions from the Court about the Plea Agreement, Morton stated she had read and discussed it with counsel, that she understood all of the terms of the Plea Agreement, and that she willingly signed the Plea

Agreement.  (Plea Tr. 16-19).  Indeed, the Court's colloquy with Morton during the Plea Proceeding and Morton's guilty pleas and allocution were so clear and precise that Morton does not – because she cannot – challenge the integrity of the plea proceeding or the sufficiency of her allocution.

███████████████████████████████████████████████████████

████████████████████

Indeed, that the Court provided Morton with "every chance . . . to raise any concerns, questions, or anxieties about the plea," and Morton raised no such issues, is directly relevant to an inquiry into the voluntary and knowing nature of Morton's guilty plea.  *See United States* v. *Torres*, 129 F.3d 710, 715 (2d Cir. 1997) (affirming the district court's denial of the defendant's motion to withdraw his guilty plea based on claims of coercion by counsel, and noting that the defendant was "given every chance by the district court to raise any concerns, questions or anxieties about the plea" in).

██████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████████



███████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████

### III.    Morton Is Guilty

Even if Morton could overcome her clear and sworn allocution – and she cannot –
Morton has also completely failed to establish her innocence.  Relying exclusively on a limited
set of largely self-serving excerpts of text messages that Morton has had for several years, and
arguments she had already made and which were at her disposal *prior* to the Plea Proceeding,
Morton claims that she did not, in fact, commit any crime.  (Morton Mem. at 7-9).  Morton
argues that her primary defenses would be that (1) she was manipulated by and lied to by Jason
Galanis, (2) she relied on information provided by other people, and (3) she attempted to report
information about Jason Galanis to the SEC and to law enforcement.  (Morton Mem. at 8).  But
Morton's rehashed and unpersuasive arguments are precisely the type of "bald statements that
simply contradict what [s]he said at [her] plea allocution" and "are not sufficient grounds to
withdraw the guilty plea."  *Hirsch*, 239 F.3d at 225 ("A claim of innocence can be a basis for
withdrawing a guilty plea, but the claim must be supported by evidence.  'A defendant's bald
statements that simply contradict what he said at his plea allocution are not sufficient grounds to
withdraw the guilty plea.'") (quoting *Torres*, 129 F.3d at 715).  And, in any event, as Morton

admits, her purported defenses are the same defenses she has "always focused on" (Morton Mem. at 8) – thus, defenses that she had considered, discussed, and rejected prior to entering her guilty plea.  (Plea Tr. 6 ("THE COURT:  And have you discussed or I should say plural, attorneys – have you discussed with them the nature of the charges, any possible defenses you may have, and the rights that you'd be giving up if you pled guilty?  THE DEFENDANT:  Yes, I have.").  Morton is guilty, and the Court should reject any contrary argument.

### A.  Morton's Allocution Contradicts Her Claim of Innocence

Morton admits that she "allocuted to conduct sufficient to satisfy the basic elements of the two counts to which she pled guilty."  (Morton Mem. at 14).  That should end the inquiry. However, she now also asserts that her allocution is consistent with her new claim of innocence because she "acted reasonably and in good faith."  (Morton Mem. at 14).  Morton's allocution that she "knew there was a material conflict of interest in connection with the bonds and did not disclose it to the client before making the purchase" and that her actions were "wrong" (Plea Tr. 20-21) is entirely inconsistent with any argument that she acted reasonably or in good faith.  In addition, Morton's claims that she somehow acted reasonably and in good faith when she forced her pension fund clients to purchase not one but *two* series of WLCC bonds are devoid of any factual support and precisely the type of "bald statements" that the Second Circuit has held are "not sufficient grounds to withdraw the guilty plea."  *Hirsch*, 239 F.3d at 225.  Morton's allocution demonstrated her "genuine guilt" and her citations to literature speculating about why other people may or may not plead guilty are simply irrelevant to the standards applicable to the instant motion.

