UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

———————————————————————x

UNITED STATES OF AMERICA

v.

BEVAN COONEY

                    No. 16 Crim. 371 (RA)

Defendant.

———————————————————————x


**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT**
**OF MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO RULE 29**
**AND MOTION FOR A NEW TRIAL PURSUANT TO RULE 33 OF THE**
**FEDERAL RULES OF CRIMINAL PROCEDURE**


The Law Office of Paula J. Notari
125 Park Avenue, 8th Floor
New York, New York 100197
Tel.: (646) 943-2172

Abraham J. Hassen
O'NEILL / HASSEN
25 Eighth Ave, Suite C
Brooklyn, New York 11217

*Attorneys for Bevan Cooney*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT………………………………………………………………1

STATEMENT OF FACTS…………………………………………………………………….2

ARGUMENT…………………………………………………………………………………..10

I.    A JUDGMENT OF ACQUITTAL MUST BE ENTERED FOR
DEFENDANT PURSUANT TO RULE 29 BECAUSE THE EVIDENCE
AT TRIAL WAS INSUFFICIENT FOR CONVICTION ................................................ 11

      1.    Standard of Review Rule 29……………………………………………………..11
      2.    Governing Principles……………………………………………………………12
      3.    Conspiracy ……………………………………………………………………12
      4.    Securities Fraud…………………………………………………………………14

          A.  The Government Failed to Prove Count 2, That Defendant Committed
          Securities Fraud Because It Failed to Prove that he Committed, or Willfully Aided others
          in committing, securities fraud............................................................................. 16

          B.  The Government Failed to Prove That Defendant Committed
          Securities Fraud Because It Failed to Prove an Intent to Deceive ........................ 22

                  i.    The Evidence of Defendant's Good Faith Belief
                      in the Legality of His Conduct Was
                      Overwhelming In Light of the Openess of His
                      Conduct …………………………………………23

          C.  The Evidence in Support of Count 1, Alleging Conspiracy to
             Commit Securities Fraud under 18 U.S.C. §§ 371, With Intent
             to Violate 15 U.S.C. §§78j (b) and 78ff, Was Legally
             Insufficient to Warrant Consideration by the Jury ……….25

II.    PURSUANT TO RULE 33, DEFENDANT'S CONVICTION MUST BE
VACATED AND A NEW TRIAL ORDERED IN THE INTEREST OF
JUSTICE ……………………………………….......................................29
      A. A new trial is warranted due to the prejudicial spillover resulting from the  trial of
         John Galanis and Mr. Cooney particularly in light of the Court's ruling to allow the
         government to re-open evidence against John Galanis after Galanis's attorney
         opened the door to substantially prejudicial 404(b) evidence during summations
         …………………………………………………………………………………..30

      B. Other Errors at trial deprived Mr. Cooney of his rights to a fair trial and thus warrant a new
         trial……………………………………………………………………………..36

III.    CONCLUSION…………………………………………………………………….40

## PRELIMINARY STATEMENT

Defendant respectfully submits this Memorandum of Law in support of his motions for a judgment of acquittal pursuant to F.R.Crim.P. 29 and a new trial pursuant to F.R.Crim.P. 33. Defendant asserts that a judgment of acquittal must be entered pursuant to Rule 29 because the evidence at trial was insufficient to convict him of securities fraud. Defendant also submits that the verdict must be vacated and a new trial granted pursuant to Rule 33 in the interest of justice because evidentiary errors at trial deprived him of a fair trial.

During this five-week trial, the government failed to introduce evidence necessary to satisfy its burden of proof for Counts One and Two. The Court should also grant Bevan Cooney a new trial. First, the allegations, charging documents, and trial evidence all showed two distinct conspiracies. Mr. Cooney was deprived of a fair trial due to the prejudicial spillover resulting from the joint trial of John Galanis, particularly in light of the fact that the court ruled during closing arguments that Mr. Galanis's attorney opened the door to evidence which had been previously excluded namely that John Galanis had been convicted in a similar fraud (the Gerova fraud). A new trial is further warranted due to the court's failure to provide a multiple conspiracies instruction to stem the "spill over effect" of permitting testimony regarding one conspiracy to prejudice the mind of the jury against the defendant who is not part of that conspiracy." *United States v. Harris*, 8 F.3d 943, 947 (2d Cir. 1993). This evidence was profoundly prejudicial against Mr. Cooney given the scant evidence against Mr. Cooney. There was no evidence at trial that Mr. Cooney was anything more than a passive investor who purchased the WLCC bond. Both government cooperators testified that they had limited contact with Mr. Cooney and that they never spoke to Mr. Cooney about the WLCC bond, other than an unrelated phone call which was purely intended to distract the jury and further prejudice Mr. Cooney. The government's only evidence against Mr. Cooney focused on (1) innocuous statements Mr. Cooney made-- primarily on email threads that he was cc'd on

cheering on his business partners  (2) other act evidence which should have been excluded and (3) testimony from two different cooperators-- who never spoke to Mr. Cooney about the WLCC bond and barely communicated with Mr. Cooney—that Mr. Cooney and Jason Galanis were "childhood friends" who referred to each other as "best friends" and (4)  testimony over the objection of counsel that Cooney allegedly contacted Francisco Martin to notify him that Jason Galanis had been arrested in September 2015 on charges not related to the WLCC bond. To further exacerbate the prejudice, in a case where there was scant evidence,  during summations the government was allowed to re-open evidence and the jury was left with the belief—albeit mistaken belief-- that Mr. Cooney must have known that John Galanis, the father of his "best friend" had been previously convicted of fraud and therefore Cooney must have knowingly participated in the instant securities fraud which is simply not the case (Mr. Cooney's defense would have been radically different if the issue of Galanis' family convictions had been present from the beginning).  The government was able to bypass their burden of production by confusing the jury with "other act" evidence which was unrelated to the instant charges and resulted in substantial prejudice against Mr. Cooney that was irreparable.

**STATEMENT OF FACTS**

The evidence at trial in this case involved two fundamentally different schemes, one involving the takeover of investment advisers and criminal breaches of fiduciary duty, and another involving the misappropriation of WLCC bond proceeds.  In the first, Jason Galanis, Gary Hirst, and Michelle Morton took over two investment advisers (collectively, "Atlantic Asset Management," "AAM," or the "Investment Advisers").  *See* Tr. 2036-39.   The evidence involved numerous individuals, entities, accounts, and victims. The subject matter of the evidence included bond underwriting practices, investment advice, fiduciary duties and conflicts of interest, annuities, bond placement, brokerage services, insurance, and other financial services.  Although the bonds were allegedly supposed to be sold

through a placement agent at which Hugh Dunkerley was employed, Tr. 1039-40, more than $43 million of the bonds were instead allegedly moved into customer accounts of AAM. *Tr. 1038-39.* In doing so, the evidence showed that, Morton and Hirst purchased the bonds in AAM client accounts without the knowledge of those clients and in violation of the client investment parameters. Tr. 1685. In addition, Morton and Hirst failed to disclose numerous conflicts to their AAM clients, including that Dunkerley, Hirst, and Jason Galanis were each involved in numerous entities that had different and allegedly inconsistent obligations with respect to the bonds. Tr. 742, 1682.

In the second scheme, the proceeds of the WLCC bonds were allegedly misappropriated, principally by Jason Galanis, Hugh Dunkerley, and Gary Hirst. The evidence showed that rather than invest the bond proceeds as promised, the money was instead routed to an account controlled by Hirst and Dunkerley, where it was misappropriated. Tr. 1022, 1310. According to the government's evidence at trial, bond proceeds were transferred to accounts controlled by Jason and John Galanis, and Jason Galanis then transferred some of that money, through layers of intermediaries, to pay his own expenses (including his legal fees in connection with defending himself against allegations of a prior fraud) and advance his own business interests, as well as to accounts associated with Hirst, John Galanis, Bevan Cooney, and Mr. Archer. Tr. 2953-60.

Mr. Cooney was merely a downstream recipient of some of the allegedly misappropriated money, which was transferred to him via intermediaries, in the second scheme. *Id.* The government presented no evidence that Mr. Cooney had any involvement in the first scheme at all, and he was not charged in Counts Three or Four of the Indictment, which allege conspiracy to commit investment adviser fraud and substantive investment adviser fraud (without this actual fraud, it is unclear from the trial evidence that the remaining scheme was even illegal). Indeed, there was no evidence that Mr. Cooney had anything at all to do with the fraud at AAM. There was no evidence that Mr. Cooney had any contact with the WLCC,

or to have been aware of any representations allegedly made to the WLCC by Jason or John Galanis, or by anyone else.  There was no evidence presented at trial that Mr. Cooney had any contact with AAM's clients, or to have been aware of any representations allegedly made to those customers by Hirst, Morton, Jason Galanis, or by anyone else.  The government presented no evidence at trial that Mr. Cooney was aware of the existence of any alleged conflicts at AAM, let alone the fact that they were undisclosed to AAM's clients.

