**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

     v.

JOHN GALANIS, a/k/a "Yanni,"
DEVON ARCHER, and
BEVAN COONEY

       Defendants.

No. 16 Cr. 371 (RA)

**DEVON ARCHER'S MEMORANDUM OF LAW IN SUPPORT OF HIS
MOTIONS FOR JUDGMENT OF ACQUITTAL UNDER RULE 29(a) AND (b)
AND FOR A NEW TRIAL UNDER RULE 33**

Matthew L. Schwartz
Laura C. Harris
Craig Wenner

BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, New York 10022
Tel.: (212) 446-2300
Fax: (212) 446-2350
mlschwartz@bsfllp.com
cwenner@bsfllp.com
lharris@bsfllp.com

*Attorneys for Devon Archer*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iv

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND ........................................................................................................ 2

LEGAL STANDARD ................................................................................................. 3

    A.    Rule 29 ................................................................................................... 3

    B.    Rule 33 ................................................................................................... 5

    C.    The Charges of Conviction .................................................................. 6

        1.    Securities Fraud ....................................................................... 6

        2.    Aiding and Abetting Liability ................................................. 7

        3.    Conspiracy ............................................................................... 8

ARGUMENT ........................................................................................................... 10

I.      THE COURT SHOULD ACQUIT DEVON ARCHER ................................... 10

    A.    The Evidence Was Insufficient To Prove That Mr. Archer Willfully
        Participated In Any Scheme To Defraud The Clients of Atlantic and
        Hughes ................................................................................................ 10

    B.    The Evidence Was Insufficient To Prove That Mr. Archer Willfully
        Participated In A Scheme To Steal The WLCC Bond Proceeds ......................... 17

        1.    The bond deals carried outward appearances of legitimacy .................... 20

        2.    Mr. Archer's alleged motive – to see his shares of Wealth
        Assurance Holding appreciate – does not support the inference that
        he knowingly and intentionally participated in a scheme to steal
        bond proceeds. ........................................................................... 24

        3.    Jason Galanis's e-mails to Mr. Archer are insufficient to establish
        that Mr. Archer knew Jason Galanis was stealing money ........................ 26

        4.    The evidence was insufficient to prove that Mr. Archer knew Jason
        Galanis was stealing bond money to acquire a Tribeca mansion ............. 36

5.      Rosemont Seneca Bohai's purchase of the second bond offering does not demonstrate Mr. Archer's knowledge or intent ......................... 40

6.      Mr. Archer's statements to Morgan Stanley and Deutsche Bank do not support an inference of fraudulent intent ............................................. 46

     a.      Mr. Archer did not lie when he wrote that the method of acquisition for the bonds was a "Purchase" and the manner of payment a "Wire Transfer" ......................................... 47

     b.      Mr. Archer did not lie when he wrote that the "$15mm was generated through sale of real estate" ........................................... 48

     c.      Mr. Archer did not say the money was generated "from real estate sales through my business, Rosemont Seneca Bohai LLC" or know that the true source was stolen bond proceeds ...................................................................... 52

     d.      Even if a juror could conclude that Mr. Archer made a false statement to Morgan Stanley, that would not support an inference that he knew Galanis was stealing the bond proceeds ...................................................................... 56

7.      Mr. Archer's statements to the Board of Trustees of the Burnham Investors Trust do not support an inference of fraudulent intent .............. 59

     a.      Mr. Archer did not lie to the BIT Board ....................................... 60

     b.      Even if a juror could conclude that Mr. Archer made a false statement to the BIT Board, that would not support an inference that he knew Galanis was stealing the bond proceeds ...................................................................... 66

8.      The evidence was insufficient to show that Mr. Archer knew that the WLCC bonds were being improperly used to boost Burnham Securities' net capital .............................................................. 67

9.      The government failed to prove that Mr. Archer knew he funded a bond interest payment or that he did so knowing Jason Galanis had misappropriated bond proceeds ................................................. 71

II.     THE COURT SHOULD GRANT MR. ARCHER A NEW TRIAL ............................... 73

  A.      The Guilty Verdict Is Unsupported By The Weight Of The Evidence ................ 74

    1.      Evidence affirmatively demonstrated that Mr. Archer did not know money was being stolen ........................................................... 75

2.    Jason Galanis and his co-conspirators exploited Mr. Archer for his money and connections ........................................................................ 78

3.    Mr. Archer invested his own money in the Burnham–Valor Group roll up ..................................................................................................... 80

4.    Mr. Archer was not involved in any misrepresentations to the alleged victims ........................................................................................ 82

5.    When the scheme fell apart, Mr. Archer stepped forward to save businesses while others tried to cover up their crimes ............................. 82

B.    The Surprise Introduction Of Extraordinarily Prejudicial Evidence Following The Government And John Galanis's Summations And Immediately Preceding Mr. Archer's Created A Manifest Injustice Requiring A New Trial ................................................................................ 85

1.    The Court has a duty to sever if prejudice from a joint trial arises during trial ................................................................................................ 85

2.    The Gerova convictions subjected Mr. Archer to the type of extreme prejudice that justifies severance and risks a miscarriage of justice ................................................................................................... 86

3.    The manner in which the Gerova evidence came in exacerbated its already substantial prejudice ................................................................... 88

4.    The late introduction of the Gerova evidence created the type of prejudice that jury instructions cannot cure ........................................... 90

C.    Mr. Archer Is Entitled To A New Trial Due To Instructional Error .................... 91

1.    The Court improperly gave a conscious avoidance instruction without a factual predicate ....................................................................... 92

2.    The jury should have been instructed on the possible existence of multiple conspiracies ....................................................................... 96

3.    The jury should have been instructed on specific issue unanimity ........... 99

CONCLUSION ................................................................................................ 101

# TABLE OF AUTHORITIES

**Cases**

*Acito v. IMCERA Group, Inc.*,
  47 F.3d 47 (2d Cir. 1995) ................................................................................................ 26

*Ernst & Ernst v. Hochfelder*,
  425 U.S. 185 (1976) ........................................................................................................... 6

*Global-Tech Appliances, Inc. v. SEB S.A.*,
  563 U.S. 754 (2011) .................................................................................................. 93, 94

*In re Hudson Tech., Inc. Sec. Litig.*,
  No. 98-cv-1616 (JGK), 1999 WL 767418 (S.D.N.Y. Sep. 28, 1999) ................................... 47

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
  289 F. Supp. 2d 416 (S.D.N.Y. 2003) ................................................................................. 7

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001) ............................................................................................... 6

*Kotteakos v. United States*,
  328 U.S. 750 (1946) .................................................................................................. 96, 98

*Mfrs. Hanover Trust Co. v. Smith Barney, Harris Upham & Co.*,
  770 F. Supp. 176 (S.D.N.Y. 1991) ..................................................................................... 67

*Pross v. Katz*,
  784 F.2d 455 (2d Cir. 1986) ............................................................................................... 7

*Schaffer v. United States*,
  362 U.S. 511 (1960) .................................................................................................. 85, 86

*SEC v. Drysdale Sec. Corp.*,
  785 F.2d 38 (2d Cir. 1986) ............................................................................................... 59

*SEC v. Zandford*,
  535 U.S. 813 (2002) ........................................................................................................... 7

*Shields v. Citytrust Bancorp, Inc.*,
  25 F.2d 1124 (2d Cir. 1994) ............................................................................................. 47

*United States v. Adeniji*,
  31 F.3d 58 (2d Cir. 1994) ................................................................................................. 95

*United States v. Alkins*,
  925 F.2d 541 (2d Cir. 1991) ............................................................................................. 96

*United States v. Aracri*,
   968 F.2d 1512 (2d Cir. 1992) ................................................................... 96

*United States v. Atehortva*,
   17 F.3d 546 (2d Cir. 1994) .............................................................. 36, 46

*United States v. Autuori*,
   212 F.3d 105 (2d Cir. 2000) ...................................................................... 5

*United States v. Basciano*,
   No. 05-cr-60 (NGG), 2007 WL 3124622 (E.D.N.Y. Oct. 23, 2007) .................... 86

*United States v. Branker*,
   395 F.2d 881 (2d Cir. 1968) ..................................................................... 86

*United States v. Cassese*,
   290 F. Supp.2d 443 (S.D.N.Y. 2003) ..................................................... 4, 45

*United States v. Cassese*,
   428 F.3d 92 (2d Cir. 2005) ......................................................................... 7

*United States v. Coriaty*,
   No. 99 CR. 1251, 2001 WL 1910843 (S.D.N.Y. July 16, 2001) ..................... 7, 59

*United States v. Coté*,
   544 F.3d 88 (2d Cir. 2008) ......................................................................... 5

*United States v. Crosby*,
   294 F.2d 928 (2d Cir. 1961) ..................................................................... 96

*United States v. D'Amato*,
   39 F.3d 1249 (2d Cir. 1994) .................................................................. 4, 36

*United States v. Desimore*,
   119 F.3d 217 (2d Cir. 1997) ....................................................................... 9

*United States v. Dickerson*,
   508 F.2d 1216 (2d Cir. 1975) ..................................................................... 8

*United States v. DiNome*,
   954 F.2d 839 (2d Cir. 1992) ..................................................................... 85

*United States v. Dixon*,
   536 F.2d 1388 (2d Cir. 1976) ................................................................... 73

*United States v. Falcone*,
   109 F.2d 579 (2d Cir. 1940) ..................................................................... 10

*United States v. Ferguson*,
    246 F.3d 129 (2d Cir. 2001)......................................................................... 5, 74, 85

*United States v. Ferrarini*,
    219 F.3d 145 (2d Cir. 2000)........................................................................... 93, 95

*United States v. Figueroa*,
    618 F.2d 934 (2d Cir. 1980)................................................................................. 87

*United States v. Friedman*,
    300 F.3d 111 (2d Cir. 2002) ................................................................................. 10

*United States v. Friedman*,
    854 F.2d 535 (2d Cir. 1988)................................................................................. 96

*United States v. Gelzer*,
    50 F.3d 1133 (2d Cir. 1995)................................................................................. 86

*United States v. Glenn*,
    312 F.3d 58 (2d Cir. 2002).............................................................................. 4, 36

*United States v. Goffer*,
    721 F.3d 113 (2d Cir. 2013)........................................................................... 93, 94

*United States v. Harris*,
    8 F.3d 943 (2d Cir. 1993) .................................................................................... 99

*United States v. Jones*,
    480 F.2d 1135 (2d Cir. 1973)............................................................................... 89

*United States v. Labat*,
    905 F.2d 18 (2d Cir. 1990)....................................................................... 8, 58, 60

*United States v. Leslie*,
    103 F.3d 1093 (2d Cir. 1997)............................................................................... 88

*United States v. Lino*,
    No. 00-cr-632 (WHP), 2001 WL 8356 (S.D.N.Y. Jan. 2, 2001) ........................... 87

*United States v. Lopez*,
    74 F.3d 575 (5th Cir. 1996) ................................................................................... 4

*United States v. Lujan*,
    529 F. Supp. 2d 1315 (D.N.M. 2007) ................................................................. 86

*United States v. Maldonado-Rivera*,
    922 F.2d 934 (2d Cir. 1990)........................................................................... 96, 97

*United States v. Martinez*,
54 F.3d 1040 (2d Cir. 1995).................................................................................. 4

*United States v. McDermott*,
245 F.3d 133 (2d Cir. 2001).................................................................................. 90

*United States v. Mulheren*,
938 F.2d 364 (2d Cir. 1991).................................................................................. 4

*United States v. Ozsusamlar*,
428 F. Supp. 2d 161 (S.D.N.Y. 2006).................................................................. 86

*United States v. Parkes*,
497 F.3d 220 (2d Cir. 2007)........................................................................... 88, 89

*United States v. Pauling*,
256 F. Supp. 3d 329 (S.D.N.Y. 2017).................................................................. 98

*United States v. Payseno*,
782 F.2d 832 (9th Cir. 1986) ............................................................................... 100

*United States v. Pelz*,
433 F.2d 48 (2d Cir. 1970).................................................................................... 73

*United States v. Restrepo*,
547 F. App'x 34 (2d Cir. 2013) ...................................................................... 96, 99

*United States v. Rittweger*,
524 F.3d 171 (2d Cir. 2008).................................................................................. 85

*United States v. Rodriguez*,
392 F.3d 539 (2d Cir. 2004)............................................................................... 8, 9

*United States v. Rodriguez*,
983 F.2d 455 (2d Cir. 1993).................................................................................. 93

*United States v. Samaria*,
239 F.3d 228 (2d Cir. 2001) ............................................................................. 9, 46

*United States v. Sanchez*,
969 F.2d 1409 (2d Cir. 1992)............................................................................. 5, 6

*United States v. Santos*,
541 F.3d 63 (2d Cir. 2008)..................................................................................... 9

*United States v. Schiff*,
801 F.2d 108 (2d Cir. 1986).......................................................................... 99, 100

*United States v. Stewart*,
    305 F. Supp. 2d 368 (S.D.N.Y. 2004) ................................................................ 7

*United States v. Svoboda*,
    347 F.3d 471 (2d Cir. 2003) ............................................................................... 9

*United States v. Taylor*,
    464 F.2d 240 (2d Cir. 1972) ............................................................................. 45

*United States v. Tonawanda Coke Corp.*,
    636 Fed. App'x 24 (2d Cir. 2016) ................................................................. 100

*United States v. Uccio*,
    917 F.2d 80 (2d Cir. 1990) ............................................................................... 96

*United States v. Ulbricht*,
    31 F. Supp. 3d 540 (S.D.N.Y. 2014) ............................................................... 98

*United States v. Vargas*,
    986 F.2d 35 (2d Cir. 1993) ................................................................................. 9

*United States v. Vilar*,
    729 F.3d 62 (2d Cir. 2013) ......................................................................... 6, 59

*United States v. Washington*,
    861 F.2d 350 (2d Cir. 1988) ............................................................................. 88

*United States v. Wiley*,
    846 F.2d 150 (2d Cir. 1988) ................................................................. 8, 58, 73

*VanCook v. SEC*,
    653 F.3d 130 (2d Cir. 2011) ............................................................................... 6

*Zafiro v. United States*,
    506 U.S. 534 (1993) ................................................................................... 86, 87

**Statutes**

15 U.S.C. § 78ff ........................................................................................... 2, 6

15 U.S.C. § 78j ........................................................................................... 2, 6, 7

18 U.S.C. § 2 ..................................................................................................... 2

18 U.S.C. § 371 ................................................................................................. 2

**Rules and Regulations**

17 C.F.R. § 240.10b-5 ..................................................................................... 2, 6

Fed. R. Crim. P. 29 ................................................................................................................. passim

Fed. R. Crim. P. 33 ................................................................................................................. 1, 5, 74

**Other Authorities**

1 SAND ET AL., MODERN FEDERAL JURY INSTRUCTIONS-CRIMINAL ¶ 19.01
  (2009) ............................................................................................................................... 96

Devon Archer respectfully submits this memorandum in support of his motions for judgment of acquittal under Rule 29(a) and (c), and in support of his motion for a new trial under Rule 33.

## PRELIMINARY STATEMENT

This Court has the opportunity to correct the jury's error and right a manifest injustice by acquitting Devon Archer.  The Court listened attentively throughout this six-week trial, and knows that the evidence was simply insufficient to demonstrate beyond a reasonable doubt that Mr. Archer possessed the requisite criminal knowledge, willfulness, or fraudulent intent, even granting the government the benefit of every inference.

No rational juror could conclude, beyond a reasonable doubt, that Mr. Archer willfully joined a criminal conspiracy, engaged in any scheme to defraud, or made a material misrepresentation in connection with the purchase or sale or the WLCC bonds.  Rather, even taken in the light most favorable to the government, the evidence shows that Mr. Archer and others – including Jason Galanis – were part of a lawful plan to acquire financial services companies with the hopes of later reorganizing and selling them for a profit.  In the course of that business, Galanis kept Mr. Archer informed about the acquisitions and about certain of the financial companies' operations, including the issuance of the WLCC bonds.  Mr. Archer provided funding – usually in the form of short-term loans – to the companies when they had cash needs, and arguably allowed Galanis to trade off of his name and relationships (although not to the extent that Galanis exploited it).

But Mr. Archer did not keep a penny of the misappropriated bond money, and the evidence simply does not permit the inference that he knew that Jason Galanis and others were

looting the companies Mr. Archer was investing in for their own benefit, or that the clients of Atlantic and Hughes were being forced to buy the WLCC bonds.

Indeed, Mr. Archer stands apart from the other admitted and alleged conspirators in a variety of ways:  whereas others profited from the scheme, he lost money; whereas others received funds directly from the fake annuity provider, Galanis took pains to ensure that Mr. Archer did not; whereas others spoke explicitly about their misdeeds, Mr. Archer was not privy to any such talk and others were instructed to withhold information from him; whereas others created false evidence and schemed to obstruct the SEC's investigation, Mr. Archer was not aware of any of that – he alone got more involved in the businesses when they went into distress. Unlike the true conspirators, who knew the business was lost cause, Mr. Archer put more of his own and investors' money in, hoping to save the business he thought he was building, even after the SEC had filed its first enforcement action.

The evidence at trial just did not support the jury's verdict, and no rational juror could have found Mr. Archer guilty.  The Court should therefore acquit him.  In addition and in the alternative, the Court should order a new trial.  Not only was the evidence such that – at a minimum – the Court must have concerns that an innocent person was convicted, but the jury's verdict was infected by evidentiary and instructional error warranting a new trial.

## BACKGROUND

On March 26, 2018, a grand jury returned a superseding indictment charging Devon Archer and four others with one count of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2 (Count II), and one count of conspiracy to commit securities fraud in violation of 18 U.S.C. § 371 (Count I).

The Indictment alleges two highly complex schemes. In the first, the defendants were accused of taking control of two investment advisers – Hughes Capital Management ("Hughes") and Atlantic Asset Management ("Atlantic") – and causing them to purchase, on behalf of the firms' clients and in violation of their fiduciary duties and client investment guidelines, approximately $40 million worth of bonds issued by the Wakpamni Lake Community Corporation (the "WLCC"). In the second scheme, the defendants were accused of misappropriating the proceeds of those bond issuances.

On May 22, 2018, three defendants – John Galanis, Devon Archer, and Bevan Cooney – proceeded to trial. During the course of the trial – discussed in greater detail below – the government presented the testimony of 16 witnesses, virtually none of whom had ever interacted with Mr. Archer. On June 20, the government rested and Mr. Archer made a motion for acquittal under Federal Rule of Criminal Procedure 29(a), which the Court deferred ruling upon. Mr. Archer then presented his own defense case.

On June 28, 2018, after approximately 165 minutes of deliberation and without asking any questions, the jury returned a verdict of guilty against all defendants on all counts. Mr. Archer now renews his motion for acquittal, or in the alternative, for a new trial.

## LEGAL STANDARD

### A.    Rule 29

Rule 29(a) provides: "After the government closes its evidence . . . the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Where, as here, the Court reserves decision on a Rule 29 motion made at the end of the government's case-in-chief, the Court must later consider the sufficiency of the evidence "on the basis of the evidence at the time the ruling

was reserved." Fed. R. Crim. P. 29(b).  Under Rule 29(c), the Court must separately consider the sufficiency of the evidence at the close of all of the evidence.

Either way, the standard is the same, and the government must show that the evidence at trial was sufficient for a rational juror to find the defendant guilty beyond a reasonable doubt. Put differently, although the Court must view the evidence in the light most favorable to the government when considering a motion for judgment of acquittal, the government still bears the burden of proving a defendant's guilt beyond a reasonable doubt.

"Where a fact to be proved is also an element of the offense . . . which is usually established only by inference – it is not enough that the inferences in the government's favor are permissible." *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995); *see also United States v. Cassese*, 290 F. Supp.2d 443, 447-8 (S.D.N.Y. 2003). The Court "must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." *Id*; *see, e.g*., *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994) ("a conviction based on speculation and surmise alone cannot stand"). When "the evidence viewed in the light most favorable to the prosecution gives 'equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence,' then 'a reasonable jury must necessarily entertain a reasonable doubt.'" *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (quoting *United States v. Lopez*, 74 F.3d 575, 577 (5th Cir. 1996) (reversing conviction for insufficiency of evidence)). In short, the government "must do more than introduce evidence 'at least as consistent with innocence as with guilt.'" *D'Amato*, 39 F.3d at 1256 (*quoting United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir. 1991)).

**B.      Rule 33**

Rule 33 provides that, "[u]pon a defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The rule by its terms gives the trial court 'broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice.'" *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001) (affirming trial court order granting new trial) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992)).

The standard under Rule 33 "differs from that applicable to a Rule 29(c) motion for judgment of acquittal, because, on a Rule 29(c) motion, the district court must view the evidence in the light most favorable to the government. Consequently, a guilty verdict might survive a Rule 29(c) motion – because a rational jury, viewing the evidence through the government's eyes, could convict – but fail to meet the Rule 33 standard because the momentum of the evidence as a whole would make a guilty verdict irrational." *Ferguson*, 246 F.3d at 139 n.1 (Walker, J., concurring in part and dissenting in part) (internal citation omitted).

"In the exercise of its discretion, the court may weigh the evidence and credibility of witnesses." *United States v. Coté*, 544 F.3d 88, 101 (2d Cir. 2008) (Sotomayor, J.). However, because "courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, '[i]t is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." *Ferguson*, 246 F.3d at 133-34 (quoting *Sanchez*, 969 F.2d at 1414). Accordingly, the Court "must strike a balance between weighing the evidence and credibility of witnesses and not 'wholly usurp[ing]' the role of the jury." *Ferguson*, 246 F.3d at 133 (alteration supplied) (quoting *United States v. Autuori*, 212 F.3d 105, 120 (2d Cir. 2000)).

"The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *Id*. at 134 (citing *Sanchez*, 969 F.2d at 1414). A "manifest injustice" occurs when, having examined the entire case – taking into account all facts and circumstances –and having conducted an objective evaluation, there exists "a real concern that an innocent person may have been convicted." *Id*. (quoting *Sanchez*, 969 F.2d at 1414).

### C.    The Charges of Conviction

#### 1.    Securities Fraud

The substantive offense of which Mr. Archer was convicted – securities fraud under 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5 – requires the government to prove "that in connection with the purchase or sale of a security the defendant, acting with scienter, made a material misrepresentation (or a material omission if the defendant had a duty to speak) or used a fraudulent device," and that he "willfully violated the law." *United States v. Vilar*, 729 F.3d 62, 88 (2d Cir. 2013) (quoting *VanCook v. SEC*, 653 F.3d 130, 138 (2d Cir. 2011)). As the Court instructed the jury, criminal securities fraud consists of three elements:  (1) that the defendant engaged in a scheme or artifice to defraud, or made a material misrepresentation/omission, in connection with the purchase or sale of securities; (2) that the defendant acted knowingly, willfully, *and* with the intent to defraud; and (3) that the defendant use or caused to be used the mails, interstate communications, or transportation in interstate commerce.  Tr. 4148:3-20.  As with any criminal offense, each and every element had to be proved beyond any reasonable doubt.

Not every material misrepresentation, however, gives rise to liability under the securities laws. Rather, a defendant must act with a "mental state embracing intent to deceive, manipulate, or defraud," also referred to as scienter. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976); *see also Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001). In the criminal context, the

6

government must further prove that a defendant acted willfully – that is, with "a realization on the defendant's part that he was doing a wrongful act." *United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005); *see also United States v. Stewart*, 305 F. Supp. 2d 368 (S.D.N.Y. 2004) (finding that the prosecution had failed to provide sufficient evidence of criminal intent to defraud and granting Rule 29 motion); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 427 (S.D.N.Y. 2003) (finding absence of scienter because "the requisite state of mind for actionable securities fraud under Rule 10b-5 is the intent to deceive, manipulate or defraud, not merely the intent to utter an untruth").

Finally, a securities fraud conviction requires that the defendant's fraudulent action occur "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b). Although this element should be construed "flexibly to effectuate its remedial purposes," *SEC v. Zandford*, 535 U.S. 813, 819 (2002), the Second Circuit has made clear that a merely tangential relationship between a misrepresentation and the purchase or sale of security cannot suffice. Rather, any alleged fraud must be "integral to the securities transaction" at issue. *Pross v. Katz*, 784 F.2d 455, 459 (2d Cir. 1986); *United States v. Coriaty*, No. 99 CR. 1251, 2001 WL 1910843, at *7 (S.D.N.Y. July 16, 2001) (granting Rule 29 motion because "[t]he connection between the misrepresentations and the sale of the securities is too tenuous to satisfy the 'in connection with' requirement of the securities laws.").

## 2.    *Aiding and Abetting Liability*

In this case, Mr. Archer was charged as both a primary violator of the securities fraud laws and as an aider and abettor.  (The verdict sheet did not ask the jury to distinguish between the two theories).

