UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                           :

UNITED STATES OF AMERICA

                           :

        - v. -

                           :       S3 16 Cr. 371 (RA)

JOHN GALANIS, et al.,

                           :

         Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# GOVERNMENT MEMORANDUM IN RESPONSE TO DEFENDANTS' POST-TRIAL MOTIONS

ROBERT KHUZAMI
Attorney for the United States, Acting Under
Authority Conferred by 28 U.S.C. § 515

Rebecca Mermelstein
Brendan F. Quigley
Negar Tekeei
Assistant United States Attorneys
     - Of Counsel -

## Table of Contents

FACTUAL BACKGROUND ................................................................................................ 1

I.    The Conspirators Hatch the Plan, and John Galanis Meets With a Representative of the WLCC ...................................................................................................................... 1

II.    The Conspirators Acquire Hughes Capital Management for the Purpose of Placing the First Tranche of Bonds and Begin Final Preparations for the First Issuance ................... 4

III.    The Conspirators Foist the Entire First Issuance Upon Unwitting Hughes Clients and then Misappropriate the Bond Proceeds ........................................................................ 6

IV.    Archer and Cooney Purchase the Second Tranche of Bonds Using Recycled Proceeds from the First Issuance ................................................................................................. 8

V.    The Conspirators Purchase Atlantic Asset Management for the Purpose of Placing the Third Tranche of Bonds ............................................................................................. 12

VI.    The Scheme Unravels and the Conspirators Attempt to Cover-Up Their Crimes ......... 16

GENERALLY APPLICABLE LAW .............................................................................. 17

I.    Rule 29 Motions for Judgements of Acquittal ............................................................ 17

II.    Rule 33 Motions for a New Trial ................................................................................ 18

DISCUSSION ................................................................................................................ 18

I.    John Galanis is Not Entitled to a Judgment of Acquittal ............................................. 18

II.    Archer Is Not Entitled to a Judgment of Acquittal or a New Trial ............................... 26

A.    The Evidence Established That Archer Knowingly and Willfully Participated in the Fraudulent Scheme From the Beginning, and Throughout Its Many Phases ............ 27

B.    The Evidence Established that Archer knew the WLCC Bond Proceeds Were Being Misappropriated, and Participated in the Misappropriation ...................................... 35

C.    Archer's Lies to Morgan Stanley and Deutsche Bank Provided Additional Evidence of his Knowing and Willful Participation in the Scheme ........................................... 41

D.    Archer's Lies to the BIT Board Provided Even More Evidence of his Knowing Participation in the Scheme and His Efforts to Cover Up his Crimes ....................... 43

E.      Archer's and his Co-Conspirators' Efforts to Cover Up Their Crimes Were Powerful Evidence of Archer's Knowledge and Intent .............................................................. 47

F.      Archer's Additional Arguments for an Acquittal Are Meritless ................................ 49

G.      The Jury's Verdict was Supported by Ample Evidence of Archer's Knowing Participation of the Scheme .......................................................................................... 52

III.    Cooney is Not Entitled to a Judgment of Acquittal or a New Trial .............................. 55

A.      The Evidence Established that Cooney Knowingly and Willfully Participated in the Fraudulent Scheme, and Throughout its Many Phases ............................................... 56

B.      The Evidence Established that Cooney Knew the WLCC Bond Proceeds Were Being Misappropriated, and Participated in the Misappropriation ....................................... 58

C.      Cooney's Lies to City National Bank Provide Additional Evidence of his Knowing and Willful Participation in the Scheme ..................................................................... 62

D.      Cooney's and his Co-Conspirators' Combined Efforts to Cover Up Their Crimes Provided Additional Powerful Evidence of Cooney's Knowledge and Intent ........... 66

E.      Ample Evidence Established that Cooney Acted with Intent to Defraud, and not in Good Faith .................................................................................................................. 68

IV.     Evidence of John Galanis's Gerova Conviction Did Not Prejudice Archer or Cooney  68

A.      Relevant Facts ............................................................................................................. 68

1.      Pretrial Proceedings ................................................................................................ 68

2.      Trial .......................................................................................................................... 70

B.      Legal Standards .......................................................................................................... 75

C.      Discussion .................................................................................................................... 78

1.      The Admission of the Gerova Evidence Did Not Warrant Severance ....................... 78

2.      The Introduction of the Gerova Evidence Following John Galanis's Summation Did Not Prejudice Archer or Cooney ............................................................................... 80

V.      The Court's Jury Instructions Are Not a Basis for a New Trial ..................................... 87

ii

A.   There Was an Adequate Factual Predicate for Giving a Conscious Avoidance Instruction ................................................................................................ 87

B.   The Court Did Not Err In Declining to Give a Multiple Conspiracy Instruction ....... 90

   1.   Applicable Law ................................................................................................ 90

   2.   Discussion ........................................................................................................ 90

C.   The Court Did Not Err in Declining to Give Archer's Requested Unanimity Instruction ................................................................................................ 93

CONCLUSION ................................................................................................ 94

## Table of Authorities

### Cases

*Global-Tech Appliances, Inc.* v. *SEB S.A.*, 563 U.S. 754 (2011) .................................................. 87

*ICC, Intern. Cargo Charters*, *Canada, Inc.* v. *TradeWinds Airlines, Inc.*, 2008 WL 4104023
   (S.D.N.Y. Aug. 28, 2008) ........................................................................... 85

*Richardson* v. *Marsh*, 481 U.S. 200 (1987) ................................................................. 75

*Schad* v. *Arizona*, 501 U.S. 624 (1991) ...................................................................... 91

*United States* v. *Alcantara*, 674 F.App'x 27 (2d Cir. Dec. 22, 2016) ........................................... 80

*United States* v. *Bandrich*, No. 12 Cr. 934 (RA), 2014 WL 7330434 (S.D.N.Y. Dec. 22, 2014) 18

*United States* v. *Basciano*, No. 05-Cr-60, 2007 WL 3124622 (S.D.N.Y. Oct. 23, 2007) ........... 77

*United States* v. *Bonventre*, 137 S. Ct. 676 L. Ed. 2d 560 (2017) ................................................ 75

*United States* v. *Bonventre*, 646 F. App'x 73 (2d Cir. 2016) ...................................................... 75

*United States* v. *Bruno*, 493 U.S. 840 (1989) ................................................................ 19

*United States* v. *Bruno*, 873 F.2d 555 (2d Cir. 1989) .......................................................... 19

*United States* v. *Carson*, 702 F.2d 351 (2d Cir. 1983) ......................................................... 75

*United States* v. *Catapano*, No. 05-Cr-229, 2008 WL 2222013 (E.D.N.Y. May 22, 2008) ........ 76

*United States* v. *Chavez*, 549 F.3d 119 (2d Cir. 2008) ......................................................... 17

*United States v. Cusimano*, 123 F.3d 83 (2d Cir. 1997) ......................................................... 89

*United States* v. *Cuti*, 720 F.3d 453 (2d Cir. 2013) ............................................................... 87, 89

*United States* v. *Eppolito*, 543 F.3d 25 (2d Cir.2008) .......................................................... 17

*United States* v. *Ferguson*, 246 F.3d 129 (2d Cir. 2001) ........................................................ 18

*United States* v. *Ferguson*, 676 F.3d 26 (2d Cir. 2011) .......................................................... 92

*United States* v. *Figueroa*, 618 F.2d 934 (2d Cir. 1980) ........................................................ 76

*United States* v. *Gambino*, 59 F.3d 353, 364 (2d Cir. 1995) ................................................... 18

*United States* v. *Gardell*, No. 00-Cr-632, 2001 WL 1135948 (S.D.N.Y. Sept. 25, 2001) ........... 76

*United States* v. *Gaskin*, 364 F.3d 438 (2d Cir. 2004).................................................................. 17

*United States* v. *Geibel*, 369 F.3d 682 (2d Cir. 2004) .................................................................. 90

*United States* v. *Goffer*, 721 F.3d 113 (2d Cir. 2013)................................................................... 87

*United States* v. *Guadagna*, 183 F.3d 122 (2d Cir. 1999) ........................................................... 17

*United States* v. *Guang*, 511 F.3d 110 (2d Cir. 2007) ................................................................. 18

*United States* v. *Hassan*, 578 F.3d 108 (2d Cir. 2008) ................................................................ 17

*United States* v. *Jackson*, 335 F.3d 170 (2d Cir.2003) ................................................................ 18

*United States* v. *James*, 239 F.3d 120 (2d Cir. 2000) ................................................................... 17

*United States* v. *Jones*, No. 15 Cr. 153 (VSB), 2018 WL 3599730 (S.D.N.Y. July 27, 2018) .... 91

*United States* v. *Kozeny*, 667 F.3d 122 (2d Cir. 2013) ................................................................ 87

*United States* v. *Lange*, 834 F.3d 58 (2d Cir. 2016) ............................................................... 86, 87

*United States* v. *Lara-Velasquez*, 919 F.3d 946 (5th Cir. 1990).................................................. 87

*United States* v. *Lauerson*, No. 98-Cr-1134, 2000 WL 1677931 (S.D.N.Y. Nov. 8, 2000)......... 76

*United States* v. *Manarite*, 448 F.2d 583 (2d Cir. 1971) ............................................................. 91

*United States* v. *McDermott*, 245 F.3d 133 (2d Cir. 2001).......................................................... 17

*United States* v. *Nektalov*, 461 F.3d 309 (2d Cir. 2006)............................................................. 86

*United States* v. *Ozsusamlar*, 428 F.Supp. 2d 161 (S.D.N.Y. 2006)........................................... 76

*United States* v. *Page*, 657 F.3d 126 (2d Cir. 2011)................................................................... 75

*United States* v. *Persico*, 645 F.3d 85 (2d Cir.2011).................................................................. 17

*United States* v. *Pitre*, 960 F.2d 1112 (2d Cir.1992) .................................................................. 18

*United States* v. *Provenzano*, 615 F.2d 37 (2d Cir.1980)............................................................ 18

*United States* v. *Rittweger*, 524 F.3d 171, 2008 WL 1808260 (2d Cir. Apr.23, 2008) ................ 75

*United States* v. *Rosenwasser*, 550 F.2d 806 (2d Cir. 1977) .......................................................... 77

*United States* v. *Salameh*, 152 F.3d 88 (2d Cir. 1998) ................................................... 74

*United States* v. *Schiff*, 801 F.2d 108 (2d Cir.1986) ....................................................... 92

*United States* v. *Smith*, 09 Cr 331, 2017 WL 3529047 (W.D.N.Y. Aug. 17, 2017).................... 85

*United States* v. *Spinelli*, 352 F.3d 48 (2d Cir. 2003) .................................................. 74

*United States* v. *Stern*, No. 16 Cr. 525 (JGK), 2017 WL 4676660 (S.D.N.Y. Oct. 17, 2017) ..... 91

*United States* v. *Svoboda*, 347 F.3d 471 (2d Cir. 2003) ............................................... 87

*United States v. Vario*, 943 F.2d 236 (2d Cir. 1991) ..................................................... 19

*United States* v. *Walker*, 142 F.3d 103 (2d Cir. 1998)................................................... 75

*United States* v. *Williams*, 2003 WL 22175980 (E.D.N.Y. Sept. 17, 2003)................................ 85

*Wilburn* v. *Eastman Kodak Co.*, 180 F.3d 475 (2d Cir. 1999) ...................................... 85

*Zafiro* v. *United States*, 506 U.S. 534 (1993) ....................................................... 74, 75

In contending that they are entitled to a judgment of acquittal or a new trial, the defendants largely rehash the arguments they made unsuccessfully to the jury.   Those arguments are even less compelling after a guilty verdict.   To accept these arguments, the Court would have to ignore much of the evidence, usurp the role of the jury, and draw its own inferences – all in favor of the defendants.   As the Court knows, none of this is appropriate.   Post-trial review is not a second bite at the trial apple.   Instead, each defendant must demonstrate that no rational jury could have found him guilty beyond a reasonable doubt or that it would be a manifest injustice to let the verdicts stand.   None of the defendants has come close.   The Court should deny their post-trial motions.

## FACTUAL BACKGROUND

The evidence at trial demonstrated that the defendants participated in a scheme to defraud two sets of victims: the Wakpamni Lake Community Corporation (the "WLCC"), by inducing the WLCC to issue $60 million worth of trial bonds; and ten pension funds, by investing their money in the WLCC bonds without disclosing material facts, resulting in over $40 million in losses.   The scheme was long running, complex, and profitable.

## I.     The Conspirators Hatch the Plan, and John Galanis Meets With a Representative of the WLCC

In early 2014, Devon Archer, Bevan Cooney, and Jason Galanis, along with others, were trying to buy financial service companies.   Their ultimate goal was to combine, or "roll-up," those companies into a conglomerate and then sell the combined company at a substantial profit. (*See, e.g.*, Tr. 906-09 (Dunkerley testimony on background of "roll-up" plan); Tr. 1321 (same); s*ee also* Tr. 2160 (Francisco Martin testimony that Jason Galanis and Archer were "business partners"); GX 3201 (Cooney email describing Jason Galanis as his "business partner")).

1

The plan, however, lacked an important ingredient: money.   The conspirators simply did not have enough to acquire the necessary companies.   (*See, e.g.*, GX 2024 (7/5/14 email from Jason Galanis to Archer and Cooney stating "My primary objective is to get us source of discretionary liquidity. sick of begging."); GX 2216 (8/14/14 email from Jason Galanis to Archer regarding potential acquisition of Fondinvest, stating "Dan and Hugh have it locked up and came to me for the money, which I have agreed to arrange/provide (probably Indians).")).

In early 2014, the conspirators began discussing using the proceeds of a Native American bond issuance to further their own business and personal interests, including the roll-up plan. On February 12, 2014, Jason Galanis emailed Archer and Cooney stating that he had been "brought a deal" involving a tax-free bond issuance by a Native American tribe and that "they need an underwriter for the municipal bonds."   (GX 2003).   The attachment to the email included a January 13, 2014 letter from Bob Griffo, of the U.S. Department of the Treasury, to Raycen Raines of the Oglala Sioux Tribe—the tribe to which the WLCC belongs—regarding an application by the Oglala Sioux to issue tribal economic development bonds.   (*See id.* at 2). Cooney responded to Jason Galanis's email by stating "we will gladly help direct some of mr[.] griffo's funds."   (GX 2004).

Jason Galanis then enlisted the help of his father, John Galanis.   Approximately a month after Jason Galanis's e-mail to Cooney and Archer, John Galanis introduced himself to Raycen Raines at a Native American development conference in Las Vegas, Nevada.   Raines had never met John Galanis—who used the first name "Yanni" in his dealings with Raines—before the conference in Las Vegas.   (*See* Tr. 1834-35).

At the meeting in Las Vegas and over the next several months, "Yanni" proposed to Raines that the WLCC issue bonds, the proceeds of which would be placed in an annuity.   (Tr.

1836).   Based on John Galanis's statements, Raines understood that that the annuity "would be like an insurance wrapper that would protect the principal investment and generate annual income to cover the interest on the bond as well as generate income for the" WLCC's economic development projects on the Pine Ridge Indian Reservation, one of the poorest areas in the United States.   (Tr. 1828-29, 1836, 1850).   John Galanis also told Raines that "[t]he payments would be guaranteed for the annual interest rate" to the bond investors and for annual payments to the WLCC.   (Tr. 1839; *see also* GX 200, 201, and 202 (annuity contracts for each bond issuance, stating annuity provider "will pay" payments to be made under annuity), GX 1304 at 4).

John Galanis initially represented to Raines that Wealth Assurance-AG would provide the annuity, Tr. 1840, GX 1304 at 3, although later the annuity provider became Wealth Assurance Private Client ("WAPCC").   John Galanis told both Raines and Tim Anderson— counsel to the WLCC and later Burnham, that the WAPCC was a "subsidiary" of Wealth Assurance-AG.   (Tr. 183; 1852).   In truth, however, there was no actual relationship between WAPCC and Wealth Assurance-AG.   (Tr. 1014).

John Galanis also explained to Raines and Anderson that Burnham Securities, an entity at which, according to John Galanis, his son Jason Galanis worked as an investment banker, would be the placement agent for the bonds.   (Tr. 150; 1838)

In addition to his oral representations to Raines and others involved in the bond deal, John Galanis also drafted or edited documents that were consistent with those oral representations.   For example, on June 16, 2014, John Galanis sent an email to Steven Haynes, a representative of the WLCC, and Tim Anderson, a lawyer representing Burnham Securities in the planned bond issuance, with Jason Galanis copied.   (GX 1304).   An attachment to the e-

3

mail, titled "Wakpamni Source & Use of Funds v15.pdf" set forth the goals and structure for the

bonds.   The document explained, for example, that:

- The "goal" of the bonds was to "create a permanent endowment to provide a current income stream supporting economic development, which will provide significant long-term employment to the [Wakpamni] community," *id.* at 2;

- Burnham Securities would be the placement agent for the bonds and Private Equity Management, LCC, operated by "Francisco Martin and Dr. Gary Hirst," would be the portfolio manager, *id.* at 3;

- The initial offering would be for $28 million, $27,500,000 of which would be used to "purchase annuity from Wealth Assurance" and $500,000 of which would be used to pay "Burnham placement fee and other bond issuance costs," *id.*;

- The WLCC would receive annual payments of between $250,000 and $350,000 for 25 years following the issuance of the bonds, *id.* at 4.[1]

## II.     The Conspirators Acquire Hughes Capital Management for the Purpose of Placing the First Tranche of Bonds and Begin Final Preparations for the First Issuance

While John Galanis was inducing the WLCC to issue the bonds, Jason Galanis, Archer,

and Cooney were discussing another important element of the scheme: finding buyers for the

bonds.

On May 9, 2014, Jason Galanis forwarded Archer, Cooney, and another individual an

email about a potential acquisition of "Hughes Asset Management," which Galanis described as

"possibly useful."   (GX 2018).   The "primary reason" that the conspirators wanted to acquire

Hughes was to provide a source of purchasers of the WLCC bonds.   (*See* Tr. 933 (Dunkerley

testimony that "the primary reason for the purchase of Hughes Capital was for the purchase of

the bond issuances")).

---

[1] In addition, in the lead up to the first bond issuance, John Galanis also drafted or edited numerous other documents containing the material terms and conditions of the bonds.   (*See, e.g.*, GX 1303, 1305, 1306, 1307, 1308).

Jason Galanis's May 9 email attached resume and background information for Michelle Morton and Richard Deary, who would run Hughes after the conspirators acquired the company. (*See* GX 2018).

Throughout the spring and summer of 2014, Jason Galanis continued to keep Archer and Cooney informed as to the status of both the first WLCC bond issuance and the Hughes acquisition.   For example, Jason Galanis informed Archer and Cooney that:

- a term sheet for the Hughes acquisition had been executed and that he "believe[d] Hughes would take $28 million of the Wakpamni bonds," to which Cooney responded "West coast offense charging down the field!," GX 2030;

- "the indians" had signed an engagement letter and that it "maybe good" for Archer to let the law firm representing the WLCC "know that you are associated with the [purported] insurance company at the right moment," GX 1235;

- Wealth Assurance-AG had wired $2.76 million to close the purchase of Hughes, GX 2034;

- a CUSIP had been issued for the bonds, GX 1267; and

- two members of the WLCC had "fully executed" the bond documents, GX 2217.[2]

Moreover, email communications from Jason Galanis made clear that their purpose in getting the WLCC to issue the bonds was to fund their own business and personal ventures.   For example, on July 19, 2014, Jason Galanis emailed Archer stating "if I get this $28mmm, I have 12-15mm to put into WAH. [Wealth Assurance Holdings]."   (GX 2031).   Archer sat on the Wealth Assurance Holdings board, Tr. 912, and owned millions of dollars of Wealth Assurance Holdings stock.   (GX 5050).   Wealth Assurance Holdings was also the parent company of Wealth Assurance-AG.   (Tr. 912).

---

[2] (*See also* GX 2299 (email from Jason Galanis to Cooney reflecting the allocation of the WLCC bonds to nine pension fund clients of Hughes)).

In addition, Jason Galanis emailed Archer on July 11, 2014 forwarding a distribution list for the first issuance of the WLCC bonds stating "closing archie[,] target close is July 31[.]" Archer responded "From your lips to God's ears!   July 31 is right around the corner!"   Galanis responded "So close[.]   Cliff is running stall for me on nyc mansion[.]   I want to be here and won't live in 1750 square foot cage[.]   Massively motivated[.]"   (GX 2028).

## III.   The Conspirators Foist the Entire First Issuance Upon Unwitting Hughes Clients and then Misappropriate the Bond Proceeds

The acquisition of Hughes closed on or about August 11, 2014.   (*See, e.g.*, GX 2034). The conspirators financed the acquisition by wiring $2.76 million to Hughes from Wealth Assurance-AG, *i.e.*, the same entity that was originally supposed to provide the annuity for the bonds.   (*See id.*).   Jason Galanis sent two other co-conspirators, Hugh Dunkerley and Gary Hirst, to assist Morton and Deary at the closing, and Hirst was installed as Hughes' Chief Investment Officer.   (Tr. 946-47).

The same day, COR Fund Advisors, an entity in which Archer and Cooney were investors, acquired a minority stake in Burnham Financial Group ("BFG"), the parent company of Burnham Securities, the placement agent for the bonds.   (*See, e.g.*, DX 9001 at 5).   Archer had been personally involved in negotiations to acquire BFG in its entirety since early 2014. (*See, e.g.*, Tr. 2607-13 (Moynihan testimony)).   He also sat on Burnham Securities' investment committee and approved Burnham's role as placement agent for the bonds.   (Tr. 1007-11).

Also in early and mid-August, Gary Hirst opened a bank account for WAPCC (the "WAPCC Account"), and Dunkerley became a signer on that account.   (Tr. 1013-14).

Thus, by mid-August 2014, the conspirators controlled (i) Hughes, the entity that would acquire the first tranche of Wakpamni bonds; (ii) Burnham Securities, the purported placement agent for the bonds; and (iii) WAPCC, the purported annuity provider for the bonds.

