UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

———————————————————————x

UNITED STATES OF AMERICA

v.

BEVAN COONEY

No. 16 Crim. 371 (RA)

Defendant.

———————————————————————x

**REPLY MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO RULE 29 AND MOTION FOR A NEW TRIAL PURSUANT TO RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE**

The Law Office of Paula J. Notari
125 Park Avenue, 8th Floor
New York, New York 100197
Tel.: (646) 943-2172

Abraham J. Hassen
O'NEILL / HASSEN
25 Eighth Ave, Suite C
Brooklyn, New York 11217

*Attorneys for Bevan Cooney*

## PRELIMINARY STATEMENT

Mr. Cooney respectfully submits this reply in response to the government's September 14, 2018 opposition motion addressing Mr. Cooney's motions for a judgment of acquittal pursuant to F.R.Crim.P. 29 and a new trial pursuant to F.R.Crim.P. 33 (Dkt. No. ). While Mr. Cooney relies on the arguments contained in his original motion (Dkt. No. 565), we write now to briefly address several issues prior to the October 5, 2018 oral argument on this matter.  We hope to convey to the Court one last time that the government's evidence in this case against Bevan Cooney was innocuous at best and insufficient to demonstrate beyond a reasonable doubt that  Mr. Cooney possessed the requisite criminal knowledge, willfulness, or fraudulent intent, even granting the government the benefit of every inference.

The government in their opposition does not point to a shred of definitive evidence that proves that Mr. Cooney knowingly participated in a fraud. Mr. Cooney's perhaps fatal judgment was that he did business with Jason Galanis, a con man who in this case, has proven to deceive the world's finest lawyers, investment bankers, accountants and the like.  Mr. Cooney believed that the WLCC bond issuances were entirely legitimate. The only question left to decide was whether Mr. Cooney knowingly participated in a fraud.  Not surprisingly, the jury's consideration of the evidence was confused by prejudicial evidence which was both irrelevant and confusing including the surprise introduction of extraordinarily prejudicial evidence after the summation of John Galanis, through no fault of Mr. Cooney.

The jury was misled to believe that Mr. Cooney and Jason Galanis were childhood friends which surely the government knows is utterly false; the jury was misled to believe that Mr. Cooney "lied to City National Bank ("CNB") about his purchase and ownership of the WLCC bonds." (GB at 62).  The jury was misled to believe that Mr. Cooney participated in a sham real estate transaction despite the fact that the

government's chief cooperator, Hugh Dunkerly contradicted their argument on this point.   The jury was misled to believe that Mr. Cooney's spoke to Francisco Martin about the WLCC bond when that was utterly false.[1]

The evidence is now undisputed by even the government that "Fulton Management acted on Cooney's behalf" (GB at 64);  the undisputed evidence shows that Fulton Management was Mr. Cooney's authorized agent who dealt almost exclusively with CNB to assist Mr. Cooney in obtaining several  loans including the 1.2 million dollar loan.  The notion that Mr. Cooney deceived CNB about his purchase and ownership of the WLCC bonds is absurd.  As discussed further herein, Steve Shapiro testified that the WLCC Bonds were not eligible collateral.  Certainly the Court can appreciate CNB's stated credit policy that they would not grant a lender a 1.2 million dollar loan based on illiquid bonds.  The evidence shows that Fulton Management applied for a line of credit on Mr. Cooney's behalf in January of 2015 and Mr. Cooney was given a $100,000 line of credit.  In connection with that loan, Mr. Cooney's representative from Fulton submitted a financial affidavit with supporting bank records.  This was an easy loan because Mr. Cooney had good credit, a longstanding relationship with CNB and therefore no one really cared about Mr. Cooney's WLCC bonds which again were not suitable collateral.  The government has focused on details that were frankly never scrutinized or given a second thought.  In May of 2015, five (5) months after Mr. Cooney obtained the 100k line of credit from CNB, his financial profile improved vastly because his IPO stock increased significantly and based on this fact alone, CNB granted Mr. Cooney a 1.2 million dollar loan. (GX 404).(email from Steve Shapiro asking Matthew Fillman "what are the basics of said exciting loan request" and Matthew Fillman summarizes the value of Mr. Cooney's IPO stock making no mention of the WLCC bond). The evidence is undisputed that CNB did not require a new financial statement.  Mr. Cooney serviced the monthly payments on the 1.2 million loan but eventually when his

---

[1] Franciso Martin admitted on cross-examination that he only spoke to Jason Galanis, Hugh Dunkerly and Gary Hirst about the WLCC bond. Tr. 2328.

IPO stock could not be sold (through no fault of his own), and Mr. Cooney's finances took a drastic turn, he could not make payment on this loan.  Mr. Cooney's actions thereafter were consistent with a cooperative lender who had every intention of making good on his loan.  He even hired an attorney to renegotiate the terms of his loan and in good faith he paid back $90,000 on the loan until he could not afford to make any additional payments.  The government misled the jury and is now trying to mislead the Court as to Mr. Cooney's fraudulent intentions.  The government now argues that Mr. Cooney profited from the fraud by using the bonds to obtain a loan he never repaid.  (GB 64).  This argument is nonsense and is not supported by a shred of evidence. The government's argument is premised on their belief that Mr. Cooney obtained the 1.2 million dollar loan with the intent of using the bonds to obtain a loan and then intentionally not repaying it. The government also argues that Mr. Cooney did not disclose to CNB that he purchased the bonds with a loan.  These arguments are contradicted by the evidence.   Fulton Management negotiated the 1.2 million loan on Mr. Cooney's behalf; Mr. Cooney was never asked to fill out a new financial statement by CNB or Fulton Management; Mr. Cooney actively involved CNB and Fulton Management in every aspect of his purchase and transfer of the WLCC bonds; Steve Shapiro himself participated in the transfer of Mr. Cooney's WLCC bonds in April and May of 2015 to Bonwick Capital.   The government knows that Mr. Cooney was not able to repay his loan because he was unable to sell his IPO stock, through no fault of his own.  Despite this impediment, Mr. Cooney made every attempt to act in good faith to repay the 1.2 million dollar loan.   Common sense tells you that a person who is committing fraud does not pay back the bank $90,000,  if their goal is to steal money from the bank.

Until the instant offense, Mr. Cooney had perfect credit and surrounded himself with reputable financial advisers like Fulton Management; he relied upon top lawyers like Tim Anderson from Dilworth Paxson and savvy financial investors from reputable investment banking firms like Burnham Securities.

Mr. Cooney's email to his mother just months before she died from brain cancer, perhaps best captures his state of mind.  On February 13, 2015 Mr. Cooney writes his mother:  "This is why we bought burnham mom. Drexel Burnham just an amazing history." (DX 3154).  Consistent with this email, Mr. Cooney is secretly recorded by Billy Crafton, an undercover informant in a tape admitted into evidence where Mr. Cooney--again explicitly asserts that his investment in Burnham securities and the deals he was doing with Burnham and Devon Archer "have these layers of legitimacy" and Mr. Cooney also tells Crafton, "the key to these deals are…and what I'm doing now is layering myself with people a lot smarter than I am."  (DX 4908-t3).  Mr. Cooney goes on to say "if you believe in the deal, and the people that are on the deal, you'll do the deal."

Although Mr. Cooney did not know he was being recorded by Crafton, his choice of words speak directly to his state of mind and his belief that he was participating in the deals with Burnham, because he believed in the legitimacy of the people he was doing deals with like Devon Archer.  While a portion of this recording was omitted for the jury's consideration, the Court may recall Mr. Cooney also said in this tape recording that these guys do not do skuzzy deals.

Another reference which reflects Mr. Cooney's innocent state of mind as to the legitimacy of the deal he was involved with, Mr. Cooney responds to Jason Galanis's email attaching the Burnham / Bonwick Term Sheet and states: "This is so solid."  (DX3155)

We urge the Court to consider that all of the government's arguments fail when you consider the context of these emails and Mr. Cooney's state of mind as discussed above.  There is not one email and certainly no testimony that proved beyond a reasonable doubt that Mr. Cooney knowingly committed this fraud.  Instead the government asks the Court to ignore the witnesses who did testify.  The government asks the court to ignore the testimony of Hugh Dunkerly that he himself believed from the inception that the WLCC bond was legitimate and that he had no idea that Galanis had recycled the money to purchase

the second tranche of bonds.  Evidence that Galanis lied to everyone including Hugh Dunkerly and Francisco Martin, the two individuals who were actively helping Jason Galanis pull of his fraud.  Evidence that these two witness who were clearly involved in the fraud never spoke to Mr. Cooney about the WLCC bond, and that they themselves did not know of Jason Galanis's fraud scheme until much later on.

