

MATTHEW L. SCHWARTZ
Tel.: (212) 303-3646
E-mail: mlschwartz@bsfllp.com

October 27, 2018

**BY ECF**

Hon. Ronnie Abrams
United States District Judge
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

    Re:    *United States v. Galanis*, S3 16 Cr. 371 (RA)

Dear Judge Abrams:

    As Your Honor knows, I represent Devon Archer. I write to provide supplemental authority in response to certain of the Court's questions at the October 22, 2018 oral argument on Mr. Archer's motions for acquittal and a new trial [ECF Nos. 567, 632]. Specifically, Your Honor asked the following two questions:

(1)    Whether the Court could consider on a Rule 33 motion the extremely short duration of the jury's deliberations in this complex case; and

(2)    Whether Mr. Archer's cross-examination of an FBI Special Agent regarding certain misleading summary charts – especially GX 4011, which incorrectly showed "RSB (Devon Archer)" receiving and passing on $903,000 in connection with the interest payment on the second bond series – cured the prejudice from their introduction.

    The Court should consider both facts – the introduction of prejudicial summary evidence and the short duration of the jury's deliberation – in resolving Mr. Archer's motions for acquittal and a new trial. While neither fact in this case is on its own dispositive, both are important factors that are part of the Court's overall assessment of whether Mr. Archer received a fair trial and whether his conviction is supported by the evidence. Both facts undermine confidence in Mr. Archer's conviction and demonstrate palpably why Mr. Archer is at grave risk of having been convicted for being part of a crime despite his absence of fraudulent intent.

    As to the summary charts: a picture is worth a thousand words. The government distilled into clear, simple, and effective charts a complex record of banking transactions involving multiple accounts, individuals, and entities. The government used color coding to highlight the involvement of each defendant, including Mr. Archer. It drew arrows showing specific money flows so the jury did not have to examine the underlying bank records. The charts were introduced into evidence by a Special Agent of the Federal Bureau of Investigation. These charts, in other words, were powerful evidence and had the ability to subsume and obviate the dry source material. They were also inaccurate and improperly targeted Mr. Archer, falsely implicating him in transactions he had nothing to do with. This was prejudicial evidence that no



amount of cross examination could cure. The introduction of the misleading charts was improper and further supports Mr. Archer's acquittal or, in the alternative, granting him a new trial.

The brevity of the jury's deliberations in this admittedly complicated case also supports granting Mr. Archer's motions. An unreasonably short jury deliberation is a strong signal, in a complex case such as this, that the jury did not follow the Court's instructions. As Mr. Archer demonstrated in his motion papers, no rational juror could have convicted Mr. Archer on the trial record. The cursory deliberation substantially increases the likelihood that the verdict was not based on a rational evaluation of the evidence against Mr. Archer and that the jury never actually determined whether the evidence showed Mr. Archer's criminal knowledge and intent beyond a reasonable doubt.

### Two-Hour Jury Deliberation in a Complex Securities Fraud Trial

As noted in Mr. Archer's opening brief, the Indictment alleges two highly complex schemes. The jury heard five weeks of testimony, and nearly 800 documentary exhibits were admitted into evidence. The evidence and the testimony of the sixteen government witnesses covered a broad range of topics and transactions, including multiple bond offerings, investment adviser frauds by co-conspirators, mergers and acquisitions of insurance and financial companies, and years' worth of e-mails read into the record. There was no direct evidence pointing to Mr. Archer's criminal knowledge and fraudulent intent, and no witness testified that they even ever spoke with him about the bonds. The only evidence of Mr. Archer's true knowledge and intent was found in the thousands upon thousands of pages of documentary evidence presented to the jury. But after approximately two hours of deliberation and without asking any questions, the jury returned a verdict of guilty against all three defendants on all counts. [*See* ECF No. 567 at 3, 18.]

Although a "brief deliberation cannot, alone, be a basis for an acquittal," it "is a factor to be considered when deciding a motion for a new trial." *United States v. Cunningham*, 108 F.3d 120, 124 (7th Cir. 1997). The Court can and should attach more significance to a short deliberation where there is other "reason to suspect that the jury in some way disregarded its instructions or otherwise failed in its duty." *Id. Accord Wilburn v. Eastman Kodak Co.*, 180 F.3d 475, 476 (2d Cir.1999) (per curiam) ("A jury is not required to deliberate for any set length of time. Brief deliberation, *by itself*, does not show that the jury failed to give full, conscientious or impartial consideration to the evidence." (emphasis added)). The Second Circuit has held that "jurors have a duty to deliberate," and "the Supreme Court has made clear that it is appropriate to charge a jury that 'when it enters the jury room it is the jurors' duty to consult with one another to consider each other's views and to discuss the evidence with the objective of reaching a just verdict if the jurors can do so.'" *United States v. Baker*, 262 F.3d 124, 130 (2d Cir. 2001) (quoting *Lowenfield v. Phelps*, 484 U.S. 231, 235 (1988)) (internal alterations omitted).

