# THE LAW OFFICES PAULA J. NOTARI
125 Park Avenue
8th Floor
NEW YORK, NEW YORK 10017
Tel. (646) 943-2172

October 29, 2018

**BY ELECTRONIC MAIL AND ECF**

The Honorable Ronnie Abrams
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Re:   *United States v. Galanis*, S3 16 Cr. 371 (RA)

Dear Judge Abrams:

As Your Honor knows, I represent Bevan Cooney. I write to join the arguments made by Devon Archer in his supplemental letter filed with the Court on October 27, 2018 (Doc 682) and to provide supplemental argument in response to certain of the Court's questions at the October 22, 2018 oral argument on Mr. Cooney's motions for acquittal and a new trial [ECF Nos. 567, 632]. Specifically, Your Honor questioned (1) whether the Court could consider on a Rule 33 motion the extremely short duration of the jury's deliberations in this complex case; and (2) whether Mr. Cooney's 1.2 loan with Citi National Bank and statements he made in connection with that loan were direct evidence of his fraudulent intent.

First, we agree with Mr. Archer that the brevity of the jury's deliberations in this admittedly complicated case supports granting Mr. Cooney's motions. As we previously discussed in Mr. Cooney original motion for acquittal and motion for new trial, an unreasonably short jury deliberation is a strong signal, in a complex case such as this, that the jury did not follow the Court's instructions. As Mr. Cooney demonstrated in his motion papers, no rational juror could have convicted Mr. Cooney on the trial record. The cursory deliberation substantially increases the likelihood that the verdict was not based on a rational evaluation of the evidence against Mr. Cooney and that the jury never actually determined whether the evidence showed Mr. Cooney criminal knowledge and intent beyond a reasonable doubt.

Furthermore, we reiterate that the Citi National Bank evidence is just more evidence that this case was highly complicated in a case where there is at best innocuous evidence consistent with Mr. Cooney's innocence like the email which Your Honor highlighted during oral argument, where Cooney asks in GX 2120 "What do we get to do with the 15mm," and Galanis answers, "Discretionary." The government should not be allowed to rely on prejudicial

sideshow evidence which we have repeatedly objected to and should have never have been admitted like the CNB evidence that had nothing to do with the WLCC bond and confused the jury.

We briefly address for the Court's consideration one last time why this evidence is not even remotely fair evidence from which anyone can infer Mr. Cooney's fraudulent intent. The jury was misled to believe that Mr. Cooney "lied to City National Bank ("CNB") about his purchase and ownership of the WLCC bonds" but that was never the case. (GB at 62).

The Court should consider the undisputed evidence that Mr. Cooney had previously obtained loans from CNB long before his involvement with the instant offense. Simply put this loan was not unusual for him and not part of some preconceived scheme. Accordingly, Steve Shapiro his personal banker testified that Mr. Cooney had previously been granted loans from CNB including a $200,000.00 loan, which did not end up in delinquent status; at the time Mr. Cooney applied for the 100k loan and the 1.2 million dollar loan in 2015, he was considered by CNB to be a customer in good standing and to have good credit. See Tr. at 1755-56, 1784-85. Mr. Cooney's motive in obtaining this 1.2 million dollar loan was consistent with his requests for other loans. Due to the nature of his employment, Mr. Cooney would go for months without income and these loans would hold him over until he could for example, sell a stock. (Steve Shapiro is questioned: Q. And it's fair to say that the purpose of the loan, as you understood it, was to help Mr. Cooney pay for personal expenses and tax obligations, correct? A. That is correct.) (Tr. 1782)(Shapiro, Cross).

The government cannot say and the Court should not miss the point that Mr. Cooney was not directly involved with the negotiations of this loan. The evidence is now undisputed by even the government that "Fulton Management acted on Cooney's behalf" (GB at 64); the undisputed evidence shows that Fulton Management was Mr. Cooney's authorized agent who dealt almost exclusively with CNB to assist Mr. Cooney in obtaining several loans including the 1.2 million dollar loan. The notion that Mr. Cooney deceived CNB about his purchase and ownership of the WLCC bonds is absurd. Steve Shapiro testified that the WLCC Bonds were not eligible collateral. Certainly the Court can appreciate CNB's stated credit policy that they would not grant a lender a 1.2 million dollar loan based on illiquid bonds. The evidence shows that Fulton Management applied for a line of credit on Mr. Cooney's behalf in January of 2015 and Mr. Cooney was given a $100,000 line of credit. In connection with that loan, Mr. Cooney's representative from Fulton submitted a financial affidavit with supporting bank records on his behalf. This was an easy loan because Mr. Cooney had good credit, a longstanding relationship with CNB and therefore no one really cared about Mr. Cooney's WLCC bonds which again were not suitable collateral. The government has focused on details that were frankly never scrutinized or given a second thought. In May of 2015, five (5) months after Mr. Cooney obtained the 100k line of credit from CNB, his financial profile improved vastly because his IPO stock increased significantly and based on this fact alone, CNB granted Mr. Cooney a 1.2 million dollar loan. (GX 404).(email from Steve Shapiro asking Matthew Fillman "what are the basics of said exciting loan request" and Matthew Fillman summarizes the value of Mr. Cooney's IPO stock making no mention of the WLCC bond). The evidence is undisputed that CNB did not require a new financial statement.

