

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 31, 2018

**BY ECF**

The Honorable Ronnie Abrams
United States District Judge, Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

Re:   **United States v. Galanis, et al.**, S3 16 Cr. 371 (RA)

Dear Judge Abrams:

The Government respectfully submits this letter in response to the defendants' October 27, 2018 (Archer) and October 29, 2018 (Cooney and Galanis) letters addressing (i) the purported inaccuracy of GX 4011, a summary chart admitted at trial; and (ii) the length of the jury's deliberations in this case. As described in further detail below, neither the admission of GX 4011 nor the length of the jury's deliberations supports a judgment of acquittal or a new trial.

**I.        GX 4011 Was Accurate and Did Not Prejudice Archer**

Months after the conclusion of trial, Archer, *for the first time*, argues that the admission of GX 4011, a summary chart describing the interest payment on the second bond issuance, was so prejudicial as to warrant a new trial. This argument is befuddling. During trial, Archer objected to several superficial elements of the Government's other summary charts – for example the abbreviation of "Wealth Assurance Private Client Corp." to "Wealth Assurance" – but never objected GX 4011 in any fashion. Nor did Archer raise this argument in his more than 150 pages of post-trial motions. Archer's present claims regarding GX 4011 are thus as untimely as they are meritless. GX 4011 accurately documents the movement of funds in connection with interest payments on the second bond issuance. Its significance, that the purported annuity provider lacked the funds to make the required interest payments and that VL Assurance functionally funded its own interest payment in a round trip transaction, was perfectly clear. Additionally, any purported ambiguity – and there was none – was remedied through cross-examination of Agent Kendall and the admission of alternative defense summary charts. In short, there was nothing at all improper about the admission of GX 4011. Nor could any purported impropriety come close to justifying a new trial.

**A.  Relevant Facts**

On May 30, 2018, the Government produced to defense counsel draft summary charts, including a draft of GX 4011. The Government subsequently produced a final version of GX 4011

which was substantively identical to the draft version. Additionally, as part of Agent Kendall's 3500 material, previous versions of the summary charts, including GX 4011, were produced.

By email dated June 14, 2018 (attached hereto as Exhibit A), Archer requested that the Government alter its summary charts in three respects. In particular, he requested that references to Wealth Assurance be changed to WAPCC or Wealth Assurance Private Client, that references to RSB (Archer) be changed to RSB, and that a reference to "proceeds from Code Rebel sales" be removed. The Government responded to Archer indicating that it intended to elicit that all references to Wealth Assurance related to Wealth Assurance Private Client Corporation and otherwise did not intend to alter its exhibits. Archer made no requests with respect to GX 4011.

By letter dated June 16, 2018, Archer informed the Court that he "objected to two very limited aspects of [the Government's] summary charts." (Dkt. 519 at pg. 9). In particular, Archer raised the same objections with respect to the Wealth Assurance and RSB nomenclature. He did not raise any objection with respect to GX 4011.

On June 19, 2018, the Court heard argument on Archer's objections to the summary chart. (Tr. 2545-2549). At no point during the discussion of the summary charts did Archer raise any objection to GX 4011.

The following day, on June 20, 2018, the Government called Agent Kendall to testify about the summary charts. After Agent Kendall testified that the charts were accurate, the Government moved to offer the summary charts into evidence. Counsel for John Galanis then objected "to the word accurate" stating "that's a conclusion; there is no proof. As a matter of fact [all three defense counsel] say these charts aren't accurate at all in many instances." (Tr. 2947). The Court received the charts into evidence.

With respect to GX 4011, which documented the interest payment on the second bond issuance, Agent Kendall testified that initially an interest payment was wired from the WLCC account to an RSB account at Morgan Stanley. (Tr. 2969). The Government elicited from Agent Kendall, however, that by the time of the interest payment RSB no longer held the bonds. (*Id*.). Agent Kendall testified that the wire was reversed and that interest payments were then routed to accounts also held at Morgan Stanley held by Burnham and VL Assurance, the actual holders of the bonds. (Tr. 2970). Agent Kendall's testimony thus made clear that the bond payment had been inadvertently sent to the original bond holder and had been reversed to provide the interest payments to the current bondholders. Agent Kendall made clear that the gravamen of GX 4011 was that the purported annuity provider lacked the funds to make interest payments on the bonds and that VL Assurance had functionally paid itself interest through this round trip transaction. (Tr. 2970) (Q: Looking at the million dollars that was wired out by VL Assurance . . . and the [money] received on October 1, what was the net result of these wires from VL Assurance? A: They received roughly 750,000 back of their million that they sent out . . . Q: So they basically paid themselves the interest on the bonds? A: Yes.).

