UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                        :

UNITED STATES OF AMERICA
                                        :

     - v. -
                                        :       16 Cr. 371 (RA)

MICHELLE MORTON,
                                        :

     Defendant.
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

## SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA

                                             ROBERT KHUZAMI
                                             Attorney for the United States,
                                             Acting Under Authority Conferred by 28
                                             U.S.C. § 515

Rebecca Mermelstein
Brendan F. Quigley
Negar Tekeei
Assistant United States Attorneys

       - Of Counsel -

The Government respectfully submits this memorandum in connection with the sentencing of defendant Michelle Morton, which is scheduled for Friday, November 30, 2018, at 11 a.m. For the reasons that follow, the Government submits that a Guidelines sentence of 120 months' imprisonment is appropriate.

## BACKGROUND

From approximately March 2014 through April 2016, Morton, along with her co-conspirators, engaged in a single fraudulent scheme that had two principle components: (a) to misappropriate the proceeds of bonds issued by the Wakpamni Lake Community Corporation ("WLCC"), a Native American tribal entity, and (b) to use funds in the accounts of clients of asset management firms controlled by Morton and others to purchase the bonds, for which there was no secondary market through which such bonds could be redeemed, without disclosure to those investors of material facts, including the existence of multiple conflicts of interest, and which investments, in some cases, were outside the investment parameters of the accounts in which they were placed. (PSR ¶ 33).

On May 16, 2018, less than one week before trial, Morton pled guilty, pursuant to a Plea Agreement, to (a) conspiracy to commit securities fraud (Count One of the Indictment), and (b) investment adviser fraud (Count Four of the Indictment). In the middle of trial against her co-defendants, on June 14, 2018, Morton informed the Court of her intention to withdraw her guilty plea in an *ex parte* letter. On July 20, Morton filed a motion to withdraw her guilty plea, professing her innocence and recanting her previous admission of guilt. On August 17, 2018, the Court denied that motion. Given the Court's familiarity with the facts of the fraudulent scheme in which Morton participated, the Government will focus in this submission on providing an overview of Morton's role in the offense.

### A. Morton's Efforts to Control Hughes and Fraudulently Purchase WLCC Bonds in Hughes Client Accounts

In the summer of 2014, as Jason Galanis and John Galanis were working to convince the WLCC to issue the first series of bonds through false and fraudulent representations, Jason Galanis and Morton, along with others, worked to acquire an investment adviser, Hughes Capital Management, Inc. ("Hughes"), whose client funds they intended to use to purchase the bonds. On July 31, 2014, Morton – through GMT Duncan LLC – received $2,660,618 from her co-conspirators, which she used to purchase Hughes.  (PSR ¶ 25).  Even *before* she and her co-conspirators acquired Hughes, Morton's focus was on how she could place the WLCC bonds into Hughes client accounts.  (PSR ¶ 78).  As Morton herself admits, her motivation was to obtain financing for her own professional gain.  (Morton Br. at 31 (arguing that Morton "succumbed to a new and different pressure when she met Jason Galanis and became caught up in the heady pursuit of significant financing for her business dream")).  Indeed, Morton had agreed to place the WLCC bonds with Hughes clients as a condition of receiving the financing from Jason Galanis to purchase Hughes.  Morton's communications with Jason Galanis in the run-up to the bond purchase make clear her knowledge of the fraudulent scheme and knowing participation in it.  For example:

- On July 21, 2014, before Morton and her co-conspirators acquired Hughes, she sent the following text message to Jason Galanis:   "Should know how$ we can proceed with bonds soon getting information[.]"   He responded: "I'm confident you will figure it out[.]"   She wrote back: "I will."

- On August 12, 2014, after Morton had acquired Hughes and introduced her co-conspirator, Gary Hirst, to Hughes staff members, she sent a text message to Jason Galanis stating: "Gary was a wreck when the PM's [portfolio managers] said that they could only by [sic] high rated bonds."

