**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**16-cr-371 (RA)**

---

**UNITED STATES OF AMERICA**

**-against-**

**BEVAN COONEY,**

**Defendant.**

---

**SENTENCING MEMORANDUM ON**
**BEHALF OF BEVAN COONEY**

**Table of Contents**

I.    PRELIMINARY STATEMENT .........................................................................1

II.   INDIVIDUALIZED ASSESSMENT OF BEVAN COONEY ............................................24

    A.    History and Characteristics of Bevan Cooney .........................................................24

        1.    Personal Background, Education and Family……………………………..25

        2.    Bevan Cooney's Dedication to His Parents and his Extended Family
            Members…………………………………………………………………32

        3.    Mr. Cooney's Commitment to His Friends Epitomizes the Character Traits
            Most Often Used to Describe Him: "Kindess and Generosity"………... 35

        4.    By All Accounts Mr. Cooney's Friends and People Who Conducted Business
            With Him Including his Representatives From Fulton Management Agree
            that the Instant Offense is Not Consistent with Mr. Cooney's Honest
            Character and Their Belief That it was Mr. Cooney's Good Nature that Led
            Him to Use Bad Judgement by Trusting Jason Galanis…………………37

III.  The Nature and Circumstances of the Offense Conduct....................................................41

IV.   ANALYSIS........................................................................................................... 42

    A.    The Law Permits a Below Guideline Sentence…………………………….…..42

        1.    Guidelines Range .............................................................................42

        2.    The Sentence Guidelines in This Case Do Not Properly Reflect the
            Degree of Bevan Cooney's Culpability ...................................................... 45

V.    Legal and Factual Challenge To the Probation Department's Calculation of Loss……… 47

        1.    The Offense Level Should Commence At No Higher Than Base Offense
            Level 7…………………………………………………………………

        2.    The Trial Evidence Failed to Establish Any Loss-Actual or Intended
            ........................................................................................................47

            1.  Actual Loss…………………………………………………...50

            2.  Intended Loss………………………………………………….53

3.  Mr. Cooney's Guidelines Should Not be Increased by 2 level because the offense involved 10 or more victims pursuant to USSG 2B1.1 (b)(2)(A)(i) as set forth in the PSR………………………………………………..56

4.  The PSR erroneously increases Mr. Cooney's base offense level by 2 levels for Obstruction of Justice pursuant to USSG 3C1.1 because it provides that Mr. Cooney provided false documents to the SEC…….57

5.  Mr. Cooney Objects to the Denial of Mitigating Role Adjustment….. 59

A.  Minor Role Reduction is Appropriate

VI.  The Court's Discretion to Vary from the Advisory Guidelines is Well Established…….60

A.  The Factors Set Forth in 18 U.S.C. § 3553 as Applied in This Case Do Not Require Incarceration.............................................................................................61

B.  Bevan Cooney's Character and Background Militate Against Substantial Incarceration ...............................................................................................................62

C.  Neither Specific nor General Deterrence Will Be Served by Substantial Incarceration ...............................................................................................................65

i.  A Sentence of Substantial Incarceration Will Not Further the Goals of Specific Deterrence or the Need to Protect the Community ..................................................................65

ii.  A Sentence of Substantial Incarceration Will Not Further General Deterrence ...................................................................................................66

D.  A Sentence of Substantial Incarceration Would Result in Unwarranted Sentencing Disparity...............................................................................................................68

1.  Other Sentencing Considerations.........................................................70

VII.  CONCLUSION....................................................................................................71

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

## 16-cr-631 (RA)

---

### UNITED STATES OF AMERICA

### -against-

### BEVAN COONEY,

### Defendant.

---

### SENTENCING MEMORANDUM ON
### BEHALF OF BEVAN COONEY

Defendant Bevan Cooney, through his counsel, respectfully submits this Sentencing Memorandum to assist the Court in determining an appropriate sentence in this case following a trial in which Bevan Cooney was convicted of Counts One and Two.

## I.    PRELIMINARY STATEMENT

Until the instant offense, Mr. Cooney had perfect credit and surrounded himself with reputable financial advisers like Fulton Management; he relied upon top lawyers like Tim Anderson from Dilworth Paxson and savvy financial investors from reputable investment banking firms like Burnham Securities. As the Court has now acknowledged in its November 15, 2018 decision and order, ECF Doc. No. 690 ("Rule 33 Op.") granting co-defendant Devon Archer a new trial, the Court viewed Mr. Cooney and Mr. Archer in many respects as similarly situated ("the flaw most fatal to Cooney's motion, and which is the most substantial distinction between the evidence against him and Archer, is that Cooney received money directly from the purported annuity provider for the WLCC.")  (Rule 33 Op. at 46). While we understand the Court's concern that a miscarriage of justice prompted a decision for new trial for Mr. Archer, we continue to believe that the evidence against Mr. Cooney was less compelling than it was against Mr. Archer.

1

This is our first opportunity to respond to the Court's decision. Given Mr. Cooney and Mr. Archer's similar roles in terms of culpability, we do believe that the Court's view of the evidence against Mr. Cooney and Mr. Archer is highly relevant at Mr. Cooney's sentencing and therefore we discuss some of the Court's rational accordingly. Mr. Cooney was named last on the indictment and given the recent SEC complaint filed against Jason Sugarman on June 26, 2019-- outlining the Government's evidence in this case, we continue to believe that Mr. Cooney is viewed by the government as less culpable than Devon Archer and certainly the least culpable defendant charged in this case to date.  (Ex. P).  The Court's decision concluded that despite being involved in the roll up plan, as an investor, see TR 907:3-9, "Cooney, a friend of Galanis', did not have a formal role at any of these entities." (Rule 33 Op. at 5). The Court further agreed that there was:

> no indication that the roll up plan itself was illegal or otherwise suspect.  Indeed in pursuit of this plan the defendants and their business partners acquired numerous legitimate companies, which collectively managed assets in the billions of dollars.  See Tr. 1324:18-24.

The Court notes in its decision that the complexity of the evidence in this case stems in part, from the tangled web of related transactions involving the legitimate companies and those entities that were created at the direction of Jason Galanis solely to further the bond scheme and which were purposefully given names to make them appear related to the legitimate entities. (Rule 33 Op. at 3)   Mr. Cooney was far less involved than Mr. Archer in any of the companies that were created by Jason Galanis.  For example, as the Court noted, Mr. Archer was a principal of the ont Group, a 2.4 billion private equity firm, and during the relevant period of this case, he was also the Chairman of Burnham, he sat on the investment committee of BSI and was on the Board of WAH. (*Id.*)   By all accounts throughout the trial the evidence was undisputed that Mr. Cooney was not a sophisticated financial investor, he did not have managerial role or any advisory role on any Board or involved in this case. Mr. Cooney had never been to the offices of Burnham Financial Group ("Burnham"), Wealth Assurance

Holdings, Burnham Securities, Inc. ("BSI") or Burnham Asset Management ("BAM").  Mr. Cooney has

nothing to do with the creation of any fake entity and just like Mr. Archer he had no idea that Jason

Galanis had misappropriated the proceeds of the WLCC bond.

Mr. Cooney's involvement with the purchase of the second tranche of bonds and the evidence

against him, is entirely similar to the evidence against Mr. Acher which the Court found was not

dispositive of his guilt.  In fact, Archer purchased the second tranche of bonds for 15 million dollars on

October 1, 2014 through an entity of which he was the sole managing member, Rosemont Seneca Bohai

("RSB") weeks before Mr. Cooney purchased the bonds for 5 million dollars on October 9, 2014. GX

4005 at 6.   Mr. Cooney purchased the bonds in his own name. Mr. Cooney followed the lead of Mr.

Archer and just like Mr. Archer, Mr. Cooney had no reason to know that the money used to purchase the

second issuance of bonds was misappropriated from the proceeds of the first set of bonds.  The

following conclusions made by the Court concerning Mr. Archer equally apply to Mr. Cooney:

- The government's overwhelming reliance on circumstantial evidence is coupled with Jason
  Galanis' deception, including of those who intentionally aided his crimes.  His modus operandi
  was to compartmentalize his schemes, such that each participant know only that which was
  essential to his or her narrowly defined role (Rule 33 Op. at p. 20)

- Indeed, the trial record is replete with acknowledgement by accomplices of Jason Galanis
  that he was intentionally deceptive, rendering them unaware of various aspects of his illegal
  conduct including those central to the WLCC scheme—and that sometimes they did not learn
  the truth until they reviewed the indictment in this case or were otherwise informed by the
  government.  See Rule 33 Op. citing Tr. 932:7-14, 933:17-20, 1028:4-10, 1120:17-1121:10,
  1126:5-1128:17, 1142:12-21, 1311:24-1312:6, 1339:10-24, 1425:1-15, 1557:2-6, 2142:6-13,
  2144:1-22, 2159:8-21, 2296:9-18, 2326:8-15, 2329:16-23, 2332:21-2333:17, 2335:2-4,
  2336:5-7, 2345:15-2346:2.

- The government's cooperating witnesses only learned that the WLCC deal was fraudulent by
  virtue of their independent observations. Dunkerly, despite his close relationship with
  Galanis and after already having performed discrete acts in furtherance of the conspiracy,
  arrived at this realization with Galanis only when he noticed that the bonds proceeds to the
  WAPC account, to which he had access, were not being used to purchase the annuity.  Rule
  33 Op. citing Tr. 1310:13-21.  Mr. Cooney just like Mr. Archer had no such clues.  *Id.*

**We believe that just like Mr. Archer, Mr. Cooney's emails are consistent with his innocence**.  The Court has now agreed that emails involving Jason Galanis, Mr. Cooney and Mr. Archer were "facially innocuous or, at best, most naturally subject to innocent interpretations."  Rule 33 Op. at p. 25.  The Court viewed these emails as more probative of Archer's innocence.  The Court cites as one example, an April 2014 message from Jason Galanis regarding a transaction that never came to fruition in which Galanis wrote "20mm bond approved.  Proceeds are 15mm to us and 5 mm to them for a winery investment they want to make."  GX 2011.  **The Court highlights Mr. Cooney's reply asking, "what do we get to with the 15mm"(GX2120)** and concludes: "while the government argues that this is further probative of criminal intent, a more natural inference is that Cooney did not understand Galanis to mean that they would steal the money but instead that there would be limitations of some sort on how the funds could be used, presumably pursuant to the agreements that would govern the contemplated transaction."  *Id*. at 27.

The Court's decision granting co-defendant Archer a new trial noted the following additional evidence which distinguished Cooney from Archer which we briefly address here only so far as this evidence is relevant to sentencing and perhaps any lingering considerations the Court may have as to the evidence against Mr. Cooney: (1) Cooney's purported lies to City National Bank ("CNB") regarding his purchase of the second tranche of bonds; (2) Cooney's receipt of money directly from the WAPC account, consisting of $75,000 from the final issuance and $4 million purportedly to purchase Jason Galanis' home in Bel Air;  and (3) Cooney's purported participation in backdating forms related to Calvert – a fake entity.

We respectfully disagree with the Court's view that Mr. Cooney was somehow part of the inside world of conspirators, and not a pawn used by Jason Galanis in furtherance of his criminal scheme.  Mr. Cooney was just as much as a pawn as Mr. Archer.  In the case of Mr. Cooney, just like in the case of Mr.

Archer, neither of the government's cooperating witnesses ever communicated with Cooney about the WLCC scheme.  *Rule 33 Op. at p.44.*  Except for a single comment by Francisco Martin regarding the so-called phone call which Cooney made after Jason Galanis was arrested in the Gerova fraud, there was simply no evidence at trial that Mr. Cooney was indistinguishable from Mr. Archer as far as evidence of communication with the cooperators.  Dunkerly testified that he met Cooney two or three times on social occasions, that Cooney was a "great guy: and that he was never together with Cooney at 1920 Bel Air (Tr. 1298) (See Ex. R); Dunkerly had trouble remembering even one email that he had with Mr. Cooney and he testified that he "never" spoke to Mr. Cooney about the WLCC bonds.  (*Id*).  While we understand the Court's decision to view Mr. Cooney as part of the Jason Galanis' inside world and the arguments by Archer's counsel that Archer was somehow used by Jason Galanis and Mr. Cooney for his money and connections (Archer Br. at 78).  We wholeheartedly reject this argument and point the Court to evidence that indicates that Archer was aware and fully embraced that others were trading on his connections in furtherance of the success of the financial conglomeration (see, e.g., GX 2211 (June 1, 2014 email from Jason Galanis to Archer and Cooney regarding a Wealth Assurance audit report, and stating, "With Archie's new 'enterprising' global profile, having full control over this platform would lead to world domination on p/e trades we are looking to do.  Aligns the media and political stature Mr. Archer now enjoys with the financial stature.  Add the golden smile, and we could be massively effective."); GX 2059 (October 28, 2014 email from Jason Galanis to Archer and Morton, encouraging Archer to "disclose how you see your partner Hunter involved . . . That will help frame things for [Morton] so she can approach our pension fund clients."); GX 2078 (April 14, 2015 emails between Archer and Jason Galanis regarding an Atlantic founding partner, Don Trotter, during which Archer asks, "How do we get ahead of Don Trotter?  Anything to do now?," and Jason Galanis responds, "feels like the plan is winning hearts and minds through a full preppy assault on the connecticut [sic] contingent")).

### i.  We respectfully Disagree With the Court that the CNB Evidence Involving Mr. Cooney Was Dispositive of His Guilt

The Court notes that it is clear from the trial record that Cooney's "ownership" of the bonds was one factor considered by CNB in election to provide him with the 1.2 million loan. Rule 33 Op. at p. 50. The court respectfully overlooks compelling email evidence which refutes this argument and testimony from Steve Shapiro himself.  Steve Shapiro testified that the WLCC Bonds were not eligible collateral under CNB's credit policy and therefore CNB's focus was always on Mr. Cooney's IPO stock which they expected he would be able to sell and make payment on the loan. (Tr 1762-63) (Shapiro):  (Q: Now, is it true that the bonds were not acceptable collateral under City National Bank's credit policy? A. That is correct) (Tr 1762-63) (Shapiro)

Certainly the Court can appreciate CNB's stated credit policy that they would not grant a lender a 1.2 million dollar loan based on illiquid bonds.  The evidence shows that Fulton Management applied for a line of credit on Mr. Cooney's behalf in January of 2015 and Mr. Cooney was given a $100,000 line of credit. In connection with that loan, Mr. Cooney's representative from Fulton submitted a financial affidavit with supporting bank records on his behalf. This was an easy loan because Mr. Cooney had good credit, a longstanding relationship with CNB and therefore no one really cared about Mr. Cooney's WLCC bonds which again were not suitable collateral.  In May of 2015, five (5) months after Mr. Cooney obtained the 100k line of credit from CNB, Mr. Cooney's financial situation changed: the value of his Code Rebel Stock had increased to $11,976,900 million. See GX 411, Tr. 1778, 1781-82.  **Based on this fact alone**, CNB granted Mr. Cooney a 1.2 million dollar loan.  There was email evidence where Fulton & Myer very clearly mentions that the exact basis for the loan request was Mr. Cooney's IPO stock and makes no mention of the WLCC Bond.  *See* (Ex. G, GX 411) (email from Steve Shapiro asking Matthew Fillman "what are the basics of said exciting loan request" and Matthew Fillman summarizes the value of Mr. Cooney's IPO stock **making no mention of the WLCC bond**).

6

CNB extended Mr. Cooney a $1.2 million promissory note in June 2015, for a period of six months becoming due on January 1, 2016.  *See* GX 414. Tr. 1786-87.   Steve Shapiro testified that at no time did he or Mr. Cooney's authorized representative from Fulton Management require that Mr. Cooney fill out a new financial statement but rather they relied upon the financial statement that Mr. Cooney's representative sent to CNB bank in January of 2015. Tr. 1786-88.

The Court notes in its opinion that the inaccuracies contained in the financial forms were not administrative in nature but go to the heart of Cooney's finances.  Rule 33 Op. at p. 50.  We address the Court's rational here.  First, the Court should not miss the point that Mr. Cooney was not directly involved with the negotiations of this loan. The government does not dispute that Fulton Management acted on Mr. Cooney's behalf; Shapiro testified that Matthew Fillman was Mr. Cooney's authorized agent who was authorized to speak to CNB on behalf of Mr. Cooney to get him a loan, Tr. 1731: 22-24. Doc. ECF at 64. Mr. Cooney consistently surrounded himself with professionals to assist him. He paid his business managers at Fulton Management, including Matthew Fillman to negotiate a bank loan and to work out the details. Tr. 1731.

Another detail the Court should consider pursuant to 18 U.S.C § 3553, we ask the Court to review and now consider what is attached hereto as **Ex. G.**   In January of 2015—in connection with Mr. Cooney's request to obtain the initial loan at issue -- he contacted Matthew Fillman, his banking and investment consultant from Fulton & Meyer.  On January 27, 2015, Fillman emailed Mr. Cooney a financial statement to be filled out and stated:   (GX3238)

> Bevan
> Sure I can work something out but can you take a minute and complete the attached.
> **Big round numbers – not too detailed.**  I just don't have a good handle of what should be on your balance sheet, plus I need the signed form to work as an application for regulatory reasons. Also would rather get something perm rather than short term loan.

