Sanjay Wadhwa
Adam S. Grace
Nancy A. Brown
Tejal D. Shah
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-1023 (Brown)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x

SECURITIES AND EXCHANGE
COMMISSION,

                              Plaintiff,

                        v.

JASON SUGARMAN,

                            Defendant.

-------------------------------------------------------- x

:
:
:
:
:
:
:
:
:
:
:
:
:

19 Civ.    (   )

**COMPLAINT AND**
**JURY DEMAND**

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendant Jason Sugarman ("Sugarman"), alleges as follows:

## SUMMARY OF THE ALLEGATIONS

1.       Over a three-year period beginning in late 2013, Sugarman and his business

partner, Jason Galanis ("Galanis"), working with others, stole $43 million from unwitting

pension funds to finance the acquisition of a global financial conglomerate of European and

Bermuda insurers, and investment advisers based in Virginia and Connecticut. Along the way,

and through a series of fraudulent transactions made complex enough to cover their tracks,

Sugarman, Galanis and their confederates also victimized a Native American tribal corporation

and surreptitiously siphoned millions of dollars in cash from the entities that they acquired.

2.      In its wake, the scheme left the investment advisers defunct, the European insurer in administrative receivership, the Bermuda insurance holding company delisted from the Bermuda Stock Exchange, the Native American tribal corporation nominally indebted for $60 million, and the pension funds with a $43 million investment in worthless securities.  Sugarman, however, benefitted immensely from the scheme; indeed, to a large extent, he was the biggest winner from the fraud, ending up with voting control over corporate assets that were acquired with bond proceeds, and from which he ultimately siphoned almost $9 million in cash for his direct and personal benefit.

3.      Sugarman carried out the scheme with eight other individuals who have already been charged by the Commission:  Galanis, Devon Archer ("Archer"), Bevan Cooney ("Cooney"), Hugh Dunkerley ("Dunkerley"), John Galanis, Gary Hirst ("Hirst"), Francisco Martin ("Martin") and Michelle Morton ("Morton") (together, the "Previously Charged Defendants").  See SEC v. Archer, et al., 16 Civ. 3505 (WHP) (S.D.N.Y.).[1]

4.      Galanis and his father, John Galanis, kicked off the centerpiece of the scheme in March 2014, when they convinced a Native American tribal corporation, the Wakpamni Lake Community Corporation ("WLCC" or "Tribal Corporation"), to become the issuer of limited recourse bonds that the father-son duo had already structured (the "Tribal Bonds" or "Bond").  The proceeds from the Bond sales were supposed to be used by the Tribal Corporation to

---

[1]      The United States Attorney's Office for the Southern District of New York filed parallel charges against all of the Previously Charged Defendants, except Martin.  See United States v. Archer, et al., 16 Cr. 371 (RA) (S.D.N.Y.) (the "Criminal Action").  All of the Previously Charged Defendants who were named in the Criminal Action either pled guilty to criminal charges, or were convicted of those charges after trial.  Archer was granted a new trial, an order that is currently on appeal to the Second Circuit.  Morton has renewed an earlier unsuccessful motion to withdraw her guilty plea.

purchase an annuity as an investment that could generate sufficient income to pay interest to bondholders.

5.      However, from the outset, Galanis and Sugarman – who were referred to by other scheme participants as the "two Jasons" and "50/50 business partners" – intended to use the proceeds from the issuance of the Tribal Bonds for their own purposes and benefit.  In April 2014, when an initial issuance of $20 million in bonds seemed imminent, Galanis emailed Sugarman:  "We would have discretion over the bond.  Let's discuss how it can be allocated."

6.      Having secured WLCC as the issuer, the next step was to identify unwitting investors to buy the Tribal Bonds.  To accomplish that, Sugarman and Galanis devised a plan to obtain control over investors' funds by acquiring investment advisers who would use their investment authority to purchase the Bonds for their clients.  Sugarman provided financing, through companies that he controlled, to purchase two investment advisers with authority over client funds.  Once the adviser firms were acquired, Morton, whom Sugarman and Galanis installed at the helm of the advisers, did what Sugarman and Galanis intended, and used client funds to purchase the Tribal Bonds in client accounts.

7.      First, in August 2014, Sugarman financed the purchase of Hughes Capital Management, LLC ("Hughes") – which managed approximately $900 million for various pension funds – and Morton assumed the role of CEO.  Second, in April 2015, Sugarman and Galanis financed Hughes' acquisition of another investment adviser with still more pension fund clients' funds under management, Atlantic Asset Management LLC ("AAM"), and they put Morton in charge of the larger enterprise.  Sugarman and Galanis exercised undisclosed control over both Hughes and AAM.

8.      On August 20, 2014, Galanis, Morton and Hirst, acting with Sugarman's knowledge and consent, directed Hughes' clients' purchases of the first $27 million tranche of bonds.  That same day, Galanis sent Sugarman a spreadsheet describing a proposed allocation of the Tribal Bonds proceeds.  The proposed allocation did not include a purchase of an annuity, as contemplated by the Bond's issuing documents, but, instead, showed the distribution of most of the net proceeds for the benefit of Sugarman, Galanis and entities that they controlled.  In the weeks following Hughes' clients' purchases of the Bonds, Galanis, Sugarman and the other Previously Charged Defendants executed their plan to misappropriate all of the proceeds and none of the proceeds was invested in any annuity.

9.      In April 2015, Sugarman, Galanis and the other Previously Charged Defendants replicated the scheme.  Galanis, acting with the knowledge and consent of Sugarman, instructed Morton to direct the purchase of $16.2 million in Tribal Bonds with an AAM's client's funds.  Once those funds were directed to Sugarman's and the Previously Charged Defendants' control, they misappropriated the proceeds for their benefit.  Again, none of the proceeds was ever invested in a legitimate annuity.

10.     Sugarman, Galanis, and the Previously Charged Defendants divvied up the misappropriated proceeds, either using them to acquire entities, to shore up the operations of their existing companies, to pay back debts, to compensate scheme participants, to buy real estate, or to make other investments for their individual benefit.

## VIOLATIONS

11.     By virtue of the conduct alleged herein, Sugarman directly or indirectly, singly or in concert, violated Sections 17(a)(l) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(l) and (3)], or, in the alternative, Section 15(b) of the Securities Act [15 U.S.C.

§ 77o(b)], by aiding and abetting Galanis's violations of Sections 17(a)(l) and (3) of the

Securities Act [15 U.S.C. §§ 77q(a)(1) an (3)]; and Section 10(b) of the Securities Exchange Act

of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17

C.F.R. §§ 240.10b-5(a) and (c)], or, in the alternative,  Section 20(e) of the Exchange Act [15

U.S.C. § 78t(e)] by aiding and abetting Galanis's violations of Section 10(b) of the Exchange Act

[15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

## JURISDICTION AND VENUE

12.     The Commission brings this action pursuant to the authority conferred upon it by

Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Sections 21(d)(l) and 21(d)(5) of the

Exchange Act [15 U.S.C. §§ 78u(d)(1) and 78u(d)(5)], seeking a final judgment:  (a) restraining

and permanently enjoining Sugarman from engaging in the acts, practices and courses of

business alleged against him herein; (b) ordering Sugarman to disgorge all ill-gotten gains and to

pay prejudgment interest on those amounts; (c) prohibiting Sugarman from acting as an officer or

director of a public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)]

and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; and (d) imposing civil money

penalties on Sugarman pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and

Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

13.     This Court has jurisdiction over this action, and venue lies in this District,

pursuant to Section 22(a) of the Securities Act [15. U.S.C. § 77v(a)] and Sections 21(d) and 27

of the Exchange Act [15. U.S .C. §§ 78u(e) and 78aa].  Sugarman, directly or indirectly, made

use of the means or instruments of transportation or communication in interstate commerce, or of

the mails, or of a facility of a national securities exchange, in connection with the transactions,

acts, practices, or courses of business alleged herein, certain of which occurred in this District.

