LAW OFFICES
**PAULA J. NOTARI**
125 PARK AVENUE
SUITE 800
NEW YORK, NEW YORK 10017
Tel. (646) 943-2172

September 28, 2018

ROSS N. Kapitansky
USPO Specialist
Southern District of New York 500 Pearl Street New
York, New York 10007-1312

Re:    *United States* v. *Bevan Cooney*, 16 Cr. 371 (RA)

Dear Officer Kapitansky

Please accept this letter as the defendant Bevan Cooney's objections to the probation report
(PSR) dated September 5, 2018. We reserve the right to supplement these objections.

The fundamental objections that Mr. Cooney has to the PSR: (1) we urge the Probation
Department to find that based on the trial evidence and the verdict after a jury trial, the
appropriate guidelines in the case should commence at no higher than 0 to 6 months.   The base
offense level for this offense is 7. U.S.S.G. § 2A1.2. (2)

The new guideline calculations should be:
Base Offense Level……………………………..7

The Guidelines should grant Mr. Cooney a minor role adjustment given the fact that he was clearly the
least culpable person charged in the conspiracy
Minor Role…………………..-2
Total Offense Level…………………………….. 5 (CHC I, 0 to 6 months )

**The Offense Conduct**

PSR ¶ ¶  15 – 56. Mr. Cooney disputes the account of the offense conduct as set forth in the PSR. Mr. Cooney requests that the Probation Department adopt the Statement of Facts as set forth in Mr. Cooney's Post Trial Memorandum attached hereto. For the reasons set forth in Mr. Cooney's Post-Trial Motions and in his Reply Motion for acquittal and a new trial also attached here, Mr. Cooney disputes the following statements and findings set for the in the PSR.

Mr. Cooney disputes the probation officer's account of his role in the offense as set forth in PSR ¶ ¶  69 – 73

Mr. Cooney denies that he conspired to commit securities fraud. PSR ¶ 2   He denies PSR ¶ 3 of the PSR that he engaged in a scheme to misappropriate the proceeds of several bond issuances by the Wakpanmi Lake Community Corporation "WLCC) and that he caused investor funds to be used to purchase the bonds, for which there was no secondary market through which such bonds could be redeemed, without disclosure to those investors of material facts, including the existence of multiple conflicts of interest, and which investments, in some cases were outside of the investment parameters of the accounts in which they were placed.

## LEGAL AND FACTUAL CHALLENGE TO THE PROBATION DEPARTMENT'S CALCULATION OF LOSS

1.  **The Offense Level Should Commence At No Higher Than Base Offense Level 7
    PSR ¶ 18**

Mr. Cooney submits these objections to the Guidelines loss calculation.  While Mr. Cooney is being sentenced on two counts of securities fraud, this case stands in stark contrast to the usual fraud case in that he did not use investor funds to line his own pockets or for personal use. Despite the fact that Cooney was **not** convicted of any offense having loss as an element, the Probation Department seeks to increase Mr. Cooney's sentencing exposure by arguing that the Guidelines base offense level of 7 should be increased 22 levels based on a $60 million loss enhancement. However, as argued below, the Probation Department should find that there is no loss enhancement because there is no evidence that Mr. Cooney caused an actual loss, or intended to cause a loss, to the WLCC, which is the only victim relating to the counts 1 and 2, the counts of conviction.

Specifically, this Court should find that there was no actual loss to the WLCC in counts one and two because as detailed herein the evidence at trial showed that the WLCC had sovereign immunity and  they would not be liable for the bond value if the bonds went unpaid. (Tr. 1913)  Moreover, there is no intended loss for these counts because Mr. Cooney never purposely sought to inflict pecuniary harm on the WLCC or anyone else, as required by the Guidelines.

Mr. Cooney was not charged or convicted of Counts 3 and 4 which involved investment adviser fraud. As an initial matter, the evidence was obviously insufficient to demonstrate that Mr. Cooney had any knowledge of undisclosed conflicts of interest at Hughes or Atlantic, or violations of Atlantic and Hughes clients' investment guidelines, let alone that he willfully joined a scheme or conspiracy to defraud Atlantic and Hughes's clients through these violations of fiduciary duty. Indeed, Mr. Cooney was never charged with investment adviser fraud, and the evidence is undisputed that Mr. Cooney never acted as an investment adviser (registered or otherwise). The government failed to prove that Mr. Cooney was involved in or aware of the scheme to defraud the clients of Hughes and Atlantic Asset Management. Literally none of the Hughes and Atlantic clients who testified at trial, had so much as even heard of Mr. Cooney. The government argued at trial that Atlantic and Hughes failed to disclose certain conflicts of interest to its investment advisory clients, namely, that there were common individuals (*i.e.*, Hugh Dunkerley and perhaps Jason Galanis) associated with the placement agent for the bonds, the annuity provider for the bond proceeds, and the group that provided the funding for Michelle Morton's acquisition of Hughes and Atlantic. Atlantic and Hughes also, according to the government, purchased WLCC bonds in certain clients' accounts without their consent and contrary to established investment guidelines, in violation of their fiduciary duties. But there was absolutely no evidence that Mr. Cooney was aware of these undisclosed conflicts or investment guidelines.

