LAW OFFICES
**PAULA J. NOTARI**
125 PARK AVENUE
8th Floor
NEW YORK, NEW YORK 10017
---------
Tel. (646) 943-2172

July 29, 2019

**BY ECF**

The Honorable Ronnie Abrams
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

    **Re:** *United States v. Bevan Cooney,* **S1 16 Cr. 371 (RA)**

Dear Judge Abrams:

    I write on behalf of Bevan Cooney, the defendant in the above-entitled case to provide the Court with an additional letter in support of sentencing and to briefly respond to some of the government's sentencing arguments. (Doc. 175).

    We dispute the government's contention that Mr. Cooney committed securities fraud in the past. The government argues on page 11 of their sentencing memorandum that there is a need for specific deterrence because in part, as revealed by the Crafton recording not placed into evidence at trial, the Wakpamni fraud was not Cooney's first participation in securities fraud. The Court may recall that the Crafton recording included conversations about a company called Flik Date that Mr. Cooney was helping to launch. Certainly, on the night Billy Crafton was wired up to meet with Mr. Cooney-- Crafton tried to get Mr. Cooney drunk and clearly hoped that this meeting would lead to incriminating evidence so that he could curry favor with the government. The Court may recall the government turned over Jason Galanis audio tapes right before trial. On or about March 8, 2018, undersigned counsel received more than 250 hours of phone calls which featured Mr. Cooney. No where in the PSR does it mention these allegations. Flik Date was a failed start-up company and Mr. Cooney never sold a single share of his stock. The government's reliance on some unintelligible blurbs of two men drinking and talking in a loud bar is just insufficient evidence. At this late juncture, we are simply not in the position to meaningfully defend allegations that Mr. Cooney committed any wrongdoing regarding Flik Date. We dispute these allegations; we have never interpreted the comments made in the Crafton recording consistent with the government's arguments. If the Court is inclined to consider these arguments to increase Mr. Cooney's sentencing then we have no alternative but to ask for a *Fatico* hearing and for discovery to be turned over relating to this issue.

    We further dispute the government's characterization on page 11 of their submission, footnote 4, that Mr. Cooney's involvement with Cloverhill Capital or any other entity is add odds with his representation that he lacked sophistication, education and experience in financial dealings. The Court has had the opportunity to read the dozens of emails that were admitted in evidence at trial where Mr. Cooney never offers so much as a single substantive response. The government failed to produce a single witness to show that Mr. Cooney was a sophisticated businessman or that he played any role in putting the WLCC bond together. On the contrary, there was overwhelming, unrefuted evidence that Mr. Cooney relied upon others to help conduct his business deals. The only businesses that Mr. Cooney ever actually operated and managed were

bars and restaurants in Los Angeles. Cloverhill Capital was an LLC created by Mr. Cooney at the direction of his accountants solely for personal use to hold his own personal private stock. This entity had no employees and never had office space. Mr. Cooney's involvement with financial firms like Burnham and the other companies he referenced in the PSR is entirely consistent with his role in this case. Mr. Cooney would introduce high net worth individuals to various business opportunities. He invested his own money and helped the company by bringing in other investors. He is a college dropout who never held any securities licenses; he has never been on the board of directors or acted in any managerial roles in any of the companies he helped raise money for. In many of these deals he would get paid in stock and he would help promote the company. Eventually once the stock went public, he would sell the stock at a higher price. This is a very common incentive for individuals like Mr. Cooney to work for companies in the early stages to later profit, if the company is successful. The government offered no evidence to establish that Mr. Cooney possessed any sophistication in finance or securities. Steve Shapiro, Mr. Cooney's long time personal banker from CNB confirmed his knowledge that Bevan was a "deal maker;" (Q. And, can you give us an explanation as to what you mean by that? A. That he was acting as a quasi-investment banker to find buyers and sellers and put the deal together and get paid a commission for putting buyers and sellers together. (Tr. 1753) Shapiro further testified that due to the nature of Mr. Cooney's employment, he would go for months without income and these loans would hold him over until he could for example, sell a stock. (Steve Shapiro is questioned: Q: And it's fair to say that the purpose of the loan, as you understood it, was to help Mr. Cooney pay for personal expenses and tax obligations, correct? A: That is correct.) (Tr. 1782)(Shapiro, Cross).

