J7V5cooS                          sentence

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,              New York, N.Y.

4               v.                          16 Cr. 371 (RA)

5    BEVAN COONEY,

6               Defendant.

7    ------------------------------x

8                                          July 31, 2019
                                           11:10 a.m.
9

10   Before:

11                      HON. RONNIE ABRAMS,

12                                         District Judge

13

14                      APPEARANCES

15   GEOFFREY S. BERMAN
          United States Attorney for the
16        Southern District of New York
     BY:  REBECCA G. MERMELSTEIN
17        BRENDAN F. QUIGLEY
          Assistant United States Attorneys
18
     THE LAW OFFICE OF PAULA J. NOTARI
19        Attorneys for Defendant
     BY: PAULA J. NOTARI
20             -AND-
     O'NEILL and HASSEN
21   BY:  ABRAHAM ABEGAZ-HASSEN

22

23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

J7V5cooS                              sentence

1              (Case called)

2              MS. MERMELSTEIN:  Good morning, your Honor.  Rebecca

3    Mermelstein and Brendan Quigley for the government.  With us is

4    Special Agent Nick Kroll of the FBI.

5              THE COURT:  Good morning to all of you.

6              MS. NOTARI:  Good morning, your Honor.  Paula Notari,

7    Abraham Abegaz-Hassen on behalf of Mr. Cooney, who is present

8    in Court.

9              THE COURT:  Good afternoon to all of you as well.

10             So, this matter is on for sentencing.  You may be

11   seated.  Thank you.

12             In United States v. Cooney, Mr. Cooney was found

13   guilty in June of last year of conspiracy to commit securities

14   fraud and securities fraud.  I denied his request for new trial

15   in an order dated November 15th.  You are all very familiar

16   with that, of course.

17             In connection with today's proceedings I have reviewed

18   the following submissions:  The Presentence Investigation

19   Report dated October 12, 2018; Mr. Cooney's sentencing

20   memorandum dated July 8, with attached letters from friends and

21   family as well as other exhibits, a supplemental letter of July

22   29th, and an additional letter I received from one of his

23   friends just yesterday.  And then I have the government's

24   sentencing memorandum of July 22nd.

25             Have the parties received each of these submissions

J7V5cooS                          sentence

1    and am I missing anything?

2              MS. MERMELSTEIN:  We do have them and you are not

3    missing them.

4              THE COURT:  Thank you.

5              So, let's begin by discussing the presentence report

6    prepared by the United States probation office.

7              Ms. Notari, I assume you have read the presentence

8    report, have you not?

9              MS. NOTARI:  Yes, your Honor.

10             THE COURT:  Have you discussed it with your client?

11             MS. NOTARI:  Yes.

12             THE COURT:  Mr. Cooney, have you had enough time and

13   opportunity to review the presentence report and discuss it

14   with your attorney?

15             THE DEFENDANT:  I have, your Honor.

16             THE COURT:  Ms. Notari, I understand you have several

17   objections to the report so why don't we go through them.  I

18   have, of course, read your papers carefully but tell me what

19   you want to highlight today.  Why don't we start with the

20   offense conduct.  Do you want to be heard further on that?

21             MS. NOTARI:  No, your Honor.  I think my post trial

22   motions, my sentencing memorandum, you know, really reiterate

23   our position regarding the nature of the offense and so I think

24   that, you know, as long as the record shows that we disagree

25   would be the recitation of the offense conduct.

J7V5cooS                          sentence

1          THE COURT:  I think the record is clear in that

2     respect and I will say I don't think it is the appropriate time

3     now to relitigate Mr. Cooney's case.  Even if it were the

4     proper time to do so, I will say that I continue to believe, as

5     detailed in my November opinion, that Mr. Cooney's receipt of

6     money from the WAPC account, participate in the Calvert

7     cover-up, purported lies that he told various entities about

8     subjects that were indisputably within the realm of his

9     knowledge, among other things, provides more than enough

10    circumstantial evidence to allow his guilty verdict to stand.

11    He, at the very least, consciously avoided learning that the

12    bond proceeds were being misappropriated and while I am not

13    going to respond to each of the assertions made in your letter,

14    I will say that I thought it was incorrect to assert, as it

15    does on page 3 of your July 29th letter, that the Court found

16    in the November opinion that Mr. Cooney did not know his

17    purchase of the second tranche of bonds was part of the

18    criminal scheme.

19          So, I will just say that.  I am going to adopt the

20    factual findings in the report as they apply to Mr. Cooney and

21    I am going to adopt them in its entirety with respect to him.

22          Are there any other factual assertions that you object

23    to in the report?

24          MS. NOTARI:  No.

25          THE COURT:  Does the government have any objections to

J7V5cooS                          sentence

1    the presentence report?

2                MS. MERMELSTEIN:  No, your Honor.

3                THE COURT:  So, I adopt the factual findings in the

4    report with respect to Mr. Cooney.  The presentence report will

5    be made a part of the record in this matter and placed under

6    seal.  If an appeal is taken, counsel on appeal may have access

7    to the sealed report without further application to the Court.

8                So now why don't we talk about your objections to the

9    guidelines and, again, I am happy to rely on the papers but if

10   you want to be heard further, I will of course give you the

11   opportunity to be heard.

12               So, first with respect to the applicable guideline,

13   whether it's 2B1.1 or 2X1.1, would you like to be heard further

14   with response to that?

15               MS. NOTARI:  Your Honor, I will rely upon my papers

16   for that.

17               THE COURT:  So, for the record, Mr. Cooney contends

18   that his sentence level should be set under Section 2X1.1, the

19   conspiracy guideline, which requires any guidelines adjustment

20   to be established with reasonable certainty.  I disagree, as

21   the guidelines make clear, 2X1.1 only applies when one has been

22   convicted of conspiracy and his or her specific offense as not

23   covered by another guidelines section.  See 2X1.1C1.

24               In this case Mr. Cooney was both convicted of

25   conspiracy and of the specific substantive offense of

J7V5cooS                          sentence

securities fraud for which the applicable guidelines section is

2B1.1.  In line with this guideline section I will therefore

evaluate any enhancements to his sentence under the typical

preponderance of the evidence standard and will be utilizing

2B1.1.

         So, next I understand Mr. Cooney argues he could not

have reasonably been foreseen the victim's losses in this case

and that the total loss attributed to him by Probation is

therefore grossly inflated.

         Do you want to be heard on this issue either?

         MS. NOTARI:  Yes, your Honor, I do, because your Honor

has just indicated is that my reading of your decision is

different what you are stating now so I do want to be heard on

that.

         THE COURT:  Sure.

         MS. NOTARI:  Well, your Honor has just indicated that

you do think that Mr. Cooney, by his actions, that somehow his

actions were different than Mr. Archer's actions and I do think

the evidence regarding Mr. Cooney and Mr. Archer is exactly the

same, in fact with regard to the purchase of the second tranche

of bonds.  In fact, I think that Mr. Cooney in fact relied upon

Mr. Archer.  The records show that Mr. Cooney purchased the

second tranche of bonds after Mr. Archer and that Mr. Archer,

there were e-mails, and the Government can confirm this showing

that there were e-mails between Mr. Cooney and some of

J7V5cooS                        sentence

Mr. Cooney's representatives like Clifford Wolf, for example,

who was Mr. Archer's attorney, and the fact that somehow one

can say that Mr. Cooney was in a different place is just -- I

can't make sense of that.  The fact that the money that was

wired to Mr. Cooney somehow came from the WAPC account when

there was overwhelming testimony that this was a very

intentional deception upon Jason Galanis where he named Wealth

Assurance Private Client and Wealth Assurance Holding, that's

the dispositive evidence in this case which seals Mr. Cooney's

fate.  Meanwhile, I have now pointed out an exhibit which

specifically shows that in connection with the wires -- first

of all, Mr. Cooney was completely open.  There was no hiding,

there was no layering of identities the way the other

individuals in this case, like Francisco Martin, he always used

the same address.  He emailed his accountants every single

wire, every document, everything went through his accountants

Fulton Management.  And now we know.  Now we have the evidence

from Eric Fulton and we have Steve Shapiro who vouched for the

reliability and the credibility of Eric Fulton and Fulton Meyer

and Alexis Gluckman and all the individuals who were conducting

business on Mr. Cooney's behalf.  And we know that Steve

Shapiro who says they were credible and now we have Eric Fulton

who was questioned and subpoenaed by the government in

connection with this case in addition to other members of

Fulton & Meyer and he comes forward and says I reviewed the

1    evidence in this case and I believe that he is an honest

2    person.  Okay?  I believe that he made mistakes and that he

3    trusted the wrong people.  But, nowhere does the government

4    essentially dispute the fact that, you know, anything that I

5    have alleged with regard to Fulton & Meyer.

