

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 14, 2022

**By ECF**

The Honorable Ronnie Abrams
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

Re:    **United States v. Devon Archer**, 16 Cr. 371 (RA)

Dear Judge Abrams:

The Government respectfully writes in opposition to the defendant's motion to stay the imposition of his sentence and the forfeiture order pending his appeal. Archer argues that he will raise the following grounds for appeal, "any one of [which] is sufficient standing alone to warrant a stay of the sentence" (Ltr. at 2): (i) the Court's jury charge, and in particular its decision to give a conscious avoidance charge, while not giving a multiple conspiracies charge; (ii) the denial of Archer's motion to sever his trial from John Galanis, particularly in light of the subsequent admission of Galanis's Gerova conviction; (iii) the Court's denial of Archer's motion to suppress the fruits of search warrants for certain email accounts; (iv) the sufficiency of the trial evidence; and (v) the Court's finding at sentencing that the whole of the charged scheme was reasonably foreseeable to Archer. For the reasons set forth below, Archer falls far short of meeting his burden of establishing the necessary "substantial question of law or fact" to justify bail pending appeal or a stay of forfeiture. The Court should deny Archer's requests.

Under 18 U.S.C. § 3143, bail pending appeal is only appropriate where a defendant shows, by clear and convincing evidence, that he is not likely to flee or pose a danger to the community and that the appeal "raises a substantial question of law or fact likely to result in (i) reversal, (ii) an order for a new trial, (iii) a sentence that does not include a term of imprisonment, or (iv) a reduced sentence to a term of imprisonment less than the time already served plus the expected duration of the appeal process."  18 U.S.C. § 3143.  The Second Circuit has noted that a "substantial question . . . is one of more substance than would be necessary to a finding that it was not frivolous.  It is a 'close' question or one that very well could be decided the other way."  *United States v. Randell*, 761 F.2d 122, 125 (2d Cir. 1985) (citing *United States v. Giancola*, 753 F.2d 898, 901 (11th Cir. 1985)).  "The defendant has the burden of persuasion to rebut the presumption in favor of detention."  *United States v. Levy*, No. S5 11 CR. 62 (PAC), 2014 WL 1483964, at *1 (S.D.N.Y. Apr. 9, 2014) (internal quotation marks and citations omitted).

In seeming recognition of their infirmity as a basis for bail pending appeal, Archer merely lists his first four purported grounds of appeal, without offering any significant argument. For the reasons already amply set forth by this Court, the jury instructions were legally proper; there was an ample factual basis for the conscious avoidance charge and no multiple conspiracies charges was warranted. (Trial Tr. 3586-3591). Nor was severance warranted. Archer's principal argument in favor of severance was that his defense was mutually antagonistic with that of John Galanis, in that he intended to argue that "Jason Galanis and [John Galanis] orchestrated a large-scale fraud in which [Archer was an] unwitting dupe[]." (Dkt. 290 at 13). Archer also argued that evidence of the Gerova fraud, the Code Rebel fraud, and John Galanis's extensive criminal and regulatory history was inadmissible against him and would cause spillover prejudice. The Court properly rejected that argument, finding that "[n]either of the arguments, even when considered together, warrant a severance." (May 16, 2018 Tr. at 96). The Court correctly concluded that Archer and Galanis's defenses were not truly mutually exclusive and that to the extent it came in at all, much of the 404(b) evidence would be admitted as direct evidence. (*Id.* at 96-98). Neither evidence of the Code Rebel fraud nor John Galanis's extensive criminal and regulatory history was admitted. After Galanis opened the door in summation, the Court permitted the Government to offer a single stipulation concerning John and Jason Galanis's prior conviction in the Gerova matter. In doing so, the Court explicitly instructed the jury that:

> It is also important for you to know that John Galanis' guilty plea was to charges stemming from the investigation that resulted in Jason Galanis' arrest in September 2015 which you have already heard about. I reiterate to you now that the conduct for which Jason Galanis was arrested and John Galanis pled guilty was entirely unrelated to this case.

> I further instruct you that Mr. Archer and Mr. Cooney were not subjects of that investigation, and there is no evidence that either of them knew about Jason or John Galanis' fraudulent conduct in that matter or in the investigation of it until after Jason Galanis was arrested in September of 2015. You are not to consider this evidence in any way against either Mr. Archer or Mr. Cooney.