### B.  Morton's Argument that Jason Galanis Manipulated Her Does Not Establish Her Innocence

Morton expends considerable time in her motion arguing that she was lied to and

manipulated by Jason Galanis.  She relies extensively on her text message communications with Jason Galanis, which she had (because she sent or received them) for more than four years prior to the entry of her guilty plea and which she and her counsel received in discovery at the very early stages of this case, more than two years ago.  Her text messages with Jason Galanis are not new.  And they do not establish her innocence.  At base, the text messages cited by Morton establish that while on some occasions Galanis flattered Morton calling her "adorable" and his "girlfriend," on other occasions he was insulting to her.  (Morton Mem. at 13-14).  But any feelings Morton may have had about Galanis do nothing to undercut the crux of her guilt – that she completely abdicated her obligations as an investment advisor and placed the Wakpamni bonds into client accounts (i) as repayment to Galanis for funding her acquisition of Hughes and Atlantic; (ii) without the disclosure of significant conflicts of interest; and (iii) notwithstanding that the bonds were an inappropriate investment for the Atlantic and Hughes' clients.  And while the burden at this stage is on Morton to establish her innocence – and not on the Government to establish her guilt – a true review of the universe of Morton's text messages in fact demonstrates how she actively participated in and perpetrated the crimes to which she pled guilty.

To provide only a few examples, beginning with Morton's communications with Jason Galanis leading up to the fraudulent purchases of WLCC bonds into Hughes Capital Management's client portfolios, the following communications demonstrate Morton's knowledge and participation in the early stages of the scheme:

- On July 21, 2014, even *before* she and her co-conspirators acquired Hughes, Morton's focus was on how she could get the WLCC bonds put into Hughes client accounts.  She sent the following text message to Jason Galanis:  "Should know how$ we can proceed with bonds soon getting information[.]"  He responded: "I'm confident you will figure it out[.]"  She wrote back: "I will."

- On August 12, 2014, after Morton had introduced her co-conspirator and co-defendant, Gary Hirst, to Hughes Capital Management staff members following her

17

acquisition of Hughes, Morton sent a text message to Jason Galanis stating: "Gary was a wreck when the PM's [portfolio managers] said that they could only by [sic] high rated bonds."

- That same day, Morton sent a text message to Jason Galanis referring to Jason Galanis's role in arranging the investment into Morton's company that allowed her to purchase Hughes, that stated "You invested because of the bonds not me." Jason Galanis responded: "The bonds are only possible because of you my dear."

- The next day, Morton sent a series of text messages to Jason Galanis about her day, including meetings with co-conspirators Hugh Dunkerley and Hirst, and, in an apparent complaint about certain aspects of the day, stated:  "And I found out I am nothing more than a bond mule . . . Lovely day[.]  But its all goooooooooood!!!!!!"

As the Court is aware, Morton and Hirst, along with their co-conspirators, subsequently caused Hughes clients to unknowingly purchase more than $27 million of WLCC bonds.  Trial testimony made clear that in directing the purchase of the bonds, Morton ran roughshod over the Atlantic employees who objected to the inappropriate investment, and that upon learning of the bonds, there was universal negative reactions from the Hughes clients.  A former Hughes employee testified how there had been a "cloud over the Wakpamni bonds" at Hughes (Trial Tr. 2053), a junior analyst quit after the bond trade was executed (Trial Tr. 2048), and Hughes clients reacted "[n]egatively across the board" once they learned the bonds were placed in their account (Trial Tr. 2049-50).  Hughes clients, pension fund and retirement fund victims of Morton's and her co-conspirators' fraudulent scheme, established that Morton caused the WLCC bonds to be purchased in their accounts without their knowledge or permission and without disclosing material conflicts of interest.  (Trial Tr. 1679-82 (Michelin Retirement Fund victim witness testimony that (a) Michelin had not been notified about the WLCC bonds before they were purchased, (b) no one had informed Michelin of multiple conflicts of interest among the parties involved in the transaction, which would have mattered, and (c) Michelin determined that the bonds were not within Michelin's investment guidelines); 1607-17 (Richmond Retirement

System ("RRS") victim witness testimony that (a) the WLCC bonds did not seem to fit within the portfolio, (b) no one had informed RRS about the relationship between the placement agent for the WLCC bonds and the people who financed the acquisition of Hughes, which was information he "would have wanted to have known," and (c) RRS tried to get Morton and Hughes to liquidate the WLCC bonds in RRS's portfolio with no success)).