Rather, the evidence at trial against Mr. Cooney was of an entirely different character, because he had absolutely no operational involvement with either the alleged fraud or the underlying businesses. Accordingly, the evidence confirmed that Mr. Cooney had no role in the operations of the investment advisers or underwriters for the WLCC bond.  There was no evidence introduced at trial and the government did not contend that Mr. Cooney played any role other than being an investor. Indeed, the primary allegation against Mr. Cooney is that he was an investor who purchased $5 million of Wakpanmi bonds from the second tranche of bonds and that he later transferred these bonds to Bonwick Capital – another entity involved in the financial roll-up.  *See*, e.g.,Tr. at 158, 222.  The single instance of active conduct alleged on the part of Mr. Cooney was that he was an investor with a small ownership interest in Burnham, the placement agent of the WLCC bond, and that he purchased some of the WLCC bonds using funds lent to him by Jason Galanis.  (Tr. 3121)

Although the evidence showed that the funds that Jason Galanis transferred to Mr. Cooney, which he in turn used to purchase the bonds, had been misappropriated from earlier WLCC bond issuances, there was no evidence that Mr. Cooney had any knowledge of the source of the funds that he allegedly used to purchase the bonds.  On the contrary, the evidence confirmed that Jason Galanis directed interest payments to be made on the bonds – including those bond issuances that had allegedly been purchased in whole by Mr. Cooney – presumably to lull the bondholders (including Mr. Cooney) into believing that

the bonds were being handled appropriately.  Tr. 2392, 2969.   The government's arguments at trial that Mr. Cooney knew that the money he used to purchase the WLCC bond was "recycled" from the original issuance – was not supported by any evidence beyond mere conjecture.   The government's lead cooperating witness Hugh Dunkerly testified that Jason Galanis lied to him about several aspects of the WLCC bond scheme.  *See* e.g. Tr. 1310.  And that he had no reason to know, for example that the 15 million dollars that was used to purchase the second tranche of WLCC bonds was recycled money from Wealth Assurance Private Clients.  Tr. 1311- 1312. Dunkerly testified that he only became aware where the money came from after he was arrested and he began reading the complaint and he participated in post arrest meetings with the government. *Id.*   Dunkerly testified with certainty that when he first became involved with the WLCC bond, as far as he knew there was "nothing improper about the bond," and he agreed that there was no discussion about misappropriating the bond proceeds (Q: certainly there was no discussion of misappropriating the bond proceeds? A: Absolutely not) (Tr: 1425:1-11).

Mr. Cooney and his trial defendants were only charged in one conspiracy; they were not charged in the conspiracy with investment adviser fraud.  The evidence is undisputed that Mr. Cooney was a member of a group of investors involved in efforts to create a financial services conglomerate which was referenced throughout the trial as a "financial roll up" and that Mr. Cooney by virtue of his investment in Burnham had a small ownership interest in the placement agent.  Tr. 907, 1174-75.  The government ignored testimony by their chief cooperator Hugh Dunkerly that there were many investors involved in the financial roll up and as they took over companies administrators of all these companies  became involved, CEO, CFOs also became involved in the plan. Tr. 1174.   Dunkerly testified that numerous companies were acquired and part of the roll-up strategy including: Burnham Securities, Burnham Asset Management, Valor Life, Atlantic Asset Management, Hughes Capital Management, Fondinvest Capital, Bonwick Capital.  Tr. 1324: 18-24.  He agreed that these companies were all real, entirely legitimate and

collectively managed billions of dollars.  Tr. 1324.

   The Government's arguments at trial, that the WLCC bond from its inception was a sham ignored the testimony of Tim Anderson the lawyer from the highly acclaimed law firm Dilworth Paxson representing Burnham Securities the placement agent of the WLCC bond.  Mr.  Anderson testified over the course of multiple days that the WLCC bond that he worked to put together as the lawyer representing Burnham was legal. Tr. 625-26.  Mr. Anderson did not suspect anything untoward about the bond until the SEC started investigating the bond way down the line in late 2015, almost a year after Mr. Cooney purchased the WLCC bond. Tr. 521-22; 557.  Mr. Anderson testified that he performed his due diligence as the lawyer in this case and that he had no problem with Jason Galanis' involvement in putting the bond together. Tr. 625.  Mr. Anderson testified that he also performed his due diligence as to the annuity and that Wealth Assurance appeared to be a real company with large assets and that there was nothing unusual or wrong about these kinds of tribal bonds being unrated. Tr. 534-35.  Mr. Anderson had previously been the lawyer –in similar tribal bonds- 5 to 10 times – and there was nothing wrong with the WLCC bond. Tr. 144, 536, 568.  The evidence at trial was undisputed that Mr. Cooney was not part of the team that put the WLCC bond together and that Mr. Cooney was just an investor. Mr. Cooney purchased $5 million of Wakpanmi bonds from the second tranche of bonds and Mr. Cooney later transferred these bonds to Bonwick – another entity involved in the roll-up.  Tr. 626-627, 620-21.  The evidence was undisputed at trial that there was nothing illegal about Mr. Cooney's transfer of the bonds to Bonwick Capital.  Although the government argued in their opening statement that Mr. Cooney was from the beginning involved in a scam (Tr. 52), Tim Anderson agreed that Mr. Cooney was not initially presented as an investor to purchase the WLCC bond but rather he was the back-up investor because the original investor for the second tranche of 5 million tranche fell out; Mr. Anderson first learned that Cooney was going to purchase the second tranche of bonds the day before he signed the initial paper work to qualify as an investor known

as a "Big Boy" letter.  Tr. at 222; 588-92, GX 1270, GX1272.  Anderson testified that he communicated with Cooney on two occasions; once to confirm his receipt of the investor letter and a second time to confirm his contact information for the physical bond.  Tr. at 230-31.  Anderson testified that he never called Mr. Cooney (Tr. 573) on the phone and he never met him in person. (Tr. 567-68) The information that Anderson received to qualify Mr. Cooney as an investor came from Jason Galanis, not Mr. Cooney. (Q: Mr. Cooney as far as you called him a sophisticated investor, that information came from Jason Galanis, correct? A: That came, the information related to Bevan Cooney came from Jason Galanis) (Tr. 589).

The government argued at trial that Mr. Cooney separately misappropriated $3,895,000 from the bond proceeds by funneling money through a sham transaction involving the purported purchase of 1920 Bel Air which was in fact, Jason Galanis's primary residence.  (Tr. 3646)   Here again the government ignored the testimony of their lead cooperating witness Hugh Dunkerly who corroborated Mr. Cooney's defense that $3,895,000 was wired into Mr. Cooney's Citi National Bank account on November 12, 2014 and wired out the very next day because Mr. Cooney intended to purchase 1920 Bel Air, obtain a lower interest rate, continue to make home improvements and to later sell the property at a profit.  The trial evidence in this case and the discovery were replete with documents which corroborated Mr. Cooney's sincere belief that he had no reason to believe that the 3.8 million dollars that was wired to him were proceeds from the WLCC bond.  *See e.g.,*DX3235, DX3056(a), GX, 2255, DX3062, GX3272)

The government further argued that Mr. Cooney used his purported ownership of the $5 million of Wakpamni bonds to fraudulently obtain a $1.2 million loan from City National Bank.  This argument was entirely refuted by the trial testimony.  The government ignores the documentary evidence admitted at trial and the testimony of Steven Shapiro-- Mr. Cooney's personal CNB banker that Mr. Cooney had a longstanding relationship with Citi National Bank; the evidence was undisputed that Citi National Bank

and Fulton Management were involved in every aspect of Mr. Cooney's WLCC bonds from the time he purchased them. See e.g. DX3514(a), GX402, GX3215, DX3530, DX3520, GX410, GX412, DX3162(b), Tr. at 602-604.  Mr. Cooney's business managers at Fulton Management were involved in every aspect of applying for his CNB loans. Steve Shapiro testified glowingly about his longstanding relationship with Fulton Management and Matthew Fillman (solid working relationship and friendship for 17 years), one of Mr. Cooney's business managers who directly negotiated Mr. Cooney's 1.2 million dollar loan. Tr. 1797. Steve Shapiro testified that prior to the 1.2 million dollar loan being classified as delinquent he communicated almost exclusively with Mr. Cooney's business managers from Fulton.  Tr. 1789.

Based on the trial evidence, Matthew Fillman was Mr. Cooney's authorized agent who was authorized to speak to Citi National Bank on behalf of Mr. Cooney to get him a loan.  Tr. 1731: 22-24. Mr. Cooney consistently surrounded himself with professionals to assist him.  He paid his business managers at Fulton Management, including Matthew Fillman to negotiate  a bank loan and to work out the details. Tr. 1731.

The evidence admitted at trial shows that Fulton Management submitted a financial statement to CNB on Mr. Cooney's behalf in February 2015 for a $100,000 line of credit. See GX405. In that application, Fulton Management submitted a financial statement on behalf of Mr. Cooney and corroborating records verifying that he owned $1.95 million of Flikmedia (FLKM) stock, in addition to $5 million of Wakpamni bonds. *See* GX 405; Tr. at 1768.  At that time, CNB granted Mr. Cooney a $100,000 line of credit. Tr. 1762; DX3755. Certainly, CNB had a full grasp of every aspect of Mr. Cooney's financial portfolio and his assets. Steve Shapiro did not dispute that he was Mr. Cooney's own personal banker. Tr. at 1770.  CNB handled the majority of Mr. Cooney's assets and they certainly handled significant aspects of Mr. Cooney's transactions concerning the instant charges. For example, the money Mr. Cooney obtained to purchase the 5 million tranche of the WLCC bonds was wired into his

CNB account. See, DX3252; GX432; GX522. The WLCC bonds were then physically delivered to the securities division of CNB. GX 403. Mr. Cooney's Code Rebel Stock was also deposited in an account with CNB Securities Bank.  Tr. 1754-55; DX 3580. Mr. Cooney also had additional business accounts with CNB for other entities that he managed.  *Id*.  Mr. Cooney had previously been granted loans from CNB including a $200,000.00 loan, which did not end up in delinquent status; at the time Mr. Cooney applied for the 100k loan and the 1.2 million dollar loan in 2015, he was considered by CNB to be a customer in good standing and to have good credit.  See Tr. at 1755-56, 1784-85.