"To convict a defendant on a theory of aiding and abetting, the government must prove that the underlying crime was committed by a person other than the defendant and that the

defendant acted, or failed to act in a way that the law required him to act, *with the specific purpose of bringing about the underlying crime.*" *United States v. Labat*, 905 F.2d 18, 23 (2d Cir. 1990) (emphasis added) (partially reversing conviction for insufficiency of evidence). It is not sufficient to show merely that a defendant's actions in fact aided or contributed to the criminal endeavor. Rather, "[t]o prove that the defendant acted with that specific intent, the government must show that he knew of the proposed crime" – a mere "general suspicion that an unlawful act may occur is not enough." *Id.* (citations omitted); *see also United States v. Rodriguez*, 392 F.3d 539, 545 (2d Cir. 2004) ("[a]n aiding and abetting conviction must be premised on more than evidence of a general cognizance of criminal activity or suspicious circumstances." (internal quotation marks omitted)).

In order to be liable as an aider or abettor, the government must show both that "the defendant had some interest in furthering the unlawful act," *id.*, and that he "consciously assisted the commission of the specific crime in some active way," *id.* (quoting *United States v. Dickerson*, 508 F.2d 1216, 1218 (2d Cir. 1975)). Where any of these elements is lacking, a judgment of acquittal is required. *See United States v. Wiley*, 846 F.2d 150, 155 (2d Cir. 1988) (reversing aiding and abetting conviction for insufficient evidence of intent).

### *3.    Conspiracy*

Mr. Archer was also convicted of conspiring to commit securities fraud.  As the Court instructed the jury, this offense has three elements.  The government was required to prove beyond a reasonable doubt (1) that the charged conspiracy existed, (2) that the defendant willfully and knowingly because a member of the conspiracy with the intent to further its illegal purposes, and (3) that one of the conspirators knowingly committed at least one overt act within the District.  *See* Tr. 4164:23-4165:17.

"[T]o find that an agreement existed amongst the alleged conspirators, the finder of fact must necessarily find some knowledge of the aims of the agreement and the intent to bring them about." *United States v. Svoboda*, 347 F.3d 471, 476 n.6 (2d Cir. 2003). This element may be satisfied by "proof of a tacit understanding among the participants, rather than by proof of an explicit agreement." *United States v. Santos*, 541 F.3d 63, 71 (2d Cir. 2008). A defendant's involvement in that agreement cannot, however, be established "simply by his presence at the scene of a crime, nor by the fact he knows a crime is being committed." *United States v. Desimore*, 119 F.3d 217, 223 (2d Cir. 1997). Rather, the evidence introduced at trial must permit a rational jury to conclude that (1) "the defendant had knowledge of the conspiracy," and (2) "the defendant intentionally joined the conspiracy." *Santos*, 541 F.3d at 70. "Proof that the defendant knew that *some* crime would be committed is not enough." *Rodriguez*, 392 F.3d at 545 (internal quotation marks omitted) (holding evidence was insufficient to support conviction under conspiracy or aiding and abetting theory where defendant did not know he was aiding and abetting a *drug* transaction); *see also United States v. Samaria*, 239 F.3d 228, 235 (2d Cir. 2001) (finding that evidence of false exculpatory statements and that the defendant had picked up stolen goods did not, without more, support finding specific knowledge of the alleged scheme).

The government also has to prove beyond a reasonable doubt that the defendant "intended to join" the alleged scheme. *Santos*, 541 F.3d at 71. Absent an express agreement to join a conspiracy, courts "typically look for evidence that the defendant, in addition to knowing the essential nature of the plan, has 'associated himself with the venture in some fashion, participated in it as something that he wished to bring about, or sought by his action to make it succeed.'" *Id.* at 72 (quoting *United States v. Vargas*, 986 F.2d 35, 39 (2d Cir. 1993)). In addition to knowing that the agreement exists, an alleged conspirator "must in some sense promote their

venture himself, make it his own, have a stake in its outcome." *United States v. Falcone*, 109 F.2d 579, 581 (2d Cir.), *aff'd*, 311 U.S. 205 (1940); *see United States v. Friedman*, 300 F.3d 111, 126 (2d Cir. 2002) (reversing convictions for aiding and abetting and conspiracy for insufficient evidence).

## ARGUMENT

## I.     THE COURT SHOULD ACQUIT DEVON ARCHER

The Court should grant Mr. Archer's motion under Rule 29 and acquit him of the two charges against him because the government's evidence was simply insufficient to establish his guilt beyond a reasonable doubt.

### A.     The Evidence Was Insufficient To Prove That Mr. Archer Willfully Participated In Any Scheme To Defraud The Clients of Atlantic and Hughes

As an initial matter, the evidence was obviously insufficient to demonstrate that Mr. Archer had any knowledge of undisclosed conflicts of interest at Hughes or Atlantic, or violations of Atlantic and Hughes clients' investment guidelines, let alone that he willfully joined a scheme or conspiracy to defraud Atlantic and Hughes's clients through these violations of fiduciary duty.  Indeed, Mr. Archer was never charged with investment adviser fraud, and the evidence is undisputed that Mr. Archer never acted as an investment adviser (registered or otherwise).  Nonetheless, the Indictment incorporates all of the conduct and allegations relating to the investment advisor fraud in its securities fraud charges:

> the defendants engaged in a scheme to misappropriate the proceeds of several bond issuances by the WLCC **and also caused investor funds to be used to purchase the bonds**, for which there was no secondary market through which such bonds could be redeemed, **without disclosure to those investors of material facts, including the existence of multiple conflicts of interest, and which investments, in some cases, were outside the investment parameters of the accounts in which they were placed**.

Ind. ¶ 30 (emphasis added); *see also* Tr. 4143:19-4144:3 (jury charge).

The government devoted a substantial portion of its time at trial proving the investment advisor fraud. The government called three different witnesses who represented clients of Atlantic and Hughes: Michael Smith; Leo Griffin; and Clifton Moore. In addition, the government called a former Hughes employee, Daniel Turney. The government introduced evidence concerning the various funds' investment parameters and assets, along with the clients' lack of knowledge about conflicts of interest and their efforts to redeem their investments. The government elicited testimony about communications the clients had with Michelle Morton and others at the asset managers. The government similarly introduced evidence concerning Gary Hirst and Michelle Morton's efforts to cause the funds to purchase the bonds, including their communications with Jason Galanis.

But the government failed to prove that Mr. Archer was involved in or aware of the scheme to defraud the clients of Hughes and Atlantic Asset Management.  Literally none of the Hughes and Atlantic clients had so much as even heard of Mr. Archer, and the government's evidence likewise failed to show even that Mr. Archer knew who Atlantic's and Hughes's clients were, let alone that he knew what disclosures or representations had or hadn't been made to them.

The government argued at trial that Atlantic and Hughes failed to disclose certain conflicts of interest to its investment advisory clients, namely, that there were common individuals (*i.e.*, Hugh Dunkerley and perhaps Jason Galanis) associated with the placement agent for the bonds, the annuity provider for the bond proceeds, and the group that provided the funding for Michelle Morton's acquisition of Hughes and Atlantic.  Atlantic and Hughes also, according to the government, purchased WLCC bonds in certain clients' accounts without their consent and contrary to established investment guidelines, in violation of their fiduciary duties.

But there was absolutely no evidence that Mr. Archer was aware of these undisclosed conflicts or investment guidelines.

Mr. Archer did not cause any client of Hughes or Atlantic to purchase bonds. Mr. Archer had no formal authority or oversight over the investment advisers – that was GMT Duncan, which was controlled by Michelle Morton and Richard Deary.[1] There is no evidence that Mr. Archer took any action whatsoever that caused Hughes and Atlantic to buy bonds on behalf of its clients. Indeed, the one Hughes or Atlantic witness called by the government, Daniel Turney, testified that he "never met, talked to or corresponded with" Mr. Archer. Tr. at 2066:15-18 (Turney). Mr. Archer was not on the boards (WA AG and Valorlife) that approved the acquisitions and funding for the investment advisers, and the government introduced no evidence that Mr. Archer proposed or knew of any conditions on that financing relating to buying bonds.[2]

---

[1]      Contrary to the Indictment's allegations, ¶ 12, the evidence at trial was insufficient to prove that Mr. Archer controlled the entity (Wealth Assurance AG, Tr. 936:20-25 (Dunkerley)) that financed the acquisition of Hughes and Atlantic.  While the government advanced the notion of Mr. Archer's "control" of Atlantic and Hughes at least through motions *in limine*, *see* ECF No. 339 at 2; ECF No. 369 at 10, it appears to have abandoned the argument at trial. Nonetheless, to the extent that the government may argue that any inference of knowledge can be imputed to Mr. Archer through his "control" of the investment advisers, the trial record does not remotely support such an inference.

Hughes and Atlantic were owned by GMT Duncan, and Michelle Morton and Richard Deary "were the operators and the Class A shareholders who made the decisions on the day-to-day operations of GMT Duncan." Tr. 1316:16-21 (Dunkerley). BFG Socially Responsible Investing was the "Class B non-voting, non-operating shareholder of GMT Duncan." Tr. 1316:12-15 (Dunkerley); *see also* Tr. 1385:20-25 (Dunkerley, testifying that the Class A holders controlled the investment advisers). BFG Socially Responsible Investing, in turn, was wholly owned by Wealth Assurance AG ("WA AG") and was created by Hugh Dunkerley in his role as a director of Wealth Assurance AG. *See* DX4039E; Tr. 1386:4-1387:2 (Dunkerley). The members of the board of directors of Wealth Assurance AG – that is, the directors who approved the creation of BFG Socially Responsible Investing and the acquisitions of the investment advisers – were Dr. Rory Knight, Jason Sugarman, Aloyse Steichen, and Hugh Dunkerley, but not Mr. Archer, who was never a member of the board of Wealth Assurance AG. DX4060; Tr. 1388:18-1389:1 (Dunkerley).

[2]      *See* DX4060 at 1 (the board of Wealth Assurance AG: "in absence of a professional investment manager within WA AG the board welcomes the formal proposal from the

Further, not one of the witnesses representing Hughes and Atlantic's investors had ever corresponded with Mr. Archer. *See id.* at 764:11-24 (Smith); 1618:12-19 (Griffin); 1689:24-1690:2 (Moore).  The government also did not present any evidence that Mr. Archer was aware of what representations or disclosures had been made to the investment advisory clients, what the clients' investment guidelines were (or that any existed), or who the investment advisory clients even were.

What the government did introduce was circumstantial evidence in the form of e-mails from Jason Galanis who copied Mr. Archer.  These e-mails, however, simply provided information to Mr. Archer about the progress that Galanis was making towards acquiring financial services companies.  In fact, the only communications involving Mr. Archer that linked the WLCC bonds to the investment advisory clients[3] made clear that the bonds were not being foisted upon them, but rather that the unnamed clients were being given an "opportunity" to invest, should they chose to do so.

As Hugh Dunkerley testified, it was no secret that Valor Group, through its subsidiaries, was going to acquire asset managers. These e-mails, however, do not support the inference – let alone the inference beyond a reasonable doubt – that Mr. Archer had knowledge of the *fraudulent* acts alleged in the indictment relating to the investment advisor fraud. In GX2213, for example, Jason Galanis e-mails Mr. Archer and Mr. Cooney on July 16, 2014, attaching the term

---

company's shareholder to invest in BFG Socially Responsible Investments Ltd. (BFG), and puts its trust in the proven expertise of Jason Sugarman and Hugh Dunkerley on investment matters."); DX4016D ("Consultant Report" to the "Board of Valorlife" regarding the "Proposed acquisition of Atlantic Asset Management LLC").

[3]     As discussed below, the overwhelming majority of e-mails involving Mr. Archer concerning the WLCC bonds were in the context of Burnham Securities Inc., the placement agent for the bonds.  Virtually none of the communications linked the WLCC bonds to the clients of Atlantic and Hughes, and the evidence in fact failed to show that Mr. Archer knew who had purchased the first and third bond issuances.

sheet for the Hughes acquisition by GMT Duncan. Jason Galanis describes the business

opportunity in Hughes and writes, in relevant part: "Need to determine where the $2.647 million

for the acquisition is getting allocated from" and "We have agreed to give the firm an

opportunity to participate in native american bond new issues. I believe they will take $28

million of the Wakpamni/Ogala [sic] Sioux issue that Greenberg Traurig is working on." *Id.* The

first statement provides no indication as to how the acquisition will be funded – in fact, it is the

exact opposite, noting that the funding source has not yet been identified. That source (the

Ballybunion fraud) was ultimately concealed from everyone except for Jason Galanis and Hugh

Dunkerley.[4]

The second statement from GX2213 plainly states that Hughes would be given "an

opportunity" to purchase bonds.  It is impossible to infer from this statement that Mr. Archer

therefore knew that Galanis, along with Morton and Hirst, intended to force Hughes to purchase

the entirety of the first bond offering without the knowledge or consent of the clients on whose

behalf they were purchased. *Id.*  Rather, this was one of many lies that Galanis told to Mr. Archer

to conceal the fraud from him.  Mr. Archer's response to this email – which likewise does not

remotely indicate that he was aware of what Jason Galanis, Morton, and Hirst would eventually

go on to do, or that anything else untoward was going on – was simply, "This is very

encouraging!" *Id.*

A second e-mail similarly provides no basis on which a rational juror could have inferred

that Mr. Archer knew how the acquisition of Hughes was actually funded. In GX2034, Jason

Galanis e-mails Mr. Archer and Mr. Cooney on August 11, 2014, and writes, "WAAG wired

---

[4]     *See* DX4060 at 2 (WAAG conditioning financing on releasing Ballybunion proceeds); Tr.
1390:1-13 (Dunkerley, testifying Mr. Archer was not involved in and had no knowledge of the
Ballybunion fraud); Tr. 1151:4-8 (Dunkerley, testifying that Jason Galanis explicitly instructed
him "not to tell anyone about the Ballybunnion situation, including Gary Hirst.").

$2.76 million today to close Hughes." This answers the question left open from GX2213, which was how the Hughes purchase was to be funded. WA AG was not an entity that Mr. Archer managed, and there is no evidence he knew where WA AG itself acquired the funding. Standing alone, moreover, there is nothing remotely suspicious or improper about WA AG funding the acquisition of the two investment advisers.

The circumstantial evidence regarding the Atlantic acquisition does not support an inference that Mr. Archer knew how the acquisition was funded, or that conflicts of interest were being withheld from Atlantic's clients. On September 20, 2014, long before the actual Hughes–Atlantic merger, Jason Galanis forwarded Mr. Archer a file called "Overview Atlantic Asset Management.pdf." GX2037. Notably, the government introduced the cover e-mail, but not the attachment, which is not part of the trial record. Mr. Archer replied to Galanis that he "Will review," but a rational juror could not infer Mr. Archer's knowledge about any particular fact that was conveyed in a memo that the jury never saw.[5] The term sheet for the deal, which Jason Galanis forwarded to Mr. Archer, also does not contain any information to suggest the deal was in any way improper. *See* GX2251.

Mr. Archer also never received information about who had purchased the bonds, let alone what representations were made to the clients of Atlantic and Hughes. For example, unlike Mr. Cooney, Mr. Archer never received a breakdown of which Hughes clients had purchased bonds. GX2299. Rather, as discussed above, Mr. Archer only knew that clients of the investment advisers would be given the "opportunity" to invest in the WLCC bonds. The only evidence that even comes close to putting Mr. Archer on notice of the identities of the bond purchasers was an e-mail in which Jason Galanis forwarded Mr. Archer an e-mail from Michelle Morton on

---

[5]     The government presumably did not introduce the attachment because it was totally benign. It was simply a description of Atlantic by Morton as a possible acquisition target.

October 31, 2014, where she had written, "If he [referring to someone named Josh Bogart] has information on the issue, he will begin the process of going through the client information to determine where they can be placed." GX2062; *see also* GX2061 (forwarding e-mail describing first part of conversation between Morton and Bogart).  Assuming that a juror could reasonably infer that "the issue" is a reference to the WLCC bonds, this e-mail does not support an inference that the bonds were placed with Atlantic clients in violation of investment guidelines.  To the contrary, the e-mail supports the exact opposite inference:  that "client information" would be carefully reviewed to determine where the bonds could be permissibly placed.  Certainly nothing in this or any other document supports the inference that Mr. Archer willfully joined a scheme to hide conflicts of interest from the investment advisers' clients and place the WLCC bonds in violation of their investment guidelines.

There is also no evidence that Mr. Archer had any responsibilities with respect to disclosing conflicts of interest, nor that he was aware of what disclosures were or were not being made to the clients of the investment advisers. It was the responsibility of Atlantic and Hughes (and certain of their employees, such as Morton and Hirst) to have alerted their investors to any conflicts of interests, but Mr. Archer was not an employee of Atlantic or Hughes. At best, Mr. Archer was a non-controlling investor in an indirect, twice-removed parent company of these entities – decidedly not the person on whose shoulders any disclosure responsibilities would have fallen.  Indeed, the evidence at trial was that at least certain of the alleged conflicts of interest *were* disclosed. *See* Tr. 186:1-10, 508:15-509:4 (Tim Anderson, testifying Dunkerley's role as a common director of WA AG and BSI was "not [a] significant concern," a "common" occurrence, and was in any case disclosed in a private placement memorandum); GX1334 at 19 (disclosing:  "In addition, certain officers and directors of the Placement Agent

16

[BSI] are affiliated with the Insurance Provider [WA AG]."). Conflicts of interest come up "fairly often in the world of investment advisers," and they are fine if disclosed, as this one was. Tr. 186:8-10 (Anderson); Tr. 1634:13-21 (Laby).

But more to the point, Mr. Archer did not in fact receive any information about what information was or was not disclosed to the clients of Atlantic and Hughes. He was simply not privy to communications between the investment advisers and their clients, and therefore had no idea what representations or misrepresentations were being made to them.

### B. The Evidence Was Insufficient To Prove That Mr. Archer Willfully Participated In A Scheme To Steal The WLCC Bond Proceeds

As just explained, there was simply no evidence at trial to connect Mr. Archer to the investment adviser fraud – the undisclosed conflicts of interest and violations of investment guidelines. Instead, the government's case against Mr. Archer was focused on the second charged scheme: the misappropriation of the proceeds of the WLCC bonds. But here, too, the proof was insufficient for a rational juror to find Mr. Archer guilty beyond a reasonable doubt.

The government did not present a single piece of direct evidence showing that Mr. Archer knew that bond money was being stolen. Neither of the government's two cooperating witnesses – Hugh Dunkerley and Francisco Martin – claimed that Mr. Archer knew anything about stolen bond money, and in fact both admitted that they had never talked with Mr. Archer about the WLCC bonds at all. Tr. 1310:7-13, 1524:13-24 (Dunkerley); Tr. 2381:17-2382:7 (Martin).[6] The government introduced numerous of Mr. Archer's personal e-mails, but none of them – notwithstanding the familiar and explicit way in which Galanis and Mr. Archer

---

[6]     The only possible exception, taking the evidence in the light most favorable to the government, is that Mr. Archer and Dunkerley may have participated in a meeting at Burnham Securities Inc. at which BSI's role as placement agent was approved. Tr. 1409:18-23 (Dunkerley). But there is no dispute that any such meeting did not involve any suggestion that the bond proceeds would be stolen, or anything else improper. Tr. 1410:1-13.

sometimes communicated – came even close to acknowledging the theft of the bond proceeds. In five weeks of testimony and nearly 800 documentary exhibits, there was not a single piece of direct evidence that Mr. Archer knew bond money was being stolen.

Instead, the government's case was entirely circumstantial.  Circumstantial evidence is, of course, perfectly valid and a crime may certainly be proven through circumstantial evidence. But in this case, with respect to Mr. Archer, the circumstantial evidence did not permit a rational juror to find Mr. Archer guilty beyond a reasonable doubt.

The government relied upon three principal categories of circumstantial evidence to attempt to prove that Mr. Archer knew of Jason Galanis's scheme to misappropriate bond proceeds. The first category is red flags: the idea that there was too much that was suspicious about the bonds and the annuity, so Mr. Archer must have known what was going on. But Mr. Archer saw the same thing – and in many cases far less – that so many other people saw who believed the bond issuances were entirely legitimate, including any number of lawyers and bankers. GX2027.  Mr. Archer was also not privy to the kind of information that would have revealed the fraud.  For example, Hugh Dunkerley testified that he was not aware that Galanis was stealing the bond proceeds until he saw where the money in the Wealth Assurance Private Client Corporation ("WAPCC") account was actually being directed.  Tr. 1139:24-1140:11.  But Mr. Archer had no access to the WAPCC account and no insight into where the money was going or that it was not being appropriately invested.  Unlike even his co-defendants, neither Mr. Archer nor any entity controlled by him (*i.e.*, Rosemont Seneca Bohai LLC) received a single wire or check from the WAPCC account, such that it could be argued that he knew that money

was being misdirected.[7]  *See* DX9003.  Certain of Mr. Archer's actions – purchasing bonds, his statements to Morgan Stanley and the BIT Board, and other acts relating to the financial conglomerate he believed they were growing – are discussed in more depth below, but the common thread through all of them is that the evidence was insufficient to support the inference that Mr. Archer did these things knowing they were part of a larger scheme.

The second category of circumstantial evidence of Mr. Archer's state of mind is motive. This is a category of evidence that the government struggled to identify through the entire trial, until, at the last possible minute in its rebuttal case, the government pointed to what had been obvious from the start: Mr. Archer had an incentive to see his business ventures succeed. Mr. Archer received stock as compensation for his participation on the board of directors for Wealth Assurance Holdings – stock that he received before any of the WLCC bond issuances were conceived of. *See* DX 4017; DX 4007S at 3.  The entire purpose of the stock grant was to align his incentives with those of the company, to see the company succeed and his stock appreciate in value. This is motive to make money, not commit crimes. Mr. Archer did not want to create a financial services firm because it felt good – he did it, like anyone in business, to make money. The fact that he received shares of stock months before the WLCC bond issuances and having nothing to do with them cannot support the inference that he somehow knew that Galanis would later cause the WLCC to issue bonds, the investment advisers to acquire them, and then would steal the proceeds.

The third and most important category of circumstantial evidence is e-mails that Jason Galanis forwarded to Mr. Archer or copied him on. These e-mails, the government argued,

---

[7]     Receipt of money directly from the WAPCC account would not necessarily lead to an inference of wrongdoing, in any case.  For example, one of the lawyers on the deal, Tim Anderson, testified that his firm received a $50,000 payment from the WAPCC account, in addition to the fees that his firm received at the closing of the bond issuances.  Tr. 490:7-492:7.

showed not only that Galanis kept Mr. Archer apprised on his efforts to locate deals for the

financial services firm, but that he kept Mr. Archer apprised of his theft of the bond money. The

e-mails, on their face, support no such inference, and no witness testified to their meaning.

Instead, the government argued to the jury that it should draw certain inferences from the e-mails

that the documents themselves simply do not support.  Instead, the government's argument

presupposed some other evidence – some conversation between Mr. Archer and Galanis or the

like – in which Mr. Archer learned that the proceeds were being stolen, but no such evidence was

presented to the jury.  Put differently, the government's urged inferences are only rational if one

presupposes Mr. Archer's guilt.  But viewed in light of the actual trial evidence – even taken

most favorably to the government – the e-mails just cannot permit a rational juror to infer Mr.

Archer's knowledge, willfulness, or intent to defraud.

### 1. *The bond deals carried outward appearances of legitimacy*

A rational juror could not conclude that anything about the nature or circumstances of the

bond issuance could have caused (let alone did cause) Mr. Archer to infer the existence of any

untoward activity that could amount to knowledge of criminal misappropriation. Although novel,

the investment strategy underlying the bond issuances was sound. *See id.* at 403:10-404:11,

405:8-16, 506:21-507:11, 536:12-19, 624:17-626:13 (Anderson); 1908:6-1909:7 (Raines). The

issuances were reviewed and blessed by a number of established law firms with experience in

tribal bond issuances – experience Mr. Archer lacked. *See id.* at 388:13-16; 395:7-396:13

(Anderson); GX1364. And while – unbeknownst to Mr. Archer – the bonds could not be placed

in the client accounts of Hughes and Atlantic, that was because the bonds did not meet the

clients' investment parameters, not because there was anything wrong with the bonds

themselves.