6

Just eleven days later, after the Hughes sale closed, on August 22, 2014, Hirst signed trade tickets, purchasing the entirety of the first issuance of Wakpamni bonds on behalf of nine Hughes clients.   (GX 813).   Over the next several days, approximately $24 million of Hughes' clients' money was deposited into the WAPCC Account, to fund the purchase of the purported annuity.   (*See* GX 512 at 1; GX 4003 at 4).   Hughes' clients, however, were not informed about the bond purchases made on their behalf or of the fact that Hughes, WAPCC, and Burnham were all controlled by related parties.   (Tr. 1610, 1617 (Griffin); Tr. 1680-81).   Further the bonds were outside of many Hughes' clients investment guidelines.   (*See* GX 4016).   Once Hughes' clients learned of the Wakpamni bond purchases after the fact, they reacted "negatively across the board," with many demanding the bonds be sold immediately.   (Tr. 2050 (Turney)).

The conspirators, however, had other plans.   Almost immediately, they began misappropriating the money placed into the WAPCC account.   More specifically, "[t]he money was wired to a series of corporations and people, and none was invested in a variable annuity contract."   (Tr. 898 (Dunkerley)).

For example, consistent with Jason Galanis's email to Archer suggesting that Galanis would use the bond proceeds "on nyc mansion," GX 2028, $1 million was sent from the WAPCC account to a law firm representing the seller of the Tribeca apartment Galanis was buying.   (GX 512 at 2 (bank records); GX 225 at 13 (sales contract identifying seller's attorney)).

$2.35 million from the first bond issuance went to an entity called Sovereign Nations Development Corporation ("Sovereign Nations").   (GX 512).   Days before the first bond issuance, John Galanis directed an associate, Mark McMillan, to establish Sovereign Nations and to open a bank account in that name.   (GX 623, 1112).   Over the next several months,

McMillan, at John Galanis's direction, disbursed that $2.35 million to John Galanis, John

Galanis's relatives, and to fund the purchase of cars and jewelry for John Galanis.   (GX 4013).

In addition, over $4 million from the first bond issuance went to Thorsdale Fiduciary and

Guaranty ("Thorsdale"), a Jason Galanis-controlled entity, where it was used to pay for travel,

meals, cars, and attorneys' fees, among other things.   (GX 4003 at 3).   And, as discussed below,

$20 million of the proceeds of the first issuance were recycled to buy even more Wakpamni

bonds.

IV.   **Archer and Cooney Purchase the Second Tranche of Bonds Using Recycled
      Proceeds from the First Issuance**

"Immediately" after the first bond issuance, John Galanis proposed to Raines that the

WLCC issue another round of bonds.   (Tr. 1853-54 (Raines)).   Even though Hughes' clients

were actually demanding that the bonds be promptly sold from their accounts, John Galanis told

Raines that additional investors wanted to invest in another round of bonds "right away."   (Tr.

1854).   John and Jason Galanis also told Tim Anderson that a "Burnham client . . . was excited

about what had occurred with the first bond issue and wanted to be supportive" by purchasing

additional bonds.   (Tr. 221).   As with the first issuance, John Galanis provided Anderson with

certain key documents related to the second issuance, including a "Source & Use of Funds"

document, which explained that the second offering would be for $20 million and that $18.5

million of that money would be used to purchase an annuity.   (GX 1304 at 3).

Prior to the second issuance, Raines asked John Galanis about using another entity as the

annuity provider, rather than WAPCC.   (Tr. 1854-55).   John Galanis—who had just received

$2.35 million from WAPCC from proceeds of the first issuance—replied that "there [was] no

reason to change" annuity providers.   (Tr. 1855).   Burnham Securities also again acted as the

placement agent for the bonds, although it once again did not undertake any actual efforts to locate purchasers.   (Tr. 1024-25; GX 213).

Given the lack of legitimate investor interest, Archer and Cooney quickly stepped in as purported legitimate purchasers of the second round of bonds.   On September 8, 2014, less than two weeks after the first bond issuance closed, Jason Galanis emailed Archer regarding logistics for Archer's purchase of a portion of the second round of bonds, including the potential closing date, the fact that Galanis was going to wire money for the purchase to an attorney, Clifford Wolff,[3] who would then wire the money to Archer, and that the bonds would be deposited at Morgan Stanley, in a portfolio that Archer would "diversify . . . over time."   (GX 2228).

Archer and Cooney also signed representation letters, which were sent to the WLCC. (GX 254 (Cooney)), GX 281 (Archer)).   The letters warranted that Archer and Cooney were sophisticated investors, who were purchasing the bonds for "investment only" and not for resale, and that they could afford a complete loss of the investment.   (GX 254, GX 281).

Archer purchased $15 million worth of the second tranche, through an entity he controlled called Rosemont Seneca Bohai ("RSB").   Consistent with Jason Galanis's September 8, 2014 email to Archer, $15 million of bond proceeds from the first issuance were transferred from WAPCC to Thorsdale and then from Thorsdale to the Wolff Law Firm and then from the Wolff Law Firm to RSB, which Archer then used to buy his portion of the second tranche on or about October 1, 2014.   (*See* GX 4004 at 7).

That day, and over the next several days, Archer made multiple false statements about the bonds and about his relationship with Galanis.

---

[3] Wolff also represented Archer Diversified in acquiring the Tribeca apartment for Galanis. (*See* GX 225 at 13, GX 2122).

For example, on October 1, 2014, the same day he purchased the bonds, Archer attended a meeting of the board of Burnham Investors Trust ("BIT"), to obtain the board's approval for his acquisition of Burnham Asset Management, another subsidiary of BFG.   During that meeting, as a condition of getting the board's approval, Archer warranted that:

> *Jason Galanis will not be involved with any of the Burnham entities and their "affiliated persons"* (within the meaning of Section 2(a)(1) of the Investment Company Act) *as well as their successors or assigns at BFG, Burnham, Burnham Securities Inc. ("BSI") or the Trust.* For the avoidance of doubt, Mr. Galanis will have no interest of any kind, direct or indirect, in any of the Burnham entities, and the Burnham entities will not invest with or in, directly or indirectly, any business or enterprise in which Mr. Galanis has any association, affiliation, or investment, pecuniary or otherwise, directly or indirectly.

(GX 763 at 3 (emphasis added)).   This was plainly false, as Jason Galanis was certainly "involved" with Burnham Securities, which was acting as the placement agent for the second issuance of WLCC bonds being consummated that very morning.

Archer also lied to Morgan Stanley, where he deposited the bonds.   In response to an email question from Catherine Driever, a Morgan Stanley employee, asking "How was the $15mm generated that was used to purchase the bonds?," Archer responded, falsely, that "$15mm was generated through the sale of real estate."   (GX 344).   Morgan Stanley also asked Archer "for more detail as to how you came to know of the purchase?"   (GX 344). Archer responded "Burnham Financial package the issuance of which I am a shareholder."   (GX 344).[4]

---

[4]  In addition, Driever later filled out a Morgan Stanley "Client Representation Letter," on which she wrote, "The funds used to purchase the bonds were from real estate sales through my business, Rosemont Seneca Bohai, LLC."   (GX 352).   Although Driever could not remember a specific conversation in which Archer provided this information, she testified that "I would not have written something that a client did not say."   (Tr. 867).

Archer also looked into depositing the bonds at Deutsche Bank and, in doing so, lied to Deutsche Bank as well.   In an October 7, 2014 email, John Tonzola of Deutsche Bank asked Archer "How did [RSB] come to own these bonds?" to which Archer again falsely responded "Real Estate Sale."   (GX 1226).

Cooney purchased the remaining $5 million of the second issuance on October 9, 2014, again using bond proceeds from the first issuance.   (*See* GX 4005 at 6).   The flow of funds to Cooney was similar to the flow of funds to Archer for his bond purchase: $5 million was sent from WAPCC to Thorsdale and then to Cooney, which Cooney then used to purchase the bonds. (*See id*).   Cooney deposited his bonds at City National Bank, bragging to Archer that, unlike Archer he had "executed my 5mm bond purchased without a hitch . . . . Need to get you out of Morgan Stanley."   (GX 1236).

As with the first bond issuance, the conspirators used the second bond issuance to further their personal and business interests.

Ultimately, Cooney transferred the entirety of the Wakpamni bonds he purchased to Bonwick Capital, an entity controlled by Archer, Cooney, and Jason Galanis, in an attempt to help Bonwick meet net capital requirements.   (Tr. 2083-2099; GX 4005).   Similarly, Archer transferred a portion of the Wakpamni bonds he purchased to Burnham, to attempt to help Burnham meet net capital requirements.   (GX 4004; Tr. 2082-83).   The Financial Industry Regulatory Authority ("FINRA") ultimately determined the Wakpamni bonds were not an allowable asset for either Burnham or Bonwick to use towards net capital.   (Tr. 2093-99).

And, after he transferred the bonds to Bonwick, Cooney obtained a $1.2 million loan from City National Bank.   In a personal financial statement submitted to the bank, Cooney failed to disclose that the $5 million used to purchase the bonds was not his own money but was

11

a "loan" from Jason Galanis.   (GX 404).   Later, when City National was considering making

the loan to Cooney, Cooney met with a City National Senior Vice President and represented that

he would be able to use the $5 million worth of Wakpamni bonds to pay back the loan if need be.

(Tr. 1742).   Cooney failed to disclose, however, that he had already transferred the Wakpamni

bonds to Bonwick.   (*See, e.g.*, Tr. 1749).

And, once again, the proceeds of the second bond issuance were not invested in an

annuity.   In November 2014, $3.8 million was wired directly from WAPCC to Cooney, who

used the money purportedly to purchase Jason Galanis's home at 1920 Bel Air in Los Angeles

(*See* GX 4007; *see also* GX 3224 (11/10/14 email from Cooney to financial advisor indicating

that money was going to be used "for a real estate purchase"), GX 3236 at 3 (1/15/15 email from

Cooney referencing the transaction as relating to "the down payment for the 1920 bel air

purchase")).   In reality, however, Cooney never actually bought the home, and the money was

sent, through a series of intermediaries, to a company called Vaudoise, in connection with

Wealth Assurance Holdings' purchase of a Vaudoise subsidiary, Valorlife.   (*See* GX 4009).   On

November 25, 2014 Galanis forwarded Cooney a press release announcing WAH's acquisition

of Valorlife from Vaudoise, to which Cooney replied "Huge Greek!! What a release . . . A five

knuckle release" and both Cooney and Galanis noted that, unlike their other endeavors, Vaudoise

actually had "positive cash flow."   (GX 2247).[5]

## V.   The Conspirators Purchase Atlantic Asset Management for the Purpose of Placing the Third Tranche of Bonds

At the same time as the conspirators were misappropriating the proceeds of the first and

second bond issuances, they were also laying the groundwork for yet another bond issuance.

---

[5] Following the acquisition of Valorlife, WAH was renamed "Valor Group." (Tr. 912).

In the late summer of 2014, again almost immediately after the first bond issuance, the conspirators began efforts to acquire another registered investment adviser, Atlantic Asset Management, which was based in Connecticut.   For example, on August 28, 2014, Jason Galanis emailed Archer and Cooney, with the subject line, "we have a decent shot of adding this one to the family," attaching Atlantic's Form ADV.   (GX 2303).   Cooney responded "Greek just running at a frenetic pace!!!   Love it[.]"   (*Id.*; *see also* GX 2037).   Negotiations over the Atlantic merger continued through the fall and winter of 2014-15.   Michelle Morton and Hugh Dunkerley negotiated with Atlantic's then-owners, and Jason Galanis regularly updated Archer and Cooney on the progress of negotiations.   (*See, e.g.*, GX 2061 (email from Jason Galanis to Archer and Cooney forwarding "Update on AAM" email from Morton); Tr. 1032-33).

From early on, one of the conspirators' reasons for purchasing Atlantic was to find a place for the purchase of additional Wakpamni bonds.   For example, on October 30, 2014, Jason Galanis forwarded Archer and Cooney an email from Morton in which Morton said that, "[i]f [a current Atlantic employee] has information on the issue[,] he will begin the process of going through the client information to determine where [the bonds] can be placed."   (GX 2062).

Ultimately, the conspirators agreed to purchase Atlantic for approximately $6.1 million in cash.   (*See* Tr. 1033 (Dunkerley); *see also* GX 828 at 4).   In addition, WAH/Valor Group—an entity for which Archer was a director and owned millions of dollars of stock—agreed to provide guarantee for an additional $4,854,420 million of Atlantic's debts.   (*See* Tr. 912, 1033 (Dunkerley); *see also* GX 828 at 4; GX 5050 (setting forth Archer's WAH stock holdings)). The purchase was structured as a merger of Hughes Capital Management into Atlantic.   (*See* Tr. 1032 (Dunkerley); 2051 (Turney)).

The Atlantic acquisition closed on April 1, 2015.   Jason Galanis emailed Archer and Cooney noting that "we have already delivered the notes for $4,854,420[] it will be nice to have dry powder to fire"; Cooney responded "just a big time hump day closing!!!!"   (GX 1229; *see also* GX 2076 (congratulatory email exchange between Archer and Jason Galanis).

While the Atlantic acquisition was being finalized, the conspirators were also taking steps to induce the WLCC to issue yet another set of bonds.   John Galanis again approached Raines and suggested that the WLCC issue additional bonds.   (Tr. 1858).   Once again, WAPCC was the purported annuity provider and Burnham was the placement agent.   (*See* Tr. 277-78, GX 202, 212).

And once again, with the acquisition of Atlantic freshly closed, the conspirators did not have to look far to find purchasers for the bonds.   An Atlantic client, the Omaha School Employees Retirement System ("OSERS") had invested $125 million in Atlantic's Global Yield Opportunity Fund ("GYOF").   (*See* Tr. 645-56).

On April 14, 2015, Galanis sent Archer, Jason Sugarman, and another individual the GYOF private placement memorandum, "the audited financials, and the performance." (GX 2078).   Galanis noted that the "only finesse needed will be Don Trotter," a Kansas City-based Atlantic employee,[6] "being marginalized, but he seems like an agreeable guy."   (*Id.*).   Archer then asked about "get[ting] ahead of" Trotter, and Galanis explained that it "feels like the plan is winning hearts and minds through a full preppy assault on the [C]onnecticut contingent . . . . not sure what floats the boat of the Kansas guy. resume below" and pasted a copy of a short biography of Trotter.   (GX 2078).

---

[6] (*See* Tr. 2052 (Turney)).

The following day, April 15, Morton purchased $16 million of the third WLCC bond issuance on behalf of OSERS and the GYOF.   (*See, e.g.*, GX 962; 4009).

OSERS received no advance notice that Atlantic was purchasing the bonds on its behalf, nor was it informed about the conflicts of interest before the bonds were put in its account. Instead, on or about April 23, 2015, Morton and other employees at Atlantic called Michael Smith of OSERS, informed him of the bond purchase, of overlapping relationships between Burnham, Wealth Assurance, and Morton's financial backers, and of the fact that the bonds "did not fit within" the GYOF's existing investment parameters.   (Tr. 742-43).   Atlantic sought Smith's after-the-fact consent for the purchase, but Smith refused.   (Tr. 746 (Smith testimony); *see also* GX 966)).   Atlantic was unable to liquidate the bonds from OSERS' account, and the bonds remain unsold.   (Tr. 751).

While OSERS was slowly learning of the bond purchase on its behalf and attempting to mitigate the damage, the conspirators misappropriated the proceeds of the third bond issuance. Once again none of that money was invested in an annuity.   Instead:

- over $5.4 million was used to purchase Fondinvest, a European fund of funds, of which Dunkerley became the owner.   (Tr. 1042; GX 4009).   Months prior, Jason Galanis had told Archer that Dunkerley and another individual had "locked up" a potential Fondinvest purchase "came to me for the money, which I have agreed to arrange/provide (probably Indians)." (GX 2218);

- $4.6 million went to VL Assurance, GX 4009, which was another Valor Group subsidiary, Tr. 375, and an entity to which Archer had transferred his $15 million in Wakpamni bonds. (GX 4004 at 7);

- $305,000 went to Hughes, to pay operating costs (GX 4009);

- $75,000 went to Cooney (GX 4009); and

- millions of dollars went to Seymour Capital and Thunder Valley, (*see* GX 512 and GX 4009), two entities set up at the direction of Gary Hirst. (Trial Tr. 2161-62).   These funds were then used to purchase shares in the initial public offering of a company called Code Rebel.   (Tr. 2165-67).

15

VI.     **The Scheme Unravels and the Conspirators Attempt to Cover-Up Their Crimes**

The conspirators' scheme unraveled after a series of events in the fall of 2015.

First, the annual interest payment on the first set of bonds was late.   (Tr. 282 (Anderson)).   Ultimately, that payment was made, in a Ponzi-like fashion, from funds contributed by Archer, Jason Sugarman, and from the proceeds of the third bond issuance.   (*See* GX 4010).   And after that first interest payment, none of the subsequent interest payments were made on the bonds.   (Tr. 281-83 (Anderson testimony)).

Second, on September 24, 2015, Jason Galanis was arrested on unrelated charges.   (*See* GX 2203; Tr. 2519-20).   Archer, Cooney, and others immediately stepped in more directly at entities related to the scheme, including at Atlantic Asset Management.   (*See, e.g.*, GX 2102; GX 1453 (email from Jason Galanis, using legal@colarisventures.com email address to Archer, attaching documents relating to Atlantic Asset Management).   Cooney also contacted Francisco Martin and told him "that Jason Galanis was arrested but not to worry, it didn't have anything to do with the bond issue."   (Tr. 2177).

Third, in light of increased scrutiny on Jason Galanis, the conspirators took steps to cover-up the Wakpamni fraud.   These steps included the creation of a fake company, Calvert Capital, to attempt to conceal the misappropriation of bond proceeds.   Francisco Martin actually incorporated Calvert Capital on October 1, 2015 in Wales.   (GX 1609).   Nonetheless, the conspirators created a series of back-dated agreements, from 2014, attempting to show that WAPCC had invested in Calvert and that Calvert in turn, had lent Archer and Cooney $20 million to purchase WLCC bonds.   (GX 1271 (purported "Secured Loan Agreement" between Cooney and Calvert); GX 1577 (purported consent of WAPCC to Calvert loaning $15,000,000 to Rosemont Seneca Bohai)).   Cooney later produced the fake Secured Loan Agreement to the

SEC in response to a subpoena.   (GX 1271; GX 4501 ¶ 18).   And Archer later attempted to "replace[]/return[]" his WLCC bonds to Calvert, which he falsely claimed was "the lender and beneficial owner . . . ," even though, when Archer bought his bonds in 2014, Calvert did not exist.   (GX 2119).

Ultimately, the WLCC was left with $60 million in outstanding debt, and the ten pension fund investors collectively lost over $40 million as a result of the fraud.

## GENERALLY APPLICABLE LAW

### I.       Rule 29 Motions for Judgements of Acquittal

A defendant challenging the sufficiency of the evidence bears a "heavy burden," *United States* v. *Gaskin*, 364 F.3d 438, 459 (2d Cir. 2004), as the standard of review is "exceedingly deferential," *United States* v. *Hassan*, 578 F.3d 108, 126 (2d Cir. 2008).   Specifically, the Court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence."   *United States* v. *Chavez*, 549 F.3d 119, 124 (2d Cir. 2008) (citations, brackets and internal quotation marks omitted); *see also United States* v. *James*, 239 F.3d 120, 124 (2d Cir. 2000) ("[T]he credibility of witnesses is the province of the jury and [this Court] simply cannot replace the jury's credibility determinations with [its] own") (internal quotation marks omitted).   Ultimately, "the task of choosing among competing, permissible inferences is for the [jury], not for the reviewing court."   *United States* v. *McDermott*, 245 F.3d 133, 137 (2d Cir. 2001); *see also United States* v. *Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (to defeat a Rule 29 motion, "the government need not exclude every reasonable hypothesis other than that of guilt") (internal quotation marks and citations omitted).

Further, the court must review all the evidence "in conjunction, not in isolation." *United States* v. *Persico*, 645 F.3d 85, 104 (2d Cir.2011) (citing *United States* v. *Eppolito*, 543 F.3d 25, 45 (2d Cir.2008)).

Finally, particularly in reviewing a conspiracy conviction, the Court must also "be careful to avoid usurping the role of the jury," *United States* v. *Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) "because a conspiracy by its very nature is a secretive operation, and it is a rare case 'where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel,'" *United States* v. *Pitre*, 960 F.2d 1112, 1121 (2d Cir.1992) (quoting *United States* v. *Provenzano*, 615 F.2d 37, 45 (2d Cir.1980)).

## II.    Rule 33 Motions for a New Trial

Rule 33 "motions for a new trial are disfavored in the Second Circuit." *United States* v. *Gambino*, 59 F.3d 353, 364 (2d Cir. 1995). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice. The trial court must be satisfied that competent, satisfactory and sufficient evidence in the record supports the jury verdict." *United States* v. *Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (citation and internal quotation marks omitted). "Simply put, to grant a Rule 33 motion, a trial judge 'must harbor a real concern that an innocent person may have been convicted.'" *United States* v. *Bandrich*, No. 12 Cr. 934 (RA), 2014 WL 7330434, at *2 (S.D.N.Y. Dec. 22, 2014) (quoting *United States* v. *Guang*, 511 F.3d 110, 119 (2d Cir. 2007)).

## DISCUSSION

## I.    John Galanis is Not Entitled to a Judgment of Acquittal

John Galanis moves for a judgment of acquittal arguing that the Government failed to prove either his membership in the charged conspiracy or that he made material misstatements to

the WLCC on which they relied.[7]   Instead he suggests that the Government sought to convict

him solely through circumstantial evidence in the form of proof that he was the father of Jason

Galanis.   John Galanis's arguments ignore the applicable legal standards, fail to draw all

inferences in favor the Government, mischaracterize and ignore significant trial evidence, and

ultimately rehash arguments already put before—and rejected—by the jury.   Galanis's motion

must be denied.

        A.   <u>The Evidence Amply Supports John Galanis's Conviction</u>

Galanis first argues that in order to convict him "the government had to prove that John

Galanis misled the WLCC representatives during the negotiations on the bond deal."   (Galanis

Br. at 2).   He further argues that his only two statements to the WLCC—that Jason Galanis "had

a position at Burnham wherein he had great influence on deciding what investment opportunities

Burnham would become involved in" and "that the Wakpamni Lake [C]ommunity had sovereign

immunity" and "would not be liable for the bond value if the bonds went unpaid"—were both

true and thus cannot sustain a conviction.   (*Id.*).   Galanis is wrong on both the law and the facts.

As a preliminary matter, in order to sustain a conviction for conspiracy to commit

securities fraud, the Government need not prove that John Galanis himself made materially false

statements to the WLCC.   It is sufficient to show that John Galanis knowingly joined the

conspiracy, even if it was other members of the conspiracy—such as Jason Galanis—who made

the materially false statements.   *See, e.g.*, *United States* v. *Vario*, 943 F.2d 236, 240 (2d Cir.