The government's opposition motion points to no evidence (because there is none) that Mr. Cooney was anything more than a passive investor in the WLCC bond.  The government fails to point to even one email where Mr. Cooney is stating something of substance.  The government points to not a shred of evidence where Mr. Cooney is deceiving anyone related to the WLCC bond deal.  Rather, in their opposition motion, they cite emails where at best, Mr. Cooney is merely cheering on business partners which was entirely consistent with the evidence that Mr. Cooney was a member of a legitimate group of investors involved in legitimate efforts to create a financial services conglomerate and that Mr. Cooney by virtue of his investment in Burnham had a small ownership interest in the placement agent. Tr. 907, 1174-75.  The government repeatedly ignores testimony by their chief cooperator Hugh Dunkerly, that numerous companies were acquired and part of the roll-up strategy including: CEO's, CFO's,  Burnham Securities, Burnham Asset Management, Valor Life, Atlantic Asset Management, Hughes Capital Management, Fondinvest Capital, Bonwick Capital (Tr. 1324: 18-24) and Dunkerly's testimony  that these companies were all real, entirely legitimate and collectively managed billions of dollars.  Tr. 1324.  The government now highlights the following Cooney comments which they argue the jury could have "reasonably inferred Cooney's early and ongoing knowing participation in multiple aspects of the fraudulent scheme."

- Indeed, on February 12, 2014, in response to an email from Jason Galanis about a communication from Bob Griffo of the U.S. Department of Treasury to Raycen Raines regarding the potential for tribal economic bonds issued by the Oglala Sioux Tribe, Cooney replied by stating "we will gladly help direct some of mr[.] griffo's funds.") (GX 2004);

- After receiving Jason Galanis's May 9, 2014 email about the opportunity to purchase Hughes, Cooney responded, the same day, "The Greek Machine gun continues to fire….." )(GX 2018).

- On June 3, 2014, Jason Galanis sent Morton a summary of COR Capital "to demonstrate who your financial sponsors are," and forwarded the same email to Cooney with the message, "whoring it out shamelessly." (GX 2212). Cooney responded, "It has to be done!";

- As the WLCC bond deal and the purchase of Hughes both progressed from June through August 2014, Cooney, like Archer, stayed involved, receiving and responding to Jason Galanis's numerous updates about the scheme. (GX 1220; GX 1235; GX 2024; GX 2025; GX 2026; GX 2029; GX 2034; GX 1267);

- In response to a July 16, 2014 update from Jason Galanis to Cooney and Archer about the executed term sheet for the Hughes acquisition, Cooney, the same day, wrote "West coast offense charging down the field!"

- After receiving Jason Galanis's August 13, 2014 email to Archer attaching materials regarding Fondinvest, stating that "Dan and Hugh have locked it up and came to me for the money, which I have agreed to arrange/provide (probably Indians)" (GX 2216), Cooney responded to Jason Galanis, on August 14, 2015, "Another fantastic puzzle piece J!" (GX 2215).

- The next day, on August 15, 2014, Jason Galanis emailed Archer and Cooney with yet another update: "Wilma Standing Bear and Geneva Lone Hill"—representatives of the WLCC—"have fully executed the agreements." (GX 2217). Cooney responded, "This is pure Genius!! The Native American Bonds!! Great work here Greek!!" *Id.* On August 19, Cooney received an email from Jason Galanis containing a spreadsheet of the WLCC bond allocation to nine Hughes pension fund client accounts. (GX 2299). Then, when the deal was done, Cooney received a copy of the "WLCC tombstone." (GX 2224).

- Cooney also participated in and stayed apprised of the conspirators' plans to purchase Atlantic so that Atlantic clients could purchase more WLCC bonds, resulting in more WLCC bond proceeds for the conspirators' personal and business endeavors. (GX 2303; GX 2242; GX 2063; GX 2065; GX 1228; GX 1282; GX 2076)).

These comments are entirely consistent with Mr. Cooney's innocence and his sincere belief that his business partners involved in the financial roll up were excited that their business endeavors were successful. This is again consistent with the testimony of Tim Anderson and the cooperators who testified that they also initially believed that the WLCC bond was legitimate until they learned that Jason Galanis had misappropriated the proceeds of the WLCC bond. The evidence is undisputed that Jason Galanis made significant efforts to hide his fraud scheme and that Mr. Cooney, like many other relied upon the

legitimacy and reputation of Burnham Securities and law firms like Dilworth Paxson to scrutinize these deals.

Even viewed in the light most favorable to the government, this evidence does not support an inference of criminal intent, or knowledge that Galanis was stealing the bond money. Without some evidence that the e-mails had an illicit meaning not discernable from their text, the e-mails demonstrate only that Mr. Cooney was enthusiastic about his partners comments regarding growing the Burnham financial services conglomerate – and that Galanis repeatedly lied to him and others. The evidence shows that Mr. Cooney believed he was engaged in a legitimate business enterprise, and cannot support a reasonable juror's finding that he knew the "essential nature of the plan" to loot the bond proceeds. *United States v. Atehortva*, 17 F.3d 546, 550 (2d Cir. 1994). At worst, the trial record contains "equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence," meaning that no jury could reasonably convict Mr. Cooney in this case. *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (quotation omitted); *see also United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994) (the government "must do more than introduce evidence that is at least as consistent with innocence as with guilt" (quotation omitted)).

The government argues in their opposition motion, that as an example of Mr. Cooney's knowledge of the misappropriation throughout the scheme, was evidence that Cooney knew what Jason Galanis meant when he emailed Cooney and Archer about the "honey trail." (GB at 59). Here the government cites (GX 2065) (an email from Jason Galanis to Archer and Cooney on November 20, 2014 with the subject line "honey trail," and an attached document containing multiple bullet points with the first bullet point stating: "Issuer Wakpamni Lake/Oglala Sioux.") and on January 12, 2015, Jason Galanis forwarded Cooney an email exchange about a wire transfer to Thorsdale, suggesting that it was "stressful" to be waiting on the transfer, and Cooney responded, "Super stressful having no liquid honey." (GX 2253).

Mr. Cooney joins the arguments for counsel for Mr. Archer (Archer at 34) , just as in the word "discretionary," each reference to "honey" in Mr. Cooney's e-mails comes in the context of what were plainly legitimate business plans, and likewise referred to assets under management. The earliest such e-mail, a January 17, 2014 message from Cooney, makes this clear. Cooney wrote Mr. Archer about a meeting with the president of the New York fireman's union to discuss investing in his business, and Cooney added that he "controls a huge pot of honey for the firemans pension." DX4706. The meaning is obvious: the pension fund is a large sum of investible assets. Certainly there was no evidence that Mr. Cooney or anyone else had plans to steal the union's pension funds.

The same reasoning applies to the "honey" reference in an April 30, 2015 e-mail from Cooney. In an exchange copying Mr. Archer, Galanis wrote, "Arch and i attacking teneo tomorrow." Cooney replied, "We continue to press until we have a huge surplus of excess honey." GX2084.  As counsel for Archer notes, the trial evidence made clear that Teneo was the "highly reputable strategic consulting company" that Mr. Archer and others engaged to create a presentation to potentially sell or attract investment in the financial conglomerate he had been building. Tr. 1087:15-1088:9 (Dunkerley).