Here, there *are* other "reason[s] to suspect that the jury in some way disregarded its instructions or otherwise failed in its duty." *Cunningham*, 108 F.3d at 124. As the Court acknowledged at oral argument, this was a complex case and required a careful consideration of the documentary evidence. In light of the complexity and volume of the documentary evidence concerning Mr. Archer (let alone the two other defendants) – and the undeniable fact that a rational jury could *only* have based a verdict concerning Mr. Archer's knowledge and intent with



respect to the bonds on the documentary evidence, given the complete and total absence of any trial testimony on that point – the Court should be concerned that two hours was "insufficient for the jury to reach a reasoned decision." *Marcus v. PQ Corp.*, 458 F. App'x 207, 213-14 (3d Cir. 2012); *see also Maurer v. Patterson*, 197 F.R.D. 244, 249 (S.D.N.Y. 2000) ("[W]here a trial is long and complicated and deals with a subject matter not lying within the ordinary knowledge of jurors a verdict should be scrutinized more closely by the trial judge than is necessary where the litigation deals with material which is familiar and simple." (quoting *Lind v. Schenly Inds.*, 278 F.2d 79, 90-91 (3d Cir. 1960)) (internal alterations omitted)).

Furthermore, the guilty verdict was inconsistent with the trial record and unsupported by the weight of the evidence. [*See* ECF No. 567 at 74-85; ECF No. 632 at 1-32.] "When brief jury deliberation is coupled with a verdict that is contrary to the great weight of the evidence . . . , it creates a situation where the district court has an affirmative duty to set aside the verdict." *Kearns v. Keystone Shipping Co.*, 863 F.2d 177, 182 (1st Cir. 1988). In *Kearns*, for example, the First Circuit affirmed the decision to set aside a verdict where the trial court found: "This jury could not have deliberated for more than 20 minutes, effectively, on each of 2 days—a total of 40 minutes—and reached a verdict that was so clearly against the weight of the evidence as to constitute a gross miscarriage of justice." *Id.* at 181.

With these two points in mind – that this was a complex securities fraud case with difficult questions concerning knowledge and intent that could only be answered by the voluminous documentary record, and that the weight of the evidence does not support a guilty verdict – the Court should recognize that the jury could not have come to a reasoned decision against all defendants on all counts in only two hours. If it does not acquit Mr. Archer outright (as it should), the Court should order a new trial.

### The Introduction of Misleading Summary Charts

The Court also rightly noted its concern with the government's introduction of misleading summary charts. In the example cited by the Court, GX 4011, the government depicted Mr. Archer as a direct participant in a scheme whereby the defendants, in the testimony of the FBI Special Agent, "basically paid themselves the interest on the bonds." Tr. 2970:20-22 (discussing GX 4011).



The chart was extremely effective in conveying a scheme to misappropriate bond proceeds from the WAPC account and use it to pay interest to existing bondholders – a core feature of the charged fraud. It was, in short, a simple and very well crafted exhibit that put Mr. Archer alone among the trial defendants in the middle of this transaction:



It was, however, entirely wrong. [*See* ECF No. 567 at 72 n.21.] Mr. Archer had absolutely no involvement in any scheme to pay himself interest on the second bond series, and it is simply not the case that the funds distributed to the actual bondholders flowed through Rosemont Seneca Bohai, Mr. Archer's entity. As Mr. Archer explained in his motion, the government's own witness was forced to acknowledge that RSB was mistakenly credited with an interest payment by Morgan Stanley, which was reversed by Morgan Stanley with no involvement of Mr. Archer. No funds flowed from RSB to either WAPCC or the bondholders. There was no basis on which the jury could have inferred that Mr. Archer took any action or knew anything at all about the payments concerning the second bond issuance – bonds he had long before moved out of RSB's account. *Id.*

Courts recognize the power of summary charts. "Since 'seeing is believing,' it is today often felt that this kind of evidence possesses an immediacy and apparent reality which endow it with particularly persuasive effect." 2 McCormick On Evid. § 212 (7th ed.). The potential prejudice from the introduction of misleading summary charts is only amplified when they are created by government agents. *See United States v. Citron*, 783 F.2d 307, 315 (2d Cir. 1986) ("We find that the evidence supporting the conviction may well have been sufficient, but that it must be vacated because of the improper admission of a summary chart placed before the jury."). In *Citron*, the government introduced a summary chart created by a government agent purporting to show that the defendant received unreported taxable income, which was a core issue in the case. The Second Circuit vacated the conviction, holding that the trial court abused its discretion in admitting the chart. *See id.* at 316-17 ("Summary charts should not be admitted unless a



proper foundation is established connecting the numbers on the chart with the underlying evidence. Courts have long required that district courts ascertain that summary charts fairly represent and summarize the evidence upon which they are based. Unless this requirement is met, the chart is more likely to confuse or mislead the jury than it is to assist it." (internal quotation marks and citations omitted)).