Mr. Cooney serviced the monthly payments on the 1.2 million loan but eventually when his IPO stock could not be sold (through no fault of his own), and Mr. Cooney's finances took a drastic turn, he could not make repayment on this loan. Mr. Cooney's actions thereafter were consistent with a cooperative lender who had every intention of making good on his loan. He even hired an attorney to renegotiate the terms of his loan and in good faith he paid back $90,000 on the loan until he could not afford to make any additional payments.

The government misled the jury and is now trying to mislead the Court as to Mr. Cooney's fraudulent intentions. The government now argues that Mr. Cooney profited from the fraud by using the bonds to obtain a loan he never repaid. (GB 64). This argument is nonsense and is not supported by the evidence. The government's argument is premised on their belief that Mr. Cooney obtained the 1.2 million dollar loan with the intent of using the bonds to obtain a loan and then intentionally not repaying it. The government also argues that Mr. Cooney did not disclose to CNB that he purchased the bonds with a loan. These arguments are contradicted by the evidence. Fulton Management negotiated the 1.2 million loan on Mr. Cooney's behalf; Mr. Cooney was never asked to fill out a new financial statement by CNB or Fulton Management; Mr. Cooney actively involved CNB and Fulton Management in every aspect of his purchase and transfer of the WLCC bonds; Steve Shapiro himself participated in the transfer of Mr. Cooney's WLCC bonds in April and May of 2015 to Bonwick Capital. The government knows that Mr. Cooney was not able to repay his loan because he was unable to sell his IPO stock, through no fault of his own. Despite this impediment, Mr. Cooney made every attempt to act in good faith to repay the 1.2 million dollar loan. Common sense tells you that a person who is committing fraud does not pay back the bank $90,000, if their goal is to steal money from the bank.

We would just reiterate the final points consistent with Mr. Cooney's innocence and we urge the Court not to be distracted by this evidence. Until the instant offense, Mr. Cooney had perfect credit and surrounded himself with reputable financial advisers like Fulton Management. Mr. Cooney conducted every transaction in his own name and he contributed and lost his own personal money to Galanis. The email highlighted by Your Honor, in addition to the emails we have previously highlighted including Mr. Cooney's unsolicited comments in the Bill Crafton recording capture Mr. Cooney's state of mind. Mr. Cooney—here again explicitly asserts that his investment in Burnham securities and the deals he was doing with Burnham and Devon Archer "have these layers of legitimacy" and Mr. Cooney also tells Crafton, "the key to these deals are…and what I'm doing now is layering myself with people a lot smarter than I am." (DX 4908-t3). Mr. Cooney goes on to say "if you believe in the deal, and the people that are on the deal, you'll do the deal."

This is just another example as to how the government has engaged in a tactic of misleading the jury to prove that Mr. Cooney deceived CNB when that was never the case. We urge the Court to consider that Shapiro had motive to color his testimony against Mr. Cooney within limits because by his own admission he conveyed to Eric Fulton in an email, that he feared that the outcome of Mr. Cooney's inability to payback the 1.2 million dollar loan could cost him his career. Shapiro writes in an email to Fulton Management:

As you are well aware, CNB was highly reluctant to do this loan in the first place. Now that everything has hit the fan, I need to make sure that this was not one of the biggest mistakes of my career.  Your help is obviously appreciated.  Steve

(GX 440)  Steve Shapiro's testimony that he was not aware that Mr. Cooney had transferred his WLCC bonds to Bonwick Capital was absurd, when on two occasions in April and May of 2015-- Shapiro personally signed the bond transfer documents. *See* DX3162(b) (Tr. 1766-70, 1794-96).

Why would a man with an unblemished record in business (with a perfect credit score), who has no prior criminal record commit a fraud only to walk away completely bankrupt and why would he pay more money to hire an attorney and pay down another $90,000 toward a loan he could not pay –if he was trying to commit fraud and steal as much money as he could.

Mr. Cooney was a victim in this case of Jason Galanis's manipulation, deceit and fraud scheme. Even viewed in the light most favorable to the government, the CNB evidence does not support an inference of criminal intent, or knowledge that Galanis was stealing the bond money. At worst, the trial record contains "equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence," meaning that no jury could reasonably convict Mr. Cooney in this case. *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (quotation omitted); see also United States v. D'Amato, 39 F.3d 1249, 1256 (2d Cir. 1994) (the government "must do more than introduce evidence that is at least as consistent with innocence as with guilt" (quotation omitted)).

We remain available to provide the Court whatever other information it may find helpful in resolving Mr. Cooney's motions.  Thank you for your consideration.

Dated: October 29, 2018                    Respectfully submitted,
                                           Paula J. Notari
                                                /s/
                                           Attorney for Bevan Cooney