On cross examination, defense counsel made explicit what had been, at the least, implicit in Agent Kendall's testimony – that the interest payment had been sent to RSB in error and had been corrected to provide the payments to the current bond holders. (Tr. 3063-3064). Archer also offered DX 4523, an internal Morgan Stanley email in which Morgan Stanley employees discuss

reversing the wire to RSB and crediting the amounts to VL Assurance and Burnham accounts at Morgan Stanley. This made clear, if it was not already, that the reversed wire had not been returned to the WLCC account at US Bank, but rather had been internally reallocated within Morgan Stanley to the correct bond holders. Finally, defense counsel confirmed with Agent Kendall that the bank records did not reflect any transfer directly between RSB and VL Assurance or Burnham. (Tr. 3071-3072).

Defense counsel sought to have Agent Kendall disavow the accuracy of GX 4011 in two ways. First, counsel confronted Agent Kendall with an earlier version of GX 4011 which had been produced as Agent Kendall's 3500 (the "Draft Chart").



The Draft Chart depicted a wire from the WLCC to RSB and depicted that wire being reversed into the WLCC account at US Bank and then being sent back out to Burnham and VL Assurance accounts (which were at Morgan Stanley). Counsel suggested to Agent Kendall that the Draft Chart was more accurate than GX 4011. But Agent Kendall correctly disagreed. As she explained, the earlier version of GX 4011 was created at a time when she was "still piecing together the parts of the transaction" (Tr. 3074). She further testified that the Draft Chart was inaccurate because there was, in fact, no reverse wire from RSB at Morgan Stanley to the WLCC account at US Bank. (Tr. 3075). Nor were there any wires directly from the WLCC to Burnham or VL Assurance as depicted in the Draft Chart. (Tr. 3077). Accordingly, Agent Kendall explained that it would have been inaccurate to leave in arrows pointing directly from the WLCC to Burnham and VL Assurance.

Defense counsel also attempted to attack the accuracy of GX 4011 through the use of DX 8011, a defense version of GX 4011. More specifically, DX 8011, page 2, showed the transaction with use of a "Morgan Stanley Correction,"

**DX 8011, Page 2**



while DX 8011 page 3 omitted any reference to the wire to RSB and simply showing a wire from the WLCC to Burnham and VL Assurance.

**DX 8011, Page 3**



Agent Kendall testified, however, that the charts in DX 8011 were inaccurate because the bank records did not reflect "the wire reverse" into the WLCC account and did not reflect any "entry outbound for the correction." (Tr. 3080). The correction happened not at US Bank, but internally within Morgan Stanley. Accordingly, while Agent Kendall acknowledged that GX 4011 could have been more clear in depicting that the wire reversal had taken place within Morgan Stanley, she also rejected the accuracy of DX 8011, which incorrectly depicted the wires going from the WLCC account at US Bank directly to VL Assurance and Burnham. Accordingly, the Court permitted DX 8011, page 3 into evidence with the addition of an asterisk indicating that the wire out of US Bank had, as a result of a Morgan Stanley Correction, ultimately gone to Burnham and VL Assurance. (Tr. 3081)



Following Agent Kendall's testimony, on the afternoon of Wednesday, June 20, 2018, the Government rested and the defense case began. Witnesses called by Archer and Cooney testified over the course of the next two days and the defense rested on Monday, June 25, 2018. That same day, the Government delivered its principal summation. The Government argued that among the other overwhelming evidence of Archer's participation in the fraud was evidence that he had helped fund the interest payments on the *first* bond issuance. (Tr. 3678; GX 4010). The Government did not reference the interest payments on the second bond issuance, did not argue that Archer had any involvement in that interest payment, and did not publish GX 4011.

Archer's summation, in contrast, utilized GX 4011 and Agent Kendall's testimony to attack the Government. Thus, for example, Archer argued that "some of the things that were on her charts . . . were misleading" and further claimed that "someone told her to do it that way. Those people may have been trying to trick you [a] little bit." (Tr. 3903). Later Archer argued that Agent Kendall's charts were "egregiously misleading" because:

[T]he government wanted you to believe that this $903,000 which
was the interest payment on the second bond – went through
Rosemont Seneca Bohai on its way to Burnham securities and to VL
Assurance. That never happened. That was just a mistake that
Morgan Stanley made.  That money was adjusted in an internal
adjustment at Morgan Stanley. Agent Kendall admitted this. Right?
And finally we showed her slide 130[1] the way the money really
moved and she said yes, this one was accurate. This one that doesn't
have Rosemont Seneca Bohai on it at all is the accurate one. That's
not the one the government offered. And in fact, that was their
choice. Look at Agent Kendall's testimony on the next page.

"Q: We know that you created a version of your chart that accurately
did not reflect payments going from RSB, Rosemont Seneca Bohai,
to Burnham Securities or VL Assurance, correct? A: Yes."