- Also on August 12, 2014, Morton sent a text message to Jason Galanis referring to Jason Galanis's role in arranging the investment into Morton's company that allowed her to purchase Hughes. She stated "You invested because of the bonds not me." Jason Galanis responded: "The bonds are only possible because of you my dear."

- The next day, on August 13, 2014, Morton sent a series of text messages to Jason Galanis about her day, including meetings with co-conspirators Hugh Dunkerley and Hirst, and, in an apparent complaint about certain aspects of the day, stated: "And I found out I am nothing more than a bond mule . . . Lovely day[.]   But its all gooooooooood!!!!!!"

(GX 3004).

Once Morton and her co-conspirators acquired Hughes, Morton, who was Chief Executive Officer of Hughes, did not legitimately evaluate the creditworthiness of the bonds or consider whether they were appropriate investments for the Hughes clients.   Indeed, Morton was well aware that clients would react badly to this investments.  (*See, e.g.*, GX 805 (email from Morton to Galanis on the eve of the bond purchase asking whether "there is any supporting documentation" for the bonds and noting that "some [clients] may contact us and ask about the placement in the portfolios and we should be prepared with an answer . . . in some cases purchases are monitored on a real time basis . . . therefore we may get inquiries as early as next week)).  Virtually the only analysis done considered which discretionary accounts could hold unrated, non-US bonds.   And despite this limited analysis, in many cases the purchase of the bonds violated the investment guidelines of the clients in whose accounts they were purchased, as Morton well knew.   (*See, e.g.*, GX 1032 (email from Carolyn Lisa to Morton making clear that the purchase of the bonds would violate various investment agreements and that the bonds could only be purchased if clients signed off in advance)).   For example, a Michelin Retirement Fund ("Michelin") account into which the bonds were purchased was permitted to hold only U.S.

3

treasury bonds, and the purchase of the WLCC bonds thus violated the governing investment agreement.  (GX 131; Tr. 1675).

Morton was also aware that material facts about the bonds had been withheld from clients in whose accounts they were placed, including (a) the fact that the bond purchases fell outside of the investment parameters set forth in the investment advisory contracts of certain Hughes clients, and (b) the fact that numerous material conflicts of interest existed among the parties involved in the transaction.  (PSR ¶¶ 44-46) (*See also*, Trial Tr. 1679-82 (Michelin victim witness testimony that (a) Michelin had not been notified about the WLCC bonds before they were purchased, (b) no one had informed Michelin of multiple conflicts of interest among the parties involved in the transaction, which would have mattered, and (c) Michelin determined that the bonds were not within Michelin's investment guidelines); 1607-17 (Richmond Retirement System ("RRS") victim witness testimony that (a) the WLCC bonds did not seem to fit within the portfolio, (b) no one had informed RRS about the relationship between the placement agent for the WLCC bonds and the people who financed the acquisition of Hughes, which was information he "would have wanted to have known," and (c) RRS tried to get Morton and Hughes to liquidate the WLCC bonds in RRS's portfolio with no success)).

Nonetheless, Morton and Hirst caused Hughes clients to purchase more than $27 million in WLCC bonds.  (PSR ¶ 44)  When Hughes clients learned that the WLCC bonds had been purchased in their accounts, the reaction was swift and universally negative.  Most Hughes clients promptly terminated their relationship with Hughes, and virtually all demanded that the bonds be liquidated.  (PSR ¶ 47).  However, because there was no ready secondary market for

the WLCC bonds, Morton's victims were never able to sell or redeem the securities, which were ultimately revealed to be entirely worthless. *Id.*

Trial testimony and other evidence made clear that in directing the purchase of the bonds, Morton ran roughshod over the Hughes employees who objected to the inappropriate investment, and wholly disregarded and marginalized the experienced financial professionals who objected to the bonds. For example, a former Hughes employee testified how there had been a "cloud over the Wakpamni bonds" at Hughes (Trial Tr. 2053), a junior analyst quit after the bond trade was executed (Trial Tr. 2048), and Hughes clients reacted "[n]egatively across the board" once they learned the bonds were placed in their account (Trial Tr. 2049-50).