This is the same financial statement which the government admitted at trial and was the basis for the government's argument that Mr. Cooney misled CNB bank.  Mr. Cooney was specifically instructed to use "Big round numbers-not too detailed." (GX411, Ex. G).  Although this email was not introduced at trial, the Court can now consider at sentencing that Mr. Cooney's loan application and the information he was told when asked to fill out his financial affidavit. Mr. Cooney hired professionals to make sure this process for applying for a loan was handled properly and in the end – this was the damning evidence which both the government and now the Court rely upon to seal Mr. Cooney's fate.  As will be further discussed in Section II, Eric Fulton and Alexis Gluckman, have now both submitted letters  (See Ex. A) on behalf of Mr. Cooney for purposes of sentencing --- attesting that Mr. Cooney is an honest person. Certainly, Fulton Management handled all of Mr. Cooney's finances and they were involved with his purchase of the WLCC bonds, his loans from CNB bank and evidence relating to Mr. Cooney and 1920 Bel Air.

The government has argued that Mr. Cooney obtained the 1.2 million dollar loan with the intent of using the bonds to obtain a loan and then he intentionally did not repay the loan.  (DOC. ECF 623 at 64).  The government also argues that Mr. Cooney did not disclose to CNB that he purchased the bonds with a loan. The evidence is undisputed that every aspect of this 1.2 million dollar loan from the moment it was negotiated until well after it was in delinquent status was handled by Mr. Cooney's authorized representatives from Futon Management. Even after Mr. Cooney was delinquent on his loan, he cooperated with CNB bank and his representatives from Fulton Management; he personally met with them and he consistently corresponded with them to attempt to make re-payment on the loan. Tr. 1789-1804. Steve Shapiro testified that prior to the 1.2 million dollar loan being classified as delinquent he communicated almost exclusively with Mr. Cooney's business managers from Fulton but eventually he began directly communicating with Mr. Cooney as well. Tr. 1789. Shapiro confirmed that in October of

2016, Mr. Cooney successfully re-negotiated new terms of his delinquent loan and in good faith, Mr. Cooney made payments of approximately $90,000 towards repayment of his loan. Tr.1803-1804. Why would a man with an unblemished record in business (with a perfect credit score), who has no prior criminal record commit a fraud only to walk away completely bankrupt and why would he pay more money to hire an attorney and pay down another $90,000 toward a loan he could not pay –if he was trying to commit fraud and steal as much money as he could.

The misconception that CNB was somehow misled or told false facts is not supported by any witness other than Steven Shapiro who is certainly bias and admittedly came under fire after Mr. Cooney defaulted on a 1.2 million dollar loan.  At sentencing, we urge the Court to consider that Shapiro had motive to color his testimony against Mr. Cooney within limits because by his own admission he conveyed to Eric Fulton in an email, that he feared that the outcome of Mr. Cooney's inability to payback the 1.2 million dollar loan could cost him his career. Shapiro writes in an email to Fulton Management: (Ex. G, GX 440)

> **As you are well aware, CNB was highly reluctant to do this loan in the first place. Now that everything has hit the fan, I need to make sure that this was not one of the biggest mistakes of my career. Your help is obviously appreciated. Ste**ve

Steve Shapiro's testimony that he was not aware that Mr. Cooney had transferred his WLCC bonds to Bonwick Capital was  in large part due to his own failure to exercise due diligence.  The Court may recall the evidence that on two prior occasions in April (Ex. G, GX410) and May of 2015 (Ex. G. GX412), Steven Shapiro personally participated in signing the official documents that transferred Mr. Cooney's bond power to Bonwick Capital. See DX 3162(b).  Certainly if Mr. Cooney was trying to hide the fact that he no longer owned his bonds or that he was transferring his bonds to Bonwick Capital, he would **not** have called upon Steve Shapiro to "medallion guarantee" his bonds – a required step to legal transfer of his bond power. (Tr. 1766-70, 1794-96).  On the contrary Mr. Cooney called upon Steve

Shapiro, his personal banker because he had absolutely no reason to hide any transaction that he was involved in.

We compare Cooney to Archer only so much as it is relevant to the alleged deception in this case and why Mr. Cooney's actions pale in comparison. Mr. Cooney fully disclosed every aspect of his finances to CNB bank and his authorized money managers, Tr. 1731: 22-24, see e.g. DX3514(a), GX402, GX3215, DX3530, DX3520, GX410, GX412, DX3162(b). Cooney was instructed by his financial advisors --to use big numbers when he filled out the financial affidavit. (GX3238)  The evidence is undisputed that Matthew Fillman had authority to negotiate loans on Mr. Cooney's behalf. (Tr. 1731).   In comparison, the BIT Board was relying upon Archer's statements and Morgan Stanley directly asked Archer where the source of money for the second tranche of bonds came from.  Cooney's transaction with CNB concerning the two loans at issue during the trial were far removed from any questions about the WLCC bond.  For example, when Cooney obtained the CNB loans there is no evidence that Steve Shapiro or anyone else from CNB asked Mr. Cooney specific questions about the WLCC bond.  Steve Shapiro testified that prior to the 1.2 million dollar loan being classified as delinquent he communicated almost exclusively with Mr. Cooney's business managers from Fulton. (Tr. 1789).

Contrast with Archer's purported deception to the BIT board which likely resulted in various investors getting involved with the WLCC bond.  Mr. Archer served an executive /advisory role at Burnham, the placement agent for the WLCC bond and certainly the BIT Board was relying upon his due diligence and honesty.   Evidence of Mr. Cooney's purported lies to CNB bank were **far removed** from the WLCC bond and misconstrued.  Mr. Cooney had absolutely no motive to deceive CNB about the ownership of his WLCC bonds because the bonds were not the basis for the 1.2 million dollar loan. (GX 411).  Yet, this evidence somehow now compromises the gravamen of evidence damning Mr. Cooney.

The recent SEC complaint  filed against Jason Sugarman on June 26, 2019 highlights evidence that after Archer purchased the second tranche of bonds, he did not control what happened to the bonds. (Ex. P).  In contrast the WLCC bonds were purchased in Mr. Cooney's name, they were physically mailed to him and Mr. Cooney made significant attempts to find an institutional buyer to purchase them. Compare (Ex. K, GX2276 and GX3245) (emails between Cooney, Alexis Gluckman and others regarding Cooney's diligent attempts to find an institutional buyers for his WLCC bonds).

The Court should consider the undisputed evidence that Mr. Cooney had previously obtained loans from CNB long before his involvement with the instant offense.  Tr. 1755-56, 1784-85.  Simply put the CNB loans were not unusual for him and not part of some preconceived scheme. Accordingly, Steve Shapiro, Mr. Cooney's long-time personal banker testified that Mr. Cooney had previously been granted loans from CNB including a $200,000.00 loan, which did not end up in delinquent status; at the time Mr. Cooney applied for the 100k loan and the 1.2 million dollar loan in 2015, he was considered by CNB to be a customer in good standing and to have good credit.  *Id.*  Mr. Cooney's motive in obtaining this 1.2 million dollar loan was consistent with his requests for other loans. Due to the nature of his employment, Mr. Cooney would go for months without income and these loans would hold him over until he could for example, sell a stock. (Steve Shapiro is questioned: Q: And it's fair to say that the purpose of the loan, as you understood it, was to help Mr. Cooney pay for personal expenses and tax obligations, correct? A: That is correct.) (Tr. 1782)(Shapiro, Cross).

Mr. Cooney admittedly should have been more careful about details but a probing review of the emails and Mr. Cooney's full disclosure shows that Mr. Cooney was not acting with fraudulent intent. For example, the Court's Rule 33 Opinion highlights evidence that Mr. Cooney purportedly "falsely informed" his accountants that the 4 million dollars which was transferred into his account was a **loan from Thoresdale**, the entity controlled by Jason Galanis.  Court Rule 33 Op. at p. 48.   We respectfully

11

believe that if the Court reconsiders this evidence, along with other evidence admitted at trial – this evidence loses it's bite.  First, consider Mr. Cooney's accountants were in possession of all of his email and the actual details concerning the wire information and therefore the names and details he provided were irrelevant.  For ex: contrast the Court's highlighted evidence with evidence that Mr. Cooney emailed his representatives at Fulton & Meyer "requesting a pdf of the down payment wire information from **wealth assurance holdings** and the wire from CNB to Camden Escrow.  See (Ex. H, GX2256). Clearly, on this date Mr. Cooney did not tell his accountants that the referenced money was from Thoresdale, rather he indicated his belief that the wire at issue was from wealth assurance holdings.

Mr. Cooney knew that Galanis was a successful businessman involved with many different entities and he regretfully did not place much meaning in the details because he had nothing to hide.  His financial managers were literally handling every aspect of his business including paying his bills.  We urge the Court to consider attached emails of Mr. Cooney reprimanding his accountants for paying his bills late because his good credit was important to him (Ex L); he was transparent and had absolutely no reason to be deceptive with his accountants because all of the documentation was wired directly to them.

### ii.    Mr. Cooney Just Like Mr Archer had No Reason to know that His receipt of $75,000 From the WAPC Account was Any Kind of Red Flag

The Court notes in its Rule 33 Opinion that "the flaw most fatal to Cooney's motion is that Cooney received money directly from the purported annuity provider for the WLCC.  Rule 33 Op.  at p. 46.  The Court finds merit in the government's argument --that Mr. Cooney knew about the misappropriation because he received $75,000 of bond proceeds from the final bond issuance that was purchased with money from OSERS  and because Mr. Cooney received the money directly from Wealth Assurance Private Client Corporation, the shell company set up to receive the bond proceeds. (Rule 33 Op. at 59).  Simply put, Mr. Cooney just like Mr. Archer was a pawn deceived by Jason Galanis and his

use of deceptive names for the false entities he created.   As the Court emphasized in its Rule 33
Opinion evidence was replete that Jason Galanis was intentionally deceptive and he purposefully created
companies with names to make them appear related to the legitimate entities. The names of these
companies meant nothing to Mr. Cooney, just like they meant nothing to Devon Archer who was far
more financially sophisticated than Mr. Cooney.  Indeed the evidence showed that Galanis purposefully
chose the name Wealth Assurance Private Client to mislead people into believing that WAPC had an
affiliation with the real Wealth Assurances (WAAG and WAH), see Tr. 1040:20-1041:5, and Mr.
Cooney was no different.   A perfect example that Mr. Cooney was not aware of the distinction between
the names of Wealth Assurance Holdings and Wealth Assurance Private Client.  On January 20, 2015,
as noted above-- Mr. Cooney emailed his representative at Fulton & Meyer "requesting a pdf  of the
down payment wire information from **wealth assurance holdings** and the wire from CNB to Camden
Escrow.  See (Ex. H, GX2256).  Mr. Cooney represented in this email that he believed that the money
was coming from an account related to Wealth Assurance Holdings which was a legitimate company.
Mr. Cooney clearly believed the money was coming from Wealth Assurance Holdings which was a
legitimate entity and he did not pay attention to the details.    In fact, the money referenced in this email
was coming from Wealth Assurance Private Client. (Compare p 2 of GX225, Ex. H) (which shows wire
transfer information indicating money was coming from WAPC, a shell company Mr. Cooney had no
knowledge of).

The Court further notes it is unclear how Cooney could have received money from WAPC for
legitimate reasons. *Id*.  The Court's argument on this point  --that there was no apparent basis for
Cooney to receive $75,000 from Galanis before Cooney even purchased the second tranche of bonds --
appears to overlook the consistent arguments by Mr. Cooney and his Defense Summary Chart (Ex. J,
DX3802) admitted into evidence --that it was not unusual for Mr. Cooney and Galanis to send money

back and forth towards their various business deals.   This lending relationship is demonstrated in an email where Jason Galanis thanks Cooney for lending him money towards a deal involving Dr. Rory Knight, the Dean of Oxford who was also on the Board of Directors of Wealth Assurance Holdings. Tr. 912, 1290-91. See (Ex. H, DX 3235)(On August 13, 2013 Jason Galanis emailed Mr. Cooney the following message after Mr. Cooney wired Galanis $35,000: "Coon, the wiring instructions are on the second page, thank you so much for handling this for us, the real estate proceeds will pay it off, but thank you for taking the shot…again." See also (Ex. J, DX 3802) (evidence that on August 13, 2013, Cooney wired Galanis 35k for Oxford Metrica, a company which Hugh Dunkerly testified that Dr. Rory Knight owned). Tr.1291.

 As evidenced by Cooney's summary chart (Ex. J, DX3802) Mr. Cooney and Jason Galanis, had a business relationship that began well before Mr. Cooney ever become involved with the WLCC bond. Mr. Cooney invested his own personal money toward many of their business endeavors which were diligently memorialized by Mr. Cooney's accountants at Fulton Management. *Id.*

Mr. Cooney just like Mr. Archer was simply not privy to the kind of information that would have revealed the fraud.   For example, Hugh Dunkerley testified that he was not aware that Galanis was stealing the bond proceeds until he saw where the money in the Wealth Assurance Private Client Corporation ("WAPC") account was actually being directed. Tr. 1139:24-1140:11. Mr. Cooney, just like Mr. Archer had no access to the WAPC account and no insight into where the money was going or that it was not being appropriately invested.

### iii.    The Government's Chief Cooperator Hugh Dunkerly And Other Evidence Not Admitted At Trial Corroborate Mr. Cooney's Belief His Involvement with 1920 Bel Air Was Intended As a Legitimate Real Estate Transaction Not Related to the WLCC Bond

The government argued at trial that Mr. Cooney separately misappropriated $3,895,000 from the bond proceeds by funneling money through a sham transaction involving the purported purchase of 1920

14

Bel Air which was in fact, Jason Galanis's primary residence. (Tr. 3646)  We urge the Court to reconsider testimony from the government's lead cooperating witness Hugh Dunkerly who corroborated Mr. Cooney's defense.  Hugh Dunkerly agreed on cross-examination that Jason Galanis was making home improvements to 1920 Bel Air and that Galanis was paying high interest rates on his mortgage and that he believed that the 3.8 million dollars was wired to Mr. Cooney's account so that Mr. Cooney could help refinance 1920 Bel Air. See Tr. 1204-05. Dunkerly corroborated Mr. Cooney's defense that Mr. Cooney intended to purchase 1920 Bel Air in an LLC, so that Jason Galanis could obtain a lower interest rate, continue to make home improvements and later sell the property at a profit. (Tr. 1204-07) The trial evidence in this case and the discovery were replete with documents which corroborated Mr. Cooney's sincere belief that he had no reason to believe that the 3.8 million dollars that was wired into his CNB account were proceeds from the WLCC bond. See e.g.,DX3235, DX3056(a), GX, 2255, DX3062, GX3272). Certainly, none of the government's cooperators testified that Mr. Cooney had any knowledge that the money wired to him relating to 1920 Bel Air were proceeds from the WLCC bond.

If Mr. Cooney were part of the dark world of sinister co-conspirators who were knowingly carrying out Jason Galanis' fraud scheme like Hugh Dunkerly and Francisco Martin, then the cooperators would have provided such testimony.  Dunkerly and Martin clearly knew about the criminal involvement of each other and Gary Hirst.   At no time, did Dunkerly testify that Mr. Cooney's involvement with 1920 Bel Air was a sham transaction.  Hugh Dunkerly initially testified on direct examination that he had no idea why the money was wired into Mr. Cooney's account (Q: At the At the time did you have any understanding when he made that transfer, understanding why that money was going out? A: No, I did not) (Tr.1032) but on cross-examination, Dunkerly was confronted with numerous emails that refreshed his recollection that the money (3.8 million) that was wired into Mr. Coooney's account on November 12, 2014 and the following day it was wired to Camden Escrow in furtherance of a real estate transaction. Tr. 1262, DX3056, DX3062, DX3235, GX2255).

There was no evidence that Mr. Cooney benefitted from this real estate transaction (Dunkerly testified that Mr. Cooney did not keep the money that was wired into his account; the evidence is undisputed that the $3,895,000 was wired into Mr. Cooney's Citi National Bank account on November 12, 2014 and wired out the very next day, November 13, 2014) (DX3802). Further, there was an email from Jason Galanis to Mr. Cooney on August 13, 2013, evidencing that Galanis told Mr. Cooney months before Mr. Cooney ever purchased the WLCC bond that Mr. Cooney's loan to Galanis involving an entirely separate business deal (Oxford Metrica) would be paid back from proceeds of a real estate transaction ("coon the wiring instructions are on second page. thank you so much for handling this for us. the real estate proceeds will pay it off, but thank you for taking the shot again." See (Ex. G, DX3235).

At sentencing we also urge the Court to review emails (Ex. H) from Eric Fulton which were not admitted at trial which corroborate Mr. Cooney's intent to obtain financing for 1920 Bel Air.  When considering the following email and the government's argument that Mr. Cooney was again wired 3.8 million dollars as part of a sham transaction we urge the Court to consider why would Mr. Cooney engage Fulton Management and others (See GX 2267) in efforts to try and obtain a mortgage on his behalf for 1920 Bel Air if this was all just a sham. Why would Galanis have asked Mark Cohen from Cohen Financial group, to conduct an LLC search (chain of title) on 1920 Bel Air if there was no intention for Mr. Cooney to purchase the property as part of an LLC. [1] *See* (GX2255) An email thread between Jason Galanis, Maria Santana, Hugh Dunkerly and Mark Cohen from Cohen Financial group regarding the history of the ownership of 1920 Bel Air by an LLC).  Similarly, why would Mr. Cooney seek an appraisal from Nest Seekers for 1920 Bel Air. (Ex. F).