For example, Burnham Securities Inc. ("Burnham Securities"), the placement agent for the sale of the Tribal Bonds, on whose investment committee and Board Sugarman sat, was located in New York, New York, and Sugarman attended meetings throughout the relevant period in this District. In addition, one of the Tribal Bonds at issue was held in, and transferred between, brokerage accounts at a brokerage firm in New York, New York.

### DEFENDANT

14.     **Jason Sugarman**, age 47, resides in Los Angeles, California. During the relevant period, he served as an officer and director of Valor Group Ltd. ("VGL"), a Bermuda-based insurance conglomerate, and was a Director and an indirect owner of then-SEC-registered broker-dealer and investment adviser Burnham Securities.

### OTHER RELEVANT INDIVIDUAL AND ENTITIES

15.     **Galanis**, age 48, resides at Terminal Island Federal Correctional Institution in San Pedro, California. In January 2017, Galanis pled guilty to criminal charges in connection with the Tribal Bonds scheme and is currently serving a sentence of 173 months (60 months of which are to be served consecutively to a sentence he received in connection with another, unrelated fraud).[2] Throughout the Tribal Bonds scheme, Galanis used a company he controlled, Thorsdale Fiduciary and Guaranty Company Ltd. ("Thorsdale"), as a vehicle to distribute misappropriated assets.

16.     **Burnham Securities**, a now-defunct SEC-registered broker-dealer based in New York, New York, served as the placement agent for the Tribal Bonds. At all relevant times,

---

[2]     Jason Galanis appealed that sentence, and on January 10, 2019, the Second Circuit remanded his case back to the District Court presiding over his sentencing for the earlier fraud (United States v. Galanis, 15 Cr. 643 (PKC) (S.D.N.Y.) ("Gerova"), for consideration of his motion to vacate his Gerova sentence on the basis of ineffective assistance of counsel pursuant to Fed. R. Crim. P. 33.

Sugarman indirectly owned an interest in Burnham Securities and was a member of its and its holding company's Board of Directors.

17.     **VGL** (f/k/a Wealth Assurance Holdings Ltd. ("WAH")) is a life insurance holding company headquartered in Bermuda.  It was incorporated in the British Virgin Islands in 2013 as WAH, and changed its name to VGL in December 2014.  From December 2013 through November 2016, its Class B common shares were listed on the Bermuda Stock Exchange. Through **COR International**, a Delaware company that he controls, Sugarman holds significant ownership interests in WAH, and its successor, VGL.  More specifically, when the conduct described herein took place, Sugarman owned all of VGL's Class A voting shares and most of its Class B economic shares.  In addition, Sugarman was the Chairman and CEO of WAH, and, subsequently, a director and officer of VGL.  Sugarman and Galanis arranged for VGL to purchase three foreign insurance companies relevant to the Tribal Bonds scheme:

    1.     **Wealth-Assurance AG ("Wealth-Assurance")** is a Liechtenstein insurance company acquired by VGL (then WAH) in 2013.  Sugarman appointed Dunkerley as President, Managing Director and member of the Board of Directors. Wealth-Assurance then provided financing for the purchase of Hughes by **GMT Duncan LLC** ("GMT").  Wealth-Assurance's subsidiary, **BFG Investments**, was an indirect owner of Hughes and AAM by virtue of an ownership interest it acquired in GMT.

    2.     **Valorlife Lebensversicherungs AG ("Valorlife")** is a Liechtenstein-based insurer.  In November 2014, Sugarman and Galanis arranged for Wealth-Assurance to purchase Valorlife with $11 million in Tribal Bond proceeds.  In April 2015, Valorlife then provided the financing for the purchase of AAM.  Valorlife and Wealth-Assurance are currently under administrative receivership.

3.    **VL Assurance ("VL Assurance")** is a Bermuda-based insurer.  In April 2015, Sugarman and Galanis arranged for VGL to purchase VL Assurance using a Tribal Bond.  VL Assurance then funneled over $8 million to Sugarman as purported loans to him or his affiliated entity.

18.    **GMT** was Hughes' and AAM's parent company.

## FACTS

### A. The Partnership of the "Two Jasons" and Their History of Coordination in Misappropriating Assets of An Acquired Company

19.    Sugarman and Galanis were business partners in the Tribal Bonds scheme.  They were in frequent contact with each other, sometimes exchanging multiple communications a day by email and phone, as well as through messaging services designed to conceal and destroy their communications, like Wickr, an end-to-end encrypted and content-expiring messaging application.  Their relationship was so close that Galanis frequently referred to Sugarman in meetings and emails as "Sug" or "Sugie Bear."  Other scheme participants referred to them as the "two Jasons."  Dunkerley, whom Sugarman enlisted to serve as his nominee in connection with various aspects of the scheme in order to avoid scrutiny, described the two as 50/50 partners, and Galanis as the "brains," and Sugarman as the "brawn" in their scheme.  In Dunkerley's view, Sugarman's brawn came from his vast business connections to wealthy, successful investors, connections Sugarman developed and cultivated through his father-in-law.

20.    Galanis regularly consulted with Sugarman to obtain his approval on even small expenditures of scheme proceeds.  On one occasion in 2013, Galanis made sure he had Sugarman's approval to pay a lawyer $25,000 out of the closing proceeds of their acquisition of Wealth-Assurance.

21.     The Tribal Bonds scheme was not the first time that Sugarman and Galanis used their control of an acquired entity to siphon cash for their own benefit.  The first time occurred only weeks after they worked together to acquire Wealth-Assurance.

22.     In December 2013, Sugarman and Galanis arranged to acquire Wealth-Assurance. Thorsdale entered into a share purchase agreement with WAH, pursuant to which Thorsdale committed to contributing €3,000,000 to Wealth-Assurance in January 2014 to fund the final payment to Wealth-Assurance's sellers, in satisfaction of the acquisition agreements, while maintaining its statutory capital requirements.  WAH's counsel sent Sugarman and Galanis drafts of the agreement by email in December 2013 prior to its execution.

23.     However, Thorsdale's purchase money ended up coming from Wealth-Assurance's own funds, because Sugarman and Galanis arranged to have Wealth-Assurance make a sham investment and then diverted the funds back to the transaction's escrow agent.

24.     At a meeting of Wealth-Assurance's Board of Directors on January 7, 2014, after a presentation by Sugarman and Dunkerley, the Board (which included Dunkerley and Sugarman) approved a €4 million investment of the company's capital in an Irish fund called Ballybunion Caplain UK Focus Growth Fund ("Ballybunion"), an investment that would have deployed Wealth-Assurance's assets in a way that met the requirements set by the Liechtenstein insurance regulators.  By email dated January 17, 2014 to the Board, Dunkerley, acting at Sugarman's and Galanis's direction, advised that the investment should be directed to Ballybunion's U.S. dollar class and the funds wired to a U.S. bank account in Ballybunion's name.