Mr.  Cooney did not cause any client of Hughes or Atlantic to purchase bonds. Mr. Cooney  had no formal authority or oversight over the investment advisers – that was GMT Duncan, which was controlled by Michelle Morton and Richard Deary. There is no evidence that Mr. Cooney took any action whatsoever that caused Hughes and Atlantic to buy bonds on behalf of its clients. The trial evidence is undisputed that Mr. Cooney was not involved in any misrepresentations to the pension fund victims or WLCC. Mr. Cooney not only never spoke to representatives of the pension funds,  See Tr. 782 (Smith testifying he's never met or communicated with Bevan Cooney); 1689(Moore, same); 2058-59 (Turney, same) he had no substantive interactions with Morton or Hirst, and the evidence showed that on March 5, 2015, months after Mr. Cooney purchased the second tranche of bonds Michelle Morton had no idea who Bevan Cooney was. *See* GX 4004(A)(Michelle Motion to Jason Galanis: (Who's Bevan again?")).

Mr. Cooney was not on the boards (WA AG and Valorlife) that approved the acquisitions and funding for the investment advisers, and the government introduced no evidence that Mr. Cooney proposed or knew of any conditions on that financing relating to buying bonds.

Therefore, as to the uncharged conduct in Counts 3 and 4, this Court should find no loss as well, because of the nonexistent evidence that Mr. Cooney was involved in this second and separate conspiracy.

**The Trial Evidence Failed to Establish Any Loss-Actual or Intended**

The analysis of loss should start from the premise that Cooney was not charged in Counts 3 and 4, the conspiracy involving investment adviser fraud. Indeed, Mr. Cooney was convicted only of those offenses, specifically securities fraud and conspiracy to commit securities fraud, which do not require any intended or actual deprivation of property as an element of the offense.

Accordingly, as the probation department examines each of the charges that could conceivably lead to a finding of loss under the guidelines, the  probation department should, respectfully, proceed from the standpoint that the jury did not find a loss or deprivation, nor can such a finding be inferred from the jury's verdict.

From this analytical starting point, we proceed to a review of actual and intended loss.

**A.     Actual Loss**

The Probation Department's analysis appears to be premised on the findings that Mr. Cooney's actual loss amounts for Counts One and Two should be equal to approximately $60 million because Jason Galanis induced the WLCC, through false and misleading representations and omissions, to issue a total of $60 million of bonds over the course of four bond issuances. PSR §37.  Raycen Raines and Tim Anderson testified that the bonds were not issued by Native Americans either individually, in a community, in a district or in a tribe. They were issued by a corporation. They testified that the Wakpamni Lake Community was separate and distinct from the WLCC, and the Wakpamni Lake Community did not waive any part of its sovereign immunity.

Based on the evidence adduced at trial from March 2014 through April 2016, Jason Galanis and others (not Mr. Cooney) caused the WLCC to issue approximately $60 million worth of debt, via the Tribal bonds at issue. Under his plan, the Wakpamni Tribe ("the Tribe") itself would not be responsible for any payments toward the bonds. His plan provided for an up-front loan to the Tribe of $2.5 million, the payment of an annual $250,000 fee to the Tribe to be used for tribal development, and an agreement that an annuity, investing pursuant to a private equity strategy of Mr. Galanis' design, would be established to pay for the interest, principal and other fees related to the Bonds.

"Proceeds from the sale of the Bonds [were] to be used to finance: (i) the purchase of an Annuity Contract; (ii) the Junction 18 Development, and (iii) pay costs of issuance of the Bonds [i.e., the interest and principal on the loan/Bonds]." In short, Jason Galanis sought to have the WLCC act as a conduit sponsor for the issuance of debt which was non-recourse to the Tribe because of their status as a Sovereign Nation. The contracts were drafted so that the Tribe was shielded from financial liability through WLCC. WLCC is a Special Purpose Entity ("SPE") created by the Tribe years before the instant offense conduct. An SPE is a subsidiary company commonly used to isolate financial risk. SPEs are commonly used to hide debt, hide ownership, and obscure relationships between different entities which are, in fact, related. Therefore, if the WLCC went bankrupt, the Tribe, as a Sovereign Nation, could not be held liable for the WLCC/SPE's debts—including the bonds at issue.