      Undersigned counsel disputes the government's argument that Mr. Cooney's "exceptional" good works and his extraordinary care for his mother after she was diagnosed with cancer and his continuing dedication to his medically fragile father do not merit a significant variance from the Guidelines. (Br. At 12). Mr. Cooney's was never a rich man and therefore his acts were not of giving money, but rather they were acts of giving time, of giving one's self which courts have consistently recognized are just as valuable and in some cases even more valuable than simply monetary contributions. See, e.g., *Tomko*, 562 F.3d at 572 (describing how the defendant's "charitable acts that involved not only money, but also his personal time."); *Cooper*, 394 F.3d at 177 (noting that personal sacrifices "are qualitatively different from the detached donation of money"); *United States v. Serafini*, 233 F.3d 758, 773, 774 (3d Cir. 2000) (noting that Serafini's contributions "weren't acts of just giving money, they were acts of giving time, of giving one's self"). Several courts have granted a defendant a variance or downward departure based on the defendant's "exceptional" good works. For example, in. *Serafini*, the Third Circuit upheld the district court's downward departure where many of the letters supporting Serafini, an elected official, "contain[ed] substantive descriptions of Serafini's generosity with his time as well as his money." *Serafini*, 233 F.3d at 773. Indeed, "several constituents and friends described situations in which Serafini extended himself to them in unique and meaningful ways during times of serious need." *Id*. at 773. The Third Circuit specifically noted three letters describing Serafini's good works: (1) a letter from a friend who sought and received from Serafini a $300,000 guarantee to secure treatment for a family member's brain tumor; (2) a letter from Serafini's constituent who, having sustained serious injury in an accident that rendered him incapacitated, was hired by Serafini and who credits Serafini with "turning his life around"; and (3) a letter from a widow who approached Serafini because she was about to lose her home and to whom Serafini gave a check for $750 with no expectation of repayment. Id. at 773-74. Finding that Serafini was "an exceptionally giving person," the Third Circuit upheld the District Court's downward departure for community and charitable activities. *Id*. at 774, 775.

As *Serafini* and other cases which we have previously cited make clear, whether it is categorized as a downward departure or the basis for a non-guidelines variance owing to the criteria delineated in 18 U.S.C.§ 3553(a), a life of extraordinary good works towards others remains a vital factor for a sentencing court to consider. See, e.g., *United States v. Tomko*, 562 F.3d 558, 572 (3d Cir. 2009) (affirming variance to a sentence of probation due largely to the defendants "exceptional" charitable acts and good works); *United States v. Thurston*, 544 F.3d 22, 26 (1st Cir. 2008) (affirming a sentence of three months incarceration and 24 months supervised release from a recommended guideline sentence of 60 months imprisonment based in part on the defendant's "charitable work, community service, generosity with time, and spiritual support and assistance to others"); *United States v. Al*i, 508 F.3d 136, 150 & n.19 (3d Cir 2007); *United States v. Cooper*, 394 F.3d 172, 177, 178 (3d Cir. 2005) (upholding the departure where the defendant's good works included "hands-on personal sacrifices, which have had a dramatic and positive impact on the lives of others").

We defer to Mr. Cooney's sentencing submission as far as the reasons why the government's stated loss amounts do not apply to Mr. Cooney. Specifically here we emphasize the Court appears to have found that Mr. Cooney like Mr. Archer's purchase of the second tranche of bonds was not part of Jason Galanis' fraud. Rather over Mr. Cooney's objection, the Court has determined that there was evidence that Mr. Cooney at some time after the fraud—learned that Mr. Galanis was part of the fraud and he backdated certain Calvert documents and additionally that Mr. Cooney lied to Citi National Bank to obtain a 1.2 million dollar loan. Even assuming arguendo that is true, then for the reasons set forth in Mr. Cooney's memorandum, it cannot be said that Mr. Cooney's actions were the proximate cause of the pecuniary loss to the victims in this case. Certainly it was not reasonably foreseeable that if Mr. Cooney misrepresented his ownership of the WLCC bonds to CNB or anyone else that somehow that omission would result in monetary loss to the WLCC or institutional purchasers who purchased the WLCC bond. Mr. Cooney like Mr. Archer played no role in devising this fraud and certainly he had no role in making any misrepresentations to any victims of the pension fund. The government's argument that Mr. Cooney was somehow fully aware that $28 million of the bonds had been placed with Hughs clients simply ignores Mr. Cooney's arguments that Mr. Cooney just like Mr. Archer was not aware of Jasan Galanis' fraud's scheme and the Court's decision that (1) there is in indication the roll up plan itself was illegal or otherwise suspect (Rule 33 Op. at 3); (2) the roll up plan and the numerous legitimate business partners that were acquired were numerous legitimate companies (Rule 33 Op. at 3).