6          So, now we have the fact that Mr. Cooney sent all of

7    the wire information to his accountant and this was, you know,

8    I mean I think the Court said it many times in the opinion,

9    that this deal was just a very small deal in the grand scheme

10   of all of the deals that Mr. Cooney, Mr. Archer, and these

11   individuals were working on.  I have submitted an exhibit of a

12   deal in 2012, Global prospectus that Devan Archer worked on

13   with Mr. Cooney and Jason Galanis and there is nothing

14   illegitimate about that deal.  In fact, there is a news article

15   attached where Mr. Archer made substantial profits on that

16   deal.

17         The expectation that Mr. Cooney could possibly make

18   the distinction between Wealth Assurance Holdings and Wealth

19   Assurance Private Client is just not fair because he certainly

20   was not in any different position than Archer.  In fact, he

21   was -- Mr. Archer was at Burnham.  He was a very significant

22   person at Burnham.  Burnham was the placement agent for these

23   bonds.  But for the fact that Devan Archer put his name on this

24   and his credibility and convinced the BIT Board that Jason

25   Galanis wasn't involved, I'm led to believe that this would

J7V5cooS                        sentence

1    have never happened.  But somehow Mr. Archer, who is closely in

2    a place to know all of this, he is a financial guru, Yale

3    graduate, he has worked for all of these boutique financial

4    firms, but somehow he can be misled but my client can't be

5    misled?  When the cooperating witnesses said not even they

6    realized Hugh Dunkerley or Francisco Martin testified that they

7    didn't realize that this was a fraud until they actually were

8    able to see the fact that the money wasn't going into the

9    annuity and they had that, the ability to be so close?

10          We have an e-mail which I have now highlighted because

11   honestly, your Honor, at the filing of the post-trial motions

12   it is difficult to know what your Honor, to preview what your

13   Honor's thinking was and honestly, as a defense lawyer, you

14   never expect what was clearly the most fair decision I think I

15   have ever read from Mr. Archer but when I parse the evidence

16   and at this juncture I want to re-highlight the fact that the

17   e-mail, Mr. Cooney sends to his Fulton & Meyer, the people

18   managing his accounts and he says, you know, the wire is coming

19   from Wealth Assurance Holdings.  It could not be more clear

20   that he thought it was Wealth Assurance Holdings and not Wealth

21   Assurance Private Client.  He just didn't pick up on it.  You

22   know?  There were e-mails.  Your Honor saw, I mean, thousands

23   and thousands of e-mails going back and forth relating to all

24   different indications and the fact that that detail is now the

25   pivotal detail, the dispositive detail which somehow makes him

1   no different than Archer is just, I just respectfully, your

2   Honor, I don't think it is fair.  I don't think it's -- I

3   just -- it is shocking and I think that, you know, trials are

4   not about character, unfortunately, and in this case, this case

5   was, there were the deviants, there were the -- Carrie Hearst

6   and Francisco Martin and there were people, Hugh Dunkerley and

7   people who were clearly part of the dark, sinister underworld

8   of Jason Galanis who were creating false documents and none of

9   those people, by the way, ever said that Mr. Cooney was

10  anything but a great guy.  None of those people -- their

11  evidence against Mr. Cooney was exactly the same as Mr. Archer.

12  At best we have that Mr. Cooney attended a lunch.  He was

13  always present at social gatherings.  Nothing about talking

14  about bonds, nothing talking about anything in detail.  And we

15  have the fateful phone call with Francisco Martin saying, you

16  know, at the last minute he remembered, after years of

17  cooperating with the government, that there was this phone call

18  which never has been documented and the Court did not put much

19  weight on that phone call saying that Mr. Cooney, you know,

20  received -- he gets this phone call and he says it is not about

21  the bonds, it is about Gerova which, frankly, is nothing

22  because no one is ever disputing that Mr. Cooney had something

23  to do with the bonds, that he purchased the bonds, and so did

24  Mr. Archer.

25              So, at best we have the same evidence and we have

1   Mr. Cooney, anything that he did is so far removed from the

2   bonds.  You know, the fact that he purchased, that he obtained

3   a loan from CNB Bank and now we have attached new evidence for

4   the Court to consider, which was something that the Court was

5   part of the pretrial motions but we actually, for reasons,

6   defense strategy reasons, never put that e-mail from Matthew

7   Fillman which says:  Bevan, he sends Mr. Cooney -- Mr. Cooney

8   sends Matthew Fillman, which is consistent with -- there was

9   nothing unusual here.  This is the same thing Mr. Cooney always

10  did.  He was part of launching and promoting stocks and startup

11  companies and in this particular instance he was applying for

12  loans because sometimes it takes a while for the stock to value

13  and for him -- there is restricted stock and he can't sell it

14  so as he did in the past he had perfect credit, he applied for

15  a loan, and Matthew Fillman says, you know, quickly fill out

16  this financial statement, use big round numbers, not too

17  detailed.  This becomes -- this financial statement becomes

18  again pivotal evidence in this case and clearly Steve Shapiro

19  and CNB Bank, this was a nothing like $100,000 or I think it

20  was a $200,000 equity loan that was based on Mr. Cooney's prior

21  credit and it had nothing to do with the bonds.  The bonds were

22  illiquid bonds.  Steve Shapiro repeatedly testified that these

23  bonds were not collateral for a loan.  And so what changes when

24  Mr. Cooney applies for the $1.2 million loan?  He now has this

25  Code Rebel stock, just like Mr. Archer, and there is the

J7V5cooS                      sentence

restricted stock and he can't sell it so the bank reluctantly,
by their own admission, they -- this was a risky loan but based
on Mr. Cooney's prior record of perfect credit, and his
relationship with Fulton & Meyer who continues to stand by
Mr. Cooney, they granted the loan and what happened then was
something which was really out of Mr. Cooney's control.  He was
deceived, he was misled, and the stock at the point that Jason
Galanis is arrested in Gerova, everything goes, to use an
adjective, everything falls away and his life, you know, his
name is -- the stock is now frozen and they can't sell the
stock and he can't pay back the loan.  And then, shortly
thereafter that, he becomes involved and arrested by the FBI in
this case and he is just not able to pay back the loan.  But,
the notion that somehow he lied about his ownership of the
bonds to get this loan -- and this relates back to it is just,
it is just not what happened and he was forthcoming and Fulton,
you know, Managers, they filled out the loan application.  And
the same is true for Gerova -- I'm sorry, not Gerova -- 1920
Bel Air.

          Again, the difference now verses the trial is now we
have put in more e-mails which we were not able to put in
during the trial which shows that Mr. Cooney was actively
trying to get a loan to purchase 1920 Bel Air, that there was
an e-mail from Jason Galanis saying thanks for taking the shot
for loaning them $75,000.  Again, Mr. Cooney did not make a

1    single dollar on this, just like Mr. Archer.

2            Mr. Archer had every reason to be involved in these

3    deals given his position with Rosemont, Seneca Baja, given his

4    position with the financial conglomerate, given by how much he

5    stood to profit.  I can't even begin to understand or know all

6    of the deals that Devon Archer was in but he was in a position

7    to profit and Mr. Cooney put $400,000 of his own money, every

8    deal he did was his own money.  And in the end, he was the only

9    one putting his own money into these deals.  Francisco Martin

10   didn't do that; Hugh Dunkerley.  He was the only one.  And to

11   think that he put all of his money into these deals and at the

12   end he was left not only with nothing but his entire world has

13   fallen apart.  He was bankrupt, his wife left him.  And so, you

14   know, it all comes down to this -- and I want to briefly go

15   back to the 1920 Bel Air evidence.