(Trial Tr. 3830-31). And as the Court explained at the time, the Gerova evidence, which was offered solely against Galanis, and with an explicit instruction that Archer knew nothing about it, did not "taint[] [Archer] in any way;" to the contrary, it "help[ed] him in a way," since it affiliated John and Jason Galanis while seemingly separating Archer from their criminal dealings. (Trial Tr. 3797). "The fact that [John Galanis] who [Archer and Cooney] didn't have connections to, was also in on this previous fraud, [didn't] hurt [Archer and Cooney]" in light of the Court's specific instruction that Cooney and Archer were unaware of the fraud. Thus, the denial of Archer's severance motion offers no basis to stay his sentence.

Archer's claims regarding suppression of the search warrants fare no better. This Court easily found that the warrants were sufficiently particular, were amply supported by probable cause, that the Government's privilege protocols were proper, and that in any event, the good faith

exception would apply. (April 26, 2018 Tr. 14-27).[1]  Archer claims that the suppression issues raise a "close" question because the Court found the limited question of whether "the warrants were overbroad in that they authorized the search for records associated with aspects of the accounts . . . other than email service" "a difficult one." (April 26, 2018 Tr. at 20).  But even if that particular question were close, it would not justify a stay of Archer's sentence because a contrary ruling would have had no effect on the ultimate suppression decision, nor on the trial.  First, with respect to certain of the accounts, it is not clear Archer had standing to move to suppress. (See, April 26, 2018 Tr. at 14, only assuming for purposes of motion that the defendants had standing). Second, as this Court already found, even if the warrants were overbroad, the good faith exception would apply. Third, the remedy for any alleged overbreadth would be to suppress only the evidence seized under the overboard portions of the warrant. *United States v. George*, 975 F.2d 72, 79 (2d Cir. 1992).  But in the instant case, only 11 non-email records were identified pursuant to the search warrant, none of which were offered as evidence at trial. Accordingly, even if Archer were to prevail on the limited "difficult" question, and suppress those 11 non-email records it would have no effect on his trial or conviction.

Any challenge to the sufficiency of the evidence has already been completely precluded by the Second Circuit's decision reversing the grant of Archer's Rule 33 motion.  Archer's reliance on *United States v. Landesman*, 17 F.4th 298 (2d Cir. 2021) is misplaced.  *Landesman* reiterated, not changed, the clarification of the Rule 33 standard elucidated in the Second Circuit's decision in *Archer*, and the Supreme Court has already declined to hear Archer's petition for certiorari on that issue. In any event, the Second Circuit's decisions in *Archer* and *Landesman,* which related to the proper application of the Rule 33 standard by a district court, have no application to the question of whether the evidence was sufficient for a jury to convict. Indeed, in denying Archer's Rule 29 motion, this Court has already found that there was sufficient evidence from which the jury was entitled to convict – a decision the Second Circuit implicitly endorsed when it went one step further and found that granting Archer's Rule 33 motion was an abuse of discretion.

The only argument truly advanced by Archer is his claim that the Court erred when "it assumed at sentencing that [it] must defer to the perceived factual findings 'implicit' in the jury's verdict that went well beyond the elements of the crime." (Ltr. at 2). But this claim fails as well. This Court correctly understood the scope of its fact finding discretion and properly found that the full scope of the fraud was reasonably foreseeable to Archer.  And even if the District Court operated from a misconception of its authority – and it did not – a stay would still be unwarranted because Archer cannot show that such an error is likely to result in a reduced sentence to a term of imprisonment less than the expected duration of the appeal process.

Archer argues that the Court incorrectly "believed that it had no discretion, consistent with [its] oath, to engage in independent fact finding with respect to the scope of Archer's knowledge of the conspiracy." (Ltr at 4). Archer further argues that the Court erred in finding that the jury necessarily found that Archer understood the full sweep of Jason Galanis's scheme.  Archer's argument, however, misstates and misunderstands the Court's ruling. The Court made explicitly

---

[1] Archer's citation to the May 14, 2018 transcript appears to have been in error as the Court ruled on the suppression motion at the April 26, 2018 conference.

clear that it understood its discretion to make factual findings, explaining for example, that "I don't think I need to accept every fact argued by the government at summation," (Sent. Tr. 7), and that "I don't think I necessarily need to find that he was involved in every aspect of the scheme." (Sent. Tr. at 9). Nor did the Court believe itself bound by "everything that the [C]ircuit said." (Sent. Tr. 17). But the Court also correctly recognized that it could not simply adopt the factual findings in its Rule 33 decision because the interpretation of the evidence in the Court's "opinion was not consistent with guilt." (Sent. Tr. 17).