Then, notwithstanding the fallout from her purchase of WLCC bonds into Hughes client portfolios, Morton, along with Jason Galanis and others, quickly moved to purchase yet *another* investment advisory firm – Atlantic – and, again despite material conflicts and material violations of investment policies and agreements, used another pension fund client's money to purchase more than $16 million of another round of WLCC bonds.  The fraudulent purchase of WLCC bonds into an Atlantic investment vehicle using Atlantic client funds was the basis for Morton's guilty plea allocution, during which she admitted:  "I knew there was a material conflict of interest in connection with the bonds and did not disclose it to the client before making the purchase.  This was wrong for me to do."  (Plea Tr. 20-21).

As demonstrated by her text messages to Jason Galanis, Morton was scheming to buy WLCC bonds with Atlantic client money again *before* the purchase of Atlantic had even been finalized.  For example, on March 25, 2015, before Hughes purchased Atlantic, Morton sent Jason Galanis the following text after meeting with an Atlantic employee:  "Going to be tough to put up a trade beforehand but he has other ideas where to place it (he came prepared) but I am super confident because he [M]ike and Cliff are on top of it.  If we go with an April 1 I am very confident that we will be able to get it placed within 48 hours depending on us bank settlement issues of which I am not aware."  (GX 3004A).  Jason Galanis responded:  "you have confidence though post close?"  Morton wrote back:  "Yes I am willing to put my credibility with you on the

line and take responsibility personally[.]  I'm really feeling good about it.  Not because I was a

bitch, but because he was ready ab discussed [sic]  the multiple clients in which the bond would

fit.  He was prepared with information.  That gave me the confidence to put myself on the line."

(GX 3004A).

Notwithstanding the rushed and disastrous placement of WLCC bonds in Hughes client

portfolios without their permission or knowledge, and without disclosing to them the massive

conflicts of interest that existed with respect to the trades, Morton was scheming to do the *same*

*thing* at Atlantic, seeking to cover up the crime with self-serving assertions about discussions

regarding "the multiple clients in which the bond would fit."  In truth, no such clients existed,

and, as Morton admitted during her allocution, she failed to disclose the conflicts of interest to

the Atlantic client who unknowingly purchased the WLCC bonds.  A former Hughes employee

testified that he was "stunned" when he learned in June 2015 – after Hughes had purchased

Atlantic – that there had been a purchase of *additional* WLCC bonds at Atlantic because (a) the

bonds had been purchased in April and he, the firm administrator who was supposed to know

what was going on, only found out about it in June, and (b) "there had always been kind of a

cloud over the Wakpamni bonds."  (Trial Tr. 2052-53).  The Atlantic client, who was the only

institutional investor in the fund Morton used to purchase the WLCC bonds, and whose $16.2

million had been used to purchase the bonds, was the Omaha School Employees Retirement

System ("OSERS").  OSERS' victim witness testimony established that Atlantic, at Morton's

direction, had purchased the WLCC bonds into an Atlantic fund using more than $16 million of

OSERS' funds without telling OSERS in advance, notwithstanding (a) the conflicts of interest

present in the purchase and (b) the WLCC bonds did not fit within the guidelines for the fund.

(Trial Tr. 656-57; 741-43).  OSERS was only informed of the WLCC purchase after the fact,

during a telephone call that Morton, among others at Atlantic, participated in.  (Trial Tr. 741-43).