The government's allegation that CNB was somehow misled or told false facts is not supported by the trial evidence and belies common sense. Mr. Cooney relied upon his authorized money managers, Tr. 1731: 22-24, and every aspect of his finances were disclosed to both Fulton Management and CNB bank. See e.g. DX3514(a), GX402, GX3215, DX3530, DX3520, GX410, GX412, DX3162(b). Even assuming *arguendo* that there was some evidence that an updated financial statement was not prepared after Mr. Cooney transferred his WLCC bond to Bonwick Capital in May of 2015, certainly the evidence is overwhelming that Mr. Cooney fully disclosed to Fulton and CNB that he had transferred his WLCC bond.  The Court may recall the evidence that on two prior occasions in April (GX410) and May of 2015 (GX412), Steven Shapiro personally participated in signing the official documents that transferred Mr. Cooney's bond power to Bonwick Capital. See DX3162(b).  This event(s) was referenced throughout the trial proceedings as "medallion guarantee" which is a legal requirement that an individual's signature is guaranteed with a notarized stamp when they are transferring their bond power.  (Tr. 1766-70, 1794-96)

In January 2015, CNB having reviewed Mr. Cooney's financial situation (including the WLCC bond), decided it would issue Mr. Cooney a $100,000 line of credit. However, by June 2015, Mr. Cooney's financial situation changed: the value of his Code Rebel Stock had increased to $11,976,900 million. See GX 411, Tr. 1778, 1781-82.  Based on the value of Cooney's Code Rebel stock, which had

increased to almost $12 million, and despite CNB also being told that Cooney could not immediately sell this stock until a later date, CNB extended Mr. Cooney a $1.2 million promissory note in June 2015, for a period of six months becoming due on January 1, 2016. *See* GX 414. Tr. 1786-87.  Steve Shapiro testified that at no time did he or Mr. Cooney's authorized representative from Fulton Management require that Mr. Cooney fill out a new financial statement but rather they relied upon the financial statement that Mr. Cooney's representative sent to CNB bank in January of 2015. Tr. 1786-88.  The evidence is undisputed that every aspect of this 1.2 million dollar loan from the moment it was negotiated until well after it was in delinquent status was handled by Mr. Cooney's authorized representatives from Futon Management. Even after Mr. Cooney was delinquent on his loan, he cooperated with CNB bank and his representatives from Fulton Management; he personally met with them and he consistently corresponded with them to attempt to make re-payment on the loan. Tr. 1789-1804.  Steve Shapiro testified that prior to the 1.2 million dollar loan being classified as delinquent he communicated almost exclusively with Mr. Cooney's business managers from Fulton but eventually he began directly communicating with Mr. Cooney as well.  Tr. 1789.  Shapiro confirmed that in October of 2016, Mr. Cooney successfully re-negotiated new terms of his delinquent loan and in good faith, Mr. Cooney made payments of approximately $90,000 towards repayment of his loan.  Tr.1803-1804.

## ARGUMENT

**I.    A JUDGMENT OF ACQUITTAL MUST BE ENTERED FOR DEFENDANT PURSUANT TO RULE 29 BECAUSE THE EVIDENCE AT TRIAL WAS INSUFFICIENT FOR CONVICTION**

This Court must enter a judgment of acquittal for defendant because insufficient evidence was submitted at trial for a jury to conclude beyond a reasonable doubt that Mr. Cooney committed securities fraud.

## 1.      Rule 29 Standard

"[I]n our system . . . the application of the beyond-a-reasonable-doubt standard to the evidence is not irretrievably committed to jury discretion." *Jackson v. Virginia*, 443 U.S. 307, 317 n.10 (1979). The Constitution prohibits a jury from convicting a defendant if no reasonable jury could have found each element of the charged offense to have been proven beyond a reasonable doubt. *Id.* at 319.  Although the jury is "permitted to enter an . . . unreasonable verdict of 'not guilty,'" it does not have the "power to enter an unreasonable verdict of guilty." *Id.* at 317 n.10 (citing *United Bhd. of Carpenters & Joiners of Am. v. United States*, 330 U.S. 395, 408 (1947)).

To safeguard that bedrock constitutional guarantee, Rule 29(a) provides that "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). While the Court must draw all reasonable inferences in the government's favor, *United States v. Josephberg*, 562 F.3d 478, 487 (2d Cir. 2009), the Court is nonetheless "obligated to 'consider the evidence presented at trial in its totality, not in isolation.'" *United States v. Kapelioujnyj*, 547 F.3d 149, 154 (2d Cir. 2008) (quoting *United States v. Zhou*, 428 F.3d 361, 369–70 (2d Cir. 2005)). "If the evidence is such that reasonable jur[ors] must necessarily have . . . a [reasonable] doubt, the judge must require acquittal, because no other result is permissible within the fixed bounds of jury consideration." *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972). If the evidence "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Coplan*, 703 F.3d 46, 69 (2d Cir. 2012). Accordingly, where the evidence is "in equipoise," a judgment of acquittal is required. *Id.* This requirement is designed

to ensure that the jury does not convict merely because it determines that "'the defendant is **probably** guilty.'" *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015) (quoting *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008)) (emphasis in original). In other words, "where the evidence viewed in the light most favorable to the government is 'at least as consistent with innocence as with guilt,' the Government has not met its burden" of proving the charged crime beyond a reasonable doubt. *United States v. Valle*, 301 F.R.D. 53, 97 (S.D.N.Y. 2014) (quoting *United States v. D'Amato,* 39 F.3d 1249, 1256 (2d Cir. 1994)), *aff'd in part, rev'd in part on other grounds*, 807 F.3d 508 (2d Cir. 2015) (quoting *United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir. 1991)).

Here the defendant meets his Rule 29 burden because the government failed at trial to prove his guilt beyond a reasonable doubt. "'[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" *Glenn*, 312 F.3d at 64 (citing *In re Winship*, 397 U.S. 358, 364 (1970). "Winship emphasized that the reasonable doubt standard 'is a prime instrument for reducing the risk of convictions resting on factual error [and] provides concrete substance for the presumption of innocence – that bedrock "axiomatic and elementary" principle whose "enforcement lies at the foundation of the administration of our criminal law."'" *Glenn*, 312 F.3d at 64(citations omitted). "Because the 'Fifth Amendment requirement of proof beyond a reasonable doubt and the Sixth Amendment requirement of a jury verdict are interrelated,' the Constitution requires a jury verdict of guilty beyond a reasonable doubt." Id.

## A.     Governing Principles

### 1.     Conspiracy

It is of course well settled that "under established case law, the fundamental

characteristic of a conspiracy is a joint commitment to an 'endeavor which, if completed, would satisfy all of the elements of [the underlying substantive] criminal offense.'" *Ocasio v. United States*, 136 S. Ct. 1423, 1429 (2016) (quoting *Salinas v. United States,* 522 U.S. 52, 65 (1997) (additional citations omitted). Otherwise stated, "[c]onspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act. The conspirators must agree to commit an object crime." *United States v. Wexler*, 522 F.3d 194, 207 (2d Cir. 2008) (citing *Iannelli v. United States,* 420 U.S. 770, 777 (1975) and *United States v. Rosenblatt,* 554 F.2d 36, 38 (2d Cir. 1977). "The prohibition against criminal conspiracy, however, does not punish mere thought; the criminal agreement itself is the *actus reus.*" *United States v. Shabani*, 513 U.S. 10, 16 (1994) (citation omitted).

From the standpoint of establishing a legally sufficient case, "[i]n order to prove a single conspiracy, the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal. The coconspirators need not have agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan." *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001) (quoting *United States v. Maldonado-Rivera,* 922 F.2d 934, 963 [2d Cir.1990] [internal quotations and citations omitted]). Thus, "it is a long-standing principle of [the] law of conspiracy that '[n]obody is liable in conspiracy except for the fair import of the concerted purpose or agreement as he understands it; if later comers change that, he is not liable for the change; his liability is limited to the common purposes while he remains in it.'" *McDermott*, *supra* (quoting *United States v. Peoni,* 100 F.2d 401, 403 (2d Cir.1938)).

The Second Circuit has "taken a bilateral approach to the crime of conspiracy: at least two people must agree. 'When one of two persons merely pretends to agree, the other party, whatever he may believe, is in fact not conspiring with anyone.'" *United States v. Valle*, 807 F.3d 508, 522–23 (2d Cir. 2015) (*quoting United States v. Bicaksiz,* 194 F.3d 390, 398 (2d Cir.1999)). Because a bilateral

agreement is the essence of a conspiracy, "[i]t is axiomatic that more is required than mere knowledge of the purpose of a conspiracy." *United States v. Hawkins*, 547 F.3d 66, 74 (2d Cir. 2008) (*citing Direct Sales Co. v. United States*, 319 U.S. 703, 711-13 (1943); *United States v. Ceballos,* 340 F.3d 115, 124 (2d Cir. 2003)). Moreover, although not requiring any more, a conspiracy to commit a substantive offense "cannot exist without at least the degree of criminal intent necessary for the substantive offense itself[.]" *United States v. Allen*, 788 F.3d 61, 70 (2d Cir. 2015) (citing *Ingram v. United States,* 360 U.S. 672, 678 (1959) (internal quotation marks omitted) and *United States v. Feola*, 420 U.S. 671 (1975)).