The testimony of Dilworth Paxson's Timothy Anderson, who served as counsel to BSI, the placement agent for the bonds, and who had extensive experience with tribal bond issuances, is most instructive on this point. *See id.* at 143:24-144:23, 155:15-51 (Anderson); 285:25-286:15, 287:22-288:7, 443:22-445:10, 575:25-576:17, 577:4-6 (Anderson). Anderson testified that he drafted or reviewed all of the core bond documents for all three bond issuances. *See id.* at 156:25-157:10, 179:8-14, 180:12-15 (Anderson); 423:4-24, 443:3-7, 481:12-15, 482:10-483:23, 522:7-523:8, 536:20-22, 537:10-538:2, 561:2-9 (Anderson). He testified that the bond issuances all involved highly reputable law firms, banks, and other entities on which he and at least one highly reputable accounting firm had performed due diligence. *See id.* at 156:8-11, 164:24-165:21 (Anderson); 317:1-319:3, 353:15-354:20, 362:17-363:14, 364:14-19, 483:24-484:22, 526:8-527:17, 527:25-528:16 (Anderson). Indeed, both Dilworth Paxson, as counsel to BSI, and Greenberg Traurig, as counsel to the WLCC, issued opinion letters effectively blessing the structure of the bond issuances. *See id.* at 388:13-16, 395:7-396:13 (Anderson); GX1364. Based on his experiences on all three bond issuances, Anderson believed them to be entirely legitimate and above-board. *See id.* at 212:22-214:5 (Anderson); 321:8-19, 376:23-377:8, 401:9-402:1, 408:2-4, 421:19-422:14, 426:9-11, 521:25-522:6, 534:15-536:10, 610:9-15, 624:17-626:13 (Anderson); 630:14-20 (Anderson). Anderson even testified that he attended the groundbreaking ceremony for the warehouse funded by one of the bond issuances in South Dakota in the dead of winter because he genuinely believed that "it was an important transaction and . . . something to be proud of," and because he "thought [he] had done a lot of good and . . . wanted to be part of it." *See id.* at 399:23-25, 400:7-10 (Anderson).[8]

---

[8]    To the extent that the government will argue that the annuity component of the bond issuances rendered them somehow facially suspect or illegitimate, the evidence is to the contrary, and indicates that, while the annuity concept was novel, it made sound financial sense and was

Galanis went out of his way to make sure that Mr. Archer believed the same, sending him a steady stream of photographs depicting progress on the construction and boasting about the good use that the bond proceeds were being put to.  DX 2064; DX 4117; DX 3550.  These were lies Galanis told to Mr. Archer to con him into believing that the WLCC bonds were working as advertised, and would hardly have been necessary or appropriate if Mr. Archer knew that Galanis had in fact gone to buy Galanis homes, cars, jewelry, and the like.

Those individuals who did eventually learn that Jason Galanis was conspiring to misappropriate bond proceeds learned it through their access to information that Mr. Archer did not have. Given that Dunkerley's visibility into and control over the WAPCC account were the only reasons how he knew that the bond proceeds were not being invested in an annuity and were instead being misappropriated, there is no reasonable basis for inferring that Mr. Archer, who lacked such visibility and control, could have had any idea about the misappropriation. *See* GX301 at 53 (showing $15 million credit to RSB Morgan Stanley account from "Citibank Florida FSB Clifford A Wolff, P.A."); GX565 at 2; GX510 at 32; Tr. 803:13-20 (Driever); 1027:1-14, 1028:5-10 (Dunkerley); 1310:7-13 (Dunkerley). Dunkerley also testified that he "had never spoken to Mr. Archer about the second WLCC bond issuance," generally, or about Mr. Archer "purchasing the [WLCC] bonds," and that he "never had a conversation with Mr. Archer in which [they] discussed misappropriating the funds from the WLCC bonds." *Id.* at 1024:18-23 (Dunkerley); see also 1310:7-18 (Dunkerley).

Francisco Martin testified that he did not know at the time he signed on to be the investment manager for the bond issuances "that Jason Galanis was going to steal any of the

---

not at all indicative of fraud. *See* Tr. at 403:10-404:11, 405:8-16, 506:21-507:11, 536:12-19, 624:17-626:13 (Anderson); 1908:6-1909:7 (Raines).  No witness testified and no document suggested that anything about the structure of the annuity investment – separate from the fact that Galanis misdirected the proceeds – was suspect.

bond money"; that he still did not know Galanis was stealing the money even after he did not

receive any money to invest even though he was supposed to be the investment manager for the

issuances; and that he only came to the conclusion that Galanis had stolen the money when

Galanis financed the acquisition of Fondinvest despite having (according to Martin) no

discernable source of income.  Tr. at 2135:1-5 (Martin); 2196:4-20, 2296:2-15, 2326:5-15,

2329:16-23 (Martin); 2391:6-15 (Martin); Tr. 2175:17-22.[9] And just as there was no evidence

that Mr. Archer was at all affiliated with the WAPCC bank account that tipped Dunkerley off to

Galanis's plan to misappropriate the bond proceeds, there was likewise no evidence that Mr.

Archer had any affiliation with Martin's erstwhile investment management company, or that he

knew how Galanis was financing the acquisition of Fondinvest. *See* Tr. 2292:24-25 (Martin); Tr.

1339:25-1340:3 (Dunkerley cross). Martin in fact never met Mr. Archer, and there is absolutely

no evidence that they communicated with one another, ever. Tr. 2292:24-25, 2381:17-2382:7

(Martin).

To the extent that Mr. Archer saw the bond documents, what he would have seen is that

the WLCC and bond documents themselves contemplated an annuity that invested in private

equity.  As set out in the bond indentures, annuity contracts, and investment management

agreements, the firm that would manage the proceeds was called "Private Equity Management."

GX204 at 21 (first bond indenture); GX206 at 21 (second bond indenture); GX210 (investment

management agreement for first bond issuance); GX209 (investment management agreement for

second bond issuance). The WLCC gave Private Equity Management discretion "to supervise

---

[9]     As discussed below in connection with Mr. Archer's motion for a new trial, this aspect of
Martin's testimony cannot be credited, as it was flatly inconsistent with his repeated
acknowledgements that he understood Galanis to be wealthy and to have significant family
money.  Tr. 2195:1-9, 2340:23-2341:3 (Martin).  For purposes of Rule 29, however, Mr. Archer
assumes the truth of Martin's statement.

and direct the investment and reinvestment of the" bond proceeds, GX210 at 1; GX209 at 1, and stated that it "wishes to invest utilizing a private equity strategy," and suggested that the "Manager invest in situations that may be overlooked by others, including in companies suffering from capital markets dislocation, financial distress, complexity or negative market sentiment." GX210 at 11; GX209 at 10. Mr. Anderson understood that the bond proceeds were to be invested in private equity, Tr. 370:17-19 (Anderson), meaning used to purchase large stakes in companies, Tr. 372:9-15, 501:12-502:13 (Anderson), and that this was "was the planned approach" as contemplated in the WLCC's bond documents. Tr. 504:3-6 (Anderson).  Indeed, the bond documents were explicit that the "annuity" in which the proceeds would be invested was not a typical, safe annuity that produced a steady return, but a high-risk investment in which the WLCC shared the upside. GX 210 at 11; GX 209 at 10; Tr. 515:9-516:15 (Anderson); GX 1334 at 14.

The government introduced no evidence that suggested Mr. Archer knew there was anything about the structure or execution of the bond issuances that was illegal, and in fact the undisputed evidence was that the bond itself was perfect lawful and sound.

> **2.      *Mr. Archer's alleged motive – to see his shares of Wealth Assurance Holding appreciate – does not support the inference that he knowingly and intentionally participated in a scheme to steal bond proceeds.***

From the start of the trial, the government struggled to answer a simple question: why would Mr. Archer participate in the alleged fraud?  At the end of the day, the evidence never provided an answer.  Throughout the trial, the government offered at least three theories of motive, but none of them were supported by the evidence.

In its opening statement, the government argued that Mr. Archer received $15 million of misappropriated bond proceeds. Tr. 58:12-13.  The record was clear, however, that Mr. Archer did not benefit from those funds – he kept neither the money nor the bonds purchased with that

money. *See* GX 4004 (government chart showing Mr. Archer gave that $15 million to US Bank for the bonds and gave all the bonds to VL Assurance).

The government's second theory of motive was to suggest Mr. Archer received over $700,000 in cash from the bond proceeds through Jason Galanis's company, Thorsdale. *See* GX4012. But while some of the alleged conspirators did keep proceeds from Thorsdale, the government's own summary witness admitted Mr. Archer did not. Tr. 3060:4-10 (Kendall). Instead, although Mr. Archer did receive two transfers from Thorsdale, they did not result in any benefit to him; there were fully offsetting transfers from Mr. Archer back to Thorsdale. *Id.*[10] The undisputed evidence at trial showed, in actuality, that Mr. Archer lost money in the investments he made into the financial conglomerate that he believed he was building. *See* DX9003 at 5.

Finally, in its rebuttal case, the government advanced a third theory of motive: that he profited because he held equity in Wealth Assurance Holdings. But the fact that Mr. Archer held stock in WAH did not provide a motive to commit fraud; it only provided a motive to see WAH succeed. When Mr. Archer agreed to join the board of directors of Wealth Assurance Holdings, he received 130,000 shares of Class B (non-voting) Common Stock. *See* DX4017; *see also* Tr. 1355:6-1356:11. That award of equity finally took place on or about April 9, 2014 – which was still long before the allegedly fraudulent bond deals. Moreover, there was absolutely no evidence presented at trial tying the award of the WAH shares in any way to the WLCC bonds. On its rebuttal case, the government pointed to the value of these shares as of December 2014 to explain why Mr. Archer had supposedly agreed to risk everything and join Jason Galanis's

---

[10]   The government's witness also conceded that she had double-counted the money mis-ascribed to Mr. Archer, most of which also ended up at a company called Vaudoise. Tr. 3055:6-12 (Kendall).

criminal enterprise. *See* Tr. 3584:8-16, 3628:25-3629:5. But even when viewed in the light most favorable to the government, there is still a fundamental disconnect between having a motive to want the larger financial enterprise to succeed on the one hand, and knowing on the other hand that within that enterprise, Jason Galanis was misappropriating money along the way. The Second Circuit has repeatedly made clear that a corporate officer's general interest in having his or her company's stock price increase is insufficient to warrant an inference of scienter. *See, e.g.*, *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (because all corporate executives have an interest in seeing the stock of their companies continue to trade at the highest possible levels, no inference of scienter could be drawn from fact that officer's compensation would increase if stock price increased).  Without some connection to the WLCC bonds, therefore, Mr. Archer's ownership of WAH stock is insufficient as a matter of law to support an inference of fraudulent intent, and no reasonable juror could have concluded otherwise.

### 3.   *Jason Galanis's e-mails to Mr. Archer are insufficient to establish that Mr. Archer knew Jason Galanis was stealing money*

In its summations, the government pointed principally to a series of e-mails to argue that Mr. Archer knew that Galanis was stealing the bond proceeds, and was a willing member of his conspiracy.  Although the sheer volume of these e-mails appears to have persuaded the jury, their substance just does not support an inference of criminal intent.  In reality, the e-mails are facially innocuous and demonstrably innocent, and cannot reasonably be interpreted otherwise. Moreover, many of the communications between Galanis and Mr. Archer negate any inference of criminal intent, because Galanis took pains to deceive Mr. Archer into believing that the WLCC bonds had value.

The government introduced a number of e-mails in which Galanis discussed his need for "discretionary" funds or "liquidity" or "assets under management," which the government

argued to the jury was somehow code for stolen money.  But no witness testified to this code –

even in communications *not* involving Mr. Archer, there was no evidence that Galanis used

terms such as these to mask speaking explicitly about his crimes.  Instead, these terms have

ordinary and appropriate meanings in the financial services context, as numerous witnesses

acknowledged.  *See, e.g.*, Tr. 650:19-651:23 (Smith); Tr. 855:2-14 (Driever); Tr. 1397:18-1398:4

(Dunkerley); Tr. 1605:21-23 (Griffen); Tr. 1635:23-1636:4 (Laby); Tr. 1660:8-12 (Laby); Tr.

1673:15-16 (Moore); Tr. 3386:3-15, 3386:18-24 (Filler).  There was no evidence to suggest that

Galanis intended a more sinister meaning, let alone that Mr. Archer understood one.  Rather, the

ordinary business usage of those and similar terms was entirely consistent with the so-called

"roll-up plan" that Mr. Archer invested in and began developing before any bonds were on the

table. For example, the pitch deck that was prepared to market the Burnham conglomerate to

potential investors boasted about the billions it had under management, with discretionary

control over.  DX 4733A at 12.  That is how bankers and asset managers – and Mr. Archer was

running a real estate private equity firm at the time, GX 343 at 6 – use the terms. *See* Tr.

1635:23-1636:4 (Laby); Tr. 1660:8-12 (Laby); Tr. 3386:3-15, 3386:18-24 (Filler).

The government introduced myriad examples of the term "discretionary" referring to

assets under management, and no evidence it ever meant anything else. The pension funds

viewed "discretion" this way. *See, e.g.*, GX122 at 29 (June 2013 Atlantic Global Yield

Opportunity Fund Private Placement Memorandum) ("The Investment Manager has wide

discretion in selecting the Designated Managers with which to invest Master Fund assets and the

Investment Manager can at any time increase or decrease the allocation to a Designated

Manager, or replace a Designated Manager, or change the strategies or sectors utilized by the

Master Fund."); Tr. 650:19-651:23 (Smith) (testifying that "discretion" in GX122 means "That

within the parameters of the private placement memorandum, that Atlantic had authority to change who the designated manager might be, or change a strategy within the context of the governing documents."); GX185 (Hughes Management Agreement with Richmond Retirement System defining "Discretionary" as "Advisory will supervise and direct the investments and make all investment decisions for the Account."); Tr. 1605:21-23 (Griffin) ("So in the industry, discretionary, it has a couple of definitions, but in short, the investment manager has discretion to invest within guidelines.").

The investment advisers viewed discretion this way. *See, e.g.*, Tr. 1397:18-1398:4 (Dunkerley) (testifying that Atlantic and Hughes had "some discretion" over the assets they were managing, which he clarified: "So if an investor has given you their money, they've also given you permission to invest it in what you believe is a good investment for them. You have discretion over how that money is spent; they've given you that legal responsibility."); GX130 at 2 (Hughes Investment Management Agreement with Michelin North America stating under the heading "Discretionary Authority" that "the Client hereby expressly grants to the Manager full and complete discretion and authority with respect to managing the investment of the Investment Assets . . . ."); Tr. 1673:15-16 (Moore) (testifying regarding GX130 that "Discretionary Authority" means that Hughes "ha[s] discretionary authority to choose which investments to purchase or sell."); GX140 (Hughes Investment Counsel Agreement with ILA Managed Health Care Trust Fund stating "Discretionary" means Hughes "will supervise and direct the investments and make all investment decisions for the Account"); GX152 (same "Discretionary" definition for Milk Drivers & Dairy Employees Local 246 Pension Plan); GX190 (same "Discretionary" definition for Terrapin Insurance Company); GX195 (same "Discretionary" definition for Washington Suburban Sanitary Commission Employees' Retirement Plan). Experts

testified that this is what discretion means in the financial industry. *See* Tr. 1635:23-1636:4 (Laby).

Consistent with the pension funds and investment adviser, the trial evidence showed "discretionary" for Mr. Archer – particularly regarding the roll-up plan – referred to assets under management. Mr. Archer's involvement in the roll-up plan long preceded any WLCC bonds, *see* DX2000, and it was always focused on obtaining assets under management. The client-facing Teneo presentation touted in bold Burnham's expansion in assets under management from $1.5 billion to $17.3 billion in the previous seven months. *See* DX4733A at 12. When "discretionary" use of assets arose in Mr. Archer's correspondence, it was always in this context.

The earliest piece of evidence introducing Mr. Archer to Native American bonds is a February 2014 email where Jason Galanis wrote about approval for "a $217 million tax free bond issuance by a native American tribe. The proceeds are exem[pt] from the required on-reservation usage." GX2004. Galanis added, "we can direct part of the proceeds i am told." GX2004. This e-mail – which was not specifically about the WLCC bonds but may, for purposes of Rule 29, be assumed to be a progenitor – is consistent with Mr. Archer's legitimate plan to raise assets under management for the roll up-plan, and provides no reason to infer anything else. First, Galanis's note that "we can direct part of the proceeds i am told" refers to the type of fee-generating discretionary assets under management that they wished to build up to make their financial services firm more valuable. This comment thus comports with the roll up and gives no basis for any negative inference.

Second, Galanis's note that "the proceeds are exem[pt] from the required on-reservation usage" reinforces the "assets under management" interpretation. *Id.* If Mr. Archer understood that Galanis intended to steal the proceeds, then whether the proceeds benefited from this

29

exemption was superfluous. After all, no indenture was going to allow Jason Galanis to spend proceeds on his mansion, but that's where he schemed to put the bond money. The only reasonable inference is that, for Mr. Archer, this e-mail referred to legitimate investment assets.

Two months later in April, 2014, Jason Galanis wrote Mr. Archer and Cooney: "$20mm bond approved. Proceeds are 15mm to us and 5mm to them for a winery investment they want to make." GX2120. In response to Cooney's question "What do we get to do with the 15mm," Galanis replied, "Discretionary." *Id.* The only fair read of this e-mail – which Mr. Archer never responded to – is that "discretionary" means "assets to manage."  As reinforced by the attached opinion letter from Dilworth Paxson, Galanis was conveying that of the $20 million bond proceeds, $5 million would be immediately invested in a capital improvement on the reservation, and the other $15 million would be invested by their financial services firm.  Again, if Mr. Archer and Mr. Cooney understood that Galanis was going to steal the money, the question "what do we get to do with the 15mm" would have been both unnecessary and enormously stupid.  The e-mail simply does not support the inference that in replying "discretionary," Galanis was somehow informed Mr. Archer that the money was going to be misappropriated.

Later emails referring to "discretionary" only strengthen this point. When Jason Galanis emailed Mr. Archer and Cooney about the bonds a few months later on June 20, 2014, he stated that "annuity proceeds get invested by an appointed manager on a discretionary basis on a 20 year contract." GX1235. The context leaves no room for interpretation: a money manager will invest the annuity proceeds "on a discretionary basis."

When Jason Galanis e-mailed Archer and Cooney six days later that he was "working with dan [McClory] and Hugh [Dunkerley] on capital vehicles that result in us controlling discretionary funds," and Archer replied, "We need discretionary funds at our command

soonest," GX2021, "discretionary" meant the same thing: assets to invest. The meaning of "discretionary" in this investment context did not change from six days earlier.  Indeed, it would make no sense if "discretionary" meant stolen money – if Mr. Archer knew that Galanis was stealing the funds, knew that "discretionary" was code for stolen money, and said that he needed "discretionary funds at our command soonest," then one would expect that he might have received some of the stolen money.  But he never did, for the simple reason that he didn't know Galanis was stealing the money.

Jason Galanis's reply confirmed this belief. He wrote that he was focused on "discretionary" and "I don't need any more deals until we can pull triggers ourselves," meaning he wanted discretion to manage assets with which he could invest, rather than simply collecting finder's fees for putting together other people's investments. The context makes the "assets under management" interpretation natural and the government's "stolen" interpretation nonsensical.

The same is true of Jason Galanis's e-mail a couple weeks later on July 5, a day after the birth of Mr. Archer's third child. Tr. 3287:21 (K. Archer).  Attaching the trust indenture for the first bond, Galanis wrote that "we got US Bank to act as trustee for the bond issue" and "GT [Greenberg Traurig] is issuer counsel." GX2024 at 3. He added that he was "encouraged by the quality [of] the work and the professionalism from everyone im [sic] coordinating. . . . my primary objective is to get us a source of discretionary liquidity. sick of begging." *Id.* "Discretionary" means here what in meant in the previous emails. While mentioning that US Bank would be trustee and Greenberg Traurig would be issuer counsel – reinforcing the legitimacy of the deals to Mr. Archer by reminding him of the white shoe intuitions involved in them – Galanis stated that he wanted "discretionary liquidity" to invest so he would not have to

"beg" to raise money to effect deals. This accords with his earlier e-mail that he wanted freedom to "pull triggers ourselves," GX2021, and his statement later in the thread that they will have "some dry powder in our control soon." GX2025. "Discretionary liquidity" is again used in the context of legitimate financial players concerning a deal that was put together legally, *see* Tr. 321:8-19 (Anderson), at a time when even Dunkerley and Martin believed the deal to be legitimate. *See* Tr. 1139:24-1140:5 (Dunkerley); Tr. 2296:9-18 (Martin).

Galanis sent Mr. Archer another e-mail soon thereafter about acquiring Hughes that reinforced this interpretation as the only possible one. Galanis attached a term sheet for the purchase of Hughes and wrote: "Firm manages $900 million on a discretionary basis for 28 institutional clients (pensions and endowments)." GX2213. Mr. Archer obviously did not take this to mean (nor was it intended to mean) that the firm had $900 million which the pair could steal, but instead that Hughes had $900 million of assets under management to invest in its discretion.[11]

Even when Galanis did not use the magic word "discretionary," the evidence shows that he repeatedly discussed with Mr. Archer the importance of amassing assets under management. For example, referencing the WLCC bond proceeds, Galanis wrote: "If I get this $28mm, I have 12-15mm to put into WAH. Wah will have $70mm in cash. Would perhaps buy karlsson $150mm note for $15mm." GX2031.  That is – consistent with the idea that any bond proceeds not used by the WLCC for capital improvements would be available for investment – Galanis explicitly proposed to have WAH manage a portion of the proceeds and use them to invest and generate returns.

---

[11]     In the same e-mail, as noted above, Galanis misled Mr. Archer about the relationship between the WLCC bonds and Hughes's clients, saying "[w]e have agreed to give the firm [*i.e.*, Hughes] an opportunity to participate in native American bond new issues." GX2213.

Likewise, on August 14, 2014, Galanis wrote Mr. Archer about acquiring a large asset manager called Fondinvest, attaching a Blackstone report and saying "i believe this is a kernel to build billions off of potentially." GX2216 at 1. Galanis added, "Dan and Hugh have locked it up and came to me for the money, which i have agreed to arrange/provide (probably Indians)." *Id.* The government argued that the parenthetical "(probably Indians)" referred to the WLCC bond proceeds. But even if that were so – and it is far from clear that that is a permissible inference – there is nothing to suggest that Mr. Archer knew that this represented a *misappropriation* of the proceeds. To the contrary, this was yet another situation in which Galanis was talking about investing the bond proceeds for profit – in this case, "billions . . . potentially." In the same e-mail, Galanis wrote that Fondinvest's "funds are fully invested and are in realization period over the next six years," and Fondinvest "believe[s] they can raise a rapid $300-400MM in new funds immediately." Fondinvest was a "real legitimate fund of funds," Tr. 1324:6-10 (Dunkerley), and in the end, Fondinvest did become part of the roll up plan, *see* Tr. 1532:19-22 (Dunkerley), and WAH did dramatically expand its assets under management. *See* DX4733 at 13. Even if the jury could have inferred that Mr. Archer understood that bond proceeds were being used to finance the Fondinvest acquisition, there was no evidence that would permit an inference of fraudulent intent. To the contrary, as the government's own witness acknowledged, an investment in Fondinvest was consistent with the WLCC bond documents and represented just the sort of private equity investment contemplated from the start. Tr. 1546:4-11, 1547:1-16 (Dunkerley).

As a final example, a few months later in October 2014, Galanis forwarded Mr. Archer a thread about potential additional bond issuances and wrote, "working on more liquidity and sources for the various projects . . . ." GX2242. Just as it always had between Galanis and Mr. Archer, "liquidity" in this context unambiguously meant assets to manage.

Not one of these e-mails – nor any others that the government introduced – supports the inference that Mr. Archer understood that Galanis was stealing the bond proceeds, and the messages on their own and grouped together are consistent with two people in business together discussing how they can grow their companies, amass more and more money to manage on a discretionary basis, and invest it in private equity – precisely as provided for in the WLCC bond documents.

Had Galanis told Mr. Archer that "liquidity" and "discretion" meant "money to steal" in some clandestine meeting in January 2014, then these emails might prove Mr. Archer's knowledge and intent. But no trial evidence suggests such a conversation ever occurred, and reams of evidence provide various reasons to think that it did not.  Not even Dunkerley and Martin knew Jason Galanis was planning to steal bond money when these e-mails were sent, and unlike Mr. Archer, they were directly involved in the bond issuances at the outset and a massive cover-up once the government's investigation began.  Mr. Archer was involved in neither.  No rational juror could infer from these e-mails that Mr. Archer knew Galanis was stealing the bond proceeds, let alone that he intended to defraud the WLCC or the clients of Atlantic and Hughes.