1991) ("[I]t is a fundamental tenet of the law of conspiracy that reasonably foreseeable acts of

individual co-conspirators taken in furtherance of the conspiracy count against all members

---

[7] John Galanis seeks only a judgment of acquittal, but does not, in the alternative, seek a new trial.

equally[.]"); *United States* v. *Bruno*, 873 F.2d 555, 560 (2d Cir. 1989), *cert. denied*, 493 U.S.

840 (1989).   There is, in any event, no doubt that John Galanis himself made materially false

and misleading statements to the WLCC.   Nor were such statements limited to the two he

identifies.

John Galanis first claims that he told the WLCC that "his son had a position at Burnham

wherein he had great influence on deciding what investment opportunities Burnham would

become involved in" and that this statement was true.   (Galanis Br. at 2).[8]  But as the trial

evidence made clear, John Galanis told the WLCC something far more specific—that Jason

Galanis was an investment banker at Burnham—and this statement was indisputably false.   (Tr.

1838 (Raines testimony that John Galanis said his son Jason worked at Burnham Securities)).

Galanis also claims that he told the WLCC that the Wakpamni Lake Community had sovereign

immunity and would not be liable for the bond proceeds if they went unpaid, and that this

statement was true.   (Galanis Br. at 2).   But neither Raines nor Anderson—the only trial

---

[8] John Galanis also fails to address evidence that he attended the Native American Economic
Development Conference for the explicit purpose of targeting the WLCC and Raycen Raines as
part of the conspiracy.   For example, the Government admitted at trial a February 12, 2014
email in which Jason Galanis tells Devon Archer and Bevan Cooney about a potential Native
American bond deal that would allow them to "direct part of the proceeds."   (GX 2003).   The
attachment contains information about Raycen Raines.   Notably, this email was sent in February
2014, *before* John Galanis met Raycen Raines at the Native American Economic Development
Conference.   The jury was thus entitled to find that it was no coincidence that John Galanis met
Raines at the conference, but that John Galanis had intentionally targeted Raines as part of his
participation in the existing conspiracy.

witnesses to whom Galanis spoke about the bonds—testified to such a statement.[9,10]

The two statements identified by Galanis were not, in any event, the sole materially false statements made by Galanis to the WLCC.   Testimony at trial established that Galanis also falsely told the WLCC that (i) socially responsible investors would want to purchase bonds issued by a Native American tribe (Tr. 1836); (ii) the bond proceeds would be placed in an annuity whose guaranteed payments would render the bonds totally safe, (Tr. 1839-40); and (iii) the annuity provider would be Wealth Assurance-AG, a well-established insurance company. (Tr. 1304).   As the evidence at trial established, there were no investors interested in the bonds, the bond proceeds were not used to buy an annuity, and the annuity provider was not Wealth Assurance-AG.   In addition to making such materially false statements in meetings and phone calls, John Galanis also provided documents containing many of these same false statements to WLCC representatives and to other professionals working on the deal.   (*See, e.g.*, GX 1304 (email from John Galanis attaching a Wakpamni Source & Use of Funds document identifying the annuity provider as "Wealth Assurance, AG," a "European insurance company")).   It was also John Galanis himself who—of his own volition—provided altered deal documents to both WLCC representatives and attorneys, which reflected Wealth Assurance Private Client Corp. as the annuity provider.   (GX 1307).   When both Anderson and Raines inquired about the change, John Galanis again lied to them, claiming that Wealth Assurance Private Client Corp. was a

---

[9] Raines was asked whether in his first meeting with John Galanis another participant (Stephen Haynes) discussed generally that a company run by Native Americans would benefit from sovereign immunity.   (Tr. 1890).   The objection to that question, however, was sustained and the witness did not answer.

[10] And had such a statement been made, it too would have been untrue, because the Wakpamni Lake Community Corporation agreed to a partial waiver of sovereign immunity.   (Tr. 207-208; 1850).

subsidiary of Wealth Assurance-AG.   (Tr. 183; 1852).   In truth, of course, Wealth Assurance

Private Client Corp had no legal relationship with Wealth Assurance-AG.   (Tr. 1014).   Finally,

almost immediately after the first bond issuance, it was John Galanis who suggested the second

bond issuance, falsely claiming that there were additional interested investors who had been

unable to invest in the first round of bonds.   In short, there was ample evidence from which the

jury was entitled to find that John Galanis personally made material misrepresentations to the

WLCC in order to induce them to issue the bonds.

Even if John Galanis had not personally made materially false statements to the WLCC—

and he did—there was ample evidence from which the jury was entitled to infer that John

Galanis had knowingly joined in a conspiracy to commit securities fraud.   First, the jury was

entitled to infer that John Galanis's central role in the bond transactions, including drafting deal

documents, providing comments to attorneys, distributing Burnham marketing materials,

suggesting additional bond issuances, and explaining the deal terms to counsel, revealed his

knowing participation in the scheme.   (*See, e.g.*, GX 1302-1307 (providing draft deal

documents); GX 1311 (Burnham marketing materials); GX 1314 (second tranche of bonds); GX

1367 (providing explanation of the annuity terms to counsel).   Given John Galanis's central

role, his present claim to have left the bond transaction to the WLCC's lawyers—an argument he

also made to the jury—is simply unsupported by the evidence.   (*See, e.g.*, Galanis Br. at 2; Tr.

3693).

John Galanis's communications with both counsel and the WLCC also specifically

evince his knowledge of the inner workings of the fraud—all of which Galanis's brief fails to

mention, let alone address.   For example, John Galanis's emails demonstrate his awareness of

the conflicts of interest present through Hugh Dunkerley's affiliation with both Burnham

Securities, the placement agent, and the Wealth Assurance entities, the purported annuity

provider.   (GX 1301).   Draft deal documents circulated by John Galanis make clear that

Galanis knew that Francisco Martin would be recruited into the scheme before even Martin

himself had been contacted.   (GX 1304).   And John Galanis's efforts to dissuade Raines from

seeking a new annuity provider make clear that Galanis understood that the purported annuity

provider was a sham and that the use of a legitimate annuity provider would make it impossible

for he and his coconspirators to misappropriate the bond proceeds.   (Tr. 1854-1855).   Taken

together, the jury was well within its rights to infer that John's inside knowledge about the

workings of the scheme and efforts to keep it going revealed his clear participation in the

conspiracy.

John Galanis also argues—as he did at trial—that the $2.35 million of bond proceeds he

received "does not prove that [he] was a member of the charged conspiracy" because "the

evidence at trial clearly demonstrated that commissions are a recognized form of payments in

these types of financial deals" and because the WLCC assumed he would receive some

compensation.   (Galanis Br. at 3) (Tr. 3698 (Galanis Summation: "finders fees or commissions

are very common in this business"); Tr. 3699 (arguing that Raines assumed John Galanis would

get a commission).   But the jury had ample reason to reject those arguments.   The fact that

commissions are a recognized form of payment says nothing about whether one was authorized

in this case.   Indeed, as this Court previously noted, the "2.35 million . . . [was] not a payment

authorized by any of the governing [bond] documents."   (Tr. 3946).   And the jury could easily

have inferred that John Galanis failed to include the fee in documents he drafted or circulated

because he knew he was not entitled to any such fee and was thus hiding it.   (*See, e.g.*, GX

1303) (email from John Galanis to Anderson attaching a use of funds description which does not

23

reference any fee to be paid to Galanis).   The fact that Raines expected John Galanis would receive some compensation does nothing to alter this analysis.   As Raines made clear, he understood that John Galanis might receive a portion of Burnham's $250,000 fee from the deal. (GX 214).   But nothing about that suggested that John Galanis would receive a fee nearly 10 times that of Burnham's.

John Galanis's bare assertion that he was entitled to the $2.35 million—and that the jury was unsupported in finding otherwise—is further undercut by the method in which he received the money.   As established at trial, John Galanis hid his connection to the account he used to hold the $2.35 million.   More specifically, at John Galanis's direction, on August 21, 2014, just days before the bonds were issued, Mark McMillan created an entity called Sovereign Nations. (GX 1112).   The very next day, Mark McMillan, again at John's direction, opened a bank account in the name of Sovereign Nations.   (GX 623).   John Galanis's name, however, was kept off both the incorporation and account opening documents.   (GX 623; 1112).   Almost immediately after being opened, the Sovereign Nations account received $2.35 million of bond proceeds.   John Galanis then began directing Mark McMillan to transfer the funds out of the Sovereign Nations account.   In order to further disguise his connection to the Sovereign Nations account, John Galanis sent such directions to McMillan from a fake email address.   (GX 3400). The jury was thus certainly entitled to infer that John Galanis created a shell entity to receive the bond proceeds, and hid his connection to that entity, because he knew he was not entitled to any such payment.   Indeed, although John Galanis boldly asserts that the trial evidence supports his entitlement to these funds, he fails to address in any fashion the extremely suspicious circumstances surrounding the Sovereign Nations account.

Finally, John Galanis asserts that "the evidence the government most relied on to prove that John Galanis was a member of the conspiracy is the fact that he is the father of Jason Galanis."   (Galanis Br. at 2).   As made clear by the rendition of evidence set forth above, there was ample evidence from which the jury could find John Galanis's knowing participation in the conspiracy, even in the absence of any connection to Jason Galanis.   Moreover, the Government made clear to the jury at trial that the mere fact of familial connection was *not* what demonstrated John Galanis's participation in the conspiracy.   (Tr. 3619) (Government summation: "to be clear, having a son who is committing a crime doesn't make you guilty on its own.").   Instead, the Government argued, and the jury was entitled to find, that John and Jason's closeness—not simply as father and son, but as partners in their financial endeavors – demonstrated John Galanis's knowledge that the Wakpamni bonds were a fraud.   For example, the Government established that John Galanis was working in tandem with Jason Galanis through testimony that Jason and John always provided consistent information about the Wakpamni bonds.   (*See, e.g.*, Tr. 167).   Indeed, the two were so intertwined that on one occasion when Tim Anderson asked Jason Galanis for information on the annuity, it was John Galanis who provided the information.   (Tr. 184).   And both John and Jason took steps to hide their communications by using an automatically deleting encrypted messaging application. (*Id.*).

Taken together with all of the other trial evidence, this evidence gave the jury ample reason to reject John Galanis's claim that he had "no reason to believe any improprieties regarding the purchase of the bonds was being committed by Jason Galanis and others." (Galanis Br. at 4).   Indeed, such an argument is laughable in light of the final piece of evidence admitted at trial—that the Wakpamni fraud was not the first fraud in which John Galanis

25

participated with Jason.   To the contrary, as John Galanis admitted in pleading guilty in the

Gerova matter, he participated in the entirely separate Gerova fraud years before the inception of

the Wakpamni fraud.   At its core, John Galanis's attacks on the trial proof rely on an effort to

claim that he was duped by Jason Galanis.   That he believed Jason to be orchestrating a

legitimate bond transaction.   But coupled with all of the other evidence in this case, evidence

that John Galanis already knew his son to be a securities fraudster makes such a belief

impossible.   And the jury was well within its rights to reject such an argument and to conclude

that John Galanis understood the Wakpamni bond scheme to be a fraud and that he knowingly

became a part of that scheme.

## II.   Archer Is Not Entitled to a Judgment of Acquittal or a New Trial

Archer moves for a judgment of acquittal or a new trial arguing principally that the jury

was not presented with sufficient evidence that (a) he participated in a scheme to defraud Hughes

and Atlantic clients, or (b) he participated in a scheme to steal the WLCC bond proceeds.   As an

initial matter, the Court should reject Archer's continued attempt to misconstrue and artificially

divide the WLCC bond scheme into seemingly unrelated parts.   Count Two of the Indictment

sets forth one overarching scheme:

> [T]he defendants engaged in a scheme to misappropriate
> the proceeds of several bond issuances by the WLCC and
> also caused investor funds to be used to purchase the
> bonds, for which there was no secondary market through
> which such bonds could be redeemed, without disclosure to
> those investors of material facts, including the existence of
> multiple conflicts of interest, and which investments, in
> some cases, were outside the investment parameters of the
> accounts in which they were placed.

(Indictment ¶ 30).   The Court has already correctly held, in rejecting the defendants' motions for

a multiple conspiracies jury charge, that "[a]lthough there were two types of misrepresentations

made to the WLCC regarding how the proceeds would be invested on its behalf and to the clients

of Hughes and Atlantic in the form of material [o]missions, both sets of misrepresentations were

clearly in furtherance of the same goal; namely, to misappropriate the bond proceed[s] for the

personal use of the co-conspirators."   (Tr. 3590).   The jury was also entitled to view the

evidence in the same manner: as proof of one overarching scheme.

The Government presented extensive testimony and documentary evidence that—when

viewed "in conjunction, not in isolation," *Persico*, 645. F.3d at 104—was more than sufficient

for a reasonable jury to conclude that Archer knowingly and willfully participated in a scheme to

defraud by causing the WLCC to issue more than $60 million in bonds based on false and

misleading representations, and causing clients of Hughes and Atlantic to purchase those bonds

so that he and his co-conspirators could then use the bonds and the bond proceeds for their own

personal and business gain.   Despite the well-established standards on a post-trial motion,

Archer essentially asks the Court to view each piece of evidence in isolation, and as *he* would see

it (*i.e.,* (a) evidence of "red flags," (b) motive, and (c) emails (*see* Archer Br. at 18-19)), and to

draw all inferences from the testimony and documents in *his* favor.   Archer made the same

arguments to a rational jury in summation and that jury, when viewing the evidence in its

entirety, reasonably rejected them.   Archer's motions should be denied.

## A.  The Evidence Established That Archer Knowingly and Willfully Participated in the Fraudulent Scheme From the Beginning, and Throughout Its Many Phases

Archer argues that the evidence did not sufficiently demonstrate that he "had any

knowledge of undisclosed conflicts of interest at Hughes or Atlantic, or violations of Atlantic

and Hughes clients' investment guidelines, let alone that he willfully joined a scheme or

conspiracy to defraud Atlantic and Hughes' clients through these violations of fiduciary duty."

(Archer Br. at 2).   Archer argues that he did not know the Hughes and Atlantic clients, and that

27

they did not know him, and that he did not cause Hughes and Atlantic clients to purchase the WLCC bonds.   (*Id.* at 11).   But, as described in further detail below, Archer was well aware of the purpose behind the conspirators' purchases of Atlantic and Hughes—to force the investment advisers' clients to purchase WLCC bonds so that the conspirators could use the proceeds of the otherwise illiquid bonds for their own purposes.   Whether Archer knew the specific details of the undisclosed conflicts of interest or violations of investment guidelines at Hughes and Atlantic, or even the specific details of how Hughes and Atlantic clients were forced to purchase the bonds, is irrelevant.[11]   As the Court properly instructed the jury, "[i]t is not necessary for the government to show that a defendant was fully informed as to all of the details of the conspiracy in order for [the jury] to infer knowledge and intent on his part.   To have guilty knowledge, a defendant need not have known the full extent of the conspiracy, or all of the activities of . . . all of the conspiracy participants."   (Tr. 4170).   It was enough for the Government to prove—as it amply did—that Archer participated in the conspiracy unlawfully, knowingly, and willfully.

Archer further argues that the Government "did not present a single piece of direct evidence showing that [he] knew that the bond money was being stolen."   (*Id.* at 17).   That argument is directly contradicted by the evidence at trial, which, as described in further detail

---

[11]  Archer argues that he was "not on the boards (WA AG and Valorlife) that approved the acquisitions and funding of the investment advisers, and the government introduced no evidence that [he] proposed or knew of any conditions on that financing relating to buying bonds." (Archer Br. at 12).   But this argument misses the mark.   It simply does not matter whether Archer was on the Wealth Assurance-AG and Valorlife boards – he and his co-conspirators worked together to make sure that they could successfully purchase Hughes and Atlantic through their web of interconnected financial services companies.   (*See supra* Factual Background, sections II, V).   Moreover, the evidence, to include Archer's communications with Jason Galanis, demonstrated that the entire purpose of purchasing Hughes and Atlantic was so that the conspirators could control investment advisers that could purchase the WLCC bonds.   (*See supra* Discussion, II.A.).

28

below, supports the jury's conclusion that Archer knowingly participated in the fraudulent scheme, and that he did so from the very beginning and every step of the way.

The trial evidence made clear that Archer, along with Cooney, Jason Galanis, and others, was part of the core group of people attempting to create a financial services conglomerate to sell for a large profit.   (Tr. 906-09; 1321; 2160; 2171).   It was also well established at trial that Archer, Jason Galanis, and Cooney needed money to fund their acquisitions.   (*See, e.g.*, GX 2024, GX 2026, GX 2023 (July 5, 2014 email from Jason Galanis to Archer and Cooney, attaching a copy of the "Og[l]ala Trust Indenture," stating "my primary objective is to get us a source of discretionary liquidity. sick of begging.").   And so, as early as February 12, 2014, Jason Galanis emailed Archer and Cooney, identifying the source of funds—Raycen Raines and the WLCC.   (GX 2003).   On April 4, 2014, Jason Galanis emailed Archer and Cooney about one of the WLCC bond ideas that preceded the ultimate WLCC bond deal—the construction and operation of a winery and the purchase of a "single premium annuity to enhance tribal social services"—writing "$20mm bond approved.   Proceeds are *15mm to us* and 5mm to them for a winery investment they want to make."   (GX 2011) (emphasis added).   From these communications, the jury was entitled to draw the reasonable inference that the conspirators viewed any WLCC bond proceeds as *their* money ("15mm to *us*") to use however *they* wanted.

Such an inference was reinforced by subsequent communications amongst the conspirators about purchasing Hughes and moving the WLCC deal forward at the same time. For example, one month later, on May 9, 2014, Jason Galanis emailed Archer, Cooney, and Andrew Godfrey about the opportunity to purchase Hughes, attaching Morton and Richard Deary's resumes, and describing the firm as "$1.0 billion AUM. all fixed income. 52 clients. all institutional."   (GX 2018).   Dunkerley testified that "the primary reason for the purchase of

Hughes Capital was for the purchase of the bond issuances."   (Tr. 933).   A few weeks later, on May 20, 2014, Jason Galanis emailed Archer and Cooney again, forwarding an email with Tim Anderson about the WLCC bond deal and writing that he was "moving the $20MM sovereign nation debt issued."   (GX 1220).   And, communicating that the WLCC was confirmed to be interested in the deal, Jason Galanis wrote to Archer and Cooney on June 20, 2014, "Arch[,] the Indians signed two hours ago our engagement . . . Nothing for you to do at this point, but giving you a heads up.   The use of the proceeds is to place the bond proceeds into a Wealth Assurance annuity. . . . btw annuity proceeds get invested by an appointed manager on a discretionary basis on a 20 year contract.   Hercules has been appointed."   (GX 1235).   Two weeks later, on July 5, 2014, Jason Galanis reported back to Archer and Cooney that "we got US Bank to act as trustee for the bond issue," "GT is issuer counsel," "Tribe counsel met and approved the issue" and "shooting for end of month. lots to accomplish to finesse this over the line, im not *counting the money* yet . . . my primary objective is to get us a source of discretionary liquidity. sick of begging."   (GX 2026).   Archer responded, the same day, "Unreal!   This is just a testament to taking a portfolio approach to pursuing opportunity (aka the ping pong method).   Unreal as you never know where the nuggets pop up."   *Id.*   After Cooney responded with a picture of a Jack playing card, with the message "The Greek!" (GX 2024), to which Archer responded "Hahahahahahahahahahaha!," Jason Galanis wrote: "on a semi serious note, you guys as partners are enabling so much more and i am so eternally appreciative.   we've laid the foundation. as importantly we know the ground rules and the strengths and weakspots now. with some dry powder in our control soon, we will be scary effective."   (GX 2025).   Again, the same day, Archer responded, "Appreciate that Jack! And completely correct!"   (GX 2026).

Six days later, on July 11, 2014, Jason Galanis forwarded Archer the distribution list for the first WLCC bond issuance, writing, "close, archie" and "target close is July 31." (GX 2027). Archer responded, "[f]rom your lips to Gods ears! July 31 is right around the corner." (GX 2028). Jason Galanis promptly responded that they were "[s]o close," and that "Cliff"—a lawyer who worked with Archer's companies—"is running the stall for me on nyc mansion[.] I want to be here and won't live in a 1750 square foot cage[.] Massively motivated[.]" *Id.* Then, on July 16, 2014, Jason Galanis sent Archer and Cooney an executed term sheet for their purchase of Hughes, writing that the firm "manages $900 million on a discretionary basis for 28 institutional clients (pensions and endowments)." (GX 2029). Jason Galanis also wrote that "[w]e have agreed to give" Hughes "an opportunity to participate in native american new bond issues," and that he believed Hughes would take "$28 million of the Wakpamni/Ogala Sioux issue." *Id.* Archer responded, "This is very encouraging." (GX 2213).[12] From these communications alone, there was ample evidence from which the jury was entitled to infer Archer's inside knowledge about the how the scheme would be successful—the conspirators needed to first induce the issuance of the WLCC bonds, and then purchase Hughes, initially, and,

---

[12] Archer argues that the language "an opportunity to participate" in the bonds in GX 2213 could have been read innocently, from Archer's perspective, at the time it was received, and did not indicate that Jason Galanis and others planned to force Hughes to fraudulently purchase the bonds. (Archer Br. at 14). In doing so, Archer asks the Court to view this evidence in isolation instead of in conjunction with the totality of the Government's evidence and to draw its inferences in favor of the defendant. But that is, of course, not a proper way to view the evidence in the context of these post-trial motions. When viewing the evidence in its totality, to include evidence of the conspirators' early discussions regarding their need for liquidity in the context of the WLCC bonds (*see, e.g.*, GX 2023), the jury was entitled to draw the inference that the wording of the email, including Archer's response – "This is very encouraging!" – was just another method employed by the conspirators to put a façade of legitimacy over the various aspects of their fraudulent scheme.

later, Atlantic, to ensure the bonds would be purchased and that there would be proceeds that they could then control.