The January 12, 2015, "honey" reference which the government cites is a perfect example of Mr. Cooney's innocent use of the word "honey."  Jason Galanis forwarded Cooney an email exchange about a wire transfer to Thorsdale, suggesting that it was "stressful" to be waiting on the transfer, and Cooney responded, "Super stressful having no liquid honey." (GX 2253).  Certainly we know from the undisputed evidence that on January 12, 2015, Mr. Cooney applied for a line of credit from CNB and we also know from other emails during this time period that Mr. Cooney was trying to find an institutional buyer for his WLCC bonds which ultimately fell through because the WLCC bonds were not DTC eligible. For example, on April 1, 2015, Mr. Cooney emails Alexis Gluckman, his account manager from Fulton Management:

Call rich isaaks my broker if you have any questions.  We need to make sure I sign anything we need me to before I leave on Saturday.  This is a huge trade.  Have an institutional buyer lined up to take me out of this bond position.  Solves all of my problems!   Thanks A!! (GX 3245)

The government argues that Mr. Cooney was a straw buyer for the WLCC bonds but every shred of evidence shows that Mr. Cooney's words and actions were consistent with his ownership of the bonds. For example, in this email above, why would Mr. Cooney be actively trying to find an institutional buyer for his bonds to "take him out of his bond position" if he did not believe that he owned the bonds. The evidence in this case is consistent with Mr. Cooney's ownership of the bonds: the bonds were mailed to Mr. Cooney; the bonds were actively handled by his managers at Fulton Management.  Mr. Cooney not Jason Galanis made direct attempts to deposit these bonds in a CNB security account. (Tr. 1757)  Mr. Cooney engaged brokers like Richard Isaacs and bankers, including Burnham Securities to find institutional buyers for his bonds.   In the end, because Mr. Cooney was unable to sell his bonds to an institutional buyer, he transferred them to Bonwick Capital.[2]  (*See also* GX 2276, Mr. Cooney is advised by Richard Isaac his broker that "Pershing had refused to initiate the input of the bonds into the DTC system.")

When considering the meaning of the "honey" reference, the Court should also consider an email from Mr. Cooney's accountant Olga Abramson from Fulton Management showed that as of May 12, 2015, Mr. Cooney had received "Zero income only loans."  (GX3251)

Mr. Cooney's January 12, 2015 reference to "super stressful having no liquid honey" (GX2253) consistent with the meaning of the undisputed evidence, demonstrates nothing more than the fact Mr. Cooney was stressed out because he had no income for 2015 and it was an innocent, albeit colorful reference to his need for money, just as Mr. Cooney innocently used the term honey in other emails to

---

[2] The government does not dispute and there is no evidence to prove that there was anything illegal about Mr. Cooney's transfer of his bonds to Bonwick Capital.

mean money.  Here again the Court must hold the government to the standard that they "must do more

than introduce evidence that is at least as consistent with innocence as with guilt" (quotation omitted)).

*United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994)

### MR. COONEY LOANED JASON GALANIS HIS OWN PERSONAL MONEY AND THE GOVERNMENT HAS PRESENTED NO EVIDENCE OF HIS MOTIVE TO COMMIT THIS CRIME

The Government does not cite any motive as to why Mr. Cooney would have participated in this

crime when he made absolutely no money.  Mr. Cooney and Mr. Archer were the only individuals who

repeatedly put up their own money.  Certainly when considering DX 3802, the summary chart which

Mr. Cooney admitted at trial through a summary witness, the government did not challenge the

testimony that Mr. Cooney made no money for his involvement in the instant offense.  On the contrary

Mr. Cooney lost all of his money and declared bankruptcy.   As detailed in Mr. Cooney's summary

chart admitted into evidence on the following dates Mr. Cooney loaned Jason Galanis his own personal

money towards various business deals they were involved with: (DX3802)

| 3/14/2013 | Outgoing wire | $400,000 | Bevan Cooney (BC) to Hunter, Taubman, Weiss LLP | DX3291;GX423; GX3209 |
|---|---|---|---|---|
| 3/22/2013 | Outgoing wire | $95,000 | Bevan Cooney to  (Jason Holmby) | DX3292;GX423;GX3209; Tr. 169; DX3233 |
| 4/17/2013 | Outgoing wire | $50,000 | Bevan Cooney to Thorsdale Fiduciary and Guaranty | (DX3293; GX3209) |
| 8/13/2013 | Outgoing wire | $35,000 | Bevan Cooney to Oxford Metrica Limited | DX3294;GX423; GX3209; Tr. 1290-91 |
| 7/6/2015 | Outgoing wire | $100,000 | Bevan Cooney to Thorsdale Fiduciary and Guaranty | DX3282; GX432; GX522 |
| 7/9/2015 | Outgoing wire | $50,000 | Bevan Cooney to Thorsdale Fiduciary and Guaranty | DX3285; GX432; GX522 |

The government's argument that Mr. Cooney knew about the misappropriation because he

received $75,000 of bond proceeds from the final bond issuance that was purchased with money from

OSERS  (GB at 59)  and because Mr. Cooney received the money directly from Wealth Assurance Private

Client Corporation, the shell company set up to receive the bond proceeds. *Id*.  However the emails that were admitted during trial, the bank records, the wire transfer evidence and Mr. Cooney's summary chart demonstrate that Mr. Cooney and Jason Galanis had a business relationship that began well before Mr. Cooney ever became involved with the WLCC bond.  Mr. Cooney lent Jason Galanis money toward many of their business endeavors which were diligently memorialized by Mr. Cooney's accountants at Fulton Management as loans.  It was not unusual for Mr. Cooney to lend Jason Galanis money and it was not unusual for Jason Galanis to lend Mr. Cooney money.  This lending relationship is demonstrated in an email where Jason Galanis thanks Cooney for lending him money towards a deal involving Dr. Rory Knight, the Dean of Oxford who was also on the Board of Directors of Wealth Assurance Holdings. Tr. 912, 1290-91. *See* (DX 3235)(On August 13, 2013 Jason Galanis emailed Mr. Cooney the following message after Mr. Cooney wired Galanis $35,000: "Coon, the wiring instructions are on the second page, thank you so much for handling this for us, the real estate proceeds will pay it off, but thank you for taking the shot…again." *See also Cooney Summary Chart* (DX 3802) (evidence that on August 13, 2013, Cooney wired Galanis 35k for Oxford Metrica, a company which Hugh Dunkerly testified that Dr. Rory Knight owned). Tr.1291.

Mr. Cooney was also not privy to the kind of information that would have revealed the fraud. For example, Hugh Dunkerley testified that he was not aware that Galanis was stealing the bond proceeds until he saw where the money in the Wealth Assurance Private Client Corporation ("WAPCC") account was actually being directed. Tr. 1139:24-1140:11. But Mr. Cooney had no access to the WAPCC account and no insight into where the money was going or that it was not being appropriately invested.  Indeed the evidence showed that Galanis purposefully chose the name Wealth Assurance Private Client to mislead people into believing that WAPCC had an affiliation with the real Wealth Assurances (WA AG and WAH), see Tr. 1040:20-1041:5 (Dunkerley), and Mr. Cooney was no different.

The government ignores the evidence that Mr. Cooney was not a sophisticated investor and Mr. Cooney believed just like Hugh Dunkerly and many others,  that Jason Galanis was a savvy investor and a good, successful business man. *Id.* at 1301:1-15 (Dunkerley).  Dunkerley testified that Jason Galanis was business partners with Jason Sugarman, whose father-in-law Peter Gruber was a billionaire and whose brother Steven Sugarman owned COR Capital, which "had been very successful in the financial space," and was CEO of and a "major investor" in Banc of California. *Id.* at 906:9-12 (Dunkerley); 1076:7-11, 1171:25-1172:8, 1331:14-1333:14 (Dunkerley).   Mr. Cooney had absolutely no reason to question the legitimacy of money that was wired into his account.

**The Government's Misrepresents the CNB Evidence And Therefore It Does not Support An Inference Of Fraudulent Intent.**

The government's argument that Mr. Cooney's 1.2 million dollar loan somehow shows evidence of his knowledge again ignores the evidence in this case which we briefly summarize here.

The Court should consider the undisputed evidence that Mr. Cooney had previously obtained loans from CNB long before his involvement with the instant offense.  Accordingly, Steve Shapiro his personal banker testified that Mr. Cooney had previously been granted loans from CNB including a $200,000.00 loan, which did not end up in delinquent status; at the time Mr. Cooney applied for the 100k loan and the 1.2 million dollar loan in 2015, he was considered by CNB to be a customer in good standing and to have good credit.  See Tr. at 1755-56, 1784-85.   Mr. Cooney's motive in obtaining this 1.2 million dollar loan was consistent with his requests for other loans. Due to the nature of his employment, Mr. Cooney would go for months without income and these loans would hold him over until he could for example, sell a stock.  (Steve Shapiro is questioned: Q. And it's fair to say that the purpose of the loan, as you understood it, was to help Mr. Cooney pay for personal expenses and tax obligations, correct? A. That is correct.) (Tr. 1782)(Shapiro, Cross).