*Citron* shares many similarities to this case. Both involved complicated evidence and concerned charts created by government agents that were highly prejudicial, and highly effective. Like GX 4011, the chart in *Citron* "identified government exhibits" in a list as the underlying evidentiary support. *Id.* at 316. The charts in both cases concerned a core issue in the case. Here, the government agent testified that GX 4011 showed Mr. Archer payed himself interest on bonds – a critical fact in a case concerning whether Mr. Archer knew bond proceeds were being misappropriated. Also like this case, when defense counsel in *Citron* objected to the chart's accuracy, Judge Wexler nonetheless "admitted the chart in evidence on the theory that 'if it is weak, cross examination will destroy it totally.'" *Id.*; *cf.* Tr. 2947:2-6 ("[Defense counsel:] we say the charts aren't accurate at all in many instances. THE COURT: You can cross-examine her on that.").[1] The Second Circuit in *Citron* vacated the conviction, holding that the district court's reliance on cross-examination as a cure was inappropriate in that circumstance. *Citron*, 783 F.2d at 316-17.

The Second Circuit similarly recognized the power of government charts when it vacated the conviction in *United States v. Groysman*, 766 F.3d 147, 163 (2d Cir. 2014). The Second Circuit may have well described GX 4011:

> Those charts—pictorial and easy to follow, generally showing only four or five boxes, connected by arrows indicating who gave fraudulent documents, checks, and cash to whom—were likely to be more memorable to jurors than the other documents, which consisted principally of lists of medical equipment on the go-bys and fictitious invoices or the transcripts of the translated conversations.

*Id.* at 161; *see also id.* at 162 (noting "the simple and easy-to-remember charts" "whose contents were inaccurate and misleading").[2] And like with the prosecution in this case, the government in

---

[1] At oral argument, the government seemed to suggest that Mr. Archer did not preserve his objection to the summary charts. But as the transcript reveals, the defendants (who were deemed to join in one another's objections) objected to the admission of all of the government's summary charts on the grounds that they were inaccurate. The Court overruled the objection in favor of cross-examination, but the objection was plainly made and preserved. *See* Tr. at 2947.

[2] *See also United States v. Wanoskia*, 800 F.2d 235, 237-38 (10th Cir. 1986) ("The opportunity for the jury to see what supposedly happened can accomplish in seconds what might otherwise take days of testimony. By conveying a visual image of what allegedly occurred, one side can imprint on the jury's mind its version of the facts. Thus the court must take special care to ensure that the demonstration fairly depicts the events at issue.").



Page 6

*Groysman* "did not emphasize the inadmissible evidence in its summation, in that it did not mention" the offending charts. *Id.* at 161. But the damage was done.

This case also raises the troubling prospect that the government knew GX 4011 was misleading when it was offered. During the cross examination of the government agent, Mr. Archer offered a draft chart prepared by the Special Agent that more correctly positioned Mr. Archer in the other defendants' scheme to pay themselves interest on the bonds – that is, he was entirely removed from it:



3517-5 at pdf 67. Notwithstanding the fact that the witness admitted that "maybe there is a better way" to depict the transfers in GX 4011, and that the draft chart "was part of my work product" and that "I worked with the prosecutors on this," the Court did not admit the draft chart into evidence. Tr. 3072:22-3076:10.

At oral argument, the government tried to defend the final chart as the accurate one, and the draft as being based on incomplete information. But the undisputable truth is that money never went from RSB or Mr. Archer to the bondholders, and to the extent GX 4011 depicted otherwise, it was false and misleading. And yet on GX 4011, the government's summary chart depicted a straight line from the WLCC account holding bond proceeds, to Mr. Archer's entity, to the bondholders – putting Mr. Archer right in the middle of a scheme to recycle bond proceeds. This was entirely misleading. Indeed, the Special Agent admitted that in all of her many summary charts, other than with respect to Mr. Archer's role in GX 4011, there was no "place else where these lines are not meant to indicate that the money goes from Point A to Point B." Tr. at 3127:12-15.

GX 4011 should never have been shown to the jury. The chart was at best a mistake by the government and at worst a targeted effort to improperly shape the evidence to fit a false


narrative about Mr. Archer's knowledge and intent. Either way, it was an extremely powerful exhibit that falsely showed Mr. Archer directly involved in paying himself interest on bonds and being in the middle of the recycling of bond proceeds. The fact that it was amongst the very last evidence presented by the government, through its final witness, only adds to the prejudice. *See, e.g., Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 509 n.9 (2d Cir. 1977) (noting "that the prejudicial effect of Friedman's improperly admitted testimony may well have been heightened by the fact that he testified as the last witness on the last day of a three week trial."). In the event that the Court does not acquit Mr. Archer, the Court should allow Mr. Archer the opportunity to be tried by a jury uninfluenced by misleading summary evidence.

We remain available to provide the Court whatever other information it may find helpful in resolving Mr. Archer's motions. Thank you for your consideration.

          Respectfully,

          /s/ Matthew L. Schwartz
          Matthew L. Schwartz