So, she had done it the right way, and the government chose to show
you the misleading way, because that was the one that had Devon
Archer and Rosemont Seneca Bohai on it. That wasn't the only time
they did it. It wasn't just Agent Kendall . . . We shouldn't be up here
correcting the government's mistakes.  If they want you to convict
Devon Archer, if they want you to find guilt beyond a reasonable
doubt, if they expect you to draw conclusions where there is no
evidence in their favor, they have to put honest evidence in front of
you. And time, after time, after time, that did not happen in this case.
It just didn't. (Tr. 3918-3919).

## B.  Applicable Law

Federal Rule of Evidence 1006 provides that "a summary, chart, or calculation" may be
used "to prove the content of voluminous writings, recordings, or photographs that cannot be
conveniently examined in court." Fed. R. Evid. 1006. The use of summary charts "is a common
procedure," which the Second Circuit has "repeatedly approved." *United States v. Conlin*, 551
F.2d 534, 538 (2d Cir. 1977); *United States v. Yousef*, 327 F.3d 56, 158 (2d Cir. 2003) (citing
*United States v. Casamento*, 887 F.2d 1141, 1149–50 (2d Cir. 1989)).  A summary chart must be
based on foundational testimony or documents connecting it with the underlying evidence
summarized, and must be "based upon and fairly represent competent evidence already before
the jury." *United States v. Koskerides*, 877 F.2d 1129, 1134 (2d Cir. 1989).

A summary chart may contain assumptions and conclusions. *See, e.g., Fagiola v. Nat'l
Gypsum Co. AC & S., Inc.*, 906 F.2d 53, 57-58 (2d Cir. 1990); *United States v. Richardson*, 233
F.3d 1285, 1294 (11th Cir. 2000); *United States v. Jennings*, 724 F.2d 436, 442 (5th Cir. 1984).
Even if the assumptions and conclusions in a summary chart are mistaken, "the chart itself is
admissible, since admissible evidence may be unpersuasive and a defendant has the opportunity

---

[1] The Government has repeatedly asked Archer's counsel to provide the Government with a  copy
of the PowerPoint slides used during his summation but the requests have been ignored.

to rebut it." *United States v. Hemphill*, 514 F.3d 1350, 1359 (D.C. Cir. 2008); *see also Fagiola*, 906 F.2d at 58 (noting that objections that a summary chart "did not fairly represent the documents and was excessively confusing and misleading go more to its weight than to its admissibility"); *United States v. Brown*, 540 F.App'x 31, 32 (2d Cir. 2013) (upholding admission of summary charts even where the summary chart contained certain inaccuracies). Nor do summary charts need to include every relevant transaction in order to be admissible. *Gill v. Arab Bank, PLC*, 893 F.Supp.2d 523, 536 (E.D.N.Y 2012) (rejecting defendant's claim that summary charts depicting only 8% of all transactions presented "an unfair picture" and concluding that "the accuracy of [] the summaries will be decided by the jury.").

Where "the defense has the opportunity to cross-examine a witness concerning the disputed issue and to present its own version of the case, the likelihood of any error in admitting summary evidence diminishes." *United States v. Richardson*, 233 F.3d 1285, 1294 (11th Cir. 2000) (internal quotation marks omitted); *see also United States v. Morin*, 538 F.App'x 1, 2 (2d Cir. 2013) ("any question as to the [summary] chart's accuracy" cured by defendant's ability "to question the government agent who prepared it); *United States v. Walker*, 191 F.3d 326, 336 (2d Cir. 1999) (upholding the admission of summary charts where underlying evidence was "before the jury and available to the defense for purposes of cross-examining" the summary witness); *United States v. Oshatz*, 912 F.2d 534, 543 (2d Cir. 1990) (upholding admission of summary charts where the defendant "had ample time during trial to check the validity of [the computer program underlying the charts] and to cross-examine the Government's witness concerning errors in his calculations.").

## C. Discussion

### a. Archer's Objection is Untimely

As a preliminary matter, Archer's eleventh hour effort to manufacture new issues based on a single inquiry from the Court during oral argument is untimely. Archer had every opportunity either to request that the Government alter its summary charts or to seek to preclude their admission. Indeed, the Government provided its draft summary charts to the defendants weeks in advance precisely to afford the defendants this opportunity. And Archer availed himself of that opportunity, requesting that the Government make certain alterations and seeking relief from the Court when the parties disagreed. But at no time did Archer ever raise an objection to the admissibility of GX 4011. Nor, despite Archer's present claim of prejudice, did Archer challenge the admission of GX 4011 in his more than 150 pages of post-trial briefing.