### B. Morton's Efforts to Control Atlantic and Fraudulently Purchase WLCC Bonds in an Atlantic Pooled Investment Vehicle

Undeterred by the fallout from her purchase of WLCC bonds into Hughes client portfolios, Morton, along with Jason Galanis and others, quickly moved to purchase yet *another* investment advisory firm – Atlantic Asset Management LLC ("Atlantic") – and, yet again used another pension fund client's money to purchase more than $16 million of another round of WLCC bonds despite material conflicts and material violations of investment policies and agreements. (PSR ¶ 68). As with Hughes, Morton and her co-conspirators schemed to place WLCC bonds with Atlantic clients even before they had purchased Atlantic. For example, on March 25, 2015, before Hughes purchased Atlantic, Morton sent Jason Galanis the following text after meeting with an Atlantic employee: "Going to be tough to put up a trade beforehand but he has other ideas where to place it (he came prepared) but I am super confident because he [M]ike and Cliff are on top of it. If we go with an April 1 I am very confident that we will be able to get it placed within 48 hours depending on us bank settlement issues of which I am not

5

aware." (GX 3004A). Jason Galanis responded: "you have confidence though post close?" Morton wrote back: "Yes I am willing to put my credibility with you on the line and take responsibility personally[.] I'm really feeling good about it. Not because I was a bitch, but because he was ready ab discussed [sic] the multiple clients in which the bond would fit. He was prepared with information. That gave me the confidence to put myself on the line." (GX 3004A). As the foregoing makes clear, notwithstanding the fraudulent placement of WLCC bonds in Hughes client portfolios without their permission or knowledge, and without disclosing to them the massive conflicts of interest that existed with respect to the trades, Morton was scheming to do the *same thing* at Atlantic, seeking to cover up the crime with self-serving assertions about discussions regarding "the multiple clients in which the bond would fit." In truth, no such clients existed, and, as Morton admitted during her allocution, she failed to disclose the conflicts of interest to the Atlantic client upon whom she foisted the worthless WLCC bonds.

On or about April 2, 2015, GMT received a capital contribution of $6,120,398 in order to enable GMT to purchase Atlantic. GMT's purchase of Atlantic also included an agreement to make a deferred payment of $4,854,420. On April 16, 2015, days after becoming the Chief Executive Officer of Atlantic, Morton caused the Omaha School Employees Retirement Systems ("OSERS") to purchase more than $16 million in additional WLCC bonds without disclosing material facts to the client, including that the bonds did not fit within the investment guidelines of the pooled investment vehicle into which they were purchased, and that certain substantial conflicts of interest existed. On April 23, 2015, fewer than ten days after Morton requested a $500,000 loan from Jason Galanis to go toward Atlantic's expenses, and one week after Morton

6

caused Atlantic to purchase $16.2 million in WLCC bonds, Morton's co-conspirators transferred $305,000 of proceeds from the third bond issuance to a bank account associated with Hughes. (GX 4009).

A former Hughes employee testified that he was "stunned" when he learned in June 2015 – after Hughes had purchased Atlantic – that there had been a purchase of *additional* WLCC bonds at Atlantic because (a) the bonds had been purchased in April and he, the firm administrator who was supposed to know what was going on, only found out about it in June, and (b) "there had always been kind of a cloud over the [first purchase of] Wakpamni bonds," so it was shocking that any additional bonds had been purchased. (Trial Tr. 2052-53).