---

[1] Cohen Financial Group is a national real estate capital services company and an originator of commercial real estate debt transactions. See www.cohenfinancial.com

Certainly, none of the government's cooperators testified that Mr. Cooney had any knowledge that the money wired to him relating to 1920 Bel Air, was proceeds from the WLCC bond. On the contrary the evidence shows that Mr. Cooney was actively seeking a mortgage to purchase 1920 Bel Air but ultimately after Mr. Cooney could not secure a mortgage, the real estate transaction failed.  See GX2267, GX 3272. On February 15, 2015—Jennifer Lowe, a private banker emailed Mr. Cooney that she found an investor to do his loan. (See, Ex.H, GX2267) This was during the time frame Mr. Cooney was searching for a mortgage for Mr. Cooney to purchase 1920 Bel Air.

Mr. Cooney was not a sophisticated investor and Mr. Cooney believed just like Hugh Dunkerly and many others, that Jason Galanis was a savvy investor and a good, successful business man. *Id*. at 1301:1-15.  Dunkerly testified that Jason Galanis was business partners with Jason Sugarman, whose father-in-law Peter Gruber was a billionaire and whose brother Steven Sugarman owned COR Capital, which "had been very successful in the financial space," and was CEO of and a "major investor" in Banc of California. *Id*. at 906:9-12 (Dunkerley); 1076:7-11, 1171:25-1172:8, 1331:14-1333:14 (Dunkerley). Mr. Cooney had absolutely no reason to question the legitimacy of money that was wired into his account. The Court cited this very same evidence to exonerate Mr. Archer.   For ex: the Court concluded that Archer's knowledge of Galanis' extravagant expenditures is unpersuasive in "light of the extensive evidence presented at trial demonstrating that Jason Galanis successfully misled every person he met into thinking he was immensely wealthy and successful." Rule 33 Op. at 31 citing TR. 2306:1-2303:17.

It is difficult to reconcile the fact that the Court has found innocent intent with regard to the fact that Archer lent his name to Jason Galanis to purchase a condominium in New York with proceeds from the bond, but Mr. Cooney is not given the same deference with regard to similar innocuous evidence that Mr. Cooney was involved in a real estate transaction with Jason Galanis.[2]  While the email exchange

---

[2] Archer's conduct related to Jason Galanis real estate: Jason Galanis purchased New York real estate with proceeds of the WLCC bond in the name of Archer Diversified.  On July 9, 2014 Clifford Wolff and his assistant, Sebastian Momtazi,

between Archer and Galanis regarding the New York condominium purchase specifically mentions proceeds of the WLCC bonds [3]-- both Hugh Dunkerly's trial testimony and emails between Jason Galanis and Cooney corroborate Mr. Cooney's innocent intent with regard to 1920 Bel Air.  This is further supported by the Court's cited evidence in favor of Mr. Archer's innocence: the Court notes that Archer's argument that Galanis told him that the money used to purchase bond proceeds for the second tranche of bonds came from real estate is supported by the fact that "Galanis specifically held himself out as having made money from real estate." (Tr. 40, 94, 417- 418, 2305).

The Court opines---evidence that Cooney was involved with a real estate transaction involving Jason Galanis and 1920 Bel Air was probative of the relationship enjoyed by Cooney and Jason Galanis "that it was Cooney whom Galanis asked to participate in this transaction related to his residence.  Rule 33 Op at p. 48.  Here again one can argue that certainly the fact that Archer lent his name to Jason Galanis so that Galanis could purchase New York real estate with proceeds of the WLCC bond in the name of Archer Diversified--- was equally probative of a similar relationship that Archer enjoyed with Jason Galanis.  In sum, just as in the case of Archer's tangled involvement with Jason Galanis' real estate, we believe the evidence concerning 1920 Bel Air and Mr. Cooney is equally unpersuasive in showing Mr. Cooney's nefarious intent.

Mr. Cooney in comparison to Devon Archer and the cooperators who testified was by far—leaps and bounds -- the most transparent participant in these transactions. In stark contrast, Mr. Cooney conducted his business with openness. For example, Mr. Cooney conducted his business using his true name and one email address (BTCooney@gmail.com); Mr. Cooney followed up on the details of the

---

emailed Devon Archer that Galanis was going to "purchase a condo using the above name  [Archer Diversified TRG, LLC] and Devon's cache [sic] . The company is using your office address." GX2122.

[3] See also Galanis email to Archer: email thread where Jason Galanis specifies that the closing date of the WLCC deal was July 31 and commented "so close. Cliff is running the stall for me on nyc mansion[.]  I want to be here and won't live in a 1750 square foot cage[.] Massively motivated."  GX2028

transactions he was involved by emailing lawyers like Tim Anderson, brokers, investment advisers and real estate agents demonstrating his consistent openness and no evidence to hide his identity.  Mr. Cooney's employed sophisticated money managers at Fulton Management to assist him in every aspect of every financial deal he was involved with including the WLCC bond, the failed real estate transaction involving 1920 Bel Air and Mr. Cooney's loans with Citi National Bank (CNB). Mr. Cooney's openness and reliance on others is inconsistent with any criminal intent or how a conspirator might act. Compare this evidence to the other conspirators like Francisco Martin who used multiple identities and layers of intermediaries to hide his involvement in this case.

iv.   **Purported Evidence of Mr. Cooney's Submission of A Calvert Document As Part of A Mass Email Production  Is Not Dispositive Evidence of His Guilt When There Was Simply No Corroborating Evidence That Mr. Cooney Knew That Calvert Was A Fake Entity**

Just as in the case of Mr. Archer, there is simply no evidence that Jason Galanis, Hugh Dunkerly or Francisco Martin ever discussed Calvert with Mr. Cooney.  The government argued at trial-- that Mr. Cooney's submission of false Calvert documents to the SEC is evidence of his guilt.  First, the government's basis for proving that Mr. Cooney submitted a false Calvert document to the SEC, was based on a stipulation that Mr. Cooney agreed to, known as GX4501. (Tr. 2492-93). The government argued during their summation that Mr. Cooney signed a stipulation that Government's Exhibits 1265, 1271, and 1284 are true and accurate copies of documents produced by Bevan Cooney to the Securities and Exchange Commission. (Tr. 3681). At no time did Mr. Cooney stipulate that he knowingly submitted a false document to the SEC.  In this case, Mr. Cooney produced the Calvert loan document to the SEC which was part of his email and he did so in accordance with a subpoena which required that he produce all of his email during the stated time period relating to certain categories including the WLCC bond. The government's argument here again ignores the testimony of their own cooperators: Hugh Dunkerly and Francisco Martin. A major part of this scheme was an entity called Calvert, which Galanis

19

and Dunkerley thought up, see Tr. 1464:17-1466:21 (Dunkerley); GX1705, Martin created, see Tr.

2181:14-19 (Martin), and Galanis, Dunkerley, and Hirst used solely to cover up their crimes. Tr. 1508:9-

17. Mr. Cooney, like the many others who received false Calvert documents had no reason to know any

of that. The evidence shows this email and the attached loan document was produced to Fulton

Management during tax season and was part of Mr. Cooney's email which he later turned over the SEC.

(GX 2298)

   Mr. Cooney hired professionals like Fulton Management and lawyers to handle the details of his

business transactions. At some point after Calvert was created, Mr. Cooney obtained documentation of

his loan which he later submitted to his accountants for tax purposes.  GX 3272, (On February 26, 2016,

Mr. Cooney emails his team from Fulton Management: Vanessa Siegel, Matthew Fillman and Eric

Fulton and writes: Vanessa I found this file for my taxes last year...").  There was certainly no evidence

from Dunkerly or Martin that Mr. Cooney was involved in the creation of this fraudulent Calvert

document.   Dunkerly admitted on cross-examination that he was involved in creating fraudulent

documents on behalf of a fake company known as Calvert Capital. Tr. 1450). At no time did Dunkerly

discuss with Mr. Cooney the fact that the Calvert documents were fraudulent. Dunkerly testified:

Q. And another big part of his narrative was this company Calvert, correct?
A. Correct.
Q. And Calvert's sole purpose was to deceive people, correct?
A. Yes.
Q. And again the only people that you ever discussed Calvert and its illicit purpose with were Gary Hirst and Jason Galanis true?
A. True.

(Tr. 1508) (Dunkerly)

   Certainly, if Mr. Cooney was in on the scheme and was knowingly advancing the false Calvert

narrative, the real conspirators would have known that Mr. Cooney was aware of the false nature of the

Calvert documents.  While we understand the Court's explanation of Mr. Archer's arguably innocent

connection with the Calvert documents[4], we respectfully disagree that Mr. Cooney's reliance on Calvert documents, a company which cooperators testified was falsely created to deceive people is consistent with his guilt.   Mr. Cooney, just like Mr. Archer was not privy to these attempts to cover up Galanis's fraud because Mr. Cooney was not privy to the fact that a fraud was being committed in the first place. The purpose of these fraudulent documents were to deceive people, just like Mr. Cooney and the government presented no evidence to prove otherwise.

At sentencing, we urge the Court to consider one last time that all of the government's arguments fail when you consider the context of Mr. Cooney's emails and the evidence of his state of mind.  For example, Mr. Cooney's email to his mother just months before she died from brain cancer, perhaps best captures his state of mind. As the Court highlighted in its Rule 33 its decision a "more natural inference of" Cooney's comment in GX 2120 "What do we get to do with the 15mm," is that "Cooney did not understand Galanis to mean that they would steal the money but instead that there would be limitations of some sort on how the funds could be used." Rule 33 Op. at 27.   On February 13, 2015 Mr. Cooney writes his mother: "This is why we bought Burnham mom. Drexel Burnham just an amazing history." (DX 3154). Consistent with this email, Mr. Cooney is secretly recorded by Billy Crafton, an undercover informant in a tape admitted into evidence where Mr. Cooney--again explicitly asserts that his investment in Burnham securities and the deals he was doing with Burnham and Devon Archer "have these layers of legitimacy" and Mr. Cooney also tells Crafton, "the key to these deals are…and what I'm doing now is layering myself with people a lot smarter than I am." (Ex. M, DX 4908-T). Mr. Cooney goes on to say "if you believe in the deal, and the people that are on the deal, you'll do the deal."

---

[4] Compare: government evidence that Archer references Calvert, a sham entity that was created by Hugh Dunkerly, Francisco Martin and Jason Galanis to assist in the cover-up of the WLCC scheme.  In writing to Mark Waddington, who is not alleged to have been a member of the conspiracy, Archer noted that the bonds he purchased in the second tranche, then held by VL Assurance, were "to be replaced / returned to Calvert," adding in a subsequent message in the exchange that "the consensus is we would like to return these bonds to the lender and beneficial owner in the quickest orderly manner possible." GX 2119.  See also Rule 33 Op. at p. 39.

Although Mr. Cooney did not know he was being recorded by Crafton, his choice of words speak directly to his state of mind and his belief that he was participating in the deals with Burnham, because he believed in the legitimacy of the people he was doing deals with. While a portion of this recording was omitted for the jury's consideration, the Court may now consider pursuant to 18 U.S.C. 3553(a) that Mr. Cooney also said in this tape recording that these guys do not do "skuzzy" deals. Another reference which reflects Mr. Cooney's innocent state of mind as to the legitimacy of the deal he was involved with, Mr. Cooney responds to Jason Galanis's email attaching the Burnham / Bonwick Term Sheet and states: "This is so solid." (DX3155).  We refer the Court to text messages attached here in, Exhibit I between Jason Galanis and Michelle Morton where Galanis is clearly talking behind Cooney's back -- using Cooney as a pawn and bragging about Mr. Cooney's connections to wealthy individuals like Kevin Washington and Morton asks Galanis "Who's Bevan Again?"  (Ex. I) GX3004A, DX3800.  This text exchange occurred on March 2, 2015, several months after Mr. Cooney purchased the second tranche of bonds and Morton still has no idea who Mr. Cooney is.  Certainly if Mr. Cooney was conspiring with Morton and Galanis, by this date, after the purchase of the second tranche of bonds, Morton would know who Bevan Cooney was. *Id.*

If Mr. Cooney was in on Jason Galanis' fraud scheme then why did Jason Galanis continue to mislead Mr. Cooney, about the bonds even after the third bond issuance.  On April 10, 2015, Galanis sent Mr. Cooney an update on the project the bonds were funding, attaching pictures of the construction and writing, "Rewarding to see it happening." DX4117. About four months later on August 4, 2015 -- Galanis e-mailed Mr. Cooney another update on the bond-funded project, attaching six more pictures of the construction. DX3550. These updates make it seem as if the bonds had been successful for the WLCC, when anyone truly in on the scheme would know that the bond-funded projects had no chance of succeeding because Galanis had stolen the bond proceeds. Yet, Galanis continued to send Mr. Cooney

these pictures, even long after the final bond issuance.

Mr. Archer's lawyers have at times in these proceedings suggested that Archer was a pawn and that Mr. Cooney and Jason Galanis were using Archer as pawn but that argument simply fails if you consider the evidence that Archer had a lot to gain from his ties with Jason Galanis and individuals that Galanis was connected to like Jason Sugarman.  Certainly as detailed in Section II below, Archer was also doing business with Galanis long before the WLCC deal and Archer's connections with entities like Rosemont Seneca Bohai would benefit from the financial conglomeration. Ex. N  On this point, we further reference emails cited above  (GX2211, GX2059, GX2078) which establish that Mr. Archer consented to others like his friend Bevan Cooney to using his pedigree and his connection to individuals like Hunter Biden toward their mutual end goal of building a financial conglomeration.  It is difficult to comprehend that a person with Devon Archer's impressive pedigree and experience would blindly follow an individual like Mr. Cooney into any kind of business deal particularly involving Jason Galanis, an individual Archer lied to the BIT Board about because he know that Galanis had an unsavory past.   On the contrary, by anyone's calculation, Cooney given his utter lack of sophistication, education and experience was anyone's pawn particularly when financially successful individuals like Archer and Jason Sugarman believed in Jason Galanis.

There is no disputing that Cooney used colorful language which we see throughout the emails; Cooney's reference in the Crafton recording describing Archer as a "show pony" was purely intended to embellish Archer's legitimate credentials and elite pedigree. See DX 4908-09.  Certainly, Cooney goes to great lengths to emphasize in that same recording that Archer was legitimate and that these individuals did not do "skuzzy" deals.   Finally, the Crafton recording was approximately one year before the WLCC bond and the conversation Mr. Cooney had with Crafton was about an entirely

separate business deal known as FLIK media which involved a dating app on social media that had absolutely nothing to do with the WLCC bond.

As detailed in the hundreds of emails, Cooney regarded Archer as another "best friend" with great affection and admiration.  The letters submitted herewith from Mr. Cooney's close friends and family detail Mr. Cooney's character and the manner in which he treated and regarded his closest friends.  Sadly in this case Mr. Cooney trusted the wrong people and he admittedly should have paid closer attention to the details.  He will have to pay the price for his poor judgment for the rest of his life.

After understanding Bevan's true history  and characteristics this Court is now faced with the question of what is an appropriate sentence in this case. As will be argued more fully below, we believe that a sentence of probation and extensive hours of community service is "sufficient, but not greater than necessary" to accomplish the goals of sentencing. As detailed herein, in a case such as this where the loss amounts dramatically overstate Mr. Cooney's culpability we believe that a probationary sentence is appropriate.  *United States v. Edwards*, 595 F.3d 1004, 1010, 1018 (9th Cir. 2010) (upholding a probationary sentence far below the guideline range as substantively reasonable in a fraud case where the sentencing judge stated that the guideline range calculated using intended loss "overstated the circumstances" of the defendant's case).   For all of the reasons discussed herein, we respectfully ask this Court to use its compassion and common sense when sentencing Bevan Cooney.

## II.    INDIVIDUALIZED ASSESSMENT OF BEVAN COONEY

### A.  History and Characteristics of  Bevan Cooney

18 U.S.C. § 3553(a)(1) provides that in determining the appropriate sentence, courts should consider "the history and characteristics of the defendant."  As part of this analysis, a sentencing court must consider any and all information relating to the background, character and conduct of the defendant, in order to "make an individualized assessment based on the facts presented." *Gall v. United States*, 552

U.S. 38, 50 (2007).  In this case both the circumstances of the offense and the history and characteristics of this very unique defendant urge a sentence of more than probation and a term of community service.

Bevan Cooney's life is not defined by the government's criminal charges and Jason Galanis' fraud scheme.  In the pages that follow, people who have lived alongside Bevan share with the Court the family man with the heart of gold eager to support his family through difficult times; the friend who answers the call for help when you are facing life challenges or health crises; and the man who has struggled with personal demons and clearly used bad judgment when he placed too much trust in Jason Galanis.  Each aspect of Bevan's life and character as told to this Court by family, friends and colleagues fits together with a different piece of the complex puzzle

1.       **Personal Background, Education, and Family**

Bevan Cooney was born in Salt Lake City, Utah and raised, along with his two older brothers in Missoula, Montana, by Kathleen du Lac (hereinafter referred to as "Mrs. Cooney or Kathy") and Gary D. Cooney.  By all accounts, Mr. Cooney's parents were extremely happily married and they raised their children with a solid belief in family values, hard work, and honor to your country and fellow man.  Mr. Cooney explains that his parents met in Reno, Nevada in the 1960's when his father was an aspiring medical doctor and his mother was recently divorced with two young boys.  In August of 1966  his parents married in Carson City, Nevada and shortly thereafter they moved along with his mother's sons (Scott, age five, and Rob, age four) to Minneapolis, where his father had been accepted to attend the University of Minnesota School of Medicine.

Bevan Troy Cooney was born on December 6, 1972.  The family moved to Missoula, Montana in July of 1975, where Bevan's father had accepted a position to join a newly formed medical group (Neurological Associates).  Mr. Cooney's father adopted Kathy's two sons from her former marriage. Mr. Cooney's mother pursued a career as an interior designer and later established her own business,

Montana Interior Design, which she operated for many years, and his father was well known for his career in Missoula as a prominent neurologist.