25.     On the day before, January 16, 2014, Sugarman had his assistant ("Sugarman's Assistant") incorporate a limited liability company bearing the Ballybunion name in Nevada, and

caused a bank account to be opened in that name.  That Ballybunion entity had no connection with any Irish investment manager of the same name, and was controlled by Sugarman and Galanis.

26.     Per Dunkerley's instructions, Wealth-Assurance wired the money to the fake Ballybunion's account in the U.S. on January 21, 2014, but that bank rejected the wire.  Faced with an urgent need to find another financial institution that would accept the wire, on January 23, 2014, two days later, Sugarman directed Sugarman's Assistant to a branch of a bank ("Bank A") where Sugarman had a high-level contact, to open an account in the fake Ballybunion's name, and facilitated the process by introducing Sugarman's Assistant to a bank officer as Manager of the fund.  At the same time, Sugarman also introduced a purported representative of Thorsdale, ("Thorsdale Representative"), Galanis's entity, so that the Thorsdale Representative, too, could open an account.  Sugarman represented to the bank officer that he had done business with both representatives, and vouched for them and their entities.  He described Ballybunion, not as the U.S. arm of any Irish investment manager, but as an "entity focused on private equity investments, with a focus on real estate," and assured the Bank A officer that Ballybunion did not trade securities or "manage[] public investments as its business, either for itself or others."

27.     On January 24, 2014, the Ballybunion account at Bank A received a wire for $5.4 million from Wealth-Assurance.  That same day, the Ballybunion account wired a little more than $4.1 million out to the Thorsdale account at Bank A, and it, in turn, wired a little over $4 million out to Novalaw-GJP, a Luxembourg law firm that served as the escrow agent for WAH's purchase of Wealth-Assurance, in satisfaction of Thorsdale's obligation to contribute €3,000,000 to Wealth-Assurance under its December 2013 share purchase agreement.  Galanis sent Sugarman a copy of the outgoing wire confirmation by email on January 25, 2014.

28.     When Bank A began asking questions about the large and swift movement of funds in and out of the accounts, Sugarman's Assistant provided assurances concerning the bona fides of both Ballybunion and Thorsdale.  Ultimately Bank A allowed the accounts to remain open but restricted their international activity.

29.     Barred only from engaging in international wire traffic, Galanis directed the remaining $92,000 out of the Thorsdale account to another Thorsdale account at a different institution, and Sugarman directed $800,000 out of the Ballybunion account to an investment in a solar company in which he had an interest, COR Financial (HK), and additional amounts to a technology investment.  All told, the Ballybunion scheme garnered Sugarman and Galanis more than $1 million from Wealth-Assurance, while allowing them to complete the Wealth-Assurance acquisition.

30.     In the following months, Wealth-Assurance employees made repeated efforts to obtain statements for the company's purported Ballybunion investment.  After multiple emails went unanswered, a Wealth-Assurance board member finally reached out to Galanis, copying Sugarman, for help.  Galanis responded by email to Sugarman and the board member on December 17, 2014 that he would "contact the parties at interest and obtain the stub period information."  On December 20, 2014, Galanis forwarded a fabricated statement, showing a June 30, 2014 valuation of $5.6 million, an impossibility given the distribution of the funds out of Ballybunion's account at Bank A, as Sugarman, who received the fabricated statement, knew. Sugarman and Galanis thereafter enlisted Dunkerley to provide additional fabricated statements. In a July 25, 2015 email from "administration@bbfund-admin.com," Dunkerley, acting at Galanis's direction and with Sugarman's knowledge and approval, provided an account statement as of December 31, 2014, showing that Wealth-Assurance's supposed investment in

11

the Ballybunion fund had grown to more than $5.7 million, even though, as Sugarman and Galanis knew, that money had never been invested in the Ballybunion Caplain UK Focus Growth Fund but had instead been diverted to the fake Ballybunion's bank account and then sent to other payees and investments months earlier.

31.     Sugarman maintained the Ballybunion investment charade even after Galanis's September 2015 arrest in the <u>Gerova</u> matter.  In January 2016, one of the officers of VGL reached out to Sugarman's Assistant, who still worked with Sugarman, with questions about the investment, noting that he had been referred to Sugarman's Assistant by Sugarman.  And in March 2016, the same VGL officer identified Sugarman's Assistant to a Wealth-Assurance employee "as your contact for all Ballybunion matters going forward, including NAV as at December 31, 2015 and future quarters."  At the time Sugarman identified Sugarman's Assistant as the Ballybunion contact to VGL, he knew, or was reckless in not knowing, that there was no investment to value, that Sugarman's Assistant was not a representative of the real Ballybunion fund, and that the Nevada Ballybunion had no connection to the Irish fund in which Wealth-Assurance's investment had been approved by its Board.

**B.  Galanis and John Galanis Entice the Tribal Entity to Issue Limited Recourse Bonds**

32.     In March 2014, Sugarman and Galanis needed another source of discretionary funding for their plans to build a financial conglomerate.  Galanis and his father, John Galanis, a recidivist fraudster who had already spent significant time in prison, came up with the Tribal Bonds scheme to provide the needed funds.

33.     At a convention in Las Vegas, John Galanis met with representatives of the WLCC to discuss the idea of the Tribal Corporation's issuance of limited recourse bonds that he and Galanis had already structured.  The WLCC is affiliated with the Wakpamni District of the

Oglala Sioux Nation, whose members live in one of the poorest regions in the United States. The WLCC ultimately agreed to the idea and issued three tranches of Tribal Bonds, totaling about $60 million. According to the Bond documents, the proceeds from the Bond sales were supposed to be used by the Tribal Corporation to purchase an annuity (as an investment that could generate sufficient income to pay interest to bondholders) from Wealth-Assurance, a VGL subsidiary.

34.     Once WLCC was secured as the issuer, Sugarman and Galanis arranged for VGL subsidiaries to provide financing to purchase two investment advisers – Hughes and AAM – with the expectation that client funds would be used to purchase the Tribal Bonds. Emails between Sugarman and Galanis reflect their intent from the outset of the scheme to use Wealth-Assurance as a conduit through which they could control and use the proceeds from the Tribal Bonds for their own benefit. In April 2014, when an initial issuance of $20 million in bonds appeared imminent, Galanis emailed Sugarman: "I believe we can arrange a trade where the tribe acquires a $20 million insurance policy from [Wealth-Assurance] in consideration for $20 million of municipal bonds issued by the tribe. [W]e would be appointed the discretionary manager over the policy. Therefore we would have discretion over the bond. [L]et's discuss how it can be allocated."

35.     In another email with Sugarman, Galanis further explained, "$20mm. $5mm to their [the Tribal Corporation's] project and $15mm to [Wealth-Assurance]. 20 year discretionary."

C. **Sugarman Arranges Financing to Purchase Investment Advisers with the Expectation that Clients' Funds Would Be Used to Purchase Tribal Bonds and Proceeds Would Be Funneled Back to WAH**

36.     In order to secure victims to purchase the Tribal Bonds, and to generate the proceeds they would misappropriate, Sugarman and Galanis arranged to obtain control over two investment advisers, and their captive client funds.  First, in August 2014, Sugarman financed the purchase of Hughes, which invested $27 million of its clients' funds in Tribal Bonds.  Second, in April 2015, Sugarman financed the purchase of AAM, and participated in inducing AAM to invest $16.2 million of its clients' funds in Tribal Bonds.

1.     **Hughes**

37.     In May 2014, Sugarman and Galanis were introduced to Morton, and the three of them began negotiating to purchase Hughes, an investment adviser with approximately $900 million under management, based in Alexandria, Virginia.