Jason Galanis provided in his sentencing memorandum:  (DOC 198)

> At its core, Mr. Galanis' crime is his use of deceptive and misleading business practices in the issuance and placement of the bonds; his fraudulent acts were a malignancy at the center of the deal. However, his specific intention was never to inflict loss on anyone. Mr. Galanis was pursuing a private equity strategy focused on acquiring insurance companies which were undervalued when compared to their net assets.

> It was Mr. Galanis' intention to pay the fees associated with the bonds with the money he made through his private equity investments. The bonds were central to his strategy because they gave Mr. Galanis the capital necessary to acquire the undervalued insurance companies he and others had identified. The bonds would help finance his private equity strategy and the fees and principal associated with the bonds would be paid as well as the agreed upon annual fees to the Tribe. The private equity investments were the variable annuity that WLCC bought from WAPCC, but the execution was not consistent with the existing contracts—on top of undisclosed conflicts of interest—and thus, fraudulent. The strategy, but for his fraudulent business practices, would have been sound. The bonds were not per-se illegal—his conduct, however, was. Mr. Galanis rationalized his fraudulent conduct because he believed that sufficient collateral existed to back the bond issuances. Mr. Galanis' company, Thorsdale Fiduciary and Guaranty Company Ltd. ("Thorsdale"), held approximately $13,419,837.23 in securities in Wealth Assurance Holdings Ltd ("WAH"). In November 2014, WAH acquired Valorlife, a licensed life insurance company in Liechtenstein. Mr. Galanis' WAH securities converted to approximately 1,677,400 shares of Valor Group, Ltd.—representing approximately 40% of the outstanding shares. Valor Group, Ltd. was audited by PricewaterhouseCoopers ("PwC") in 2015; PwC's audit confirmed two independent Embedded Value Appraisals which found Valor Group to be worth $259,552,895.22.63

> Mr. Galanis' intention was to deliver these Valor securities to WAPCC as collateral for the bond debt. Again, the revenue generated from these investments would fund the annuity that would pay the bond fees and principal. Mr. Galanis justified misappropriating the bond proceeds—including $5 million in personal expenses, $2.5 million to his father as a "finder's fee" and $1.25 million to defense lawyers64—because at all times the collateral exceeded the total amount of the bond issuances, and as long as he continued to pay the interest and fees associated with the bonds, everyone, in the end, would make money.

> It bears repeating that Mr. Galanis' actions were not in accord with the operative contracts. And obviously, nothing about the above conduct commends itself to the Court.

See Jason Galanis Sent. Mem (Doc 198)

At Jason Galanis's sentencing, he maintained that he never intended for anyone to lose money. *Id.* Certainly, Jason Galanis never told Mr. Cooney that this was a fraudulent scheme or that anyone would lose money. The evidence at trial showed that Jason Galanis carefully controlled the flow of information to further his schemes and cover his tracks. See DX4801 (Martin e-mailing: "Jason [Galanis] is VERY sensitive on how communication flows."); Tr. 1120:17-19 (Dunkerley) (Q: Jason Galanis told you at times, don't tell other people certain information. A: Correct). This manipulation to

keep parties – and especially Mr. Cooney – in the dark provides further evidence that Mr. Cooney was unaware of Galanis's schemes.  The evidence was overwhelming that Galanis was incredibly secretive about his plans to steal the bond proceeds, even amongst his admitted conspirators. Despite being intimately involved in the entities set up to steal the bond money, neither Dunkerley nor Martin knew Galanis was stealing bond money until well after he began doing so. When Martin executed a contract with the WLCC on behalf of Private Equity Management to invest the bond proceeds, he was unaware that Galanis planned to steal the money, Tr. 2329:16-23 (Martin), only (claimed) inferring it later from Galanis's financing of the Fondinvest acquisition, Tr. 2175:19-22 (Martin). And even though he (with Gary Hirst) controlled the WAPCC account where the bond money ended up, Dunkerley did not know that the bonds were part of a criminal scheme until he saw where Galanis instructed him to wire the proceeds. Tr. 1139:24-1140:11. (Dunkerley). So even as Galanis was implementing his bond scheme, his own key co-conspirators did not know about his plans.