The Government's arguments fail to acknowledge the Court's decision as it should also apply to Mr. Cooney:

- Jason Galanis' deception, including of those who intentionally aided his crimes. His modus operandi was to compartmentalize his schemes, such that each participant know only that which was essential to his or her narrowly defined role (Rule 33 Op. at p. 20)

- Indeed, the trial record is replete with acknowledgement by accomplices of Jason Galanis that he was intentionally deceptive, rendering them unaware of various aspects of his illegal conduct including those central to the WLCC scheme—and that sometimes they did not learn the truth until they reviewed the indictment in this case or were otherwise informed by the government. See Rule 33 Op. citing Tr. 932:7-14, 933:17-20, 1028:4-10, 1120:17-1121:10, 1126:5-1128:17, 1142:12-21, 1311:24-1312:6, 1339:10-24, 1425:1-15, 1557:2-6, 2142:6-13, 2144:1-22, 2159:8-21, 2296:9-18, 2326:8-15, 2329:16-23, 2332:21-2333:17, 2335:2-4, 2336:5-7, 2345:15-2346:2.

- The government's cooperating witnesses only learned that the WLCC deal was fraudulent by virtue of their independent observations. Dunkerly, despite his close relationship with Galanis and after already having performed discrete acts in furtherance of the conspiracy, arrived at this realization with Galanis only when he noticed that the bonds proceeds to the WAPC account, to which he had access, were not being used to purchase the annuity.  Rule 33 Op. citing Tr. 1310:13-21.  Mr. Cooney just like Mr. Archer had no such clues.  *Id.*

Accordingly,  when determining the loss calculation as to Mr. Cooney-- the sentencing court should limit the defendant's liability to those acts of co-conspirators that were reasonably foreseeable and part of the criminal activity that the defendant "agreed to jointly undertake." *United States v. Lloyd*, 807 F.3d 1128, 1145 (9th Cir. 2015) (in securities fraud case, reversing judgment attributing loss from California telemarketing boiler room to defendant managing Florida boiler room because defendant did not design overall scheme, did not pool resources, and was compensated from commissions from only his operation). See also *United States v. Sykes*, 774 F.3d 1145, 1150–52 (7th Cir. 2014) (analyzing concept of foreseeability in detail).

The loss amount calculation includes losses based not only on the defendant's own actions but also the actions of co-schemers, if those actions were "within the scope of," "in furtherance of," and "reasonably foreseeable in connection with" the jointly undertaken criminal activity, § 1B1.3(a)(1)(B), and "occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense," § 1B1.3(a)(1); see  *United States v. White*, 883 F.3d 983 (7th Cir. 2018) citing *Sykes*, 774 F.3d at 1150. The notes to § 1B1.3 explain that in joint criminal activity, the scope of different defendants' relevant conduct may be different. Relevant conduct "does not include the conduct of members of a conspiracy **prior to the defendant joining the conspiracy**, even if the defendant knows of that conduct." § 1B1.3 cmt. n.3(B).

Mr. Cooney like Mr. Archer played no role in devising this fraud and certainly he had no role in making any misrepresentations to any victims of the pension fund. Mr. Cooney never acted as an investment adviser (registered or otherwise).  Mr. Cooney had zero contact with the institutional investors.  The fact that Jason Galanis emailed Mr. Cooney the names of institutional investors on about August 19, 2014 before Mr. Cooney agreed to purchase the second tranche of bonds with Mr. Archer (GX2299), is entirely consistent with the evidence that around the same time (August 24, 2014) Jason Galanis informed Tim Anderson that there were institutional investors purchasing the bond and significant demand for the bonds.  This was part of Jason Galanis' attempt to deceive Tim Anderson and Mr. Cooney that the bond was successful.  Compare (GX 1268) and (GX2299).   Recall the testimony of Tim Anderson that Jason Galanis repeatedly assured him that there were buyers for the bond:
Q. And it is fair to say that you were repeatedly assured that there were buyers for the bond?
A. Yes.
Q. Shortly after the issuance of the first bond and it closed, you received what was information from Jason Galanis, and it was called the green light to go forward with the second issuance, correct?
A. Correct.
Q. If I can refer you to Government Exhibit 1268 which I believe was already moved into evidence. Now, this email was sent to you on August 24th by Jason Galanis, correct?
A. Correct.
Q. And this was a list of pension funds who purchased the first issuance of the bonds?