16           The 1920 Bel Air evidence we have included now in the

17   record for the Court's consideration an exhibit, I believe it

18   is H, the fact that there was an appraisal done for 1920 Bel

19   Air and the reason why that didn't go into evidence is because

20   we had trouble -- we had trouble verifying the reliability but

21   the government -- I mean, it was part of the e-mail that this

22   particular agency did an appraisal, that Mr. Cooney did an LLC

23   check, that Mr. Cooney, Fulton was actively looking for a loan

24   for him, that there was an e-mail to Cohen which is a

25   nationally reputable company that they were looking for a

J7V5cooS                      sentence

1    mortgage for him.  And Hugh Dunkerley, he didn't dispute the

2    fact that this was all -- he never said, oh, this was part

3    of -- that Mr. Cooney was somehow the straw buyer for 1920

4    Bel Air.  Yes.  Mr. Cooney had good credit and Mr. Cooney --

5    and, your Honor, in fairness, your Honor acknowledged and the

6    fact that it was okay for Mr. Archer to believe that he was

7    going to be involved in the New York condo and again put his

8    name Archer Diversified on that and there were e-mails between

9    Jason Galanis and Devon Archer which specifically talked about

10   the WLCC bond and the proceeds which was much closer to than

11   this remote deal with 1920 Bel Air that never happened.  It

12   never even happened.  Mr. Cooney was going to -- I mean talk

13   about personal relationship, it is the same personal

14   relationship that Archer had with Cooney, with Jason Galanis,

15   and now Mr. Cooney and somehow it is being viewed in a

16   different light.

17          The other thing I want to mention is this notion, you

18   know, Matt Schwartz is very, very good.  He is very, very

19   clever and he is very good and he is probably the best lawyer

20   that many of us will ever see and he was very effective in

21   convincing your Honor that somehow Mr. Cooney was part of this

22   inside world stepping on poor little Devon Archer.  But, I am

23   hoping that the letters -- the letters that we have submitted,

24   the Court has viewed Mr. Cooney up until this point --

25          THE COURT:  I just want to be clear, nothing

1    Mr. Schwartz said with respect to Mr. Cooney had any effect on

2    my decision.

3            MS. NOTARI:  Okay, I understand.  I am just saying the

4    strategy he used with regard to the draft and recording and the

5    other e-mail that somehow furthered the narrative that

6    Mr. Cooney was, you know, using Devon Archer as a show pony and

7    I would just reiterate that we have included e-mails where it

8    was very -- and the government actually, you know I think it's

9    their position too, according to these e-mails, that this was

10   the nature of the relationship that they were using Devon

11   Archer, his reputation, his preppy smile, his cache, his Yale

12   degree, and his relationship with Hunter Biden and Chris Heinz

13   to get -- to further for the financial conglomeration and there

14   was nothing -- there was nothing -- the fact that somehow this

15   person Devon Archer, given his stature, could be taken or by

16   Mr. Cooney who didn't graduate from college who was just a

17   passive investor who is not making a single intelligent

18   comment -- no offense, Mr. Cooney -- on any of these e-mails,

19   is just preposterous.  And the reason why I think the

20   letters -- the many letters that we have submitted on

21   Mr. Cooney's behalf I would think they -- and I would let your

22   Honor know that these were not e-mails that were directed.

23   These were e-mails that came to me in a very natural fluid way

24   and shockingly, the comments were so consistent in who

25   Mr. Cooney is.  And I focus on the letter yesterday from Dan

J7V5cooS                        sentence

1   Burrell because Dan Burrell is the person that introduced

2   Mr. Cooney to Devon Archer.  And that was during the John Perry

3   presidential campaign and Mr. Archer and Dan Burrell were

4   working together and the introduction was made and Dan Burrell

5   who went on to be the leader, the CEO of Rosemont Salisbury

6   Capital Management, this was a company that where Devon Archer

7   was a managing partner and Chris Heinz was a managing partner.

8   So now, at the sentencing of Mr. Cooney, Dan Burrell writes a

9   letter on Mr. Cooney's behalf.

10          You know, these are people, the most legitimate people

11  in the country, some of the most successful people in the world

12  and, you know, it makes sense that a lot of people would say --

13  Eric Fulton -- I am not getting near that federal case.  I am

14  not writing a letter.  I am not standing by and vouching for

15  you.  But, he has come out and said, no, I am going to write a

16  letter because this is not Bevan Cooney.  This is not who he

17  is.  This is not his character.  And that has to, you know,

18  that has to count for something.  The fact that so many people

19  have said this is inconsistent.

20          There is numerous letters of individuals who know

21  Mr. Cooney and recognize the manner in which he writes.  He is

22  very fun, yes, he likes to exaggerate, he likes to make the

23  joke when he can and show pony is just -- and his Montana

24  style, it is just funny.  Devon Archer is a show pony.  He is

25  beautiful, he is talented, he is smart.  He is an unusual

J7V5cooS                    sentence

person and he is always tan and glowing and so, you know, in

Bevan Cooney's world, show pony is a good word and somehow that

word is now, again, it has just been, it is just this world

where somehow Mr. Cooney, who was the lowest man on this totem

pole, he was the lowest person in this case, and I think the

government will -- I will give them a chance to comment on

this -- that Mr. Cooney was the least culpable person on this

indictment.  And I think that they would agree that the

evidence against Mr. Archer is far more significant and is

related to the bond than Mr. Cooney and now we are in this

position where the exact same evidence -- and your Honor has

indicated, you know, that repeatedly in this decision -- that

the evidence is very similar.  Your Honor indicates that there

was nothing wrong with the roll-up plan, that the pursuit and

the business partners acquired numerous legitimate companies.

Your Honor has indicated that this was a tangled web

of related transactions involving legitimate companies.  Your

Honor has indicated repeatedly that there was replete evidence

of Jason Galanis, that he was intentionally deceptive rendering

him a unaware of various aspects of his legal conduct and that

he specifically -- he specifically created these false

companies with similar names to deceive people.  And, in fact,

your Honor relied upon Mr. Cooney's e-mail asking what do we

get to do with the 15 million as somehow evidence of Devon

Archer's innocence.

1          So, it is perplexing that we are in such a different

2    position and the other evidence relating to -- I mean,

3    certainly Mr. Archer had intentioned Calvert and somehow the

4    fact that Hugh Dunkerley testified they created Calvert and

5    didn't tell anybody.  The only person that knew about this was

6    Gary Hirst, Hugh Dunkerley and Jason Galanis, but somehow the

7    fact that, you know, Mr. Cooney -- your Honor, I understand the

8    Court's decision as far as perhaps the latter conduct.  I just

9    still don't understand how the Court's decision could be that

10   Mr. Cooney's actions somehow made him knowledgeable that the

11   bond was fraudulent when lawyers and experts and everyone,

12   including your Honor, has said that -- I think your Honor's

13   decision was specifically the e-mails involving Jason Galanis,

14   Mr. Cooney, and Mr. Cooney were facially innocuous, at best,

15   most naturally subjected to innocent interpretations.

16          So, I don't understand what gets us to his knowledge

17   of the bond.  The mere fact that this money came from an

18   annuity called Wealth Assurance Private Client, that he clearly

19   thought was Wealth Assurance Holdings.  And the significance of

20   this is because, all things put aside, we are at sentencing and

21   the question here, which is really the dispute, is what is the

22   loss.  What was the foreseeable conduct?  What was the actions

23   that were jointly undertaken?  And by virtue of your Honor's

24   comment that somehow suggests that Mr. Cooney was in on this,

25   this deal to make this fraudulent bond; I don't even know how

J7V5cooS                          sentence

1     that's possible.

2              If your Honor thinks that the purchase of the second

3     tranche of bonds by Devon Archer was innocent then how,

4     suddenly, does his conduct, which is exactly the same which is

5     weeks later and, quite frankly, Michelle Morton, months after

6     the purchase of the second tranche of bonds, she doesn't even

7     know who Bevan Cooney is.  And clearly in that e-mail, the text

8     message string between Jason Galanis and Michelle Morton,

9     they're talking about -- he is pimping out Mr. Cooney because

10    he has relationships to rich people which is exactly what Jason

11    Galanis does.  He is talking about Kevin Washington, the

12    billionaire and now we have a view to Jason Galanis and his

13    strategy and what he does.  And he was using Mr. Cooney just

14    like he was using Mr. Archer.  There is no difference.

15             Mr. Cooney's connection to all of this, and it is

16    undisputed, is that he puts people together and he puts

17    business deals together, he puts high net worth people

18    together, and when he puts these deals together he doesn't play

19    a very detailed sophisticated role and the academics of it, it

20    is just he puts high net worth together.  He has an incredible

21    group of friends who are friends from all different levels.