Archer first argues that the Court could and should have found that he committed securities fraud when he lied to Morgan Stanley in order to deposit the Wakpamni bonds. (Ltr. at 9). In support, Archer incorrectly claims that the Government argued to the jury that Archer could be convicted of securities fraud solely for lying to Morgan Stanley. (*Id.*). That is patently not what the Government argued and, indeed, such an argument would be impermissible given the way the case was charged. First, the Government did not argue that Archer's lies to Morgan Stanley constituted securities fraud. Rather, the Government clearly argued that the lies were sufficient to show that "Archer was a knowing participant in this scheme." (Trial Tr. 3656). Given that the only truly contested issue at trial was Archer's knowledge, this clear evidence of his knowing participation was "enough to convict him." (*Id.*) And, as this Court recognized at Archer's sentencing, "the jury found [] Archer guilty of the crimes as alleged in the indictment," (Sent. Tr. at 8), that is, a scheme "to defraud the Wakpamni by inducing them to issue bonds on the false promise that the proceeds would be invested into an annuity, which the Defendants instead misappropriated for their own use" and to "defraud Hughes's and Atlantic's clients by gaining ownership and control of those investment advisers" "and causing client funds to be invested in the Wakpamni bonds, without disclosing the material facts to these clients, including that the bonds did not fit within the investment parameters of certain clients' investment advisory contracts and that certain substantial conflicts of interest existed." *United States v. Archer*, 977 F.3d 181, 185-86 (2d Cir. 2020) (internal quotations and citations omitted). The Court was thus right to reject Archer's claim that it could find that "Archer did not know that Galanis was stealing bond proceeds, while acknowledging that the jury convicted him of securities fraud when he allegedly lied to Morgan Stanley." (Ltr. at 10).

Archer's principal argument, however, seems to be that the Court erred when it found itself bound by the verdict to conclude that Archer "knew that the investment advisor clients were being defrauded *and* that the tribal bond proceeds were being misappropriated." (Sent. Tr. at 8) (emphasis added). Instead, Archer argues that the Court was free to find that, although he was a participant in the scheme, Archer knew only of some portion of the scheme – for example, that he knew only that the Wakpamni were fraudulently induced to issue bonds, but not that the bond proceeds would be misappropriated, or that he knew only that the bond proceeds were being misappropriated, but not that the Atlantic and Hughes clients were being defrauded. Archer may be right, in the abstract, that the Court had discretion to make its own findings concerning the scope of Archer's knowledge. And, as Archer, acknowledges, the Court plainly understood that conviction on these charges *could be* premised on knowledge of only some aspect of the scheme. Indeed, with respect to co-defendant Michelle Morton, the Court did exactly that, finding that she was a participant in defrauding the clients of Atlantic and Hughes, but did not know that the WLCC had been fraudulently induced to issue bonds or that the bond proceeds were being

misappropriated. Thus, it is clear that when the Court found that it must accept that Archer knew both that the investment advisor clients were being defrauded and that the tribal bond proceeds were being misappropriated, it was not saying that each was necessarily found by the jury as an element of the crime.

Instead, the Court recognized that a reassessment of the evidence was warranted in light of the Second Circuit's decision reinstating the jury's verdict. The Court's decision to grant Archer's Rule 33 motion considered the evidence in the light most favorable to Archer. Considered through the lens of Archer's undeniable guilt, the evidence took on a wholly different light. While the Court could theoretically have found that Archer knew of only one part of the scheme, that conclusion would have made no sense when viewing the evidence through the lens of the guilty verdict. As the Court explained at sentencing:

> [There were] a wealth of emails in which Archer, Cooney, and Galanis discussed the progression of the Wakpamni scheme, and . . . those emails go back to early 2014 in the communications, and . . . Galanis ensured that Archer stayed up to date on the deal with the Wakpamni, including by informing Archer that the proceeds from the sale of the bonds were supposed to be placed into an annuity.
>
> Other emails sent to Archer did keep him informed about the progress of the Hughes and Atlantic acquisitions and specifically referenced the possibility of placing the Wakpamni bonds with them. For example, in one email, Galanis told Archer that he believed Hughes would take 28 million of the bonds, which is what transpired after the first bond issuance.
>
> There was also evidence introduced at trial to the effect that Mr. Archer personally purchased $15 million worth of bonds in the second issuance using money given to him by Jason Galanis, made representations to the WLCC that he was purchasing the bonds 'for his own account and for investment only,' transferred them to another entity controlled by his codefendants, made false statements about the source of the money to Morgan Stanley and Deutsche Bank, and stated that Calvert was the 'lender and beneficial owner' of the bonds from the second offering. Later on, he also misled the BIT Board as to Galanis's involvement with the Burnham companies.

(Sent. Tr. at 24-25) (internal citations omitted).  In other words, viewed through the lens of guilt, the Court correctly concluded that there was proof by a preponderance that the full scheme was reasonably foreseeable to Archer.  He was updated on the deal with the Wakpamni *from its inception* and made aware that the bond proceeds were supposed to be placed in an annuity. He was similarly informed of the acquisition of both Hughes and Atlantic, and the fact that the Wakpamni bonds would be purchased using their client accounts. Archer personally participated

by purchasing $15 million of the second tranche using money given to him by Galanis, misrepresented the purpose of the purchase to the WLCC, transferred the bonds for no consideration to yet another entity, and lied to the banks about the source of proceeds used to buy the bonds. And he continued participating in the scheme right up to the bitter end when he utilized the fraudulent Calvert cover story concocted by his co-conspirators. Given Archer's knowledge of the bond issuances, the annuity, and the placement of the bonds with the Hughes and Atlantic investors, as well as his personal purchase of $15 million of bonds with money from Jason Galanis, and his varied lies to banks and the BIT Board, it would make no sense to find that he knew about only one aspect of the scheme.  Archer's guilt having already been proven beyond a reasonable doubt, the Court was then bound by *the evidence* – not the jury's verdict – to find that the *entirety* of the scheme was foreseeable to Archer.

        Archer also argues that should he prevail on his claim of sentencing error he is likely to be resentenced to no term of imprisonment or a term of imprisonment less than the expected duration of his appeal.  Archer is wrong.  As set forth above, considered through the lens of guilt, the sole logical conclusion is that Archer understood the full scope of the fraud.  But even if the Court had erred in its understanding of its discretion on remand for sentencing, there is simply no way that the Guidelines range could be as low as the 0 to 6 months Archer claims.  That claim is premised on Archer's faulty suggestion that he could have been convicted of a scheme to lie to Morgan Stanley in order to deposit the bonds, a crime he claims caused no financial loss. But as this Court has already recognized, that was plainly not the crime charged and there is no means by which the loss amount attributable to Archer could be zero.  The first bond issuance was itself more than $25 million, the second was $20 million, and the third was more than $15 million.  For all the reasons set forth by the Government in its sentencing submission, there was more than sufficient evidence to establish by a preponderance that the full loss amount was foreseeable to Archer.  But even if Archer prevailed on appeal and even if this Court reached a different conclusion at a resentencing, it still would not markedly alter the Guidelines analysis. Since in order to be guilty Archer was necessarily aware of at least one of the bond issuances, the very smallest loss amount for which could have been foreseeable to him is $15 million, which would result in only a two level decrease to the Guidelines range utilized by this Court, resulting in a recommended Guidelines range of 87 to 108 months' imprisonment.  U.S.S.G.  § 2B1.1(b)(1)(L).

        Moreover, even if some reduction in the Guidelines were likely, that would not justify bail pending appeal because a change to the Guidelines is unlikely to result in a change to the sentence in this case. Here the Guidelines were plainly not the driving force of the sentence imposed. As the Court explained, it believed a variance was warranted because "the inordinate emphasis that the sentencing guidelines place in fraud cases on the amount of actual or intended financial loss . . . can oftentimes lead to unreasonable and unfair sentences" and would do so in this case. (Sent. Tr. at 39). Indeed, the Court imposed a sentence of only approximately 10% of the bottom of the applicable Guidelines range. Because the Guidelines did not drive the Court's sentence, a reduction in the Guidelines is unlikely to affect the sentence the Court deemed appropriate.[2]

---

[2] Indeed, should Archer be resentenced following a successful sentencing appeal, he might well receive a *higher* sentence. The Court sentenced Archer to a shorter sentence that Cooney because Cooney was sentenced prior to the pandemic, where Archer would face "prison time that is much

Archer also summarily requests that the Court "exercise its discretion" to stay the enforcement of the forfeiture order.[3]  The Court should not do so.