After the phone call, OSERS immediately demanded that the WLCC bonds be sold out of the

fund, but, despite Morton's promises and assurances, the bonds were never sold.  (Trial Tr. 746-

53).

At Atlantic, Morton repeated the *modus operandi* she and her co-conspirators used to

fraudulently place WLCC bonds in Hughes client portfolios – (1) scheming to place bonds with

firm clients even before purchasing the firm, (2) contravening established firm policies and

procedures regarding investment decisions to force firm employees to purchase the bonds, and

(3) purchasing the bonds notwithstanding the fact that there was no secondary market through

which the bonds could be redeemed, no disclosure to investors of material conflicts of interest,

and the bonds were, in many cases, outside the investment parameters of the client accounts into

which they were placed.  Morton implemented the scheme not once, but *twice.*

Morton's argument that Jason Galanis "convinced her that he was genuinely interested in

a socially responsible approach to investing, particularly with Native American tribes" is

similarly unavailing.  (Morton Mem. at 10).  Morton's purported belief that socially responsible

investing, including investments in Native American initiatives, was a worthy and potentially

financially fruitful endeavor is of no moment.  Such a belief – if one existed – is not a defense

for forcing Hughes and Atlantic clients to purchase the bonds without their knowledge, in

violation of many of their investment parameters, and without disclosing the material conflicts

inherent in the bonds – all so that she could be assured the financial backing by Jason Galanis

and her other co-conspirators, and so that she would have the opportunity to run her own

investment advisory firm.  For the same reason, Morton's arguments that Jason Galanis at times

lied to her, or manipulated or took advantage of her, in no way absolve her of culpability for role

in the scheme.  Morton was not Jason Galanis's victim.  It was she, along with Jason Galanis and her co-conspirators, who victimized the Wakpamni community and dozens of pension fund victims for personal and professional gain.

### C.  Morton's Purported Reliance on Others Does Not Establish Innocence

The Court should also reject Morton's argument that she is innocent because she "relied on her business partner and many of her other employees when making the decision to purchase the Bonds."  (Morton Mem. at 10).  First, such an assertion is a blanket admission that *she* made the decision to purchase the bonds, further establishing her culpability.  Second, any argument that she asked other people for advice or looked to others to help her decision-making in no way supports a claim of innocence.  Morton, as an investment adviser, had a fiduciary duty to her clients.  She violated that duty in the course of the charged scheme by railroading employees at Hughes and Atlantic and forcing them to participate in the rushed purchase of the bonds before any thorough analysis could be done and before, as demonstrated above, any clients were notified about, among other things, the material conflicts of interest inherent in the bonds.  Morton knew what she was doing was wrong, and if she roped others into her decision-making, it was only in an attempt to insulate herself from liability.  Finally, Morton's arguments about reliance on others are not new and the evidence she points to is not new.  Her arguments rely exclusively on text messages, emails, and other information that she has had in discovery for several years.[3]

---

[3] Morton also claims, citing no evidence, that "[a]t no time during the Bond transaction at Hughes or Atlantic did any of the employees who examined the Bonds tell Ms. Morton that they were improper investments."  (Morton Mem. at 11-12).  This is, of course, incorrect and unsupported by the record.

### D. Morton's Attempted Cooperation was Part of Her Attempt to Cover Up Her Crimes and Only Further Establishes her Culpability

The argument that Morton "acted as a whistleblower in this case," (Morton Mem. at 12) is absurd and should be rejected outright. In any event, rather than support her incredible claim of innocence, Morton's (failed) attempted cooperation *after* she had already forced Hughes and Atlantic clients to purchase the WLCC bonds, and *after* she began to have concerns about litigation and regulatory investigations, only underscores her guilt and demonstrates her attempt to cover up her crimes.