2.    <u>Securities Fraud</u>

The statute which was charged as the object of the alleged conspiracy under 18 U.S.C. § 371 was 15 U.S.C.A. § 78j (b) (entitled "manipulative and deceptive devices."). That section states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange–
>
> ***
>
> (b)    To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

In turn, the referenced rule of the Securities and Exchange Commission that underscored the theory of this count is codified at 17 C.F.R. § 240.10b-5 ("Rule 10b-5"). That provision states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

14

(a)     To  employ  any  device,  scheme,  or  artifice  to  defraud,

(b)     To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c)     To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

The elements in security fraud cases are well settled. "Liability for securities fraud requires proof that the defendant acted with scienter, which is defined as 'a mental state embracing intent to deceive, manipulate or defraud.'" *United States v. Litvak*, 808 F.3d 160, 178 (2d Cir. 2015) (quoting *United States v. Newman,* 773 F.3d 438, 447 (2d Cir.2014) (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12 (1976)), *abrogated on other grounds*, *Salman v. United States*, 137 S. Ct. 420 (2016)]). *See also S.E.C. v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012). On the other hand, the operative *actus reus* is obviously the use of "any manipulative or deceptive device or contrivance" in furtherance of contravening the cited SEC rule.

With regard to the requisite *scienter,* "[i]n the context of other securities laws, the language 'fraudulent, deceptive, or manipulative' has been construed to reach conduct motivated by either intent to defraud *or* intent to deceive." *United States v. Tagliaferri*, 820 F.3d 568, 574 (2d Cir. 2016) (citing *Schreiber v. Burlington N., Inc.,* 472 U.S. 1, 12 (1985) and quoting *Ernst & Ernst*, 425 U.S. at 199, for the proposition that "['Manipulative'] connotes intentional or willful conduct designed to *deceive or defraud* investors by controlling or artificially affecting the price of securities") (emphasis supplied by *Tagliaferri* court).

In turn, as to "wilful," "'[w]hen used in a criminal statute, it generally means an act done with a bad purpose.'" *Tagliaferri*, 820 F.3d at 573 (quoting *Screws v. United States,* 325 U.S. 91, 101 (1945) (internal quotation marks omitted) and *Bryan v. United States,* 524 U.S. 184, 191 (1998)

(holding that "willfully" requires only "that the defendant acted with knowledge that his conduct was unlawful." (internal quotation marks omitted)). Thus, the Second Circuit "has held in contexts similar to this one that to prove willfulness, 'the prosecution need only establish a realization on the defendant's part that he was doing a wrongful act.'" *Tagliaferri*, 820 F.3d at 573 (quoting *United States v. Dixon,* 536 F.2d 1388, 1395 (2d Cir.1976) (Friendly, J.) (internal quotation marks omitted); and citing *United States v. Kaiser,* 609 F.3d 556, 567-70 (2d Cir. 2010)).

In furtherance of any such alleged scheme, "[a] fraudulent statement made in violation of section 10(b) must therefore be a statement made 'in connection with the purchase or sale of any security.'" *United States v. Kelley*, 551 F.3d 171, 175 (2d Cir. 2009). Moreover, "once full and fair disclosure has occurred, the fairness of the terms of the transaction is at most a tangential concern of the statute." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 478 (1977) (citing *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 381-85 (1970)).

A.   **The Government Failed to Prove That Mr. Cooney Committed Securities Fraud Because It Failed to Prove that he committed, or willfully aided others in committing, securities fraud.**

In order to survive a motion pursuant to Rule 29, the evidence viewed in the light most favorable to the government must prove beyond a reasonable doubt that the defendant had in fact committed a deceptive or misleading act.  The evidence at trial failed to meet this burden.

Count Two of the Indictment, which charges all three trial defendants with substantive securities fraud, should be dismissed as against Mr. Cooney because the government failed to prove that Mr. Cooney committed, or willfully aided others in committing, securities fraud.  In particular, the government failed to prove any misleading statement or omission made by Mr. Cooney in connection with the purchase or sale of securities, and the government failed to identify any allegedly manipulative device or artifice to defraud employed by Mr. Cooney.

The evidence in this case did not prove that Mr. Cooney took any steps to misappropriate bond proceeds; at best it alleges that he was a passive recipient of some of those proceeds. The government presented no evidence that Mr. Cooney had any knowledge of the fact that there was no secondary market for the bonds, or that there were "multiple conflicts of interest," or that investment into the bonds was "outside the investment parameters" of certain AAM clients. There was also no evidence that Mr. Cooney had any interaction with AAM or its clients at all (other than a passive ownership interest), or that he was aware of any representations made to them – let alone that he made those misrepresentations himself, or somehow aided and abetted them. *See* Trial Tr. 507-508, 587-89, 613-614

As will be detailed below, the acts alleged by Mr. Cooney, none of them can fairly be said to be part of the substantive securities fraud alleged in Count Two, and in fact many of the allegations related to Mr. Cooney are entirely innocent. The only two cooperators who knew Mr. Cooney testified that they had knowledge of Jason Galanis' fraud but they both initially believed that WLCC bond was legal from its inception and they never spoke to Mr. Cooney about the WLCC bond. [1]

The government's evidence -- dozens of innocuous email threads, most of which Mr. Cooney is merely cc'd on—emails from Jason Galanis to Mr. Cooney and others about being kept "apprised" of lawful developments concerning the acquisition of a business, or being "well aware" that the bonds might be lawfully sold to certain investors – cannot suffice to prove a securities fraud charge beyond a reasonable doubt. The three allegations of affirmative conduct on Mr. Cooney's part,

---

[1] Francisco Martin testified that he met with the government for more than 2 years and that he did not recall when he began telling the government the truth. Tr. 2228. He attempted to present evidence that Mr. Cooney contacted him in September of 2015 to notify him that Jason Galanis had been arrested in the Gerova fraud. Tr. 2176-77. Martin admitted on cross-examination that he only spoke to Jason Galanis, Hugh Dunkerly and Gary Hirst about the WLCC bond. Tr. 2328.

meanwhile, cannot constitute a substantive securities fraud as a matter of law, and certainly are not part of the fraud alleged in Count Two.

•    First, even assuming arguendo that Mr. Cooney lied to CNB bank in his financial statement to obtain a 1.2 million dollar loan, this alleged misrepresentation does not constitute a statement or omission in connection with "the purchase or sale of any security," 15 U.S.C. § 78(b)— the securities here being the bonds issued by the WLCC, and acquired by the clients of the Investment Advisers. The Placement Agent allegedly contracted with the WLCC to solicit investors for the bonds. In the light most favorable to the government, the alleged misrepresentation by Mr. Cooney was "to representatives of CNB bank" who were neither the issuer nor purchaser of the bonds, nor the entity responsible for locating investors in the bonds.

•    Second, evidence that Mr. Cooney personally acquired the entirety of the second bond issuance, along with Mr. Archer. This is the sole "purchase or sale of any security" in which Mr. Cooney was allegedly personally involved, 15 U.S.C. § 78j(b), but there is nothing allegedly fraudulent about it.  Rather, according to the evidence at trial, Mr. Cooney purchased the entirety of the "second bond issuance" for fair market value.  Tim Anderson, one of the lawyers from Dilworth Paxson representing the placement agents, testified over multiple days that there was nothing out of the ordinary about the bond and that it was legal. Tr. 625-26.  He also testified that that Mr. Cooney was duly qualified as an individual investor and that there was nothing unusual about his purchase of the WLCC bond. Tr. 587, 589-90,  Thus, the bonds that Mr. Cooney allegedly purchased were not foisted upon AAM investors, who were in no way victimized by Mr. Cooney's alleged conduct, and allegations of undisclosed conflicts of interest and ignored investment parameters simply have nothing to do with this transaction.  Likewise, because Mr. Cooney allegedly paid in full for the bonds, the bond issuers were not injured by Mr. Cooney.  See *Chemical Bank v. Arthur Anderson & Co*., 726

F.2d 930, 943 (2d Cir. 1984) (Friendly, J.) (if purchaser gets "exactly what they expected," there is no securities fraud).

The government argued at trial that Mr. Cooney separately misappropriated $3,895,000 from the bond proceeds by funneling money through a sham transaction involving the purported purchase of 1920 Bel Air which was in fact, Jason Galanis's primary residence.  But this evidence was clearly not made "in connection with the purchase or sale" of the WLCC bonds; the sale had already been consummated and it cannot constitute a stand-alone act of securities fraud.  Here again the government ignores the testimony of their lead cooperating witness Hugh Dunkerly who corroborated Mr. Cooney's defense that $3,895,000 from the bond was wired into Mr. Cooney's Citi National Bank account on November 12, 2014 and wired out the very next day, November 13, 2014. See also DX3802.  Hugh Dunkerly initially testified on direct examination that he had no idea why the money was wired into Mr. Cooney's account   (Q: At the At the time did you have any understanding when he made that transfer, understanding why that money was going out? A: No, I did not) (Tr.1032) but on cross-examination, Dunkerly was confronted with numerous emails that refreshed his recollection him that the money (3.8 million) that was wired into Mr. Coooney's account on November 12, 2014 and the following day it was wired to Camden Escrow in furtherance of a legitimate real estate transaction. Tr. 1262.  The evidence admitted at trial showed that the real estate transaction did not occur, and that Mr. Cooney was not able to purchase 1920 Bel Air for reasons that were out of his control.  See GX3272.  Hugh Dunkerly agreed on cross-examination that Jason Galanis was making home improvements to 1920 Bel Air and that he was paying high interest rates on his mortgage and that he believed that the 3.8 million dollars was wired to Mr. Cooney's account so that Mr. Cooney could help refinance 1920 Bel Air.  See Tr. 1204-05.  On cross examination Hugh Dunkerly testified:

Q. And during October/November of 2014, Mr. Galanis, Jason
Galanis was trying to refinance his property at 1920 Bel Air?
A. Correct.
Q. And you learned that Mr. Cooney was going to help him with
that, correct?
A. Yes.
Q. During this time period that you were working with Jason
Galanis, he was doing a two- to three-million dollars home
improvement, correct?
A. Slightly after this period, but yes.
Q. He was doing construction on the home?
A: Yes.