Like "discretionary," each reference to "honey" in Mr. Archer's e-mails comes in the context of what were plainly legitimate business plans, and likewise referred to assets under management. The earliest such e-mail, a January 17, 2014 message from Cooney, makes this clear. Cooney wrote Mr. Archer about a meeting with the president of the New York fireman's union to discuss investing in his business, and Cooney added that he "controls a huge pot of honey for the firemans pension." DX4706. The meaning is obvious: the pension fund is a large

sum of investible assets.  Certainly there was no evidence that Mr. Archer, Cooney, or anyone else had plans to steal the union's pension funds.[12]

In November 2014, Galanis sent Mr. Archer an e-mail laying out a "honey trail." GX2065. That e-mail attached a plan for additional bond issuances and was filled with (false) information designed to convince Mr. Archer that the business plan was legitimate. For instance, it stated bond proceeds would fund an Interest Reserve and purchase an Indexed Annuity from Valor Group – formerly WAH.  This was consistent with Galanis's earlier suggestion, discussed above, that some of the bond proceeds would be managed by WAH – and by tying WAH's management of the funds explicitly to an annuity product, made clear to Mr. Archer that this was a permissible investment rather than a misappropriation. (Of course, the reality – totally unbeknownst to Mr. Archer – is that the bond proceeds were routed to WAPCC.  But Galanis certainly never told Mr. Archer that.)

The same reasoning applies to the "honey" reference in an April 30, 2015 e-mail from Cooney. In an exchange copying Mr. Archer, Galanis wrote, "Arch and i attacking teneo tomorrow." Cooney replied, "We continue to press until we have a huge surplus of excess honey." GX2084. Of course, trial evidence made clear that Teneo was the "highly reputable strategic consulting company" that Mr. Archer and others engaged to create a presentation to potentially sell or attract investment in the financial conglomerate he had been building. Tr. 1087:15-1088:9 (Dunkerley). That Mr. Archer wanted to attract additional investment into or profit from the business was neither a secret nor illicit: it was his stated goal all along. *See* Tr. 1321:9-1322:3 (Dunkerley).

---

[12]     To the extent the government may argue otherwise, Mr. Archer was not a part of any such scheme.  In fact, Cooney forwarded that e-mail to Jason Galanis, writing "Keeping on top of our horse!!!" If Cooney and Jason Galanis were scheming to steal money from the fireman's fund, they were hiding it from Mr. Archer.

\*       \*       \*

Even viewed in the light most favorable to the government, this evidence does not support an inference of criminal intent, or knowledge that Galanis was stealing the bond money. Without some evidence that the e-mails had an illicit meaning not discernable from their text, the e-mails demonstrate only that Mr. Archer was concerned with growing the Burnham financial services conglomerate – and that Galanis repeatedly lied to him. The evidence shows that Mr. Archer believed he was engaged in a legitimate business enterprise, and cannot support a reasonable juror's finding that he knew the "essential nature of the plan" to loot the bond proceeds. *United States v. Atehortva*, 17 F.3d 546, 550 (2d Cir. 1994). At worst, the trial record contains "equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence," meaning that no jury could reasonably convict Mr. Archer in this case. *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (quotation omitted); *see also United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994) (the government "must do more than introduce evidence that is at least as consistent with innocence as with guilt" (quotation omitted)).

### 4.   The evidence was insufficient to prove that Mr. Archer knew Jason Galanis was stealing bond money to acquire a Tribeca mansion

Following the first bond issuance, Jason Galanis bought a Tribeca mansion located at 260 West Broadway. He and Dunkerley funded the purchase in large part from two different, brazen thefts – the first was $1 million dollars of misappropriated WLCC bond money, and the second was approximately $3.2 million that they stole from Valorlife. The government did not allege in the Indictment that Mr. Archer helped further this crime, but in its summation, the government argued that "Devon Archer was also involved in funding Jason Galanis' luxury homes with bond proceeds. Archer helped Jason Galanis steal bond proceeds to pay for those homes." Tr. 3646:15-18. These arguments find no support in the evidence.

It was no secret that Jason Galanis had a checkered past. To help get the approval of the building condominium association, Jason Galanis and Cliff Wolff created a company called Archer Diversified TCG, LLC. Jason Galanis filled out the application and signed all of the paper work on behalf of this new company, but the name of the company allowed him to associate Devon Archer with the deal. Cliff Wolff emailed Seb Momtazi, copying Mr. Archer, to let them know that "Jason Galanis is going to purchase a condo using the above name [Archer Diversified] and Devon's cache [sic]." GX2122. While neither Momtazi nor Mr. Archer respond, viewed in the light most favorable to the government, a rational juror could have concluded that Mr. Archer was silently permitting Galanis to trade off of his name and reputation.  But that is a far cry from "help[ing] Jason Galanis steal bond proceeds to pay for those homes."  Tr. 3646:15-18.

The proof falls short for several reasons. To begin with, allowing Jason Galanis to use the name "Archer Diversified" is not illegal. It is also not probative of whether or not Mr. Archer was agreeing to or aware of the manner in which Jason Galanis was going to pay for the 260 West Broadway property. The government even stipulated to the irrelevance of Archer Diversified TCG to its case-in-chief: "Devon Archer at no point had an ownership interest in Archer Diversified TCG, LLC, nor is there any evidence that Mr. Archer had any affiliation, association, or involvement with Archer Diversified TCG, LLC." DX4745.

Apart from Mr. Archer's implied, silent acquiescence to the use of the Archer name, there is no other act by Mr. Archer that conceivably suggests he knew Galanis was financing his homes with stolen money, let alone that he "helped Jason Galanis steal bond proceeds to pay for those homes." Tr. 3646:17-18.

The record is absolutely clear that Mr. Archer had no insight into or control over the accounts from which the Tribeca mansion payments originated. The initial down payment of $1 million came from the WAPCC account controlled by Hugh Dunkerley, *see* DX512 at 2 (payment to Katsky Korins), and as discussed above, Mr. Archer had no visibility into that account, directly or indirectly.

Mr. Archer likewise had no knowledge of the source of the other $3.2 million Galanis stole to make the second payment on the Tribeca mansion. This money was stolen from Valorlife, a company Mr. Archer believed he was investing in and served as a key piece of the roll-up plan. In a scheme that has no connection to Mr. Archer, Galanis and Dunkerley conned the Valorlife board and management into thinking they too were purchasing WLCC bonds. *See* DX4127 (Valorlife writing to Tim Anderson: "received your contact details from Mr Jason Galanis. He informed me that I can contact you with regards to details of the purchase of the bonds by Valorlife (USD 3'195'000 on the 08.12.2014)."). Valorlife, of course, never actually bought or received any bonds, and Galanis and Dunkerley caused Valorlife to make the payment to the Wolff Law Firm, which then used that money to buy 260 West Broadway. *See* DX4824 (Valorlife payment confirmation of $3.195 million to Wolff Law Firm Trust Account for "Valorlife purchase of municipal bonds OglalaSioux/Wakpamni Lake Community Corporation"); GX4015 (government summary chart). The communications regarding Valorlife's payment were among Tim Anderson, Jason Galanis, and executives and board members of Valorlife. *See* DX4824 at 1; DX4127. This all had nothing to do with Mr. Archer, had nothing to do with the WLCC bonds except in the sense that Galanis and Dunkerley sold Valorlife non-existent ones, and was done entirely without Mr. Archer's knowledge.

To argue that Mr. Archer knew that Galanis was financing his homes with stolen money, the government again pointed to a handful of e-mails.  There are two possibly relevant e-mails concerning the Tribeca property, but no rational juror could conclude, beyond a reasonable doubt, that these e-mails show Mr. Archer knew Galanis purchased the Tribeca mansion with misappropriated bond proceeds.

In the first, from July 2014, Galanis forwarded Mr. Archer the distribution list (*i.e.*, the list of legitimate professionals working on the transaction) for the first bond issuance and wrote "target close is July 31," and Archer replied that "July 31 is right around the corner!" Galanis responded to Mr. Archer's comment, "So close," then pivoted to a boast about his housing situation: "Cliff is running the stall for me on nyc mansion / I want to be here and won't live in 1750 square foot cage / Massively motivated[.]" GX2028.

This e-mail does not plausibly put Mr. Archer on notice that Galanis was going to use bond money to buy his New York mansion. As the government acknowledged, Galanis's response "seems like kind of a non sequitur. Right? They're talking about the bonds, and all of a sudden he is talking about his mansion." Tr. 3647:8-10 (closing argument). While the government urged the jury to connect the two thoughts – and perhaps, to Galanis, the two were connected – there was no evidence showing why Mr. Archer would interpret the e-mail that way. The evidence at trial actually showed that Jason Galanis routinely interjected new and unrelated thoughts in e-mail threads. *See, e.g.*, GX2216 (8/14/14 e-mail from Galanis to Mr. Archer stating: "i realize I through [sic] a lot of crap at you, so i am sometimes hesitant to throw more. hopefully you see my kill ratio is high so seeing all of the deals doesn't leave the impression that i'm shotgunning."). Ultimately, as the government did prove, the bonds and the purchase of 260 West Broadway were connected, but Mr. Archer would not have known that.

Even assuming that Mr. Archer did interpret the e-mail to suggest a connection, the statements are at best ambiguous as to whether Galanis trying to *earn* money or *steal* money. From earlier e-mails, Mr. Archer learned that Galanis sourced the deal for the WLCC bonds. And as Tim Anderson testified, Burnham Securities received a placement agent fee. Tr. 208:21-24. Others earned fees as well, like Mr. Anderson's firm, Dilworth Paxson. *Id.* at 278:18-23. GX2028 is equally consistent with Mr. Archer believing that Galanis was being compensated legitimately from the bond deal as it is with Mr. Archer understanding that Galanis was going to misappropriate the proceeds.[13]

The second e-mail with Mr. Archer concerning the Tribeca mansion more clearly supports the inference that Jason Galanis was earning, not stealing, money. In an e-mail from September 2014, Mr. Archer provides Galanis an update on the negotiations with the BIT Board. Mr. Archer writes, "I sent letter back to BIT yesterday saying I can't deny doing business with you basically…take it or leave it." GX2222.  Galanis replies, "Super comforting arch, especially as I take the tribeca plunge. Got to earn to keep up with my rapper spending!" Jason Galanis was a profligate spender. The face of the e-mail in GX2222 states that he was "earning" his money to afford it.

>    **5.      *Rosemont Seneca Bohai's purchase of the second bond offering does not demonstrate Mr. Archer's knowledge or intent***

In this extraordinarily complicated case, the government established that Mr. Archer took or caused someone else to take any action "in connection with the purchase or sale" of the

---

[13]      The government also suggested that GX2028 was evidence that Mr. Archer knew Galanis needed the bond money to afford the mansion. Tr. 3647:11-16. While it certainly might have been true that Galanis had no money and was living hand-to-mouth, there is no evidence that Mr. Archer actually knew that. Like everyone else, Mr. Archer thought Galanis was wealthy. GX2028 might suggest how Galanis would direct his earnings, it says nothing about what he can or cannot afford without those earnings.

charged securities:  Rosemont Seneca Bohai's purchase of a portion of the second WLCC bond offering.  Certainly, taken in the light most favorable to the government, a rational juror could have concluded that RSB received $15 million from Galanis, used that money to buy WLCC bonds, and then transferred those bonds in their entirety to Burnham Securities Inc.

But there was no evidence that Mr. Archer made or was aware of any misstatements to the WLCC in connection with this purchase.  To the contrary, the evidence proved that RSB paid cash to WLCC for the full value of the bonds.  The problem with the second bond issuance – which did not involve any clients of the investment advisers – was not that RSB bought them.  It was that the money used to pay for them had come (the jury could reasonably conclude) from the misappropriated proceeds of the first issuance, and that that money, once paid to the WLCC for the second issuance, was promptly stolen again by Galanis and Dunkerley.

But the evidence did *not* establish that Mr. Archer knew either of those things.  As discussed above, there was no evidence from which a rational juror could have concluded that Mr. Archer knew and intended that the bond proceeds be misappropriated.  And the evidence at trial, through cooperating witnesses and documents and e-mails, proved beyond a reasonable doubt that Galanis likewise hid the source of the money that RSB used to acquire the bond from Mr. Archer.

Indeed, Galanis went to great lengths to obscure the source of the money he provided to RSB for the second bond offering.  As the government itself alleged, Galanis purposefully hid the original source of the $15 million by transferring that money to RSB "through layers of intermediaries." Ind. ¶ 17; *see also* GX301 at 53 (showing $15 million credit to RSB Morgan Stanley account from "Citibank Florida FSB Clifford A Wolff, P.A."); GX565 at 2; GX510 at 32; Tr. 803:13-20 (Driever); 1027:1-14, 1028:5-10 (Dunkerley); 1310:7-13 (Dunkerley).

Galanis carefully engineered a series of transfers involving accounts controlled by different people, resulting in the compartmentalized knowledge of his co-conspirators with only Galanis seeing the full picture.

Certainly, Mr. Archer did not see the full picture, and no rational juror could have concluded beyond a reasonable doubt that Mr. Archer knew he was buying the second bond issuance with the proceeds of the first. Every witness either had no relevant knowledge or affirmatively testified that Mr. Archer was not involved in any communications that would have informed him of the source of the money.

First, at Jason Galanis's direction, Hugh Dunkerley withdrew $15 million from WAPCC's bank account, which was holding the proceeds of the first bond issuance, as a cash withdrawal and deposited those funds in a bank account belonging to Galanis's entity Thorsdale as a cash deposit. See GX510 at 32; GX522 at 47; GX565; see also Tr. at 1027:1 18 (Dunkerley); *id.* at 1312:8-1313:5, 1516:10-1517:15 (Dunkerley). As the government argued when John Galanis instructed his employee to do precisely the same thing with respect to transfers out of the bank account for Sovereign Nations, the sole purpose of this maneuver – going to a physical bank branch, doing a cash withdrawal and simultaneous deposit rather than a simple wire or funds transfer – was to make it harder to track the flow of funds. Tr. 1514:4-1517:17 (Dunkerley).

Jason Galanis ensured that there was "a clear paper trail" for the wires from Thorsdale to the Wolff Law Firm and from the Wolff Law Firm to RSB, *see* Tr. at 803:14-20 (Driever); 1517:18-1518:4 (Dunkerley), but at the same time ensured there was no such paper trail for the original transfer from WAPCC into Thorsdale's account, *see id.* at 1517:3-8 (Dunkerley). In other words, there was no paper trail linking the money that ended up with RSB back to the first

WLCC bond issuance and/or WAPCC (which held the bond proceeds), and there was no other evidence – no e-mails, documents, or testimony – that show that Mr. Archer could have understood the ultimate source of the funds.  As a result, no rational juror could have concluded beyond a reasonable doubt that Mr. Archer knew that Jason Galanis funded the second bond offering with the proceeds of the first offering.

Indeed, other than Galanis, *no one* knew that the money transferred to RSB came from the first bond issuance.  Dunkerley had "direct visibility into" and control over the WAPCC bank account, *id*. at 1310:16-18,1437:20-23, but had no visibility into the Thorsdale account. He knew the original source of the $15 million but not that it was transferred on to RSB or used to buy the second bond issuance. *Id.* at 1312:8-1313:5 (Dunkerley); *see also id.* at 1511:15-1512:8 (Dunkerley). The information was so well hidden from him, in fact, that before Dunkerley was arrested in this case in May 2016, he had "no idea" as to "what happened to that money after it went to Thorsdale." *Id.* at 1028:5-10 (Dunkerley). Dunkerley did not even know that the bond deals were part of a fraud until the moment when Jason Galanis began directing him to loot the proceeds from the WAPCC bank account that he controlled. *See* Tr. 1128:14-17, 1139:24-1140:11, 1192:6-10.

As discussed above, unlike Dunkerley, the evidence was undisputed that Mr. Archer did not have access to or knowledge about the WAPCC account activity. To the contrary, Dunkerley explicitly testified that Mr. Archer "never had any visibility into the Wealth Assurance Private Client bank account." *Id*. at 1339:2-1340:3. Dunkerley also testified that he "had never spoken to Mr. Archer about the second WLCC bond issuance," generally, or about Mr. Archer "purchasing the [WLCC] bonds," and that he "never had a conversation with Mr. Archer in which [they] discussed misappropriating the funds from the WLCC bonds." *Id*. at 1024:18-23 (Dunkerley);

see also 1310:7-18 (Dunkerley). They did not even meet until they were both arraigned in this case in May 2016, *see id.* at 1309:2-7 (Dunkerley). As far as Dunkerley was aware (based on lies from Jason Galanis), "Mr. Archer had a contract from some Chinese investors and that he had to use the money or that contract would expire," and "the Chinese investor money" was the money that "was being invested into the second bond issuance by Rosemont Seneca Bohai." Tr. at 1310:19-1311:18 (Dunkerley); *see also id.* at 1025:2-10 (Dunkerley); *see also id.* at 1461:13-1462:4, 1509:10-25 (Dunkerley).

Following Dunkerley's transfer of $15 million from WAPCC to Thorsdale, Francisco Martin (again at Jason Galanis's direction) wired the money from Thorsdale to a bank account maintained by the Wolff Law Firm. *See* GX522 at 51; *see also* Tr. at 1517:18-1518:4 (Dunkerley). Martin, for his part, had some control over the Thorsdale account, which he understood to be Jason Galanis's family office account.  *See* Tr. 2165:9-13 (Martin).  Although Martin could not recall any specifics about the transaction, Tr. 2338:6-2339:13 ("Again, I don't remember the details."), e-mails between him and Galanis show that Martin knew that the $15 million went to the Wolff Law Firm and then from there to RSB's account. *See* DX4795 (Galanis providing instructions for Martin to pass on to Mr. Wolff); Tr. at 803:14-20; GX301 at 53. That is, Martin knew that Thorsdale transferred $15 million to RSB via the Wolff Law Firm, but there was no evidence that Martin understood the funds originated from the first WLCC bond issuance.[14]  And whatever Martin's knowledge was, none of it can be attributed to Mr. Archer.

---

[14]     The government may argue that the jury could have inferred that Martin knew the $15 million came from bond proceeds based on his testimony that other money Jason Galanis invested in Fondinvest must have come from bond proceeds because "There was no other income that was generated from Jason Galanis' business." Tr. 2175:15-22. But the fact that Martin, who controlled the Thorsdale account, had insight into Galanis's finances provides no basis to infer that Mr. Archer had the same understanding. There is no evidence that Martin ever met or spoke with Mr. Archer. Tr. 2292:24-25, 2381:15-2382:7.

Martin testified that he had never met Mr. Archer, *id.* at 2292:24-25, 2381:17-2382:7 (Martin), and the trial record is bereft of any evidence that Martin and Mr. Archer ever communicated in any way, shape, or form.

Under Rule 29, a rational juror is not permitted to rely upon "conjecture" or "pure speculation," *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972) (internal quotation marks omitted), but there is nothing other than speculation and conjecture to suggest that Mr. Archer knew he was handling stolen money when RSB bought the WLCC bonds. No rational juror could find that Mr. Archer knew Jason Galanis was stealing bond proceeds and passing them on to him, unless the jury speculated that at some other point in time, Galanis somehow informed him of that fact.  *See also Cassese*, 290 F. Supp.2d at 447-48.[15]

*     *     *

Had Mr. Archer never purchased the WLCC bonds, he may never have been charged – after all, aside from RSB's purchase of the second bond issuance, Mr. Archer did little more than receive e-mails and invest his own money.  By agreeing to buy the bonds on Galanis's behalf, Mr. Archer arguably acted naively or foolishly, but there was nothing about the transaction that was unlawful:  Mr. Archer told no lies, paid full value, and had no understanding that the money used to purchase the bonds was stolen, rather than Galanis's legitimate wealth.  No witness or document shows that Mr. Archer was aware of where the money came from or that Jason Galanis was using the WAPCC account for his own personal benefit. Dunkerley and Martin each had pieces of the puzzle, but only Jason Galanis could see the full picture.

Instead, as far as the trial evidence goes, Mr. Archer simply understood he was receiving money from a person (Galanis) he believed to be extraordinarily wealthy to invest on his behalf,

---

[15]      There is also no evidence upon which a rational juror could find that Mr. Archer consciously avoided knowing the source of the funds.

and later transferred the bonds at Galanis's instructions.  Mr. Archer did so, moreover, after

receiving the affirmative blessing of counsel.  *See* DX4126 (attorney Clifford Wolff, talking

about RSB's investment letter for the second bond issuance:  "this letter is approved for

signature by Devon").   This conduct is not sufficient to support an inference of fraudulent intent.

*See United States v. Samaria*, 239 F.3d 228, 235 (2d Cir. 2001) (finding that evidence of false

exculpatory statements and that the defendant had picked up stolen goods did not, without more,

support finding specific knowledge of the alleged scheme); *cf. Atehortva*, 17 F.3d at 548-51

(finding that even a defendant who knowingly participated in a kidnapping conspiracy – but did

not know that the kidnapping was commissioned to further a drug conspiracy – was not guilty of

the drug conspiracy).

### 6.      *Mr. Archer's statements to Morgan Stanley and Deutsche Bank do not support an inference of fraudulent intent*

The government argued that Mr. Archer's fraudulent intent could be inferred from his

alleged false statements to Morgan Stanley and Deutsche Bank.  *See* Tr. 3656:6-22.  But the

evidence showed that Mr. Archer's statements were not false, and even if they were, did not

support an inference that he knew Galanis was stealing the bond proceeds.

There are three relevant statements that the government argued Mr. Archer made to

Morgan Stanley. They are:

1. The method of acquisition for the bonds was a "Purchase" and the manner of payment a "Wire Transfer." GX343 at 2.

2. The "$15mm was generated through sale of real estate." GX344 at 1.

3. "The funds used to purchase the bonds were from real estate sales through my business, Rosemont Seneca Bohai LLC." GX352 at 4.

The evidence showed that Mr. Archer made the first statement and that it was entirely accurate.

The evidence likewise showed that Mr. Archer made the second statement, and that it was

inaccurate, but not that Mr. Archer knew it was inaccurate when he made it.  And with respect to

the third statement, the evidence showed that Mr. Archer did not make the statement at all –

rather, it was a miscommunication by a Morgan Stanley employee, who wrote it onto a form that

was later signed by Mr. Archer's assistant.  And perhaps more to the point, even if Mr. Archer

made all of these statements and knew them to be false at the time, they would not support the

inference that Galanis was stealing the bond proceeds.  At best, they would support the inference

that Mr. Archer understood that he could not tell Morgan Stanley that he got the money from

Galanis, and perhaps that something improper was afoot.  But evidence that a defendant knew or

should have known that something improper was going on is not sufficient to demonstrate

specific knowledge or fraudulent intent.  *See In re Hudson Tech., Inc. Sec. Litig*., No. 98-cv-1616

(JGK), 1999 WL 767418, at *7 (S.D.N.Y. Sep. 28, 1999) ("[T]hat the defendant 'knew or should

have known that the bank's loan problems had worsened material and were worsening was

insufficient to plead fraudulent intent.'" (quoting *Shields v. Citytrust Bancorp, Inc*., 25 F.2d

1124, 1129 (2d Cir. 1994)).

> **a.     Mr. Archer did not lie when he wrote that the method of acquisition for the bonds was a "Purchase" and the manner of payment a "Wire Transfer"**

The record shows that the first statement to Morgan Stanley was made by Mr. Archer and

was entirely accurate. On October 1, 2014, Morgan Stanley employee Catharine Driever e-

mailed Mr. Archer's assistant Seb Momtazi (copying Mr. Archer and another banker named

Eugene Schatz), attaching a "Private Securities Form" and asking Momtazi to "complete all

blank fields and have Devon sign on page 3." GX342. Momtazi then "dropped off the original in

the lobby of [Morgan Stanley's] building," and Driever scanned and e-mailed herself a copy of

the form. *See* Tr. 795:18-21 (Driever); GX343. The completed form reads, in relevant part:

GX343 at 2. While Driever instructed Momtazi to fill out the form, there is no evidence in the record to determine whose handwriting is on the form. However, the jury could have determined that the form was signed by Mr. Archer:



GX343 at 4; *see also* Tr. 3299:20-3300:5 (K. Archer, identifying Mr. Archer's signature).

There is no dispute that the answers to the questions in GX343 are entirely accurate. Mr. Archer purchased the bonds and paid using a wire transfer from the RSB LLC account to the WLCC's account at U.S. Bank. *See* GX 301 at 63.

### b. Mr. Archer did not lie when he wrote that the "$15mm was generated through sale of real estate"

Approximately a week later, on October 7, 2014, Driever asked Mr. Archer in an e-mail, "How was the $15mm generated that was used to purchase the bonds?" GX344 at 1-2. Mr. Archer replied "$15mm was generated through sale of real estate."  GX344 at 1.