Even more evidence of Archer's knowledge could be found in emails from July and August 2014, as both the bond issuances and the Hughes purchase were being finalized.   For example, on July 19, 2014, Jason Galanis wrote to Archer that he was "in closing docs on $28mm with GT.   Close.   Could fall apart but close."   (GX 2031).   That same day, Jason Galanis wrote to Archer, "If I get this $28mm, I have 12-15mm to put into WAH."   *Id.*   Archer wrote back, "I'm not sure I can take anymore of the precious.   It's incredibly capital intensive greenfield work.   But let's discuss because there's also a lot of blue sky!"   *Id.*   On August 11, 2014, Jason Galanis wrote Archer and Cooney: "WAAG wired $2.78 million today to close Hughes."   (GX 2034).   Two days later, on August 13, 2014, Jason Galanis forwarded Archer and Cooney the CUSIP for the WLCC bonds, writing, "closing soon…."   (GX 1267).   The very next day, on August 14, 2014, Jason Galanis again wrote to Archer attaching materials regarding Fondinvest, stating that "Dan and Hugh have locked it up and came to me for the money, which I have agreed to arrange/provide (probably Indians)."   (GX 2216).   (This, only weeks after a June 27, 2014 email exchange regarding, the conspirators' purchase of Fondinvest in which Archer stated, "We need discretionary funds at our command soonest." (GX 2021)).   Archer responded, the same day, "Very interesting project.   Will read tonight when we wrap dinner and I get out of the bubble!"   *Id.*

Archer argues that it is not permissible to infer that the statement "(probably Indians)" referred to the WLCC bond proceeds and, even if it did, it was in the context of Jason Galanis "talking about investing the bond proceeds for profit" and did not permit the inference of fraudulent intent.   (Archer Br. at 33).   That argument misses the mark and ignores the context

32

of GX 2021.   For example, first, the very next day, on August 15, 2014, Jason Galanis emailed

Archer and Cooney with yet another update:   "Wilma Standing Bear and Geneva Lone Hill"—

representatives of the WLCC—"have fully executed the agreements."   (GX 2217).   This and

other communications support the rational inference that Jason Galanis's reference to "probably

Indians" was a direct reference to the WLCC bond proceeds that the conspirators expected to

receive.   Second, there is no dispute that the conspirators later took WLCC bond proceeds and

used them *to purchase Fondinvest*, just as they had discussed.   (Tr. 1042; GX 4009).[13]

Continuing to keep his co-conspirators updated on the progress of their scheme, on

August 30, 2014, Jason Galanis informed Archer that the second tranche of the first WLCC bond

issuances had closed, forwarding the Closing Statement and First Supplemental Indenture for the

bonds.   (GX 2035).   Then, on September 11, 2014, when the first bond issuance was

completely settled, Jason Galanis emailed Archer and Cooney a copy of the "WLCC tombstone."

(GX 2224).

Moreover, even while in the midst of forcing Hughes clients to purchase WLCC bonds,

the conspirators were planning to purchase yet another investment adviser—Atlantic.   (GX 2303

(August 28, 2014 email from Jason Galanis to Archer and Cooney, subject "we have a decent

shot of adding this one to the family," discussing Atlantic and attaching the Atlantic ADV).

And, there could be no question that Archer, Cooney and Jason Galanis had their eye on making

sure that Atlantic was able to take on more WLCC bonds so they could "sell" even *more* WLCC

---

[13]   Archer also argues that an investment in in Fondinvest was "consistent with the WLCC bond
documents and represented just the sort of private equity investment contemplated from the
start."   (Archer Br. at 33).   That argument does not pass muster.   There was no annuity, and
Archer knew that he and others were using the proceeds of the bond issuances for themselves
and not, as promised to the WLCC, to an annuity.

bonds for "more liquidity and sources for the various projects."   (*See* GX 2242 (October 30,

2014 email from Jason Galanis to Archer and Cooney, forwarding email from Morton regarding

Atlantic's purchase of WLCC bonds—several months before the conspirators purchased

Atlantic).   Additional communications from late 2014 through early 2015 made clear that

Archer and Cooney stayed up-to-date on the conspirators' efforts to purchase Atlantic.   (*See* GX

2037 (September 20, 2014 email from Jason Galanis to Archer attaching "Overview Atlantic

Asset Management.pdf," to which Archer responded, "Will review"); GX 1224 (September 22,

2014 email from Galanis to Archer and Cooney, forwarding Morton's communications with

Atlantic personnel regarding the potential purchase); GX 2063 (November 10, 2014 email from

Jason Galanis to Archer and Cooney, forwarding a seemingly encouraging message from an

Atlantic employee regarding the potential merger, and writing, "the below will add $11.5 million

to the empire," to which Archer responded, "Great message"); GX 2065 (November 20, 2014,

email from Jason Galanis to Archer and Cooney with the subject line "honey trail," attaching a

document containing multiple bullet points with the first bullet point stating: "Issuer Wakpamni

Lake/Oglala Sioux."); GX 1228 (February 2, 2015 email from Jason Galanis to Archer and

Cooney, forwarding revised Hughes-Atlantic Merger Agreement, and writing, "VERY close

boys"); GX 1282 (March 30, 2015 email from Jason Galanis to Archer and Cooney attaching

Atlantic deal documents and describing the deal structure); GX 2076 (April 2, 2015 emails

between Archer and Jason Galanis congratulating each other on the Atlantic purchase).

   Based on this evidence alone the jury could reasonably have inferred that Archer had

extensive knowledge about the scheme, its goals, and its progress from the very beginning and

through its various phases.   The jury also could reasonably have inferred that Archer willfully

participated in controlling all sides of the transaction—from the inducement of the WLCC, to

Burnham's role as Placement Agent, to the conspirators' control of Hughes, Atlantic, *and* the so-called annuity provider.

### B. The Evidence Established that Archer knew the WLCC Bond Proceeds Were Being Misappropriated, and Participated in the Misappropriation

Some of the same evidence, and additional evidence, supports the jury's reasonable inference that Archer knew the WLCC bond proceeds were being misappropriated and that he participated in the misappropriation.

From the very beginning, Archer knew that one of the goals of the scheme was that the conspirators would be able use the bond proceeds however they wanted.   Jason Galanis's April 4, 2014 email to Archer and Cooney—"$20mm bond approved.   Proceeds are *15mm to us* and 5mm to them" (GX 2011) (emphasis added)—hides absolutely nothing and demonstrates the cavalier way in which Archer and his conspirators treated and viewed the WLCC bond proceeds: money for them to use however they wanted.   When Cooney asked, "What do *we* get to do with the 15mm," Jason Galanis responded, to both Archer and Cooney, "Discretionary."   (GX 2120). Moreover, Archer was well aware that the WLCC bond proceeds were supposed to be placed in an annuity.   (*See, e.g.*, GX 1235 (June 20, 2014 email from Jason Galanis to Archer and Cooney, stating, "The use of the proceeds is to place the bond proceeds into a Wealth Assurance annuity.")).   But Archer, Jason Galanis, and Cooney continued to discuss how they planned to use the money for themselves.   (*See, e.g.*, GX 2024 ((July 5, 2014 email from Jason Galanis to Archer and Cooney about the WLCC bonds, writing "im not counting the money yet" and "my primary objective is to get us a source of discretionary liquidity. sick of begging."); GX 2031 (July 19, 2014 email from Jason Galanis to Archer, stating "If *I* get this *$28mm*, *I* have 12-15mm to put into WAH") (emphasis added); GX 2216 (August 14, 2014 email from Jason Galanis to Archer, writing ("Dan and Hugh have locked it up and came to me for the money, which I have

agreed to arrange/provide (probably Indians); GX 2035 (August 30, 2014 email from Jason

Galanis to Archer attaching the Closing Statement for the second tranche of bonds from the first

issuance, which allocated $2,228,847 to the purchase of an annuity).   The jury was entitled to

infer, from these ongoing communications alone, that Archer knew the conspirators intended to

use the bond proceeds for their own use, and not in an annuity for the benefit of the WLCC.

The jury could reasonably draw the inference that, because there was no annuity (Tr.

1092-93 (Dunkerley testimony)), Archer, who needed money for the roll-up and knew the bond

proceeds were going to be used to support the roll-up plan and not toward an actual annuity,

knew that the WLCC bond proceeds were being misappropriated.   The jury also, therefore,

could reasonably infer from the evidence that Archer participated in the misappropriation.

First, Archer helped Jason Galanis use the WLCC bond proceeds from the first bond

issuance to purchase a home in Tribeca at 260 West Broadway.   Archer argues that the evidence

was insufficient to show that he knew Jason Galanis was stealing bond money for the purchase.

(Archer Br. at 36).   But, again, Archer takes too narrow a view of the evidence.   For example,

on July 9, 2014, Clifford Wolff emailed Momtazi and Archer, with the subject line "Archer

Diversified TRG, LLC." to inform them that "Jason Galanis is going to purchase a condo using

the above name and Devon's cache [sic].   The company is using your office address."   (GX

2122).   Then, as described above, three weeks later, in the same communication about the

WLCC bond deal and the target close date of July 31, 2014, Jason Galanis tells Archer that they

are "so close. Cliff is running the stall for me on nyc mansion[.]   I want to be here and won't

live in a 1750 square foot cage[.] Massively motivated[.]"   (GX 2028).   The jury was entitled to

draw the inference that Archer, who knew that Jason Galanis was purchasing a property in New

York and was allowing Jason Galanis to use his name and "cachet" to do so, then knew exactly

how Jason Galanis planned to purchase the property with the WLCC bond proceeds that they were "so close" to getting.   Archer urges the Court to draw a different inference—that there was "no evidence" showing why Archer would interpret GX 2028 to mean that Jason Galanis planned to use WLCC bond proceeds to finance his purchase of the Tribeca home.   (Archer Br. at 39).   But when viewed in the context of the multiple other emails during the same time period about the conspirators' need for liquidity and their plan to use the WLCC bond proceeds to achieve that liquidity, the jury was entitled to infer that GX 2028 and GX 2122 established that Archer knew Jason Galanis planned to use the WLCC bond proceeds to purchase a home.

Archer's argument that GX 2028 could be read to imply that Jason Galanis was going to *earn* WLCC bond proceeds as legitimate compensation for his role in the bond deal (as opposed to *steal* the bond proceeds, as he did), should also be rejected.   (Archer Br. at 40 (GX 2222)).   This is simply another instance of Archer asking the Court to draw all inferences in *his* favor— and not the Government's, as is required now that the jury has returned its verdict.   The only evidence Archer points to in support of his inference is a September 2014 email exchange regarding Archer lying to Jason Galanis about defending him to the BIT Board in which Galanis responded, "Super comforting arch, especially as I take the tribeca plunge.   Got to earn to keep up with my rapper spending!"   (GX 2222).   Again, when viewed in the context of all of the other evidence, the jury was entitled to draw the inference that Jason Galanis's use of "earn" did not refer to a legitimate method of earning money, but the method Archer and Galanis were planning together to use—stealing the bond proceeds.

Second, Archer participated in the further misappropriation of the WLCC bond proceeds when he used the proceeds from the first bond issuance to purchase even more bonds.   There is no dispute that Archer purchased $15 million of WLCC bonds in October 2014 through RSB, an

entity he controlled.   Instead, Archer argues that there was no evidence that (a) he made or was aware of any misstatements to the WLCC in connection with this purchase, or (b) he knew the money used to pay for them had come from the misappropriated proceeds of the first issuance. (Archer Br. at 41).   As an initial matter, to sustain a conviction against Archer for conspiracy to commit securities fraud, the Government did not need to prove that Archer himself made materially false statements to the WLCC.   It was sufficient to show that Archer knowingly joined the conspiracy, even if it was other members of the conspiracy—like Jason Galanis and John Galanis—who made the materially false statements.   In any event, there was sufficient evidence for the jury to conclude that Archer was aware of misstatements being made to the WLCC.   As the Court instructed, "the reasonably foreseeable acts or statements of any member of the conspiracy, committed in furtherance of the common purpose of the conspiracy, are deemed, under the law, to be the acts or statements of all the members, and all of the members are responsible for each act or statement[.]"   (Tr. 4176).   In light of the evidence that there was no real annuity and that Archer, Jason Galanis and Cooney planned to steal the bond proceeds from the beginning, the jury was entitled to infer, of course, that the lies being told to the WLCC to induce the bond issuances were foreseeable to Archer.

As for Archer's knowledge of the origin of the $15 million dollars that Jason Galanis gave him to purchase the WLCC bonds—there was sufficient evidence for the jury to conclude that Archer knew he was purchasing the bonds with recycled bond proceeds from the first bond issuance.   Less than two weeks after the first WLCC bond issuances closed, on September 8, 2014, Archer and Jason Galanis were communicating regarding Archer's purchase of additional bonds.   Jason Galanis emailed Archer with an update:   "arch[,] the tribe and GT want to close on the 18th, which is next thurs.   we would need to wire to cliff this week so he can wire to you

38

on Monday I would think. . . . Morgan Stanley will hold $15,000,000 of your municipal portfolio.   you will diversify it over time."   (GX 2223).   It was no secret that, to fund Archer's purchase of the bonds, Jason Galanis was transferring $15 million to Archer via Cliff Wolff. (*See, e.g.*, GX 2300 (September 24, 2014 email from Momtazi to Jason Galanis, Wolff, and Archer regarding transaction details, including wire instructions); GX 2115 (September 24, 2014 email from Jason Galanis to Archer, Wolff and Momtazi, forwarding a security alert from Jason Galanis's Chase back account for a wire transfer of $15,000,000); GX 2112 (September 25, 2014 email from Jason Galanis to Momtazi, Archer and Wolff regarding wire instructions and RSB's origination of the trade to purchase the bonds)).   In light of Jason Galanis's numerous communications bemoaning his need for money and desire to use of the WLCC bond proceeds (*see, e.g.*, GX 2023, GX 2024, GX 2025, GX 2026), the jury was entitled to infer that Jason Galanis did not just have $20 million dollars – $15 million to Archer and $5 million to Cooney— to give his friends to purchase Native American bonds.[14]   From this evidence alone the jury could reasonably infer that Archer, having been kept in the loop every step of the way, knew that the money used to pay for the $15 million of WLCC bonds he purchased through RSB had come from the misappropriated proceeds of the first issuance.

But there was even more evidence of Archer's knowledge in his continuous involvement with every aspect of this purchase of the WLCC bonds.   (*See, e.g.*, GX 2039 (September 29, 2014 email from Momtazi to Driever, copying Archer and blind carbon copying Jason Galanis,

---

[14]  Archer further argues that the evidence at trial demonstrated that Jason Galanis held himself out to be wealthy and successful, and, therefore, Archer could not have known that the $15 million Jason Galanis gifted him to purchase $15 million in worthless WLCC bonds came from misappropriated bond proceeds.   (*See* Archer Br. at 49-51).   But this argument is also contradicted by the record evidence of Jason Galanis's communications about being desperate for and wanting more money.

with directions for the bond purchase, including CUSIP and transaction details); GX 2041
(September 29, 2014 Momtazi and Jason Galanis emails, copying Archer, regarding bond
transaction logistics); GX 2042 (September 29, 2014 email from Archer to Momtazi and Jason
Galanis regarding transferring the bonds to Morgan Stanley); GX 2043 (September 29, 2014
email from Archer to Jason Galanis and Momtazi, asking if they knew "Keith," a representative
of U.S. Bank, the trustee for the bonds, and "does he know anything?").   Well before the
transaction closed, on September 24, 2014, Archer signed a letter stating that RSB was a
sophisticated investor who was purchasing the bonds for investment purposes and could afford a
complete loss of the investment.   (GX 281).   On September 30, 2014, when the transaction *still*
had not closed, Archer and Momtazi were trying to decide whether to work with Deutsche Bank
instead of Morgan Stanley to conduct the purchase.   (GX 2045).   When Momtazi asked Archer
if they should give the purchase information to Deutsche Bank "and see if they can do it in
theory," Archer wrote: "Yes.   But looks like we'll get it done with MS first and we can move it
if need be.   No issue asking DB though.   Don't say amount yet."   *Id.*   On October 1, 2014,
Jason Galanis proposed a solution to effecting the purchase, and Archer responded, "Agreed.
Instruct."   (GX 2047).   Archer also emailed Momtazi and Jason Galanis later that day, reporting
that "I initiated the wire and awaiting voice confirm."   (GX 2049).   In fact, consistent with
Jason Galanis's September 8, 2014 email, and as described above, $15 million of bond proceeds
from the first issuance were transferred from WAPCC to Thorsdale and then from Thorsdale to
the Wolff Law Firm and then from the Wolff Law Firm to RSB, which Archer then used to buy
his portion of the second tranche on or about October 1, 2014.   (*See* GX 4004 at 7).   Based on
these emails and transactional details alone, the jury could have reasonably inferred that Archer
knew he was purchasing additional WLCC bonds with proceeds misappropriated and recycled

from the first bond issuance.

Yet there was even more evidence that Archer knowingly participated in this fraudulent transaction in the form of Archer's multiple false statements to Morgan Stanley and Deutsche Bank regarding the WLCC bonds—false statements designed to conceal the true origin of the funds he used to purchase the bonds.

### C.  Archer's Lies to Morgan Stanley and Deutsche Bank Provided Additional Evidence of his Knowing and Willful Participation in the Scheme

The jury was also entitled to infer that Archer's multiple false statements to Morgan Stanley and Deutsche Bank in connection with his purchase of the WLCC bonds were in furtherance of the scheme and part of his (and his co-conspirators') efforts to conceal the fraudulent nature of the transactions.   There is no dispute that on October 7, 2014, Driever emailed Archer with a list of questions about the Wakpamni bonds, including, "How was the $15mm generated that was used to purchase the bonds?"   (GX 344).   Archer responded, "$15mm was generated through the sale of real estate[.]"   *Id.*   There is no dispute that the $15 million that Archer used to purchase the second issuance of WLCC bonds was not, in fact, from real estate proceeds but, instead, misappropriated proceeds from the first bond issuance.

Archer argues that his statement to Morgan Stanley was not a lie because "Jason Galanis cultivated in those around him the perception that a significant portion of his wealth came specifically from his real estate holdings and dealings," and, therefore, "a rational juror could not have concluded that [he] was lying when he told Morgan Stanley that—as far as he knew—the $15 million used by RSB to buy the bonds was generated through Jason Galanis's dealings in real estate."   (Archer Br. at 52).   This argument is confounding.   To begin with, it misrepresents the record at trial.   Archer did *not*, in fact, tell Morgan Stanley that "*as far as he knew*" the $15 million used by RSB to buy the bonds was generated through "*Jason Galanis's*

41

*dealings*" in real estate.    Archer told Morgan Stanley, unequivocally, that "$15mm was generated through the sale of real estate."    (GX 344).    He concealed the true origin—Jason Galanis and, the jury was entitled to conclude, the WLCC bond proceeds—to hide the fraud. Moreover, there was no evidence that Jason Galanis had obtained the $15 million from the sale of real estate, or that Archer had a reasonable belief that the $15 million Jason Galanis transferred to him came from some sort of real estate deal.

Then, on October 20, 2014, Archer lied again to Morgan Stanley in connection with the Client Representation Letter that Morgan Stanley required before it would hold the bonds for Archer.    (*See* GX 352).    The Client Representation Letter, which Driever filled out and Archer signed, stated that "The funds used to purchase the bonds were from real estate sales through my business, Rosemont Seneca Bohai, LLC."    (GX 352).    Faced with more devastating evidence of his lies to Morgan Stanley, Archer argues that (a) Driever authored the misstatement herself and did not, in fact, communicate with Archer before filling out the form, and (b) Momtazi, not Archer, signed the letter.    (Archer Br. at 53-56).    Archer's, arguments, again, cast the evidence in the light most favorable to Archer and not, as is required, to the Government.    Although Driever could not remember the specific conversation in which Archer provided her with this information, she testified that that she "would not have written something that a client did not say."    (Tr. 867).    Based on this testimony, the jury could have reasonably inferred that Driever, the ultra-careful and nervous Morgan Stanley employee whose practice was to write only what a client had told her, had a conversation with Archer in which he represented to her unmistakably that "[t[he funds used to purchase the bonds were from real estate sales through his business, Rosemont Seneca Bohai, LLC."    Moreover, regardless of whether Archer himself physically signed the letter, he was copied on the email Momtazi sent to Driever with the signed form and

knew that the misrepresentation was being made and signed with his name.   (GX 352).

Archer also told the same lies to Deutsche Bank.   On October 7, 2014, responding to an inquiry about what steps Archer would need to take to have the WLCC bonds held at Deutsche Bank, a Deutsche Bank representative emailed Archer, "How did the entity come to own these bonds?"  (GX 1226).   Archer responded, "Real Estate Sale."   *Id.*   The jury was entitled to draw the inference from this that Archer's repetition of the lies he told to Morgan Stanley was again in an effort to conceal the true story of how the bonds were purchased—using $15 million of proceeds from the first bond issuance, wired from Jason Galanis to Archer's lawyer, and then to Archer's company, RSB—so that he could successfully purchase $15 million of the second bond issuance in furtherance of the fraudulent scheme.

Archer's additional assertion that even if a juror could conclude that he lied to Morgan Stanley, such a conclusion would not support the inference that he knew Jason Galanis was stealing the bond proceeds (Archer Br. at 56), is undermined by the totality of the evidence.   In particular, evidence of (a) Archer's early knowledge of and participation in the scheme, (b) Archer's knowledge of the plans to misappropriate the bond proceeds, (c) Archer's simultaneous lies to the BIT Board (*see infra* Discussion, section II.D.), and (d) Archer's efforts to cover up the WLCC bond scheme (*see infra*, Discussion, section II.E.), supports the rational inference that Archer's lies to Morgan Stanley (and Deutsche Bank) evinced his knowledge of the misappropriation that helped him to acquire $15 million of WLCC bonds.

### D.  Archer's Lies to the BIT Board Provided Even More Evidence of His Knowing Participation in the Scheme and His Efforts to Cover Up his Crimes

The jury was also entitled to reasonably conclude that Archer's repeated lies to the BIT Board provided even *more* evidence of his knowledge and participation in the fraudulent scheme, as those lies helped to cover up the scheme and keep it going.   After months of questions and

43

inquiries from the BIT Board about Jason Galanis and his involvement in Burnham, on

September 5, 2014, Archer told the BIT Board:

> We have represented to you that Jason Galanis has never been, and
> will not become, an officer, employee, consultant, director or
> member of the management of either Burnham Financial Group.
> Inc. ("BFG") or Burnham Securities, Inc. ("BSI," and with BFG
> and BAM, the "Burnham Group").   CORFA and BAM Holdings
> will continue to abide by the above commitment.   In addition, Mr.
> Galanis will not be sourcing any type of transaction to the
> Burnham Group or any member thereof.