The evidence admitted at trial shows that Fulton Management submitted a financial statement to CNB on Mr. Cooney's behalf in February 2015 for a $100,000 line of credit. See GX405. In that application, Fulton Management submitted a financial statement on behalf of Mr. Cooney and corroborating records verifying that he owned $1.95 million of Flikmedia (FLKM) stock, in addition to $5 million of Wakpamni bonds. *See* GX 405; Tr. at 1768.  At that time, CNB granted Mr. Cooney a $100,000 line of credit, (Tr. 1762; DX3755) CNB had a full grasp of every aspect of Mr. Cooney's financial portfolio and his assets. Steve Shapiro did not dispute that he was Mr. Cooney's own personal banker. Tr. at 1770.  CNB handled the majority of Mr. Cooney's assets and they certainly handled significant aspects of Mr. Cooney's transactions concerning the instant charges. For example, the money Mr. Cooney obtained to purchase the 5 million tranche of the WLCC bonds was wired into his CNB account. See, DX3252; GX432; GX522. The WLCC bonds were then physically delivered to the securities division of CNB. GX 403. Mr. Cooney's Code Rebel Stock was also deposited in an account with CNB Securities Bank.  Tr. 1754-55; DX 3580.

The government misled the jury and now the Court that Mr. Cooney did not inform CNB that he purchased the bonds with a loan from Jason Galanis.  Again that argument is not supported by the evidence.   Steve Shapiro testified that in connection with the 1.2 million dollar loan from CNB, he spoke almost exclusively with Mr. Cooney's representative from Fulton Management. Tr. 1802. Shapiro testified that Cooney disclosed to Fulton Management and CNB that the money he used to purchase the WLCC bond was loaned to him by Jason Galanis and this information was referenced in a Balance Sheet (GX403) reflecting Mr. Cooney's assets and liabilities that Fulton Management prepared and submitted to CNB bank on Mr. Cooney's behalf.  On cross examination Shapiro was questioned about the Balance Sheet submitted on Mr. Cooney's behalf and he confirmed that on this Balance Sheet Mr. Cooney specifically disclosed that he had in fact purchased the WLCC bonds with a loan:

Q. Now on the second sheet we have the liabilities listed,
correct?
A. Correct.
Q. And under one of the liabilities is in fact a loan to
Thorsdale, correct?
A. Correct.
Q. Did you ask for documentation of that loan?
A. No, this was a result of our February 23rd meeting.
Q. So Mr. Cooney in fact disclosed that the bonds were an
asset and that in fact there was a liability of a loan on the
bonds, correct?
A. That he presented it in March of 2016, correct.
Q. And prior to March of 2016 -- you said prior to 2016 you
had limited contact with Mr. Cooney. You spoke with his
business managers, correct?
A. That is correct.

(Tr.1802) (Shapiro)

This is just another example as to how the government has engaged in a tactic of misleading the

jury to prove that Mr. Cooney deceived CNB when that was never the case.  The government now argues

for purposes of this motion, the Court should accept the credibility of the testimony of Steve Shapiro.

(GB at 65). We urge the Court to consider that Shapiro had motive to color his testimony against Mr.

Cooney within limits because by his own admission he conveyed to Eric Fulton in an email, that he feared

that the outcome of Mr. Cooney's inability to payback the 1.2 million dollar loan could cost him his

career.  Shapiro writes in an email to Fulton Management:

> As you are well aware, CNB was highly reluctant to do this loan in the first place. Now that
> everything has hit the fan, I need to make sure that this was not one of the biggest mistakes of
> my career.  Your help is obviously appreciated.  Steve

(GX 440)  Steve Shapiro's testimony that he was not aware that Mr. Cooney had transferred his WLCC

bonds to Bonwick Capital was absurd, when on two occasions in April and May of 2015-- Shapiro

personally signed the bond transfer documents. *See* DX3162(b) (Tr. 1766-70, 1794-96).  Even accepting

this evidence as true, by Shapiro's own testimony the WLCC bonds were not acceptable collateral under

CNB's credit policy and therefore CNB's focus was always on Mr. Cooney's IPO stock which they expected he would be able to sell and make payment on the loan. (Tr 1762-63) (Shapiro):

Q. Now, is it true that the bonds were not acceptable collateral under City National Bank's credit policy?
A. That is correct.
Q. Can you just explain that to us?
A. The bonds could not be custodied by City National securities. We would have required them to be custodied by City National securities in order to be able to take it as collateral. So, without our ability to custody, no collateral.

(Tr 1762-63) (Shapiro)

Steve Shapiro testified that at no time did he or Mr. Cooney's authorized representative from Fulton Management require that Mr. Cooney fill out a new financial statement but rather they relied upon the financial statement that Mr. Cooney's representative sent to CNB bank in January of 2015. Tr. 1786-88.  The government now agrees that Fulton Management acted on Mr. Cooney's behalf  (Shapiro testified that Matthew Fillman was Mr. Cooney's authorized agent who was authorized to speak to CNB on behalf of Mr. Cooney to get him a loan,  Tr. 1731: 22-24) but they ignore the evidence that Mr. Cooney provided full disclosure to CNB as to the details of his finances.  (GB at 59)  The trial evidence is undisputed that CNB and Fulton Management were involved in every aspect of Mr. Cooney's WLCC bonds from the time he purchased them. See e.g. DX3514(a), GX402, GX3215, DX3530, DX3520, GX410, GX412, DX3162(b), Tr. at  602-604. Steve Shapiro testified glowingly about his longstanding relationship with Fulton Management and Matthew Fillman (solid working relationship and friendship for 17 years), one of Mr. Cooney's business managers who directly negotiated Mr. Cooney's 1.2 million dollar loan. Tr. 1797. Steve Shapiro testified that prior to the 1.2 million dollar loan being classified as delinquent he communicated almost exclusively with Mr. Cooney's business managers from Fulton.  Tr. 1789.

The evidence is undisputed that every aspect of this 1.2 million dollar loan from the moment it was negotiated until well after it was in delinquent status was handled by Mr. Cooney's authorized representatives from Futon Management.

Even after Mr. Cooney was delinquent on his loan, he cooperated with CNB bank and his representatives from Fulton Management; he personally met with them and he consistently corresponded with them to attempt to make re-payment on the loan. Tr. 1789-1804. Steve Shapiro testified that prior to the 1.2 million dollar loan being classified as delinquent he communicated almost exclusively with Mr. Cooney's business managers from Fulton but eventually he began directly communicating with Mr. Cooney as well. Tr. 1789. Shapiro confirmed that in October of 2016, Mr. Cooney successfully re-negotiated new terms of his delinquent loan and in good faith, Mr. Cooney made payments of approximately $90,000 towards repayment of his loan. Tr.1803-1804.

The government ignores the following argument which is entirely consistent with Mr. Cooney's innocence. If Mr. Cooney was committing fraud and he obtained the CNB 1.2 million dollar loan as part of this fraud, then why did he hire an attorney and in good faith make $90, 0000 in payment towards this delinquent loan, when his finances were in dire circumstances. Why would Mr. Cooney throw more money at a fraud, if his goal was to steal money.  Why would a man with an unblemished record in business (with a perfect credit score), who has no prior criminal record commit a fraud only to walk away completely bankrupt. This ending is consistent with the conclusion that Mr. Cooney was a victim in this case of Jason Galanis's manipulation, deceit and fraud scheme.

**Contrary to What the Government Now Argues the Evidence Shows that Jason Galanis Had Planned to Involve Mr. Cooney in A Real Estate Transaction in August of 2013 Long Before Mr. Cooney Purchased the WLCC Bonds in October 2014 and the Government Continues to Ignore Evidence That Hugh Dunkerly Stomped Out Their Theory That This Was a Sham Purchase of 1920 Bel Air.**

The government argues that "Cooney's sham "purchase" of 1920 Bel Air was still more evidence of his participation in the misappropriation." The government suggests the defense does not sufficiently raise counter evidence to prove that this was a legitimate real estate transaction. The government here again ignores the testimony of Hugh Dunkerly which corroborated Mr. Cooney's sincere belief that this was

intended as a legitimate transaction.  We again turn to the evidence.