Archer's decision to consent to the introduction of GX 4011 objection was a clear strategic choice. Armed with what he believed would permit him to successfully impeach Agent Kendall's testimony and thus attack the credibility of the Government's investigation and prosecution more generally, Archer opted to lay in wait. That may well have been the better strategic choice. Archer succeeded in extracting from Agent Kendall the concession that GX 4011 could have been made even more accurate through certain of his proposed changes. And that concession allowed him to raise an attack on the legitimacy of the entire case. (Tr. 3919) (Archer Summation) (arguing that the jury could not convict because as evidenced by Agent Kendall's testimony the Government had failed to put honest evidence before the jury). But Archer cannot have it both ways. Having held back his objections to GX 4011 in an effort to discredit Agent Kendall and the Government's case, he cannot now claim prejudice from its admission.

Archer's suggestion that he preserved an objection to GX 4011 through Galanis's single vague objection to the Government's characterization of the entirety of the summary charts as accurate is simply wrong. Such a generalized objection is simply insufficient to preserve a specific claim. *United States v. Indi-viglio*, 352 F.2d 276, 279 (2d Cir. 1965) (Where an objection or motion is "broadly worded and encompass[es] so many possible errors in the . . . proceedings that it fail[s] to particularize any one specific ground . . . . this is a general objection which is insufficient to preserve . . . a specific claim."). A more specific objection is required because it "alerts the district court to a potential problem [] and facilitates its remediation at little cost to the parties, avoiding the unnecessary expenditure of judicial time and energy in appeal and remand." *United States v. Villafuerte*, 502 F.3d 204, 208 (2d Cir. 2007). Indeed, had Archer raised his purported concerns with GX 4011 with the Government (as he did with respect to other summary charts) the Government would have been happy to have a good-faith discussion with counsel about proposed edits on the condition that the defendants not attack this omission as rendering the chart inaccurate. And if Archer had raised a specific objection at the time the Government offered GX 4011 (or any time prior to that), the Court could have addressed his concerns during trial and could have – if appropriate – directed that any changes be made prior to admission. Archer chose not to do so. But having forfeited his opportunity to seek changes to GX 4011 prior to its admission, and having strategically elected not to object to its admission, Archer cannot now claim prejudice.

> **b. GX 4011 Was Accurate and Archer Suffered No Prejudice From Its Admission**

Archer argues that he is entitled to a new trial because GX 4011 was "entirely wrong." (Dkt. 682 at 4). But it is Archer who is wrong. There is no dispute that on October 1, 2015 the WLCC account at US Bank wired $903,000, representing an interest payment on the second bond issuance to RSB's Morgan Stanley account. There is similarly no dispute that at the time of the interest payment RSB no longer held the Wakpmani bonds. Nor is there any dispute that the wire was subsequently reversed or that the $903,000 was instead sent to Burnham and VL Assurance, who actually held the bonds. Finally, there is no dispute that the reversed wire from RSB did not return to the WLCC account nor did it pass through any other account. In short, GX 4011 was entirely accurate.



That GX 4011 did not explicitly reference the internal Morgan Stanley correction that caused the reversal is of no moment.  Agent Kendall's summary charts did not purport to explain who directed each transfer, but simply tracked the movement of money between accounts.  Nor was there anything misleading about this evidence.  Neither Agent Kendall's testimony nor the contents of GX 4011 suggested that it was Archer who directed that the $903,000 be sent from RSB to the bondholder accounts.  Indeed, GX 4011's explicit reference to the "wire [being] reversed," makes clear that the reversal of that wire and the distribution of the money to VL Assurance and Burnham was a correction. Coupled with Agent Kendall's testimony that RSB had previously held the bonds but did not hold them at the time of the interest payment, the clear import was that the wire had been sent in error and the correction effectuated to provide the interest payment to the current bondholders.

Archer claims, however, that "the government agent testified that GX 4011 showed Mr. Archer payed himself interest on the bonds." (Dkt. 682 at 5).  Agent Kendall said no such thing. With respect to GX 4011, Agent Kendall testified that by virtue of the round trip transaction *VL Assurance* (and not Archer) had functionally paid itself interest on the bonds. (Tr. 2970) (Q: Looking at the million dollars that was wired out by VL Assurance  . . . and the [money] received on October 1, what was the net result of these wires from VL Assurance? A: They received roughly 750,000 back of their million that they sent out . . . Q: So they basically paid themselves the interest on the bonds? A: Yes.).  This was indisputably true.  There was thus nothing misleading nor prejudicial about Agent Kendall's testimony or GX 4011.[2]

Even if there was any ambiguity about GX 4011 – and there was not – that ambiguity was amply clarified by the cross-examination of Agent Kendall and the admission of DX 4523 and 8011.[3]  Archer's cross-examination made explicit what was implicit in GX 4011: that the interest payment was wired to RSB in error, on the incorrect assumption that RSB held the bonds, and that the error was corrected internally at Morgan Stanley by reversing the wire and sending the interest payment to the correct bond holders.   This also further emphasized what was already clear in GX 4011 – that Archer himself did not direct the distribution of the interest payment to VL Assurance and Burnham.