OSERS was the only institutional investor in the fund Morton used to purchase the WLCC bonds. OSERS' victim witness testimony established that Atlantic, at Morton's direction, had purchased the WLCC bonds into an Atlantic fund using more than $16 million of OSERS' funds without telling OSERS in advance, notwithstanding (a) the conflicts of interest present in the purchase and (b) the fact that the WLCC bonds did not fit within the guidelines for the fund. (Trial Tr. 656-57; 741-43). OSERS was only informed of the WLCC purchase after the fact, during a telephone call in which Morton, among others at Atlantic, participated. (Trial Tr. 741-43). After the phone call, OSERS immediately demanded that the WLCC bonds be sold out of the fund, but, despite Morton's promises and assurances for the several months, the bonds were never sold. (Trial Tr. 746-53).

In sum, at Atlantic, Morton repeated the *modus operandi* she and her co-conspirators used to fraudulently place WLCC bonds in Hughes client portfolios – (1) scheming to place bonds with firm clients even before purchasing the firm, (2) contravening established firm

7

policies and procedures regarding investment decisions to force firm employees to purchase the bonds, and (3) purchasing the bonds notwithstanding the fact that there was no secondary market through which the bonds could be redeemed, no disclosure to investors of material conflicts of interest, and the bonds were, in many cases, outside the investment parameters of the client accounts into which they were placed. Morton implemented the scheme not once, but *twice*.

### C. Morton Contacts FINRA and Attempts to Cooperate as Part of her Attempt to Cover Up Her Crimes

By June 2015, Hughes clients had been barraging Morton with complaints about the WLCC bonds for several months. OSERS, the Atlantic client, had similarly expressed its shock and dissatisfaction about the purchase of the WLCC bonds, and demanded that the bonds be sold immediately. By that time, Morton was well aware that those complaints could lead to litigation and regulatory inquiries. As the Court has already noted: "Morton attempted to cooperate in June 2015, months after WLCC bonds were deposited into accounts of clients of Hughes and Atlantic and only after she was put on notice by clients that she would likely face legal action." (August 17, 2018 Order Denying Mot. to Withdraw Guilty Plea (Dkt. No. 568)).

Indeed, communications leading up to June 2015 demonstrate that Morton was specifically concerned about the threat of investigations and litigation related to the WLCC bonds. For example, in a text message to Jason Galanis on March 12, 2015, Morton raised concerns about "be[ing] subject to litigation or [an] sec inquiry" after she was contacted by representatives of one of the pension funds, Richmond Retirement Services:

> Got an email from an attorney and the city attorney from Richmond today about the bond. Got to figure out how to handle. Cannot be subject to litigation or sec inquiry. Gotta focus . . . Focus on the threat of a lawsuit for breach of fiduciary duty for putting the bond in an account

8

(GX 3004).

Morton's self-serving efforts to purportedly attempt to raise concerns with FINRA regarding Jason Galanis were part of her attempt to save herself by pointing the finger at others. Her attempts occurred well after she learned that Hughes and Atlantic clients were dismayed and contemplating legal action regarding the WLCC bonds. The SEC served Morton with its first set of document requests related to the WLCC bonds in July 2015. In the late summer and fall of 2015, after being approached by the FBI, Morton met with prosecutors and agents and also communicated with SEC staff. Among other things, Morton recorded two meetings with Jason Galanis, sent the SEC and the FBI selective and self-serving emails, and consented to a search of her cellphone. Thus, Morton's belated and meager "cooperation" occurred because she had been caught, not because of any legitimate desire to blow the whistle.

## DISCUSSION

In light of the seriousness of the offense, the need to the promote respect for the law, and provide just punishment, the Government respectfully submits that a Guidelines sentence of 120 months is appropriate.

**I.      The Guidelines Range is 168 to 210 Months' Imprisonment, with a Statutory Maximum of 120 Months' Imprisonment for Counts One and Four**

The Government and the Probation Department agree, and Morton does not dispute, that the Guidelines range is 168 to 210 months' imprisonment. This is calculated as follows:

- Pursuant to U.S.S.G. § 3D1.2(d), Counts One and Four are grouped together because the offense level is determined largely on the basis of the total amount of loss.