Bevan has fond memories of his parents reminiscing about his grandparents and uncles who served this country in prior wars.   Bevan was extremely active in sports.  He grew up skiing on the rural nearby Montana mountain ranges which surrounded their ranch style home.   In Missoula, Bevan recalls an extremely happy childhood surrounded by nature, loving family and close personal friends who he continues to remain in close contact with until the present date like his long-time best friend Kevin Washington who grew up three houses away from him.   Mr. Cooney's relationship with Kevin and the Washington family is significant because years later Kevin Washington introduced Jason Galanis to Bevan.   The Court may recall a text message that was admitted into evidence (GX3004A) where Mr. Cooney's friendship with Kevin Washington is mentioned in a text message between Jason Galanis and co-defendant, Michelle Morton.[5]  (See Ex. I).  Kevin Washington's parents Dennis and Phyllis Washington were extremely wealthy and well respected by all who came to know them including the Cooney family; Mr. Cooney was raised alongside Kevin Washington raised on the same block in Missoula, Montana.  Bevan recalls the story that one Halloween, Phyllis knocked on his parents' door and from that moment on, Kevin and Bevan became best friends at age 3.   Dennis Washington was a rich mining billionaire.  Phyllis Washington and Kathy Cooney worked together at PJ's Interiors Decorating for more than 20 years where Bevan's mother began her design career in Missoula.  The Washington and Cooney families did just about everything together including outdoor activities like fishing, hunting, skiing and yachting.  Bevan and Kevin attended the local public school together and played varsity sports on the same high school football and tennis team.   Mr. Cooney recalls that although he and many of his friends like Kevin Washington came from upper middle class families,

---

[5] It is clear in this text message that Jason Galanis exploited Bevan for his connections to wealthy individuals like Kevin Washington.  (GX3004A) (Ex. I).

Bevan had friends at school from all different socio-economic backgrounds.   As detailed in the letters submitted to the Court--- Bevan is extremely kind, compassionate, warm hearted and just an all-around great person to be around.  As evidenced by the many emails which were introduced as evidence in this case, Bevan is also extremely light hearted and he loves to joke about everything he can possibly find humorous.  Bevan loves to socialize with his close family and the submitted letters evidence that Bevan's personal friends and family love to be around him.  See Ex. B and Ex D (letters of support from family and close personal friends).

Mr. Cooney graduated high school in 1991 and he initially attended school at the University of Arizona because he clarifies he loved the warm weather and palm trees.  Like many young college students, Bevan became more focused on the party scene than his academic studies.  Bevan recalls during his Freshman year at the University of Arizona that he became a member of a fraternity known as Sig Ep and his focus quickly turned to promoting parties and living the fraternity life which included excessive drinking. Bevan's grades suffered but he continued to focus on promoting fraternity parties and he also became involved in promoting night clubs.  It was during this period that Bevan and his then business partner at the time, Jake King who is currently a restauranteur in Los Angeles, pioneered the "throwback party".  Bevan and Jake became masterful at bringing people together and transforming slow bars and nightclubs into local hot spots.  Bevan was quickly earning a full time living from his party promotion business.  Although Bevan stayed in Arizona for four years, he dropped out of college after the second year and he never obtained his college degree.

Around the same time, Bevan kept in close contact with Kevin Washington; Kevin initially went to the University of Montana and he eventually transferred to the University of San Diego where Kevin met Jason Galanis through mutual friends.   In the early 1990's, Mr. Cooney was introduced to Jason Galanis where they became friends; at the time Bevan was still living in Arizona.  Although Bevan first

met Jason Galanis in the early 1990's they had a falling out in approximately 2000 and they rekindled their friendship in approximately 2010; they had no contact for at least 10 years. Mr. Cooney became re-acquainted with Galanis when Galanis began doing business with Jason and Steven Sugarman who Mr. Cooney was friendly with. Clearly, the trial evidence that Mr. Cooney and Jason Galanis were friends from their childhood was not true; Mr. Cooney grew up in Missoula, Montana and Jason Galanis grew up in California as detailed in his sentencing memorandum. (Doc 198)

Bevan met his first wife Heather Herzikof in approximately 1992 while they were in college together in Arizona. (Ex. B)  After Heather graduated in 1995, they both moved to Los Angeles together where Bevan pursued a career in promoting night clubs and Heather obtained full time employment as a kindergarten teacher. They married in 2000 after dating for 10 years and divorced several years later because it became obvious that they were leading incompatible lifestyles. Bevan was simply not ready to settle down and have a family. Although Bevan and Heather divorced after just a few years of marriage, they have continued to remain close personal friends. Heather writes in her letter to the Court:

> I have known Bevan since 1992. We became friends in college and were eventually married. Our 14-year relationship allowed me to get to know him on a deep level. Bevan has an extremely kind and generous soul. He was very caring for not only me but my family as well. Even though we are no longer married, he has been there to support me and my family through challenging times. Family has always been a priority to him. I wish for him to be able to be there for his two children.
>
> We would still be married today, however substance abuse got in the way of our marriage. While we were married, he loved planning vacations with both our families. Holidays were always so important to him as a time to honor family and traditions. Bevan is a man of his word. If he reflects and is willing to work on himself, he does so wholeheartedly. When we went through our divorce he was always upstanding and honored all of our agreements. When he knows he has made a mistake, as he did in our marriage, he takes responsibility.

(Ex. B, Letter of  Heather Herikoff)

Like many of the close personal friends and family members who have come to know Bevan, Heather highlights Bevan's upstanding honor, kindness and generosity as key attributes which have been

consistently described in the sentencing letters submitted to the Court on Mr. Cooney's behalf.

After Bevan moved to Los Angeles in 1995, he worked in various different trades including real estate and promoting nightclubs with Jake King. Mr. Cooney opened his first restaurant known as "El Dorado" in Brentwood, California with approximately twenty investors including Darren Feinstein, Jake King and Jason Sugarman. Bevan was responsible for raising funding from investors. This began Mr. Cooney's career connecting individuals in business deals. The expectation was that Bevan would bring people together and he would often get a profit from the deal much like a real estate broker or any kind of broker who earns a commission for landing a business deal. Mr. Cooney introduced Kevin Washington to Darren Feinstein and Jason Sugarman.

Mr. Cooney met Devon Archer in 2004 at the Beverly Hills Hotel. They were introduced by Dan Burrell, one of Bevan's best friends in Los Angeles. Dan was running John Kerry's presidential campaign west coast financing and Devon was working for Kerry's east coast finance campaign. Both Dan and Devon were both graduates of Yale. Dan went on to become the CEO of Rosemont Solebury Capital Management LLC, where Devon Archer and Chris Heinz also worked as managing partners. Mr. Cooney and Mr. Archer maintained a close friendship after that meeting. They traveled on vacation with their families to places like Disney World, Kentucky, Maine and New York. They introduced each other to their close personal friends and even celebrated some holidays like Thanksgiving together. Mr. Cooney recalls he had a strictly personal relationship with Mr. Archer until Mr. Cooney introduced Mr. Archer to a deal known as Prospect Global Resources (PGRX) in 2012 where Jason Galanis was also an investor. In connection with this deal, they had discovered the largest potash deposit in the United States and successfully raised 120 million dollars and took the company public via NASDAQ. Mr. Archer's group with James Bulger of Thornton Thai made a fee of over 2 million dollars by introducing Sichuan Chemicals Industry Holding Co, a billion dollar Chinese company to the deal and they committed via an

off take agreement to purchase  at least 500,000 metric tons of potash annually over 10 years starting in late 2015. *See* Ex. N, Devon Archer quoted in

www.wsj.com/articles/SB100001424052970203400604578071084173043720 (Wall Street Journal Article, October 22, 2012 ("U.S. Firm, China Sign Potash Deal). (Ex. P).

   The Court may recall evidence at trial that Mr. Cooney was involved in the purchase and re-launching of the Viper room, a famous nightclub on Sunset Boulevard in Hollywood formerly owned by actor Johnny Depp, also the infamous location where actor  River Phoenix overdosed on drugs.  Mr. Cooney raised capital from investors like Jason Sugarman to purchase the Viper Room from the estate of its former owner Anthony Fox.  The club was purchased in 1994 for 1.7 million dollars and later in approximately 2008-- fifty one percent (51%) of the club was sold to Harry and Peter Morton, the owners of the Hard Rock Casino and Pink Taco for  approximately $2.2 million dollars.  Later on in 2015, after Mr. Cooney was involved with the purchase of the WLCC bond, he was again involved in the re-purchase of the Viper room.  See Ex. L, attached email correspondence with Eric Fulton.  In 2015, before Bevan was arrested in this case, he put together a group of high net worth investors and re-purchased the Viper Room with the idea to expand the Viper Room brand to other cities including merchandizing their product line.  Mr. Cooney and these investors had already successfully launched a world-wide apparel and merchandise business and attracted the attention of investors to continue building the brand.   Mr. Cooney was in negotiations with Cesar's Palace to open a Viper Room in Las Vegas; the deal was close to being finalized when Mr. Cooney was arrested.   Mr. Cooney had to divest and ultimately sell his interest in the Viper Room because of all of the problems he faced after his arrest.  Mr. Cooney's name and reputation were in shambles and certainly no investor wanted to be a part of any deal that he was involved with.  This is just one example of how Bevan's arrest in this case ruined him financially.  This was just one of the many legitimate deals that Mr. Cooney was involved with shortly

before he was arrested in this case and is further proof that his star was on the rise and he had literally no motive to involve himself in Jason Galanis' fraud scheme where Jason Galanis was the only person to profit.

The Court may recall evidence that Mr. Cooney was also involved in promoting music; he became involved in promoting the Audiotistic music festival which was the biggest music festival in California at the time. Mr. Cooney hired well known music acts like Outkast, Roots, Talib and NAS. See (GX4005) where Mr. Cooney discusses his involvement in promoting music. Mr. Cooney was a self-starter from the very beginning; he never needed to be told what to do, he would just find his way. And despite the fact that Bevan dropped out of college, he made his parents very proud. Mr. Cooney learned a lot from his parents' strong family values and work ethic, and he carried this with him throughout his life. Mr. Cooney continues to live by the motto his father drilled into him: loyalty and hard work pay off.

After Mr. Cooney's divorce from Heather, he met Rachel Boggs (hereinafter "Rachel") on a blind date at the Viper Room in 2007 when he was 33 years old; at the time Rachel was only 22 years old. This relationship moved very quickly and after Bevan learned that Rachel was pregnant, they married within 3 months of their first blind date. Mr. Cooney had strong beliefs in family values and he wanted his child raised by parents who were legally married and he was deeply in love with Rachel. Mr. Cooney's daughter, CC was born on February 9th, 2008. Bevan recalls this was a magical time in his life.[6] He was living with Rachel and his daughter in Los Angeles, California and after he learned that Rachel was pregnant with their second child, they moved to San Francisco to be closer to Bevan's family living in Northern California. Shortly thereafter, they purchased a home in Rachel's hometown of Perrysburg, Ohio because Rachel was having a tough pregnancy and she wanted to be closer to her family. On March 10th 2010, their son TC was born. Bevan and his family enjoyed a very normal, rural

---

[6] The names of Mr. Cooney's minor children have been abbreviated to protect their identity.

life in Ohio.  They ultimately ended up moving to Incline Village, Nevada where Bevan was ultimately arrested in this case (in the presence of his wife and children).  Shortly thereafter because of financial hardship they moved to their Michigan vacation home and within 6 months of Mr. Cooney's arrest on the instant charges Rachel filed for divorce.  This began a downward spiral in Mr. Cooney's life.  After his arrest, his finances continued to unravel; he eventually filed for bankruptcy, he was sued for millions of dollars, his mother was diagnosed with an advanced stage malignant brain tumor and Rachel made the decision to move back to Ohio with their children-- where she aggressively pursued divorce and full custody of their children.

### 2.    Bevan Cooney's Dedication to His Parents and his Extended Family Members

Bevan Cooney was always the bedrock of his family, and still is.  Despite building a busy professional career that caused him to work long hours and travel away from his childhood home town in Montana, Mr. Cooney always made his family a top priority.  As Bevan's niece, Chloe Cooney explains in her letter to the Court, three years ago her grandmother, Bevan's mother, was diagnosed with glioblastoma, which brought the Cooney family closer together again.   As detailed in Chloe's letter to the Court, Mr. Cooney took a very active role in ensuring that his mother was provided with the best medical care after she was diagnosed with brain cancer.  He found his mother the best neurosurgeon in the United States, who was located in Los Angeles and he let his entire family stay with him during his mother's surgery.  Bevan took care of his mother for three months until she could finally return home to Montana.  Chloe Cooney states the following about her Uncle Bevan who slowly brought the family all back together:

> Bevan is a key part of the family. Without him, the Cooney family could have fully slipped from each other. We may not have been very close in my childhood, but he has become a large part of my life the past years. Constantly supporting me in everything I do, from making an effort to come to my art shows, to coming to my Lacrosse games, taking the time to take me out to dinner to simply sending me photos of his daily life. He always manages to make my day better. Losing Bevan would not only cause the family pain but would personally take away a mentor. He has

easily become the closest uncle I have.

(Ex. B, Letter of Chloe Cooney)

Bevan Cooney has also developed a particularly close relationship with Kylie Cooney, the oldest of Bevan's two nieces.  She also goes on to explain how in the past five (5) years, her Uncle Bevan "has evolved into an entirely different person in my eyes."  Kylie described how she talks to Bevan almost every week and he has been there for her when she has issues she needs to talk through; he provides advice and has introduced her to professionals that he knows in the industry of fashion design.  Kylie also provides details as to the love and care that Bevan provided his mother throughout the duration of her last few years battling cancer. She details how her grandmother moved in with her Uncle Bevan and how he took care of her during her chemotherapy and radiation.   She also details the following in her letter to the Court:

> The last couple of weeks of her life she was hospitalized and on life support. These memories are some of the most painful ones I hold, but at the same time they are some of the most valuable. I saw a new side of Bevan. He wasn't afraid to cry with me, to talk with me about everything going on, to sit in silence, and to just hug it out. He played one of the most important roles in me being able to slowly accept what was happening, and later begin to gain acceptance of the situation.
>
> I suffer from manic depression, bipolar, and severe anxiety. This experience nearly pushed me over the edge into a mental breakdown. If it was not for my family I don't think I would still be here today, and Bevan was one of the key people involved. I know this is a lot of information, but I feel that it is vital because it shows how bad things were at the time, and how much support Bevan gave to not just me, but the whole family.

(Ex. B, Letter of Kylie Cooney.)

Mr. Cooney's mother passed away on March 21, 2017 at St. John's Providence Hospital in Santa Monica, California, after a courageous year and a half battle with a malignant brain tumor. She passed quietly and peacefully, in the company of beloved family members. See Ex. E, Kathy Cooney's Obituary.  After Bevan's mother passed away from brain cancer, Mr. Cooney moved back to Missoula, Montana to live with his father.  Bevan explains that his life was in shambles; his wife left him and he

could no longer afford to provide for two separate households.  His parents had been married for 52 years, and Bevan could not fathom the thought of his father living alone.  Bevan moved back to Missoula, Montana in 2017 and he has lived there ever since.  Mr. Cooney's niece Kylie wrote about Bevan's dedication to his father.

> He has also become a huge part in my grandfather's life. Moving back to Missoula to care of him. Knowing very well that Dr. Cooney could take care of himself without Bevan, my grandfather couldn't live without him. He may irritate the Doctor at times, but he also brings him much joy. I couldn't bare to see my grandpa alone everyday and not have Bevan by his side. (Ex. B.)

Bevan's childhood best friend, Jon Milne Sherron, who grew up with Bevan in Missoula, Montana also writes about Bevan's dedication to his parents:

> Bevan also lost his mother to cancer recently. As you can imagine it was a very difficult time for his family. Upon the discovery of the brain tumor Bevan jumped into action and found the best doctor in the entire country for her condition. The family immediately got her to one of the best surgeons available. Through Bevans help and guidance, the family flew their mother to Los Angeles monthly for treatments which helped her live over six months longer than anyone expected. After his mother's passing, Bevan moved back to Missoula to be a support for his father. I have personally seen the transformation of his mourning father come back to life with the love and support Bevan has been there to give and provide him on a daily basis. Once again, while back in Missoula, Bevan has returned to be a giving soul to the community.

(Ex. D,  Letter of Jon Milne Sherron)

Anyone who knows Mr. Cooney, like Mr. Sherron knows Bevan's special dedication to his parents over the years.   Mr. Cooney explains that it is difficult to comprehend the devastation of getting arrested, your name suddenly trashed across newspaper headlines, your wife filing for divorce, your mother getting diagnosed with terminal brain cancer, not being able to seek joint custody of your children because your future is so uncertain.  This has been Mr. Cooney's life since his arrest but he has managed to keep his held head high and focus on the people who need his support like his father, the friends who have supported him, his family members and his children.   It is clear that Mr. Cooney's optimism, strength, and dedication have been essential to his father, his children, his siblings and his

nieces in so many different ways.  They each have come to rely on Bevan to hold them together, overcome life's challenges, and grow individually and as a family.