38.     On June 3, 2014, Galanis provided Morton with a document titled "Introduction to COR Capital," to provide to Hughes' then-owner to "demonstrate who [Morton's] financial sponsors are."  The "Introduction to COR Capital" document, which Galanis authored, described several businesses that COR Capital purportedly owned, including Wealth-Assurance and Burnham Securities, and referred to a website that Sugarman had launched, www.corfunds.com, which included similar information relating to COR Capital's businesses.

39.     Sugarman held himself out as a Member and Manager of COR Capital, including in a Board Resolution he signed in connection with the purchase of Wealth-Assurance in 2013. Sugarman saw and approved Galanis's "Introduction to COR Capital."  Indeed, its description of COR Capital and its business interests was consistent with the description of the businesses in the application Sugarman authorized for submission to the Liechtenstein regulators in seeking approval for the Wealth-Assurance acquisition in 2013.  It was also consistent with his own

14

handwritten notes, dated May 2, 2014, that Sugarman provided to a graphics employee of COR
Capital in connection with his work on the corfunds.com website.

40.     On July 16, 2014, Galanis sent Sugarman a copy of the executed term sheet for
the acquisition of Hughes, noting: "[W]e get discretion over $900 million." Galanis also told
Sugarman that they "need[ed] to raise $2.7MM in two weeks" for the acquisition of Hughes.
And to assure Sugarman that the acquisition would result in their control over client funds,
Galanis added that he would be "appointing Hirst as acting CIO [Chief Investment Officer]" of
Hughes. With one of their own directing the investments, Sugarman's and Galanis's control
over the bond proceeds was guaranteed.

41.     To obtain funding for the acquisition, Sugarman had Galanis draft a memo to the
Board of Wealth-Assurance, recommending that Wealth-Assurance acquire an interest in Hughes
through a newly formed Wealth-Assurance subsidiary, BFG Investments. Galanis sent drafts of
the memo to Sugarman for comments on August 5 and August 7, 2014. The memo was drafted
as if it were from Dunkerley, whom Sugarman and Galanis had installed as WAH's nominee
CEO, to Sugarman and another Wealth-Assurance board member, and as if WAH had "referred"
an investment proposal to Wealth-Assurance. As Sugarman knew, Galanis's role behind the
scenes was to remain just that, given his prior disciplinary history with the SEC, and to conceal
his involvement from the official Wealth-Assurance records, Galanis's name was not on the
memo, despite his authorship of it.[3]

42.     The investment memo reflects Sugarman's and Galanis's plan to purchase Hughes
so that they could direct investments of Hughes' client funds in the Tribal Bonds and funnel a

_____

[3]     In 2007, Galanis had been barred for five years from acting as an officer or director of
any public company pursuant to a settlement of a Commission enforcement action, SEC v.
Penthouse Int'l, Inc., et al., 05-cv-0780 (S.D.N.Y.).

15

large portion of the proceeds from those bond purchases to WAH. It contained a recommendation that the investment to purchase Hughes be conditioned on confirmation by WAH of an executed Subscription Agreement pursuant to which an entity named "Wakpamni Investments" would purchase $12 million of WAH's Class B shares.

43.     On August 11, 2014, Wealth-Assurance held a meeting of its Board of Directors, including Sugarman, during which Dunkerley's memo (ghost-written by Galanis) was circulated to the Board, presenting the opportunity to purchase Hughes through BFG Investments and recommending the purchase. Notably, the minutes from the Board meeting reflect the Board's understanding that this was Dunkerley's and Sugarman's proposal, noting that the Board "puts its trust in the proven expertise of Jason Sugarman and Hugh Dunkerley on investment matters." Based on the memo's representations, Wealth-Assurance agreed to make the investment.

44.     On August 12, 2014, Wealth-Assurance caused its newly-formed subsidiary BFG Investments to make a capital contribution of $2,660,618 to GMT, which funds GMT then used to finance its purchase of Hughes. Hughes became GMT's subsidiary, and Morton became the CEO of Hughes.

45.     The day after GMT acquired Hughes, Galanis obtained a CUSIP for the Tribal Bonds which he forwarded to Sugarman. On August 20, 2014, Galanis forwarded a spreadsheet and trade blotter to Sugarman, reflecting that nine of Hughes' clients had purchased a total of $27,077,436 of Tribal Bonds. Burnham Securities served as the placement agent in exchange for a $250,000 fee from the Bond sale proceeds.

46.     Sugarman knew from Galanis that the proceeds from the Bond sales were supposed to be used by the Tribal Corporation to purchase an annuity (as an investment that could generate sufficient income to pay interest to bondholders) from Wealth-Assurance.

16

Sugarman also knew, or was reckless in not knowing, how the proceeds were meant to be invested through his review of the transaction as a member of Burnham's Investment Committee, which approved the transaction as laid out in the deal documents, including the Placement Agent Agreement, in a meeting attended by at least Dunkerley.

47.    However, on August 20, 2014, the same day that the Bonds were purchased, Galanis sent Sugarman a spreadsheet describing an alternative proposed allocation of all of the Tribal Bonds proceeds.  The proposed allocation did not include any funds being used to purchase an annuity from Wealth-Assurance.  Instead, it included, among other things, $12 million for "WAH B Shares" (as had been contemplated in the investment memo provided to Wealth-Assurance's board recommending the investment), $1.3 million for "Bonair/ICA [a Hirst entity]," $100,000 for "Camden" [a Sugarman entity] and $47,500 for "JS [Jason Sugarman]."

48.    In the weeks following Hughes' clients' purchases of the Bonds, Galanis, Sugarman and the Previously Charged Defendants misappropriated all of the proceeds for their personal benefit.  Galanis arranged for an entity called Wealth Assurance Private Client Corporation ("WAPCC"), which had a strikingly similar name but bore no relationship to Wealth-Assurance, to be set up as the purported annuity provider, and directed that it be named in the annuity contract as the entity to which the proceeds should be directed.  Making this last-minute change to the annuity contract allowed Sugarman and Galanis to direct the proceeds to their control, but also avoided raising the suspicion of the Indenture Trustee (who was charged with directing the proceeds) or the Tribal Corporation, who had to authorize the release of the proceeds.

49.    WAPCC, acting through Dunkerley, sent most of the proceeds to Thorsdale, and from there, Sugarman and Galanis further misappropriated the funds, including in ways that

Galanis had proposed in the August 20, 2014 spreadsheet that he sent to Sugarman.  For example, on August 29, 2014, $1.3 million of the bond proceeds were used to repay a loan that Hirst, through his company Insurance Company of the Americas ("ICA"), had made to Sugarman and Galanis in connection with the acquisition of Wealth-Assurance, and on September 4, 2014, $47,500 of the bond proceeds were sent to Sugarman.

50.     As Sugarman and Galanis had initially planned when they convinced Wealth-Assurance's Board to purchase Hughes, the largest chunk of proceeds from Hughes' clients' purchases of Tribal Bonds was used for the benefit of WAH.  However, instead of using $12 million to buy WAH Class B shares, Galanis devised a way to multiply the Tribal Bonds proceeds by recycling the funds to purchase new sham bonds.

51.     On September 24, 2014, Galanis sent $15 million of bond proceeds from the Thorsdale account to Rosemont, an entity owned by Archer.  Rosemont then wired $15 million to the Tribal Corporation to purchase a new tranche of Tribal Bonds (the "Rosemont Bond"), and the Tribal Corporation, in turn, sent most of the recycled funds to WAPCC, with the ostensible purpose of purchasing a new annuity.