Raycen Raines testified at trial  (Tr. 1913) that written right into the resolution adopting the bond deal, there is clear language that the Wakpamni Lake Community is not financially responsible for anything relative to this deal and neither are any individuals. And was also clear that the bonds themselves only mention the WLCC and not the Wakpamni Lake Community itself.  Raines testified:

> Q. We were talking about the non-recourse bonds, correct?
> A. Yes.
> Q. And would I be correct in saying also that when the
> resolution was passed by the Wakpamni Lake Community Corporation to adopt these bonds, right?
> A. Yes.
> Q. And would I be correct in saying that in that resolution it actually says that the revenue bonds shall never constitute the depth or indebtedness of the Wakpamni Lake Community and shall not give rise to the financial obligation of the Wakpamni Lake Community or charged against its general credit or taxing power?
> A. Yes.
> Q. And would I be correct in that it further states that there will be no personal liability for the directives of the WLCC nor any person executing the bonds also, correct?
> A. Yes.
> Q. You had no personal exposure either, right?
> A. Correct.

Tim Anderson testified essentially that the WLCC only waived their sovereign immunity to the profits generated by the bond proceeds and nothing else.  Therefore based on the testimony on Anderson and Raines, as a result of the bond deal, the WLCC had been making approximately $250,000 a year. That money could not be reached by creditors.  The creditors therefore could only reach the revenue produced by the assets that were ascertained by the bonds such as for example: profits generated from the warehouse that was built.  Anderson testified:  (Tr. 358-359)

Q. So we are in agreement that it was WLCC that issued the bonds.
A. WLCC, correct.
Q. So the party at risk here was the WLCC.
A. As the issuer of the bonds, yes.
Q. Right. Now, last week I believe you stated that the WLCC waived their immunity status, right?

A. With respect to the bond, yes.

Q. That's what I'm talking about.

A. Um-hum.

Q. But would you agree with me that it wasn't a total waiver;
it was a limited waiver?

A. Correct.

Q. And the only thing that WLCC was risking was the assets
that it got from the bonds?

A. Yes and no.

Q. OK, why don't you give more detail.

A. So, they were risking the revenue produced by those assets,
not the assets themselves. Someone couldn't take the warehouse
away.

Q. They couldn't take the warehouse.

A. Correct.

Q. They couldn't take the land.

A. Correct.

Q. What they were risking was the revenue that was produced by
that entity.

A. That's correct.

Q. And if it produced no money, profit, they weren't risking a
penny.

A. They were risking whatever revenue would be produced by
those warehouses -- or the warehouse.

Q. And if no revenue was produced, then they weren't risking
anything?

A. No other assets, correct.

Q. And at the time the WLCC had no assets, right?

A. I don't know. I don't know.

Q. It had no revenue from the warehouse, right?

A. Before it was built?

Q. Yes.

A. Correct.

Q. So when the WLCC signed onto this bond deal, they were only
risking the revenue they might get from this bond deal.

MS. TEKEEI: Objection.

THE COURT: Overruled.

A. The bond -- the loan under the bond -- was secured by
revenue from the warehouse.

Q. And if it -- again, if it generated no revenue, there was
nothing at risk to the WLCC?

A. From a revenue standpoint, no, correct.

Therefore since the WLCC was the only victim connected to Counts 1 and 2 that was foreseeable to Mr. Cooney (who was a passive investor who purchased 5 million dollars worth of bonds), there was no actual loss to the WLCC.  There was no evidence at trial that the WLCC was ever sued by creditors or by the institutional investors who invested in the bond knowingly or unknowingly. Mr. Cooney had no idea, just like Tim Anderson that Jason Galanis misappropriated the proceeds from the WLCC bond.

**B.**     **Intended Loss**

This Court should also find that these counts do not have an intended loss either. Under the Guidelines, intended loss "means the pecuniary harm that the defendant purposely sought to inflict." U.S.S.G. § 2B1.1, comment. (n.3(A)(ii)(I)); see also *United States v. Middlebrook*, 553 F.3d 572, 578 (7th Cir. 2009) ("[T]he true measure of intended loss [is] in the mind of the defendant."). Before making an intended loss determination, however, a district court must make a specific factual finding regarding the scope of the defendant's subjective intent. See *United States v. Stanley*, 12 F.3d 17, 21 (2d Cir. 1993) (remanding case for resentencing where the district court accepted the PSR's loss calculation without first specifically determining  how many victims the defendant actually intended to defraud); *United States v. Confredo*, 528 F.3d 143, 152 (2d Cir. 2008) (remanding case for resentencing for the district court to consider the defendant's subjective intent before determining the intended loss amount); see also *United States v. Yihao Pu*, 814 F.3d 818, 826 (7th Cir. 2016) (remanding the case for  resentencing where there was no evidence in the record that the defendant intended any loss to the victims).