A. That's right.
Q. So it is fair to say this list was consistent with what you were being told that there was a significant interest of buyers in the bond?
A. That's correct.

(Anderson) (Tr. 568).

      We further highlight the evidence that on March 5, 2015, months after Mr. Cooney purchased the second tranche of bonds Michelle Morton had no idea who Bevan Cooney was)(See GX 4004(A)(Michelle Motion to Jason Galanis: (Who's Bevan again?")).  This evidence is consistent with the fact that Mr. Cooney was being deceived just like Tim Anderson and many others regarding Galanis' fraud scheme.  The fact that Mr. Cooney knew that there were institutional investors purchasing the bond is not dispositive evidence and certainly does not support the government's argument that the loss was foreseeable. (GB at 4).  Mr. Cooney's jointly undertaken conduct must have been in furtherance of the actual fraud and just as in the case of Mr. Archer there is simply no evidence that it was and therefore the loss to the victims was not foreseeable.  The Court's decision respectfully does not isolate a single act that Mr. Cooney jointly participated involving the creation of the WLCC bonds or victims--- other than his conduct relating to (1) the CNB loan, (2) 1920 Bel Air and (3) Mr. Cooney's submission of  Calvert documents to the SEC.  These actions were simply not related to the loss caused to the victims and therefore not foreseeable. Losses caused by the acts of co-conspirators should only be included in the loss calculation if they were reasonably foreseeable to the defendant.  USSG §1B1.3(a)(1)(B) (defining relevant conduct for jointly undertaken activity).  See *United States v. Nash*, 338 F. App'x 96, 98–99 (2d Cir. 2009); *United States v. Mauskar*, 557 F.3d 219, 233 (5th Cir.  For reasons already discussed in Mr. Cooney's sentencing submission, the government has also failed to prove that Mr. Cooney subjectively intended to cause pecuniary harm to any victims and therefore no increase for loss should apply.  § 2B1.1(b)(1)(K).

      Mr. Cooney defers to his previous argument regarding Calvert.  Notably, the government appears to agree that Mr. Cooney "submission of fraudulent documents to the SEC long after the issuance of the bonds" did not result in any loss to the investors.  GB at 5.

      As to Mr. Cooney's further comments, we rely upon Mr. Cooney's arguments as set forth in his sentencing submission.   The government's characterization that Mr. Cooney was somehow operating at the helm of a massive fraud is simply not supported by the evidence and the Court's recent decision granting Devon Archer a new trial.

      We understand and respect the government's intent to hold defendants accountable for the tragic financial loss to honorable investors who certainly did nothing to deserve their unfortunate fate but this was not Mr. Cooney's intent. Mr. Cooney is intent on learning from his mistakes and he further assures this Court that he will continue to rebuild his life on a foundation of honesty and integrity. He explains: In ending his letter, that he pledges to do his "absolute best to use [his] skills and whatever talents [he has] been blessed with for the betterment of humanity." (Ex. T: Letter of Bevan Cooney).

      Finally, for the reasons stated in Mr. Cooney's original sentencing memorandum and above, Mr. Cooney objects to the restitution ordered as part of his sentence. The Mandatory Victim Restitution Act, 18 U.S.C. § 3663A, applies to a victim's losses from the offense of conviction. The amount of restitution is limited to the actual losses caused by the specific conduct underlying the offense. *United States v. Orillo*, 733 F.3d 241, 244 (7th Cir. 2013), citing *United*

*States v. Kennedy*, 726 F.3d 968 (7th Cir. 2013); see also *United States v. Burns*, 843 F.3d 679, 689 (7th Cir. 2016) ("The MVRA has a proximate cause requirement."); United States v. *Locke*, 643 F.3d 235, (7th Cir. 2011) (concluding that court erred in ordering Locke to pay restitution to victims not clearly harmed by the conduct in Locke's counts of conviction).

    Thank you for your consideration.

                                          Respectfully,

                                          /s/ Paula Notari
                                          Paula Notari

                                          Counsel for Bevan Cooney

cc:    AUSA's Rebecca Mermelstein, Negar Tekeei, Brendan Quigley (by ECF)