22             Today in this courtroom are two people who wrote

23    letters on his behalf; we have Eugene Brennan and his brother

24    James Brennan and both of these individuals wrote very, very

25    detailed letters about who Mr. Cooney is.  And these are not

J7V5cooS                    sentence

1    rich, powerful people.  Eugene is a fire fighter in Rockaway

2    Beach.  He wrote the Court --

3              Eugene, could you just stand up?

4              He wrote the Court a letter about how he had a

5    lucrative position on Wall Street and after September 11th, he

6    was so moved by the dedication of the people and the fire

7    fighters that were lost, that he decided that he wanted to

8    change his career and he became a fireman.  And who was there

9    by his side?  A person he had known for, at the time, close to

10   10 years but Bevan Cooney, who convinced him to leave his

11   lucrative job and go where his passion was, his fire fighting.

12             THE COURT:  Thank you for being here today.

13             MS. NOTARI:  Thank you.

14             And James Brennan, Eugene's brother, who also has

15   known Mr. Cooney for 25 years, he was the best man at his

16   wedding and, again, another telling story of Mr. Cooney, how

17   when Mr. Brennan was in a personal crisis and he was struggling

18   with addiction, Mr. Cooney personally drove him to the Betty

19   Ford Center for treatment.

20             This is, again, the government has minimized the

21   importance of these many letters and all of this significant

22   charitable and spiritual work that Mr. Cooney does but these

23   individuals are not powerful people like Mr. Burrell but

24   they're still people that Mr. Cooney has forged incredible

25   friendships with and he has been by their side and, in fact,

1    Mr. Brennan is very involved in charity work, he had a party --

2    a charitable event last night and Mr. Cooney, he indicates in

3    his letter, was personally responsible for helping him raise

4    funds after Hurricane Sandy that tore apart Rockaway Beach.

5            So, Mr. Cooney, his lifeline in life are his friends

6    and his family.  That's who he is.  He is all about -- he is

7    not about money.  He is not about greed.  He is about -- his

8    pulse beats through his friendships and the good that he can do

9    and he was, by his own admission he used poor judgment, just

10   like Devon Archer did.  Devon Archer lied to the BIT Board.  He

11   lied to the BIT Board because he believed in the deal.  Like,

12   he lied to the BIT Board because he knew that Jason Galanis had

13   an unsavory past and Mr. Cooney knew Jason Galanis from his

14   early years.  You know, they met in San Diego through mutual

15   friends and then for 10 years he had nothing to do with Jason

16   Galanis and people will tell you, everyone, much like the Court

17   and we heard, people had different views of Jason Galanis.

18   And, you know, maybe some people would have stayed away from

19   him but when he came back into his life was extremely

20   successful, he had the house in Bel Air, he was friends with

21   Jason Sugarman and Steven Sugarman and it just seemed all of

22   these legitimate people.

23           I mean anyone who is in business with Jason Sugarman

24   and Steven Sugarman would not question the legitimacy.  I mean,

25   these are people that are so legitimate and Mr. Cooney

J7V5cooS                          sentence

re-evaluated Jason Galanis and Mr. Archer, all of them gave him

a chance because they were so excited by this financial

conglomeration.  And everyone was, it is undisputed, everybody

was deceived by Jason Galanis -- the WLCC, all of the lawyers,

Tim Anderson, these are the biggest law firms in the country,

the most reputable law firms in the country -- everyone.  And

Mr. Cooney was no different.  He trusted in the legitimacy of

all of these individuals and that's really the only thing the

Crafton reporting says.  The Crafton reporting said

specifically, the keys to these deals and what I am doing now

is land myself with people a lot smarter than I am.  Devon

Archer, in particular.  I have 10, 12 years' relationship with

him.  He an ex-lacrosse player.  He is a great dude.  Do you

know him from Montana?  I met him out in L.A. when he was

working with John Carey's presidential campaign 12 years ago

through Dan Burrell.  I don't know if you know Dan Burrell.

Again, this is the telling of the truth, that he met through

Dan Burrell.  And now we have a letter from Dan Burrell.  Chris

Heinz is his best friend from college, you know, the Heinz

family.  So, you have these layers of legitimacy with all the

deals we are doing now.  Know what I'm sayin'?  So if you went

to him he is not afraid.  Like all of us if you believe in the

deal and the people that are on the deal, you will do the deal.

        So what is the downside of this reporting?  Comments

of a show pony.  That's what brilliant Matt Schwartz has

J7V5cooS                          sentence

```
 1   convinced -- he has done an effective job with some other
 2   innocuous e-mail of somehow putting Mr. Cooney in this world of
 3   people like Gary Hirst, slithering deviants who were -- and
 4   this is where we are now.
 5            So, it is just, it is a shock being -- your Honor, I
 6   think my point, in going through this narrative with your
 7   Honor, is we respect your Honor.  We respect the due process
 8   that you provided and the very careful decisions.
 9   Unfortunately, from this side it does feel like the deceit is
10   continuing and it is just not -- it is just not -- we don't
11   believe it is fair because it is just an uneven view of the
12   evidence against Mr. Archer and Mr. Cooney and it is hard to
13   understand why there is such a different view and specifically
14   as for the loss.  I am probably going to get to that point
15   right now if your Honor wants to go there.
16            THE COURT:  Yes, if you want to respond to any of the
17   enhancements I am happy to hear you on that.
18            MS. NOTARI:  So, in terms of the loss, the government
19   does not seem to make mention of any of the Court's findings in
20   terms of specifically the fact that the government is now
21   relying upon the fact that somehow, by virtue of the fact that
22   Mr. Cooney knew that there was investors and that he purchased
23   the second tranche of bonds, that that somehow translates into
24   guilt.  Well, that's exactly the same true for Devon Archer and
25   the Court has viewed that that is not dispositive evidence.
```

J7V5cooS                        sentence

And it is very clear that Jason Galanis was trying to convince

Tim Anderson that there should be a new issuance of bonds and

he sends him an e-mail in August of 2000, I believe it was

right from Mr. Cooney made the second purchase of bonds so

right before August 2014.  He is e-mailing Mr. Anderson a list

of the institutional buyers and he is doing the same thing to

Mr. Cooney; he wants him to purchase the second tranche of

bonds.  And so, that's it.  The fact that Mr. Cooney was sent

an e-mail that he knew that there were people purchasing the

bond, and that he knew that there was -- that somehow he knew

that there was, that they were doing this, is evidence of his

guilt that it was foreseeable in terms of the loss.

        The Court has specifically, in your Honor's decision,

focused on thee things.  You focused on the evidence concerning

the misrepresentations to CNB Bank.  The second is your Honor

has focused on 1920 Bel Air.  And the third is your Honor has

focused on Calvert.  None of those things relate to the bond,

the victims.  Clearly there were -- our position is there were

two conspiracies and that Mr. Cooney is not even charged in

Counts Three and Four which relate to the institutional

investors and the loss -- the law very clearly said that there

has to be a causal relationship between the defendant's fraud,

misstatements, and the loss to the victims.  The cases that I

have outlined, and there are many, many more, specifically say

that it has to be jointly undertaken activity in furtherance of

J7V5cooS                         sentence

1    the conspiracy.  There is cases which show in drug transactions

2    where, for example, if you are just participating in a one-load

3    drive and you only know there is 15 tons of marijuana, you are

4    not going to be responsible for the entire conspiracy because

5    it is not foreseeable.

6           So, here, at best, your Honor's decision regarding

7    Calvert or CNB Bank, it just doesn't link back to the loss of

8    the victims and the only way you get there is if somehow you

9    are finding that Mr. Cooney was, did design this fraud and was

10   part of it.  And there is just no evidence of that.  There is

11   no evidence that Mr. Cooney was anything but a passive investor

12   and the Court's decision has very carefully outlined, as far as

13   the evidence against Mr. Archer, why this was not dispositive

14   evidence.

15          So, our position is nothing the government says in

16   their brief.  There is no case, nothing they cite links the

17   three acts that your Honor focuses on which convinced your

18   Honor that Mr. Cooney, at some point after the fact it seems,

19   joined the conspiracy, is not in furtherance of the loss.  And

20   for that reason we really -- we do believe that the loss is

21   zero to six months.  We believe that there is no way to tie

22   anything and there is cases which I have submitted of people

23   working in telecommunications firms where they're making --

24   where they know that other people are participating in fraud

25   but they're not part of it.  That is just not good enough.  The

J7V5cooS                          sentence

guidelines specifically say in relevant conduct, and I believe

it is 1B3.1 that it has to be in furtherance of and you have to

be aware of the fraudulent conduct and I don't believe the

government has proven that.