"If a defendant appeals from a conviction or an order of forfeiture, the court may stay the order of forfeiture on terms appropriate to ensure that the property remains available pending appellate review."  Fed. R. Crim. P. 32.2(d).  The Court may require the defendant to provide security in order to obtain a stay.  *Id.*; *see also* Fed. R. App. P. 8.

Although the Second Circuit has not had occasion to articulate the factors that should guide a district court's exercise of its discretion to stay a forfeiture order, that court has considered the following factors in deciding whether to stay district court proceedings pending an interlocutory appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."  *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007).

Specifically in the forfeiture context, at least one court of appeals and several district courts have considered the following four factors in evaluating whether a forfeiture order should be stayed pending appeal: (i) the likelihood of success on appeal; (ii) whether the forfeited asset is likely to depreciate over time; (iii) the forfeited asset's intrinsic value to the defendant (*i.e.*, the availability of substitutes); and (iv) the expense of maintaining the forfeited property.  *United States v. Ngari*, 559 F. App'x 259, 272 (5th Cir. 2014);  *United States v. Silver*, 203 F. Supp. 3d 370, 385 (S.D.N.Y. 2016);  *see also United States v. Bodouva*, No. 16 Cr. 214 (VEC), 2016 WL 7351634, at *6 (S.D.N.Y. Dec. 16, 2016) (stay denied because defendant failed to demonstrate likelihood of success on appeal); *United States v. Young*, No. 12 Cr. 210 (RJA), 2014 WL 1671507, at *2 (W.D.N.Y. Apr. 24, 2014) (stay denied because defendant did not set forth any arguments demonstrating likelihood of success on appeal); *United States v. Davis*, No. 07 Cr. 11 (JCH), 2009 WL 2475340, at *2-3 (D. Conn. June 15, 2009) (stay denied because, among other things, further delaying forfeiture would prevent Government from using the forfeited assets in creating a restitution fund for victims).  The factors laid out in *Silver* are consistent with those described by this Court in *In re World Trade Center Disaster Site Litigation*, which consider the potential for irreparable injury to the parties involved.

As is somewhat evident from the factors themselves, stays of forfeiture virtually always involve the forfeiture of real property.  Cash cannot depreciate. It has no intrinsic value to a defendant and can be easily repaid should a defendant prevail on appeal. It costs the Government nothing to maintain it. In the present case, the Government has not sought the forfeiture of any specific property. The proposed forfeiture order contemplates only the entry of a money judgment, which deprives the defendant of nothing. Indeed, until such time as the Government seeks to

---

more punitive given conditions that have been extraordinarily harsh." (Sent. Tr. 41). But COVID conditions are rapidly improving and it is unlikely that if Archer were resentenced in the future this consideration would apply.

[3] The defendant does not seek, nor should the Court permit, delay of the *entry* of the forfeiture and restitution orders.

enforce the judgment through forfeiture of substitute assets, the stay serves no purpose. To the extent the Government seeks to forfeit cash, there can be no justification for a stay. This is true both because the defendant's likelihood of prevailing on appeal is extraordinarily low and because given the nature of cash it can always be returned to the defendant following an appeal. *Bodouva*, 2016 WL 7351634, at *6 (denying forfeiture stay in part because the "case involved the forfeiture of cash, not unique property that might have intrinsic value to the Defendant" so that should the defendant prevail on appeal he can be made whole by the return of the cash forfeited."). And should the Government seek to forfeit any of the defendant's real property he can move to stay that particular forfeiture. A full stay of forfeiture at this point would not only be premature and unwarranted, it would also prejudice the Government as it would delay even further the Government's ability to litigate third party interest in any potentially forfeitable asset. There can be no cause to needlessly delay that litigation. In short, the defendant's motion for a stay should be denied.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:  /s/ Rebecca Mermelstein
Rebecca Mermelstein
Negar Tekeei
Assistant United States Attorneys
(212) 637-2360/2482

cc:     Matthew Schwartz, Esq. (via ECF)