In her declaration submitted in support of her pre-trial motions, Morton asserted that on June 11, 2015, almost ten months *after* she purchased the first series of WLCC bonds on behalf of Hughes Capital Management, she contacted a representative of FINRA to discuss her "suspicions about [Jason] Galanis." (Dkt. No. 299, Morton Aff. ¶ 11). Morton also claimed that she asked the FINRA representative "to alert the SEC so that it could open an investigation into the matter without my name being associated." (*Id.* ¶ 12). But by then, of course, it was too late. Morton had already worked with Jason Galanis and others to purchase Hughes, and then Atlantic, for the purpose of placing the WLCC bonds into unwitting pension fund client portfolios, and Morton had already forced Hughes and Atlantic clients to purchase more than $40 million dollars in WLCC bonds.

Critically, by the time Morton first purportedly contacted the FINRA representative, Hughes clients had been barraging Morton with complaints about the WLCC bonds for several months, and she was well aware that those complaints could lead to litigation and regulatory inquiries. The jig was up. Indeed, communications from before June 2015 show that Morton was concerned about the threat of investigations and litigation related to the WLCC bonds. For example, in a text message she sent to Jason Galanis on March 12, 2015, Morton raised concerns

about "be[ing] subject to litigation or [an] sec inquiry" after she was contacted by representatives

of one of the pension funds, Richmond Retirement Services:

> Got an email from an attorney and the city attorney from
> Richmond today about the bond. Got to figure out how to handle.
> Cannot be subject to litigation or sec inquiry. Gotta focus . . .
> Focus on the threat of a lawsuit for breach of fiduciary duty for
> putting the bond in an account

(GX 3004).

Morton's self-serving efforts to purportedly attempt to raise concerns with FINRA

regarding Jason Galanis were part of her attempt to save herself by pointing the finger at others.

They occurred well after she learned that Hughes and Atlantic clients were dismayed and

contemplating legal action regarding the WLCC bonds.  The SEC served Morton with its first set

of document requests related to the WLCC bonds in July 2015.  In the late summer and fall of

2015, after being approached by the FBI, Morton met with prosecutors and agents and also

communicated with SEC staff.  Among other things, Morton recorded two meetings with Jason

Galanis, and sent the SEC and the FBI selective and self-serving emails.[4]  Thus, Morton's

purported cooperation with the Government and the FBI occurred after the SEC had served

document requests on her; and after the FBI had approached her, not because of steps that she

affirmatively took on her own.

***

---

[4] In the instant motion, Morton relies, again, on arguments she made, which the Government
opposed and which the Court rejected, in her failed motion to dismiss the indictment and
suppress evidence based on outrageous Government misconduct.  (*See* Dkt. Nos. 297, 308).  In
the Government's opposition to Morton's pretrial motions, the Government disputed, and still
disputes, many of the details concerning what representations were made to her.  The
Government does not believe that a resolution of such factual disputes is necessary for purposes
of this motion because even assuming arguendo that Morton's allegations are correct (as the
Government generally does for purposes of this brief only), they do not support any claim of
innocence and she would not be entitled to the remedy she now seeks.

Accordingly, the record evidence conclusively establishes that Morton knowingly participated in the WLCC bond scheme by causing her investors' funds to be used to purchase the bonds, without disclosure to those investors of material facts, including the existence of multiple conflicts of interest, and which bonds, in some cases, violated the investment guidelines of the client accounts in which they were placed. For all of the reasons stated above, Morton's claim that health and family concerns "deluded her view of her circumstances" and caused her to plead guilty even though she maintains her innocence does not provide a basis to withdraw her plea with respect to Counts One and Four of the Indictment.

## IV. The Court Should Also Deny the Motion Because of the Passage of Time and the Prejudice to the Government

In addition, the Court should deny Morton's motion because of the passage of time between the entry of Morton's plea and her motion to withdraw that plea and because of the significant prejudice to the Government resulting from events that transpired during that time.