(Tr. 1204-05) Dunkerly corroborated Mr. Cooney's defense that Mr. Cooney intended to purchase

1920 Bel Air in an LLC, so that Jason Galanis could obtain a lower interest rate, continue to make home

improvements and later sell the property at a profit. (Tr. 1204-07)  The trial evidence in this case and the

discovery were replete with documents which corroborated Mr. Cooney's sincere belief that he had no

reason to believe that the 3.8 million dollars that was wired into his CNB account were proceeds from the

WLCC bond. *See e.g.,*DX3235, DX3056(a), GX, 2255, DX3062, GX3272).   Certainly, none of the

government's cooperators testified that Mr. Cooney had any knowledge that the money wired to him

relating to 1920 Bel Air were proceeds from the WLCC bond.   On the contrary the evidence shows that

Mr. Cooney's business managers were assisting Mr. Cooney in obtaining a mortgage to purchase 1920

Bel Air but ultimately after Mr. Cooney could not secure a mortgage, the real estate transaction failed.

See GX2267, GX 3272.  Further, there was no evidence that Mr. Cooney benefitted from this transaction

(Dunkerly testified: The Government certainly did not dispute Mr. Cooney's summary witness and the

chart she admitted into evidence (DX3802) which established that they money which was wired into Mr.

Cooney account was wired out the very next day.   Further, there was an email from Jason Galanis to Mr.

Cooney evidencing that Galanis told Mr. Cooney months before Mr. Cooney ever purchased the WLCC

bond that Mr. Cooney's loan to Galanis involving an entirely separate business deal (Oxford Metrica)

would be paid back from proceeds of a real estate transaction ("coon the wiring instructions are on the

second page. thank you so much for handling this for us. the real estate proceeds will pay it off,  but thank you for taking the shot again." *See* DX3235. These are the only allegations of affirmative action on the part of Mr. Cooney, and none can constitute securities fraud as a matter of law.

"The purpose of § 10(b) and Rule 10b-5 is to protect persons who are deceived in securities transactions – to make sure that buyers of securities get what they think they are getting and that sellers of securities are not tricked into parting with something for a price known to the buyer to be inadequate." Chemical Bank, 726 F.2d at 943.  In order to prove substantive securities fraud, therefore, the government must prove beyond a reasonable doubt that the defendant committed some deceptive act – "some act that gives the victim a false impression" – in connection with the purchase or sale of securities.  *United States v. Finnerty*, 533 F.3d 143, 148-49 (2d Cir. 2008).  Due process does not permit assumption of an element of a crime; it requires proof. The securities laws require no less. The government had to prove that defendant's alleged acts actually had a tendency to deceive and thus constituted securities fraud. *Finnerty*, Slip Copy, 2006 WL 2802042, at *2.  In this case there simply did not exist any cognizable conduct motivated by any intent to defraud or deceive anyone. *United States v. Tagliaferri*, 820 F.3d at 574. Nor, was there intentional or willful conduct on Mr. Cooney's part designed to deceive or defraud investors. In other words, there is no statement by Mr. Cooney, let alone agreed upon conduct amounting to "constructive fraud," *United States v. Royer*, 549 F.3d 886, 900 (2d Cir. 2008), that supports any intentional, purposeful or willful agreement to violate the securities fraud statute. The government has simply not "establish[ed] a realization on the defendant's part that he was doing a wrongful act.'" *Tagliaferri*, 820 F.3d at 573.  On the contrary, the documentary evidence, as well as the testimonial evidence from witnesses like Tim Anderson, showed that there was unquestionably disclosure, not deception, in the mass emails to a wide audience as to Mr. Cooney's intentions. As counsel for Mr. Cooney argued throughout the trial and in closing arguments, Mr. Cooney provided full disclosure to his

business managers at Fulton Management who handled every aspect of his purchase of the WLCC bond, his CNB loan for 1.2 million dollars and his attempted purchase of 1920 Bel Air. Therefore, to the extent that there was, even arguably, any residual unfairness to anyone else, it does not, ipso facto, translate into actionable criminal deception.  See *Santa Fe Indus., Inc. v. Green*, 430 U.S. at 478.

Mr. Cooney is not alleged to have had any interactions with any alleged victim, and he is not alleged to have been aware of, let alone aided or abetted, any misrepresentations by others to any alleged victim.  He therefore cannot be liable for substantive securities fraud.  See *Id.* ("The government has identified no way in which Finnerty communicated anything to his customers, let alone anything false."). Because the only alleged misrepresentations, or indeed affirmative acts, alleged to have been made by Mr. Cooney were purportedly to parties other than those participating in the securities transactions at issue, Mr. Cooney cannot be liable for the charged substantive securities fraud violation.  See, e.g., *United States v. Farrah*, 11 Fed. Appx. 34, 27 (2d Cir. 2001) (table) ("Because the objects and methods of deceit for each were different," defendant's fraud upon bankruptcy trustee and general creditors was "not part of the 'same course of conduct'" as charged wire fraud).  In order to support a substantive securities fraud count, Mr. Cooney needs to have undertaken – or at least willfully aided and abetted – some specific fraudulent act or omission "in connection with the purchase or sale of any security."  Because the trial is bereft of any such evidence as to Mr. Cooney, Count Two must be dismissed against him.  Accordingly, defendant's Rule 29 motion should be granted.

      **B.**      **The Government Failed to Prove That Defendant Committed Securities Fraud Because It Failed to Prove an Intent to Deceive**

As the Court correctly charged the jury, the government had to prove not only that defendant engaged in practices that "would operate as a deceit" on customers, but also had to prove that Mr. Cooney acted with knowledge that he was doing a wrongful act under the securities laws. Trial Tr. at 1361; see

also *United States v. Peltz*, 433 F.2d 48, 54-55 (2d Cir. 1970).  The Court correctly charged the jury:

> it follows that "good faith," as I will define that term, on the part of a defendant is a complete defense to a charge of securities fraud.  A person who acts on a belief or opinion honestly held is not punishable under the securities fraud statutes merely because his opinion or belief turns out to be wrong.  Tr. 4155.

To prove the requisite intent, the government had to prove beyond a reasonable doubt that defendant lacked good faith. See *United States v. Regan*, 937 F.2d 823, 826-27 (2d Cir. 1991).   It failed to do so.  Even viewing the evidence most favorably for the government, the evidence of Mr. Cooney's good faith was both powerful and undisputed. The evidence consisted of: (1) Mr. Cooney relied on his business managers to assist him in every deal that he was involved in including his acquisition of the WLCC bond and Mr. Cooney conducted his business in an environment of complete openness, completely at odds with an intent to violate the securities laws.  For these reasons, the government failed to prove his intent to deceive and lack of good faith beyond a reasonable doubt.

      **1.  Evidence of Defendant's Good Faith Belief in the Legality of His Conduct Was Overwhelming In Light of the Openness of His Conduct**

Wholly negating defendant's bad faith is the undisputed evidence of Mr. Cooney's open manner in dealing with his every action the government spinned as involving a sham.  For example, Tim Anderson testified that he never met Mr. Cooney (Tr. 567-68 ) but it was Mr. Cooney who reached out to Mr. Anderson with questions about his purchase of the WLCC bond. (Tr. 602)  Mr. Cooney emailed Mr. Anderson and included in these emails his business managers from Fulton Management, as well as the trustee from U.S. Bank.  Mr. Anderson agreed during his testimony that Mr. Cooney emailed with him questions about his purchases of the WLCC bond and included several individuals on these emails:

> Q. And in this particular email Mr. Cooney is asking you, I have this paperwork from the bond, should I deliver this to City National Bank?
>
> A.  He did ask that, yes.

Q. And he included several people in that email?

A. Yes.

Q. He included you, he included Matthew Fillman, he included Alexis Gluckman, he included U.S. Bank and he was simply asking for directions as to what he should do with the bank, with the bond, correct?

A. Yes.

Q. Tell us what the subject of this email is.

A. These instructions are for purchase of Wakpamni Town Center bonds for tomorrow A M, 10-9-2014.

Q. This subject matter was part of an ongoing thread regarding Mr. Cooney's instructions on purchasing the bond. Is that right?

A. That is what it appears to be, yes.

(Tr. 602)

Mr. Anderson instructed Mr. Cooney with details regarding the purchase of his WLCC bond which the government now claims to be criminal.   See e.g. Tr. at 230-31, 602)  How can a defendant have believed he was engaging in wrongful conduct when he openly brings numerous people to give details about what he is doing and consistently asks experienced professionals (lawyers, accountants, bankers) to advise him on what to do to make sure that he is in compliance with the law.  There was no evidence and not a single witness who testified that Mr. Cooney ever tried to conceal his identity and /or his involvement in purchasing the bond.  In fact, Mr. Cooney used his true name to purchase the bond and in the entire case he used only one email address which again reflected his true name: Btcooney@gmail.com.  See e.g. Tr.  1279 (Dunkerly) (Q: Do you ever recall Mr. Cooney being associated with any other identity, or e-mail, or firm, or any other -- or was he always under the name B.T. Cooney? A: I don't remember -- no other alias that I know of.)  In sum, the evidence viewed most favorably to the

government fails to prove beyond a reasonable doubt that defendant acted with an intent to deceive and in bad faith. Accordingly, a judgment of acquittal must be entered in his favor.