The evidence fails to establish beyond a reasonable doubt that this statement was knowingly false, although it was surely incorrect.  As explained above in Section I.B.5, the

48

evidence showed that the money transferred to RSB to buy the bonds in fact came from Clifford

Wolff's attorney account, and before that from Thorsdale, and WAPCC, and ultimately from the

proceeds of the first WLCC bond issuance.  But as also discussed above, the evidence

established only that Mr. Archer knew that the money came from Thorsdale, via Wolff.  *See*

GX2115; GX2223; GX2300 at 1; GX301 at 53 (showing $15 million credit to RSB Morgan

Stanley account from "Citibank Florida FSB Clifford A Wolff, P.A."); GX565 at 2; GX510 at

32; Tr. 803:13-20 (Driever); 1027:1-14, 1028:5-10 (Dunkerley); 1310:7-13 (Dunkerley).

According to the government, an honest answer to Morgan Stanley's question would

have disclosed that the money came from Galanis, or Wolff, or perhaps from the WLCC bonds.

But Driever testified that she "didn't ask who generated" the $15 million, "didn't ask where did

Mr. Archer get the money from," and "didn't ask whether it was income or a gift or a loan." Tr.

at 862:8-864:11(Driever). Likewise, Driever confirmed that Mr. Archer "did not say *who* sold

the real estate," "didn't say *he* sold the real estate," "didn't say that it was *his* real estate," and

"didn't say it was *Rosemont Seneca Bohai's* real estate," either. Tr. at 862:8-864:11 (Driever)

(emphases added).

Instead, Mr. Archer answered the question asked and based his response on the

information he had at the time. As an initial matter, the evidence adduced at trial makes clear that

Jason Galanis went to great lengths to convince everyone around him that he was a wildly

successful and fabulously wealthy businessman, such that Mr. Archer would have reasonably

believed that the $15 million that Thorsdale transferred to RSB to purchase the bonds was

actually Jason Galanis's money, not the recycled proceeds of the first bond issuance.

For example, Dunkerley testified that "Jason Galanis led a very lavish life, . . . jet-setting

between the west coast and the east coast," either flying first-class or taking private planes. Tr.

at 1194:7-1195:1. He further testified that Jason Galanis and his wife each drove their own

Bentleys, *id.* at 1195:2-6, 1417:4-6, and that Jason Galanis "appeared to be a wealthy and

successful person," *id.* at 1416:25-1417:3 (Dunkerley). Dunkerley also testified that Jason

Galanis was business partners with Jason Sugarman, whose father-in-law Peter Gruber was a

billionaire and whose brother Steven Sugarman owned COR Capital, which "had been very

successful in the financial space," and was CEO of and a "major investor" in Banc of California.

*Id.* at 906:9-12 (Dunkerley); 1076:7-11, 1171:25-1172:8, 1331:14-1333:14 (Dunkerley).

Dunkerley testified that, even as he sat in court having witnessed Jason Galanis's crimes first-

hand – indeed, having pled guilty to his own role in them – he nevertheless still believed that

Jason Galanis was a savvy investor and a good, successful business man. *Id.* at 1301:1-15

(Dunkerley).

    Martin similarly testified that he believed that Jason Galanis "was a deal-maker" who

"had all of the trappings of success and wealth," and that he personally "saw evidence that [Jason

Galanis] was very successful," including that "he lived in a beautiful house," that "he and his

wife drove fancy cars," and that he even "talk[ed] about buying a private plane at one point." *Id.*

at 2195:2-21, 2305:23-2307:17 (Martin). Like Dunkerley, Martin testified that Jason Galanis did

business with Jason Sugarman, whose "father-in-law was Peter Gruber who was a billionaire."

*Id.* at 2195:12-17 (Martin). And Martin testified that he believed that Jason Galanis had "family

money," and that Thorsdale was his "family office, which "managed what [he] understood to be

the Galanis family money." *Id.* at 2340:23-2341:3 (Martin).

    Beyond Jason Galanis's peacock-like outward display of ostentatious wealth and aura of

impressive business success, the evidence also shows that Jason Galanis cultivated in those

around him the perception that a significant portion of his wealth came specifically from his real

estate holdings and dealings. For example, Dunkerley testified that Jason Galanis had introduced him to Omar Amanat, who was supposedly "in an intense legal battle . . . with a Russian oligarch" over control of "a large hotel company" with "assets of between $500 million and $1 billion," and that, as part of a "real estate deal that Jason Galanis had arranged, . . . [t]heir plan was to purchase [the hotel company] out of bankruptcy." Tr. at 924:3-14 (Dunkerley); 1418:1-18 (Dunkerley). Dunkerley also testified about Galanis and Jason Sugarman having sold a hotel in Miami, *id.* at 1417:18-20 (Dunkerley), and Martin testified that he "wired money to an escrow account for what [he] understood to be a real estate purchase on behalf of Jason Galanis." *Id.* at 2305:19-22 (Martin).  Even Tim Anderson, the lawyer, testified that he was aware of the Galanis "family's real estate investments."  Tr. at 480:6-15; *see also* DX1344.

And of course, both Dunkerley and Martin testified about 1920 Bel Air, Jason Galanis's extravagant Bel Air mansion on the west side of Los Angeles, in the foothills of the Santa Monica Mountains. The pictures and video of 1920 Bel Air that have been entered into evidence speak for themselves. *See* DX3711; DX3709; DX3710. Dunkerley testified that Jason Galanis and his wife had "daily maids and servants" at the house, and discussed a "two- to three-million dollar[] home improvement" project that Jason Galanis was doing on the mansion. *Id.* at 1196:23-1197:6, 1202:2-25, 1204:21-1205:7 (Dunkerley). Martin testified that 1920 Bel Air was "a multi-million dollar home." *Id.* at 2195:2-9, 2306:21-2307:7 (Martin); *see also* DX4914. Dunkerley also testified about a $10 million apartment in TriBeCa that the bi-coastal Jason Galanis also owned, which contained a mural "that was worth a tremendous amount of money." *Id.* at 1055:22-23 (Dunkerley) 1203:1-25 (Dunkerley).

Even Galanis's e-mail address – jason@holmbycompanies.com – was an allusion to wealth from real estate investing.  .  As Anderson testified, Holmby Hills is a tony section of Los Angeles, adjacent to Beverly Hills.  Tr. 533:24-534:3 (Anderson).

All this is to say, based on the evidence adduced at trial, a rational juror could not have concluded that Mr. Archer was lying when he told Morgan Stanley that – as far as he knew – the $15 million used by RSB to buy the bonds was generated through Jason Galanis's dealings in real estate.

**c.     Mr. Archer did not say the money was generated "from real estate sales through my business, Rosemont Seneca Bohai LLC" or know that the true source was stolen bond proceeds**

On October 20, 2014, Driever emailed Momtazi (copying Mr. Archer and Eugene Schatz) a "new rep letter" that was already filled in and asked Momtazi to "scan a signed copy now, and return the original to me at your convenience." GX349 at 1. That unsigned letter read, in relevant part:

b. Manner of payment:

*The funds used to purchase the bonds were from real estate sales through my business, Rosemont Seneca Bohai LLC*

GX349 at 2. Momtazi responded the same day, attaching a scanned copy of the signed revised form, containing the same representations as in GX349. *See* GX352 at 4.

The misrepresentations in the revised Private Securities Form (GX352 at 4) cannot be attributed to Mr. Archer. This is not an unimportant fact. The only probative value of the letter is *Mr. Archer's* state of mind, not whether he can be liable for the actions of others in connection with custodying the bonds, which is not an alleged crime. Two important pieces of evidence demonstrate that no rational juror could have concluded beyond a reasonable doubt that Mr. Archer knowingly participated in Jason Galanis's fraud based on the representation letter, GX352. First, the evidence showed that Mr. Archer did not sign the second letter.

52

Mr. Archer's wife identified Mr. Archer's signature on the first representation letter – the one that accurately said the "manner of payment" was a "wire transfer":



GX343 at 4; *see also* Tr. 3300:3-5 (K. Archer, identifying Mr. Archer's signature).

The second letter – the one that said the money came "from real estate sales through my business, Rosemont Seneca Bohai LLC" – was obviously signed by a different person, and no rational juror could conclude otherwise:



GX352 at 6; *see also* Tr. 3299:20-3300:7 (K. Archer: "I don't recognize that signature."); DX4348A.

Any reasonable factfinder would conclude that Momtazi signed Mr. Archer's name to the client representation letter in question (surely thinking he was doing Mr. Archer a favor), not Mr. Archer himself. Driever emailed both Momtazi and Mr. Archer the completed but unsigned version of this client representation letter. *See* GX349; *see also* Tr. at 870:13-871:5 (Driever). As mentioned above, Momtazi, not Mr. Archer, e-mailed the signed letter back to Driever without

any word from Mr. Archer. *See* GX352 at 1. In fact, Momtazi first attempted to send the signed

letter back to Driever just seventeen minutes after receiving it from her, but attached the wrong

document to his e-mail. *See* GX350; GX352; *see also* Tr. at 883:19-885:13 (Driever). When

Momtazi sent Driever the correct document shortly thereafter, he wrote that the signed letter and

the incorrect document that he had initially sent her "were next to each other," GX352 at 1,

meaning that the letter had been printed, signed, and scanned to Momtazi's computer within the

seventeen minutes between Momtazi receiving the unsigned letter and sending the incorrect

document. Given this chain of events – the plainly different signatures, the seventeen-minute

print-sign-scan turnaround, and Dr. Archer's identification of her husband's signature on only

the first letter – it is obvious Momtazi, not Mr. Archer, signed this client representation letter.

Additionally, it was Momtazi, not Mr. Archer, who dropped the signed hard copy of the

letter off at Morgan Stanley's offices, just as he had dropped off the signed hard copy of an

earlier client representation letter. *See* Tr. at 795:10-21, 801:11-802:5 (Driever); 849:8-25

(Driever). Moreover, Driever testified that Momtazi was an authorized person on at least one of

RSB's accounts, meaning that Momtazi had the authority to take certain actions on behalf of the

account. *See* GX312 at 1, 11; *see also* Tr. at 812:6-813:13, 815:11-17 (Driever). She also testified

that, like the overwhelming majority of the government's witnesses, she never met Mr. Archer,

*see* Tr. at 788:11-14 (Driever); 816:5-10 (Driever); that she spoke to Mr. Archer only "a few

times," and that their conversations were limited to brief "voice confirms" and other ministerial

matters, *see id.* at 788:7-18, 793:15-794:3 (Driever); 816:5-18 (Driever); and that she dealt

mainly with Momtazi on the account she oversaw, *see id.* at 788:15-789:23, 815:21-816:4;

816:19-817:3. Indeed, the vast majority of Driever's correspondence in evidence is between her

and Momtazi, and only shows Mr. Archer being silently copied. *See* GX339; GX342; GX349;

GX352; GX2039; *see also* Tr. at 790:21-791:20, 794:8-17, 799:1-17, 801:11-17 (Driever);

817:5-16, 820:11-821:14, 848:9-849:15, 894:24-895:2, 896:3-5 (Driever). Those rare instances

where Mr. Archer actually sends Driever an email are limited to his responses to her questions

about the WLCC bonds discussed above, *see* GX344 at 1; *see also* Tr. at 797:1-798:6 (Driever);

an e-mail about his availability for a "voice confirm," *see* GX341 at 1; *see also* Tr. at 792:21-

793:19 (Driever); and an e-mail in which he simply writes the word "Confirmed" in response to

a question about whether he planned on holding the WLCC bonds, *see* GX348 at 1; *see also* Tr.

at 798:14-20 (Driever). Ms. Driever clearly treated Momtazi as a stand-in for Mr. Archer, even

going so far as to refer to Momtazi as "Devon" in one email. *See* GX341 at 1; *see also* Tr. at

830:20-831:12 (Driever).

       This evidence supports just one reasonable conclusion:  Mr. Archer did not sign the letter.

Certainly, the evidence does not support an inference that Mr. Archer reviewed and subscribed to

the misstatements in the letter – misstatements that Driever authored in the first place.  Indeed,

the evidence shows that Driever embellished Mr. Archer's statement that the $15 million was

generated from real estate sales, *see* GX344 at 1, with her own reasonable (albeit mistaken)

supposition that it was *RSB* that had sold the real estate in question. Twenty-six minutes after

Mr. Archer emailed Driever with the "real estate" answer, Driever wrote to Morgan Stanley

compliance employee Elena Tomasino, twisting what Mr. Archer had told her into: "[t]he funds

used to purchase the bonds ($15 million) [being] from real estate sales through his business,

Rosemont Seneca Bohai LLC." *Compare* GX344 at 1 *with* GX345 at 2; *see also* Tr. at 862:8-

864:11; 865:1-869:8 (Driever).[16] The evidence does not indicate that Mr. Archer sent any follow-

---

[16]    Along the same lines, Driever added her own color to a response that Mr. Archer
provided to another one of her questions. Driever asked Mr. Archer to "provide more detail as to
how you came to know of this issuance" and he wrote simply that "Burnham Financial packaged

up email to Driever or otherwise spoke to her in the twenty-six minutes between his email to her and her email to Tomasino, so there is no reasonable basis to conclude that Mr. Archer, rather than Driever, was the source of her "through RSB" addition to his statement. *See* Tr. at 799:18-801:9 (Driever); *see also id.* 865:1-869:8, 873:22-876:6 (Driever).

Driever repeated her mischaracterization of Mr. Archer's statement about the source of the $15 million in the revised client representation letter that she admitted to having filled out "in Mr. Archer's voice," writing that "[t]he funds used to purchase the bonds were from real estate sales through my business, Rosemont Seneca Bohai LLC." Tr. at 870:13-871:5; 873:22-876:66 (Driever); *see also* GX349 at 2.[17] And as explained above, this letter was signed by Seb Momtazi, not Mr. Archer.

> ### d. Even if a juror could conclude that Mr. Archer made a false statement to Morgan Stanley, that would not support an inference that he knew Galanis was stealing the bond proceeds

As set forth above, a rational juror could not find based upon the trial evidence that Mr. Archer intentionally deceived Morgan Stanley.  At worst, he made a factually untrue statement. But even if the Court were to disagree and determine that a rational juror could conclude that Mr. Archer knowingly misled Morgan Stanley about the $15 million coming from real estate sales, that would hardly support the securities fraud charge against him.  The reality is that people lie,

---

the issuance of which I am a shareholder," but Driever turned that into: "Devon Archer is a shareholder of Burnham Financial. Burnham Financial packaged the issuance for the Wakpamni bonds. Some of the bankers at Burnham came to Devon with the bonds, and he agreed to purchase them." *Compare* GX 344 at 1 *with* GX 345 at 2; *see also* Tr. at 862:8-864:11; 865:1-869:8 (Driever).

[17]     Again here, as in her e-mail to Tomasino, Driever added to Mr. Archer's answer as to how he "came to know of this issuance," writing the following in Mr. Archer's voice: "Purchased through a private placement. I am a shareholder of Burnham Financial who packaged the issuance. They approached me regarding the offering." *Compare* GX 344 *with* GX 349; *see also* Tr. at 870:13-871:5; 873:22-876:6 (Driever).

and they lie for all sorts of reasons.  It is not enough to convict Mr. Archer to show that at some

point in his business dealings he made a misstatement; that misstatement must demonstrate his

intent to defraud the WLCC and/or the clients of Atlantic and Hughes by willfully facilitating a

scheme to steal the proceeds of the WLCC bonds.

At most, Mr. Archer's statements to Morgan Stanley (and his identical statement to

Deutsche Bank) demonstrate that he concealed the fact that Jason Galanis provided him with the

money for RSB to purchase the bonds – as set forth above, that's all the evidence showed Mr.

Archer knew about the true source of funds.  But knowingly concealing Jason Galanis's role in

the bond purchase – even if that is what Mr. Archer did, and it isn't – is not the same as knowing

that Galanis was stealing the money.  Indeed, Mr. Archer might have had any number of reasons

for concealing Galanis's role:  perhaps Galanis wanted it kept secret, perhaps Mr. Archer didn't

want to deal with the follow-up questions that would have inevitably come after some banker

googled Galanis, or perhaps there was some other reason entirely.  Even if Mr. Archer knew that

something was amiss – even if he knew that Galanis was up to no good, and that's why his role

couldn't be revealed – it would not support an inference of specific fraudulent intent.

The government's own witness proved this point.  Francisco Martin admitted that he

falsely represented to financial institutions that he was the beneficial owner of Thorsdale, and

even falsified documents to prove as much.  Tr. 2165:9-19 (Martin).  But the purpose of these

lies, Martin explained, was to allow him to direct transactions from the Thorsdale accounts, not

to cover up Galanis's role in the theft of bond proceeds or otherwise to facilitate any theft by or

from Galanis.  Tr. 2351:25-2353:9 (Martin).  Indeed, Martin testified that at the time that he told

these lies to the banks and provided the false documents, he had no idea Galanis was stealing the

bond proceeds.  *See* Tr. 2296:9-12 (Martin) (Martin did not understand that Jason Galanis was

going to steal any of the bond money); *id.* at 2329:21-23 (same); *id.* at 2335:2-4 (Jason Galanis did not tell Martin where the bond proceeds went).  By the government's own evidence, therefore, a lie to a financial institution about Galanis's non-involvement in a transaction could not support an inference of knowledge or fraudulent intent. When even Galanis's admitted co-conspirator did not know that Galanis stole the bond money despite his far more egregious lies and falsification of documents to banks, there is no reasonable inference that would allow the jury to conclude that Mr. Archer knew the bond proceeds were stolen or recycled, even assuming for the sake of argument that it could permissibly infer that he made a misstatement at all.

To convict Mr. Archer of the charged crimes, the jury had to find beyond a reasonable doubt that Mr. Archer had the specific intent to defraud the WLCC and/or the clients of Atlantic and Hughes by misappropriating bond proceeds, and that he willfully and actively joined a conspiracy with that misappropriation as one of its aims.  It is not enough that he know something bad was going on, or even that Galanis was committing some crime.  To be convicted, Mr. Archer had to know that Galanis was committing *this crime.  See Labat*, 905 F.2d at 23 (holding that, to prove defendant acted with specific intent, "the government must show that he knew of the proposed crime," and that "[a] general suspicion that an unlawful act may occur is not enough"); *see also Wiley*, 846 F.2d at 155 (reversing aiding and abetting conviction for insufficient evidence of intent regarding a specific crime charged).  His statements to Morgan Stanley just do not support that knowledge.[18]

---

[18]        The statements to Morgan Stanley and Deutsche Bank also themselves could not constitute a securities fraud.  To begin with, the evidence was insufficient to show that any misstatements to Morgan Stanley or Deutsche Bank were "in connection with the purchase or sale" of a security.  Rather, RSB had already purchased the bonds and was seeking to custody them at one of the two banks, and it was in connection with determining whether to take custody of the bonds that Mr. Archer made the alleged misstatement.  Indeed, Morgan Stanley's representative expressly acknowledged that "Morgan Stanley was not involved in the purchase or

### 7.   *Mr. Archer's statements to the Board of Trustees of the Burnham Investors Trust do not support an inference of fraudulent intent*

The government argued that Mr. Archer's fraudulent intent could be inferred from his alleged false statements to the BIT Board. Tr. 3661:10-13. But the evidence showed that Mr. Archer's statements to the BIT Board were not false, and even if they were, did not support an inference that he knew Galanis was stealing the bond proceeds.

At the outset, as the BIT Board representative acknowledged, Mr. Archer's statements to the BIT Board had no connection to the actual bond issuances at issue in the case. Tr. 2656:14-2658:2 (Moynihan).  Indeed, the BIT Board was not aware of the existence of the WLCC bonds until long after the SEC had filed its first enforcement action.  Tr. 2806:12-16 (Moynihan).  Rather, Mr. Archer's interactions with the BIT Board concerned a potential change in ownership of the Burnham Financial Group. Because the Burnham Investors Trust was a significant client

---

sale of the WLCC bonds."  Tr. 828:6-14 (Driever).  Mr. Archer "did not purchase [the bonds] through Morgan Stanley," Tr. 792:3-5 (Driever), and Morgan Stanley "would never [have been] able to buy the bonds," Tr. 822:4-823:1 (Driever); *see also* Tr. 832:8-833:9, 845:6-11.  Instead, Morgan Stanley "got involved in simply holding the bonds after they were bought." *Id.* at 822:4-823:1 (Driever); *see also id.* at 538:3-15 (Anderson).  Thus, any alleged misstatements to Morgan Stanley or Deutsche Bank could not sustain a securities fraud charge.  *See United States v. Coriaty*, 99-CR-1251, 2001 WL 1910843 (S.D.N.Y. 2001) (granting judgment of acquittal where misrepresentations "did not relate to the nature or value of the securities" even where the misrepresentation induced the sale of securities); *see also SEC v. Drysdale Sec. Corp.*, 785 F.2d 38, 43 (2d Cir. 1986) (finding no securities fraud where the "direct result" of a misrepresentation was a collateralized loan, not a securities purchase or sale).

Mr. Archer's statements to the banks were also immaterial. There is no evidence that anyone involved in the purchase or sale of a security, such as the WLCC, ever heard or relied on these statements. *See Levinson*, 485 U.S. at 238 (it is not "enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant" to *an investor's decision* to buy or sell a security"). Morgan Stanley did not make any "investment decision" relating to the WLCC bonds, and the government has never claimed that Morgan Stanley was a victim of the securities fraud.  Rather, as the Court properly instructed the jury, Tr. 4143:19-4144:3, the relevant investors in this case were the WLCC (which issued the bonds) and the clients of Atlantic and Hughes (which bought them).  But neither set of victims was aware of Mr. Archer's statements to the banks, so those statements could not possibly have been material to their investment decisions.  *See Vilar*, 729 F.3d at 89.

of Burnham Asset Management ("BAM"), a Burnham Financial Group subsidiary at the time, the new ownership group – including Mr. Archer – wanted to ensure that the BIT Board would not move the Trust's assets post-acquisition.  Tr. 2666:13-2667:9 (Moynihan).  Indeed, Mr. Archer's desire to keep the Trust as a client of BAM was entirely consistent with his desire to amass assets under management, as discussed above.  If the purpose of the BFG acquisition was instead to somehow facilitate the bond scheme, on the other hand, Mr. Archer would have been indifferent to the BIT Board – but the evidence showed that he certainly was not.  To the contrary, Mr. Archer, aided by Jon Burnham, engaged in protracted negotiations with the BIT Board over a period of months.

The evidence was insufficient to prove that Mr. Archer's statements to the BIT Board were evidence of fraudulent intent. Rather, Mr. Archer's statements were accurate. His statements were technical and carefully constructed, drafted by lawyers during a course of negotiation, meant to both sufficiently cordon off Jason Galanis from any official role with any of the Burnham entities, while at the same time allowing for Galanis to continue his consultancy role in the financial roll-up plan. This was an act by Mr. Archer in furtherance of growing the financial conglomerate, not in furtherance of a scheme to misappropriate bond proceeds, which occurred regardless of any representations to or approvals by the BIT Board. As with Mr. Archer's statements to Morgan Stanley, his statements to the BIT Board had nothing to do with "bringing about the underlying crime" of securities fraud. *Labat*, 905 F.2d at 23.

### a.        Mr. Archer did not lie to the BIT Board

The record shows that over the course of a protracted negotiation, COR Fund Advisors (or CORFA), which was the investor group that wanted to purchase the Burnham Financial Group, and the BIT Board arrived at a representation concerning Jason Galanis that both sides could accept. Mr. Archer took on the role as one of the representatives of CORFA in these

negotiations, and the government argued that Mr. Archer "falsely represented" to the BIT Board
that "Jason Galanis would not be involved with any entities affiliated with [BSI] or source deals
to [BSI], despite [knowing] of Jason Galanis's role in procuring the Bond Issuances." Ind. ¶ 10.
The record, however, shows that the actual representations Mr. Archer made were not false; the
representations put as much distance between Jason Galanis and the Burnham Investors Trust as
possible, while still allowing for Galanis to serve as a consultant to CORFA and to continue his
role in the broader roll-up strategy.

The key representation at issue is contained within a letter to the BIT Board dated
September 26, 2014. In it, CORFA and a newly-created entity called BAM Holdings, LLC,
respond to an earlier letter from the BIT Board asking for confirmation of the BIT Board's view
of Jason Galanis's ongoing role:

> You have provided us with assurances regarding the non-
> participation of Mr. Jason Galanis. We believe that you understand
> our views on the subject; that is, that we want an iron-clad
> assurance going forward, he will not be involved with any of the
> Burnham entities and their 'affiliated persons' (within the meaning
> of Section 2(a)(19) of the Investment Company Act) as well as
> their successors or assigns at [BFG, BAM, BSI,] or Burnham
> Investors Trust. But for the avoidance of doubt, it is our
> understanding that Mr. Galanis will have no interest of any kind,
> direct or indirect, in any of the Burnham entities or their
> successors, that he will not source deals to the Burnham entities
> and that the Burnham entities will not invest with or in, directly or
> indirectly, any business or enterprise in which Mr. Galanis has any
> association, affiliation or investment, pecuniary or otherwise,
> directly or indirectly.