(GX 760).   The very next day, Archer emailed Jason Galanis, reporting that, "I sent a letter back

to BIT yesterday saying I can't deny doing business with you basically . . . take it or leave it."

(GX 2221).   Three days later, Archer and Jason Galanis were together in the midst of

negotiating the purchase of the second WLCC bond issuance, a deal that Jason Galanis was

directly involved with as the point of contact for Burnham.   (*See* GX 2223 (September 8, 2018

email from Jason Galanis to Archer regarding $15 million purchase of WLCC bonds); GX 213

(Placement Agent Agreement for the second bond issuance, purchased by Archer, listing Jason

Galanis as the point of contact for Burnham).   Notwithstanding Jason Galanis's continued and

ongoing role at Burnham and involvement in sourcing deals Burnham worked on, Archer, on

September 26, 2014, perpetuated the lie.   Asked to confirm that "Mr. Galanis will have no

interest of any kind, direct or indirect, in any of the Burnham entities or their successors, that he

will not source deals to the Burnham entities and that the Burnham entities will not invest with or

in, directly or indirectly, any business or enterprise in which Mr. Galanis has any association,

affiliation or investment, pecuniary or otherwise, directly or indirectly," Archer responded,

"Confirmed."   (GX 762).

Then, days later, on October 1, 2014, the very same day that he purchased the WLCC

bonds, Archer, at a meeting with the BIT Board, agreed that "Jason Galanis will not be involved with any of the Burnham entities or their 'affiliated persons,'" "will have no interest of any kind, direct or indirect, in any of the Burnham entities or their successors," and "will not source deals to the Burnham entities, and the Burnham entities will not invest with or in, directly or indirectly, any business or enterprise in which Mr. Galanis has any association, affiliation or investment, pecuniary or otherwise, directly or indirectly."   (GX 763).   Also that day, Jason Galanis emailed Archer and Cooney providing them with an update from Hugh Dunkerley regarding New Line Trading, stating that he was "Frenetic" and "Working Fondinvest and Atlantic.   Will report.   Couple other snivelies percolating."   (GX 2052).   Having also purchased the WLCC bonds that same day, Archer responded "Big accomplishment today" and toasted Jason Galanis and Cooney with a "remote chug of wine beer or shot!"   *Id.*

Archer continued to hide Jason Galanis's involvement in Burnham from others.   (GX 2066 (December 19, 2014 email from Archer to Matt Nordgren, stating, "Over at Burnham.   We have some regulatory issues with JG so can't mention his name.").   In other words, at the very same time that Archer was working with Jason Galanis and others to fund the acquisition of Atlantic so that it could purchase additional WLCC bonds and become part of the Burnham mega-company, Archer was hiding Jason Galanis's involvement to the BIT Board and others. Then, on October 19, 2015, after Jason Galanis's arrest, Archer had the audacity to thank the BIT Board for their insistence that Jason Galanis not be involved in Burnham.   (GX 782).   That day, he also told the BIT Board that the group of investors seeking to purchase Burnham had changed its plans, and revealed to the BIT Board that the financing for the purchase was to have come from Wealth Assurance, AG, or Valor, and that Jason Galanis was an advisor to the board of that entity.   *Id.*   Archer further told the BIT Board that "since they *now* intended to sever all

45

connections with any firms associated with Mr. Galanis, it was no longer possible to finance the operations of BSI or proceed with that transaction." *Id.*   In other words, in complete violation of his 2014 promises to the BIT Board that Jason Galanis would have "no involvement" with Burnham, Archer finally admitted to the BIT Board that he had planned to have a Burnham entity acquired by a company that Jason Galanis advised.

Finally, in February 2016, Archer met with the BIT Board one more time, and, again, lied to them.   He told the BIT Board that he had "no involvement whatsoever" with the events described in the SEC's complaint against Atlantic Asset Management.   (GX 784).   Archer denied his involvement with Atlantic and its purchase of the WLCC bonds notwithstanding his extensive involvement with the purchase of Atlantic for the purpose of placing more WLCC bonds.   Of course, Jason Galanis was intricately involved in the conspirators' purchase and control of Atlantic and forceful use of an Atlantic client's funds to purchase the entirety of the third bond issuance—in direct contravention of Archer's promise to the BIT Board that Jason Galanis would have no involvement with Burnham.   It was all part of the common scheme.

Archer makes several arguments in an attempt to discount this devastating evidence, all of which were rejected by the jury.   Archer's argument that his statements to the BIT Board were technically true because of the way the conspirators structured the deals to eliminate Jason Galanis's on-paper involvement and, therefore, he did not lie to the BIT Board (Archer Br. at 60) should be flatly rejected, as it is wholly undercut by the overwhelming evidence of Archer's ongoing blanket misrepresentations to the BIT Board that Jason Galanis would have "no involvement" in any way with Burnham.   In any event, the way that Archer, Jason Galanis and their co-conspirators *actually* did business was different than how it looked on paper, and the jury was entitled to infer that Archer's obfuscations to the BIT Board in the context of his (and

46

Burnham's) ongoing relationship with Jason Galanis undercut the "literally true" argument.

Archer further argues that the evidence was insufficient to prove that his statements to the BIT

Board were evidence of fraudulent intent.   (Archer Br. at 60).   However, Archer's lies to the

BIT Board in the face of his and Burnham's ongoing involvement with Jason Galanis and the

WLCC bond scheme were highly probative of his knowledge and intent—especially in light of

the defense's argument that Archer was somehow duped by Jason Galanis.   The jury was

entitled to draw the reasonable inference that the fact that Archer was willing to repeatedly

minimize and lie about Jason Galanis's role is evidence of Archer's willful participation in the

scheme and his efforts to keep it concealed.

### E.  Archer's and his Co-Conspirators' Efforts to Cover Up Their Crimes Were Powerful Evidence of Archer's Knowledge and Intent

The jury was also entitled to reasonably conclude that Archer's additional efforts to cover

up the WLCC bond scheme—on top of his lies to the BIT Board—provided additional evidence

of his knowledge and participation in the fraudulent scheme.

First, there can be no dispute that Archer helped make the interest payment due to the

Hughes pension fund clients in September 2015.   On September 1, 2015, Jason Galanis sent

Archer wire instructions for a transfer to Wealth Assurance Private Client Corp. with the promise

that "if you get this out today, I am assured we can turn it today."  (GX 2121).   That day,

Archer sent Wealth Assurance Private Client Corp. $250,000, which was then promptly used to

pay the interest payments on the first round of bond issuances.  (GX 4010).   And, the testimony

at trial established that Jason Galanis told Francisco Martin that "Devon Archer made a

payment" to pay interest on the bonds.  (Tr. 2170).   Archer's argument that the Government

failed to prove that he knew he funded a bond interest payment or that he did so knowing that

Jason Galanis had misappropriated the bond proceeds (Archer Br. at 71-72) again views the

47

evidence in isolation and not as a whole.   After having participated for more than a year in multiple aspects of the fraudulent scheme, Archer, seemingly out of nowhere, transferred $250,000 to the shell company WAPCC just in time for the first interest payment to be made on fraudulently induced and fraudulently purchased WLCC bonds.   The jury was entitled to infer that this was absolutely no coincidence, and merely another step taken by Archer to help ensure that the house of cards did not fall.

Second, Archer, with Dunkerley's help, worked to paper over the $15,000,000 transfer from Thorsdale to RSB that funded his purchase of the second WLCC bond issuance as a "loan" to RSB by Calvert, the shell company created by Francisco Martin on October 1, 2015. Dunkerley testified about signing a loan agreement from Calvert, backdated August 23, 2014 (before Calvert even existed) suggesting that Calvert invested $15 million in RSB.   (Tr. 1059; GX 1577).   On November 25, 2015, after their scheme had begun to unravel, Archer emailed Mark Waddington at VL Assurance, writing that the WLCC bonds "are to be replaced / returned to Calvert," and "I think the consensus is we would like to return these bonds to the lender and beneficial owner in the quickest orderly manner possible."   (GX 2119).   This suggestion by Archer that "Calvert" was the "lender and beneficial owner" of the bonds was obviously false, given that Calvert did not exist until a year after Archer purchased his bonds, and was part of the Calvert cover story created as Archer and his co-conspirators desperately tried to continue to hide the scheme.

Finally, Archer took the helm upon Jason Galanis's arrest, and was intricately involved in "damage control" immediately after the arrest of his "dear friend."   (GX 2102).   On September 25, 2015, Archer emailed Cooney, Jason Sugarman, and Andrew Godfrey a list of "Immediate issues" for "immediate discussion" after the "unfortunate event[]" of Jason Galanis's arrest.   *Id.*

Among the "immediate issues" Archer listed were the following: "Indian bond due diligence & closing ???"; "Damage control . . . who are the main folks we need to pre empt with a call . . . what's our consistent messaging???"; a "$309k funding requirement for Sept 30"; the "far too expensive" office in New York City that "absolutely needs support from Valor"; and "Atlantic funding request??? Michelle mine as well be asking for $1 billion (are they solvent?)."   *Id.* From this detailed list of outstanding items, sent by Archer within a day of Jason Galanis's arrest, the jury could reasonably conclude that Archer had extensive knowledge of the operational aspects of the bond scheme—to include the needs of the entities, like Atlantic, that were involved in the roll-up plan.   Moreover, the jury was entitled to conclude that Archer's willingness to jump in and take over Jason Galanis's role reflected his desire to protect and cover up the scheme for as long as possible.[15]

### F.  Archer's Additional Arguments for an Acquittal Are Meritless

Archer makes a series of additional arguments that should each be rejected.

First, Archer argues that the bond issuances "carried outward appearances of legitimacy" and, therefore, a rational juror could not have concluded that Archer knew the bond issuances were a fraud.   (Archer Br. 20).   Archer made this argument to the jury, which flatly rejected it. The Court, too, should reject this argument for several reasons.   As an initial matter, the evidence described above demonstrates that Archer knew far more about the WLCC bond

---

[15] Jason Galanis did not completely disengage.   On October 2, 2015, Jason Galanis forwarded – using the "clean" email account set up for him by Francisco Martin to avoid law enforcement detection, legal@colarisventures.com – to Archer directions for appointments to Atlantic's board.   (GX 1453; Tr. 2181 (Martin testimony)).   Jason Galanis maintained some involvement even in the aftermath of his arrest, which was all the more reason for Archer, among the select few co-conspirators to receive emails from Jason Galanis's secret email account, to cover up their crimes.

issuances, placement, and proceeds than anyone on the outside. For example, Archer knew that he and his co-conspirators were in control of (a) the bond issuances (as the Placement Agent) and, later, as the purchaser of $15 million in WLCC bonds, (b) Hughes and Atlantic (as the investment advisers who purchased the bonds for their clients), and (c) the bond proceeds (through WAPCC). This information—that Archer and his co-conspirators were on all sides of the deal—was not provided to people like Tim Anderson, on whose testimony Archer relies for his argument (Archer Br. 22-24). Also, unlike Archer, Anderson did not know that the purpose of the bond issuances was so that the conspirators could fund their roll-up plan. And Anderson did not know that Archer received the money to purchase the WLCC bonds from Jason Galanis (and from the proceeds of the first bond issuance) and was not present for all of Archer's lies to Morgan Stanley, Deutsche Bank, and the BIT Board in connection with the WLCC bonds and the conspirators' roll-up plans. Therefore, any argument that Archer was in the dark because his co-conspirators did what they could to create an aura of legitimacy to the outside world is nonsensical when viewing the evidence as a whole.

Second, Archer's argument that his "alleged motive—to see his shares of Wealth Assurance Holding appreciate—does not support the inference that he knowingly and intentionally participated" in the scheme (Archer Br. at 24) takes too myopic a view of the evidence and arguments advanced by the Government at trial. From the beginning, the Government was clear that Archer's participation in the fraud was as a result of his and his co-conspirators' desire to purchase various financial services companies to combine them into a conglomerate that could be sold at a substantial profit. Archer urges the Court to isolate evidence of his motive to (a) his $15 million purchase of WLCC bonds with misappropriated bond proceeds, (b) the $700,000 in bond proceeds that were funneled through his account, and

(c) his receipt of more than $5 million of shares in Wealth Assurance Holdings as three different

events.   (Archer Br. at 24-25).   But, as described above, Archer's $15 million purchase of

WLCC bond proceeds and the funneling of $700,000 through his account were all steps taken in

furtherance of his and his co-conspirators' goal to use the bond proceeds to fund and prop up

their financial services conglomerate before they could sell it for a profit.   Given Archer's

ownership interest in Burnham and his ownership of $5 million worth of WAH shares, he stood

to profit substantially if and when he and his co-conspirators could sell the combined company to

others.

Third, Archer argues that the evidence was insufficient to show that he knew the WLCC

bonds were being improperly used to boost Burnham Securities' net capital.   (Archer Br. at 67).

Archer does not dispute that a portion of the bonds that RSB purchased were transferred to

Burnham and then used to meet Burnham's net capital requirements.   (Archer Br. at 68).

Archer's argument that this was not evidence that a jury could rely upon in convicting him again

ignores the totality of the evidence.   In furtherance of the scheme, and to make it look to the

WLCC that there was legitimate market interest in the bonds so that it would continue to issue

more bonds, Archer stepped in as a purported legitimate purchaser of $15 million of bonds

purchased using bond proceeds from the first bond issuance.   In doing so, Archer lied to Morgan

Stanley and Deutsche Bank about the source of the proceeds for the purchase.   Then, Archer

authorized the transfer of WLCC bonds to Burnham (GX 2075), and the bonds were placed on

Burnham's books only weeks after Burnham fell below its 120% early warning mark for net

capital—a mark that FINRA used to monitor firms that were getting close to net capital

deficiency (and which, if they failed to raise capital, would have to cease operations).   (GX 1076

(Burnham reporting to FINRA that it had been below 120% of its net capital requirement on

51

April 20, 2015); Tr. 2074-76; (GX 1080 (WLCC bonds used toward Burnham's net capital in

May 2015)).   The WLCC bonds then helped Burnham regain and maintain net capital

compliance until FINRA determined that the bonds were not appropriately counted toward net

capital.   (GX 1078; Tr. 2098-99).   That determination caused Burnham to provide another

notification to FINRA, this time showing that, without the WLCC bonds, Burnham had been net

capital deficient for more than *four months*.   (GX 1078).   The evidence also demonstrated that

Archer was, around the same time as his transfer of WLCC bonds to Burnham, well aware of

Bonwick's net capital problems and made sure that Bonwick—another Burnham roll-up entity—

would get a timely transfer of funds to meet its net capital requirements.   (GX 2092 (emails with

Archer regarding transfer of bonds to Bonwick), GX 2095 (same), GX 2097 (July 1, 2015 email

from Archer to Momtazi, Godfrey, and Wool regarding "Bonwick transfer," writing "Can we all

get on the same page about what we need to transfer funds to Bonwick for their requirements

today.").   From this evidence, taken in its entirety, the jury was more than entitled to infer that

Archer knowingly used the fraudulently-purchased WLCC bonds to help prop up Burnham so

that it did not fail before the time came for the ultimate Burnham conglomerate sale from which

he and his conspirators would reap substantial profits.

### G.  The Jury's Verdict was Supported by Ample Evidence of Archer's Knowing Participation of the Scheme

The Court should also reject Archer's Rule 33 argument that the jury's verdict was

unsupported by the evidence.   (Archer Br. at 74).   The jury's verdict was supported by ample

evidence, as described above, of Archer's knowing participation in the fraudulent scheme from

beginning to end.   Archer's arguments to the contrary are belied by the clear record.

First, Archer's argument that he did not know the WLCC bond proceeds were being

stolen because Jason Galanis controlled the flow of information and kept him out of the loop (*see*

52

Archer Br. at 75) ignores the quantity and type of information Archer *did* receive from Jason

Galanis.   The overwhelming evidence demonstrated that Archer was, in fact, one of the few

people whom Jason Galanis kept *in the loop* at every stage of every key transaction in the

scheme.   (*See supra* Discussion, Section II.A. (describing examples of communications among

Jason Galanis, Archer and Cooney throughout the scheme)).   Evidence of Archer's (a) pattern of

lies to banks about the WLCC bonds, (b) pattern of lies to the BIT Board about Jason Galanis's

involvement with Burnham, and Archer's involvement in the Hughes-Atlantic merger for the

purpose of purchasing additional WLCC bonds, and (c) efforts to cover up the fraudulent scheme

through, among other methods, contributing to the interest payment on the first issuance of

WLCC bonds and use of fake documents to paper over RSB's WLCC bond purchase, all

provided ample evidence to support the jury's verdict that Archer knowingly joined the

conspiracy and knowingly participated in the scheme.

Second, Archer's argument that he was somehow used by Jason Galanis, Cooney, and

others for his money and connections (Archer Br. at 78) falls flat in light of the record evidence

that Archer *knew* they were trading on his connections (*see, e.g.*, GX 2211 (June 1, 2014 email

from Jason Galanis to Archer and Cooney regarding a Wealth Assurance audit report, and

stating, "With Archie's new 'enterprising' global profile, having full control over this platform

would lead to world domination on p/e trades we are looking to do.   Aligns the media and

political stature Mr. Archer now enjoys with the financial stature.   Add the golden smile, and we

could be massively effective."); GX 2059 (October 28, 2014 email from Jason Galanis to Archer

and Morton, encouraging Archer to "disclose how you see your partner Hunter involved . . . That

will help frame things for [Morton] so she can approach our pension fund clients."); GX 2078

(April 14, 2015 emails between Archer and Jason Galanis regarding an Atlantic founding

partner, Don Trotter, during which Archer asks, "How do we get ahead of Don Trotter? Anything to do now?," and Jason Galanis responds, "feels like the plan is winning hearts and minds through a full preppy assault on the connecticut [sic] contingent")).

Third, whether Archer invested his own money into the Burnham-Valor Group roll-up plan is inapposite.   What matters is that Archer expected to gain considerable profits from the sale of the conspirators' financial services conglomerate, and acted in accordance with that expectation throughout his participation in the WLCC bond scheme.   Archer and Jason Galanis even communicated about the expected payout on the heels of the closing of the first bond issuance and while discussing their potential purchase of Atlantic.   (GX 2222 (September 6, 2014 emails between Archer and Cooney, discussing their need for money, with Jason Galanis reassuring Archer that "This chapter will be the real earner now.")).

Fourth, Archer's suggestion that he was not involved in the scheme because, he argues, he was "not involved in any misrepresentations" to the WLCC or pension fund victims should be rejected.   Whether Archer had any contact with the WLCC or pension fund victims, or ever spoke or met with members of the WLCC or pension fund victims, is of no moment.[16]   It was more than sufficient that Archer knowingly and willfully participated in the fraudulent scheme, and entered into the conspiracy, for the jury to have found him guilty.   Archer, like his co-conspirators, played a distinct role in the conspiracy, and did not need to be involved in every

---

[16] In any event, Archer did in fact sign a representation letter, which was sent to the WLCC, in which he warranted that RSB was a sophisticated investor, who was purchasing the bonds for "investment only" and not for resale, and that they could afford a complete loss of the investment.   (GX 281).   The jury was entitled to find that these statements were themselves deceptive, given that, in making them, Archer portrayed himself (through RSB) as a legitimate investor who was using its own funds to invest.

54

aspect of the conspiracy to be found guilty.   (*See* Tr. 4170 (Court's instructions regarding conspiracy)).

Finally, Archer's contention that he "stepped forward to save businesses" when the scheme fell apart, "while others tried to cover up their crimes," (Archer Br. at 82) pretends that those efforts were part of some altruistic effort of Archer's, rather than a concerted effort to cover up his participation in the crimes.   Indeed, the jury could reasonably have found that these efforts to were part of his "damage control" initiative and, like his post-Galanis-arrest lies to the BIT Board and his use of fake Calvert documents, designed to cover up his participation in the fraudulent scheme.   (*See supra* Discussion, sections II.D., II.E.).   Archer attempts to discount the Calvert evidence by arguing that GX 2119 only shows that "at some point after Calvert was created, someone told [him] that Galanis's bonds should be transferred there."   (Archer Br. at 83).   Archer's own language in GX 2119—stating that the WLCC bonds were to be "replaced / returned to Calvert" and, again, that he would like to "return these bonds to the lender and beneficial owner"—undermines that argument.   Calvert did not exist in October 2014, when Archer purchased the bonds, and there was no evidence that Calvert ever held the bonds such that they needed to be "returned / replaced" to Calvert.   Archer knew that because he purchased the bonds himself in October 2014, and never transferred them to Calvert.

The evidence was more than sufficient to support the jury's verdict and, as such, the Court should deny Archer's motion for a new trial.

### III.   <u>Cooney is Not Entitled to a Judgment of Acquittal or a New Trial</u>

Cooney moves for a judgment of acquittal and a new trial arguing that the Government failed to prove that Cooney was involved in either of two schemes: (a) the "first" scheme involving "the takeover of investment advisers and criminal breaches of fiduciary duty," and (b)

the "second" scheme involving the misappropriation of WLCC bond proceeds.   (Cooney Br. at 2-3).   In so doing, Cooney, like Archer, attempts to artificially divide a single overarching scheme into two parts and, for the same reasons stated above, the Court should reject the defendants' attempts to misconstrue the charged scheme.   Cooney further argues that the Government failed to prove that (a) he committed any deceptive or misleading act, (b) made any misleading statements or omissions, (c) employed any manipulative device or artifice to defraud, or (d) he had an intent to deceive.   (Cooney Br. at 16-22).   In other words, Cooney argues that the Government failed to prove that he knowingly and willfully participated in the charged scheme.   Cooney's arguments, like those of his co-defendants, misconstrue and ignore the applicable legal standards and the trial record.   When viewed as a whole, the evidence at trial was more than sufficient for a reasonable jury to conclude that Cooney (a) knowingly and willfully participated in the fraudulent scheme at its inception and throughout the scheme, (b) knew that the WLCC bond proceeds were being misappropriated, and participated in the misappropriation, (c) lied to City National bank in furtherance of the scheme, and (d) worked with Jason Galanis, Archer, and other co-conspirators to cover up their crimes.   Cooney's motions should be denied.

### A.  The Evidence Established that Cooney Knowingly and Willfully Participated in the Fraudulent Scheme, and Throughout its Many Phases

The evidence directly supports the jury's conclusion that Cooney knowingly participated in the fraudulent scheme.   Indeed the evidence showed that he did so from the very beginning and every step of the way.