First we should highlight that the government attempted to mislead the jury by failing to address on direct examination any reference to Dunkerly's involvement as the managing agent of 1920 Bel Air. Hugh Dunkerly initially testified on direct examination that he had no idea why the money was wired into Mr. Cooney's account  (Q: At the At the time did you have any understanding when he made that transfer, understanding why that money was going out? A: No, I did not) (Tr.1032) but on cross-examination, Dunkerly was confronted with numerous emails that refreshed his recollection that the money (3.8 million) that was wired into Mr. Coooney's account on November 12, 2014 and the following day it was wired to Camden Escrow in furtherance of a legitimate real estate transaction. Tr. 1262.  The evidence admitted at trial showed that the real estate transaction did not occur, and that Mr. Cooney was not able to purchase 1920 Bel Air for reasons that were out of his control.  _See_ GX3272.  As detailed in Mr. Cooney's previously filed post-trial motion, Hugh Dunkerly agreed on cross-examination that Jason Galanis was making home improvements to 1920 Bel Air and that Galanis was paying high interest rates on his mortgage and that Dunkerly believed that the 3.8 million dollars was wired into Mr. Cooney's account so that Mr. Cooney could help refinance 1920 Bel Air.  See Tr. 1204-05.  Dunkerly corroborated Mr. Cooney's defense that Mr. Cooney intended to purchase 1920 Bel Air in an LLC, so that Jason Galanis could obtain a lower interest rate, continue to make home improvements and later sell the property at a profit. (Tr. 1204-07)  Contrary to what the government now suggests, the trial evidence in this case corroborates Mr. Cooney's sincere belief that he had no reason to believe that the 3.8 million dollars that was wired into his CNB account were proceeds from the WLCC bond.  We turn to some of this evidence and we highlight DX3235, an email from Jason Galanis on August 13, 2013 to Mr. Cooney evidencing that Galanis told Mr. Cooney months before Mr. Cooney ever purchased the WLCC bond that Mr. Cooney's loan to Galanis involving an entirely separate business deal (Oxford Metrica) would be paid

back from proceeds of a real estate transaction ("coon the wiring instructions are on the second page. thank you so much for handling this for us. the real estate proceeds will pay it off, but thank you for taking the shot again." This email, consistent with the testimony of Dunkerly that Galanis planned to sell 1920 Bel Air to make a profit, demonstrates that Cooney and Galanis had a plan to profit from the proceeds of a real estate transaction.

When considering the following email and the government's argument that Mr. Cooney was again wired 3.8 million dollars as part of a sham transaction we urge the Court to consider why would Mr. Cooney engage Fulton Management and others (See 2267) in efforts to try and obtain a mortgage on his behalf for 1920 Bel Air if this was all just a sham. Why would Galanis have asked Mark Cohen from Cohen Financial group, to conduct an LLC search (chain of title) on 1920 Bel Air if there was no intention for Mr. Cooney to purchase the property as part of an LLC.[3] *See* (GX2255) An email thread between Jason Galanis, Maria Santana, Hugh Dunkerly and Mark Cohen from Cohen Financial group regarding the history of the ownership of 1920 Bel Air by an LLC).

> **DX 3056**: an email thread between Hugh Dunkerly, Bevan Cooney and Maria Santana regarding wiring instructions and escrow relating to 1920 Bel Air
>
> **DX3056(a)**: An email from Hugh Dunkerly to Maria Santa from Camden Escrow regarding 1920 Bel Air
>
> **GX2255**: An email thread between Jason Galanis, Maria Santana, Hugh Dunkerly and Mark Cohen from Cohen Financial group regarding the history of the ownership of 1920 Bel Air by an LLC
>
> **DX3062**: an email thread between Hugh Dunkerly, Bevan Cooney and Maria Santana regarding cancellation of escrow
>
> **GX3272**: Email thread between Bevan Cooney and his account managers at Fulton Management: Eric Fulton, Matthew Fillman and Vanessa Seigel regarding documentation that 1920 Bel Air was a failed real estate transaction

---

[3] Cohen Financial Group is a national real estate capital services company and an originator of commercial real estate debt transactions. See www.cohenfinancial.com

**GX2267:** On February 15, 2015—Jennifer Lowe, a private banker emailed Mr. Cooney that she found an investor to do his loan. (See GX2267)

Certainly, none of the government's cooperators testified that Mr. Cooney had any knowledge that the money wired to him relating to 1920 Bel Air were proceeds from the WLCC bond.   On the contrary the evidence shows that Mr. Cooney was actively seeking a mortgage to purchase 1920 Bel Air but ultimately after Mr. Cooney could not secure a mortgage, the real estate transaction failed.   On February 15, 2015—Jennifer Lowe, a private banker emailed Mr. Cooney that she found an investor to do his loan. (See GX2267)  This was during the time frame Mr. Cooney was searching for a mortgage for Mr. Cooney to purchase 1920 Bel Air.

There was no evidence that Mr. Cooney benefitted from this real estate transaction (Dunkerly testified that Mr. Cooney did not keep the money that was wired into his account; the evidence is undisputed that the $3,895,000 was wired into Mr. Cooney's Citi National Bank account on November 12, 2014 and wired out the very next day, November 13, 2014) (DX3802).   These are the only allegations of affirmative action on the part of Mr. Cooney, and for all of the reasons set forth in Mr. Cooney's post trial motion, none can constitute securities fraud as a matter of law.

The government's argument that Cooney's reaction to Jason Galanis's arrest and efforts to cover up the WLCC bond scheme—on top of his lies to CNB—provided even more evidence of his knowledge and participation in the fraudulent scheme is again based on Francisco Martin's wholly fabricated evidence.  We remind the Court that prior to trial, Mr. Cooney objected to the admissibility of the alleged Cooney phone call to Martin, along with evidence of Jason Galanis, John Galanis, and Gary Hirst's arrests and convictions in the Gerova case. The Court initially barred the latter evidence, but over Mr. Cooney's objection allowed Martin to testify that he first learned that Jason Galanis had been arrested after he received a phone call from Bevan Cooney in September of 2015. (Tr. 2176-77). Martin testified that he had only spoken to Cooney "a couple of times" and that Cooney told him during this

phone call that "Jason Galanis was arrested but not to worry, it didn't have anything to do with the bond issue." When asked by the government if Cooney was connected in any fashion to the bond issue, Martin testified that Cooney "was somehow involved, but I didn't know the extent of it." *See* Trial Tr. at 2176-77.[4]

 Throughout the trial, the parties and the Court were extremely cautious about the topic, negotiating over how evidence of Jason Galanis's September 2015 arrest would be admitted, whether it would be admitted against Mr. Archer and Mr. Cooney at all, the language of the Court's accompanying instructions, and the like. *See, e.g*., Tr. 194:8-201:25 (discussing admissibility); 2060:2-2062:3, 2375:16-2376:22, 2488:25-2491:14 (discussing manner of admission and limiting instructions). As Mr. Archer notes in his post-trial brief, the Court and the parties alike recognized the Gerova arrests and convictions for what they were: a third rail that would have electrocuted any defendant who touched it.

This evidence should have been precluded and should now be disregarded. Francisco Martin testified that he met with the government for more than 2 years and that he did not recall when he began telling the government the truth. Tr. 2228. There is certainly no independent proof of this phone call. Even assuming *arguendo* that Martin was telling the truth, this testimony is just another example as to how the government tried to mislead the jury by creating the false impression that Cooney and Martin had spoken substantively about the illegality of the WLCC bond. That never happened. Martin admitted on cross-examination that he only spoke to Jason Galanis, Hugh Dunkerly and Gary Hirst about the WLCC bond. Tr. 2328. In a case where the government had nothing to rely upon but innocuous evidence against Mr. Cooney, Martin was hauled into the United States with the promise of

---

[4] The Jury was instructed, "So, ladies and gentlemen, you've just heard evidence that in September 2015 Jason Galanis was arrested. You need to know that Jason Galanis' arrest in September 2015 was for unrelated conduct and had nothing to do with this case. I further instruct you that Mr. Cooney was not a subject of that investigation, and there is no evidence that he knew about Jason Galanis' conduct in that unrelated case until after Jason Galanis was arrested. See Tr. 2178:1-8.

immunity, he lied to the Government for almost two years before he began telling the truth and at some point, he came up with this so-called phone call.  Certainly, if Martin had disclosed the phone call when he was first arrested in early 2016 or soon thereafter, the government would have come up with some phone records to show the date and time of this phone call.