---

[2] Archer also argues that he was unduly prejudiced by GX 4011 because it suggested that he was "alone among the trial defendants in the middle of this transaction" (Dkt. 682 at 4) and because it "put[] Mr. Archer right in the middle of a scheme to recycle bond proceeds." (Id. at 6).  As discussed above, GX 4011 did no such thing.  Moreover, Archer's claim that such a suggestion was different in kind that the other evidence against him is wholly unsupported in light of the clear evidence that Archer was alone among the trial defendants in assisting to make interest payments on the *first* bond issuance.  See, GX 4010.

[3] Archer suggests that the Court should have admitted 3517-5, pg. 67, the Draft Chart about which he questioned Agent Kendall, merely because she agreed that there might have been a better way to depict the transfers and because she agreed it was her work product.  (Dkt. 682 at 6).  But Agent Kendall was clear that 3517-5 *was not accurate* (Tr. 3075-77) and there was thus no basis on which to admit it.

Pointing to the Second Circuit's decision in *United States v. Citron*, however, Archer argues that cross-examination is an insufficient cure for any purported prejudice. But as *Citron* itself explained, cross-examination is generally an adequate cure for any purported inaccuracies in a summary chart. 783 F.2d 307, 316 (2d Cir. 1986) ("reliance on cross-examination may be appropriate" to cure prejudice); *see, also*, *United States v. Morin*, 538 F.App'x 1, 2 (2d Cir. 2013) ("any question as to the [summary] chart's accuracy" cured by defendant's ability "to question the government agent who prepared it); *United States v. Walker*, 191 F.3d 326, 336 (2d Cir. 1999) (upholding the admission of summary charts where underlying evidence was "before the jury and available to the defense for purposes of cross-examining" the summary witness). Such a remedy was insufficient in *Citron* itself only because of the unique circumstances present there – that "the government provided no explanation, either in the form of worksheets, testimony, or other methods of elucidation, showing how it derived the figure" and because the chart did not "fairly represent and summarize the evidence on which [it] was based." *Citron*, 783 F.2d at 316-317. Indeed, the District Court conceded in that case that it had "never seen such playing with numbers and doubletalk and triple talk, which no one understands," *id.* at 316, but nevertheless admitted the chart on the grounds that "if it is weak, cross examination will destroy it totally." *Id.* That is a far cry from the circumstances here. The Government laid an appropriate foundation for GX 4011, the method of its assembly was clear to all, the chart fairly and accurately summarized the evidence and was admitted without any specific objection. In such circumstance any purported inaccuracy was amply cured by cross-examination.

Archer's reliance on *United States v. Groysman* is similarly misplaced. 766 F.3d 147, 163 (2d Cir. 2014). Archer suggest that the Second Circuit's reversal of a conviction in *Groysman* based on a summary chart "may well have described GX 4011" merely because both GX 4011 and the chart in *Groysan* were "pictoral and [] easy to follow, generally showing only four or five boxes, connected by arrows indicating who gave fraudulent documents, checks, and cash to whom." (Dkt. 682 at 5) (internal citations omitted). But the situation in *Groysman* could not have been more different. In that case, essentially everything about the admission of the disputed charts had been improper, including that: (i) they did not "summarize voluminous writings, recordings, or photographs"; (ii) were instead "pictorial representations of hearsay testimony" offered through a witness who had, in effect, summarized in tabular form the anticipated testimony from two cooperating witnesses who testified later at the trial; and (iii) the charts "contained inaccurate and misleading information." *Groysman*, 766 F.3d at 156 (internal quotation marks omitted). Moreover, the Government in that case called the summary witness as its first witness "which gave a coherent, and superficially reliable, narrative of the government's version of [the defendant's] participation in the fraudulent scheme" and functioned as "the equivalent of an opening argument or summation by the prosecution but was presented as evidence" and to bolster the cooperator's subsequent testimony. *Id.* at 157. Nothing remotely approaching such an unusual or egregious situation occurred here. There is no dispute that GX 4011 summarized voluminous writings and relied only on documents properly in evidence. GX 4011 did not draw conclusions or make arguments, but merely traced the flow of funds between accounts. It relied solely on admitted documentary evidence and thus neither summarized nor bolstered any witness testimony. Even assuming that there was anything inaccurate about GX 4011 – and there was not – any such inaccuracy could not have infected the entirety of the trial as the summary charts in *Groysman* did.

In short, Archer has not and cannot show any prejudice arising from the admission of GX 4011, both because GX 4011 was accurate as offered and because any purported confusion was

more than adequately cured by Archer's cross-examination and his admission of DX 4523 and 8011.