- U.S.S.G. §2X1.1(a) applies to the offense charged in Count One. Pursuant to §2X1.1(a), the base offense level for conspiracy is the offense level for the substantive offense.

9

- U.S.S.G. § 2B1.1 applies to the substantive offense of securities fraud, which is the object of the conspiracy charged in Count One. Pursuant to U.S.S.G. § 2B1.1(a)(1), because securities fraud has a statutory maximum term of imprisonment of 20 years, the base offense level is 7.

- Pursuant to U.S.S.G. § 2B1.1(b)(1)(L), because the loss resulting from the offense was more than $25,000,000 but less than $65,000,000, 22 levels are added.

- Pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i), because the offense involved 10 or more victims, two levels are added.

- Pursuant to U.S.S.G. § 2B1.1(b)(19)(A)(iii), because the offense involved a violation of securities law and the defendant was an investment adviser or associated with an investment advisor at the time of the offense, four levels are added.

(PSR ¶¶ 86-91). As set forth in the Plea Agreement, Morton was also entitled to a two level reduction for acceptance of responsibility only if she "clearly demonstrate[d] acceptance of responsibility to the satisfaction of the Government through her allocution and subsequent conduct prior to the imposition of sentencing." (PSR ¶ 8). She has not done so. Although Morton pled guilty, she subsequently sought to withdraw her guilty plea, claiming, among other things, that she was innocent. This false profession of innocence is wholly inconsistent with any acceptance of responsibility and – as Morton herself recognized in seeking to withdraw her plea – makes any reduction for acceptance of responsibility inappropriate. (*See* Morton Motion to Withdraw Guilty Plea (Dkt. 549) at 6, n. 2 (noting that if "the Court denies Ms. Morton's motion [] she [would] face sentencing without credit for acceptance of responsibility)).

Accordingly, the total offense level is 35. Morton has no criminal history points and is thus in Criminal History Category I. Therefore, the Guidelines range is 168 to 210 months' imprisonment. However, pursuant to U.S.S.G. § 5G1.1(a), because the statutorily authorized maximum sentence for Counts One and Four is 120 months' imprisonment, which is less than

10

the minimum of the applicable Guidelines range, the statutorily authorized maximum sentence for Counts One and Four is the applicable Guideline sentence. Accordingly, the applicable Guideline sentence for Counts One and Four is 120 months' imprisonment.[1]

## II. A Guidelines Sentence is Appropriate

A total sentence of 120 months' imprisonment is sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing. The Court should reject Morton's arguments that she be sentenced to home confinement and community service, as such a sentence would fail to recognize the seriousness of the offense here. Moreover, it would create an unwarranted sentencing disparity amongst her co-defendants, where Jason Galanis was sentenced to 173 months' imprisonment and Hirst was sentenced to 96 months' imprisonment for their conduct in this case.

The Probation Department recommends a total sentence of 84 months' imprisonment – 60 months on Count One and 24 months on Count Four, to run consecutively. While observing that Morton "has failed to fully accept full responsibility for her actions," the Probation Department's recommendation appears to be based largely on Morton's lack of prior criminal history – which is accounted for in her Criminal History Category – and that she "remained compliant during Pretrial Services, but for the fact that she was not employed." (PSR at 36). The Government respectfully disagrees with the Probation Department's assessment and submits, as set forth below, that a more substantial sentence called for by the Guidelines is warranted.

---

[1] This is also the Stipulated Guidelines Sentence reflected in the Plea Agreement.

### A. A Guidelines Sentence Would Recognize the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment, and to Provide Adequate General Deterrence

A Guidelines sentence would be appropriate "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," 18 U.S.C. § 3553(a)(2)(A), and to provide general deterrence, 18 U.S.C. § 3553(a)(2)(B).