### 3.   Mr.  Cooney's Commitment to His Friends Epitomizes the Character Traits Most Often Used to Describe Him:  "Kindness and Generosity"

The government has attempted to portray Mr. Cooney as a one-dimensional "villain" driven by greed in his quest to profit from the business deals he was involved in with Jason Galanis and others by highlighting words in Mr. Cooney's emails like "liquid honey."  But this depiction of Mr. Cooney could not be further from the truth. Did Mr. Cooney hope to profit from the business deals he was involved in? Absolutely.  Bevan learned the importance of working hard from his parents.  But was money the ideal that motivated Mr. Cooney above all else?  No it was not.  Money was just a means to an end for Mr. Cooney, like it is for most of us.  It enabled him to provide a comfortable existence for his close and extended family.  Mr. Cooney wanted to make sure that his bills were always paid and that he was providing for his family members' needs.  However, time and again in the letters submitted on his behalf, two character traits resound when friends and family describe Mr. Cooney:  generosity and kindness.

There are those who strongly differ with the government about Mr. Cooney's actual character and values.  Here are just a few examples from the many letters submitted on Mr. Cooney's behalf.

**Peter Holt Gardiner  (Ex. D):**
I came to know Bevan best while I was dealing with medical problems related to cancer during the period 2003-2004, and during this difficult period, Bevan was one of few friends who became family, by constantly supporting me with visits and laughter, kind words and tremendous emotional support. In fact, I attended his wedding in the middle of my chemotherapy treatments, which at the time were proving unsuccessful. I am firmly of the belief that Bevan's support during this period was a large part of my success overcoming this horrible illness and a reason I am alive today. As a result, I have always felt indebted to his kindness, and constant help during this period and feel obliged to share with you this side of Bevan which is so strong and spectacular.

**James Brennan (Ex. D):**
I am married with four young children and Bevan has been a supportive friend over the past 25 years who has had a significant impact on making that a reality. He stood as a groomsman at our wedding

and more importantly he spearheaded an intervention in 2008, flying in to participate, and then personally driving me to the Betty Ford Center for treatment. Frankly, I do not believe I would be alive today had he not taken the lead on this, and I am certain I would have lost my family. I have not had a drink since that day in May of 2008. Some of the biggest blessings in my life have come after that day. My second chance at life. Bevan has witnessed and been a part in many of these blessings, which have been both personal and business…..(excerpts omitted) Bevan was personally responsible for helping me raise a lot of those funds. Over the past 10 years I can't count how many times I have thanked Bevan for my second chance, my new lease on life. He has always said that everyone deserves one, and I am living proof of that.

**Al Dunlop (Ex. D):**

I grew up in Missoula, MT and have known Bevan Cooney nearly 40 years… In the spring of 2016 my family was hammered with a horrible tragedy. My son, ███████ was diagnosed with an aggressive Lymphoma cancer tumor in his chest. We went from a doctor appointment in Missoula, MT directly to the airport where an air ambulance took us straight to Seattle, WA without so much as a toothbrush. This began our fight for his life in a strange city under unbelievable circumstances.

It didn't take long for Bevan to catch wind of our situation. He put me in contact with a real estate friend of his in Seattle, who helped me secure an apartment in a good area, close to the hospital where we would live for nearly a year. Bevan would call or text daily, exchange pictures of our family pets and cooking accomplishments etc.  In short, he helped keep me staying positive and motivated through the rehabilitation of my son. ███████ is now in remission.

**Jon Milne Sherron, (Ex. D):**

Bevan is a true and loyal friend. So much so that I consider him a brother that I never had. Bevan is the type of friend who is there for you through thick and thin and would give you the shirt off his back if you were in need. His compassion in life for friends, family and loved ones goes beyond many. Throughout the trials and tribulations of life Bevan has been there for me, as well as many of others. His generosity and loyalty to his friends is unparalleled.

A few years ago, my father was diagnosed with stage four cancer. Every other month I would be his caretaker. During the year and a half battle for his life, Bevan was there for me. Always answering the phone when I called from the hospital and continually checking in for updates, concern and to share his love with me and our family. It was through Bevans love and compassion that really helped me get through this difficult time.

**Shawn Marsenich, (Ex. D):**

Bevan has always been like a big brother to me by providing support and guidance and help to me in some of my best times, but also in some of my darkest hours. He has never wavered. He has never turned his back on me in times of great need. What he has done is step up and support me 100%, which in some instances required Bevan asking support of key / influential individuals to my situation. These actions have allowed me to receive a 2nd chance in life. A chance that I have parlayed into a beautiful family and a 19-year work career. This would not have been possible without Bevan's support!

These are but a few of the people whose lives Mr. Cooney affected.  They represent, however, an important sample of witnesses to his true character:  something that criminal trials do not allow to be portrayed.  The government is dead wrong about Mr. Cooney.  He is not motivated by greed, except perhaps a greed to bring joy to as many sick, challenged, and struggling friends and family members he could find.  His greed knew no limit as far helping these friends and family members in need; or provided comfort and guidance during difficult times.   We learned from the testimony of Hugh Dunkerly that Mr. Cooney is a "great guy" but this part of Mr. Cooney's character was never told in these proceedings.  (Tr. 1298).

**4.    Mr. Cooney's Representatives From Fulton Management Agree that the Instant Offense is Not Consistent with Mr. Cooney's Honest Character and Their Belief That It was Mr. Cooney's Good Nature that Led Him To Use Bad Judgment By Trusting Jason Galanis**

Until the instant offense, Mr. Cooney had perfect credit and surrounded himself with reputable financial advisers like Fulton Management. Mr. Cooney's business managers from Fulton Management have now come forward to write letters on his behalf as to his character for honesty and that in particular that instant offense conduct was not consistent with the person they knew.  This is critical evidence which this court should consider heavily at sentencing.  Mr. Cooney employed Fulton Management to assist him in every aspect of every financial deal he was involved with including the WLCC bond, the failed real estate transaction involving 1920 Bel Air and Mr. Cooney's loans with Citi National Bank (CNB). See e.g. DX3514(a), GX402, GX3215, DX3530, DX3520, GX410, GX412, DX3162(b), Tr. at 602-604.   At trial, Steven Shapiro-- Mr. Cooney's personal CNB banker testified glowingly about his longstanding relationship with Fulton Management. Tr. 1797.  At trial, when asked about his relationship with Eric Fulton, the owner of Fulton Management, Steve Shapiro testified:  That he had a long-standing relationship with Fulton Management. Tr. 1750: 25, 1752: 1-25 Shapiro testified that he had 200 to 300 hundred customers from Fulton and Myer.  *Id*.   Shapiro repeatedly testified that

he also conducted business concerning Mr. Cooney and the various loans with Alexis Gluckman who

was at the time Mr. Cooney's Account Manager. 1766:6-13.   Shapiro testified that there was no one

person at Fulton working exclusively for Mr. Cooney; his recollection was that Eric Fulton, Matthew

Fillman and Alexis Gluckman were all doing business on behalf of Mr. Cooney and Citi National Bank

and Shapiro testified that **all three individuals were reputable**. 1766:14-19.   Yet, now the same

people from Fulton Management who conducted business on Mr. Cooney's behalf with Steve Shapiro;

individuals who Shapiro attests are reputable are writing to the Court detailing Mr. Cooney's character.

Eric Fulton the owner of Fulton Management writes:

> I am writing to plead for your leniency when sentencing Mr. Bevan Cooney of Missoula,
> Montana.  My name is W. Eric Fulton, and I am partner here at Fulton Management. I have
> been an accountant and business manager for almost 30 years and I've been chosen as one of
> the top business managers in my field by The Hollywood Reporter and Variety magazine for
> many years. I first started working with Bevan over 10 years ago and during this time he has
> always shown to be an honest and professional individual. I was originally introduced to him
> through another client of mine and I've had an opportunity to spend some time with Bevan
> outside of the office as well. I very much enjoyed spending time with him and feel that he is
> a man with a good heart and means well in both business and as a friend.
>
> I am aware of the charges that Mr. Cooney has before the court and while it is unfortunate
> that he has made some bad decisions, I find it difficult to reconcile these charges with the
> actions of the person I have known. I believe as we move forward, he will emerge into a
> better individual and it comes as no surprise that he is ready to accept responsibility for his
> actions.

(Ex. A, Letter of Eric Fulton)

Eric Fulton, the same person who conducted business with Mr. Cooney and acted on Mr.

Cooney's behalf with Citi National Bank and Steve Shapiro to obtain the 1.2 million dollar loan is

attesting to Mr. Cooney's character as an "honest and professional" individual and expressing

difficulty reconciling the instant charges with the actions of the person he has known for the past 10

years.

Similarly Alexis Brown, formerly known as Alexis Gluckman another one of Mr. Cooney's

account managers from Fulton Management who was questioned by the government in this case and

whose name appears throughout the emails in this case has written a letter attesting to Mr. Cooney's

honesty.  She writes in her letter:

> My name is Alexis Brown and I have known Bevan Cooney for over 10 years. We met while I
> was his business manager when he was a client at Fulton Management. Bevan has always been
> an honest and professional person. I have had an opportunity to spend time with Bevan in and
> out of the office, He is a very kind and caring man with a big heart.  I am aware of the charges
> that Bevan has before the court and I can say that in all the time I have known him, Bevan has
> been a decent, hardworking and trustworthy person. I believe any behavior he displayed that
> has caused him to be before your court, was a one-off event.

(Ex. A, letter of Alexis Brown)

The Court may recall that Tim Anderson testified that Mr. Cooney emailed Mr. Anderson

questions about his purchase of the WLCC bond and included in these emails his business managers

from Fulton Management, including Alexis Brown (Gluckman). (Tr. 602)   Alexis Brown (Gluckman)

was involved in every aspect of Mr. Cooney's dealings relating to the instant offense conduct.

(GX3245).

Eric Fulton and Alexis Brown are familiar with the charges in this case and they continue to

represent that Mr. Cooney is (1) an honest person and professional person and (2)  that the instant

charges are not consistent with the person they have known for the last decade.  One might expect that

an employee from Fulton Management would opt to stay silent on these matters relating to a federal

indictment.  On the contrary, both Eric Fulton and Alexis Brown have written letters on Mr. Cooney's

behalf and we can only hope that these letters weigh heavily in the Court's consideration as to Mr.

Cooney's involvement in this case.

Similarly another business colleague, Daniel Hunter Del Monico explains in his letter that the

Bevan he has known and done business with for almost two decades is not the man he read about in this

case and that he has contacted many mutual friends of theirs and they all share the same view of Bevan:

My name is Daniel Hunter Del Monico, I am the grandson of Dan Del Monico, of "Del Monico's Steaks & Restaurants" of NY…I have been friends with Bevan for almost two decades, as well has having done business with him. We have many mutual friends, and I know many people he has done business with. I took the time to read about this case, and although I am not a lawyer or Judge, nor did I attend the trial, I can tell you without reservation that this is not the man I know. I have put myself in several business situations with Bevan where if he had wished he could have taken advantage of me and other partners, and he did not. I have never found Bevan to be anything short of completely honorable. Before writing this letter, which I take very seriously as I am allowing him to use my family name(s), I also called many of our mutual friends and asked if Bevan had ever disappointed them in this way, as maybe I was unaware. To a person they said "no", their view of Bevan was the same as mine.

(Ex. C, Letter of Daniel Hunter Del Monico)

Bevan's childhood friend, Jon Milne Sherron, (Ex.D) also reflects on his similarly held

belief that Bevan was "too loyal and committed to a friend who may have led him astray."   Mr.

Sherron writes:

> As with everyone in life, we all can make mistakes. Bevan's mistake was that he was too loyal and committed to a friend who may have led him astray. He has made his mistakes, but the punishment should fit the crime. He was misguided and trusted too much.  (Ex. H, Letter of Jon Milne Sherron)

Mr. Cooney's longtime friend Adam Winnick, a technology investor and investment banker for

close to 20 years here provides some key insight as to why he and Bevan's mutual friends believe that

Bevan's downfall in this case stemmed "not from a selfish motivation to enrich himself at the expense of

others but rather a lack of judgement about who he chose to be friends with, and more so, to be in business

with.  Mr. Winnick also explains to this sentencing Court his view of the government's evidence against

Mr. Cooney as it relates to Bevan's "colorful" emails:  Mr. Winnick explains:  (Ex. D)

> I am not familiar with all the details of the case against Bevan, but when I read the complaint and the colorful flourishes of Bevan's language included by the Attorney General, I didn't see a criminal. I saw my friend Bevan being supportive of his friend (with characteristic humor). Clearly Bevan was supportive to a fault.
>
> My father was a successful businessman in Los Angeles before I left for college but when I returned home a few short years after college, he was one of its most prominent. It was during this time that my friendship with Bevan began. There were many people promising friendship and it was not clear who I could trust. This became much easier when my father's business had setbacks and received negative coverage in the media. Many friends abandoned me. Not Bevan.

I'd like to think that in this case, Bevan exercised good judgment in standing by me. But I think it's fair to say that Bevan didn't always exercise such judgement. His friendship and partnership with Jason Galanis being the clearest example of this.

One's judgement can certainly be blinded by a number of self-serving factors and perhaps that was the case here. Our mutual friends, however, are generally unanimous in our belief that Bevan' s problems stem not from a selfish motivation to enrich himself at the expense of others but rather a lack of judgement about who he chose to be friends with, and more so, to be in business with.

This sentiment is echoed by another longtime friend of Mr. Cooney.  Peter Holt Gardiner writes: "I also find it difficult to reconcile these charges with the actions of the person I have known for almost 25 years – who has been a supportive and amazing friend to me and my family."  In his letter, he describes how Bevan's devotion to his friends has proved to be his biggest weakness:  (Ex. D)

Bevan's weakness, however, that has led him to where he finds himself today. During the time I have known him, Bevan has placed a huge value and primacy on friendship, for better or for worse. While this has been a huge benefit in many of Bevan's relationships I am aware of, including his relationship with me, I believe his devotion to his friends has also proved his biggest weakness, and has allowed him to fall into the circumstances he finds himself in currently.

Mr. Cooney's friend of more than 20 years, Eugene Brennan (Ex. D) who works as fireman with FDNY Ladder 3, concurs in the unanimous sentiments of Bevan's longtime friends that "Bevan would never knowingly participate in anything fraudulent."  Eugene writes: " I know him to have a strong moral compass and to choose the right thing over money- as he has advised me to do in the past."

### III.    The Nature and Circumstances of the Offense Conduct

18 U.S.C. § 3553(a)(1) provides that in determining the appropriate sentence, Courts should consider "the nature and circumstances of the offense."  Indeed, the "offense conduct" in this case is highly disputed between the parties – even after the convictions. The prosecution has argued that Bevan Cooney should be sentenced as if he were convicted of the *entire* fraud scheme alleged in Count One of the Indictment.  However, after filing post-trial motions even the Court appears to agree that after

scrutinizing the evidence that it may well be that Mr. Cooney just like Mr. Archer was "unaware of the criminal object of the WLCC deal at the time he participated in the vast majority of the email communications with Archer and Galanis."  See Rule 33 Op. at p. 45.   The Court suggests that at some point Cooney became a member of the conspiracy.  *Id.*  The Court points to evidence that Cooney participated in the Calvert cover up and purported lies Cooney told CNB bank well after Cooney purchased the second tranche of WLCC bonds.  In evaluating Mr.  Cooney's offense conduct for purposes of evaluating this first sentencing factor, and later in calculating the advisory Guidelines range, these differing views represent the *sine qua non* of Mr. Cooney's sentence. The difference in the advisory Guidelines calculation, as described below, is immense. According to the U.S. Probation Department, the "offense conduct" could result in a sentence approximating 11 years. In the view of defense counsel, based on the Court's decision in this case and the Court's view of Devon Archer,  at most Mr. Cooney's offense conduct should result in an advisory Guidelines score of no more than 0 to 6 months.

## IV.   ANALYSIS

### A.     <u>The Law Permits a Below Guideline Sentence</u>

#### 1.     Guidelines Range

We dispute the U.S Probation's Guideline analysis as set forth Pre-Sentence Report and urge the Court to Find that the following Guidelines analysis.

| CATEGORY | POINTS |
|---|---|
| Base Offense Level - § 2B1.1(a)(1) | 7 |
| Loss Enhancement - § 2B1.1(b)(1)(K) | +0 |
| **Minor Role** | **-2** |
| **Total Offense Level:** | **5**<br>**(0 to 6 months)** |

Bevan has no prior criminal history; therefore his criminal history level for purposes of the Sentencing Guidelines is a Category I. (PSR ¶ 96). The advisory Guidelines range associated with an adjusted offense level of 5 is 0 to 6 months.

Mr. Cooney objects to the Guidelines analysis set forth in the PSR and has filed formal objections with the Probation and this Court which we are attaching as Defense Exhibit Q (See Objection Letter to the PSR).   Please note these objections were filed before the Court's Rule 33 Memorandum and Decision regarding the evidence against Mr. Archer and Mr. Cooney.  Although we will not cite these objections in their entirety in this Sentencing Memorandum, we incorporate the objections by reference and will further address these objections below.  Additionally, given the Court's recent decision and order, we believe that the Guideline Calculations should reflect the findings of the Court.  The Court appears to have found that Mr. Cooney like Mr. Archer's purchase of the second tranche of bonds was not part of Jason Galanis' fraud.  Rather over Mr. Cooney's objection, the Court has determined that there was evidence that Mr. Cooney at some time after the fraud—learned that Mr. Galanis was part of the fraud and he backdated certain Calvert documents and additionally that Mr. Cooney lied to Citi National Bank to obtain a 1.2 million dollar loan.  Even assuming arguendo that is true, then for the reasons set forth below, it cannot be said that Mr. Cooney's actions were the proximate cause of the pecuniary loss to the victims in this case.  Certainly it was not reasonably foreseeable that if Mr. Cooney misrepresented his ownership of the WLCC bonds to CNB or anyone else that somehow that omission would result in monetary loss to the WLCC or institutional purchasers who purchased the WLCC bond.  Mr. Cooney like Mr. Archer played no role in devising this fraud and certainly he had no role in making any misrepresentations to any victims of the pension fund.   We therefore believe that given the Court's Rule 33 Opinion, the evidence of Mr. Cooney's offense conduct was not the proximate cause of any loss. Simply put, there

was  no evidence that Mr. Cooney caused an actual loss, or intended to cause a loss, to the WLCC, which is the only victim relating to the counts 1 and 2, the counts of conviction. The government has failed to prove that Mr. Cooney subjectively intended to cause pecuniary harm to any victims and therefore no increase for loss should apply. § 2B1.1(b)(1)(K).