52.     However, instead of actually investing any of the funds in an annuity for the benefit of Tribal Corporation, Galanis recycled a portion of the funds once more to fund Cooney's purchase of a newly-issued $5 million Tribal Bond (the "Cooney Bond").  Sugarman and Galanis then used $11 million of the proceeds remaining from the Rosemont Bond and the proceeds of the Cooney Bond to enable WAH to purchase another insurance company, Valorlife, in November 2014, as described more fully in paragraphs 73 to 79.

53.     And through the recycling of the first Bonds' proceeds into the purchase of additional bonds, Sugarman, Galanis, Archer and Cooney not only retained and used the cash

proceeds, but ended up with additional Bonds, nominally worth another $20 million, that they could, and did, use as currency for additional acquisitions and other purposes.

2.   **AAM**

54.   In late 2014, Sugarman and Galanis began searching for additional investment advisers to supply more client funds to invest in yet another tranche of Tribal Bonds. Morton identified AAM, an investment manager with $11 billion in assets under management, as a potential target for Hughes.

55.   On October 30, 2014, Morton emailed Galanis that she had had a conversation with AAM's Chief Strategist "about our SRI/Native American Initiative" and reported that "he is so on board with this." According to Morton, the AAM Chief Strategist told her that if she made him aware of the details of the Bonds ahead of time, he would do his "damndest to get it placed within a day after the acquisition." Galanis, keeping Sugarman apprised of the progress on obtaining more bond proceeds, forwarded Morton's email to Sugarman, with the note "Bingo."

56.   On November 10, 2014, Galanis forwarded Sugarman another email in which the AAM Chief Strategist told Morton that he had said "prayers" and remained hopeful that she would acquire AAM. Sugarman asked whether the AAM Chief Strategist was Jewish, to which Galanis responded, "all we care is that he likes firewater," referring to the Tribal Bonds. Sugarman replied:  "Yes."

57.   On December 1, 2014, at Sugarman's direction, Dunkerley provided AAM's General Counsel a letter on behalf of the COR Group of Companies, Inc., confirming COR's agreement to provide financing to capitalize the purchase of AAM.

58.   On February 1, 2015, Galanis sent Sugarman a draft "consultant report" directed to the "Board of Valorlife" regarding the financing of the proposed acquisition of AAM, and

asking Sugarman to tell him if the draft "is going in the right direction." After Sugarman provided feedback, Galanis sent him a revised memo to make it "much more Valor focused." Ultimately, Sugarman and Galanis obtained Valorlife's authorization to finance GMT's purchase of AAM through BFG Investments with an upfront capital contribution of $6,120,398.

59.     The terms of the purchase were memorialized in an Amended and Restated Limited Liability Company Agreement for GMT ("Restated Agreement"), entered into as of April 2, 2015. The Restated Agreement provided that AAM's Board of Managers was to consist of four persons, comprised of two Class A Holders (Morton and her business partner) and two persons selected by BFG Investments (the WAH subsidiary that financed the purchase) as the Class B Holder.

60.     Sugarman and Galanis celebrated the acquisition. In his email to Sugarman notifying him that the deal had closed, Galanis wrote: "Big milestone. . . Very proud of us." Sugarman responded: "Agree. Now time to make money!"

61.     Immediately after the acquisition of AAM closed, and as he and Sugarman had envisioned, Galanis instructed Morton to identify investors to purchase additional Tribal Bonds. When Morton told Galanis that AAM's approval of investment in the Bonds was not forthcoming, Galanis pushed back strongly.

62.     In an April 10, 2015, email that he forwarded to Sugarman, Galanis reminded Morton that investing in Tribal Bonds was a "fundamental part of the business plan" and that it was in "everyone's interest to maintain their word" by investing AAM's clients' funds in the Bonds.

63.     The following business day, Monday, April 13, 2015, Morton sent Galanis offering memoranda of two funds managed by AAM – Global Yield Opportunity Fund

("GYOF") and Global Alpha Trust – to determine where to place the Tribal Bonds.  GYOF was a pooled investment vehicle which at the time had only one investor, Omaha School Employees Retirement System ("OSERS").  Galanis forwarded Morton's email to Sugarman, noting that despite Morton's claim that there were no available discretionary funds to invest, "apparently we have a $126 million feeder fund to an Atlantic Cayman hedge fund. . . she said this was a managed account for months."

64.     The next day, Galanis emailed Archer and Sugarman that Morton was in the process of arranging for a Burnham employee to take over the management of GYOF to enable the investment, but that the "only finesse needed" was that the current manager of the fund, a legacy AAM employee, would feel "marginalized."  Sugarman responded:  "Let's have [the Burnham employee] call [the legacy AAM employee] and see if he likes sports.  If so, fly him out for a warriors or dodgers," referring to the Golden State Warriors and LA Dodgers, two teams in which Sugarman's in-laws had significant investments.  A few hours later, Sugarman confirmed that arrangements to entertain the AAM employee had been made.

65.     On April 16, 2015, Morton managed to place the Bonds herself, directing the investment of $16.2 million of GYOF's client funds in the new issuance of Tribal Bonds.  Once again, Burnham Securities served as the placement agent.

66.     Thus, Sugarman and Galanis replicated the misappropriation of the Hughes' clients' funds with the misappropriation of AAM's client's funds:  They used the VGL entities to fund the acquisition of a firm with discretionary access to millions of dollars of client funds, and then immediately had the firm invest client money in the Bonds.  And as before, once client money was used to invest in the Bonds, Sugarman personally received a portion of the proceeds.

21

On April 20, 2015, WAPCC—the fake annuity provider set up for the scheme and to which the proceeds were directed—wired $236,000 to the account of Jason Sugarman and his wife.

### D. Sugarman Participated in and Benefitted from the Misappropriation of the Tribal Bonds Proceeds

67.     Based on the documents governing the $43.2 million in Tribal Bonds sold to Hughes and AAM clients, and after the deduction of various issuance costs and up-front payments to the Tribal Corporation, $40.1 million of the bond proceeds were to be invested in annuities issued by an insurance provider said to be related to Wealth-Assurance. Instead, all of the Hughes and AAM bond proceeds were sent to the WAPCC account. At Galanis's direction, and with Sugarman's knowledge and approval, most of the funds were sent from WAPCC to Thorsdale (Galanis's entity), and further misappropriated from there.

68.     Sugarman and Galanis directed a large portion of the bond proceeds to be sent from Thorsdale to an account in the name of Wealth Assurance Holdings, Ltd. ("WAH NV"), a Nevada corporation that bore the same name, but had no actual relationship to WAH. WAH NV's bank account statements were sent to an office in California that Sugarman and his brother used in connection with various businesses. Sugarman and Galanis installed Dunkerley as WAH NV's sole director and president.