The Sentencing Commission's November 2015 amendments to the Guidelines now require courts to determine intended loss by following the method applied in *United States v. Manatau*, 647 F.3d 1048 (10th Cir. 2011). [1] *Manatau* makes clear that "the intended loss must have been an object of the defendant's purpose." [2] Furthermore, intended loss "does not mean a loss that the defendant merely *knew* would result from his scheme or a loss he might have *possibly and potentially* contemplated."[3] In so holding, *Manatau* affirms the fundamental difference, and significance, between the mental states of *knowledge* and *intent*: it is the "difference between a man who wills that a particular act or result take place [intent] and another who is merely willing that it should take place [knowledge]." [4]

Consequently, in order to base the loss amount on intended loss for these counts,  the evidence would need to establish that Mr. Cooney "purposely sought to inflict" monetary harm to the WLCC.  If the Court considers the conspiracy charged in Counts 3 and 4 over Mr. Cooney's objection, then the evidence would need to also establish that Mr. Cooney "purposefully sought to inflict" monetary harm to the institutional investors who purchased the WLCC bond.

There is no evidence whatsoever, at trial  or otherwise,  supporting such an assertion. While some institutional investors may have lost value in their various funds because of Jason Galanis misappropriated the proceeds of the WLCC fund, these losses fail to provide any basis to conclude that Mr. Cooney "purposely sought to  inflict" pecuniary harm to these investors. This case is simply not comparable to the usual investment fraud cases where the defendant fails to invest the funds and instead misappropriates the investors' funds to support his own lifestyle- demonstrating that defendant's subjective intent to deprive the investors of their money.  Unlike these cases, the evidence here established that Mr. Cooney was also a victim of Jason Galanis's fraud scheme and made no money for his involvement in this case.  Mr. Cooney did not keep a penny of the misappropriated bond money, and the evidence simply does not permit the inference that he knew that Jason Galanis was misappropriating the proceeds of the WLCC bond or that the clients of Atlantic and Hughes were being forced to buy the WLCC bonds.

---

[1] See, Amendments to the Sentencing Guidelines (effective November 1, 2015), Policy Statements and Official Commentary at 29.
[2] Id. at 1048.
[3] Id. at 1050.
[4] Id. at 1051.

8

Mr. Cooney, stands apart from the other admitted and alleged conspirators in a variety of ways: whereas others profited from the scheme, Mr. Cooney invested his own money and lost money. The evidence, at trial shows that Mr. Cooney was part of a lawful plan to acquire financial services companies with the hopes of later reorganizing and selling them for a profit. Mr. Cooney invested hundreds of thousands of dollars of his own money in furtherance of the financial conglomeration (otherwise referenced throughout the trial as the "financial roll up") he and his partners were trying to build.  See DX3802.

Mr. Cooney's intent was corroborated by the government's cooperating witness Hugh Dunkerly, and his testimony that numerous companies were acquired and part of the roll-up strategy including: CEO's, CFO's,  Burnham Securities, Burnham Asset Management, Valor Life, Atlantic Asset Management, Hughes Capital Management, Fondinvest Capital, Bonwick Capital (Tr. 1324: 18-24) and Dunkerly's testimony  that these companies were all real, entirely legitimate and collectively managed billions of dollars.  Tr. 1324.

Mr. Cooney unlike the cooperators who testified at trial including Dunkerly and Francisco Martin repeatedly put up his own money because he did not know about the fraudulent scheme.  When considering DX 3802, the summary chart which Mr. Cooney admitted at trial through a summary witness, the government did not challenge the testimony that Mr. Cooney made no money for his involvement in the instant offense.  On the contrary Mr. Cooney lost all of his money and declared bankruptcy.   As detailed in Mr. Cooney's summary chart admitted into evidence on the dates cited therein,  Mr. Cooney loaned Jason Galanis his own personal money towards various business deals they were involved with: (DX3802).

Thus, the evidence supports the conclusion that Mr. Cooney had  no  intent  to cause any pecuniary  harm  to anyone, and so there is no intended loss amount. As succinctly noted by the Tenth Circuit: "the term [intended loss] means exactly what it says: to be included in an advisory guidelines calculation the intended loss must have been an object of the defendant's purpose." *United States v. Manatau*, 647 F.3d 1048, 1048, 1056-57 (10th Cir. 2011) (remanding the case for resentencing because a sentencing court "cannot simply calculate "intended loss" by toting up credit limits without any finding that the defendant intended to inflict a loss reasonably approaching those limits."). Without any evidence establishing Mr. Cooney 's subjective intent to purposely inflict monetary harm on the WLCC or any institutional investors harmed by Jason Galanis' fraud scheme, there is no basis for this Court to include any loss amount for Counts One and Two and certainly Counts Three and Four which Mr. Cooney was not charged in or convicted of.