        So, unless your Honor, we want to be more specific in

questions or evidence, we just completely disagree with the

guidelines and we don't believe, unless they can show loss

specific to victims, the victims in this case, we do not

believe that you can increase under the guidelines for the

number of victims.  It has to be -- you specifically have to

show that those victims, but for the conduct of Mr. Cooney,

that those victims suffered loss and then there is an increase

for the number of victims.  And here there has been nothing

said but my understanding was that the WLCC did not suffer any

losses.  It was always -- the evidence at trial was very

specific.  And Mr. Touger spent a lot of time on that with

witnesses that the deal was structured so that there was no

loss for the WLC and Raycen Raines testified to that and have

included that in my submission.

        So, the other objection I have is of obstruction of

justice.  For me that is problematic too because Mr. Cooney,

this is not a situation where Mr. Cooney was asked to produce a

document, specifically asked to produce a document and he

produced a fraudulent document.  This was a mass production by

his attorneys and, clearly, if his attorneys knew that this was

1    a false document they could have invoked the act of production

2    privilege which would have applied and that evidence would

3    never have gone into the trial, would not have been admissible.

4    He could have invoked that privilege.  So, if he didn't produce

5    it, it is a double-edged sword.  If he didn't produce it, it

6    would have been obstruction.  The fact that he produced it is

7    obstruction.

8            So, there is nothing to say, there is no evidence in

9    the record that he had any specific knowledge but, again I

10   would defer to my papers on that and if --

11           THE COURT:  Thank you.

12           Does the government want to respond to any of that

13   with respect to the guidelines calculation?

14           MS. MERMELSTEIN:  Only if your Honor wants us to.

15           THE COURT:  The only thing I really actually would

16   like to ask you is is there anyone you think is less culpable

17   than Mr. Cooney in this scheme and do you want to speak at all

18   to the minor role reduction?  And speak to it in light of the

19   amendment to the rule.

20           MS. MERMELSTEIN:  I think that there is no indicted

21   defendant who is less culpable than Mr. Cooney but that is in a

22   scheme in which there was an enormous amount of culpability to

23   go around and Mr. Cooney was involved, intimately, in an

24   enormous number of communications and transactions and actions

25   throughout a long scheme involving multiple bond transactions.

J7V5cooS                    sentence

1    He was involved in every single one and he played a critical

2    role.  Right?  In the absence of someone to misappropriate the

3    money, to recycle the money to buy bonds so that the thing

4    could keep going, to organize the purchase of the investment

5    advisors for the purpose of dumping these bonds into client

6    accounts, there could have been no scheme.  And so, I don't

7    think that he is close to having a minor role.  I don't think

8    the fact that you are less culpable in certain respects than

9    your co-defendants, the least culpable person does not get a

10   minor role as a matter of course.

11          THE COURT:  The standard is now, pursuant to amendment

12   794, that there is relative culpability and it is by reference

13   to one co-participant in the case at hand and not, as the

14   Second Circuit had previously held, as compared to the average

15   participant in such a crime.

16          MS. MERMELSTEIN:  I agree with that, your Honor, but I

17   think that the question is does someone have a minor role

18   relative to the co-defendants, not whether or not they were

19   sort of not the leader or not --

20          THE COURT:  Are they substantially less culpable than

21   the average participant in the criminal activity at issue?

22   That's the standard now.

23          MS. MERMELSTEIN:  And he is not.

24          THE COURT:  Thank you.

25          So, let's first talk about the loss determination.  As

I stated earlier, the jury could, in my view, have reasonably

concluded that Mr. Cooney knowingly participated in the charged

scheme and he, thus, would have reasonably foreseen the

consequences of this scheme.  As I noted in my November

opinion, it is possible that Mr. Cooney was unfamiliar with the

criminal object of the WLCC deal at its inception but that he

at least obtained the requisite knowledge during the course of

the fraud.  I do think the government has proved that

Mr. Cooney knew the objectives of the criminal conspiracy at

the time he acquired the second tranche of bonds for $5 million

from which he received nearly $4 million in proceeds from the

WAPC account for the supposed purchase of Jason Galanis's home

in Bel Air which, in my view, is a critical piece of evidence.

And, as Mr. Cooney would have been aware at that point, the

$20 million used to purchase the bonds had been misappropriated

from Hughes' investors.  Furthermore, he would also have known

that $16 million was misappropriated from the Atlanta client to

purchase the third round of bonds out of which he personally

received $75,000.  Thus, it would have been reasonably

foreseeable to Mr. Cooney that the victims in this case would

sustain a combined loss of between $25 million and $65 million.

So, I do believe that the 22-level enhancement and the offense

level is warranted.

        Mr. Cooney also argues that the sentencing enhancement

for 10 or more victims should not apply here.  As with the loss

J7V5cooS                          sentence

amount, Mr. Cooney predicates this argument on his claim that

he did not knowingly participate in the charged scheme.  I have

already rejected that argument for the reasons stated today and

in my November opinion.  The fraudulent scheme had 10 or more

victims which included the investment funds and the Wakpamni

Lake Community Corporation.  Thus, I find a two-level

enhancement for 10 or more victims is appropriate in this case.

     Mr. Cooney further asserts that an obstruction of

justice enhancement is unwarranted.  I disagree.  Again, as

detailed in my November opinion, Mr. Cooney knowingly provided

his financial managers with fraudulent documents related to

Calvert Capital in order to cover up the WLCC scheme.  It is

also undisputed that Cooney then knowingly produced this

document to the SEC.  As the sentencing guidelines application

notes make clear, the defendant commits obstruction of justice

where he produces false, altered, and counterfeit documents

during an official investigation.  That is guideline provision

3C1.1, application note 4C.  As a result, I find that a

two-level obstruction of justice enhancement is warranted.

     Finally, Mr. Cooney argues that he is entitled to a

minor role reduction pursuant to Section 3B1.2 because he was

substantially less culpable than the average participant in the

Wakpamni bond fraud.  I do think this is a close question but

after considering the relevant factors set forth in application

note 3C2 Section 3B1.2, I agree with Mr. Cooney.  There is no

J7V5cooS                        sentence

1    doubt that he played an important role in the fraudulent scheme

2    having purchased the second tranche of WLCC bonds through

3    recycled proceeds but, as made clear by Amendment 794 to the

4    Sentencing Guidelines as I noted a moment ago, relative

5    culpability is now to be assessed only by reference to one's

6    co-participants in the case at hand and not as the Second

7    Circuit has previously held as compared to the average

8    participant in such a crime.  That's a quote from United States

9    v. Allston, 899 F.3d at 149.  Here I believe that Mr. Cooney is

10   substantially less culpable than the average participant in the

11   criminal activity at issue.  That's 3B1.1, application note

12   3(a), and as the government acknowledged, there was no one

13   charged who is less culpable than he.

14        Excluding Devon Archer, five other individuals have

15   either pled guilty or were convicted at trial for their

16   participation in the scheme:  Jason Galanis, John Galanis, Hugh

17   Dunkerley, Gary Hirst, Michelle Morton.  It is undisputed that

18   Jason Galanis was the mastermind behind and orchestrator of the

19   fraud.  As for John Galanis, he induced the Wakpamni tribe to

20   issue its bonds in the first place, something which was

21   undoubtedly the heart of the fraudulent scheme but which

22   Mr. Cooney took no part in.

23        With respect to Hugh Dunkerley, he served as the

24   placement agent for the tribal bond issuances and is the sole

25   managing member of the WAPC, roles which were pivotal in

misappropriating the bond proceeds and, again, which is not

note which did not involve Mr. Cooney.  Gary Hirst, too, played

a more significant role than Mr. Cooney.

        As I made clear at his sentencing, Mr. Hirst, among

other things, set up the annuity provider that was supposed to

invest the bond proceeds on behalf of the WLPC, as well as the

bank account into which the bond proceeds were deposited.

Unlike Mr. Cooney, Mr. Hirst was also charged in all four

counts of the indictment.

        It is also significant that Jason Galanis and John

Galanis retained more in criminal proceeds that Mr. Cooney, as

did Gary Hirst, with respect to an entity that he controlled.