First, Morton's attempt to withdraw her plea is undermined by the fact that more than two months elapsed between the Plea Proceeding and the instant motion, and she only filed the instant motion *after* the Court ordered her to do so by a date certain. That Morton filed an *ex parte* letter with the Court stating that she intended to seek to withdraw her plea on June 14, 2018 – more than four weeks after the Plea Proceeding – does not alter that analysis. Morton's purported basis for withdrawing her plea existed as of May 18 when she claims to have "snapped out of her deluded state." But even if that self-serving assertion were true, Morton's decision to delay for more than four weeks prior to raising the issue at all and more than two months to make the instant motion is inexplicable. This is too long a period to support a claim that the plea was made in haste or confusion. *See United States* v. *Spencer*, 836 F.2d 236, 239 (6th Cir. 1987) (five weeks too long), *cert. denied*, 486 U.S. 1009 (1988); *United States* v. *Carr*, 740 F.2d 339,

345 (5th Cir. 1984), *cert. denied*, 471 U.S. 1004 (1985) (twenty-two days too long); *Nunez Cordero* v. *United States*, 533 F.2d 723, 726 (1st Cir. 1976) (two weeks too long).

Second, and relatedly, there is no question that the Government has been prejudiced here. Morton wants the Court to believe that her fugue state lasted *just* long enough for her to avoid being tried with her co-defendants – a back door way to obtain unwarranted severance if ever there were one. Morton has now been in possession of the Government's exhibits and 3500 materials for months. She has had the benefit of watching the Government put on its case-in-chief and make its jury addresses. The sixteen witnesses called by the Government, including the WLCC victims and pension fund victims, and various percipient witnesses to Morton's participation in the fraudulent scheme, have already been subject to hours, if not days, of testimony and cross-examination and Morton has been permitted a full preview of the Government's trial strategy.

Permitting Morton to withdraw her plea under such circumstances would be grossly improper and would provide a template for future fraudsters willing to lie to the Court in order to get a preview of the Government's case. Even by her own claim, Morton had a change of heart two days after the Plea Proceeding and *prior to the inception of trial*. Morton could have raised this issue prior to trial and – if a motion to withdraw her plea was granted – could have proceeded to trial with her co-defendants. But Morton explicitly chose not to do so in an effort to both benefit from a preview of the Government's case and to obtain the severance the Court had already denied. That kind of gamesmanship cannot be rewarded.

Morton's claim that the trial against Morton's co-defendants gave the Government the *advantage* of a "dress rehearsal" is embarrassing (Morton Mem. at 18). No trial lawyer could suggest with a straight face that a three-defendant, six-week long criminal trial involving months

of preparation and six weeks of witnesses could be seen as a helpful "dress rehearsal" for another criminal trial – especially one where the defendant would have the benefit of hundreds of pages of sworn statements of the Government's witnesses as grist for cross.  To retry this case against a defendant who has, under oath, admitted her guilt would not be a matter of mere inconvenience. It would be enormously prejudicial to the Government, the witnesses, and a waste of the time and resources of the Court.  Thus, the Second Circuit has repeatedly held that "[t]he standard for withdrawing a guilty plea is stringent because society has a strong interest in the finality of guilty pleas, and allowing withdrawal of pleas not only undermines confidence in the integrity of our judicial procedures, but also increases the volume of judicial work, and delays and impairs the orderly administration of justice."  *United States* v. *Rose*, 891 F.3d 82, 85 (2d Cir. 2018) (citing *Schmidt*, 373 F.3d at 103 (internal quotation marks omitted)).

Accordingly, the Court should also deny Morton's motion to withdraw because of the passage of time and the prejudice to the Government from allowing Morton to proceed to trial after the trial against her co-defendants – a trial that, absent her guilty plea, she would have been present for – has already concluded.

## <u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully submits that the defendant's

motion to withdraw her plea should be denied.

Dated: New York, New York
July 30, 2018

Respectfully submitted,

ROBERT KHUZAMI
Attorney for the United States, Acting Under
Authority Conferred by 28 U.S.C. § 515

By:       _____/s_____
Rebecca Mermelstein
Brendan F. Quigley
Negar Tekeei
Assistant United States Attorneys
Tel.:  (212) 637-2360/2190/2482