> **C.     The Evidence in Support of Count 1, Alleging Conspiracy to Commit Securities Fraud under 18 U.S.C. §§ 371, With Intent to Violate 15 U.S.C. §§78j (b)   and 78ff, Was Legally Insufficient to Warrant Consideration by the Jury**

"Although...a defendant's knowing agreement to join a conspiracy must, more often than not, be proven through circumstantial evidence, and even though we must view all of the evidence as pieces of a unified whole, the circumstantial evidence here was simply too thin to warrant an inference of guilty knowledge on the part of Bevan Cooney. See *United States v. Nusraty*, 867 F.2d  759,  764 (2d Cir. 1989) (citing  *United States  v. Manton*, 107 F.2d  834, 839 (2d Cir.1939), cert. denied, 309 U.S. 664 (1940) and *Glasser v. United States*, 315 U.S. 60, 80 (1942)). According to Count 1, the alleged agreement is supposed to have existed among Mr. Cooney and his alleged co-conspirator(s).

As discussed above, the government has always charged – two distinct conspiracies, one involving the takeover of investment advisers and criminal breaches of fiduciary duty, and another involving the misappropriation of WLCC bond proceeds.  Even after the investment adviser defendants pleaded guilty, the government continued to make the same allegations and put on the same evidence that was at issue when both conspiracies were charged.

While no defendant at trial is charged with investment adviser fraud, the government remained committed to arguing that the trial defendants – despite the fact that none of them were investment advisers –conspired to commit and committed securities fraud in connection with the failure to disclose material conflicts of interest to the clients of Atlantic and Hughes.  See Gov. Mem. In Opp. to Defendants' Pre-Trial Motions [ECF No. 308] at 33 ("A trial against any single defendant in this case would necessarily involve the same evidence of how the participants in the scheme caused the WLCC to issue more than $60 million in bonds based on false and misleading representations, caused Hughes and

Atlantic clients to purchase issuances of the bonds, failed to invest the bond proceeds on the WLCC's behalf in the manner agreed upon, recycled certain of the bond proceeds, and misappropriated the proceeds of the bonds for their own purposes.").

The government, at trial introduced hours of testimony and thousands of documents to prove up a conspiracy to improperly purchase WLCC bonds in the client accounts of Hughes and Atlantic, outside of those clients' investment guidelines and without disclosing conflicts of interest.  *See*, e.g. Tr. 639-59 (direct testimony of Michael Smith, representative of OSERS, a Hughes Capital Management pension fund client); 1667-88 (direct testimony of Clifton Moore, CIO of Micheline retirement plans, a Hughes client); 2033-53 (direct testimony of Daniel Turney, employee of Hughes and Atlantic Asset Management). Not one of these witnesses knew or had ever met Mr. Cooney or any his co-defendants. See Tr. 782 (Smith testifying he's never met or communicated with Bevan Cooney); 1689(Moore, same); 2058-59 (Turney, same).

The fact is, there is not an iota of evidence as to either of these theories supporting any semblance of an agreement, let alone one that contemplated a violation of 15 U.S.C. § 78j(b). Simply put, there is no proof of any "joint commitment to an endeavor which, if completed, would satisfy all of the elements of [that] criminal offense." *Ocasio v. United States, supra*, 136 S. Ct. at 1429. Therefore, there is no proof that Mr. Cooney had knowingly and willfully joined any conspiracy. *United States v. Svoboda*, 347 F.3d 471, 476 (2d Cir. 2003), cert. denied sub. nom., *Robles v. United States* 541 U.S. 1044 (2004).  In this case only four witnesses testified that they had directly communicated with Mr. Cooney:

- Tim Anderson testified that he only emailed Mr. Cooney briefly in response to limited questions that Mr. Cooney asked him about his purchase of the WLCC bond;  Tr. at 230-31.

- Hugh Dunkerly testified that he met Mr. Cooney not more than 2 to 3 times on social occasions; he could not recall a single email with Mr. Cooney and he "never" spoke to Mr. Cooney about the WLCC bond.  Tr. 1298

- Francisco Martin testified that he met Mr. Cooney 2 or 3 times (Tr. 2176-77);  there was no evidence of email between Mr. Cooney and Martin.  Tr. 2215. Martin admitted that all of the emails that he reviewed with the government on direct examination regarding the WLCC bond and his work on the WLCC bond did not have anything to do with Mr. Cooney.  Tr. 2215. Martin further admitted that he only spoke to Jason Galanis, Hugh Dunkerly and Gary Hirst about the WLCC bond. Tr. 2328. As detailed below Martin's contribution to this case was inflammatory testimonial evidence about his recollection that Galanis told him that Cooney was his childhood friend and that Cooney was the first to notify him that Galanis had been arrested in September 2015 in a separate fraud unrelated to the WLCC bond; (Tr. 2171-72; 2176-77)

- Steve Shapiro, a banker from CNB testified about his contact with Mr. Cooney regarding an unrelated bank loan for 1.2 million dollars but this evidence was clearly not made "in connection with the purchase or sale" of the WLCC bonds; the sale had already been consummated and it cannot constitute a stand-alone act of securities fraud.

The government's evidence -- dozens of innocuous email threads, most of which Mr. Cooney is merely cc'd on—emails from Jason Galanis to Mr. Cooney and others about being kept "apprised" of lawful developments concerning the acquisition of a business, or being "well aware" that the bonds might be lawfully sold to certain investors –does not amount to either direct or circumstantial evidence of any

such agreement. Based on this analysis, there is absent evidence of an agreement between Cooney and any of the recipients, to commit, via an affirmative act of deception or deception by omission, the substantive securities fraud alleged as the object of the non-existent agreement.

As far as any proof of an agreement between Mr. Cooney and his alleged co-conspirators is concerned, there is simply no independent evidence of any such mutual understanding to deceive anyone. Accordingly, the Government has failed to establish "that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal" with an agreement "on the essential nature of the plan." *McDermott, supra*, 245 F.3d at 137.

In addition to the absence of an agreement, totally lacking in the government's proof was evidence of the essential deceptive or "manipulative" device or contrivance which is "virtually a term of art when used in connection with securities markets." *Santa Fe Indus., Inc.*, 430 U.S. at 476 (quoting Ernst & Ernst *v. Hochfelder*, 425 U.S. 185, 199 (1976)). There did not exist any cognizable conduct motivated by any intent to defraud or deceive anyone. *United States v. Tagliaferri*, 820 F.3d at 574.   In other words, there is no statement, let alone agreed upon conduct amounting to "constructive fraud," United States v. Royer, 549 F.3d 886, 900 (2d Cir. 2008), that supports any intentional, purposeful or willful agreement to violate the securities fraud statute.  There is no proof of an agreement to employ "any device, scheme, or artifice to defraud," Rule 10b-5(a); there is absent any proof of any agreement to utilize "any untrue statement of a material fact" or the failure "to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," Rule 10b-5(b); and there is absent any proof of any agreement to commit "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." Rule 10b-5(c).  Accordingly, because the result is that, as to the § 371 violation alleged, no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt,"

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979), Count 1 should be dismissed and a judgment of acquittal should be entered.

## II.  PURSUANT TO RULE 33, DEFENDANT'S CONVICTION MUST BE VACATED AND A NEW TRIAL ORDERED IN THE INTEREST OF JUSTICE

The verdict in this case must be set aside and a new trial ordered in the interest of justice. Rule 33 permits a district court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The rule by its terms give the trial court broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001). In deciding whether to grant a motion for a new trial pursuant to Rule 33, "the judge is not required to view the evidence in the light most favorable to the prosecution." *United States v. Coriaty*, 2001 WL 1910843 (S.D.N.Y. 2001), at *2. "In exercising the discretion so inferred, the court is entitled to 'weigh the evidence and in so doing evaluate for itself the credibility of the witnesses.'" *United States v. Robinson*, 430 F.3d 537, 543 (2d Cir. 2005)(internal citations omitted). Moreover, the court must view any errors in its conduct of the trial and assess their impact on the fairness of the trial. *United States v. Schnitzer*, 145 F.3d 721, 731 (5th Cir. 1998) (district court properly recognized troubling implications of its evidentiary rulings and granted new trial in "interest of justice"); *United States v. Elizondo*, 277 F.Supp.2d 691, 703 (S.D.Tex. 2002) (district court recognized error in its admission of guilty plea and granted new trial). Where trial court errors result in a fundamentally unfair trial, a new trial must be granted. See, e.g., *Walker v. Engle*, 703 F.2d 959, 963 (6th Cir. 1983).