DX4335 at 2. CORFA and BAM Holdings responded with a one-word reply to this portion of the
BIT Board's letter: "Confirmed." GX762 at 2.

As a threshold matter, the government failed to prove that Mr. Archer knowingly made
any statement in the September 26 letter at all. The evidence at trial clearly shows that the letter
was e-mailed to the BIT Board not by Mr. Archer but instead by Andrew Godfrey, and that while

the letter was written as if it were coming from Mr. Archer, he did not actually sign it. *See* DX4389; *see also* Tr. at 2794:10-2795:2. As with the Morgan Stanley statements, it was actually Seb Momtazi who affixed Mr. Archer's signature to the letter. *See* DX4388. The record also does not show that the BIT Board even received the signed version of the letter. *See* Tr. 2812:19-2813:6 (Moynihan, testifying that the BIT Board produced documents "at the request of Burnham, and I assume they made their way to the government" but that she did not know if GX762 was received by the Burnham Investors Trust). To the extent that the letter contains any misrepresentations (and for the reasons stated below, it does not), those misrepresentations cannot be properly attributed to Mr. Archer.

But with regard to the substance of the representation, the Jason Galanis-related paragraph of the BIT Board's earlier letter (then confirmed by CORFA in GX762) contains three sentences. The first merely states that CORFA and BAM Holdings had "provided [the BIT Board] with assurances regarding the non-participation of Mr. Jason Galanis" but does not describe the assurances. The second sentence describes the BIT Board's belief that CORFA and BAM Holdings understand what the BIT Board wants. It is the third sentence that contains the prospective commitment that the BIT Board actually demanded.

Specifically, the BIT Board sought confirmation of their understanding of three specific points: "[1] that Galanis will have no interest of any kind, direct or indirect, in any of the Burnham entities or their successors, [2] that he will not source deals to the Burnham entities and [3] that the Burnham entities will not invest with or in, directly or indirectly, any business or enterprise in which Mr. Galanis has any association, affiliation or investment, pecuniary or otherwise, directly or indirectly." GX762 at 1-2. The evidence did not show that any of these representations were false.

First, Jason Galanis did not have any ownership interest in any of the Burnham entities or their successors at any point in time after which this representation was made. While Jason Galanis had an indirect ownership interest in CORFA at one point early on, Mr. Archer bought him out of CORFA after the BIT Board raised issues with Galanis being part of the investor syndicate. *Compare* GX753 at 5 and DX4311 at 6 (indicating that BOE Capital LLC owns 35.11% of CORFA and that "BOE Capital LLC membership interests are owned 30% by Devon Archer, 30% by Bevan Cooney and 40% by Thorsdale Fiduciary & Guaranty Company Ltd."), *with* GX757 at 2 and DX4345 at 3 ("CORFA is managed by BOE Capital LLC, which is totally owned and controlled by Devon Archer."); *see also* DX9001 (summary chart showing changing ownership of CORFA and BFG). And even if Jason Galanis had not been bought out of CORFA, CORFA never ultimately purchased any of the Burnham entities, and thus cannot have been considered a Burnham successor.[19] Indeed, the only company that actually bought one of the Burnham entities – BAM Holdings, which bought BAM – was never owned, directly or indirectly, by Galanis. *See* DX4027; GX757 at 2 and DX4345 at 3 ("BAM will be owned 100% by BAM Holdings LLC, an entity 55% owned by Devon Archer, 10% owned by Andrew Godfrey, 25% owned by Kirin Global Enterprises and 10% owned by Jon Burnham."); *see also* Tr. at 2622:15-2623:6, 2775:22-2776:11 (Moynihan).

---

[19]     The government argued on rebuttal that the fact that Jason Galanis used an "@burnhamequitypartners.com" email address shows that he had an ownership interest in or was otherwise affiliated with a Burnham entity. *See* Tr. 4077:24-4078:14. But there is no evidence that "Burnham Equity Partners" was actually affiliated with any Burnham entity. In fact, this was merely what CORFA intended at one point to change its name to upon completion of its planned acquisition of BFG. *See* GX792 at 1 (Mar. 19, 2014 BIT Board minutes referencing proposed acquisition by Burnham Equity Partners LLC). Because the acquisition never happened, the name change did not happen, either, and no company called Burnham Equity Partners ever actually existed, despite Mr. Galanis's use of that email account. *See, e.g.*, Tr. 2159:14-16 (Martin, testifying that he does not know if there is a Burnham Equity Partners).

Second, there is no evidence that Jason Galanis sourced any deals to Burnham Financial Group after the date of the CORFA/BAM Holdings letter.  Jason Galanis sourced the WLCC bond deals to BSI *before* the date of CORFA and BAM Holdings' September 26, 2014 letter. The government argued that because the second bond issuance was happening at the time of these negotiations, and because the third bond issuance happened months later, the representation that Galanis "will not source deals" was a lie. *See* Tr. 3672:16-3673:2. But the representation was *not* that the Burnham entities would cease doing business with companies that Galanis had already introduced. And even if, in some strained reading, BSI's work as placement agent for the WLCC bonds was three separate, independent deals, rather than a continuation of an existing deal to act as placement agent for the WLCC,[20] Galanis and Morton had already identified Atlantic (whose clients purchased the bonds in the third offering) as an acquisition target by the time of the commitment to the BIT Board. *See, e.g.*, GX2037 (Sept. 20, 2014 e-mail from Galanis to Archer attaching "Overview Atlantic Asset Management.pdf").

The only other deal that Galanis arguably sourced to Burnham Financial Group, according to the trial record, was the Code Rebel IPO.  But that IPO was in the works since at least early 2014 – long before the representations to the BIT Board.  GX1260.  In other words, even though there were deals that were *concluded* later, there are no introductions made by Galanis or new deals "sourced" by him after September 26, 2014. There is no doubt that the BIT

---

[20]     The record in fact shows that all of the WLCC bond issuances were part of the same deal. Each had the same issuer, issuer counsel, trustee, placement agent, counsel to the placement agent, annuity provider, and investment manager. *Compare* GX200, GX204, GX205, GX210, GX211, GX214, GX252, GX1364 (core bond documents for first issuance), *with* GX201, GX206, GX207, GX209, GX213, GX215, GX216 (core bond documents for second issuance) *and* GX202, GX208, GX212, GX217, GX263 (core bond documents for third issuance). And as BSI's attorney Timothy Anderson explicitly testified that "[t]he terms of the annuity and the investment contracts are basically the same for the first and second and third issuances." Tr. 499:2-5 (Anderson). Additionally, Francisco Martin testified that he understood that all of the bond issuances were "the same deal." Tr. at 2331:7-13 (Martin).

Board was a sophisticated party, fully capable of making fine distinctions such as this. *Compare* GX760 at 2, DX4333 at 3 ("Jason Galanis has never been, and will not become"), *with* GX760 at 2, DX4333 at 3 ("[Jason] Galanis will not be sourcing").

Third, there is no evidence that any of the Burnham entities invested in "any business or enterprise in which Mr. Galanis has any association." GX762 at 1-2 and DX4335 at 2. No evidence was adduced at trial indicating that BFG, BAM, or BSI invested in Thorsdale or any other entities owned or operated by Jason Galanis. Likewise, there was no evidence indicating that BFG, BAM, or BSI invested in CORFA or Valor Life or any other entities for which Jason Galanis may have served as a consultant or been otherwise associated or affiliated. *See* DX4015; DX4338; DX4025; DX4026.

Other representations Mr. Archer may have made to the BIT Board are consistent with Galanis continuing to act as a consultant to CORFA and to the Valor Group. An earlier letter dated September 5, 2014, for example, stated that "CORFA and BAM Holdings will continue to abide" by a prior retrospective commitment "that Jason Galanis has never been, and will not become, an officer, employee, consultant, director or member of the management of" Burnham Financial Group ('BFG'), Burnham Asset Management Corporation ('BAM'), or BSI. GX760 at 2; DX4333 at 3; *see also* GX757 at 1; DX4345 at 2 (each containing same prior commitment). Not included on the list is CORFA, BAM Holdings, or the Valor Group of companies. And as Dunkerley testified, Galanis was never "actually a [BSI] employee." Tr. 917:6-7 (Dunkerley). Galanis's role as a consultant to CORFA and/or Valor Group was also not a surprise to the BIT Board. Jon Burnham was explicit in April 2014 that Jason Galanis "operated as a consultant." DX4354 at 2; *see also* GX757 at 1;  DX4345 at 2 (Aug. 21, 2014 letter to the BIT Board, stating that "Jason Galanis ha[d] consulted with CORFA and certain of its members").

In sum, a rational juror could not have found, beyond a reasonable doubt, that Mr. Archer made any intentionally false statements to the BIT Board.

> **b.    Even if a juror could conclude that Mr. Archer made a false statement to the BIT Board, that would not support an inference that he knew Galanis was stealing the bond proceeds**

Mr. Archer's statements to the BIT Board, even if they were intentionally untruthful, would still not support an inference of fraudulent intent in connection with the alleged crime – the misappropriation of bond proceeds. Rather, to the extent that a juror could have concluded beyond a reasonable doubt that Mr. Archer lied to the BIT Board, it would only support the inference that he wanted to get the deal done without limiting his ability to continue to (unfortunately) rely upon Galanis's assistance.

The negotiations with the BIT Board had nothing to do with the WLCC bond issuances. *See* Tr. 2656:14-2658:17, 2804:13-2806:16 (Moynihan).  Part of BSI's role as placement agent for the WLCC bond issuances was, of course, to solicit investors for the bonds. *See* GX211; GX212; GX213; *see also* Tr. at 151:8-152:2 (Anderson); 355:12-19, 523:9-13 (Anderson). But the BIT Board was not a corporate affiliate of BSI. The BIT Board was the board of the Burnham Investors Trust, an entity that was entirely separate from the BFG family of companies and all of the other entities involved with the bond issuances. *See* Tr. at 2605:4-22 (Moynihan); *see also id.* at 2643:20-2644:20 (Moynihan).

The BIT Board oversaw investments by the Burnham Investors Trust, which was one of Burnham Asset Management's (not BSI's) customers. The Burnham Investors Trust entered into certain investment advisory agreements with Burnham Asset Management (or BAM). *See id.* at 2605:4-22 (Moynihan); *see also id.* at 2643:20-2644:20, 2666:17-2667:2 (Moynihan). The BIT Board and the Burnham Investors Trust were not actually related to any of the Burnham entities, let alone the broker-dealer BSI, which merely shared a common corporate parent with BAM, the

Trust's investment adviser. *See* GX4002 (demonstrative); *see also* Tr. at 2658:19-2660:17 (Moynihan). And while BSI served as the placement agent for the bond issuances, the evidence does not show BAM having anything to do with the bonds whatsoever. *See Mfrs. Hanover Trust Co. v. Smith Barney, Harris Upham & Co.*, 770 F. Supp. 176, 180 (S.D.N.Y. 1991) (the relevant inquiry is "whether defendants' alleged fraud deprived plaintiff of information that might have been useful to it in deciding whether to purchase or sell securities"). Moreover, there was no suggestion by anyone at any time that the Burnham Investors Trust – or any BAM client – should invest in the bonds. Tr. 2657:24-2658:10 (Moynihan).

In other words, regardless of what happened at BAM, the bonds scheme could have still continued uninterrupted. What was important to Mr. Archer, however, was the role the Burnham Investors Trust potentially played in the Valor Group roll-up. At worst, assuming for the sake of argument that Mr. Archer made some knowingly untrue statement to the BIT Board, the evidence showed Mr. Archer concealed Jason Galanis's role in advising CORFA and Valor Group on growing the financial conglomerate. There is no connection between that misrepresentation and the alleged crime – that Mr. Archer had the specific knowledge that Galanis was stealing bond money.

### 8. *The evidence was insufficient to show that Mr. Archer knew that the WLCC bonds were being improperly used to boost Burnham Securities' net capital*

The government argued that the bonds purchased by RSB were transferred in part of Burnham Securities, where they were used to satisfy net capital requirements. Tr. 4079:20-21 (rebuttal); *see also* Tr. 3650:21-3651:7 (closing) (claiming that Mr. Archer wanted to "try and fool FINRA"). FINRA later determined that the bonds did not qualify as an "allowable asset" for net capital purposes. Tr. 2094:3-12 (FINRA's review took "a couple of months," after which FINRA notified Burnham that the first would need to reclassify the bonds as non-allowable);

GX1078 at 2 (notification to FINRA of net capital deficiency explains that Burnham Securities "was made aware of the unallowable asset status of the bond" in a January 11, 2016 phone conversation). Whatever the significance of this evidence, it does not show Mr. Archer's criminal knowledge or intent.

There is no question that the evidence showed that a portion of the bonds that RSB purchased were used by Burnham Securities to meet its net capital requirements for a period of time. Tr. 2125:12-2126:9 (Walch). However, the evidence did not show that Mr. Archer was involved in BSI's decision to use the bonds for net capital, or that Mr. Archer even knew about it or believed it was in furtherance of any fraud. Indeed, at the time that BSI first began counting the bonds towards its net capital, it was already significantly in excess of its requirements; there was therefore no benefit at that time to using the bonds for net capital. GX 1085 at 4-5; Tr. 2125:2-2126:9 (Walsh). And while the evidence showed that, months later, BSI briefly fell below its net capital requirements, there was no evidence that Mr. Archer was aware of that fact at the time. Tr. 2100:17-24 (Walch, testifying that she never met with or spoke to Mr. Archer, and that her discussion of Burnham Securities' statements and actions were not references to Mr. Archer's statements or actions).

On April 9, 2015, RSB LLC transferred the $15 million of WLCC bonds it was holding to VL Assurance (Bermuda) Ltd. *See* GX301 at 135 (RSB Morgan Stanley statement); GX306 at 8 (VL Assurance (Bermuda) Ltd. Morgan Stanley statement). On May 18, 2015, VL Assurance moved the full $15 million bonds from one of its Morgan Stanley accounts to another Morgan Stanley account. *See* GX306 at 18. On May 29, 2015, a portion of the bonds were transferred from VL Assurance's Morgan Stanley to BSI's Morgan Stanley account. *See* GX322 at 7 (VL Assurance account statement); GX327 at 7 (BSI account statement). Burnham Securities then

started using the WLCC bonds for net capital purposes in May 2015. *See* GX1080; GX1085. Just

prior to using the bonds, BSI held $230,006 in net capital, or 230 percent of its minimum

requirement.  GX 1085 at 4-5; Tr. 2125:2-10 (Walsh).  Burnham Securities continued to use the

bonds to meet net capital requirements until FINRA informed the firm in a phone call on January

11, 2016, that it had determined the bonds were an unallowable asset. *See* GX1078 at 2. BSI

replaced the bonds with cash two days later. *Id.*

  For three independent reasons, a rational juror could not have relied upon these facts in

convicting Mr. Archer of any crime. First, there is no evidence that Mr. Archer was ever

involved in any of the communications or decisions concerning BSI's net capital, including the

negotiations with FINRA concerning the correct haircut for the bonds. Patricia Walch, the

government witness from FINRA who monitored BSI, never met or communicated with Mr.

Archer. Tr. 2100:16-24. In fact, the first time the government even asked Ms. Walch about Mr.

Archer was during the trial, on June 8, 2018. Tr. 2101:20-23. The people controlling the VL

Assurance (Bermuda) accounts were Jason Sugarman and David Ezekiel. *See* GX306; GX322.

Jon Burnham and Marcelle Devine controlled the BSI Morgan Stanley account. *See* GX327. The

FINRA filings were submitted by other people at BSI. The only communication that Mr. Archer

actually made concerning moving the bonds after they had been deposited with VL Assurance

had nothing at all to do with net capital. *See* GX2086.  In other words, satisfying BSI's net

capital requirements with the bonds is not something Mr. Archer did.

  Second, even if Mr. Archer had some involvement in moving the bonds initially, BSI had

far in excess of its minimum net capital at the time, even excluding the bonds.  Tr. 2125:12-

2126:9 (Walch).  Counting the bonds towards the firm's net capital therefore served no purpose

at the time, let alone an illicit one.  *See* Tr. 2072:1-6 (Walch, testifying that purpose of the net

capital requirement is to ensure that Burnham Securities did not go below the statutory minimum ); *cf. id.* at 3387:5-25 (Filler, noting that illiquid assets that aren't allowable for net capital purposes can still be validly included in fair market value for net worth or financial condition purposes).  And although BSI later came to rely upon the bonds to satisfy its minimum net capital, *see* GX1078 at 2 (reporting a temporary net capital deficiency upon reclassifying the bonds), there is absolutely no evidence that Mr. Archer knew it.  Nor is there any evidence that BSI or any of the alleged conspirators somehow benefited from the bonds being used for net capital purposes, especially given BSI's modest $100,000 minimum requirement.  *See* Tr. 2072:1-6 (Walch).

Third, as explained above in Section I.B.5, Mr. Archer did not know the bonds were purchased with recycled money. Mr. Archer and others who transacted in these bonds believed the bonds had real value – that they were purchased with real money and were backed by investments in private equity. Moving assets with real value between affiliated companies is not evidence of a crime. In fact, the reason FINRA determined that the bonds were an unallowable asset was *not* that the bonds were fraudulent, but rather, FINRA determined over a matter of months that the bonds should not be classified as municipal securities and could not be adequately priced. *See, e.g.*, Tr. 2093:7-2094:5 (Walch). FINRA rejected the arguments put forward by Burnham Securities' lawyers that the bonds were municipal bonds rather than sovereign bonds, but made no determination about their market value. *See* Tr. 2111:7-24 (Walch); Tr. 3387:5-25 (Filler, noting that fair market value of illiquid assets is valid to account for net worth or financial condition purposes, but that the purposes of the net capital requirements for broker-dealers is to ensure that in the case of "sudden market moves," they have the needed "cash to make sure that the brokerage firm is alive and not filing for bankruptcy").

**9.      *The government failed to prove that Mr. Archer knew he funded a bond interest payment or that he did so knowing Jason Galanis had misappropriated bond proceeds***

At trial, the government introduced evidence concerning a payment Mr. Archer made to the WAPCC account. This, the government argued, was in connection with the interest payments on the first bond issuance. The evidence was insufficient to demonstrate, however, that Mr. Archer knew that he was financing an interest payment on the bonds, and, more fundamentally, that Mr. Archer knew that the payment was needed because Jason Galanis had misappropriated the bond proceeds.

With respect to the first series of bonds, the evidence showed that Mr. Archer wired $250,000 to the WAPCC account and that Galanis may have used at least a portion of that money to pay interest on the first bond issuance, while putting the remainder in his own pocket. *See* GX4010; GX512 at 66.  The government argued that Mr. Archer's payment was designed to conceal and further the scheme by lulling its victims into believing the annuity was producing income.

The key document the government used to argue that Mr. Archer knew the payment was for bond interest is GX2121, an e-mail in which Galanis provided Mr. Archer with wiring instructions. While the beneficiary of the listed account was "Wealth Assurance Private Client," there is no information on the face of the e-mail that suggests the payment is for interest on bonds. The only thing Jason Galanis writes other than the wiring instructions is, "if you get this out today, i am assured we can turn it today." *Id.* The jury was left to speculate as to what Mr. Archer thought the reason was for the payment.

In other words, as with so much of this case, the evidence showed that Mr. Archer sent money to WAPCC that (a juror could infer) was used to make payments on the bonds, but it did not show that Mr. Archer knew that was the purpose of the payment.  Indeed, the evidence

71

showed that Galanis purposefully chose the name Wealth Assurance Private Client to mislead people into believing that WAPCC had an affiliation with the real Wealth Assurances (WA AG and WAH), *see* Tr. 1040:20-1041:5 (Dunkerley), and Mr. Archer was no different. Mr. Archer made frequent payments to those entities he was investing in, loaning money to make up for temporary liquidity shortages or capital infusions. *See* DX9003 at 5 (summary chart). At the same time, Galanis was using misdirection to steer otherwise legitimate payments into his own pocket, such as when Galanis and Dunkerley tricked WA AG into investing money in Galanis's fake Las Vegas asset manager Ballybunion, which was named to mimic a legitimate firm. Tr. 1122:9-12 (Dunkerley); Tr. 921:23-922:13 (Dunkerley). Dunkerley thereafter produced fake account statements to WAAG to cover up their fraud. Tr. 922:14-22 (Dunkerley). Mr. Archer meanwhile was kept completely in the dark about this and Jason Galanis's other schemes. *See* Tr. 1147:5-11 (Dunkerley).

Later, when Francisco Martin partially paid Mr. Archer back at the direction of Jason Galanis, Martin wrote that the purpose of the wire transfer was "purchase of municipal bonds." Tr. 2171:1-3. The reason Martin wrote that, he testified, was "Because it would have looked weird to put to pay interest on a municipal bond." Tr. 2171:6-8. Even though Mr. Archer never met or communicated with Martin, *see* Tr. at 2381:15-2382:7 (Martin), the government is likely to argue that this shows Mr. Archer somehow also knew that the payment was for interest on the bonds. But nothing in Martin's testimony or any other evidence suggests, let alone proves, that Mr. Archer was aware of where the money went beyond WAPCC, let alone that he intended for the money to be used to further Jason Galanis's scheme to steal the bond proceeds.[21]

---

[21]     In addition, the government attempted but failed to prove that Mr. Archer also was involved in paying interest on the second issuance as well. *Compare* GX 4011, *with* DX8011 at 2-3. As the government's own witness was forced to acknowledge, however, RSB

\*     \*     \*

Because the evidence was insufficient to show that Mr. Archer knew about, let alone intended to bring about or consciously assisted in, the commission of any acts of securities fraud, a judgment of acquittal is required. *See Wiley*, 846 F.2d at 155 (reversing aiding and abetting conviction for insufficient evidence of intent). A judgment of acquittal must be entered because no rational juror could find, beyond a reasonable doubt, that Mr. Archer acted with the criminal intent to defraud the WLCC or the clients of Hughes and Atlantic, or to help Galanis steal the proceeds – that is, there was insufficient evidence that Mr. Archer acted with "some evil purpose," *United States v. Dixon*, 536 F.2d 1388, 1397 (2d Cir. 1976), by committing a knowingly and intentionally wrongful act under the securities laws.  *See United States v. Pelz*, 433 F.2d 48, 55 (2d Cir. 1970) (holding that "in order to establish criminal liability . . . it was necessary . . . that the prosecution establishes a realization on the defendant's part that he was doing a wrongful act [and] that the act be wrongful under the securities laws and that the knowingly wrongful act involve a significant risk of effecting the violation that has occurred.") (internal quotations omitted).  Because the trial record contains no proof of such criminal knowledge or intent, the Court should enter a judgment of acquittal.

## II.     THE COURT SHOULD GRANT MR. ARCHER A NEW TRIAL

Mr. Archer is also entitled to a new trial in the interest of justice – either as an alternative to acquittal should the Court determine that, viewed in the light most favorable to the government, the evidence can technically withstand the Rule 29 analysis, or (preferably) as a

---

mistakenly received an interest payment which was reversed by Morgan Stanley, and no funds flowed from RSB to either WAPCC or the bondholders in connection with the second issuance. *See* DX4523; Tr. 3070:25-3072:8 (Kendall). There was no basis on which the jury could have inferred that Mr. Archer took any action or knew anything at all about the payments concerning the second bond issuance – bonds he had long before moved out of RSB's account.

backstop to an order acquitting Mr. Archer.  *See* Fed. R. Crim. P. 29(d)(1) ("If the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed. The court must specify the reasons for that determination."); *see also* Fed. R. Crim. P. 29(d)(3)(A).

Mr. Archer should receive a new trial for at least three independent reasons.  First, the evidence does not support a guilty verdict.  As explained above, the trial evidence was insufficient as a matter of law to convict Mr. Archer.  Under the more forgiving Rule 33 analysis, under which the Court may look at the entirety of the trial record, Mr. Archer respectfully submits that it would be a "manifest injustice" to allow the verdict to stand because the evidence – which was entirely absent as to Mr. Archer's criminal intent – raises "a real concern that an innocent person may have been convicted." *Ferguson*, 246 F.3d at 134 (internal quotation marks omitted).  In addition, Mr. Archer is entitled to a new trial because of the grossly prejudicial effect of the last-second introduction of evidence of Jason and John Galanis's conviction on securities fraud charges in the Gerova case, and because of serious errors in the jury instructions.  In particular, the Court's decision to give a conscious avoidance charge lacked any factual predicate and was relied upon explicitly by the government in both its principal and rebuttal summations.  The Court's decision to forego both a multiple conspiracies charge and a specific unanimity instruction (or, alternatively, a detailed verdict sheet) was also, respectfully, error justifying a new trial.