Cooney and Jason Galanis were close friends and business partners, and Cooney, like Archer, was part of the core group of people involved in the roll-up plan.   (*See supra*

56

Discussion, II.A.)   Cooney participated in early communications with Jason Galanis and Archer about the group's need for money (*supra* Discussion, Section II.A. (GX 2024, 2026, 2023)), and about Raycen Raines and the WLCC bonds (*supra* Discussion, Section II.A.; GX 2003, GX 2011, GX 1220, GX 1125).   Indeed, on February 12, 2014, in response to an email from Jason Galanis about a communication from Bob Griffo of the U.S. Department of Treasury to Raycen Raines regarding the potential for tribal economic bonds issued by the Oglala Sioux Tribe, Cooney replied by stating "we will gladly help direct some of mr[.] griffo's funds."   (GX 2004).

Cooney was also involved in the group's purchase of Hughes for the purpose of placing the WLCC bonds.   (*Supra* Discussion, section II.A; GX 2018, GX 1220).   After receiving Jason Galanis's May 9, 2014 email about the opportunity to purchase Hughes, Cooney responded, the same day, "The Greek Machine gun continues to fire….." (GX 2018).   On June 3, 2014, Jason Galanis sent Morton a summary of COR Capital "to demonstrate who your financial sponsors are," and forwarded the same email to Cooney with the message, "whoring it out shamelessly." (GX 2212).   Cooney responded, "It has to be done!"   *Id.*

As the WLCC bond deal and the purchase of Hughes both progressed from June through August 2014, Cooney, like Archer, stayed involved, receiving and responding to Jason Galanis's numerous updates about the scheme.   (GX 1220; GX 1235; GX 2024; GX 2025; GX 2026; GX 2029; GX 2034; GX 1267).   In response to a July 16, 2014 update from Jason Galanis to Cooney and Archer about the executed term sheet for the Hughes acquisition, Cooney, the same day, wrote "West coast offense charging down the field!"   (GX 2030).   After receiving Jason Galanis's August 13, 2014 email to Archer attaching materials regarding Fondinvest, stating that "Dan and Hugh have locked it up and came to me for the money, which I have agreed to arrange/provide (probably Indians)" (GX 2216), Cooney responded to Jason Galanis, on August

57

14, 2015, "Another fantastic puzzle piece J!"   (GX 2215).   The next day, on August 15, 2014, Jason Galanis emailed Archer and Cooney with yet another update:   "Wilma Standing Bear and Geneva Lone Hill"—representatives of the WLCC—"have fully executed the agreements." (GX 2217).   Cooney responded, "This is pure Genius!! The Native American Bonds!! Great work here Greek!!"   *Id.*   On August 19, Cooney received an email from Jason Galanis containing a spreadsheet of the WLCC bond allocation to nine Hughes pension fund client accounts.   (GX 2299).   Then, when the deal was done, Cooney received a copy of the "WLCC tombstone."   (GX 2224).

Cooney also participated in and stayed apprised of the conspirators' plans to purchase Atlantic so that Atlantic clients could purchase more WLCC bonds, resulting in more WLCC bond proceeds for the conspirators' personal and business endeavors.   (GX 2303; GX 2242; GX 2063; GX 2065; GX 1228; GX 1282; GX 2076)).

Based on these communications alone the jury reasonably inferred Cooney's early and ongoing knowing participation in multiple aspects of the fraudulent scheme.   Cooney argues that "dozens of innocuous email threads" offered by the Government at trial were insufficient to establish Cooney's knowing and willful participation in the scheme.   (Cooney Br. at 17). However, the jury could reasonably have inferred that these emails showed Cooney's knowledge of and participation in multiple sides of the transaction—from the inducement of the WLCC, to Burnham's role as Placement Agent, and to the conspirators' control of Hughes *and* the so-called annuity provider.

### B.  The Evidence Established That Cooney Knew the WLCC Bond Proceeds Were Being Misappropriated, and Participated in the Misappropriation

Again, some of the same evidence and additional evidence supports the jury's reasonable inference that Cooney knew the WLCC bond proceeds were being misappropriated and that he participated in the misappropriation.

Cooney was well aware that a goal of the scheme was that the conspirators would be able to use the bond proceeds however they wanted.   (*See infra* Discussion, II.B; GX 2011, GX 2120, GX 1235, GX 2024, GX 2031, GX 2215).   The jury was entitled to infer, from these ongoing communications and Cooney's established relationship with Jason Galanis, that Cooney knew the conspirators intended to use the bond proceeds for their own use and not in an annuity for the benefit of the WLCC.

Cooney's knowledge of the misappropriation continued throughout the scheme, including through the conspirators' purchase of Atlantic so that they could "sell" additional WLCC bonds, which Cooney believed was "[v]ery promising."   (GX 2242; *see also* GX 2303; GX 2063; GX 2065; GX 1228; and GX 1282).   For example, the jury was entitled to infer that Cooney knew exactly what Jason Galanis meant when he emailed Cooney and Archer about the "honey trail" that would begin with the Wakpamni bonds—more money to be gained from the WLCC bond proceeds.   (GX 2065 (November 20, 2014 email from Jason Galanis to Archer and Cooney with the subject line "honey trail," and an attached document containing multiple bullet points with the first bullet point stating:   "Issuer Wakpamni Lake/Oglala Sioux.")).   On January 12, 2015, Jason Galanis forwarded Cooney an email exchange about a wire transfer to Thorsdale, suggesting that it was "stressful" to be waiting on the transfer, and Cooney responded, "Super stressful having no liquid honey."   (GX 2253).

Moreover, the jury was entitled to conclude that Cooney knew about the misappropriation because he participated in it.   First, Cooney received $75,000 of bond

proceeds from the final bond issuance that was purchased with money from OSERS, the Atlantic

client and pension fund who was forced to purchase the entirety of the third series of bonds.

(GX 4009).   Cooney received the money directly from Wealth Assurance Private Client

Corporation, the shell company set up to receive the bond proceeds.   *Id.*   On April 28, 2015,

Cooney's business manager at Fulton Meyer emailed him asking, "Was the wire from Wealth

Assurance a loan?"   (GX 3250).   Cooney responded, "Yes.   Please add up all loans from

wealth assurance and [T]horsdale for the past couple years."   *Id.*   But, of course, it would make

no sense at all for "Wealth Assurance"—which was supposed to be an insurance company—to

make personal loans to any individual, much less to Jason Galanis's personal friends and

business partners.   The jury was entitled to conclude that Cooney knew he was receiving money

from the shell company set up to receive the bond proceeds, and was lying to his business

manager about having received a "loan" in order to conceal the fraud.

Second, Cooney's sham "purchase" of 1920 Bel Air was still more evidence of his

participation in the misappropriation.   With respect to the sham transaction involving 1920 Bel

Air, the evidence at trial indisputably established that on November 12, 2014 Cooney received

$3,895,000 in bond proceeds from the WAPCC account, and immediately forwarded the money

to an escrow account, purportedly for the purchase of 1920 Bel Air, Jason Galanis's home, and

then again immediately authorized its transfer for use in the purchase of Vaudoise.   (GX 4007).

Cooney asserts that the "trial evidence" was "replete with documents which corroborated Mr.

Cooney's sincerely held belief that he had no reason to believe that the 3.8 million dollars that

was wired to him were proceeds from the WLCC bond." (Cooney Br. at 9).   But the exhibits

cited by Cooney show no such thing.[17]   To the contrary, Cooney completely ignores the

indisputable trial evidence that Cooney *knew* exactly where the money had come from.   For

example, the evidence at trial included emails in which Cooney tells others that the $3.8 million

wire came from Wealth Assurance Holdings—the parent of the purported annuity provider. (GX

3236).   Thus, whatever Cooney's intentions for the use of the $3.8 million, he clearly

understood that it came from misappropriated bond proceeds.[18]   Cooney's knowledge that the

bond proceeds were being misappropriated was, of course, highly relevant proof that he was a

knowing participant in the fraud.

Third, Cooney's purchase of $5 million of WLCC bonds in the second bond issuance is

further evidence of his knowledge of and participation in the misappropriation of bond proceeds

from the first issuance.   Cooney argues that there was "nothing allegedly fraudulent" about his

purchase of the second bond issuance, advancing testimony by Anderson that there was nothing

out of the ordinary about the bond and that Cooney was qualified as an individual investor.

---

[17]   In support of this assertion, Cooney cites a variety of emails that have nothing to say about his intent, and many of which do not relate in any fashion to this transaction.   More specifically, Cooney references: DX 3235 (an August 2013 email relating to a $35,000 wire to Oxford Metrica), DX 3056(a) (the November 13, 2014 authorization for the $3.8 million to be transferred out of escrow), GX 2255 (an email concerning John Moran and Burnham on which Cooney is not copied), DX 3062 (purported cancellation instructions for the 1920 Bel Air transaction dated in March 2015), and GX 3272 (a February 2016 email in which Cooney claims the $3.8 million was a loan from Jason Galanis's entity, Thorsdale).

[18]   Cooney is also wrong that the evidence establishes that he truly intended to purchase Jason Galanis's home.   First, Cooney's directive that the $3.8 million be immediately transferred out of escrow makes clear that he did not believe he was truly purchasing a home.   Second, Cooney's repeated lies about the transaction make clear that he understood it was a sham.   (*See, e.g.*, GX 3272 (falsely claiming the money came from Thorsdale); DX 3062 ("cancellation" notice dated months after the money had been wired out of escrow)).   That Dunkerley understood Cooney to be assisting Galanis in "refinancing" his home does nothing to alter this assessment and is a far cry from the actual purchase of the home by Cooney.

(Cooney Br. at 18).    As an initial matter, there is no dispute that Cooney purchased $5 million of

(worthless) WLCC bonds in October 2014 with money he received from Thorsdale through

Wealth Assurance.    (GX 4005).    And there can be no serious dispute that Anderson was kept in

the dark about the fact that Cooney and the conspirators were on all sides of the deal.    Cooney,

of course, knew this, and, therefore, cannot rely on Anderson's testimony to pretend as though he

believed his purchase of the WLCC bonds was legitimate.    Cooney's additional suggestion that

the WLCC was not injured by his purchase of the bonds (Cooney Br. at 18) is both wrong and

completely irrelevant, given that harm is not an element of a criminal securities fraud case.

The evidence before the jury was that Cooney, Jason Galanis's close friend who was

desperate for money, received $5 million dollars from Jason Galanis that he then promptly used

to purchase WLCC bonds which he used in order to obtain a personal loan (*see infra* Discussion,

III.C.) even after he had transferred them to Bonwick to help keep it afloat (*see* GX 4005

(Cooney's May 29, 2015 transfer of WLCC bonds to Bonwick); GX 1070-1075, 1082-1084

(Bonwick FINRA reports regarding net capital deficiencies and use of WLCC bond proceeds to

meet net capital requirements); Tr. 2083-92).    This—especially considering the numerous

emails and other evidence of Cooney's knowledge of the progress of the WLCC bond

transaction, combined with the conspirators' efforts to purchase investment advisers to place the

bonds and later control the proceeds—provided more than sufficient evidence for the jury to

conclude that Cooney was knowingly playing his part to further the fraudulent scheme.

### C.  Cooney's Lies to City National Bank Provide Additional Evidence of his Knowing and Willful Participation in the Scheme

Even more evidence of Cooney's willful participation in the scheme comes from

Cooney's lies to City National Bank ("CNB") about his purchase and ownership of the WLCC

bonds.[19]    Cooney argues that evidence (i) that he lied to CNB bank about his purchase and

ownership of the Wakpamni bonds; and (ii) of his funneling of misappropriated bond proceeds

through a sham transaction involving the "purchase" of Jason Galanis's home (which money was

ultimately used to fund the purchase of Vaudoise) does not support his conviction because

neither constitutes a statement or omission in connection with the purchase or sale of any

security.   (Cooney Br. at 20-23).   Cooney's argument misses the mark.   The Government never

argued that Cooney's misstatements to CNB or misconduct with respect to the sham purchase of

1920 Bel Air themselves constituted a misstatement or omission in connection with the purchase

or sale of securities.   As was clear throughout trial and in the arguments of counsel, the relevant

purchases and sales of securities involved the sale of the three tranches of bonds by the WLCC

and the respective purchase of those bonds by Archer, Cooney and the Hughes and Atlantic

clients.   And as was amply established at trial, and as described in the Factual Background

sections I, III, IV and V and in Discussion Section I, *supra*, numerous false statement and

omissions were made in connection with those purchases and sales.

---

[19]  Cooney summarily asserts that "the Court's admissibility of 'other act' evidence" – namely
the City National Bank and 1920 Bel Air Evidence – "which was entirely unrelated to the WLCC
bond[,] substantially prejudiced Mr. Cooney, confused the jury as to evidence central to the
government's case and thereby deprived Mr. Cooney's [sic] right to a fair trial." (Cooney Br. at
40-41).   Cooney makes virtually no argument in support of this claim except to point to his
"previously filed objections to this other act evidence."   (Cooney Br. at 41).   But for the reasons
previously found by the Court, the City National Bank evidence was properly admitted as
evidence of Cooney's knowledge and intent that – among other things – the bonds had been
purchased with borrowed money and that they did not truly belong to him.   And the 1920 Bel
Air evidence not only evinced Cooney's relationship with Galanis, but was direct evidence of
Cooney's participation in misappropriating the bond proceeds.   This evidence was thus properly
admitted and in no way "confused and diverted the jury from consideration of the evidence . . .
against Mr. Cooney."   (Cooney Br. at 41).

The CNB and 1920 Bel Air evidence was offered at trial for several purposes.   The CNB evidence constitutes proof of Cooney's knowledge and intent that the bond transactions were fraudulent and that his purchase of the bonds as a straw buyer was not legitimate.   That evidence also established that—contrary to Cooney's claims—he had profited from the fraud by using the bonds to obtain a loan he never repaid.   The 1920 Bel Air evidence established Cooney's involvement in the misappropriation of the bond proceeds and was thus direct evidence that he knew of—and participated in—the misappropriation of bond proceeds.   Cooney spends a significant portion of his brief arguing—as he did unsuccessfully at trial—for an alternative interpretation of the CNB and 1920 Bel Air evidence.   But drawing all inferences in favor the Government, as the Court must, the jury had ample basis to conclude that Cooney lied to CNB bank and participated in a sham transaction involving the use of misappropriated bond proceeds to "purchase" 1920 Bel Air.   And with or without such evidence, the jury had ample basis to convict Cooney of the crimes charged.

Cooney attacks his false statements to CNB in connection with two separate loan applications on the basis that the loan applications were handled by his authorized agent, Fulton Management and by CNB.   (Cooney Br. at 10).   And while the evidence indisputably showed that Fulton Management acted on Cooney's behalf, it also clearly established that it was Cooney himself who lied about the source of proceeds used to purchase the Wakpamni bonds, and indeed, about his ownership of the bonds themselves.   As described in further detail above, in approximately October 2014, Cooney received $5 million from the WAPCC account which he used to purchase a portion of the second tranche of bonds.   At the time he received the money, he recognized the money as a loan.   (GX 3216).   In approximately January 2015, Cooney *himself* completed a personal financial statement in connection with his application for a

$100,000 loan from CNB.   ((GX 405) (loan application signed by Cooney).   But while he claimed ownership of $5 million of Wakpamni bonds in that financial statement, he intentionally omitted any mention of the corresponding loan used to purchase them.   (*Id.*).   In May 2015, Cooney transferred the entirety of his bonds to Bonwick for net capital purposes.   A month later, Cooney sought a $1.2 million loan from CNB.   In doing so, Cooney personally signed an affirmation that the January 2015 personal financial statement remained correct.   (GX 414). Cooney thus hid from CNB that he no longer possessed the Wakpamni bonds.   It was not until Cooney failed to repay the loan that Cooney first disclosed to CNB that he did not have the bonds anymore, never really had them, and had pledged them elsewhere.   (Tr. 1749).   The jury was thus entitled to infer that (i) Cooney lied about the source of proceeds used to purchase the bonds in order to hide the fact that they had been purchased using recycled bond proceeds; (ii) Cooney's inconsistent statements regarding his ownership of the bonds revealed that he was merely a strawman for their purchase; and (iii) Cooney financially benefited from his participation in the scheme by using the bonds to obtain a $1.2 million loan he never repaid.

Cooney's suggestion that Fulton Management was aware of his true financial situation is of no moment since it was he himself who personally made false statements to CNB.   And Cooney's claim that CNB knew he had transferred the Wakpamni bonds prior to their issuance of the $1.2 million loan is similarly unavailing.   Cooney places great weight on the fact that a CNB employee medallion guaranteed Cooney's signature on a document that effectuated the transfer of the bonds.   But as the CNB employee himself testified—and his testimony must be credited for purposes of this motion—he was unaware that it was the *Wakpamni* bonds that Cooney was transferring.   (Tr. 1742).   And Cooney cannot have believed otherwise because during the very meeting where he obtained the medallion guarantee he told the CNB employee

he would be willing to sell the Wakpamni bonds to repay the loan if necessary (and thus failed to disclose that he had already transferred the bonds).   (Tr. 1741-42).

### D.  Cooney's and His Co-Conspirators' Combined Efforts to Cover Up Their Crimes Provided Additional Powerful Evidence of Cooney's Knowledge and Intent

Cooney's reaction to Jason Galanis's arrest and efforts to cover up the WLCC bond scheme—on top of his lies to CNB—provided even more evidence of his knowledge and participation in the fraudulent scheme.

First, upon Jason Galanis's arrest, Cooney called Francisco Martin and told him that "that Jason Galanis was arrested but not to worry, it didn't have anything to do with the bond issue." (Tr. 2177).   This was powerful evidence of Cooney's involvement in the scheme and communications with other co-conspirators regarding the scheme.   From this testimony, the jury was entitled to draw the inference that Cooney knew Francisco Martin was involved in the WLCC bond scheme and that they were in the fraud together.

Second, Cooney was part of the conspirators' immediate "damage control" efforts after Jason Galanis's arrest.   As described above (*supra*, Discussion, II.E.), on September 25, 2015, Archer emailed Cooney, Jason Sugarman, and Andrew Godfrey his list of "immediate issues" that needed to be addressed, to include the WLCC bonds and Atlantic issues.   (GX 2102). Cooney responded, the same day, "Good prelim checklist Arch.   Let's all conference this am. Let me know what time works for all.   Best, Coon."   *Id.*   Cooney's involvement in the Archer spear-headed damage control efforts provides even more evidence of Cooney's involvement in the scheme.   His immediate response—that Archer's list was a good "prelim checklist"—and willingness to "conference this am" to discuss the cover-up provided the jury with a rational basis to conclude that Cooney was a participant in the scheme.

Third, Cooney used a backdated, fake loan agreement to paper over the $5 million transfer from Thorsdale that funded his purchase of $5 million of the second bond issuance. (GX 2298).   On February 28, 2016, Cooney emailed his business managers a "secured loan agreement for the bonds," purporting to show that "Calvert Capital Partners G.P. loaned $5 million to the Bevan Troy Cooney Family Trust on October 2, 2014, days before Cooney purchased the WLCC bonds.   (GX 2298).   The "secured loan agreement" was signed by Cooney and Jason Galanis.   But, of course, this was a total sham.   Calvert was not even created until October 2015 (GX 1609), and, therefore, the "secured loan agreement" could not have existed in October 2014.   The document, like other Calvert documents, had been backdated in an attempt to cover up the fraud.   (Tr. 1058-59)   Then, Cooney not only provided the fake, backdated "secured loan agreement" to his business managers at Fulton Meyer, but also to the SEC in response to a subpoena.   (GX 1271 ("Secured Loan Agreement" produced by Cooney to the SEC; GX 4501 ¶ 18 (stipulation that GX 1271 was produced by Cooney to the SEC).   There can be no question that the jury was entitled to draw the reasonable inference that Cooney's use of the fake Calvert loan agreement with his business managers and then with the SEC was part of the conspirators' cover-up efforts, and evidence Cooney's knowledge and participation in the scheme.

Finally, Cooney (along with Archer) was among the few people who Jason Galanis communicated with via his secret email address—"legal@colarisventures.com"—that was set up by Francisco Martin to avoid law enforcement detection after Jason Galanis's arrest.   On October 1, 2015—days after Jason Galanis's arrest—Cooney forwarded an email with the subject line "Cooney bonds account" to Jason Galanis at "Legal@colarisventures.com."   (GX 2294).

67

### E. Ample Evidence Established that Cooney Acted with Intent to Defraud, and not in Good Faith

Cooney argues, as he did to the jury, that he acted in good faith and, therefore, the Government did not establish that he possessed an intent to defraud in connection with the scheme.   (Cooney Br. at 23).   In support of this argument, Cooney cites to his communications with Anderson in connection with the purchase of his portion of the second bond issuance, and his reliance on his business managers "to assist him in every deal that he was involved in including his acquisition of the WLCC bond."   (*Id.*).   But these arguments ignore the overwhelming evidence of Cooney's knowing participation in the scheme from beginning to end, his communications with Archer and Cooney about various aspects of the scheme, his lies to CNB in connection with the WLCC bonds, and his efforts to cover up his involvement in the fraud.   The Court should reject, as the jury did, Cooney's good-faith arguments.

## IV.   Evidence of John Galanis's Gerova Conviction Did Not Prejudice Archer or Cooney

### A.  Relevant Facts

#### 1.  Pretrial Proceedings

By way of background, in September 2015, Jason Galanis, John Galanis, Gary Hirst and others were arrested on Indictment 15 Cr. 643 (PKC), and charged with securities fraud and other related offenses (the "Gerova Case").   Jason and John Galanis pleaded guilty.   Gary Hirst was convicted after trial.

The Government sought to offer evidence relating to the Gerova Case in the present trial in two principal ways.   First, the Government sought to offer the fact of Jason Galanis's arrest in order to provide context to the communications and actions of both Archer and Cooney following that arrest.   Second, the Government sought to offer evidence that John Galanis had engaged in prior criminal conduct with Jason Galanis pursuant to Rule 404(b) to show that John

Galanis was not duped by Jason Galanis and did not otherwise believe Jason Galanis to be involved in legitimate business transactions.[20]

The Court agreed that evidence of Jason Galanis's arrest was admissible because it was inextricably intertwined with evidence of Cooney and Archer's criminal intent.   The Court permitted evidence that following Jason Galanis's arrest (i) Cooney had notified Francisco Martin, another co-conspirator, of the arrest and had told Martin not to worry because Galanis's arrest did not involve the bonds; and (ii) Archer had made misrepresentations about Jason Galanis's involvement in Burnham in response to inquiries from the BIT Board.   In doing so, the Court found that such evidence was both probative and not outweighed by any danger of unfair prejudice.   (See, e.g., Tr. 351) (The Court: "I am going to allow the government to elicit Francisco Martin's testimony with respect to the call with Cooney regarding Galanis' arrest.   . . I do think it's of great probative value and not outweighed by the danger of unfair prejudice.").