Beyond the fact that the government had no independent proof of this phone call, absent testimony from Martin that he had knowledge that Cooney explicitly knew about the fraud scheme, Martin's testimony about the phone call was purely intended to confuse and prejudice the jury.  There were many innocent individuals not charged in this case like Tim Anderson who were "involved" with the WLCC bond and like Mr. Cooney, they had no idea that there was a fraud scheme.  (Martine testifies "Q. Now, prior to that phone call, did you have any understanding that Bevan Cooney was connected in any fashion to the bond issue? A. I knew that he was somehow involved, but I didn't know the extent of it.) (Tr. at 2176-77).  Therefore, it follows the phone call evidence had no significance beyond suggesting to the jury that Cooney was aware of the Gerova fraud.  The government agreed that Mr. Cooney was not a subject of the Gerova investigation, and there was no evidence that Cooney knew about Jason Galanis' conduct in that unrelated case until after Jason Galanis was arrested.  Evidence of this phone call was irrelevant-- and again just more mud on the walls which exacerbated the prejudice of the last minute evidence that John Galanis had been convicted of the Gerova fraud, along with his son Jason.   Surely, by the end of summations the jury was left with the belief that anyone who knew about Galanis's involvement with Gerova, was also part of that fraud scheme.   This evidence, coupled with testimony that Galanis and Cooney were childhood best friends (which again was not even true), cemented in the jury's view that Cooney by virtue of his long-term connection to the Galanis family, knew that father and son were committing fraud and therefore Cooney was guilty by association. Evidence of this phone call, was irrelevant, confusing and prejudicial evidence which the jury should

never have been allowed to consider and the Court should reject the government's argument that this evidence "provided even more evidence of his (Cooney's) knowledge and participation in the fraudulent scheme."

The government further argues that Mr. Cooney's submission of false Calvert documents to the SEC is evidence of his guilt. First, the government's basis for proving that Mr. Cooney submitted a false Calvert document to the SEC, was based on a stipulation that Mr. Cooney agreed to, known as GX4501. (Tr. 2492-93). The government argued during their summation that Mr. Cooney signed a stipulation that Government's Exhibits 1265, 1271, and 1284 are true and accurate copies of documents produced by Bevan Cooney to the Securities and Exchange Commission. (Tr. 3681). At no time did Mr. Cooney stipulate that he knowingly submitted a false document to the SEC.  In this case, Mr. Cooney produced the Calvert loan document to the SEC which was part of his email and he did so in accordance with a subpoena which required that he produced all of his email during the stated time period relating to certain categories including the WLCC bond. At the time that Mr. Cooney submitted that document to the SEC, along with hundreds of others emails, he had no idea that the Calvert document was false.

This Calvert document which was produced to the SEC was part of a mass production of email. Clearly, the evidence shows this email and the attached loan document was produced to Fulton Management during tax season and was part of Mr. Cooney's email which he later turned over the SEC. (GX 2298) Certainly, Mr. Cooney and his lawyers at the time who were advising him believed that this document was genuine, and not a fake document created by Jason Galanis and his henchman or else they would have invoked Mr. Cooney's act of production privilege. *U.S. v. Hubbell*, 530 U.S. 27 (2000) (a person can invoke his Fifth Amendment rights against the production of documents where the act of producing the documents is incriminating in itself).

The government's argument here again ignores the testimony of their own cooperators, Hugh Dunkerly and Francisco Martin.  A major part of this scheme was an entity called Calvert, which Galanis and Dunkerley thought up, see Tr. 1464:17-1466:21 (Dunkerley); GX1705, Martin created, see Tr. 2181:14-19 (Martin), and Galanis, Dunkerley, and Hirst used solely to cover up their crimes. Tr. 1508:9-17.  Mr. Cooney, like the many others who received false Calvert documents had no reason to know any of that. The only evidence connecting Mr. Cooney to Calvert was the fact that during tax season in February 2016, Mr. Cooney sent Fulton Management documents which memorialized the loan he received from Jason Galanis to purchase the WLCC bond.  (GX2298).   This was just one of many documents that Mr. Cooney provided to his tax accountant during tax season. *See also* GX 3272, (Here again on February 26, 2016, Mr. Cooney emails his team from Fulton Management: Vanessa Siegel, Matthew Fillman and Eric Fulton and writes: Vanessa I found this file for my taxes last year..."

  Mr. Cooney hired professionals like Fulton Management and lawyers to handle the details of his business transactions. At best, it proves that at some point after Calvert was created, Mr. Cooney obtained documentation of his loan which he later submitted to his accountants for tax purposes.  There was certainly no evidence from Dunkerly or Martin that Mr. Cooney was involved in the creation of this fraudulent Calvert document.  Dunkerly admitted on cross-examination that he was involved in creating fraudulent documents on behalf of a fake company known as Calvert Capital.  Tr. 1450).  At no time did Dunkerly discuss with Mr. Cooney the fact that the Calvert documents were fraudulent. Dunkerly testified:

> Q. And another big part of his narrative was this company
> Calvert, correct?
> A. Correct.
> Q. And Calvert's sole purpose was to deceive people, correct?
> A. Yes.
> Q. And again the only people that you ever discussed Calvert
> and its illicit purpose with were Gary Hirst and Jason Galanis,
> true?

A.  True.

(Tr. 1508) (Dunkerly)

In closing we urge the Court to consider the following important points when evaluating the voluminous evidence in this case and the arguments made by the government on these issues.

The government points to no evidence that Mr. Cooney had any contact with the WLCC, or that Mr. Cooney was even aware of any representations allegedly made to the WLCC by Jason or John Galanis, or by anyone else.  The government points to no evidence (because there was none)   that Mr. Cooney had any contact with AAM's clients, or that he was aware of any representations allegedly made to those customers by Hirst, Morton, Jason Galanis, or by anyone else.   The government points to no evidence that Mr. Cooney  was aware of the existence of any alleged conflicts at AAM, let alone the fact that they were undisclosed to AAM's clients.

The government's argument that the Court should consider Cooney's knowledge of the progress of the WLCC bond.  Even in the light most favorable to the government, the evidence shows that Mr. Cooney and others – including Jason Galanis – were part of a lawful plan to acquire financial services companies with the hopes of later reorganizing and selling them for a profit. In the course of that business, Galanis kept Mr. Cooney and others informed about the acquisitions and about certain of the financial companies' operations, including the issuance of the WLCC bonds. Mr. Cooney, at times provided funding – usually in the form of short-term loans – to the companies when they had cash needs, and similarly Galanis paid back Cooney and /or loaned him money.  This was the nature of their business relationship, as demonstrated by the summary chart and supporting bank records admitted into evidence at trial.  No rational juror could conclude, beyond a reasonable doubt, that Mr. Cooney willfully joined a criminal conspiracy, engaged in any scheme to defraud, or made a material misrepresentation in connection with the purchase or sale or the WLCC bonds.

Mr. Cooney did not keep a penny of the misappropriated bond money, and the evidence simply does not permit the inference that he knew that Jason Galanis was misappropriating the proceeds of the WLCC bond or that the clients of Atlantic and Hughes were being forced to buy the WLCC bonds. Mr. Cooney, stands apart from the other admitted and alleged conspirators in a variety of ways: whereas others profited from the scheme, Mr. Cooney invested his own money and lost money. Mr. Cooney invested hundreds of thousands of dollars of his own money in the roll-up plan. See DX3802.