### c.   Allegations of Government Misconduct are Without an Iota of Support

Without a single iota of support, and in the face of the clear facts, Archer baselessly alleges that the Government may have known "GX 4011 was misleading when it was offered" and that its use may have been "a targeted effort to improperly shape the evidence to fit a false narrative about Mr. Archer's knowledge and intent." (Dkt. 682 at 6-7).  Archer's spurious accusations should be flatly rejected.

As both Agent Kendall testified and as the undersigned represented in Court, the summary charts represented the Government's efforts to faithfully represent the transactions *as they actually occurred*.  Defense counsel suggests that the existence of the Draft Chart showing the wire to RSB returning to US Bank before being rewired to Burnham and VL Assurance is evidence that the Government knew the truth and chose not to show it.  That is simply ridiculous.  As a preliminary matter, it was the Government itself that produced the draft version of GX 4011 to defense counsel – conduct wildly inconsistent with purported efforts to hide the truth.  Moreover, a review of the entirety of the prior draft of GX 4011 – and not merely the portion included in Archer's letter – makes crystal clear the Government's good faith efforts to ascertain the exact series of wire transfers involved in the second interest payment and to faithfully depict them.



1. GX 306 (VL Assurance) shows transfer to BFG.
2. We are waiting for BFG's Bank of America bank records to show transfer from BFG to US BANK.
3. GX 647 shows transfers to Denver Bond Masters.
   1. GX 301 (RSB statement) shows the money coming in, says its an interest payment, and shows the wire being reversed.
   2. GX 330 (Bonwick account statement) shows money going to Bonwick and says its for an interest payment.
   3. GX 327 shows money going to Burnham and that it's the for Wakpamni interest.
   4. GX 308 (VL Assurance) shows money arriving back at VL Assurance and the line item says its Wakpamni interest.
   5. **GX 647 (US BANK) shows the RSB and Bonwick money leaving US BANK via Denver Bondmasters. I don't see the reversal or the money going to Burnham/VL assurance.**

As evidenced in the full page of Agent Kendall's 3500 material set forth above, at the time the Draft Chart was created, the Government had identified bank records showing the wire to RSB and the reversal of that wire.  And the Government had also identified payments to Burnham and VL Assurance which were identified as interest payments.  But, as reflected in paragraph 5 in bold, the Government had been unable to locate the money sent to RSB being returned to US Bank. Nor could the Government identify a wire from US Bank to Burnham and VL Assurance.  When the Government subsequently confirmed that there were no such wires and that the wire to RSB was reversed directly to VL Assurance and Burnham, it updated its charts to so accurately reflect.  The suggestion that any of this was in bad faith is simply ludicrous.

## II.    Length of Jury Deliberations

Archer, joined by Galanis and Cooney, also argues that the Court should consider the length of the jury's deliberations in connection with post-trial motions because (a) "this was a complex case and required a careful consideration of the documentary evidence," and (b) "the guilty verdict was inconsistent with the trial record and unsupported by the weight of the evidence." (Dkt. 682 at 2-3).  In so doing, the defendants improperly suggest that the relatively shortly deliberations, standing alone, are sufficient to undermine the verdict and to raise questions about whether the jury followed the Court's instructions.  (*See, e.g.*, Dkt. 685) (Cooney Ltr.) ("an unreasonably short jury deliberation is a strong single, in a complex case such as this, that the jury did not follow the Court's instructions.").  The defendants are wrong.  The law is clear that no meaning can be ascribed merely to the length of a jury's deliberations.  The defendants' second argument fairs no better.  The length of jury deliberations can be considered, if at all, only upon a showing that the guilty verdict was in significant contravention of the trial evidence or that some other basis exists to doubt the jury's ability to follow the Court's instructions.  But as described at length in the Government's principal post-trial briefing, the jury's guilty verdict was amply supported by the evidence.  And as described in further detail below, both the trial record and this Court's own observations of the jury make clear that they were attentive, careful and dutiful.  That they were able to reach a prompt verdict speaks only to their attentiveness throughout trial and to the overwhelming weight of the evidence.

As a preliminary matter, it simply cannot be disputed that this was a careful, attentive jury. The Court had a chance to observe the jury throughout this trial, noting, for example, in its introductory remarks to the final jury charge: "You have paid careful attention to the evidence, and I am confident that you will act together with fairness and impartiality to reach a just verdict." (Tr. 4120).  This was, of course, true – the jury *had*, in fact, been paying extremely close attention throughout the trial, taking notes on Government and defense examinations of witnesses, writing down exhibit numbers, and remaining focused throughout the entire trial and three days of Government and defense summations.  In fact, the jury was paying such careful attention that counsel for Archer praised them for it:

> I think certainly myself, Mr. Archer, Laura, Craig, Kendall, appreciate the hard work and attention you obviously are paying every single day; and on this point at least I think I can speak for the other lawyers, including the government and Judge Abrams, and we thank you all very sincerely for your attentiveness to the evidence.