#### 1. Morton Participated in a Massive Fraudulent Scheme and Her Professed Justifications are Unpersuasive

Simply put, this was a massive fraud which resulted in incredible losses to pension and retirement fund victims. To start with, the loss amount of $43 million plainly puts Morton and her co-conspirators among the most culpable of fraud defendants nationwide. Sentencing Commission statistics for 2017 show only 1.3 percent of defendants sentenced last year pursuant to U.S.S.G. § 2B1.1 had a loss figure of greater than $20,000,000. *See* U.S. Sentencing Comm., *Use of Guidelines and Specific Offense Characteristics, Offender Based, Fiscal Year 2017*, at 11, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2017/Use_of_SOC_ Guideline_Based.pdf.

Further, the Wakpamni scheme was highly complex. In both the late summer of 2014 and the spring of 2015, the conspirators nearly simultaneously (i) executed the purchase of an investment adviser firm (Hughes in 2014 and Atlantic in 2015) and (ii) executed a bond issuance, the entirety of which they placed with clients of that newly acquired investment adviser. To succeed, the conspirators needed to deceive the WLCC, lawyers involved in the bond issuances and sales, banks involved in various aspects of the bond transactions and related wire transactions, and Hughes and Atlantic employees and, ultimately, victim clients, who voiced

12

doubts about and rejected the bond purchases.

Morton played a key role in this scheme. Morton, who had a fiduciary duty to Hughes and Atlantic clients, bulldozed her way through the established investment policies of both Hughes and Atlantic in order to force Hughes and Atlantic clients to purchase worthless WLCC bonds—all to benefit herself and her co-conspirators. In a complete breach of her duties as an investment adviser, Morton did not care about Hughes or Atlantic clients' interests or investment strategies – she agreed to purchase WLCC bonds into Hughes and Atlantic client accounts *before* she acquired Hughes and Atlantic and *before* the necessary analysis had been done as to whether the bonds would fit in the investment parameters of client accounts. Any suggestion by Morton that the WLCC bonds were a good investment for Hughes and Atlantic clients or that she had altruistic motives in placing the bonds in client portfolios is belied by her own communications with Jason Galanis expressing initial doubts about the bonds before agreeing to go through with the purchase as a condition of obtaining financing to purchase Hughes. And if Morton truly believed the WLCC bonds were a good investment, she could have consulted clients before their purchase, disclosed the relevant conflicts, and confirmed that the clients indeed wished to make the purchase. Instead, Morton abandoned her fiduciary duties to Hughes and Atlantic clients by putting her interests – obtaining financing to purchase those firms and becoming the Chief Executive Officer of them – ahead of her clients' interests. Morton was aware that the WLCC bonds did not fit within Hughes and Atlantic client investment strategies, knew that the bonds were outside the parameters of client accounts, and, rather than take the time to vet the bonds, disclose conflicts of interest, or even introduce herself to clients, she rushed place the bonds in client accounts. For example, as described above, and as Morton knew, even the limited

13

analysis that was done in the days after Morton purchased Hughes showed that the bonds violated the investment guidelines of many of the clients in whose accounts they were purchased.

Morton's professed justifications for her conduct are entirely unpersuasive and contrary to the record evidence. For instance, Morton argues that she was interested in socially responsible investing and Native American development initiatives, and that she "liked the idea of purchasing the Bonds for appropriate client accounts because she believed the WLCC Bonds supported Hughes' desire to make socially responsible investments and because of her history supporting Native American economic development." (Morton Br. at 14-15). But whether Morton "liked" the idea of the bonds or was interested in socially responsible investing is wholly irrelevant. Morton breached her fiduciary duty to Hughes and Atlantic clients when she forced them to purchase WLCC bonds, disregarding the firms' established investment policies and practices, the investment parameters of client accounts, and failing to disclose material conflicts of interest in the transactions. Trial testimony established that "socially responsible investing" was not relevant to the investment strategies that Hughes was authorized to implement for some of its client accounts. (Trial Tr. 1680 (Michelin witness testimony that Michelin did not have a mandate to make socially responsible investments and "socially responsible investing" was not relevant to the U.S. government bond portfolio that Michelin held with Hughes); 1603 (RRS witness testimony that RRS did not have any requirements or mandate to make a certain percentage of investments in socially responsible causes)).