Specifically, this Court should find that there was (1) no actual loss to the WLCC in counts one and two as set forth below; (2) there was no intended loss for these counts because Mr. Cooney never purposely sought to inflict pecuniary harm on the WLCC or anyone else, as required by the Guidelines and (3) as set forth in Mr. Cooney's original objections there has been no demonstrated loss to the WLCC;  the evidence at trial showed that the WLCC would not be liable for the bond value if the bonds went unpaid. (Tr. 1913)  Mr. Cooney was not charged or convicted of Counts 3 and 4 which involved investment adviser fraud and the evidence is undisputed that Mr. Cooney never acted as an investment adviser (registered or otherwise). The government failed to prove that Mr. Cooney was involved in or aware of the scheme to defraud the clients of Hughes and Atlantic Asset Management. Literally none of the Hughes and Atlantic clients who testified at trial, had so much as even heard of Mr. Cooney.  (Tr. 82, 1689, 2058-59). Mr.  Cooney did not cause any client of Hughes or Atlantic to purchase bonds. Mr. Cooney had no formal authority or oversight over the investment advisers – that was GMT Duncan, which was controlled by Michelle Morton and Richard Deary.   The trial evidence is undisputed that Mr. Cooney was not involved in any misrepresentations to the pension fund victims or WLCC.  There was no evidence that Mr. Cooney had any substantive interactions with Gary Hirst or Michelle Morton. [7]

Mr. Cooney was not on the Boards (WAAG and Valorlife) that approved the acquisitions and funding for the investment advisers, and the government introduced no evidence that Mr.

---

[7] As already noted above, on March 5, 2015, months after Mr. Cooney purchased the second tranche of bonds Michelle Morton had no idea who Bevan Cooney was)(*See* GX 4004(A)(Michelle Motion to Jason Galanis: (Who's Bevan again?")).

Cooney proposed or knew of any conditions on that financing relating to buying bonds. Therefore, as to the uncharged conduct in Counts 3 and 4, this Court should find no loss as well, because of the nonexistent evidence that Mr. Cooney was involved in this second and separate conspiracy.

Finally, for the reasons set forth in Mr. Cooney's objections he should receive a minor role reduction because he was clearly a minor participant in the offense.  He was listed as the least culpable person on the indictment and at most it can be said that he simply followed the lead of other more culpable participants like Jason Galanis, Hugh Dunkerly and Francisco Martin.

> **2.      The Sentence Guidelines in This Case Do Not Properly Reflect the Degree of Bevan Cooney's Culpability**

The Guidelines analysis in this case, even if legally correct, demonstrates an oft-criticized aspect of the Sentencing Guidelines:

> Imposing a sentence on a fellow human being is a formidable responsibility. It requires a court to consider, with great care and sensitivity, a large complex of facts and factors. The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense. Whereas apples and oranges may have but a few salient qualities, **human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results.**

United States v. Gupta, 904 F. Supp. 2d 349, 350 (2012) (Rakoff, J.) (emphasis added); see also United States v. Adelson, 441 F. Supp. 2d 506, 509 (2006) (Rakoff, J.) ("As many have noted, the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as the weight of drugs in narcotics cases or the amount of financial in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors."). This is particularly true when addressing the Guidelines' loss enhancements, which are "a relatively weak indicator of the moral seriousness of the offense or the need for deterrence." *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427

(S.D.N.Y. 2004) (Lynch, J.).

Although we dispute with the sentence recommended in the Final PSR, not even the Probation Department recommends a Guidelines sentence in this case and instead joins the defense in noting that a non-guideline sentence may be appropriate based on Mr. Cooney's employment history, his lack of criminal history, his family ties and responsibilities.   PSR ¶ 158.  That is because, while a Guidelines range in a usual case is not presumed reasonable (*Nelson v. United States*, 555 U.S. 350, 352 (2009)), the Guidelines range in this case–135-168  months (11 to 14 years)–is entirely unreasonable to the point that it cannot honestly serve as a real starting point of the Court's sentencing considerations, otherwise, this could be the epitome of "the harm that guideline calculations can visit on human beings if not cabined by common sense." *Adelson*, 441 F. Supp. 2d at 512; *see also United States v. Faibish*, No. 12-CR-265, 2015 WL 4637013, at *2 (E.D.N.Y. Aug. 3, 2015) (Vitaliano, J.) (refusing to "peg [the defendant's] fate to a guidelines-computed loss amount" where, using "common sense," the court found that "a strict application of the existing guidelines derived from the existing loss table in this case would unfairly balloon [the defendant's] sentencing range beyond any reasonable proportion to his crimes").

We understand that this Court may, as a technical matter, be required to look to the Guidelines calculation as a "starting point." We respectfully urge, however, that Your Honor will agree that a level 33 is draconian and offensive under the facts of this case as to this defendant and, accordingly, when deciding on the degree of variance to impose, will temper justice with mercy and impose a sentence not greater than necessary to meet the ends of justice.

V.      **Legal and Factual Challenge to The Probation Department's Calculation of Loss**

      A.      **The Offense Level Should Commence At No Higher Than Base Offense Level 7 and Because this Case Involved a  Conspiracy The Court Must Find USSG § 2X1.1 applies and Revert to the Standard of Proof Beyond A Reasonable Certainty When Considering Whether Any Adjustments Pursuant to  § 2B1.1 Apply**

Mr. Cooney contends that his sentence level should be set under § 2X1.1, the conspiracy guideline, rather than § 2B1.1, the guideline for larceny, embezzlement, and other forms of theft. § 2X1.1(a) of the Federal Sentencing Guidelines states that where a conspiracy is not covered by a specific offense guideline, the base offense level is "[t]he base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." (emphasis added).  Consequently, in this case since § 2B1.1, makes no mention of a conspiracy, the Court here must therefore revert to  the reasonable certainty standard described in Section 2X1.1(a) when it considers the offense level increase for loss under §2B1.1 and also when it considers whether the increase for 10 or more victims applies under  § 2B1.1(b)(2)(A)(i) See *United States v. Nadirashvili*, 655 F.3d 114, 122 (2d Cir. 2011)(remanded the case with instructions for the district court "to recalculate" defendant Solomontan's offense applying the reasonable certainty standard to any facts underlying the offense level adjustments listed in Section 2K2.1(b)); *United States v. Savarese*, 404 F.3d 651, 655–56 (2d Cir.2005).

    i.      **The Determination of Loss Pursuant to § 2B1.**1

The sentencing guidelines define loss pursuant to § 2B1.1 as the greater of "actual" loss or "intended" loss.  USSG §2B1.1, comment. (n.3(A)).   Losses caused by the acts of co-conspirators should only be included in the loss calculation if they were **reasonably foreseeable** to the defendant. USSG §1B1.3(a)(1)(B) (defining relevant conduct for jointly undertaken activity).  See *United States v. Nash*, 338 F. App'x 96, 98–99 (2d Cir. 2009); *United States v. Mauskar*, 557 F.3d 219, 233 (5th Cir.

2009); *United States v. Wilkins*, 308 F. App'x 920, 929 (6th Cir. 2009); *United States v. Codarcea*, 505 F.3d 68, 72 (1st Cir. 2007); United States v. Catalfo, 64 F.3d 1070, 1082–83 (7th Cir. 1995); *see also* United States v. Offill, 666 F.3d 168, 180 (4th Cir. 2011) (applying same principle to financial gain imputed to defendant in conspiracy).

Accordingly, the sentencing court should limit the defendant's liability to those acts of co-conspirators that were reasonably foreseeable and part of the criminal activity that the defendant "agreed to jointly undertake." *United States v. Lloyd*, 807 F.3d 1128, 1145 (9th Cir. 2015) (in securities fraud case, reversing judgment attributing loss from California telemarketing boiler room to defendant managing Florida boiler room because defendant did not design overall scheme, did not pool resources, and was compensated from commissions from only his operation). See also *United States v. Sykes*, 774 F.3d 1145, 1150–52 (7th Cir. 2014) (analyzing concept of foreseeability in detail).

In determining whether loss is reasonably foreseeable, courts have found that the **actual loss** must have a causal link to the defendant's conduct.  The second circuit has emphasized that the Sentencing Guidelines import the requirement of a causal relationship between the defendant's conduct and the determined loss: In *United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006), the Court held that a Guideline loss "must be the result of the fraud[,]" id. at 128, and that "[l]osses from causes other than the fraud must be excluded from the loss calculation." *Id*. Thereafter, in Rutkoske, 506 F.3d 170, the Court emphasized that it saw "no reason why considerations relevant to loss causation in a civil fraud case should not apply, at least as strongly, to a sentencing regime in which the amount of loss caused by a fraud is a critical determinant of the length of a defendant's sentence." *Id*. at 179. In the referenced civil fraud context, a loss causation analysis typically examines how directly the subject of the fraudulent statement caused the loss, and whether the resulting loss was a foreseeable outcome of the fraudulent statement. Related factors

include whether intervening causes are present, and the lapse of time between the fraudulent statement and the loss. *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 96 (2d Cir. 2001).

Similarly, *United States v. Whiting*, 471 F.3d 792, 802 (7th Cir. 2006) held that there must be a causal link between the conduct of the defendant and claimed actual losses.  In that case, the defendant was convicted of converting funds from employees' paychecks that were intended for medical benefits and making false statements related to those employees' health benefits. The "actual loss" was calculated using the total amount of unpaid medical claims made by the employees. *Id.*  However, the Seventh Circuit reversed because the trial court stated on the record that there was no "causal link" between the defendant's misstatements about benefits and the losses caused by the medical claims in the case. *Id.*  See also *Rothwell*, 387 F.3d at 584 (finding no reasonable link between fraud committed by the defendant during the construction of a building and the subsequent default on a construction loan, and therefore holding that losses from the loan could not be attributed to the defendant at sentencing); *United States v. Isaacson*, 752 F.3d 1291, 1305–06 (11th Cir. 2014) (remanding because government failed to establish that fraudulent valuations caused losing investment; to the contrary, "Morgan Stanley was going to make this investment, and had made its own internal decision that despite significant risk factors, it was going to invest, because it thought it was a good deal, and it was willing to overlook certain red flags, like the audited financial statements . . . being late"); *United States v. Stein*, 846 F.3d 1135, 1154 (11th Cir. 2017) (remanding because government failed to prove that investors relied upon fraudulent information); *Harrington v. United States*, 489 F. App'x 50, 57 (6th Cir. 2012) ("*Rothwell* stands for the uncontested proposition that a sentencing court applying § 2B1.1 must make a reasonable estimate of loss using proximate cause as its measure.").

The analysis of loss should start from the premise that Cooney was not charged in Counts 3 and 4, the conspiracy involving investment adviser fraud. Indeed, Mr. Cooney was convicted only of

those offenses, specifically securities fraud and conspiracy to commit securities fraud, which do not require any intended or actual deprivation of property as an element of the offense. Accordingly, as the court examines each of the charges that could conceivably lead to a finding of loss under the guidelines, the court should, respectfully, proceed from the standpoint that the jury did not find a loss or deprivation, nor can such a finding be inferred from the jury's verdict. From this analytical starting point, we proceed to a review of actual and intended loss.

### ii.  Actual Loss

The Probation Department's analysis appears to be premised on the findings that Mr. Cooney's actual loss amounts for Counts One and Two should be equal to approximately $60 million because Jason Galanis induced the WLCC, through false and misleading representations and omissions, to issue a total of $60 million of bonds over the course of four bond issuances. PSR §37. For all of the reasons cited above and in the Court's Rule 33 Opinion, we do not believe that there was sufficient evidence Mr. Cooney knowingly and willingly participated in the charged fraud scheme and therefore the $60 million dollar loss was not foreseeable. Additionally, we would also note any argument that Mr. Cooney should somehow still be held accountable based on conduct which happened later on in the conspiracy fails for several reasons. First, Mr. Cooney maintains his innocence but even assuming that the Court accepts the government's interpretation of the evidence, as consistent with Mr. Cooney's knowing involvement in the offense conduct at a later point in conspiracy, there was no "causal link" between Mr. Cooney's purported fraudulent actions with CNB, the transaction involving 1920 Bel Air or his purported submission of false Calvert Documents to the SEC and the ultimate loss to the institutional investors who lost money and therefore the stated loss as set forth in the PSR was not reasonably foreseeable to Mr. Cooney.

The Court should further consider that although the trial evidence showed that there was were

3 bond issuances, Mr. Cooney was alleged only to be involved with the second bond issuance which according to the evidence did not involve new victims.  The government argued that the money Cooney used to purchase 5 million dollars worth of bonds was money Jason Galanis recycled and therefore there were no additional victims.  As detailed herein any argument that Mr. Cooney is liable for a loss to CNB bank because he obtained a fraudulent loan equally fails.  Mr. Cooney provided full disclosure to CNB bank and CNB's sole basis for granting him the 1.2 million dollar loan was the value of his Code Rebel stock. (GX411).  CNB was admittedly "highly reluctant" to do the loan in the first place, as Steve Shapiro later admitted in an email (GX 440), because he was aware that Mr. Cooney's ability to pay back the loan within 6 months was based on Mr. Cooney's ability to sell his Code Rebel stock which never happened.

Furthermore, beyond the reasoning of the Court that "it may well be that Cooney-like Archer, Dunkerly and Martin—was unaware of the criminal object of the WLCC deal at the time he participated in the vast majority of communications with Archer and Galanis"  Rule 33 Op at 45, the WLCC was the only victim connected to Counts 1 and 2 that was foreseeable to Mr. Cooney (who was a passive investor who purchased 5 million dollars worth of bonds), and there was no actual loss to the WLCC.  There was no evidence at trial that the WLCC was ever sued by creditors or by the institutional investors who invested in the bond knowingly or unknowingly. There was no actual loss to the WLCC.  Mr. Cooney had no idea, just like Tim Anderson that Jason Galanis misappropriated the proceeds from the WLCC bond.

Based on the evidence, Jason Galanis and others (not Mr. Cooney) caused the WLCC to issue approximately $60 million worth of debt, via the Tribal bonds at issue. Under his plan, the Wakpamni Tribe ("the Tribe") itself would not be responsible for any payments toward the bonds. His plan, as detailed in Jason Galanis' sentencing memorandum provided for an up-front loan to the

Tribe of $2.5 million, the payment of an annual $250,000 fee to the Tribe to be used for tribal development, and an agreement that an annuity, investing pursuant to a private equity strategy of Mr. Galanis' design, would be established to pay for the interest, principal and other fees related to the Bonds. (Doc 198)

At Jason Galanis's sentencing, he maintained that he never intended for anyone to lose money. (Doc 198)  Certainly, Jason Galanis never told Mr. Cooney that this was a fraudulent scheme or that anyone would lose money. The evidence at trial showed that Jason Galanis carefully controlled the flow of information to further his schemes and cover his tracks. See DX4801 (Martin e-mailing: "Jason [Galanis] is VERY sensitive on how communication flows."); Tr. 1120:17-19 (Dunkerley) (Q: Jason Galanis told you at times, don't tell other people certain information. A: Correct). This manipulation to keep parties – and especially Mr. Cooney – in the dark provides further evidence that Mr. Cooney was unaware of Galanis's schemes.  The evidence was overwhelming that Galanis was incredibly secretive about his plans to steal the bond proceeds, even amongst his admitted conspirators. Despite being intimately involved in the entities set up to steal the bond money, neither Dunkerly nor Martin knew Galanis was stealing bond money until well after he began doing so. When Martin executed a contract with the WLCC on behalf of Private Equity Management to invest the bond proceeds, he was unaware that Galanis planned to steal the money, Tr. 2329:16-23; (Martin), only (claimed) inferring it later from Galanis's financing of the Fondinvest acquisition, Tr. 2175:19-22 (Martin). And even though he (with Gary Hirst) controlled the WAPC account where the bond money ended up, Dunkerley did not know that the bonds were part of a criminal scheme until he saw where Galanis instructed him to wire the proceeds. Tr. 1139:24-1140:11. (Dunkerley). So even as Galanis was implementing his bond scheme, his own key co-conspirators did not know about his plans.

Raycen Raines and Tim Anderson testified that the bonds were not issued by Native Americans either individually, in a community, in a district or in a tribe. They were issued by a corporation. They testified that the Wakpamni Lake Community was separate and distinct from the WLCC, and the Wakpamni Lake Community did not waive any part of its sovereign immunity.   Raycen Raines testified at trial  (Tr. 1913) that written right into the resolution adopting the bond deal, there is clear language that the Wakpamni Lake Community is not financially responsible for anything relative to this deal and neither are any individuals. And was also clear that the bonds themselves only mention the WLCC and not the Wakpamni Lake Community itself.  (Q: And would I be correct in that it further states that there will be no personal liability for the directives of the WLCC nor any person executing the bonds also, correct? A: Yes. Q: You had no personal exposure either, right?  A: Correct.