69.     Sugarman personally participated in and benefited from the misappropriation of the bond proceeds in at least six ways:

**1.      $524,500 Transferred to Sugarman and His Spouse**

70.     Sugarman directed Galanis to send him $524,500 directly from the bond proceeds in five separate transfers to him or to him and his wife:

| Date | Amount | Entity from which Funds were Sent | Recipient |
|------|--------|-----------------------------------|-----------|
| 9/4/2014 | $47,500.00 | Thorsdale | Jason & Elizabeth Sugarman |
| 9/4/2014 | $120,000.00 | WAH NV | Jason & Elizabeth Sugarman |
| 10/30/2014 | $78,064.48 | WAH NV | Lausanne LLC (an entity owned by Elizabeth Sugarman) |
| 10/30/2014 | $42,935.52 | WAH NV | Elizabeth Sugarman |
| 4/20/2015 | $236,000.00 | WAPCC | Jason & Elizabeth Sugarman |

**2.      Sugarman and Galanis Misused the $15 Million Rosemont Bond to Benefit Themselves**

71.     As described in paragraphs 51-52, above, Galanis recycled $15 million of the proceeds from Hughes' clients' purchases of Tribal Bonds to enable the purchase of the Rosemont Bond.  Sugarman knew that the Bonds had been issued by no later than October 29, 2014, when Galanis sent him an email attaching Bloomberg screenshots of the issuance.  And, Sugarman both knew of and shared Galanis's intention to use the Rosemont Bond as currency for other transactions made by their group; on October 30, 2014, Sugarman asked a business associate familiar with Bermuda insurance regulations whether the Bermuda Monetary Authority would give another Sugarman insurer appropriate statutory capital credit for the Bond if it were placed in the insurer's portfolio.  With the same goal in mind, Galanis asked a similar question of the lawyer who had represented Burnham in the placement of the Rosemont Bond.  On

November 14, 2014, in an email Galanis forwarded to Sugarman, Galanis asked the lawyer

whether Rosemont could "transfer title to" a portion of the "$15MM . . . they own to an

insurance company they have an investment in." And Sugarman knew, or was reckless in not

knowing, that the Rosemont Bond had not been paid for with Rosemont funds. Although both

Sugarman and Galanis were discussing the uses to which they could put the Rosemont Bond,

neither included Archer in these discussions, indicating that both knew that Archer had no

legitimate interest in the Bonds his entity had purportedly bought. For his part, Archer never

treated the Rosemont Bond as his own; when he wanted to use it as currency himself, as

discussed below in paragraph 91, he asked Sugarman and Galanis to approve the use.

72.     Sugarman and Galanis deployed the $15 million Rosemont Bond and $5 million

Cooney Bond in four different ways:

        ***a.***     ***Sugarman and Galanis Used $11,000,000 of the Rosemont and Cooney***
              ***Bonds' Proceeds to Purchase Liechtenstein-based Insurer Valorlife***

73.     In late 2013 and early 2014, Sugarman and Galanis negotiated Wealth-

Assurance's purchase of Valorlife from Swiss insurer, Vaudoise Insurance Holding Ltd.

("Vaudoise"), for approximately $20 million. Galanis emailed Sugarman, Archer and Cooney:

"Good news is this is a deal. Bad news is timing. Let's discuss how to flush out our potentials."

After several failed attempts at securing funding from other sources, Sugarman and Galanis

ultimately used most of the Rosemont and Cooney Bond proceeds for the purchase.

74.     On November 10, 2014, when regulatory approval of the purchase was imminent,

a Wealth-Assurance director emailed the other directors, including Sugarman, indicating that

Wealth-Assurance's Board of Directors had passed a resolution to fund a portion of the purchase

and the remaining funds would be sent by WAH. He instructed Wealth-Assurance's secretary to

"liaise with Jason Sugarman to ensure that these series of transfers are carried out with the utmost efficacy." Sugarman forwarded the email to Galanis.

75.     On November 14 and November 17, 2014, Sugarman and Galanis siphoned $11,000,000 of the Rosemont Bond and Cooney Bond proceeds to Vaudoise to purchase Valorlife. As with the first issuance of the Bonds, the Rosemont and Cooney Bond proceeds were sent from the Tribal Corporation to WAPCC ostensibly to purchase an annuity. Instead, in a plan hatched by Sugarman and Galanis, Sugarman and Galanis arranged for most of the funds to be sent from WAPCC to Vaudoise in two ways that were designed to disguise that the real source was recycled proceeds from earlier Tribal Bond sales.

76.     First, Sugarman and Galanis arranged to send $3,895,000 from WAPCC to Cooney on November 12, 2014, who forwarded those funds the next day, along with an additional $30,000 of bond proceeds that he had received from Thorsdale, to Camden Escrow, an entity owned by Sugarman. On November 14, 2014, Camden Escrow sent $3,950,000 to a law firm's trust account, which in turn sent $3,925,000 to Vaudoise.

77.     Second, Sugarman and Galanis sent $10,570,000 from WAPCC to Thorsdale, and then $7,080,000 from Thorsdale to WAH NV, finally sending $7,075,000 from WAH NV to Vaudoise in two wires on November 14, 2014 and November 17, 2014. By arranging for WAH NV to send the funds to Vaudoise, Sugarman and Galanis were able to maintain the appearance that WAH was completing the acquisition.

78.     According to marketing material prepared by Galanis, the purchase resulted in WAH becoming the leading life insurer in Liechtenstein, with assets of $6.75 billion and gross revenue over $1 billion.

79.     Sugarman was the primary beneficiary of the purchase. Through COR

International, Sugarman owned all of WAH's voting shares, and most of its economic shares.

Once he gained control over Valorlife, he was able to direct its investments in ways to benefit

himself and Galanis, including $3,195,000 to purportedly purchase Tribal Bonds, as described

below, and $6,120,398 to purchase AAM.

> ### b.   *Sugarman Arranged for Valorlife to Purchase a Portion of the Rosemont Bond to Facilitate Galanis's Purchase of a Manhattan Apartment*

80.     In December 2014, Sugarman and Galanis convinced the board of Valorlife – to

which Sugarman had been appointed after the acquisition – to invest $3,195,000 in Tribal Bonds.

On December 1, 2014, Galanis sent Sugarman a memo from WAH to the Investment Committee

of Valorlife recommending the investment.

81.     Board Minutes from a December 4, 2014 meeting of Valorlife's Board of

Directors note that "in absence of a professional investment manager within Valorlife the board

welcomes the formal proposal from the company's shareholder [Sugarman] to invest in the

described Fixed Income Municipal Bonds, and puts its trust in the proven expertise of Jason

Sugarman and Hugh Dunkerley on investment matters. . . .  It has been represented to the Board

that a full due diligence has been conducted on the underlying investment in the bonds. . . ."

The Board Minutes include the CUSIP of the Tribal Bonds to be purchased, which matches the

CUSIP of the Rosemont Bond.

82.     The Valorlife Board—which included Sugarman and Dunkerley as voting

members—agreed to the investment, and on December 8, 2014, Valorlife transferred $3,195,000

to a trust account at a law firm ostensibly to purchase a portion of the Rosemont Bond.

However, the law firm did not send Valorlife's money to Rosemont.  Instead, with the

knowledge of Sugarman and Galanis, the law firm wired funds to a title company and a different

law firm. The title company was the title agent for an apartment located at 260 West Broadway in Manhattan, which was purchased by Galanis around the time of the transfer of funds; the transferee law firm was the firm that represented the seller of that apartment.

83.     In January 2015, an employee at Valorlife's corporate parent asked an attorney for Burnham for details concerning the Bond Valorlife had purchased. She related that she understood that a portion of the Rosemont Bond would be transferred to reflect the purchase. In actuality, though, Rosemont never transferred any portion of the Rosemont Bond to Valorlife. Instead, the Rosemont Bond remained in a New York City brokerage account in the name of "RSB LLC" until Galanis and Sugarman found another use for it in April 2015.