2.  **Mr. Cooney's Guidelines should not be increased by 2 levels because the offense involved 10 or more victims pursuant to USSG 2B1.1 (b)(2)(A)(i) as set forth in ¶81 of the PSR   Mr. Cooney was convicted of Counts 1 and 2 of the indictment which only involved, one victim identified as** the **WLCC.**

The application notes of Subsection 2B1.1 of the USSG provides that "Victim" means (A) any person who sustained any part of the actual loss determined under subsection (b)(1); or (B) any individual who sustained bodily injury as a result of the offense. "Person" includes individuals, corporations, companies, associations, firms, partnerships, societies, and joint stock companies. In this case since the evidence showed that the bonds were issued by a corporation, known as the WLCC.  The evidence showed that the Wakpamni Lake Community was separate and distinct from the WLCC.  (Tr. 193) The WLCC was a corporation and therefore qualifies as one person and because there was only 1

victim in this case relating to the actual counts of conviction, the 2 level increase does not apply.  For all of the reason stated above, Mr. Cooney was not charged in Count 2 and 3 and there is no evidence of his involvement in those counts and therefore the institutional investors were not foreseeable to him and therefore the enhancement for 10 or more victims is not appropriate.

3. **The PSR erroneously increases Mr. Cooney's base offense level by 2 levels for Obstruction of Justice pursuant to USSG 3C1.1 because it provides that Mr. Cooney provided false documents to the SEC, who were in process of the investigating the instant offense.  ¶84 of the PSR**

The PSR provides here that  the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution or sentencing of the instant offense of conviction and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct or a closely related offense.  ¶**84**

The probation department's basis for seeking an increase for obstruction of justice was that Mr. Cooney knowingly provided false documents to the SEC which Mr. Cooney disputes. At trial, the government argued in their summation that Mr. Cooney's submission of false Calvert documents to the SEC was evidence of his guilt. (Tr. 2492-93)  The government's basis for proving that Mr. Cooney submitted a false Calvert document to the SEC, was based on a stipulation that Mr. Cooney agreed to, known as GX4501.  (Tr. 2492-93) The government argued during their summation that Mr. Cooney signed a stipulation "that Government's Exhibits 1265, 1271, and 1284 are true and accurate copies of documents produced by Bevan Cooney to the Securities and Exchange Commission." *Id.*  This was an underhanded tactic by the government to mislead the jury into erroneously believing that Mr. Cooney somehow did not dispute that he submitted a false document to the SEC.  At no time did Mr. Cooney stipulate that he knowingly submitted a false document to the SEC.   At the time that Mr. Cooney submitted that document to the SEC, his attorneys submitted these emails along with hundreds of others emails to the SEC, as part of their investigation.  Mr. Cooney had no idea that the Calvert document he submitted to the SEC was false.

The analysis in the PSR ignores the testimony of the government's own cooperators, Hugh Dunkerly and Francisco Martin.  A major part of this scheme was an entity called Calvert, which Galanis and Dunkerley thought up, see Tr. 1464:17-1466:21 (Dunkerley); GX1705, Martin created, see Tr. 2181:14-19 (Martin), and Galanis, Dunkerley, and Hirst used solely to cover up their crimes. Tr. 1508:9-17.   Mr. Cooney, like the many others who received false Calvert documents had no reason to know any of that. The only evidence connecting Mr. Cooney to Calvert was the fact that during tax season in February 2016, Mr. Cooney sent Fulton Management documents which memorialized the loan he received from Jason Galanis to purchase the WLCC bond.  (GX2298).   This was just one of many documents that Mr. Cooney provided to his tax accountant during tax season.  *See* also GX 3272, (Here again on February 26, 2016, Mr. Cooney emails his team from Fulton Management: Vanessa Siegel, Matthew Fillman and Eric Fulton and writes: Vanessa I found this file for my taxes last year..."

Mr. Cooney hired professionals like Fulton Management and lawyers to handle the details of his business transactions. At best, it proves that at some point after Calvert was created, Mr. Cooney obtained documentation of his loan.  There was certainly no evidence from Dunkerly or Martin that Mr. Cooney was involved in the creation of this fraudulent Calvert docments.  Dunkerly admitted on cross-examination that he was involved in creating fraudulent documents on behalf of a fake company known as Calvert Capital.  Tr. 1450).  At no time did Dunkerly discuss with Mr. Cooney the fact that the

Calvert documents were fraudulent. Dunkerly testified:

> Q. And another big part of his narrative was this company
> Calvert, correct?
> A. Correct.
> Q. And Calvert's sole purpose was to deceive people, correct?
> A. Yes.
> Q. And again the only people that you ever discussed Calvert
> and its illicit purpose with were Gary Hirst and Jason Galanis,
> true?
> A.  True.