Moreover, it is worth reiterating, as I stated earlier, that it

is unclear whether Mr. Cooney was knowingly involved in the

scheme from its inception, something that cannot be said for

many of these individuals.

        I am not going to address Michelle Morton because she

has a motion pending and has not yet been sentenced, but based

on the other defendants' roles, I think Mr. Cooney was

substantially less culpable than the average participant.

Accordingly, because he did not plan or organize the criminal

activity or participate in the commission of the criminal

activity to the same degree or extent as his co-conspirators, I

find that a minor role reduction is warranted.

        I should note that in imposing sentence I'm not going

J7V5cooS                          sentence

to consider his alleged participation in the Crafton fraud.

The government hasn't produced enough evidence at this stage

for me to conclude by a preponderance of the evidence that

Mr. Cooney was criminally liable in this matter.  Unless the

government is seeking a Fatico hearing I am just --

          MS. MERMELSTEIN:  No, your Honor.

          THE COURT:  I am just going to not consider that

evidence.

          So, for those reasons, I find that Mr. Cooney's

offense level is 31 so it is lower due to the two-level

decrease based on the minor role application, his Criminal

History Category is I, and his recommended guideline sentence

is therefore 108 to 135.

          I will just note for the record that I also calculated

what Mr. Cooney's sentencing guidelines range would be if I

were to have concluded that he became knowingly involved in a

criminal scheme at a later time, namely when the third tranche

of bonds were issued from which he received $75,000 in proceeds

from the WAPC account.  If that were the case, the loss amount

foreseeable to him would be the $16 million stolen from the

Atlantic client and there would not be the 10 or more victims

since the Hughes investors would be excluded from the total

amount of victims.  This would have resulted in an offense

level of 27, which combined with the Criminal History Category

of I, amounts to a guideline sentence of between 70 and 87

1    months.

2              As you all know, the Sentencing Guidelines that we

3    have been discussing were at one time mandatory.  They are no

4    longer mandatory.  Judges are no longer required to follow them

5    but judges must consider them in determining an appropriate

6    sentence and ensure that they have been calculated properly.

7              That range, of course as I said, is only advisory.

8    Courts may impose a sentence outside of that range based on one

9    of two concepts:  A departure or a variance.  The departure

10   allows for a sentence outside of the advisory range based on

11   some provision in the guidelines.

12             Ms. Notari, are you seeking a departure based on his

13   good deeds or are you really just seeking a variance?

14             MS. NOTARI:  Your Honor, we are seeking both

15   departure, variance, but also specifically on his good deeds,

16   but also we believe that based on what the Court has just said,

17   I think that there is an argument that the loss calculation

18   overstates the reasonableness as it applies to Mr. Cooney and

19   his actions in this case.  So, both.

20             THE COURT:  I am denying those motions for departure

21   but I am considering those factors when imposing sentence and I

22   fully intend to do so.

23             With respect to his good deeds, I will note I do have

24   a host of letters.  I have read all of them.  They mean a lot

25   to me because they tell me who the person is who is sitting in

J7V5cooS                        sentence

front of me and what he has done in his life other than the

conduct, and so that is helpful for me.

So, as I said, I don't think that there is a proper

basis to grant either departure motion but I will consider

those arguments with respect to what the appropriate sentence

is.

Would the government like to be heard with respect to

sentencing or any of the victims other than what's been said

already?

MS. MERMELSTEIN:  Your Honor, I think everyone in this

courtroom is amply familiar with the facts of the case at this

point.  There is just no question that Mr. Cooney engaged in a

large scale fraud at the expense of victim pension funds and a

tribal entity for his own gain and the gain of his

co-conspirators.  That he ended up with very little because

everything fell apart is really not the way to think about what

the goals of the conspiracy were, which was for all of these

defendants to share in the enormous profits they anticipated

from the rollup scheme they were going to fund on the backs of

longshoremen's pensions and the tribal entity.  I think the

guidelines are appropriate here.  The losses here are enormous

and it was obvious that they would be enormous given how much

money was being misappropriated and stolen.

The idea that Mr. Cooney was just friends with people

and encouraging and didn't know that this was a fraud I think

1    has been properly rejected and where that leaves him is

2    standing before the Court for sentencing having wholly failed

3    to acknowledge any culpability in the scheme --

4              THE COURT:  He has a right to go to trial, doesn't he?

5              MS. MERMELSTEIN:  Of course he has a right to go to

6    trial but the trial is over, he stands convicted, and he

7    continues to assert that he is essentially a victim, and in

8    doing that has completely failed to take any responsibility for

9    the conduct he engaged in or for his efforts to cover that up

10   by submitting false documents in an effort to mislead the

11   investigation.

12             So, I think a very serious jail sentence is warranted

13   here.  I don't think that the guidelines in this case overstate

14   the seriousness of the crime.  I think it's wonderful --

15             THE COURT:  Do you think he should get more than I

16   gave Gary Hirst?  I gave Gary Hirst 96 months.  Gary Hirst was

17   a lot older, he has health issues.  I mean there were other

18   issues with respect to him, but.

19             MS. MERMELSTEIN:  I think there are a number of

20   factors which distinguish Mr. Hirst, of course the government

21   sought a guideline sentence for Mr. Hirst.

22             THE COURT:  Right.

23             MS. MERMELSTEIN:  One, Mr. Hirst accepted

24   responsibility and pled guilty.  Two, Mr. Hirst was already

25   serving a significant sentence that your Honor properly

J7V5cooS                     sentence

balanced when considering how much more time he needed to do.

That's not the case here.  And, the government, in agreeing

that there is no less culpable defendant than Mr. Cooney, the

government does not view his role as meaning -- there is no one

who is beneath him, but neither do I think that he is so far

below everyone else that he is distinguished in that fashion.

And, it is admirable that he has friends who care about him and

who he has sought to help, but he is not in an extraordinary

category of good work --

          THE COURT:  Which is why I didn't grant the departure.

          MS. MERMELSTEIN:  -- that justify some significant

departure or variance.

          So, I think for the reasons we set forth and I think

your Honor being familiar with the trial record here, think a

very serious sentence is appropriate and is, in fact,

commensurate with sentences that were imposed on the

co-defendants who have been sentenced, to date, when you

consider that those people accepted responsibility and all of

them, so far, were serving significant terms of incarceration

already that properly had to be accounted for in thinking about

how much more time was necessary.

          THE COURT:  Thank you.

          Ms. Notari, is there anything else you would like to

say?

          MS. NOTARI:  Your Honor, yes.

1          First, I would note that I think that I have included

2     most of this in my submission, but I just want to highlight

3     some things, specifically I want to highlight in terms of

4     Mr. Cooney's background, which again the government doesn't

5     view his background and extraordinary deeds particularly

6     important towards where the Court comes out in his sentencing.

7     I would note that that certainly is not where other Courts have

8     come out and I would note Judge Rakoff says, *surely the man is*

9     *to receive credit for the good he has done*.  That basically

10    these decisions and the Second Circuit have said that a

11    person's character is -- and what they have done in the past is

12    absolutely key and crucial when you are considering sentencing

13    and that Mr. Cooney, the letters, and I understand your Honor

14    has read all of the letters but in terms of punishment,

15    deterrence, specific deterrence and the government alluded to

16    the fact that he hasn't learned his lesson, first, your Honor,

17    he did file a letter with the Court indicating --

18          THE COURT:  Yes.

19          MS. NOTARI:  -- how apologetic.

20          THE COURT:  Yes.  I have read his letter.

21          MS. NOTARI:  In his life -- one cannot minimize what

22    his life has been like and what, in the four years since he has

23    been going through this, he has literally lost everything.  His

24    ex-wife left him.  He doesn't get to see -- he can't afford --

25    you know, he realizes that his ex-wife and children are better

1    off in Ohio because that's where her family is; she remarried,

2    she is actually pregnant.  But she -- the cruelty and the way

3    that she has limited his ability to see his children and the

4    fact that he has been unable to essentially work, that he is --

5    notwithstanding, he continues to be the most positive,

6    supportive person.  He has literally, during these proceedings

7    his mother died of cancer and he managed to gather the family

8    and get her doctors and nurture his nieces Chloe and -- and he

9    has continued to do the same for his father.  His father is

10   very frail, as indicated in the letter.  The medical

11   documentation of all the numerous conditions he has, his father

12   literally has no one in Montana to care for him but Bevan.  He

13   sees doctors on approximately two to three times a week and

14   there is no one else to care for him and in terms of specific

15   deterrence, and I think your Honor could be, likely feels that

16   you will never hear from Mr. Cooney again.  But this --

17             THE COURT:  I agree with that, actually.  I don't have

18   a real concern about recidivism.