A.   **A NEW TRIAL IS WARRANTED DUE TO PREJUDICIAL SPILLOVER RESULTING FROM THE JOINT TRIAL OF JOHN GALANIS AND MR. COONEY PARTICULARLY IN LIGHT OF THE COURT'S RULING TO ALLOW THE GOVERNMENT TO REOPEN EVIDENCE AGAINST JOHN GALANIS  AFTER GALANIS'S ATTORNEY OPENED THE DOOR TO SUBSTANTIALLY PREJUDICIAL 404(b) EVIDENCE DURING SUMMATIONS**

Prior to trial, Mr. Cooney joined Mr. Archer's motion to sever his trial from that of John Galanis. *See Dkt*. 262, 263. The principal grounds for that motion was that Mssrs. Cooney and Archer would be subject to considerable spillover prejudice, both from the evidence introduced germane to the charges against his co-defendants and also from any so-called "other act" evidence that may later be noticed and introduced. *See* Dkt. 263 at 15-21. The Court denied Mr. Cooney's severance motion but precluded the government from introducing evidence of John Galanis's Gerova conviction.  Therafter, the attorney for John Galanis during his summation violated the Court's previous ruling and opened the door to other act evidence. Following defense summation for John Galanis by his attorney, the Court allowed the government to re-open their case and admit evidence that John Galanis's attorney had misled the jury during his summations and the jury was informed by way of a stipulation that John Galanis had been convicted in the Gerova fraud.  Mr. Cooney renewed his request for severed trials and subsequently moved for a mistrial immediately after the Court ruled that it would allow the government to re-open evidence and reargue summations. *See* Tr 3799, 3813, 3819.   Specifically the Court ruled that it would allow the government to introduce evidence of John Galanis's previously excluded Gerova conviction because the lawyer for John Galanis misled the jury in his summation by giving the jury the impression \ "that John Galanis was unaware of Jason Galanis's mentioned fraud,"  (see Tr. 3792)  and opened the door to previously excluded 404(b) evidence.  Following the stipulation, the Court further allowed the government to make additional summation arguments in response to the counsel for John Galanis's arguments to the jury during summation.  The alleged misrepresentation to the jury during summations

by John Galanis's attorney and the introduction of the Gerova conviction after summations had already commenced --then took center stage as a principal focus of the summations immediately before defendant Archer and then Cooney's final summations.  Indisputably, this evidence was inadmissible against Bevan Cooney and particularly prejudicial against Mr. Cooney given the court's ruling to allow over defense counsel's repeated objections:  irrelevant evidence relating to Mr. Cooney's childhood connection to the Galanis family and Mr. Cooney's purported "knowledge" that Jason Galanis had been arrested in September of 2015 in the  Gerova fraud.  Tr. 2176-77. Accordingly, in a case where the government presented, at best,  innocuous evidence against Mr. Cooney—the Court allowed the government to elicit testimony from Francisco Martin (over Mr.  Cooney's repated objection, see Tr. 244, 341-342) that Mr. Cooney was the first person to notify Francisco Martin that Mr. Cooney had been arrested on charges related to the Gerova fraud.  Francisco Martin testified as follows. (Tr. 2171-2172)2

> Q. Are you familiar with an individual named Bevan Cooney?
> A. Yes.
> Q. Did you discuss him with Jason Galanis?
> A. Yes.
> Q. And what did Jason Galanis tell you about Bevan Cooney?
> A. That they were childhood friends.
> Q. And did they have an ongoing relationship?
> A. Yes.
> Q. What did Jason Galanis tell you about their present-day
> relationship?
> A. He said they were from time to time doing business
> together.
> Q. Were they close?
> A. It was my understanding that they were.
> Q. Did you ever meet Bevan Cooney?
> A. Yes.
> Q. Would you recognize him if you saw him again?

> Martin testified that he first learned that Jason Galanis had been arrested after he received

 a phone call from Bevan Cooney. (Tr. 2176-77)

---

[2] Francisco Martin admitted on cross examination that Jason Galanis is the person who told him that Galanis and Mr. Cooney were childhood friends and that Galanis frequently lied to him  (Tr. 2215-16).

Q. I want to direct your attention now to September of 2015.
What, if anything, happened with respect to Jason Galanis at
that time?
A. I believe that's when he was arrested.
Q. How did you learn that Jason Galanis had been arrested?
A. I received a phone call from Bevan Cooney.
Q. Was it common for you to receive phone calls from Bevan
Cooney?
A. No, not often
Q. How many times had you met Bevan Cooney at that point in
time?
A. A couple times.
Q. What did Bevan Cooney tell you?
A. He told me that Jason Galanis was arrested but not to
worry, it didn't have anything to do with the bond issue.
Q. Now, prior to that phone call, did you have any
understanding that Bevan Cooney was connected in any fashion to
the bond issue?
A. I knew that he was somehow involved, but I didn't know the
extent of it.
Q. And how did you react to that phone call?
A. I was shocked and concerned.
Q. Why?
A. Because I was in the middle of doing all of these illicit
transactions together with Jason Galanis, and I thought that
was going to come back to me.

*See* Trial Tr. at 2176-77.[3]

Certainly, in a case where there was no reference to Bevan Cooney beyond testimony that he was

a passive investor who purchased the WLCC bonds, Francisco Martin's testimony was substantially even

more prejudicial after the jury heard for the first time that John Galanis had been previously convicted in

the same September 2015 fraud that led to his son, Jason Galanis's arrest and therefore was part of a con

artist family acting in concert with his son.  Because the government accused Bevan Cooney of acting in

---

[3] The Jury was instructed,  "So, ladies and gentlemen, you've just heard evidence that in September
2015 Jason Galanis was arrested. You need to know that Jason Galanis' arrest in September 2015 was
for unrelated conduct and had nothing to do with this case. I further instruct you that Mr. Cooney was
not a subject of that investigation, and there is no evidence that he knew about Jason Galanis' conduct in
that unrelated case until after Jason Galanis was arrested. See Tr. 2178:1-8.

concert with Jason and John Galanis throughout the trial, in a case where there was no direct evidence against Mr. Cooney and there was certainly no evidence that Mr. Cooney ever met John Galanis --this other act evidence was devastatingly prejudicial to Mr. Cooney and risked tainting the jury to believe that Bevan Cooney as the childhood "best friend" and business partner of Jason Galanis was certainly knowledgeable that John Galanis had been previously convicted of fraud (stemming from the same fraud that led to Jason Galanis's arrest in September of 2015) and therefore Mr. Cooney was also involved in the fraud. The spillover prejudice against Mr. Cooney pervaded the structure of the government's case here and could not be ameliorated by a limiting instruction. The only way to avoid this unfair prejudice would have been to exclude that other act evidence entirely, or if the Court determined that the government should be permitted to use this evidence against Mr. Cooney, to sever Cooney from the trial and allow Mr. Cooney to proceed to verdict before the current jury, which is exactly what counsel for Mr. Archer requested as a possible remedy. 4 See Tr. 3796. By adopting neither option, the Court subjected Bevan Cooney to unfair, overwhelming prejudice, and a new trial should now be granted.

Rule 403 allows a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. Allegations of obstruction of justice are particularly powerful and unquestionably carry a substantial risk of prejudice. See *United States v. Ruggiero*, 824 F. Supp. 379, 389–90 (S.D.N.Y. 1993) (precluding cross-examination regarding obstruction under Rule 403). In a joint trial, when a court determines that it will admit evidence against one defendant, "[a] district court [still] has a continuing duty to protect [the other] defendant from substantial prejudice resulting from improper joinder and to consider whether severance is necessary." *United States v. Nersesian*, 824 F.2d 1294, 1304 (2d Cir. 1987); see also *United States v. Morgan*, 394

---

[4] Counsel for Archer: What I would suggest, your Honor, is I could close, Ms. Notari could close, the government could rebut. The jury could be instructed to deliberate solely with respect to Mr. Archer and Mr. Cooney, and after they return a verdict, assuming they return a verdict, they could receive this evidence, there could be supplemental argument, and that way there wouldn't be a taint with respect to the Gerova arrest. (Tr. 3796)

F.2d 973, 978 (6th Cir. 1968); *Flores v. United States*, 379 F.2d 905, 909 (5th Cir. 1967). In both cases, the law's purpose is to protect the other defendant where the prejudicial evidence might "prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). Although courts often employ limiting instructions, where the potential spillover prejudice is substantial, a curative instruction may not be sufficient when there is "'doubt whether it [is] at all possible to carry out that instruction[ because t]o do so would certainly require twelve minds more disciplined than those of the average human juror.'" *Flores*, 379 F.2d at 908 (quoting *Barton v. United States*, 263 F.2d 894, 898 (5th Cir. 1959)).

Here, the evidence regarding John Galanis's previous Gerova conviction should have been excluded based on, among other reasons, the unfair prejudice to Cooney resulting from its admission. This last minute evidence, highlighted for the jury during summations—with the government's repeated arguments that Mr. Cooney and Jason Galanis were best friends from childhood and that Mr. Cooney was aware that Galanis had been arrested in the Gerova fraud in September of 2015 – the same time when the jury learned for the first time during summations that Jason's father John Galanis was arrested and later convicted in the same fraud was unquestionably influential on the jury. The government hammered during their summation that the trial was "game over," (see Tr. 3832) once the jury learned that John Galanis and his son Jason were both arrested and convicted in the same Gerova fraud which preceded the instant charges. For example, the government argued to the jury:

> When you think about what John Galanis knew and what he understood in this case, at every step of the way you have to think about, well, what did he know about his son Right? When he is referring deals to Jason Galanis at Burnham in 2014, he knows he is a criminal; he knows that he has committed securities fraud -- and not just that Jason Galanis did it; they did it together. How could John Galanis think that he was being asked to participate in a regular transaction given what he knew about Jason Galanis?  (Tr. 3833)

Although the Court offered a limiting instruction that the Gerova evidence and the actions by John Galanis's attorney were not being offered against Mr. Cooney, see Tr.  3829-3831, no instruction could have erased the message that the government consistently hammered  throughout trial—that essentially Jason Galanis, his father and Bevan Cooney his "best childhood friend" banded together to commit fraud. As counsel for Mr. Cooney argued in her bid to implore the court for a severance or mistrial, certainly common sense dictates that anyone would know their best friend from childhood's father was convicted of fraud.  See Tr 3799, 3813, 3819.