### A.    The Guilty Verdict Is Unsupported By The Weight Of The Evidence

As explained above in the context of the Rule 29 analysis, the trial evidence was insufficient to support a guilty verdict as a matter of law.  But under Rule 33 – where the Court is instructed to look at the entirety of the evidence, including the countervailing evidence that

directly undermined the government's urged inferences – it is clear that the trial record contained voluminous evidence affirmatively showing that Mr. Archer was unaware that others were stealing bond proceeds.

Rather than including Mr. Archer in their schemes, the evidence shows that Jason Galanis and other co-conspirators actively hid their criminal wrongdoing from him. When they were communicating with Mr. Archer, it was always about legitimate business dealings. And not only did they hide their wrongdoing from Mr. Archer, they exploited Mr. Archer for his money and connections.

### 1.     Evidence affirmatively demonstrated that Mr. Archer did not know money was being stolen

The government argued that Galanis's elliptical references to "liquidity" and "discretionary" assets were coded language to discuss stolen bond proceeds.  But the evidence showed that the real conspirators explicitly discussed their criminal wrongdoing.  For instance, Galanis and Dunkerley frequently met in person to plot their schemes on whiteboards, *see* Tr. 1429:15–1430:13 (Dunkerley), but they never included Mr. Archer. *See* Tr. 1435:23-25 (Dunkerley). Galanis, Dunkerley, Hirst, and Martin all used Wickr to send self-destructing messages to one another, *see* Tr. 1141:21-23 (Dunkerley); 2168:18-23 (Martin); 2297:22-24 (Martin), but they never did so with Mr. Archer. Morton worked with directly Hirst and Dunkerley, *see* GX811; GX813; GX828; GX904; GX2616; GX2609; DX802, and she texted with Jason Galanis thousands of times, *see* Tr. 2415:11-13, including explicit communications in which she and Galanis acknowledged that his aim was to put the WLCC bonds to Morton's unsuspecting clients, *see* GX 3004A at 282.  But Morton did not know Mr. Archer personally, *see* GX2059, DX3004B at 808-09, 871-72, 928, and did not so much as have his number in her phone. Tr. 2414:14-17, 2418:8-10 (Santos).

Dunkerley testified that he participated in only legitimate conference calls with Mr. Archer but never spoke to him personally, *see* Tr. 1309:8-14 (Dunkerley), never spoke to him about the bonds or anything improper for that matter, Tr. 1310:7-13, 1524:13-24 (Dunkerley), and never even saw Mr. Archer in person until his arraignment. Tr. 1309:2-7 (Dunkerley).

The other admitted conspirator, Martin, testified that he never met Mr. Archer at all, Tr. 2381:17–2382:7, and there is no evidence that they ever communicated in any form or fashion. So when Galanis, Dunkerley, Hirst, Martin, and Morton communicated about their bond scheme, they by definition never included Mr. Archer.

The evidence at trial showed that Jason Galanis carefully controlled the flow of information to further his schemes and cover his tracks. *See* DX4801 (Martin e-mailing: "Jason [Galanis] is VERY sensitive on how communication flows."); Tr. 1120:17-19 (Dunkerley) (Q. . . . Jason Galanis told you at times, don't tell other people certain information. A. Correct). This manipulation to keep parties – and especially Mr. Archer – in the dark provides further evidence that Mr. Archer was unaware of Galanis's schemes.

For example, Dunkerley admitted that Galanis specifically instructed him not to be physically present at meetings at which Mr. Archer would be present, Tr. 1328:19-23, ensuring that Mr. Archer could never test Galanis's statements to him. Tr. 1328:19-1329:1 (Dunkerley). Revealingly, when a Galanis associate included Mr. Archer on an particular e-mail, Galanis exploded: writing, "if you f***ing email devon and rohan ever in the same f***ing email I disown you. Do not risk our relationships. All we have." DX4719 (expletives omitted).  Galanis expressed much the same sentiment in a January 22, 2014 e-mail, in which he Galanis chastised someone for sending Mr. Archer a "bizarre" e-mail about a potential investment by Mr. Archer's

business contacts, writing, "Please respect bevan's relationship with Devon. . . . You'll mush this if you send shit like that." DX4708. Galanis added later, "I think you should use bevan. . . ." *Id.*

The evidence was overwhelming that Galanis was incredibly secretive about his plans to steal the bond proceeds, even amongst his admitted conspirators. Despite being intimately involved in the entities set up to steal the bond money, neither Dunkerley nor Martin knew Galanis was stealing bond money until well after he began doing so. When Martin executed a contract with the WLCC on behalf of Private Equity Management to invest the bond proceeds, he was unaware that Galanis planned to steal the money, Tr. 2329:16-23 (Martin), only (he claimed) inferring it later from Galanis's financing of the Fondinvest acquisition, Tr. 2175:19-22 (Martin). And even though he (with Gary Hirst) controlled the WAPCC account where the bond money ended up, Dunkerley did not know that the bonds were part of a criminal scheme until he saw where Galanis instructed him to wire the proceeds. Tr. 1139:24-1140:11. (Dunkerley). So even as Galanis was implementing his bond scheme, his own key co-conspirators did not know about his plans. And as explained in Section I.B.5 above, Galanis went to particular pains to hide this scheme from Mr. Archer, laundering $15 million before transferring it to Mr. Archer. Galanis did not go through such machinations with his transfer of bond proceeds to other alleged conspirators, including his father, Bevan Cooney, Jason Sugarman, and others who received funds directly from the WAPCC account. *See, e.g.*, GX 512 at 2 (Sovereign Nations), 34 (Sugarman), 35 (Cooney),.  But when Mr. Archer was involved, the transaction were made by Galanis to appear above-board, precisely to fool him.

Even after the third bond issuance, Galanis continued to mislead Mr. Archer about the bonds. On April 10, 2015, Galanis sent Mr. Archer an update on the project the bonds were funding, attaching pictures of the construction and writing, "Rewarding to see it happening."

DX4117. About four months later on August 4, Galanis e-mailed Mr. Archer another update on

the bond-funded project, attaching six more pictures of the construction. DX3550. These updates

make it seem as if the bonds had been successful for the WLCC, when anyone truly in on the

scheme would know that the bond-funded projects had no chance of succeeding because Galanis

had stolen the bond proceeds. Yet Galanis continued to send Mr. Archer these pictures, even

long after the final bond issuance.

Again and again, from before the first bonds were issued until months after the final

bonds were purchased, Galanis lied to Mr. Archer about the bonds. He told Mr. Archer that the

bond proceeds would be going into legitimate investments, and he repeatedly updated Mr.

Archer on the bonds to make them appear successful. None of this makes sense if Mr. Archer

knew the bond money was being stolen.

### 2. *Jason Galanis and his co-conspirators exploited Mr. Archer for his money and connections*

Mr. Archer was indisputably a valuable resource with valuable connections. *See* GX343

at 6; Tr. 854:21-855:5 (Driever); Tr. 1329:15-1330:7 (Dunkerley). The way Galanis and his co-

conspirators flaunted Mr. Archer's status and legitimacy behind his back – and amongst each

other – shows how Mr. Archer was not aware of their scheme.

For instance, in the same January 2014 e-mail in which Galanis asked to "respect bevan's

relationship with Devon," he wrote that "[t]he alternative is to pimp devon and see how quickly

he stops responding. . . .  it will happen." DX4708.  Cooney replied, "Devon is not used to

'swimming in shit.'" *Id*.  This exchange makes explicit how Galanis and others spoke of and

used Mr. Archer to advance their personal interests.

Indeed, the record was littered with instances in which Galanis used Mr. Archer's name,

credentials, and relationships.  For example, also in early 2014, Galanis instructed Martin to

share Mr. Archer's bio with Fred Ruopp since they'll have "many local connects in common," DX4804, which Martin subsequently did. DX4813. The previous month, Galanis wrote in an e-mail to Dunkerley and Dan McClory regarding Mr. Archer's bio, "[i]t may be worth clarifying that Devon's two partners in Rosemont are Chris Heinz and Hunter Biden, the step son of the Secretary of State John Kerry and the son of the Vice President Joe Biden, respectively." DX4836.  In March 2014, Jason Galanis "added Devon prominently" to his business plan in an e-mail to Jason Sugarman. DX4709. And in a June 2014 e-mail to Morton, Jason Galanis put Mr. Archer's bio at the top of COR Capital's non-alphabetical leadership summary, to which Morton responded, "I love this guy!!!!" DX800.

Galanis employed the same strategy with the WLCC. Even though Mr. Archer never met the WLCC representative Raycen Raines, Tr. 1863:23-1864:1, 1866:8-12 (Raines), Raines had heard of Mr. Archer, Tr. 1864:2-3 (Raines). Raines heard people brag "more than once or twice" that Mr. Archer was business partners with Hunter Biden, 1864:8-24 (Raines), but never from Mr. Archer. Tr. 1866:8-12 (Raines); *see also* Tr. 1867:12-15 (Raines, agreeing that Galanis "did in fact boast about Mr. Archer and Mr. Biden's involvement.").

This manner of showcasing Mr. Archer's connections and legitimacy was epitomized in a May 2014 recording in which Cooney touted Mr. Archer as "the biggest whale of anyone," "the biggest show pony of all time," and "a total f***ing whale," explaining, "You don't get more politically connected and make people more comfortable than that." DX4908 (expletive omitted). Cooney explained that Mr. Archer and his connections would thus add "layers of legitimacy with all the deals we're doing now." DX4909.  Similarly, after Cooney emailed Mr. Archer to request he join a meeting with the president of the New York fireman's union, he (Cooney) forwarded the e-mail to Galanis and wrote, "Keeping on top of our horse!!" DX4706.

This and similar evidence shows that not only was Mr. Archer not in on Galanis's scheme, he was systematically kept out of it.

### 3.    *Mr. Archer invested his own money in the Burnham–Valor Group roll up*

Mr. Archer invested – and lost – almost $1 million of his own money in the roll-up plan. *See* DX9003. The government's own summary chart shows Mr. Archer investing $250,000 in Galanis's business, of which Galanis took $240,000 for himself. GX4010. This is not the conduct of two men who are in a common enterprise to steal money from the customers of Atlantic and Hughes – it was Galanis looking to Mr. Archer as one more mark who could be bled of his money even as Galanis was taking advantage of Mr. Archer's name and relationships.

Mr. Archer not only paid for "highly reputable strategic consulting company" Teneo Consulting "to produce a strategy for . . . the sale of Burnham." Tr. 1087:20-1088:2 (Dunkerley), but he made the introduction himself. Tr. 1310:4-6 (Dunkerley). It would make no sense for Mr. Archer to continually invest his money and reputation in the roll-up and receive nothing in return if he knew that Jason Galanis was just stealing the bond proceeds.  Notably, there was no evidence that Jason Galanis or any of the other alleged co-conspirators – not Dunkerley, Martin, Morton, Hirst, John Galanis, Cooney, Jason Sugarman, or anyone else – repeatedly invested their own money into the Burnham/Valor roll-up.  Mr. Archer was fundamentally different in this way, which demonstrates his innocence.

Trial evidence showed that while Mr. Archer worked to build WAH into a financial conglomerate, Galanis was busy plundering the company through other schemes. Mr. Archer was a director of and shareholder in WAH long before the WLCC bond issuance, *see* DX4017; DX4007S at 3, and thus had every incentive to help grow the company. *See* Tr. 1357:3-14

(Dunkerley); Tr. 3208:10-18. But while Mr. Archer worked to build WAH, Galanis and Dunkerley were stealing from it.

First, Galanis and Dunkerley tricked WA AG into investing money in Galanis's fake Las Vegas asset manager Ballybunion. Tr. 1122:9-12 (Dunkerley); Tr. 921:23-922:13 (Dunkerley). Dunkerley thereafter produced fake account statements to WA AG to cover up their fraud. Tr. 922:14-22 (Dunkerley). And consistent with Mr. Archer's incentives, the trial evidence demonstrates he had no clue this was going on. *See* Tr. 1147:5-11 (Dunkerley).

Second, Galanis and Dunkerley conned Valorlife into believing that it was purchasing a bond, and then diverted the money toward the purchase of Galanis's home at 260 West Broadway. *See* DX4824; GX4015; GX225; GX226; GX512 at 2; GX654; GX1579. Mr. Archer was not on any e-mail or communication concerning this fraud upon Valorlife, *see* DX4824; DX4127, Dunkerley "was told specifically by Jason Galanis that no one else was to know" about the fraud, Tr. 1147:10-11 (Dunkerley), and the government stipulated that "Devon Archer at no point had an ownership interest in Archer Diversified TCG, LLC, nor is there any evidence that Mr. Archer had any affiliation, association, or involvement with Archer Diversified TCG, LLC." JX4745. As discussed above, although Mr. Archer was copied on one email concerning Archer Diversified's purchase of 260 West Broadway, GX2122, as the government acknowledged, this is still not evidence that Archer had anything to do with that company, and is an additional step removed from the Valorlife scam.  There was no evidence that Mr. Archer knew that Galanis was stealing from WA AG and Valorlife to finance his lifestyle, and the evidence is undisputed that those thefts were directly contrary to Mr. Archer's interests, since he was a WAH/Valor shareholder.

4.     *Mr. Archer was not involved in any misrepresentations to the alleged victims*

The trial evidence is undisputed that Mr. Archer was not involved in any misrepresentations to the pension fund victims or WLCC.

In its rebuttal summation, the government argued, "[you] know who else didn't interact with the WLCC or the pension fund victims?  Jason Galanis." Tr. 4065:9-10.  But this was false argument.  It was Jason Galanis and others who bragged to the WLCC about Mr. Archer's connections (Tr. 1864:8-24, 1867:12-15 (Raines)); Mr. Archer never met them. Tr. 1866:8-12 (Raines). Nor did Mr. Archer interact with the lawyer coordinating the bond deals, Tim Anderson, *see* Tr. 560:24-561:1 (Anderson), although Jason Galanis did extensively, *see* Tr. 325:7-17, 424:15-19 (Anderson).  Mr. Archer did not interact with the Hughes and Atlantic employees who were working on the bonds, *see* Tr. 2066:15-18 (Turney), whereas Galanis was (according to the government) effectively controlling Morton and Hirst's actions while they worked at the asset managers, *see* Indictment ¶ 12-13.  As discussed above, Mr. Archer not only never spoke to representatives of the pension funds, *see* Tr. 765:9-24 (Smith); Tr. 1618:12-19 (Griffin); 1689:24-1690:2 (Moore), he had no substantive interactions with Morton or Hirst, and the evidence showed that Morton wasn't even sure who he was.

5.     *When the scheme fell apart, Mr. Archer stepped forward to save businesses while others tried to cover up their crimes*

When Galanis's scheme started to fall apart in September 2015 following his arrest and the issuance of SEC subpoenas, Galanis and Dunkerley got to work to figure out how to cover up their crimes. Mr. Archer, meanwhile, stepped forward to try to save his businesses. At Galanis's instruction, Martin lied and submitted false documents to the government. Tr. 2244:19-23, 2296:21-2297:5 (Martin). At the same time, Galanis, Dunkerley, and Hirst created false

documents to mislead the Securities and Exchange Commission. Tr. 927:16-21, 1057:14-19 (Dunkerley); Tr. 1146:18-20, 1227:13-18 (Dunkerley).

A major part of this scheme was an entity called Calvert, which Galanis and Dunkerley thought up, *see* Tr. 1464:17-1466:21 (Dunkerley); GX1705, Martin created, *see* Tr. 2181:14-19 (Martin), and Galanis, Dunkerley, and Hirst used solely to cover up their crimes. Tr. 1508:9-17 (Dunkerley). Galanis, Dunkerley, and Bevan Cooney signed fraudulent, back-dated Calvert agreements meant to deceive the government. *See* GX2298; GX1577; Tr. 1058:19-1059:21 (Dunkerley), 1508:12-13 (Dunkerley). But Mr. Archer did not know about any of that. He did not sign any fraudulent back-dated documents, and he was not involved in any of the Calvert scheming. Tr. 1464:1-13, 1509:6-8 (Dunkerley).  Literally the only evidence connecting Mr. Archer to Calvert at all was a single e-mail involving Mr. Archer and Mark Waddington, in which Mr. Archer agreed that the WLCC bonds originally purchased by RSB on Galanis's behalf should be transferred to Calvert.  GX2119.  There is nothing about this e-mail that would support an inference of knowledge or intent.  At best, it proves that at some point after Calvert was created, someone told Mr. Archer that Galanis's bonds should be transferred there.  The e-mail does not support any inference that Mr. Archer knew that Calvert was a recently-created entity, nor is there any suggestion that Mr. Archer falsely claimed that Calvert had been the original purchaser of the bonds.  Unlike others, he did not sign any back-dated Calvert documents.  To the contrary, there was a back-dated Calvert document relating to Mr. Archer's entity, RSB, but Mr. Archer did not sign it, nor was he ever asked to.  *See* 1462:9-1464:13 (Dunkerley).  This is solely consistent with Mr. Archer's innocence:  if he was in on the scheme and was knowingly advancing the false Calvert narrative, the real conspirators would not have needed to shield him from their fake documents.  But Mr. Archer was not privy to these attempts to cover up Galanis's

fraud, because Mr. Archer was not privy to the fact that a fraud was being committed in the first place.

Mr. Archer acted in a manner completely contrary to Galanis and the other alleged co-conspirators. Mr. Archer met with the BIT Board on multiple occasions to face their questions and address their concerns. *See* GX782; GX783; GX784. He took heat for the SEC's complaint against AAM, *see* GX784, even though, as the government acknowledged, Mr. Archer "is not one of the unnamed individuals discussed in that lawsuit." Tr. 3239:12-13. The trial evidence is clear that when the scheme fell apart, others lied and schemed while Mr. Archer stepped forward to help his business. *See, e.g.*, Tr. 2798:17-19 (Moynihan, testifying that after the subpoenas, Mr. Archer brought in a new investor for the Burnham Financial Group). This further shows that Mr. Archer had no clue that Galanis and others were stealing bond money.

*      *      *

Taken together, the evidence paints an unmistakable picture:  Devon Archer was not a knowing and willful participant in Jason Galanis's fraud.  He did not benefit from it or receive a single penny directly from WAPCC; instead he lost his own money.  He did not hide or create false documents; instead he got his hands dirty for the first time trying to save the Burnham business.  He was not involved in or aware of any misrepresentations to either the WLCC or the clients of Atlantic and Hughes.  He did not know his alleged co-conspirators and they did not know him.  And he certainly never spoke about anything improper; rather, his conspirators affirmatively lied to him, controlled his access to information, and then talked about him behind his back as a "horse" or "show pony" they could ride, a "whale" they could harpoon, or, on the other hand, about "pimping" him out.

On this record, any reasonable person would have a "real concern that an innocent person may have been convicted," such that "letting a guilty verdict stand would be a manifest injustice." *Ferguson*, 246 F.3d at 133.  The Court should therefore grant Mr. Archer a new trial.

**B.     The Surprise Introduction Of Extraordinarily Prejudicial Evidence Following The Government And John Galanis's Summations And Immediately Preceding Mr. Archer's Created A Manifest Injustice Requiring A New Trial**

Prior to trial, Mr. Archer hotly contested the admissibility of evidence of Jason Galanis, John Galanis, and Gary Hirst's arrests and convictions in the Gerova case.  The Court appropriately barred that evidence at trial.  Throughout the trial, the parties and the Court were extremely cautious about the topic, negotiating over how evidence of Jason Galanis's September 2015 arrest would be admitted, whether it would be admitted against Mr. Archer at all, the language of the Court's accompanying instructions, and the like.  *See, e.g.*, Tr. 194:8-201:25 (discussing admissibility); 2060:2-2062:3, 2375:16-2376:22, 2488:25-2491:14 (discussing manner of admission and limiting instructions).  The Court and the parties alike recognized the Gerova arrests and convictions for what they were:  a third rail that would have electrocuted any defendant who touched it.  Its last-second introduction through no fault of Mr. Archer – after the close of evidence, when Mr. Archer had no chance to respond – worked extraordinary prejudice that requires a new trial.

*1.     The Court has a duty to sever if prejudice from a joint trial arises during trial*

"The Supreme Court has instructed that 'the trial judge has a continuing duty at all stages of the trial to grant a severance if prejudice does appear.'" *United States v. Rittweger*, 524 F.3d 171, 179 (2d Cir. 2008) (Sotomayor, J.) (quoting *Schaffer v. United States*, 362 U.S. 511, 516 (1960)); *see also United States v. DiNome*, 954 F.2d 839, 845 (2d Cir. 1992) (quoting same).  "Such prejudice exists . . . when 'there is a serious risk that a joint trial would compromise a

specific trial right of one of the defendants, or prevent the jury from making a reliable judgment

about guilt or innocence.'" *Id.* (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)).

> This kind of prejudice is particularly injurious to defendants who
> are charged in only a few of the many counts, who are involved in
> only a small proportion of the evidence, and who are linked with
> only one or two of their co-defendants. The jury is subjected to
> weeks of trial dealing with dozens of incidents of criminal
> misconduct which do not involve these defendants in any way. As
> trial days go by, "the mounting proof of the guilt of one is likely to
> affect another."

*United States v. Branker*, 395 F.2d 881, 888 (2d Cir. 1968) (quoting *Schaffer*, 362 U.S. at 523

(Douglas, J., dissenting)).

### 2.   *The Gerova convictions subjected Mr. Archer to the type of extreme prejudice that justifies severance and risks a miscarriage of justice*

The Supreme Court has held that prejudice sufficient to require severance may exist

when "evidence that the jury should not consider against a defendant and that would not be

admissible if a defendant were tried alone is admitted against a codefendant." *Zafiro*, 506 U.S. at

539. This is especially applicable to Rule 404(b) evidence, which has a unique ability to

"erroneously . . . lead a jury to conclude that a defendant [is] guilty." *Id.* Thus, "[t]he Second

Circuit recognizes the potential 'spillover' prejudice that a co-defendant may incur in a joint trial

where prior-act evidence is admitted against another co-defendant." *United States v. Ozsusamlar*,

428 F. Supp. 2d 161, 173 (S.D.N.Y. 2006) (citing *United States v. Gelzer*, 50 F.3d 1133, 1140

(2d Cir. 1995)); *see also United States v. Basciano*, No. 05-cr-60 (NGG), 2007 WL 3124622, at

*5 (E.D.N.Y. Oct. 23, 2007) (severance granted based on prejudicial effect of proffered Rule

404(b) evidence that a co-defendant had previously been convicted for the same conduct for

which the defendant was currently on trial); *United States v. Lujan*, 529 F. Supp. 2d 1315, 1326

(D.N.M. 2007) (finding that the introduction of additional murders perpetrated by co-defendant,

which would not be admissible against the moving defendants in a separate trial, would create

the possibility "that a jury might infer [the defendants'] guilt because of the enhanced likelihood of [the co-defendant's] guilt," and was a "factor weighing in favor of severance"); *cf. United States v. Figueroa*, 618 F.2d 934, 944 (2d Cir. 1980) (remanding for new trial where Rule 404(b) evidence erroneously admitted against one defendant caused sufficient likelihood of prejudice to co-defendants).

The introduction of the Gerova evidence provides multiple independently sufficient grounds for severance.[22] It created both a situation where "evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant," and where "evidence of a codefendant's wrongdoing . . . could lead a jury to conclude that a defendant was guilty." *Zafiro*, 506 U.S. at 537, 539; *see also United States v. Lino*, No. 00-cr-632 (WHP), 2001 WL 8356, at *23 (S.D.N.Y. Jan. 2, 2001) (finding that district court reviewing a severance motion should consider "prejudice from evidence admitted only against co-defendants but which is inadmissible or excluded as to a particular defendant.").

As the pre-trial briefing and trial itself showed, the Gerova fraud was a similar crime to what was charged here, which gave evidence of the Gerova convictions especially powerful prejudicial force. While "the government repeatedly represented to [the Court] that the Gerova matter was wholly unrelated and irrelevant to the current case," April 13, 2018 Hearing Transcript at 25:25-26:2 (comments of the Court), Mr. Archer explained how similar the two frauds were. *See* ECF No. 290 at 25-27 (stating how, in both cases, "Jason Galanis obtained effective control over existing entities in order to cause them to enter into transactions designed to further his fraudulent scheme," and "[b]oth involved the use of investment advisory firms to

---

[22]    Mr. Archer contemporaneously moved for a severance and for a mistrial upon the introduction of the Gerova evidence.  Tr. 3813:19.

cash out on the fraud using client funds."). After all the evidence was presented, the Court agreed

that the Gerova fraud constituted "conduct similar to the charges in the indictment." Trial Tr.

3830:2.