In light of representations by counsel for John Galanis that he did not intend to argue that John Galanis had relied on or been duped by Jason Galanis, however, the Court precluded admission of John Galanis's involvement in the Gerova matter, finding it more prejudicial than probative.[21]   The Court recognized, however, that "the evidence may be presented in some form if Mr. Galanis opens the door to it," (May 16, 2018 Conference Tr. at 7-8), and counsel for John Galanis agreed that an argument that "John Galanis was just following the instructions of Jason

---

[20]  The Government also sought to admit evidence of the Gerova case as direct evidence.

[21]  Archer alleges that "the defendants made clear in pre-trial briefing – and the Court agreed – that introduction of the Gerova evidence unfairly prejudiced Mr. Archer." (Archer Br. at 98). As the Court itself made clear, however, the portions of the pretrial conference cited by Archer concerned the prejudice to John Galanis from admission of his prior conviction and did not relate to any potential prejudice to Archer.

Galanis and trusted him to the nth degree, that would promptly open the door."   (*Id*. at 9).

### 2.   Trial

Consistent with the Court's ruling, the Government offered evidence at trial that Jason

Galanis had been arrested in an unrelated matter in September 2015.[22]   During testimony

concerning Cooney's conversations with Francisco Martin following Jason Galanis's arrest, the

Court instructed the jury as follows:

> You've just heard evidence that in September 2015 Jason Galanis
> was arrested. You need to know that Jason Galanis' arrest in
> September 2015 was for unrelated conduct and had nothing to do
> with this case.   I further instruct you that Mr. Cooney was not a
> subject of that investigation, and that there is no evidence that he
> knew about Jason Galanis' conduct in that unrelated case until
> after Jason Galanis was arrested.

(Tr. 2177-78).   The Court offered the same instruction with respect to Archer following

testimony about Archer's communications with the BIT Board in the wake of Galanis's arrest.

(Tr. 2519-20).

Throughout the trial, and notwithstanding the consensus between both the Court and the

parties about what would open the door to Gerova evidence, counsel for John Galanis implied

that John Galanis had trusted and relied on Jason Galanis by eliciting testimony that other

witnesses had done exactly that.   (*See, e.g.*, Tr. 387; 424 (Tim Anderson "believed" and

"trusted" Jason Galanis and did not do any diligence to confirm Galanis's statements); Tr. 1138

---

[22] Galanis's 2015 arrest was not the only evidence of Jason Galanis's bad conduct put before the
jury.   At the defendants' request, the Court read a stipulation to the jury stating, in sum and in
substance, that Jason Galanis, Hirst, and Morton had each pled guilty to various charges in the
present case.   (Tr. 1466-7). ████████████████████████████████

███████████████████████████████████████████████████████████████

(Dunkerley "trusted what [he] was told" by Jason Galanis and did not do any of his own due diligence); Tr. 2198; 2210 (cross-examination of Francisco Martin concerning his trust in Jason Galanis)).   Accordingly, by letter dated June 14, 2018, the Government argued that John Galanis had opened the door to the Gerova evidence through his questioning of witnesses.   The Government also argued that, if the Court did not yet agree that the door had been opened, the Government reserved the right to introduce the Gerova evidence following defense summations should defense counsel open the door during closing arguments.   (Dkt. 511).   The Court did not permit the introduction of the Gerova evidence at that time.   (Tr. 2457).   The Court did, however, warn counsel that an argument in summation that Jason Galanis duped John Galanis could still open the door and was clear that the Court would permit the Government to reopen evidence if appropriate.   (Tr. 2458).

During closing arguments, counsel for John Galanis repeatedly argued that John Galanis (and others) had been duped by Jason Galanis.   (Tr. 3764 ("Jason Galanis was able to fool each and every person in this case . . . the prosecution has produced no evidence that shows that John Galanis had any idea or involvement with what his son was doing"); Tr. 3769 ("Jason fooled each and every person in this case"); Tr. 3748 ("The evidence clearly shows that Jason was lying to everyone to get more funds.   The prosecution has produced no evidence that shows that anyone knew the truth")).   Accordingly, following John Galanis's summation, the Government moved to reopen evidence to offer evidence of John Galanis's participation in the Gerova fraud with Jason Galanis.   (Tr. 3768-69; Dkt. 532).

The Court granted the Government's motion, agreeing that the Gerova evidence was not barred by Rule 404 because it was "exceptionally probative of John Galanis' knowledge and intent" especially in light of counsel's arguments that John Galanis "was fooled by Jason Galanis

in the context of [the] WLCC scheme and lacked knowledge as to the fraudulent aspects of the

bond offerings." (Tr. 3791).   The Court further found that such evidence would "not result in

unfair prejudice to John Galanis."   (Tr. 3792).   The Court also indicated its intention to give an

appropriate limiting instruction, instructing the jury with regard to (i) the limited purpose for

which such evidence could be used against John Galanis; (ii) that such evidence could not be

considered in any way against Archer or Cooney; and (iii) that Archer and Cooney had neither

been subjects of the Gerova investigation nor was there any evidence they had been aware of it

until after Jason and John's arrests. (Tr. 3793-3794).

    While acknowledging that the Court's proposed instruction was "very robust" and that

counsel "[couldn't] really take issue with the language of [the Court's] instruction," counsel for

Archer and Cooney nonetheless objected to the admission of the Gerova evidence as prejudicial

to their clients.   (Tr. 3797).   But as the Court repeatedly recognized, the Gerova evidence did

not "taint[] [Archer or Cooney] in anyway."   (Tr. 3797).   This was especially true in light of the

fact that evidence of Jason Galanis's prior arrest was already in evidence.   As the Court

acknowledged, the only new evidence put before the jury—that Jason's arrest had been in

connection with the Gerova fraud and that John Galanis had also participated in that fraud—did

nothing to prejudice Archer or Cooney.   (Tr. 3794 ("THE COURT: It was in front of the jury

before with respect to Jason Galanis's arrest.   The only additional fact with respect to your

client[s] was John Galanis was a part of it")).   Indeed, since the jury heard no evidence that

Archer or Cooney had known John Galanis, evidence of John's wrongdoing would not prejudice

them at all.   (Tr. 3795 ("THE COURT: I can understand the prejudice if this related to someone

that he was close to or in contact with Archer or Cooney, but instead this really just goes to John

Galanis, and I think everyone has essentially acknowledged they [Archer/Cooney and John

Galanis] had no connection to one another.")).

If anything, the Court's extremely robust instruction—which separated Archer and Cooney from their co-conspirators, actually "help[ed] [Archer and Cooney] in a way." (Tr. 3797).   As the Court explained:

> [T]he jury knows there was a fraud, they know Jason Galanis, who both of your clients knew well, was in on it.   The fact that his father, who they didn't have connections to, was also in on this previous fraud, I don't think it hurts your clients in particular because I am giving this very clear instruction that not only can this evidence not be considered against either of them, but I am instructing them factually . .   that Mr. Archer and Mr. Cooney were not subjects of that investigation and there is no evidence that either of them knew about Jason or John Galanis' fraudulent conduct until after Jason Galanis was arrested in September 2015.

(Tr. 3798).   Counsel also expressed a preference to "put some distance between this issue" and Archer and Cooney's summations.   (Tr. 3797).   Although the Court had intended to permit the Government to offer the additional evidence, permit short re-summations by the Government and John Galanis, and then to proceed to Archer and Cooney's summation, the Court indicated a willingness to adopt a different schedule, for example, permitting Archer and Cooney to sum up prior to reopening the evidence.   (Tr. 3795-96).   Archer and Cooney declined that offer.   In addition, neither Archer nor Cooney sought to offer any additional evidence in light of the admission of the Gerova evidence.

Accordingly, the Court permitted the evidence to be reopened.   (Tr. 3786-94).   The Gerova evidence was offered by stipulation.   (Tr. 3829).   By agreement of the parties, (Tr. 3816-7), following admission of the Gerova evidence, and in addition to the limiting instruction, the Court instructed the jury that "John Galanis's guilty plea was to charges stemming from the investigation that resulted in Jason Galanis' arrest in September 2015."   (Tr. 3830). Thereafter,

73

both the Government and counsel for John Galanis gave short supplementary summations to
address the new evidence, followed by Archer and then Cooney's summation.

    As the Court had predicted, far from prejudicing Archer and Cooney, evidence of John
Galanis's participation in the Gerova fraud with Jason Galanis bolstered Archer and Cooney's
argument that they were innocent dupes who should be distinguished from the "real" criminals
like Jason Galanis, John Galanis, Gary Hirst, Hugh Dunkerley and Francisco Martin.   (*See, e.g.*,
Tr. 3851 (Archer summation) (arguing that a third basis for reasonable doubt was the "the real
conspirators" and arguing that "other than Jason Galanis, who lied to everyone about everything,
the evidence is clear that Devon Archer barely knew the real conspirators here")); Tr. 3912-13
(Archer summation) (contrasting Archer's reaction to news of Jason Galanis's 2015 arrest to the
reactions of the "true" criminals); Tr. 3933 (Archer summation) (labeling Jason Galanis and
Hugh Dunkerley "the really bad guys in this story."); Tr. 3999-4000 (Cooney summation)
(contrasting the "two worlds" of Jason Galanis—the "dark world" where Jason Galanis worked
with Francisco Martin, Dunkerley, and Hirst—and the "other" legitimate world in which Cooney
was involved); Tr. 4055 (Cooney summation) (arguing that Francisco Martin only spoke to the
true co-conspirators—Jason Galanis and Gary Hirst—about the bonds, but never spoke to
Cooney).   Indeed, counsel repeatedly pointed to the unequivocal nature of the Court's limiting
instruction to argue to the jury that Archer and Cooney—unlike John Galanis—knew nothing
about the Gerova fraud or Jason Galanis's criminal past until after the September 2015 arrests.
(*See, e.g.*, Tr. 3843-44 ("[A]s the Judge just told you, unlike John Galanis, Devon had no idea
about that.   Devon didn't know about Jason and John Galanis's prior crimes.   There is no such
evidence; the judge just told you that."); Tr. 3912 ("The judge instructed you that's a hundred
percent true.   The judge instructed you that there is no evidence that Devon Archer knew about

74

the conduct underlying the arrest or that the investigation existed."); Tr. 3915 ("[T]his morning

you heard the truth, which said the government was trying to get Jason and John Galanis for a

long time. That's how this case got started.   Devon Archer got sucked up into it.   There are no

witnesses against him.")).

### B.  Legal Standards

Rule 14 provides that "[i]f the joinder of offenses or defendants in an indictment, an

information, or a consolidation for trial appears to prejudice a defendant or the government, the

court may order separate trials of counts, sever the defendants' trials, or provide any other relief

that justice requires."   A defendant seeking severance under Rule 14, however, has a very heavy

burden.   "There is a preference in the federal system for joint trials of defendants who are

indicted together."   *Zafiro* v. *United States*, 506 U.S. 534, 537 (1993).   "This preference is

particularly strong where, as here, the defendants were alleged to have participated in a common

plan or scheme."   *United States* v. *Salameh*, 152 F.3d 88, 115 (2d Cir. 1998)*; see also United

States* v. *Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003) ("Joint trials are often particularly appropriate

in circumstances where the defendants are charged with participating in the same criminal

conspiracy.").   As the Supreme Court has explained:

> It would impair both the efficiency and the fairness of the criminal
> justice system to require . . . that prosecutors bring separate
> proceedings, presenting the same evidence again and again
> requiring victims and witnesses to repeat the inconvenience (and
> sometimes trauma) of testifying, and randomly favoring the last-
> tried defendants who have the advantage of knowing the
> prosecution's case beforehand.   Joint trials generally serve the
> interests of justice by avoiding inconsistent verdicts and enabling
> more accurate assessment of relative culpability—advantages which
> sometimes operate to the defendant's benefit.   Even apart from
> these tactical considerations, joint trials generally serve the interests
> of justice by avoiding the scandal and inequity of inconsistent
> verdicts.

*Richardson* v. *Marsh*, 481 U.S. 200, 210 (1987).   In light of this presumption, "defendants are

not entitled to severance [under Rule 14] merely because they may have a better chance of

acquittal in separate trials."   *Zafiro*, 506 U.S at 540.

Indeed, even assuming that a particular defendant is somehow prejudiced by joinder, the

issue under Rule 14 is whether that prejudice "'is sufficiently severe to outweigh the judicial

economy that would be realized by avoiding multiple lengthy trials.'"   *United States* v. *Page*,

657 F.3d 126, 129 (2d Cir. 2011), quoting *United States* v. *Walker*, 142 F.3d 103, 110 (2d Cir.

1998).   It is well settled that "differing levels of culpability and proof are inevitable in any

multi-defendant trial and, standing alone, are insufficient grounds for separate trials."   *United*

*States* v. *Carson*, 702 F.2d 351, 366-67 (2d Cir. 1983); *United States* v. *Bonventre*, 646 F. App'x

73, 81 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 676, 196 L. Ed. 2d 560 (2017).   The Supreme

Court has instructed that district courts should only grant a severance under Rule 14 when "there

is a serious risk that a joint trial would compromise a specific trial right of one of the defendants,

or prevent the jury from making a reliable judgment about guilt or innocence."   *Zafiro*, 506 U.S.

at 539.

Admission of 404(b) evidence against one defendant, does not generally justify severance

from other defendants against whom the evidence is inadmissible.   *United States* v. *Rittweger*,

524 F.3d 171, 2008 WL 1808260, at *5 (2d Cir. Apr.23, 2008) (*quoting United States* v. *Carson,*

702 F.2d 351, 367 (2d Cir. 1983)) ("the fact that evidence may be admissible against one

defendant but not another does not necessarily require a severance.").   In considering severance

in such cases, courts have "distinguished between the adverse inference a jury may draw against

a co-defendant because of his association with a defendant with a prior criminal conviction," and

the risk for "'unfair prejudice in instances where the admission of prior-act evidence against one

76

defendant tends to prove directly or implicate another defendant's involvement in the prior act.'" *United States* v. *Catapano*, No. 05-Cr-229, 2008 WL 2222013 at *19 (E.D.N.Y. May 22, 2008) (quoting *United States* v. *Ozsusamlar*, 428 F.Supp. 2d 161, 174 (S.D.N.Y. 2006); *see also United States* v. *Figueroa*, 618 F.2d 934, 946 (2d Cir. 1980) (comparing the risk "if the jury were simply to draw an adverse inference against the co-defendants because of their association with a defendant shown to have a prior criminal record," which the Court held "seems too insubstantial in most circumstances to survive forceful instructions" with "the high risk of prejudice to co-defendants when evidence of a defendant's prior act, like a Bruton confession, tends to prove directly, or even by strong implication, that the co-defendants also participated in the prior act").

Courts thus routinely deny severance motions where the potential prejudice arises as a result of one defendant's association with a co-defendant with a prior conviction. *See, e.g. Ozsusamlar*, 428 F. Supp. at 173 (in murder for hire and extortion prosecution of a father and son, the court permitted the midtrial introduction of evidence of father's involvement in a prior violent extortion where the co-defendant son had no involvement in prior extortion); *United States* v. *Gardell*, No. 00-Cr-632, 2001 WL 1135948, at *8 (S.D.N.Y. Sept. 25, 2001) (declining to sever based on the potential admission of 404(b) evidence concerning one defendant's bribing of brokers where such evidence was "sufficiently attributable to [the first defendant] that a jury could consider it without any significant spillover effect" and "there is no evidence before the Court that [the second defendant] directly associated with [the first defendant]." *United States* v. *Lauerson*, No. 98-Cr-1134, 2000 WL 1677931 at *6 (S.D.N.Y. Nov. 8, 2000) (in trial of two doctors for conspiring to commit health care fraud and mail fraud and making false and misleading statements to health care insurers, admission of evidence that one doctor had previously provided false diagnosis did not warrant severance where there was no evidence that

77

the second doctor was involved in the false diagnoses).   In such cases a limiting instruction

suffices to guard against unfair prejudice.   *United States* v. *Rosenwasser*, 550 F.2d 806, 813-14

(2d Cir. 1977) ("[W]hen similar act evidence is admitted in a multiple defendant trial, it is clear

that the co-defendant claiming prejudice could not have been involved in the similar offense. In

those circumstances, there is little doubt that a cautionary instruction is sufficient to preserve the

co-defendant's right to a fair trial.").   Severance is thus warranted only in those extremely rare

cases in which 404(b) evidence with respect to one defendant directly implicates other

defendants.   *See, e.g.*, *United States* v. *Basciano*, No. 05-Cr-60, 2007 WL 3124622, at *6

(S.D.N.Y. Oct. 23, 2007) (granting severance where the Government sought to offer 404(b)

evidence of Basciano's prior conviction for a murder for which his co-defendants were currently

on trial).

### C. Discussion

#### 1.  The Admission of the Gerova Evidence Did Not Warrant Severance

Archer and Cooney argue that admission of evidence of John Galanis's Gerova

conviction following Galanis's summation necessitated severance and/or a mistrial.   Archer and

Cooney are wrong.

Archer and Cooney's argument relies on a generic recitation of severance considerations

but fails to note that the introduction of 404(b) evidence against one defendant warrants

severance only where that evidence also implicates the other defendants.   That is plainly not the

case here.   The evidence put before the jury demonstrated that John Galanis pled guilty to

conspiring with Jason Galanis between 2009 and 2011 to commit securities fraud in connection

with the sale of Gerova stock.   There was no suggestion at trial that Archer or Cooney

participated in the Gerova fraud.   Indeed, the Court explicitly instructed the jury not only that

78

Archer and Cooney had no involvement in Gerova, but that there was no evidence that they had any awareness of that fraud until after Jason Galanis's arrest.   It was thus clear that Archer and Cooney were neither directly nor indirectly implicated by the Gerova evidence.   Any ostensible prejudice could have arisen only from Archer and Cooney's association with John Galanis.   But as the Court noted, the evidence at trial demonstrated that Archer and Cooney had virtually no direct association with John Galanis.   (Tr. 3795).   "In those circumstances, there is little doubt that a cautionary instruction is sufficient to preserve the co-defendant's right to a fair trial." *Rosenwasser*, 550 F.3d at 813-813.   The Court's clear instruction that the jury was to consider the Gerova evidence solely against John Galanis and was "not to consider [it] in any way against either Mr. Archer or Mr. Cooney" thus more than adequately protected against any prejudice. (Tr. 3831).

Archer argues, however, that the prejudice was more acute here because of similarities between the Gerova conduct and the Wakpamni conduct.   More specifically, Archer argues that Gerova and Wakpamni were similar crimes in that "Jason Galanis obtained effective control over existing entities in order to cause them to enter into transactions designed to further his fraudulent schemes" and "[b]oth involved the use of investment advisory firms to cash out on the fraud using client funds."   (Archer Br. at 97-98).   But in making that argument, Archer conflates unrelated arguments made by counsel during pretrial proceedings with the evidence actually before the jury.   And it is, of course, only the evidence that was in fact before the jury that could give rise to any potential prejudice.   In that regard, the sole Gerova evidence put before the jury demonstrated that John Galanis participated in a securities fraud

> in that John Galanis and others openly managed brokerage
> accounts of an individual and effectuated the sale of Gerova stock,
> and received and concealed proceeds derived therefrom, knowing

that this activity was designed to conceal from the investing public
the true ownership and control of that Gerova stock.

GX 4506).   The Wakpamni jury thus had no idea that, in Gerova, Jason Galanis had secretly

obtained control over an existing entity. Nor did the fact that John Galanis opened and managed

brokerage accounts for a single individual suggest to the Wakpamni jury that the Gerova fraud

involved the use of investment advisory firms to cash out of the fraud using client funds.   In

short, the Wakpamni jury had no reason to believe that the Gerova fraud was particularly similar

to the Wakpamni fraud and there can have been no amplification of any prejudice arising from

such purported similarity.   In any event, any such prejudice was more than cured by the Court's

robust limiting instruction.

Cooney, for his part, argues that the admission of the Gerova evidence was particularly

prejudicial to him because it "risked tainting the jury to believe that Bevan Cooney as the

childhood 'best friend' and business partner of Jason Galanis was certainly knowledgeable that

John Galanis had been previously convicted of fraud."   (Cooney Br. at 35).   As this Court has

already recognized, given Cooney's minimal connections to John Galanis, admission of the

Gerova evidence did not prejudice Cooney.   (Tr. 3799 ("THE COURT: " honestly don't think

[the Gerova evidence] is prejudicial [to Cooney]")).   More significantly, in light of the Court's

explicit instruction that Cooney had been unaware of both Jason and John Galanis's involvement

in Gerova until Jason's arrest in September 2015, the jury could not have assumed that Bevan

Cooney—whatever his friendship with Jason Galanis—was aware of John Galanis's criminal

past.

## 2.   The Introduction of the Gerova Evidence Following John Galanis's Summation Did Not Prejudice Archer or Cooney

Archer and Cooney argue that the introduction of the Gerova evidence following John

Galanis's summation—and not during the Government's principal presentation of evidence—further prejudiced them because (i) it "deprived [Archer] of the opportunity to present countervailing evidence;" (Archer Br. at 99); (ii) gave the false impression that Archer had sought to conceal a "highly material fact from the jury," (Archer Brief at 90); (iii) distracted the jury from Archer and Cooney's summations; and (iv) exacerbated the purportedly prejudicial testimony of Francisco Martin concerning his conversations with Cooney about Jason Galanis's September 2015 arrest.[23]   Each of these arguments is without merit.

Archer now claims that the timing of the introduction of the Gerova evidence deprived him of the ability to offer "countervailing" evidence, namely "evidence that one of Galanis's primary motivations for committing the WLCC fraud was to finance his legal defense in the ongoing Gerova investigation" and "evidence of the relationship between the Gerova conspirators (Jason Galanis, John Galanis, Gary Hirst, Jason [sic] brother Derek[24] who served as a lawyer to the annuity provider here and was also convicted in Gerova, etc.)."   (Archer Br. at 99-100).   Those arguments fail.