Unlike any of the other individuals charged in this case, Mr. Cooney did not have a sophisticated financial background. He was not a director, CEO or member of the board of any of the companies involved in this case or elsewhere. Mr. Cooney was not aware that any of the money that passed through his CNB bank account was from the proceeds of the WLCC bond. As detailed in Mr. Cooney's post trial motion and herein, Mr. Cooney was not aware that the money he used to purchase the WLCC bond was "recycled" from the original issuance. Mr. Cooney was not aware of the false nature of the Calvert documents; Mr. Cooney was not privy to these attempts to cover up Galanis's fraud, because Mr. Cooney was not privy to the fact that a fraud was being committed in the first place. Jason Galanis went to extreme lengths to make sure that the individuals were who part of this fraud scheme did not speak openly to Mr. Cooney. For example, Dunkerly and Martin had limited contact with Mr. Cooney and there was no email correspondence between Mr. Cooney, Dunkerly and Martin whatsoever regarding the WLCC bond. The evidence at trial showed that Jason Galanis carefully controlled the flow of information to further his schemes and cover his tracks. See DX4801 (Martin e-mailing: "Jason [Galanis] is VERY sensitive on how communication flows."); Tr. 1120:17-19 (Dunkerley) (Q: Jason Galanis told you at times, don't tell other people certain information. A: Correct). This manipulation to keep parties – and especially Mr. Cooney – in the dark provides further evidence that Mr. Cooney was unaware of Galanis's schemes. The evidence was overwhelming that Galanis was incredibly secretive about his plans to steal

the bond proceeds, even amongst his admitted conspirators. Despite being intimately involved in the entities set up to steal the bond money, neither Dunkerley nor Martin knew Galanis was stealing bond money until well after he began doing so. When Martin executed a contract with the WLCC on behalf of Private Equity Management to invest the bond proceeds, he was unaware that Galanis planned to steal the money, Tr. 2329:16-23 (Martin), only (claimed) inferring it later from Galanis's financing of the Fondinvest acquisition, Tr. 2175:19-22 (Martin). And even though he (with Gary Hirst) controlled the WAPCC account where the bond money ended up, Dunkerley did not know that the bonds were part of a criminal scheme until he saw where Galanis instructed him to wire the proceeds. Tr. 1139:24-1140:11. (Dunkerley). So even as Galanis was implementing his bond scheme, his own key co-conspirators did not know about his plans.

Mr. Cooney, at all times acted in a manner completely contrary to Galanis and the other alleged coconspirators who were knowingly involved in this conspiracy.  In stark contrast, he conducted his business with openness. For example, Mr. Cooney conducted his business using his true name and one email address (BTCooney@gmail.com); Mr. Cooney followed up on the details of the transactions he was involved by emailing lawyers like Tim Anderson, brokers, investment advisers and real estate agents demonstrating his consistent openness and no evidence to hide his identity.  Mr. Cooney's actions when added up show that he had no clue that Galanis and others were stealing bond money.  He did not hide or create false documents and he employed sophisticated money managers at Fulton Management  to assist him in every aspect of every financial deal he was involved with including the WLCC bond, the failed real estate transaction involving 1920 Bel Air and Mr. Cooney's loans with Citi National Bank (CNB). Mr. Cooney's openness and reliance on others is inconsistent with any criminal intent or how a conspirator might act. Compare this evidence to the other conspirators who used multiple identities and layers of intermediaries to hide their involvement in this case.

Just as Mr. Cooney said in his unsolicited recording to Billy Crafton, he was doing deals with people who were legitimate and a lot smarter than him (DX4802). There is not a single email where Mr. Cooney is either giving advice or making any remotely insightful comment beyond cheering his business partners like Devon Archer and others who he believed to be sophisticated and legitimate in these matters.

The trial evidence is undisputed that Mr. Cooney was not involved in any misrepresentations to the pension fund victims or WLCC.  As discussed above and in Mr. Cooney's post trial response, Mr. Cooney not only never spoke to representatives of the pension funds,  See Tr. 782 (Smith testifying he's never met or communicated with Bevan Cooney); 1689(Moore, same); 2058-59 (Turney, same) he had no substantive interactions with Morton or Hirst, and the evidence showed that on March 5, 2015, months after Mr. Cooney purchased the second tranche of bonds Michelle Morton had no idea who Bevan Cooney was.  GX 4004(A)(Michelle Motion to Jason Galanis: (Who's Bevan again?").

The government asks the court to ignore the evidence that Mr. Cooney never intended to purchase the bond until October of 2014 and /or that Mr. Cooney only agreed to purchase the bond because he was told during the same time period that Tim Anderson was told that there were investors who were purchasing the bond. (Compare GX1268 and GX 2299, within the same week on August 19, 2015 and then again on August 24, 2015, Jason Galanis emails both Bevan Cooney and Tim Anderson with a list of institutional investors who purchased the WLCC bond: Anderson confirmed that he was "repeatedly assured that there buyers for the bond," that there was "significant investor demand and therefore a need to invest in more bonds."  Tr. 528.  This is consistent with Mr. Cooney's innocence and the fact that he believed that the WLCC bond was a great success and that if he purchased the WLCC bonds, he could later resell them to another institutional buyer which in fact tried to do.

Certainly, if Mr. Cooney was in on the scheme and was knowingly advancing the false Calvert narrative, the real conspirators would have known that Mr. Cooney was aware of the false nature of the

Calvert documents.  But Mr. Cooney was not privy to these attempts to cover up Galanis's fraud, because Mr. Cooney was not privy to the fact that a fraud was being committed in the first place.   The purpose of these fraudulent documents were to deceive people, just like Mr. Cooney and the government presented no evidence to prove otherwise.

Mr. Cooney joins Mr. Archer's arguments that even after the third bond issuance, Galanis continued to mislead Mr. Cooney about the bonds. On April 10, 2015, Galanis sent Mr. Archer and Cooney an update on the project the bonds were funding, attaching pictures of the construction and writing, "Rewarding to see it happening."  DX4117. About four months later on August 4, Galanis e-mailed Mr. Archer and Cooney another update on the bond-funded project, attaching six more pictures of the construction. DX3550. These updates make it seem as if the bonds had been successful for the WLCC, when anyone truly in on the scheme would know that the bond-funded projects had no chance of succeeding because Galanis had stolen the bond proceeds. Yet, Galanis continued to send Mr. Cooney these pictures, even long after the final bond issuance. Again and again, from before the first bonds were issued until months after the final bonds were purchased, Galanis lied to Mr. Cooney about the bonds. He told Mr. Cooney that the bond proceeds would be going into legitimate investments, and he repeatedly updated Mr. Cooney on the bonds to make them appear successful. None of this makes sense if Mr. Cooney knew the bond money was being stolen.

The evidence at trial just did not support the jury's verdict, and no rational juror could have found Mr. Cooney guilty. The Court should therefore acquit him. In addition and in the alternative, the Court should order a new trial. Not only was the evidence such that – at a minimum – the Court must have concerns that an innocent person was convicted, but the jury's verdict was infected by evidentiary and instructional error warranting a new trial.

**MR. COONEY IS ENTITLED TO A NEW TRIAL PARTICULARLY IN LIGHT OF NEWLY ACQUIRED EVIDENCE IS CONSISTENT WITH MR. COONEY'S INNOCENCE AND LYING COOPERATORS**

Mr.  Cooney relies on the arguments made in his original motion as to why this Court should grant him a new trial and he also joins the arguments of his co-defendant Devon Archer set forth in his motion for new trial particularly as they apply to Mr. Cooney.  However, we wish to address the government's arguments asking the court to reject Mr. Cooney's motion for a new trial and we also raise here for the first time considerations involving newly discovered evidence which further prejudice Mr. Cooney and underscore the necessity of a new trial if the Court does not acquit Mr. Cooney of Counts 1 and 2.

The government argues that the Gerova evidence did not "taint [Archer or Cooney] in anyway" and this was especially true in light of the fact that evidence of Jason Galanis's prior arrest was already in evidence. (GB at 72) citing (Tr. 3797) The government here cites the Court's ruling (over Mr. Cooney's repeated objection) that, the only new evidence put before the jury—was that Jason's arrest had been in connection with the Gerova fraud and that John Galanis had also participated in that fraud.  The government here relies on the Court's rational "since the jury heard no evidence that Archer or Cooney had known John Galanis, evidence of John's wrongdoing would not prejudice them at all.") (Tr. 3795 ("THE COURT: I can understand the prejudice if this related to someone that he was close to or in contact with Archer or Cooney, but instead this really just goes to John Galanis, and I think everyone has essentially acknowledged they [Archer/Cooney and John Galanis] had no connection to one another.")). Mr. Cooney rejects this argument.  Mr. Cooney has always maintained that this evidence was extremely prejudicial in light of Francisco Martin's testimony that Cooney and Galanis were best childhood friends, which is simply not even true. (Tr. 2171-72; 2176-77)

The fact that the jury heard no evidence that Cooney had known John Galanis is irrelevant.  The jury heard evidence that Jason and John Galanis were father and son and that Jason Galanis and Cooney were best friends from childhood. The precise prejudice which the Court assured the parties was not present, in fact was present:  **The jury was essentially told that Mr. Cooney was both close to and in contact with the Galanis family**.  The obvious, inescapable, conclusion any juror would make was that Bevan Cooney as the childhood "best friend" and business partner of Jason Galanis was certainly knowledgeable that John Galanis had been previously convicted of fraud (stemming from the same fraud that led to Jason Galanis's arrest in September of 2015)  and therefore Mr. Cooney was also involved in the fraud scheme. This devastatingly prejudicial evidence could not have been cured by a limiting instruction and was further exacerbated when the government was allowed to re-open evidence and highlight this evidence during a second summation against John Galanis.