Tr. 3840. Counsel went on to praise the jury for its close scrutiny of the evidence throughout every day of the trial, providing an example of the jury's close attention:

> So I am going to sit down in just a moment, and before I do, I want to make the same request I made before and I've made a few times, which is that you exercise your own common sense when you scrutinize the evidence closely just as you have every single day while we have been here at trial.
>
> I remember vividly that one of the very first witnesses, it may have been Mr. Anderson, it may have been Ms. Driever, I was asking a question, and I showed the witness a document, and there was something kind of funny the way the emails had been produced, and in some of the intermediate emails the headers were not totally complete, and you all spoke and you said hey, I think we're missing a page, I think we're missing some information. I had to show you, I had to prove to you that it was full, complete and accurate, a single email. I had to show you the production numbers. I had to show you there were other emails in the chain from the same person that had the same sort of error.
>
> You required a month ago, you absolutely required that precision, that attention to detail. That wasn't our argument. That was you requiring absolute accuracy . . .

Tr. 3939-40. It therefore cannot reasonably be disputed that the jury did, in fact, pay close attention every single day of the trial, scrutinizing the evidence and demanding accuracy from the parties. If there is any significance to the fact that this scrutinizing, careful, and attentive jury came to a verdict on the first full day of deliberations it is only that the evidence against each defendant was overwhelming. *See* Gov't Mem. In Response to Def. Post-Trial Motions (Dkt. 623 at 18-38). The length of deliberations thus clearly do not support a new trial in this case.

The cases cited by the defendants do not suggest otherwise.[4] While "the claim that the jury contemptuously or flippantly disregarded its duty in considering a matter submitted to it can be

---

[4] In his Sur-sur Reply, Archer characterizes the Court's question at oral argument as being "[w]hether the Court could consider on a Rule 33 motion the extremely short duration of the jury's deliberations in this complex case." (Dkt. 682 at 1). But the Court never suggested the deliberations were "extremely short" and instead asked only whether "it is appropriate [] in the context of a Rule 33 motion to consider the length of the jury's deliberations?" Oct. 22, 2018 Tr. at 32. Nor were the deliberations in this matter unusually short. To the contrary, numerous juries in this District have returned verdicts in a similar time frame in cases of similar length and complexity. *See, e.g.*, *United States v. Bergstein*, 16 Cr. 746 (PKC) (jury returned verdict after two to three hours of deliberations after a four-week complex trial on charges of securities and investment adviser fraud); *United States v. Scali*, 16 Cr. 466 (NSR) (jury returned a verdict in ten minutes after month long trial including approximately seven hours of summations and ten

the proper subject of a motion for a new trial," *Wilburn v. Eastman Kodak Co.*, 180 F.3d 475, 476 (2d Cir. 1999), "[a] jury is not required to deliberate for any set length of time. Brief deliberation, *by itself*, does not show that the jury failed to give full, conscientious or impartial consideration to the evidence." *Id.* at 476 (emphasis added); *see also United States v. Ross*, 694 F. App'x 4, 8 (2d Cir. 2017) (in a summary order, rejecting a defendant's argument that the district court should have granted a new trial because "the jury deliberated for too short a time period," holding that "[f]or a trial judge to grant a Rule 33 motion, he must harbor a real concern that an innocent person may have been convicted," and "there is no set time for which a jury is required to deliberate."); *United States v. Smith*, 09 Cr 331, 2017 WL 3529047, at * 7 (W.D.N.Y. Aug. 17, 2017) (denying defendants' motion for a new trial based on claim that jury could not have reached a legitimate verdict in a five and a half week, multi-defendant trial in only three and a half hours); *United States v. Williams*, 2003 WL 22175980 at *6 (E.D.N.Y. Sept. 17, 2003) ("relatively short length of time" between substitution of alternate jurors and rendering of verdict is no basis for finding that jury failed to follow court's instruction to begin its deliberations anew once alternates were placed on jury).