Morton's attempt to blame others for the decision to purchase the bonds is similarly, and transparently, false. For example, Morton points the finger at her business partner, Richard Deary, co-defendant Gary Hirst, the Hughes Chief Compliance Officer and "other Hughes

14

investment employees" who she says analyzed the potential purchase of the bonds for Hughes accounts.  (Morton Br. at 15).  As discussed above, any such analysis was incomplete and only demonstrated to Morton that the bonds were not appropriate for many Hughes client accounts. Moreover, Morton completely fails to address (a) her own conduct – her plan to make sure Hughes client accounts would purchase the bonds before she acquired Hughes, and her actions in implementing that plan immediately after purchasing Hughes, and (b) her failure to disclose material conflicts of interest to Hughes clients prior to purchasing the bonds in Hughes client accounts.

Morton also argues that the clients wished to liquidate the WLCC bonds because they "did not like" the investments.  (Morton Br. at 15).  This too is refuted by the record evidence. Upon learning about Morton's acquisition of Hughes without proper notice and the purchase of the bonds, Hughes clients, unsurprisingly, decided to leave.  (Tr. 1613).  The Michelin witness testified that even leaving aside the change in ownership, the purchase of the bonds would have itself likely caused Michelin to terminate Hughes.  (Tr. 1686).  Similarly, the RRS witness testified that the purchase of the bond played a role in their decision to terminate Hughes.  As the witnesses testified, the bonds were inappropriate investments for their portfolios and fell outside of the parameters of the investment agreements.  (*See, e.g.*, Tr. 1612; 1676).

Finally, Morton argues that, during negotiations to purchase Atlantic, an Atlantic investment employee "informed [her] that Atlantic clients would be interested in the WLCC Bonds."  (Morton Br. at 16).  This description appears based on DX 1142, an email from Morton to Galanis, in which she recounts that she spoke to an Atlantic representative and told the representative about the Hughes "Native American Initiative" and that investing in the "Native

15

Sovereign private placement bonds" (i.e., the Wakpamani bonds) was important to her. Morton relayed that Atlantic was "on board with this" and would do its "damndest to get it placed." There is no indication that the employee said Atlantic clients would be interested in the investment, and, regardless, the WLCC bonds were outside of the investment parameters of the Atlantic investment fund into which they were ultimately purchased.

Morton's participation in the scheme and complete breach of fiduciary duties to Hughes and Atlantic clients, causing them to lose more than $40 million dollars, constitute incredibly serious conduct over an extended time period. Morton's argument that her conduct was "aberrant" in the scheme of her life (Morton Br. at 31) ignores that her conduct in this scheme spanned more than a year and involved a *modus operandi* that she implemented not once, but twice – first with Hughes client funds and then again with an Atlantic client's funds.

The amount of the loss Morton caused Hughes and Atlantic clients, the scope of the fraud, and Morton's specific involvement in numerous aspects of the fraud show that a Guidelines sentence is necessary to reflect the seriousness of the offense, promote respect for the law, and deter others from engaging in similar conduct in the future.