Tim Anderson testified essentially that the WLCC only waived their sovereign immunity to the profits generated by the bond proceeds and nothing else.  Therefore based on the testimony on Anderson and Raines, as a result of the bond deal, the WLCC had been making approximately $250,000 a year. That money could not be reached by creditors.  The creditors therefore could only reach the revenue produced by the assets that were ascertained by the bonds such as for example: profits generated from the warehouse that was built.  (Tr. 358-359)

### iii.   Intended Loss

This Court should also find that based on the evidence in this case against Mr. Cooney and the reasoning set forth in the Court's Rule 33 Opinion granting co-defendant Archer a new trial, there was no intended loss either.  Under the Guidelines, intended loss "means the pecuniary harm that the defendant purposely sought to inflict." U.S.S.G. § 2B1.1, comment. (n.3(A)(ii)(I)).  Before making an intended loss determination, however, a district court must make a specific factual finding regarding the scope of the defendant's subjective intent. See *United States v. Stanley*, 12 F.3d 17, 21 (2d Cir. 1993) (remanding case

for resentencing where the district court accepted the PSR's loss calculation without first specifically determining how many victims the defendant actually intended to defraud); *United States v. Confredo*, 528 F.3d 143, 152 (2d Cir. 2008) (remanding case for resentencing for the district court to consider the defendant's subjective intent before determining the intended loss amount); see also *United States v. Yihao Pu*, 814 F.3d 818, 826 (7th Cir. 2016) (remanding the case for resentencing where there was no evidence in the record that the defendant intended any loss to the victims).

The Sentencing Commission's November 2015 amendments to the Guidelines now require courts to determine intended loss by following the method applied in *United States v. Manatau*, 647 F.3d 1048 (10th Cir. 2011).[8] *Manatau* makes clear that "the intended loss must have been an object of the defendant's purpose."[9] Furthermore, intended loss "does not mean a loss that the defendant merely *knew* would result from his scheme or a loss he might have *possibly and potentially* contemplated."[10] In so holding, *Manatau* affirms the fundamental difference, and significance, between the mental states of *knowledge* and *intent*: it is the "difference between a man who wills that a particular act or result take place [intent] and another who is merely willing that it should take place [knowledge]."[11]

Consequently, in order to base the loss amount on intended loss for these counts, the evidence would need to establish that Mr. Cooney "purposely sought to inflict" monetary harm to the WLCC. If the Court considers the conspiracy charged in Counts 3 and 4 over Mr. Cooney's objection, then the evidence would need to also establish that Mr. Cooney "purposefully sought to inflict" monetary harm to the institutional investors who purchased the WLCC bond.

We believe that based on the Court's Rule 33 Opinion, that there is no evidence whatsoever, at

---

[8] See, Amendments to the Sentencing Guidelines (effective November 1, 2015), Policy Statements and Official Commentary at 29.
[9] Id. at 1048.
[10] Id. at 1050.
[11] Id. at 1051.

trial or otherwise, supporting such an assertion. The Court concluded that while the emails between Cooney, Archer and Jason Galanis related to the acquisitions of Hughs and Atlantic, "there was nothing inherently illegal or illegitimate about these transactions, even though they were motivated by a desire to locate purchasers of the WLCC bonds."  Rule 33 Opinion at p. 30.  Rather, the Court in this case concluded, the fraud as it pertains to the investment advisers in that bonds were purchased for their clients.

While some institutional investors may have lost value in their various funds because Jason Galanis misappropriated the proceeds of the WLCC fund, these losses fail to provide any basis to conclude that Mr. Cooney "purposely sought to  inflict"  pecuniary harm to these investors. This case is simply not comparable to the usual investment fraud cases where the defendant fails to invest the funds and instead misappropriates the investors' funds to support his own lifestyle- demonstrating that defendant's subjective intent to deprive the investors of their money.  Unlike these cases, the evidence here established that Mr. Cooney was also a victim of Jason Galanis's fraud scheme.  Mr. Cooney did not keep a penny of the misappropriated bond money, and the evidence simply does not permit the inference that he knew that Jason Galanis was misappropriating the proceeds of the WLCC bond or that the clients of Atlantic and Hughes were being forced to buy the WLCC bonds.

For all of the reasons detailed above, Mr. Cooney, stands apart from the other admitted and alleged conspirators in a variety of ways: whereas others profited from the scheme, Mr. Cooney invested his own money and lost money.  See DX3802.  The evidence, at trial shows that Mr. Cooney was part of a lawful plan to acquire financial services companies with the hopes of later reorganizing and selling them for a profit.  Mr. Cooney invested hundreds of thousands of dollars of his own money in furtherance of the financial conglomeration (otherwise referenced throughout the trial as the "financial roll up") he and his partners were trying to build. See DX3802. Thus, the evidence supports the conclusion that Mr. Cooney

had no intent to cause any  pecuniary  harm  to anyone, and so there is no intended loss amount. As succinctly noted by the Tenth Circuit: "the term [intended loss] means exactly what it says: to be included in an advisory guidelines calculation the intended loss must have been an object of the defendant's purpose." *United States v. Manatau*, 647 F.3d 1048, 1048, 1056-57 (10th Cir. 2011) (remanding the case for resentencing because a sentencing court "cannot simply calculate "intended loss" by toting up credit limits without any finding that the defendant intended to inflict a loss reasonably approaching those limits."). Without any evidence establishing Mr. Cooney 's subjective intent to purposely inflict monetary harm on the WLCC or any institutional investors harmed by Jason Galanis' fraud scheme, there is no basis for this Court to include any loss amount for Counts One and Two and certainly Counts Three and Four which Mr. Cooney was not charged in or convicted of.

### iv.     Mr. Cooney's Guidelines should not be increased by 2 levels because the offense involved 10 or more victims pursuant to USSG 2B1.1 (b)(2)(A)(i)

Based on the foregoing sine there was no evidence that Mr. Cooney's offense conduct involved his intent to harm any victims of Jason Galanis' fraud scheme this 2 level increase does not apply.  The Court's findings as to dispositive evidence of Mr. Cooney's offense conduct relates to additional evidence which does not relate to the creation or issuance of the WLCC bond or the institutional purchasers who were defrauded by the WLCC bond.   Mr. Cooney was only charged in Counts 1 and 2 and once again the evidence at trial showed that the bonds that Mr. Cooney was alleged to have purchased along with co-defendant Archer was money that was recycled from the purchase from previous bonds and therefore there were no additional institutional victims who lost money in connection with the purchase of bonds connected to Mr. Cooney and Mr. Archer.

The application notes of Subsection 2B1.1 of the USSG provides that "Victim" means (A) any person who sustained any part of the actual loss determined under subsection (b)(1); or (B) any individual who sustained bodily injury as a result of the offense. "Person" includes individuals,

corporations, companies, associations, firms, partnerships, societies, and joint stock companies.

The PSR incorrectly includes victims who should not be calculated as part of the actual loss calculation  determined by the court under U.S.S.G. § 2B1.1(b)(2). *In United States v. Abiodun*, 536 F.3d 162, (2d Cir. July 30, 2008),  defendants pleaded guilty to, inter alia, a scheme to commit credit card and access device fraud through the use of stolen credit information. At sentencing, the district court applied a six-level enhancement to Abiodun's offense level upon finding that his conduct affected more than 250 victims.  The Court held that District Court erred as a matter of law when including [the reimbursed] individuals among the tally of defendants' victims because the losses attributable to these victims were not included in the loss calculation. The Guidelines' adjustment for the number of victims refers to the victims who sustained losses as determined by the loss calculation Guideline. See U.S.S.G. § 2B1.1 cmt n.l (defining "victim" as "any person who sustained any part of the actual loss determined under subsection (b)(1)"); cf. *United States v. Leach*, 417 F.3d 1099, 1106-07 (10th Cir. 2005) (adopting a similar approach).  For the reasons set forth above, because there was no actual loss to the institutional investors based on Mr. Cooney's conduct,  there should be no increase for the number of victims  for the purposes of an enhancement under U.S.S.G. § 2B1.1(b)(2).  Mr. Cooney was not charged in Counts 3 and 4 and there is simply no reliable evidence proved  "beyond a reasonable certainty" of his involvement in those counts and therefore the institutional investors were not foreseeable to him and the enhancement for 10 or more victims is not appropriate

**v.**      **The PSR erroneously increases Mr. Cooney's base offense level by 2 levels for Obstruction of Justice pursuant to USSG 3C1.1 because it provides that Mr. Cooney provided false documents to the SEC, who were in process of the investigating the instant offense.**

The PSR provides here that  the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution or sentencing of the instant offense of conviction and the obstructive conduct related to the defendant's

offense of conviction and any relevant conduct or a closely related offense.  PSR at ¶84.  Once again

pursuant to  U.S.S.G § 2X1.1  this enhancement must be proven by "beyond a reasonable certainty."

The probation department's basis for seeking an increase for obstruction of justice was that Mr.

Cooney knowingly provided false documents to the SEC which Mr. Cooney disputes.

We reiterate all of the arguments made above concerning Mr. Cooney's submission of the Calvert

document to the SEC. There was no evidence that Mr. Cooney had any idea that Calvert was a fake

company created by Galanis and others.  This Calvert document which was produced to the SEC was

part of a mass production of email.  This was just one of many documents that Mr. Cooney provided to

his tax accountant during tax season.  *See* GX 3272, (Here again on February 26, 2016, Mr. Cooney

emails his team from Fulton Management: Vanessa Siegel, Matthew Fillman and Eric Fulton and writes:

Vanessa I found this file for my taxes last year..."  Clearly, this email and the attached loan document

was produced to Fulton Management and was not created or turned over to the SEC with the purpose or

intent to thwart the SEC's investigation of the WLCC bond issuance and therefore the 2 level increase

for obstruction of justice is not proper.  Certainly, if Mr. Cooney and his lawyers at the time, who were

advising him, believed that Calvert was a fake company created by Jason Galanis and his henchman,

they would have invoked Mr. Cooney's act of production privilege. *U.S. v. Hubbell,* 530 U.S. 27 (2000)

(a person can invoke his Fifth Amendment rights against the production of documents where the act of

producing the documents is incriminating in itself).

The analysis in the PSR ignores the testimony of the government's own cooperators, Hugh Dunkerly

and Francisco Martin.  As already discussed above,  a major part of this scheme was an entity called Calvert,

which Galanis and Dunkerly thought up, see Tr. 1464:17-1466:21 (Dunkerley); GX1705, Martin created, see

Tr. 2181:14-19 (Martin), and Galanis, Dunkerley, and Hirst used solely to cover up their crimes. Tr. 1508:9-17.

Mr. Cooney, like the many others who received false Calvert documents had no reason to know any of that.

It is well settled that an adjustment under § 3C1.1 "is appropriate only upon a finding that the defendant had the 'specific intent to obstruct justice, i.e., that the defendant consciously acted with the purpose of obstructing justice.' " *United States v. Labella–Szuba*, 92 F.3d 136, 139 (2d Cir.1996), citing *United States v. Defeo*, 36 F.3d 272, 276 (2d Cir.1994) (citation omitted).   In this case, as already discussed above Mr. Cooney produced the Calvert loan document to the SEC which was part of his email and he did so in accordance with a subpoena which required that he produced all of his email during the stated time period. If Mr. Cooney had destroyed this document or failed to produce it to the SEC -- as part of his email then he would have thwarted the investigation and been charged with Obstruction of Justice.  Mr. Cooney acting in good faith with the advice of his attorney complied with the subpoena and now he is being further punished for his compliance with the subpoena.

### vi.    Mr. Cooney Objects to the Denial of a Mitigating Role Adjustment

Mr. Cooney defers to the law and arguments set forth above and in his legal objections to the PSR attached hereto.  When considering this requested Mr. Cooney respectfully urges the Court to review the SEC Complaint which was filed against Jason Sugarman on June 26, 2019, a 37 page complaint which outlines the fraud scheme as carried out by Jason Galanis, Jason Sugarman and certain others alleged to have played a central role in the fraud including John Galanis, Michelle Morton, Hugh Dunkerly and Francisco Martin.  Mr. Cooney is merely mentioned in connection with his purchase of the second tranche of bonds which the Court has ruled by itself is not dispositive evidence of his guilt.   Mr. Cooney maintains his innocence but even assuming that the Court accepts the government's interpretation of the evidence, as consistent with Mr. Cooney's knowing involvement in the offense conduct, he clearly was the least culpable defendant and he is entitled to a minor-role adjustment because he was "substantially less culpable than the average participant in the criminal activity," i.e., the Wakpamni bond fraud.

Mr. Cooney as previously argued did not have a financial background and did not even graduate

from college.  He followed the lead of the more financially savvy individuals who led this deal including lawyers like Tim Anderson.  He was not involved in the putting this deal together.  He simply acted at the behest of others who told him what to do.  The evidence is undisputed that he was asked to purchase the 5 million dollar portion of the second tranche of bonds at the last minute.  Perhaps Mr. Cooney's lack of sophistication is best expressed in (GX2120)  In April, 2014, Jason Galanis wrote Mr. Archer and Cooney: "$20mm bond approved. Proceeds are 15mm to us and 5mm to them for a winery investment they want to make." GX2120. In response to Cooney's question **"What do we get to do with the 15mm."**

There is no email where Mr. Cooney is providing any substantive advice; rather he is consistently-- simply cheering on his business partners and what appears to be the success of their deals. Mr. Cooney by his questions and comments and the fact that he repeatedly emailed and cc'd his business managers and lawyers like Tim Anderson for advice, did not understand the "scope and structure of the criminal activity."   Mr. Cooney did not play a role in organizing any of the criminal activity and he exercised absolutely no "decision-making authority."   Mr. Cooney was not a Director, Manager, CEO or member of the boards of any of the entities involved in this case or elsewhere.   Mr. Cooney acted at the direction of Jason Galanis and others and in the end he made no money on his involvement in this offense. On the contrary he lost all of his money and declared bankruptcy.  Therefore, considering all of the relevant factors should make him "substantially less culpable than the average participant in the criminal activity." As such, a minor-role reduction is clearly appropriate.

**VI.    The Court's Discretion to Vary from the Advisory Guidelines Is Well Established**

In United States v. Booker, 543 U.S. 220, 226-46 (2005), the Supreme Court held that the then-mandatory Sentencing Guidelines system violated the Sixth Amendment. As a result, the Booker Court rendered the Sentencing Guidelines merely "advisory." Booker, 543 U.S. at 245, 125 S. Ct. at

756-57. Later, the Court further clarified its position, holding that, in addition to being advisory, the Guidelines "now serve as one factor among several courts must consider in determining an appropriate sentence." Kimbrough v. United States, 552 U.S. 85, 90, 128 S. Ct. 558, 564 (2007). Peugh v. United States, 133 S. Ct. 2072, 2080 (2013) ("Under the resulting scheme, a district court is still required to consult the Guidelines. But the Guidelines are no longer binding, and the district court must consider all of the factors set forth in § 3553(a) to guide its discretion at sentencing." (citations omitted)).  Since *Booker*, the Supreme Court has since re-emphasized that the Guidelines are both advisory and not to be presumed reasonable: Nelson v. United States, 555 U.S. 350, 352, 129 S. Ct. 890, 892 (2009) ("The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable").  Section 3553(a), "as modified by Booker, contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals  of sentencing." Kimbrough, 552 U.S. at 101, 128 S. Ct. at 570 (citing the sentencing goals set forth at 18 U.S.C. § 3553(a)(2)(A)-(D)).

> **A.     The Factors Set Forth in 18 U.S.C. § 3553 as Applied in This Case Do Not Require Additional Incarceration**

In fashioning an appropriate sentence, one consideration for this Court is whether the imposed sentence is sufficient "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). There are several reasons why these concerns are met in this case with a sentence of probation, followed by court-mandated therapy and extended hours of community services. First, a sentence of 5 years of probation (analogous to a term of supervised release) will restricted Bevan's liberty and will continue for a number of years. As noted by former Judge John Gleeson from this District:

> Imprisonment is not the only way we punish. Supervised release brings with it a series of significant restrictions on a defendant's liberty. Offenders on supervised release, like the probationer in Gall, "may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission

> from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking." Imprisonment is concededly a more onerous form of punishment, and different in kind from supervision, but Zimmerman is being punished.

United States v. Zimmerman, No. 10-CR-598 JG, 2012 WL 3779387, at *6 (E.D.N.Y. June 19, 2012) (citing and quoting Gall v. United States, 552 U.S. 38, 48-49 (2007); see also UnitedStates v. Springer, 684 F. App'x 37, 40 (2d Cir. 2017) (referring to Supervised Release as "conditional liberty"). Second, as part of our sentencing recommendation, Bevan would need to complete extensive hours of community service. This community service obligation is a serious commitment of time and energy by a defendant and should a defendant fail to meet the requirement for any reason, the defendant risks a violation of the terms of release. Considering the severe nature of these punishments, our proposed sentence is sufficient to satisfy the factors in 18 U.S.C. § 3553(a)(2)(A) listed above.

### B.      Bevan Cooney's Character and Background Militate Against Incarceration

Section 3553(a) allows a sentencing court to consider a defendant in all of his unique humanity. It is long been recognized that a defendant's character is always "a central consideration in the fashioning of a just sentence." United States v. Merritt, 988 F.2d 1298, 1307 (2d Cir. 1993).

As Judge Jed S. Rakoff of the Southern District of New York so eloquently explained:

> [S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

United States v. Adelson, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006); accord Gall v. United States, 552 U.S. 38, 52, 128 S. Ct. 586, 598 (2007) ("'It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual

and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue'" (quoting Koon v. United States, 518 U.S. 81, 113, 116 S. Ct. 2035, 2053 (1996))); see also 18 U.S.C. § 3661; U.S.S.G. §1B1.4 (sentencing court not limited with respect to the information concerning a defendant's background, character and conduct that it may consider for the purpose of imposing an appropriate sentence).