> ### c.     Sugarman Used the Rosemont Bond to Buy a Bermuda Insurance Company

84.     Notwithstanding that a portion of the Rosemont Bond had purportedly been sold off to Valorlife, in April 2015, Sugarman found another use for the full $15 million bond: financing the purchase of yet another insurance subsidiary, this time Bermuda International Insurance Services Limited ("BIISL," subsequently known as "VL Assurance").

85.     On March 31, 2015, Galanis emailed Archer and Sugarman regarding a proposed structure for the acquisition of BIISL by VGL whereby Rosemont would contribute the Rosemont Bond to VGL. Sugarman replied: "Great. Thank you." On April 9, 2015, pursuant to the Galanis plan that Sugarman had approved, Archer signed a letter authorizing his New York City-based broker to transfer the Rosemont Bond then in its custody, and then purportedly valued at $16.7 million, to an account at the same broker in the name of VL Assurance.

86.     This transfer enabled Sugarman to purchase BIISL with the highly illiquid (and worthless) Rosemont Bond. By the time Archer authorized the transfer of the Rosemont Bond from Rosemont's account to VL Assurance's, Sugarman and Galanis had already made a down-

payment for BIISL, re-christened it as "VL Assurance," and had obtained control of its assets. By replacing the former BIISL's liquid holdings with the Rosemont Bond to satisfy its statutory minimum net capital requirements, VL Assurance could liquidate almost $14 million of the former BIISL's own statutory capital and use the resulting cash to pay its prior owners the acquisition price without running afoul of regulatory capital requirements.

87.     Just as he had done with Valorlife, Sugarman used his ownership and control of VGL to direct VL Assurance's investments.  On May 21, 2015, Sugarman directed VL Assurance to liquidate another $8.5 million of liquid bonds that it held at the time to fund two "loans," of $4.25 million each, to entities that he controlled:  VGL and Inversiones Balesia, a foreign subsidiary of a cell towers company.

88.     In both instances, and at Sugarman's direction, VL Assurance sent the funds to Sugarman's attorney's trust account, not to the purported borrowers.  From there, and again at Sugarman's direction, Sugarman's attorney disbursed the money to several different individuals and entities for Sugarman's benefit, including funds sent directly to Sugarman's other business interests, funds paid to a third party to settle a lawsuit to which Sugarman and his brother were parties and to make charitable donations in his name.

89.     Although the promissory notes provided that the loans were to be repaid a year later, neither loan was ever repaid by the borrowers.

> **d.    Sugarman and Galanis Used the Rosemont Bond to Meet Burnham Securities' Net Capital Requirements**

90.     In May 2015, Burnham Securities was facing difficulty meeting the Commission's minimum regulatory net capital requirements.  This presented another opportunity for Sugarman and Galanis to make use of the Rosemont Bond.

91.     On May 12, 2015, Archer wrote to Galanis and Sugarman to ask that they approve

the transfer of the Rosemont Bond to Burnham Securities, telling them that Burnham needed the Rosemont Bond that had been transferred from the Rosemont account to the VL Assurance account to pay for the VL Assurance acquisition, noting that "it will be very helpful for the Burnham change of control app[lication] with FINRA." On May 29, 2015, Sugarman, on behalf of VL Assurance, gave written instructions to the broker holding the Rosemont Bond on behalf of VL Assurance to "journal 2,600,000 of the [Wakpamni Bonds] . . . to the account titled Burnham Securities Inc." The Bond (with a supposed market value of $3 million) was purportedly transferred to Burnham Securities in exchange for a promissory note, but the loan was never documented, indicating that the transaction was a sham. In a spreadsheet of VL Assurance's assets prepared at Sugarman's direction by a VL Assurance finance employee over a year later, on July 16, 2016, the $3 million dollar promissory note was listed with the following note: "Details to be agreed/confirmed." At the point that they arranged for the transfer of the Bond to Burnham Securities, Sugarman and Galanis knew that there was no bona fide market for the Tribal Bonds, and that they were responsible for arranging all of the sales of the Bonds to date. Yet they arranged for Burnham Securities to include the full value of the Bonds with accrued interest – $3,023,123 – in its calculation of net capital in an attempt to meet the Commission's minimum net capital requirements and keep Burnham Securities in business.

### 3. Repayment of $1.3 Million Loan from Hirst

92.     In 2013, Sugarman and Galanis borrowed $1.3 million from Hirst as part of their purchase of Wealth-Assurance. Hirst loaned them the money through ICA, an entity that he controlled.

93.     On August 29, 2014, with Sugarman's knowledge and consent, Galanis wired $1.3 million of the proceeds from the first Tribal Bond issuance from Thorsdale to Rosemary &

Rue, another company controlled by Hirst, as repayment of the debt.

94.     The wire to Hirst's company was consistent with the spreadsheet detailing the allocation of proceeds that Galanis had shared with Sugarman on the day the first Tribal Bonds were sold.

**4.     Payments to Hughes and AAM**

95.     Morton's agreement to wrongfully invest her firm clients in the Tribal Bonds was driven by her expectation of continued backing from her firm's co-owners and financiers: Sugarman and Galanis.  Sugarman and Galanis complied with her pleas for additional funds, both by arranging wire transfers from their personal accounts and by improperly diverting to Hughes and AAM a portion of the bond proceeds that WAPCC was supposed to be investing in annuities on behalf of the Tribal Corporation.

96.     Sugarman and his wife made two payments to Hughes/AAM:  1) a $100,000 payment on February 26, 2015; and 2) a $45,000 payment on April 16, 2015 (the same day that Morton directed the AAM clients' purchase of Tribal Bonds).

97.     In addition, Hughes and AAM received at least $655,000 of bond proceeds for working capital:  1) a $350,000 payment on September 8, 2014, that Galanis (with Sugarman's knowledge and approval) had WAPCC wire to Thorsdale and then to WAH NV, which then wired it to Hughes; and 2) a $305,000 payment that Dunkerley (also with Sugarman's knowledge and approval) wired to AAM directly from the WAPCC account on April 23, 2015.

98.     In April 2015, Galanis had Sugarman and the other GMT board members document two of these payments to Hughes and AAM as loans from Thorsdale.  In doing so, Galanis falsely represented that Thorsdale was "unaffiliated from the Class B share holder" and demanded that Thorsdale be awarded "board observer rights as well."

30

99.     On September 26, 2015 – after Galanis had been arrested in the Gerova matter –
Morton once again turned to Sugarman with an additional capital request. Sugarman responded
by accusing Morton of believing "that there is a blank check without accountability or
transparency" and questioning why she was showing negative cash flow after she had showed
him a "very profitable pro forma" when they had met in New York City the prior week.

**5.     Purchases of Code Rebel IPO Securities**

100.    At the direction of Sugarman and Galanis, WAPCC used a significant portion of
the proceeds from the sale of the April 2015 Tribal Bonds to support the successful initial public
offering ("IPO") of Code Rebel Corporation ("Code Rebel"), in which Sugarman, Galanis, and
other Previously Charged Defendants all held shares.

101.    In October 2014, Galanis sent Sugarman draft registration statements for Code
Rebel and emailed members of Burnham's investment committee, including Sugarman,
concerning the possibility of Burnham Securities acting as an underwriter for Code Rebel's
IPO.

102.    In May 2015, Sugarman, Galanis and other Previously Charged Defendants
coordinated the success of Code Rebel's IPO, which Burnham Securities had agreed to
underwrite. To ensure that they controlled the offering and that only those who could be trusted
not to dump the shares in the market too early would be allowed to participate, Galanis and
Sugarman contacted several individuals, including their "friends and family" to purchase shares
during the IPO. In trying to induce a potential investor, Sugarman told an associate that in
speaking to the investor, he should "be clear that the shares will remain in the acct and we will
flip them after 30 days." In another email to a potential investor, Sugarman's Assistant wrote,
cc:ing Sugarman: "We strongly believe it will trade up during the first 50 days."