(Tr. 1508) (Dunkerly)

Certainly, if Mr. Cooney was in on the scheme and was knowingly advancing the false Calvert narrative, the real conspirators would have known that Mr. Cooney was aware of the false nature of the Calvert documents.  But Mr. Cooney was not privy to these attempts to cover up Galanis's fraud, because Mr. Cooney was not privy to the fact that a fraud was being committed in the first place.  The purpose of these fraudulent documents were to deceive people, just like Mr. Cooney and the government presented no evidence to prove otherwise.   Mr. Cooney, at all times acted in a manner completely contrary to Galanis and the other alleged coconspirators who were knowingly involved in this conspiracy.   Mr. Cooney conducted business in his true name with one email address (BTCooney@gmail.com); Mr. Cooney conducted his business in an open fashion and involved his business managers at Fulton Management on every deal;  Mr. Cooney followed up on the details of the transactions he was involved by emailing lawyers like Tim Anderson, brokers, investment advisers and real estate agents demonstrating his consistent openness and no evidence to hide his identity.   By Cooney's actions when added up show that he had no clue that Galanis and others were stealing bond money.  Mr. Cooney was not a knowing and willful participant in Jason Galanis's fraud. He did not benefit from it; instead he lost his own money. Contrary to what the government argues, Mr. Cooney did not hide or create false documents and he certainly did not submit a false document to the SEC with the intention of thwarting an investigation.  This email was just part of the hundreds, if not thousands of emails that Mr. Cooney was required to produce to the SEC in accordance with a subpoena.

It is well settled that an adjustment under § 3C1.1 "is appropriate only upon a finding that the defendant had the 'specific intent to obstruct justice, i.e., that the defendant consciously acted with the purpose of obstructing justice.' " *United States v. Labella–Szuba*, 92 F.3d 136, 139 (2d Cir.1996), citing *United States v. Defeo*, 36 F.3d 272, 276 (2d Cir.1994) (citation omitted).   In this case, Mr. Cooney produced the Calvert loan document to the SEC which was part of his email and he did so in accordance with a subpoena which required that he produced all of his email during the stated time period.   *See Defense Exhibit A, SEC subpoena which was sent to Mr. Cooney.* Certainly, if Mr. Cooney had destroyed this document or failed to produce it to the SEC -- as part of his email then he would have thwarted the investigation and been charged with Obstruction of Justice.  Mr. Cooney acting in good faith complied with the subpoena and now he is being further punished for his compliance with the subpoena.

This Calvert document which was produced to the SEC was part of a mass production of email. Clearly, this email and the attached loan document was produced to Fulton Management and was not created or turned over to the SEC with the purpose or intent to thwart the SEC's investigation of the WLCC bond issuance and therefore the 2 level increase for obstruction of justice is not proper.

### 4.   MR. COONEY OBJECTS TO THE DENIAL OF MITIGATING ROLE ADJUSTMENT.

**A. Minor Role Reduction is Appropriate**
1. Applicable Law
A mitigating role adjustment under Section 3B1.2 is appropriate only when a defendant is "substantially less culpable than the average participant in the criminal activity." U.S.S.G. 3B1.2, app. note 3(A). In considering the applicability of a mitigating role adjustment, the Sentencing Commission has instructed courts to "consider the following non-exhaustive list of factors:

(i) the degree to which the defendant understood the scope and structure of the criminal activity;
(ii) the degree to which the defendant participated in planning or organizing the criminal activity;
(iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;
(iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;
(v) the degree to which the defendant stood to benefit from the criminal activity." U.S.S.G. § 3B1.2, app. note 3(C).

Mr. Cooney maintains his innocence but even assuming that the Court accepts the government's interpretation of the evidence, as consistent with Mr. Cooney's knowing involvement in the offense conduct, he clearly was the least culpable defendant and he is entitled to a minor-role adjustment because he was "substantially less culpable than the average participant in the criminal activity," i.e., the Wakpamni bond fraud.