19             MS. NOTARI:  He will live up to whatever conditions,

20   whatever the Court imposes.  And in terms of --

21             THE COURT:  And I think he is very different from, at

22   the very least, the Galanises that I have sentenced already in

23   that respect.

24             MS. NOTARI:  And Gary Hirst, how can you compare?

25   First of all, there is two frauds and I understand he got 96

J7V5cooS                       sentence

1    months, but then your Honor gave him an additional three years

2    to run consecutive.  So.

3            THE COURT:  Which was part of the 96 months.

4            MS. NOTARI:  But he was involved in two separate

5    frauds, and he was a lawyer, and there is no question in terms

6    of comparing the conduct that he made possible by virtue of his

7    being a lawyer and strategizing and that he was a crucial part

8    of the conspiracy whereas Mr. -- you know, here at this

9    sentencing we are looking at a lot of, you know, evidence which

10   that the Court characterized as consciousness of guilt.  And

11   so, anything nearing a sentence of what Gary Hirst would be

12   incredibly tragic and unfair, particularly in light of the

13   disparity and the fact that I have included other sentences and

14   the national average of mean and median sentences in

15   nationwide, the Second Circuit, federal courts, that in terms

16   of -- in terms of what the sentences are -- and we are seeing

17   in my submission that these are 18, you know, anything in the

18   two-year range and none of these defendants, they're all far

19   more culpable than Mr. Cooney.  I mean, if we look at these

20   cases, you know, they were all -- there was significant loss

21   but they were far more culpable.

22            And so, you know, in terms of going to trial, I mean I

23   think your Honor is at an advantage having seen the evidence in

24   this case because what the government depicted clearly in the

25   indictment and what actually they were able to prove is very

1   different.  And so, and your Honor had the ability to see the

2   evidence, and this was simply not a case that anyone could

3   plead guilty to because they weren't able to prove so much of

4   what they alleged and it was just not true.  So, but

5   nevertheless, Mr. Cooney, I have included in terms of

6   disparity.  And, you know, general deterrence is, the law is

7   very clear that it should not be the sole basis for imposing a

8   sentence and that specifically research has shown that

9   individuals, while it has a deterrent effect, the fact that a

10  person gets arrested is the deterrent effect and an increase in

11  severity of the punishments do not yield significant deterrent

12  effects.

13          So, your Honor, we urge the Court, respectfully, to

14  impose a sentence that is fair but Mr. Cooney is, he has been

15  punished for four years and, you know, a sentence that will

16  allow him to -- obviously, your Honor, we think probation with

17  community service is appropriate given our stance of this case

18  and the evidence and given the Court's decision with

19  Mr. Archer, but a sentence that will allow him to meaningfully

20  come back and be a functional person, be a father to his

21  children.  He has not been able to meaningfully pursue any

22  custody with his kids because he just has no idea what is going

23  to happen in this case.  I mean, his life has been on hold and

24  one can only imagine what it must feel like for these children

25  who he can't -- he doesn't have the money to really visit them

J7V5cooS                     sentence

frequently, his ex-wife limits that, and I just think that your

Honor will not see or hear from him.  He will thrive and

continue to be the charitable person he has always been and

even more so.

        You have the final say, we respect that but we really

just believe that a sentence of a lot of custody is just not

fair and just and it is not necessary and it doesn't serve --

it will serve no purpose beyond a general deterrence, perhaps.

It is certainly not going to specifically deter him and that's

just not been recognized as a sole basis for imposing a

sentence of significant jail time.

        THE COURT:  Thank you.

        Mr. Cooney, I read your letter but is there anything

you would like to say today?

        THE DEFENDANT:  That's okay, your Honor.  Thank you.

        THE COURT:  Thank you.

        So, I am required to consider the advisory guidelines

range of 108 to 135 months as well as various other factors

that are outlined in a provision of the law that is 18, United

States Code, Section 3553(a) and I have done so.  Those factors

include but are not limited to the nature and circumstances of

the offense and the personal history and characteristics of the

defendant.  Judges are also required to consider the need for

the sentence imposed to reflect the seriousness of the offense,

promote respect for the law, provide just punishment for the

J7V5cooS                          sentence

offense, afford adequate deterrence to criminal conduct,

protect the public from future crimes of the defendant, and

avoid unwarranted sentencing disparities, among other things.

          So, there is no real dispute in my view about the

seriousness of the crime and the harm that it caused to one of

the poorest Native American tribes in the country as well as

the clients of Hughes and Atlantic Pension Fund held for the

benefit of transit workers and longshoremen and housing

authority workers and city employees, among others.  This crime

caused real harm to real people.  Indeed, as I believe the

evidence established at trial, Mr. Cooney participated in a

scheme that stole more than $40 million from these pension fund

clients and left the Wakpamni Lake Community Corporation

without money for economic development and owing more than

$60 million on the outstanding bonds.

          This is a serious crime and a serious sentence needs

to be imposed to reflect that seriousness and to promote

respect for the law and to provide just punishment, and to

afford adequate deterrence to others who may seek to engage in

similar criminal conduct.  Deterrence, in my view, is

especially important in white collar cases.

          I have also considered the need to avoid unwarranted

sentencing disparities.  I would note that while Mr. Cooney's

sentencing brief and Ms. Notari today highlighted various

securities fraud cases in which defendants have received

1  sentences of under 36 months, the fraud in this case was

2  considerable.  I have also considered the roles of the various

3  individuals in this scheme.  I sentenced Jason Galanis to 173

4  months, 60 months which was to run concurrent to the scheme in

5  the Gerova case; John Galanis got a sentence of 120 months, 48

6  of which was to run concurrent; and Gary Hirst got a sentence

7  of 96 months, 36 months to run concurrent.

8          Look.  Every sentence is different and there are

9  different factors that must be considered for each person but

10  it is important that I consider the sentences in those cases,

11  and it is especially important that I consider that Mr. Cooney

12  played a comparatively smaller role in this scheme as compared

13  to his co-conspirators, as noted earlier, and did not retain

14  close to the amount of criminal proceeds that various other

15  individuals in the conspiracy did.  I have also considered that

16  he has no real significant criminal history and I don't think

17  there is real cause to believe that he will recidivate.

18          Finally, as I noted earlier, I have read the many

19  letters about good deeds that he has done for friends and for

20  family and about who he is as a person.  So, I have considered

21  all of that and I am ready to impose sentence.

22          Mr. Cooney, please rise.  It is the judgment of this

23  Court that you be committed to the custody of the Bureau of

24  Prisons for a term of 30 months on Count One and Count Two, to

25  run concurrently to each other.  That term of imprisonment will

J7V5cooS                          sentence

be followed by a term of three years of supervised release also

to run concurrently.  I believe that this sentence is

sufficient but not greater than necessary to comply with the

purposes of sentencing set forth in the law.

        You can be seated, if you would like.

        I will just note for the record that even if the lower

guidelines range of 70 to 87 months that I discussed earlier,

assuming that he gained the requisite knowledge at a later

point in time, my sentence would have been the same and it also

would have been the same if I didn't apply the obstruction

enhancement.  This sentence is significantly below both of

those, the guidelines range he would have been facing in either

of those scenarios.

        I also want to say that a sentence, even of two and a

half years is a long sentence, particularly for an individual

who has never been charged or convicted of a felony offense

before.

        I am going to describe the terms of Mr. Cooney's

supervised release.  All standard conditions of supervision

shall apply.  In addition, and I am not going to read them out

loud, Ms. Notari, unless you would like me to read them out

loud --

        MS. NOTARI:  Your Honor, when you are done I wanted to

ask for a few more things in the judgment.

        THE COURT:  Yes.  Just let me finish the standard

J7V5cooS                          sentence

conditions.

So, the mandatory conditions I will read out loud. You must not commit another federal state or local crime. You must not unlawfully possess a controlled substance. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the Court. You must cooperate in the collection of DNA as directed by the probation officer. And, you must make restitution in accordance with the law.

And then, just make sure to read again, I know you said you read them, the standard conditions and comply with them.