Perhaps the best evidence of this prejudice was the fact that the jury deliberated for less than two hours, despite 5 weeks of testimony and thousands of exhibits.  Several carts of evidence were wheeled back into the jury room consisting of thousands of exhibits and the jury did not appear to review a single exhibit.  We should emphasize that the vast majority of these thousands of documents were exhibits that the jury never had the opportunity to review; nor were they read into evidence.  In a case where the only witnesses who had ever met Mr. Cooney testified that they never spoke to him about the WLCC bond and offered zero evidence that he had participated in either of the two charged conspiracies, the jury received all of the evidence just two hours before announcing that it had reached a verdict. And the jury reached that blanket verdict without asking a single question about the evidence and / or jury instructions.  The jury's rushed, undiscerning verdict surely does not evince the kind of "meticulous care . . . in weighing the evidence and reaching [a] verdict" that would allow a court to conclude "that the prosecutor's remarks did not undermine the jury's ability to view the evidence fairly and free from passion and prejudice." *United States v. Biasucci*, 786 F.2d at 515 (improper remarks did not require reversal where jury acquitted some defendants, demonstrating careful consideration of each count for each defendant).

Indeed having determined to admit the other act evidence of the Gerova conviction after summations commenced over the defendants' objections, the Court at the very least should have severed

the trials of John Galanis and Mr. Cooney, and allowed the presently constituted jury to consider Mr. Cooney's guilt or innocence untainted by the fabrication allegations.  A district court may grant a mistrial and sever a non-moving defendant from the ongoing criminal trial, and that determination of which particular defendant to sever is consigned to the Court's discretion. *United States v. Odom*, 888 F.2d 1014, 1018 (4th Cir. 1989). Although the Second Circuit has held that severing a non-moving defendant may present double-jeopardy concerns upon retrial absent "manifest necessity," See *United States v. Huang*, 960 F.2d 1128, 1134 (2d Cir. 1992), courts have found manifest necessity where the prejudicial actions are attributable to the non-moving defendant, a consideration not present in *Huang*. See *Odom*, 888 F.2d at 1018-20 (counsel for severed defendant introduced prejudicial evidence and argument regarding co-defendant, thus warranting severance of non-moving party); cf. *Arizona v. Washington*, 434 U.S. 497, 505 (1978) (finding "manifest necessity" to grant prosecution's request for a mistrial where defense counsel referenced prosecutorial misconduct in prior trial that itself had resulted in a mistrial). Here, the circumstance that gave rise to opening the door to evidence of the Gerova fraud during summations was the introduction of evidence that the government contended was fabricated by the attorney for John Galanis.  (See  e.g. Tr. 3792)  The Court was thus fully empowered to sever the trials of Mr. Cooney and John Galanis and to allow the government to present its fabrication testimony in a separate proceeding. In light of the spillover prejudice to Mr. Cooney, the Court should have followed this path once it found the fabrication evidence admissible against John Galanis.

### B. OTHER ERRORS AT TRIAL DEPRIVED MR. COONEY OF HIS RIGHTS TO DUE PROCESS, TO CONFRONT WITNESSES, AND TO PRESENT A DEFENSE, AND THUS WARRANT A NEW TRIAL.

Multiple other errors at trial undermined Bevan Cooney's constitutional rights to a fair trial, to due process of law, to confront the witnesses against him, and to present a defense. First, the Court should have granted a multiple conspiracies charge on the facts of this case, where the jury could easily believe

36

that there was one conspiracy to defraud the clients of Atlantic and Hughes by failing to disclose material conflicts of interest – a conspiracy that included Jason Galanis, Hugh Dunkerley, Michelle Morton, and Gary Hirst – and another, separate conspiracy to misappropriate the proceeds of the WLCC bonds. While the government certainly argued that these two schemes were part of a single, overarching conspiracy, that is always the case when a multiple conspiracies charge is given; the issue only arises when the government alleges a single conspiracy that the jury could reasonably conclude was actually two or more separate schemes. "A conviction cannot stand if the government has alleged a single conspiracy, but its proof demonstrates multiple conspiracies." See *United States v. Alkins*, 925 F.2d 541, 553-54 (2d Cir. 1991) (citing *Kotteakos v. United States*, 328 U.S. 750 (1946)). Accordingly, "where the proof is susceptible to the inference that there was more than one conspiracy, the question of whether one or more than one conspiracy has been established is a question of fact for a properly instructed jury." *United States v. Maldonado-Rivera*, 922 F.2d 934, 962 (2d Cir. 1990); accord *United States v. Uccio*, 917 F.2d 80, 87 (2d Cir. 1990); *United States v. Friedman*, 854 F.2d 535, 561 (2d Cir. 1988), cert. denied, 490 U.S. 1004 (1989). "A multiple conspiracies charge is required where several different conspiracies could be inferred from the evidence offered at trial." *United States v. Restrepo*, 547 F. App'x 34, 40 (2d Cir. 2013) (citing *United States v. Aracri*, 968 F.2d 1512, 1520 (2d Cir. 1992); *Maldonado-Rivera*, 922 F.2d at 962-63)); see also 1 SAND ET AL., MODERN FEDERAL JURY INSTRUCTIONS-CRIMINAL ¶ 19.01, Instruction 19-5 & cmt. at 19-22 (2009) ("Generally speaking, the instruction is appropriate in cases where a number of defendants have been collectively charged in the indictment with participation in a single, overall conspiracy, but where there is a basis for the defense claim that multiple conspiracies existed."). "The charge is designed to assist the jury in determining whether a defendant's conduct was part of the single, comprehensive conspiracy charged." Id. (citing *Aracri,* 968 F.2d at 1520). The need for such an instruction stems from the potential "'spill over effect' of permitting testimony regarding one conspiracy

37

to prejudice the mind of the jury against the defendant who is not part of that conspiracy." *United States v. Harris*, 8 F.3d 943, 947 (2d Cir. 1993).  "A proper multiple conspiracies instruction must stress that in order to return a conviction, jurors are required to find that the single conspiracy charged existed and that the individual defendant knowingly participated in that conspiracy." *Restrepo*, 547 F. App'x at 40 (citing *United States v. Berger*, 224 F.3d 107, 114 (2d Cir. 2000)).

As discussed extensively in Mr. Archer's objections to the jury instructions (Doc. 531), the government has always charged – initially in separate counts and later in a single count – two distinct conspiracies, one involving the takeover of investment advisers and criminal breaches of fiduciary duty, and another involving the misappropriation of WLCC bond proceeds.  As already discussed above, even after the investment adviser defendants pled, the government at trial continued to make the same allegations and put on the same evidence that was at issue when both conspiracies were charged.  Since the evidence and allegations of both distinct conspiracies were put in front of the jury, the Court should have instructed the jury on multiple conspiracies. Since a "multiple conspiracies charge is required where several different conspiracies could be inferred from the evidence offered at trial," *Restrepo*, 547 F. App'x at 40 (citation omitted), one was absolutely necessary here.  The allegations, charging documents, and trial evidence all show two distinct conspiracies.  Mr. Cooney was therefore hugely prejudiced without a multiple conspiracies instruction to stem the "'spill over effect' of permitting testimony regarding one conspiracy to prejudice the mind of the jury against the defendant who is not part of that conspiracy." *United States v. Harris*, 8 F.3d 943, 947 (2d Cir. 1993).

Additionally, in a case where there was scant evidence against Mr. Cooney, the Court's admissibility of "other act" evidence concerning Mr. Cooney, which was entirely unrelated to the WLCC bond--substantially prejudiced Mr. Cooney, confused the jury as to evidence central to the government's

case and thereby deprived Mr. Cooney's right to a fair trial.[5]  In addition to the reasons stated above and the many reasons set forth in Mr. Cooney's previously filed objections to this other act evidence, given the scant evidence in this case against Mr. Cooney, the admission of this evidence proved to be unfairly prejudicial pursuant to Fed. R. Evid. 403. As the Supreme Court has stated, "[t]he term, 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S.172, 180 (1997). Evidence that is unfairly prejudicial possesses "'an undue tendency to suggest decision on an improper basis . . . .'" *Id.*  In short, in a case where there was purely equivocal evidence against Mr. Cooney, the cumulative effects of prejudicial other act evidence, prejudicial evidence of multiple conspiracies and the evidence that John Galanis, the father of Mr. Cooney's "childhood best friend" had been previously convicted of securities fraud --  the cumulative effects of this substantially prejudicial evidence  confused and diverted the jury from consideration of the evidence and the lack of evidence against Mr. Cooney.  A new trial is required to remedy these manifold errors.

---

[5] In sum, as detailed above (1) Mr. Cooney's failed real estate transaction involving 1920 Bel Air which the government concluded was a sham despite the testimony of their lead cooperator Hugh Dunkerly who corroborated Mr. Cooney's defense that Mr. Cooney was asked to assist Jason Galanis to get a lower interest rate for 1920 Bel Air and further that Jason Galanis was making home improvement to the said property because he later planned to sell it and (2) Mr. Cooney's unrelated bank loan from CNB bank which was entirely negotiated by an authorized member of his money management team from Fulton management.

## III.

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in Mr. Archer's post trial motions to the extent these arguments apply to Mr. Cooney, the Court should enter judgment of acquittal for Mr. Cooney on Counts One and Two, and grant Mr. Cooney a new trial.

Respecfully submitted

/s/  Paula J. Notari

Dated: New York, New York
August 17, 2018

The Law Office of Paula J. Notari
125 Park Avenue, 8th Floor
New York, New York 100197
Tel.: (646) 943-2172

Abraham J. Hassen
O'NEILL / HASSEN
25 Eighth Ave, Suite C
Brooklyn, New York 11217