Indeed, the defendants made clear in pre-trial briefing – and the Court agreed – that

introduction of the Gerova evidence unfairly prejudiced Mr. Archer. After the parties argued

extensively about whether the Gerova convictions could come in, *see* ECF Nos. 290, 308, 314,

the Court determined the evidence was just too prejudicial:

> I think the unfair prejudice substantially outweighs its probative
> value. I just can't conclude that such evidence passes the 403
> balancing test **in light of the substantial prejudice that would
> result from jurors in one criminal prosecution hearing that a
> jury in a previous matter had convicted two of the defendants
> for engaging in a scheme to defraud.**

April 13, 2018 Hearing Transcript at 26:2-26:8 (emphasis added). When the government

attempted to reargue the issue, the Court reiterated this point: "I think it is too prejudicial. They

were convicted before another jury in another case." *Id.* at 27:1-2. This was true then and

remained true the day the Gerova evidence was introduced: it is too prejudicial.

### 3. *The manner in which the Gerova evidence came in exacerbated its already substantial prejudice*

The prejudice sufficient to initially exclude the Gerova convictions was expanded

exponentially by the way they came in. In the rare case that the court allows a prosecution to

reopen its case after the close of evidence, it is usually "to establish venue, identify the

defendant, or attend to other technical matters." *United States v. Leslie*, 103 F.3d 1093, 1104 (2d

Cir. 1997) (citing *United States v. Washington*, 861 F.2d 350, 353 (2d Cir. 1988) (where case

was reopened for police officer to identify defendant)). In *United States v. Parkes*, for instance,

the Second Circuit upheld the trial court's decision to allow the prosecution to reopen its case

when the jury charge changed, which "necessitated additional proof to establish the jurisdictional

predicate" of the crime. 497 F.3d 220, 231 (2d Cir. 2007); *see also United States v. Jones*, 480 F.2d 1135, 1137 (2d Cir. 1973) (reopening case to admit letter establishing jurisdiction, which was not a question of fact for the jury). The court so held, however, because the defendant "was not prejudiced by the presentation of this evidence upon reopening, rather than at some earlier point." *Id.*

In this case, the complete opposite is true. The timing quite literally could not have been worse. One day after the government and one defendant closed, and immediately preceding Mr. Archer's summation, the prosecution introduced what the Court acknowledged was extremely prejudicial evidence that a codefendant sitting next to Mr. Archer the whole trial was already convicted of a similar crime along with Jason Galanis, and that the pair had been arrested of securities fraud in the midst of the charged conduct. So when Mr. Archer's counsel rose to give his closing argument, the jury was sitting there absorbing the fact that a defendant they had heard about for five weeks and the prime mover of the charged fraud in this case were both convicted securities fraudsters who had been arrested in the midst of the time period that the jury had heard about.

The timing of the introduction of this evidence not only hung over Mr. Archer's summation, but Mr. Archer was deprived of the opportunity to present countervailing evidence. Had he known that the Gerova evidence would be admitted in a trial against him, his objection notwithstanding, Mr. Archer would have introduced evidence of the relationship between the Gerova conspirators (Jason Galanis, John Galanis, Gary Hirst, Jason brother Derek who served as a lawyer to the annuity provider here and was also convicted in Gerova, etc.). That evidence would have stood in stark contrast to the undisputed fact that Mr. Archer had nothing to do with Gerova and had no knowledge that it was being investigated. Mr. Archer would also have

introduced evidence that one of Galanis's primary motivations for committing the WLCC fraud

was to finance his legal defense in the ongoing Gerova investigation,[23] – a fact he obviously hid

from Mr. Archer, who didn't know that there was such a case.  Instead, Mr. Archer was not

given the opportunity to present any of this evidence, and the jury got a one-sided and prejudicial

view of the Gerova facts.

### 4. *The late introduction of the Gerova evidence created the type of prejudice that jury instructions cannot cure*

The prejudicial impact of the Gerova evidence was too great to be cured by a jury

instruction, particularly when it immediately preceded Mr. Archer's summation. The Second

Circuit has held that the presumption that a jury will adhere to instructions "fades when there is

an overwhelming probability that the jury will be called upon to perform humanly impossible

feats of mental dexterity." *United States v. McDermott*, 245 F.3d 133, 139-40 (2d Cir. 2001). Mr.

Archer maintains that a jury instruction would fail to cure prejudice from the Gerova convictions

in any event, but the timing of the evidence's introduction removes all doubt.  Indeed, the jury

had heard (over Mr. Archer's objections) evidence about Jason Galanis's arrest in September

2015 on "unrelated charges" on several occasions.  *See* Tr. 2176:17-2177:6 (Martin); Tr. 2178:1-

8 (Court's instructions); Tr. 2180:21-23 (Martin); Tr. 2211:15-20, 2223:6-13 (Martin); Tr.

2631:14-2633:25 (Moynihan); Tr. 2706:3-5, Tr. 2796:21-25 (Moynihan); GX782.  To learn that

the charges were in fact very much related not only prejudiced Mr. Archer, but also created the

false impression that he had been trying to conceal this highly material fact from the jury.

---

[23]     *See* GX4003 at 4 (showing payments from Thorsdale to attorneys); GX4012 (showing
$16,600,168 in payments from Thorsdale to "Accountants/Lawyers"); Sentencing Memorandum
on Behalf of Jason Galanis [ECF No. 198] at 24 (noting Jason Galanis spent $1.25 million on
"defense lawyers"); ECF No. 511 at 9-10 (government letter arguing that questioning McMillan
about the use of Wakpamni bond proceeds to pay for "legal fees in connection with the Gerova
investigation . . . would open the door to evidence regarding the Gerova investigation and
convictions").

Although the Court instructed the jury to disregard this evidence as to Mr. Archer, to do so would have required the type of "feats of mental dexterity" no jury can perform, and so no instruction can cure.

The Gerova evidence should never have been introduced in a trial involving Mr. Archer – as the Court recognized at the outset – and its late introduction was so prejudicial as to deny Mr. Archer a fair trial.  Mr. Archer appreciates the Court's need to enforce its prior warnings to John Galanis's counsel and certainly does not condone the remarks that led to the introduction of the Gerova evidence.  But the fact remains that it had no place in a trial of Mr. Archer, and its late introduction created an incurable and overwhelming prejudice that the jury was simply unable to ignore – as evidenced by the jury's virtually instantaneous conviction, despite the absence of any direct evidence of fraudulent intent.  The Court should therefore order a new trial.

## C.     Mr. Archer Is Entitled To A New Trial Due To Instructional Error

From the beginning, the government charged – initially in separate counts and then in a single count – two distinct schemes, one involving the takeover of investment advisers and criminal breaches of fiduciary duty, and another involving the misappropriation of WLCC bond proceeds.  Even though the investment adviser defendants pled, the government spent weeks of trial putting on evidence about fiduciary duties, conflicts of interest, and other issues specific to the takeover and exploitation of investment advisers, none of which concerned Mr. Archer.

In light of the trial evidence, Mr. Archer asked the Court to instruct the jury on the possibility of multiple conspiracies and its duty to agree unanimously that Mr. Archer participated in a *particular* scheme, and not to instruct the jury on conscious avoidance.  *See* ECF No. 531.  After agreeing to give an issue-unanimity instruction, *see* Tr. 3818:14-22 (the Court: "On unanimity I wasn't going to use a verdict form in the way that you did, but I was going to make clear, and I will get out the language with respect to unanimity, we'll print that out

now and I can read you what I was intending to instruct the jury."); *see also* Mar. 6, 2018 Hearing Tr. 86:1-15 (ruling that different theories of liability do not create prejudice because the Court could "entertain suggestions that the jurors be explicitly instructed that they be unanimous as to the factual predicate underlying the basis for convicting any of the defendants on Count Two"), the Court ultimately reconsidered and denied all of these requests. *See* Tr. 3586:7-3588:2, 3590:6-3591:5, 3947:2-10.

The resulting jury charge was erroneous, and it denied Mr. Archer a fair trial. In giving a conscious avoidance instruction with no factual predicate, the Court substantially prejudiced Mr. Archer – a prejudice compounded by the government's arguments, which relied heavily upon that theory. In omitting a multiple conspiracies and specific unanimity instruction, the Court answered vital questions that belonged to the jury, and made it impossible to know what the jury actually found. And because the jury also received a *Pinkerton* instruction, Tr. 4176:16-4177:4, it may have relied on a problematic conspiracy conviction in reaching its substantive verdict. These fundamental errors require a new trial.

### 1. The Court improperly gave a conscious avoidance instruction without a factual predicate

With respect, the Court's conscious avoidance charge on the facts of this case constituted reversible error. No trial evidence suggested that Mr. Archer deliberately closed his eyes to Galanis's misappropriation of bond proceeds or any other material fact, so the instruction only served to prejudice him. And in light of the complete lack of trial evidence suggesting Mr. Archer knew about misappropriation of bond proceeds, the erroneous instruction constitutes reversible error.

A conscious avoidance instruction "may only be given if (1) the defendant asserts the lack of some specific aspect of knowledge required for conviction; and (2) the appropriate

factual predicate for the charge exists, *i.e.*, 'the evidence is such that a rational juror may reach [the] conclusion beyond a reasonable doubt . . . that [the defendant] was aware of a high probability [of the fact in dispute] and consciously avoided confirming that fact.'" *United States v. Ferrarini*, 219 F.3d 145, 154 (2d Cir. 2000) (quoting *United States v. Rodriguez*, 983 F.2d 455, 458 (2d Cir. 1993)) (internal citation omitted; alterations supplied).  Moreover, the second condition is only met where the evidence shows that the defendant deliberately closed his eyes to the relevant fact:  "[W]e have held that conscious avoidance cannot be established when the factual context '*should have apprised* [the defendant] of the unlawful nature of [his] conduct,' – and have instead required that the defendant have been 'shown to have decided not to learn the key fact.'"  *Id*. at 157 (quoting *Rodriguez*, 983 F.2d at 458) (emphasis supplied).  That is, "the defendant must take deliberate actions to avoid learning of that fact."  *United States v. Goffer*, 721 F.3d 113, 128 (2d Cir. 2013) (quoting *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011)).

No trial evidence suggested that Mr. Archer took "deliberate actions to avoid learning" anything, *id.*, so a conscious avoidance instruction was improper and prejudicial.  In agreeing to give a conscious avoidance instruction, the Court offered one potential factual predicate as to Mr. Archer, namely that he "was given $15 million by Jason Galanis to purchase the second tranche of WLCC bonds, which . . . seems unusual to say the least."  Tr. 3587:13-16.  The Court stated that this was one of "the sorts of red flags about the legitimacy of the transaction that may be used to show both actual knowledge and conscious avoidance," Tr. 3587:20-22 (citing *Goffer*, 721 F.3d at 127).  "For those reasons," the Court concluded, "I believe it is appropriate to instruct the jury that should they conclude the defendants lacked the requisite knowledge, they may consider whether it was the result of conscious avoidance."  Tr. 3587:24-3588:2.

But even by the Court's logic, there was no evidence that Mr. Archer deliberately closed his eyes.  Even assuming that Galanis's transfer of $15 million to RSB to invest in bond was "unusual," the Court of Appeals has been clear that "conscious avoidance cannot be established when the factual context '*should have apprised* the defendant of the unlawful nature of his conduct.'"  *Ferrarini*, 219 F.3d at 157 (alterations and citation omitted; emphasis supplied).  The supposed suspicious nature of a transaction on its own cannot justify a conscious avoidance instruction.  "[T]he defendant must take deliberate actions to avoid learning of" some fact. *Global-Tech Appliances*, 563 U.S. at 769.  Mr. Archer never did.

The *Goffer* case cited by the Court in its decision is instructive.  There, the defendant claimed ignorance as to whether stock tips he received were based on inside information.  In approving the trial court's conscious avoidance charge, the Second Circuit found that trial evidence allowed a jury to conclude that the defendant "was aware of a high probability that the source of [co-defendant's] information was illegal." *Goffer*, 721 F.3d at 127.  But that red flag alone was not enough.  The Second Circuit also pointed to evidence that the defendant contributed to a "conversation about the need for plausible deniability," which "underscore[d] [the defendant's] conscious avoidance of knowledge as to [his codefendant's] source." *Id.*  The Second Circuit only approved of the conscious avoidance instruction because there was evidence that the defendant saw a red flag *and* took specific action to avoid learning more.  No comparable deliberate avoidance evidence exists for Mr. Archer, and the suggestion that he could be convicted just because there was something "unusual" about a transaction is contrary to law.

In light of the absence of evidence showing Mr. Archer had actual knowledge, the conscious avoidance instruction constitutes reversible error.  "[A]n erroneously given conscious

94

avoidance instruction constitutes harmless error if the jury was charged on actual knowledge and there was 'overwhelming evidence' to support a finding that the defendant instead possessed *actual* knowledge of the fact at issue." *Ferrarini*, 219 F.3d at 154 (quoting *United States v. Adeniji*, 31 F.3d 58, 64 (2d Cir. 1994)) (emphasis supplied). Far from "overwhelming evidence," the trial record contained no legally sufficient evidence showing that Mr. Archer possessed actual knowledge that bond proceeds were misappropriated (let alone fraudulent intent). No witness testified that Mr. Archer knew about the scheme, *see* Section I.B, no document showed he knew what was going on, *see, e.g.*, Section I.B.5, and he certainly did not share in the spoils of Galanis's theft, *see* Section I.B.2.

Although the Court's conscious avoidance instruction was, standing alone, error that should be cured by granting Mr. Archer a new trial, the prejudice from the charge was deepened by the government's argument. Relying on the conscious avoidance charge, which the government emphasized to the jury in its summation, *see* Tr. 3634:20-3635:10, the government characterized its lack of evidence of Mr. Archer's knowledge in terms of conscious avoidance, Tr. 3682:18-20 ("Devon Archer kept his hands a little cleaner. He didn't submit the fake Calvert documents himself. Dunkerley did it for him."). At the same time, the government repeatedly asked the jury to infer that Mr. Archer had actual knowledge. *See* Tr. 3684:11-12 ("Nobody was a taking advantage of Archer. He knew exactly what . . . happened."). The government presented no evidence that Mr. Archer was consciously avoiding knowledge, and also insisted that the jury could infer he had actual. The government's summation thus emphasizes the inappropriateness of the conscious avoidance charge.

The government's rebuttal made matters worse. The government repeatedly insisted that aspects of the deal, which the jury was considering only in hindsight, "made no sense." Tr.

4069:20-4070:19.  Yet the government then immediately added that "Devon Archer knew" that the deal was illegitimate.  Tr. 4070:19-20.

> ### 2. *The jury should have been instructed on the possible existence of multiple conspiracies*

"A conviction cannot stand if the government has alleged a single conspiracy, but its proof demonstrates multiple conspiracies."  *United States v. Alkins*, 925 F.2d 541, 553 (2d Cir. 1991) (citing *Kotteakos v. United States,* 328 U.S. 750 (1946)).  "[I]n order to prove a single conspiracy, the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal."  *United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990).  "[W]here the proof is susceptible to the inference that there was more than one conspiracy, the question of whether one or more than one conspiracy has been established is a question of fact for a properly instructed jury."  *Alkins*, 925 F.2d at 553-54 (quoting *Maldonado-Rivera*, 922 F.2d at 962); *accord United States v. Uccio*, 917 F.2d 80, 87 (2d Cir. 1990); *United States v. Friedman*, 854 F.2d 535, 561 (2d Cir. 1988), *cert. denied,* 490 U.S. 1004 (1989); *United States v. Crosby*, 294 F.2d 928, 945 (2d Cir. 1961) ("Whether a scheme is one conspiracy or several is primarily a jury question, since it is a question of fact as to the nature of the agreement.").

"A multiple conspiracies charge is required where several different conspiracies could be inferred from the evidence offered at trial."  *United States v. Restrepo*, 547 F. App'x 34, 40 (2d Cir. 2013) (citing *United States v. Aracri,* 968 F.2d 1512, 1520 (2d Cir. 1992); *Maldonado-Rivera,* 922 F.2d at 962-63)); *see also* 1 SAND ET AL., MODERN FEDERAL JURY INSTRUCTIONS-CRIMINAL ¶ 19.01, Instruction 19-5 & cmt. at 19-22 (2009) ("Generally speaking, the instruction is appropriate in cases where a number of defendants have been

collectively charged in the indictment with participation in a single, overall conspiracy, but where there is a basis for the defense claim that multiple conspiracies existed.").

As discussed above, the government has charged and offered evidence of two distinct conspiracies, one concerning the takeover and exploitation of asset managers in violation of fiduciary duties, and another concerning the misappropriation of bond proceeds.  Although the government's theory – as it always is in multiple conspiracy cases – was certainly that there was a single overarching scheme, a rational juror could have easily concluded that there were two conspiracies:  one involving Galanis, Dunkerley, Hirst, and Morton to foist the WLCC bonds onto the clients of Atlantic and Hughes, and another involving Galanis, Dunkerley, Hirst, and Martin to steal the proceeds of the bonds.  The two schemes can easily be separated:  the bond proceeds could have easily been stolen regardless of who bought the bonds, and likewise a crooked investment adviser might have any number of reasons to stick unsuitable securities to unsuspecting clients.  Since the evidence and allegations of both distinct conspiracies was put in front of the jury, the Court was required to instruct the jury on multiple conspiracies.

The government's own theory of Mr. Archer's motive to misappropriate bond proceeds conflicts with the alleged goal of the investment adviser fraud, necessitating a multiple conspiracies charge.  *See Maldonado-Rivera*, 922 F.2d at 963 ("The goals of all the participants need not be congruent for a single conspiracy to exist, so long as their goals are not at cross-purposes.").  As discussed in Section I.B.2, the government offered and retracted multiple motive theories before settling, in its rebuttal case, on the theory that Mr. Archer joined the conspiracy in order to increase the value of his WAH shares.  But this supposed aim of stealing bond proceeds – to pump up WAH – conflicts with the investment adviser scheme, which sapped

WAH's subsidiaries Atlantic and Hughes.  These cross-purposes require a multiple conspiracies instruction.

Moreover, to the extent the evidence supports any connection between the two schemes, it only allows for "a 'wheel' or 'hub-and-spoke' conspiracy, in which 'one person typically acts as a central point while others act as 'spokes' by virtue of their agreement with the central actor.'"  *United States v. Pauling*, 256 F. Supp. 3d 329, 335 (S.D.N.Y. 2017) (quoting *United States v. Ulbricht*, 31 F. Supp. 3d 540, 554 (S.D.N.Y. 2014) (citing *Kotteakos v. United States*, 328 U.S. 750, 754-55 (1946)).  This is literally how Dunkerley described the scheme:

> Q. And I believe you described Jason Galanis as the hub of the wheel on the deals he was working on, correct?
>
> A. Correct.
>
> Q. What you mean by that is, if you think of a common wheel, it has a hub and it has spokes that come out of that hub, right?
>
> A. Yes.
>
> Q. And Jason Galanis you describe as the middleman, the hub, giving out instructions to all the different spokes, right?
>
> A. Correct.

Tr. 1119:25-1120:9 (Dunkerley).  But "[i]n the context of wheel conspiracies, 'to prove a single conspiracy, the Government must show that there was a "rim" around the spokes, such that the "spokes" became coconspirators with each other.'"  *Pauling*, 256 F. Supp. 3d at 335 (quoting *Ulbricht*, 31 F. Supp. 3d at 554) (internal alterations omitted).  "In the absence of such a 'rim,' the spokes are acting independently with the hub; while there may in fact be separate conspiracies, there cannot be a single conspiracy."  *Ulbricht*, 31 F. Supp. 3d at 554.

The trial evidence showed that Mr. Archer never conspired or had substantive contact with the "spoke" of the investment adviser fraud.  As described in Section I.A, Jason Galanis

purposefully walled off Mr. Archer from the other alleged conspirators.  Dunkerley put this

plainly in terms of a "hub-and-spoke" conspiracy:

> Q. And not all of those spokes in the wheel knew each other, right?
>
> . . .
>
> A. To my knowledge not all – they did not all know each other, absolutely.
>
> Q. And furthermore, not – Jason Galanis told you at times, Don't tell other people certain information.
>
> A. Correct.
>
> Q. So as far as you know, you had some knowledge that another spoke in the wheel maybe didn't.
>
> A. Correct.

Tr. 1120:10-24 (Dunkerley).  The trial evidence showed no "rim" connecting Mr. Archer to the

investment adviser conspirators, and in fact showed that Jason Galanis erected walls blocking

Mr. Archer from these other "spokes."

"A multiple conspiracies charge is required where several different conspiracies *could be*

*inferred* from the evidence offered at trial," *Restrepo*, 547 F. App'x at 40 (citation omitted,

emphasis added), in order to stem the "'spill over effect' of permitting testimony regarding one

conspiracy to prejudice the mind of the jury against the defendant who is not part of that

conspiracy."  *United States v. Harris*, 8 F.3d 943, 947 (2d Cir. 1993).  Because a rational juror

could certainly have inferred from the trial record the existence of separate conspiracies, Mr.

Archer was entitled to a multiple conspiracies charge and the lack of such an instruction

prejudiced and denied him a fair trial.

### 3.    *The jury should have been instructed on specific issue unanimity*

"[A] jury must reach a unanimous verdict as to the factual basis for a conviction."  *United*

*States v. Schiff*, 801 F.2d 108, 114 (2d Cir. 1986).  "A general instruction on unanimity is

sufficient to insure that a unanimous verdict is reached, except in cases where the complexity of the evidence or other factors create a genuine danger of jury confusion." *United States v. Tonawanda Coke Corp.*, 636 Fed. App'x 24, 29 (2d Cir. 2016) (quoting *Schiff*, 801 F.2d at 114-15) (citing *United States v. Payseno*, 782 F.2d 832, 835-37 (9th Cir. 1986)) (internal alterations omitted).

This was a complex case in which Galanis effected at least two different frauds within a fog of different entities and relationships, and a specific unanimity instruction was necessary to ensure the jury actually agreed on a verdict.[24]  As the government stated in its opening, "the defendants tried to make this scheme complicated.  They carried out a fraud that involved lots of different companies, and lots of different people, who played lots of different roles. . . . Complexity was their friend."  Tr. 65:7-12.  The government repeated this after the evidence came in:  "As [we] told you in the opening statement, complexity was these defendants' friend. . . . [T]hey threw up similar sounding shell companies and wire transfers and purchase agreements[.]"  Tr. 3596:4-9.  As outlined above, the morass of companies and transactions separated into two distinct schemes, with a common hub in Galanis.  This created a textbook case for juror confusion in the absence of a specific unanimity instruction.

Mr. Archer has been clear on this point all along.  From his first pre-trial motions until now, Mr. Archer has argued that Count Two of the Indictment charged two separate and distinct

---

[24]  Indeed, the Court initially recognized that a specific unanimity instruction was necessary in this case, before reversing itself.  The Court even drafted an appropriate unanimity charge, which it ultimately never delivered.  *See* Tr. 3951:10-21 (". . . One more point about the requirement that your verdict must be unanimous. Count Two of the indictment accuses the defendants of committing substantive securities fraud in either one of two different ways: The first relates to misstatements made to the WLCC; the second is the alleged material omissions with respect to clients of Hughes and Atlantic. The government does not have to prove both of these for you to return a guilty verdict on this charge. Proof beyond a reasonable doubt of one or the other is enough, but in order to return a guilty verdict, all 12 of you must agree that the same one has been proven.'").

alleged schemes as a single crime, requiring either a specific issue unanimity charge, a detailed verdict sheet, or both.  *See* ECF No. 290 at 1, ECF No. 303 at 3; see also Defense Proposed Verdict Form [ECF No. 373 Ex. B].  As explained above, the trial and briefing that followed only reinforced that this case concerned two distinct schemes, only one of which even arguably involved Mr. Archer.

The lack of a specific unanimity instruction thus left open the possibility that Mr. Archer was convicted when the jury did not agree on what scheme he joined.  For instance, six jurors might have believed that the clients of Atlantic and Hughes were defrauded but the WLCC was not, and the other six might have believed the reverse.  Because of how the jury was instructed, this may in fact be what the jurors decided when convicting Mr. Archer.  The Court should grant Mr. Archer a new trial to correct this fundamental error.

## **CONCLUSION**

For all the reasons stated herein, the Court should acquit Mr. Archer of the charges against him under Rule 29, and order a new trial under Rule 33.


Dated:      August 17, 2018
                 New York, New York

                                                             Respectfully,

                                                              /s/ Matthew L. Schwartz
                                                             Matthew L. Schwartz
                                                             Laura C. Harris
                                                             Craig Wenner

                                                             BOIES SCHILLER FLEXNER LLP
                                                             575 Lexington Avenue, 7th Floor
                                                             New York, New York 10022
                                                             Tel.: (212) 446-2300
                                                             Fax: (212) 446-2350

mlschwartz@bsfllp.com
cwenner@bsfllp.com
lharris@bsfllp.com

*Attorneys for Devon Archer*