_____

[23] Archer also makes much of his claim that courts *typically* permit the Government to reopen its case after the close of evidence to "establish venue, identify the defendant or attend to other technical matters."   (Archer Br. at 98).   But the relative infrequency of the need to reopen evidence as a result of door-opening during a summation has nothing to say about the propriety of doing it here.   Indeed, neither Archer nor Cooney disputes that John Galanis's summation opened the door to the Gerova evidence.   And the Court carefully followed the Second Circuit's procedure as set forth in *United States* v. *Alcantara*, 674 F.App'x 27 (2d Cir. Dec. 22, 2016) in permitting the reopening of evidence.

[24] Jason's brother Derek Galanis is not an attorney and did not serve as a legal adviser to any entity involved in the Wakpamni fraud.   Jason's brother Jared is an attorney and was on certain emails relating to the Wakpamni bond fraud and for purposes of this motion the Government assumes that Archer intended to refer to Jared Galanis.

Archer's claim that he could not offer evidence of Jason Galanis's motive (to use Wakpamni bond proceeds to fund his legal defense) until after the admission of the Gerova evidence is simply wrong. Archer's incentive and ability to offer such evidence or make such an argument existed throughout trial. During the main presentation of the evidence, the Government demonstrated both that Jason Galanis was arrested in September 2015 and that bond proceeds were paid out of the Thorsdale account to attorneys. Bank records demonstrating the identities of such attorneys were also admitted into evidence. Archer does not specify what if any additional evidence he could or would have offered on this issue. But the existing trial record gave Archer ample basis to argue that Galanis' motive in committing the Wakpamni fraud was to fund his Gerova defense—an argument Archer chose not to make in summation.[25] And to the extent the argument Archer wished to advance was that Galanis generally used the bond proceeds in ways unknown to Archer, that argument was both available to Archer based on the existing trial record and was made repeatedly by him in summation. (*See, e.g.*, Tr. 3864) (arguing that Archer had no insight into the relevant bank accounts and could not have known how the bond proceeds were being misappropriated). In short, nothing about the admission of Gerova evidence altered Archer's ability or interest in making arguments about Galanis's motives or his misuse of the Wakpamni bond proceeds.

Archer also argues that had the Gerova evidence been offered earlier in the trial he would have sought to offer evidence of the relationships among the Gerova conspirators because evidence of Jason Galanis, John Galanis, Gary Hirst, and Jared Galanis's participation in both

---

[25] Archer was of course free to make such an argument. Notably, however, the bond issuances took place between August 2014 and May 2015, long before Galanis's Gerova arrest in September 2015. It is thus highly unlikely that Galanis's motive *was* to fund his Gerova legal defense.

Gerova and Wakpamni "would have stood in stark contrast to the undisputed fact that Mr. Archer had nothing to do with Gerova and had no knowledge that it was being investigated." (Archer Br. at 89).   As a preliminary matter, it is not at all clear that Archer could have offered such evidence because evidence of Hirst or Jared Galanis's knowledge and intent with respect to Gerova has no bearing on Archer's own intent.   To put it another way, evidence of coconspirators' guilt in another fraud in no way suggests Archer's innocence in the crime on trial.   In any event, Archer's claim that the late introduction of the Gerova evidence precluded him from attempting to offer such evidence is simply wrong.   Notably, Archer did not seek to offer any additional evidence following the admission of the Gerova evidence.   Archer cannot now complain that he was prevented from doing that which he did not seek to do.   Indeed, Archer could easily have sought to include evidence of Hirst and Jared Galanis's involvement in the Gerova matter in the stipulation reflecting John Galanis's participation but chose not to do so.

Even assuming arguendo that such evidence was admissible and that Archer was precluded from offering such evidence by virtue of the timing of the Gerova evidence he has still suffered no prejudice.   The gravamen of Archer's claim is that he should have been able to distinguish himself from the "real criminals" who had closer ties to Jason Galanis.   But he was already able to distinguish himself based on the trial record.   Indeed, the admission of the Gerova evidence against John Galanis, coupled with the Court's robust instruction concerning Archer and Cooney's lack of knowledge of Gerova, gave Archer all the ammunition he need to argue that with respect to Wakpamni there were criminals and there were victims and that he was the latter.   (*See, e.g.*, Tr. 3843-4 ("as the Judge just told you, unlike John Galanis, Devon had no idea about that.   Devon didn't know about Jason and John Galanis's prior crimes.   There is no such evidence; the judge just told you that."); Tr. 3912 ("The judge instructed you that's a

hundred percent true.   The judge instructed you that there is no evidence that Devon Archer knew about the conduct underlying the arrest or that the investigation existed."); Tr. 3915 ("this morning you heard the truth, which said the government was trying to get Jason and John Galanis for a long time.   That's how this case got started. Devon Archer got sucked up into it. There are no witnesses against him.")).

Both Archer and Cooney argue that the late admission of the Gerova evidence made worse the prior trial testimony about Jason Galanis's arrest in 2015.   Cooney, for his part, argues that "Francisco Martin's testimony was substantially even more prejudicial after the jury heard for the first time that John Galanis had been previously convicted in the same September 2015 fraud that led to his son, Jason Galanis's arrest."   (Cooney Br. at 34).   Archer argues that evidence of John Galanis's involvement in Gerova undercut the Court's instruction prior instruction that Jason Galanis's arrest had been in an "unrelated matter" and "created the false impression that [Archer] had been trying to conceal this highly material fact from the jury." (Archer Br. at 100).   Archer and Cooney are wrong.

If anything, the prior admission of both Jason Galanis's SEC bar and 2015 arrest diminished any prejudice that could have arisen from the admission of evidence of John Galanis's participation in Gerova.   The jury heard at trial that both Archer and Cooney were close with Jason Galanis, but had little if anything to do with John Galanis.   The jury also heard that Jason Galanis had an SEC bar (which was publicly known) and had been arrested for criminal conduct about which Archer and Cooney had been unaware.   The jury thus already understood that Archer and Cooney had chosen to do business with Jason Galanis despite his warts, albeit without specific knowledge of his prior criminal behavior.   That John Galanis, an individual with whom Archer and Cooney had very little direct interaction also had a fraudulent

past, did little to move the needle, especially in light of the preexisting evidence relating to Jason Galanis. (Tr. 3799 ("THE COURT: But the evidence of the best friend's [Jason Galanis] arrest was already in evidence a while back.   So the fact that his father was in on it, I am not sure how that hurts your client.")).

Nor did anything about the admission of the Gerova evidence suggest to the jury that Archer had attempted to mislead them.   The *Government* offered evidence that Jason Galanis had been arrested in September 2015.   The *Court* then instructed the jury—without objection from Archer or Cooney—that the 2015 arrest "was for unrelated conduct and has nothing to do with this case."   (Tr. 2176-77; 2178; 2180; 2211; 2223; 2631; 2706; 2796).   That was, of course, a correct statement.   The Gerova fraud took place years before the Wakpamni fraud and the two were not related.   When John Galanis's summation necessitated the admission of the Gerova evidence, the Court and the parties discussed whether the jury should be informed that the Gerova fraud in which Jason and John Galanis had participated was the same conduct that had given rise to Jason's September 2015 arrest, or whether the jury should be left to believe that Jason's September 2015 arrest was for yet more criminal conduct.   (Tr. 3806).   Archer requested—and the other parties did not object—that the jury be instructed that the September 2015 arrest was in connection with Gerova.   (Tr. 3809 (the Government: "we are agnostic on whether or not the jury should be told this [Gerova] conduct was the conduct for which Jason Galanis was arrested in 2015. . . the defense, at least Mr. Schwartz was inclined to do that, and that is fine with us."); Tr. 3817).   The Court gave the requested instruction.   (Tr. 3830-3831). That it was Archer who requested this instruction makes his present claim to have been prejudiced by it somewhat baffling.   In any event, nothing about this instruction suggested to the jury that Jason's September 2015 arrest was in fact "related" to the Wakpamni matter.

Moreover, to the extent that the jury believed the Court's initial instruction was incorrect, the jury could not have believed that it was *Archer* who had tried to conceal the correct information from the jury.   Any view on the accuracy of the instruction would surely have been held against the Government for offering the proof in the first instance.[26]

Finally, both Archer and Cooney argue that the admission of the Gerova evidence shortly before their closings distracted the jury from the defense closings and that the jury's singular focus on this prejudicial evidence is demonstrated by the jury's relatively quick verdict.   As the Court will have observed itself, the jury in this matter was attentive throughout trial and in particular during the defendants' summations.   Nothing about the admission of a single stipulation against John Galanis impeded the jury's ability to listen to, process, and carefully consider the defendants' arguments.   And the jury's ability to reach a verdict within the first day does nothing to alter this assessment.   "Brief deliberation . . . does not show that the jury failed to give full, conscientious or impartial consideration to the evidence." *ICC, Intern. Cargo Charters, Canada, Inc.* v. *TradeWinds Airlines, Inc.*, 2008 WL 4104023, at * 3 (S.D.N.Y. Aug. 28, 2008), citing *Wilburn* v. *Eastman Kodak Co.*, 180 F.3d 475, 476 (2d Cir. 1999); *See also*, *United States* v. *Smith*, 09 Cr 331, 2017 WL 3529047, at * 7 (W.D.N.Y. Aug. 17, 2017) (denying defendants' motion for a new trial based on claim that jury could not have reached a legitimate verdict in a five and a half week, multi-defendant trial in only three and a half hours); *United States* v. *Williams*, 2003 WL 22175980 at *6 (E.D.N.Y. Sept. 17, 2003) ("relatively short length of time" between substitution of alternate jurors and rendering of verdict is no basis for finding

---

[26]  The Government also notes that at Archer's request, and with John Galanis's consent, the jury was instructed that the Gerova evidence was being offered in light of arguments made by John Galanis, not Archer. (Tr. 3807).

that jury failed to follow court's instruction to begin its deliberations anew once alternates were

placed on jury).   Indeed, if anything, the verdict on the first full day of deliberations makes clear

that—as the Government maintained—the evidence against each defendant was overwhelming,

given their deep and extended involvement in a massive fraud.

## V.   The Court's Jury Instructions Are Not a Basis for a New Trial

The defendants collectively argue that they are entitled to a new trial because the Court

(i) gave a conscious avoidance charge without an adequate factual predicate; (ii) failed to give a

multiple conspiracies charge; and (iii) failed to give the defendants' requested specific unanimity

instruction.

These proposed instructions were the subject of extensive argument during the trial, and

the defendants' Rule 33 motions add nothing new to the arguments already made and already

rejected by this Court.   Moreover, the defendants cite no case in which a Rule 33 motion was

granted on the grounds that a Court declined to give a jury instruction requested by the

defendant.   For these reasons and the specific reasons below, the defendant's arguments related

to jury instructions are meritless.

### A.  There Was an Adequate Factual Predicate for Giving a Conscious Avoidance Instruction

The Court should reject Archer's argument that there was not an adequate factual

predicate for a conscious avoidance instruction.

"'A conscious avoidance instruction is warranted (i) when a defendant asserts the lack of

some specific aspect of knowledge required for conviction and (ii) the appropriate factual

predicate for the charge exists, *i.e.*, the evidence is such that a rational juror may reach the

conclusion beyond a reasonable doubt that the defendant was aware of a high probability of the

fact in dispute and consciously avoided confirming that fact.'"   *United States* v. *Lange*, 834 F.3d

58, 77 (2d Cir. 2016) (quoting *United States* v. *Nektalov*, 461 F.3d 309, 314 (2d Cir. 2006)).

Archer does not question—nor could he—that the element of knowledge was in dispute

here.   Instead, Archer claims that the factual predicate is not met because there was no evidence

that Archer "saw a red flag *and* took specific action to avoid learning more."   (Archer Br. at 94

(emphasis in original)).   Under controlling Second Circuit precedent, however, where a

defendant's involvement in an offense was "so overwhelmingly suspicious," a jury is entitled to

infer that any lack of actual knowledge on the defendant's part is attributable to the defendant's

deliberate decision to avoid confirming a disputed fact.   *United States* v. *Svoboda*, 347 F.3d 471,

480 (2d Cir. 2003) ("[T]he second prong may be established where, '[a] defendant's involvement

in the criminal offense may have been *so overwhelmingly suspicious* that the defendant's failure

to question the suspicious circumstances establishes the defendant's purposeful contrivance to

avoid guilty knowledge.'"   (quoting *United States* v. *Lara-Velasquez*, 919 F.3d 946, 951-52 (5th

Cir. 1990) (emphasis in original)); *accord United States* v. *Lange*, 834 F.3d 58, 78 (2d Cir. 2016)

(quoting *Svoboda*); *United States* v. *Cuti*, 720 F.3d 453, 463 (2d Cir. 2013) (quoting *United

States* v. *Kozeny*, 667 F.3d 122, 133 (2d Cir. 2013)) (same).[27]

---

[27] In pressing a contrary position Archer relies primarily on language from *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011).   The Supreme Court in *Global-Tech*—a civil patent case—noted that the federal courts of appeals "all appear to agree on two basic requirements" for the doctrine of willful blindness: that "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact."   563 U.S. at 769.   The Supreme Court, however, did not purport to overrule case law holding that the jury can infer the requisite "deliberate actions" from the suspicious nature of the transaction and the defendant's involvement in it.   Indeed, the *Global Tech* court cited *Svoboda*, *see* 563 U.S. at 769, and the Second Circuit has affirmatively held that *Global-Tech* "did not alter the conscious avoidance standard."   *United States* v. *Goffer*, 721 F.3d 113, 127-28 (2d Cir. 2013) (also noting that "red flags about the legitimacy of a

Here, as stated by the Court on the record and as explained the Government's prior filings in support of a conscious avoidance instruction, Archer's involvement in the Wakpamni scheme was sufficiently suspicious that the jury could easily have found that it established his "purposeful contrivance to avoid guilty knowledge."

There was ample evidence that Archer knew that Jason Galanis did not have $20 million to give him and Cooney to buy the second tranche of bonds, absent the proceeds of the first issuance.   For example, in GX 2021, Archer told Galanis and Cooney that "we need discretionary funds at our command soonest," to which Galanis responded "I'm laser focused on summer cash hole, and discretionary.   I don't need any more deals until we can pull triggers ourselves."   Similarly, in GX 2023, Galanis emailed Archer and Cooney at draft copy of the indenture for the first bond issuance, stating that his "primary objective is to get us a source discretionary liquidity."   Moreover, all of the trial defendants were aware that Jason Galanis-related entities were on all sides of the first bond issuance, including the investment adviser, the placement agent, and the annuity provider.   More generally, there is ample evidence from his interactions with the BIT Board that Archer was on notice of red flags surrounding Galanis's past regulatory history.   (*See also* GX 2111 (April 2014 email between Archer and Galanis in regarding efforts to clean up search results of Galanis on Google, in which Archer notes "Don't get me wrong in that I enjoy defending you but might be nicer if it wasn't as challenging!").

---

transaction can be used to show both actual knowledge and conscious avoidance" (quotation and citation omitted)).   Moreover, case law since *Global-Tech*-including *Lange*, *Cuti,* and *Kozeny* cited above, shows that any required "deliberate action" by the defendant can be inferred based on the suspicious circumstances surrounding the defendant's involvement in a transaction.

And as the Court noted, "Archer was given $15 million by Jason Galanis to purchase the second tranche of WLCC bonds, which, particularly given' Galanis' role in setting up the bond issuance, seems unusual to say the least."   (Trial Tr. 3587).

Accordingly, the Court properly gave a conscious avoidance instruction.[28]

**B.  The Court Did Not Err In Declining to Give a Multiple Conspiracy Instruction**

The Court should also reject the defendants' arguments that it erred in declining to give a multiple conspiracies instruction.

### 1.  Applicable Law

A defendant challenging a district court's decision to omit a multiple conspiracy charge must show both that "there was evidence of separate networks operating independently of each other" and that the defendant "suffered substantial prejudice resulting from the failure to give the requested charge."  *See United States v. Cusimano*, 123 F.3d 83, 89 (2d Cir. 1997) (internal citation and quotation marks omitted).   For the reasons articulated by this Court at the trial (Tr. 3590-91), a multiple conspiracies charge was not warranted, and thus the defendants' Rule 33 motions in this regard must be denied.

### 2.  Discussion

The conspiracy alleged and proved at trial was a single conspiracy.   As the Court noted in denying the multiple conspiracies charge, the misstatements to the WLCC and the failure to disclose material facts to the Hughes and Atlantic investors "were clearly in furtherance of the

---

[28]  Further, Archer's arguments notwithstanding, there was nothing inappropriate about the Government arguing both its actual knowledge and conscious avoidance theories to the jury in summation.   "The Government need not choose between an actual knowledge theory and a conscious avoidance theory . . . .   To the contrary, in many cases, the evidence support each theory will be the same.'"   *Cuti*, 720 F.3d at 463 (internal quotation and citation omitted).

90

same goal; namely to misappropriate the bond proceed[s] for the personal use of the co-conspirators." (Tr. 3950). The misrepresentations to the WLCC were necessary to secure the issuance of the bonds, and the failure to disclose material facts to the Hughes and Atlantic investors was necessary to find purchasers of those bonds. *See United States* v. *Payne*, 591 F.3d 46, 61 (2d Cir. 2010) ("'[A] single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance.'" (quoting *United States* v. *Geibel*, 369 F.3d 682, 689 (2d Cir. 2004)).

Nor can the defendants show substantial prejudice from a failure to give a multiple conspiracies instruction. The Court instructed the jury that:

- The charges in the indictment "relate to an alleged scheme by *each* of the defendants to defraud [the WLCC] to issue bonds . . . based upon false and misleading representations and to fraudulently cause clients of Atlantic and Hughes to buy certain of these bonds, thereby defrauding those entities as well." (Tr. 4143-44).

- "To find the defendants guilty, you must find that the Government has proven the specific charges in the indictment, and not some other crime, beyond a reasonable doubt." (Tr. 4142).

- "The Government must prove the existence of the conspiracy charged in Count One" and "that the defendant you are considering willfully and knowingly became a member of the conspiracy." (Tr. 4164-65).

- "To satisfy its burden of proof that a defendant knowingly and willfully became a member of a conspiracy to accomplish an unlawful purpose, the government must prove beyond a reasonable doubt that the defendant knew that he was a member of an operation or conspiracy to accomplish that unlawful purpose . . . ." (Tr. 4169-70).

These instructions, and the Court's charge as a whole, ensured that the jury found the defendants "guilty of having participated in the *charged* conspiracy" and that there was no substantial prejudice from the Court declining to give a multiple conspiracies charge. *United*

*States* v. *Jones*, No. 15 Cr. 153 (VSB), 2018 WL 3599730, at *7 (S.D.N.Y. July 27, 2018)

(emphasis in original).[29]

---

[29] Archer's other arguments in support of a multiple conspiracies charge are equally unavailing. The purchase of the bonds did not "sap[]" Hughes and Atlantic, Archer Br. at 97-98, (as opposed to their clients).   Indeed, as discussed above and extensively at trial, the bond scheme allowed the defendants to generate tens of millions of dollars of discretionary liquidity for their own business and personal endeavors, including Archer's interests in Wealth Assurance Holdings and Burnham, without the defendants having to invest *any* significant portion of their own money.

Further, the Court should reject Archer's argument that the charged conspiracy was a "hub and spoke" conspiracy and that he "never conspired or had substantive contact with the 'spoke' of the investment adviser fraud,'" i.e., there was never a connecting "rim" between Archer and the investment adviser fraud spoke.   (Archer Br. at 98-99). Even if Archer's factual assertion was correct, that would not render appropriate the multiple conspiracies charge. The existence of a connecting rim 'depends on whether or not the spokes knew or had reason to know of the existence, but not necessarily the identity, of one or more of the other spoke participants in the wheel conspiracy."   *United States* v. *Stern*, No. 16 Cr. 525 (JGK), 2017 WL 4676660, at *4 (S.D.N.Y. Oct. 17, 2017) (quoting *United States* v. *Manarite*, 448 F.2d 583, 589 (2d Cir. 1971)). Here, as set forth above, the evidence was overwhelming that Archer knew of the investment adviser sphere of the conspiracy, given, among other things, his repeated email communications with Jason Galanis and Cooney about Hughes and Atlantic.

### C.  The Court Did Not Err in Declining to Give Archer's Requested Unanimity Instruction

Nor did the Court err in declining to give an instruction on "specific issue unanimity." (Archer Br. at 99).   Notably, Archer cites no authority for the proposition that his requested instruction should have been given.

There is no requirement that the jury agree on how a defendant committed an offense. *See Schad* v. *Arizona*, 501 U.S. 624, 631–32 (1991) ("We have never suggested that in returning general verdicts . . . the jurors should be required to agree upon a single means of commission . . . . Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict.").   "A general instruction on unanimity is sufficient to insure that a unanimous verdict is reached, except in cases where complexity of the evidence or other factors create a genuine danger of jury confusion."   *Ferguson*, 676 F.3d at 279-80 (quoting *United States* v. *Schiff*, 801 F.2d 108, 114–15 (2d Cir.1986)).

Notably, in none of the cases cited by Archer has the Second Circuit found a case so complex as to "create a genuine danger of jury confusion."   To the contrary, courts have repeatedly used, and the Second Circuit has repeatedly affirmed the use of, general verdict forms in complex securities fraud cases like this one.   (*See* Gov't 6/24/18 Letter (attaching verdict forms from five recent securities fraud trials in this District); *see also United States* v. *Ferguson*, 676 F.3d 26, 279-80 (2d Cir. 2011) (declining to find error based on district court's failure to require special findings as to theories of liability in multi-defendant case involving "complicated" "accounting and insurance concepts").

And here, the Court repeatedly instructed the jury that, to overcome the presumption of innocence, it had to be "unanimously satisfied" of each defendant's guilt beyond a reasonable

doubt, Tr. 4123; that it had to reach a "unanimous verdict," Tr. 4183, and that the "verdict must be unanimous," Tr. 4815.

These instructions, and the Court's charge as a whole, were sufficient to ensure the jury reached a unanimous verdict.

***

Accordingly, the Court's instructions are not a basis for a new trial.

**<u>CONCLUSION</u>**

The Court should deny the defendants' post-trial motions in their entirety.

<br>

Respectfully submitted,

ROBERT KHUZAMI
Attorney for the United States, Acting Under
Authority Conferred by 28 U.S.C. § 515

<br>

By:      /s/_____
         Rebecca Mermelstein
         Brendan F. Quigley
         Negar Tekeei
         Assistant United States Attorneys
         (212) 637-2360 / 2190 / 2482

<br>

Dated: September 14, 2018
      New York, New York