The government's argues that Archer and Cooney declined the Court's offer to minimize the prejudice by adopting a different summation schedule namely, "permitting Archer and Cooney to sum up prior to reopening the evidence." (Tr. 3795-96).  While the Court surely tried to consider various options, this option would have surely heightened the prejudice against Mr. Cooney.  The final message to the jury would have been the words of the government, without any opportunity by Archer or Cooney to soften the devastating blow.  Respectfully, this was not a meaningful option which Mr. Cooney could have even considered.  The government's other argument, "that neither Archer nor Cooney sought to offer any additional evidence in light of the admission of the Gerova evidence" (GB at 73) is premised on fantasy, not the reality of the courtroom and the options that Mr. Cooney had.  Mr. Cooney could not have anticipated the possibility that counsel for John Galanis would open the door to such prejudicial evidence and in the rare case that the court allows a prosecution to reopen its case after the close of evidence, it is usually "to establish venue, identify the defendant, or attend to other technical matters." *United States v.*

*Leslie*, 103 F.3d 1093, 1104 (2d Cir. 1997) (citing *United States v. Washington*, 861 F.2d 350, 353 (2d Cir. 1988) (where case was reopened for police officer to identify defendant)). Mr. Cooney was deprived of the opportunity to present countervailing evidence and given the manner this evidence was introduced, the prejudicial impact was too great to be cured by a jury instruction. We defer to the arguments in our previous brief and we join Mr. Archer's arguments on this point citing Second Circuit cases holding that the presumption that a jury will adhere to instructions "fades when there is an overwhelming probability that the jury will be called upon to perform humanly impossible feats of mental dexterity." *United States v. McDermott*, 245 F.3d 133, 139-40 (2d Cir. 2001).

Finally, on September 13, 2018 the government emailed counsel for Mr. Cooney, Devon Archer and John Galanis a letter detailing the following information. The letter provides

[redacted]

[redacted]

[redacted]

[redacted]



Relief under Rule 33 based on newly discovered evidence may be granted only upon a showing that (1) the evidence [was] newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal.' " *United States v. Forbes*, 790 F.3d 403, 406–07 (2d Cir. 2015) (quoting *United States v. Owen*, 500 F.3d 83, 87 (2d Cir. 2007)). The Second Circuit does not "preclude the possibility that a codefendant's post-trial exculpatory statements may ever qualify as 'newly discovered evidence." *Owen*, 500 F.3d at 91. A new trial pursuant to Rule 33 based on newly discovered evidence may be granted "only upon a showing that the evidence could not with due diligence have been discovered before or during trial, that the evidence is material, not cumulative, and that admission of the evidence would probably lead to an acquittal." *Owen* citing *United States v. Alessi*, 638 F.2d 466, 479 (2d Cir.1980); see also *United States v. Canova*, 412 F.3d 331, 349 (2d Cir.2005); *United States v. Zagari*, 111 F.3d 307, 322 (2d Cir.1997).

In this case, the evidence turned over to the SEC consisting of statements to the SEC by Jason Galanis on or about August 21, 2018 were certainly not available to any of the trial defendants including Mr. Cooney before the trial proceedings which commenced on May 22, 2018. Upon making further inquiry on this recent letter, undersigned counsel has learned that Jason Galanis, for the first time likely met with the SEC before the trial date. We would ask the Court to order the government to turn over any information they possess which relates to Galanis meeting with the SEC before August 21, 2018. Certainly, the information which Galanis turned over to the SEC is material evidence to the defense of Mr. Cooney and in light of the scant evidence against Mr. Cooney, this newly discovered  evidence would likely have resulted in an acquittal.  For example, Galanis now turns over evidence that

Hugh Dunkerly falsely told the United States Attorney's Office that Dunkerly and Galanis diverted millions of dollars of funds.   Galanis further asserts that emails prove that these efforts were coordinated by Jason Sugarman.  Galanis contends that Dunkerly lied during his testimony and that he was financially motivated to protect Sugarman because Sugarman was paying at least $100,000 for Dunkerly's counsel.

A new trial is required if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury. . . ."  405 U.S. at 154, (92 S.Ct. 763), citing *Napue v. Illinois*, 360 U.S. 264, 271, (79 S.Ct. 1173, 3 L.Ed.2d 217) (1959).  See also *Flores v. Craven*, 503 F.2d 1030 (9th Cir. Sept. 10, 1974), (memorandum for publication), where this court stated that the test must be whether the nondisclosure "could . . . have affected the (trier of fact's) estimation of credibility." See also *Armour v. Salisbury*, 492 F.2d 1032, 1036-37 (6th Cir. 1974); *United States v. Diaz-Rodriguez*, 478 F.2d 1005, 1008 (9th Cir. 1973) (test for granting new trial whether admission of undisclosed evidence would have been more likely to result in a different verdict).  Evidence affecting the credibility of a government witness has been held to be material under the Brady doctrine. *See* Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *United States v. Butler*, 567 F.2d 885, 890 (9th Cir.1978).

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

In addition to this, the suppression of material evidence served also to prejudice the presentation of the defense case to the jury. The concealment of evidence relating to the criminal involvement of Jason Sugarman and Steven Sugarman in Galanis's fraud scheme certainly induced the Court to limit the scope of what could be argued to the jury.

Therefore given the scant, innocuous evidence in this case against Mr. Cooney,  Mr. Cooney is entitled to a new trial in the interest of justice – either as an alternative to acquittal should the Court determine that, viewed in the light most favorable to the government, the evidence can technically withstand the Rule 29 analysis, or (preferably) as a backstop to an order acquitting Mr. Cooney. *See* Fed. R. Crim. P. 29(d)(1) ("If the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed. The court must specify the reasons for that determination."); *see also* Fed. R. Crim. P. 29(d)(3)(A).

Mr. Cooney should receive a new trial for at least four independent reasons. First, the evidence does not support a guilty verdict. As explained above and in Mr. Cooney's previously filed post trial motion, the trial evidence was insufficient as a matter of law to convict Mr. Cooney. Under the more forgiving Rule 33 analysis, under which the Court may look at the entirety of the trial record, Mr. Cooney respectfully submits that it would be a "manifest injustice" to allow the verdict to stand because

the evidence– which was entirely absent as to Mr. Cooney's criminal intent – raises "a real concern that an innocent person may have been convicted." *Ferguson*, 246 F.3d at 134 (internal quotation marks omitted). In addition, Mr. Cooney is entitled to a new trial because of the grossly prejudicial effect of the last-second introduction of evidence of Jason and John Galanis's conviction on securities fraud charges in the Gerova case, and because of serious errors in the jury instructions. In particular, we join the argument's raised in Mr. Archer's post-trial motion that the Court's decision to give a conscious avoidance charge lacked any factual predicate and was relied upon explicitly by the government in both its principal and rebuttal summations. The Court's decision to forego both a multiple conspiracies charge and a specific unanimity instruction (or, alternatively, a detailed verdict sheet) was also, respectfully, error justifying a new trial.   Finally, for all of the reasons stated herein the newly discovered evidence regarding Hugh Dunkerly, Steven Sugarman and Jason Sugarman undermines confidence in the outcome of Mr. Cooney's trial.

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in Mr. Cooney and Mr. Archer's post-trial motions and reply brief to the extent these arguments apply to Mr. Cooney, the Court should enter judgment of acquittal for Mr. Cooney on Counts One and Two, and grant Mr. Cooney a new trial.

Respecfully submitted

/s/  Paula J. Notari

Dated: New York, New York
September 26, 2018

The Law Office of Paula J. Notari
125 Park Avenue, 8th Floor
New York, New York 100197
Tel.: (646) 943-2172

Abraham J. Hassen
O'NEILL / HASSEN
25 Eighth Ave, Suite C
 Brooklyn, New York 11217

35