The defendants in this case have pointed to no errors – aside from rehashing their arguments about the sufficiency and weight of the evidence (which the Court should also reject) – that could possibly demonstrate that the jury "failed to give full, conscientious or impartial consideration to the evidence" during their deliberations. As described above, this was an attentive, scrutinizing jury, and there is no indication that the jury did anything other than follow the Court's careful instructions. Indeed, "[a] jury is presumed to follow its instructions." *Weeks v. Angelone*, 528 US 225, 234 (2000) (citing *Richardson v. Marsh*, 481 US 200, 211 (1987)). "[A]bsent evidence to the contrary, [the Court] presume[s] that jurors remain true to their oath and conscientiously observe the instructions and admonitions of the [C]ourt." *United States v. Rosario*, 111 F.3d 293, 300 (2d Cir. 1997) (quotation and citation omitted). The Court clearly and specifically instructed the jury, *inter alia*, that it was to consider "all the evidence" fairly and impartially (Tr. 4124), that its verdict "as to each defendant must be determine separately with respect to him, solely on the evidence or lack of evidence presented against him" (Tr. 4144), and that it was to "consider each count of the indictment separately and . . . return a separate verdict as to each defendant on each count." (Tr. 4144). As the jury is presumed to have followed the Court's instructions, and there is no evidence that it did anything other than precisely that, the Court should reject the notion that the length of the deliberations demonstrates anything other than the fact that the Government's proof, as summarized in its summations and extensive post-trial briefing, was overwhelming as to each defendant.

*United States v. Cunningham*, 108 F.3d 120 (7th Cir. 1997), a case cited by the defense, supports this conclusion. In *Cunningham*, the Seventh Circuit reversed a district court's judgment

---

separate counts including mail fraud, structuring cash transactions, and obstruction of justice); *United States v. Brian Block*, 16 Cr. 595 (JPO) (jury returned verdict after three to four hours of deliberations in complex accounting fraud trial involving six separate counts); *United States v. Seng*, 15 Cr. 706 (VSB) (jury returned verdict on first day of deliberations after a five-week trial including bribery, foreign corrupt practices act and money laundering charges*); United States v. Tucker*, 16 Cr. 91 (PKC) (jury returned verdict in less than five hours in a five-week trial of two defendants on fourteen separate counts).

of acquittal, holding that the district court "mistakenly relied on irrelevant factors to support the Rule 29 motion," pointing to the district court's opinion that began by noting the length of the jury deliberations, and stating that:

> The time it takes the jury to decide is not the relevant factor.  The weight of the evidence is. . . . If we trust our jury system, we must trust our jurors.  Before attaching great significance to the short time the jury took for deliberations, we must have reason to suspect that the jury in some way disregarded its instructions or otherwise failed in its duty.  A brief deliberation cannot, alone, be a basis for an acquittal.  . . . At best, it is a factor to be considered when deciding a motion for a new trial, and even then cannot be the only basis for granting a new trial.

*Cunningham*, 108 F.3d at 123-24.  Here, the defendants have offered no reason – because there is no reason – "to suspect that the jury in some way disregarded its instructions or otherwise failed in its duty."  And accordingly, the length of their deliberations should play no role in this Court's consideration of their post-trial motions.

Also distinguishable is *Kearns v. Keystone Shipping Co.*, 863 F.2d 177 (1st Cir. 1988), in which the First Circuit upheld the district court's granting of a motion for a new trial in an age discrimination action.  In *Kearns*, the district court took note that the jury "could not have deliberated for more than 20 minutes, effectively, on each of 2 days."  But more significantly, the court found that the jury did so in a case where the verdict "was so clearly against the weight of the evidence as to constitute a gross miscarriage of justice."  *Kearns*, 863 F.2d at 181.  Such a verdict would, of course, require a new trial without regard to the length of deliberations.  Taken together, the outcome was even more clear.  As the First Circuit explained: "When brief jury deliberation is coupled with a verdict that is contrary to the great weight of the evidence [] it creates a situation where the district court has an affirmative duty to set aside the verdict."  *Id.* at 182.  But the length of jury deliberations is relevant only where a verdict constitutes a gross miscarriage of justice.  That is simply not the case here.  In stark contrast to *Kearns*, this is not a case in which the verdict is "contrary to the great weight of the evidence."  To the contrary, and as described in the Government's summations an in the extensive post-trial briefing, the evidence of each defendant's case was clear and overwhelming and the jury was on solid footing in returning a prompt guilty verdict.

Thus, as described above, a Court can consider the length of a jury's deliberations as a factor in connection with a Rule 33 motion only where there is reason to believe the jury disregarded its instructions or where the verdict is contrary to the great weight of the evidence.  Even then, the length of jury deliberations is not dispositive, and should be factored only with extreme caution in light of the strong presumption that jurors remain true to their oath and conscientiously observe the instructions and admonitions of the Court, particularly when it comes to rendering a verdict.  In the present case, the jury's verdict was amply supported by the evidence and there is no reason to believe that it disregarded its instructions.  Accordingly, the Court should not consider the length of the jury's deliberations in any way.

Respectfully submitted,

ROBERT KHUZAMI
Attorney for the United States, Acting Under
Authority Conferred by 28 U.S.C. § 515

By:  /s/_____
    Rebecca Mermelstein
    Brendan F. Quigley
    Negar Tekeei
    Assistant United States Attorneys
    (212) 637-2360/2190/2482

Enclosures

cc:    Counsel of record (via ECF)