### B. Morton's Attempted Cooperation Does Not Support a Variance

Morton overstates the value and extent of her attempted cooperation, which does not support a variance in light of the seriousness of her conduct and the other sentencing factors discussed. Morton's efforts to contact FINRA, her communications with the SEC, and her meeting with the Government and the FBI all carry a common theme – Morton's attempt to cover up her crimes by casting blame on anyone but herself for the fraudulent scheme. Morton's contact with FINRA occurred well after Morton had already forced Hughes and Atlantic clients to purchase more than $40 million in worthless WLCC bonds. Morton argues

that, when she reached out to FINRA, she was "wholly unaware of Galanis's broader scheme to misappropriate the proceeds of the Bonds for his own purposes." (Morton Br. at 17). But even if Morton did not know how Jason Galanis intended to misappropriate the bond proceeds, her communications with Jason Galanis and others, and the roughshod method by which she forced the bonds to be purchased in Hughes and Atlantic client accounts, demonstrate that she was aware of the many problems with the WLCC bonds from the very beginning of her involvement in the scheme. She chose to stay quiet until she was caught because it was in her interest to maintain the fraud and further her personal gain.

Moreover, and as noted above, Morton engaged with the SEC only *after* receiving document requests, and only met with the FBI and the Government *after* the FBI approached her. There is no evidence that Morton would have engaged with law enforcement if she had thought her fraud could have remained hidden. Once it began, Morton's attempted cooperation was limited to recording two meetings, approximately nine telephone calls with Jason Galanis, and sending the SEC and FBI selective and self-serving emails. Morton also signed a consent form to search her cellphone, which contained communications that the Government later used as part of its proof against Morton and her co-conspirators. Morton speculates that providing consent to search her phone and her recording of meetings with Jason Galanis "ultimately provided the government with evidence that led to guilty pleas and convictions in this case." (Morton Br. at 28). While the contents of Morton's cellphone were helpful, the mere act of consenting to a search of her phone does not set Morton apart from countless other defendants who consent to their phones being searched instead of requiring the Government to obtain a search warrant, and does not qualify as the type of assistance that would merit a sentence reduction. When viewed

17

in the context of her offense conduct, her refusal to accept responsibility for her role in the offense, and other sentencing factors, Morton's attempted cooperation should not be a basis for a sentence reduction.

### C. Morton's Medical Condition, Personal History, and Characteristics Do Not Warrant a Below Guidelines Sentence

Morton's personal history and medical conditions do not warrant the significantly below-Guidelines sentence of home confinement and community service that she seeks. Morton acknowledges that she led, in many respects, a highly privileged life and enjoyed the support of her parents for most of her life. In her sentencing submission, Morton recounts extremely serious events in her life that are obviously very difficult. However, those events, which occurred many years ago, have nothing to do with her extremely serious offense conduct and do not mitigate against a Guidelines sentence. Morton's medical conditions – and the medical conditions of her family members – also do not set her apart from countless other defendants and do not provide a basis for the significantly below Guidelines sentence that she seeks. There is no reason to believe that the Bureau of Prisons is not capable of treating the medical issues Morton is currently dealing with.

***

Accordingly, a Guidelines sentence is appropriate.

## III. Restitution and Forfeiture

Consistent with the recommendation of Probation, the Court should order restitution in the amount of $43,785,175. A proposed order of restitution (with a schedule of victims filed under seal) is attached. In addition, the Morton should be required to forfeit the amount of $9,086,016, representing the funds that Morton received for GMT Duncan to purchase each of

Atlantic and Hughes, in addition to $305,000 that Morton received to cover Atlantic expenses after purchasing WLCC bonds into an Atlantic account.  The Government will provide a proposed preliminary order of forfeiture prior to sentencing.

## CONCLUSION

For the foregoing reasons, the Government requests that the Court impose a total Guidelines sentence of 120 months' imprisonment on Counts One and Four.

Respectfully submitted,

ROBERT KHUZAMI
Attorney for the United States, Acting Under
Authority Conferred by 28 U.S.C. § 515

By:  /s/ Negar Tekeei
     Rebecca Mermelstein/Brendan F. Quigley/
     Negar Tekeei
     Assistant United States Attorneys
     (212) 637-2360/2190/2482

Dated: November 23, 2018
       New York, New York