The letters submitted on behalf of Bevan Cooney demonstrate his good deeds and charitable works. Post-Booker, a defendant's history of charitable activities can be considered as one of the factors appropriate in imposing a sentence under the advisory guidelines. See Rita, 127 S. Ct. at 2473 (Stevens, J., concurring) ("Matters such as . . . charitable, or public service are not ordinarily considered under the Guidelines [but are] matters that § 3553(a) authorizes the sentencing judge to consider.")  Notably, several courts have granted a defendant a variance or downward departure based on the defendant's "exceptional" good works. For example, in United States v. Serafini, 233 F.3d 758, 773, 774 (3d Cir. 2000), the Third Circuit upheld the district court's downward departure where many of the letters supporting Serafini, an elected official, "contain[ed] substantive descriptions of Serafini's generosity with his time as well as his money." Serafini, 233 F.3d at 773. Indeed, "several constituents and friends described situations in which Serafini extended himself to them in unique and meaningful ways during times of serious need." Id. at 773. Finding that Serafini was "an exceptionally giving person," the Third Circuit upheld the District Court's downward departure for community and charitable activities. Id. at 774, 775.

As Serafini and other cases make clear, whether it is categorized as a downward departure or the basis for a non-guidelines variance owing to the criteria delineated in 18 U.S.C. § 3553(a), a life of extraordinary good works towards others remains a vital factor for a sentencing court to consider. See, e.g., United States v. Tomko, 562 F.3d 558, 572 (3d Cir. 2009) (affirming variance

to a sentence of probation due largely to the defendants "exceptional" charitable acts and good works); United States v. Thurston, 544 F.3d 22, 26 (1st Cir. 2008) (affirming a sentence of three months incarceration and 24 months supervised release from a recommended guideline sentence of 60 months imprisonment based in part on the defendant's "charitable work, community service, generosity with time, and spiritual support and assistance to others"); See other cases upholding downward departure for good works United States v. Ali, 508 F.3d 136, 150 & n.19 (3d Cir 2007); United States v. Cooper, 394 F.3d 172, 177, 178 (3d Cir. 2005); United States v. Woods, 159 F.3d 1132, 1136 (8th Cir. 1998).

Tellingly, many of the courts that have addressed a defendant's good works have recognized that the defendant's contribution of his time and energy is more valuable than simply his monetary contributions. See, e.g., Tomko, 562 F.3d at 572 (describing how the defendant's "charitable acts that involved not only money, but also his personal time."); Cooper, 394 F.3d at 177 (noting that personal sacrifices "are qualitatively different from the detached donation of money"); Serafini, 233 F.3d at 775 (noting that Serafini's contributions "weren't acts of just giving money, they were acts of giving time, of giving one's self").

Here, Mr. Cooney's history of consistent charitable works are truly exceptional. While Bevan was never a person who had deep pockets to give others money, in numerous instances, almost every friend that writes on his behalf discusses a time when Mr. Cooney dramatically and positively changed their life around.  Bevan is consistently characterized as a compassionate man who prioritizes his family and friendships first and gives selflessly to make sure that they are cared for. Whether he is making arrangements for a mutual friend to help another friend or family member in need or making sure that he is personally present to take his ailing family member to get medical care or friend to get the rehabilitative services they need to change their life around, Bevan has proven over

and over again to be there for those in need.  These charitable activities, along with a sentence of probation and community service demonstrate Bevan's commitment to his community and further support the conclusion that substantial additional incarceration is neither appropriate nor necessary.

### C.    Neither Specific nor General Deterrence Will Be Served by Additional Incarceration

Congress has instructed that, in fashioning an appropriate sentence, the Court should take into account the need for deterrence, and to protect the public from the potential that the defendant will commit additional crimes in the future. Under this prong of § 3553(a), courts assess whether a sentence will sufficiently deter the defendant from committing further crimes, and the public at large from committing similar offenses.

#### 1.    A Sentence of Incarceration Will Not Further the Goals of Specific Deterrence or the Need to Protect the Community

Specific deterrence is achieved by sending a clear message to the defendant. Bevan  has received this message. Since 2016, Bevan has been indicted, charged by the SEC and sued numerous times. Due to the nature of his indictment, he has been unable to work in the world of finance. He has watched his family suffer agonies and hardship at the hands of his lost employment and lost confidence in being able to provide economic security for his family.  He has suffered the loss of basically all of the financial assets that he accumulated for his family over nearly 20 years of professional life. After his arrest, his wife almost immediately filed for divorce because she realized that Bevan would no longer be able to support her in the lifestyle she was accustomed to. Within months of their divorce being finalized, she remarried another man she had met for only 2 months. Bevan had to accept that his ex-wife moved his two children to Ohio so that she could be closer to her parents and family members from her hometown. Nothwithstanding the emotional devastation of being separated from his children, he has emotionally supported his ex-wife's decision to move

because he was limited in his ability to support her in a more expensive city like Los Angeles where they used to live.  Mr. Cooney moved back into his father's home because his father needed his care and support after Bevan's mother died in March of 2017 but also because he could not afford to support his children and to pay rent and expenses for his own separate household.  Bevan has also suffered by sitting through a five-week trial, which ended in convictions on two felony counts. During that process, Bevan went through a very public jury selection.  Bevan's name and reputation has been smeared across the news media.  Even after this case is a distant memory, Mr. Cooney will suffer lasting and permanent impact.  He will forever be known as a convicted felon and he must now live with the uncertainty that he could not see his children until they are at least teenagers because his ex-wife will never bring his children to visit him if he is sentenced to a term of incarceration.  He will never get back the time he will miss from his children's childhood.

Given the punishment that Bevan has already received, and the punishment he will continue to receive as a convicted felon, there is no basis to believe that he would commit any other crimes in the future. See United States v. Nesbeth, 188 F. Supp. 3d 179, 180 (E.D.N.Y. 2016) (urging sentencing courts to consider the collateral consequences facing a convicted felon). As such, there is no need for incarceration to further the goal of specific deterrence.

### 2.        A Sentence of Incarceration Will Not Further General Deterrence

General deterrence has also been achieved here, given the public nature of this prosecution and Bevan's two felony convictions. Imposing a sentence of substantial additional incarceration will not serve the general deterrence purposes under § 3553(a). Indeed, research has consistently shown that, while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." M. Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28 (2006); see also United States v. Yeaman, 248 F.3d

223, 238 (3d Cir. 2001) (Nygaard, J., dissenting) ("It is widely recognized that the <u>duration</u> of incarceration provides little or no general deterrence for white collar crimes.").

Moreover, a sentence of probation or a short sentence can also send a strong message to potential white collar offenders. <u>See</u> <u>Adelson</u>, 441 F. Supp. 2d at 514 (describing the "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders"); <u>United States v. Tomko</u>, 562 F.3d 558, 573 (3d Cir. 2009) (declining to adopt government's argument that district court's probation-only sentence in complex securities fraud case, which government described as a "100% variance," would harm general deterrence.

Furthermore, "general deterrence" alone cannot support the weight of a sentence sending an individual to prison. <u>See</u> <u>United States v. Corsey</u>, 723 F.3d 366, 381 (2d Cir. 2013) (Underhill, J., concurring) (where the district court's § 3553 analysis relied "almost exclusively on one word – 'deterrence,'" that factor simply could not "'bear the weight assigned it under the totality of circumstances in the case,'" (quoting <u>United States v. Cavera</u>, 550 F.3d 180, 191 (2d Cir. 2008))). A sentence substantially below-Guidelines would still reflect the need for general deterrence. The deterrent effect is particularly strong in this case, where Bevan's trial, conviction has already been reported in the news. The last almost three years have been extraordinarily harsh on Bevan and any additional sentence will not generate additional deterrence.

Moreover, because deterrence is only one factor to be considered under § 3553(a), in assessing the deterrent value of any aspect of a sentence, this Court can and should assume that people learning of the sentence will also be aware of all the facts the Court considered, including Bevan's determination and hard work, set forth above, rather than just the limited and mostly inaccurate details described in the press.

**D.      A Sentence of Incarceration Would Result in Unwarranted Sentencing Disparity**

Another factor that a sentencing court must consider before imposing sentence is the need to avoid unwarranted sentence disparities. 18 U.S.C. § 3553(a)(6) requires the Court to consider sentences afforded to defendants "with similar records who have been found guilty of similar conduct."   The primary purpose of this provision is to reduce unwarranted sentence disparities nationwide. *United States v. Wills*, 476 F.3d 103, 109 (2nd Cir. 2007).  What the statute commands is for the Court to examine the criminal conduct upon which the defendant's conviction is based and, in sentencing the defendant, consider the sentences by other courts nationwide for similar criminal conduct.  Thus, the linchpin of the disparity analysis is the specific criminal conduct that formed the basis for the jury's verdict, not the criminal statutory provision that was violated and not every allegation in the indictment.

As stated throughout this submission, Bevan's case is significantly different from most other fraud cases because there is no evidence that he made a single misrepresentation to an investor, he is not even charged in the advisory / investor fraud counts.  There was no cooperator testimony that Mr. Cooney had any knowledge of misrepresentations to investors or testimony that he had knowledge that Jason Galanis was misappropriating money from proceeds of the WLCC bond. This Court should also consider that, unlike most fraud cases, Bevan was a passive investor and his involvement did not lead his investors to any financial hardship. Because of these factors, we respectfully submit that a sentence of substantial additional incarceration would create unwarranted sentencing disparities with cases where the fraud was even larger, the conduct more egregious and where the defendant was required to pay restitution because the fraud victims lost money. A non-exhaustive list of such cases is detailed in the below.  Please note given Mr. Cooney's conduct we believe that he is far less culpable than any of the defendants sentenced below but we believe the Court can consider these sentences as a ceiling certainly not a floor.

| CASE | NATURE OF OFFENSE | GUIDELINE RANGE | SENTENCE |
|------|-------------------|-----------------|----------|
| U.S. v. Block (SDNY) 16 Cr. 595 (JPO) | Conspiracy to Commit Securities Fraud; Securities Fraud; False Statements in Filings with SEC | Life | 18 months $100,000 fine (after trial) |

Block was the former CFO of a real estate investment trust that manipulated financial results of the trust in various SEC filings. The government argued the loss in the case to be $315 million based on the market drop following disclosure of the fraud.

| | | | |
|------|-------------------|-----------------|----------|
| U.S. v. Lamm (EDNY) 15 Cr. 43 (FB) | Securities Fraud | 78-97 months | 36 months $15m restitution |
| U.S. v. Lumiere (SDNY) 16 Cr. 483 (JSR) | Conspiracy to Commit Securities Fraud | 135-168 months | 18 months $1,000,000 fine |
| U.S. v. Hochfeld (SDNY) 13 Cr. 21 (PAC) | Securities Fraud; Wire Fraud | 78-97 months | 24 months $2.1m forfeiture |
| U.S. v. Sekaran (SDNY) 12 Cr. 821 (RPP) | Securities Fraud; Mail Fraud | 41- 51 months | 30 months $2.2m restitution |

- Lamm was the "operational expert" of multiple, overlapping fraud schemes in which individual investors lost life savings and retirement funds.

- Lumiere's offense involved fraudulently inflated performance results and misleading investors about performance results.

- As General manager of an investment fund, Hochfeld misappropriated over $2 million from the fund for use on personal vacations and antiques.

- Sekaran made numerous misrepresentations to family and friend investors, including false statements to prevent redemptions. In total, more than ten investors lost approximately $2.3 million while Sekaran personally took more than $500,000 for himself.

These sentences in the chart above are consistent with the statistics compiled by the United

States Sentencing Commissions for 2016 regarding sentences in all fraud cases (not just securities

fraud cases) showing that the average fraud sentences nationally, in the Second Circuit, in all New

York Federal Courts and in the Eastern District of New York as follows [12]

---

[12] United States Sentencing Commission, Statistical Information Packet Fiscal Year 2016, Eastern District of New York, Table 7 at p. 10; United States Sentencing Commission, Statistical Information Packet Fiscal Year 2016, Second Circuit, Table 7 at p. 10; United States Sentencing Commission, Statistical Information Packet Fiscal Year 2016, New York State, Table 7 at p. 10.

| JURISDICTION | MEAN | MEDIAN |
|---|---|---|
| Nationwide | 34 months | 24 months |
| Second Circuit | 30 months | 18 months |
| NY Federal Court | 29 months | 18 months |
| EDNY | 33 months | 24 months |

Considering these sentences, and sentencing averages, a sentence of substantial additional incarceration in this case would create unwarranted sentencing disparities.

### E.      Other Sentencing Considerations

In 2017 Mr. Cooney moved back to Missoula, Montana shortly after his passed away to help care for his ailing father who has been hospitalized at least 4 times since Mr. Cooney moved back to Missoula. As detailed in several letters of Mr. Cooney's family members and friends, Mr. Cooney is the only family member who watches over his father.  Mr. Cooney's father's medical records attached hereto in Ex. Q will be submitted to the Court and the Government but not filed on ECF.  On one occasion Mr. Cooney saved his father's life after finding him passed out on the kitchen floor; his father was hypoglycemic from low blood sugar and diabetes.  The district courts in this Circuit have consistently recognized a defendant's family circumstances as justification for imposing a non-Guidelines sentence.  We previously have recognized that "[a] defendant's extraordinary family circumstances can constitute a legitimate basis for imposing a below-guidelines sentence." *United States v. Mayala*, 2009 WL 1181051 (E.D.N.Y. 2009); *United States v. Outerie*, 2008 WL 5459158 (E.D.N.Y. 2008) (district court imposed a sentence at the low end of the Guidelines range where the "defendant has an infant child and a good work history" ); *United States v. Aristizabal*, 2007 WL 4555900 (E.D.N.Y. 2007) (a below-guidelines sentence was imposed because the defendant had a good relationship with his wife and children and he has been trying to support them"). Mr. Cooney respectfully requests that the Court consider the effects of his

incarceration on his father who is in need of his care.

Finally, should this Court sentence Bevan to a term of incarceration, Bevan will be designated to a Bureau of Prisons ("BOP") facility to serve the remainder of his sentence. Considering that Bevan has no prior criminal record and his convictions are for non- violent offenses, we respectfully request that, if this Court sentences Bevan to additional incarceration, it include in its Judgment a recommendation that the BOP waive the Public Safety Factor for "Threat To Government Officials."   Given Mr. Cooney's history of using alcohol we also ask that the Court sentence him to the 500 Residential Drug Abuse Program (RDAP) administered by the United States Federal Bureau of Prisons.

## VII.   CONCLUSION

Mr. Cooney was not a sophisticated business man. He did his best to surround himself with the individuals who he believed were much smarter than him.   He also hired accountants and money managers to handle his business because his credit and his reputation were extremely important to him.   (Ex. L).   Notwithstanding Mr. Cooney is extremely remorseful for his poor judgement and blindly letting Jason Galanis lead him down this path when he should have taken more precaution.   He should not have trusted his fate to other people simply because he believed them to be smarter than him.   Jason Galanis was masterful at deceiving people including his friends.   He exploited their weaknesses and in Bevan's case, he exploited Bevan's good nature and the fact that Bevan was not a detail person. Jason Galanis used Bevan Cooney for his connections with individuals like Kevin Washington.   Mr. Cooney likewise believed that his involvement in the financial conglomeration with Burnam Securities and individuals like Devon Archer, Hunter Biden and others was the opportunity of a lifetime.   The WLCC bond was just one small aspect of their business dealings.   Mr.  Cooney apologizes for his poor judgment and he is extremely remorseful.   His life since his arrest and since letting Jason Galanis back into his life has been a downward spiral.   His star and career was on the

rise and now he can barely work in the field he once loved.  He was thriving in a life with his wife and two beautiful children.  Prior to this offense Mr. Cooney's wife and children were the center of his universe; currently his ex-wife limits his access to even weekly phone calls.  He had been unable to pursue a meaningful custody arrangement with his children because his future is so uncertain and he recognizes that his children need stability during this very uncertain period in his life.  As detailed in the letters of Mr. Cooney's family members, long-time friends and business associates,  Mr. Cooney is comprised of more than the individual the government has depicted him to be: specifically he is a kind, caring and a generous person who uses his time and effort to help those in need.  We also ask this Court to consider that, although Bevan was convicted of fraud, he was not looking to hurt or damage any banks or investors like many other fraudsters.  Mr. Cooney is not a con-artist or a person who has ever looked to earn a penny by harming another individual, financially or otherwise.   We respect the Court's decision but in a case where the Court has opined that the evidence was complex and innocuous a sentence of incarceration would be unjust and cruel.

In sum, after weighing all those factors delineated in 18 U.S.C. § 3553(a), we respectfully submit that a substantial period of incarceration would be inimical to the ends of justice because "the punishment should fit the offender and not merely the crime" *Pepper v. United States*, 131 S. Ct. 1229, 1240 (2011).   Mr. Cooney is a far cry from even the least culpable defendant convicted of fraud in the above chart and he was the least culpable defendant in this case. A sentence of probation, along with extensive hours of community service, is "sufficient, but not greater than necessary" to accomplish the goals of sentencing and consistent with the interests of justice.

Dated:    July 8, 2019
          New York, New York

                                                        Respectfully submitted,
                                                         /s/ Paula Notari
cc: all parties                                                      /s/ Abraham Hassen
(via ECF and  email)