103.    Upon receiving an email from Burnham concerning the IPO, Sugarman's father asked Sugarman, "Is this correct, that you wanted me to buy 100 shares of the IPO?"  Sugarman also directed VL Assurance to purchase $250,000 worth of shares.

104.    Code Rebel's stock was initially offered on the NASDAQ on May 19, 2015 at $5/share.  At the time of the IPO, Sugarman and his wife each held 245,000 shares.

105.    Between April 29 and May 18, 2015, Dunkerley, acting at Sugarman and Galanis's direction or with their knowledge, authorized wires totaling $4,336,000 from the WAPCC account to two brokerage accounts at Burnham Securities in New York that Galanis instructed an associate to open in the names of Thunder Valley Engineering ("Thunder Valley") and Seymour Capital.  On May 18, 2015, when one of the wires had not yet reached Burnham Securities, Galanis emailed Sugarman, "hugh wire hasn't shown," and said that he was hoping the SWIFT confirm was "conclusive . . . in time."  Galanis's email included an attachment with a list of all the commitments they had secured to purchase Code Rebel shares during the IPO, including from Thunder Valley, Seymour Capital, VL Assurance and Sugarman's father.

106.    Thunder Valley and Seymour Capital used $4,335,000 of the funds that they received from WAPCC to purchase 867,000 shares of Code Rebel during the IPO.  The shares purchased by Thunder Valley and Seymour Capital represented 87% of the shares offered during Code Rebel's IPO.  The remaining 13% was also sold to friendly accounts, including accounts controlled by Sugarman.

107.    Thunder Valley and Seymour Capital liquidated at least a portion of the shares immediately on the open market at prices ranging from $14 to $36 per share, well above the IPO purchase price of $5 per share.  As of October 15, 2015 IPO, Thunder Valley and Seymour Capital liquidated 324,120 shares of Code Rebel for proceeds of $4,523,312.

108.    Despite Thunder Valley's and Seymour Capital's profitable trading with money furnished by WAPCC, WAPCC did not recoup the $4.3 million it had sent to their accounts.  Instead, Thunder Valley and Seymour Capital, acting at Galanis's direction, sent millions of dollars to a variety of other transferees, including Galanis's criminal defense attorneys, Burnham Financial Group (Burnham Securities' holding company) and Rosemont.

109.    In June 2015, Sugarman arranged to have the certificates for his 245,000 shares and his wife's 245,000 shares transferred to brokerage accounts in New York.  He also arranged to donate a portion of his shares (made valuable because of the successful IPO that Sugarman and Galanis engineered with bond proceeds) to a charitable organization.

### 6.    Payment of WAPCC's Interest Obligations to Bondholders

110.    In September 2015, after Galanis's arrest in the Gerova matter, emails circulated among Sugarman, Archer and Cooney discussing items that needed attention, including the Tribal Bonds.  The fake annuity provider, WAPCC, needed to pay more than $1.5 million to the indenture trustee to cover the interest coming due on the first tranche of Tribal Bonds sold in August 2014.

111.    On September 22, 2015, as part of the joint effort to fund WAPCC's payments, and deflect scrutiny of their scheme, Sugarman had his attorney wire $250,000 to WAPCC.  Those funds came from the $8.5 million that Sugarman had directed VL Assurance to send to his attorney's trust account, purportedly pursuant to the loan agreements with Inversiones Balesia and VGL in June 2015.

112.    WAPCC received the remainder of the funds necessary to make the interest payment from accounts controlled by Archer and Hirst.

## FIRST CLAIM FOR RELIEF

### Violations of and Aiding and Abetting Violations of Section 17(a)(l) and (3) of the Securities Act

113.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 - 112.

114.     Sugarman, directly or indirectly, singly or in concert with others, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails in the offer or sale of securities, with scienter, employed devices, schemes or artifices to defraud or engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon a purchaser.

115.     By virtue of the foregoing, Sugarman directly or indirectly, violated, and unless restrained and enjoined, will continue violating, Sections 17(a)(1) and (3) of the Securities Act [15 U.S .C. §§ 77q(a)(l) and (3)].

116.     In the alternative, Sugarman directly or indirectly, knowingly or recklessly provided substantial assistance to Galanis, who, directly or indirectly, singly or in concert with others, in the offer or sale of a security, with scienter, used the means or instruments of transportation or communication in interstate commerce or used the mails to employ devices, schemes or artifices to defraud or to engage in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon a purchaser.

117.     By virtue of the foregoing, Sugarman aided and abetted, and unless restrained and enjoined, will continue aiding and abetting, violations of Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)] in violation of Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)].

## SECOND CLAIM FOR RELIEF

### Violations of and Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) Thereunder

118.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 - 112.

119.    Sugarman directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce or of the mails or of a facility of a national securities exchange to employ devices, schemes, or artifices to defraud; and to engage in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

120.    By virtue of the foregoing, Sugarman violated, and unless restrained and enjoined, will continue violating, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R.§§ 240.10b-5(a) and (c)].

121.    In the alternative, Sugarman directly or indirectly, provided knowing and substantial assistance to Galanis, who, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce or of the mails or of a facility of a national securities exchange to employ devices, schemes, or artifices to defraud; and to engage in acts , practices, or courses of business which operated or would operate as a fraud or deceit upon others.

122.    By virtue of the foregoing, Sugarman aided and abetted, and unless restrained and enjoined, will continue aiding and abetting, violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R.§§ 240.10b-5(a) and (c)] in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

35

## PRAYER FOR RELIEF

**WHEREFORE,** the Commission respectfully requests that the Court enter a Final

Judgment:

### I.

Permanently restraining and enjoining Sugarman, his agents, servants, employees and

attorneys and all persons in active concert or participation with him who receive actual notice of

the injunction by personal service or otherwise, and each of them, from violating, directly or

indirectly, Sections 17(a)(1) and (3) of the Securities Act [15 U.S .C. §§ 77q(a)(l) and (3)];

### II.

Permanently restraining and enjoining Sugarman, his agents, servants, employees and

attorneys and all persons in active concert or participation with them who receive actual notice

of the injunction by personal service or otherwise, and each of them, from violating, directly or

indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c)

[17 C.F.R.§§ 240.10b-5(a) and (c)];

### III.

Permanently barring Sugarman from acting as an officer or director of a public company

pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the

Exchange Act [15 U.S.C. § 78u(d)(2)];

### IV.

Directing Sugarman to disgorge all ill-gotten gains, plus prejudgment interest thereon;

### V.

Directing Sugarman to pay civil money penalties pursuant to 20(d) of the Securities Act

[15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

## VI.

Granting such other and further relief as this Court deems just and appropriate.

**<u>JURY DEMAND</u>**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this

case be tried to a jury.

Dated: New York, New York
       June 26, 2019

By:    *Sanjay Wadhwa*
       _____
       Sanjay Wadhwa
       Adam S. Grace
       Nancy A. Brown
       Tejal D. Shah
       Attorneys for the Plaintiff
       SECURITIES AND EXCHANGE
          COMMISSION
       New York Regional Office
       Brookfield Place
       200 Vesey Street, Suite 400
       New York, New York 10281
       (212) 336-1023 (Brown)
       Email:  brownN@sec.gov