Mr. Cooney as set forth in his post-trial motions and reply brief, did not have a financial background and did not even graduate from college. He followed the lead of the more financially savvy individuals who led this deal including lawyers like Tim Anderson. He was not involved in the putting this deal together. He simply acted at the behest of others who told him what to do. The evidence is undisputed that he was asked to purchase the 5 million dollar portion of the second tranche of bonds at the last minute. Perhaps Mr. Cooney's lack of sophistication is best expressed in (GX2120) In April, 2014, Jason Galanis wrote Mr. Archer and Cooney: "$20mm bond approved. Proceeds are 15mm to us and 5mm to them for a winery investment they want to make." GX2120. In response to Cooney's question **"What do we get to do with the 15mm."**

There is no email where Mr. Cooney is providing any substantive advice; rather he is consistently-- simply cheering on his business partners and what appears to be the success of their deals. Mr. Cooney by his questions and comments and the fact that he repeatedly emailed and cc'd his business managers and lawyers like Tim Anderson for advice, did not understand the "scope and structure of the criminal activity."   Mr. Cooney did not play a role in organizing any of the criminal activity and he exercised absolutely no "decision-making authority."   Mr. Cooney was not a Director, Manager, CEO or member of the boards of any of the entities involved in this case or elsewhere.  Mr. Cooney acted at the direction of Jason Galanis and others and in the end he made no

money on his involvement in this offense.  On the contrary he lost all of his money and declared bankruptcy.  Therefore, considering all of the relevant factors should make him "substantially less culpable than the average participant in the criminal activity." As such, a minor-role reduction is clearly appropriate.

**Additional Factual Objections to Pre-Sentence Report:**

Mr. Cooney objects to the following factual statements in the Presentence Report:

¶70 Mr. Cooney denies that he used his purported ownership of the $5 million of Wakpanmi bonds to fraudulently obtain a $1.2 million dollar loan from Citi National Bank.  Mr. Cooney provided full disclosure to his business managers who were authorized agents on his behalf to negotiate the loan(s) with CNB.  Both Fulton Management and CNB had complete access to Mr. Cooney's bank accounts with CNB and his finances and they were both involved in every aspect of his purchase and transfer of the WLCC bond to Bonwick Capital.  CNB asked Fulton Management the basis of Cooney's request for a 1.2 million dollar loan and Fulton explained that Mr. Cooney owned an IPO stock that was valued at almost 12 million dollars which he would be able to sell in 6 months.  It was this IPO stock and Mr. Cooney's perfect credit and solid history lending from CNB which led CNB to grant Mr. Cooney a 6 month loan. The loan was only 6 months because Mr. Cooney was expected to be able to sell his IPO stock within 6 months.  Steve Shapiro testified at trial that Mr. Cooney in good faith serviced the loan payments on the loan and after the loan became delinquent Mr. Cooney renegotiated the terms of the loan, he ultimately paid down $90,000 toward repayment of the loan.   Mr. Cooney provided Fulton Management with loan documents which memorialized that he in fact borrowed money to purchase the WLCC bond.  Steve Shapiro testified that due to the nature of the WLCC bonds under CNB's credit policy the WLCC bonds could not be used as collateral to secure either the 100K line of credit in January 2015 or the $1.2 million dollar loan.  The WLCC bonds were of no interest to CNB and never were.  The government misconstrued the evidence in this case to make the arguments they want to make.  Steve Shapiro testified that before Mr. Cooney's 1.2 million dollar loan was delinquent and he could not make payments on it because he could not sell his IPO stock, he never even spoke to Mr. Cooney.  Shapiro's communication was Mr. Cooney's agents from Fulton Money management.  Shapiro testified that he was not made aware that Mr. Cooney had transferred his WLCC bonds to Bonwick, yet Shapiro himself was asked on 2 separate occasions in April and May 2015 to essentially notarize the paperwork that allowed Mr. Cooney to transfer his bond power to Bonwick.

¶70 Mr. Cooney will be preparing and submitting a financial statement in the next week.  This was an oversight on the part of undersigned counsel.

¶143 Mr. Cooney disputes the Guidelines range as calculated by the Probation Department as set forth herein and does appear to be eligible for a probationary sentence.

¶144 For the reasons stated **in** our objection to the loss amounts, we object to the "maximum fine" for Counts One and **Two.** Pursuant to 18 USC§ 3571(d) the maximum fine should be the amount which the terms to be  "twice the gross gain" from the offense.

¶146  **We** object to "fine range" of $35,000 to $5,000,000

¶148 For the reasons stated above we object to stated restitution amount.

13

**Page 1, Mr. Cooney's lead counsel in the case is:**
Paula J. Notari
125 Park Avenue, 8th Floor
New York, New York 10017
(646)943-2172
paulanotari@aol.com


**Personal and Family Data**

**Paragraph entitled Identifying Data**:
Mr. Cooney never successfully obtained a Bachelor's Degree as reported in the PSR


       Please contact me **if** you **require** any clarification on these objections, or if you require any **additional information.**

Very truly yours,
/s/ Paula J. Notari
Abraham Hassen
Attorneys for Bevan Cooney

cc: (via email) AUSA Rebecca Mermelstein
Negar Tekeei
Brendan Quigley