MR. QUIGLEY:  Your Honor, if I may?

THE COURT:  Yes.

MR. QUIGLEY:  The PSR reflects that the old standard condition 12, and I only know this because it came up in another case, that that has been modified by a standing order.

THE COURT:  That is correct, so consider this to be modified by that standing order as well and thank you for reminding me of that.

In addition, I am going to apply the special conditions, the financial ones in light of the nature of this case and in light of the restitution and forfeiture I am going to impose.  You must provide the probation officer with access

J7V5cooS                         sentence

1      to any requested financial information and must not incur new

2      credit card charges or open lines of credit without the

3      approval of the probation officer unless you are in compliance

4      with the installment payment schedule.

5              The probation department also recommends an outpatient

6      treatment program.  Ms. Notari, do you think that is necessary

7      now?

8              MS. NOTARI:  Your Honor, no, but we are asking for the

9      500-hour drug program so I think that would just be -- I think

10     that it is appropriate given that he does have his past and he

11     can certainly benefit from it but he hasn't -- there has been

12     no problems with that, so.

13             THE COURT:  But you are asking for a drug treatment?

14             MS. NOTARI:  Yes; at the jail.

15             THE COURT:  The RDAP program?

16             MS. NOTARI:  Yes.

17             THE COURT:  I will make that recommendation but I

18     think if you are asking for that I am going to include the

19     outpatient treatment program as well because if he has an issue

20     that needs to be addressed, then it should be addressed on

21     supervised release as well.

22             MS. NOTARI:  That's fine.

23             Well, I would just ask if there is a way that the

24     Court can structure the language so that it is within the

25     discretion of the probation officer and then it is not --

J7V5cooS                        sentence

1            THE COURT:  I can do that.  I just have to make sure I

2      am not seeding too much control to the probation officer.

3            MS. NOTARI:  Yes.

4            MS. MERMELSTEIN:  Your Honor.

5            THE COURT:  Yes.

6            MS. MERMELSTEIN:  I'm sorry.

7            We have no position on whether or not there should be

8      any kind of treatment with respect to a condition.

9            THE COURT:  Yes.

10           MS. MERMELSTEIN:  But, the idea that Mr. Cooney

11     doesn't need post-prison treatment and only wants eligibility

12     for a prison program that would allow him a benefit seems

13     inconsistent to me.

14           THE COURT:  I agree, which is why I denied that

15     request.  I completely agree with that, I think that seems

16     inconsistent and seems to indicate that there is an ulterior

17     motive.  I get it.  But, that being said, the Probation

18     Department made that recommendation for a reason in light of --

19     I will go back to the PSR -- in light of all of the substance

20     abuse issues that were noted in paragraphs 116 to 121 -- or

21     really to 120 and his history in this respect, and so that's

22     why I am making a recommendation.  But, I agree with you.

23           I am going to just include the language that's

24     included here on page 37.  It is that he will participate in an

25     outpatient treatment program approved by the probation office

J7V5cooS                          sentence

1    which program may include testing to determine whether you have

2    reverted to using drugs or alcohol.  You must contribute to the

3    costs of services rendered based on your ability to pay and the

4    availability of third-party payments.  The Court authorizes the

5    release of available drug treatment evaluations or reports

6    including the presentence investigation report to the substance

7    abuse provider.

8           Look.  If in fact the probation officer doesn't think

9    he needs treatment anymore or is complying with treatment and

10   it is successful and you want to amend that condition, you can

11   write me a letter.

12          I decline to impose a fine in light of the significant

13   forfeiture and restitution orders that will be imposed.

14          I am imposing the special assessment of $200 which is

15   mandatory and must be paid immediately.

16          Do you want to be heard, Ms. Notari, with respect to

17   restitution or forfeiture?

18          MS. NOTARI:  Your Honor, I believe in my letter that I

19   filed on Monday we are objecting to the restitution.

20          THE COURT:  All right.

21          MS. NOTARI:  And so, for the reasons stated, we would

22   defer to our papers.

23          THE COURT:  Understood.

24          With respect to restitution for the reasons stated

25   earlier, I believe the government has established that

J7V5cooS                           sentence

Mr. Cooney knew that Hughes Atlantic investment money had been
misappropriated and his restitution order should therefore
encompass these loss amounts.  See United States v. Feomano,
721 F. App'x at 52.  Accordingly, pursuant to the order of
restitution he shall pay $43,785,176 in restitution to the
victims of the offenses charged in counts One and Two.  His
liability shall be joint and several with that of the other
defendants in order to make restitution for the offenses in
this matter.  The names, addresses and specific amounts owed to
each victim are outlined in the schedule of victims page which
will be filed under seal.  As to the payment schedule, I am
going to adopt the payment schedule recommended in the
presentence report on page 38.

          I also understand the government is seeking forfeiture
of $9,527,000.  It is true that Mr. Cooney only received
$75,000 in illicit proceeds.  Nevertheless, the Second Circuit
has made clear that forfeiture in criminal proceedings under
18 U.S.C. Section 981 includes illicit proceeds that have, at
some point, been under the defendant's control or the control
of his co-conspirators so long as the actions generating those
proceeds were reasonably foreseeable to the defendant.  See the
Contorinis case, 692 F.3d at 147.  Here it is undisputed that
during the conspiracy $5,557,000 in bond proceeds was sent to
Mr. Cooney's bank account from Thorsdale which were, in part,
later used to purchase additional Wakpamni bonds, and

J7V5cooS                         sentence

1    $3,895,000 was sent to his bank account from Wealth Assurance

2    Private Client Corporation which was eventually used to fund

3    the purchase of Valor Life.  Thus, this money was, if only

4    temporarily, under his control and at the very least under the

5    control of his co-conspirators.  So, for the reasons stated

6    earlier, it was also proven at trial that he was aware that

7    these proceeds were misappropriated from the Hughes and

8    Atlantic investors.

9          So, I think I have a restitution order, I don't have a

10   forfeiture order, but I will sign one in the amount of

11   $9,527,000.

12         So, that's my sentence.  Is there any legal reason,

13   other than the ones previously stated, that this sentence

14   should not be imposed?

15         MS. MERMELSTEIN:  No, your Honor.

16         THE COURT:  So, that's the sentence of this Court.

17         Mr. Cooney, you have a right to appeal your conviction

18   and sentence except to whatever extent you may validly waived

19   your right as part of your -- which you have not waived that

20   right.  So, you have a right to appeal you your conviction and

21   sentence.  If you do choose to appeal, the notice of appeal

22   must be filed within 14 days of the judgment of conviction.  If

23   you are not able to pay for the costs of appeal, you may apply

24   for leave to appeal in forma pauperis, which simply means that

25   Court costs, just filing fees, will be waived.  If you request,

J7V5cooS                        sentence

1   the Clerk of Court will prepare and file a notice of appeal on

2   your behalf.

3           Are there underlying indictments that need to be

4   dismissed.

5           MS. MERMELSTEIN:  Yes, your Honor.  The government

6   moves to dismiss the underlying indictments.

7           THE COURT:  They are dismissed.

8           We need to talk about voluntary surrender date,

9   Ms. Notari?

10          MS. NOTARI:  Your Honor, also, if your Honor can

11  recommend in the judgment the FCI Sheridan Oregon, which is the

12  closest BOP facility near Montana where his father lives so

13  that at least his father can drive with Mr. Cooney's partner,

14  who is here, and she would be able to drive his dad, they would

15  be able to visit him.

16          THE COURT:  I will make that recommendation.  It is

17  minimum security?

18          MS. NOTARI:  It is minimum security.

19          THE COURT:  I will make that recommendation.

20          MS. NOTARI:  And you have already indicated the RDAP

21  program.

22          I would ask for 60 days, only because I am going to

23  try to facilitate that.

24          THE COURT:  That's fine.  60 days is fine.  So, why

25  don't we say October 1st he'll surrender to the facility to

J7V5cooS                              sentence

1   which he is designated on October 1st by 2:00 p.m. unless he

2   hears otherwise from the probation department his pretrial

3   service officer.  Failure to surrender when required may result

4   in a warrant being issued for your arrest so please surrender,

5   as I know you will, on October 1st, by that time.

6              Are there any other applications, Ms. Notari?

7              MS. NOTARI:  No, your Honor.

8              THE COURT:  Thanks.  We are adjourned.

9                              o0o